IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE VIII, Village L, Aceh, Indonesia,<br>JOHN DOE IX, Village, M, Aceh, Indonesia,<br>JOHN DOE X, Village N, Aceh, Indonesia,<br>JOHN DOE XI, Village O, Aceh, Indonesia,<br><br>                    Plaintiffs,<br><br>             vs.<br><br>EXXONMOBIL CORPORATION, 5959 Las Colinas<br>Boulevard, Irving, Texas, 75039-2298, EXXONMOBIL<br>OIL INDONESIA INC., c/o ExxonMobil Corp., 5959<br>Las Colinas Boulevard, Irving, Texas, 75039-2298,<br>MOBIL CORPORATION, c/o ExxonMobil Corp.,<br>5959 Las Colinas Boulevard,<br>Irving, Texas, 75039-2298, and<br>MOBIL OIL CORPORATION,<br>c/o ExxonMobil Corp., 5959 Las Colinas Boulevard,<br>Irving, Texas, 75039-2298,<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR EQUITABLE RELIEF
AND DAMAGES**

## COMPLAINT

### I.    INTRODUCTION – NATURE OF THE ACTION

1.    Plaintiffs John Doe VIII, John Doe IX, John Doe X, John Doe XI (hereinafter referred to as "Plaintiffs" unless otherwise specified), bring this Complaint for equitable relief and for damages to remedy the injury they have suffered and continue to suffer from conduct inflicted by members of the Indonesian military retained by Defendants ExxonMobil Corporation, ExxonMobil Oil Indonesia Inc., Mobil Corporation, and Mobil Oil (hereafter collectively referred to as "Defendants" unless otherwise specified) to provide security services.

2.    This is an action for declaratory judgment pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201, *et seq.*, as well as for compensatory and punitive damages, and injunctive relief. The claims in this action arise from Defendants' conduct in connection with the operation of their natural gas extraction and processing facilities in Aceh Province, Indonesia. Plaintiffs have been subjected to serious abuses, including unprovoked shootings, beatings, and arbitrary detention in violation of the statutes and common law of the various states of the United States, including the District of Columbia, and Indonesian law.

3.    Plaintiffs do not have access to an independent or functioning legal system within Indonesia to raise their complaints. Further, if they complain to the military authorities, they would face certain retribution and punishment from these authorities. Plaintiffs have pursued the claims set forth herein within a reasonable time of learning of the prospect for bringing an action in the United States courts.

## II.    JURISDICTION AND VENUE

4.    Subject matter jurisdiction exists under 28 U.S.C. § 1332 (a)(2), diversity jurisdiction, as Plaintiffs are citizens of a foreign state while the Defendants are citizens of the United States and the amount in controversy for each Plaintiff exceeds $75,000.  Personal jurisdiction over Defendants is based on D.C. Code §§ 13-334 and 13-423 (2001)

5.    Venue properly lies in this Judicial District pursuant to 28 U.S.C. § 1391(b) and (c).

## III.    PARTIES

### Plaintiffs

6.    Plaintiff John Doe VIII is a citizen of Aceh Province, Indonesia and resides in Village L.  He brings this action for equitable relief and for damages on behalf of himself to remedy the injuries to his person caused by the wrongful conduct of Defendants, their joint venture partners, and/or their agents, as described more fully herein, and to prevent future harm from occurring.  He fears for his life and the lives of his fellow villagers if he were to disclose his identity and the identity of his village, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

7.    Plaintiff John Doe IX is a citizen of Aceh Province, Indonesia and resides in Village M.  He brings this action for equitable relief and for damages on behalf of himself to remedy the injuries to his person caused by the wrongful conduct of Defendants, their joint venture partners, and/or their agents, as described more fully herein, and to prevent future harm from occurring.  He fears for his life and the lives of his fellow villagers if he were to disclose his identity and the identity of his village, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

3

8.    Plaintiff John Doe X is a citizen of Aceh Province, Indonesia and resides in Village N.  He brings this action for equitable relief and for damages on behalf of himself to remedy the injuries to his person caused by the wrongful conduct of Defendants, their joint venture partners, and/or their agents, as described more fully herein, and to prevent future harm from occurring.  He fears for his life and the lives of his fellow villagers if he were to disclose his identity and the identity of his village, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

9.    Plaintiff John Doe XI is a citizen of Aceh Province, Indonesia and resides in Village O.  He brings this action for equitable relief and for damages on behalf of himself to remedy the injuries to his property caused by the wrongful conduct of Defendants, their joint venture partners, and/or their agents, as described more fully herein, and to prevent future harm from occurring.  He fears for his life and the lives of his fellow villagers if he were to disclose his identity and the identity of his village, but will nevertheless provide such disclosures in accordance with the terms of an appropriate confidentiality order.

## Defendants

10.    Defendant ExxonMobil Corporation ("ExxonMobil Corp.") is a New Jersey corporation with its principal place of business in Texas doing business and authorized to do business in the District of Columbia.  ExxonMobil Corp. maintains numerous places of business within the District of Columbia, including a major office at 2001 Pennsylvania Avenue, N.W.  ExxonMobil Corp. was created on November 30, 1999 though the merger of Exxon Corporation and Mobil Corporation, and is the successor in interest to all assets and liabilities previously belonging to the merged entities, including all of their subsidiaries and affiliates.  As a result of the merger, Mobil Corporation merged into Exxon Corporation, which

4

then changed its name to ExxonMobil Corporation. Mobil Corporation became a wholly-owned subsidiary of ExxonMobil Corp. ExxonMobil Corp. is now listed as the largest publicly held American corporation in the world by the magazine *Fortune*. In calendar year 2000, ExxonMobil Corp. reported the world's largest corporate profits, a feat it has since repeated.

11.    The principal business of ExxonMobil Corp. and its divisions and affiliates is energy, involving exploration for, and production of, crude oil and natural gas, manufacturing of petroleum products and transportation and sale of crude oil, natural gas and petroleum products.

12.    Defendant ExxonMobil Corp. is directly, and indirectly through various wholly-owned subsidiaries and divisions, engaged in the marketing and distribution of petroleum products throughout the District of Columbia. Among its activities within the District of Columbia, ExxonMobil Corp. sells marine and automotive fuel products to vendors, including service station dealers; conducts business with and through various product and retail service distributors; solicits and advertises its own credit and debit cards; and regularly contracts with the Washington Post and other publications for the publication of opinion editorials promoting its business interests. In addition, from its place of business at 2001 Pennsylvania Avenue, N.W., ExxonMobil Corp. engages in activities to further its business interests through interactions with Members of Congress and the Executive Branch, and various regulatory agencies of the United States government. ExxonMobil Corp. also employs numerous employees and contractors within the District of Columbia to perform lobbying, public relations, advertising, and other business promotion activities. Furthermore, ExxonMobil has numerous shareholders, including institutional investors, who reside in the District of Columbia.

13.     Defendant Mobil Corporation ("Mobil Corp.") is a Delaware corporation with its principal place of business in Texas. Mobil Corp. is a wholly-owned subsidiary of Defendant ExxonMobil Corp. since the completion of its merger with the Exxon Corporation on November 30, 1999. Prior to its merger with the Exxon Corporation, Mobil Corp.'s principal place of business was in New York and later in Virginia.

14.     Mobil Corp. was incorporated in Delaware in 1976, and conducted its business primarily through its wholly-owned subsidiaries, including Defendant Mobil Oil Corporation ("Mobil Oil"), which is incorporated in New York and has its principal place of business in Texas. Prior to Mobil Corp.'s 1999 merger with the Exxon Corporation, Mobil Oil had its principal place of business in New York and later in Virginia. Mobil Oil is, and has been since 1999, a wholly-owned subsidiary of ExxonMobil Corp.

15.     As a wholly-owned subsidiary and/or affiliate company of Defendant ExxonMobil Corp., Defendant Mobil Oil is doing business and is authorized to do business in the District of Columbia, both on its own behalf and through its position as a wholly-owned subsidiary and/or affiliate company of Defendant ExxonMobil Corp. Upon information and belief, Defendant Mobil Oil is engaged in the marketing and distribution of petroleum products throughout the District of Columbia, and, among its activities, sells automotive gasoline and other products to service station dealers as well as leasing service stations to dealers under retail service-station leases and sales agreements using the trademarked name "Mobil."

16.     Defendant ExxonMobil Oil Indonesia, Inc. ("EMOI") was, for the period of time relevant in this Complaint, a Delaware corporation, with, upon information and belief, its principal place of business in Indonesia. EMOI subsequently incorporated in the Cayman Islands. EMOI is a wholly-owned subsidiary of ExxonMobil Corp. EMOI is the successor

entity to Mobil Oil Indonesia, Inc. ("MOI"), which was a Delaware corporation originally

incorporated in 1967 by Defendant Mobil Oil or another of Defendant Mobil's wholly-owned

subsidiaries for the purpose of exploring, exploiting and developing oil and natural gas located

in the Arun area of the Aceh Province, located in Northern Sumatra, Indonesia. Upon

information and belief, MOI's principal place of business was located in Indonesia. As of

November 30, 1999, MOI became a wholly-owned subsidiary of Defendant ExxonMobil Corp.

MOI's name was changed to ExxonMobil Oil Indonesia, Inc. (EMOI) in 2000.

      17.     Upon information and belief, Defendant ExxonMobil Corp. and its predecessors

in interest, for the purpose of attempting to shield themselves from liability or responsibility

from wrongful acts committed in furtherance of their natural gas activities in Indonesia's Aceh

Province, created, or caused to have created, several wholly-owned subsidiaries, divisions

and/or affiliated companies. These entities include, but are not limited to, Mobil Oil

Exploration & Producing Southeast, Inc. and Mobil Exploration Indonesia Inc. and referred to

herein as the "Other EXMOB Companies."

## Defendants' Centralized Structure and Decision-Making In the United States

      18.     Upon information and belief, ExxonMobil Corp. and EMOI management

decisions related to Indonesia are centralized and made in the United States.

      19.     More specifically, ExxonMobil Corporation is the largest publicly owned

company in the world. It is a U.S. corporation whose stock is traded on the New York Stock

Exchange. Profits from the operations of ExxonMobil Corp. and its affiliates and subsidiaries

in Indonesia are reported by, and thus accrue to, ExxonMobil Corp. and its shareholders.

      20.     Since its incorporation in 1967, MOI, the predecessor to EMOI, held its Board of

Directors meetings in New York at 150 East 42nd St., New York, New York, in a building

known as the Socony-Mobil Building.  Upon information and belief, MOI Board meetings,

including those at which important decisions related to Indonesia and the retention of military

members as security personnel were made, were held at this location in New York.

21.    The by-laws of MOI required that all meetings of the stockholders be held at

MOI's office in New York City except as otherwise directed by the Board of Directors.  Upon

information and belief, all MOI shareholder meetings were held in New York City.

22.    ExxonMobil Corp., including through principals acting out of ExxonMobil

Corp.'s headquarters in Irving, Texas, sets policy for and on behalf of all ExxonMobil Corp.

entities, including but not limited to EMOI, including as follows:

(a)    Since the early 1990's, ExxonMobil Corp. put in place a comprehensive

program known as the "Operations Integrity Management System"

("OIMS"), which provides for centralized policies on social issues that are

formulated and enforced from ExxonMobil Corp.'s corporate headquarters

in Irving, Texas.  Defendant ExxonMobil Corp. applies OIMS throughout

all of ExxonMobil Corp., including all of its subsidiaries and affiliates.[1]

ExxonMobil Corp.'s public documents state that OIMS is "ExxonMobil-

wide"[2] and "used by every ExxonMobil-operated facility"[3] in all of the

over 200 countries where ExxonMobil Corp. operates, including in its

---

[1]    *See* "Meeting Environmental Expectations," ExxonMobil document, available at:
www.exxonmobil.com/Corporate/Files/Corporate/enviroenglish.pdf (referring to the application of OIMS "not only
to Exxon Mobil Corp. or to one of its divisions but collectively to all of the companies affiliated with ExxonMobil
Corporation or to any one or more of them.")
[2]    *See* "Operations Integrity Management System (OIMS)", available at:
www.exxonmobilchemical.com/public_pa/WorldwideEnglish/CorpCitizenship/Com.
[3]    *See* "IFC Safeguard Policies, ExxonMobil Consultation Comments," April 29, 2005, available at:
www.ifc.org/IFCExt/SafeGuardDocs.Nsf/0/2b158426a6f1501885256ff2006b3920/$FILE/IFC%20Safegard%20Poli
cies%20-%20ExxonMobil%20comments%20Apr%2029,%2005.doc

upstream exploration activities.[4]  ExxonMobil Corp.'s OIMS has been touted as a "corporate-wide commitment with high degree of ownership and involvement,"[5] so designed to ensure that all ExxonMobil Corp.'s "business units pull together."[6]

(b)    The OIMS process begins "at the very top" of ExxonMobil Corp., and includes regular, significant review and direction by senior management.[7] Upon information and belief, ExxonMobil Corp. primarily provides OIMS control checks internally, eschewing third party verification, with ultimate responsibility for the program resting upon corporate headquarters.[8]  Upon information and belief, OIMS applies to the management of EMOI.

(c)    Upon information and belief, Mobil Corp. had similar centralized management procedures.  In 1996, the CEO of Mobil set five year targets for improving environmental, health and safety (EHS) performance "with the use of a common EHS management system."  In 1998, Mobil Corp. had over 100 implementation and certification programs worldwide designed to meet the "ISO 9000" standards.

(d)    In 2000, the United States Department of State and the United Kingdom Foreign Office, along with NGOs including Amnesty International, Human Rights Watch, and Business for Social Responsibility, and a group

---

[4]    *See* "How ExxonMobil ensures systematic improvement and harmonious performance," John D. Symonds, ISO Management Systems, July-August, 2002, available at www.iso.org/iso/en/iso9000-14000/addresources/articles/pdf/casestudy_4-02.pdf.

[5]    *See* "The Robert W. Campbell Award", www.campbell.aard.org/RWC%202-OIMS.pdf.

[6]    *See* "How ExxonMobil ensures systematic improvement and harmonious performance," John D. Symonds, ISO Management Systems, July-August 2002, available at www.iso.org/iso/en/iso9000-14000/addresources/articles/pdf/casestudy_4-02.pdf.

[7]    *Id.*

[8]    *See* IFC Safeguard Policies, ExxonMobil Consultation Comments", April 29, 2005, available at www.ifc.org/IFCExt/safeGuardDocs/Nsf/0/2b158426a6f1501885256ff2006b3920/$FILE/IFC.

of leading companies developed the Voluntary Principles on Security and Human Rights. ExxonMobil Corp. was invited to participate but chose not to. However, ExxonMobil Corp. has since endorsed the Principles and its "Corporate Citizen Report" states that "detailed guidance for implementing the principles has been developed and will be applied at operating sites." Upon information and belief, ExxonMobil Corp. made this decision on behalf of all Defendants and other subsidiaries and affiliates of ExxonMobil Corp.

23.     ExxonMobil Corp. and its controlling principals and other top ExxonMobil Corp. officials have been continuously involved in ExxonMobil Corp.'s and EMOI's operations in Indonesia, including through meetings and involvement with Indonesian officials and business organizations, including:

(a)     Mr. Lucio Noto, Chief Executive Officer of Mobil Corporation (ExxonMobil Corporation's predecessor), met with the U.S. ambassador to Indonesia on November 3, 1998 regarding reports linking Mobil Corp. to human rights abuses.

(b)     Harry Longwell, Executive Vice President of ExxonMobil Corp., who worked at ExxonMobil Corp.'s Irving, Texas headquarters, also met with President Megawati Soekarnoputri to discuss security problems in Aceh.[9] Other ExxonMobil Corp. officials who have met with Indonesian officials include Stuart McGill, President of ExxonMobil Production Company, and Rex W. Tillerson, President of ExxonMobil Corp.

---

[9]     *ExxonMobil Execs Meet Megawati to Discuss Indonesian Security Issues*, Asia Pulse, Aug. 16, 2002.

(c)     Robert Haines, the Manager of International Affairs, of ExxonMobil

Corp., based in Irving, Texas, is the Chairman of the U.S-Indonesia

Business Council.  Mr. Haines has led delegations to Jakarta to meet with

the Indonesian President and other government officials.

24.     ExxonMobil Corporation's activities in Indonesia are also a subject of concern

for the Corporation's U.S. shareholders.  In 2005, shareholders of ExxonMobil Corp. were

asked to vote on a proposal by two important institutional shareholders – the New York City

Teachers' Retirement System and the New York City Board of Education Retirement System –

that ExxonMobil Corp. management "review and report to shareholders by September, 2005,

on the corporation's security arrangements with the Indonesian military and private security

forces, including support, both monetary and in kind, to the Indonesian government and

military." [10]  The ExxonMobil Corp. Directors recommended that shareholders vote against the

shareholder resolution, and issued a statement that a "standalone Aceh security report is [not]

warranted.[11]

25.     Communications regarding abuses by ExxonMobil security personnel in

Indonesia are formulated in and disseminated from the United States, including  as follows:

(a)     Upon information and belief, representatives of ExxonMobil Corp.

corporate headquarters have met with New York City pension funds, as

well with Amnesty International and other non-governmental

organizations, regarding action ExxonMobil Corp. is taking related to

---

[10]     *See* Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, ExxonMobil
Corporation, Apr. 13, 2005, at 33.
[11]     *See id.* at 34.

human rights issues in its overseas operations, including, upon information and belief, abuse issues in Indonesia.[12]

(b)     Andre Madec, Planning Manager for Corporate Public Affairs, ExxonMobil Corp., has traveled to Indonesia to review ExxonMobil Corp.'s policies there.

(c)     Houston-based ExxonMobil Corp. spokeswoman Susan Reeves says that "we have communicated to the government of Indonesia our opposition to human rights abuse in any form by any organization or individual, as well as our concern over the violence in Aceh."[13]

26.     Upon information and belief, when ExxonMobil Corp. desired to hire or otherwise retain additional security personnel for its Aceh facilities, it was ExxonMobil Corp. management officials based in the United States who made and implemented the decision to do so.

27.     Defendant ExxonMobil Corp. is fully liable for its own acts and the acts of any subsidiaries, affiliates, divisions or other entities directly or indirectly under its ownership and control, including Defendants Mobil, Mobil Oil and EMOI, as well as other ExxonMobil subsidiaries and affiliates. Any such subsidiaries, affiliates, divisions or other entities are alter egos of Defendant ExxonMobil Corp., or, alternatively, are in an agency relationship with it. ExxonMobil Corp. is vicariously liable under the doctrine of *respondeat superior* for the acts or

---

[12]     *See* www.amnestyusa.org/business/xom_background.html. (noting that ExxonMobil has been accused of complicity in human rights abuses through their contract with the Indonesian military to provide security for a natural gas project in the province of Aceh, northern Sumatra and "that to help address these issues, in 1998, Amnesty International USA began actively engaging in campaigning and dialogue with Mobil Oil around these issues. Following the merger between Mobil and Exxon in 1999, AIUSA continued this approach with ExxonMobil.")

[13]     William Mellor, *Indonesia Seeks $80 Billion as It Fights Corruption*, Bloomberg News, March 24, 2005, at 5.

omissions of any subsidiaries, affiliates, divisions or other entities under its ownership and control.

## IV.    BACKGROUND

### The Origins of Defendants' Presence In Aceh Province

28.     Defendant Mobil Oil or its predecessors in interest commenced business operations in Indonesia more than one hundred years ago.  Beginning on or about December 26, 1967, Mobil Oil conducted business in Indonesia through its wholly-owned subsidiary, Mobil Oil Indonesia (MOI).  MOI is now known as ExxonMobil Oil Indonesia (EMOI).  Mobil Oil's parent company and successor in interest, ExxonMobil Corp., has continued to conduct business in Indonesia through EMOI from 1999 to the present.

29.     In or about 1971, Mobil Corp. discovered one of the largest natural gas fields in the world in Arun, which is located in the northern Aceh province in Indonesia.  Thereafter, Mobil Corp. was granted the exclusive rights to explore for and produce natural gas in the Arun area by the Indonesian government, and Mobil Corp. and MOI/EMOI developed natural gas facilities to extract the natural gas.  (The extraction facility, further described below, is referred to hereinafter as "ExxonMobil Extraction Facility" or "Extraction Facility.")  Through a joint venture, which is now 35% owned by ExxonMobil Corp., ExxonMobil Corp. also developed a natural gas liquefaction facility to process the natural gas for shipment (the liquefaction facility is referred to hereinafter as the "Arun Liquefaction Facility").

30.     The Arun area that houses the natural gas fields, the Arun Liquefaction Facility, and the ExxonMobil Extraction Facility, and the activities associated therewith, are referred to hereinafter as the "Arun Project."

13

31.     Since the November 30, 1999 merger, ExxonMobil Corp., either directly or indirectly through its corporate subsidiaries, affiliates and divisions, including EMOI, the Mobil Companies and/or the Other EXMOB Companies, has owned and operated the extraction facilities, succeeded to the Mobil Companies' 35% share in the Arun Liquefaction facility, and succeeded to all other interests of Mobil Corp. and its subsidiaries and affiliates in the Arun Project. Defendants ExxonMobil Corp., Mobil Corp., Mobil Oil, and MOI/EMOI are referred to collectively hereinafter as "ExxonMobil."

### The Arun Project Facilities

32.     Aceh is a relatively small province located in Northern Sumatra, Indonesia. It has a population of approximately four million people. Although it is largely undeveloped, it has extensive oil and natural gas deposits, as well as timber and minerals, and is responsible for a substantial amount of Indonesia's exports. Aceh produces around one third of Indonesia's liquefied natural gas.

33.     The Arun Liquefaction Facility developed through ExxonMobil's joint venture is located in north Aceh province.

34.     ExxonMobil's natural gas fields and the ExxonMobil Extraction Facility premises are located on a vast area in North Aceh owned and/or leased and/or controlled and occupied by ExxonMobil. In addition to extraction operations and production facilities, the ExxonMobil Extraction Facility premises house ExxonMobil headquarters buildings and other facilities such as barracks for ExxonMobil security personnel. The Extraction Facility is the base of operations for ExxonMobil, including its U.S. personnel, in Aceh. Pipelines carrying the natural gas run through the property and along roads that abut the area occupied by the facility.

35.    Between the Arun Liquefaction Facility and the ExxonMobil Extraction Facility lies one sizeable town, Lhokseumawe.  In the area covered by ExxonMobil's facilities and the surrounding region, there are also several small settlements or villages.  Acehnese also live along the roads that abut the pipelines running through and from the ExxonMobil extraction facility property.  In 2002, over 2,000 Acehnese residents worked at ExxonMobil's facilities.

36.    The Arun natural gas field is Indonesia's largest producing natural gas field and holds between 13 and 14 trillion cubic feet of gas.  In 1999, the Arun gas fields produced 2 billion cubic meters of natural gas a day.

37.    ExxonMobil Corp. has received hundreds of millions of dollars in revenue from the Arun Project.  Throughout the 1990's and until Mobil Corp.'s merger with the Exxon Corporation in 1999, the Arun gas fields comprised approximately 25% of Mobil Corp's world-wide revenues.[14]

38.    In March 2001, when ExxonMobil temporarily shut down its operations at Arun, Pertamina, the Indonesian natural gas company, reported it stood to lose $100 million for every month that the ExxonMobil facility was shut down.[15]

### ExxonMobil's Security Personnel

39.    From the inception of the Arun Project, ExxonMobil has employed or otherwise retained members of the Indonesian military to provide security services for its facilities and operations in Aceh province, despite the common knowledge, and the knowledge of ExxonMobil, that members of the Indonesian military had a history of gross human rights abuses without reprimand or punishment.

---

[14]    The Arun gas fields have been called "the jewel in the company's crown."  Jay Solomon, *Fueling Fears: Mobil Sees Gas Plant Become Rallying Point for Indonesian Rebels,* Wall St. J., Sep. 7, 2000, at 2.
[15]    Patrick Smith, *Exxon's Indonesian Exit Could Have Been Avoided,* Bloomberg News, Mar. 25, 2001, at 1.

40.     Among the members of the military ExxonMobil retained to provide security were members of Unit 113, which thereafter had the sole and specific purpose of providing security for ExxonMobil.

41.     ExxonMobil security personnel acted "for defensive purposes only, and not for maintaining general law and order."[16]

42.     ExxonMobil security personnel acted at all times relevant to this Complaint under the direction and control of ExxonMobil.

43.     ExxonMobil security personnel acted at all times relevant to this Complaint within the scope of and pursuant to their retention by ExxonMobil.

44.     ExxonMobil paid and continues to pay the Indonesian military a regular monthly or annual fee for security services.[17]

45.     In addition to other lump sums, upon information and belief, ExxonMobil pays three million rupiah ($294) per low-ranking military personnel a month. [18]

46.     In 2000, ExxonMobil was paying more than $500,000 per month to retain members of the Indonesian military as security personnel.

47.     At all times relevant herein, ExxonMobil has had the ability to supervise, control and direct, and has supervised, controlled and directed, the actions and activities of its security personnel.  Such supervision, control and direction has included the following:

---

[16]     Letter from R.I. Wilson, President and General Manager, ExxonMobil Oil Indonesia Inc., to the Editor, N.Y. Times, July 18, 2002.

[17]     Slobodan Lekic, *Indonesian Military Admits to Taking Money from U.S. Company*, Associated Press, Dec. 29, 2005 (ExxonMobil has acknowledged that it paid to have members of the Indonesian military provide security services).

[18]     Aceh Rebels Accuse ExxonMobil of involvement in "brutal military campaign," Agence France-Presse, Jan. 11, 2002. See also Patrick Smith, Exxon's Indonesia Exit Could Have Been Avoided, Bloomberg News, Mar. 25, 2001 at 1. ("ExxonMobil, by all accounts, . . . paid the salaries of the troops that guarded its fields and the nearby P.T. Arun liquefaction plant; it shared equipment the army apparently could not afford."). According to press reports, only one-third to one-quarter of the financing for Indonesia's armed forces comes from the state budget.  The rest is collected from "protection payments." *E.g.*, Slobodan Lekic, *Indonesian Army Admits U.S. firm's 'support'*, Associated Free Press, Dec. 30, 2005; Tina Rosenberg, *A Guerrilla War Stoked by a Thirst for Cash*, N.Y. Times, Dec. 27, 2001, at A18.

(a)    conditioning payment on the provision of specific security services;

(b)    making decisions about where to place bases, strategic mission planning, and making decisions about specific deployment areas;

(c)    material support to ExxonMobil security personnel, including but not limited to:

    (i)    constructing and/or providing facilities that were used for the detention, interrogation, unprovoked shootings, beatings, and other abuses of Plaintiffs;

    (ii)    providing weapons funding, military equipment, and other supplies used in the abuse of Acehnese residents, including Plaintiffs;

    (iii)    paying consultants and/or mercenaries to provide advice, training, intelligence, and equipment to ExxonMobil security personnel.

**ExxonMobil Security Personnel Perpetrated**
**Abuses and Injuries Against Plaintiffs**

48.    Upon information and belief, beginning at least in the early 1990s and continuing to the present, ExxonMobil security personnel were responsible for widespread acts of abuse, including murder, committed against Plaintiffs.

49.    Upon information and belief, ExxonMobil provided equipment, facilities, and other material support to ExxonMobil security personnel that were used in the commission of abuses committed against Acehnese villagers, including Plaintiffs.

50.    At all times relevant to this Complaint, ExxonMobil security personnel were acting under the supervision, direction, and control of, and with the knowledge and authority of ExxonMobil.

17

**ExxonMobil Was Aware of Abuses By Members of The Indonesian Military
When It Retained Them as Security Forces**

51.    Because the history of abuses by the Indonesian military had been extremely
well-publicized and widely condemned, ExxonMobil was aware when it retained members of
Indonesia's military to provide security for its Aceh operations that members of the Indonesian
military had in the past engaged in abuses of Indonesian citizens, including kidnapping, murder,
rape, torture and other forms of abuse.

52.    Continuously during the time that it retained members of the Indonesian military
as security personnel, ExxonMobil knew or should have known that members of the military
continued to commit gross abuses, because the publication and condemnation of unpunished
abuses by members of the military continued at all times that ExxonMobil retained military
members as security personnel.

53.    ExxonMobil knew or should have known of abuses by its security personnel
because reports and complaints of such abuse were publicized and/or directed to ExxonMobil
and ExxonMobil officials during the period that ExxonMobil retained members of the
Indonesian military as security personnel.

**Common Knowledge of Unpunished Abuses By Members
of the Indonesian Military**

54.    At least as early as the 1970's and continuing through the present, it was widely
known that members of the Indonesian military were not firmly under civilian control and had
committed murder, torture, illegal detention and new abuses against Indonesian civilians.
Unpunished abuses by members of the Indonesian military have been recognized and

condemned by the United Nations Security Council[19] and the United States, [20] among others.

These practices have also been documented and widely publicized by the news media[21] and

human rights organizations.[22]

       55.     Upon information and belief, Defendants were aware of the history of

unpunished abuses by members of the Indonesian military.

**Complaints and Reports of Abuse Specifically About and/or
Provided to Defendants**

       56.     Defendants were aware of the abuses committed by ExxonMobil security forces.

Top ExxonMobil officials attended meetings where human rights abuses by the security

---

[19]    In 1975, United Nations Security Council adopted resolutions deploring human rights abuses in East Timor. *See, e.g.,* U.N. S/Res/384 (1975); U.N. S/RES/1272 (1999) (calling for cooperation into investigations of reports of systematic, widespread, and flagrant violations of international humanitarian and human rights law).

[20]    The United States Congress has repeatedly cut off and/or restricted aid to Indonesia in response to human rights abuses by the Indonesian military. It also passed U.S. Senate Resolution 91 which criticized Indonesia's failure to prosecute the perpetrators of human rights abuses and directed the State Department to urge the Indonesian military to prosecute human rights abuses by its soldiers. S. Res. 91, 107th Cong., 1st Sess. (2001). The United States Department of State yearly reports on countries' human rights practices have repeatedly condemned abuses of civilians by members of the Indonesian military for several years. *See, e.g.,* U.S. Dep't of State, Indonesia Country Report on Human Rights Practices ("Country Report") for 1983, Washington, D.C. 1983 at 775; Country Report for 1984 at 774; Country Report for 1985 at 774; Country Report for 1993 at 1.

[21]    For example, in 1977, the Washington Post reported the United States House of Representatives would investigate the "accusation that the Indonesians carried on indiscriminate slaughter and committed other atrocities following their December 1975 occupation of East Timor." John Sharkey, House to Probe Charge Indonesians Killed 100,000 on Timor, Wash. Post, Mar. 13, 1977, at A19. *See also, e.g.,* Around the World, Wash. Post, Jan. 2, 1979, at A11 (President of East Timorese independence movement shot dead in an ambush by Indonesian troops). In 1984, the Washington Post reported in 1984 that "illegal executions by military, police or government units have aroused public concerns and drawn condemnation from local and foreign human rights activists." William Branigin, *Death Squads Claim Victims in Asia,* Wash. Post, Apr. 12, 1984, at A21.

[22]    For example, in 1989, Human Rights Watch described arbitrary detention and torture by members of the Indonesian military. Human Rights-Watch Report 1989: Indonesia and East Timor, available at: http:///www.hrw.org/reports/1989/WR89/Indonesia.html. The same organization reported in 1999 that Indonesia soldiers had "kill[ed] more than a thousand civilians, often leaving their mutilated bodies by the side of roads and rivers. Many more were arrested, tortured, and arbitrarily detained for months, sometimes years." Human Rights Watch, Indonesia: Why Aceh is Exploding, August 27, 1999, at 2, available at: www.hrw.org. The report noted that hundreds of men disappeared and many women were raped and concludes that "not a single move was made to hold Indonesian soldiers accountable for atrocities, despite all the new information that had emerged." Id. Amnesty International has issued a long series of reports on human rights abuses in Indonesia, which included reporting on summary executions and disappearances of East Timorese at the hands of the Indonesian military in a statement before the United Nations General Assembly. *See Statement on Behalf of Amnesty International to the United Nations General Assembly,* available at 127 Cong. Rec. 10826 (1981). Amnesty International later reported that between 1989 and 1993 in Aceh, "an estimated 2,000 civilians, including children and the very elderly, have been unlawfully killed, some in public executions and others while in military custody." "Shock Therapy": Restoring Order in Aceh, available at: www.amnestyusa.org/refugee/document.do?cd=B3CCDFC439385424802569A60060395C The report noted that "none of the suspected perpetrators of past violations has yet been brought to justice." *Id.*

personnel were discussed. For example, the United States Ambassador to Indonesia discussed the allegations regarding Mobil with Mobil's Chairman, Lucio Noto, during a November 3, 1998 meeting. In addition, a complaint was filed against ExxonMobil in 2001 alleging similar abuses.

57.     Upon information and belief, Defendants were aware of press reports in leading publications that investigated and detailed accounts of abuses by ExxonMobil's security personnel, including:

     (a)    BusinessWeek magazine undertook an independent investigation of the allegations made against ExxonMobil and published its findings in an article dated December 1998.[23]

        (i)    The article notes that "Mobil's headquarters in Fairfax, Va. provided detailed responses to questions from BusinessWeek's reporters and editors." *Id.*

        (ii)    The article also states that "Mobil says if it had known of abuses associated with its operations, it would have protested aggressively." *Id.*

        (iii)    The article quotes H. Sayed Mudhahar, identified as a former top government official in Aceh who also served as a public relations manager for ExxonMobil's joint venture partner, P.T. Arun, as saying "there wasn't a single person in Aceh who didn't know that the massacres were taking place … everybody was afraid." *Id.*

---

[23]    Michael Shari, *Indonesia: What did Mobil Know?*, BusinessWeek, Dec. 28, 1998.

(iv)    The article notes that Acehnese who were detained and tortured at the Rancong Camp attended Friday afternoon services at a mosque at the Liquefaction Facility alongside its employees.[24]

(v)     The article describes an area along a road near the Extraction Facility that served as a respository for the remains of the victims and became known as "Skull Hill."[25] ExxonMobil contractors and employees traveled the road that passed Skull Hill on a daily basis and discussed it at work.[26]

(b)     In December 1998, the Associated Press reported that the Indonesian-government backed National Human Rights Commission "had received witness reports that Mobil managers were aware of abuses in Aceh and even provided equipment to soldiers involved in atrocities."[27]

(c)     In September 2000, the Wall Street Journal's Asia edition ran a story recounting reports of abuses by ExxonMobil security forces, including "numerous reports of abuses by troops in and around [Exxon]Mobil facilities."[28]

(d)     In July 2001, an article in Time magazine's Asia edition reported that in Aceh "people literally line up to tell stories of abused and murders committed by the troops they call *Exxon's army*."[29]

---

[24]    *See id.* at 7.
[25]    *See id.* at 6.
[26]    *See id.*
[27]    Christopher Torchia, *Indonesian Human Rights Group Studies Allegations Against Mobil,* Associated Press, Dec. 24, 1998.
[28]    Jay Solomon, *Fueling Fears,* Wall St. J., Sep. 7, 2000.
[29]    Mark R. Mitchell, *Who Knew?,* Time Asia, Jan 29, 2001 (emphasis added).

     (i)     The article further reported that a farmer named Anwar was held for a month by ExxonMobil security personnel and whipped nightly with ropes of barbed wire, burned with cigarettes and beaten unconscious with a wooden board. He was also forced to watch the security personnel shoot his brother in the head. The article states that "Anwar says part of his ordeal took place inside the gates of ExxonMobil's cluster IV gas field. He says he was dragged, kicking and screaming, past men wearing white uniforms and ExxonMobil hard hats…." *Id.*

     (ii)    The article also noted that "according to locals, riding a bicycle or oxcart on the street in front of ExxonMobil's facilities has become a deadly game of dodge-bullet, with soldiers taking potshots at just about anybody who moves. Those who pass at the wrong time of day are sometimes dragged into ExxonMobil's warehouses and taught a lesson." *Id.*

58.    Upon information and belief, in spite of this knowledge, Defendants continued to retain members of the Indonesian military as security personnel at all times relevant to this Complaint.

59.    In spite of their knowledge, Defendants have refused demands to investigate, improve, or cease its security forces' abusive actions. For example, numerous human rights groups, including several based in Aceh, specifically requested that Defendants cease their operations in Aceh until they could make arrangements to operate without using members of the Indonesian military for security. These requests were refused, and Defendants instead

determined to *increase*, and did increase, the number of Indonesian soldiers it employed or otherwise retained to guarantee the security of the Arun Project, without regard for, and with full knowledge of, the abuses committed against the Acehnese people who live near the Arun Project.  Moreover, Defendants have continued to pay ExxonMobil security personnel knowing that the security personnel would continue to take any and all actions, including extreme violence of the character and nature described above.

## V.    INJURIES AND HARM SUFFERED BY PLAINTIFFS

60.    Plaintiff John Doe VIII is a citizen of Aceh Province, Indonesia, and resides in Village L.  Plaintiff John Doe VIII passed by ExxonMobil security posts on his way to and from work.  ExxonMobil security forces repeatedly asked him for bribes, but he was eventually unable to pay because he did not earn enough at his job.  In June 2004, as he was cycling home, Plaintiff John Doe VIII stopped at a coffee shop.  While he was standing outside the shop, one or more ExxonMobil security personnel shot Plaintiff John Doe VIII in the knee.  When onlookers attempted to assist Plaintiff John Doe VIII, ExxonMobil security personnel prevented them from doing so. The ExxonMobil security personnel then proceeded to raid the coffee shop, leaving Plaintiff John Doe VIII in the ditch where he fell. Plaintiff John Doe VIII was unarmed, and the shooting was completely unprovoked. Following the shooting, villagers helped take Plaintiff John Doe VIII to a small local health clinic, but the health professionals there were unable to treat his acute level of injury.  Accordingly, Plaintiff John Doe VIII was then taken to a hospital where he received treatment.  Plaintiff John Doe VIII has been unable to return to his previous job working as a laborer at a local plantation because he no longer has the physical strength necessary to do the job due to the injuries sustained from the attack by ExxonMobil security personnel.  Defendants are liable for the acts described herein.

61.    Plaintiff John Doe IX is a citizen of Aceh Province, Indonesia, and resides in Village M. In June 2004, John Doe IX visited his local coffee shop. As he arrived, he saw ExxonMobil security personnel appear at the establishment and shoot Plaintiff John Doe VIII in the knee. When Plaintiff John Doe IX went to assist John Doe VIII, ExxonMobil security personnel intervened. One of the ExxonMobil security personnel took Plaintiff John Doe IX by his ankle, while two other ExxonMobil security personnel pointed their weapons at him. One of the ExxonMobil security personnel dragged Plaintiff John Doe IX along the ground for a number of meters, during which Plaintiff John Doe IX sustained injuries to his arm. Another ExxonMobil security personnel then stomped Plaintiff John Doe IX's head, causing further injury. Defendants are liable for the acts described herein.

62.    Plaintiff John Doe X is a citizen of Aceh Province, Indonesia, and resides in Village N. On his way to visit relatives after a death in the family in October 2004, Plaintiff John Doe X traveled by motorbike past a security post run by ExxonMobil security personnel. Just after the security post, ExxonMobil security personnel stopped him. The ExxonMobil security personnel kicked him and ordered him to return to the ExxonMobil security post. When he returned to the ExxonMobil security post, Plaintiff John Doe X was interrogated about the activities of other villagers. The ExxonMobil security personnel accused Plaintiff John Doe X of being insufficiently cooperative and therefore kicked him again. He was then taken inside the ExxonMobil security post, detained, and beaten. After his release, Plaintiff John Doe X required medical treatment for his injuries. Later, armed ExxonMobil security personnel appeared at the home of Plaintiff John Doe X. Five of the armed ExxonMobil security personnel entered Plaintiff John Doe X's home to conduct what they called a "peaceful ceremony," in which the ExxonMobil security personnel admitted that they had beaten Plaintiff

John Doe X and apologized for doing so. However, they remained armed throughout the entire "ceremony." Moreover, ExxonMobil did not provide Plaintiff John Doe X with any compensation. Defendants are liable for the acts described herein.

63.     Plaintiff John Doe XI is a citizen of Aceh Province, Indonesia, and resides in Village O. In or around October 2004, Plaintiff John Doe XI traveled by car past an ExxonMobil security post on his way to a volleyball match. Further along, two ExxonMobil security personnel stopped his car and ordered him to return to that ExxonMobil security post. On returning to the ExxonMobil security post, ExxonMobil security personnel stationed there kicked and punched him. The ExxonMobil security personnel accused him of having driven too quickly past the ExxonMobil security post. Plaintiff John Doe XI works as a fruit trader, and the ExxonMobil security personnel demanded that he bring them some of his merchandise when he traveled past. A few days after this incident, around five ExxonMobil security personnel organized what they called a "peaceful ceremony," in which the ExxonMobil security personnel admitted responsibility for beating John Doe XI and apologized. However, they also instructed John Doe XI not to complain about what happened to him. ExxonMobil did not offer any compensation to Plaintiff John Doe XI. Defendants are liable for the acts described herein.

## VI.    CAUSES OF ACTION

64.     Defendants have exploration and production rights to the Arun Project, of which ExxonMobil Corp. is a part owner. Pursuant to the contract granting these exploration and production rights and in exchange for ExxonMobil's regularly scheduled payment of fees, ExxonMobil retains personnel for purposes of securing its interests at the Arun Project. ExxonMobil also provides these security personnel with training, supervision, equipment and other resources and support.

65.    In committing the tortious conduct alleged herein, ExxonMobil's security personnel were acting under the supervision of Defendants and/or as Defendants' agents, and/or were acting within the course and scope of the security duties for which they were retained with the advance knowledge, acquiescence or subsequent ratification of Defendants.  These security personnel were acting in furtherance of ExxonMobil's financial and corporate interests.

66.    Defendants had reason to know and/or did know the nature and scope of the tortious conduct alleged herein, including the unprovoked shootings, assault, battery and detention of Plaintiffs carried out by ExxonMobil's security personnel, as well as tortious conduct carried out through the use of and benefit from the funding, equipment and other resources provided by ExxonMobil.  With this knowledge or probable knowledge, Defendants provided and continue to provide this funding, equipment and other resources to ExxonMobil's security personnel.

67.    The tortious conduct alleged herein, including the unprovoked shootings, assault, battery and detention of Plaintiffs carried out by ExxonMobil's security personnel was reasonably foreseeable.  Defendants failed to exercise due care in retaining ExxonMobil's security personnel.

68.    Defendants and/or their predecessors acquiesced to tortious conduct, as alleged herein, including the unprovoked shootings, assault, battery and detention of Plaintiffs carried out by ExxonMobil's security personnel.

69.    With respect to all of the causes of action described below, the harm to Plaintiffs was caused by the commissions or omissions of Defendants, including Defendants' retention and supervision of ExxonMobil's security personnel.

26

## First Cause of Action
### Negligence

70.　Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

71.　Defendants had a duty of reasonable care towards Plaintiffs to ensure that neither they nor their agents engaged in conduct leading to or likely to lead to foreseeable harm, injury or death, as described herein.  Defendants failed to use due care to protect the Plaintiffs from foreseeable injury, harm, and death.

72.　Defendants had a duty to Plaintiffs to take ordinary care to ensure that ExxonMobil security personnel whom Defendants retained to perform security services, were not unfit, incompetent or otherwise dangerous to Plaintiffs.

73.　At all relevant times, Defendants and/or their agents, had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

74.　Defendants and/or their agents breached the duty of care that they owed Plaintiffs.  In engaging in the conduct alleged herein, including the retention of ExxonMobil security personnel, Defendants and/or their agents have not acted as ordinarily prudent and careful persons would act in similar circumstances.

75.　Defendants and/or their agents breached of the duty of care that they owed Plaintiffs is the proximate cause of Plaintiffs' damages, as alleged herein.

## Second Cause of Action
### Negligent Hiring

76.　Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

77.     Defendants and/or agents selected, hired, retained and/or contracted with ExxonMobil security personnel to perform work and provide security for the ExxonMobil facilities in Arun.

78.     Defendants had a duty to Plaintiffs to take reasonable care to ensure that ExxonMobil security personnel whom Defendants retained to perform security services, were not unfit, incompetent or otherwise dangerous to Plaintiffs.

79.     Despite actual or constructive knowledge of these characteristics, Defendants hired, retained, and/or contracted with ExxonMobil security personnel to provide security services. At the time that Defendants selected, hired, retained and/or contracted for the security personnel and at all other relevant times, Defendants knew or reasonably should have known that the security personnel were unfit, incompetent, and/or dangerous and that, as a result, would intentionally and/or negligently violate, did violate and would continue to harm Plaintiffs, as alleged herein.

80.     Defendants failed to exercise reasonable care in selecting, hiring, retaining and contracting for the security personnel whom Defendants and/or their agents retained to perform this work. Defendants breached their duty to Plaintiffs, who suffered harm and injury, including harm and injury caused by resources, property, funding and/or equipment under Defendants' control.

81.     As a direct and proximate result of those violations, Plaintiffs would and did suffer injuries as further alleged herein.

82.     As a direct and proximate result of Defendants' negligent selection, hiring, retention and/or contracting with ExxonMobil security personnel, Plaintiffs have suffered and continue to suffer injuries entitling them to damages in amounts to be proven at trial.

83.     Defendants' conduct constitutes negligent hiring and is actionable under the laws of the District of Columbia.

### Third Cause of Action
### Negligent Supervision

84.     Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

85.     When engaging in the wrongful conduct alleged herein, ExxonMobil security personnel were acting as employees and/or agents of Defendants.

86.     Defendants had a duty to Plaintiffs to take reasonable care to ensure that the ExxonMobil security personnel whom Defendants supervised to perform security services, were not unfit, incompetent or otherwise dangerous to Plaintiffs.

87.     Defendants exercised control over the operative details of the security services provided by the ExxonMobil security personnel, including control over the resources, property, funding and/or equipment used to injure and harm Plaintiffs.

88.     Defendants also had the authority to supervise, prohibit, control, and/or regulate the ExxonMobil security personnel so as to prevent these acts and omissions from occurring. Defendants also had the ability to cease production until such time as the tortious conduct alleged herein were stopped and/or prevented.

89.     Defendants knew or reasonably should have known that the ExxonMobil security personnel would create a risk of harm and actually harm or otherwise violate Plaintiffs' rights, and that, as a direct and proximate result of those violations, Plaintiffs would suffer injuries as alleged herein.

90.     Defendants knew or reasonably should have known that unless they intervened to protect Plaintiffs and properly supervise, prohibit, control and/or regulate the conduct

described herein, the ExxonMobil security personnel would perceive their acts and omissions as being ratified and condoned.

91.     Defendants failed to exercise due care by failing to supervise, prohibit, control or regulate the ExxonMobil security personnel. Defendants breached their duty to Plaintiffs, who suffered harm and injury, including harm and injury caused by resources, property, funding and/or equipment under Defendants' control.

92.     As a direct and proximate result of Defendants' negligent supervision of the ExxonMobil security personnel, Plaintiffs have suffered and continue to suffer injuries entitling them to damages in amounts to be proven at trial.

93.     Defendants' conduct constitutes negligent supervision and is actionable under the laws of the District of Columbia.

### Fourth Cause of Action
### Intentional Infliction of Emotional Distress

94.     Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

95.     Defendants and/or their agents intentionally committed outrageous and extreme acts, as alleged herein, including the unprovoked shootings, assault, battery and detention of Plaintiffs carried out by ExxonMobil security personnel. These acts, which are without privilege, were intended to cause and did cause Plaintiffs to suffer severe emotional distress.

96.     In the alternative, Defendants engaged in outrageous and extreme acts with reckless disregard for the probability of causing Plaintiffs severe emotional distress and did in fact cause Plaintiffs to suffer severe emotional distress.

97.     Defendants' outrageous and extreme conduct constitutes the intentional and/or reckless infliction of emotional distress and is actionable under the laws of the District of Columbia.

### Fifth Cause of Action
**Battery**

98.     Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

99.     Defendants and/or their agents committed intentional knowing, and/or reckless acts which resulted in harmful or offensive contact with the bodies of Plaintiffs.  Plaintiffs did not consent to the contact.

100.    Defendants acted with the intent to cause injury and actually did cause injury, damage, loss and harm to Plaintiffs including but not limited to the following injuries:

> (i)     Plaintiff John Doe VIII's gunshot wounds, which resulted in severe injury leaving him unable to perform his job as a laborer; and

> (ii)    Plaintiffs John Does IX, X, and XI's injuries suffered as a result of beatings inflicted by ExxonMobil security personnel.

101.    The acts described herein constitute battery, actionable under the laws of the laws of the District of Columbia.

### Sixth Cause of Action
**Assault**

102.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

103.    Defendants and/or their agents intentionally, knowingly and/or recklessly committed or attempted and/or threatened to commit wrongful acts intending to cause harmful

or offensive contact with Plaintiffs. Defendants and/or their agents caused Plaintiffs to imminently fear and/or apprehend such harmful, offensive and/or unlawful contact. Defendants acted with the intent to threaten and harm and did actually threaten and harm Plaintiffs.

104.    Defendants' commissions and omissions, as alleged herein, demonstrated that Defendants had an imminent ability and intent to subject Plaintiffs to an intentional, offensive and harmful contact. Defendants knew or should have known that Plaintiffs would regard such intentional and harmful contact as offensive.

105.    Plaintiffs did not consent to such conduct, which caused injury, damage, loss and harm to Plaintiffs.

106.    The acts described herein constitute assault, actionable under the laws of the District of Columbia.

## Seventh Cause of Action
### Arbitrary Arrest, Detention and False Imprisonment

107.    Plaintiffs incorporate by reference all of the preceding paragraphs as if set forth herein.

108.    Defendants, their co-venturers or agents arbitrarily arrested, detained, took into custody, and/or falsely imprisoned Plaintiffs John Does X and XI within boundaries fixed by Defendants. Such arrest, detention, and/or false imprisonment was illegal and unjust, carried on without any other lawful authority or justification.

109.    Plaintiffs John Does X and XI were placed in fear for their lives, were deprived of their freedom, separated from their families and forced to suffer severe physical and mental abuse, as alleged herein. Plaintiffs did not consent to such conduct, which caused injury, damage, loss and harm to Plaintiffs John Does X and XI.

110.    These acts constitute arbitrary arrest, detention, and false imprisonment actionable under the laws of the District of Columbia.

## VII.  DAMAGES

### Compensatory Damages

111.    Plaintiffs are entitled to recover compensatory damages in an amount to be ascertained at trial.

### Punitive Damages

112.    Defendants' unlawful, wanton, reprehensible, reckless and malicious conduct also warrants the imposition of punitive damages in an amount to be determined at trial.

113.    Defendants and/or their agents' tortious conduct alleged herein, including the unprovoked shootings, assault, battery and detention of Plaintiffs carried out by ExxonMobil security personnel, was intended to and actually did injure Plaintiffs.  Defendants engaged in such outrageous conduct knowingly, willfully, maliciously, unlawfully and/or with reckless indifference and/or gross neglect to the injury and harm Defendants and/or their agents caused Plaintiffs.

114.    Defendants and/or their agents were consciously indifferent and/or consciously aware of the foreseeable result that Plaintiffs would suffer injuries caused by Defendants' and/or their agents' tortious conduct, as alleged herein, including the unprovoked shootings, assault, battery and detention of Plaintiffs carried out by ExxonMobil security personnel.

## VIII.  DEMAND FOR JURY TRIAL

115.    Plaintiffs demand a trial by jury on all issues so triable.

## IX.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court to:

(a)    enter judgment in favor of each of the Plaintiffs on all counts of the Complaint;

(b)    declare that Defendants have violated the laws of the District of Columbia as set forth herein;

(c)    award each of the Plaintiffs damages, including compensatory and punitive damages, in an amount greater than $75,000;

(d)    grant each of the Plaintiffs equitable relief, permanently enjoining Defendants from further engaging in abuses against Plaintiffs and their fellow villagers;

(e)    award each of the Plaintiffs the costs of suit including reasonable attorneys' fees, and

(f)    award each of the Plaintiffs such other and further relief as the Court deems just under the circumstances.

Dated: May 31, 2007

Respectfully submitted,

Michael D. Hausfeld, DC Bar # 153742
Agnieszka M. Fryszman, DC Bar # 459208
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
West Tower - Suite 500
Washington, DC 20005-3964
T: (202) 408-4600
F: (202) 408-4699

Terrence Collingsworth, DC Bar # 471830
Derek J. Baxter, DC Bar # 479361
INTERNATIONAL LABOR RIGHTS FUND
2001 S Street, N.W., Suite 420
Washington, DC 20009
T: (202) 347-4100
F: (202) 347-4885

*Plaintiffs' Counsel*

IMANAGE 288337.1

35