IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| JOHN DOE VIII, Village L, Aceh Indonesia, | ) | |
| JOHN DOE IX, Village M, Aceh Indonesia, | ) | |
| JOHN DOE X, Village N, Aceh Indonesia, | ) | |
| JOHN DOE XI, Village O, Aceh Indonesia, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case: 1:07-cv-01022 (LFO) |
| | ) | |
| EXXON MOBIL CORPORATION, 5959 | ) | |
| Las Colinas Boulevard, Irving, Texas, 75039-2298, | ) | |
| EXXONMOBIL OIL INDONESIA, PT, | ) | |
| 27-30/F Wisma GKBI, Jl. Jend Sudirman 28, | ) | |
| Jakarta, Indonesia, MOBIL CORPORATION, | ) | |
| 800 Bell Street, Houston, TX 77002, MOBIL | ) | |
| OIL CORPORATION, 800 Bell Street, Houston, | ) | |
| TX 77002, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____

**DEFENDANTS EXXON MOBIL CORPORATION, MOBIL CORPORATION,
EXXONMOBIL OIL CORPORATION, AND EXXONMOBIL OIL INDONESIA INC.'S
MOTION TO DISMISS**

Pursuant to Rules 12 and 19 of the Federal Rules of Civil Procedure, Defendants Exxon

Mobil Corporation, Mobil Corporation, ExxonMobil Oil Corporation, and ExxonMobil Oil

Indonesia Inc. respectfully move this Court to dismiss Plaintiff's Complaint.  The grounds

supporting this motion are set forth in the accompanying memorandum of law.

Washington, DC
September 17, 2007

Respectfully submitted,

*Alex Young K Oh /ws*
_____
Theodore V. Wells, Jr. (Bar No. 468934)
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064

Alex Young K. Oh (Bar No. 499955)
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1615 L Street, NW, Suite 1300
Washington, DC  20036

*Robert J Meyer*
_____
Martin J. Weinstein (Bar No. 37792)
Robert J. Meyer (Bar No. 41620)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC  20006
Telephone:  (202) 303-1000
Facsimile:  (202) 303-2000

Paul W. Wright (Bar No. 20747)
Patrick J. Conlon (Bar No. 414621)
Exxon Mobil Corporation
800 Bell Street
Houston, TX  77002

Attorneys for Defendants
Exxon Mobil Corporation, Mobil Corporation,
ExxonMobil Oil Corporation,
and ExxonMobil Oil Indonesia Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

JOHN DOE VIII, Village L, Aceh Indonesia,    )
JOHN DOE IX, Village M, Aceh Indonesia,    )
JOHN DOE X, Village N, Aceh Indonesia,    )
JOHN DOE XI, Village O, Aceh Indonesia,    )
    )
    Plaintiffs,    )
    )
    v.    )    Case: 1:07-cv-01022 (LFO)
    )
EXXON MOBIL CORPORATION, 5959    )
Las Colinas Boulevard, Irving, Texas, 75039-2298, )
EXXONMOBIL OIL INDONESIA INC.,    )
27-30/F Wisma GKBI, Jl. Jend Sudirman 28,    )
Jakarta, Indonesia, MOBIL CORPORATION,    )
800 Bell Street, Houston, TX 77002, MOBIL    )
OIL CORPORATION, 800 Bell Street, Houston,    )
TX 77002,    )
    Defendants.    )

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS EXXON MOBIL CORPORATION, MOBIL CORPORATION, EXXONMOBIL OIL CORPORATION, AND EXXONMOBIL OIL INDONESIA INC.'S MOTION TO DISMISS

Theodore V. Wells, Jr. (Bar No. 468934)
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Alex Young K. Oh (Bar No. 499955)
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
1615 L Street, NW, Suite 1300
Washington, DC 20036

Martin J. Weinstein (Bar No. 37792)
Robert J. Meyer (Bar No. 41620)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
Telephone: (202) 303-1000
Facsimile: (202) 303-2000

Paul W. Wright (Bar No. 20747)
Patrick J. Conlon (Bar No. 414621)
Exxon Mobil Corporation
800 Bell Street
Houston, TX 77002

Attorneys for Defendants Exxon Mobil
Corporation, Mobil Corporation, ExxonMobil Oil
Corporation, and ExxonMobil Oil Indonesia Inc.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ................................................................................................. 2

ARGUMENT ........................................................................................................................ 8

I.    THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE THE
      PARTIES ARE NOT COMPLETELY DIVERSE ..................................................... 8

II.   PLAINTIFFS LACK STANDING TO SUE IN A U.S. COURT BECAUSE THEY
      ARE NON-RESIDENT ALIENS ............................................................................... 9

III.  THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS UNDER THE
      DOCTRINES OF COMITY, ACT OF STATE, POLITICAL QUESTION, AND
      FOREIGN AFFAIRS PREEMPTION ...................................................................... 11

      A.    Principles of Comity Require Deference to the Helsinki Peace Accord. ................. 11

      B.    The Act of State Doctrine Applies Because the Indonesian Government
            Considers the Soldiers' Activities Official Acts. ...................................................... 15

      C.    The Political Question Doctrine Bars Adjudication of Plaintiffs' Claims,
            Because the Political Branches Have Expressed Strong Support for the Helsinki
            Peace Accord. ........................................................................................................... 17

      D.    The Foreign Affairs Preemption Doctrine Bars Adjudication of Plaintiffs'
            Common Law Claims, Because State Law Cannot Be Applied in a Matter That
            Affects Foreign Relations Absent Advancing Some State Interest. ........................... 18

IV.   THE COURT CANNOT JOIN AN INDISPENSABLE PARTY, BPMIGAS, WHOSE
      INTERESTS WOULD BE ADVERSELY AFFECTED BY ADJUDICATION OF THE
      CLAIMS IN ITS ABSENCE ................................................................................... 19

      A.    BPMIGAS Is a Necessary Party for Just Adjudication. ........................................... 20

      B.    BPMIGAS Cannot Be Joined as a Party So the Case Must Be Dismissed. .............. 23

V.    THE COURT LACKS PERSONAL JURISDICTION OVER EMOI BECAUSE EMOI
      HAS INSUFFICIENT CONTACTS TO THE DISTRICT OF COLUMBIA ..................... 26

VI.   PLAINTIFFS' CLAIMS ARE TIME-BARRED BECAUSE THEY WERE BROUGHT
      AFTER THE APPLICABLE LIMITATIONS PERIODS HAD EXPIRED ........................ 28

VII.   PLAINTIFFS' CLAIMS MUST BE DISMISSED BECAUSE DISTRICT OF
       COLUMBIA LAW CANNOT APPLY .................................................................... 31

       A.   Indonesia Has a Greater Interest Than the District of Columbia or the United
            States, and Application of D.C. Law Would Frustrate Indonesian Policy............... 31

       B.   Application of D.C. Law Would Violate Due Process. ............................................ 34

       C.   Application of D.C. Law Would Violate Defendants' Right To Fair Notice. .......... 36

VIII.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER D.C. LAW BECAUSE THEY
       CANNOT BE LEGALLY RESPONSIBLE FOR THE INDONESIAN SOLDIERS'
       ALLEGED CONDUCT ..................................................................................... 36

       A.   The PSC Demonstrates That There Was No Legal Relationship Between
            Defendants and the Indonesian Military. ................................................................. 38

       B.   Defendants Cannot Be Legally Responsible for the Acts of the Employees of
            Another Entity. ......................................................................................................... 40

       C.   Plaintiffs Fail To State a Claim for Negligent Hiring. ............................................ 42

       D.   Plaintiffs Fail To State a Claim for Negligent Supervision. .................................... 43

       E.   There Is No Discernible Negligence Standard for Military Oversight. .................... 44

CONCLUSION ......................................................................................................................... 45

# TABLE OF AUTHORITIES

## CASES

*ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007) .............................................................. 10

\*Aguinda v. Texaco, Inc._, 945 F. Supp. 625 (S.D.N.Y. 1996) ................................. 24-25

\*Aguinda v. Texaco, Inc._, 142 F. Supp. 2d 534 (S.D.N.Y. 2001), aff'd, 303 F.3d 470
  (2d Cir. 2002) .......................................................................................................... 25

*Alexander v. Wash. Gas Light Co.*, 481 F. Supp. 2d 16 (D.D.C. 2006) ...................... 43

*Alvarez-Machain v. United States*, 331 F.3d 604 (9th Cir. 2003) ................................ 32

\*Am. Ins. Ass'n v. Garamendi_, 539 U.S. 396 (2003) ................................................... 18

\*Am. Banana Co. v. United Fruit Co.*, 213 U.S. 347 (1909) ........................... 14,15,16

*Arbelaez v. Newcomb*, 1 Fed Appx. 1 (D.C. Cir. 2001) ............................................... 11

*Armiger v. Real S.A. Transportes Aereos*, 377 F.2d 943 (D.C. Cir. 1967) ................. 32

*Ashkir v. United States*, 46 Fed. Cl. 438 (Fed. Cl. 2000) ........................................... 11

*In re Assicurazioni Generali S.p.A. Holocaust Litig.*, 340 F. Supp. 2d 494
  (S.D.N.Y. 2004) ...................................................................................................... 19

*Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34 (D.D.C. 2003) ...................... 26

\*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ................................................... 36

\*Baker v. Carr*, 369 U.S. 186 (1962) ........................................................................... 17

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) .......................................... 36,37,38

\*Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144 (D.D.C. 1976) ..................... 10

*Bigio v. Coca-Cola Co.*, 448 F.3d 176 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 1842 (2007) ....... 11

*Boehner v. McDermott*, 332 F. Supp. 2d 149 (D.D.C. 2004), aff'd, 441 F.3d 1010
  (D.C. Cir. 2006) ...................................................................................................... 35

*Boise Tower Assocs., LLC v. Wash. Capital Joint Master Trust,* No. 03-141-S-MHW, 2006
  U.S. Dist. LEXIS 45851 (D. Idaho June 22, 2006) ............................................... 34

iii

* - Authorities upon which we chiefly rely are marked with asterisks.

*Brown v. Argenbright Sec., Inc., 782 A.2d 752 (D.C. 2001) ....................................... 43

Burger-Fischer v. Degussa AG, 65 F. Supp. 2d 248 (D.N.J. 1999)................................ 18

Burgess v. Pelkey, 738 A.2d 783 (D.C. 1999) .............................................................. 30

Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp., 172 F. Supp. 2d 79
   (D.D.C. 2001) ...................................................................................................... 32

*Chappell v. Wallace, 462 U.S. 296 (1983).................................................................. 44

*Charles v. Barrett, 233 N.Y. 127 (1922) .......................................................... 40,41,42

Corrie v. Caterpillar, Inc., 403 F. Supp. 2d 1019 (W.D. Wash. 2005) ........................ 18

*Danziger v. Ford Motor Co., 402 F. Supp. 2d 236 (D.D.C. 2005)............................... 33

Dist. of Columbia v. Chinn, 839 A.2d 701 (D.C. 2003) ......................................... 30,31
*
Dist. of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co., 797 F.2d 1041
   (D.C. Cir. 1986) ..................................................................................................... 9

Doe v. Exxon Mobil Corp., 473 F.3d 345 (D.C. Cir. 2007), petition for cert. filed, 76
   U.S.L.W. 3050 (U.S. July 20, 2007) (No. 07-81)....................................... 3,8,17,18,19

*Doe v. State of Israel, 400 F. Supp. 2d 86 (D.D.C. 2005) .......................... 11,15,16,18

Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1 (2004)........................................ 10

Eminente v. Johnson, 361 F.2d 73 (D.C. Cir. 1966) .................................................... 10

Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938) .......................................................... 19

Estate of Carter v. Dist. of Columbia, 903 F. Supp. 165 (D.D.C. 1995) ...................... 41

*Eze v. Yellow Cab Co., 782 F.2d 1064 (D.C. Cir. 1986)............................................... 9

In re Ford Motor Co. Bronco II Prod. Liab. Litig., 177 F.R.D. 360 (E.D. La. 1997) ................. 35

*Freudensprung v. Offshore Technical Servs., 379 F.3d 327 (5th Cir. 2004) ............................ 28

Frumkin v. JA Jones, Inc., 129 F. Supp. 2d 370 (D.N.J. 2001) ...................................... 18

Geier v. America Honda Motor Co., 529 U.S. 861 (2000) .............................................. 19

Giles v. Shell Oil Corp., 487 A.2d 610 (D.C. 1985) ................................................... 44

iv

* - Authorities upon which we chiefly rely are marked with asterisks.

*Gilligan v. Morgan*, 413 U.S. 1 (1973) ........................................................ 44

*Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408 (1984) ........................................ 10

*Herbert v. Dist. of Columbia*, 808 A.2d 776 (D.C. 2002) ............................................ 31

*Hodge v. S. Ry. Co.*, 415 A.2d 543 (D.C. 1980) ........................................ 28

*Hunter v. Dist. of Columbia*, 943 F.2d 69 (D.C. Cir. 1991) ...................................... 29

*Huntington v. Attrill*, 146 U.S. 657 (1892) ........................................ 34

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ........................................ 27

*Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354
    (9th Cir. 1981) ........................................ 16

*Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424 (D.N.J. 1999) ........................................ 11,18

*Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399 (3d Cir. 1993) ...................... 20

*Johnson v. Dist. of Columbia*, No. 04-936 (RMC), 2005 U.S. Dist. LEXIS 16918
    (D.D.C. July 20, 2005) ........................................ 29,30

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) ........................................ 8,9

*Joo v. Japan*, 413 F.3d 45 (D.C. Cir. 2005), *cert. denied*, 546 U.S. 1208 (2006) ................ 17,18

*Jordan v. NUCOR Corp.*, 295 F.3d 828 (8th Cir. 2002) ........................................ 43

*Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998) ........................................ 25

*Kickapoo Tribe of Indians of Kickapoo Reservation in Kan. v. Babbitt*, 43 F.3d 1491 (D.C.
    Cir. 1995) ........................................ 23

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) ........................................ 28,31

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) ........................................ 8

*Kolesar v. United Agri Prods., Inc.*, 412 F. Supp. 2d 686 (W.D. Mich. 2006), *aff'd*, No. 06-
    1416, 2007 U.S. App. LEXIS 21581 (6th Cir. Sept. 4, 2007) ........................................ 35

*Kukatush Mining Corp. v. SEC*, 309 F.2d 647 (D.C. Cir. 1962) ........................................ 10,11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................ 21

\* - Authorities upon which we chiefly rely are marked with asterisks.

*Maddox v. Bano*, 422 A.2d 763 (D.C. 1980) ............................................................ 30

*McCluney v. Joseph Schlitz Brewing Co.*, 649 F.2d 578 (8th Cir.), *aff'd*, 454 U.S. 1071 (1981) ...................................................................................................................... 35

*Mittleman v. United States*, 104 F.3d 410 (D.C. Cir. 1997) ..................................... 29

*Moser v. Pollin*, 294 F.3d 335 (2d Cir. 2002) ............................................................ 8

*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005) ................. 18,19

*Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) .............................................. 22

*In re Nazi Era Cases*, 236 F.R.D. 231 (D.N.J. 2006), *aff'd*, No. 06-3655, 2007 U.S. App. LEXIS 17470 (3d Cir. July 20, 2007) .................................................................... 11

*In re Nazi Era Cases*, 196 Fed. Appx. 93 (3d Cir. 2006) .......................................... 18

*Oetjen v. Central Leather Co.*, 246 U.S. 297 (1918) ................................................ 15

*Oriska Ins. Co. v. Brown & Brown of Tex., Inc.*, No. 02-578, 2005 WL 894912 (N.D.N.Y. Apr. 8, 2005) .......................................................................................................... 28

*Osseiran v. Int'l Fin. Corp.*, No. 06-336 (RWR), 2007 WL 2153272 (D.D.C. July 27, 2007) ..................................................................................................................... 39

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ......................................... 34,35

*Prakash v. Am. Univ.*, 727 F.2d 1174 (D.C. Cir. 1984 ............................................... 8

*Price v. Int'l Tel. & Tel. Corp.*, 651 F. Supp. 706 (S.D. Miss. 1986) ........................ 35

*Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102 (1968) .............. 23

*Reeder v. Lerner Corp.*, No. 91-1381 (LFO), 1992 U.S. Dist. LEXIS 1010 (D.D.C. Jan. 31, 1992) ............................................................................................. 26

*Ricaud v. America Metal Co.*, 246 U.S. 304 (1918) ................................................. 15

*Rymer v. Pool*, 574 A.2d 283 (D.C. 1990) ............................................................... 32

*Rynn v. Jaffe*, 457 F. Supp. 2d 22 (D.D.C. 2006) ................................................ 29,30

*Sabir v. Dist. of Columbia*, 755 A.2d 449 (D.C. 2000) ........................................... 31

*Saadeh v. Farouki*, 107 F.3d 52 (D.C. Cir. 1997) ................................................... 8,9

vi

* - Authorities upon which we chiefly rely are marked with asterisks.

*Saffron v. Wilson*, 481 F. Supp. 228 (D.D.C. 1979)........................................................ 41

*Samra v. Shaheen Bus. & Inv. Group, Inc.*, 355 F. Supp. 2d 483 (D.D.C. 2005)......................... 32

*Satterfield v. United States*, 788 F.2d 395 (6th Cir. 1986)............................................. 44

*\*Scales v. George Wash. Univ.*, No. 89-0796 (LFO), 1991 U.S. Dist. LEXIS 16765
(D.D.C. Nov. 15, 1991) ............................................................................. 30

*\*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005), *cert. denied*, 547 U.S. 1069 (2006)..... 18

*Shaller v. Columbia Hosp. for Women, Med. Ctr.*, 685 F. Supp. 852 (D.D.C. 1988)................. 8,9

*In re Ski Train Fire in Kaprun Austria*, 342 F. Supp. 2d 207 (S.D.N.Y. 2004) .................... 28

*Smith v. Halliburton, Co.*, No. 06-0462, 2006 U.S. Dist. LEXIS 61980
(S.D. Tex. Aug. 30, 2006)........................................................................... 45

*\*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ............................................... 13,14

*\*In re S. African Apartheid Litig.*, 238 F. Supp. 2d 1379 (S.D.N.Y. 2002)........................ 14

*Steinberg v. Int'l Comm'n on Holocaust Era Ins. Claims*, 34 Cal. Rptr. 3d 944
(Ct. App. 2005) ................................................................................... 19

*Stewart-Veal v. District of Columbia*, 896 A.2d 232 (D.C. 2006) ................................. 31

*Tramontana v. Varig Airlines*, 350 F.2d 468 (D.C. Cir. 1965) .................................... 32

*\*Underhill v. Hernandez*, 168 U.S. 250 (1897) ................................................. 15

*\*Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227 (11th Cir. 2004) ......................... 11

*United States v. Ferrara*, 54 F.3d 825 (D.C. Cir. 1995) ........................................ 26

*\*United States v. Shearer*, 473 U.S. 52 (1985) ................................................ 44

*Warth v. Seldin*, 422 U.S. 490 (1975) .......................................................... 21

*W. Md. R.R. Co. v. Harbor Ins. Co.*, 910 F.2d 960 (D.C. Cir. 1990)............................... 20

*Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. 2006) ................. 45

*Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57 (2d Cir. 2005)............................... 18

*Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765 (D.C. Cir. 1986) ................. 23

vii

* - Authorities upon which we chiefly rely are marked with asterisks.

*Wickenhauser v. Edward D. Jones & Co.*, 953 F. Supp. 286 (E.D. Mo. 1996) ............................ 35

*\*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ............................................ 27

*Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d (D.D.C. 2005) ............................................ 32,33

## STATUTES

28 U.S.C. § 1332(a)(2) (2007) ............................................................................................ 8

D.C. Code § 12-301 (2007) ............................................................................................ 29

D.C. Code § 13-423 (2007) ............................................................................................ 26

## RULES

Fed. R. Civ. P. 12 (2007) ............................................................................................ 1,37

Fed. R. Civ. P. 19 (2007) ............................................................................................ 1,20

## LAW REVIEWS

Derek J. Baxter, *Protecting the Power of the Judiciary: Why the Use of State Department "Statements of Interest" in Alien Tort Statute Litigation Runs Afoul of Separation of Powers Concerns*, 37 Rutgers L. Rev. 807 (2006) ............................................ 14

## TREATISES

16 Am. Jur. 2d *Conflict of Laws* § 9 (1998 & Supp. 2005) ............................................ 34

41 Am. Jur. 2d, *Independent Contractors* § 35 (2005) ............................................ 43,44

41 Am. Jur. 2d, *Independent Contractors* § 36 (2005) ............................................ 42

Restatement (Second) Conflicts of Laws § 3 cmt. c (1971) ............................................ 32

5 Charles Wright & Arthur Miller, Federal Practice and Procedure § 216 (3d ed. 2004) ............................................................................................ 37

\* - Authorities upon which we chiefly rely are marked with asterisks.

Pursuant to Rules 12 and 19 of the Federal Rules of Civil Procedure, Exxon Mobil Corporation, Mobil Corporation, ExxonMobil Oil Corporation, and ExxonMobil Oil Indonesia Inc. (collectively, "Defendants") submit this memorandum of law in support of their motion to dismiss.

## PRELIMINARY STATEMENT

Four anonymous Indonesian citizens seek to invoke this Court's jurisdiction to hold Defendants responsible for the purported acts of Indonesian soldiers that occurred on Indonesian soil during an Indonesian civil war. The civil war that ravaged Plaintiffs' home province ended recently with an historic peace agreement – negotiated by a distinguished European envoy with the assistance of neighboring Southeast Asian nations, and heralded by the United States – that provides for a Truth and Reconciliation Commission and related administrative procedures to resolve claims arising from Indonesian soldiers' alleged misconduct during the civil war. As demonstrated herein, Plaintiffs' attempt to circumvent those procedures via litigation in this overseas forum threatens to undermine those procedures and the peace itself.

Plaintiffs' attempt to use this Court to adjudicate their allegations is impermissible for numerous reasons. *First*, the Court lacks subject matter jurisdiction because complete diversity of citizenship is lacking. *Second*, Plaintiffs lack standing to invoke the jurisdiction of this Court because they are non-resident aliens. *Third*, given the newly-signed peace agreement in Indonesia, the Court should dismiss the Complaint under the doctrines of international comity, act of state, political question, and foreign affairs preemption. *Fourth*, Plaintiffs' claims must be dismissed for failure to join an indispensable party, an entity of the Indonesian government which was responsible for providing security at a gas field operated by ExxonMobil Oil Indonesia Inc. ("EMOI"). *Fifth*, the Court lacks personal jurisdiction over EMOI. *Sixth*, Plaintiffs' claims are time-barred. *Seventh*, Plaintiffs' common law claims under D.C. law must be dismissed, because D.C. law cannot apply. *Eighth*, even assuming D.C. law applies, Plaintiffs fail to state a claim on each of their claims.

## FACTUAL BACKGROUND

Taking the allegations of the Complaint as true, Plaintiffs are citizens of Aceh Province,

Indonesia. (Compl. ¶¶ 6-9.) Plaintiff John Doe VIII and Plaintiff John Doe IX claim they were

injured during a raid by Indonesian soldiers in Aceh in June 2004 (*id.* ¶¶ 60-61), and Plaintiff John

Doe X and Plaintiff John Doe XI claim they were injured by Indonesian soldiers in October 2004

while passing military security checkpoints in Aceh (*id.* ¶¶ 62-63.) Plaintiffs assert common law

tort claims – negligence, negligent hiring, negligent supervision, intentional infliction of emotional

distress, battery, assault, and arbitrary arrest – "under the laws of the District of Columbia." (*Id.* ¶¶

83, 93, 97, 101, 106, 110.)

Defendants are four independent corporations, Exxon Mobil Corporation, Mobil

Corporation, ExxonMobil Oil Corporation, and EMOI. Plaintiffs allege, in substance, that

Defendants are liable for injuries they sustained at the hands of Indonesian soldiers because the

Indonesian soldiers provide security for EMOI's operations at the Arun gas field in Aceh.

EMOI operates the Arun gas field pursuant to a production sharing contract ("PSC") with

BPMIGAS, a 100% Indonesian state-owned entity.[1] Plaintiffs cite to the PSC in support of their

allegations. (Compl. ¶ 64.) Under the PSC, defendant EMOI simply operates the gas field for the

Indonesian state-owned entity. While Plaintiffs allege that Defendants own, lease, or control the

Arun gas field (*id.* ¶ 34), the PSC clearly states that EMOI is the "Contractor" for BPMIGAS (*see*

*generally* Declaration of Peter J. Coleman ("Coleman Decl.") Ex. 1).[2] *See also Doe v. Exxon Mobil*

*Corp.*, 473 F.3d 345, 346 (D.C. Cir. 2007) ("Pursuant to a contract with the Indonesian government,

Exxon *operates* a large natural gas extraction and processing facility in the Aceh province of

---

[1]    EMOI originally entered into the PSC with Pertamina, which was then the 100% state-owned representative of the Indonesian government. In 2003, in a government reorganization, BPMIGAS, a 100% Indonesian state-owned entity, assumed Pertamina's responsibilities for the management of production sharing contracts generally, including the PSC with EMOI for the Arun gas field. (Declaration of Peter J. Coleman ¶ 5.)

[2]    Defendants supply the Court with an entire copy of the PSC, because the Court may consider documents that "are both referenced in the complaint and central to the plaintiff's claims." *Osseiran v. Int'l Fin. Corp.*, No. 06-336 (RWR), 2007 WL 2153272, at *5 (D.D.C. July 27, 2007).

2

Indonesia.") (emphasis added), *petition for cert. filed,* 76 U.S.L.W. 3050 (U.S. July 20, 2007) (No. 07-81). Under the PSC, EMOI does not own any natural resources, facilities or equipment associated with the operations.

Although the Complaint loosely describes the Indonesian soldiers assigned to protect the Arun gas field as "ExxonMobil security personnel," the PSC makes clear that BPMIGAS, not EMOI, is obligated to provide security for the Arun gas field. (Coleman Decl. Ex. 1 at ¶ 5.3(c) (BPMIGAS shall "otherwise assist and expedite CONTRACTOR'S execution of the Work Program by providing … security protection").) Moreover, Indonesian law requires BPMIGAS, which has management responsibilities on behalf of the Indonesian government, to safeguard the Arun gas field as a "national vital object." (*See* Presidential Decree 63/2004, Art. 4 (Coleman Decl. Ex. 2).) While the PSC requires EMOI to reimburse BPMIGAS for a share of the operating expenses incurred by BPMIGAS for the gas field, including for security expenses (Coleman Decl. Ex. 1 at ¶ 5.3(c)), nothing in the PSC grants EMOI any command and control authority over the soldiers BPMIGAS is obligated to pay to protect the Arun gas field. (*See generally* Coleman Decl. Ex. 1.) Any judgment in this case that prohibits use of government forces as security providers at the Arun field would violate Indonesian law, interfere with plans of the national and provincial governments to rebuild the Aceh economy, and jeopardize the long-term stability of the region.

Plaintiffs allege that they were injured in Aceh in 2004 by military soldiers safeguarding EMOI's operations. This was a time of violent conflict in Aceh, which prompted the then Indonesian President to put the entire province under the control of the Indonesian military. (Exs. A, B, C; Declaration of Ruth Wedgwood ("Wedgwood Decl.") ¶ 17.) The claims here are thus inextricably linked to the Indonesian military's conduct and operations during the civil war. (Compl. ¶¶ 48-54.)

Indeed, the presence of the Indonesian military in Aceh dates back to the 1970s, when the secessionist "Free Aceh Movement" ("GAM") declared Acehnese independence and thereby sparked a civil war, resulting in the deployment of thousands of Indonesian troops to Aceh. (Wedgwood Decl. ¶¶ 13-17.)  Over the course of the long-running conflict, both the Indonesian military and the GAM were accused of numerous human rights abuses.  (*Id.* ¶ 14.)  It is widely-reported that the GAM openly and directly posed threats to, and engaged in violent attacks against, various facilities of EMOI as part of the civil conflict.  (*Id.* ¶¶ 54-55, 56) (referencing a 2003 news article that quoted the military spokesman of the GAM insurgency, Mr. Sofyan Dawood, as stating that "[w]e don't want to attack vital projects but if the military or police who guard the projects make a sweeping [search for rebels], we will attack the military or police there.".)

In light of the fierce violence in Aceh in 2003, then Indonesian President Megawati Soekarnoputri declared a "State of Emergency" in Aceh and placed the entire province under martial law and the control of the Indonesian military.  (*See* Presidential Decree No. 28/2003 (Ex. A).)  One year later, President Soekarnoputri kept the province under the day-to-day control of the military and stated that Aceh remained in "Civil Emergency".  (*See* Ex. B; *see also* Ex. C (declaring that the military remains in control of day-to-day affairs in Aceh, under the direction of the President).)  Thus, even apart from BPMIGAS' responsibility to secure the Arun gas field, the entire province was under the control of the Indonesian military in the relevant time period.

In the aftermath of the tsunami disaster in December 2004, during which 120,000 Acehnese lost their lives, both sides of the armed conflict were prompted into peace negotiations and, ultimately, peace was achieved in Aceh through the signing, on August 15, 2005, of the Helsinki Peace Accord ("Helsinki Peace Accord").  (*See* Ex. D; Wedgwood Decl. ¶¶ 18-26.)  The Helsinki Peace Accord is particularly relevant to the justiciability of Plaintiffs' claims in this Court.  President Martti Ahtisaari of Finland – a respected peace envoy – and other officials from the

4

European Union, Association of Southeast Asian Nations ("ASEAN"), and other countries mediated the agreement between GAM and the Indonesian government that was ultimately reflected in the Helsinki Peace Accord. (*See id.*; Wedgwood Decl. ¶¶ 19, 29.) Under the Helsinki Peace Accord, the Indonesian government granted full amnesty for all persons "who have participated in GAM activities as soon as possible," and at most, within 15 days; the agreement also required GAM to give up its weapons, in four stages of decommissioning, and also required the government of Indonesia to "withdraw all elements of the non-organic military and non-organic police forces" in a four-step process; the agreement also required that the police "receive special training in Aceh and overseas with emphasis on respect for human rights." (Wedgwood Decl. ¶ 32.) The Helsinki Peace Accord also establishes an "independent and impartial court system, including a court of appeals" for Aceh. (Ex. D ¶ 1.4.3.) In addition, Aceh is now self-governing in almost all domestic affairs, and has the right to raise funds and seek foreign direct investment without going through Jakarta. The Helsinki Peace Accord also states that Aceh "is entitled to retain seventy (70) percent of the revenues from all current and future hydrocarbon deposits and other natural resources in the territory of Aceh as well as the territorial sea surrounding Aceh," one of the critical disputes that had been at the heart of the long-running civil conflict. (Wedgwood Decl. ¶ 27.)

Most critically, the Helsinki Peace Accord establishes legal and political mechanisms for adjudicating *all* war-related injuries suffered in Aceh. Specifically, the Helsinki Peace Accord creates a Human Rights Court, a Truth and Reconciliation Commission, and a joint Claims Settlement Commission in Aceh. (*Id.* ¶¶ 2.2-2.3.) The Helsinki Peace Accord expressly requires that "[a]ll civilians who have suffered a demonstrable loss due to the conflict [are to] receive an allocation of suitable farming land, employment, or, in the case of incapacity to work, adequate social security from the authorities of Aceh." (*Id.* ¶ 3.2.5.) (*See* Wedgwood Decl. ¶¶ 31, 36, 40 (stating that such mode of handling war-related claims have been used in connection with the

resolution of numerous other international and national conflicts, such as the Holocaust, the Iranian

hostage crisis, El Salvador and Iraq).)  These mechanisms have now been fully implemented under

Indonesian law (Ex. E), as confirmed by the Aceh Monitoring Mission ("AMM"), which was

established to oversee the implementation of the Helsinki Peace Accord and was headed by the

European Union and ASEAN contributing countries.  (Ex. F.)

The United States has expressed its support for all of these developments.  After the

Indonesian government and GAM signed the Helsinki Peace Accord, the State Department issued a

statement indicating that it "firmly supports this 'Memorandum of Understanding,'" and it

subsequently issued another statement congratulating the parties on signing the agreement,

emphasizing that successful implementation would "require steadfast commitment to peace by all

parties." (*See* Exs. G, H.)  In November 2006, the White House "congratulated Indonesia on the

successful signing and implementation of a Memorandum of Understanding that has brought peace

to the province of Aceh, and renewed the United States' firm support for Indonesia's peace-building

efforts in Aceh." (*See* Ex. I.)  The Executive Branch "also re-emphasized the United States' strong

support for Indonesia's national unity and territorial integrity, and opposition to secessionist

movements in any part of Indonesia." (*Id.*)

Finally, House Resolution 238 was introduced in Congress in March 2007.  (*See* Ex. J.)

Now with 31 sponsors, it praises the "first democratic elections in Aceh" and expresses further

support for the "democratic development and implementation of the Helsinki Memorandum of

Understanding." (*Id.*)  It also congratulates Irwandi Yusuf, the "first democratic elected governor of

Aceh," and expresses "ongoing support for the further democratic development of Aceh and the

Helsinki Memorandum of Understanding." (*Id.*)  The resolution encourages "both parties to live up

to their commitments under the Helsinki Memorandum of Understanding, *especially with regard to*

*establishing a Human Rights Court for Aceh and a Commission of Truth and Reconciliation*" (now

6

established), and encourages the Executive Branch to "commit resources in supporting the peace and building a strong civil society in Aceh." (*See id.*)

Plaintiffs improperly seek to circumvent the Helsinki Peace Accord and its exclusive claims mechanisms by pursuing their assault and battery allegations against Indonesian soldiers in the District of Columbia. They do so anonymously, even though peace now prevails in their province with a former GAM rebel leader as governor (Ex. J), with all non-organic (*i.e.*, non-Acehnese) military and police withdrawn from Aceh (Ex. D. ¶ 4.5), and with "complete freedom of movement and speech in Aceh." (Ex. F.) And they pursue their claims in this forum despite the lack of any nexus between their claims and the District of Columbia, and despite opposition by the governments of the United States and Indonesia voiced repeatedly against similar claims by other Indonesian villagers in this Court. In *Doe v. Exxon Mobil Corp.* No. 01-1357 ("*Doe I*"), the United States State Department warned that the litigation "would in fact risk a potentially serious adverse impact on significant interests of the United States." (Ex. K.) The Indonesian government also protested the extraterritorial adjudication of "an allegation against an Indonesian government institution, *cq* the Indonesian military, for operations taking place in Indonesia." (Exs. M, N.) Indeed, Plaintiffs by their Complaint not only impugn the actions of the Indonesian military, but seek injunctive relief from this Court to change its behavior. (Compl. ¶¶ 60-63; ¶ IX (d).)

In October 2005, this Court in *Doe I* dismissed plaintiffs' similar claims purportedly arising under federal law for lack of subject matter jurisdiction and for failure to state a claim. (*Doe I*, Docket No. 103.) This Court declined to dismiss the state law claims in *Doe I*, presumably because the Court believed, based on the set of facts presented by the *Doe I* plaintiffs, that their claims could not be heard in Indonesia. (*Id.*) The Court thereafter implemented certain safeguards intended to protect Indonesian sovereignty. The Court of Appeals later determined that the decision to permit the *Doe I* state law claims to proceed subject to certain limitations was not clear and indisputable

error. 473 F.3d at 353. In response, the Indonesian government issued its *third* complaint regarding the *Doe I* litigation, confirming that, notwithstanding this Court's best intentions to implement safeguards so as not to invade Indonesia's sovereignty, the *Doe I* lawsuit nonetheless offends Indonesia's sovereignty and now threatens to undermine the Helsinki Peace Accord. (Ex. D.)

Respectfully, Defendants submit that the Court's authority to entertain this second lawsuit is even more tenuous than in the first lawsuit. When *Doe I* was filed in June 2001, the civil war was raging; but the instant lawsuit was filed in May 2007, during a time of peace and in defiance of legal mechanisms specifically created in Indonesia to hear such claims on *an exclusive basis*. For those reasons and the others discussed below, the Complaint must be dismissed.

**ARGUMENT**

Federal courts are "courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). They possess "only that power authorized by the Constitution and statute." *Id.* "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (internal citations omitted). Where jurisdiction is challenged, federal courts may "consider materials extrinsic to the complaint" in deciding on a motion to dismiss. *Moser v. Pollin*, 294 F.3d 335, 339 (2d Cir. 2002).

## I.   THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE THE PARTIES ARE NOT COMPLETELY DIVERSE

Plaintiffs allege that the Court has diversity jurisdiction in this case under 28 U.S.C. § 1332(a)(2). (*See* Compl. ¶ 4.) That provision confers jurisdiction in the district courts where the amount in controversy exceeds $75,000 and where the matter is between "citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2). Diversity as between the plaintiffs and the defendants must be complete. *See Saadeh v. Farouki*, 107 F.3d 52, 55 (D.C. Cir. 1997) ("[F]ederal diversity jurisdiction is lacking if there are any litigants from the same state on opposing sides.") (*quoting Prakash v. Am. Univ.*, 727 F.2d 1174, 1178 n.25 (D.C. Cir. 1984)); *Shaller v.*

*Columbia Hosp. for Women, Med. Ctr.*, 685 F. Supp. 852, 853 (D.D.C. 1988) ("The law is well established that, in diversity suits, complete diversity of citizenship is required."). It is well-established, therefore, that federal courts lack diversity jurisdiction "over a lawsuit between an alien on one side, and an alien and a citizen on the other side." *Saadeh*, 107 F.3d at 61; *see also Eze v. Yellow Cab Co.*, 782 F.2d 1064, 1065 (D.C. Cir. 1986). That is precisely the situation here: Plaintiffs are aliens and they are suing an alien (EMOI) and citizens of states of the United States (Exxon Mobil Corporation, Mobil Corporation, and ExxonMobil Oil Corporation).

"[D]iversity of citizenship is determined at the time the complaint is filed." *Saadeh*, 107 F.3d at 57; *see also Shaller*, 685 F. Supp. at 853. At the time the Complaint was filed, Plaintiffs were aliens. (Compl. ¶¶ 6-9.) EMOI is also an alien because a corporation "is deemed to be a citizen of any state in which it is incorporated and of the state where it has its principal place of business." *Shaller*, 685 F. Supp. at 853 (*citing Dist. of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co.*, 797 F.2d 1041, 1043 (D.C. Cir. 1986)). In May 2007, when the Complaint was filed, EMOI was incorporated in the Cayman Islands with its principal place of business in Indonesia. (Compl. ¶ 16; Declaration of Brenda Fitzpatrick ("Fitzpatrick Decl.") ¶ 6 & Exs. 1, 2; Coleman Decl. ¶ 2).) *See Saadeh*, 107 F.3d at 56 n.5 (A corporation incorporated in one foreign country with its principal place of business in another foreign country is an alien).

Accordingly, aliens are present as both plaintiffs and a defendant in this lawsuit; complete diversity is lacking and the Court must dismiss the case.

## II.     PLAINTIFFS LACK STANDING TO SUE IN A U.S. COURT BECAUSE THEY ARE NON-RESIDENT ALIENS

Because Plaintiffs are non-citizens and non-residents, and because Plaintiffs do not assert jurisdiction under a federal statute, they lack standing to invoke this Court's jurisdiction. Standing jurisprudence has two components: Article III standing, which enforces the Constitution's "case or controversy" requirement, and prudential standing, which embodies "'judicially-self-imposed limits

on the exercise of federal jurisdiction.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (citations omitted). Such judicially-self-imposed or prudential limitations "remove jurisdiction where the Article III standing requirements are otherwise satisfied." *ACLU v. NSA*, 493 F.3d 644, 677 (6th Cir. 2007).

One such well-established prudential standing limitation is "the general rule that non-resident aliens have no standing to sue in United States courts." *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 152 (D.D.C. 1976). This limitation is founded on the premise that only residents are permitted to invoke the powers of the Court. "Citizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar. The years have not destroyed nor diminished the importance of citizenship nor have they sapped the vitality of a citizen's claims upon his government for protection." *Johnson v. Eisentrager*, 339 U.S. 763, 769 (1950). In the interest of promoting commerce, courts have expanded standing to *resident aliens* because "[m]ere lawful presence in the country creates an implied assurance of safe conduct and gives [aliens] certain rights." *Id.* at 770. But "it was the alien's presence within its territorial jurisdiction that gave [the] Judiciary the power to act." *Id.* at 771. "When the *non-resident* alien does not make application under a statute to the United States for certain action, or is not subjected to its courts, but is harmed in his own country, he cannot and should not expect entitlement to the advantages of a United States court." *Berlin Dem. Club*, 410 F. Supp. at 152-53 (emphasis added).

Plaintiffs are indisputably non-resident aliens and do not bring any statutory claims. (*See* Compl. ¶¶ 6-9, ¶¶ 64-110.) They accordingly lack standing to invoke the jurisdiction of this Court, and their claims should be dismissed. *See, e.g., Berlin Dem. Club*, 410 F. Supp. at 152-53 (holding that non-resident aliens lacked standing to file suit complaining about military misconduct abroad); *Eminente v. Johnson*, 361 F.2d 73, 73 (D.C. Cir. 1966) (dismissing tort claims filed by "a non-resident alien" for injuries suffered in a foreign country caused by the armed forces); *Kukatush*

*Mining Corp. v. SEC*, 309 F.2d 647 (D.C. Cir. 1962) (dismissing for lack of standing claims brought by non-resident aliens); *Ashkir v. United States*, 46 Fed. Cl. 438, 443-44 (Fed. Cl. 2000) (Mexican respondent abroad had no "substantial connection" to the United States and thus had no standing); *cf. Arbelaez v. Newcomb*, 1 Fed. Appx. 1, 1 (D.C. Cir. 2001) ("Appellants are foreign nationals without a substantial connection to the United States; they therefore lack standing . . . .").

Accordingly, the Complaint should be dismissed in its entirety for lack of standing.

## III.   THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS UNDER THE DOCTRINES OF COMITY, ACT OF STATE, POLITICAL QUESTION, AND FOREIGN AFFAIRS PREEMPTION

Plaintiffs' claims challenge the domestic acts of a foreign sovereign during a time of civil war, and are not appropriately heard in a United States court for a number of independent reasons. Especially in light of the claims process established by the Helsinki Peace Accord, and in deference to numerous statements by the Indonesian and United States governments concerning the need to support the fragile peace achieved in 2005, this Court should dismiss the Complaint under the doctrines of comity, act of state, political question, and foreign affairs preemption.

### A.    Principles of Comity Require Deference to the Helsinki Peace Accord.

Under principles of comity, courts should dismiss lawsuits concerning claims arising abroad where international interests dictate adjudication of the dispute by other means. *See, e.g., Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237-40 (11th Cir. 2004) (dismissing claims out of international comity towards a peace process supported by the Executive Branch); *In re Nazi Era Cases Against German Defs. Litig.*, 236 F.R.D. 231, 240-42 (D.N.J. 2006) (same), *aff'd*, No. 06-3655, 2007 U.S. App. LEXIS 17470 (3d Cir. July 20, 2007); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 489-91 (D.N.J. 1999) (same); *Doe v. State of Israel*, 400 F. Supp. 2d 86, 114 (D.D.C. 2005) (adjudication of war-related claims arising from injuries in Israel would offend international comity); *see also Bigio v. Coca-Cola Co.*, 448 F.3d 176 (2d Cir. 2006) (noting that a country's

11

objections to a lawsuit and a possible impact on international relations with a foreign country would

warrant dismissal on international comity grounds), *cert. denied*, 127 S. Ct. 1842 (2007).

As discussed above, the Helsinki Peace Accord, which established procedural processes,

including the Truth and Reconciliation Commission, the Human Rights Court, and the Joint Claims

Settlement Commission, (*see* Ex. D. ¶¶ 2.2, 2.3, 3.2.5, 3.2.6), provides the *exclusive* mechanism for

resolving all war-related claims by Acehnese residents.  As observed by Professor Ruth Wedgwood,

a noted international law scholar, "the joint administrative claims settlement process established by

the [Helsinki Peace Accord] was meant to preclude other methods of advancing claims for

compensation."  (Wedgwood Decl. ¶ 41.)[3]  The agreement seeks to handle claims arising from the

conflict "in an expeditious and consistent manner, using an administrative process of claims

settlement" rather than judicial adjudication.  (*Id*.)  Professor Wedgwood notes that such mode of

handling claims arising from armed conflicts – through binding administrative process – is

common, and is particularly suited to the situation in Aceh given the need to reinvigorate its

economy after the tsunami destruction.  (*Id.* ¶ 35.)   Professor Wedgwood reasons that:  "where

there are numerous losses caused by a long-running armed conflict, it makes sense to have an

administrative claims settlement process, allowing a visible consistency of results and a practical

way of handling matters where the proof will often not rise to the level of certainty required for

judicial proceedings."  (*Id.* ¶ 41.)

With respect to the concern for "visible consistency of results," it should be noted that the

Helsinki Peace Accord grants "[a]ll civilians who have suffered a demonstrable loss due to the

conflict [to] receive an allocation of suitable farming land, employment or, in the case of incapacity

to work, adequate social security from the authorities of Aceh."  (Ex. D ¶ 3.2.5.)  If this Court were

---

[3]       In connection with the Helsinki Peace Accord and the Aceh Reconciliation Process, the Indonesian
government has firmly and consistently stated that these kinds of claims must be heard in Indonesia – not the U.S.  (*See*
Indonesian Statements (Exs. M, N, O).)

to entertain this action and Plaintiffs did obtain damages in this Court such an award likely will far exceed the relief available under the Helsinki Peace Accord's process. Such disparity in results likely will lead to a general disregard for the process established under the accord, and will undermine the fragile peace established in 2005.

By all accounts, the Helsinki Peace Accord has not only achieved peace in Aceh, but also has had a tremendously positive impact on the region's economic growth and future prospects. (*See* Wedgwood Decl. ¶¶ 43-51.) In November 2005, the President of Indonesia directed the Head of the National Land Agency to implement procedures to award land as compensation for those injured during the civil conflict (Ex. E), and the AMM thereafter declared in December 2006 that all required procedures had been fully implemented. (Ex. F.)

The Helsinki Peace Accord is not just an agreement between Indonesia and GAM: it was a carefully-crafted agreement mediated by members of the international community, including President Martti Ahtisaari of Finland and other high-level government officials. The peace agreement – which seeks the proper balance between accountability and amnesty – has been supported and lauded by the political branches of the U.S. government. (*See, e.g.*, State Department Statements (Exs. G, H); White House Statement (Ex. I); H. Res. 238 (Ex. J).) The Executive Branch has not only expressed its "firm support" for the Helsinki Peace Accord and its forums, but it has also confirmed in the similar *Doe I* proceeding its support for the peace process as an important U.S. foreign policy goal. (Exs. K, L.)

In *Sosa v. Alvarez-Machain*, the Supreme Court referenced the Truth and Reconciliation Committee established by the Government of South Africa to address alleged injuries resulting from the apartheid regime there, and suggested that in cases brought against multinational corporations in the United States asserting claims properly before the Truth and Reconciliation Committee, courts "should give serious weight to the Executive Branch's view of the case's impact on foreign policy."

542 U.S. 692, 733 n.21 (2004) (*citing In re S. African Apartheid Litig.*, 238 F. Supp. 2d 1379

(S.D.N.Y. 2002)).  Plaintiffs' counsel agrees:  "Taking the South Africa case as an example, should

the Truth and Reconciliation Commission actually provide a fair and complete remedy for the

claims of particular plaintiffs against specific defendants, dismissal on international comity grounds

might be appropriate."  Derek J. Baxter, *Protecting the Power of the Judiciary:  Why the Use of*

*State Department "Statements of Interest" in Alien Tort Statute Litigation Runs Afoul of Separation*

*of Powers Concerns*,  37 Rutgers L. Rev. 807, 822 (2006).  Here, as in the South Africa example, a

fully functioning Truth and Reconciliation Commission is in effect, and its role as the exclusive

forum for grievances such as Plaintiffs' should be honored by this Court:

> [The Helsinki Peace Accord is] worthy of respect and full observance
> by all parties... [T]his Court should be mindful of the 2005 peace
> agreement's attempt to assure a uniform and even-handed method of
> repairing  losses from the conflict, and the possible effects of a visible
> disparity in  outcome through extraterritorial litigation.

(Wedgwood Decl. ¶¶ 57-58.)

Other comity concerns justify dismissal as well.  As discussed above, an Indonesian

government agency, BPMIGAS, had responsibility to manage and safeguard the Arun gas field, and

the Indonesian military provided security in accordance with Indonesian law.  The U.S. Supreme

Court addressed similar circumstances in *American Banana Co. v. United Fruit Co.*, 213 U.S. 347

(1909) (Holmes, C.J.).  During the Panamanian revolt against Colombia, soldiers in the Costa Rican

military seized a plantation and a cargo of supplies belonging to the plaintiff.  *Id.* at 354-55.  The

defendant (a large American company) subsequently obtained the plantation, and the plaintiff filed

suit, claiming under U.S. law that the defendant wrongfully conspired with the soldiers and the

military to drive the plaintiff out of business.  *Id.* at 355.  A unanimous Court rejected the claims,

labeling plaintiff's attempt to apply American law "startling":

> [T]he general and almost universal rule is that the character of an act as
> lawful or unlawful must be determined wholly by the law of the country

> where the act is done. . . . For another jurisdiction, if it should happen to lay
> hold of the actor, to treat him according to its own notions rather than those
> of the place where he did the acts, not only would be unjust, but would be
> an interference with the authority of another sovereign, contrary to the
> comity of nations, which the other state concerned justly might resent.

*Id.* at 356. Similarly, here, the Government of Indonesia takes offense to the application of U.S. law

to such claims, as it has already expressed in *Doe I*, especially now that internal mechanisms have

been implemented under the Helsinki Peace Accord. (Ex. O.) Adjudication of Plaintiffs' claims

here would be contrary to the comity of nations, and this lawsuit should be dismissed.

### B.     The Act of State Doctrine Applies Because the Indonesian Government Considers the Soldiers' Activities Official Acts.

As detailed above, all of Plaintiffs' claims relate to the conduct of Indonesian military

personnel during a civil war in Aceh and, specifically, during a period of civil emergency after a

declaration of martial law. Courts in similar cases have dismissed actions premised upon foreign

soldiers' alleged conduct. *See, e.g., Am. Banana Co.*, 213 U.S. at 359 (plaintiffs could not raise tort

or antitrust claims against a company based on the acts of Costa Rican soldiers in taking over a

plantation; the Court automatically deemed the Costa Rican government to have ratified its soldiers'

acts); *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) ("Every sovereign State is bound to respect

the independence of every other sovereign State, and the courts of one country will not sit in

judgment on the acts of the government of another done within its own territory."); *Oetjen v.

Central Leather Co.*, 246 U.S. 297, 299-304 (1918) (dismissing tort claims against an American

company based on the acts of Pancho Villa and his soldiers in Mexico); *Ricaud v. Am. Metal Co.*,

246 U.S. 304, 306-10 (1918) (dismissing tort claims against an American company for the acts of

Mexican soldiers during the Mexican revolution); *State of Israel*, 400 F. Supp. 2d at 113.

In *Doe I*, the Court declined to dismiss under the act of state doctrine because – after

dismissing PT Arun Co. ("PT Arun"), a defendant in *Doe I* that was 55% owned by the Indonesian

government – it concluded that "resolution of this case will not turn on any 'official action' of the

Indonesian government." But the Indonesian government continues to protest this Court's adjudication of *Doe I*, even after the dismissal of PT Arun, affirming its original observation that such claims present "an allegation against an *Indonesian government institution, cq the Indonesian military, for operations taking place in Indonesia.*" (Exs. M, N, O.) Thus, the Indonesian government considers its official acts to be impugned in the *Doe I* litigation, an observation equally applicable to the present Complaint because the alleged torts occurred during officially-declared periods of martial law and civil emergency. (Exs. A, B, C.) *See Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354, 1359 (9th Cir. 1981) ("The act of state doctrine is apposite whenever the federal courts must question the legality of the sovereign acts of foreign states."). As the Court held in *American Banana*, the "acts of the soldiers and the officials of Costa Rica [were] not alleged to have been without the consent of the government," and the injuries "seem to have been the direct effect of the acts of the Costa Rican government." 213 U.S. at 359.

The same is true here. The act of state doctrine applies here because the Court cannot resolve Defendants' supposed liability for the soldiers' acts without first condemning the soldiers' alleged acts (Compl. ¶¶ 60-63) themselves, which the Indonesian government characterizes as its own operations. (Ex. M.) Allegations of torts allegedly committed by foreign military officials for harms such as unlawful detention during a civil war implore the Court to "'declare invalid'" and deny "'legal effect to acts of a military commander representing the . . . government.'" *State of Israel*, 400 F. Supp. 2d at 113 (citation omitted). Such a determination "would offend notions of international comity *and sovereignty.*" *Id.* at 114 (emphasis added); *IAM*, 649 F.2d at 1360 ("The 'touchstone' or 'crucial element' [for application of the act of state doctrine] is the potential for interference with our foreign relations."). Thus, Plaintiffs' claims necessarily would turn on this Court's adjudication of the official action of the Indonesian government, and the Court should accordingly dismiss the Complaint under the act of state doctrine.

16

**C.**    **The Political Question Doctrine Bars Adjudication of Plaintiffs' Claims, Because the Political Branches Have Expressed Strong Support for the Helsinki Peace Accord.**

The political question doctrine applies to bar adjudication of claims that, *inter alia*, constitute an impermissible intrusion by courts into foreign policy matters. *Baker v. Carr*, 369 U.S. 186, 211 (1962). In *Doe I*, the Court declined to dismiss plaintiffs' common law claims under the political question doctrine on the grounds that it could limit discovery and thereby manage any justiciability concerns. (*Doe I*, Docket No. 103 at 14-15.) Defendants' appeal of that ruling was dismissed for lack of appellate jurisdiction and Defendants' alternative petition for a writ of mandamus was denied. *Doe v. Exxon Mobil*, 473 F.3d 345 (D.C. Cir. 2007).

Immediately after the Court of Appeals' decision, the Indonesian government affirmed its opposition to this litigation, even after the dismissal of PT Arun and even as limited to the state law claims before the Court. (Ex. O.) As the Indonesian government recognized, even with limited discovery and a focus solely on the U.S. Defendants' acts, omissions, and knowledge pertaining to the plaintiffs' alleged injuries, the wartime activities of the Indonesian military will necessarily be at issue in the *Doe I* litigation and this matter. (Exs. M, N, O.) Indeed, the Court cannot grant the relief sought by Plaintiffs without passing judgment on the Indonesian soldiers' conduct, or on the operation of EMOI as a contractor for BPMIGAS in Aceh.

Importantly, neither the Court, nor the majority nor the dissent in the *Doe I* appeal, considered the impact of the recently-implemented Helsinki Peace Accord, and the recent statements of support for it by the political branches. (*See supra* pp. 6-7 & Exs. D, G, H, I, J.) These new developments, combined with the State Department's earlier stated concerns regarding *Doe I*, (Exs. K, L), render this case in clear conflict with the policies of the political branches.

Under similar circumstances, courts have routinely dismissed claims under the political question doctrine. *See Joo v. Japan*, 413 F.3d 45 (D.C. Cir. 2005), *cert. denied*, 546 U.S. 1208

(2006); *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005), *cert. denied*, 547 U.S. 1069 (2006);

*State of Israel*, 400 F. Supp. 2d at 96, 112; *see also In re Nazi Era Cases Against German Defs.*

*Litig.*, 196 Fed. Appx. 93, 100 (3d Cir. 2006); *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d

57 (2d Cir. 2005); *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1132 (W.D. Wash. 2005);

*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1195 (C.D. Cal. 2005); *Frumkin v. JA*

*Jones, Inc.*, 129 F. Supp. 2d 370, 383-84 (D.N.J. 2001); *Iwanowa*, 67 F. Supp. 2d 424; *Burger-*

*Fischer v. Degussa AG*, 65 F. Supp. 2d 248 (D.N.J. 1999). The same should be done here.

**D.     The Foreign Affairs Preemption Doctrine Bars Adjudication of Plaintiffs'**
**Common Law Claims, Because State Law Cannot Be Applied in a Matter That**
**Affects Foreign Relations Absent Advancing Some State Interest.**

In the appeal from *Doe I*, Judge Kavanaugh noted in dissent that "the state-law tort claims

are likely preempted as a result of the State Department's specific statement of harm to foreign

policy." 473 F.3d at 365. (The majority in *Doe I* did not address the point.)

Judge Kavanuagh's observation is rooted in long-standing precedent. As the Supreme Court

has stated, the possibility that state law (in this case D.C. tort law) "will produce something more

than an incidental effect in conflict with express foreign policy of the National Government . . .

require[s] preemption of the state law." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003).

As was the case in *Garamendi*, there exists here a clear internationally-established agreement for

dealing with any Aceh-war-related claims, and those mechanisms have been implemented by

Indonesia. As noted above, the express U.S. foreign policy is strongly in support of those

procedures. (*See supra* pp. 6-7.)

In *Mujica*, the court engaged in an expansive analysis of the foreign affairs preemption

doctrine and concluded that California tort law could not be used to adjudicate injuries suffered by

Colombian citizens during activities by the Colombia military in Colombia, allegedly at the behest

of a California corporation; and concluded that the litigation threatened U.S. foreign policy interests

18

and did not advance any interest of the state of California.  381 F. Supp. 2d at 1187-88; *see also In re Assicurazioni Generali S.p.A. Holocaust Litig.*, 340 F. Supp. 2d 494, 501 (S.D.N.Y. 2004) (dismissing tort claims under the foreign affairs doctrine); *Steinberg v. Int'l Comm'n on Holocaust Era Ins. Claims*, 34 Cal. Rptr. 3d 944, 951-52 (Ct. App. 2005) (same).  Here, as noted above, significant U.S. foreign policy interests may be adversely affected by the continuation of this lawsuit, yet, on the other hand, no interest of the District of Columbia is served by applying its common law to torts bearing no nexus to the jurisdiction.

In *Doe I*, this Court declined to dismiss under the foreign affairs doctrine, noting that "no state government has passed any statute in conflict with U.S. foreign policy." (*Doe I*, Docket No. 137 at 5.)  Drawing a distinction between state statutes and common law, the Court declared that *Mujica* was wrongly decided.  (*Id.*)  But application of the foreign affairs preemption doctrine is *not* limited to state statutes.  Judge Kavanaugh rejected this Court's interpretation of the foreign affairs preemption doctrine as applying to statutes only.  *Doe I*, 473 F.3d at 365 (dissenting op.).  As the Supreme Court has made clear, state common law, like state statutory law, "is the law of the state": "whether the law of the State shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern."  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *accord Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 886 (2000) (holding that a federal statute preempted state tort claims).  Because this Court cannot apply D.C. common law in a manner that conflicts with U.S. foreign policy, the common law claims must be dismissed under the foreign affairs preemption doctrine.

## IV.    THE COURT CANNOT JOIN AN INDISPENSABLE PARTY, BPMIGAS, WHOSE INTERESTS WOULD BE ADVERSELY AFFECTED BY ADJUDICATION OF THE CLAIMS IN ITS ABSENCE

The Complaint should also be dismissed pursuant to Rules 12(b)(7) and 19 because Plaintiffs have failed to join BPMIGAS, an "indispensable" party.

Rule 19(a) determines when a person must be joined as a "necessary" party to a lawsuit to ensure a just adjudication. Rule 19(b) governs when the entire case should simply be dismissed because the person who is necessary under Rule 19(a) cannot be joined, and is "indispensable" to the matter. When read together, Rule 19(a) and Rule 19(b) set forth a three-step process in the compulsory party joinder inquiry: (1) determine whether the absentee is needed for just adjudication; (2) determine whether joinder is feasible; and (3) if joinder of the necessary absentee is not feasible, determine whether the court should dismiss the case. *See W. Md. Ry. Co. v. Harbor Ins. Co.*, 910 F.2d 960, 962-63 n.5 (D.C. Cir. 1990).

### A.    BPMIGAS Is a Necessary Party for Just Adjudication.

Under Rule 19(a), an absent party is necessary to the lawsuit if: (1) without joinder of the absentee, "complete relief cannot be accorded among those already parties"; (2) the absentee "claims an interest relating to the subject of the action" and is so situated that the disposition of the action without joining the absentee "may . . . as a practical matter impair or impede [the absentee's] ability to protect that interest"; or (3) the absentee "claims an interest relating to the subject of the action" and is so situated that disposition of the case without joining the absentee may "leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Fed. R. Civ. P. 19(a). The rule is written in the disjunctive, so a court should join an absentee if any one of the three situations is present. *See, e.g., Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 405 (3d Cir. 1993). BPMIGAS qualifies as a necessary party under *each* criterion.

In the Complaint, Plaintiffs request, among other things, a permanent injunction to prevent "abuses against Plaintiffs and their fellow villagers."[4] (Compl. ¶ IX(d).) An injunction, however, is

---

[4]    The overbreadth of Plaintiffs' claims is plainly manifest in this paragraph of the Complaint. The "fellow villagers" on whose behalf the Plaintiffs seek an injunction obviously have no standing and cannot make the necessary

only effective if it actually restrains the entity capable of effectuating the prohibition. Defendants have neither any command and control authority over Indonesian soldiers, nor the authority to dictate who should provide security for the Arun gas field. The PSC obligates BPMIGAS to supply security for the gas field, and Indonesian law requires the use of government forces to defend such Indonesian national vital assets. (*See* 2/3/06 Declaration of Robert N. Hornick ("Hornick Decl.") ¶ 35 & Ex. C thereto; Presidential Decree 63/2004 (Coleman Decl. Ex. 2); Shawn Donnan, *Indonesia plans to revise security pay guidelines*, Fin. Times, Feb. 7, 2006 ("Indonesian law *requires* resource projects deemed to be of national importance, such as Freeport's Grasberg mine *and ExxonMobil's Arun gas field in Aceh*, to be guarded by security forces.") (Ex. P) (emphasis added).) Accordingly, an injunction issued by this Court that purports to prohibit the Indonesian military from committing abuses against Plaintiffs, or even to prohibit EMOI from utilizing Indonesian military as security, would be meaningless because the Indonesian military or BPMIGAS would not be bound by such an injunction. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 (1992) (refusing to grant injunction because it would not be binding on an absentee and would therefore not redress the alleged injury). Because BPMIGAS is the entity responsible for managing and safeguarding the Arun gas field, BPMIGAS is a necessary party. Without BPMIGAS, Plaintiffs' requested injunctive relief cannot be accorded.

BPMIGAS is also a necessary party under the second category of Rule 19(a) because it "claims an interest relating to the subject of the action" and is so situated that the disposition of the action without joining the absentee "may . . . as a practical matter impair or impede [its] ability to protect that interest." Fed. R. Civ. P. 19(a)(2)(i). BPMIGAS, as the representative of the Indonesian government with responsibility for providing security for the Arun gas field, has an absolute interest in proceedings in a court in the United States that may dictate how it must conduct

---

showing to justify injunctive relief as to them. *See Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) ("Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party.").

its duties and whom it can or cannot use in connection with security for Indonesia's oil and gas fields, or even to opine that its use of the military in the past was unlawful. Any judgment in this case that interferes with BPMIGAS' obligation to use government forces as security providers for the fields would interfere with plans of the national and provincial governments to rebuild the Aceh economy, and jeopardize the long-term stability of the region. (*See* Wedgwood Decl. ¶ 42.)

Moreover, BPMIGAS likely has many responses to make to the Complaint's allegations, such as the fact that the Aceh region has been in a state of civil war, and that many rebel separatists were affirmatively attacking the vital national assets in the Arun gas field in order to disrupt BPMIGAS' operations. (*See id.* ¶¶ 54-56 (describing reported incidents of GAM attacks on the Arun gas field).) None of these arguments from BPMIGAS' side, however, can be presented or explained in the absence of joining BPMIGAS. Accordingly, BPMIGAS is a "necessary" party under the second category of Rule 19(a).

Finally, BPMIGAS is a necessary party under the third category of Rule 19(a) because without its participation here, Defendants may be left with inconsistent obligations that cannot be reconciled. As noted above, the PSC requires BPMIGAS to provide security for the Arun gas field, and it was BPMIGAS that was required under Indonesian law to use the Indonesian military to protect the country's vital assets. EMOI, as a contractor to BPMIGAS, has no choice but to accede to the use of the Indonesian military, and furthermore has no control whatsoever over the scope and extent of the military's operations. If this Court were to issue an injunction, however, to the effect that EMOI could not utilize the Indonesian military in the course of its operations, or that EMOI would have to control the Indonesian military's actions, EMOI would be left in the untenable position of being held in contempt or breaching its obligations under the PSC.[5]

---

[5]    Nor can this Court, under the Commerce Clause, use D.C. law simply to compel Defendants to cease operations in Indonesia. *See National Foreign Trade Council v. Natsios*, 181 F.3d 38, 70 (1st Cir. 1999), *aff'd sub nom. Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000).

**B.      BPMIGAS Cannot Be Joined as a Party So the Case Must Be Dismissed.**

If an absent person is necessary under Rule 19(a), and cannot be joined, Rule 19(b) requires

a court to determine whether the necessary party is "indispensable," or, in other words, so important

to the disposition of the case that the matter should be dismissed rather than proceed in that person's

absence. The Rule identifies the following four factors to consider in making this determination:

"*first*, to what extent a judgment rendered in the person's absence might be prejudicial to the person

or those already parties; *second*, the extent to which, by protective provisions in the judgment, by

the shaping of relief, or other measures, the prejudice can be lessened or avoided; *third*, whether a

judgment rendered in the person's absence will be adequate; *fourth*, whether the plaintiff will have

an adequate remedy if the action is dismissed for nonjoinder." Fed. R. Civ. P. 19(b) (emphasis

added); *see also Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118-19

(1968); *Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 774 (D.C. Cir. 1986).

There is no dispute that BPMIGAS cannot be joined as a party to this litigation. BPMIGAS

is a 100% Indonesian state-owned entity. As this Court held in *Doe I* with respect to PT Arun, an

entity that is 55%-owned by the Indonesian government, "[a]djudicating the liability of an entity

owned by the Indonesian government would create a significant risk of interfering in Indonesian

affairs and thus U.S. foreign policy concerns." (*Doe I*, Docket No. 103 at 14.)

It is well-established that if an indispensable party has immunity from the lawsuit, the court

should dismiss the case. *Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1496 (D.C. Cir. 1995)

(reversing and remanding with instructions to dismiss the case for failure to join the state of Kansas,

an indispensable party, because Kansas enjoyed immunity under the Eleventh Amendment of the

U.S. Constitution); *see also Wichita & Affiliated Tribes*, 788 F.2d at 777-78 (affirming dismissal for

failure to join indispensable third-party tribes immune from suit). The D.C. Circuit also stated that

"'there is very little room for balancing of other factors' set out in Rule 19(b) where a necessary party under Rule 19(a) is immune from suit." *Kickapoo*, 43 F.3d at 1496 (citation omitted).

Given that BPMIGAS is necessary to the case, but cannot be joined, all four factors under Rule 19(b) counsel in favor of dismissal. First, a judgment against Defendants would prejudice them because it would essentially require Defendants to supervise and issue orders to BPMIGAS and the Indonesian military, both of which would infringe on the sovereignty of the Indonesian government and violate the PSC. Any attempt by EMOI to exert control over BPMIGAS and the military would almost certainly lead to harsh political and legal reaction. Moreover, if EMOI is ordered to refuse the security of the Indonesian military, it would be in violation of Indonesian law.

The second and third factors under Rule 19(b) are related. There is little chance that relief can be focused or shaped in any manner by the Court that would lessen the prejudice to Defendants. The central issue revolves around the actions of Indonesian soldiers. Participation of BPMIGAS and the military itself is required to change the soldiers' behavior, or to determine the appropriate remedy for any misconduct of the military.

Fourth, Plaintiffs will have adequate remedies elsewhere. As detailed above, *supra pp.* 4-6, there have been significant political and legal developments in Aceh under the Helsinki Peace Accord, with legal forums being established to address concerns arising out of the long-running civil war in the region between the military and the separatist rebels. Indeed, these new forums are being established precisely to address the types of injuries allegedly suffered by Plaintiffs.

Other courts facing similar situations have dismissed the claims under Rule 19. For example, in *Aguinda v. Texaco, Inc.*, citizens of Peru and Ecuador brought suit in the United States District Court for the Southern District of New York against Texaco, Inc., alleging that oil operations conducted by a consortium – which consisted of Ecuador's state-run oil company and a fourth generation subsidiary of defendant Texaco, Inc. – polluted rain forests and rivers in those two

countries and caused environmental damage and personal injuries. 945 F. Supp. 625, 627-28 (S.D.N.Y. 1996). The plaintiffs sought both injunctive relief and damages. Texaco moved to dismiss on various grounds, including for failure to join the Republic of Ecuador and PetroEcuador, the state-run oil company, as indispensable parties under Rule 19. *Id.* In granting Texaco's motion, the district court reasoned that it could not accord complete equitable relief without the presence of the government of Ecuador and PetroEcuador. *Id.* at 628. However, Ecuador and PetroEcuador were immune, and could not be joined, so Rule 19 provided a basis to dismiss the entire case. *Id.* at 627-28 ("When a necessary party is thus immune from suit because of sovereign immunity, that alone is ordinarily sufficient to warrant dismissal of the action.").

The Second Circuit vacated the district court's ruling, primarily on *forum non conveniens* and international comity grounds not applicable to this analysis. *Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998). The Second Circuit also vacated part of the dismissal under Rule 19(b), holding that the district court's reasoning did not justify dismissal of the entire case, but did justify dismissal of all equitable claims that would require participation by the Republic of Ecuador to accord full relief. *Id.* at 161. In other words, the Second Circuit stated that the district court could have allowed claims that would not involve the Republic of Ecuador. *Id.*

On remand, Texaco again moved to dismiss, based primarily on *forum non conveniens*. *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 538 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470 (2d Cir. 2002). The district court granted the motion; in dicta, the court observed that "[e]ven assuming *arguendo* that plaintiffs' claims for equitable relief could be separated from the rest of the litigation," it was "doubtful" that the court could fully address the claims without the participation of the government of Ecuador and PetroEcuador. *Id.* at 542.

As in *Aguinda*, Defendants here were not the parties in control of security where the harms allegedly occurred. Under both Indonesian law and the contractual terms of the PSC, BPMIGAS is

responsible for providing security for the Arun gas field. As such, BPMIGAS is an indispensable party who cannot be joined and the case should be dismissed under Rule 19.

## V.    THE COURT LACKS PERSONAL JURISDICTION OVER EMOI BECAUSE EMOI HAS INSUFFICIENT CONTACTS TO THE DISTRICT OF COLUMBIA

This Court must also dismiss Plaintiffs' claims against EMOI for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2) (2007). EMOI is not a resident of the District of Columbia, is not registered to do business here, and does not in fact conduct any business here. (*See generally* Coleman Decl.; Compl. ¶ 16.)

For this Court to maintain personal jurisdiction over EMOI, jurisdiction must be proper under the District of Columbia's long-arm statute and the Due Process Clause. *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995). To meet this burden, Plaintiffs must allege "specific facts" on which personal jurisdiction can be based; they cannot rely on conclusory allegations. *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003). Furthermore, Plaintiffs cannot aggregate allegations concerning multiple defendants to demonstrate personal jurisdiction over any individual defendant. *Id.* In deciding a motion to dismiss for lack of personal jurisdiction, the Court need not treat Plaintiffs' allegations as true. *Id.* Instead, the Court may consider and weigh affidavits and other relevant matter. *Id.*

Plaintiffs attempt to assert personal jurisdiction over EMOI here on the basis of D.C.'s long-arm statute. (*See* Compl. ¶ 4.) Under the District of Columbia's long-arm statute, a court may exercise personal jurisdiction over a person only as to a claim for relief "*arising from*" the person's transacting business, contracting to supply services, or causing tortious injury in Washington, D.C. *See* D.C. Code § 13-423(a), (b) (2007) (emphasis added); *Reeder v. Lerner Corp.*, No. 91-1381 (LFO), 1992 U.S. Dist. LEXIS 1010 (D.D.C. Jan. 31, 1992) (Oberdorfer, J.). Thus, under the D.C. long-arm statute, a non-resident defendant such as EMOI must engage in some activity in the District of Columbia, and that activity must be the genesis of the plaintiffs' claims. The facts as

alleged, however, suggest no activity conducted by EMOI in the District of Columbia, much less that the alleged injuries "arise from" such conduct. (*See id.* ¶¶ 16, 60-63.) The long-arm statute, therefore, cannot confer jurisdiction over EMOI.

Given the total lack of any contacts with the District of Columbia, assertion of personal jurisdiction with respect to EMOI would also violate the Fifth Amendment's Due Process Clause. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 413-14 (1984). For a court to exercise jurisdiction over an out-of-state defendant, the defendant must have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). Under this standard, a defendant must "purposefully avail" itself of the forum: "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). In this case, EMOI has not purposefully availed itself of the District of Columbia. In fact, EMOI has no jurisdictional connection with the District of Columbia whatsoever. (*See generally* Coleman Decl.) Simply put, Plaintiffs are capable of suing EMOI in Indonesia, as other Indonesian citizens have done. There is no valid basis for their attempt to drag EMOI half-way across the world to litigate in a forum to which it has no connection.

Defendants acknowledge that this Court in *Doe I* determined that plaintiffs in that matter had adequately pleaded, subject to later proof, that EMOI was an "alter-ego" of the other defendants for jurisdictional purposes. But Plaintiffs have no basis to claim that EMOI is somehow a "sham" corporate entity that really operates in Washington, D.C. On the contrary, EMOI operates solely in Indonesia; it has consistently maintained its separate corporate identity; it has an independent board of directors; it is adequately capitalized; it does not share employees, office space, bank accounts, or telephone numbers with the other defendants, or in any other way fail to maintain corporate

separateness; it does not commingle its funds with the other defendants; it maintains its own offices and payroll in Indonesia; and it was incorporated by its shareholders for legitimate purposes – namely, engaging in business ventures in Indonesia. (*See, e.g.*, Coleman Decl. ¶¶ 8-36; *see also* Fitzpatrick Decl. ¶¶ 3-9 (discussing separate corporate status of EMOI and other defendants).)

"As a general rule, . . . the proper exercise of personal jurisdiction over a nonresident corporation may not be based solely upon the contacts with the forum state of another corporate entity with which the defendant may be affiliated." *Freudensprung v. Offshore Technical Servs.*, 379 F.3d 327, 346 (5th Cir. 2004) (citing cases); *see also Oriska Ins. Co. v. Brown & Brown of Tex., Inc.*, No. 02-578, 2005 WL 894912, at *2 (N.D.N.Y. Apr. 8, 2005) (court cannot exercise jurisdiction over subsidiary based upon parent's business in forum, even if subsidiary is wholly-owned by parent). This is because "even a wholly owned subsidiary is presumed to be a separate entity in the absence of 'clear evidence' that it is controlled by the parent." *In re Ski Train Fire in Kaprun Austria*, 342 F. Supp. 2d 207, 214-15 (S.D.N.Y. 2004). Plaintiffs have asserted no basis to contradict those fundamental principles of corporate law, and they have alleged no "specific facts" proving that the principles should be disregarded here.

## VI. PLAINTIFFS' CLAIMS ARE TIME-BARRED BECAUSE THEY WERE BROUGHT AFTER THE APPLICABLE LIMITATIONS PERIODS HAD EXPIRED

The District of Columbia's choice-of-law rules determine the governing statute of limitations for this matter. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). District of Columbia courts hold that the applicable limitations period is governed by forum law. *See Hodge v. S. Ry. Co.*, 415 A.2d 543, 544 (D.C. 1980). Under D.C. statute of limitations law, all of Plaintiffs' claims except negligent hiring and negligent supervision are time-barred.[6]

---

[6] The choice of law for this procedural issue is separate from the choice of law for Plaintiffs' substantive claims, discussed in Part VII *infra*.

In the District of Columbia, claims of assault, battery, false arrest, and false imprisonment are all subject to a one-year statute of limitations. *See Rynn v. Jaffe*, 457 F. Supp. 2d 22, 24 (D.D.C. 2006); D.C. Code § 12-301(4). Plaintiffs' alleged injuries occurred in June 2004 and October 2004 (Compl. ¶¶ 60-63), but this lawsuit was not filed until May 2007. Thus, Plaintiffs' battery (Cause V), assault (Cause VI), and false imprisonment/false arrest (Cause VII) claims are all time-barred.[7]

What remains are Plaintiffs' claims for negligence, negligent hiring, negligent supervision, and intentional infliction of emotional distress (Causes I-IV, respectively). Under D.C. Code § 12-301(8), actions "'for which a limitation is not otherwise specifically prescribed'" are time-barred after three years. *Rynn*, 457 F. Supp. 2d at 24 (citation omitted); *see* D.C. Code § 12-301(8). The District of Columbia, however, "does not resort to this default provision every time a plaintiff uses a label that does not precisely match a specific statute of limitations." *Mittleman v. United States*, 104 F.3d 410, 415 (D.C. Cir. 1997). Rather, under D.C. law, "[r]esidual tort claims" are "subject to subsection 4's one-year limitation *if they are sufficiently 'intertwined' with subsection 4 claims.*" *Rynn*, 457 F. Supp. 2d at 24 (*citing Mittleman*, 104 F.3d at 415 (emphasis added).)

"To qualify for subsection 8's three-year limitation, a claim of intentional infliction of emotional distress ('IIED') must be 'independent' in that it stems from conduct separate from the alleged subsection 4 wrongs." *Id.* (*citing Hunter v. Dist. of Columbia*, 943 F.2d 69, 72 (D.C. Cir. 1991)). Here, Plaintiffs' IIED allegations are not "independent" of the other intentional tort claims. (Compl. ¶¶ 94-97 (basing IIED claims on the same "outrageous and extreme acts, as alleged herein, including the unprovoked shootings [sic – only one shooting alleged], assault, battery and detention of Plaintiffs carried out by ExxonMobil security personnel").) Thus, the Court must also dismiss Plaintiffs' IIED claims (Cause IV) as time-barred. *Rynn*, 457 F. Supp. 2d at 24 (dismissing IIED

---

[7]    Plaintiffs make no claim of equitable tolling and indeed no such claim could apply here. "In construing D.C. law, federal courts cannot apply the doctrine of equitable tolling differently than would the District of Columbia courts." *Williams v. Dist. of Columbia*, 916 F. Supp. 1, 5 (D.D.C. 1996). "District of Columbia law does not recognize the concept of equitable tolling." *Johnson v. Marcheta Investors L.P.*, 711 A.2d 109, 111 n.2 (D.C. 1998).

claims based on one-year limitations period); *Scales v. George Wash. Univ.*, No. 89-0796-LFO, 1991 U.S. Dist. LEXIS 16765, at *14 (D.D.C. Nov. 15, 1991) (Oberdorfer, J.) (same).

Generally speaking, negligence claims, such as Plaintiffs' claims in Causes I, II, and III, "are covered by [the] three-year statute of limitations." *See Johnson v. Dist. of Columbia*, No. 04-936 (RMC), 2005 U.S. Dist. LEXIS 16918, at *8 (D.D.C. July 20, 2005). "It is well settled," however, that "the plaintiff's characterization of the claim is not controlling, and [the court] must look beyond the conclusory terms of the pleadings to the substantive elements of any alleged causes of action." *Burgess v. Pelkey*, 738 A.2d 783, 786 (D.C. 1999) (internal citations and quotations omitted). "In order to state a separate claim for negligence [such as Cause I here], a complaint 'must specify a negligent act and characterize a breach of duty which might have given rise to liability'. . . . [U]se of the terms 'carelessly and negligently,' without more, are conclusory and do not raise a cognizable claim for negligence." *Rynn*, 457 F. Supp. 2d at 25 (*citing Dist. of Columbia v. Chinn*, 839 A.2d 701, 708 (D.C. 2003); *Maddox v. Bano*, 422 A.2d 763, 764-65 (D.C. 1980)). Moreover, "[a] claim resulting from the use of force beyond that which was reasonably necessary is clearly based upon battery, not negligence." *Johnson*, 2005 U.S. Dist. LEXIS 16918, at *8.

The D.C. Court of Appeals "explored these legal concepts at length in *District of Columbia v. Chinn*, 839 A.2d 701 (D.C. 2003)." *Id.* at *9. In *Chinn*, the court explained that "[w]hether a plaintiff can also plead negligence in addition to battery depends on whether he has made 'a separate and distinct claim for negligence apart from the battery allegations.'" *Id.* (*citing Chinn*, 839 A.2d at 711). *Chinn* delineated two lines of cases – one where separate negligence and battery claims were precluded because the plaintiffs did not plead separate and distinct allegations and the other where the plaintiffs pleaded separate negligence and battery allegations. Where the plaintiff bases a negligence claim "on [an] alleged battery," then the one-year statute of limitations applies, and the negligence claims should be dismissed. *See id.* at *11-*12; *accord Rynn*, 457 F. Supp. 2d at

25 (*citing Sabir v. Dist. of Columbia*, 755 A.2d 449 (D.C. 2000)); *see also Stewart-Veal v. Dist. of Columbia*, 896 A.2d 232, 235-36 (D.C. 2006).

As in *Chinn*, the negligence claims here (Compl. ¶¶ 70-75) are intertwined with the battery claims. Plaintiffs do not allege any negligence-based injuries other than those arising from the alleged batteries themselves. (*Id.* ¶¶ 60-63.) Thus, the Court should dismiss Plaintiffs' negligence claim (Cause I) as well as their intentional tort claims (Causes IV-VII) as time-barred.

## VII.    PLAINTIFFS' CLAIMS MUST BE DISMISSED BECAUSE DISTRICT OF COLUMBIA LAW CANNOT APPLY

Plaintiffs here assert their claims under D.C. law. (*See id.* ¶¶ 83, 93, 97, 101, 106, 110.) But this Court cannot apply D.C. law to Plaintiffs' claims, and they must therefore be dismissed.

A court sitting in a purported diversity case must also follow the choice-of-law rules of the forum when determining the *substantive* law to be applied. *Klaxon Co.,* 313 U.S. at 496. The District of Columbia follows the "government interest" test, considering (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicile, residence, nationality, place of incorporation, and place of the business of the parties"; and (4) "the place where the relationship is centered." *Herbert v. Dist. of Columbia*, 808 A.2d 776, 779-80 (D.C. 2002). The court must apply another state's law when that other state's interest in the litigation is substantial and application of District of Columbia law would frustrate the clearly articulated public policy of that state. *Id.* Under these principles, D.C. law should not apply here.

### A.    Indonesia Has a Greater Interest Than the District of Columbia or the United States, and Application of D.C. Law Would Frustrate Indonesian Policy.

It is beyond dispute here that the alleged injuries occurred in Indonesia and that the parties' relationship is centered in Indonesia. (Compl. ¶¶ 60-63.) The purported conduct underlying the claims is principally alleged to have occurred in Indonesia, where the soldiers purportedly harmed Plaintiffs (*id.*), and where EMOI allegedly hired, paid, supervised, and trained the soldiers, (*id.*

¶¶ 39-47). To a lesser extent, Plaintiffs allege limited connections to various other locations (*e.g.*, New York, NY; Irving, TX; Houston, TX; and Fairfax, VA). (*Id.* ¶¶ 18-27.) All Plaintiffs reside in Indonesia, and EMOI maintains its principal place of business there. (*Id.* ¶¶ 6-9, 16.) No defendant is incorporated in or has its principal place of business in the District of Columbia. (*Id.* ¶¶ 10, 13, 14, 16.) Although Exxon Mobil Corp. is alleged to conduct business in the District of Columbia, no wrongdoing by any defendant is alleged to have occurred in the District of Columbia. (*Id.* ¶¶ 10, 12.) Accordingly, the interests of Indonesia clearly outweigh the District of Columbia's.

In *Doe I*, this Court in applying D.C.'s choice-of-law test compared the interests of Indonesia to the purported interests of the entire United States (rather than to the District of Columbia alone). (*Doe I*, Docket No. 137 at 2-3.) But the District of Columbia follows the Restatement, *Rymer v. Pool*, 574 A.2d 283, 285 (D.C. 1990), which expressly provides that the United States is not a "state" for choice-of-law purposes. Restatement (Second) Conflicts of Laws § 3 cmt. c (1971). Accordingly, courts have not considered the interests of the entire United States against the interest of other sovereigns. *See Tramontana v. Varig Airlines*, 350 F.2d 468, 471 (D.C. Cir. 1965); *see also Armiger v. Real S.A. Transportes Aereos*, 377 F.2d 943, 944 (D.C. Cir. 1967);[8] *Samra v. Shaheen Bus. & Inv. Group, Inc.*, 355 F. Supp. 2d 483, 496-97 (D.D.C. 2005); *Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp.*, 172 F. Supp. 2d 79, 90 (D.D.C. 2001).[9]

---

[8] Decisions of the United States Court of Appeals for the District of Columbia Circuit rendered before February 1, 1971, such as *Tramontana* and *Armiger*, constitute local District of Columbia precedent. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

[9] *Alvarez-Machain* and *Wyatt*, cited by the Court in *Doe I*, do not diminish these principles. *Alvarez-Machain* dealt with the application of *federal common law* – not state law. There, the court was called upon to consider common law in determining damages available under the Alien Tort Statute, 28 U.S.C. § 1350. *Alvarez-Machain v. United States*, 331 F.3d 604, 632 (9th Cir. 2003). Moreover, the United States was a party to the litigation and its conduct was directly at issue. *Id.* at 634. Thus, it was appropriate in that case to compare Mexico's interests with the United States' interests and then, because the interests of the United States prevailed, to apply federal common law rather than California tort law. *Id.* at 635. Here, the United States is not a party, its conduct is not at issue, and the Court is not attempting to interpret a federal statute by reference to common law principles. In *Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131 (D.D.C. 2005), the court considered application of D.C., Tennessee, and Turkish law, and selected D.C. law as the law of the forum because – unlike here – no party had demonstrated that application of any of those laws would lead to disparate results. *Id.* at 139-40. Here, *Wyatt* actually compels application *of Indonesian law* because the Court has already concluded that Indonesian law would lead to a different result, at a minimum with respect to punitive

Even if the Court were to again weigh the comparative interests of Indonesia and the United States, the interests of Indonesia in the application of its law to these claims has increased dramatically since *Doe I*, because application of D.C. law would frustrate the clearly articulated policy of Indonesia that war-related claims be resolved pursuant to the Helsinki Peace Accord. Indonesia (including both GAM and the Indonesian federal government) has formulated clear policies for resolving war-related issues in Aceh. (*See supra* pp. 4-6.) Indonesia's superior interest in this litigation is confirmed by its February 1, 2007 diplomatic note highlighting the importance of the Aceh peace and reconciliation process and noting the Indonesian government's concern over the litigation in *Doe I*. (Ex. O.) Moreover, application of D.C. law would frustrate Indonesia's interest in governing the conduct of EMOI, which operates only in Indonesia.

In sum, it is impossible to conclude, as the Court did in *Doe I*, that the United States has "an overriding interest in applying its own law to defendants." Such a conclusion would be particularly problematic in light of the Helsinki Peace Accord's administrative claims process. Providing an alternate forum and process will certainly undermine the processes established by the Helsinki Peace Accord. The Executive and Legislative Branches have consistently expressed the United States' interest in supporting the Helsinki Peace Accord (Exs. G, H, I, J), and the United States cannot have "an overriding interest" in applying its law to a non-resident corporation (EMOI). Finally, Indonesian policy as reflected in the *unavailability* of punitive damages under Indonesian law is also an expression of policy that is entitled to consideration. *See Danziger v. Ford Motor Co.*, 402 F. Supp. 2d 236, 240 (D.D.C. 2005). Inasmuch as the punitive damages rules in two jurisdictions differ, the Court must apply the rule of the jurisdiction with the superior interest, even if that jurisdiction does *not* recognize punitive damages. *See Boise Tower Assocs., LLC v. Wash.*

---

damages. And the court in *Wyatt* did *not*, as this Court in *Doe I* did, first compare the interests of the United States to the interests of Turkey, and then select D.C. law. Rather, only in dicta did the court suggest that it might compare the interests of Turkey directly to those of the United States, based on critical factors not present here: the plaintiffs in *Wyatt* were U.S. citizens whose abduction in Turkey was designed to affect U.S. foreign policy. *Id.* at 140 n.6.

*Capital Joint Master Trust*, No. 03-141-S-MHW, 2006 U.S. Dist. LEXIS 45851, at *37, *41 (D.

Idaho June 22, 2006) (holding that the absence of punitive damages in Washington created a

conflict that *favored* application of Washington law).

> **B.      Application of D.C. Law Would Violate Due Process.**

"Laws have no force of themselves beyond the jurisdiction of the State which enacts them,

and can have extra-territorial effect only by the comity of other States." *Huntington* v. *Attrill*, 146

U.S. 657, 669 (1892). "It is a firmly established principle of American jurisprudence that the law,

statutory or otherwise . . . of one state has no extraterritorial effect in another state." 16 Am. Jur. 2d

*Conflict of Laws* § 9 (1998 & Supp. 2005). For a state's substantive law to be selected in a

constitutionally permissible manner, "that State must have a significant contact or significant

aggregation of contacts" to the claims at issue, "such that choice of its law is neither arbitrary nor

fundamentally unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818-23 (1985).

In *Shutts*, the Supreme Court held that a Kansas court could not constitutionally apply

Kansas law to claims based on conduct that occurred outside the state, even though the defendant

did significant business in Kansas, *id.* at 819-20, and even though the Kansas court had personal

jurisdiction over both the defendant and the out-of-state plaintiffs, *see id.* at 806-14. The Court

recognized that because the defendant in *Shutts* "own[ed] property and conduct[ed] substantial

business in the State," Kansas "certainly ha[d] an interest in regulating [the defendant's] conduct *in

Kansas*," and could therefore apply Kansas law to claims arising from Kansas leases. *Id.* at 819-20

(emphasis added). But the defendant's contacts with Kansas and the state's general interest in

resolving the dispute did *not* suffice to give the Kansas court authority to apply Kansas law to the

defendant's out-of-state conduct, at least insofar as Kansas law reflected different policy choices

from the state laws that would otherwise govern the conduct. *Id.* at 821-22. "Given Kansas' lack of

interest in claims unrelated to that State, and the substantive conflict with [other jurisdictions], we

conclude that application of Kansas law to every claim in this case is sufficiently arbitrary and unfair as to exceed constitutional limits." *Id.* (internal quotation marks and citation omitted).

Under that precedent, this Court and others routinely have refused to apply the law of a state absent a significant relationship between the state and the matter being litigated. *See, e.g., Boehner v. McDermott*, 332 F. Supp. 2d 149, 154-55 (D.D.C. 2004), *aff'd*, 484 F.3d 573 (D.C. Cir. 2006); *McCluney v. Joseph Schlitz Brewing Co.*, 649 F.2d 578, 582-84 (8th Cir.), *aff'd*, 454 U.S. 1071 (1981); *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 371 (E.D. La. 1997); *Wickenhauser v. Edward D. Jones & Co.*, 953 F. Supp. 286, 289 (E.D. Mo. 1996). For example, in *Price v. International Telephone and Telegraph Corp.*, 651 F. Supp. 706 (S.D. Miss. 1986), the plaintiffs attempted to invoke Mississippi law in a tort action even though the tort occurred outside of the state, the plaintiffs resided outside of the state, and the only relationship to the forum was that the defendant was registered to do business in Mississippi:

> Conspicuously absent from the allegations of plaintiffs' complaint is even a tenuous connection between Mississippi and the parties or facts underlying this cause of action. . . . Mississippi's sole contact with this litigation is that it is the forum state.

*Id.* at 708 (internal quotation and citation omitted). The court held it would violate due process to apply Mississippi law. *Id.* at 709-10; *see Kolesar v. United Agri Prods.*, 412 F. Supp. 2d 686, 694-95 (W.D. Mich. 2006), *aff'd*, No. 06-1416, 2007 U.S. App. LEXIS 21581 (6th Cir. Sept. 4, 2007).

So too in this case, D.C. law should not apply to Plaintiffs' claims. D.C. common law has absolutely no contacts in this case – let alone a "significant contact or significant aggregation of contacts" to Plaintiffs' claims that would override the interests of Indonesia. *Shutts*, 472 U.S. at 818. The matter concerns the alleged conduct of *Indonesian* soldiers acting in *Indonesia* against *Indonesian* citizens, and the soldiers' relationship to an Indonesian government contractor (EMOI) with its principal place of business in Indonesia. Although some of the Defendants may have unrelated business interests in the District of Columbia, *Shutts* demonstrates that such contacts,

absent a nexus to the claims at issue, are insufficient to justify application of D.C. law. D.C. law

can no more logically apply to Plaintiffs' claims here than can the laws of Florida, California,

Hawaii, or any of the other dozens of states in which some of the Defendants conduct business

wholly unrelated to EMOI's operations in Indonesia. Application of D.C. law would accordingly be

"arbitrary [and] fundamentally unfair." *Id.*

> C.   **Application of D.C. Law Would Violate Defendants' Right To Fair Notice.**

The basic constitutional limitations on a *state's* authority to impose its laws or regulate

conduct extraterritorially are reinforced by Defendants' due process rights to fair notice of the law

that will govern their conduct. "Elementary notions of fairness enshrined in our constitutional

jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to

punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc.*

*v. Gore*, 517 U.S. 559, 574 (1996). "When considering fairness" in the context of constitutional

limits on choice of law, "an important element is the expectation of the parties." *Shutts*, 472 U.S. at

822 (finding "no indication that . . . the parties had any idea that Kansas law would control").

The due process implications of the Court's choice of law determination, as well as the

infringement of the policy choices of another state (Indonesia), are clear. Defendants could hardly

have anticipated that D.C. law would apply to EMOI's operation of natural gas field in Aceh,

Indonesia. EMOI has no contacts with the District of Columbia, and Plaintiffs allege no actions by

*any* Defendants in the District of Columbia bearing on any of their claims.

For all those reasons, the Court must conclude that D.C. law cannot apply here.

## VIII.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER D.C. LAW BECAUSE THEY CANNOT BE LEGALLY RESPONSIBLE FOR THE INDONESIAN SOLDIERS' ALLEGED CONDUCT

The myriad jurisdictional, prudential, and procedural defects discussed above are sufficient

to warrant dismissal of the Complaint. But even assuming that Plaintiffs claims can be properly

heard in this Court, and that some of the negligence-based claims are not time-barred, and that

District of Columbia law applies, the Complaint fails as a substantive matter because Plaintiffs

cannot articulate any viable means to hold Defendants accountable for the acts of Indonesian

soldiers assigned by the Indonesian government to defend the Arun gas field from rebel attacks.

In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court clarified the

standard for determining whether a complaint fails to state a claim under Rule 12(b)(6). The Court

held that, in order to survive a motion to dismiss, "[f]actual allegations must be enough to raise a

right to relief above the speculative level." *Id.* at 1965. "The pleading must contain something

more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right

of action." *Id.* (*quoting* 5 Charles Wright & Arthur Miller, Federal Practice and Procedure § 216, at

235-36 (3d ed. 2004)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to

relief' requires more than labels and conclusions" and a "formulaic recitation of the elements of a

cause of action will not do." *Id.* at 1964-65. The complaint must be examined to determine if it

presents a "plausible claim for relief," and if it does not, "this basic deficiency should . . . be

exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.*

Plaintiffs' claims fail under this standard. All of Plaintiffs' D.C. common law claims rest on

the same underlying premise: Defendants "retained" the Indonesian military for security at the

Arun gas field and knew or should have known that atrocities would be committed, (1) because

members of the Indonesian military "had in the past engaged in abuses of Indonesian citizens, and

(2) because "[c]ontinuously during the time that [Defendants] retained members of the Indonesian

military as security personnel, ExxonMobil knew or should have known that members of the

military continued to commit gross abuses, because the publication and condemnation of

unpunished abuses by members of the military continued at all times that ExxonMobil retained

military members as security personnel." (Compl. ¶¶ 51-52.) For all the reasons set forth below,

Plaintiffs' claims that Defendants are responsible for the alleged conduct of the Indonesian military

are not "plausible," *Bell Atl. Corp.*, 127 S. Ct. at 1965, and therefore fail to state a claim.

### A.    The PSC Demonstrates That There Was No Legal Relationship Between Defendants and the Indonesian Military.

The sole basis in the Complaint for the purported liability of the corporate Defendants for

the tortious acts of the Indonesian soldiers lies in Plaintiffs' allegations that Defendants "employed

or otherwise retained" members of the Indonesian military to provide security through an

arrangement with the Indonesian government under which Defendants "paid . . . the Indonesian

military . . . for security services." (Compl. ¶¶ 39, 40, 44-45 & n.18.)  Plaintiffs claim that

"ExxonMobil paid and continues to pay the Indonesian military" a regular monthly or annual fee.

(*Id.* ¶¶ 24, 44 (alleging payments "to the Indonesian government and military"); ¶ 45 (alleging that

ExxonMobil paid the Indonesian government three million rupiah ($294) per soldier per month); ¶

46 (alleging that ExxonMobil paid the Indonesian government more than $500,000 per month).)

Plaintiffs also assert that Defendants had "the ability to supervise, control and direct, and ha[ve]

supervised, controlled and directed the actions and activities of its security personnel." (*Id.* ¶ 47.)

Critically, nowhere do Plaintiffs allege that Defendants hired any individual soldiers or paid

any individual soldiers directly, much less that Defendants hired and paid the individual soldiers

that allegedly harmed Plaintiffs.  Moreover, Plaintiffs also do not claim that Defendants directed the

commission of the alleged torts at issue; instead, Plaintiffs allege broadly that "ExxonMobil"

generally paid money *to the government and military* and helped decide where to deploy the troops

to guard the oil field from rebels and protect workers. (*See id.* ¶¶ 44-47.)

Ordinarily, a court deciding a motion to dismiss might assume that Plaintiffs' fanciful

allegations that Defendants "hired or retained" and "controlled" members of the Indonesian military

were true.  But it is well-established that a court on a motion to dismiss may consider a document

referenced in the complaint, *Osseiran v. Int'l Fin. Corp.*, No. 06-336 (RWR), 2007 WL 2153272, at

*5 (D.D.C. July 27, 2007), and here the PSC demonstrably contradicts Plaintiffs' allegations.

      According to the Complaint, the relationship between the Defendants and the Indonesian

military rests on the PSC between EMOI and BPMIGAS, the Indonesian state-owned agency

charged with administering the country's oil and gas reserves. (Compl. ¶ 64.) Examination of the

PSC itself, however, reveals Plaintiffs' allegations to be demonstrably untrue. First, the PSC

reveals that *EMOI is a contractor* serving BPMIGAS in Aceh. (Coleman Decl. Ex. 1.) Thus, the

Arun gas field was not, as Plaintiffs allege, "owned and/or leased and/or controlled" by EMOI or

any of the Defendants. (Compl. ¶ 34.) Nor did EMOI own any facilities, equipment, or the natural

gas itself. (Coleman Decl. Ex. 1.) And with respect to security, the PSC provides that

> Pertamina shall . . . otherwise assist and expedite CONTRACTOR'S
> [EMOI's] execution of the Work Program by providing facilities,
> supplies and personnel including, but not limited to, supplying or
> otherwise making available all necessary visas, work permits,
> transportation, *security protection* and rights of way and easements as
> may be requested by CONTRACTOR and made available from the
> resources under PERTAMINA's control. In the event such facilities,
> supplies or personnel are not readily available, then PERTAMINA
> shall promptly secure the use of such facilities, supplies and personnel
> from alternative sources. *Expenses thus incurred by PERTAMINA at
> CONTRACTOR's request shall be reimbursed to PERTAMINA and
> included in the Operating Costs.*

(Coleman Decl. Ex. 1 at ¶ 5.3(c) (emphasis added).)

      As the PSC makes clear, BPMIGAS – the successor to Pertamina – is responsible for

security at the Arun gas field. EMOI is simply a contractor to BPMIGAS. Moreover, Indonesian

law required BPMIGAS to use the Indonesian military for security of the Arun gas field, a "vital

national object." (*See* 2/3/06 Declaration of Robert N. Hornick ("Hornick Decl.") ¶ 35 & Ex. C

thereto; Presidential Decree 63/2004 (Coleman Decl. Ex. 2); Shawn Donnan, *Indonesia plans to

revise security pay guidelines*, Fin. Times, Feb. 7, 2006 ("Indonesian law *requires* resource projects

deemed to be of national importance, such as Freeport's Grasberg mine *and ExxonMobil's Arun gas*

*field in Aceh*, to be guarded by security forces.") (Ex. P) (emphasis added).) EMOI thus served

BPMIGAS as a contractor while the Indonesian military guarded the vital state-owned facility in

accordance with Indonesian law. No contractual relationship existed between Defendants and the

Indonesian military. Because the provision of security was solely BPMIGAS' obligation,

Defendants plainly did not have any command and control authority over Indonesian soldiers. Nor

did Defendants have any choice in selecting the Indonesian military in general or individual soldiers

in particular to provide security for its personnel and operations.

Although Plaintiffs rely heavily on alleged payments by EMOI for security services, the

PSC demonstrates that EMOI was required to reimburse BPMIGAS for such items as part of the

overall operating costs for the project. (Coleman Decl. Ex. 1 at ¶ 5.3(c).) This accounting

arrangement between EMOI and BPMIGAS did not detract from BPMIGAS' sole responsibility for

the provision of security at the Arun gas field, nor did it create any relationship between the

Indonesian military and EMOI (or the other Defendants).

As demonstrated above, the PSC squarely disproves Plaintiffs' claim that Defendants

retained or employed the Indonesian military generally or any particular individual Indonesian

soldiers in Aceh. Under these circumstances, Plaintiffs have failed to state a claim for relief

because the very contract they rely on in their Complaint contradicts their factual allegations and

renders them implausible. The common law claims (Causes I-VII) must accordingly be dismissed.

## B.    Defendants Cannot Be Legally Responsible for the Acts of the Employees of Another Entity.

Plaintiffs also fail to allege facts sufficient to give rise to an inference of a master-servant

relationship between Defendants and the alleged tortfeasing soldiers. In *Charles v. Barrett*, 233

N.Y. 127 (1922), Justice Cardozo addressed the liability of a company for the alleged torts of the

employees of another entity. In *Charles*, the Adams Express Company hired Steinhauser, a general

employer, to supply a van and chauffeur. The chauffer struck and killed the plaintiff's son. The

plaintiff filed suit against the Adams Express Company, arguing that Adams Express Company

should be liable for the acts of Steinhauser's chauffeur.  Justice Cardozo disagreed:

> We think that truck and driver were in the service of the *general employer*
> [and not the defendant].  There was *no such change of masters* as would
> relieve Steinhauser of liability if the driver of the van had broken the seals,
> and stolen the contents.  By the same token, there was no such change as to
> relieve of liability for other torts committed in the conduct of the enterprise.
> Where to go and when might be determined for the driver by the commands
> of the defendant.  The duty of going carefully, for the safety of the van as
> well as for that of wayfarers, remained a duty of the master at whose hands
> he had received possession.  Neither the contract nor its performance shows
> a change in control so radical as to disturb that duty or its incidence.

*Id.* at 129 (emphasis added).  The court then stated the rule for when an employee of a general

employer enters into a relationship with another entity:

> The rule now is that as long as the employee is furthering the business of
> his general employer by the service rendered to another, *there will be no
> inference of a new relation* unless command has been surrendered, and no
> inference of its surrender from the mere fact of its division.

*Id.* (emphasis added).  The rule is now followed in this Court.  *See Estate of Carter v. Dist. of

Columbia*, 903 F. Supp. 165, 167-68 (D.D.C. 1995) (refusing to hold the District of Columbia liable

for the actions of U.S. Park Police officers while patrolling D.C. streets); *Saffron v. Wilson*, 481 F.

Supp. 228, 245-46 (D.D.C. 1979) (Oberdorfer, J.) (same).

As in *Charles* and the cited cases from this jurisdiction, the primary alleged tortfeasors here

were not employees of Defendants.  Rather, they were employees of the Indonesian military.

Plaintiffs' allegations make clear that the soldiers were furthering the "business" (security) of their

general employer (the Indonesian military).  (*See, e.g.*, Compl. ¶ 44 (alleging that Defendants paid

the Indonesian military, not the individual soldiers).)  Plaintiffs' allegations also make clear that the

Indonesian military did not surrender command of its military forces in conducting military raids

and operating military security checkpoints.  (*See, e.g., id.* ¶ 54 (alleging that the military remained

under military – not civilian – control).)  As Justice Cardozo explained, a court cannot infer

surrender of command by "the mere fact of its division." *Charles*, 233 N.Y. at 129. Accordingly, as a matter of law, the soldiers did not change "masters" and "there will be no inference of a new relation" between the soldiers and EMOI (or any of the other Defendants).

### C.     Plaintiffs Fail To State a Claim for Negligent Hiring.

Plaintiffs' negligent hiring claim (Cause II) fails for three additional reasons. To state a claim for negligent hiring, "it is necessary to show both that the contractor was incompetent or unskilled to perform the job for which he or she was hired, and that the employer knew or had reason to know of the contractor's incompetence." 41 Am. Jur. 2d, *Independent Contractors* § 36 (2005). To impose liability, "negligence in hiring [the] employee or independent contractor must be [the] proximate cause of injuries to plaintiff, that is, there must be evidence that plaintiff's injuries were brought about by reason of employment of the incompetent servant or independent contractor and were, in some manner, job-related." *Id.*

First, Plaintiffs do not, and cannot, allege that Defendants "hired" the Indonesian military as its "contractor." Plaintiffs claim that, "[p]ursuant to the contract granting these exploration and production rights and in exchange for ExxonMobil's regularly scheduled payment of fees, ExxonMobil retains personnel for purposes of securing its interests at the Arun Project." (Compl. ¶ 64.) But, as shown above, the PSC specifies that *BPMIGAS*, an agency of the Indonesian government, was responsible for providing security at the site. (Coleman Decl. Ex. 1 at ¶ 5.3(c).) The alleged payments by EMOI to the military were made for cost-sharing purposes as between EMOI and BPMIGAS, per the PSC. (*Id.*)

More critically, even accepting the notion that Defendants "hired" the military by paying money to the government, Plaintiffs fail to allege any plausible inference that such "hiring" proximately caused their injuries. Indeed, no causation could be established because, as noted in

Part VIII.A, *supra*, Indonesian law required Indonesian soldiers to provide security for the Arun gas field.

Lastly, Plaintiffs' allegations that "it was widely known that members of the Indonesian military were not firmly under civilian control and had committed murder, torture, illegal detention and new abuses against Indonesian civilians" (Compl. ¶ 54) do not demonstrate that the individual (unnamed) soldiers alleged to have injured Plaintiffs (*id.* ¶¶ 60-63) were negligently hired. Even if Plaintiffs were to allege that Defendants hand-picked and hired members of the Indonesian military individually – there is no such allegation in the Complaint – Plaintiffs' negligent hiring claim would still fail because to state such a claim, Plaintiffs must identify the "individuals who were negligently hired" and what it was in their individual backgrounds that supposedly made it negligent to "hire" them. *See, e.g., Alexander v. Wash. Gas Light Co.*, 481 F. Supp. 2d 16, 42 (D.D.C. 2006) (applying Maryland law). Plaintiffs make no such allegations.

### D.     Plaintiffs Fail To State a Claim for Negligent Supervision.

The negligent supervision claim (Cause III) suffers additional defects. To establish such a claim, "an employer of an independent contractor must have supervised the work that caused [the] injury, had actual or constructive knowledge of the danger which caused the injury, *and* had the opportunity to prevent the injury, but negligently failed to do so." 41 Am. Jur. 2d, *Independent Contractors* § 35 (emphasis added) (*citing Jordan v. NUCOR Corp.*, 295 F.3d 828 (8th Cir. 2002)); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001) (rejecting negligent supervision claim where the plaintiff failed to establish "that a person with supervisory authority over [the security guard] saw what occurred or [had] an opportunity to stop it").

Here, Plaintiffs do not allege that any Defendants "supervised" the alleged shooting of John Doe VIII, the alleged attack on John Doe IX, the alleged detention or attack on John Doe X, or the alleged attack on John Doe XI. (*See* Compl. ¶¶ 60-63.) Plaintiffs similarly fail to allege that

Defendants had the opportunity to prevent the alleged injuries in question (they clearly could not) or that they "negligently failed to do so." 41 Am. Jur. 2d, *Independent Contractors* § 35. In the absence of such allegations, Plaintiffs cannot establish the required elements of a negligent supervision claim. *Accord Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985) (dismissing negligent hiring and supervision claims where no master-servant relationship existed). The claim should therefore be dismissed.

E.      **There Is No Discernible Negligence Standard for Military Oversight.**

Finally, even if a legally sufficient relationship between Defendants and the allegedly tortfeasing soldiers were somehow identified, the Court would still have to dismiss Plaintiffs' negligence claims (Counts I-III) because the Court could not properly define a standard of care for such claims. Indeed, courts have routinely refused to entertain negligence claims relating to the oversight of military activities, which is the crux of Plaintiffs' Complaint here. *See, e.g., United States v. Shearer*, 473 U.S. 52, 58-59 (1985) (rejecting judicial attempts to adjudicate claims relating to military supervision and discipline); *Gilligan v. Morgan*, 413 U.S. 1, 4 (1973) (rejecting judicial attempts to adjudicate claims relating to military composition, training, equipping, and control); *Chappell v. Wallace*, 462 U.S. 296, 302 (1983) ("[I]t is difficult to conceive of an area of government activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments . . . ."); *Satterfield v. United States*, 788 F.2d 395, 398-99 & n.4 (6th Cir. 1986) ("[T]he Supreme Court has consistently observed that the selection of personnel for the military is indeed a military decision not subject to judicial scrutiny.") ("Inasmuch as civilian courts are counseled not to 'question basic choices about discipline, supervision, and

44

control of a serviceman,' plaintiff's claim of negligent supervision and control was properly

dismissed."); *Smith v. Halliburton Co*, No. 06-0462, 2006 U.S. Dist. LEXIS 61980, at \*23-\*26

(S.D. Tex. Aug. 30, 2006) (rejecting tort and negligent supervision claims against corporation when

premised on decisions relating to military composition, supervision, control, etc.) ("Policy

determinations involving force protection measures in a hostile area of Iraq are clearly not

appropriate for judicial determination."); *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d

1277 (M.D. Ga. 2006) (rejecting tort claims against contractor based on strategic and tactical

military decisions made in a combat zone).

Because courts lack the ability to determine the appropriate standard for selecting and

supervising military personnel, particularly for combat operations in a war zone, Plaintiffs'

negligence-based claims – all of which challenge Defendants' supposed retention of Indonesian

soldiers to guard Indonesian-owned facilities – cannot be adjudicated and must be dismissed.

## CONCLUSION

For all of these reasons, the Court should dismiss Plaintiffs' claims.

Washington, DC
September 17, 2007

Respectfully submitted,

_____
Theodore V. Wells Jr. (Bar No. 468934)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Alex Young K. Oh (Bar No. 499955)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1615 L Street, NW, Suite 1300
Washington, DC 20036

_____
Martin J. Weinstein (Bar No. 37792)
Robert J. Meyer (Bar No. 41620)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
Telephone: (202) 303-1000
Facsimile: (202) 303-2000

Paul W. Wright (Bar No. 20747)
Patrick J. Conlon (Bar No. 414621)
Exxon Mobil Corporation
800 Bell Street
Houston, TX 77002

Attorneys for Defendants Exxon Mobil Corporation, Mobil Corporation,
ExxonMobil Oil Corporation, and ExxonMobil Oil Indonesia Inc.

EXHIBIT A

**The Jakarta Post**.com                    **Aceh Issues**                    August 30, 2007

Presidential
Decree No.
28/2003 On The
Declaration of a
State of
Emergency with
the Status of
Martial Law in
Nanggroe Aceh
Darussalam
Province

Cessation of
Hostilities
Framework
Agreement
Between
Government of the
Republic of
Indonesia And the
Free Aceh
Movement

## Presidential Decree No. 28/2003 On The Declaration of a State of Emergency with the Status of Martial Law in Nanggroe Aceh Darussalam Province

### THE PRESIDENT OF THE REPUBLIC OF INDONESIA

**Considering:**

a. that a series of amicable efforts made by the government,either by means of the stipulation of special autonomy for the Province of Nanggroe Aceh Darussalam, as an integrated approach in a comprehensive development plan or as dialog held overseas, has failed to stop the intention and actions by the Free Aceh Movement (GAM) to secede from the unitary State of the Republic of Indonesia and declare its independence;

b. that such a situation and intensified armed violence that has been increasingly geared toward acts of terrorism by the Free Aceh Movement (GAM), have not only disrupted public order and peace, as well as the smooth running of the local administration and the implementation of various development programs, but also has led to widespread and heavy difficulties for the Acehnese community and other communities in the Province of Nanggroe Aceh Darussalam in general;

c. that the situation would eventually disrupt the integrity of the Unitary State of the Republic of Indonesia and thus cannot be allowed to continue, but must immediately be ended through integrated efforts to ensure that public life and the running of the administration can be restored;

d. that in conformity with the mandate in the 1945 Constitution that the President is required to protect the entire nation and the entire motherland of Indonesia, and also in accordance with the authority that the President holds on the basis of the Emergency Law, and after listening to and considering thoroughly all the views and support expressed by the Leadership of the House of Representatives of the Republic of Indonesia, the factions and Commissions I and II of the House of Representatives of the Republic of Indonesia, as jointly decided upon at the conclusion of a consultation meeting on May 15, 2003, between the President and the entire Leadership of the House of Representatives of the Republic of Indonesia, the factions and the two Commissions referred to earlier, and further to this, after observing the development of circumstances and the attitude of the Free Aceh Movement (GAM) in the days after said consultation meeting, which failed to change for the better, it is deemed necessary to declare an emergency at the level of martial law for the entire territory of the Province of Nanggroe Aceh Darussalam;

**In view of:**

1. Subarticle (1) of Article 4, Article 10 and Article 12 of the 1945 Constitution, as already amended by the Fourth Amendment to the 1945 Constitution;

2. Law No. 23 Prp/1959 on a state of emergency (Statute Book No. 139/1959, Supplement to Statute Book No. 1908) as already amended twice, the latest by Law No. 52 Prp/1960 (Statute Book No. 170/1960, Supplement to Statute Book No. 2113);

3. Law No. 2/2002 on the Police Force of the Unitary State of the Republic of Indonesia (Statute Book No. 2/2002, Supplement to Statute Book No. 4168);

**DECIDES**

**To stipulate:**

A PRESIDENTIAL DECREE ON THE DECLARATION OF A STATE OF EMERGENCY WITH THE STATUS OF MARTIAL LAW IN THE PROVINCE OF NANGGROE ACEH DARUSSALAM

**Article 1**

The entire territory of the Province of Nanggroe Aceh Darussalam is declared to be in a state of emergency with the status of martial law.

**Article 2**

(1) The President, as the central martial law ruler, shall exercise the highest authority at the level of martial law, as referred to in Article 1.

(2) In exercising the authority of a state of emergency with the status of martial law, the President shall be assisted by the martial law central board of executives in charge of day-to-day operations, which shall comprise:

**1. Chairman:**

Coordinating Minister for Political and Security Affairs

**2. Members :**

a. Coordinating Minister for the Economy;

b. Coordinating Minister for Public Welfare;

c. Minister of Social Affairs;

d. Minister of Home Affairs;

e. Minister of Foreign Affairs;

f. Minister of Defense;

g. Minister of Justice and Human Rights;

h. Minister of Health;

i. Minister of National Education;

j. Minister of Manpower and Transmigration;

k. Minister of Resettlement and Regional Infrastructure;

l. Minister of Religious Affairs;

m. Minister of Transportation;

n. Minister of Finance;

o. State Minister of Communications and Information;

p. Commander-in-Chief of the Indonesian Military;

q. Chief of the Police of the Republic of Indonesia

r. The Attorney General;

s. Chief of the State Intelligence Agency;

t. Chief-of-Staff of the Army of the Indonesian Military;

u. Chief-of-Staff of the Navy of the Indonesian Military; and

v. Chief-of-Staff of the Air Force of the Indonesian Military.

**Article 3**

(1) Martial law in the territory of the Province of Nanggroe Aceh Darussalam shall be exercised by the commander of the Iskandar Muda Military Command, as the regional martial law authority.

(2) In exercising martial law in the region, the chief of the Iskandar Muda Military Command shall be assisted by:

1. the governor of the Province of Nanggroe Aceh Darussalam;

2. the chief of the regional police of the Province of Nanggroe Aceh Darussalam;

3. the chief of the provincial prosecutor's office of the Province of Nanggroe Aceh Darussalam.

**Article 4**

The Province of Nanggroe Aceh Darussalam, as referred to in Article 1, shall be subject to the provisions of martial law as referred to in Law No. 23 Prp/1959 on a state of emergency, as already amended twice, the latest by Law No. 52 Prp/1960.

**Article 5**

All expenses arising from the enforcement of this presidential decree shall be borne by the state budget and the regional budget of the Province of Nanggroe Aceh Darussalam.

**Article 6**

This presidential decree shall take effect as from 00.00 Western Indonesia Standard Time on May 19, 2003, for a period of 6 (six) months, unless extended by virtue of a separate presidential decree.

For public knowledge, this presidential decree shall be published in the Statute Book of the Republic of Indonesia.

Stipulated in Jakarta

On May 18, 2003

PRESIDENT OF THE REPUBLIC OF INDONESIA

sgd.

**MEGAWATI SOEKARNOPUTRI**

Proclaimed in Jakarta

On May 18, 2003

STATE SECRETARY OF

THE REPUBLIC OF INDONESIA

sgd.

**BAMBANG KESOWO**

STATUTE BOOK OF THE REPUBLIC OF INDONESIA NO. 54/2003

Copied true to the original

Deputy Secretary of the Cabinet

for Laws and Legislation

sgd.

**Lambock V. Nahattands**

(Seal of the Secretariat of the Cabinet of the Republic of Indonesia over signature)

# EXHIBIT B



Home
Martial Law
Daily Reports
Indonesian
Government
International Response
A S N L F
Peace Process
NGOs
Issues
Analysis
General Info
Links
Contact Us

**INDONESIAN GOVERNMENT**

Indonesia Government ▶ Decrees and Legislations..

**PRESIDENTIAL DECREE**

---

### DECREEE OF THE PRESIDENT OF THE REPUBLIC OF INDONESIA
### NUMBER 43 YEAR 2004
### CONCERNING
### THE DECLARATION OF A CHANGE IN THE LEVEL OF STATE OF DANGER IN NANGGROE ACEH DARUSSALAM PROVINCE FROM A STATE OF MILITARY EMERGENCY TO A STATE OF CIVIL EMERGENCY

---

### THE PRESIDENT OF THE REPUBLIC OF INDONESIA,

---

**Considering:** that since the declaration of a State of Danger of the level of Military Emergency in Nanggroe Aceh Darussalam province, which was combined with the implementing of a Co-ordinated Operation involving a Humanitarian Operation, an Economic Restoration Operation, an Law Enforcement Operation, an operation to Stabilise Governance, and a Security Restoration Operation, have together produced significant results in improving the conditions of public security, order and calm, of government organisation and of social and economic life and public welfare in Nanggroe Aceh Darussalam;

That based on the above-mentioned considerations, and in order to safeguard the continuance of the steps taken in the various [government/military] Operations described above, as well as after thorough consideration of all views and endorsements expressed by the Indonesian national parliament through the consultative Meeting between the government and the national parliament on May 17 2004, [the president] considers it has become necessary to downgrade, by Presiential Decree, the State of Danger of the level of Military Emergency to a State of Danger of the level of Civil Emergency, in Nanggroe Aceh Darussalam province.

**Remembering:** Article 4 subsection 1, Article 10, Article 12 and Article 28 A-J of the 1945 Constitution, as they have been amended, most recently with the Fourth Amendment to the 1945 Constitution;

Law Number 23 of Year 1959 on States of Danger (Republic of Indonesia Government Gazette Year 1959 Number 139, Government Gazette Appendix Number 1908), as it has been amended on two occasions, most recently by Law Number 52 of Year 1960 (Republic of Indonesia Government Gazette Year 1960 Number 170, Government Gazette Appendix 2113);

Law Number 8 of Year 1981 on Legal Procedure in Criminal Cases (Republic of Indonesia Government Gazette Year 1981 Number 76, Government Gazette Appendix 3209);

Law Number 2 of Year 2002 on the Police Force of the Republic of Indonesia (R of I Government Gazette Year 2002 Number 2, Government Gazette 4168);

Law Number 3 of Year 2002 on National Defence (R of I Government Gazette Year 2002 Number 3, Government Gazette Appendix 4169);

Presidential Decree Number 28 of Year 2003 declaring a State of Danger of the level of Military Emergency in Nanggroe Aceh Darussalam province (R of I Government Gazette Year 2003 Number 54), and its extension through Presidential Decree Number 97 of Year 2003 on the Prolonging of the State of Danger of the level of Military Emergency in Nanggroe Aceh Darussalam province (R of I Government Gazette Year 2003 Number 135).

**DECREES THE FOLLOWING:**

**PRESIDENTIAL DECREE ON THE DOWNGRADING OF THE STATE OF DANGER IN NANGGROE ACEH DARUSSALAM FROM THE LEVEL OF MILITARY EMERGENCY TO THE LEVEL OF CIVIL EMERGENCY.**

**Article 1**

From the beginning of the day this Presidential Decree comes into force the status of the State of Danger of the level of Military Emergency in Nanggroe Aceh Darussalam province is downgraded to a State of Danger of the level of Civil Emergency.

**Article 2**
(1)

(2) The highest authority for the State of Danger of the level of Civil Emergency as decreed in Article 1 shall be exercised by the President as Central Civil Emergency Authority.

In carrying out this authority for the State of Danger of the level of Civil Emergency the President shall be assisted by the Central Civil Emergency Authority Day-to-day Implementation Body, consisting of:

**a. Chair: The Co-ordinating Minister for Politics and Security;**

**b. Members:**

01. The Co-ordinating Minister for the Economy;
02. The Co-ordinating Minister for Social Welfare;
03. The Minister of the Interior;
04. The Minister for Foreign Affairs;
05. The Minister for Defence;
06. The Social Minister;
07. The Minister for Justice and Human Rights;
08. The Health Minister;
09. Menteri Pendidikan Nasional;
10. The Minister for Settlement and Regional Infrastructure;
11. The Minister of Religions;
12. The Minister for Communications;
13. The Finance Minister;
14. The Minister for industry and Trade;
15. The minister for Energy and Mineral Resources;
16. The Minister for Fisheries and the Sea;
17. The Minister of Agriculture;
18. The Minister of Forestry;
19. The Minister of Manpower and Transmigration;
20. The State Minister for Co-operatives and small and Middle sized Enterprises;
21. The State Minister for Communication and Information;
22. The Commander in Chief of the Indonesian National Armed Forces (TNI);
23. The Chief of the Indonesian National Police;
24. The Attorney General;
25. The Chief of the State Intelligence Agency;
26. The Chief-of-Staff of the Indonesian National Army (TNI-AD);
27. The Chief-of-Staff of the Indonesian National Navy (TNI-AL);
28. The Chief-of-Staff of the Indonesian National Air Force (TNI-AU).

**c. Secretary: The Secretary of the State co-ordinating Minister for Politics and Security.**

**Article 3**
(1)

(2) The highest authority for the State of Danger of the level of Civil Emergency within Nanggroe Aceh Darussalam province shall be exercised by the Governor of Nanggroe Aceh Darussalam as Regional Civil Emergency Authority. In carrying out this authority the Governor shall be assisted by:

1. The Commander (Pangdam) of Iskandar Muda Regional Military Command (KODAM);
2. The Chief of Police for Nanggroe Aceh Darussalam province;
3. The Chief Public Prosecutor of Nanggroe Aceh Darussalam province.

**Article 4**

To facilitate the carrying-out of the tasks of the Regional Civil Emergency Authority for Nanggroe Aceh Darussalam province, a Team shall be assigned to him to give assistance and carry out monitoring as staff of the Central Civil Emergency Auhthority assigned to Nanggroe Aceh Darussalam province.

**Article 5**
(1)

(2) In exercising his authority and carrying out its duties the Regional Civil Emergency Authority must follow directions and orders given by the Central Civil Emergency Authority and shall be responsible to that authority through the Chair of the Central Civil Emergency Authority Day-to-day Implementation Body. In all decisions he takes the Regional Civil Emergency Authority must consult with all [three above-mentioned] assistants to the Regional Civil Emergency Authority.

**Article 6**
(1)

(2) The Co-ordinated Operation that was been carried out throughout the State of Danger of the level of Military Emergency shall be continued by the Civil Emergency Authority.

The Co-ordinating Minister for Politics and Security, as Chair of the Central Civil Emergency Authority Day-to-day Implementation Body, shall remain as Implementation Co-ordinator of the Co-ordinated Operation at the national level.

**Article 7**

With the coming into force of the downgrading of the State of Danger of the level of Military Emergency to the level of Civil Emergency, detainees of the Regional Military Emergency Authority shall be transferred to the

custody of the Indonesian National Police and become detainees of the Indonesian National Police in accordance with Law Number 8 of Year 1981 on Legal Procedure in Criminal Cases.

**Article 8**

All expenses required for the carrying out of this Presidential Decree shall be borne by the National State Budget and the Budget of Nanggroe Aceh Darussalam province.
Segala biaya yang diperlukan dalam rangka pelaksanaan Keputusan

**Article 9**

This Presidential Decree shall come into force at 00.00 hours on May 19 2004, and remain in force for six months unless terminated or extended by Decree of the President him/herself.

So that everyone shall know of it, it is ordered that this Presidential Decree be published in the Government Gazette of the Republic of Indonesia.

Written in Jakarta
on 18 May 2004

by

**THE PRESIDENT OF THE REPUBLIC OF INDONESIA**

signed

**MEGAWATI SOEKARNOPUTRI**

Enacted in Jakarta
on 18 May 2004

by

**THE SECRETARY OF STATE OF THE REPUBLIC OF INDONESIA**

signed

**BAMBANG KESOWO**

**REPUBLIC OF INDONESIA GOVERNMENT GAZETTE YEAR 2004 NUMBER 46.**

**Back** ◀

Copyright © 2003-2005 Acheh-Eye.Org. All rights reserved.
Comments and suggestions please email.
webmaster@acheh-eye.org

EXHIBIT C



September 7, 2007

**Home**
Martial Law
Daily Reports
Indonesian
Government
International Response
A S N L F
Peace Process
NGOs
Issues
Analysis
General Info
Links
Contact Us

INDONESIAN GOVERNMENT

Indonesia Government ▶ Decrees and Legislations..

**INTRUCTION**

---

**INSTRUCTION No. 01 of 2004**
**OF THE PRESIDENT OF THE REPUBLIC OF INDONESIA**
**CONCERNING**

---

**THE IMPLEMENTATION OF OPERATION INTEGRATE IN A SITUATION OF DANGER, AND A LEVEL OF CIVIL EMERGENCY IN NANGGROE ACEH DARUSSALAM PROVINCE**

---

**THE PRESIDENT OF THE REPUBLIK INDONESIA,**

---

**Considering:**

a. that Decision No. 43 of 2004 about the Declaration of a Change in Status of Danger Condition from a Level of Military Emergency to a condition of Danger at a Level of Civil Emergency in Nanggroe Aceh Darussalam Province, determined by Operation Integrate that includes Operation Humanity, Operation Economic Recovery, Operation Uphold the Law, Operation Stabilisation of the Government and Operation Security Restoration, remains as follows;

b. that mentioned in section a, needs to be considered in order to determine the policy for the implementation of Operation Integrate in accordance with the Presidential Instruction

**In view of :**

1. The 1945 Constitution 1945, Article 4, subsection (1), Article 10, Article 12 and Article 28A-J, in the same manner already changed a number of times, the latest with the Fourth Amendment to the 1945 Constituon;

2. Law No. 23 Prp 1959 about Condition of Danger (Republic of Indonesia National Paper, No. 139, 1959; Republic of Indonesia National Paper Supplementary Paper 1908), in the same manner already amended twice, the latest with Law No. 52 Prp 1960 (Republic of Indonesia National Paper No. 170, 1960, Republic of Indonesia National Paper Supplementary Paper No. 2113);

3. Presidential Decision No. 43 2004 about the Declaration of a Change in Status of Danger Condition from a Level of Military Emergency to a condition of Danger to a Level of Civil Emergency in Nanggroe Aceh Darussalam Province (Republic of Indonesia National Paper No.46, 2004);

**HEREBY INSTRUCTS:**

**To:**

1. Coordinating Minister for Political and Security Affairs as Head responsible for the Daily Implementation of the Central Command of the Civil Emergency;

2. Coordinating Minister for Economics as Member of the Body responsible for the Daily Implementation of the Central Command of the Civil Emergency;

3. Coordinating Minister for Public Health as Member of the Body for the Daily Manager of the Central Command of the Civil Emergency;

4. Minister for Internal Affairs as Member of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency;

5. Commander of the Armed Forces of Indonesia as Member of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency;

6. Head of the National Police Force of the Republic of Indonesia as Member of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency;

7. Attorney General as Member of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency;

8. Head of the Body for National Intelligence as Member of the Body Responsible for the Daily Implementation of

the Central Command of the Civil Emergency;

9. Other Ministers as Member of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency;

10. Heads of Staff of the Armed Forces of Indonesia, Army, Navy and Airforce as Members of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency;

11. Governor of the as Commander of the Civil Emergency in the area of the Province of Nanggroe Aceh Darussalam;

**To:**

**FIRST**: The Coordinating Minister for Political and Security Affairs as Head of the Body for the Daily Implementation of the Central Command of the Civil Emergency and as Coordinator of the Implementation of Operation Integrate at Central level:

1. Coordinate the formulation and maintenance of strategic policy, public planning, comprehensive actions and operational guidance in accordance with implementing and evaluating the implementation of Operation Integrate;

2. Form an Assistance and Monitoring Team as Central Civil Emergency Force Apparatus with the task of providing assistance to the head of the Central Civil Emergency Force and to monitor the implementation of Operation Integrate;

3. Show and maintain an Officer with Responsibility for/ Implementer of the Daily Operations, from every Operation in the area, upon suggestion from each Officer Responsible for Strategic Operational Policy at the Central level.

**SECOND** : Coordinating Minister for Economic Affairs as a Member of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency and who is Responsible for Strategic Policy Operation Economic Restoration at the Central level, to coordinate Departments which come under your area of coordination to formulate and maintain strategic policy, planning, comprehensive action and orientation of the implementation of Operation Economic Restoration.

**THIRD** : Coordinating Minister for Public Health as Member of Member of the Body responsible for the Daily Implementation of the Central Command of the Civil Emergency and who is Responsible for Strategic Policy for Operation Humanity at the Central level, to coordinate Departments which come under your area of coordination to formulate and maintain strategic policy, planning, comprehensive action and orientation of the implementation of Operation Humanity.

**FOURTH** : Minister for Internal Affairs as Member of the Body responsible for the Daily Implementation of the Central Command of the Civil Emergency and who is Responsible for Strategic Policy for Operation Stabilisation of the Government at the Central level, to coordinate Departments which come under your area of coordination to formulate and maintain strategic policy, planning, comprehensive action and orientation of the implementation of Operation Stabilisation of the Government.

**FIFTH** : Commander of the Armed Forces of Indonesia as Member of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency and who is Responsible for Strategic Policy for Operation Security Restoration at the Central level:

1. To coordinate the formulation and maintenance of strategic policy, planning and comprehensive actions and guidance of the implementation of Operation Security Restoration;

2. To prepare and to mobilize the strength of the Army Units within the framework of the implementation of Operation Security Restoration as required.

**SIXTH** : Head of the National Police Force of the Republic of Indonesia as Member of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency and who is Responsible for the Strategic Policy for Operation Uphold the Law at the Central level:

1. To coordinate the formulation and maintenance of strategic policy, planning and comprehensive actions and guidance of the implementation of Operation Uphold the Law;

2. To prepare and to mobilize the strength of the Police Units within the framework of the implementation of Operation Uphold the Law as required.

**SEVENTH** : Attorney General as Member of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency as who is Responsible for Strategic Policy for Operation Uphold the Law especially in the area of Prosecution.

**EIGHTH** : Head of the Body for National Intelligence as Member of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency, to give strategic intelligence support to the Central Command of the Civil Emergency and Regional Commander of the Civil Emergency within the framework of the implementation of Operation Integrate.

**NINTH** : To Ministers as Members of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency, to assist the Head of the Body for the Daily Implementation of the Central Command of the Civil Emergency and Officers Responsible for Strategic Policy of each Operation, within the framework to formulate strategic policy, to plan comprehensive actions, to compile a manual for implementation, along with

preparing and providing a support program, established with technical assistance for improving the implementation of Operation Integrate in accordance with the tasks and functions of each area.

**TENTH** : Heads of Staff of the Armed Forces of Indonesia, Army, Navy and Airforce as Members of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency;

1. To carry out the establishment and technical control in accordance with the scope of the units of the Army and to implement the task of the Operation Security Restoration in Nanggroe Aceh Darussalam Province;
2. To assist the Commander of the Army in preparing and mobilizing Army units in accordance with its scope.

**ELEVENTH** : Governor of Nanggroe Aceh Darussalam Province as Commander of the Civil Emergency in the area of the Province of Nanggroe Aceh Darussalam:

1. To implement and to lead Operation Integrate across all regions Nanggroe Aceh Darussalam Province, with assistance from:

a. Commander of the Iskander Youth Regional Command;
b. Head of Regional Police in Nanggroe Aceh Darussalam Province;
c. Head of the Attorney General's Office for Nanggroe Aceh Darussalam Province;

2. In the implementation and carrying out of Operation Integrate, Regional Commander of the Civil Emergency is helped by the Officer Responsible for Implementing the Daily Operations who is appointed and maintained by the Head of the Body Responsible for the Daily Implementation of the Central Command of the Civil Emergency;

3. In the interpretation of every decision in order to carry out Operation Integrate, the Regional Commander of the Civil Emergency must do so according to the instruction and rules that are given by the Central Command of the Civil Emergency and decisions based on its own initiative must be done in cooperation with all Deputy Members of the Regional Commander of the Civil Emergency and observed by an Assistance and Monitoring Team;

4. Together with the DPRD of Nanggroe Aceh Darussalam Province, carry out the adaptation of activities and programs to support Operation Integrate which estimates its funding from Fiscal Earnings and the Regional Budget for Nanggroe Aceh Darussalam Province, with calculation and funding from the Fiscal Budget and National Expenditure;

5. To be responsible for and report results of the implementation of Operation Integrate to the Central Command of the Civil Emergency through the Head of the Body for the Daily Implementation of the Central Command of the Civil Emergency;

**TWELFTH** : All necessary costs associated with carrying out this Presidential Instruction, be charged to the Fiscal Budget and National Expenditure and Fiscal Budget and Regional Expenditure of Nanggroe Aceh Darussalam Province.

**THIRTEENTH** :
**FOURTEENTH** :

To report on the implementation of this Presidential Instruction to the President as Central Commander of the Civil Emergency, through the Head responsible for the daily implementation of the Central Command of the Civil Emergency from time to time or periodically.

To implement this Presidential Instruction with full responsibility. This Presidential Decision shall come into effect on the day it is issued.

Issued in Jakarta on 1 June 2004

**PRESIDENT REPUBLIC OF INDONESIA,**

signed

**MEGAWATI SOEKARNOPUTRI**

Copied from the original Deputy Secretary of Cabinet
Laws and Legislation

**Lambock V. Nahattands**

Back 

Copyright © 2003-2005 Acheh-Eye.Org. All rights reserved.
Comments and suggestions please email.
webmaster@acheh-eye.org

# EXHIBIT D

# Memorandum of Understanding
## between
## the Government of the Republic of Indonesia
## and
## the Free Aceh Movement

The Government of Indonesia (GoI) and the Free Aceh Movement (GAM) confirm their commitment to a peaceful, comprehensive and sustainable solution to the conflict in Aceh with dignity for all.

The parties commit themselves to creating conditions within which the government of the Acehnese people can be manifested through a fair and democratic process within the unitary state and constitution of the Republic of Indonesia.

The parties are deeply convinced that only the peaceful settlement of the conflict will enable the rebuilding of Aceh after the tsunami disaster on 26 December 2004 to progress and succeed.

The parties to the conflict commit themselves to building mutual confidence and trust.

This Memorandum of Understanding (MoU) details the agreement and the principles that will guide the transformation process.

To this end the GoI and GAM have agreed on the following:

## 1    GOVERNING OF ACEH

### 1.1    Law on the Governing of Aceh

1.1.1    A new Law on the Governing of Aceh will be promulgated and will enter into force as soon as possible and not later than 31 March 2006.

1.1.2    The new Law on the Governing of Aceh will be based on the following principles:

a)    Aceh will exercise authority within all sectors of public affairs, which will be administered in conjunction with its civil and judicial administration, except in the fields of foreign affairs, external defence, national security, monetary and fiscal matters, justice and freedom of religion, the policies of which belong to the Government of the Republic of Indonesia in conformity with the Constitution.

b)    International agreements entered into by the Government of Indonesia which relate to matters of special interest to Aceh will be entered into in consultation with and with the consent of the legislature of Aceh.

c)    Decisions with regard to Aceh by the legislature of the Republic of Indonesia will be taken in consultation with and with the consent of the legislature of Aceh.

d)    Administrative measures undertaken by the Government of Indonesia with regard to Aceh will be implemented in consultation with and with the consent of the head of the Aceh administration.

1.1.3   The name of Aceh and the titles of senior elected officials will be determined by the legislature of Aceh after the next elections.

1.1.4   The borders of Aceh correspond to the borders as of 1 July 1956.

1.1.5   Aceh has the right to use regional symbols including a flag, a crest and a hymn.

1.1.6   Kanun Aceh will be re-established for Aceh respecting the historical traditions and customs of the people of Aceh and reflecting contemporary legal requirements of Aceh.

1.1.7   The institution of Wali Nanggroe with all its ceremonial attributes and entitlements will be established.

## 1.2    Political participation

1.2.1   As soon as possible and not later than one year from the signing of this MoU, GoI agrees to and will facilitate the establishment of Aceh-based political parties that meet national criteria. Understanding the aspirations of Acehnese people for local political parties, GoI will create, within one year or at the latest 18 months from the signing of this MoU, the political and legal conditions for the establishment of local political parties in Aceh in consultation with Parliament. The timely implementation of this MoU will contribute positively to this end.

1.2.2   Upon the signature of this MoU, the people of Aceh will have the right to nominate candidates for the positions of all elected officials to contest the elections in Aceh in April 2006 and thereafter.

1.2.3   Free and fair local elections will be organised under the new Law on the Governing of Aceh to elect the head of the Aceh administration and other elected officials in April 2006 as well as the legislature of Aceh in 2009.

1.2.4   Until 2009 the legislature of Aceh will not be entitled to enact any laws without the consent of the head of the Aceh administration.

1.2.5   All Acehnese residents will be issued new conventional identity cards prior to the elections of April 2006.

1.2.6   Full participation of all Acehnese people in local and national elections will be guaranteed in accordance with the Constitution of the Republic of Indonesia.

1.2.7   Outside monitors will be invited to monitor the elections in Aceh. Local elections may be undertaken with outside technical assistance.

1.2.8   There will be full transparency in campaign funds.

## 1.3    Economy

1.3.1   Aceh has the right to raise funds with external loans. Aceh has the right to set interest rates beyond that set by the Central Bank of the Republic of Indonesia.

1.3.2   Aceh has the right to set and raise taxes to fund official internal activities. Aceh has the right to conduct trade and business internally and internationally and to seek foreign direct investment and tourism to Aceh.

1.3.3     Aceh will have jurisdiction over living natural resources in the territorial sea surrounding Aceh.

1.3.4     Aceh is entitled to retain seventy (70) per cent of the revenues from all current and future hydrocarbon deposits and other natural resources in the territory of Aceh as well as in the territorial sea surrounding Aceh.

1.3.5     Aceh conducts the development and administration of all seaports and airports within the territory of Aceh.

1.3.6     Aceh will enjoy free trade with all other parts of the Republic of Indonesia unhindered by taxes, tariffs or other restrictions.

1.3.7     Aceh will enjoy direct and unhindered access to foreign countries, by sea and air.

1.3.8     GoI commits to the transparency of the collection and allocation of revenues between the Central Government and Aceh by agreeing to outside auditors to verify this activity and to communicate the results to the head of the Aceh administration.

1.3.9     GAM will nominate representatives to participate fully at all levels in the commission established to conduct the post-tsunami reconstruction (BRR).

## 1.4     Rule of law

1.4.1     The separation of powers between the legislature, the executive and the judiciary will be recognised.

1.4.2     The legislature of Aceh will redraft the legal code for Aceh on the basis of the universal principles of human rights as provided for in the United Nations International Covenants on Civil and Political Rights and on Economic, Social and Cultural Rights.

1.4.3     An independent and impartial court system, including a court of appeals, will be established for Aceh within the judicial system of the Republic of Indonesia.

1.4.4     The appointment of the Chief of the organic police forces and the prosecutors shall be approved by the head of the Aceh administration. The recruitment and training of organic police forces and prosecutors will take place in consultation with and with the consent of the head of the Aceh administration in compliance with the applicable national standards.

1.4.5     All civilian crimes committed by military personnel in Aceh will be tried in civil courts in Aceh.

## 2     HUMAN RIGHTS

2.1     GoI will adhere to the United Nations International Covenants on Civil and Political Rights and on Economic, Social and Cultural Rights.

2.2     A Human Rights Court will be established for Aceh.

2.3     A Commission for Truth and Reconciliation will be established for Aceh by the Indonesian Commission of Truth and Reconciliation with the task of formulating and determining reconciliation measures.

## 3    AMNESTY AND REINTEGRATION INTO SOCIETY

### 3.1    Amnesty

3.1.1    GoI will, in accordance with constitutional procedures, grant amnesty to all persons who have participated in GAM activities as soon as possible and not later than within 15 days of the signature of this MoU.

3.1.2    Political prisoners and detainees held due to the conflict will be released unconditionally as soon as possible and not later than within 15 days of the signature of this MoU.

3.1.3    The Head of the Monitoring Mission will decide on disputed cases based on advice from the legal advisor of the Monitoring Mission.

3.1.4    Use of weapons by GAM personnel after the signature of this MoU will be regarded as a violation of the MoU and will disqualify the person from amnesty.

### 3.2    Reintegration into society

3.2.1    As citizens of the Republic of Indonesia, all persons having been granted amnesty or released from prison or detention will have all political, economic and social rights as well as the right to participate freely in the political process both in Aceh and on the national level.

3.2.2    Persons who during the conflict have renounced their citizenship of the Republic of Indonesia will have the right to regain it.

3.2.3    GoI and the authorities of Aceh will take measures to assist persons who have participated in GAM activities to facilitate their reintegration into the civil society. These measures include economic facilitation to former combatants, pardoned political prisoners and affected civilians. A Reintegration Fund under the administration of the authorities of Aceh will be established.

3.2.4    GoI will allocate funds for the rehabilitation of public and private property destroyed or damaged as a consequence of the conflict to be administered by the authorities of Aceh.

3.2.5    GoI will allocate suitable farming land as well as funds to the authorities of Aceh for the purpose of facilitating the reintegration to society of the former combatants and the compensation for political prisoners and affected civilians. The authorities of Aceh will use the land and funds as follows:

   a)   All former combatants will receive an allocation of suitable farming land, employment or, in the case of incapacity to work, adequate social security from the authorities of Aceh.

   b)   All pardoned political prisoners will receive an allocation of suitable farming land, employment or, in the case of incapacity to work, adequate social security from the authorities of Aceh.

   c)   All civilians who have suffered a demonstrable loss due to the conflict will receive an allocation of suitable farming land, employment or, in the case of incapacity to work, adequate social security from the authorities of Aceh.

3.2.6    The authorities of Aceh and GoI will establish a joint Claims Settlement Commission to deal with unmet claims.

3.2.7    GAM combatants will have the right to seek employment in the organic police and organic military forces in Aceh without discrimination and in conformity with national standards.

## 4    SECURITY ARRANGEMENTS

4.1    All acts of violence between the parties will end latest at the time of the signing of this MoU.

4.2    GAM undertakes to demobilise all of its 3000 military troops. GAM members will not wear uniforms or display military insignia or symbols after the signing of this MoU.

4.3    GAM undertakes the decommissioning of all arms, ammunition and explosives held by the participants in GAM activities with the assistance of the Aceh Monitoring Mission (AMM). GAM commits to hand over 840 arms.

4.4    The decommissioning of GAM armaments will begin on 15 September 2005 and will be executed in four stages and concluded by 31 December 2005.

4.5    GoI will withdraw all elements of non-organic military and non-organic police forces from Aceh.

4.6    The relocation of non-organic military and non-organic police forces will begin on 15 September 2005 and will be executed in four stages in parallel with the GAM decommissioning immediately after each stage has been verified by the AMM, and concluded by 31 December 2005.

4.7    The number of organic military forces to remain in Aceh after the relocation is 14700. The number of organic police forces to remain in Aceh after the relocation is 9100.

4.8    There will be no major movements of military forces after the signing of this MoU. All movements more than a platoon size will require prior notification to the Head of the Monitoring Mission.

4.9    GoI undertakes the decommissioning of all illegal arms, ammunition and explosives held by any possible illegal groups and parties.

4.10    Organic police forces will be responsible for upholding internal law and order in Aceh.

4.11    Military forces will be responsible for upholding external defence of Aceh. In normal peacetime circumstances, only organic military forces will be present in Aceh.

4.12    Members of the Aceh organic police force will receive special training in Aceh and overseas with emphasis on respect for human rights.

## 5    ESTABLISHMENT OF THE ACEH MONITORING MISSION

5.1    An Aceh Monitoring Mission (AMM) will be established by the European Union and ASEAN contributing countries with the mandate to monitor the implementation of the commitments taken by the parties in this Memorandum of Understanding.

5.2    The tasks of the AMM are to:
   a) monitor the demobilisation of GAM and decommissioning of its armaments,
   b) monitor the relocation of non-organic military forces and non-organic police troops,
   c) monitor the reintegration of active GAM members,
   d) monitor the human rights situation and provide assistance in this field,
   e) monitor the process of legislation change,
   f) rule on disputed amnesty cases,
   g) investigate and rule on complaints and alleged violations of the MoU,
   h) establish and maintain liaison and good cooperation with the parties.

5.3    A Status of Mission Agreement (SoMA) between GoI and the European Union will be signed after this MoU has been signed. The SoMA defines the status, privileges and immunities of the AMM and its members. ASEAN contributing countries which have been invited by GoI will confirm in writing their acceptance of and compliance with the SoMA.

5.4    GoI will give all its support for the carrying out of the mandate of the AMM. To this end, GoI will write a letter to the European Union and ASEAN contributing countries expressing its commitment and support to the AMM.

5.5    GAM will give all its support for the carrying out of the mandate of the AMM. To this end, GAM will write a letter to the European Union and ASEAN contributing countries expressing its commitment and support to the AMM.

5.6    The parties commit themselves to provide AMM with secure, safe and stable working conditions and pledge their full cooperation with the AMM.

5.7    Monitors will have unrestricted freedom of movement in Aceh. Only those tasks which are within the provisions of the MoU will be accepted by the AMM. Parties do not have a veto over the actions or control of the AMM operations.

5.8    GoI is responsible for the security of all AMM personnel in Indonesia. The mission personnel do not carry arms. The Head of Monitoring Mission may however decide on an exceptional basis that a patrol will not be escorted by GoI security forces. In that case, GoI will be informed and the GoI will not assume responsibility for the security of this patrol.

5.9    GoI will provide weapons collection points and support mobile weapons collection teams in collaboration with GAM.

5.10    Immediate destruction will be carried out after the collection of weapons and ammunitions. This process will be fully documented and publicised as appropriate.

5.11    AMM reports to the Head of Monitoring Mission who will provide regular reports to the parties and to others as required, as well as to a designated person or office in the European Union and ASEAN contributing countries.

5.12    Upon signature of this MoU each party will appoint a senior representative to deal with all matters related to the implementation of this MoU with the Head of Monitoring Mission.

5.13    The parties commit themselves to a notification responsibility procedure to the AMM, including military and reconstruction issues.

5.14    GoI will authorise appropriate measures regarding emergency medical service and hospitalisation for AMM personnel.

5.15    In order to facilitate transparency, GoI will allow full access for the representatives of national and international media to Aceh.

## 6    DISPUTE SETTLEMENT

6.1    In the event of disputes regarding the implementation of this MoU, these will be resolved promptly as follows:

   a) As a rule, eventual disputes concerning the implementation of this MoU will be resolved by the Head of Monitoring Mission, in dialogue with the parties, with all parties providing required information immediately. The Head of Monitoring Mission will make a ruling which will be binding on the parties.

   b) If the Head of Monitoring Mission concludes that a dispute cannot be resolved by the means described above, the dispute will be discussed together by the Head of Monitoring Mission with the senior representative of each party. Following this, the Head of Monitoring Mission will make a ruling which will be binding on the parties.

   c) In cases where disputes cannot be resolved by either of the means described above, the Head of Monitoring Mission will report directly to the Coordinating Minister for Political, Law and Security Affairs of the Republic of Indonesia, the political leadership of GAM and the Chairman of the Board of Directors of the Crisis Management Initiative, with the EU Political and Security Committee informed. After consultation with the parties, the Chairman of the Board of Directors of the Crisis Management Initiative will make a ruling which will be binding on the parties.

GoI and GAM will not undertake any action inconsistent with the letter or spirit of this Memorandum of Understanding.

Signed in triplicate in Helsinki, Finland on the 15 of August in the year 2005.

**On behalf of the Government of the Republic of Indonesia,**         **On behalf of the Free Aceh Movement,**

**Hamid Awaludin**                                         **Malik Mahmud**
*Minister of Law and Human Rights*                         *Leadership*

As witnessed by

**Martti Ahtisaari**
*Former President of Finland*
*Chairman of the Board of Directors of the Crisis Management Initiative*
*Facilitator of the negotiation process*

EXHIBIT E

INDONESIAN

| | |
|---|---|
| Type: | PRESIDENTIAL INSTRUCTION (INPRES) |
| By: | THE PRESIDENT OF THE REPUBLIC OF INDONESIA |
| Number: | 15 YEAR 2005 (15/2005) |
| Date: | NOVEMBER 14, 2005 (JAKARTA) |
| Title: | IMPLEMENTATION OF MEMORANDUM OF UNDERSTANDING BETWEEN THE GOVERNMENT OF THE REPUBLIC OF INDONESIA AND FREE ACEH MOVEMENT |

THE PRESIDENT OF THE REPUBLIC OF INDONESIA,

In the context of implementation of Memorandum of Understanding between the Government of the Republic of Indonesia and Free Aceh Movement which was signed in Helsinki, Finland on August 15, 2005, hereinafter referred to in this Presidential Instruction as Memorandum of Understanding, hereby instruct:

The        :    1.  Ministers of Indonesia Bersatu Cabinet;
                2.  Attorney General;
                3.  Commander-in-Chief of the Indonesian Armed Forces;
                4.  Chief of the State Police Force of the Republic of Indonesia;
                5.  Head of State Intelligence Agency;
                6.  Head of National Land Agency;
                7.  Head of Executive Board of Agency for Rehabilitation and Reconstruction of the Region and Life of People in Nanggroe Aceh Darussalam Province and Nias Islands of North Sumatra Province; and
                8.  Governor of Nanggroe Aceh Darussalam Province.

TO:

FIRST:        Take steps for planning and arranging policies according to respective scope of duties, roles and functions as well as authority in the context of implementing Memorandum of Understanding.

SECOND:      Particularly to the:

              1.    Coordinating Minister for Political, Law, and Security Affairs:

                    a.    coordinate and synchronize the whole policy planning and making in the implementation of Memorandum of Understanding;

b.  together with related parties, settle disputes in the implementation of Memorandum of Understanding which cannot be settled at the level of senior representative of each party and the Head of Aceh Monitoring Mission;

c.  monitor, control and evaluate the implementation of Memorandum of Understanding.

2.  Coordinating Minister for the Economy:

Coordinate policy planning and making in the implementation of Memorandum of Understanding in economic sector, particularly concerning funds through foreign debts, regional taxes, natural resources management, transportation and trade by involving ministers and heads of related institutions within their scope of coordination and the Governor of Nanggroe Aceh Darussalam Province.

3.  Coordinating Minister for Public Welfare:

Coordinate policy planning and making in the implementation of Memorandum of Understanding in social and humanity sectors, particularly concerning social security and other compensations in the context of accelerating reintegration of everyone who is involved in Free Aceh Movement into the society, or compensations to other society members who are affected by conflict impacts by involving ministers and heads of related institutions within their scope of coordination and the Governor of Nanggroe Aceh Darussalam Province.

4.  Minister of Home Affairs:

a.  prepare plans and policies regarding regional government organization in Nanggroe Aceh Darussalam Province, either covering the preparation/perfection of laws regarding regional government organization in Nanggroe Aceh Darussalam Province, political participation, economy, social culture, society institutions or other laws and regulations as well as reintegration and empowerment of everyone who is involved in Free Aceh Movement into the society, in coordination with related institutions;

b.  facilitate Regional Government of Nanggroe Aceh Darussalam Province and Regencies/Municipalities for the strengthening of Regional Government organization.

5.  Minister of Foreign Affairs:

a.  prepare administration procedures and facilitate foreign parties which are involved in Aceh Monitoring Mission;

    b.    prepare diplomacy plans, policies and steps to gain international support in the context of implementation of Memorandum of Understanding, in coordination with related institutions.

6.    Minister of Defense:

Formulate policies in state defense organization related to security arrangement in Aceh, in coordination with TNI, particularly concerning:

    a.    relocation of power of non organic TNI;
    b.    empowerment of non organic TNI existing in Aceh;
    c.    use of TNI power and other defense components.

7.    Minister of Law and Human Rights:

    a.    prepare/improve laws and regulations concerning government organization in Aceh, political participation and other laws and regulations within the context of Unified State of the Republic of Indonesia and 1945 Constitution, in coordination with related institutions particularly the Minister of Home Affairs;

    b.    prepare plans and policies concerning the grant of amnesty and abolition including conducting data collection and administration activities for the implementation, as well as arrangement regarding human rights pursuant to Memorandum of Understanding, in coordination with related institutions;

    c.    as Chairman of Negotiation Team of the Government of Republic of Indonesia together with the Minister of Communication and Informatics and other members of negotiation team, prepare materials as well as perform the promulgation of Memorandum of Understanding in accordance with the policy stipulated by the Coordinating Minister for Political, Law, and Security Affairs.

8.    Minister of Finance:

    a.    take necessary steps together with the State Minister for National Development Planning/Head of National Development Planning Board and other related institutions in the context of financial management, funds supply and budget control, either originating from State Revenues and Expenditures Budget or funds originating from multilateral and bilateral donor institutions;

    b.    prepare policies related to regional tax arrangement, foreign loans, and banking.

9.      Minister of Communication and Informatics:

a.      as a Member of Negotiation Team of the Government of Republic of Indonesia together with the Minister of Law and Human Rights prepare materials as well as perform the promulgation of Memorandum of Understanding pursuant to the policy stipulated by the Coordinating Minister for Political, Law, and Security Affairs;

b.      prepare plans and implement information spread of Memorandum of Understanding overseas as well as assist access facilitation for representatives of national and international media to Nanggroe Aceh Darussalam Province, in coordination with Minister of Foreign Affairs and related institutions;

c.      act as Senior Representative of the Government of Republic of Indonesia to perform coordination and cooperate with Aceh Monitoring Mission in dealing with all matters related to the implementation of Memorandum of Understanding.

10.     Minister of Transportation:

Prepare plans and policies of authority in development implementation and management of all seaports and airports within Nanggroe Aceh Darussalam Province, as well as opening of direct access to other countries by sea and air, in coordination with related institutions and the Governor of Nanggroe Aceh Darussalam Province.

11.     Minister of Manpower and Transmigration:

Prepare plans and policies by coordinating with related institutions and the Governor of Nanggroe Aceh Darussalam Province, concerning:

a.      the provision of jobs which are suitable to the capacity of everyone involved in Free Aceh Movement and people who encounter loss due to the conflict;

b.      resettlement of ex migrant refugees.

12.     Minister of Social Affairs:

Plan and prepare policies for providing reasonable social security to everyone who is involved in Free Aceh Movement and people who encounter loss due to the conflict and have not obtained jobs, in coordination with related institutions and the Governor of Nanggroe Aceh Darussalam Province.

13.     State Minister for National Development Planning/Head of National Development Planning Board:

Prepare and take necessary steps in the context of coordination in preparing plan for the implementation of Memorandum of Understanding as well as perform coordination with international donor community in mobilizing financing sources and fund allocation.

14. Attorney General:

   a.   provide support to the Minister of Law and Human Rights, in the context of implementation of granting amnesty and abolition particularly to the detainees who are still in the imprisonment of the Attorney General;

   b.   prepare plans and policies regarding mechanisms of appointment of the Head of Chief Prosecutor's Office of Aceh and opening as well as training of public prosecutors by referring to the national standards;

   c.   implement law enforcement duties in accordance with the scope of his duties and authority, in coordination with other law enforcement officials.

15. Commander-in-Chief of the Indonesian Armed Forces:

   a.   prepare plans and policies regarding the retreat of non organic TNI unit from Aceh which will start on September 15, 2005 up to December 31, 2005 in four phases in line with the submission of weapons of Free Aceh Movement;

   b.   prepare plans and policies regarding organic TNI unit that remains in Aceh after relocation;

   c.   prepare plans and policies regarding support to the implementation of duties of Aceh Monitoring Mission;

   d.   give opportunity to everyone who is involved in Free Aceh Movement to obtain jobs as members of organic soldiers in Aceh without discrimination and in accordance with national standards of recruitment of TNI soldiers.

16. Chief of the State Police Force of the Republic of Indonesia:

   a.   prepare plans and policies regarding the retreat of all elements of Non organic Police Force from Nanggroe Aceh Darussalam Province, as from September 15, 2005 up to December 31, 2005 in four phases in line with the submission of weapons of Free Aceh Movement;

   b.   prepare plans and policies regarding organic Police Force power that remains in Nanggroe Aceh Darussalam Province after relocation;

    c.    prepare plans and policies regarding the implementation of duties and responsibilities in maintaining security and order as well as law enforcement in Nanggroe Aceh Darussalam Province;

    d.    prepare plans and policies for safeguarding of personnel, equipment as well as the whole series of activities of Aceh Monitoring Mission, in coordination with the Head of Aceh Monitoring Mission and the Chairperson of Representative Team of the Government of Republic of Indonesia;

    e.    prepare plans and policies regarding providing opportunity to everyone who is involved in Free Aceh Movement to become members of Police Force in Nanggroe Aceh Darussalam Province without discrimination and in accordance with national standards;

    f.    prepare plans and policies of safeguarding to everyone who is involved in Free Aceh Movement who has obtained amnesty and abolition, in coordination with Minister of Law and Human Rights and the Governor of Nanggroe Aceh Darussalam Province;

    g.    stipulate policies and procedures of acceptance, registration, temporary storage and publication of weapons of Free Aceh Movement which are submitted before September 15, 2005.

17.    Head of State Intelligence Agency:
Prepare plans, policies and perform integrated intelligence activities to support the realization of conducive situation for successful implementation of Memorandum of Understanding as well as disclose clandestine network which has the potential and makes attempts to cause the Memorandum of Understanding to fail, in coordination with related institutions.

18.    Head of National Land Agency:
Prepare policy plans and steps concerning the provision/allocation of agricultural land for everyone who is involved in Free Aceh Movement and people who encounter loss due to the conflict, in coordination with related institutions and the Governor of Nanggroe Aceh Darussalam.

19.    Head of Executive Board of Agency for Rehabilitation and Reconstruction of the Region and Life of People in Nanggroe Aceh Darussalam Province and Nias Islands of North Sumatra Province:

Prepare plans and policies to assign candidate representatives of ex Free Aceh Movement to fully participate in the Rehabilitation and Reconstruction Agency according to the required criteria and capacity.

20.    Governor of Nanggroe Aceh Darussalam Province:

a.    prepare plans and policies concerning:

    1)    the organization of regional government in Nanggroe Aceh Darussalam Province covering the drafting/perfection of laws on regional government organization in Nanggroe Aceh Darussalam Province, Aceh names and titles of elected senior officials, boundaries of Nanggroe Aceh Darussalam Province, use of regional symbols including flag, logo and hymn, arrangement of qanun and establishment of *Lembaga Wali Nanggroe (Nanggroe Guardian Institution)*;

    2)    political participation that includes the establishment of political parties which are based in Nanggroe Aceh Darussalam Province and the establishment of local political parties in Nanggroe Aceh Darussalam Province, facilitate smooth implementation of Regional Election in Nanggroe Aceh Darussalam Province in April 2006;

    3)    provide new identity cards to all inhabitants of Nanggroe Aceh Darussalam Province prior to the Regional Election in April 2006.

b.    plan and implement reintegration and empowerment of everyone who is involved in Free Aceh Movement into the society as from admission, provisioning, return to hometowns and job preparation.

**THIRD:**    All costs that are required in the context of implementation of this Memorandum of Understanding shall be charged to State Revenues and Expenditures Budget and Regional Revenues and Expenditures Budget or aids from official donating countries/entities.

**FOURTH:**    This Presidential Instruction shall be implemented with full responsibility and the results shall be reported periodically and occasionally to the President through the Coordinating Minister for Political, Law and Security Affairs.

This Presidential Instruction shall come into effect as from the date of issue.

Issued in Jakarta
on November 14, 2005

THE PRESIDENT OF THE REPUBLIC OF INDONESIA,

signed
DR. H. SUSILO BAMBANG YUDHOYONO

Issued as true copy
Deputy Cabinet Secretary

Penelitian Hukum Indonesia - Copyright © 2007

For Law and Legislations Division,

signed and stamped
Lambock V. Nahattands

-----------------------------

NOTE

Source:        LOOSE LEAF STATE SECRETARIAT YEAR 2005

# EXHIBIT F

Website of Aceh Monitoring Mission (AMM) - Archive



| HOME | AMM | HEADQUARTER | DISTRICT OFFICES | INFO | PHOTO |

## Aceh Monitoring Mission (AMM)

## Archive

## Key Documents | Press and Public Information | Photogallery

### Mission Accomplished

On 15 December 2006 the Aceh Monitoring Mission (AMM) came to an end. All tasks assigned to AMM and as specified in the Memorandum of Understanding (MoU), signed in Helsinki on 15 August 2005, have been completed. The peace in Aceh has been re-established and the peace process has become irreversible and self-sustaining. There is complete freedom of movement and speech in Aceh and on 11 December 2006 the province held its first direct and democratic local elections. The AMM was established on 15 September 2005 and its overall aim has been to monitor the implementation of the MoU agreed by the Government of Indonesia and the Free Aceh Movement (GAM). The peace process belongs to the people of Aceh and now the signatories of the MoU, together with the newly and democratically elected Governor, and with the support of the EU, ASEAN and the wider international community, will need to continue the long term implementation of the MoU.

Open letter to the people of Aceh

EU Council Conclusions on Aceh

Article by EU High Representative for the CFSP on Aceh

### AMM has completed all its tasks – last COSA 2 December

The 44th and last COSA meeting was held on Saturday 2 December 2006. The parties remarked on the



EXHIBIT G

**U.S. DEPARTMENT of STATE**

Press Statement
**Sean McCormack, Spokesman**
Washington, DC
July 29, 2005

# Indonesia -- Developments in Aceh and Papua

The Indonesian Government and the Free Aceh Movement (GAM) plan to sign a landmark peace accord on August 15 to end the longstanding conflict that has plagued Aceh. The United States firmly supports this "Memorandum of Understanding" as described in broad outlines by the parties. The United States commends the parties for their commitment to a peaceful resolution, and recognizes the efforts both sides have made to find mutually agreeable terms. We look forward to supporting the implementation of the peace agreement in the coming months.

Likewise, with respect to Papua, the United States reiterates its firm support for the territorial integrity of Indonesia. The United States does not support or condone any efforts to promote the secession of Papua from the Republic of Indonesia. We believe that implementation of political and economic reforms, in the context of Special Autonomy and within a united Indonesia, is the key to addressing longstanding grievances, including human rights concerns.

**2005/742**

EXHIBIT H



Press Statement
**Sean McCormack, Spokesman**
Washington, DC
August 15, 2005

# Indonesia - Aceh Peace Accord

The United States congratulates the Government of Indonesia and the leadership of the Free Aceh Movement (GAM) on today's signing in Helsinki of a formal Memorandum of Understanding to end the long conflict in the province of Aceh.

We commend both parties for their vision and courage to seek lasting peace for the people of Aceh. Successful implementation of the agreement will require steadfast commitment to peace by all parties.

The United States commends the European Union and five member countries of the Association of Southeast Asian Nations (ASEAN) for their willingness to participate in the monitoring of the implementation of the Memorandum of Understanding. We look forward to supporting the implementation of the peace agreement in the coming months.

**2005/782**

Released on August 15, 2005

# EXHIBIT I



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH


CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
November 20, 2006

**Joint Statement Between the United States and the Republic of Indonesia**

- President Bush Meets with President Yudhoyono of Indonesia
- President's Trip to Southeast Asia

President Susilo Bambang Yudhoyono and President George W. Bush today reaffirmed the strength and vitality of the bilateral relationship between Indonesia and the United States, and reviewed the highly positive development of U.S-Indonesia relations over the past two years. The two Presidents recognized the special and enduring bonds between the two countries and their people, demonstrated recently by the close cooperation following the devastating tsunami in Aceh and Hurricane Katrina. President Bush expressed his admiration for the resilience and determination of the Indonesian people and government in rebuilding areas affected by the earthquake in Yogyakarta and Central Java.

The two Presidents reaffirmed that Indonesia and the United States are bound by a broad-based democratic partnership based on equality, mutual respect, common interests and shared values of freedom, pluralism and tolerance. The Presidents committed themselves to broadening and deepening such partnership.

President Bush congratulated Indonesia on the successful signing and implementation of a Memorandum of Understanding that has brought peace to the province of Aceh, and renewed the United States' firm support for Indonesia's peace-building efforts in Aceh. President Bush also re-emphasized the United States' strong support for Indonesia's national unity and territorial integrity, and opposition to secessionist movements in any part of Indonesia. President Bush stressed the importance of a united, democratic, pluralistic and prosperous Indonesia to the region and beyond.

President Bush congratulated President Yudhoyono on signing an agreement with the Millennium Challenge Corporation for a $55 million Threshold program, noting that it represents a resounding endorsement of President Yudhoyono's anti-corruption program and "pro-growth, pro-job, and pro-poor" economic strategy. President Bush expressed confidence that the threshold program will have a transformative effect on Indonesia's development and international competitiveness.

Noting the strength and importance of educational and cultural links, the Presidents reviewed the excellent work being done through the US$157 million U.S-Indonesia Education Initiative on basic education, the cornerstone of U.S. assistance to Indonesia and a symbol of our forward-looking partnership. The Presidents highlighted the importance of education for democracy, tolerance and economic progress and reaffirmed their commitment to working together to revitalize their cooperation in education. The Presidents also expressed their desire to encourage more people-to-people contacts through travel, educational exchanges, and tourism between Indonesia and the United States.

President Yudhoyono and President Bush noted with satisfaction the continuing development of U.S-Indonesia economic and trade relations. They welcomed the strong support by APEC Leaders for the conclusion of an ambitious Doha Round agreement and noted their joint commitment to do everything possible to realize the development goals of the Doha negotiations. President Yudhoyono briefed President Bush on his government's program to strengthen the investment climate by improving infrastructure, reducing red tape, enhancing the rule of law and respect for contracts. They welcomed a number of positive developments since their May 2005 meeting in Washington DC, including:

* The establishment of the ASEAN-U.S. Enhanced Partnership;

* Signing of a U.S.-ASEAN Trade and Investment Framework Arrangement (TIFA);

* The June 2006 extension of U.S. Export-Import Bank coverage to private Indonesian corporations for the first time since 1998;

* The upgrading of Indonesia from the Special 301 Priority Watch List in November 2006 based on steps to improve intellectual property rights enforcement; and

* The strengthening of our dialogue through our bilateral Trade and Investment Framework Agreement (TIFA) to further promote and facilitate trade and investment.

The Presidents praised two recently signed MOUs, one on Cooperation in Trade in Textile and Apparel Goods and another on Combating Illegal Logging and Associated Trade in the context of the TIFA between the two countries. They also applauded the resumption of cooperation and capacity building activities between the U.S. Forest Service and the Indonesian Ministry of Forestry.

The two Presidents discussed the grave threat posed by Avian Influenza (AI), and President Yudhoyono reiterated his Government's firm commitment to combating its spread. He briefed President Bush on Indonesia's completion of a unified national response plan, increase in the AI budget for 2007, and active participation in the International Partnership on Avian and Pandemic Influenza. President Bush announced the United States would increase its AI assistance to Indonesia to expand animal surveillance and response efforts and strengthen nation-wide public awareness. President Bush confirmed that the U.S. Centers for Disease Control and Prevention and Animal and Plant Health Inspection Service would assign permanent staff to Indonesia to build more effective partnerships with their counterparts in Indonesia. President Yudhoyono thanked President Bush for the United States' work in support of the Indonesian Ministry of Health's efforts to identify human AI cases and investigate AI outbreaks. The two Presidents stressed the imperative of continued and enhanced cooperation between Indonesian and American health workers and medical scientists to fight infectious diseases, including through the Naval Medical Research Unit (NAMRU-2), which has been in operation since 1968. They agreed that negotiations to extend the research work of NAMRU-2 should be expedited.

President Bush and President Yudhoyono reviewed the expanding partnership between the U.S. and Indonesia in the area of disaster management, emergency preparedness, and mitigation. The two Presidents noted the steady progress on constructing the west coast road in Aceh Province that will restore communication and economic links to communities that were devastated by the tsunami, and agreed on the importance of expediting land acquisition so that the road can be completed on schedule. President Bush applauded the significant progress made in reconstructing Aceh, paving the way for sustained peace and economic growth. President Bush and President Yudhoyono also welcomed the recent agreement between their two governments to cooperate on the development of a tsunami early warning system that will safeguard Indonesia's tsunami-prone areas by 2009.

The two leaders noted the tremendous opportunities for cooperation between Indonesia and the United States in the areas of alternative fuels and environmental protection. President Yudhoyono briefed President Bush on his ambitious biofuel development initiative and the Presidents endorsed the U.S.-Indonesia Energy Policy Dialogue as a forum to discuss ways and means to acquire clean and safe alternative energy, including biofuels.

As the leaders of two nations which have both suffered terrorist attacks on their soil, the two leaders reaffirmed their solidarity in defeating the scourge of terrorism. Both Presidents expressed satisfaction at the successful arrest and conviction in Indonesia of suspects involved in the 2002 incident in Timika, and agreed to begin negotiations toward a Mutual Legal Assistance Treaty.

President Bush and President Yudhoyono discussed a broad range of regional and global security issues. President Bush and President Yudhoyono welcomed the successful restoration of bilateral military ties, and pledged to make such ties sustainable and mutually beneficial in the support of peace and stability. They agreed that such ties would be primarily targeted at increasing coordination on disaster relief, exchanges and training on the role of militaries in democratic societies, increasing mutual professional development and enhancing regional and maritime security. They agreed to explore the possibility of a Status of Forces Agreement.

President Bush congratulated Indonesia on its election as a non-permanent member of the United Nations Security Council. Both Presidents pledged to work closely together on issues before the Council in order to maintain international peace and security, especially the challenge posed by North Korea's nuclear weapons program. President Bush applauded Indonesia's participation in maintaining peace in southern Lebanon by volunteering forces to join UNIFIL. The two Presidents also discussed the Arab-Israeli conflict, and both Presidents stressed their support for the establishment of a viable, independent, democratic and sovereign Palestine state that would live side by side in peace with Israel.

The two Presidents stressed the importance of inter-civilizational and inter-faith dialogues. The two Presidents expressed their concern to see growing religious intolerance in some parts of the world and their common desire to work against it. President Bush expressed great admiration and respect for Indonesia's long history of religious tolerance and moderate Islamic thought.

# # #

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2006/11/20061120-3.html

🖨 CLICK HERE TO PRINT

# EXHIBIT J

# NEW SEARCH | HOME | HELP | ABOUT COSPONSORS

## H.RES.238
**Title:** Commending the first democratic elections in Aceh, a province in Sumatra, Indonesia, and expressing support for the further democratic development and implementation of the Helsinki Memorandum of Understanding.
**Sponsor:** Rep Crowley, Joseph [NY-7] (introduced 3/12/2007)    Cosponsors (31)
**Latest Major Action:** 7/31/2007 House committee/subcommittee actions. Status: Committee Agreed to Seek Consideration Under Suspension of the Rules, by Unanimous Consent.

## COSPONSORS(31), ALPHABETICAL [followed by Cosponsors withdrawn]:    (Sort: by date)

Rep Ackerman, Gary L. [NY-5] - 7/27/2007
Rep Berman, Howard L. [CA-28] - 6/19/2007
Rep Blumenauer, Earl [OR-3] - 6/19/2007
Rep Bordallo, Madeleine Z. [GU] - 7/31/2007
Rep Burton, Dan [IN-5] - 3/12/2007
Rep Carnahan, Russ [MO-3] - 7/27/2007
Rep Engel, Eliot L. [NY-17] - 6/19/2007
Rep Faleomavaega, Eni F.H. [AS] - 7/27/2007
Rep Grijalva, Raul M. [AZ-7] - 6/19/2007
Rep Hastings, Alcee L. [FL-23] - 7/27/2007
Rep Hinojosa, Ruben [TX-15] - 7/27/2007
Rep Klein, Ron [FL-22] - 7/27/2007
Rep Lantos, Tom [CA-12] - 7/27/2007
Rep Lee, Barbara [CA-9] - 7/30/2007
Rep Maloney, Carolyn B. [NY-14] - 7/27/2007
Rep McCollum, Betty [MN-4] - 6/19/2007
Rep McDermott, Jim [WA-7] - 3/12/2007
Rep McGovern, James P. [MA-3] - 6/19/2007
Rep McNulty, Michael R. [NY-21] - 7/27/2007
Rep Meeks, Gregory W. [NY-6] - 7/27/2007
Rep Payne, Donald M. [NJ-10] - 6/19/2007
Rep Sanchez, Linda T. [CA-39] - 7/27/2007
Rep Schwartz, Allyson Y. [PA-13] - 7/27/2007
Rep Scott, David [GA-13] - 7/27/2007
Rep Sherman, Brad [CA-27] - 7/27/2007
Rep Sires, Albio [NJ-13] - 7/27/2007
Rep Smith, Adam [WA-9] - 7/30/2007
Rep Stark, Fortney Pete [CA-13] - 6/19/2007
Rep Watson, Diane E. [CA-33] - 7/27/2007
Rep Wexler, Robert [FL-19] - 3/12/2007
Rep Woolsey, Lynn C. [CA-6] - 7/27/2007

IV

110TH CONGRESS
1ST SESSION

# H. RES. 238

Commending the first democratic elections in Aceh, a province in Sumatra, Indonesia, and expressing support for the further democratic development and implementation of the Helsinki Memorandum of Understanding.

---

## IN THE HOUSE OF REPRESENTATIVES

MARCH 12, 2007

Mr. CROWLEY (for himself, Mr. MCDERMOTT, Mr. WEXLER, and Mr. BURTON of Indiana) submitted the following resolution; which was referred to the Committee on Foreign Affairs

---

# RESOLUTION

Commending the first democratic elections in Aceh, a province in Sumatra, Indonesia, and expressing support for the further democratic development and implementation of the Helsinki Memorandum of Understanding.

Whereas for three decades there has been a continuous armed conflict in Aceh, a province in Sumatra, Indonesia;

Whereas violence between the Indonesian military and the Free Aceh Movement has resulted in an estimated 15,000 deaths in the region;

Whereas the tsunami on December 26, 2004, killed at least 165,000 people in Aceh, devastated the landscape, and led to the loss of livelihood for 600,000 people;

2

Whereas the Government of Indonesia and the Free Aceh Movement signed a Memorandum of Understanding on August 15, 2005, in Helsinki;

Whereas the Aceh Monitoring Mission (AMM), led by the European Union (EU), the Association of Southeast Asian Nations (ASEAN), Norway, and Switzerland, has supported the implementation of the Helsinki Memorandum of Understanding successfully;

Whereas the Free Aceh Movement has demobilized its military troops and decommissioned its arms;

Whereas the Government of Indonesia has withdrawn its non-organic military and police forces from Aceh;

Whereas the Law on the Governing of Aceh (LoGA) was signed into law by Indonesian President Susilo Bambang Yudhoyono on August 1, 2006;

Whereas the general life situation of the Acehnese has improved significantly since the signing of the Helsinki Memorandum of Understanding and the Acehnese populate markets and celebrate festivities in public;

Whereas the first democratic and peaceful gubernatorial and district administrative elections in Aceh were held on December 11, 2006, and more than 80 percent of entitled Acehnese voted; and

Whereas Irwandi Yusuf, a former leader of the Free Aceh Movement, won the gubernatorial election with the highest support of more than 38 percent of total votes: Now, therefore, be it

1      *Resolved,* That the House of Representatives—

2          (1) commends the first democratic elections in

3      Aceh, a province in Sumatra, Indonesia, in which

3

the Acehnese have shown their strong commitment
to democracy and peace, and congratulates Irwandi
Yusuf, the first democratic elected governor of Aceh;

(2) expresses its ongoing support for the fur-
ther democratic development of Aceh and the Hel-
sinki Memorandum of Understanding signed by the
Government of Indonesia and the Free Aceh Move-
ment on August 15, 2005;

(3) encourages both parties to live up to their
commitments under the Helsinki Memorandum of
Understanding, especially with regard to establishing
a Human Rights Court for Aceh and a Commission
of Truth and Reconciliation; and

(4) encourages the Secretary of State and the
Administrator of the United States Agency for
International Development to commit resources in
supporting the peace and building a strong civil soci-
ety in Aceh.

○

EXHIBIT K

THE LEGAL ADVISER

DEPARTMENT OF STATE

WASHINGTON

July 29, 2002

Honorable Louis F. Oberdorfer
United States District Court for
    The District of Columbia
333 Constitution Ave., NW
Washington, D.C. 20001

            Re:  *Doe, et al. v. ExxonMobil, et al.*
                 No. 01-CV-1357 (DDC)

Dear Judge Oberdorfer:

    This is in response to your letter of May 10, in which
you invite the views of the Department of State in
connection with the above-captioned proceedings.
Specifically, you inquire "whether the Department of State
has an opinion (non-binding) as to whether adjudication of
this case at this time would impact adversely on interests
of the United States, and, if so, the nature and
significance of that impact." As you requested, this
letter specifically addresses the potential adverse impacts
of the litigation on U.S. interests. It does not address
the legal issues before the court.

    For the reasons detailed below, the Department of
State believes that adjudication of this lawsuit at this
time would in fact risk a potentially serious adverse
impact on significant interests of the United States,
including interests related directly to the on-going
struggle against international terrorism. It may also
diminish our ability to work with the Government of
Indonesia ("GOI") on a variety of important programs,
including efforts to promote human rights in Indonesia.

2

However, before describing those concerns, the
Department would like to reaffirm its condemnation of human
rights abuses by elements of the Indonesian armed forces in
locations such as Aceh.  Without expressing a view on the
allegations in this specific lawsuit, we would like to
reiterate that a lasting, peaceful solution to the Aceh
conflict that maintains Indonesian sovereignty can only be
achieved if the military and police end human rights
abuses.  The Department will continue to work vigorously to
bring such abuses to an end through diplomatic and other
means.

        With respect to this litigation, it is the
Department's considered opinion that adjudication at this
time could adversely affect United States interests in two
ways, recognizing that such effects cannot be determined
with certainty.[1]  First, the GOI may respond to the
litigation by curtailing cooperation with the United States
on issues of substantial importance to the United States.
Second, the litigation's potential effects on Indonesia's
economy could in turn adversely affect important United
States interests.

**Potential Bilateral Effects**
        In our experience, the government and people of
Indonesia react most negatively to any perceived intrusion
into areas of Indonesian sovereignty.  We anticipate that
adjudication of this case will be perceived in Indonesia as
a U.S. court trying the GOI for its conduct of a civil war
in Aceh.  All of the human rights abuses and injuries
alleged in the complaint refer to conduct claimed to have
been committed by the military and police forces of the
GOI.  This issue presents special sensitivities for
Indonesia because it is deeply concerned about maintaining
national cohesion in the face of strong anti-government
secessionist movements in Aceh and elsewhere.  The

---

[1] Much of this assessment is necessarily predictive and contingent on
how the case might unfold in the course of litigation.  E.g., the
nature, extent, and intrusiveness of discovery; the degree to which the
case might directly implicate matters of great sensitivity to the
Government of Indonesia and call for judicial pronouncements on the
official actions of the GOI with respect to the conduct of its military
activities in Aceh; the effect that a decision in favor of plaintiffs
might encourage secessionist activities in Aceh and elsewhere in
Indonesia; whether the case were to go to a jury and, if so, whether a
substantial monetary award were to be imposed on Exxon Mobil; how other
large commercial interests might interpret such a judgment when making
investment decisions in Indonesia.

3

Indonesian response to such perceived U.S. "interference" in its internal affairs could impair cooperation with the U.S. across the full spectrum of diplomatic initiatives, including counterterrorism, military and police reform, and economic and judicial reform.

This lawsuit could potentially disrupt the on-going and extensive United States efforts to secure Indonesia's cooperation in the fight against international terrorist activity.  Indonesia is the fourth largest state in the world, with a population of some 210 million.  It is also the largest Muslim nation, and serves as a focal point for U.S. initiatives in the ongoing war against Al Qaida and other dangerous terrorist organizations.  U.S. counter-terrorism initiatives could be imperiled in numerous ways if Indonesia and its officials curtailed cooperation in response to perceived disrespect for its sovereign interests.

The United States also is actively seeking to assist Indonesia in reform efforts aimed at ending the kinds of abuses alleged in this litigation.  Through improved training and support of security personnel, as well as judicial reform, these programs are designed to establish a higher degree of professionalism and respect for individual rights.  Should the GOI withdraw from these programs in reaction to the litigation, it will impact adversely on our goal of improving Indonesia's treatment of all members of its population, including the people of Aceh.  An adverse effect on our human rights objectives is also possible if the GOI were to turn down U.S. companies bidding for new contracts in response to the suit.  Working side-by-side with U.S. firms, Indonesian companies and government agencies see the advantages of modern business practices including transparency, respect for contracts, fair labor practices, anti-corruption, efficiency, and competitiveness.  We would expect that foreign companies, such as from the People's Republic of China (CNOOC and PetroChina both acquired multi-million dollar rights to Indonesian oil and gas fields this year), would be far less concerned about human right abuses, or about upholding best business practices.

**Potential Effects on Indonesia's Stability**

Economic and political stability in Indonesia is important to U.S. interests in the region.  Given Indonesia's large population, resources, key geographic

DA0184

4

location, and proximity to key U.S. allies, instability there could create problems ranging from interruption in vital shipping lanes, to refugee outflows, to a new home for terrorists.  To the extent this litigation contributes to a worsening of the economic conditions in Indonesia that breed instability it would adversely affect U.S. interests.

Here, timing is an important consideration, because there is already substantial evidence that Indonesia's foreign investment climate is deteriorating.  The GOI's Investment Coordinating Board (BKPM), for example, reported that foreign direct investment approvals dropped 88 percent in the first quarter of 2002 (US$ 291.5 million) compared to the first quarter of 2001 (US$ 2.44 billion).  Total BKPM foreign direct investment approvals for 2001 also dropped 41.5 percent from the previous year.  While the dollar value of investment proposals may be inflated and many proposals do not necessarily result in actual projects, the magnitude of the change confirms that the underlying trend is worsening.

This litigation appears likely to further discourage foreign investment, particularly in extractive industries in remote or unstable areas that require security protection.  This, in turn, could have decidedly negative consequences for the Indonesian economy.  Revenues from the oil and gas sector, for example, are one of the core contributors to GOI budget revenues, comprising 35 percent of the Indonesian Government's total revenues in 2001.  In the last few years, oil and gas revenues (including taxes on the sector) have become an increasingly important source of government funds, comprising 19, 23, and 31 percent of total government revenue respectively in 1998, 1999, and 2000.  In addition, oil and gas revenues, which are received in U.S. dollars, offer important protection for the GOI from foreign exchange risk.  However, in order to maintain its current level of revenues from the sector, Indonesia must develop new fields, or invest further to maintain production at existing oil and gas fields.  More generally, Indonesia must maintain a growing economy to deal with the effects of the 1997-98 financial crisis, which left the GOI with the costs of a Rp 660 trillion (US$ 75 billion) bank bailout.  Efforts by the U.S. and other donors to enhance Indonesia's fiscal sustainability through debt rescheduling and international lending programs will be undermined if Indonesia cannot sustain its own commitments.

5

A viable, well-funded central government is also important to U.S. interests in domestic Indonesian policies. Providing more and higher quality public services, especially education and health services, is a key factor in reducing poverty and maintaining political stability. Given its size and large population, any threat to Indonesia's political stability could impact on the security of U.S. treaty allies Australia and Thailand, as well as other countries in the region. Adequate government resources are also necessary to maintain properly trained and equipped security forces that do not need to rely on unregulated and often corrupt business dealings, practices which contribute to actions outside of a central chain of command. Professional personnel are also crucial for making progress on a host of U.S. priorities, including promoting regional stability, countering ethnic and sectarian violence, combating piracy, trafficking of persons, smuggling, narcotics trafficking, and environmentally unsustainable levels of fishing and logging. Litigation in the U.S. that discourages further investment in Indonesia poses a risk of weakening the Indonesian economy in conflict with these U.S. goals.

In this respect, we note that increasing opportunities for U.S. business abroad is an important aspect of U.S. foreign policy. Under the circumstances presented here, the adjudication of these claims could prejudice the Government of Indonesia and Indonesian businesses against U.S. firms bidding on contracts in extractive and other industries.

For the information of the Court, I am enclosing a copy of a letter received on July 15, 2002, from Indonesia's Ambassador to the United States Soemadi Djoko M. Brotodiningrat to Deputy Secretary of State Richard Armitage. In the letter Ambassador Soemadi expresses his government's objections to the continued adjudication of this case. He states that Indonesia views this litigation as an unacceptable extraterritorial act that will complicate efforts to safeguard foreign investors and will

6

negatively impact Indonesia's struggle to secure economic
recovery.  He also states that the case will have an
adverse impact on effort towards peace in Aceh, which is at
an extremely sensitive stage.

Sincerely,

William H. Taft, IV
The Legal Adviser

Enclosure:
       Letter from Indonesian Ambassador

EXHIBIT L

THE LEGAL ADVISER

DEPARTMENT OF STATE

WASHINGTON

July 15, 2005

Honorable Louis F. Oberdorfer
United States District Court for
   the District of Columbia
333 Constitution Ave., NW
Washington, D.C. 20001

   Re: *Doe, et al. v. ExxonMobil, et al.*, No. 01-CV-1357 (DDC)

Dear Judge Oberdorfer:

   Thank you for inviting the views of the Department of State and the Government of
Indonesia regarding plaintiffs' proposed discovery plan of May 16.

   The proposed discovery plan triggers the concerns set forth in the State Department letter
of July 2002, which remain valid today. With regard to the practicalities of conducting
discovery in Indonesia, and Indonesian objections to the discovery plan, we are transmitting for
the Court's information Indonesian diplomatic note No. 145/VI/05/05/DN of June 15 in response
to the Court's invitation for the views of the Government of Indonesia.

   Finally, we emphasize that the discussion of human rights abuses remains a key component
in our relations with the Government of Indonesia, and we continue to work vigorously to bring
human rights abuses in Aceh to an end through diplomatic and other means.

   I hope that this information will be helpful to the Court.

                                        Sincerely,

                                        John B. Bellinger, III

Enclosure:
   Diplomatic Note No. 145/VI/05/05/DN


GOVERNMENT
EXHIBIT
A

DA0244

EXHIBIT M

KEDUTAAN BESAR REPUBLIK INDONESIA
EMBASSY OF THE REPUBLIC OF INDONESIA
WASHINGTON, D.C. 20036

CHANCERY
2020 MASSACHUSETTS AVENUE, N.W.
TELEPHONE (202) 775-5200

THE AMBASSADOR

Washington, D.C.  15 July 2002

*Excellency,*

I have the honour to draw your attention to the lawsuit filed in the United States District Court for the District of Columbia on June 19, 2001 against Exxon Mobil Corporation, Civ. No. 01-1357 (LFO).

While fully respecting the United States sovereignty over its judiciary, I feel nevertheless obliged to express my concern should the above-mentioned lawsuit be adjudicated, for the following reasons:

1.  As a matter of principle, we cannot accept the extra territorial jurisdiction of a United States Court over an allegation against an Indonesian government institution, eg the Indonesian military, for operations taking place in Indonesia.

2.  While allegation of abuses of human rights by the Indonesian military against the separatist Free Aceh movement is at best questionable, its adjudication in the United States court will definitely compromise the serious efforts of the Indonesian government to guarantee the safety of foreign investments, including in particular those from the United States, and thus will adversely affect Indonesia's struggle to secure economic recovery, a struggle which is supported by the United States.

3.  The adjudication of the above-mentioned lawsuit will also have an adverse impact on the process to find a peaceful and satisfactory solution on the problem of Aceh, which is currently at an extremely sensitive and delicate stage, a process which is also of interest to the United States.

I would highly appreciate your kind consideration on the points I raised should you be seized with the matter.

Please accept, Excellency, the assurances of my highest consideration.

Soemadi D.M. Brotodiningrat
Ambassador

The Honorable
Richard L. Armitage
Deputy Secretary of State
The Department of State
Washington, D.C.

EXHIBIT N

### EMBASSY OF THE REPUBLIC OF INDONESIA
#### 2020 MASSACHUSETTS AVENUE, N.W.
#### WASHINGTON, D.C. 20036

No.: 145/VI/05/05/DN

The Embassy of the Republic of Indonesia presents its compliment to the Department of State and has the honor to refer to Civil Action No. 01 – 1357 (LFO) on *Doe, et al. v. ExxonMobil* et al. case. In this connection, the Embassy has further the honor to reiterate the statements contained in the letter from Ambassador Brotodiningrat to Hon. Richard L. Armitage, Deputy Secretary of State, dated July 15, 2002.

In line with the above reaffirmation, in particular that of the Ambassador's statement that *"as a matter of principle, we cannot accept the extra territorial jurisdiction of a United States Court over an allegation against an Indonesian government institution, cq the Indonesian military, for operations taking place in Indonesia"*, the Embassy would like to draw the kind attention of the Department that limited discovery as proposed by the plaintiffs is unacceptable to Indonesia. The Embassy further requests the esteemed Department to help ensure that the judicial sovereignty of the Republic of Indonesia be fully and thoroughly respected.

The Embassy of the Republic of Indonesia avails itself of this opportunity to renew to the Department of State the assurances of its highest consideration.

Washington, DC, June 15, 2005

**The Department of State**
**of The United States of America**
**Washington, DC**

DA0245

EXHIBIT O



**EMBASSY OF THE REPUBLIC OF INDONESIA**
2020 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20036

No.: 120/II/07/05/DN

The Embassy of the Republic of Indonesia presents its compliments to the Department of State and has the honor to refer to the letter of Ambassador Brotodiningrat to the Honorable Richard L. Armitage, Deputy Secretary of State, dated July 15, 2002, and the diplomatic note of the Indonesian Embassy No. 145/VI/05/05/DC dated July 15, 2005 (attached). Both documents clearly expressed the position of Indonesian Government toward the ongoing civil litigation referred to as Lawsuit Civ. No. 01-1356 (LFO) in the United States District Court for the District of Columbia.

The Embassy of the Republic of Indonesia follows with concern the continuation of the case whereby the District Court dismissed the federal claims but allowed Plaintiffs to amend their baseless complaint to be heard at the state level.

In this regard, Indonesia should like to reaffirm its position as contained in the previous correspondences.

In addition, the Embassy should like to highlight the progress that has been made towards establishing peace in Aceh. It is a well-known fact that peace has finally arrived in Aceh with the signing of the Memorandum of Understanding between Government of Indonesia and Free Aceh Movement signed in Helsinski on 15 August 2005, which provided, inter-alia, a legal basis for the promulgation of a new law of government in Aceh guaranteeing free and fair local elections, the establishment of a human rights court and the establishment of a commission for truth and reconciliation, to end all acts of

violence and the establishment of an Aceh Monitoring Mission by the European Union and ASEAN Contributing Countries to monitor the implementation of the MoU.

Based on this MoU, Aceh has witnessed a free and fair election monitored by international community, including US-based election monitors.

On 14 August 2006, in the "International Conference: One Year After the Signing of MoU Helsinki" in Jakarta, Indonesia, Finnish President, Japanese Prime Minister, British Prime Minister, H.E. Nelson Mandela, Malaysia Prime Minister, Australian Prime Minister, UN Secretary-General, congratulated Indonesia for its achievement in materializing the peace in Aceh.

It is against this backdrop that the continuation of the Lawsuit Civ. No. 01-1357 (LFO) could be deemed as undermining the result of the democratic process, ending more than three decades of conflict in Aceh.

The Embassy highly appreciates the kind consideration of the Department on this matter and for it to be communicated with relevant institutions in the United States.

The Embassy of the Republic of Indonesia avails itself of this opportunity to renew to the Department of State the assurances of its highest consideration.

Washington, D.C.,  February 1, 2007



**The Department of State**
**of The United States of America**
**Washington, D.C.**

EXHIBIT P

# Indonesia plans to revise security pay guidelines

By Shawn Donnan in Jakarta
Published: February 7 2006 02:00 | Last updated: February 7 2006 02:00

Indonesia plans to revise guidelines governing the relationship between its military and foreign companies for which its soldiers provide security in conflict areas, the country's defence minister said yesterday.

The move follows renewed allegations surrounding Freeport McMoRan and its relationship with the Indonesian military in remote Papua province, where the New Orleans-based miner operates the world's largest gold and copper mine.

Recent reports that Freeport has made millions of dollars in payments to individual military officers have prompted calls for investigations from Indonesia and the US, with some alleging the company may have violated the US Foreign Corrupt Practices Act. Freeport has denied any wrongdoing.

Juwono Sudarsono, Indonesia's defence minister, said yesterday the allegations had prompted a review in Jakarta of the guidelines governing relationships such as Freeport's with the military.

He said new guidelines could be issued within weeks. The government was considering a change that would require all companies to funnel payments to the military through a local partner or government agency, he told reporters.

As an example, he cited the case of ExxonMobil, whose natural gas facilities in the conflict-torn Aceh province have been guarded since 2000 by the military via an arrangement with state oil company Pertamina, its local partner.

Indonesian law requires resource projects deemed to be of national importance, such as Freeport's Grasberg mine and ExxonMobil's Arun gas field in Aceh, to be guarded by security forces.

Soldiers' meagre salaries have meant companies such as Freeport often supplement them or provide barracks, food, and other compensation. In some cases the practice has led to awkward relationships between companies and the military.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE VIII, et al.,       ) | |
|         ) | |
| Plaintiffs,     ) | |
|         ) | |
| v.         ) | Civ. No. 07-01022 (LFO) |
|         ) | |
| EXXON MOBIL CORPORATION, et al.,   ) | |
|         ) | |
| Defendants.    ) | |
|         ) | |

## DECLARATION OF BRENDA C. FITZPATRICK

I, Brenda C. Fitzpatrick, hereby declare as follows:

1.     I am Assistant Secretary of Exxon Mobil Corporation, a position I have held since November 1, 1997.  I am authorized to execute this declaration on behalf of Exxon Mobil Corporation.

2.     Defendants in this matter are Exxon Mobil Corporation, Mobil Corporation, ExxonMobil Oil Corporation, and ExxonMobil Oil Indonesia Inc.

3.     Exxon Mobil Corporation is a New Jersey corporation with its principal place of business in Irving, Texas.

4.     Mobil Corporation is a Delaware corporation with its principal place of business in Irving, Texas.  Exxon Mobil Corporation is the sole shareholder of Mobil Corporation.

5.     ExxonMobil Oil Corporation is a New York corporation with its principal place of business in Irving, Texas.  Mobil Corporation is the sole shareholder of ExxonMobil Oil Corporation.

6.    ExxonMobil Oil Indonesia Inc. ("EMOI") is a Cayman Islands corporation with its principal place of business in Jakarta, Indonesia. Mobil Exploration and Producing North America Inc. ("MEPNA") is the sole shareholder of EMOI. Mobil Corporation is the sole shareholder of MEPNA.

7.    EMOI's Certificate of Registration in the Cayman Islands is attached as Exhibit 1. EMOI's Memorandum and Articles of Association is attached as Exhibit 2.

8.    Eighteen individuals hold officer positions in EMOI. EMOI has no officers in common with any of the other defendants, except for one Assistant Secretary who is also Assistant Secretary of Exxon Mobil Corporation.

9.    EMOI has four directors. None of EMOI's directors are in common with any of the other defendants.

10.    The facts set forth herein have been verified by me after appropriate inquiry.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 12, 2007.



BRENDA C. FITZPATRICK

- 2 -

# EXHIBIT 1



MC-159740

# Certificate of Registration By Way of Continuation

I, D. EVADNE EBANKS    Assistant Registrar of Companies in and for the Cayman Islands DO HEREBY CERTIFY, pursuant to the Companies Law CAP. 22, that all requirements of the said Law in respect of registration were complied with by

## EXXONMOBIL OIL INDONESIA INC.

an Exempted Company registered by way of continuation in the Cayman Islands with Limited Liability with effect from 16th day of December Two Thousand Five

Given under my hand and Seal at George Town in the Island of Grand Cayman this 16th day of December Two Thousand Five

Assistant Registrar of Companies,
Cayman Islands, B.W.I.

REGISTRAR OF COMPANIES
CAYMAN ISLANDS
EXEMPTED

EXHIBIT 2

THE COMPANIES LAW (2004 REVISION)

OF THE CAYMAN ISLANDS

COMPANY LIMITED BY SHARES

MEMORANDUM AND ARTICLES

OF

ASSOCIATION

OF

EXXONMOBIL OIL INDONESIA INC.

THE COMPANIES LAW (2004 REVISION)

OF THE CAYMAN ISLANDS

COMPANY LIMITED BY SHARES

MEMORANDUM OF ASSOCIATION

OF

EXXONMOBIL OIL INDONESIA INC.

(As adopted on 16th December, 2005)

1      The name of the Company is ExxonMobil Oil Indonesia Inc.

## REGISTERED OFFICE

2      The registered office of the Company shall be at the offices of M&C Corporate Services Limited, PO Box 309GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands, or at such other place as the Directors may from time to time decide.

## OBJECTS AND POWERS

3      The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the Companies Law (2004 Revision) or as the same may be revised from time to time, or any other law of the Cayman Islands.

4      The liability of each Member is limited to the amount from time to time unpaid on such Member's shares.

## AUTHORISED CAPITAL

5      The authorised capital of the Company is US$900,000 divided into 860,000 Common Shares of US$1.00 each and 40,000 Preference Shares of US$20.00 each, with such rights and restrictions as are contained in the Memorandum and Articles of Association.

2

## REGISTERED SHARES

6        Shares shall be issued as registered shares.

## CONTINUATION

7        The Company has power to register by way of continuation as a body corporate limited by shares under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

## TERMS

8        Capitalised terms that are not defined in this Memorandum of Association bear the same meaning as those given in the Articles of Association of the Company.

## AMENDMENT OF MEMORANDUM AND ARTICLES OF ASSOCIATION

9        The Company may alter its Memorandum of Association by a special resolution of Members.

CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG. _____

DONNELL H. DIXON
Sur Assistant Registrar

Date. 20th December 2006

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

THE COMPANIES LAW (2004 REVISION)

OF THE CAYMAN ISLANDS

COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

EXXONMOBIL OIL INDONESIA INC.

(As adopted on 16th December, 2005)

**INTERPRETATION**

1    In these Articles Table A in the First Schedule to the Statute does not apply and, unless there is something in the subject or context inconsistent therewith:

| | |
|---|---|
| **"Articles"** | means these articles of association of the Company. |
| **"Auditor"** | means the person for the time being performing the duties of auditor of the Company (if any). |
| **"Common Share"** | means a common share of US$1.00 par value in the capital of the Company having the rights attaching to it set out in these Articles and shall include the Class A Common Shares unless the context otherwise requires. |
| **"Company"** | means the above named company. |
| **"Directors"** | means the directors for the time being of the Company. |
| **"Dividend"** | includes an interim dividend. |
| **"Electronic Record"** | has the same meaning as in the Electronic Transactions Law (2003 Revision). |
| **"Member"** | has the same meaning as in the Statute. |
| **"Memorandum"** | means the memorandum of association of the Company. |
| **"Ordinary Resolution"** | means a resolution passed by a simple majority of the Members as, being entitled to do so, vote in person or, |

2

|  | where proxies are allowed. by proxy at a general meeting, and includes a unanimous written resolution. In computing the majority when a poll is demanded regard shall be had to the number of votes to which each Member is entitled by the Articles. |
|---|---|
| **"Preferred Share"** | means a preferred share of US$20.00 par value in the capital of the Company having the rights attaching to it set out in these Articles. |
| **"Register of Members"** | means the register maintained in accordance with the Statute and includes (except where otherwise stated) any duplicate Register of Members. |
| **"Registered Office"** | means the registered office for the time being of the Company. |
| **"Seal"** | means the common seal of the Company and includes every duplicate seal. |
| **"Share" and "Shares"** | means a share or shares in the Company and includes a fraction of a share. |
| **"Special Resolution"** | (a) means a resolution that is passed by a majority of not less than two-thirds of the Members as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of which notice specifying the intention to propose the resolution as a special resolution has been duly given; or <br> (b) a resolution approved in writing by all of the Members entitled to vote at a general meeting of the company in one or more instruments each signed by one or more afresaid, and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed. |
| **"Statute"** | means the Companies Law (2004 Revision) of the Cayman Islands. |

2    In the Articles:

2.1    words importing the singular number include the plural number and vice-versa;

2.2    words importing the masculine gender include the feminine gender;

2.3    words importing persons include corporations;

3

2.4    "written" and "in writing" include all modes of representing or reproducing words in visible form, including in the form of an Electronic Record;

2.5    references to provisions of any law or regulation shall be construed as references to those provisions as amended, modified, re-enacted or replaced from time to time;

2.6    any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

2.7    headings are inserted for reference only and shall be ignored in construing these Articles; and

2.8    in these Articles Section 8 of the Electronic Transactions Law shall not apply.

## COMMENCEMENT OF BUSINESS

3    The business of the Company may be commenced as soon after incorporation as the Directors shall see fit.

## ISSUE OF SHARES

4    Subject to the provisions, if any, in the Memorandum (and to any direction that may be given by the Company in general meeting) and without prejudice to any rights attached to any existing Shares, the Directors may allot, issue, grant options over or otherwise dispose of Shares (including fractions of a Share) with or without preferred, deferred or other rights or restrictions, whether in regard to Dividend, voting, return of capital or otherwise and to such persons, at such times and on such other terms as they think proper.

5    The Company shall not issue Shares to bearer.

## PREFERENCE SHARES

6    The Preference Shares shall confer on the holders thereof the following rights and restrictions (and Article 7 of these Articles shall take effect subject thereto)

     (i)    the holders of the Preference Shares shall be entitled to receive and the Company shall pay thereon if and when declared by the directors out of monies of the Company available for the payment of dividends a fixed cumulative preferential dividend at a rate to be set by the directors at the time of issuance and pursuant to such other rights set by the directors at the time of issuance. No dividends shall at any time be declared or paid on any Common Shares of the Company for any financial year unless the preferential dividend on the Preference Shares then issued and outstanding shall have been declared and paid or provided for at the date of such declaration or payment. The holders of the Preference Shares shall not be entitled to any dividends other than the preferential dividends provided for herein.

4

    (ii)    The holders of the Preference Shares shall be entitled to attend and vote at meetings of the members convened to consider the following matters:

        (a)    the reduction of the authorised capital, or

        (b)    amendments affecting the rights and privileges of the Preference Shares, or

        (c)    to wind up the Company, or

        (d)    to sanction the sale of assets of the Company.

    (iii)    In the event of the liquidation, dissolution or winding up of the Company, the holders of the Preference Shares shall be entitled to receive an amount equal to the capital contributed in consideration for the issuance of their shares and all dividends thereon and unpaid before any amount shall be paid or any property or asset of the Company distributed to the holders of any Common Shares. After payment to the holders of the Preference Shares of the amounts so payable to them as above provided, they shall not be entitled to share in any further distribution of the property or assets of the Company.

## SHARE RIGHTS AND LIMITATIONS

7    The designations, powers, preferences, rights, qualification, limitations and restrictions of each class and series of shares that the Company is authorised to issue shall be fixed by resolution of directors but the directors shall not allocate different rights as to voting, dividends, redemption or distributions on liquidation between the types of shares of the Company unless the Memorandum of Association shall have been amended to create additional separate classes of shares and all shares of each separate class and series shall have identical rights as to voting, dividends, redemption and distributions.

## VARIATION OF CLASS RIGHTS

8    If at any time the authorised capital is divided into different classes or series of shares, the rights attached to any class or series (unless otherwise provided by the terms of issue of the shares of that class or series) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of not less than three-fourths of the issued shares of that class or series and of the holders of not less than three-fourths of the issued shares of any other class or series of shares which may be affected by such variation.

9    The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

5

## SHARES CERTIFICATES

10    Subject to such conditions as the Directors may reasonably determine for the issue of certificates every Member holding shares in the Company shall be entitled to a certificate which certificate shall be signed by a Director or officer of the Company under the Seal specifying the share or shares held by him and the signature of the Director or officer and the Seal may be facsimiles.

11    Any Member receiving a share certificate for registered shares shall indemnify and hold the Company and its Directors and officers harmless from any loss or liability which it or they may incur by reason of any wrongful or fraudulent use or representation made by any person by virtue of the possession thereof. If a share certificate for registered shares be worn out or defaced, the Directors may upon surrender thereof for cancellation issue a new one in its stead and if it be lost or destroyed, the Directors may upon the loss or destruction being established to their satisfaction and upon such indemnity being given to the Company as it by resolution of Directors may determine issue a new one in its stead.

## TRANSFER OF SHARES

12    Subject to any limitations in the Memorandum of Association, shares in the Company may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, but in the absence of such written instrument of transfer the Directors may accept such evidence of a transfer of shares as they consider appropriate.

13    The Company shall not be required to treat a transferee of a share in the Company as a Member until the transferee's name has been entered in the Share Register.

## REDEMPTION AND REPURCHASE OF SHARES

14    Subject to the provisions of the Statute the Company may issue Shares that are to be redeemed or are liable to be redeemed at the option of the Member or the Company. The redemption of such Shares shall be effected in such manner as the Company may, by Special Resolution, determine before the issue of the Shares.

15    Subject to the provisions of the Statute, the Company may purchase its own Shares (including any redeemable Shares) provided that the Members shall have approved the manner of purchase by Ordinary Resolution.

16    The Company may make a payment in respect of the redemption or purchase of its own Shares in any manner permitted by the Statute, including out of capital.

6

## VARIATION OF RIGHTS OF SHARES

17    If at any time the authorised capital is divided into different classes or series of shares, the rights attached to any class or series (unless otherwise provided by the terms of issue of the shares of that class or series) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of not less than three-fourths of the issued shares of that class or series and of the holder of not less than three-fourths of the issued shares of any other class or series of shares which may be affected by such variation.

18    The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

## LIEN ON SHARES

19    The Company shall have a first and paramount lien on every share issued for a promissory note or for any other binding obligation to contribute money or property or combination thereof to the Company and the Company shall also have a first and paramount lien on every share standing registered in the name of a Member, whether singly or jointly with any other person or persons, for all the debts and liabilities of such Member or his estate to the Company whether the same shall have been incurred before or after notice to the Company of any interest of any person other than such Member, and whether the time for the payment or discharge of the same shall have actually arrived or not, and notwithstanding that the same are joint debts or liabilities of such Member or his estate and any other person, whether a Member of the Company or not. The Company's lien on a share shall extend to all dividends payable thereon. The Directors may at any time either generally, or in any particular case, waive any lien that has arisen or declare any share to be wholly or in part exempt from the provisions of this Article.

## TRANSMISSION OF SHARES

20    If a Member dies the survivor or survivors where he was a joint holder, and his legal personal representatives where he was a sole holder, shall be the only persons recognised by the Company as having any title to his interest.  The estate of a deceased Member is not thereby released from any liability in respect of any Share, which had been jointly held by him.

21    Any person becoming entitled to a Share in consequence of the death or bankruptcy or liquidation or dissolution of a Member (or in any other way than by transfer) may, upon such evidence being produced as may from time to time be required by the Directors, elect either to become the holder of the Share or to have some person nominated by him as the transferee.  If he elects to become the holder he shall give notice to the Company to that effect, but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by that Member before his death or bankruptcy, as the case may be.

7

22    If the person so becoming entitled shall elect to be registered himself as holder he shall deliver or send to the Company a notice in writing signed by him stating that he so elects.

23    A person becoming entitled to a Share by reason of the death or bankruptcy or liquidation or dissolution of the holder (or in any other case than by transfer) shall be entitled to the same Dividends and other advantages to which he would be entitled if he were the registered holder of the Share. However, he shall not, before being registered as a Member in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company and the Directors may at any time give notice requiring any such person to elect either to be registered himself or to transfer the Share. If the notice is not complied with within ninety days the Directors may thereafter withhold payment of all Dividends, bonuses or other monies payable in respect of the Share until the requirements of the notice have been complied with.

## REGISTER OF MEMBERS

24    The Company shall maintain or cause to be maintained the Register of Members in accordance with the Statute.

## CLOSING REGISTER OF MEMBERS OR FIXING RECORD DATE

25    For the purpose of determining Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any Dividend, or in order to make a determination of Members for any other proper purpose, the Directors may provide that the Register of Members shall be closed for transfers for a stated period which shall not in any case exceed forty days. If the Register of Members shall be closed for the purpose of determining Members entitled to notice of, or to vote at, a meeting of Members the Register of Members shall be closed for at least ten days immediately preceding the meeting.

26    In lieu of, or apart from, closing the Register of Members, the Directors may fix in advance or arrears a date as the record date for any such determination of Members entitled to notice of, or to vote at any meeting of the Members or any adjournment thereof, or for the purpose of determining the Members entitled to receive payment of any Dividend or in order to make a determination of Members for any other proper purpose.

27    If the Register of Members is not so closed and no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or Members entitled to receive payment of a Dividend, the date on which notice of the meeting is sent or the date on which the resolution of the Directors declaring such Dividend is adopted, as the case may be, shall be the record date for such determination of Members.  When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Article, such determination shall apply to any adjournment thereof.

8

# AMENDMENTS OF MEMORANDUM AND ARTICLES OF ASSOCIATION AND ALTERATION OF CAPITAL

28    28.1    Subject to the requirements of the Statute, the Company may by Ordinary Resolution:

(a)    increase or decrease its authorised capital and in connection therewith the Company may in respect of any unissued shares increase or decrease the number of such shares, increase or reduce the par value of any such shares or effect any combination of the foregoing;

(b)    consolidate and divide all or any of its share capital into Shares of larger amount than its existing Shares; however, that where shares are divided or combined, the aggregate par value of the new shares must be equal to the aggregate par value of the original shares;

(c)    By subdivision of its existing Shares or any of them divide the whole or any part of its Share capital into Shares of smaller amount than is fixed by the Memorandum or into Shares without par value; or

(d)    cancel any Shares that at the date of the passing of the resolution have not been taken or agreed to be taken by any person

28.2    Subject to the requirements of the Statute, the capital may by Special Resolution be reduced by:

(a)    returning to members any amount received by the Company upon the issue of any of its shares, the amount being surplus to the requirements of the Company, or

(b)    cancelling any capital that is lost or not represented by assets having a realisable value.

28.3    No reduction of capital shall be effected unless the Directors determine that immediately after the reduction of the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and that the realisable value of the assets of the Company will not be less than its total liabilities, other than deferred taxes, as shown in books of the Company and its remaining issued and outstanding share capital.

29    All new Shares created in accordance with the provisions of the preceding Article shall be subject to the same provisions of the Articles with reference to the payment of calls, liens, transfer, transmission, forfeiture and otherwise as the Shares in the original share capital.

30    Subject to the provisions of the Statute and the provisions of these Articles as regards the matters to be dealt with by Ordinary Resolution, the Company may by Special Resolution:

30.1    change its name;

9

30.2    alter or add to these Articles; and

30.3    alter or add to the Memorandum with respect to any objects, powers or other matters specified therein.

## REGISTERED OFFICE

31    Subject to the provisions of the Statute, the Company may by resolution of the Directors change the location of its Registered Office.

## GENERAL MEETINGS

32    All general meetings other than annual general meetings shall be called extraordinary general meetings.

33    The Directors may, whenever they think fit convene a general meeting of the Company.

34    General meetings shall also be convened on the written requisition of any Member or Members entitled to attend and vote at general meetings of the Company who hold not less than 10 per cent of the paid up voting share capital of the Company.

## NOTICE OF GENERAL MEETINGS

35    Subject to the provisions of Section 60 of the Law relating to Special Resolutions, seven days notice at the least counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such persons as are, under the Articles, entitled to receive such notices from the Company, but with the consent of all the Members entitled to receive notice of some particular meeting attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Members may think fit.

36    The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Member shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

37    No business shall be transacted at any general meeting unless a quorum of Members is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Members holding at least 50 percent of the paid up shares of the Company entitled to vote at the meeting present in person or by proxy shall be a quorum.

38    A person may participate at a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the

10

meeting can communicate with each other. Participation by a person in a general meeting in this manner is treated as presence in person at that meeting.

39    A resolution (including a Special Resolution) in writing (in one or more counterparts) signed by all Members for the time being entitled to receive notice of and to attend and vote at general meetings (or, being corporations, signed by their duly authorised representatives) shall be as valid and effective as if the resolution had been passed at a general meeting of the Company duly convened and held, including the signatures transmitted electronically.

40    If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Members, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Member or Members present and entitled to vote shall be a quorum.

## VOTES OF MEMBERS

41    Subject to any rights and restrictions for the time being attached to any class or classes of shares, on a show of hands every Member present in person and every person representing a Member by proxy shall at a general meeting of the Company have one vote and on a poll every Member and every person representing a Member by proxy shall have one vote for each share of which he or the person represented by proxy is the holder.

42    In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register of Members.

43    The instrument appointing a proxy shall be in writing under the hand of the appoint or of his attorney duly authorized in writing or, if the appoint or is a corporation, either under seal or under the hand of an officer or attorney duly authorized. A proxy need not be a Member of the Company.

44    An instrument appointing a proxy may be in any usual or common form or such other form as may be approved.

## CORPORATE MEMBERS

45    Any corporation or other non-natural person which is a Member may in accordance with its constitutional documents, or in the absence of such provision by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of Members, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as the corporation could exercise if it were an individual Member.

11

## DIRECTORS

46     The first Directors of the Company shall be elected by the subscribers to the Memorandum of Association. Thereafter, the Directors shall be elected by the Members for such term as the Members determine. The Directors may elect any number of additional Directors for such term as they may determine or until such time as the Members shall elect or re-elect any one or more Directors.

47     The minimum number of Directors shall be 3 and the maximum number shall be 7, as determined from time to time by the Directors or Members.

48     With the prior or subsequent approval by a resolution of Members, the Directors may, by a resolution of Directors fix the emoluments of Directors with respect to services to be rendered in any capacity to the Company.

49     Each Director shall hold office for the term, if any, fixed by resolution of Members or until his earlier death, resignation or removal.

50     A Director may be removed from office, with or without cause, by a resolution of Members.

51     A Director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice.

52     A vacancy in the Board of Directors may be filled by a resolution of Members or by a resolution of a majority of the remaining Directors.

53     A Director shall not require a share qualification, and may be an individual or a company.

## DISQUALIFICATION OF DIRECTORS

54     The office of a Director shall be vacated if the Director:

    54.1     becomes bankrupt or makes any arrangement or composition with his creditors;

    54.2     is found to be or becomes of unsound mind;

    54.3     resigns his office by notice in writing to the Directors; or

    54.4     is removed from office by notice addressed to him at his last known address and signed by all his co-Directors

## PROCEEDINGS OF DIRECTORS

55     Subject to the provisions of the Law, these Articles and to any resolutions made in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may

12

exercise all powers of the Company. No resolution made by the Company in general meeting shall invalidate any prior act of the Directors which would have been valid if that resolution had not been made

56    The Directors may by resolution appoint officers of the Company at such time as shall be considered necessary or expedient. Such officers may consist of a Chairman of the Board, a President and one or more Vice Presidents, Secretaries, Treasurers, and such other officers with such other designations as may from time to time be deemed desirable. Any number of offices may be held by the same person

57    The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of Directors or resolution of Members, but in the absence of any specific allocation of duties it shall be the responsibility of a Chairman of the Board to preside at meetings of Directors and Members, and the President to act in the absence of the Chairman of the Board, the President will also manage the day to day affairs of the Company the Vice Presidents to act in order of seniority in the absence of the President, but to otherwise perform such duties as may be delegated to them by the President, the Secretaries to maintain the Share Register, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company.

58    The officers of the Company shall hold office until their successors are duly elected, but any officer elected or appointed by the Directors may be removed at any time with or without cause, by resolution of Directors. Any vacancy occurring in any office of the Company may be filled by resolution of Directors.

59    The Directors may from time to time and at any time by power of attorney appoint any company, firm or person or body of persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney may contain such provisions for the protection and convenience of persons dealing with any such attorney as the Directors may think fit, and may also authorize any such attorney to delegate all or any of the powers, authorities and discretion vested in him.

60    The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following paragraphs shall be without prejudice to the general powers conferred by this paragraph.

61    The Directors may establish any committees for managing any of the affairs of the Company and may appoint any persons to be members of such committees.

62    The Directors may delegate to any such committee any of the powers, authorities and

13

discretion's for the time being vested in the Directors including the power and authority to affix the Seal, as are set forth in the resolution of Directors establishing the committee, except that no committee has any power or authority to appoint Directors or affix their emoluments, or to appoint officers or agents of the Company.

63    The meetings and proceedings of each committee established by the Directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of Directors so far as the same are not superseded by any provisions in the resolution establishing the committee.

64    Any such delegates as aforesaid may be authorized by the Directors to subdelegate all or any of the powers, authorities, and discretion for the time being vested to them.

## MEETINGS OF DIRECTORS

65    The Directors or committee thereof may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and the Secretary or Assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

66    A Director or Directors may participate in any meeting of the Board of Directors, or of any committee thereof by means of telephone or similar communication equipment by way of which all persons participating in such meeting can hear each other and such participation shall be deemed to constitute presence in person at the meeting.

67    The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be more than two Directors shall be two and, if there be two or less Directors, shall be one. A Director represented by an Alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

68    The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

68.1    all appointments of officers made by the Directors;

68.2    the names of the Directors present at each meeting of the Directors and of any committee of the Directors;

68.3    all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

69    A resolution signed by all the Directors shall be as valid and effectual as if it had been passed at a meeting of the Directors duly called and constituted. When signed a resolution may consist of several documents each signed by one or more of the Directors.

14

70    The continuing Directors may act notwithstanding any vacancy in their body but if and so long as their number is reduced below the number fixed by or pursuant to the Articles of the Company as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

71    The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

72    All acts done by any meeting of the Directors or of a committee established by the Directors, or by any person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and was qualified to be a Director.

## DIRECTORS' INTEREST

73    A Director or alternate Director of the Company may be or become a director or other officer of or otherwise interested in any company promoted by the Company or in which the Company may be interested as shareholder or otherwise, and no such Director or alternate Director shall be accountable to the Company for any remuneration or other benefits received by him as a director or officer of, or from his interest in, such other company.

74    No person shall be disqualified from the office of Director or alternate Director or prevented by such office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or any contract or transaction entered into by or on behalf of the Company in which any Director or alternate Director shall be in any way interested be or be liable to be avoided, nor shall any Director or alternate Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or transaction by reason of such Director holding office or of the fiduciary relation thereby established. A Director (or his alternate Director in his absence) shall be at liberty to vote in respect of any contract or transaction in which he is interested provided that the nature of the interest of any Director or alternate Director in any such contract or transaction shall be disclosed by him at or prior to its consideration and any vote thereon.

75    A general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting on a resolution in respect of a contract or transaction in which he has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

15

## ALTERNATE DIRECTORS

76    Any Director may in writing appoint any Person, who need not be a Director, to be his alternate to act in his place at any meeting of the Directors at which he is unable to be present. The alternate so appointed will vote on that Director's behalf in accordance with instructions given by that Director, or in the absence of such instructions, at his own discretion. Every such alternate shall be entitled to notice of meetings of the Directors and to attend and vote thereat as a Director when the person appointing him is not personally present, if he is a Director in his own right, to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be an officer of the Company and shall be deemed to be the agent of the Director appointing him. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

## SEAL

77    The Company may, if the Directors so determine, have a Seal. The Seal shall only be used by the authority of the Directors or of a committee of the Directors authorised by the Directors. Every instrument to which the Seal has been affixed shall be signed by at least one person who shall be either a Director or some officer or other person appointed by the Directors for the purpose.

78    The Company may have for use in any place or places outside the Cayman Islands a duplicate Seal or Seals each of which shall be a facsimile of the common Seal of the Company and, if the Directors so determine, with the addition on its face of the name of every place where it is to be used.

79    Notwithstanding the foregoing, the Secretary or any Assistant Secretary shall have the authority to affix the Seal to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DIVIDENDS

80    The Company may by a resolution of directors declare and pay dividends in money, shares, or other property. In the event that dividends are paid in specie the directors shall have responsibility for establishing and recording in the resolution of directors authorising the dividends, a fair and proper value for the assets to be so distributed.

81    The Company may, by resolution of the Directors, may from time to time pay to the Members such interim dividends as appear to the Directors to be justified by the profits of the Company.

82    The Company may, by resolution of the Directors, before declaring any dividend, set aside out of the profits of the Company such sum as they think proper as a reserve fund,

16

and may invest the sum so set apart as a reserve fund upon such securities as it may select.

83    No dividend shall be declared and paid unless the directors determine that immediately after the payment of the dividend the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realisable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in its books of account, and its issued and outstanding share capital.

84    Notice of any dividend that may have been declared shall be given to each member in manner hereinafter mentioned and all dividends unclaimed for 3 years after having been declared may be forfeited by resolution of directors for the benefit of the Company.

85    No dividend shall bear interest as against the Company and no dividend shall be paid on treasury shares or shares held by another company of which the Company holds directly or indirectly, shares having more than 50 percent of the vote in electing directors.

86    A share issued as a dividend by the Company shall be treated for all purposes having been issued for money equal to the surplus that is transferred to capital upon the issue of the share.

87    In the case of a dividend of authorised but inissued shares with par value an amount equal to the aggregate par value of the shares shall be transferred from surplus to capital at the time of the distribution.

88    In the case of a dividend of authorised but unissued shares without par value, the amount designated by the directors shall be transferred from surplus to capital at the time of the distribution, except that the directors shall designate as capital an amount that is at least equal to the amount that the shares are entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

89    A division of the issued and outstanding shares of a class or series of shares into a larger number of shares of the same class or series having a proportionately smaller par value shall not constitute a dividend of shares.

## CAPITALISATION

90    The Directors may capitalise any sum standing to the credit of any of the Company's reserve accounts (including share premium account and capital redemption reserve fund) or any sum standing to the credit of profit and loss account or otherwise available for distribution and to appropriate such sum to Members in the proportions in which such sum would have been divisible amongst them had the same been a distribution of profits by way of Dividend and to apply such sum on their behalf in paying up in full unissued Shares for allotment and distribution credited as fully paid-up to and amongst them in the proportion aforesaid. In such event the Directors shall do all acts and things required to give effect to such capitalisation, with full power to the Directors to make such provisions as they think fit for the case of Shares becoming distributable in fractions (including provisions whereby the benefit of fractional entitlements accrue to the Company rather than to the Members

17

concerned). The Directors may authorise any person to enter on behalf of all of the Members interested into an agreement with the Company providing for such capitalisation and matters incidental thereto and any agreement made under such authority shall be effective and binding on all concerned.

## ACCOUNTS AND AUDIT

91 The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

92 The books of account shall be kept at the registered office of the Company, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

93 The Directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors, and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Law or authorized by the Directors or by the Company by Ordinary Resolution.

94 The accounts relating to the Company's affairs shall be audited in such manner and with such financial year end as may be determined from time to time by the Company by Ordinary Resolution or failing any such determination by the Directors or failing any determination as aforesaid shall not be audited.

## AUDITORS

95 The Company may by Special Resolution of Members call for the accounts to be examined by Auditors.

96 The first auditors shall be appointed by resolution of Directors; subsequent auditors shall be appointed by a Special Resolution of the Members.

97 The Auditors may be Members of the Company but no Director or other officer shall be eligible to be an Auditor of the Company during his continuance in office.

98 The remuneration of the auditors of the Company, in the case of auditors appointed by the Directors, may be fixed by resolution of Directors but subject hereto shall be fixed by resolution of Members or in such manner as the Company may by resolution of Members determine.

99 The Auditors shall examine each profit and loss account and balance sheet required to be served on every member of the Company or laid before a meeting of the members of the Company and shall state in a written report whether or not

18

99.1  in their opinion the profit and loss account and balance sheet give a true and fair view respectively of the profit and loss for the period covered by the accounts, and of the state of affairs of the Company at the end of that period;

99.2  all the information and explanations required by the Auditors have been obtained.

100  The report of the auditors shall be annexed to the accounts and shall be read at the meeting of Members at which the accounts are laid before the Company or shall be served on the Members.

101  Every Auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the Directors and Officers of the Company such information and explanations as he thins necessary for the performance of the duties of the Auditors.

102  The Auditors of the Company shall be entitled to receive notice of, and to attend any meetings of Members of the Company at which the Company's profit and loss account and balance sheet are to be presented.

## NOTICES

103  A notice may be given by the Company or by the persons entitled to give notice to any Member personally by sending it by post to him to the address, if any, supplied by him to the Company for the giving of notices to him. Where a notice is sent by post, service of the notice shall be deemed to be effected by properly addressing, prepaying and posting a letter containing the notice and to have been effected at the expiration of 120 hours after the letter containing the same is posted.

104  A notice may be given by the Company to the joint holders of a share by giving the notice to the joint holder named first in the Register of Members in respect of the share.

105  A notice may be given by the Company to the persons entitled to a share in consequence of the death or bankruptcy of a Member by sending it through the post in a prepaid letter addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt, or by any like description at the address, if any, supplied for the purpose by the persons claiming to be so entitled, or (until such address has been so supplied) by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred. A notice may be given by the Company to the persons entitled to a share in consequence of the death or bankruptcy of a Member by sending it through the post in a prepaid letter addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt, or by any like description at the address, if any, supplied for the purpose by the persons claiming to be so entitled, or (until such address has been so supplied) by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred.

106  Notice of every general meeting shall be given to:

19

106.1 all Members who have supplied to the Company an address for the giving of notices to them; and

106.2 every person entitled to a share in consequence of the death or bankruptcy of a Member, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

107 No other person shall be entitled to receive notices of general meetings.

## VOLUNTARY WINDING UP

108 The Company may voluntarily commence to wind up and dissolve by a Special Resolution.

## TRANSFER BY WAY OF CONTINUATION

109 The Company may by resolution of the Directors resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other Jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## AMENDMENT OF ARTICLES OF ASSOCIATION

110 Subject to the Law and the rights attaching to the various classes of shares, the Company may at any time and from time to time by resolution of the Directors alter or amend these Articles in whole or in part.

CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG._____

DONNELL H. DIXON
Ass't. Assistant Registrar

Date: 20th December 2006

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE I, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>EXXON MOBIL CORPORATION, et al., )<br><br>Defendants. ) | Civ. No. 01-1357 (LFO) |

## DECLARATION OF ROBERT N. HORNICK

I, Robert N. Hornick, hereby declare as follows:

### Qualifications

1.    I am a resident of New York, a member of the New York Bar, and a partner in the law firm of Morgan, Lewis & Bockius LLP, where I specialize in commercial law and arbitration, especially relating to Indonesia.  I am submitting this Declaration regarding Indonesian law at the request of the Defendants in this matter.

2.    After graduating from Amherst College (B.A. 1966) and Harvard Law School (J.D. 1970), I spent the years 1970-73 as a Fellow of the International Legal Center, doing research, writing and teaching relating to Indonesia and Indonesian law, including two years residence in Indonesia.  My principal assignment was advisor to the Survey of Indonesian Economic Law, a project of the Research Institute of Law and Criminology of the Padjadjaran University Law School, in which various books were written and published in English for foreign readers, describing fields of Indonesian law

related to the economic life of Indonesia, including agrarian law, business law, mining law, tax law and labor law. I also compiled, with a colleague, the first comprehensive bibliography of Indonesian language legal materials, taught on foreign investment in Indonesia and participated in other projects about Indonesian law. Through this experience I learned to read and speak the Indonesian language and I began compiling a private collection of Indonesian legal materials, which I continue to maintain and update and which is now, I believe, one of the largest in the world.

3.       As part of my practice, I travel frequently to Indonesia, negotiate and document Indonesia-related transactions, represent Indonesian and foreign clients in disputes relating to Indonesia, assist clients (Indonesian as well as foreign) with Indonesian law research and follow Indonesian legal developments. I am a director and past vice president of the American Indonesian Chamber of Commerce. My C.V., together with a list of my publications and speeches, is attached as Exhibit A hereto.

4.       I am not admitted to the Indonesian Bar, and I do not practice, or hold myself out as practicing, Indonesian law. I have served as a consultant on Indonesian law to various U.S. government and multilateral agencies, and on several occasions have been retained to provide advice to the Government of Indonesia on commercial law reform in Indonesia. In addition, I have previously given expert evidence on Indonesian law, by written and/or oral testimony, in several judicial and arbitral proceedings, including but not limited to the following:

1985:       Y. Haryanto v. E.D. & F. Man (Sugar) Limited (High Court of Justice, Queen's Bench Division, Commercial Court, London, England)

1986:       Loet Schuwer and General International Airreps, Inc. v. Garuda International Airways et al. (U.S. District Court, Central District of California)

1992:        <u>Pertamina v. Kartika Ratna Thahir</u> (High Court, Republic of Singapore)

1998:        <u>Wal-Mart Stores, Inc. v. P.T. Multipolar Corporation, et al.</u> (U.S. District Court, Northern District of California)

1998-99:     <u>Himpurna California Energy Limited v. P.T. PLN</u> (UNCITRAL arbitration, Jakarta, Indonesia)

1999:        <u>In the Matter of the Application of Time Inc. for an Order Issuing Subpoenas for the Taking of Depositions and the Production of Documents For Use in the Central Jakarta District Court, Indonesia</u> (U.S. District Court, Southern District of New York)

1999-00:     <u>Karaha Bodas Company v. Pertamina and others</u> (UNCITRAL arbitration, Geneva, Switzerland)

2000:        <u>P.T. Indopac Perdana Finance v. Putra Masagung, et al.</u> (U.S. District Court, Northern District of California)

2001-2005:   <u>In the Matter of an Arbitration between Karaha Bodas Company, L.L.C. v. Pertamina and PT PLN</u> (U.S. District Court, Southern District of Texas; U.S. District Court, Southern District of New York; High Court of the Hong Kong Special Administrative Region, Court of First Instance)

## **Purpose of Declaration**

5.     I have been asked to provide an overview of Indonesian tort law as it relates to the claims set forth in Plaintiffs' First Amended Complaint for Equitable Relief and Damages ("First Amended Complaint"), assuming Indonesian tort law were to apply.

6.     I have read the First Amended Complaint as well as the following items filed in this matter:

a.     Affidavit of Judge Bismar Siregar dated September 27, 2001.

b.     Declaration of Frans Hendra Winarta dated December 15, 2001.

c.     Declaration of Frans Hendra Winarta dated December 9, 2005.

d.     Declaration of Abdul Haris Semandawai dated December 12, 2005 ("Semandawai Decl.").

## The Civil Code

7.      Indonesian private law is the product of a system of legal pluralism, recognizing several sources and systems as applying simultaneously to persons in Indonesia depending upon the circumstances involved, particularly the "population group" (ethnic origin) of the participants.  The sources include customary (adat) law, Islamic law, the Civil and Commercial Codes, and the Indonesian constitution. *See generally*, S. Gautama and R. Hornick, *An Introduction to Indonesian Law: Unity in Diversity* (rev. ed. 1974), ch. I.  For purposes of this Declaration, I discuss Civil Code tort law, rather than customary (adat) tort law or Islamic tort law, because (i) foreign companies such as the Defendants doing business in Indonesia are part of the "western" or "European" law sphere that is ordinarily subject to the Civil Code, and (ii) where there is a conflict of law between the Indonesian law applicable to a tort victim and the Indonesian law applicable to the alleged tortfeasor, the law of the alleged tortfeasor generally applies.

8.      The Civil Code, which was promulgated in 1847, is based on the (then) Dutch Civil Code.  The original text is still Dutch.  There is no legislatively approved translation.  That said, there are Indonesian language translations which have been prepared under the auspices of the Indonesian Government or otherwise by prominent legal scholars, and in practice most commentators and courts cite to the Indonesian language rather than Dutch language version of the Code.  This is to be expected, not only because Indonesia is now independent of Holland and the official language of Indonesia is Bahasa Indonesia rather than Dutch, but also because Dutch language

- 4 -

proficiency in Indonesia has declined since independence, and relatively few Indonesian lawyers or judges are now able to read or speak Dutch.

9.     In Indonesia, as in many other civil law countries, judicial decisions, especially Supreme Court decisions, have *de facto* weight and are important in the determination and interpretation of Indonesian civil law, but there is no rule of *stare decisis*. A former Supreme Court judge has stated: "Judicial decisions play a role not only in the interpretation of legislative provisions. They can even fill gaps in the law. . . . They function as a source of law outside the formal law." Setiawan, "Pengaruh Yurisprudensi Terhadap Peraturan Perundang – Undangan" [The Influence Of Case Law On The Law], 65 *Varia Peradilan* 133 (1991) at p. 144. [1]

10.     There is no readily accessible indexing system for Indonesian judicial decisions, nor any official publication of judicial decisions. Some decisions are compiled and published by commercial publishers or by the Supreme Court of Indonesia. Also, there are law journals that regularly publish some judicial decisions.

11.     There is also a substantial body of scholarly writing about Indonesian civil law in the Indonesian language. Although scholarly opinion has no binding effect *de jure*, it has, like judicial decisions, *de facto* weight - - as evidenced, for example, by the fact that lawyers in their pleadings before Indonesian courts, as well as the courts themselves in their decisions, cite scholarly opinion. This is consistent with practice in other civil law systems.

12.     Finally, it should be noted that there is a special relationship between Indonesian and Dutch law. The Dutch Civil Code was used as a model for drafting the Indonesian Civil Code because Indonesia was a Dutch colony at the time the Code was

---

[1] Unless otherwise indicated, all translations are mine.

promulgated. Although Indonesian law and Dutch law are not the same, there are important similarities. Therefore, Indonesian judges and commentators sometimes refer to Dutch cases and scholars when interpreting provisions of the Civil Code, particularly Dutch jurisprudence and scholarship from the period prior to independence. In addition, some judges and scholars look to modern Dutch authority for guidance.

### Indonesia Tort Law Generally

13.    Where the Civil Code applies, the subject of wrongful acts ("torts" in U.S. law) is governed by Book III, Title 3 (Articles 1365-1380). Article 1365, the most important Code provision respecting wrongful acts, provides that

> Every wrongful act which causes injury to another shall be the responsibility of the wrongdoer, who shall pay compensation for the injury.[2]

14.    There are four elements to satisfy in order for a wrongful act to be a compensable wrong: wrongful behavior, fault, injury and causation.

a.    **Wrongful Behavior.** The behavior at issue must be wrongful, either because it (i) violates a statute or regulation, (ii) violates another person's rights (e.g., property rights), (iii) violates good morals (*kesusilaan yang baik*) or (iv) violates a duty of care (*kepatutan*) owed to other persons or things.

b.    **Fault.** The wrongdoer must misbehave intentionally or negligently.

c.    **Injury.** There must be an injury to persons or things. Injuries are broadly of two kinds: material (capable of being measured in money) and moral or immaterial (said not to be measurable monetarily, such as harm to reputation, pain and emotional distress).

---

[2] My translation of Article 1365, together with the several other Civil Code articles cited elsewhere in this Declaration, are compiled in Exhibit B hereto, for ease of reference. There is no official English translation of the Civil Code.

d.    **Causation.**  The injury must be caused by the wrongful behavior.  This has been interpreted to mean, as is the case for breach of contract other than by fraud, that the injury must be both foreseeable and a direct, rather than indirect, consequence of the misbehavior.  Foreseeability refers to scope of injury as well as possibility.

### Damages for Tort

15.    The Civil Code does not contain any explicit provision concerning remedies for wrongful acts.  In practice, the principal remedy is monetary damages; articles 1246-48 (Exh. B) respecting monetary damages for breach of contract are applied by analogy.  *See e.g.,* J. Satrio, *I Hukum Perikatan, Perikatan Yang Lahir Dari Undang-Undang* 306 (1993) ("[T]he provisions of Articles 1246-1248 (only) apply by analogy to claims for damages based on wrongful acts").  Also, in appropriate circumstances, a court may, instead of (or in addition to) monetary damages, grant a declaratory judgment establishing the unlawfulness of an act and/or an injunction prohibiting or compelling specific behavior.

16.    As explained in the preceding section, compensable injuries are broadly of two kinds:  material (capable of being measured in money) and moral (not measurable monetarily).  Damages for material loss should compensate the injured party for all reasonably foreseeable costs incurred or to be incurred that are a direct consequence of the wrongful act, including lost profits (past and future), if any.  Damages for moral loss should compensate the injured party for harm that cannot be quantified in money, such as reputational harm, pain and emotional distress. The objective is to restore the injured party to the position it would have been in had the wrongful act not occurred.  A "normal

- 7 -

person" test is applied to determine foreseeability, *i.e.*, would an ordinary, normal person have foreseen that the claimed loss would occur as a result of the wrongful behavior?

17.    Moral damages cannot be recovered for wrongful death. However, I am aware of cases in which courts have sometimes allowed moral damages for the wrongful death of a child.

18.    **Punitive Damages.** There is no concept of punitive damages in Indonesian law. The sole purpose of damages is to compensate an injured party for losses arising from the wrongful act, not punishment. Even moral damages, which are allowed in certain instances to compensate for injuries not capable of monetary quantification, are intended only to compensate the victim, not punish the wrongdoer.

19.    I note that Plaintiffs' expert, Mr. Abdul Haris Semendawai, has testified that "[t]he Indonesian legal system would allow for broad types of damages, including what the American legal system refers to as punitive damages. . . . [Article 1365 of the Indonesian Civil Code] does not contain the term 'punitive,' but an element of the compensation amount could be punitive." Semendawai Decl. ¶ 4.

20.    I do not agree with Mr. Semendawai. The term "punitive damages" means damages that are intended to punish and deter blameworthy conduct, whereas damages in Indonesian law are limited to compensation for direct and foreseeable losses arising from the wrongful conduct. This limitation is expressed in Articles 1246-48 of the Code which apply by analogy to torts. *See* ¶ 15 and Exh. B.

21.    I know of no Indonesian case in which punitive damages have been granted and no Indonesian commentator who says that punitive damages are permissible.

- 8 -

## Particular Torts

22.    Generally speaking, the Code does not identify by name individual torts. A tort exists, if at all, by virtue of Article 1365. However, the Code does recognize and regulate several specific torts, including wrongful death (Article 1370), bodily injury (Article 1371) and defamation (Articles 1372-80).

23.    Plaintiffs' first cause of action (wrongful death) would be cognizable as wrongful death under Article 1370. Plaintiffs' second cause of action (battery) would be cognizable as bodily injury under Article 1371. Certain, but not all, of plaintiffs' other causes of action would also be cognizable under Indonesian law. In particular, negligence, arbitrary arrest/false imprisonment, and conversion have been recognized as wrongful acts by case law. I believe that assault, negligent hiring and negligent supervision could also constitute torts under Indonesian law, although I am not aware of any cases or commentaries directly on point.

24.    In my opinion, intentional or negligent infliction of emotional distress does not constitute a tort under the Civil Code and therefore does not give rise to tort liability. As mentioned above, damages for emotional distress can be recovered in certain instances where emotional distress accompanies other tortious injury such as bodily injury. But the infliction of emotional distress itself is not a tort giving rise to liability.

## Wrongful Death

25.    The cause of action for wrongful death under Article 1370 of the Civil Code (Exh. B) is limited to surviving spouses, parents and children, to whom all of the following must apply in order for liability to attach:

    a.    The surviving person must have depended on the decedent for support while the decedent was alive.

    b.    The support must have been derived from the decedent's employment.

    c.    The surviving person must still need the support. Thus, for example, if the surviving person inherits a sufficient estate so that the support is no longer needed, then the surviving person is not entitled to damages. Rachmat Setiawan, *Tinjauan Elementer Perbuatan Melawan Hukum* 68-69 (1982) ("If those having a right to claim compensation don't need it, because they have obtained an inheritance, then they may not file a claim.")

26.    Damages for wrongful death are generally limited to compensation for lost support and may not include moral damages. However, several courts have awarded moral damages (including for emotional distress) to parents for the wrongful death of a child. I do not know of any case in which a child was awarded moral damages for loss of a parent, or a spouse was awarded moral damages for loss of the other spouse.

27.    The amount of compensation for lost support is "capped" at the anticipated earnings of the deceased during his or her life expectancy. The amount of damages may be calculated taking into account the social status and financial condition of the plaintiff and defendant, subject to the aforementioned cap. II *Satrio* 153 ("The comparison is meant as a limitation, to reduce [compensation], so it can't be made greater and the maximum is the same as the amount of support which he would enjoy from the decedent during the decedent's life"). Thus, the amount of damages can be more for a poor plaintiff suing a rich defendant than for a rich plaintiff suing a poor defendant, but never more than the cap.

- 10 -

## Bodily Injury

28.     According to Article 1371 of the Civil Code (Exh. B), the victim of intentional or negligent infliction of bodily injury is entitled to recover from the wrongdoer out-of-pocket costs of treating and curing the injury (*e.g.,* hospital charges, doctors' fees, and medicine) as well as other damages caused by the injury, such as lost earnings.  As in the case of wrongful death, the amount of such damages may be adjusted downward based on the relative social status and financial condition of the plaintiff and defendant.

29.     It is also settled as a matter of jurisprudence that the victim may recover moral damages (for pain, suffering and emotional distress).

## Survival of Claims

30.     Under the Civil Code, a cause of action belongs to the injured person.[3]  In the event the injured person dies before making a claim or during the pendency of a legal proceeding, the cause of action usually becomes part of the decedent's estate and passes to the heirs.  As a general rule, all of the heirs must agree in order to pursue the decedent's claim.

31.     Many Indonesians, particularly from rural areas, are subject to local customary inheritance law, not Civil Code inheritance law.  To the extent that the Plaintiffs here are subject to local customary (adat) or Islamic inheritance law, those laws would have to be consulted to determine whether and to what extent the heirs are entitled to maintain tort claims brought by individual plaintiffs who have died since this case was commenced.

---

[3] A wrongful death action belongs to the surviving spouse, child or parent, not the decedent.

## **Vicarious Liability**

32.    Article 1367(1) of the Civil Code provides generally that a person shall be liable not only for injuries caused by his own wrongdoing (as specified in Article 1365), but also for injuries caused by the wrongdoing of those for whom he is responsible. Subsections (2)-(4) identify three categories of persons to whom Article 1367(1) shall apply:  parents and guardians with respect to minor children in their custody; teachers and artisans with respect to pupils and apprentices while under their supervision; and employers and principals with respect to their employees and representatives while performing their work.  The subject of employees and representatives is governed by subsection (3).

33.    Subsection (3) of Article 1367 states:

> Employers and those appointed to represent the affairs of
> others shall be responsible for damage caused by the acts
> of their employees and subordinates in performing the
> work for which they are engaged.

34.    Two elements must be satisfied for liability to attach under Article 1367(3).  First, the relationship of the responsible party to the tortfeasor must be one of employment or representation.  In practice, the commentators and courts focus more on the extent to which the purported employer/principal has authority to control and instruct the employee/representative regarding his work, rather than on the formalities of the relationship.  Second, the tortious act must be done in the course of performing the employment or representation.  In other words, there must be a "functional" connection between the wrongful act and the work that the employee/representative is being directed to perform in order for vicarious liability to attach.

- 12 -

35.     The analysis under Indonesian law of Defendants' purported vicarious

liability for the wrongful acts alleged here would be particularly complicated because the

individual wrongdoers are soldiers in the Indonesian Armed Forces who were formally

employed by, and responsible to, the Government of Indonesia, not Defendants.  Under

Indonesian law, the Armed Forces are mandated to protect against domestic as well as

foreign threats, including armed rebellion, civil war, and sabotage of vital national

objects (such as natural gas fields).  *See* Law No. 3/2002 dated January 8, 2002 re:

National Defense, arts. 4, 7 and 10 and Official Elucidation thereto.[4]  This was also the

law at the time that the wrongful conduct alleged here purportedly occurred.

36.     **Necessary Parties.**    As a general rule under Indonesian law, all

necessary parties must be before the court, in order for the court to adjudicate the subject

matter of a particular claim involving all of those parties.  "If the parties to a claim are

incomplete, then such claim must be dismissed.  For example, suppose A and B are

jointly indebted to X.  If in claiming repayment of this debt, X sues A without joining B

as a defendant, then X's claim must be dismissed. . . ."  Riduan Syahrani, *Hukum Acara

Perdata di Lingkungan Peradilan Umum* 25 (1988).

37.     In my opinion, as a matter of Indonesian law, in those instances where

responsibility is being attributed to one or more of the Defendants for the wrongful acts

of individual Indonesian soldiers, (i) the elements of vicarious liability under Article

1367(3) of the Civil Code would have to be proved (taking into account the responsibility

of the Armed Forces under Indonesian law to safeguard natural resources and other vital

assets of the country), and (ii) the individual soldiers who actually committed the

wrongful acts alleged would be necessary parties to the lawsuit.

---

[4] A translation of Law No. 3/2002, done by Business News, is attached hereto as Exhibit C.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on February 3, 2006.

_Robert Hornick_
_____
Robert N. Hornick

- 14 -

# EXHIBIT A

Exhibit A

## Robert N. Hornick – C.V.

**Address:**    101 Park Avenue
New York, NY 10178
**Phone:**    (212) 309-6945
**E-mail:**    RHornick@MorganLewis.com

### Career Summary
**Private law practice,** with special emphasis on international arbitration, commercial transactions, Indonesia
**Author,** leading introductory text in English on Indonesian law

### Education
**Harvard Law School,** J.D. (1970)
Harvard Legal Aid Bureau (Director)
Harvard International Law Journal (Note Editor)
**Visva Bharati University,** India (Rotary Fellowship) (1966-67)
**Amherst College,** B.A., English (with Honors) (1966)

### Bar Admission
New York

### Work
**Partner,** Morgan Lewis & Bockius, LLP (1996-present)
**Partner,** Coudert Brothers (1981-1996)
Member, Executive Committee (1983-89)
Managing Partner (1991-93)
**Associate,** Coudert Brothers (1973-1980)
**ILC Fellow,** Bandung, Indonesia (1970-73)

### Publications, Speeches
AN INTRODUCTION TO INDONESIAN LAW (rev. ed. 1974)
"The Relevance of Int'l Standards for U.S. Courts in the Enforcement of Arbitration Agreements under the New York Convention, 6 Am. Rev. Int'l Arb. 149 (1995)
"The Mihaly Arbitration: Pre-Investment Expenditure as a Basis for ICSID Jurisdiction," 20(2) J. Int'l Arb. 189 (2003)
(Complete List attached)

### Recent Honors
Guide to World's Leading Experts in International Arbitration (Euromoney) (2004)
America's Leading Business Lawyers, Int'l Arbitration (Chambers USA) (2005)

## PUBLICATIONS

"Indonesia's Formal Legal System:  An Introduction," 20 Am. J. Comp. L. 492 (1972)

"Komentar Dan Pendapat Tentang Prasaran Dr. R. Soemitro S.H. Mengenai Penanaman Modal Dan Padjak Padjak," IV/1 Padjadjaran 46 (1972) (Some Remarks on Foreign Investment and Taxation)

*English Language Writings on Indonesian Law* (Cambridge 1973)

*An Introduction to Indonesian Law* (rev. ed. 1974)

*Bibliografi Hukum Indonesia 1945-1972* (2nd ed. 1974) (Indonesian Legal Bibliography, 1945-1972)

"Indonesian Mortgage Law," 5 Lawasia 30 (1974)

"Indonesian Maritime Law," 8 J. Maritime L. and Commerce 73 (1976)

"The Recognition and Enforcement of Foreign Judgments in Indonesia," 18 Harv. Int'l. L.J. 97 1977)

*Bibliografi Hukum Indonesia, Suplemen I 1972-1976* (1981) (Indonesian Legal Bibliography, 1st Supplement 1972-1976)

"Taxation of Foreigners in Indonesia," I Int'l. Tax & Business Lawyer 82 (1983)

"Secured Lending in the ASEAN Countries," in R. Vickers (ed.), *Legal Problems of Capital Investment and Secured Lending in the ASEAN Countries* (U.S.A. 1983)

"Indonesia – Validity of Foreign Trademark License Upheld," East Asian Executive Reports 8 (July 1984)

"Foreign Banking in Indonesia," 6 Northwest J. Int'l. Law 760 (1984)

"Indonesia – Major Tax Changes Implemented," East Asian Executive Reports 8 (March 1984)

"Indonesia –1984 Income Tax Law Update: Literal Interpretation and Workable System Evolving," East Asian Executive Reports 9 (May 1985)

"Indonesia – Counterfeit Trademarks More Difficult to Cancel," East Asian Executive Reports 8 (Dec. 1985)

"Indonesia – Foreign Arbitral Awards Are Not Enforceable," East Asian Executive Reports 11 (Nov. 1985)

"Indonesia," in F. Schwank and F. Rider (eds.), *Banks Abroad* 183 (Great Britain 1986)

"ICSID's Emerging Jurisprudence: The Scope of ICSID's Jurisdiction," 19 N.Y.U. J. Int'l. L. & Politics 33 (1986)

"Indonesia – High Court Upholds First User's Right to Cancel Registration of Counterfeit Mark At Any Time," East Asian Executive Reports 12 (Apr. 1987)

A-2

"Indonesia – Court Sets Tougher Standards for Expedited Enforcement of Acknowledgment of Debt," East Asian Executive Reports 9 (Sept. 1987)

"The Employment of Foreigners in Indonesia," 29 Malaya L.R. 337 (1987)

"Foreign Investment in Indonesia," 11 Fordham Int'l. L.J. 724 (1988)

"Jakarta Court Declares Standard International Sales Contract Illegal," East Asian Executive Reports 6 (March 1990)

"Indonesia – Supreme Court Issues Regulation Allowing Enforcement of Foreign Arbitral Awards," XII/6 International Lawyer's Newsletter 19 (1990)

"Indonesian Arbitration in Theory and Practice," 39 Am. J. Comp. L. 559 (1991)

"Foreign Investment Regulation in Indonesia: An Overview," U.S.-ASEAN Council Special Report (Oct.. 1994)

"The Relevance of International Standards for U.S. Courts in the Enforcement of Arbitration Agreements under the New York Convention," 6 American Review of International Arbitration 149 (1995)

"Planning For and Successfully Resolving International Disputes" (conference paper), in American Conference Institute (ed.), *International Business Transactions* (New York 1997)

"Indonesia – Supreme Court Rules that Loan Signed Abroad Cannot be Secured by Hypothec on Indonesian Land," East Asian Executive Reports 8 (February 1997)

"Indonesia's Telecom KSOs," *International Privatization Review 1997/98* 89 (1997)

"Significant Legal Issues Decided in the Case of Pertamina v. Kartika Ratna Thahir," 2-3 Asian Comm. L. Rev. 99 (1997)

"Foreign Investment in Indonesia: Recent Legal and Regulatory Developments," U.S.-ASEAN Council Special Report (rev. Jan. 1998), republished in "East Asian Executive Reports" (Dec. 1997 and Jan. 1998)

"Indonesian Bankruptcy Law Protects Creditors," XVII Int'l. Financial L.R. 24 (May 1998)

"Indonesia – Export Financing: Supreme Court Properly Allocates Risk," East Asian Executive Reports 11 (May/June 1999)

"Fiduciary Transfer – Indonesia's New Law on Collateral Security," XIX Int'l. Financial Law Review 28 (July 2000) "

"Reforming Indonesia's Justice System," The Asian Wall Street Journal (December 18, 2001)

"A Foreign Lawyer's Perspective on Corruption in Indonesia," in Woodrow Wilson Center, *Old Game or New? Corruption in Today's Indonesia* 9 (2001).

"The Mihaly Arbitration: Pre-Investment Expenditure as a Basis for ICSID Jurisdiction," 20(2) J. Int'l Arb. 189 (2003)

## *SPEECHES*

"Legal Problems of Investment in Indonesia," Association of Bar of City of New York (Great Hall Lecture 1974)

"Customary Law in Indonesia," Asia Society (New York 1976)

"Joint Ventures in Indonesia," World Trade Institute (New York 1986)

"Government Business Dialogue for Improving Laws Affecting Business in Indonesia," United Nations Development Program Conference (Jakarta 1988)

"Indonesian Arbitration," Law Society of Singapore (Singapore 1990)

"Doing Business in Indonesia:  Recent Legal Developments," ABA International Section Conference (New York 1990)

"Resolving Business Disputes:  An Indonesian Case Study," New York University (New York 1991)

"Law and Economic Development in Indonesia," Yale Law School (New Haven 1994)

"Dispute Resolution for Foreigners Doing Business in Indonesia," California Southeast Asia Business Council (San Francisco 1994)

"Deregulation in Indonesia -- A Legal Audit," New York Chamber of Commerce (New York 1994)

"The Practice of International Arbitration," Harvard Law School (Cambridge 1994-95)

"International Arbitration -- ICSID," Harvard Asia-Pacific Business Conference (Cambridge 1995)

"Institutional vs. Ad Hoc Arbitration in the International Market," Harvard Asia-Pacific Business Conference (Cambridge 1995)

"The Commercial Law Environment in Indonesia -- An Overview," National Foreign Trade Council (New York 1995)

"The Commercial Law Environment in Indonesia -- An Overview," U.S.-ASEAN Trade Council (Washington, DC 1995)

"Indonesian Commercial Law Reform," U.S. Dept. of Commerce Trade Policy Coordinating Committee (Washington, DC 1995)

"Commercial Law Environment for Foreign Investment in Indonesia," California Southeast Asia Business Council/Government of Indonesia Indonesian Business Opportunities Forum (San Francisco 1995)

"The U.N. Sales Convention in International Arbitration," New York State Bar Association (New York 1995)

A-4

"The Role of International Commercial Arbitration in the Development of Private Power Sources," India Power Sector Study Seminar (New York 1996)

"Law and Economic Change in Indonesia," New York University Law School (New York 1995)

"Law and Economic Development:  an Indonesian Perspective," New York University (New York 1995)

"Legal Aspects of Distribution in Indonesia," Consumer Indonesia Forum (New York 1996)

"An Introduction to Law and Economic Change in Indonesia," New York Law School Faculty (New York 1996)

"Project Finance," CETIC Seminar (Beijing 1996)

"Praktek Arbitrase dan Mediasi Internasional Chusus Dalam Bidang Perdagangan," [Practical Aspects of International Commercial Arbitration and Mediation], Gadjah Mada University Law School (Yogyakarta 1996)

"Dispute Resolution in Indonesia," Harvard Asia-Pacific Business Conference (Cambridge 1997)

"Has the Time Come for Using International Arbitration Clauses in Indonesian Financial Documentation?" Indonesian Financial Law Forum (Singapore 1997)

"Foreign Investment and Legal Culture in Indonesia," New York University (New York 1997)

"Foreign Investment in Indonesia: Recent Legal and Regulatory Developments," U.S.-ASEAN Trade Council (Washington, DC 1998)

"U.S. Assistance to Indonesian Law Reform," Council on Foreign Relations (New York 1998)

"Legal Aspects of Distribution in Indonesia," PILLS Seminar (Philadelphia 1998)

"Law Reform and the Financial Crisis in Southeast Asia: the Case of Indonesia," American Foreign Law Association (New York 1999)

"Planning for and Successfully Resolving International Disputes," American Conference Institute on International Business Transactions (Chicago 1997, 1998, 1999 and New York 1998, 1999, 2000)

"Enforceability of International Arbitral Awards in Indonesia," California State Bar Conference on International Arbitration in Asia (San Francisco 2000)

"The Effectiveness of Arbitration Provisions in the Asian Financial Crisis:  An Assessment," Asian Development Bank (Manila 2001)

"Corruption in Today's Indonesia," Woodrow Wilson Center (Washington, D.C. 2001)

"The Ethics of Contacting an Adverse Party's Employees in International Arbitration," Thirteenth Annual Workshop of Institute for Transnational Arbitration (Dallas 2002)

# EXHIBIT B

Exhibit B

<u>Civil Code – Excerpts</u>

1246. The expenditures, losses and interest that may be claimed by the creditor shall consist of the loss he has suffered and the profits of which he has been deprived, subject to the exceptions and caveats set forth below.

1247. The debtor is only required to compensate for expenditures, losses and interest that were foreseen or could have been foreseen at the time the contract was made, except in the case of a breach of contract caused by the debtor's fraud.

1248. Even in the case where a breach of contract is caused by fraud, the compensation for expenditures, losses and interest which the creditor suffers shall be limited to those arising directly out of the breach.

1365. Every wrongful act which causes injury to another shall be the responsibility of the wrongdoer, who shall pay compensation for the injury.

1367(3). Employers and those appointed to represent the affairs of others shall be responsible for damage caused by the acts of their employees and subordinates in performing the work for which they are engaged.

1370. In the case of intentional or negligent homicide, the surviving husband or wife, child or parents of the decedent, who customarily obtains support from the employment of the decedent, shall be entitled to compensation, which shall be calculated based on the status and wealth of the two parties, as well as the circumstances.

1371. In the case of one who intentionally or negligently causes a bodily wound or disability, the victim shall be entitled to claim compensation for the damages caused by said wound or disability, in addition to reimbursement for his costs of treatment.

Such compensation shall also be calculated based on the status and wealth of the two parties, as well as the circumstances.

The last-mentioned provision shall apply generally to the calculation of damages for wrongs against individuals.

# EXHIBIT C

Exhibit C

1A

 GOVERNMENT REGULATIONS

## N A T I O N A L   D E F E N S E
### (Law No. 3/2002 dated January 8, 2002)



WITH THE MERCY OF GOD THE ALMIGHTY,

THE PRESIDENT OF THE REPUBLIC OF INDONESIA,

Considering:

a. that national defense is based on philosophy and ideology of Indonesian people to guarantee the integrity and existence of the Unitary State of the Republic of Indonesia on the basis of state ideology Pancasila and Constitution of 1945;

b. that national defense as a public administration function constitutes an effort to realize a unit of national defense to achieve national objectives, namely to protect all Indonesian people and territories; to improve social welfare, to enhance the quality of national life and to participate in creating the word orderliness based on freedom, eternal peace and social justice;

c. that in executing the national defense, every citizen has the right and obligation to participate in efforts to defend the country as the reflection of national life guaranteeing the rights of citizens to live in a equitable, just, safe, prosperous and peaceful condition;

d. that efforts of national defense are realized by establishing, maintaining, developing and using national defense forces based on principles of democracy, human rights, environment, national regulations and laws, international law, international customs and the principle of peaceful co-existence;

e. that since Law No. 20/1982 concerning principal provisions on the Defense and Security of the Republic of Indonesia (Statute Book of 1982 No. 51, Supplement to Statute Book No. 3234) as already amended by Law No. 1/1988 on the Amendment to Law No. 20/1982 regarding principal provisions on Defense and Security of the Republic of Indonesia (Statute Book of 1988 No. 3, Supplement to Statute Book No. 3368) is no longer relevant anymore to the development of the public administration of the Republic of Indonesia and changes in the institution of the Indonesian Military encouraged by the progress of legal awareness living in the society, the law needs to be replaced.

Business News 6732/1-3-2002

f. that based on the considerations as meant in letters a, b, c, d and e, it is necessary to enact a law on National Defense;

In view of:

1. Article 5, sub-article (1), article 10, article 11, article 20, sub-article (1) and sub-article (2), article 27, sub-article (3) and Article 30 of the State Constitution of 1945;

2. Stipulation of People's Consultative Assembly of the Republic of Indonesia No. VI/MPR/2000 on the Separation of the Indonesian Military and Police of the Republic of Indonesia and Stipulation of People's Consultative Assembly of the Republic of Indonesia No. VII/MPR/2000 on the Role of the Indonesian Military and Police of the Republic of Indonesia;

With the joint approval of
THE HOUSE OF REPRESENTATIVES
and
THE PRESIDENT OF THE REPUBLIC OF INDONESIA,

D E C I D E S :

To stipulate:
LAW ON NATIONAL DEFENSE

CHAPTER I
GENERAL PROVISIONS
Article 1
In this law, what is meant by:

1. National defense is all efforts to defend the sovereignty of the country, the integrity of territories of the Unitary State of the Republic of Indonesia and the protection of all people against threats and disturbances to the integrity of the nation and country.

2. National defense system is an temporary defense system involving all Indonesian citizens, regions and other national resources, as well as being prepared early by the government and executed totally, integratedly, effectively and continuously to uphold the sovereignty of the country, the integrity of territories and protection of all people against all threats.

3. Realization ......

2A

3. Realization of national defense is all activities to implement policies on national defense.

4. National defense management is all activities at the strategic level and policies covering planning, implementation, supervision and control over national defense.

5. Main component is the Indonesian Military ready for use to execute national defense tasks.

6. Reserve components are national resources already prepared through mobilization for enlarging and strengthening the force and capability of the main component.

7. Supporting component is national resources which can be used for enhancing the forces and capabilities of the main and reserve components.

8. National resources are human resources, natural resources and artificial resources.

9. Natural resources are potentials deposited in land, water and airspace, which in their original forms can be used for interests of national defense.

10. Artificial resources are natural resources having their effectiveness already enhanced for interests of national defense.

11. National facilities and infrastructures are results of human works, which can be used as supporting instruments of national defense interests in the framework of supporting national interests.

12. Citizens are citizens of the Republic of Indonesia.

13. The House of Representatives is the House of Representatives of the Republic of Indonesia.

14. Minister is the minister responsible for the defense field.

15. Commander is the Commander of the Indonesian Military.

16. Chief of Staff of Arms is the Chief of Army Staff, Chief of Navy Staff and Chief of Air Force Staff.

CHAPTER II
ESSENCE, PRINCIPLES, OBJECTIVES AND FUNCTIONS
Article 2

The essence of national defense is all universal defense efforts whose realization is based on awareness of citizens of rights and obligations as well as confidence in their own strengths.

Article 3

(1) National defense is formulated on the basis of principles of democracy, human rights, social welfare, environment, national law, international law, international customs and the principle of peaceful co-existence.

(2) National defense is formulated by observing the geographic condition of Indonesia as an archipelago country.

Article 4

National defense aims at safeguarding and protecting the sovereignty of the country, the integrity of territories of the Unitary State of the Republic of Indonesia and the protection of all people against all forms of threats.

Article 5

National defense functions to realize and defend the whole territories of the Unitary State of the Republic of Indonesia as a defense unity.

CHAPTER III
REALIZATION OF NATIONAL DEFENSE
Article 6

National defense is realized through efforts to develop and foster the capability, state and national preventive forces as well as to overcome every threat.

Article 7

(1) National defense, as meant in Article 6, is realized by the government and prepared early by a national defense system.

(2) The national defense system, in facing military threats, places the Indonesian Military as the main component, supported by reserve and supporting components.

(3) The national defense system, in facing non-military threats, places government institutions outside the defense field as the main element in accordance with forms and characteristics of the facing threats with the supports from other elements of national forces.

Article 8

(1) Reserve components consist of citizens, natural resources, artificial resources as well as national facilities and infrastructures already prepared through mobilization to enlarge and strengthen the main component.

(2) Supporting components consist of citizens, natural resources, artificial resources as well as national facilities and infrastructures which can directly or indirectly be used for enhancing the strength and capability of the main and reserve components.

(3) The reserve and supporting components as meant in sub-article (1) and sub-article (2) are regulated by law.

Article 9

(1) Every citizen has the right and obligation to participate in efforts to defend the country, which is realized in the execution of national defense.

(2) The

3A

(2) The participation of citizens in efforts to defend the country as meant in sub-article (1) is realized through:
a. civic education;
b. compulsory basic military training;
c. voluntary or compulsory dedication as soldiers of the Indonesian Military
d. dedication in accordance with professions.

(3) Provisions on civic education, compulsory basic military training and dedication in accordance with professions are regulated by a law.

### Article 10

(1) The Indonesian Military plays a role as a defense instrument of the Unitary State of the Republic of Indonesia.

(2) The Indonesian Military consists of Army, Navy and Air Forces.

(3) The Indonesian Military has the task of executing policies on national defense to:
a. defend the sovereignty of the country and the integrity of territories;
b. protect the dignity and safety of the nation;
c. execute military operations other than wars; and
d. actively participate in the tasks of regional and international peacekeeping.

### Article 11

The organizational structure, tasks and functions of the Indonesian Military as the instrument of national defense are regulated by a law.

### CHAPTER IV
### MANAGEMENT OF THE NATIONAL DEFENSE SYSTEM
### Article 12

The management of the national defense system as a public administration function aims at protecting national interests and supporting national policies in the defense field.

### Article 13

(1) The President has authority and responsibility in the management of the national defense system.

(2) In the management of the national defense system as meant in sub-article (1), the President stipulates general policies on national defense, which become the reference for planning, implementation and supervision over the national defense system.

### Article 14

(1) The President has authority and responsibility to mobilize the Indonesian Military Force.

(2) In mobilizing the Indonesian Military force to face armed threats, the authority of the President as meant in sub-article (1) must secure approval from the House of Representatives.

(3) In an emergency situation to face armed threats, the President can directly mobilize the Indonesian Military force.

(4) In the direct mobilization of the Indonesian Military force as meant in sub-article (3), the President must apply for approval of the House of Representatives at the latest 2 x 24 (two times twenty four) hours.

(5) In the case that the House of Representatives does not approve the mobilization as meant in sub-article (3), the President stops the mobilization of military operation.

### Article 15

(1) In stipulating general policies on national defense as meant in article 13, sub-article (2), the President is assisted by the National Defense Council.

(2) The National Defense Council as meant in sub-article (1) functions as the advisor of the President in stipulating general policies on defense and mobilization of all components of national defense.

(3) In the framework of performing its function, the National Defense Council has tasks to:
a. analyze, evaluate and formulate integrated policies on national defense so the ministries of the government, non-ministry government institutions and the people together with the Indonesian Military can perform their respective tasks in supporting the realization of national defense;
b. analyze, evaluate and formulate integrated policies on the mobilization of the components of national defense in the framework of mobilization and demobilization;
c. analyze and evaluate the risks of policies to be implemented.

(4) The National Defense Council as meant in sub-article (1) is led by the President with members consisting of permanent members and non-permanent members who have the same rights and obligations.

(5) Permanent . . . . . .

4A

(5) Permanent members consist of the Vice President, the Minister of Defense, the Minister of Foreign Affairs, the Ministry of Home Affairs and the Commander.

(6) Non-permanent members consist of government and non-government officials considered necessary in accordance with the problem faced.

(7) Permanent and non-permanent members are appointed by the President.

(8) The Organizational structure and working system of the National Defense Council as meant in sub-article (1) are further regulated by a presidential decree.

### Article 16

(1) A Minister leads the Ministry of Defense.

(2) The Minister assists the President in formulating general policies on national defense.

(3) The Minister stipulates policies on the realization of national defense based on general policies stipulated by the President.

(4) The Minister formulates blue print on defense and stipulates policies on bilateral, regional and international co-operation in his field.

(5) The Minister formulates general policies on the use of the forces of the Indonesian Military and other defense components.

(6) The Minister stipulates policies on budget, procurement, recruitment, exploitation of national resources as well as the fostering of defense technology and industry needed by the Indonesian Military and other defense components.

(7) The Minister cooperates with the leaders of ministries and other government institutions as well as formulating and executing the strategic planning of the exploitation of national resources for the interests of defense.

### Article 17

(1) The President appoints and dismisses the Commander after getting approval from the House of Representatives.

(2) The appointed Commander as meant in sub-article (1) is appointed from high-rank officers of the Indonesian Military, who are holding or have already held the position of the chiefs of staff of forces.

(3) The president appoints and dismisses the chefs of staff of forces on the proposal of the Commander.

(4) Procedures of the appointment and dismissal of the Commander and chiefs of staff as meant in sub-article (1) are further regulated by a presidential decree.

### Article 18

(1) The Commander leads the Indonesian Military.

(2) The Commander realizes the strategic planning and military operations, the fostering of military professions and forces as well as maintaining operational alertness.

(3) The Commander has authority to use all components of national defense in the realization of military operations based on laws.

(4) The Commander is responsible to the President with regard to use of components of national defense and co-operates with the Minister in meeting the needs of the Indonesian Military .

### Article 19

In facing the form and characteristics of non-military threats outside the authority of defense institutions, the controlling of the problem is coordinated by the leader of an institution in accordance with his field.

### CHAPTER V
### FOSTERING OF DEFENSE CAPABILITIES
### Article 20

(1) The fostering of capabilities of national defense is aimed at realizing a national defense system as meant in this law.

(2) All national resources in the form of human resources, natural resources and artificial resources, values, technology and fund can be used for improving the capabilities of national defense which are further regulated by a government regulation.

(3) Development in regions must observe the fostering of the capabilities of defense as meant in Article (1), which is further regulated by a government regulation.

### Article 21

The use of all natural and artificial resources must pay attention to principles of sustainability, diversity, productivity of environment.

5A

### Article 22

(1) The territory of Indonesia can be used for the fostering of the capabilities of defense by observing the rights of the people and the existing regulations and laws.

(2) The territory used as strategic and permanent military installations and military exercises is stipulated by a government regulation.

### Article 23

(1) In the framework of improving the capabilities of national defense, the government conducts researches and development of industry and technology in the field of defense.

(2) In performing the tasks as meant in sub-article (1), the Minister encourages and increases the growth of defense industry.

### CHAPTER VI
### SUPERVISION
### Article 24

(1) The House of Representatives supervises the realization of general policies on national defense.

(2) The House of Representatives can ask for information on the realization and management of national defense.

### CHAPTER VII
### FINANCING
### Article 25

(1) National defense is financed by fund from the State Budget of Revenues and Expenditures.

(2) The financing of national defense is aimed at constructing, maintaining, developing and using the Indonesian Military and other defense components.

### CHAPTER VIII
### TRANSITIONAL PROVISIONS
### Article 26

On the date of the enforcement of this law, the existing operational regulations on the realization of national defense are declared remaining effective as long as new operational regulations based on this law have not been issued and as long as these regulations are not against this law.

### Article 27

The existing organizations or institutions, which are the elements of the realization of national defense, remain effective until they are amended or replaced by new organizations or institutions based on the provisions of this law.

### CHAPTER IX
### CLOSING PROVISIONS
### Article 28

On the date of the enforcement of this law, Law No. 20/1980 concerning principal provisions on defense and security of the unitary state of the Republic of Indonesia (Statute Book of 1980 No. 51, Supplement to Statute Book No. 3234) as already amended by Law No. I/1988 on the Amendment to Law No. 20/1982 regarding principal provisions on Defense and Security of the Unitary State of the Republic of Indonesia (Statute Book of 1988 No. 3, Supplement to Statute Book No. 3368) is declared not effective.

### Article 29

This law starts to be effective on the date of promulgation.

For public cognizance, this law shall be promulgated by placing it in the Statute Book of the Republic of Indonesia.

Legalized in Jakarta
On January 8, 2002
THE PRESIDENT OF THE REPUBLIC OF INDONESIA,
sgd
MEGAWATI SOEKARNOPUTRI

Promulgated in Jakarta
On January 8, 2002
THE STATE SECRETARY,
Sgd
BAMBANG KESOWO

THE STATUTE BOOK OF
THE REPUBLIC OF INDONESIA NO. 3

### ELUCIDATION
### ON
### LAW NO. 3/2002
### CONCERNING
### NATIONAL DEFENSE

### I. GENERAL

In the national life, the aspect of defense is a very essential factor in guaranteeing the survival of the country. Without capable of defending itself against foreign and/or domestic threats, a country will be unable to maintain its

6A

existence. Indonesian, which proclaimed its independence on August 17, 1945, is determined to fight for, defend and enforce its independence as well as the sovereignty of the country and a nation based on the State Ideology of Pancasila and the State Constitution of 1945.

The way of life of Indonesian people on national defense as stipulated in the preamble and body of the State Constitution of 1945 is:

a. independence is the right of all nations and therefore colonialism on the world must be eliminated because it is not relevant to humanity and justice;

b. the government of a country protects all Indonesian people and motherland, improves social welfare, enhance the quality of national life and participates in realizing word orderliness based on independence, eternal peace and social justice;

c. the rights and obligations of every citizen to participate in efforts to defend the country; and

d. land, water and natural resources kept inside are controlled by the country and used maximally for the prosperity of the people.

From the way of life mentioned above, Indonesian people in realizing the national defense system follow principles that:

a. Indonesian people have the rights and obligation to fight for and defend the independence and sovereignty of the country, the integrity of territory and the protection of the safety of all Indonesian people against all threats;

b. defending a country realized through participation in efforts of national defense is the responsibility and dignity of every citizen. Therefore, no single citizen is allowed to avoid an obligation to defend the country, except stipulated by laws. This principle contains an understanding that efforts of national defense must be based on awareness of the rights and obligation of citizens and confidence in their own strength;

c. Indonesian people love peace but better love their independence and sovereignty. Any dispute or conflict between Indonesian people and other nations will always be settled through peaceful ways. For Indonesian people, war is the last way and only made if all peaceful efforts and settlement are not successful. This principle shows the insights of Indonesian people on war and peace;

d. Indonesian people are against all forms of colonialism and follows free and active political policies. For the matter, external national defense is actively defensive in nature, meaning not aggressive and not expansive as long as national interests are not under threats. Based on the stance and view, Indonesian people are not tied to or do not participate in a defense pact with other countries;

e. the form of national defense is universe in nature in the sense of involving all people and all national resources, national facilities and infrastructures as well as the whole territory of the country as a defense unity; and

f. national defense is formulated based on the principles of democracy, human rights, social welfare, environment, national laws, international laws and traditions as well as the principle of living in harmony and peace by observing the geographic condition of Indonesia as an archipelago country. Beside the principles, national defense also observes the principles of independence, sovereignty and social justice.

The globalization era marked by the progress of science and technology, telecommunications and information is decisive in influencing the pattern and form of threats. Threats to national sovereignty previously conventional (physical) in nature at present develop to become multi-dimensional (non-physical) from both inside and outside the country. The multi-dimensional threats can come from the problems of both ideology, political, economy, social and culture or security related to international crimes such as among others terrorism, narcotics, the stealing of natural resources, piracy and environmental destruction.

All of these cause the problem of defense to become very complicated so that the settlement is the responsibility of not only the Ministry of Defense but also all related institutions both government and non-government institutions.

The preamble of the State Constitution of 1945, paragraph 4 stipulates that the government of the State of Republic of Indonesia has obligations to protect Indonesian people and all territory of Indonesia, improve social welfare, make Indonesian people intellectual and participate in the realization of word orderliness based on independence, peace and social justice. Based on the provision, it can be concluded that protecting all Indonesian people and the territory of the country against every foreign and domestic threat is essentially one of the functions of the state government.

Elucidation . . . . .

7A

Elucidation on the State Constitution of 1945 on the system of the state government affirms that Indonesia is based on laws and not based entirely on power. The President is the highest executor of the government of the state after the People's Consultative Assembly. Then, the body of the State Constitution of 1945 mentions that the authority of the President are among others:

a. holding the executive power in accordance with the State Constitution of 1945;
b. holding the highest power of the Army, Navy and Airforces;
c. with approval from the House of Representatives, declaring wars, creating peace and making agreement with other countries; and
d. declaring a state of emergency.

Based on the authority, the President holds the power of realizing the state government including efforts of the realization of national defense. For the matter, it is necessary to stipulate a law as the legal basis of the realization of national defense.

National defense is aimed at maintaining and protecting the sovereignty of the country, the integrity of the territory of the Unitary State of the Republic of Indonesia and the safety of all Indonesian people against all forms of threats. Therefore, all efforts in the realization of national defense must refer to the objective. That is why, national defense has functions to realize and defend all of the territory of the Unitary State of the Republic of Indonesia as a defense unity.

National defense is executed by the government and prepared early with the system of national defense through efforts to develop and foster the capability and preventing forces of the country and nation as well as facing every threat.

The system of national defense in facing military threats places the Indonesian Military as the main component with the supports of reserve components and supporting components. In facing non-military threats, the system of national defense places government institutions outside the field of defense as the main component adjusted to the form and characteristics of the threats with the supports of other elements of national forces.

The system of national defense involves all components of national defense, consisting of the main component, reserve components and supporting components. This is different from the main component of the forces of the Defense and Security of the State of the Republic of Indonesia, which consists of basic component, the main component, special components and supporting components.

Another difference is that in this law, the Indonesian Military is stipulated as the only the main component, meanwhile, the reserves of the Indonesian Military are included into reserve components. Such an arrangement is aimed at enable the execution of the realization of national defense to be in accordance with international laws related to the principle of differentiating the treatment for combats and non-combat as well as for simplifying the organizing of efforts to defend the country. Besides, this law also stipulates natural resources, artificial resources, national facilities and infrastructures as both reserve components and supporting components.

Every citizen has the right and obligations to participate in efforts to defend the country executed through civic education, basic military training, dedication as the soldiers of the Indonesian Military and dedication in accordance with professions.

The term of the Indonesian Military used in this law is as the substitution of the term of Armed Forces of the Republic of Indonesia (ABRI) in Law No. 20/1982. Based on Stipulation of the People's Consultative Assembly No. VI/MPR/2000 and No. VII/MPR/2000, the Indonesian Military and the Police of the Republic of Indonesia are institutionally separate in accordance with their respective roles and functions. The Indonesian Military, consisting of Army, Navy and Air Forces, is a state instrument playing a role as a defense instrument of the country, while the Police of the Republic of Indonesia is a state instrument playing a role in maintaining national security and public orderliness, enforcing law, providing protection and services for the society.

To support the interests of national defense, human resources, natural resources and artificial resources as well as national facilities and infrastructures within and/or outside the management of the Ministry of Defense in charge of the field of defense are used maximally as possible as both reserve components or supporting components.

The President as the highest caretaker of the management of national defense is assisted by the National Defense Council functioning as the advisor of the President in stipulating general policies on national defense. To face military threats, the President has the authority to mobilize the forces of the Indonesian Military with approval from the House of Representatives.

In an emergency condition, the President can directly mobilize the forces of the Indonesian Military with the provision that the President must ask for the approval from the House of Representatives at the latest 2x24 (two times twenty four) hours. If the House of Representatives does not approve it, the President must stop the military operation.

Business News 6732/1-3-2002

The ......

8A

The minister assists the President in formulating general policies on national defense and stipulating policies on the realization of policies on national defense. Besides, the Minister formulates the "blue prints" of defense, stipulates policies on bilateral, regional and international cooperation in his field, formulates general policies on the use of the forces of the Indonesian Military and other defense components, stipulates policies on budgeting, procurement, recruitment, management of national resources as well as the fostering of defense technology and industry. In the case of formulating and executing the strategic planning of the management of national resources for the interests of defense, the Minister cooperates with the leadership of ministries and other government institutions.

The Commander is elected and dismissed by the President after getting approval from the House of Representatives. The commander executes the planning of military strategies and operations, the fostering of military professionalism and forces as well as the maintaining of operational alertness. In accordance with the existing regulations and laws, the Commander can use all components of national defense, whose accountability is then reported to the President. In the case of meeting the needs of the Indonesian Military , the Commander cooperates with the Minister. The fostering of the capabilities of national defense is executed through the efficient use of all national resources as well as the use of the territory of the country and the development of defense industry to improve the capabilities of national defense by observing the rights of the society and the existing regulations and laws.

To guarantee the realization of national defense meeting the principle of democracy, the House of Representatives controls the execution of general policies on national defense and can ask for information on the realization and management of national defense.

In relation to the development of awareness of law rowing in the society upholding the principles of democracy, human rights, social welfare, environment and the principle of living in harmony and peace, Law No. 20/1982 concerning principal provisions on Defense and Security of the Republic of Indonesia already amended by Law No. 1/1988 needs to be replaced by this law.

. ARTICLE BY ARTICLE

Article 1
    Sufficiently clear

Article 2
    What is meant by universal characteristic is participation of all citizens, exploitation of all national resources and all territories in national defense efforts.

What is meant by the confidence in own forces is the spirit of relying on own strengths as the basic capital without closing opportunities for cooperating with other countries.

Article 3
Sub-article (1)
    What is meant by international custom is a not written provision practiced universally and recognized by international communities.

Sub-article (2)
    Sufficiently clear

Article 4
    What is meant by threat is every effort and activity, made both in and outside the country, considered as endangering the sovereignty of the country, the integrity of the territory of the country and the safety of all people of the country

Article 5
    What is meant by all territories of the Unitary State of the Republic of Indonesia as a defense unit is that a threat to part of the territories is a threat to all territories and becomes the responsibility of all people of the country.

Article 6
    Sufficiently clear

Article 7
Sub-article (1)
    Sufficiently clear

Sub-article (2)
    What is meant by a military threat is a threat using organized armed forces considered as having capability of endangering the sovereignty of the country, the integrity of territories of the country and the safety of all people of the country.
    The military threat can be in the form of among others:
a. Aggression taking the form of the use of the armed forces of another country against the sovereignty of the country, the integrity of the territory of the country and the safety of all people of the country or in the forms and ways of among others:
    1) Invasion taking the form of attacks by the armed forces of another country against the territory of the Unitary State of the Republic of Indonesia.
    2) Bombardment

9A

2) Bombardment taking the form of the use of other weapons by the armed forces of another country against the territory of the Unitary State of the Republic of Indonesia.

3) Blockade of a port or coast or air territory of the Unitary State of the Republic of Indonesia by the armed forces of another country.

4) Attacks by the element of the armed forces of another country against the element of army unit or navy unit or air force unit of the Indonesian Military.

5) The element of the armed forces of another country present in the territory of the Unitary State of the Republic of Indonesia based on an agreement, whose action or presence is against a provision of the agreement.

6) An action of a country permitting the use of its territory by another country as an area for preparing an aggression against the Unitary State of the Republic of Indonesia.

7) The sending of armed groups or soldiers of fortune by another country to do a violence in the territory of the Unitary State of the Republic of Indonesia or do an action similar as mentioned above.

b. Territory violation by another country using both non-commercial ships and planes.

c. Intelligence by another country to seek and obtain military secrets.

d. Sabotage for destroying a vital military installation and a vital national object, which endangers the safety of the people of the country.

e. An armed terrorist action by an international terrorism network or that cooperating with a local terrorism or local terrorism of high escalation so as to endanger the sovereignty of the country, the integrity of the territory of the country and the safety of all people of the country.

f. Armed rebellion.

g. Civil war occurring between an armed group of the society and another armed group of the society.

Sub-article (3)
    Sufficiently clear

Article 8
Sub-article (1)
    What is meant by mobilization is an action to mobilize and use simultaneously national resources and national facilities and infrastructures as forces of national defense.

Sub-article (2)
    Sufficiently clear

Sub-article (3)
    Sufficiently clear

Article 9
Sub-article (1)
    Efforts of national defense are the attitudes and behaviors of citizens inspirited by the love of the Unitary State of the Republic of Indonesia based on the State Ideology of Pancasila and the State Constitution of 1945 in guaranteeing the continuation of the life of Indonesian people as a nation and a country. Efforts of national defense is, beside as the basic human obligation, also the dignity of every citizen performed with total awareness, responsibility and readiness to sacrifice in dedication for the nation and the country.

Sub-article (2)
Letter a
    In civic education, understanding on awareness on national defense has been covered.
Letters b and c
    Sufficiently clear
Letter d
    What is meant by dedication in accordance with professions is the dedication of citizens having certain professions for the interests of national defense including in facing and/or reducing the effects caused by wars, natural disasters or other disasters.

Sub-article (3)
    Sufficiently clear

Article 10
Sub-article (1) and sub-article (2)
    Sufficiently clear

Sub-article (3)
Letter a and b
    Sufficiently clear
Letter c
    Military operation principally consists of military operations for wars and military operations not for wars. Military operation covers planned activities carried out by a military unit with target, time, place and logistic supports already stipulated before passing through detailed planning.

Non-war .....

10A

Non-war military operations are in the forms of among others humanitarian assistance, assistance for the State Police of the Republic of Indonesia in the frame work of the task of the public security and orderliness, assistance for civil government, shipping/flight safeguarding, assistance for search and rescue, assistance for evacuation of refugees and assistance for dealing with the victims of natural disasters.

Letter d
    Sufficiently clear

Article 11
    Sufficiently clear

Article 12
    What is meant by national interests are the maintaining of the existence of the Unitary State of the Republic of Indonesia based on the State Ideology of Pancasila and the State Constitution of 1945 and the guaranteeing of the smoothness and security of national development in sustainability to materialize the objectives of development and national objectives. National interests are realized by observing 3 (three) basic norms as follows:

1. The system of the life of the society, nation and country of Indonesia based on the State Ideology of Pancasila and the State Constitution of 1945.

2. Efforts of achieving national objectives are executed through national development in sustainability, environmental insights and national resilience based on the insights on the archipelago country.

3. Facilities used are all national potentials and forces used comprehensively and in integration.

Article 13
Sub-article (1)
    Sufficiently clear

Sub-article (2)
    What is meant by general policies on national defense cover among others efforts in constructing, maintaining and developing in integration and direction all of the components of national defense.

Article 14
Sub-article (1)
    The authority of mobilizing the forces of the Indonesian Military in the frame work of military operations is only in the hand of the President.

Sub-article (2)
    What is meant by armed threats are various efforts and activities carried out by organized and armed groups or parties, coming from both inside and outside the country, which threaten the sovereignty of the country, the integrity of the territory of the country and the safety of all people of the country.

Sub-article (3)
    What is meant by urgent situation is a situation when a decision must be made based on the consideration of space, time and target in accordance with the prediction of the risks faced.

Sub-article (4)
    The period of 2x24 hours (two times twenty four hours) is calculated as of the decision of the mobilization of forces.

Sub-article (5)
    Sufficiently clear

Article 15
Sub-article (1)
    In assisting the President to stipulate general policies on national defense, the National Defense Council provide inputs based on the result of analyses on various aspects of national defense.

Sub-article (2 up to sub-article (6)
    Sufficiently clear

Sub-article (7)
    Non-permanent members from the element of non-government are 5 (five) persons, consisting of experts in the field of defense, social organizations and non-governmental organizations.

Sub-article (8)
    Sufficiently clear

Article 16
Sub-article (1) up to sub-article (3)
    Sufficiently clear

Sub-article (4)
    What is meant by the "blueprints" of defense is a statement on comprehensive defense policies issued by the Minister and disseminated to the public both domestically and internationally to create mutual trust and eliminate conflict potentials.

Sub-article (5) . . . . . .

11A

Sub-article (5)

What is meant by formulating general policies is to prepare the stipulation of policies related to the objectives of the use of the Indonesian Military force as the main component and other components of defense.

Sub-article (6)

Procurement carried out by the Ministry of Defense must meet operational requirements and technical specification of defense equipment.

Recruitment covers activities of stipulation of allocation, publication and calling.

Sub-article (7)

Strategic planning is the national planning in a bid to manage national defense by creating the synergy of all national resources containing potentials of defense capabilities to become national defense strengths.

Article 17
Sub-article (1) and sub-article (2)
Sufficiently clear

Sub-article (3)

In submitting a proposal on the election of the Chief of the Staff of Army, the Commander propose minimally 2 (two) candidates.

Sub-article (4)
Sufficiently clear

Article 18
Sub-article (1) up to Sub-article (3)
Sufficiently clear

Sub-article (4)

The use of forces whose accountability must be reported to the President is a military operation action.

Article 19
Sufficiently clear

Article 20
Sub-article (1)
Sufficiently clear

Sub-article (2)

What is meant by values are a set of systems, principles and conditions whose truth are believed to be used as instruments of regulating life in measuring the perfor-

mance, both moral and physical, and also showing the ider tity of the related parties.

Values related to the system of national defens are among others:
a. Values contained in the State Ideology of Pancasila ar the State Constitution of 1945;
b. Values contained in the seven principles of Sapta Marg. Oath of Soldiers and the Doctrines of the Indonesia Military;
c. Values as the nation of fighters.
d. Values of gotong royong (mutual cooperation).
e. New values relevant to the needs of Indonesian peopl

Sub-article (3)
Sufficiently clear

Article 21

What is meant by the principle of sustainability the exploitation of natural resources and artificial resource which is directed to enable the meeting of needs and ca be used as the back up of the needs of long term.

What is meant by the principle of diversity is th exploitation of natural resources and artificial resource through diversification to avoid dependence.

What is meant by the principle of productivity the exploitation of natural resources and artificial resource with optimal use.

Article 22
Sufficiently clear

Article 23
Sub-article (1)
Sufficiently clear

Sub-article (2)

What is meant by encouraging and increasing th growth of defense industry includes activities in encourac ing and developing national industry producing equipmer supporting defense through both the activity of promotio and development of science and technology.

Article 24 up to article 29
Sufficiently clear

SUPPLEMENT TO STATUTE BOOK OF
THE REPUBLIC OF INDONESIA NO. 4169

···=== ( M ) ===···

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
JOHN DOE VIII, *et al.*,
Plaintiffs,

v.                                    Case:  1:07-cv-01022 (LFO)

EXXON MOBIL CORPORATION, *et al.*,

Defendants.

## DECLARATION OF RUTH WEDGWOOD

I, Ruth Wedgwood, declare as follows:

1.  I have been asked by counsel for the defendants in the above-titled civil action to
    provide my opinion on several specialized questions arising in the field of
    international law and post-conflict peacemaking, including the structure and purpose
    of truth and reconciliation commissions and claims commissions that may also
    provide comprehensive national schemes for reparations and indemnification after a
    civil conflict. This opinion is offered to assist the court in considering the
    defendants' motion to dismiss.

### I. Qualifications and Experience

2.  I offer this opinion in my personal capacity.  I hold a permanent appointment at
    Johns Hopkins University, in Washington, D.C., as the Edward B. Burling Professor
    of International Law and Diplomacy, and Director of the Program in International
    Law and Organizations at the School of Advanced International Studies.

3.  I am a graduate of the Yale Law School, and a member of the bars of the District of
    Columbia and New York, and the Supreme Court of the United States.  I served as a
    law clerk to Judge Henry Friendly in the United States Court of Appeals for the
    Second Circuit, and for Justice Harry Blackmun in the United States Supreme Court.
    I have also served as an Assistant United States Attorney in the Southern District of
    New York.  As an academic, I have taught in the fields of international law, conflict
    of laws, United Nations and International Security, international human rights, the
    law of armed conflict, constitutional law, and legal history.

4. I have previously served as Co-Director of Studies at the Hague Academy of International Law in the Netherlands, as Charles Stockton Professor of International Law at the U.S. Naval War College, Newport, Rhode Island, and as Professor of Law at Yale University Law School. I am a member of the editorial board of the American Journal of International Law, a former vice-president of the American Society of International Law, and vice-president of the International Law Association, American Branch. Since 1993, I have served on the Secretary of State's Advisory Committee on Public International Law. Since 2003, I have served as the American member of the United Nations Human Rights Committee, sitting in New York and Geneva. In 2006, I was elected to a second term on the Human Rights Committee by the 156 states parties. In the work of the committee, I have had occasion to review the human rights record of numerous states that have acceded to the International Covenant on Civil and Political Rights, including problems arising from civil conflicts.

5. I have previously served as a senior fellow in international organizations and law at the Council on Foreign Relations, in New York City, where I directed a diplomatic roundtable for members of the United Nations community discussing problems of peacekeeping and post-conflict transition. I am a member of the Council on Foreign Relations, the American Law Institute, the International Institute for Strategic Studies, and the International Institute of Humanitarian Law.

## II. Introduction

6. The purpose of this affidavit is to make available to the Court pertinent precedents and practice in international law, including archival materials, that might otherwise not be familiar or readily available.

7. The matter before the Court concerns the defendants' motion to dismiss state law tort claims, pleaded in diversity jurisdiction, said to arise under the law of the District of Columbia, in regard to events that took place in the province of Aceh, on the island of Sumatra, in the state of Indonesia.

8. The matter now pending before the court in regard to the motion to dismiss may be informed by the signal events of 2005, and in particular, by the entry into force of a comprehensive peace and claims settlement agreement in Aceh, entitled the "Memorandum of Understanding between the Government of the Republic of Indonesia and the Free Aceh Movement," which will be described below.[1]

---

[1] BBC News, Aceh Rebels Sign Peace Agreement, http://news.bbc.co.uk/2/hi/asia-pacific/4151980.stm (updated Aug. 15, 2005). An English language version of the "Memorandum of Understanding" is attached as an Appendix to this declaration.

9. In short, this binding agreement of 2005 seeks to end Aceh's long-standing civil conflict by a broad and comprehensive package that includes three important measures: (a) offering amnesty to the GAM insurgents, foreswearing any prosecution potentially arising from the rebellion, (b) providing in-kind assistance to former combatants to aid in their demobilization, and (c) providing in-kind and other compensation to all persons who suffered losses in the conflict.

10. In summary, it is my opinion that the administrative claims settlement process established by the 2005 Peace Agreement and executed by the parties in the long-running Aceh conflict was intended to be a comprehensive settlement of the issues arising from that conflict, precluding other methods of advancing claims for compensation.

11. In this regard, the importance of maintaining equality among the claimants under the Aceh settlement agreement, and the delicate nature of that peace agreement, are two of the factors that the Court should consider in its resolution of the tort claims filed in this court by several plaintiffs who have retained American counsel.

### III. The Civil War in Aceh, Failed Attempts to Settle the Conflict, and 2005 Comprehensive Peace Agreement

12. The conflict in northern Indonesia's "special territory" of Aceh, on the island of Sumatra, has been violent and difficult. Indonesia achieved independence from the Dutch in 1949, but the amalgamation of the largely Muslim territory of Aceh with the largely Christian territory of North Sumatra led to early resistance, and in 1959, the Indonesian government granted the territory a special degree of autonomy as a "special territory" (*daerah istimewa*).

13. The economic development of Aceh's natural resources of gas and oil was begun in the 1970's, and soon thereafter, a movement called GAM ("*Geraken Aceh Merdeka*" or "Free Aceh Movement") demanded independence from the Indonesian government in Jakarta. The GAM movement renewed its activities in the 1980's, with fighting between the guerrilla movement and the government. Both the military and the GAM were accused of human rights abuses.

14. In 1998 the collapse of the Suharto government brought significant change, and Indonesia gradually became a multiparty democracy, with a vibrant press and civil society. In March 1999, President Bachajuddin Jusuf Habibie went to Banda Aceh, apologized for past abuses, and appointed an Independent Commission to Investigate Violence. However, extremely serious human rights abuses were reported in regard to both sides in the conflict. Many of the acts of violence were committed by combatants out of uniform. These depredations were referred to as the acts of the "OTK" -- meaning "unknown persons" or *orang tidak kenal*, and both sides

reportedly used this tactic of eschewing responsibility for observance of the laws of war.

15. In May 2000, a "humanitarian pause" was agreed upon between the GAM and Jakarta, after talks facilitated by the Henry Dunant Center in Geneva. But there was no effective cessation of violence in the province, and in April 2001, Indonesian President Abdurrahman Wahid authorized the resumption of military operations.

16. Another attempt to find a political solution resulted in the signing of a Cessation of Hostilities Agreement (COHA) on December 9, 2002.[2]  But this pact, mediated through Sweden, also failed to achieve stability. Despite further mediation in Japan, the GAM was unwilling to accede to Indonesian conditions that it should disarm, and accept as sufficient the guarantee of autonomy for Aceh.

17. After this failure, the Indonesian government declared martial law in Aceh, and began a campaign called "*Operasi Terpadu*" ("integrated operation") to quell the GAM.  "Unlike previous military operations," one observer noted at the time, "the government this time has made it clear from the outset that the main objective of the campaign is to win the hearts and minds of the people.  To achieve this purpose, the military operation is only one element together with a humanitarian operation, law enforcement, and governance."[3]

18. A third chance for peace followed upon the terrible natural disaster of December 2004.  More than 120,000 people in Aceh lost their lives in the devastating tsunami and earthquake that shocked the region and the world.[4]  Large portions of Aceh were destroyed, with hundreds of thousands of people displaced from their homes, farms, and places of work.

19. After the trauma of the tsunami, both sides in the Aceh conflict accepted the invitation for peace talks extended by the former president of Finland, Martti Ahtisaari.  These talks were conducted throughout the spring of 2005, with agreement reached on August 15, 2005.

20. It is often true that the ability to reach a successful conclusion to a protracted conflict requires a confluence of events. The Helsinki talks saw the newly elected president of Indonesia, Susilo Bambang Yudhoyono, sitting at a table alongside the leadership of the GAM.  While the talks built upon earlier attempts undertaken by Indonesian vice president Jusuf Kalla to open a dialogue with the GAM in 2004, the acute shock

---

[2] Cessation of Hostilities, Framework Agreement between Government of the Republic of Indonesia and the Free Aceh Movement, signed Dec. 9, 2002, *available at* <http://www.usip.org/library/pa/aceh/aceh_12092002.html>.
[3] See Rizal Sukma, *Security Operations in Aceh: Goals, Consequences, and Lessons*, Project on International Conflicts, East-West Center, Washington, D.C., 2004.
[4] See, e.g., Amy Waldman, "Thousands Die as Quake-Spawned Waves Crash onto Coastlines Across Southern Asia," *New York Times*, Dec. 27, 2004; Seth Mydans, "After the Tsunami: At Home, in Company of Memories," *New York Times*, Apr. 20, 2005.

of the earthquake (akin to the "earthquake diplomacy" seen between Turkey and Greece in 1999), and the skilled mediation of Ahtisaari, provided a powerful combination.

21. The former Finnish president is one of a small class of envoys and former national political leaders who has enjoyed extraordinary success and experience in peace negotiations. From 1981 to 1984, he served as United Nations special envoy in Namibia, and later headed the UN transitional administration in Namibia. From 1992 to 1993, he chaired the working group for Bosnia-Herzegovina, within the International Conference on the former Yugoslavia, which sought to quell the bitter violence during the break-up of the former Yugoslavia.

22. Ahtisaari is also widely admired for his role in helping to resolve the Kosovo military conflict in 1999, in negotiations with former Serb president Slobodan Milosevic. This gained Serbia's acceptance of the UN mandate under which the Kosovo region gained substantial autonomy following the NATO military intervention. Ahtisaari currently serves as the UN special envoy for negotiations on the final status of Kosovo.

23. His skill in the Aceh negotiations, held in Helsinki in 2005, deserves equally high praise. The International Crisis Group chaired by former Australian foreign minister Gareth Evans, has lauded President Ahtisaari as serving the role of "a fully empowered mediator, not a mere 'facilitator' ... and one both highly skilled and splendidly intolerant of nonsense."[5]

24. The role of Indonesian president Susilo Bambang Yudhoyono was also remarked as constructive and brave. In January 2006, Congressman Robert Wexler of Florida -- who had been attentive to the crisis in Aceh as a senior Democratic member of the House Foreign Affairs Committee and co-chairman of the Congressional Indonesia Caucus -- announced that he had asked the Norwegian Prize Committee to consider the award of the Nobel Peace Prize to President Yudhoyono for advancing the resolution of the conflict in Aceh. See *U.S. congressman backs SBY for Nobel Peace Prize*, Jakarta Post, January 30, 2006.[6]

25. The effect of the tsunami also focused international attention on the region, and created a sense of the challenge that remained in the reconstruction of Aceh. See,

---

[5] Gareth Evans, "Aceh is building peace from its ruins," *Int'l Herald Tribune*, Dec. 23, 2005.

[6] Congressman Wexler also sent a follow-up letter to the Norwegian Nobel committee, on September 14, 2006, stating that "When I previously submitted the nomination of President Yudhoyono ... I did so based on the accomplishment of reaching an agreement that was internationally recognized for its even-handedness. At that time, I could only speculate as to the potential success of the agreement, or to its staying power. Today, however, nearly nine months after my initial submission, I am pleased to report that not only has the agreement held strong, but the region of Aceh is thriving despite numerous obstacles." See <www.wexler.house.gov/news>.

e.g., Nina Larson, *Expert says Tsunami Effect Pushes Indonesia, Aceh Separatists Closer to Peace*, Agence France Presse, April 13, 2005.[7]

26. By August 15, 2005, the parties had a detailed agreement in hand. It is entitled a "Memorandum of Understanding between the Government of the Republic of Indonesia and the Free Aceh Movement."[8]

27. It is a remarkable document, and provides the framework for an ongoing peace process. In its first paragraph, the agreement states that it is designed to provide a *"peaceful, comprehensive and sustainable* solution to the conflict." (Emphasis added). In the agreement, the GAM has accepted the virtues of autonomy, even without gaining independence. In return, the government of Indonesia has agreed that Aceh will be self-governing in almost all domestic affairs. The agreement gives Aceh the right to raise funds through external loans,[9] and the right to set its own taxes.[10] Aceh can seek foreign direct investment without going through Jakarta.[11] It also provides in binding fashion that Aceh "is entitled to retain seventy (70) percent of the revenues from all current and future hydrocarbon deposits and other natural resources in the territory of Aceh as well as the territorial sea surrounding Aceh"[12] – thus resolving one of the major issues about the distribution of revenues from foreign direct investment.

28. To create a culture of human rights observance, the agreement provides that a Human Rights Court must be established for Aceh.[13] It obligates the government of Indonesia to "adhere to the United Nations International Covenants on Civil and Political Rights and on Economic, Social and Cultural Rights."[14] Indonesia has deposited its instruments of accession with the United Nations Secretary General, thus assuming the obligation of periodic reporting to the United Nations treaty monitoring committees in Geneva.[15]

29. The "comprehensive" agreement also provided for European Union and contributing ASEAN countries to lead an international monitoring mission to resolve any disputes

---

[7] Ms. Larson's news story notes the conclusion of former mediator David Gorman that "Due to the tsunami, neither party wants to lose the hearts and minds of the Aceh people. They can't afford to do so now." In addition, noted Ms. Larson, in the 2005 presidential election, President Yudhoyono was supported by a "large majority" of the voters in Aceh, which also "made the timing of the talks opportune."

[8] The text of the memorandum is available on the website of the BBC, and is reproduced in an appendix to this declaration.

[9] Memorandum of Understanding, art. 1.3.1.

[10] Memorandum of Understanding, art. 1.3.2.

[11] Memorandum of Understanding, art. 1.3.2.

[12] Memorandum of Understanding, art. 1.3.4.

[13] Memorandum of Understanding, art. 2.2.

[14] Memorandum of Understanding, art. 2.1.

[15] Indonesia deposited its accessions to the Covenant on Civil and Political Rights and the Covenant on Economic, Social and Cultural Rights on Feb. 23, 2006. Indonesia also was elected to the United Nations Human Rights Council in 2006, and will be subject to a "Universal Periodic Review" of its human rights record. See General Assembly Resolution 60/251.

in implementation, including matters of human rights and legislative change.[16] This monitoring mission, as former Australian Foreign Minister Gareth Evans has noted, was "seen as more neutral, professional and generally effective than its counterpart in the failed 2003 agreement."[17]

## IV. Amnesty, Disarmament, the Truth and Reconciliation Commission and Claims Settlement Commission as a Central Part of the Comprehensive Peace Settlement

30.  The Ahtisaari-brokered peace agreement also provides for two crucial commissions as part of the overall agreement.  First, the 2005 pact mandates that a "Commission for Truth and Reconciliation" should be established "with the task of formulating and determining reconciliation measures."[18]

31.  The work of a truth and reconciliation commission has been recognized as highly important in the aftermath of many civil conflicts, as a way of acknowledging the suffering of the past, while trying to knit communities back together.  Truth and reconciliation commissions have been used with considerable success in such conflicts as Guatemala, El Salvador, and South Africa.[19]

32.  As part of reconciliation, the 2005 comprehensive agreement required that the government of Indonesia should "grant amnesty to all persons who have participated in GAM activities as soon as possible" and at most, within 15 days.[20]  It specified that all "political prisoners and detainees held due to the conflict" must be released without any conditions within 15 days of the agreement.[21]  It required too that the GAM should give up its weapons, in four stages of decommissioning,[22] and required that the government of Indonesia must "withdraw all elements of the non-organic military and non-organic police forces" in a four-step process.[23]  It limits the size of the "organic" police and military forces[24] and requires that the police "receive special training in Aceh and overseas with emphasis on respect for human rights."[25]

---

[16] Memorandum of Understanding, art. 5.
[17] Gareth Evans, "Aceh is building peace from its ruins," *Int'l Herald Tribune*, Dec. 23, 2005.
[18] Memorandum of Understanding, art. 2.3.
[19] A broad literature is available on truth and reconciliation commissions, and their relationship to conflict management. *See, e.g.*, Robert Rotberg & Dennis Thompson, *Truth vs. Justice: The Morality of Truth Commissions* (2000); Charles Villa-Vicencio & Wilhelm Verwoerd, *Looking Back, Reaching Forward – Reflections on the Truth and Reconciliation Commission of South Africa* (2000); William Schabas & Shane Darcy (eds.), *Truth Commissions and Courts* (2004); Mark R. Amstutz, *The Healing of Nations: The Promise and Limits of Political Forgiveness* (2005).
[20] Memorandum of Understanding, art. 3.1.1.
[21] Memorandum of Understanding, art. 3.1.2.
[22] Memorandum of Understanding, arts. 4.3 & 4.4.
[23] Memorandum of Understanding, arts. 4.5 & 4.6.
[24] Memorandum of Understanding, art. 4.7.
[25] Memorandum of Understanding, art. 4.12.

33. This has been and remains a delicate process. As Gareth Evans put it, "There are still some major hurdles ahead in Aceh, and the sustainability of this peace is not yet absolutely guaranteed."[26]

34. The reintegration of former combatants is crucial, together with the settlement of claims that concern persons injured in the conflict. Because of the presence of the OTK's during the conflict, the identity of the party inflicting harm on an innocent person is often not known. Even apart from the deliberate confusion about the identity of forces caused by the so-called OTK's, the daunting task of handling thousands of claims of injury and loss arising amidst the chaos of a guerrilla conflict, with military actions taken by forces on both sides, could pose a serious obstacle to an effective peace.

35. Thus, the agreement seeks to handle claims arising from the conflict in an expeditious and consistent manner, using an administrative process of claims settlement.[27] With the economic challenges of Aceh, and the need to reinvigorate its economy after the tsunami destruction, it is not surprising that the 2005 agreement declined to remit such claims to judicial adjudication, but instead has channeled such claims through a binding administrative process.

36. This modality of handling claims has been used before. In 1991, for example, following the conclusion of the first Persian Gulf War, the U.N. Security Council created a "compensation commission" for claims arising from the war.[28] The Iraq commission, seated in Geneva, has devised ways to handle the thousands of civil claims that arose from the war, taking account of the fact that the demanding standards of judicial proof may be impractical.

37. In article 3.2.5 of the 2005 Aceh agreement, the Government of Indonesia and the representatives of the Free Aceh Movement agreed that "suitable farming land" as well as "funds" would be allocated to the authorities of Aceh "for the purpose of facilitating the reintegration to society of the former combatants and the compensation for political prisoners *and affected civilians."* (Emphasis added).

38. Under article 3.2.5(c) of this "comprehensive" agreement, there is a specification of available forms of compensation. In particular, **"*All civilians who have suffered a demonstrable loss due to the conflict* will receive an allocation of suitable farming land, employment or, in the case of incapacity to work, adequate social security from the authorities of Aceh."** (Emphasis added).

---

[26] Gareth Evans, "Aceh is building peace from its ruins," *Int'l Herald Tribune*, Dec. 23, 2005.

[27] Memorandum of Understanding, arts. 3.2.4 to 3.2.6.

[28] The UN Compensation Commission was established as a subsidiary organ of the UN Security Council to process claims and pay compensation for losses arising from Iraq's invasion and occupation of Kuwait. See UN Security Council resolution 692 (1991).

39. According to the agreement, any "unmet claims" are to be dealt with by a **"joint Claims Settlement Commission"** to be established by the "authorities of Aceh" and the government of Indonesia.[29]

40. In numerous international and national conflicts, as well as reparations in such horrors as the Holocaust, the issue of claims has been handled by a similar claims commission mechanism. At the present time, for example, the Iran-United States Claims Tribunal still sits in The Hague, Netherlands, to handle claims arising from the 1979-1981 Iranian hostage crisis.[30] Claims settlement commissions have been used in many disputes where the number of potential claims might tax an existing judicial system.

41. I would conclude, based on the terms and provisions of the GAM-Indonesia 2005 agreement, that the joint administrative claims settlement process established by the 2005 "comprehensive" agreement was meant to preclude other methods of advancing claims for compensation. In circumstances such as these, where there are numerous losses caused by a long-running armed conflict, it makes sense to have an administrative claims settlement process, allowing a visible consistency of results and a practical way of handling matters where the proof will often not rise to the level of certainty required for judicial proceedings.

### V. The Effects of the 2005 Comprehensive Settlement Agreement on Aceh's Economic Growth and Future

42. As noted above, one of the long-standing points of contention in Aceh has been the issue of how local citizens would share in the economy of the country. Thus, one key feature of the comprehensive settlement agreement is the guarantee that 70 percent of future revenues from extractive industries in Aceh such as gas and oil are allocated to the autonomous government of Aceh.

43. The prospects for economic growth in Aceh have dramatically improved since the conclusion of the comprehensive settlement agreement, with new interest by foreign investors. Pursuant to the settlement agreement, the citizens of Aceh voted in a state-wide election for a new governor of the province. The newly-elected governor, Mr. Irwandi Yusuf, happens to be a former leader of the GAM movement. He has announced that attracting outside investment is key to the future of the province.

44. This long-sighted policy has been remarked upon by Sidney Jones, a senior analyst for the International Crisis Group – a non-governmental organization that happens to be chaired by former Finnish president Martti Ahtisaari. In a recent article in the

---

[29] Memorandum of Understanding, art. 3.2.6.

[30] The documents and case law of the Iran-United States Claims Tribunal are available on-line at www.iusct.org. See also, Ruth Wedgwood, *Double-Jointed Diplomacy*, Christian Science Monitor, August 1, 1996 (Iran-U.S. claims tribunal also provides "a discreet and useful back channel for communications").

*Jakarta Post*, Ms. Jones noted that, "As governor, Irwandi Yusuf will give priority to generating jobs, attracting investment and speeding up reconstruction." Sidney Jones, *Priorities for a GAM-Led Government in Aceh*, *Jakarta Post*, December 29, 2006.

45. To that end, "Irwandi has made it clear in all post-election interviews that he will focus on improving the economic welfare of Aceh's poor, particularly farmers and fishers, and on upgrading public services. In his view, the first depends in part on direct access of Acehnese to international commodity markets, without going through Medan-based middlemen. Improving port facilities, fixing roads, facilitating transportation links between Aceh and Malaysia, including direct Banda Aceh-Kuala Lumpur fights, getting abandoned palm oil plantations working again, attracting investment for joint ventures in agribusiness – all this could be part of the medium to long-term picture." *Id.*

46. There have been other signs of economic growth. Thus, the involvement of former guerrillas in starting small businesses has been noted. See *Aceh Ex-Rebels' Japan Funded Businesses Thrive: IOM Survey*, in *Aceh Eye*, August 15, 2007, reprinted on-line, at <www.fkmcpr.nl> ("The International Organization for Migration, with funding from the Japanese government, has so far helped some 5,000 former combatants establish small businesses in Indonesia's northernmost province …. They include coffee shops, kiosks, fish trading, brick factories and tailor houses, as well as companies making fermented soybean cake 'tempeh'."

47. There has been overseas investment interest in tourism. See *Singapore Businessmen Eye Investment in Aceh's Tourism Sector,"* *Aceh Eye*, August 10, 2007, reprinted on-line, at <www.fkmcpr.nl> ("Several businessmen from Singapore and Malaysia have visited hot springs in Krueng Raya (Aceh Besar District). They have expressed their interest in developing various tourism facilities …' Aceh Besar District Head Bukhair Daud said …."

48. A Chinese company has signed a memorandum of understanding to build a highway between Banda Aceh city and the eastern part of Nanggroe Aceh Darussalam province. See *Chinese businesses interested in building Aceh-Medan highway*, Jakarta Post, August 9, 2007, reprinted on-line, at <www.fkmcpr.nl>.

49. Members of the Swedish Trade Council have expressed interest in investing in the province, according to the head of the Aceh-Nias Reconstruction and Rehabilitation Board, asking "about security assurance and the possible impact of the Muslim Syariah law on their business later in Aceh." See *Swedish businesspeople wish to invest in Aceh*, ANTARA News, May 15, 2007, available on-line, at <www.fkmcpr.nl>

50. In addition, the economy has been bolstered by the assistance provided in international post-tsunami reconstruction and relief, though its wise expenditure may be a challenge. See *Aceh's Budget, Poverty, and the World Bank Report*, *Tempo*

*Magazine*, February 13, 2007, available on-line at www.fkmcpr.nl> ("A heavy task however awaits Irwandi's new government, because a survey has shown that the capacity of regional governments in many of the regencies in handling public funds in various different sectors is still extremely poor. … "). Accord, *An Analysis of Public Spending in Aceh in 2006*, Report of the World Bank, 2007, available on-line at <www.worldbank.org>.

51. Meanwhile, the prospect of free legislative and presidential elections has been met by the stated commitment of the GAM to enter politics. See *GAM vows to take part in 2009 polls*, Jakarta Post, April 28, 2006, available on-line at <www.fkmcpr.nl> (after meeting between "former rebel movement leaders" and the vice-president of Indonesia, former "[s]elf-styled GAM prime minister" Malik Mahmood stated, "Yesterday I was in Aceh and saw security was improving. People there already have normal lives.… I am happy to be able to return to Jakarta. For almost 40 years, I had not stepped foot in Jakarta.").

## VI. The Effect of the 2005 Comprehensive Agreement and Claims Settlement Process on Judicial Proceedings

52. Though the claims of the plaintiffs in the instant case are directed against the corporate entity of ExxonMobil, rather than Indonesia as such, they arise from the alleged failure of the Indonesian army to obey lawful standards during the civil conflict – in particular, during military police deployments in the areas where ExxonMobil operated Indonesia's natural gas fields.

53. The claims process specified by the 2005 comprehensive agreement, as formulated and endorsed by the two parties to the conflict, does not depend upon the particular type of military action undertaken by Indonesian troops or military police during the conflict. By its stated terms, the 2005 comprehensive agreement's claims process would seem to encompass Indonesia's provision of perimeter security to the industrial and extractive projects operated by ExxonMobil, that was provided to protect those facilities from attack during the civil conflict in Aceh.

54. It is not disputed that the insurgent guerrilla forces of GAM seeking independence for Aceh chose to pose a threat and engaged in violent attacks against various natural gas facilities of Indonesia that were operated by ExxonMobil, as part of the civil conflict.

55. For example, according to the August 13, 2003 issue of *Jakarta Suara Pembaruan,* a newspaper published in Jakarta, a bomb exploded in the condensate burner unit at Cluster II in North Aceh, and another homemade bomb was found with 50 metres of connecting cable. According to November 22, 2002 reporting by *Agence France Press*, another news agency, three Exxon Mobil workers were kidnapped in North Aceh by insurgents, though they were released two days later.

56. Similarly, on May 19, 2003, the military spokesman of the GAM insurgency, Mr. Sofyan Dawood, gave a statement to the Hong Kong bureau of the Agence France Presse news agency – remarking that Indonesian military forces were not off limits just because they conducted perimeter security patrols. Mr. Dawood stated, "We don't want to attack vital projects but if the military or police who guard the projects make a sweeping [search for rebels], we will attack the military or police there."[31] (bracketed language in original story).

## VII. Conclusion

57. The judgment that each party to an armed conflict must make, when faced with the prospect of the continued destructiveness of war, is whether the terms upon which a settlement has been offered are, though not optimal, still acceptable. The comprehensive agreement accepted and endorsed both by the GAM and the Government of Indonesia, on August 15, 2005, concluded a long-standing conflict that had been onerous both to the people of Aceh and Indonesia as a whole. Thus, its terms are worthy of respect and full observance by all parties.

58. In particular, the 2005 comprehensive agreement, reached through international mediation supervised by former Prime Minister Martti Ahtisaari, frames a specific method for the compensation of "All civilians who have suffered a demonstrable loss due to the conflict." In considering the pending motion to dismiss the complaint, this Court should be mindful of the 2005 peace agreement's attempt to assure a uniform and even-handed method of repairing losses from the conflict, and the possible effects of a visible disparity in outcome through extraterritorial litigation.

Respectfully Submitted,


Ruth Wedgwood
Edward B. Burling Professor of International Law and Diplomacy
Director of the Program in International Law and Organizations
School of Advanced International Studies
Johns Hopkins University
September 17, 2007

---

[31] Hong Kong Agence France Press, May 19, 2003.

I declare, under penalty of perjury and the laws of the United States of America, that to the best of my knowledge and belief, the statements made in this Declaration are true and correct.

Executed on September 17, 2007, at Washington, D.C.

_____

RUTH WEDGWOOD

# APPENDIX

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# Memorandum of Understanding
## between
## the Government of the Republic of Indonesia
## and
## the Free Aceh Movement

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The Government of Indonesia (GoI) and the Free Aceh Movement (GAM) confirm their commitment to a peaceful, comprehensive and sustainable solution to the conflict in Aceh with dignity for all.

The parties commit themselves to creating conditions within which the government of the Acehnese people can be manifested through a fair and democratic process within the unitary state and constitution of the Republic of Indonesia.

The parties are deeply convinced that only the peaceful settlement of the conflict will enable the rebuilding of Aceh after the tsunami disaster on 26 December 2004 to progress and succeed.

The parties to the conflict commit themselves to building mutual confidence and trust.

This Memorandum of Understanding (MoU) details the agreement and the principles that will guide the transformation process.

To this end the GoI and GAM have agreed on the following:

## 1    Governing of Aceh

### 1.1    Law on the Governing of Aceh

1.1.1    A new Law on the Governing of Aceh will be promulgated and will enter into force as soon as possible and not later than 31 March 2006.

1.1.2    The new Law on the Governing of Aceh will be based on the following principles:

    a)   Aceh will exercise authority within all sectors of public affairs, which will be administered in conjunction with its civil and judicial administration, except in the fields of foreign affairs, external defence, national security, monetary and fiscal matters, justice and freedom of religion, the policies of which belong to the Government of the Republic of Indonesia in conformity with the Constitution.

    b)   International agreements entered into by the Government of Indonesia which relate to matters of special interest to Aceh will be entered into in consultation with and with the consent of the legislature of Aceh.

    c)   Decisions with regard to Aceh by the legislature of the Republic of Indonesia will be taken in consultation with and with the consent of the legislature of Aceh.

    d)   Administrative measures undertaken by the Government of Indonesia with regard to Aceh will be implemented in consultation with and with the consent of the head of the Aceh administration.

1.1.3 The name of Aceh and the titles of senior elected officials will be determined by the legislature of Aceh after the next elections.

1.1.4 The borders of Aceh correspond to the borders as of 1 July 1956.

1.1.5 Aceh has the right to use regional symbols including a flag, a crest and a hymn.

1.1.6 Kanun Aceh will be re-established for Aceh respecting the historical traditions and customs of the people of Aceh and reflecting contemporary legal requirements of Aceh.

1.1.7 The institution of Wali Nanggroe with all its ceremonial attributes and entitlements will be established.

## 1.2    Political participation

1.2.1 As soon as possible and not later than one year from the signing of this MoU, GoI agrees to and will facilitate the establishment of Aceh-based political parties that meet national criteria. Understanding the aspirations of Acehnese people for local political parties, GoI will create, within one year or at the latest 18 months from the signing of this MoU, the political and legal conditions for the establishment of local political parties in Aceh in consultation with Parliament. The timely implementation of this MoU will contribute positively to this end.

1.2.2 Upon the signature of this MoU, the people of Aceh will have the right to nominate candidates for the positions of all elected officials to contest the elections in Aceh in April 2006 and thereafter.

1.2.3 Free and fair local elections will be organised under the new Law on the Governing of Aceh to elect the head of the Aceh administration and other elected officials in April 2006 as well as the legislature of Aceh in 2009.

1.2.4 Until 2009 the legislature of Aceh will not be entitled to enact any laws without the consent of the head of the Aceh administration.

1.2.5 All Acehnese residents will be issued new conventional identity cards prior to the elections of April 2006.

1.2.6 Full participation of all Acehnese people in local and national elections will be guaranteed in accordance with the Constitution of the Republic of Indonesia.

1.2.7 Outside monitors will be invited to monitor the elections in Aceh. Local elections may be undertaken with outside technical assistance.

1.2.8 There will be full transparency in campaign funds.

## 1.3    Economy

1.3.1 Aceh has the right to raise funds with external loans. Aceh has the right to set interest rates beyond that set by the Central Bank of the Republic of Indonesia.

1.3.2 Aceh has the right to set and raise taxes to fund official internal activities. Aceh has the right to conduct trade and business internally and internationally and to seek foreign direct investment and tourism to Aceh.

1.3.3    Aceh will have jurisdiction over living natural resources in the territorial sea surrounding Aceh.

1.3.4    Aceh is entitled to retain seventy (70) per cent of the revenues from all current and future hydrocarbon deposits and other natural resources in the territory of Aceh as well as in the territorial sea surrounding Aceh.

1.3.5    Aceh conducts the development and administration of all seaports and airports within the territory of Aceh.

1.3.6    Aceh will enjoy free trade with all other parts of the Republic of Indonesia unhindered by taxes, tariffs or other restrictions.

1.3.7    Aceh will enjoy direct and unhindered access to foreign countries, by sea and air.

1.3.8    GoI commits to the transparency of the collection and allocation of revenues between the Central Government and Aceh by agreeing to outside auditors to verify this activity and to communicate the results to the head of the Aceh administration.

1.3.9    GAM will nominate representatives to participate fully at all levels in the commission established to conduct the post-tsunami reconstruction (BRR).

### 1.4    Rule of law

1.4.1    The separation of powers between the legislature, the executive and the judiciary will be recognised.

1.4.2    The legislature of Aceh will redraft the legal code for Aceh on the basis of the universal principles of human rights as provided for in the United Nations International Covenants on Civil and Political Rights and on Economic, Social and Cultural Rights.

1.4.3    An independent and impartial court system, including a court of appeals, will be established for Aceh within the judicial system of the Republic of Indonesia.

1.4.4    The appointment of the Chief of the organic police forces and the prosecutors shall be approved by the head of the Aceh administration. The recruitment and training of organic police forces and prosecutors will take place in consultation with and with the consent of the head of the Aceh administration in compliance with the applicable national standards.

1.4.5    All civilian crimes committed by military personnel in Aceh will be tried in civil courts in Aceh.

### 2    HUMAN RIGHTS

2.1    GoI will adhere to the United Nations International Covenants on Civil and Political Rights and on Economic, Social and Cultural Rights.

2.2    A Human Rights Court will be established for Aceh.

2.3    A Commission for Truth and Reconciliation will be established for Aceh by the Indonesian Commission of Truth and Reconciliation with the task of formulating and determining reconciliation measures.

3    AMNESTY AND REINTEGRATION INTO SOCIETY

### 3.1  Amnesty

3.1.1    GoI will, in accordance with constitutional procedures, grant amnesty to all persons who have participated in GAM activities as soon as possible and not later than within 15 days of the signature of this MoU.

3.1.2    Political prisoners and detainees held due to the conflict will be released unconditionally as soon as possible and not later than within 15 days of the signature of this MoU.

3.1.3    The Head of the Monitoring Mission will decide on disputed cases based on advice from the legal advisor of the Monitoring Mission.

3.1.4    Use of weapons by GAM personnel after the signature of this MoU will be regarded as a violation of the MoU and will disqualify the person from amnesty.

### 3.2  Reintegration into society

3.2.1    As citizens of the Republic of Indonesia, all persons having been granted amnesty or released from prison or detention will have all political, economic and social rights as well as the right to participate freely in the political process both in Aceh and on the national level.

3.2.2    Persons who during the conflict have renounced their citizenship of the Republic of Indonesia will have the right to regain it.

3.2.3    GoI and the authorities of Aceh will take measures to assist persons who have participated in GAM activities to facilitate their reintegration into the civil society. These measures include economic facilitation to former combatants, pardoned political prisoners and affected civilians. A Reintegration Fund under the administration of the authorities of Aceh will be established.

3.2.4    GoI will allocate funds for the rehabilitation of public and private property destroyed or damaged as a consequence of the conflict to be administered by the authorities of Aceh.

3.2.5    GoI will allocate suitable farming land as well as funds to the authorities of Aceh for the purpose of facilitating the reintegration to society of the former combatants and the compensation for political prisoners and affected civilians. The authorities of Aceh will use the land and funds as follows:

   a) All former combatants will receive an allocation of suitable farming land, employment or, in the case of incapacity to work, adequate social security from the authorities of Aceh.

   b) All pardoned political prisoners will receive an allocation of suitable farming land, employment or, in the case of incapacity to work, adequate social security from the authorities of Aceh.

   c) All civilians who have suffered a demonstrable loss due to the conflict will receive an allocation of suitable farming land, employment or, in the case of incapacity to work, adequate social security from the authorities of Aceh.

3.2.6  The authorities of Aceh and GoI will establish a joint Claims Settlement Commission to deal with unmet claims.

3.2.7  GAM combatants will have the right to seek employment in the organic police and organic military forces in Aceh without discrimination and in conformity with national standards.

4      SECURITY ARRANGEMENTS

4.1    All acts of violence between the parties will end latest at the time of the signing of this MoU.

4.2    GAM undertakes to demobilise all of its 3000 military troops. GAM members will not wear uniforms or display military insignia or symbols after the signing of this MoU.

4.3    GAM undertakes the decommissioning of all arms, ammunition and explosives held by the participants in GAM activities with the assistance of the Aceh Monitoring Mission (AMM). GAM commits to hand over 840 arms.

4.4    The decommissioning of GAM armaments will begin on 15 September 2005 and will be executed in four stages and concluded by 31 December 2005.

4.5    GoI will withdraw all elements of non-organic military and non-organic police forces from Aceh.

4.6    The relocation of non-organic military and non-organic police forces will begin on 15 September 2005 and will be executed in four stages in parallel with the GAM decommissioning immediately after each stage has been verified by the AMM, and concluded by 31 December 2005.

4.7    The number of organic military forces to remain in Aceh after the relocation is 14700. The number of organic police forces to remain in Aceh after the relocation is 9100.

4.8    There will be no major movements of military forces after the signing of this MoU. All movements more than a platoon size will require prior notification to the Head of the Monitoring Mission.

4.9    GoI undertakes the decommissioning of all illegal arms, ammunition and explosives held by any possible illegal groups and parties.

4.10   Organic police forces will be responsible for upholding internal law and order in Aceh.

4.11   Military forces will be responsible for upholding external defence of Aceh. In normal peacetime circumstances, only organic military forces will be present in Aceh.

4.12   Members of the Aceh organic police force will receive special training in Aceh and overseas with emphasis on respect for human rights.

5      ESTABLISHMENT OF THE ACEH MONITORING MISSION

5.1    An Aceh Monitoring Mission (AMM) will be established by the European Union and ASEAN contributing countries with the mandate to monitor the implementation of the commitments taken by the parties in this Memorandum of Understanding.

5.2    The tasks of the AMM are to:
    a) monitor the demobilisation of GAM and decommissioning of its armaments,
    b) monitor the relocation of non-organic military forces and non-organic police troops,
    c) monitor the reintegration of active GAM members,
    d) monitor the human rights situation and provide assistance in this field,
    e) monitor the process of legislation change,
    f) rule on disputed amnesty cases,
    g) investigate and rule on complaints and alleged violations of the MoU,
    h) establish and maintain liaison and good cooperation with the parties.

5.3    A Status of Mission Agreement (SoMA) between GoI and the European Union will be signed after this MoU has been signed. The SoMA defines the status, privileges and immunities of the AMM and its members. ASEAN contributing countries which have been invited by GoI will confirm in writing their acceptance of and compliance with the SoMA.

5.4    GoI will give all its support for the carrying out of the mandate of the AMM. To this end, GoI will write a letter to the European Union and ASEAN contributing countries expressing its commitment and support to the AMM.

5.5    GAM will give all its support for the carrying out of the mandate of the AMM. To this end, GAM will write a letter to the European Union and ASEAN contributing countries expressing its commitment and support to the AMM.

5.6    The parties commit themselves to provide AMM with secure, safe and stable working conditions and pledge their full cooperation with the AMM.

5.7    Monitors will have unrestricted freedom of movement in Aceh. Only those tasks which are within the provisions of the MoU will be accepted by the AMM. Parties do not have a veto over the actions or control of the AMM operations.

5.8    GoI is responsible for the security of all AMM personnel in Indonesia. The mission personnel do not carry arms. The Head of Monitoring Mission may however decide on an exceptional basis that a patrol will not be escorted by GoI security forces. In that case, GoI will be informed and the GoI will not assume responsibility for the security of this patrol.

5.9    GoI will provide weapons collection points and support mobile weapons collection teams in collaboration with GAM.

5.10   Immediate destruction will be carried out after the collection of weapons and ammunitions. This process will be fully documented and publicised as appropriate.

5.11   AMM reports to the Head of Monitoring Mission who will provide regular reports to the parties and to others as required, as well as to a designated person or office in the European Union and ASEAN contributing countries.

5.12   Upon signature of this MoU each party will appoint a senior representative to deal with all matters related to the implementation of this MoU with the Head of Monitoring Mission.

5.13   The parties commit themselves to a notification responsibility procedure to the AMM, including military and reconstruction issues.

5.14   GoI will authorise appropriate measures regarding emergency medical service and hospitalisation for AMM personnel.

5.15    In order to facilitate transparency, GoI will allow full access for the representatives of national and international media to Aceh.

6    DISPUTE SETTLEMENT

6.1    In the event of disputes regarding the implementation of this MoU, these will be resolved promptly as follows:

a)    As a rule, eventual disputes concerning the implementation of this MoU will be resolved by the Head of Monitoring Mission, in dialogue with the parties, with all parties providing required information immediately. The Head of Monitoring Mission will make a ruling which will be binding on the parties.

b)    If the Head of Monitoring Mission concludes that a dispute cannot be resolved by the means described above, the dispute will be discussed together by the Head of Monitoring Mission with the senior representative of each party. Following this, the Head of Monitoring Mission will make a ruling which will be binding on the parties.

c)    In cases where disputes cannot be resolved by either of the means described above, the Head of Monitoring Mission will report directly to the Coordinating Minister for Political, Law and Security Affairs of the Republic of Indonesia, the political leadership of GAM and the Chairman of the Board of Directors of the Crisis Management Initiative, with the EU Political and Security Committee informed. After consultation with the parties, the Chairman of the Board of Directors of the Crisis Management Initiative will make a ruling which will be binding on the parties.

*******************************

GoI and GAM will not undertake any action inconsistent with the letter or spirit of this Memorandum of Understanding.

*****************************

Signed in triplicate in Helsinki, Finland on the 15 of August in the year 2005.

**On behalf of the Government of the Republic of Indonesia,**          **On behalf of the Free Aceh Movement,**

**Hamid Awaludin**                                                      **Malik Mahmud**
*Minister of Law and Human Rights*                                      *Leadership*

As witnessed by

**Martti Ahtisaari**
*Former President of Finland*
*Chairman of the Board of Directors of the Crisis Management Initiative*
*Facilitator of the negotiation process*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                        )
JOHN DOE VIII, Village L, Aceh Indonesia,    )
JOHN DOE IX, Village M, Aceh Indonesia,      )
JOHN DOE X, Village N, Aceh Indonesia,       )
JOHN DOE XI, Village O, Aceh Indonesia,      )
                                                        )
              Plaintiffs,                               )
                                                        )
       v.                                               )          Case: 1:07-cv-01022 (LFO)
                                                        )
EXXON MOBIL CORPORATION,  5959               )
Las Colinas Boulevard, Irving, Texas, 75039-2298, )
EXXONMOBIL OIL INDONESIA, PT,                )
27-30/F Wisma GKBI, Jl. Jend Sudirman 28,    )
Jakarta, Indonesia, MOBIL CORPORATION,       )
800 Bell Street, Houston, TX 77002, MOBIL    )
OIL CORPORATION, 800 Bell Street, Houston,   )
TX 77002,                                               )
                                                        )
              Defendants.                               )
_____)

### [PROPOSED ORDER]

Upon consideration of Defendants' Motion To Dismiss and the memorandum in support

thereof, and accompanying exhibits and declarations, it is on this ____ day of _____, 2007,

hereby

ORDERED, that Defendants' Motion To Dismiss be, and the same hereby is granted; and

it is further

ORDERED, that the Complaint is dismissed.

_____

United States District Judge