IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE VIII, Village L, Aceh Indonesia,<br>JOHN DOE IX, Village M, Aceh Indonesia,<br>JOHN DOE X, Village N, Aceh Indonesia,<br>JOHN DOE XI, Village O, Aceh Indonesia,<br><br>Plaintiffs,<br><br>v.<br><br>EXXON MOBIL CORPORATION, 5959<br>Las Colinas Boulevard, Irving, Texas, 75039-2298,<br>EXXONMOBIL OIL INDONESIA INC.,<br>27-30/F Wisma GKBI, Jl. Jend Sudirman 28,<br>Jakarta, Indonesia, MOBIL CORPORATION,<br>800 Bell Street, Houston, TX 77002, MOBIL<br>OIL CORPORATION, 800 Bell Street, Houston,<br>TX 77002,<br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case: 1:07-cv-01022 (LFO) |

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
EXXON MOBIL CORPORATION, MOBIL CORPORATION,
EXXONMOBIL OIL CORPORATION, AND EXXONMOBIL OIL INDONESIA INC.'S
MOTION TO DISMISS

Theodore V. Wells, Jr. (Bar No. 468934)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Alex Young K. Oh (Bar No. 499955)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1615 L Street, NW, Suite 1300
Washington, DC 20036

Martin J. Weinstein (Bar No. 37792)
Robert J. Meyer (Bar No. 41620)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
Telephone: (202) 303-1000
Facsimile: (202) 303-2000

Paul W. Wright (Bar No. 20747)
Patrick J. Conlon (Bar No. 414621)
Exxon Mobil Corporation
800 Bell Street
Houston, TX 77002

Attorneys for Defendants Exxon Mobil
Corporation, Mobil Corporation, ExxonMobil Oil
Corporation, and ExxonMobil Oil Indonesia Inc.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 2

ARGUMENT ............................................................................................................................... 8

I.    THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE THE
PARTIES ARE NOT COMPLETELY DIVERSE .................................................................. 8

II.    PLAINTIFFS LACK STANDING TO SUE IN A U.S. COURT BECAUSE THEY
ARE NON-RESIDENT ALIENS ............................................................................................ 9

III.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS UNDER THE
DOCTRINES OF COMITY, ACT OF STATE, POLITICAL QUESTION, AND
FOREIGN AFFAIRS PREEMPTION ................................................................................... 11

    A.    Principles of Comity Require Deference to the Helsinki Peace Accord .................. 11

    B.    The Act of State Doctrine Applies Because the Indonesian Government
Considers the Soldiers' Activities Official Acts. ..................................................... 15

    C.    The Political Question Doctrine Bars Adjudication of Plaintiffs' Claims,
Because the Political Branches Have Expressed Strong Support for the Helsinki
Peace Accord. ........................................................................................................... 17

    D.    The Foreign Affairs Preemption Doctrine Bars Adjudication of Plaintiffs'
Common Law Claims, Because State Law Cannot Be Applied in a Matter That
Affects Foreign Relations Absent Advancing Some State Interest ........................... 18

IV.    THE COURT CANNOT JOIN AN INDISPENSABLE PARTY, BPMIGAS, WHOSE
INTERESTS WOULD BE ADVERSELY AFFECTED BY ADJUDICATION OF THE
CLAIMS IN ITS ABSENCE ................................................................................................. 19

    A.    BPMIGAS Is a Necessary Party for Just Adjudication. .......................................... 20

    B.    BPMIGAS Cannot Be Joined as a Party So the Case Must Be Dismissed. .............. 23

V.    THE COURT LACKS PERSONAL JURISDICTION OVER EMOI BECAUSE EMOI
HAS INSUFFICIENT CONTACTS TO THE DISTRICT OF COLUMBIA ..................... 26

VI.    PLAINTIFFS' CLAIMS ARE TIME-BARRED BECAUSE THEY WERE BROUGHT
AFTER THE APPLICABLE LIMITATIONS PERIODS HAD EXPIRED ........................ 28

VII.   PLAINTIFFS' CLAIMS MUST BE DISMISSED BECAUSE DISTRICT OF
       COLUMBIA LAW CANNOT APPLY .................................................................... 31

       A.    Indonesia Has a Greater Interest Than the District of Columbia or the United
             States, and Application of D.C. Law Would Frustrate Indonesian Policy................ 31

       B.    Application of D.C. Law Would Violate Due Process. ............................................. 34

       C.    Application of D.C. Law Would Violate Defendants' Right To Fair Notice. .......... 36

VIII.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER D.C. LAW BECAUSE THEY
       CANNOT BE LEGALLY RESPONSIBLE FOR THE INDONESIAN SOLDIERS'
       ALLEGED CONDUCT ....................................................................................... 36

       A.    The PSC Demonstrates That There Was No Legal Relationship Between
             Defendants and the Indonesian Military. ................................................................. 38

       B.    Defendants Cannot Be Legally Responsible for the Acts of the Employees of
             Another Entity. ......................................................................................................... 40

       C.    Plaintiffs Fail To State a Claim for Negligent Hiring. .............................................. 42

       D.    Plaintiffs Fail To State a Claim for Negligent Supervision...................................... 43

       E.    There Is No Discernible Negligence Standard for Military Oversight. .................... 44

CONCLUSION ...................................................................................................................... 45

# TABLE OF AUTHORITIES

## CASES

*ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007)...............................................................10

*\*Aguinda v. Texaco, Inc.*, 945 F. Supp. 625 (S.D.N.Y. 1996)..................................24-25

*\*Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470
  (2d Cir. 2002)...........................................................................................................25

*Alexander v. Wash. Gas Light Co.*, 481 F. Supp. 2d 16 (D.D.C. 2006)........................43

*Alvarez-Machain v. United States*, 331 F.3d 604 (9th Cir. 2003) ................................32

*\*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) ....................................................18

*\*Am. Banana Co. v. United Fruit Co.*, 213 U.S. 347 (1909)............................14,15,16

*Arbelaez v. Newcomb*, 1 Fed Appx. 1 (D.C. Cir. 2001) ................................................11

*Armiger v. Real S.A. Transportes Aereos*, 377 F.2d 943 (D.C. Cir. 1967) ...................32

*Ashkir v. United States*, 46 Fed. Cl. 438 (Fed. Cl. 2000) ..............................................11

*In re Assicurazioni Generali S.p.A. Holocaust Litig.*, 340 F. Supp. 2d 494
  (S.D.N.Y. 2004)........................................................................................................19

*Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34 (D.D.C. 2003) .......................26

*\*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996)....................................................36

*\*Baker v. Carr*, 369 U.S. 186 (1962) ............................................................................17

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ..........................................36,37,38

*\*Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144 (D.D.C. 1976) .....................10

*Bigio v. Coca-Cola Co.*, 448 F.3d 176 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 1842 (2007).......11

*Boehner v. McDermott*, 332 F. Supp. 2d 149 (D.D.C. 2004), *aff'd*, 441 F.3d 1010
  (D.C. Cir. 2006) .......................................................................................................35

*Boise Tower Assocs., LLC v. Wash. Capital Joint Master Trust,* No. 03-141-S-MHW, 2006
  U.S. Dist. LEXIS 45851 (D. Idaho June 22, 2006) .................................................34

* - Authorities upon which we chiefly rely are marked with asterisks.

*Brown v. Argenbright Sec., Inc., 782 A.2d 752 (D.C. 2001) ...................................... 43

Burger-Fischer v. Degussa AG, 65 F. Supp. 2d 248 (D.N.J. 1999)............................... 18

Burgess v. Pelkey, 738 A.2d 783 (D.C. 1999) ........................................................ 30

Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp., 172 F. Supp. 2d 79
    (D.D.C. 2001) .............................................................................................. 32

*Chappell v. Wallace, 462 U.S. 296 (1983)............................................................. 44

*Charles v. Barrett, 233 N.Y. 127 (1922) ....................................................... 40,41,42

Corrie v. Caterpillar, Inc., 403 F. Supp. 2d 1019 (W.D. Wash. 2005) ........................ 18

*Danziger v. Ford Motor Co., 402 F. Supp. 2d 236 (D.D.C. 2005)............................. 33

Dist. of Columbia v. Chinn, 839 A.2d 701 (D.C. 2003) ......................................... 30,31
    *

Dist. of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co., 797 F.2d 1041
    (D.C. Cir. 1986) ............................................................................................. 9

Doe v. Exxon Mobil Corp., 473 F.3d 345 (D.C. Cir. 2007), petition for cert. filed, 76
    U.S.L.W. 3050 (U.S. July 20, 2007) (No. 07-81)...................................... 3,8,17,18,19

*Doe v. State of Israel, 400 F. Supp. 2d 86 (D.D.C. 2005) ........................... 11,15,16,18

Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1 (2004) ...................................... 10

Eminente v. Johnson, 361 F.2d 73 (D.C. Cir. 1966) ................................................. 10

Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938) ...................................................... 19

Estate of Carter v. Dist. of Columbia, 903 F. Supp. 165 (D.D.C. 1995) ..................... 41

*Eze v. Yellow Cab Co., 782 F.2d 1064 (D.C. Cir. 1986)............................................ 9

In re Ford Motor Co. Bronco II Prod. Liab. Litig., 177 F.R.D. 360 (E.D. La. 1997) ................ 35

*Freudensprung v. Offshore Technical Servs., 379 F.3d 327 (5th Cir. 2004)............................ 28

Frumkin v. JA Jones, Inc., 129 F. Supp. 2d 370 (D.N.J. 2001) ...................................... 18

Geier v. America Honda Motor Co., 529 U.S. 861 (2000) ............................................. 19

Giles v. Shell Oil Corp., 487 A.2d 610 (D.C. 1985) .................................................. 44

iv

* - Authorities upon which we chiefly rely are marked with asterisks.

*Gilligan v. Morgan, 413 U.S. 1 (1973) .......................................................................... 44

*Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408 (1984) ........................ 10

*Herbert v. Dist. of Columbia, 808 A.2d 776 (D.C. 2002) .......................................... 31

Hodge v. S. Ry. Co., 415 A.2d 543 (D.C. 1980) ......................................................... 28

Hunter v. Dist. of Columbia, 943 F.2d 69 (D.C. Cir. 1991) ........................................ 29

Huntington v. Attrill, 146 U.S. 657 (1892) ................................................................... 34

*Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945) .................................................. 27

Int'l Ass'n of Machinists & Aerospace Workers v. OPEC, 649 F.2d 1354
    (9th Cir. 1981) .......................................................................................................... 16

Iwanowa v. Ford Motor Co., 67 F. Supp. 2d 424 (D.N.J. 1999) ........................... 11,18

Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399 (3d Cir. 1993) ..... 20

Johnson v. Dist. of Columbia, No. 04-936 (RMC), 2005 U.S. Dist. LEXIS 16918
    (D.D.C. July 20, 2005) ......................................................................................... 29,30

Johnson v. Eisentrager, 339 U.S. 763 (1950) .............................................................. 8,9

*Joo v. Japan, 413 F.3d 45 (D.C. Cir. 2005), cert. denied, 546 U.S. 1208 (2006) ....... 17,18

Jordan v. NUCOR Corp., 295 F.3d 828 (8th Cir. 2002) .............................................. 43

*Jota v. Texaco, Inc., 157 F.3d 153 (2d Cir. 1998) ..................................................... 25

*Kickapoo Tribe of Indians of Kickapoo Reservation in Kan. v. Babbitt, 43 F.3d 1491 (D.C.
    Cir. 1995) .................................................................................................................. 23

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941) .................................. 28,31

Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375 (1994) ............................... 8

Kolesar v. United Agri Prods., Inc., 412 F. Supp. 2d 686 (W.D. Mich. 2006), aff'd, No. 06-
    1416, 2007 U.S. App. LEXIS 21581 (6th Cir. Sept. 4, 2007) ................................. 35

Kukatush Mining Corp. v. SEC, 309 F.2d 647 (D.C. Cir. 1962) ............................ 10,11

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) .................................................. 21

* - Authorities upon which we chiefly rely are marked with asterisks.

*Maddox v. Bano*, 422 A.2d 763 (D.C. 1980) ............................................................ 30

*McCluney v. Joseph Schlitz Brewing Co.*, 649 F.2d 578 (8th Cir.), *aff'd*, 454 U.S. 1071 (1981) ...................................................................................................................... 35

*Mittleman v. United States*, 104 F.3d 410 (D.C. Cir. 1997) ...................................... 29

*Moser v. Pollin*, 294 F.3d 335 (2d Cir. 2002) ............................................................ 8

*\*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005) ................. 18,19

*Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ............................................. 22

*In re Nazi Era Cases*, 236 F.R.D. 231 (D.N.J. 2006), *aff'd*, No. 06-3655, 2007 U.S. App. LEXIS 17470 (3d Cir. July 20, 2007) ................................................................. 11

*In re Nazi Era Cases*, 196 Fed. Appx. 93 (3d Cir. 2006) .......................................... 18

*\*Oetjen v. Central Leather Co.*, 246 U.S. 297 (1918) ................................................ 15

*Oriska Ins. Co. v. Brown & Brown of Tex., Inc.*, No. 02-578, 2005 WL 894912 (N.D.N.Y. Apr. 8, 2005) ........................................................................................................ 28

*Osseiran v. Int'l Fin. Corp.*, No. 06-336 (RWR), 2007 WL 2153272 (D.D.C. July 27, 2007) ................................................................................................................. 39

*\*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ........................................... 34,35

*Prakash v. Am. Univ.*, 727 F.2d 1174 (D.C. Cir. 1984 ................................................ 8

*Price v. Int'l Tel. & Tel. Corp.*, 651 F. Supp. 706 (S.D. Miss. 1986) ......................... 35

*Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102 (1968) ............... 23

*Reeder v. Lerner Corp.*, No. 91-1381 (LFO), 1992 U.S. Dist. LEXIS 1010 (D.D.C. Jan. 31, 1992) .............................................................................................. 26

*Ricaud v. America Metal Co.*, 246 U.S. 304 (1918) .................................................. 15

*Rymer v. Pool*, 574 A.2d 283 (D.C. 1990) ................................................................ 32

*\*Rynn v. Jaffe*, 457 F. Supp. 2d 22 (D.D.C. 2006) .................................................. 29,30

*Sabir v. Dist. of Columbia*, 755 A.2d 449 (D.C. 2000) ............................................. 31

*\*Saadeh v. Farouki*, 107 F.3d 52 (D.C. Cir. 1997) .................................................. 8,9

vi

\* - Authorities upon which we chiefly rely are marked with asterisks.

*Saffron v. Wilson*, 481 F. Supp. 228 (D.D.C. 1979) ............................................................ 41

*Samra v. Shaheen Bus. & Inv. Group, Inc.*, 355 F. Supp. 2d 483 (D.D.C. 2005) ........................ 32

*Satterfield v. United States*, 788 F.2d 395 (6th Cir. 1986) ............................................ 44

*\*Scales v. George Wash. Univ.*, No. 89-0796 (LFO), 1991 U.S. Dist. LEXIS 16765
    (D.D.C. Nov. 15, 1991) ............................................................................ 30

*\*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005), *cert. denied*, 547 U.S. 1069 (2006) ..... 18

*Shaller v. Columbia Hosp. for Women, Med. Ctr.*, 685 F. Supp. 852 (D.D.C. 1988) ................. 8,9

*In re Ski Train Fire in Kaprun Austria*, 342 F. Supp. 2d 207 (S.D.N.Y. 2004) ..................... 28

*Smith v. Halliburton, Co.*, No. 06-0462, 2006 U.S. Dist. LEXIS 61980
    (S.D. Tex. Aug. 30, 2006) ......................................................................... 45

*\*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ............................................... 13,14

*\*In re S. African Apartheid Litig.*, 238 F. Supp. 2d 1379 (S.D.N.Y. 2002) ....................... 14

*Steinberg v. Int'l Comm'n on Holocaust Era Ins. Claims*, 34 Cal. Rptr. 3d 944
    (Ct. App. 2005) .................................................................................... 19

*Stewart-Veal v. District of Columbia*, 896 A.2d 232 (D.C. 2006) ................................ 31

*Tramontana v. Varig Airlines*, 350 F.2d 468 (D.C. Cir. 1965) ................................... 32

*\*Underhill v. Hernandez*, 168 U.S. 250 (1897) .................................................. 15

*\*Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227 (11th Cir. 2004) ......................... 11

*United States v. Ferrara*, 54 F.3d 825 (D.C. Cir. 1995) ........................................ 26

*\*United States v. Shearer*, 473 U.S. 52 (1985) ................................................. 44

*Warth v. Seldin*, 422 U.S. 490 (1975) .......................................................... 21

*W. Md. R.R. Co. v. Harbor Ins. Co.*, 910 F.2d 960 (D.C. Cir. 1990) ............................. 20

*Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. 2006) ................. 45

*Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57 (2d Cir. 2005) ............................. 18

*Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765 (D.C. Cir. 1986) ................. 23

vii

* - Authorities upon which we chiefly rely are marked with asterisks.

*Wickenhauser v. Edward D. Jones & Co.*, 953 F. Supp. 286 (E.D. Mo. 1996) ........................... 35

*\*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ........................... 27

*Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d (D.D.C. 2005) ........................... 32,33

## STATUTES

28 U.S.C. § 1332(a)(2) (2007) ........................................................................ 8

D.C. Code § 12-301 (2007) ........................................................................ 29

D.C. Code § 13-423 (2007) ........................................................................ 26

## RULES

Fed. R. Civ. P. 12 (2007) ........................................................................ 1,37

Fed. R. Civ. P. 19 (2007) ........................................................................ 1,20

## LAW REVIEWS

Derek J. Baxter, *Protecting the Power of the Judiciary:  Why the Use of State Department
  "Statements of Interest" in Alien Tort Statute Litigation Runs Afoul of Separation of
  Powers Concerns*,  37 Rutgers L. Rev. 807 (2006) ................................... 14

## TREATISES

16 Am. Jur. 2d *Conflict of Laws* § 9 (1998 & Supp. 2005) ........................... 34

41 Am. Jur. 2d, *Independent Contractors* § 35 (2005) ........................... 43,44

41 Am. Jur. 2d, *Independent Contractors* § 36 (2005) ........................... 42

Restatement (Second) Conflicts of Laws § 3 cmt. c (1971) ........................... 32

5 Charles Wright & Arthur Miller, Federal Practice and Procedure § 216
  (3d ed. 2004) ........................................................................ 37

\* - Authorities upon which we chiefly rely are marked with asterisks.

Pursuant to Rules 12 and 19 of the Federal Rules of Civil Procedure, Exxon Mobil Corporation, Mobil Corporation, ExxonMobil Oil Corporation, and ExxonMobil Oil Indonesia Inc. (collectively, "Defendants") submit this memorandum of law in support of their motion to dismiss.

## PRELIMINARY STATEMENT

Four anonymous Indonesian citizens seek to invoke this Court's jurisdiction to hold Defendants responsible for the purported acts of Indonesian soldiers that occurred on Indonesian soil during an Indonesian civil war. The civil war that ravaged Plaintiffs' home province ended recently with an historic peace agreement – negotiated by a distinguished European envoy with the assistance of neighboring Southeast Asian nations, and heralded by the United States – that provides for a Truth and Reconciliation Commission and related administrative procedures to resolve claims arising from Indonesian soldiers' alleged misconduct during the civil war. As demonstrated herein, Plaintiffs' attempt to circumvent those procedures via litigation in this overseas forum threatens to undermine those procedures and the peace itself.

Plaintiffs' attempt to use this Court to adjudicate their allegations is impermissible for numerous reasons. *First*, the Court lacks subject matter jurisdiction because complete diversity of citizenship is lacking. *Second*, Plaintiffs lack standing to invoke the jurisdiction of this Court because they are non-resident aliens. *Third*, given the newly-signed peace agreement in Indonesia, the Court should dismiss the Complaint under the doctrines of international comity, act of state, political question, and foreign affairs preemption. *Fourth*, Plaintiffs' claims must be dismissed for failure to join an indispensable party, an entity of the Indonesian government which was responsible for providing security at a gas field operated by ExxonMobil Oil Indonesia Inc. ("EMOI"). *Fifth*, the Court lacks personal jurisdiction over EMOI. *Sixth*, Plaintiffs' claims are time-barred. *Seventh*, Plaintiffs' common law claims under D.C. law must be dismissed, because D.C. law cannot apply. *Eighth*, even assuming D.C. law applies, Plaintiffs fail to state a claim on each of their claims.

1

## FACTUAL BACKGROUND

Taking the allegations of the Complaint as true, Plaintiffs are citizens of Aceh Province, Indonesia. (Compl. ¶¶ 6-9.)  Plaintiff John Doe VIII and Plaintiff John Doe IX claim they were injured during a raid by Indonesian soldiers in Aceh in June 2004 (*id.* ¶¶ 60-61), and Plaintiff John Doe X and Plaintiff John Doe XI claim they were injured by Indonesian soldiers in October 2004 while passing military security checkpoints in Aceh (*id.* ¶¶ 62-63.)  Plaintiffs assert common law tort claims – negligence, negligent hiring, negligent supervision, intentional infliction of emotional distress, battery, assault, and arbitrary arrest – "under the laws of the District of Columbia."  (*Id.* ¶¶ 83, 93, 97, 101, 106, 110.)

Defendants are four independent corporations, Exxon Mobil Corporation, Mobil Corporation, ExxonMobil Oil Corporation, and EMOI.  Plaintiffs allege, in substance, that Defendants are liable for injuries they sustained at the hands of Indonesian soldiers because the Indonesian soldiers provide security for EMOI's operations at the Arun gas field in Aceh.

EMOI operates the Arun gas field pursuant to a production sharing contract ("PSC") with BPMIGAS, a 100% Indonesian state-owned entity.[1]  Plaintiffs cite to the PSC in support of their allegations.  (Compl. ¶ 64.)  Under the PSC, defendant EMOI simply operates the gas field for the Indonesian state-owned entity.  While Plaintiffs allege that Defendants own, lease, or control the Arun gas field (*id.* ¶ 34), the PSC clearly states that EMOI is the "Contractor" for BPMIGAS (*see generally* Declaration of Peter J. Coleman ("Coleman Decl.") Ex. 1).[2]  *See also Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 346 (D.C. Cir. 2007) ("Pursuant to a contract with the Indonesian government, Exxon *operates* a large natural gas extraction and processing facility in the Aceh province of

---

[1]    EMOI originally entered into the PSC with Pertamina, which was then the 100% state-owned representative of the Indonesian government.  In 2003, in a government reorganization, BPMIGAS, a 100% Indonesian state-owned entity, assumed Pertamina's responsibilities for the management of production sharing contracts generally, including the PSC with EMOI for the Arun gas field.  (Declaration of Peter J. Coleman ¶ 5.)

[2]    Defendants supply the Court with an entire copy of the PSC, because the Court may consider documents that "are both referenced in the complaint and central to the plaintiff's claims."  *Osseiran v. Int'l Fin. Corp.*, No. 06-336 (RWR), 2007 WL 2153272, at *5 (D.D.C. July 27, 2007).

Indonesia.") (emphasis added), *petition for cert. filed,* 76 U.S.L.W. 3050 (U.S. July 20, 2007) (No. 07-81). Under the PSC, EMOI does not own any natural resources, facilities or equipment associated with the operations.

Although the Complaint loosely describes the Indonesian soldiers assigned to protect the Arun gas field as "ExxonMobil security personnel," the PSC makes clear that BPMIGAS, not EMOI, is obligated to provide security for the Arun gas field. (Coleman Decl. Ex. 1 at ¶ 5.3(c) (BPMIGAS shall "otherwise assist and expedite CONTRACTOR'S execution of the Work Program by providing … security protection").) Moreover, Indonesian law requires BPMIGAS, which has management responsibilities on behalf of the Indonesian government, to safeguard the Arun gas field as a "national vital object." (*See* Presidential Decree 63/2004, Art. 4 (Coleman Decl. Ex. 2).) While the PSC requires EMOI to reimburse BPMIGAS for a share of the operating expenses incurred by BPMIGAS for the gas field, including for security expenses (Coleman Decl. Ex. 1 at ¶ 5.3(c)), nothing in the PSC grants EMOI any command and control authority over the soldiers BPMIGAS is obligated to pay to protect the Arun gas field. (*See generally* Coleman Decl. Ex. 1.) Any judgment in this case that prohibits use of government forces as security providers at the Arun field would violate Indonesian law, interfere with plans of the national and provincial governments to rebuild the Aceh economy, and jeopardize the long-term stability of the region.

Plaintiffs allege that they were injured in Aceh in 2004 by military soldiers safeguarding EMOI's operations. This was a time of violent conflict in Aceh, which prompted the then Indonesian President to put the entire province under the control of the Indonesian military. (Exs. A, B, C; Declaration of Ruth Wedgwood ("Wedgwood Decl.") ¶ 17.) The claims here are thus inextricably linked to the Indonesian military's conduct and operations during the civil war. (Compl. ¶¶ 48-54.)

Indeed, the presence of the Indonesian military in Aceh dates back to the 1970s, when the secessionist "Free Aceh Movement" ("GAM") declared Acehnese independence and thereby sparked a civil war, resulting in the deployment of thousands of Indonesian troops to Aceh. (Wedgwood Decl. ¶¶ 13-17.)  Over the course of the long-running conflict, both the Indonesian military and the GAM were accused of numerous human rights abuses.  (*Id.* ¶ 14.)  It is widely-reported that the GAM openly and directly posed threats to, and engaged in violent attacks against, various facilities of EMOI as part of the civil conflict.  (*Id.* ¶¶ 54-55, 56) (referencing a 2003 news article that quoted the military spokesman of the GAM insurgency, Mr. Sofyan Dawood, as stating that "[w]e don't want to attack vital projects but if the military or police who guard the projects make a sweeping [search for rebels], we will attack the military or police there.".)

In light of the fierce violence in Aceh in 2003, then Indonesian President Megawati Soekarnoputri declared a "State of Emergency" in Aceh and placed the entire province under martial law and the control of the Indonesian military.  (*See* Presidential Decree No. 28/2003 (Ex. A).)  One year later, President Soekarnoputri kept the province under the day-to-day control of the military and stated that Aceh remained in "Civil Emergency".  (*See* Ex. B; *see also* Ex. C (declaring that the military remains in control of day-to-day affairs in Aceh, under the direction of the President).)  Thus, even apart from BPMIGAS' responsibility to secure the Arun gas field, the entire province was under the control of the Indonesian military in the relevant time period.

In the aftermath of the tsunami disaster in December 2004, during which 120,000 Acehnese lost their lives, both sides of the armed conflict were prompted into peace negotiations and, ultimately, peace was achieved in Aceh through the signing, on August 15, 2005, of the Helsinki Peace Accord ("Helsinki Peace Accord").  (*See* Ex. D; Wedgwood Decl. ¶¶ 18-26.)  The Helsinki Peace Accord is particularly relevant to the justiciability of Plaintiffs' claims in this Court. President Martti Ahtisaari of Finland – a respected peace envoy – and other officials from the

European Union, Association of Southeast Asian Nations ("ASEAN"), and other countries mediated the agreement between GAM and the Indonesian government that was ultimately reflected in the Helsinki Peace Accord. (*See id.*; Wedgwood Decl. ¶¶ 19, 29.)  Under the Helsinki Peace Accord, the Indonesian government granted full amnesty for all persons "who have participated in GAM activities as soon as possible," and at most, within 15 days; the agreement also required GAM to give up its weapons, in four stages of decommissioning, and also required the government of Indonesia to "withdraw all elements of the non-organic military and non-organic police forces" in a four-step process; the agreement also required that the police "receive special training in Aceh and overseas with emphasis on respect for human rights." (Wedgwood Decl. ¶ 32.)  The Helsinki Peace Accord also establishes an "independent and impartial court system, including a court of appeals" for Aceh. (Ex. D ¶ 1.4.3.)  In addition, Aceh is now self-governing in almost all domestic affairs, and has the right to raise funds and seek foreign direct investment without going through Jakarta. The Helsinki Peace Accord also states that Aceh "is entitled to retain seventy (70) percent of the revenues from all current and future hydrocarbon deposits and other natural resources in the territory of Aceh as well as the territorial sea surrounding Aceh," one of the critical disputes that had been at the heart of the long-running civil conflict. (Wedgwood Decl. ¶ 27.)

Most critically, the Helsinki Peace Accord establishes legal and political mechanisms for adjudicating *all* war-related injuries suffered in Aceh.  Specifically, the Helsinki Peace Accord creates a Human Rights Court, a Truth and Reconciliation Commission, and a joint Claims Settlement Commission in Aceh. (*Id.* ¶¶ 2.2-2.3.)  The Helsinki Peace Accord expressly requires that "[a]ll civilians who have suffered a demonstrable loss due to the conflict [are to] receive an allocation of suitable farming land, employment, or, in the case of incapacity to work, adequate social security from the authorities of Aceh." (*Id.* ¶ 3.2.5.)  (*See* Wedgwood Decl. ¶¶ 31, 36, 40 (stating that such mode of handling war-related claims have been used in connection with the

resolution of numerous other international and national conflicts, such as the Holocaust, the Iranian

hostage crisis, El Salvador and Iraq).)   These mechanisms have now been fully implemented under

Indonesian law (Ex. E), as confirmed by the Aceh Monitoring Mission ("AMM"), which was

established to oversee the implementation of the Helsinki Peace Accord and was headed by the

European Union and ASEAN contributing countries.  (Ex. F.)

The United States has expressed its support for all of these developments.  After the

Indonesian government and GAM signed the Helsinki Peace Accord, the State Department issued a

statement indicating that it "firmly supports this 'Memorandum of Understanding,'" and it

subsequently issued another statement congratulating the parties on signing the agreement,

emphasizing that successful implementation would "require steadfast commitment to peace by all

parties." (*See* Exs. G, H.)  In November 2006, the White House "congratulated Indonesia on the

successful signing and implementation of a Memorandum of Understanding that has brought peace

to the province of Aceh, and renewed the United States' firm support for Indonesia's peace-building

efforts in Aceh." (*See* Ex. I.)  The Executive Branch "also re-emphasized the United States' strong

support for Indonesia's national unity and territorial integrity, and opposition to secessionist

movements in any part of Indonesia." (*Id.*)

Finally, House Resolution 238 was introduced in Congress in March 2007. (*See* Ex. J.)

Now with 31 sponsors, it praises the "first democratic elections in Aceh" and expresses further

support for the "democratic development and implementation of the Helsinki Memorandum of

Understanding." (*Id.*)  It also congratulates Irwandi Yusuf, the "first democratic elected governor of

Aceh," and expresses "ongoing support for the further democratic development of Aceh and the

Helsinki Memorandum of Understanding." (*Id.*)  The resolution encourages "both parties to live up

to their commitments under the Helsinki Memorandum of Understanding, *especially with regard to*

*establishing a Human Rights Court for Aceh and a Commission of Truth and Reconciliation*" (now

established), and encourages the Executive Branch to "commit resources in supporting the peace and building a strong civil society in Aceh." (*See id.*)

Plaintiffs improperly seek to circumvent the Helsinki Peace Accord and its exclusive claims mechanisms by pursuing their assault and battery allegations against Indonesian soldiers in the District of Columbia. They do so anonymously, even though peace now prevails in their province with a former GAM rebel leader as governor (Ex. J), with all non-organic (*i.e.*, non-Acehnese) military and police withdrawn from Aceh (Ex. D. ¶ 4.5), and with "complete freedom of movement and speech in Aceh." (Ex. F.) And they pursue their claims in this forum despite the lack of any nexus between their claims and the District of Columbia, and despite opposition by the governments of the United States and Indonesia voiced repeatedly against similar claims by other Indonesian villagers in this Court. In *Doe v. Exxon Mobil Corp.* No. 01-1357 ("*Doe I*"), the United States State Department warned that the litigation "would in fact risk a potentially serious adverse impact on significant interests of the United States." (Ex. K.) The Indonesian government also protested the extraterritorial adjudication of "an allegation against an Indonesian government institution, *cq* the Indonesian military, for operations taking place in Indonesia." (Exs. M, N.) Indeed, Plaintiffs by their Complaint not only impugn the actions of the Indonesian military, but seek injunctive relief from this Court to change its behavior. (Compl. ¶¶ 60-63; ¶ IX (d).)

In October 2005, this Court in *Doe I* dismissed plaintiffs' similar claims purportedly arising under federal law for lack of subject matter jurisdiction and for failure to state a claim. (*Doe I*, Docket No. 103.) This Court declined to dismiss the state law claims in *Doe I*, presumably because the Court believed, based on the set of facts presented by the *Doe I* plaintiffs, that their claims could not be heard in Indonesia. (*Id.*) The Court thereafter implemented certain safeguards intended to protect Indonesian sovereignty. The Court of Appeals later determined that the decision to permit the *Doe I* state law claims to proceed subject to certain limitations was not clear and indisputable

error. 473 F.3d at 353. In response, the Indonesian government issued its *third* complaint regarding the *Doe I* litigation, confirming that, notwithstanding this Court's best intentions to implement safeguards so as not to invade Indonesia's sovereignty, the *Doe I* lawsuit nonetheless offends Indonesia's sovereignty and now threatens to undermine the Helsinki Peace Accord. (Ex. D.)

Respectfully, Defendants submit that the Court's authority to entertain this second lawsuit is even more tenuous than in the first lawsuit. When *Doe I* was filed in June 2001, the civil war was raging; but the instant lawsuit was filed in May 2007, during a time of peace and in defiance of legal mechanisms specifically created in Indonesia to hear such claims on *an exclusive basis*. For those reasons and the others discussed below, the Complaint must be dismissed.

## ARGUMENT

Federal courts are "courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). They possess "only that power authorized by the Constitution and statute." *Id.* "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (internal citations omitted). Where jurisdiction is challenged, federal courts may "consider materials extrinsic to the complaint" in deciding on a motion to dismiss. *Moser v. Pollin*, 294 F.3d 335, 339 (2d Cir. 2002).

## I.   THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE THE PARTIES ARE NOT COMPLETELY DIVERSE

Plaintiffs allege that the Court has diversity jurisdiction in this case under 28 U.S.C. § 1332(a)(2). (*See* Compl. ¶ 4.) That provision confers jurisdiction in the district courts where the amount in controversy exceeds $75,000 and where the matter is between "citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2). Diversity as between the plaintiffs and the defendants must be complete. *See Saadeh v. Farouki*, 107 F.3d 52, 55 (D.C. Cir. 1997) ("[F]ederal diversity jurisdiction is lacking if there are any litigants from the same state on opposing sides.") (*quoting Prakash v. Am. Univ.*, 727 F.2d 1174, 1178 n.25 (D.C. Cir. 1984)); *Shaller v.*

*Columbia Hosp. for Women, Med. Ctr.*, 685 F. Supp. 852, 853 (D.D.C. 1988) ("The law is well established that, in diversity suits, complete diversity of citizenship is required."). It is well-established, therefore, that federal courts lack diversity jurisdiction "over a lawsuit between an alien on one side, and an alien and a citizen on the other side." *Saadeh*, 107 F.3d at 61; *see also Eze v. Yellow Cab Co.*, 782 F.2d 1064, 1065 (D.C. Cir. 1986). That is precisely the situation here: Plaintiffs are aliens and they are suing an alien (EMOI) and citizens of states of the United States (Exxon Mobil Corporation, Mobil Corporation, and ExxonMobil Oil Corporation).

"[D]iversity of citizenship is determined at the time the complaint is filed." *Saadeh*, 107 F.3d at 57; *see also Shaller*, 685 F. Supp. at 853. At the time the Complaint was filed, Plaintiffs were aliens. (Compl. ¶¶ 6-9.) EMOI is also an alien because a corporation "is deemed to be a citizen of any state in which it is incorporated and of the state where it has its principal place of business." *Shaller*, 685 F. Supp. at 853 (*citing Dist. of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co.*, 797 F.2d 1041, 1043 (D.C. Cir. 1986)). In May 2007, when the Complaint was filed, EMOI was incorporated in the Cayman Islands with its principal place of business in Indonesia. (Compl. ¶ 16; Declaration of Brenda Fitzpatrick ("Fitzpatrick Decl.") ¶ 6 & Exs. 1, 2); Coleman Decl. ¶ 2).) *See Saadeh*, 107 F.3d at 56 n.5 (A corporation incorporated in one foreign country with its principal place of business in another foreign country is an alien).

Accordingly, aliens are present as both plaintiffs and a defendant in this lawsuit; complete diversity is lacking and the Court must dismiss the case.

## II.   PLAINTIFFS LACK STANDING TO SUE IN A U.S. COURT BECAUSE THEY ARE NON-RESIDENT ALIENS

Because Plaintiffs are non-citizens and non-residents, and because Plaintiffs do not assert jurisdiction under a federal statute, they lack standing to invoke this Court's jurisdiction. Standing jurisprudence has two components: Article III standing, which enforces the Constitution's "case or controversy" requirement, and prudential standing, which embodies "'judicially-self-imposed limits

on the exercise of federal jurisdiction.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (citations omitted).  Such judicially-self-imposed or prudential limitations "remove jurisdiction where the Article III standing requirements are otherwise satisfied." *ACLU v. NSA*, 493 F.3d 644, 677 (6th Cir. 2007).

One such well-established prudential standing limitation is "the general rule that non-resident aliens have no standing to sue in United States courts." *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 152 (D.D.C. 1976).  This limitation is founded on the premise that only residents are permitted to invoke the powers of the Court.  "Citizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar.  The years have not destroyed nor diminished the importance of citizenship nor have they sapped the vitality of a citizen's claims upon his government for protection." *Johnson v. Eisentrager*, 339 U.S. 763, 769 (1950).  In the interest of promoting commerce, courts have expanded standing to *resident aliens* because "[m]ere lawful presence in the country creates an implied assurance of safe conduct and gives [aliens] certain rights." *Id.* at 770.  But "it was the alien's presence within its territorial jurisdiction that gave [the] Judiciary the power to act." *Id.* at 771.  "When the *non-resident* alien does not make application under a statute to the United States for certain action, or is not subjected to its courts, but is harmed in his own country, he cannot and should not expect entitlement to the advantages of a United States court." *Berlin Dem. Club*, 410 F. Supp. at 152-53 (emphasis added).

Plaintiffs are indisputably non-resident aliens and do not bring any statutory claims.  (*See* Compl. ¶¶ 6-9, ¶¶ 64-110.)  They accordingly lack standing to invoke the jurisdiction of this Court, and their claims should be dismissed. *See, e.g., Berlin Dem. Club*, 410 F. Supp. at 152-53 (holding that non-resident aliens lacked standing to file suit complaining about military misconduct abroad); *Eminente v. Johnson*, 361 F.2d 73, 73 (D.C. Cir. 1966) (dismissing tort claims filed by "a non-resident alien" for injuries suffered in a foreign country caused by the armed forces); *Kukatush*

*Mining Corp. v. SEC*, 309 F.2d 647 (D.C. Cir. 1962) (dismissing for lack of standing claims brought by non-resident aliens); *Ashkir v. United States*, 46 Fed. Cl. 438, 443-44 (Fed. Cl. 2000) (Mexican respondent abroad had no "substantial connection" to the United States and thus had no standing); *cf. Arbelaez v. Newcomb*, 1 Fed. Appx. 1, 1 (D.C. Cir. 2001) ("Appellants are foreign nationals without a substantial connection to the United States; they therefore lack standing . . . .").

Accordingly, the Complaint should be dismissed in its entirety for lack of standing.

## III.   THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS UNDER THE DOCTRINES OF COMITY, ACT OF STATE, POLITICAL QUESTION, AND FOREIGN AFFAIRS PREEMPTION

Plaintiffs' claims challenge the domestic acts of a foreign sovereign during a time of civil war, and are not appropriately heard in a United States court for a number of independent reasons. Especially in light of the claims process established by the Helsinki Peace Accord, and in deference to numerous statements by the Indonesian and United States governments concerning the need to support the fragile peace achieved in 2005, this Court should dismiss the Complaint under the doctrines of comity, act of state, political question, and foreign affairs preemption.

### A.   Principles of Comity Require Deference to the Helsinki Peace Accord.

Under principles of comity, courts should dismiss lawsuits concerning claims arising abroad where international interests dictate adjudication of the dispute by other means. *See, e.g., Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237-40 (11th Cir. 2004) (dismissing claims out of international comity towards a peace process supported by the Executive Branch); *In re Nazi Era Cases Against German Defs. Litig.*, 236 F.R.D. 231, 240-42 (D.N.J. 2006) (same), *aff'd*, No. 06-3655, 2007 U.S. App. LEXIS 17470 (3d Cir. July 20, 2007); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 489-91 (D.N.J. 1999) (same); *Doe v. State of Israel*, 400 F. Supp. 2d 86, 114 (D.D.C. 2005) (adjudication of war-related claims arising from injuries in Israel would offend international comity); *see also Bigio v. Coca-Cola Co.*, 448 F.3d 176 (2d Cir. 2006) (noting that a country's

11

objections to a lawsuit and a possible impact on international relations with a foreign country would

warrant dismissal on international comity grounds), *cert. denied*, 127 S. Ct. 1842 (2007).

As discussed above, the Helsinki Peace Accord, which established procedural processes,

including the Truth and Reconciliation Commission, the Human Rights Court, and the Joint Claims

Settlement Commission, (*see* Ex. D. ¶¶ 2.2, 2.3, 3.2.5, 3.2.6), provides the *exclusive* mechanism for

resolving all war-related claims by Acehnese residents.  As observed by Professor Ruth Wedgwood,

a noted international law scholar, "the joint administrative claims settlement process established by

the [Helsinki Peace Accord] was meant to preclude other methods of advancing claims for

compensation."  (Wedgwood Decl. ¶ 41.)[3]  The agreement seeks to handle claims arising from the

conflict "in an expeditious and consistent manner, using an administrative process of claims

settlement" rather than judicial adjudication.  (*Id.*)  Professor Wedgwood notes that such mode of

handling claims arising from armed conflicts – through binding administrative process – is

common, and is particularly suited to the situation in Aceh given the need to reinvigorate its

economy after the tsunami destruction.  (*Id.* ¶ 35.)   Professor Wedgwood reasons that:  "where

there are numerous losses caused by a long-running armed conflict, it makes sense to have an

administrative claims settlement process, allowing a visible consistency of results and a practical

way of handling matters where the proof will often not rise to the level of certainty required for

judicial proceedings."  (*Id.* ¶ 41.)

With respect to the concern for "visible consistency of results," it should be noted that the

Helsinki Peace Accord grants "[a]ll civilians who have suffered a demonstrable loss due to the

conflict [to] receive an allocation of suitable farming land, employment or, in the case of incapacity

to work, adequate social security from the authorities of Aceh."  (Ex. D ¶ 3.2.5.)  If this Court were

---

[3]        In connection with the Helsinki Peace Accord and the Aceh Reconciliation Process, the Indonesian
government has firmly and consistently stated that these kinds of claims must be heard in Indonesia – not the U.S.  (*See*
Indonesian Statements (Exs. M, N, O).)

to entertain this action and Plaintiffs did obtain damages in this Court such an award likely will far exceed the relief available under the Helsinki Peace Accord's process. Such disparity in results likely will lead to a general disregard for the process established under the accord, and will undermine the fragile peace established in 2005.

By all accounts, the Helsinki Peace Accord has not only achieved peace in Aceh, but also has had a tremendously positive impact on the region's economic growth and future prospects. (*See* Wedgwood Decl. ¶¶ 43-51.) In November 2005, the President of Indonesia directed the Head of the National Land Agency to implement procedures to award land as compensation for those injured during the civil conflict (Ex. E), and the AMM thereafter declared in December 2006 that all required procedures had been fully implemented. (Ex. F.)

The Helsinki Peace Accord is not just an agreement between Indonesia and GAM: it was a carefully-crafted agreement mediated by members of the international community, including President Martti Ahtisaari of Finland and other high-level government officials. The peace agreement – which seeks the proper balance between accountability and amnesty – has been supported and lauded by the political branches of the U.S. government. (*See, e.g.*, State Department Statements (Exs. G, H); White House Statement (Ex. I); H. Res. 238 (Ex. J).) The Executive Branch has not only expressed its "firm support" for the Helsinki Peace Accord and its forums, but it has also confirmed in the similar *Doe I* proceeding its support for the peace process as an important U.S. foreign policy goal. (Exs. K, L.)

In *Sosa v. Alvarez-Machain*, the Supreme Court referenced the Truth and Reconciliation Committee established by the Government of South Africa to address alleged injuries resulting from the apartheid regime there, and suggested that in cases brought against multinational corporations in the United States asserting claims properly before the Truth and Reconciliation Committee, courts "should give serious weight to the Executive Branch's view of the case's impact on foreign policy."

542 U.S. 692, 733 n.21 (2004) (*citing In re S. African Apartheid Litig.*, 238 F. Supp. 2d 1379

(S.D.N.Y. 2002)). Plaintiffs' counsel agrees: "Taking the South Africa case as an example, should

the Truth and Reconciliation Commission actually provide a fair and complete remedy for the

claims of particular plaintiffs against specific defendants, dismissal on international comity grounds

might be appropriate." Derek J. Baxter, *Protecting the Power of the Judiciary: Why the Use of*

*State Department "Statements of Interest" in Alien Tort Statute Litigation Runs Afoul of Separation*

*of Powers Concerns*, 37 Rutgers L. Rev. 807, 822 (2006). Here, as in the South Africa example, a

fully functioning Truth and Reconciliation Commission is in effect, and its role as the exclusive

forum for grievances such as Plaintiffs' should be honored by this Court:

> [The Helsinki Peace Accord is] worthy of respect and full observance
> by all parties… [T]his Court should be mindful of the 2005 peace
> agreement's attempt to assure a uniform and even-handed method of
> repairing  losses from the conflict, and the possible effects of a visible
> disparity in  outcome through extraterritorial litigation.

(Wedgwood Decl. ¶¶ 57-58.)

Other comity concerns justify dismissal as well.  As discussed above, an Indonesian

government agency, BPMIGAS, had responsibility to manage and safeguard the Arun gas field, and

the Indonesian military provided security in accordance with Indonesian law.  The U.S. Supreme

Court addressed similar circumstances in *American Banana Co. v. United Fruit Co.,* 213 U.S. 347

(1909) (Holmes, C.J.).  During the Panamanian revolt against Colombia, soldiers in the Costa Rican

military seized a plantation and a cargo of supplies belonging to the plaintiff.  *Id.* at 354-55.  The

defendant (a large American company) subsequently obtained the plantation, and the plaintiff filed

suit, claiming under U.S. law that the defendant wrongfully conspired with the soldiers and the

military to drive the plaintiff out of business.  *Id.* at 355.  A unanimous Court rejected the claims,

labeling plaintiff's attempt to apply American law "startling":

> [T]he general and almost universal rule is that the character of an act as
> lawful or unlawful must be determined wholly by the law of the country

14

> where the act is done. . . . For another jurisdiction, if it should happen to lay
> hold of the actor, to treat him according to its own notions rather than those
> of the place where he did the acts, not only would be unjust, but would be
> an interference with the authority of another sovereign, contrary to the
> comity of nations, which the other state concerned justly might resent.

*Id.* at 356. Similarly, here, the Government of Indonesia takes offense to the application of U.S. law

to such claims, as it has already expressed in *Doe I*, especially now that internal mechanisms have

been implemented under the Helsinki Peace Accord. (Ex. O.) Adjudication of Plaintiffs' claims

here would be contrary to the comity of nations, and this lawsuit should be dismissed.

## B.      The Act of State Doctrine Applies Because the Indonesian Government Considers the Soldiers' Activities Official Acts.

As detailed above, all of Plaintiffs' claims relate to the conduct of Indonesian military

personnel during a civil war in Aceh and, specifically, during a period of civil emergency after a

declaration of martial law.  Courts in similar cases have dismissed actions premised upon foreign

soldiers' alleged conduct.  *See, e.g., Am. Banana Co.*, 213 U.S. at 359 (plaintiffs could not raise tort

or antitrust claims against a company based on the acts of Costa Rican soldiers in taking over a

plantation; the Court automatically deemed the Costa Rican government to have ratified its soldiers'

acts); *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) ("Every sovereign State is bound to respect

the independence of every other sovereign State, and the courts of one country will not sit in

judgment on the acts of the government of another done within its own territory."); *Oetjen v.

Central Leather Co.*, 246 U.S. 297, 299-304 (1918) (dismissing tort claims against an American

company based on the acts of Pancho Villa and his soldiers in Mexico); *Ricaud v. Am. Metal Co.*,

246 U.S. 304, 306-10 (1918) (dismissing tort claims against an American company for the acts of

Mexican soldiers during the Mexican revolution); *State of Israel*, 400 F. Supp. 2d at 113.

In *Doe I*, the Court declined to dismiss under the act of state doctrine because – after

dismissing PT Arun Co. ("PT Arun"), a defendant in *Doe I* that was 55% owned by the Indonesian

government – it concluded that "resolution of this case will not turn on any 'official action' of the

Indonesian government." But the Indonesian government continues to protest this Court's adjudication of *Doe I*, even after the dismissal of PT Arun, affirming its original observation that such claims present "an allegation against an *Indonesian government institution, cq the Indonesian military, for operations taking place in Indonesia.*" (Exs. M, N, O.) Thus, the Indonesian government considers its official acts to be impugned in the *Doe I* litigation, an observation equally applicable to the present Complaint because the alleged torts occurred during officially-declared periods of martial law and civil emergency. (Exs. A, B, C.) *See Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354, 1359 (9th Cir. 1981) ("The act of state doctrine is apposite whenever the federal courts must question the legality of the sovereign acts of foreign states."). As the Court held in *American Banana*, the "acts of the soldiers and the officials of Costa Rica [were] not alleged to have been without the consent of the government," and the injuries "seem to have been the direct effect of the acts of the Costa Rican government." 213 U.S. at 359.

The same is true here. The act of state doctrine applies here because the Court cannot resolve Defendants' supposed liability for the soldiers' acts without first condemning the soldiers' alleged acts (Compl. ¶¶ 60-63) themselves, which the Indonesian government characterizes as its own operations. (Ex. M.) Allegations of torts allegedly committed by foreign military officials for harms such as unlawful detention during a civil war implore the Court to "'declare invalid'" and deny "'legal effect to acts of a military commander representing the . . . government.'" *State of Israel*, 400 F. Supp. 2d at 113 (citation omitted). Such a determination "would offend notions of international comity *and sovereignty.*" *Id.* at 114 (emphasis added); *IAM*, 649 F.2d at 1360 ("The 'touchstone' or 'crucial element' [for application of the act of state doctrine] is the potential for interference with our foreign relations."). Thus, Plaintiffs' claims necessarily would turn on this Court's adjudication of the official action of the Indonesian government, and the Court should accordingly dismiss the Complaint under the act of state doctrine.

16

**C.    The Political Question Doctrine Bars Adjudication of Plaintiffs' Claims, Because the Political Branches Have Expressed Strong Support for the Helsinki Peace Accord.**

The political question doctrine applies to bar adjudication of claims that, *inter alia*, constitute an impermissible intrusion by courts into foreign policy matters. *Baker v. Carr*, 369 U.S. 186, 211 (1962).  In *Doe I*, the Court declined to dismiss plaintiffs' common law claims under the political question doctrine on the grounds that it could limit discovery and thereby manage any justiciability concerns. (*Doe I*, Docket No. 103 at 14-15.)  Defendants' appeal of that ruling was dismissed for lack of appellate jurisdiction and Defendants' alternative petition for a writ of mandamus was denied.  *Doe v. Exxon Mobil*, 473 F.3d 345 (D.C. Cir. 2007).

Immediately after the Court of Appeals' decision, the Indonesian government affirmed its opposition to this litigation, even after the dismissal of PT Arun and even as limited to the state law claims before the Court. (Ex. O.)  As the Indonesian government recognized, even with limited discovery and a focus solely on the U.S. Defendants' acts, omissions, and knowledge pertaining to the plaintiffs' alleged injuries, the wartime activities of the Indonesian military will necessarily be at issue in the *Doe I* litigation and this matter. (Exs. M, N, O.)  Indeed, the Court cannot grant the relief sought by Plaintiffs without passing judgment on the Indonesian soldiers' conduct, or on the operation of EMOI as a contractor for BPMIGAS in Aceh.

Importantly, neither the Court, nor the majority nor the dissent in the *Doe I* appeal, considered the impact of the recently-implemented Helsinki Peace Accord, and the recent statements of support for it by the political branches. (*See supra* pp. 6-7 & Exs. D, G, H, I, J.) These new developments, combined with the State Department's earlier stated concerns regarding *Doe I*, (Exs. K, L), render this case in clear conflict with the policies of the political branches.

Under similar circumstances, courts have routinely dismissed claims under the political question doctrine. *See Joo v. Japan*, 413 F.3d 45 (D.C. Cir. 2005), *cert. denied*, 546 U.S. 1208

(2006); *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005), *cert. denied*, 547 U.S. 1069 (2006);

*State of Israel*, 400 F. Supp. 2d at 96, 112; *see also In re Nazi Era Cases Against German Defs.*

*Litig.*, 196 Fed. Appx. 93, 100 (3d Cir. 2006); *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d

57 (2d Cir. 2005); *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1132 (W.D. Wash. 2005);

*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1195 (C.D. Cal. 2005); *Frumkin v. JA*

*Jones, Inc.*, 129 F. Supp. 2d 370, 383-84 (D.N.J. 2001); *Iwanowa*, 67 F. Supp. 2d 424; *Burger-*

*Fischer v. Degussa AG*, 65 F. Supp. 2d 248 (D.N.J. 1999). The same should be done here.

**D.     The Foreign Affairs Preemption Doctrine Bars Adjudication of Plaintiffs'
Common Law Claims, Because State Law Cannot Be Applied in a Matter That
Affects Foreign Relations Absent Advancing Some State Interest.**

In the appeal from *Doe I*, Judge Kavanaugh noted in dissent that "the state-law tort claims

are likely preempted as a result of the State Department's specific statement of harm to foreign

policy." 473 F.3d at 365. (The majority in *Doe I* did not address the point.)

Judge Kavanuagh's observation is rooted in long-standing precedent. As the Supreme Court

has stated, the possibility that state law (in this case D.C. tort law) "will produce something more

than an incidental effect in conflict with express foreign policy of the National Government . . .

require[s] preemption of the state law." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003).

As was the case in *Garamendi*, there exists here a clear internationally-established agreement for

dealing with any Aceh-war-related claims, and those mechanisms have been implemented by

Indonesia. As noted above, the express U.S. foreign policy is strongly in support of those

procedures. (*See supra* pp. 6-7.)

In *Mujica*, the court engaged in an expansive analysis of the foreign affairs preemption

doctrine and concluded that California tort law could not be used to adjudicate injuries suffered by

Colombian citizens during activities by the Colombia military in Colombia, allegedly at the behest

of a California corporation; and concluded that the litigation threatened U.S. foreign policy interests

18

and did not advance any interest of the state of California.  381 F. Supp. 2d at 1187-88; *see also In re Assicurazioni Generali S.p.A. Holocaust Litig.*, 340 F. Supp. 2d 494, 501 (S.D.N.Y. 2004) (dismissing tort claims under the foreign affairs doctrine); *Steinberg v. Int'l Comm'n on Holocaust Era Ins. Claims*, 34 Cal. Rptr. 3d 944, 951-52 (Ct. App. 2005) (same).  Here, as noted above, significant U.S. foreign policy interests may be adversely affected by the continuation of this lawsuit, yet, on the other hand, no interest of the District of Columbia is served by applying its common law to torts bearing no nexus to the jurisdiction.

In *Doe I*, this Court declined to dismiss under the foreign affairs doctrine, noting that "no state government has passed any statute in conflict with U.S. foreign policy." (*Doe I*, Docket No. 137 at 5.)  Drawing a distinction between state statutes and common law, the Court declared that *Mujica* was wrongly decided.  (*Id.*)  But application of the foreign affairs preemption doctrine is *not* limited to state statutes.  Judge Kavanaugh rejected this Court's interpretation of the foreign affairs preemption doctrine as applying to statutes only.  *Doe I*, 473 F.3d at 365 (dissenting op.).  As the Supreme Court has made clear, state common law, like state statutory law, "is the law of the state": "whether the law of the State shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *accord Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 886 (2000) (holding that a federal statute preempted state tort claims).  Because this Court cannot apply D.C. common law in a manner that conflicts with U.S. foreign policy, the common law claims must be dismissed under the foreign affairs preemption doctrine.

## IV.   THE COURT CANNOT JOIN AN INDISPENSABLE PARTY, BPMIGAS, WHOSE INTERESTS WOULD BE ADVERSELY AFFECTED BY ADJUDICATION OF THE CLAIMS IN ITS ABSENCE

The Complaint should also be dismissed pursuant to Rules 12(b)(7) and 19 because Plaintiffs have failed to join BPMIGAS, an "indispensable" party.

Rule 19(a) determines when a person must be joined as a "necessary" party to a lawsuit to ensure a just adjudication. Rule 19(b) governs when the entire case should simply be dismissed because the person who is necessary under Rule 19(a) cannot be joined, and is "indispensable" to the matter. When read together, Rule 19(a) and Rule 19(b) set forth a three-step process in the compulsory party joinder inquiry: (1) determine whether the absentee is needed for just adjudication; (2) determine whether joinder is feasible; and (3) if joinder of the necessary absentee is not feasible, determine whether the court should dismiss the case. *See W. Md. Ry. Co. v. Harbor Ins. Co.*, 910 F.2d 960, 962-63 n.5 (D.C. Cir. 1990).

### A.    BPMIGAS Is a Necessary Party for Just Adjudication.

Under Rule 19(a), an absent party is necessary to the lawsuit if: (1) without joinder of the absentee, "complete relief cannot be accorded among those already parties"; (2) the absentee "claims an interest relating to the subject of the action" and is so situated that the disposition of the action without joining the absentee "may . . . as a practical matter impair or impede [the absentee's] ability to protect that interest"; or (3) the absentee "claims an interest relating to the subject of the action" and is so situated that disposition of the case without joining the absentee may "leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Fed. R. Civ. P. 19(a). The rule is written in the disjunctive, so a court should join an absentee if any one of the three situations is present. *See, e.g., Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 405 (3d Cir. 1993). BPMIGAS qualifies as a necessary party under *each* criterion.

In the Complaint, Plaintiffs request, among other things, a permanent injunction to prevent "abuses against Plaintiffs and their fellow villagers."[4] (Compl. ¶ IX(d).) An injunction, however, is

---

[4]    The overbreadth of Plaintiffs' claims is plainly manifest in this paragraph of the Complaint. The "fellow villagers" on whose behalf the Plaintiffs seek an injunction obviously have no standing and cannot make the necessary

only effective if it actually restrains the entity capable of effectuating the prohibition.  Defendants

have neither any command and control authority over Indonesian soldiers, nor the authority to

dictate who should provide security for the Arun gas field.  The PSC obligates BPMIGAS to supply

security for the gas field, and Indonesian law requires the use of government forces to defend such

Indonesian national vital assets.  (*See* 2/3/06 Declaration of Robert N. Hornick ("Hornick Decl.")

¶ 35 & Ex. C thereto; Presidential Decree 63/2004 (Coleman Decl. Ex. 2); Shawn Donnan,

*Indonesia plans to revise security pay guidelines*, Fin. Times, Feb. 7, 2006 ("Indonesian law

*requires* resource projects deemed to be of national importance, such as Freeport's Grasberg mine

*and ExxonMobil's Arun gas field in Aceh*, to be guarded by security forces.") (Ex. P) (emphasis

added).)  Accordingly, an injunction issued by this Court that purports to prohibit the Indonesian

military from committing abuses against Plaintiffs, or even to prohibit EMOI from utilizing

Indonesian military as security, would be meaningless because the Indonesian military or

BPMIGAS would not be bound by such an injunction.  *See, e.g., Lujan v. Defenders of Wildlife*, 504

U.S. 555, 569 (1992) (refusing to grant injunction because it would not be binding on an absentee

and would therefore not redress the alleged injury).  Because BPMIGAS is the entity responsible for

managing and safeguarding the Arun gas field, BPMIGAS is a necessary party.  Without

BPMIGAS, Plaintiffs' requested injunctive relief cannot be accorded.

   BPMIGAS is also a necessary party under the second category of Rule 19(a) because it

"claims an interest relating to the subject of the action" and is so situated that the disposition of the

action without joining the absentee "may . . . as a practical matter impair or impede [its] ability to

protect that interest."  Fed. R. Civ. P. 19(a)(2)(i).  BPMIGAS, as the representative of the

Indonesian government with responsibility for providing security for the Arun gas field, has an

absolute interest in proceedings in a court in the United States that may dictate how it must conduct

---

showing to justify injunctive relief as to them. *See Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) ("Art. III judicial
power exists only to redress or otherwise to protect against injury to the complaining party.").

its duties and whom it can or cannot use in connection with security for Indonesia's oil and gas fields, or even to opine that its use of the military in the past was unlawful. Any judgment in this case that interferes with BPMIGAS' obligation to use government forces as security providers for the fields would interfere with plans of the national and provincial governments to rebuild the Aceh economy, and jeopardize the long-term stability of the region. (*See* Wedgwood Decl. ¶ 42.)

Moreover, BPMIGAS likely has many responses to make to the Complaint's allegations, such as the fact that the Aceh region has been in a state of civil war, and that many rebel separatists were affirmatively attacking the vital national assets in the Arun gas field in order to disrupt BPMIGAS' operations. (*See id.* ¶¶ 54-56 (describing reported incidents of GAM attacks on the Arun gas field).) None of these arguments from BPMIGAS' side, however, can be presented or explained in the absence of joining BPMIGAS. Accordingly, BPMIGAS is a "necessary" party under the second category of Rule 19(a).

Finally, BPMIGAS is a necessary party under the third category of Rule 19(a) because without its participation here, Defendants may be left with inconsistent obligations that cannot be reconciled. As noted above, the PSC requires BPMIGAS to provide security for the Arun gas field, and it was BPMIGAS that was required under Indonesian law to use the Indonesian military to protect the country's vital assets. EMOI, as a contractor to BPMIGAS, has no choice but to accede to the use of the Indonesian military, and furthermore has no control whatsoever over the scope and extent of the military's operations. If this Court were to issue an injunction, however, to the effect that EMOI could not utilize the Indonesian military in the course of its operations, or that EMOI would have to control the Indonesian military's actions, EMOI would be left in the untenable position of being held in contempt or breaching its obligations under the PSC.[5]

---

[5]        Nor can this Court, under the Commerce Clause, use D.C. law simply to compel Defendants to cease operations in Indonesia. *See National Foreign Trade Council v. Natsios*, 181 F.3d 38, 70 (1st Cir. 1999), *aff'd sub nom. Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000).

**B.     BPMIGAS Cannot Be Joined as a Party So the Case Must Be Dismissed.**

If an absent person is necessary under Rule 19(a), and cannot be joined, Rule 19(b) requires

a court to determine whether the necessary party is "indispensable," or, in other words, so important

to the disposition of the case that the matter should be dismissed rather than proceed in that person's

absence.  The Rule identifies the following four factors to consider in making this determination:

"*first*, to what extent a judgment rendered in the person's absence might be prejudicial to the person

or those already parties; *second*, the extent to which, by protective provisions in the judgment, by

the shaping of relief, or other measures, the prejudice can be lessened or avoided; *third*, whether a

judgment rendered in the person's absence will be adequate; *fourth*, whether the plaintiff will have

an adequate remedy if the action is dismissed for nonjoinder."  Fed. R. Civ. P. 19(b) (emphasis

added); *see also Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118-19

(1968); *Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 774 (D.C. Cir. 1986).

There is no dispute that BPMIGAS cannot be joined as a party to this litigation.  BPMIGAS

is a 100% Indonesian state-owned entity.  As this Court held in *Doe I* with respect to PT Arun, an

entity that is 55%-owned by the Indonesian government, "[a]djudicating the liability of an entity

owned by the Indonesian government would create a significant risk of interfering in Indonesian

affairs and thus U.S. foreign policy concerns."  (*Doe I*, Docket No. 103 at 14.)

It is well-established that if an indispensable party has immunity from the lawsuit, the court

should dismiss the case.  *Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1496 (D.C. Cir. 1995)

(reversing and remanding with instructions to dismiss the case for failure to join the state of Kansas,

an indispensable party, because Kansas enjoyed immunity under the Eleventh Amendment of the

U.S. Constitution); *see also Wichita & Affiliated Tribes*, 788 F.2d at 777-78 (affirming dismissal for

failure to join indispensable third-party tribes immune from suit).  The D.C. Circuit also stated that

"'there is very little room for balancing of other factors' set out in Rule 19(b) where a necessary party under Rule 19(a) is immune from suit." *Kickapoo*, 43 F.3d at 1496 (citation omitted).

Given that BPMIGAS is necessary to the case, but cannot be joined, all four factors under Rule 19(b) counsel in favor of dismissal. First, a judgment against Defendants would prejudice them because it would essentially require Defendants to supervise and issue orders to BPMIGAS and the Indonesian military, both of which would infringe on the sovereignty of the Indonesian government and violate the PSC. Any attempt by EMOI to exert control over BPMIGAS and the military would almost certainly lead to harsh political and legal reaction. Moreover, if EMOI is ordered to refuse the security of the Indonesian military, it would be in violation of Indonesian law.

The second and third factors under Rule 19(b) are related. There is little chance that relief can be focused or shaped in any manner by the Court that would lessen the prejudice to Defendants. The central issue revolves around the actions of Indonesian soldiers. Participation of BPMIGAS and the military itself is required to change the soldiers' behavior, or to determine the appropriate remedy for any misconduct of the military.

Fourth, Plaintiffs will have adequate remedies elsewhere. As detailed above, *supra pp.* 4-6, there have been significant political and legal developments in Aceh under the Helsinki Peace Accord, with legal forums being established to address concerns arising out of the long-running civil war in the region between the military and the separatist rebels. Indeed, these new forums are being established precisely to address the types of injuries allegedly suffered by Plaintiffs.

Other courts facing similar situations have dismissed the claims under Rule 19. For example, in *Aguinda v. Texaco, Inc.*, citizens of Peru and Ecuador brought suit in the United States District Court for the Southern District of New York against Texaco, Inc., alleging that oil operations conducted by a consortium – which consisted of Ecuador's state-run oil company and a fourth generation subsidiary of defendant Texaco, Inc. – polluted rain forests and rivers in those two

countries and caused environmental damage and personal injuries. 945 F. Supp. 625, 627-28 (S.D.N.Y. 1996). The plaintiffs sought both injunctive relief and damages. Texaco moved to dismiss on various grounds, including for failure to join the Republic of Ecuador and PetroEcuador, the state-run oil company, as indispensable parties under Rule 19. *Id.* In granting Texaco's motion, the district court reasoned that it could not accord complete equitable relief without the presence of the government of Ecuador and PetroEcuador. *Id.* at 628. However, Ecuador and PetroEcuador were immune, and could not be joined, so Rule 19 provided a basis to dismiss the entire case. *Id.* at 627-28 ("When a necessary party is thus immune from suit because of sovereign immunity, that alone is ordinarily sufficient to warrant dismissal of the action.").

The Second Circuit vacated the district court's ruling, primarily on *forum non conveniens* and international comity grounds not applicable to this analysis. *Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998). The Second Circuit also vacated part of the dismissal under Rule 19(b), holding that the district court's reasoning did not justify dismissal of the entire case, but did justify dismissal of all equitable claims that would require participation by the Republic of Ecuador to accord full relief. *Id.* at 161. In other words, the Second Circuit stated that the district court could have allowed claims that would not involve the Republic of Ecuador. *Id.*

On remand, Texaco again moved to dismiss, based primarily on *forum non conveniens*. *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 538 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470 (2d Cir. 2002). The district court granted the motion; in dicta, the court observed that "[e]ven assuming *arguendo* that plaintiffs' claims for equitable relief could be separated from the rest of the litigation," it was "doubtful" that the court could fully address the claims without the participation of the government of Ecuador and PetroEcuador. *Id.* at 542.

As in *Aguinda*, Defendants here were not the parties in control of security where the harms allegedly occurred. Under both Indonesian law and the contractual terms of the PSC, BPMIGAS is

responsible for providing security for the Arun gas field. As such, BPMIGAS is an indispensable party who cannot be joined and the case should be dismissed under Rule 19.

## V.   THE COURT LACKS PERSONAL JURISDICTION OVER EMOI BECAUSE EMOI HAS INSUFFICIENT CONTACTS TO THE DISTRICT OF COLUMBIA

This Court must also dismiss Plaintiffs' claims against EMOI for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2) (2007). EMOI is not a resident of the District of Columbia, is not registered to do business here, and does not in fact conduct any business here. (*See generally* Coleman Decl.; Compl. ¶ 16.)

For this Court to maintain personal jurisdiction over EMOI, jurisdiction must be proper under the District of Columbia's long-arm statute and the Due Process Clause. *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995). To meet this burden, Plaintiffs must allege "specific facts" on which personal jurisdiction can be based; they cannot rely on conclusory allegations. *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003). Furthermore, Plaintiffs cannot aggregate allegations concerning multiple defendants to demonstrate personal jurisdiction over any individual defendant. *Id.* In deciding a motion to dismiss for lack of personal jurisdiction, the Court need not treat Plaintiffs' allegations as true. *Id.* Instead, the Court may consider and weigh affidavits and other relevant matter. *Id.*

Plaintiffs attempt to assert personal jurisdiction over EMOI here on the basis of D.C.'s long-arm statute. (*See* Compl. ¶ 4.) Under the District of Columbia's long-arm statute, a court may exercise personal jurisdiction over a person only as to a claim for relief "*arising from*" the person's transacting business, contracting to supply services, or causing tortious injury in Washington, D.C. *See* D.C. Code § 13-423(a), (b) (2007) (emphasis added); *Reeder v. Lerner Corp.*, No. 91-1381 (LFO), 1992 U.S. Dist. LEXIS 1010 (D.D.C. Jan. 31, 1992) (Oberdorfer, J.). Thus, under the D.C. long-arm statute, a non-resident defendant such as EMOI must engage in some activity in the District of Columbia, and that activity must be the genesis of the plaintiffs' claims. The facts as

alleged, however, suggest no activity conducted by EMOI in the District of Columbia, much less that the alleged injuries "arise from" such conduct. (*See id.* ¶¶ 16, 60-63.)  The long-arm statute, therefore, cannot confer jurisdiction over EMOI.

Given the total lack of any contacts with the District of Columbia, assertion of personal jurisdiction with respect to EMOI would also violate the Fifth Amendment's Due Process Clause. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 413-14 (1984).  For a court to exercise jurisdiction over an out-of-state defendant, the defendant must have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted).  Under this standard, a defendant must "purposefully avail" itself of the forum: "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  In this case, EMOI has not purposefully availed itself of the District of Columbia.  In fact, EMOI has no jurisdictional connection with the District of Columbia whatsoever.  (*See generally* Coleman Decl.)  Simply put, Plaintiffs are capable of suing EMOI in Indonesia, as other Indonesian citizens have done.  There is no valid basis for their attempt to drag EMOI half-way across the world to litigate in a forum to which it has no connection.

Defendants acknowledge that this Court in *Doe I* determined that plaintiffs in that matter had adequately pleaded, subject to later proof, that EMOI was an "alter-ego" of the other defendants for jurisdictional purposes.  But Plaintiffs have no basis to claim that EMOI is somehow a "sham" corporate entity that really operates in Washington, D.C.  On the contrary, EMOI operates solely in Indonesia; it has consistently maintained its separate corporate identity; it has an independent board of directors; it is adequately capitalized; it does not share employees, office space, bank accounts, or telephone numbers with the other defendants, or in any other way fail to maintain corporate

27

separateness; it does not commingle its funds with the other defendants; it maintains its own offices and payroll in Indonesia; and it was incorporated by its shareholders for legitimate purposes – namely, engaging in business ventures in Indonesia. (*See, e.g.*, Coleman Decl. ¶¶ 8-36; *see also* Fitzpatrick Decl. ¶¶ 3-9 (discussing separate corporate status of EMOI and other defendants).)

"As a general rule, . . . the proper exercise of personal jurisdiction over a nonresident corporation may not be based solely upon the contacts with the forum state of another corporate entity with which the defendant may be affiliated." *Freudensprung v. Offshore Technical Servs.*, 379 F.3d 327, 346 (5th Cir. 2004) (citing cases); *see also Oriska Ins. Co. v. Brown & Brown of Tex., Inc.*, No. 02-578, 2005 WL 894912, at *2 (N.D.N.Y. Apr. 8, 2005) (court cannot exercise jurisdiction over subsidiary based upon parent's business in forum, even if subsidiary is wholly-owned by parent). This is because "even a wholly owned subsidiary is presumed to be a separate entity in the absence of 'clear evidence' that it is controlled by the parent." *In re Ski Train Fire in Kaprun Austria*, 342 F. Supp. 2d 207, 214-15 (S.D.N.Y. 2004). Plaintiffs have asserted no basis to contradict those fundamental principles of corporate law, and they have alleged no "specific facts" proving that the principles should be disregarded here.

## VI.     PLAINTIFFS' CLAIMS ARE TIME-BARRED BECAUSE THEY WERE BROUGHT AFTER THE APPLICABLE LIMITATIONS PERIODS HAD EXPIRED

The District of Columbia's choice-of-law rules determine the governing statute of limitations for this matter. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). District of Columbia courts hold that the applicable limitations period is governed by forum law. *See Hodge v. S. Ry. Co.*, 415 A.2d 543, 544 (D.C. 1980). Under D.C. statute of limitations law, all of Plaintiffs' claims except negligent hiring and negligent supervision are time-barred.[6]

---

[6]     The choice of law for this procedural issue is separate from the choice of law for Plaintiffs' substantive claims, discussed in Part VII *infra*.

In the District of Columbia, claims of assault, battery, false arrest, and false imprisonment are all subject to a one-year statute of limitations. *See Rynn v. Jaffe*, 457 F. Supp. 2d 22, 24 (D.D.C. 2006); D.C. Code § 12-301(4). Plaintiffs' alleged injuries occurred in June 2004 and October 2004 (Compl. ¶¶ 60-63), but this lawsuit was not filed until May 2007. Thus, Plaintiffs' battery (Cause V), assault (Cause VI), and false imprisonment/false arrest (Cause VII) claims are all time-barred.[7]

What remains are Plaintiffs' claims for negligence, negligent hiring, negligent supervision, and intentional infliction of emotional distress (Causes I-IV, respectively). Under D.C. Code § 12-301(8), actions "'for which a limitation is not otherwise specifically prescribed'" are time-barred after three years. *Rynn*, 457 F. Supp. 2d at 24 (citation omitted); *see* D.C. Code § 12-301(8). The District of Columbia, however, "does not resort to this default provision every time a plaintiff uses a label that does not precisely match a specific statute of limitations." *Mittleman v. United States*, 104 F.3d 410, 415 (D.C. Cir. 1997). Rather, under D.C. law, "[r]esidual tort claims" are "subject to subsection 4's one-year limitation *if they are sufficiently 'intertwined' with subsection 4 claims.*" *Rynn*, 457 F. Supp. 2d at 24 (*citing Mittleman*, 104 F.3d at 415 (emphasis added).)

"To qualify for subsection 8's three-year limitation, a claim of intentional infliction of emotional distress ('IIED') must be 'independent' in that it stems from conduct separate from the alleged subsection 4 wrongs." *Id.* (*citing Hunter v. Dist. of Columbia*, 943 F.2d 69, 72 (D.C. Cir. 1991)). Here, Plaintiffs' IIED allegations are not "independent" of the other intentional tort claims. (Compl. ¶¶ 94-97 (basing IIED claims on the same "outrageous and extreme acts, as alleged herein, including the unprovoked shootings [sic – only one shooting alleged], assault, battery and detention of Plaintiffs carried out by ExxonMobil security personnel").) Thus, the Court must also dismiss Plaintiffs' IIED claims (Cause IV) as time-barred. *Rynn*, 457 F. Supp. 2d at 24 (dismissing IIED

---

[7] Plaintiffs make no claim of equitable tolling and indeed no such claim could apply here. "In construing D.C. law, federal courts cannot apply the doctrine of equitable tolling differently than would the District of Columbia courts." *Williams v. Dist. of Columbia*, 916 F. Supp. 1, 5 (D.D.C. 1996). "District of Columbia law does not recognize the concept of equitable tolling." *Johnson v. Marcheta Investors L.P.*, 711 A.2d 109, 111 n.2 (D.C. 1998).

claims based on one-year limitations period); *Scales v. George Wash. Univ.*, No. 89-0796-LFO,

1991 U.S. Dist. LEXIS 16765, at *14 (D.D.C. Nov. 15, 1991) (Oberdorfer, J.) (same).

Generally speaking, negligence claims, such as Plaintiffs' claims in Causes I, II, and III, "are

covered by [the] three-year statute of limitations." *See Johnson v. Dist. of Columbia*, No. 04-936

(RMC), 2005 U.S. Dist. LEXIS 16918, at *8 (D.D.C. July 20, 2005). "It is well settled," however,

that "the plaintiff's characterization of the claim is not controlling, and [the court] must look beyond

the conclusory terms of the pleadings to the substantive elements of any alleged causes of action."

*Burgess v. Pelkey*, 738 A.2d 783, 786 (D.C. 1999) (internal citations and quotations omitted). "In

order to state a separate claim for negligence [such as Cause I here], a complaint 'must specify a

negligent act and characterize a breach of duty which might have given rise to liability'. . . . [U]se

of the terms 'carelessly and negligently,' without more, are conclusory and do not raise a cognizable

claim for negligence." *Rynn*, 457 F. Supp. 2d at 25 (*citing Dist. of Columbia v. Chinn*, 839 A.2d

701, 708 (D.C. 2003); *Maddox v. Bano*, 422 A.2d 763, 764-65 (D.C. 1980)). Moreover, "[a] claim

resulting from the use of force beyond that which was reasonably necessary is clearly based upon

battery, not negligence." *Johnson*, 2005 U.S. Dist. LEXIS 16918, at *8.

The D.C. Court of Appeals "explored these legal concepts at length in *District of Columbia

v. Chinn*, 839 A.2d 701 (D.C. 2003)." *Id.* at *9. In *Chinn*, the court explained that "[w]hether a

plaintiff can also plead negligence in addition to battery depends on whether he has made 'a

separate and distinct claim for negligence apart from the battery allegations.'" *Id.* (*citing Chinn*,

839 A.2d at 711). *Chinn* delineated two lines of cases – one where separate negligence and battery

claims were precluded because the plaintiffs did not plead separate and distinct allegations and the

other where the plaintiffs pleaded separate negligence and battery allegations. Where the plaintiff

bases a negligence claim "on [an] alleged battery," then the one-year statute of limitations applies,

and the negligence claims should be dismissed. *See id.* at *11-*12; *accord Rynn*, 457 F. Supp. 2d at

25 (*citing Sabir v. Dist. of Columbia*, 755 A.2d 449 (D.C. 2000)); *see also Stewart-Veal v. Dist. of Columbia*, 896 A.2d 232, 235-36 (D.C. 2006).

As in *Chinn*, the negligence claims here (Compl. ¶¶ 70-75) are intertwined with the battery claims. Plaintiffs do not allege any negligence-based injuries other than those arising from the alleged batteries themselves. (*Id.* ¶¶ 60-63.) Thus, the Court should dismiss Plaintiffs' negligence claim (Cause I) as well as their intentional tort claims (Causes IV-VII) as time-barred.

## VII.    PLAINTIFFS' CLAIMS MUST BE DISMISSED BECAUSE DISTRICT OF COLUMBIA LAW CANNOT APPLY

Plaintiffs here assert their claims under D.C. law. (*See id.* ¶¶ 83, 93, 97, 101, 106, 110.) But this Court cannot apply D.C. law to Plaintiffs' claims, and they must therefore be dismissed.

A court sitting in a purported diversity case must also follow the choice-of-law rules of the forum when determining the *substantive* law to be applied. *Klaxon Co.,* 313 U.S. at 496. The District of Columbia follows the "government interest" test, considering (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicile, residence, nationality, place of incorporation, and place of the business of the parties"; and (4) "the place where the relationship is centered." *Herbert v. Dist. of Columbia*, 808 A.2d 776, 779-80 (D.C. 2002). The court must apply another state's law when that other state's interest in the litigation is substantial and application of District of Columbia law would frustrate the clearly articulated public policy of that state. *Id.* Under these principles, D.C. law should not apply here.

### A.    Indonesia Has a Greater Interest Than the District of Columbia or the United States, and Application of D.C. Law Would Frustrate Indonesian Policy.

It is beyond dispute here that the alleged injuries occurred in Indonesia and that the parties' relationship is centered in Indonesia. (Compl. ¶¶ 60-63.) The purported conduct underlying the claims is principally alleged to have occurred in Indonesia, where the soldiers purportedly harmed Plaintiffs (*id.*), and where EMOI allegedly hired, paid, supervised, and trained the soldiers, (*id.*

¶¶ 39-47). To a lesser extent, Plaintiffs allege limited connections to various other locations (*e.g.*, New York, NY; Irving, TX; Houston, TX; and Fairfax, VA). (*Id.* ¶¶ 18-27.) All Plaintiffs reside in Indonesia, and EMOI maintains its principal place of business there. (*Id.* ¶¶ 6-9, 16.) No defendant is incorporated in or has its principal place of business in the District of Columbia. (*Id.* ¶¶ 10, 13, 14, 16.) Although Exxon Mobil Corp. is alleged to conduct business in the District of Columbia, no wrongdoing by any defendant is alleged to have occurred in the District of Columbia. (*Id.* ¶¶ 10, 12.) Accordingly, the interests of Indonesia clearly outweigh the District of Columbia's.

In *Doe I*, this Court in applying D.C.'s choice-of-law test compared the interests of Indonesia to the purported interests of the entire United States (rather than to the District of Columbia alone). (*Doe I*, Docket No. 137 at 2-3.) But the District of Columbia follows the Restatement, *Rymer v. Pool*, 574 A.2d 283, 285 (D.C. 1990), which expressly provides that the United States is not a "state" for choice-of-law purposes. Restatement (Second) Conflicts of Laws § 3 cmt. c (1971). Accordingly, courts have not considered the interests of the entire United States against the interest of other sovereigns. *See Tramontana v. Varig Airlines*, 350 F.2d 468, 471 (D.C. Cir. 1965); *see also Armiger v. Real S.A. Transportes Aereos*, 377 F.2d 943, 944 (D.C. Cir. 1967);[8] *Samra v. Shaheen Bus. & Inv. Group, Inc.*, 355 F. Supp. 2d 483, 496-97 (D.D.C. 2005); *Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp.*, 172 F. Supp. 2d 79, 90 (D.D.C. 2001).[9]

---

[8] Decisions of the United States Court of Appeals for the District of Columbia Circuit rendered before February 1, 1971, such as *Tramontana* and *Armiger*, constitute local District of Columbia precedent. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

[9] *Alvarez-Machain* and *Wyatt*, cited by the Court in *Doe I*, do not diminish these principles. *Alvarez-Machain* dealt with the application of *federal common law* – not state law. There, the court was called upon to consider common law in determining damages available under the Alien Tort Statute, 28 U.S.C. § 1350. *Alvarez-Machain v. United States*, 331 F.3d 604, 632 (9th Cir. 2003). Moreover, the United States was a party to the litigation and its conduct was directly at issue. *Id.* at 634. Thus, it was appropriate in that case to compare Mexico's interests with the United States' interests and then, because the interests of the United States prevailed, to apply federal common law rather than California tort law. *Id.* at 635. Here, the United States is not a party, its conduct is not at issue, and the Court is not attempting to interpret a federal statute by reference to common law principles. In *Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131 (D.D.C. 2005), the court considered application of D.C., Tennessee, and Turkish law, and selected D.C. law as the law of the forum because – unlike here – no party had demonstrated that application of any of those laws would lead to disparate results. *Id.* at 139-40. Here, *Wyatt* actually compels application *of Indonesian law* because the Court has already concluded that Indonesian law would lead to a different result, at a minimum with respect to punitive

32

Even if the Court were to again weigh the comparative interests of Indonesia and the United States, the interests of Indonesia in the application of its law to these claims has increased dramatically since *Doe I*, because application of D.C. law would frustrate the clearly articulated policy of Indonesia that war-related claims be resolved pursuant to the Helsinki Peace Accord. Indonesia (including both GAM and the Indonesian federal government) has formulated clear policies for resolving war-related issues in Aceh. (*See supra* pp. 4-6.) Indonesia's superior interest in this litigation is confirmed by its February 1, 2007 diplomatic note highlighting the importance of the Aceh peace and reconciliation process and noting the Indonesian government's concern over the litigation in *Doe I*. (Ex. O.) Moreover, application of D.C. law would frustrate Indonesia's interest in governing the conduct of EMOI, which operates only in Indonesia.

In sum, it is impossible to conclude, as the Court did in *Doe I*, that the United States has "an overriding interest in applying its own law to defendants." Such a conclusion would be particularly problematic in light of the Helsinki Peace Accord's administrative claims process. Providing an alternate forum and process will certainly undermine the processes established by the Helsinki Peace Accord. The Executive and Legislative Branches have consistently expressed the United States' interest in supporting the Helsinki Peace Accord (Exs. G, H, I, J), and the United States cannot have "an overriding interest" in applying its law to a non-resident corporation (EMOI). Finally, Indonesian policy as reflected in the *unavailability* of punitive damages under Indonesian law is also an expression of policy that is entitled to consideration. *See Danziger v. Ford Motor Co.*, 402 F. Supp. 2d 236, 240 (D.D.C. 2005). Inasmuch as the punitive damages rules in two jurisdictions differ, the Court must apply the rule of the jurisdiction with the superior interest, even if that jurisdiction does *not* recognize punitive damages. *See Boise Tower Assocs., LLC v. Wash.*

---

damages. And the court in *Wyatt* did *not*, as this Court in *Doe I* did, first compare the interests of the United States to the interests of Turkey, and then select D.C. law. Rather, only in dicta did the court suggest that it might compare the interests of Turkey directly to those of the United States, based on critical factors not present here: the plaintiffs in *Wyatt* were U.S. citizens whose abduction in Turkey was designed to affect U.S. foreign policy. *Id.* at 140 n.6.

*Capital Joint Master Trust*, No. 03-141-S-MHW, 2006 U.S. Dist. LEXIS 45851, at *37, *41 (D.

Idaho June 22, 2006) (holding that the absence of punitive damages in Washington created a

conflict that *favored* application of Washington law).

### B.    Application of D.C. Law Would Violate Due Process.

"Laws have no force of themselves beyond the jurisdiction of the State which enacts them,

and can have extra-territorial effect only by the comity of other States." *Huntington* v. *Attrill*, 146

U.S. 657, 669 (1892). "It is a firmly established principle of American jurisprudence that the law,

statutory or otherwise . . . of one state has no extraterritorial effect in another state." 16 Am. Jur. 2d

*Conflict of Laws* § 9 (1998 & Supp. 2005). For a state's substantive law to be selected in a

constitutionally permissible manner, "that State must have a significant contact or significant

aggregation of contacts" to the claims at issue, "such that choice of its law is neither arbitrary nor

fundamentally unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818-23 (1985).

In *Shutts*, the Supreme Court held that a Kansas court could not constitutionally apply

Kansas law to claims based on conduct that occurred outside the state, even though the defendant

did significant business in Kansas, *id*. at 819-20, and even though the Kansas court had personal

jurisdiction over both the defendant and the out-of-state plaintiffs, *see id.* at 806-14. The Court

recognized that because the defendant in *Shutts* "own[ed] property and conduct[ed] substantial

business in the State," Kansas "certainly ha[d] an interest in regulating [the defendant's] conduct *in

Kansas*," and could therefore apply Kansas law to claims arising from Kansas leases. *Id.* at 819-20

(emphasis added). But the defendant's contacts with Kansas and the state's general interest in

resolving the dispute did *not* suffice to give the Kansas court authority to apply Kansas law to the

defendant's out-of-state conduct, at least insofar as Kansas law reflected different policy choices

from the state laws that would otherwise govern the conduct. *Id.* at 821-22. "Given Kansas' lack of

interest in claims unrelated to that State, and the substantive conflict with [other jurisdictions], we

34

conclude that application of Kansas law to every claim in this case is sufficiently arbitrary and

unfair as to exceed constitutional limits." *Id.* (internal quotation marks and citation omitted).

Under that precedent, this Court and others routinely have refused to apply the law of a state

absent a significant relationship between the state and the matter being litigated. *See, e.g., Boehner*

*v. McDermott*, 332 F. Supp. 2d 149, 154-55 (D.D.C. 2004), *aff'd*, 484 F.3d 573 (D.C. Cir. 2006);

*McCluney v. Joseph Schlitz Brewing Co.*, 649 F.2d 578, 582-84 (8th Cir.), *aff'd*, 454 U.S. 1071

(1981); *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 371 (E.D. La. 1997);

*Wickenhauser v. Edward D. Jones & Co.*, 953 F. Supp. 286, 289 (E.D. Mo. 1996). For example, in

*Price v. International Telephone and Telegraph Corp.*, 651 F. Supp. 706 (S.D. Miss. 1986), the

plaintiffs attempted to invoke Mississippi law in a tort action even though the tort occurred outside

of the state, the plaintiffs resided outside of the state, and the only relationship to the forum was that

the defendant was registered to do business in Mississippi:

> Conspicuously absent from the allegations of plaintiffs' complaint is
> even a tenuous connection between Mississippi and the parties or
> facts underlying this cause of action. . . . Mississippi's sole contact
> with this litigation is that it is the forum state.

*Id.* at 708 (internal quotation and citation omitted). The court held it would violate due process to

apply Mississippi law. *Id.* at 709-10; *see Kolesar v. United Agri Prods.,* 412 F. Supp. 2d 686, 694-

95 (W.D. Mich. 2006), *aff'd*, No. 06-1416, 2007 U.S. App. LEXIS 21581 (6th Cir. Sept. 4, 2007).

So too in this case, D.C. law should not apply to Plaintiffs' claims. D.C. common law has

absolutely no contacts in this case – let alone a "significant contact or significant aggregation of

contacts" to Plaintiffs' claims that would override the interests of Indonesia. *Shutts*, 472 U.S. at

818. The matter concerns the alleged conduct of *Indonesian* soldiers acting in *Indonesia* against

*Indonesian* citizens, and the soldiers' relationship to an Indonesian government contractor (EMOI)

with its principal place of business in Indonesia. Although some of the Defendants may have

unrelated business interests in the District of Columbia, *Shutts* demonstrates that such contacts,

absent a nexus to the claims at issue, are insufficient to justify application of D.C. law.  D.C. law can no more logically apply to Plaintiffs' claims here than can the laws of Florida, California, Hawaii, or any of the other dozens of states in which some of the Defendants conduct business wholly unrelated to EMOI's operations in Indonesia.  Application of D.C. law would accordingly be "arbitrary [and] fundamentally unfair."  *Id.*

C.     **Application of D.C. Law Would Violate Defendants' Right To Fair Notice.**

The basic constitutional limitations on a *state's* authority to impose its laws or regulate conduct extraterritorially are reinforced by Defendants' due process rights to fair notice of the law that will govern their conduct.  "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996).  "When considering fairness" in the context of constitutional limits on choice of law, "an important element is the expectation of the parties."  *Shutts*, 472 U.S. at 822 (finding "no indication that . . . the parties had any idea that Kansas law would control").

The due process implications of the Court's choice of law determination, as well as the infringement of the policy choices of another state (Indonesia), are clear.  Defendants could hardly have anticipated that D.C. law would apply to EMOI's operation of natural gas field in Aceh, Indonesia.  EMOI has no contacts with the District of Columbia, and Plaintiffs allege no actions by *any* Defendants in the District of Columbia bearing on any of their claims.

For all those reasons, the Court must conclude that D.C. law cannot apply here.

VIII.  **PLAINTIFFS FAIL TO STATE A CLAIM UNDER D.C. LAW BECAUSE THEY CANNOT BE LEGALLY RESPONSIBLE FOR THE INDONESIAN SOLDIERS' ALLEGED CONDUCT**

The myriad jurisdictional, prudential, and procedural defects discussed above are sufficient to warrant dismissal of the Complaint.  But even assuming that Plaintiffs claims can be properly

36

heard in this Court, and that some of the negligence-based claims are not time-barred, and that

District of Columbia law applies, the Complaint fails as a substantive matter because Plaintiffs

cannot articulate any viable means to hold Defendants accountable for the acts of Indonesian

soldiers assigned by the Indonesian government to defend the Arun gas field from rebel attacks.

In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court clarified the

standard for determining whether a complaint fails to state a claim under Rule 12(b)(6).  The Court

held that, in order to survive a motion to dismiss, "[f]actual allegations must be enough to raise a

right to relief above the speculative level." *Id.* at 1965.  "The pleading must contain something

more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right

of action." *Id.* (*quoting* 5 Charles Wright & Arthur Miller, Federal Practice and Procedure § 216, at

235-36 (3d ed. 2004)).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to

relief' requires more than labels and conclusions" and a "formulaic recitation of the elements of a

cause of action will not do." *Id.* at 1964-65.  The complaint must be examined to determine if it

presents a "plausible claim for relief," and if it does not, "this basic deficiency should . . . be

exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.*

Plaintiffs' claims fail under this standard.  All of Plaintiffs' D.C. common law claims rest on

the same underlying premise:  Defendants "retained" the Indonesian military for security at the

Arun gas field and knew or should have known that atrocities would be committed, (1) because

members of the Indonesian military "had in the past engaged in abuses of Indonesian citizens, and

(2) because "[c]ontinuously during the time that [Defendants] retained members of the Indonesian

military as security personnel, ExxonMobil knew or should have known that members of the

military continued to commit gross abuses, because the publication and condemnation of

unpunished abuses by members of the military continued at all times that ExxonMobil retained

military members as security personnel." (Compl. ¶¶ 51-52.)  For all the reasons set forth below,

Plaintiffs' claims that Defendants are responsible for the alleged conduct of the Indonesian military are not "plausible," *Bell Atl. Corp.*, 127 S. Ct. at 1965, and therefore fail to state a claim.

### A.     The PSC Demonstrates That There Was No Legal Relationship Between Defendants and the Indonesian Military.

The sole basis in the Complaint for the purported liability of the corporate Defendants for the tortious acts of the Indonesian soldiers lies in Plaintiffs' allegations that Defendants "employed or otherwise retained" members of the Indonesian military to provide security through an arrangement with the Indonesian government under which Defendants "paid . . . the Indonesian military . . . for security services." (Compl. ¶¶ 39, 40, 44-45 & n.18.)  Plaintiffs claim that "ExxonMobil paid and continues to pay the Indonesian military" a regular monthly or annual fee. (*Id.* ¶¶ 24, 44 (alleging payments "to the Indonesian government and military"); ¶ 45 (alleging that ExxonMobil paid the Indonesian government three million rupiah ($294) per soldier per month); ¶ 46 (alleging that ExxonMobil paid the Indonesian government more than $500,000 per month).) Plaintiffs also assert that Defendants had "the ability to supervise, control and direct, and ha[ve] supervised, controlled and directed the actions and activities of its security personnel." (*Id.* ¶ 47.)

Critically, nowhere do Plaintiffs allege that Defendants hired any individual soldiers or paid any individual soldiers directly, much less that Defendants hired and paid the individual soldiers that allegedly harmed Plaintiffs.  Moreover, Plaintiffs also do not claim that Defendants directed the commission of the alleged torts at issue; instead, Plaintiffs allege broadly that "ExxonMobil" generally paid money *to the government and military* and helped decide where to deploy the troops to guard the oil field from rebels and protect workers. (*See id.* ¶¶ 44-47.)

Ordinarily, a court deciding a motion to dismiss might assume that Plaintiffs' fanciful allegations that Defendants "hired or retained" and "controlled" members of the Indonesian military were true.  But it is well-established that a court on a motion to dismiss may consider a document

referenced in the complaint, *Osseiran v. Int'l Fin. Corp.*, No. 06-336 (RWR), 2007 WL 2153272, at

*5 (D.D.C. July 27, 2007), and here the PSC demonstrably contradicts Plaintiffs' allegations.

According to the Complaint, the relationship between the Defendants and the Indonesian

military rests on the PSC between EMOI and BPMIGAS, the Indonesian state-owned agency

charged with administering the country's oil and gas reserves.  (Compl. ¶ 64.)  Examination of the

PSC itself, however, reveals Plaintiffs' allegations to be demonstrably untrue.  First, the PSC

reveals that *EMOI is a contractor* serving BPMIGAS in Aceh.  (Coleman Decl. Ex. 1.)  Thus, the

Arun gas field was not, as Plaintiffs allege, "owned and/or leased and/or controlled" by EMOI or

any of the Defendants.  (Compl. ¶ 34.)  Nor did EMOI own any facilities, equipment, or the natural

gas itself.  (Coleman Decl. Ex. 1.)  And with respect to security, the PSC provides that

> Pertamina shall . . . otherwise assist and expedite CONTRACTOR'S
> [EMOI's] execution of the Work Program by providing facilities,
> supplies and personnel including, but not limited to, supplying or
> otherwise making available all necessary visas, work permits,
> transportation, *security protection* and rights of way and easements as
> may be requested by CONTRACTOR and made available from the
> resources under PERTAMINA's control.  In the event such facilities,
> supplies or personnel are not readily available, then PERTAMINA
> shall promptly secure the use of such facilities, supplies and personnel
> from alternative sources.  *Expenses thus incurred by PERTAMINA at
> CONTRACTOR's request shall be reimbursed to PERTAMINA and
> included in the Operating Costs.*

(Coleman Decl. Ex. 1 at ¶ 5.3(c) (emphasis added).)

As the PSC makes clear, BPMIGAS – the successor to Pertamina – is responsible for

security at the Arun gas field.  EMOI is simply a contractor to BPMIGAS.  Moreover, Indonesian

law required BPMIGAS to use the Indonesian military for security of the Arun gas field, a "vital

national object."  (*See* 2/3/06 Declaration of Robert N. Hornick ("Hornick Decl.") ¶ 35 & Ex. C

thereto; Presidential Decree 63/2004 (Coleman Decl. Ex. 2); Shawn Donnan, *Indonesia plans to

revise security pay guidelines*, Fin. Times, Feb. 7, 2006 ("Indonesian law *requires* resource projects

deemed to be of national importance, such as Freeport's Grasberg mine *and ExxonMobil's Arun gas*

*field in Aceh,* to be guarded by security forces.") (Ex. P) (emphasis added).)  EMOI thus served

BPMIGAS as a contractor while the Indonesian military guarded the vital state-owned facility in

accordance with Indonesian law.  No contractual relationship existed between Defendants and the

Indonesian military.  Because the provision of security was solely BPMIGAS' obligation,

Defendants plainly did not have any command and control authority over Indonesian soldiers.  Nor

did Defendants have any choice in selecting the Indonesian military in general or individual soldiers

in particular to provide security for its personnel and operations.

        Although Plaintiffs rely heavily on alleged payments by EMOI for security services, the

PSC demonstrates that EMOI was required to reimburse BPMIGAS for such items as part of the

overall operating costs for the project.  (Coleman Decl. Ex. 1 at ¶ 5.3(c).)  This accounting

arrangement between EMOI and BPMIGAS did not detract from BPMIGAS' sole responsibility for

the provision of security at the Arun gas field, nor did it create any relationship between the

Indonesian military and EMOI (or the other Defendants).

        As demonstrated above, the PSC squarely disproves Plaintiffs' claim that Defendants

retained or employed the Indonesian military generally or any particular individual Indonesian

soldiers in Aceh.  Under these circumstances, Plaintiffs have failed to state a claim for relief

because the very contract they rely on in their Complaint contradicts their factual allegations and

renders them implausible.  The common law claims (Causes I-VII) must accordingly be dismissed.

**B.      Defendants Cannot Be Legally Responsible for the Acts of the Employees of
         Another Entity.**

        Plaintiffs also fail to allege facts sufficient to give rise to an inference of a master-servant

relationship between Defendants and the alleged tortfeasing soldiers.  In *Charles v. Barrett*, 233

N.Y. 127 (1922), Justice Cardozo addressed the liability of a company for the alleged torts of the

employees of another entity.  In *Charles*, the Adams Express Company hired Steinhauser, a general

employer, to supply a van and chauffeur.  The chauffer struck and killed the plaintiff's son.  The

40

plaintiff filed suit against the Adams Express Company, arguing that Adams Express Company

should be liable for the acts of Steinhauser's chauffeur.  Justice Cardozo disagreed:

> We think that truck and driver were in the service of the *general employer*
> [and not the defendant].  There was *no such change of masters* as would
> relieve Steinhauser of liability if the driver of the van had broken the seals,
> and stolen the contents.  By the same token, there was no such change as to
> relieve of liability for other torts committed in the conduct of the enterprise.
> Where to go and when might be determined for the driver by the commands
> of the defendant.  The duty of going carefully, for the safety of the van as
> well as for that of wayfarers, remained a duty of the master at whose hands
> he had received possession.  Neither the contract nor its performance shows
> a change in control so radical as to disturb that duty or its incidence.

*Id.* at 129 (emphasis added).  The court then stated the rule for when an employee of a general

employer enters into a relationship with another entity:

> The rule now is that as long as the employee is furthering the business of
> his general employer by the service rendered to another, *there will be no
> inference of a new relation* unless command has been surrendered, and no
> inference of its surrender from the mere fact of its division.

*Id.* (emphasis added).  The rule is now followed in this Court.  *See Estate of Carter v. Dist. of

Columbia*, 903 F. Supp. 165, 167-68 (D.D.C. 1995) (refusing to hold the District of Columbia liable

for the actions of U.S. Park Police officers while patrolling D.C. streets); *Saffron v. Wilson*, 481 F.

Supp. 228, 245-46 (D.D.C. 1979) (Oberdorfer, J.) (same).

    As in *Charles* and the cited cases from this jurisdiction, the primary alleged tortfeasors here

were not employees of Defendants.  Rather, they were employees of the Indonesian military.

Plaintiffs' allegations make clear that the soldiers were furthering the "business" (security) of their

general employer (the Indonesian military). (*See, e.g.,* Compl. ¶ 44 (alleging that Defendants paid

the Indonesian military, not the individual soldiers).)  Plaintiffs' allegations also make clear that the

Indonesian military did not surrender command of its military forces in conducting military raids

and operating military security checkpoints. (*See, e.g., id.* ¶ 54 (alleging that the military remained

under military – not civilian – control).)  As Justice Cardozo explained, a court cannot infer

surrender of command by "the mere fact of its division." *Charles*, 233 N.Y. at 129.  Accordingly,

as a matter of law, the soldiers did not change "masters" and "there will be no inference of a new

relation" between the soldiers and EMOI (or any of the other Defendants).

### C.        Plaintiffs Fail To State a Claim for Negligent Hiring.

Plaintiffs' negligent hiring claim (Cause II) fails for three additional reasons.  To state a

claim for negligent hiring, "it is necessary to show both that the contractor was incompetent or

unskilled to perform the job for which he or she was hired, and that the employer knew or had

reason to know of the contractor's incompetence." 41 Am. Jur. 2d, *Independent Contractors* § 36

(2005).  To impose liability, "negligence in hiring [the] employee or independent contractor must be

[the] proximate cause of injuries to plaintiff, that is, there must be evidence that plaintiff's injuries

were brought about by reason of employment of the incompetent servant or independent contractor

and were, in some manner, job-related." *Id.*

First, Plaintiffs do not, and cannot, allege that Defendants "hired" the Indonesian military as

its "contractor."  Plaintiffs claim that, "[p]ursuant to the contract granting these exploration and

production rights and in exchange for ExxonMobil's regularly scheduled payment of fees,

ExxonMobil retains personnel for purposes of securing its interests at the Arun Project." (Compl. ¶

64.)  But, as shown above, the PSC specifies that *BPMIGAS*, an agency of the Indonesian

government, was responsible for providing security at the site.  (Coleman Decl. Ex. 1 at ¶ 5.3(c).)

The alleged payments by EMOI to the military were made for cost-sharing purposes as between

EMOI and BPMIGAS, per the PSC.  (*Id.*)

More critically, even accepting the notion that Defendants "hired" the military by paying

money to the government, Plaintiffs fail to allege any plausible inference that such "hiring"

proximately caused their injuries.  Indeed, no causation could be established because, as noted in

Part VIII.A, *supra*, Indonesian law required Indonesian soldiers to provide security for the Arun gas field.

Lastly, Plaintiffs' allegations that "it was widely known that members of the Indonesian military were not firmly under civilian control and had committed murder, torture, illegal detention and new abuses against Indonesian civilians" (Compl. ¶ 54) do not demonstrate that the individual (unnamed) soldiers alleged to have injured Plaintiffs (*id.* ¶¶ 60-63) were negligently hired.  Even if Plaintiffs were to allege that Defendants hand-picked and hired members of the Indonesian military individually – there is no such allegation in the Complaint – Plaintiffs' negligent hiring claim would still fail because to state such a claim, Plaintiffs must identify the "individuals who were negligently hired" and what it was in their individual backgrounds that supposedly made it negligent to "hire" them.  *See, e.g., Alexander v. Wash. Gas Light Co.*, 481 F. Supp. 2d 16, 42 (D.D.C. 2006) (applying Maryland law).  Plaintiffs make no such allegations.

### D.        Plaintiffs Fail To State a Claim for Negligent Supervision.

The negligent supervision claim (Cause III) suffers additional defects.  To establish such a claim, "an employer of an independent contractor must have supervised the work that caused [the] injury, had actual or constructive knowledge of the danger which caused the injury, *and* had the opportunity to prevent the injury, but negligently failed to do so."  41 Am. Jur. 2d, *Independent Contractors* § 35 (emphasis added) (*citing Jordan v. NUCOR Corp.*, 295 F.3d 828 (8th Cir. 2002)); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001) (rejecting negligent supervision claim where the plaintiff failed to establish "that a person with supervisory authority over [the security guard] saw what occurred or [had] an opportunity to stop it").

Here, Plaintiffs do not allege that any Defendants "supervised" the alleged shooting of John Doe VIII, the alleged attack on John Doe IX, the alleged detention or attack on John Doe X, or the alleged attack on John Doe XI.  (*See* Compl. ¶¶ 60-63.)  Plaintiffs similarly fail to allege that

Defendants had the opportunity to prevent the alleged injuries in question (they clearly could not) or that they "negligently failed to do so." 41 Am. Jur. 2d, *Independent Contractors* § 35. In the absence of such allegations, Plaintiffs cannot establish the required elements of a negligent supervision claim. *Accord Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985) (dismissing negligent hiring and supervision claims where no master-servant relationship existed). The claim should therefore be dismissed.

### E.        There Is No Discernible Negligence Standard for Military Oversight.

Finally, even if a legally sufficient relationship between Defendants and the allegedly tortfeasing soldiers were somehow identified, the Court would still have to dismiss Plaintiffs' negligence claims (Counts I-III) because the Court could not properly define a standard of care for such claims. Indeed, courts have routinely refused to entertain negligence claims relating to the oversight of military activities, which is the crux of Plaintiffs' Complaint here. *See, e.g., United States v. Shearer*, 473 U.S. 52, 58-59 (1985) (rejecting judicial attempts to adjudicate claims relating to military supervision and discipline); *Gilligan v. Morgan*, 413 U.S. 1, 4 (1973) (rejecting judicial attempts to adjudicate claims relating to military composition, training, equipping, and control); *Chappell v. Wallace*, 462 U.S. 296, 302 (1983) ("[I]t is difficult to conceive of an area of government activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments . . . ."); *Satterfield v. United States*, 788 F.2d 395, 398-99 & n.4 (6th Cir. 1986) ("[T]he Supreme Court has consistently observed that the selection of personnel for the military is indeed a military decision not subject to judicial scrutiny.") ("Inasmuch as civilian courts are counseled not to 'question basic choices about discipline, supervision, and

44

control of a serviceman,' plaintiff's claim of negligent supervision and control was properly dismissed."); *Smith v. Halliburton Co*, No. 06-0462, 2006 U.S. Dist. LEXIS 61980, at *23-*26 (S.D. Tex. Aug. 30, 2006) (rejecting tort and negligent supervision claims against corporation when premised on decisions relating to military composition, supervision, control, etc.) ("Policy determinations involving force protection measures in a hostile area of Iraq are clearly not appropriate for judicial determination."); *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. 2006) (rejecting tort claims against contractor based on strategic and tactical military decisions made in a combat zone).

Because courts lack the ability to determine the appropriate standard for selecting and supervising military personnel, particularly for combat operations in a war zone, Plaintiffs' negligence-based claims – all of which challenge Defendants' supposed retention of Indonesian soldiers to guard Indonesian-owned facilities – cannot be adjudicated and must be dismissed.

## CONCLUSION

For all of these reasons, the Court should dismiss Plaintiffs' claims.

Washington, DC
September 17, 2007

Respectfully submitted,

_Alex Young K. Oh /ns_
_____
Theodore V. Wells, Jr. (Bar No. 468934)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Alex Young K. Oh (Bar No. 499955)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1615 L Street, NW, Suite 1300
Washington, DC 20036

_Robert J. Meyer_
_____
Martin J. Weinstein (Bar No. 37792)
Robert J. Meyer (Bar No. 41620)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
Telephone: (202) 303-1000
Facsimile: (202) 303-2000

Paul W. Wright (Bar No. 20747)
Patrick J. Conlon (Bar No. 414621)
Exxon Mobil Corporation
800 Bell Street
Houston, TX 77002

Attorneys for Defendants Exxon Mobil Corporation, Mobil Corporation,
ExxonMobil Oil Corporation, and ExxonMobil Oil Indonesia Inc.

45