# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN DOE VIII, et al., | ) |
|     Plaintiffs, | ) |
|     v. | )    Case: 1:07-cv-01022 (LFO) |
| EXXON MOBIL CORPORATION, et al., | ) |
|     Defendants. | ) |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Michael D. Hausfeld (D.C. Bar #153742)
Agnieszka M. Fryszman (D.C. Bar #459208)
Brent W. Landau (D.C. Bar #479251)
**Cohen, Milstein, Hausfeld & Toll P.L.L.C.**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone:     (202) 408-4600
Facsimile:     (202) 408-4699

Terrence P. Collingsworth
(D.C. Bar #471830)
**International Rights Advocates**
218 D Street, S.E., 3rd Floor
Washington, D.C.  20003
Telephone:     (202) 470-2515

**Counsel for Plaintiffs**

November 2, 2007

# TABLE OF CONTENTS

**Page**

ARGUMENT ............................................................................................................ 2

A.   Standard Of Review .................................................................................. 2

B.   Statement Of The Case ............................................................................. 3

C.   Plaintiffs' Claims Are Justiciable ............................................................ 4

    1.   The Doctrine Of Comity Does Not Apply ..................................... 8

    2.   There Is No Act Of State In This Case ......................................... 10

    3.   Plaintiffs' Claims Do Not Implicate The Political Question
       Doctrine ....................................................................................... 12

    4.   Foreign Policy Preemption Is Not Applicable ............................. 16

D.   District Of Columbia Law Governs Plaintiffs' Tort Claims .................. 17

    1.   Indonesian Law Does Not Apply To Plaintiffs' Claims ............... 17

    2.   D.C. Law Applies To All Claims .................................................. 21

    3.   Application Of D.C. Law Does Not Violate Due Process Or
       Defendants' Right To Fair Notice ................................................ 22

E.   The Complaint Is Sufficient To Sustain Plaintiffs' Claim That
    ExxonMobil Is Liable For The Tortious Conduct Of Its Security Personnel ...... 24

    1.   There Is A Clearly Established Standard Of Care For Security
       Personnel ...................................................................................... 26

    2.   ExxonMobil Is Directly Liable For Negligent Hiring And
       Supervision .................................................................................. 28

    3.   ExxonMobil Is Vicariously Liable For The Actions Of Its Security
       Personnel ...................................................................................... 30

    4.   The PSC ........................................................................................ 32

F.   Plaintiffs Have Standing ......................................................................... 33

G.   This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims .... 35

    1.   An Alien Corporation Is Deemed A Citizen Of The State In Which
       It Has Its Principal Place Of Business .......................................... 36

    2.   Because EMOI Is An Alter Ego Of EMC, EMOI's Principal Place
       Of Business Is In Texas ................................................................ 37

    3.   EMOI Should Be Deemed To Be A Citizen Only Of Texas ......... 39

H.   This Court Has Personal Jurisdiction Over EMOI ................................. 43

I.   Plaintiffs' Claims Are Not Barred By The Statute Of Limitations ......... 44

# TABLE OF CONTENTS
(continued)

**Page**

1.    Plaintiffs' Claims For Negligence, Negligent Hiring And Negligent Supervision Are Not Time-Barred........................................................... 44

2.    Plaintiffs' Claims For Assault, Battery, False Imprisonment And False Arrest Are Subject To Equitable Tolling........................................ 45

3.    Plaintiffs' Claims For Intentional Infliction Of Emotional Distress Are Subject To The Three-Year Residual Statute Of Limitations........... 49

J.    BPMIGAS Is Neither A Necessary Nor Indispensable Party, Rendering Irrelevant BPMIGAS's Absence From This Suit ................................................. 49

1.    BPMIGAS Is Not A Necessary Party ..................................................... 50

2.    BPMIGAS Is Not An Indispensable Party Even If The Court Determines That It Is A Necessary Party................................................. 53

CONCLUSION.............................................................................................................. 56

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abebe-Jira v. Negewo,*
   72 F.3d 844 (11th Cir. 1996) ...................................................................15

*\*Alfred Dunhill v. Republic of Cuba,*
   425 U.S. 682 (1976)...................................................................12

*Am. Ins. Ass'n v. Garamendi,*
   539 U.S. 396 (2003)...................................................................16, 17

*Arias v. Dyncorp,*
   No. 01-1908, 2007 WL 1521044 (D.D.C. May 21, 2007).......................................35

*\*Baker v. Carr,*
   369 U.S. 186 (1962)...................................................................12, 13

*Baldwin County Welcome Center v. Brown,*
   466 U.S. 147 (1984)...................................................................48

*Banco Nacional de Cuba v. Sabbatino,*
   376 U.S. 398 (2d Cir. 1964)...................................................................12

*\*Beaty v. Rep. of Iraq,*
   480 F. Supp. 2d 60 (D.D.C. 2007) ...................................................................17

*Bell Atlantic Corp. v. Twombly,*
   127 S. Ct. 1955 (2007)...................................................................3, 24, 25, 26

*Bodner v. Banque Paribas,*
   114 F. Supp. 2d 117 (E.D.N.Y. 2000) ...................................................................46

*Bonar, Inc. v. Schottland,*
   631 F. Supp. 990 (E.D. Pa. 1986) ...................................................................39

*\*Bowoto v. Chevron Corp.,*
   No. 99-02506, 2007 WL 2349345 (N.D. Cal. Aug. 14, 2007) ...........................................12, 35

*Brown v. Argenbright Sec., Inc.,*
   782 A.2d 752 (D.C. 2001) ...................................................................30

\* - Authorities upon which we chiefly rely are marked with asterisks.

*Burnett v. N.Y. Cent. Railroad Co.,*
  380 U.S. 424 (1965)..................................................................................45

*Cardenas v. Smith,*
  733 F.2d 909 (D.C. Cir. 1984) .................................................................33

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,*
  148 F.3d 1080 (D.C. Cir. 1998)...............................................................43

*Cherokee Nation of Oklahoma v. Babbitt,*
  117 F.3d 1489 (D.C. Cir. 1997)...............................................................49

*Chung v. U.S. Dep't of Justice,*
  333 F.3d 273 (D.C. Cir. 2003) .................................................................45

*Constructores Civiles de Centroamerica, S.A. v. Hannah,*
  459 F.2d 1183 (D.C. Cir. 1972)...............................................................34

*Dames & Moore v. Regan,*
  453 U.S. 654 (1981)..................................................................................14

*Delgado v. Plaza Las Ams., Inc.,*
  139 F.3d 1 (1st Cir. 1998).........................................................................53

*Disconto Gesellschaft v. Umbreit,*
  28 U.S. 570 (1908)....................................................................................34

*District of Columbia v. Chinn,*
  839 A.2d 701 (D.C. Cir. 2003) .................................................................45

*District of Columbia v. Davis,*
  386 A.2d 1195 (D.C. 1978) ......................................................................30

*Doe I v. Exxon Mobil Corp.,*
  2006 WL 1193855 (D.D.C. May 3, 2006)................................................18

*\*Doe I v. Exxon Mobil Corp.,*
  393 F. Supp. 2d 20 (D.D.C. 2005) .....................................................*passim*

*\*Doe I v. Exxon Mobil Corp.,*
  473 F.3d 345 (D.C. Cir. 2007)..................................................................13

*\*Doe I v. Exxon Mobil Corp.,*
  No. 01-1357 (D.D.C. filed June 19, 2001) ("*Doe I*") .........................*passim*

*\*Doe I v. Exxon Mobil Corp.,*
  No. 01-1357, 2006 WL 516744, at *3 (D.D.C. Mar. 2, 2006) .............*passim*

*Doe v. Islamic Salvation Front,*
  993 F. Supp. 3 (D.D.C. 1998) ...................................................................................15

*Doe v. Rafael Saravia,*
  348 F. Supp. 2d 1112 (E.D. Cal. 2004) .....................................................................46

*Doe v. Unocal Corp.,*
  963 F. Supp. 880 (C.D. Cal. 1997) ............................................................................47

*El-Fadl v. Cent. Bank of Jordan,*
  75 F.3d 668 (D.C. Cir. 1996) .....................................................................................44

*Eldredge v. Carpenters 46 N. California Counties Joint.,*
  662 F.2d 534 (9th Cir. 1981) .....................................................................................51

*Erickson v. Pardus,*
  127 S. Ct. 2197 (2007) ........................................................................................ *passim*

*Estate of Carter v. District of Columbia,*
  903 F. Supp. 165 (D.D.C. 1995) ................................................................................31

*\*Estate of Ferdinand Marcos Human Rights Litigation,*
  25 F.3d 1467 (9th Cir. 1994) ...............................................................................11, 15

*Estrada v. Ahrens,*
  296 F.2d 690 (5th Cir. 1961) .....................................................................................34

*Filartiga v. Pena-Irala,*
  630 F.2d 876 (2d Cir. 1980) ......................................................................................15

*Flatow v. Islamic Republic of Iran,*
  999 F. Supp. 1 (D.D.C. 1998) ....................................................................................12

*Friends for All Children v. Lockheed Aircraft Corp.,*
  587 F. Supp. 180 (D.D.C. 1984) ...........................................................................1, 20

*Galu v. Swiss Air Transp. Co.,*
  873 F.2d 650 (2d Cir. 1989) ......................................................................................11

*Gilligan v. Morgan,*
  413 U.S. 1 (1973) ......................................................................................................27

*Gordon and Breach Sci. Publishers S.A. v. Am. Inst. of Physics,*
  905 F. Supp. 169 (S.D.N.Y. 1995) ..............................................................................8

*\*Grimandi v. Beech Aircraft Corp.,*
  512 F. Supp. 764 (D. Kan. 1981) .............................................................37, 38, 39, 40

*GTE New Media Servs., Inc. v. BellSouth Corp.,*
  199 F.3d 1343 (D.C. Cir. 2000) ..................................................43

*\*Hartford Fire Ins. Co. v. California,*
  509 U.S. 764 (1993) ...............................................................8, 9

*Hilao v. Estate of Marcos,*
  103 F.3d 767 (9th Cir. 1996) ......................................................46

*Hilton v. Guyot,*
  159 U.S. 113 (1895) ...............................................................8, 9

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
  333 F.3d 156 (D.C. Cir. 2003) ......................................................2

*Hulburt Oil & Grease Co. v. Hulburt Oil & Grease Co.,*
  371 F.2d 251 (7th Cir. 1966) ......................................................51

*Ibrahim v. Titan Corp.,*
  391 F. Supp. 2d 10 (D.D.C. 2005) .............................................34, 35

*In re "Agent Orange" Prod. Liab. Litig.,*
  373 F. Supp. 2d 7 (E.D.N.Y. 2005) ................................................17

*In Re Aircrash in Bali, Indonesia,*
  684 F.2d 1301 (9th Cir. 1982) ....................................................20

*In re Burlington Coat Factory Sec. Litig.,*
  114 F.3d 1410 (3rd Cir. 1997) ....................................................33

*Ingersoll Mill. Mach. Co. v. Granger,*
  833 F.2d 680 (7th Cir.1987) ......................................................10

*\*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
  478 U.S. 221 (1986) ............................................................13, 14

*Jean v. Dorelien,*
  431 F.3d 776 (D.C. Cir. 2005) ....................................................46

*\*Jerguson v. Blue Dot Investment, Inc.,*
  659 F.2d 31 (5th Cir. 1981) ....................................................36, 43

*Jones v. Hartford Life and Acc. Ins. Co.,*
  443 F. Supp. 2d 3 (D.D.C. 2006) .................................................22

*Jones v. Wittenberg University,*
  534 F.2d 1203 (6th Cir. 1976) ....................................................27

*Jota v. Texaco,*
   157 F.3d 153 (2d Cir. 1998)................................................................9

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.,*
   536 U.S. 88 (2002).....................................................................36

*Kadic v. Karadzic,*
   70 F.3d 232 (2d Cir. 1995).............................................................11

*\*Kirkpatrick & Co. v. Environmental Tectonics Corp.,*
   493 U.S. 400 (1990)................................................................11, 12

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
   313 U.S. 487 (1941)...................................................................21

*Klinghoffer v. S.N.C. Achille Lauro,*
   937 F.2d 44 (2d Cir. 1991)............................................................13

*Koohi v. United States,*
   976 F.2d 1328 (9th Cir. 1992) .......................................................14

*Krieger v. Fadely,*
   211 F.3d 134 (D.C. Cir. 2000).........................................................2

*Krieger v. Trane Co.,*
   765 F. Supp. 756 (D.D.C. 1991).......................................................54

*Laker Airways, Ltd. v. Sabena, Belgian World Airlines,*
   731 F.2d 909 (D.C. Cir. 1984)........................................................10

*Levy v. Currier,*
   587 A.2d 205 (D.C. 1991)............................................................29

*Lexington Ins. Co. v. Forrest,*
   263 F. Supp. 2d 986 (E.D. Pa. 2003) .................................................10

*\*Linder v. Portocarrero,*
   963 F.2d 332 (11th Cir. 1992) ...................................................11, 14

*McCluney v. Joseph Schlitz Brewing Co.,*
   649 F.2d 578 (8th Cir. 1981) ........................................................23

*Mujica v. Occidental Petroleum Corp.,*
   381 F. Supp. 2d 1164 (C.D. Cal. 2005) ...............................................16

*Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.,*
   176 F.R.D. 329 (C.D. Cal. 1997)..............................................35, 51, 54

*Nat'l S.S. Co. v. Tugman,*
  106 U.S. 118 (1882) ..................................................................................42

*Nelligan v. Cmty. Gen. Hosp. of Sullivan County,*
  240 F.R.D. 123 (S.D.N.Y. 2007) ..............................................................53

*Newcombe v. Adolf Coors Co.,*
  157 F.3d 686 (9th Cir. 1998) ....................................................................51

*Order of R.R. Telegraphers v. Ry. Express Agency, Inc.,*
  321 U.S. 342 (1944) ..................................................................................48

*Osseiran v. International Finance Corp.,*
  498 F. Supp. 2d 139 (D.D.C. 2007) ..........................................................33

*People of Saipan v. United States Dep't of Interior,*
  356 F. Supp. 645 (D. Haw. 1973) .............................................................34

*\*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797 (1985) .............................................................................22, 23

*Phillips v. Heine,*
  984 F.2d 489 (D.C. Cir. 1993) ..................................................................46

*Powell v. McCormack,*
  395 U.S. 486 (1969) .............................................................................12, 13

*Price v. International Telephone and Telegraph Corp.,*
  651 F. Supp. 706 (S.D. Miss. 1986) .........................................................23

*Pyramid Securities Ltd. v. IB Resolution, Inc.,*
  924 F.2d 1114 (D.C. Cir. 1991) ................................................................38

*Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.,*
  461 F.2d 1140 (3d Cir. 1972) ....................................................................38

*Rasul v. Bush,*
  542 U.S. 466 (2004) .............................................................................15, 33

*Reaves-Bey v. Karr,*
  840 A.2d 701 (D.C. Cir. 2004) ..................................................................44

*Remington Rand Corp. v. Delaware v. Bus. Sys. Inc.,*
  830 F.2d 1260 (1987) ..................................................................................9

*Republic of the Philippines v. Marcos,*
  862 F.2d 1355 (9th Cir. 1988) ..................................................................13

*Rosner v. United States*,
  231 F. Supp. 2d 1202 (S.D. Fla. 2002) ..................................................46

*S.E.C. v. Banner Fund Int'l*,
  211 F.3d 602 (D.C. Cir. 2000) ...................................................8, 10

*Saadeh v. Farouki*,
  107 F.3d 52 (D.C. Cir. 1997) ...................................................36, 42

*Safeway Stores, Inc. v. Kelly*,
  448 A.2d 856 (D.C. 1982) ..................................................27

*Saffron v. Wilson*,
  481 F. Supp. 228 (D.D.C. 1979) ..................................................31

*Sale v. Haitian Centers Council*,
  509 U.S. 155 (1993) ..................................................34

*Samra v. Shaheen Bus. & Inv. Group, Inc.*,
  355 F. Supp. 2d 483 (D.D.C. 2005) ..................................................21

*Saunders v. Nemati*,
  580 A.2d 660 (D.C.1990) ..................................................49

*Scheuer v. Rhodes*,
  416 U.S. 232 (1974) ..................................................28

*Smith v. Halliburton Co.*,
  No. 06-0462, 2006 WL 2521326 (S.D. Tex. Aug. 30, 2006) ..................................................28

*Somportex v. Philadelphia Chewing Gum Corp.*,
  453 F.2d 435 (3d Cir. 1971) ..................................................9

*Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distrib. Pty. Ltd.*,
  647 F.2d 200 (D.C.Cir.1981) ..................................................54

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506 (2002) ..................................................2

*Toms v. Country Quality Meats, Inc.*,
  610 F.2d 313 (5th Cir. 1980) ..................................................37

*Trans World Hospital Supplies Ltd. v. Hospital Corp. of America*,
  542 F. Supp. 869 (M.D. Tenn. 1982) ..................................................40, 41

*U.S.I. Properties Corp. v. M.D. Construction Co.*,
  860 F.2d 1 (1st Cir. 1988) ..................................................38

*Ulliman Schutte Const., Inc. v. Emerson Process Management Power & Water Solutions,*
    No. 02-1987, slip op. (D.D.C. June 19, 2007) ................................................................22

*United States v. BCCI Holdings (Lux.), S.A.,*
    916 F. Supp. 1276 (D.D.C. 1996) ................................................................48

*United States v. Labs of Va.,*
    272 F. Supp. 2d 764 (N.D. Ill. 2003) ................................................................12

*Vareka Investment, N. V. v. American Investment Properties, Inc.,*
    724 F.2d 907 (11th Cir. 1984) ................................................................36

*Warren v. Dist. of Columbia,*
    353 F.3d 36 (D.C. Cir. 2004) ................................................................2

*Western Maryland Ry. Co. v. Harbor Ins. Co.,*
    910 F. 2d 960 (D.C. Cir. 1990) ................................................................50

*Whitaker v. Kellogg Brown & Root, Inc.,*
    444 F. Supp. 2d 1277 (M.D. Ga. 2006) ................................................................28

*Wilderness Soc'y v. Morton,*
    463 F.2d 1261 (D.C. Cir. 1972) ................................................................34

*Wilson v. Good Humor Corp.,*
    757 F.2d 1293 (D.C. Cir. 1985) ................................................................27, 29, 32

*Windward Shipping (London) Ltd. v. American Radio Ass'n, AFL-CIO,*
    415 U.S. 104 (1974) ................................................................34

*Wright v. Sony Pictures Entm't, Inc.,*
    394 F. Supp. 2d 27 (D.D.C. 2005) ................................................................22

*Wyatt v. Syrian Arab Republic,*
    398 F. Supp. 2d 131 (D.D.C. 2005) ................................................................19

*Y.W.C.A. v. Allstate Insurance Co.,*
    275 F.3d 1145 (D.C. Cir. 2002) ................................................................21

*Young v. U.S.,*
    535 U.S. 43 (2002) ................................................................45

*Zipes v. TWA, Inc.,*
    455 U.S. 385 (1982) ................................................................45

**STATE CASES**

*Dillard Dep't Store v. Silva*,
    148 S.W.3d 370 (Tex. 2004)....................................................................................27

*\*Oparaugo v. Watts*,
    884 A.2d 63 (D.C. 2005) ........................................................................................19

*Pusey v. Bator*,
    762 N.E.2d 968 (Ohio 2002)..................................................................................27

*Rymer v. Pool*,
    574 A.2d 283 (D.C. 1990) ..............................................................................18, 19


**STATUTES**

28 U.S.C. § 1332(a)(2)....................................................................................................35

28 U.S.C. § 1332(c) ................................................................................................. *passim*

D.C. Code § 12-301(4).....................................................................................................49

D.C. Code § 12-301(8).................................................................................................44, 49

No. 112006 Cal. Ins. Code § 13800 (West 2005) .......................................................5, 16


**FEDERAL RULES**

Fed. R. of Civ. P. 8(a)(2) ...................................................................................................2

Fed. R. Civ. P. 12(b)(6)...............................................................................................2, 3

Fed. R. Civ. P. Rule 19 ....................................................................................................49


**TREATISES**

Charles Alan Wright et al., *Federal Practice and Procedure*, (3d ed. 2004)........................ *passim*

Prosser & Keeton, *Torts* (5th ed. 1984) ...........................................................................32

Restatement (Second) of Conflict of Laws (1971) ....................................................18, 20

Restatement (Second) of Torts (1965).............................................................................29

OTHER AUTHORITIES

16 Brook. J. Int'l L. 675 (1990) ............................................................................40

H. Geoffrey Moulton, Jr., *Alien Corporations and Federal Diversity Jurisdiction,*
    84 Colum. L. Rev. 177 (1984) ...........................................................................41

Ary Hermawan, *Court Throws Out 'Illogical Law' on Rights Tribunal,* Jakarta Post, Dec.
    8, 2006 (attached hereto as Ex. H) ......................................................................5

*Case Concerning the Commission for Truth and Reconciliation* (attached hereto as Ex. F) ..........5

Celeste Pozo, *Foreign Affairs Doctrine Wanted Dead or Alive: Reconciling One Hundred
    Years of Preemption Cases,* 41 Val. U. L. Rev. 591 (2006) .....................................16

Chad Bouchard, *Indonesian Court Voids Key Human Rights Law,*
    VoiceofAmerica.com, Dec. 8, 2006 (attached hereto as Ex. I) ................................5

*Indonesian Court Rules Truth Commission Illegal, Casts Doubt On Justice For Suharto
    Abuses,* International Herald Tribune, Dec. 7, 2006 (attached hereto as Ex. G) .......................5

Maslan Rizal, *Rights Activists in Aceh Charged Under Public Incitement Articles,*
    Detik.com, aug. 10, 2007 ....................................................................................7

Nermeen Shaikh, *Interview with Irwandi Yusuf, Governor of Aceh,* AsiaSource.org (Sept.
    13, 2007) (attached hereto as Ex. J) ....................................................................6

Sinan Kalayoglu, *Correcting Mujica,* 24 Wis. Int'l L.J. 1045 (2007) ...........................................16

United Nations Development Programme, *Access to Justice in Aceh: Making the
    Transition to Sustainable Peace and Development in Aceh* (2006) .........................................5

World Bank, *Aceh Conflict Monitoring Update, 1st-31st August 2007* (2007).............................7

World Bank, *The Aceh Peace Agreement: How Far Have We Come?* (Dec. 2006) ......................6

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Abebe-Jira v. Negewo,*
   72 F.3d 844 (11th Cir. 1996) ...................................................................15

*\*Alfred Dunhill v. Republic of Cuba,*
   425 U.S. 682 (1976) ...............................................................................12

*Am. Ins. Ass'n v. Garamendi,*
   539 U.S. 396 (2003) ...........................................................................16, 17

*Arias v. Dyncorp,*
   No. 01-1908, 2007 WL 1521044 (D.D.C. May 21, 2007) .........................................35

*\*Baker v. Carr,*
   369 U.S. 186 (1962) ...........................................................................12, 13

*Baldwin County Welcome Center v. Brown,*
   466 U.S. 147 (1984) ...............................................................................48

*Banco Nacional de Cuba v. Sabbatino,*
   376 U.S. 398 (2d Cir. 1964) .....................................................................12

*\*Beaty v. Rep. of Iraq,*
   480 F. Supp. 2d 60 (D.D.C. 2007) ..............................................................17

*Bell Atlantic Corp. v. Twombly,*
   127 S. Ct. 1955 (2007) ...................................................................3, 24, 25, 26

*Bodner v. Banque Paribas,*
   114 F. Supp. 2d 117 (E.D.N.Y. 2000) ..........................................................46

*Bonar, Inc. v. Schottland,*
   631 F. Supp. 990 (E.D. Pa. 1986) ..............................................................39

*\*Bowoto v. Chevron Corp.,*
   No. 99-02506, 2007 WL 2349345 (N.D. Cal. Aug. 14, 2007) ...............................12, 35

*Brown v. Argenbright Sec., Inc.,*
   782 A.2d 752 (D.C. 2001) .......................................................................30

\* - Authorities upon which we chiefly rely are marked with asterisks.

*Burnett v. N.Y. Cent. Railroad Co.*,
  380 U.S. 424 (1965)................................................................45

*Cardenas v. Smith*,
  733 F.2d 909 (D.C. Cir. 1984)................................................33

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,
  148 F.3d 1080 (D.C. Cir. 1998)..............................................43

*Cherokee Nation of Oklahoma v. Babbitt*,
  117 F.3d 1489 (D.C. Cir. 1997)..............................................49

*Chung v. U.S. Dep't of Justice*,
  333 F.3d 273 (D.C. Cir. 2003)................................................45

*Constructores Civiles de Centroamerica, S.A. v. Hannah*,
  459 F.2d 1183 (D.C. Cir. 1972)..............................................34

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981)................................................................14

*Delgado v. Plaza Las Ams., Inc.*,
  139 F.3d 1 (1st Cir. 1998)......................................................53

*Disconto Gesellschaft v. Umbreit*,
  28 U.S. 570 (1908)................................................................34

*District of Columbia v. Chinn*,
  839 A.2d 701 (D.C. Cir. 2003) ..............................................45

*District of Columbia v. Davis*,
  386 A.2d 1195 (D.C. 1978) ....................................................30

*Doe I v. Exxon Mobil Corp.*,
  2006 WL 1193855 (D.D.C. May 3, 2006) ..............................18

*\*Doe I v. Exxon Mobil Corp.*,
  393 F. Supp. 2d 20 (D.D.C. 2005)................................... *passim*

*\*Doe I v. Exxon Mobil Corp.*,
  473 F.3d 345 (D.C. Cir. 2007)................................................13

*\*Doe I v. Exxon Mobil Corp.*,
  No. 01-1357 (D.D.C. filed June 19, 2001) ("*Doe I*") ........ *passim*

*\*Doe I v. Exxon Mobil Corp.*,
  No. 01-1357, 2006 WL 516744, at *3 (D.D.C. Mar. 2, 2006) ...... *passim*

*Doe v. Islamic Salvation Front,*
    993 F. Supp. 3 (D.D.C. 1998) .................................................................15

*Doe v. Rafael Saravia,*
    348 F. Supp. 2d 1112 (E.D. Cal. 2004).................................................46

*Doe v. Unocal Corp.,*
    963 F. Supp. 880 (C.D. Cal. 1997) .......................................................47

*El-Fadl v. Cent. Bank of Jordan,*
    75 F.3d 668 (D.C. Cir. 1996)................................................................44

*Eldredge v. Carpenters 46 N. California Counties Joint.,*
    662 F.2d 534 (9th Cir. 1981) ................................................................51

*Erickson v. Pardus,*
    127 S. Ct. 2197 (2007)................................................................. *passim*

*Estate of Carter v. District of Columbia,*
    903 F. Supp. 165 (D.D.C. 1995) ..........................................................31

*\*Estate of Ferdinand Marcos Human Rights Litigation,*
    25 F.3d 1467 (9th Cir. 1994) ........................................................11, 15

*Estrada v. Ahrens,*
    296 F.2d 690 (5th Cir. 1961) ...............................................................34

*Filartiga v. Pena-Irala,*
    630 F.2d 876 (2d Cir. 1980)..................................................................15

*Flatow v. Islamic Republic of Iran,*
    999 F. Supp. 1 (D.D.C. 1998) ..............................................................12

*Friends for All Children v. Lockheed Aircraft Corp.,*
    587 F. Supp. 180 (D.D.C. 1984) ......................................................1, 20

*Galu v. Swiss Air Transp. Co.,*
    873 F.2d 650 (2d Cir. 1989)..................................................................11

*Gilligan v. Morgan,*
    413 U.S. 1 (1973)..................................................................................27

*Gordon and Breach Sci. Publishers S.A. v. Am. Inst. of Physics,*
    905 F. Supp. 169 (S.D.N.Y. 1995) .........................................................8

*\*Grimandi v. Beech Aircraft Corp.,*
    512 F. Supp. 764 (D. Kan. 1981)...........................................37, 38, 39, 40

*GTE New Media Servs., Inc. v. BellSouth Corp.,*
199 F.3d 1343 (D.C. Cir. 2000) ........................................................................43

*\*Hartford Fire Ins. Co. v. California,*
509 U.S. 764 (1993) ........................................................................................8, 9

*Hilao v. Estate of Marcos,*
103 F.3d 767 (9th Cir. 1996) ..............................................................................46

*Hilton v. Guyot,*
159 U.S. 113 (1895) ........................................................................................8, 9

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
333 F.3d 156 (D.C. Cir. 2003) .............................................................................2

*Hulburt Oil & Grease Co. v. Hulburt Oil & Grease Co.,*
371 F.2d 251 (7th Cir. 1966) ..............................................................................51

*Ibrahim v. Titan Corp.,*
391 F. Supp. 2d 10 (D.D.C. 2005) ..................................................................34, 35

*In re "Agent Orange" Prod. Liab. Litig.,*
373 F. Supp. 2d 7 (E.D.N.Y. 2005) ....................................................................17

*In Re Aircrash in Bali, Indonesia,*
684 F.2d 1301 (9th Cir. 1982) ............................................................................20

*In re Burlington Coat Factory Sec. Litig.,*
114 F.3d 1410 (3rd Cir. 1997) ............................................................................33

*Ingersoll Mill. Mach. Co. v. Granger,*
833 F.2d 680 (7th Cir.1987) ...............................................................................10

*\*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
478 U.S. 221 (1986) .....................................................................................13, 14

*Jean v. Dorelien,*
431 F.3d 776 (D.C. Cir. 2005) ............................................................................46

*\*Jerguson v. Blue Dot Investment, Inc.,*
659 F.2d 31 (5th Cir. 1981) ...........................................................................36, 43

*Jones v. Hartford Life and Acc. Ins. Co.,*
443 F. Supp. 2d 3 (D.D.C. 2006) ........................................................................22

*Jones v. Wittenberg University,*
534 F.2d 1203 (6th Cir. 1976) ............................................................................27

*Jota v. Texaco,*
157 F.3d 153 (2d Cir. 1998)................................................................................9

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.,*
536 U.S. 88 (2002)........................................................................................36

*Kadic v. Karadzic,*
70 F.3d 232 (2d Cir. 1995)..............................................................................11

*Kirkpatrick & Co. v. Environmental Tectonics Corp.,*
493 U.S. 400 (1990).................................................................................11, 12

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
313 U.S. 487 (1941)........................................................................................21

*Klinghoffer v. S.N.C. Achille Lauro,*
937 F.2d 44 (2d Cir. 1991)..............................................................................13

*Koohi v. United States,*
976 F.2d 1328 (9th Cir. 1992) .........................................................................14

*Krieger v. Fadely,*
211 F.3d 134 (D.C. Cir. 2000) ...........................................................................2

*Krieger v. Trane Co.,*
765 F. Supp. 756 (D.D.C. 1991) .......................................................................54

*Laker Airways, Ltd. v. Sabena, Belgian World Airlines,*
731 F.2d 909 (D.C. Cir. 1984) .........................................................................10

*Levy v. Currier,*
587 A.2d 205 (D.C. 1991) ...............................................................................29

*Lexington Ins. Co. v. Forrest,*
263 F. Supp. 2d 986 (E.D. Pa. 2003) ................................................................10

*Linder v. Portocarrero,*
963 F.2d 332 (11th Cir. 1992) ....................................................................11, 14

*McCluney v. Joseph Schlitz Brewing Co.,*
649 F.2d 578 (8th Cir. 1981) ...........................................................................23

*Mujica v. Occidental Petroleum Corp.,*
381 F. Supp. 2d 1164 (C.D. Cal. 2005) ............................................................16

*Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.,*
176 F.R.D. 329 (C.D. Cal. 1997)...........................................................35, 51, 54

*Nat'l S.S. Co. v. Tugman,*
106 U.S. 118 (1882)................................................................................42

*Nelligan v. Cmty. Gen. Hosp. of Sullivan County,*
240 F.R.D. 123 (S.D.N.Y. 2007) .........................................................53

*Newcombe v. Adolf Coors Co.,*
157 F.3d 686 (9th Cir. 1998) ...............................................................51

*Order of R.R. Telegraphers v. Ry. Express Agency, Inc.,*
321 U.S. 342 (1944)..............................................................................48

*Osseiran v. International Finance Corp.,*
498 F. Supp. 2d 139 (D.D.C. 2007) ......................................................33

*People of Saipan v. United States Dep't of Interior,*
356 F. Supp. 645 (D. Haw. 1973) .........................................................34

*\*Phillips Petroleum Co. v. Shutts,*
472 U.S. 797 (1985)......................................................................22, 23

*Phillips v. Heine,*
984 F.2d 489 (D.C. Cir. 1993) ..............................................................46

*Powell v. McCormack,*
395 U.S. 486 (1969).......................................................................12, 13

*Price v. International Telephone and Telegraph Corp.,*
651 F. Supp. 706 (S.D. Miss. 1986)......................................................23

*Pyramid Securities Ltd. v. IB Resolution, Inc.,*
924 F.2d 1114 (D.C. Cir. 1991) ............................................................38

*Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.,*
461 F.2d 1140 (3d Cir. 1972)................................................................38

*Rasul v. Bush,*
542 U.S. 466 (2004).......................................................................15, 33

*Reaves-Bey v. Karr,*
840 A.2d 701 (D.C. Cir. 2004) .............................................................44

*Remington Rand Corp. v. Delaware v. Bus. Sys. Inc.,*
830 F.2d 1260 (1987)..............................................................................9

*Republic of the Philippines v. Marcos,*
862 F.2d 1355 (9th Cir. 1988) ..............................................................13

*Rosner v. United States,*
    231 F. Supp. 2d 1202 (S.D. Fla. 2002) .................................................................46

*S.E.C. v. Banner Fund Int'l,*
    211 F.3d 602 (D.C. Cir. 2000) ........................................................................8, 10

*Saadeh v. Farouki,*
    107 F.3d 52 (D.C. Cir. 1997) ........................................................................36, 42

*Safeway Stores, Inc. v. Kelly,*
    448 A.2d 856 (D.C. 1982) ...............................................................................27

*Saffron v. Wilson,*
    481 F. Supp. 228 (D.D.C. 1979) ........................................................................31

*Sale v. Haitian Centers Council,*
    509 U.S. 155 (1993) .......................................................................................34

*Samra v. Shaheen Bus. & Inv. Group, Inc.,*
    355 F. Supp. 2d 483 (D.D.C. 2005) ....................................................................21

*Saunders v. Nemati,*
    580 A.2d 660 (D.C.1990) .................................................................................49

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974) .......................................................................................28

*Smith v. Halliburton Co.,*
    No. 06-0462, 2006 WL 2521326 (S.D. Tex. Aug. 30, 2006) ......................................28

*Somportex v. Philadelphia Chewing Gum Corp.,*
    453 F.2d 435 (3d Cir. 1971) ..............................................................................9

*Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distrib. Pty. Ltd.,*
    647 F.2d 200 (D.C.Cir.1981) .............................................................................54

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002) .........................................................................................2

*Toms v. Country Quality Meats, Inc.,*
    610 F.2d 313 (5th Cir. 1980) .............................................................................37

*Trans World Hospital Supplies Ltd. v. Hospital Corp. of America,*
    542 F. Supp. 869 (M.D. Tenn. 1982) ...............................................................40, 41

*U.S.I. Properties Corp. v. M.D. Construction Co.,*
    860 F.2d 1 (1st Cir. 1988) ................................................................................38

*Ulliman Schutte Const., Inc. v. Emerson Process Management Power & Water Solutions,*
No. 02-1987, slip op. (D.D.C. June 19, 2007) ........................................................22

*United States v. BCCI Holdings (Lux.), S.A.,*
916 F. Supp. 1276 (D.D.C. 1996) ........................................................................48

*United States v. Labs of Va.,*
272 F. Supp. 2d 764 (N.D. Ill. 2003) ....................................................................12

*Vareka Investment, N. V. v. American Investment Properties, Inc.,*
724 F.2d 907 (11th Cir. 1984) ............................................................................36

*Warren v. Dist. of Columbia,*
353 F.3d 36 (D.C. Cir. 2004) ...............................................................................2

*Western Maryland Ry. Co. v. Harbor Ins. Co.,*
910 F. 2d 960 (D.C. Cir. 1990) ...........................................................................50

*Whitaker v. Kellogg Brown & Root, Inc.,*
444 F. Supp. 2d 1277 (M.D. Ga. 2006) ................................................................28

*Wilderness Soc'y v. Morton,*
463 F.2d 1261 (D.C. Cir. 1972) ..........................................................................34

*Wilson v. Good Humor Corp.,*
757 F.2d 1293 (D.C. Cir. 1985) ..............................................................27, 29, 32

*Windward Shipping (London) Ltd. v. American Radio Ass'n, AFL-CIO,*
415 U.S. 104 (1974) ...........................................................................................34

*Wright v. Sony Pictures Entm't, Inc.,*
394 F. Supp. 2d 27 (D.D.C. 2005) .......................................................................22

*Wyatt v. Syrian Arab Republic,*
398 F. Supp. 2d 131 (D.D.C. 2005) .....................................................................19

*Y.W.C.A. v. Allstate Insurance Co.,*
275 F.3d 1145 (D.C. Cir. 2002) ..........................................................................21

*Young v. U.S.,*
535 U.S. 43 (2002) .............................................................................................45

*Zipes v. TWA, Inc.,*
455 U.S. 385 (1982) ...........................................................................................45

**STATE CASES**

*Dillard Dep't Store v. Silva,*
    148 S.W.3d 370 (Tex. 2004)..................................................................................27

*\*Oparaugo v. Watts,*
    884 A.2d 63 (D.C. 2005) .....................................................................................19

*Pusey v. Bator,*
    762 N.E.2d 968 (Ohio 2002)...............................................................................27

*Rymer v. Pool,*
    574 A.2d 283 (D.C. 1990) .............................................................................18, 19


**STATUTES**

28 U.S.C. § 1332(a)(2)...............................................................................................35

28 U.S.C. § 1332(c) ...........................................................................................*passim*

D.C. Code § 12-301(4)...............................................................................................49

D.C. Code § 12-301(8).........................................................................................44, 49

No. 112006 Cal. Ins. Code § 13800 (West 2005) ..................................................5, 16


**FEDERAL RULES**

Fed. R. of Civ. P. 8(a)(2) .............................................................................................2

Fed. R. Civ. P. 12(b)(6)............................................................................................2, 3

Fed. R. Civ. P. Rule 19 ..............................................................................................49


**TREATISES**

Charles Alan Wright et al., *Federal Practice and Procedure* (3d ed. 2004)........................*passim*

Prosser & Keeton, *Torts* (5th ed. 1984) ...................................................................32

Restatement (Second) of Conflict of Laws (1971) ................................................18, 20

Restatement (Second) of Torts (1965)........................................................................29

**OTHER AUTHORITIES**

16 Brook. J. Int'l L. 675 (1990) ..................................................................................40

H. Geoffrey Moulton, Jr., *Alien Corporations and Federal Diversity Jurisdiction,*
    84 Colum. L. Rev. 177 (1984) ................................................................................41

Ary Hermawan, *Court Throws Out 'Illogical Law' on Rights Tribunal,* Jakarta Post, Dec.
    8, 2006 (attached hereto as Ex. H) ...........................................................................5

*Case Concerning the Commission for Truth and Reconciliation* (attached hereto as Ex. F) ..........5

Celeste Pozo, *Foreign Affairs Doctrine Wanted Dead or Alive: Reconciling One Hundred
    Years of Preemption Cases,* 41 Val. U. L. Rev. 591 (2006) .....................................16

Chad Bouchard, *Indonesian Court Voids Key Human Rights Law,*
    VoiceofAmerica.com, Dec. 8, 2006 (attached hereto as Ex. I) ................................5

*Indonesian Court Rules Truth Commission Illegal, Casts Doubt On Justice For Suharto
    Abuses,* International Herald Tribune, Dec. 7, 2006 (attached hereto as Ex. G) .......................5

Maslan Rizal, *Rights Activists in Aceh Charged Under Public Incitement Articles,*
    Detik.com, aug. 10, 2007 ..........................................................................................7

Nermeen Shaikh, *Interview with Irwandi Yusuf, Governor of Aceh,* AsiaSource.org (Sept.
    13, 2007) (attached hereto as Ex. J) .........................................................................6

Sinan Kalayoglu, *Correcting Mujica,* 24 Wis. Int'l L.J. 1045 (2007) ...........................................16

United Nations Development Programme, *Access to Justice in Aceh: Making the
    Transition to Sustainable Peace and Development in Aceh* (2006) ...........................5

World Bank, *Aceh Conflict Monitoring Update, 1st-31st August 2007* (2007).............................7

World Bank, *The Aceh Peace Agreement: How Far Have We Come?* (Dec. 2006).......................6

For the same reasons that this Court declined to dismiss the plaintiffs' state law claims in *Doe I v. Exxon Mobil Corp.*, No. 01-1357 (D.D.C. filed June 19, 2001) ("*Doe I*"), this Court should similarly deny Defendants' Motion to Dismiss the identical claims raised by John Doe VIII and his fellow Plaintiffs against the same Defendants. Defendants provide the Court with no reason to diverge from its holding in *Doe I*.

Defendants rest the bulk of their argument on an assertion that the Helsinki Memorandum of Understanding ("MoU") has resulted in available alternative fora "for adjudicating *all* war-related injuries suffered in Aceh" that have been "fully implemented." Defendants' Memorandum in Support of ExxonMobil Corporation Motion to Dismiss ("Def. Mem.") at 5, 6 (emphasis in the original). This assertion is simply false.

None of the fora envisioned by the MoU (attached hereto as Ex. A) have been implemented and, moreover, they do not apply to Plaintiffs' claims: (1) no Aceh Truth and Reconciliation Commission has been established as the implementing legislation necessary for the establishment of the Aceh TRC has been ruled unconstitutional by the Indonesian Constitutional Court; (2) the Human Rights Court cited by Defendants is statutorily barred from considering incidents that predate 2006, and is thus unavailable to Plaintiffs here, even if Plaintiffs' claims met the subject matter criteria; and (3) the Joint Claims Settlement Commission has not been established and is therefore not an available remedy to Plaintiffs or anyone else. Furthermore, Plaintiffs bring suit against ExxonMobil for its actions in securing its facilities, acts that bear only a tangential relationship, if any, to the unrest in Aceh. These fora, even if they were established and available, could not provide a remedy from Defendants. Thus, Defendants' attempt to invoke the doctrines of comity, act of state, political question and foreign affairs preemption is without merit.

1

Defendants' remaining arguments are similarly unavailing. As this Court held in *Doe I*, District of Columbia law governs Plaintiffs' state law tort claims. As in *Doe I*, the complaint here is sufficient to sustain Plaintiffs' claim that ExxonMobil is liable for the tortious conduct of its security personnel. Plaintiffs, who have standing, have stated timely claims over Defendants subject to jurisdiction in this Court.

Defendants' Motion to Dismiss should be denied.

## ARGUMENT

**A.     Standard Of Review**

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (*per curiam*) (quoting *Twombly*, 127 S. Ct. at 1965). Plaintiffs are not required to plead all elements of their prima facie case in the complaint, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-14 (2002), or "plead law or match facts to every element of a legal theory," *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (quoting *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)).

In resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations – including mixed questions of law and fact – as true and draw all reasonable inferences in the plaintiff's favor. *See Erickson*, 127 S. Ct. at 2200; *Warren v. Dist. of Columbia*, 353 F.3d 36, 40 (D.C. Cir. 2004) (accepting plaintiff's allegation of constructive knowledge "as true" because "mixed questions of law and fact – such as negligence and constructive knowledge – are treated like factual issues for the purposes of Rule 12(b)(6)"); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003).

A motion to dismiss for failure to state a claim under Rule 12(b)(6) may be granted only

if the complaint cannot be supported by "any set of facts consistent with the allegations in the complaint." *Twombly*, 127 S. Ct. at 1968; *accord Erickson*, 127 S. Ct. at 2200.

**B.    Statement Of The Case**

Plaintiffs allege that Defendants employed or otherwise retained members of the Indonesian military to provide security services for its facilities and operations in Aceh province. Compl., Dkt. 4. These security personnel had the "sole and specific purpose" of providing security for ExxonMobil. *Id.* ¶ 40. Defendants paid a regular fee for security services, including, in 2000, more than $500,000 per month and, in addition, $294 per-person each month. *Id.* ¶¶ 44-46. At all times, Defendants had the ability to supervise, control, and direct, and did supervise, control, and direct, the actions and activities of their security personnel. *Id.* ¶¶ 42, 47. Defendants also provided their security personnel with training, military equipment, and other resources and support. *Id.* ¶¶ 47, 64. For example, Defendants hired consultants to provide advice, training, intelligence, and equipment to their security personnel. *Id.*

Defendants' security personnel were responsible for severe acts of abuse, including assault, battery, arbitrary arrest, and false imprisonment committed against Plaintiffs. *Id.* ¶¶ 60-64. For example, both John Doe X and John Doe XI were traveling past security posts run by ExxonMobil personnel when they were ordered to stop, detained, and beaten. *Id.* ¶¶ 62, 63. Armed ExxonMobil security personnel later came to their homes for what they called a "peaceful ceremony" in which they admitted beating Plaintiffs, apologized, but also instructed them not to discuss what had happened. *Id.* The security personnel also demanded that John Doe XI, who works as a fruit trader, bring them samples of his goods when he traveled past the checkpoint. *Id.* ¶ 63. John Doe VIII was shot in the knee by Exxon Mobil security personnel as he stopped to get coffee. *Id.* ¶ 60. John Doe IX tried to come to his assistance, but the security personnel intervened and dragged John Doe IX away by the ankle and stomped on his head. *Id.* ¶ 61.

3

Defendants are directly liable for the negligent hiring and negligent supervision of their security personnel as at the time Defendants retained the security personnel, Defendants knew or should have known that the security personnel were unfit and dangerous. *Id.* ¶¶ 51-69. Defendants are also vicariously liable for the torts of, *inter alia*, assault and arbitrary detention committed by their security personnel. *Id.*

Plaintiffs do not have access to an independent or functioning legal system within Indonesia to raise their complaints. *Id.* ¶ 3.

**C.   Plaintiffs' Claims Are Justiciable**

Defendants rest their entitlement to dismissal on justiciablity grounds on the existence of a claims process established by the MoU. This argument is fatally flawed for two reasons. First, Plaintiffs raise claims against private corporate defendants for the conduct of their paid security personnel, personnel who "had the sole and specific purpose of providing security for ExxonMobil" and acted "for defensive purposes only, and not for maintaining general law and order." Compl. ¶¶ 40, 41. Plaintiffs raise no claims against the Indonesian government, the Free Aceh Movement, or any other party to the armed conflict. Defendants' expert concedes as much, and specifically declines to provide firm assurances that Plaintiffs' claims would be considered by the proposed tribunals or that the tribunals could provide a remedy from Defendants. Decl. of Ruth Wedgwood ("Wedgwood Decl.") ¶¶ 52, 54 (Attached to Def. Mem.); *see also* Decl. of Johnson Panjaitan ("Panjaitan Decl.") ¶¶ 6, 9 (MoU fora, even if established, could not adjudicate disputes between private parties) (attached hereto as Ex. B).

Second, even if Plaintiffs' claims could be resolved by the proposed procedures, no alternative claims resolution process exists. The alternative claims procedures referenced in the

MoU[1] required specific enabling domestic legislation in order to take effect. This legislation, known as the Law on Governance in Aceh, was passed by the Indonesian House of Representatives in July 2006. Defendants assert that the Aceh TRC is "fully functioning," "in effect," and "now established." Def. Mem. at 6-7, 14, 18.[2] But the Law on Governance in Aceh provides that the Aceh TRC is "not to be separate from" a national Indonesia-wide Truth and Reconciliation Commission. Law of the Republic of Indonesia on the Governing of Aceh, Law No. 112006 Cal. Ins. Code § 13800 (West 2005) § 229(2) (attached hereto as Ex. C); *see also* Decl. of Ross Clarke ("Clarke Decl.") at 1-2 (attached hereto as Ex. D). The national TRC has never been established. *See* Clarke Decl. at 1; Panjaitan Decl. ¶ 5; United Nations Development Programme, *Access to Justice in Aceh: Making the Transition to Sustainable Peace and Development in Aceh* (2006) ("UN Report") at 90 (attached hereto as Ex. E). More importantly, Indonesia's Constitutional Court – Indonesia's highest court for interpreting its constitution – found the law authorizing the national TRC unconstitutional and therefore invalid. *See Case Concerning the Commission for Truth and Reconciliation* (attached hereto as Ex. F); *Indonesian Court Rules Truth Commission Illegal, Casts Doubt On Justice For Suharto Abuses*, International Herald Tribune, Dec. 7, 2006 (attached hereto as Ex. G); Ary Hermawan, *Court Throws Out 'Illogical Law' on Rights Tribunal*, Jakarta Post, Dec. 8, 2006 (attached hereto as Ex. H); Chad Bouchard, *Indonesian Court Voids Key Human Rights Law*, Voice of America.com, Dec. 8, 2006 (attached hereto as Ex. I). As a result, no Aceh TRC has been established. *See* Clarke Decl. at 1-2 ("the Constitutional Court decision to annul the national

---

[1]     The MoU is not an international agreement, but a statement of agreed principles between the Indonesian government and the Free Aceh Movement intended to resolve the unrest in Aceh province. It was facilitated by former Finnish President Martti Ahtisaari, now the chairperson of a private NGO. *See* Panjaitan Decl. ¶ 3.

[2]     Notably, Defendants' expert only states that the claims settlement procedures "should be established" and are "to be" established. Wedgewood Decl. ¶¶ 30, 39.

TRC law has prevented the establishment of an Aceh-specific TRC . . . there can be no doubt therefore that an Acehnese TRC is neither 'established', 'fully functioning' or 'in effect'"); Panjaitan Decl. ¶ 5 ("By this decision, the Commission of Truth and Reconciliation does not exist . . . there is no plan moving forward to create a modified Commission of Truth and Reconciliation").

Defendants also rely on the purported establishment of a Human Rights Court. But this Court is statutorily authorized to hear only claims arising after the July 2006 enactment of the Law on Governance in Aceh. *See* Ex. C, § 228(1) (Human Rights Court to "resolve cases of human rights violations that take place *subsequent to the enactment of this Law*" (emphasis added)); *see also* Clarke Decl. at 2-3; Panjaitan Decl. ¶ 8. As the first democratically elected governor of Aceh recently explained, "[a] human rights court for future violations -- give me a break!" Nermeen Shaikh, *Interview with Irwandi Yusuf, Governor of Aceh*, AsiaSource.org (Sept. 13, 2007) (attached hereto as Ex. J). Thus, Plaintiffs' claims, which predate July 2006, cannot be heard by the Human Rights Court. Moreover, the Human Rights Court has yet to be established, and the Law on Governance in Aceh provides no timeframe for its establishment or for its funding. *See* Clarke Decl. at 3; Panjaitan Decl. ¶ 8; UN Report at 89. This future court currently provides no remedy to anyone.

Finally, the Indonesian government has also failed to establish the Joint Claims Settlement Commission referenced by Defendants, and thus no remedy is available from this Commission. *See* Clarke Decl. at 3-4 (Joint Claims Settlement Commission "has not been established" and "no concrete steps have been taken towards its establishment"); Panjaitan Decl. ¶ 7; World Bank, *The Aceh Peace Agreement: How Far Have We Come?* 5 (Dec. 2006) (Key elements of the MoU are not yet implemented) (attached hereto as Ex. K).

The failure of the Law on Governance in Aceh to fully realize the promises of the MoU has been widely observed. *See, e.g.,* Clarke Decl. at 1-5; *Indonesia: Aceh Rights Court Must Address Past Abuse*, Human Rights Watch (May 26, 2006) (attached hereto as Ex. L); UN Report at 89 (noting provisions of the Law "are weak and may do little to enhance citizens' access to justice"); Governor Irwandi Yusuf, *A Vision for Economic and Social Progress in the Wake of the Tsunami and the Helsinki Peace Accord* (Jan. 10, 2007) (noting need to address unresolved issues of MoU, "especially the question of reconciliation and past human rights abuses") (attached hereto as Ex. M).

The situation for lawyers and other human rights defenders working in the province remains of serious concern. In August 2007, eight members of the Aceh Legal Aid Foundation who were attempting to assist Acehnese villagers reclaim land seized by the military in the early 1990's were arrested and charged with incitement to hatred and public unrest under the Criminal Code for distributing pamphlets to the villagers. The lawyers claim they were arrested to prevent them from representing their clients. *See* World Bank, *Aceh Conflict Monitoring Update, 1st-31st August 2007* 6 (2007) (attached hereto as Ex. N); Maslan Rizal, *Rights Activists in Aceh Charged Under Public Incitement Articles*, Detik.com, Aug. 10, 2007 (attached hereto as Ex. O). *See also* Clarke Decl. at 5 ("providing justice and building reconciliation have now all but been side-lined…Where transitional justice mechanisms have been stipulated in law but not implemented, extraterritorial litigation may be an indispensable aspect of the process to uphold victims' rights and achieve full accountability for human rights violations.").

As there is no Aceh TRC, no Human Rights Court, and no Joint Claims Settlement Commission, Defendant's motion to dismiss on justiciability grounds, which is predicated on the existence of these fora, must be denied.

7

1.    **The Doctrine Of Comity Does Not Apply**

Comity reflects the extent to which one nation will permit the law of another nation, "as put in force within its territory," to operate within its dominion. *Hilton v. Guyot*, 159 U.S. 113, 163 (1895). The threshold question in a comity analysis is whether "there is in fact a true conflict between domestic and foreign law." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798 (1993) (citing *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court S. Dist. Ia.*, 482 U.S. 522, 555 (1987) (Blackmun, J., concurring and dissenting). A "true conflict" exists *only* if it is alleged that compliance with the laws of both countries would be impossible. *Id.* If a conflict exists, courts then determine whether comity is warranted.

The extension of comity is discretionary. *E.g.*, *Hartford Fire Ins. Co.*, 509 U.S. at 764; *S.E.C. v. Banner Fund Int'l*, 211 F.3d 602, 613 (D.C. Cir. 2000) ("comity does not require the district court to stay its hand"); *Gordon and Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 905 F. Supp. 169, 178 (S.D.N.Y. 1995) ("well-established" that deference not obligatory). Finally, comity is an affirmative defense and defendants bear the burden of establishing its application. *Banner Fund Int'l*, 211 F.3d at 613. Defendants have failed to meet their burden here.

First, Defendants have failed to establish a true conflict, thus the threshold for comity is not met. There is no conflict here between Indonesian law and American law or between the mechanisms of the MoU, which must be implemented by Indonesia to have effect, and American law. None of the tribunals has been established and, moreover, the proposed tribunals do not have jurisdiction over Plaintiffs' claims. *See supra* pp. 4-7. In addition, the MoU did not provide for exclusive jurisdiction. *See* Clarke Decl. at 5-6 ("There is...no provision in either the Helsinki MoU or [the Law on Governance for Aceh], or under international law, that restricts victims of human rights violations in the plaintiffs' circumstances from accessing international

8

fora."). Defendants have failed to "claim that their compliance with the laws of both countries is otherwise impossible, [thus] we see no conflict ...." *Hartford Fire Ins. Co.*, 509 U.S. at 799.

Second, Defendants have not established that they are subject to jurisdiction in Indonesia, a pre-condition for dismissal on comity grounds. *Jota v. Texaco,* 157 F.3d 153 (2d Cir. 1998).

Third, even if Defendants had met the threshold requirements, there is no basis for extending comity here. Courts typically extend comity where there has already been a full and fair adjudication elsewhere. *See, e.g., Hilton*, 159 U.S. at 163 (extending comity because "full and fair trial" was had); *Remington Rand Corp. v. Delaware v. Bus. Sys. Inc.*, 830 F.2d 1260, 1266 (1987) (declining to extend comity where affected party was not afforded due process); *Cf. Somportex v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435 (3d Cir. 1971) (foreign default judgment could not be given comity unless notice and opportunity to be heard in foreign proceeding were provided). Comity cannot be extended to a tribunal that has yet to be established and where the existing justice system is inhospitable to Plaintiffs' claims. *See Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 29 (D.D.C. 2005) (record supports finding that prosecution of suit in Indonesia would be futile); *see also, e.g.,* Clarke Decl. at 3 (Indonesian judiciary appears incapable of holding human rights trials for military personnel "that adhere to international fair trial guarantees"); United States Department of State, Country Reports on Human Rights Practices – 2005, Indonesia (Mar. 8, 2006) at 1 (detailing "widespread corruption" in judiciary that "degraded an already weak regard for rule of law and contributed to impunity") (attached hereto as Ex. P); United States Department of State, Country Reports on Human Rights Practices – 2004, Indonesia (Feb. 28, 2005) at 1 (attached hereto as Ex. Q).

Defendants fail to cite a single case in support of their proposition that courts must dismiss a case on comity grounds when an alternative dispute resolution mechanism has yet to be

established.[3] To the contrary, courts decline to extend comity to *concurrent* proceedings. *See, e.g.*, *S.E.C. v. Banker Fund Int'l*, 211 F.3d at 612; *Laker Airways, Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 939 (D.C. Cir. 1984) ("comity ordinarily requires that courts of a separate sovereign not interfere with concurrent proceedings …"); *see also Ingersoll Mill. Mach. Co. v. Granger*, 833 F.2d 680, 686 (7th Cir.1987) (appropriate to stay case under international comity pending outcome of *pre-existing* and *concurrent* case in Belgian courts); *Lexington Ins. Co. v. Forrest,* 263 F. Supp. 2d 986, 1003 (E.D. Pa. 2003).

### 2.    There Is No Act Of State In This Case

Defendants raise the same arguments this Court rejected in *Doe I*, asserting that the act of state doctrine shields them from liability for their own actions and for the torts, including assault and battery, committed by their paid security forces.[4] The act of state doctrine does not apply to here. As this Court explained in *Doe I*, "the resolution of this case will not turn on any 'official action' of the Indonesian government." *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 28 (D.D.C. 2005).

---

[3]    In two of the cases cited by Defendants, *Ungaro-Benages v. Dresdner Bank AG,* 379, F.3d 1227, 1237-40 (11th Cir. 2004) and *In re Nazi Era Cases Against German Defendants Litig.,* 236 F.R.D. 231, 240-242 (D.N.J. 2006), an Executive Agreement between the United States and Germany was already in force, and a dedicated alternative dispute mechanism had been firmly established by the time the courts dismissed the relevant cases on grounds of comity. In *Iwanowa v. Ford Motor Co.,* 67 F. Supp. 2d 424, 490 (D.N.J. 1999), the court dismissed the claims because Germany had already paid reparations as compensation for the alleged misconduct. *Doe I v. State of Israel,* 400 F. Supp. 2d 86, 113 (D.D.C. 2005) considered comity indirectly, in the course of its dismissal of the case on sovereign immunity grounds and explicitly distinguished that case from others, such as the instant case, where Plaintiffs "challenge the actions of third-parties in procuring the alleged unlawful acts…." *Id.* 113. These cases thus provide no support for Defendants.
Defendants' reliance on dicta in *Bigio v. Coca Cola Co.,* 448 F.3d 176, 178-79 (2d Cir. 2006), is misplaced as the Second Circuit reversed – not upheld – a district court's dismissal on international comity grounds, permitting "a common law suit for damages primarily between Canadian citizens and a United States company, which may likely focus on what Coca-Cola knew about the [plaintiff's] ownership rights before it acquired its present interest" to proceed. Defendants' citation of *American Banana Co. v. United Fruit Co.,* 213 U.S. 347 (1909), for the proposition that the application of American law to a Costa Rican conspiracy was "startling" is itself startling as that holding was overruled decades ago. *See, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 704 (1962); *United Phosphorus, Ltd. v. Angus Chemical Co.,* 322 F.3d 942. 946, 959 (7th Cir. 2003).
[4]    Defendants do not assert that any Indonesian action related to the MoU requires deference under the act of state doctrine, perhaps recognizing Indonesia has not implemented the dispute resolution components of the MoU.

As this Court found in *Doe I*, this case is governed by *Kirkpatrick & Co. v. Environmental Tectonics Corp.*, 493 U.S. 400, 406 (1990). *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 28 (D.D.C. 2005) (holding act of state doctrine is "only implicated when 'a court must decide – that is, when the outcome of a case turns upon – the effect of *official action* by a foreign sovereign.'" (citing *Kirkpatrick*). Here, as in *Kirkpatrick*, "the factual predicate for application of the act of state doctrine does not exist": nothing in the present suit requires the Court to declare invalid an official act of a foreign sovereign. *See Kirkpatrick*, 493 U.S. at 405. In *Kirkpatrick*, a unanimous Supreme Court found that although the facts necessary to establish respondent's claim would also establish that Nigerian officials violated the law, "it still does not suffice" to trigger application of the act of state doctrine. Similarly, although the facts necessary to establish Plaintiffs' claims here will also establish that individual soldiers committed acts of assault or battery, that does not suffice to trigger the act of state doctrine. Individual acts of assault and battery are not the official acts of the Indonesian government for two reasons: first, the acts were committed by individuals without the authority to bind the state and second, tortious conduct is not an "act of state." *See, e.g., Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir. 1995) (expressing doubt that rape could ever be "the officially approved policy of a state"); *Estate of Ferdinand Marcos Human Rights Litigation*, 25 F.3d 1467, 1471 (9th Cir. 1994) (holding act of state doctrine applies "only when officials having sovereign authority act in an official capacity" and finding that illegal acts are not "official acts" unreviewable by federal courts); *Linder v. Portocarrero*, 963 F.2d 332, 336 (11th Cir. 1992) ("there is no foreign civil war exception to the right to sue for tortious conduct"); *Galu v. Swiss Air Transp. Co.*, 873 F.2d 650, 654 (2d Cir. 1989) (remanding for determination of whether act in question "was an action that had been ordered in the exercise of the sovereign authority of Switzerland, or whether it was

simply an *ad hoc* decision of the local police officers."); *Bowoto v. Chevron Corp.*, No. 99-02506, 2007 WL 2349345, *3-5 (N.D. Cal. Aug. 14, 2007); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 24 (D.D.C. 1998) (extrajudicial killing not an "act of state").[5]

The burden of proving act of state rests on the party asserting the applicability of the doctrine. *Alfred Dunhill v. Republic of Cuba*, 425 U.S. 682, 694 (1976). Even if the doctrine applies, its proper application requires a balancing of interests that clearly points to the exercise of jurisdiction over this case. *Kirkpatrick*, 493 U.S. at 400; *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (2d Cir. 1964). In carrying out the balance, the key question is whether a United States court is called upon to apply well established legal principles. *E.g., United States v. Labs of Va.,* 272 F. Supp. 2d 764, 772 (N.D. Ill. 2003) (where unambiguous legal principles govern, act of state doctrine does not apply). This case requires no more than the application of long established tort law principles to the facts. Thus, a balancing of the *Sabbatino* factors supports jurisdiction. Finally, application of the act of state doctrine is within the discretion of the court, *see W.S. Kirkpatrick*, 493 U.S. at 409, and is not warranted here.[6]

### 3.    Plaintiffs' Claims Do Not Implicate The Political Question Doctrine

The political question doctrine is a narrow body of law rooted in separation of powers principles. *See Baker v. Carr*, 369 U.S. 186, 217 (1962); *Powell v. McCormack*, 395 U.S. 486,

---

[5]    Notably, the letters submitted by Defendants from the Indonesian Government do not assert that the torts at issue constitute official acts of the Government of Indonesia.

[6]    The few cases cited by Defendants are easily distinguished. *Underhill v.Hernandez*, 168 U.S. 250, 253 (1897) held only that the "acts of *legitimate* warfare cannot be made the basis of individual liability." (internal quotations omitted). Deciding that case would have required passing judgment on "acts of legitimate warfare" carried out by a military commander "representing the authority of the revolutionary party as a government...." *Id.* at 254. This case does not concern acts of legitimate warfare by military commanders. In *Oetjen v. Central Leather Co.,* 246 U.S. 297, 304 (1918) granting relief would have required the court to declare the Mexican government's prior seizure of property, within its own territory–the archetypical act of state–legally ineffective. This case does not concern the seizure of property by a foreign state. *American Banana Co. v. United Fruit Co.,* 213 U.S. 347 (1909), as Justice Scalia noted in *Kirkpatrick*, 493 U.S. at 407-08, "was not an act of state case." Finally, plaintiffs in *Doe I v. Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005), brought claims directly against the State of Israel for its policy promoting settlement on the West Bank and for the official conduct of its military in carrying out that policy. Those facts bear no relation to Plaintiffs' claims against ExxonMobil.

512 (1969); *Tel-Oren*, 726 F.2d 774, 798 (D.C. Cir. 1984) (Edwards, J. concurring) (political question doctrine "a very limited basis for nonjusticiability"). No conflict between the branches of government is presented by Plaintiffs' state law tort claims. Defendants do not seriously contend the political question doctrine applies here. They fail to identify the relevant legal standard or meet a single one of the *Baker* factors.[7]

This Court declined to dismiss plaintiffs' state law tort claims in *Doe I* on political question grounds. *See Exxon Mobil Corp.*, 393 F. Supp. 2d at *23. This decision was correct. As the Court of Appeals found when it denied Defendants' petition for mandamus in *Doe I*, "we note that several other circuits have refused to invoke the political question doctrine to dismiss claims that were very similar to those in the instant case." *Doe I v. Exxon Mobil Corp.*, 473 F.3d 345, 355 (D.C. Cir. 2007) (citing cases).

Defendants fail to identify any applicable *Baker* factors because they cannot. The first *Baker* factor does not apply because determining whether defendants breached a duty of care to plaintiffs "falls within the traditional role of courts to interpret the law...." *Powell*, 395 U.S. at 548; *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2d Cir. 1991). The second *Baker* factor does not apply because a tort action by four individual plaintiffs is judicially manageable and well established legal standards exist for resolving it. *See Klinghoffer*, 937 F.2d at 49; *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988).

None of the last four, prudential, *Baker* factors apply here. No initial policy determination need be made to resolve Plaintiffs' claims of negligent hiring, negligent

---

[7]     *Baker* established a six-part test for identifying separation of powers concerns, holding that "[u]nless one of these formulations are inextricable from the case at bar, there should be no dismissal for non-justiciability. 369 U.S. at 217; see also Vieth v. Jubelirer, 541 U.S. 267, 278 (2004) (factors listed in "descending order of both importance and certainty").

supervision, assault, battery and arbitrary detention. Nor will adjudication of these claims express a lack of respect to a coordinate branch. *See, e.g.*, *Linder*, 963 F.2d at 337 (no political question where "complaint challenges neither the legitimacy of the United States foreign policy toward the contras, nor does it require the court to pronounce who was right and who was wrong in the Nicaraguan civil war."); *Koohi v. United States*, 976 F.2d 1328, 1331, 1332 n.3 (9th Cir. 1992) (expressing doubt that the political question doctrine could ever be applied to bar a suit against private parties, and stating that the Court had "found no Supreme Court or Court of Appeals decisions which have dismissed a suit brought against a private party on the basis of the political question doctrine."); *Tel-Oren*, 726 F.2d at 798 (Edwards, J. concurring) (tort suit arising out of terrorist acts presents no clash between branches of government).

Defendants' argument that the MoU (which, as described above, has not been fully implemented) creates a political question is without merit. In *Japan Whaling*, the Supreme Court found that the political question doctrine did not bar judicial resolution of whether, pursuant to statute, the Secretary of Commerce was required to take certain steps regarding Japan's whaling practices, despite the fact that the Executive Branch had entered into an Executive Agreement with Japan regarding the conduct at issue. *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 229-30 (1986); *see also Dames & Moore v. Regan*, 453 U.S. 654, 688-90 (1981) (legal claims may not be destroyed by the U.S. through an international agreement in the absence of an alternative means of redress). This case is more clearly justiciable than *Japan Whaling*, as no United States agreement is at risk of repudiation and no international agreement has resolved Plaintiffs' claims against the Defendants.[8]

---

[8]      None of the cases cited by Defendants support finding a political question here. The Holocaust-era forced and slave labor cases were dismissed in favor of a settlement reached (and implemented) by the United States resolving the precise claims at issue. In *Hwang Geum Joo v. Japan*, 413 F.3d 45, 49 (D.C. Cir. 2005), the United

14

Defendants' argument that this court cannot pass judgment on Indonesian soldiers' conduct is without merit, and was rejected by this Court in *Doe I*, where the Court ensured no such problem would arise, and indeed none has. Further, the Supreme Court has rejected Defendants' position. In *Sosa v. Alvarez-Machain*, the Supreme Court considered the claims of a Mexican national who was kidnapped by a Mexican agent in Mexico, and held that international and, by extension, domestic, law are "very much concerned" with "the power of foreign governments over their own citizens" and "[i]t would take some explaining to say now that federal courts must avert their gaze" from such cases. 542 U.S. 692, 727-30 (2004). *Sosa* approvingly cited *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), and *In Re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467 (9th Cir. 1994), both cases involving abuses by foreign officials against their own citizens. 542 U.S. at 732; *see also, e.g., Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996); *Doe v. Islamic Salvation Front*, 993 F. Supp. 3 (D.D.C. 1998).

Moreover, as the Court of Appeals found in *Doe I*, "Exxon cites no cases in which a federal court has held that, in a matter involving like issues and comparable circumstances (*i.e.*, claims by a private party against a private United States corporation), the complaint *must* be dismissed under the political question doctrine. And we aware of no such authority." *Doe I*, 473 F.3d 345, 355 (D.C. Cir. 2007).

---

States had signed a multi-lateral treaty waiving private claims against Japan. No United States treaty waiving or resolving Plaintiffs' claims is at issue here. Moreover, Plaintiffs' claims have not, in fact, been settled, waived, or been committed to another adequate forum. *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005), was a case brought against the United States and its former national security advisor, challenging United States foreign policy during the cold war. *Corrie v. Caterpillar, Inc.,* 403 F. Supp. 2d 1164 (C.D. Cal. 2005) concerned sales of goods to a foreign government pursuant to a statutory scheme authorized by the Congress and financed by the Executive Branch. On appeal, the Ninth Circuit found that the "decisive factor here is that Caterpillar's sales to Israel were paid for by the United States ... these sales were financed by the executive branch pursuant to a congressionally enacted program...." *Corrie v. Caterpillar, Inc.*, No. 05-36210, 2007 WL 2694701, *6 (9th Cir. Sept. 17, 2007). These cases are simply inapposite.

### 4.    Foreign Policy Preemption Is Not Applicable

Defendants move to dismiss the Complaint based on the foreign affairs doctrine. This Court correctly rejected Defendant's sole authority, *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005), as wrongly decided. *Doe I*, 2006 WL 516744 at 3, n.2. *Doe I* is correct: no court has followed *Mujica*'s holding and, moreover, it has been widely criticized. *See, e.g.*, Sinan Kalayoglu, *Correcting Mujica*, 24 Wis. Int'l L.J. 1045 (2007) (arguing *Mujica* "incorrectly decided" and an example of "analysis gone awry"); Celeste Pozo, *Foreign Affairs Doctrine Wanted Dead or Alive: Reconciling One Hundred Years of Preemption Cases*, 41 Val. U. L. Rev. 591 (2006) (arguing *Mujica* misapplied preemption analysis and noting that *Doe I* "rightly concluded that the *Garamendi* analysis was not applicable").

Under the foreign policy preemption doctrine, state laws may be preempted if there is a conflict between the state law and the "exercise of the federal executive authority." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003). *Garamendi* concerned a settlement negotiated by the United States to resolve the claims of Holocaust survivors against insurance companies holding Nazi-era claims. California passed a statute, the Holocaust Victim Insurance Relief Act of 1999, Cal. Ins. Code § 13800 (West 2000), designed to facilitate relief for the families of Holocaust survivors, specifically targeting those same insurance companies. The Supreme Court found that the California statute conflicted with and was preempted by the German Foundation Agreement and accompanying Executive Agreement negotiated and signed by the United States. *Id.* at 420.

Defendants' invocation of the Helsinki MoU does not change the analysis previously conducted by this Court as the attempted analogy to *Garamendi* fails. First, the common law of tort presents no encroachment on the field of foreign affairs: "Here, in contrast, no state government has passed any statute in conflict with U.S. foreign policy. The *Garamendi* analysis

16

is simply not applicable here, because there are no encroachments by any state on to the federal field of foreign affairs." *Doe I v. Exxon Mobil Corp.,* No. 01-1357, 2006 WL 516744, at *3 (D.D.C. Mar. 2, 2006). *See also Beaty v. Rep. of Iraq*, 480 F. Supp. 2d 60, 87 (D.D.C. 2007) (rejecting application of foreign affairs preemption to tort law claims: "the existence of such court-created common law evinces no effort on the part of either of those state governments to weigh in on knotty issues of international consequence"); *In re "Agent Orange" Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 80-81 (E.D.N.Y. 2005) (no preemption of New York tort law).

Second, the United States has not concluded an agreement with Indonesia regarding Plaintiffs' claims. Rather, the MoU is a mediated accord between the Government of Indonesia and the Free Aceh Movement. Therefore, there has been no "exercise of the federal executive authority." *Garamendi*, 539 U.S. at 421. Third, because the MoU has not been implemented, it cannot serve as the basis for preemption. *See Beaty*, 480 F. Supp. 2d at 87-88 (no preemption as possibility of future efforts "is no substitute" for the actual resolution achieved by Executive in *Garamendi*).[9]

## D.    District Of Columbia Law Governs Plaintiffs' Tort Claims

As this court has already held, District of Columbia law, as the law of the forum state, applies to all of Plaintiffs' claims. Unlike in *Doe I*, Plaintiffs do not bring a wrongful death claim. *Doe I*, 2006 WL 516744, at 1-2. The application of District of Columbia law is consistent with due process and fundamental fairness.

### 1.    Indonesian Law Does Not Apply To Plaintiffs' Claims

This Court has already found that the United States has a stronger interest than Indonesia

---

[9]    Defendants' reliance on *Geier v. Am. Honda Motor Co., Inc*, 529 U.S. 861, 881-82 (2000), a conflict preemption case, is inapposite. In that case, the conflict between state law and the Federal statute would have arisen if defendants had been forced to comply with the duty that plaintiffs argued existed under state tort law. Neither party contends that meeting the standard of care here presents a conflict with U.S. foreign policy.

in applying its law to this case, and thus United States tort law applies. *Doe I*, 2006 WL 516744, at *4. Defendants have offered no reason why the Court should reach a different decision here, except to assert that "providing an alternate forum and process will certainly undermine the processes established by the Helsinki Peace Accord." Def. Mem. at 33. Contrary to Defendants' assertions, the Helsinki MoU's administrative claims process is neither functional nor applicable to this claim. *See supra* at pp. 4-7. This forward-looking accord, brokered between the Government of Indonesia and GAM—neither of whom is a party to this case—has no bearing on the choice of law analysis in this case.

Defendants cite no other grounds for departing from the Court's prior decision not to apply Indonesian law to the same facts. The focus of this case, as in *Doe I*, is on "whether U.S. companies violated U.S. law by its conduct in protecting their pipeline in Indonesia," *Doe I*, 2006 WL 516744, at *3, and "the acts or omissions in the United States by the U.S. Exxon defendants which may be a proximate cause of plaintiffs' alleged injuries, or regarding knowledge on the part of U.S. Exxon defendants" of the tortious acts. *Doe I v. Exxon Mobil Corp.*, 2006 WL 1193855 (D.D.C. May 3, 2006). The United States continues to have "an overarching, vital interest" in these questions. *Doe I*, 2006 WL 516744, at *3. It follows that United States tort law applies to Plaintiffs' claims for the same reasons relied on in *Doe I*.

Defendants mischaracterize the choice of law analysis that District of Columbia courts apply to determine whether domestic or international law applies. Neither District of Columbia case law nor the Restatement (Second) of Conflict of Laws counsels against comparing the interests of Indonesia against the interests of the United States in the course of the choice of law analysis. On the contrary, the District of Columbia favors application of the law of the forum where the application of foreign law would not serve the interests of justice. *Rymer v. Pool*, 574

A.2d 283, 285 (D.C. 1990) ("the forum will usually apply its own law for the reason that in this way it can best do justice to the parties") (citing Restatement (Second) of Conflict of Laws).  In addition, where a party has failed to adequately prove the contents of the foreign law, the Court may apply District of Columbia law.  *See Oparaugo v. Watts*, 884 A.2d 63, 72 (D.C. 2005) (because party failed to provide information on the elements of cause of action under Nigerian law, "it was permissible for the trial court to apply the law of the District of Columbia even though Nigeria may have had more significant contacts with the transaction."); *Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131 (D.D.C. 2005) (where defendants failed to show how foreign law differed or would lead to disparate results, the law of the United States forum would apply); *Rymer,* 574 A.2d at 285 (where a party has failed to adequately prove foreign law, the party is understood to have acquiesced in the application of the local law of the forum).

Here, as in *Oparaugo*, Defendants have had the opportunity to provide the Court with the applicable foreign law and have failed to do so.  Defendants' choice of law argument does not cite a single Indonesian statute, a single Indonesian court decision, or a single Indonesian law source, such as a treatise or an expert affidavit, that would provide information on substantive Indonesian law.  *See* Def. Mem. at 31–36.  Other than the MoU, which has no application here, Defendants' only reference to Indonesian law refers to an alleged "*unavailability* of punitive damages under Indonesian law . . . ." Def. Mem. at 33.  Defendants are incorrect; "The Indonesian legal system would allow for broad types of damages, including what the American legal system refers to as punitive damages."  Declaration of Abdul Haris Semendawai ¶ 4 (citing the provisions of Article 1365 of the Indonesian Civil Code) (attached hereto as Ex. W).

Even if there were a conflict between Indonesian and domestic laws regarding punitive damages, Indonesian punitive damages law would not apply under the District of Columbia's

choice of law rules. When the purpose of the lawsuit is to deter or punish conduct, this Court has

held that "it is clear that, under the interest analysis approach to choice of laws applied in the

District of Columbia, foreign jurisdictions have no interest in applying their law to damages

issues if it would result in less protection to their nationals in a suit against a United States

corporation." *Friends for All Children v. Lockheed Aircraft Corp.*, 587 F. Supp. 180, 191

(D.D.C. 1984) (applying District of Columbia law to an action brought on behalf of orphans

from Vietnam) (internal citations omitted); *see also In re Aircrash in Bali, Indonesia*, 684 F.2d

1301, 1307 (9th Cir. 1982) (Australia, home of decedent, has no interest in protecting a

California defendant from large damage awards). Thus, to the extent Indonesian law would

provide less generous punitive damages, Indonesia has no interest in applying these laws to

Defendants.[10]

In support of their argument that the District of Columbia cannot compare the interests of

the United States against the interests of a foreign country for choice of law purposes,

Defendants cite the Restatement (Second) of Conflict of Laws for the principle that "the United

States is not a 'state' for choice-of-law purposes." Def. Mem. at 32. Defendants ignore the more

salient clause in the Restatement that provides:

> The rules in the Restatement of this Subject apply to cases with
> elements in one or more States of the United States and are
> generally applicable to cases with elements in one or more foreign
> nations. *There may, however, be factors in a particular
> international case which call for a result different from that which
> would be reached in an interstate case.*

Restatement (Second) of Conflict of Laws § 10 (1971) (emphasis added).[11] Defendants' own

---

[10]    *Danziger v. Ford Motor Co.*, 402 F.Supp. 2d 236, 241 (D.D.C. 2005) provides no support to Defendants as
the court there found "no true conflict" among the applicable bodies of law because the "laws, though different,
produce the same result when applied to the facts at issue."
[11]    Similarly, in *Rymer*, the District of Columbia Court of Appeals found that "the trial court should look at the
determinative factors for choice-of-law questions in the District of Columbia: 'which jurisdiction has the most

authority does not support their position. *See, e.g., Samra v. Shaheen Bus. & Inv. Group, Inc.*, 355 F. Supp. 2d 483, 497 (D.D.C. 2005) (examining the "substantive contract law of most American states" when determining whether to apply the law of England, Jordan, or an American jurisdiction).[12]

Defendants also fail to recognize that the choice of law analysis in the instant case would result in the same outcome whether the Court weighed the interests of each domestic state against each foreign state, or aggregated the analysis, as this Court has already found that the laws of the relevant States do not conflict. *Doe I*, 2006 WL 516744, at *4. Thus, Defendants' effort to persuade this Court to depart from holding in *Doe I* is without merit.

## 2.    D.C. Law Applies To All Claims

When a District Court exercises diversity jurisdiction, it looks to the forum state's choice of law provision to determine the substantive law to apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Because this is a diversity case brought in the District of Columbia, the District of Columbia's choice of law provisions determine which state's law applies to Plaintiffs' claims.

The first step in the District of Columbia's choice of law analysis is to determine whether there is a conflict between the law of the forum and the law of any other jurisdiction with an interest in the case. Where there is no material conflict, the forum applies its own law. *Y.W.C.A. v. Allstate Insurance Co.*, 275 F.3d 1145, 1150 (D.C. Cir. 2002); *Ulliman Schutte Const., Inc. v.*

---

substantial interest in having its law applied.'" *Rymer*, 574 A.2d at 286 (citing *Estrada v. Potomac Elec. Power Co.*, 488 A.2d 1359, 1365 (D.C.1985)). Critically, *Rymer* did not instruct the courts to examine which *state* has the most substantial interest in having its law applied. Defendants' reliance on the Restatement's definition of "state" is therefore inapposite.

[12]    Defendants' other citations support the conclusion reached by this Court in *Doe I* that the United States has the greatest interest in the actions of its corporations. *See, e.g., Tramontana v. S.A. Empresa De Viacao*, 350 F.3d 468, 471 (D.C. Cir. 1965 (focusing on Brazil's interest in regulating its aviation industry); *Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp.*, 172 F. Supp. 2d 79, 94 (D.D.C. 2001) (focusing on Russia's interest in regulating its arms industry).

21

*Emerson Process Management Power & Water Solutions*, No. 02-1987, slip op. at *3 (D.D.C. June 19, 2007); *Jones v. Hartford Life and Acc. Ins. Co.*, 443 F. Supp. 2d 3 (D.D.C. 2006); *Wright v. Sony Pictures Entm't, Inc.*, 394 F. Supp. 2d 27, 31 (D.D.C. 2005).

As in *Doe I*, District of Columbia law applies to all of Plaintiffs' claims, because there is no material conflict between the laws of any of the interested jurisdictions. *Doe I*, 2006 WL 516744, at *4. Thus, the remainder of the choice of law analysis is unnecessary.

### 3. Application Of D.C. Law Does Not Violate Due Process Or Defendants' Right To Fair Notice

Defendants' Constitutional rights are not injured by the application of District of Columbia law to this case. The Supreme Court has held that a court must determine whether a true conflict of law exists before reaching the due process question. As the Court stated in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985), "We must first determine whether [forum] law conflicts in any material way with any other law which could apply. There can be no injury in applying [a state's] law if it is not in conflict with that of any other jurisdiction connected to this suit."

Defendants do not assert that their due process rights would be infringed by being subjected to the laws of the United States, in general. This stands to reason, as all of the Defendants were incorporated in the United States during the time period relevant to Plaintiffs' injuries. Defendants cannot, and do not, argue that being subject to the laws of the United States violates their Constitutional rights.

Instead, Defendants argue that the application of District of Columbia law to the instant case violates their due process rights because there are insufficient contacts, they allege, between the District of Columbia and Plaintiffs' claims. Defendants' argument fails, however, because *Shutts* clearly instructs the courts that the first step in the due process analysis is to determine

whether there is a true conflict between the bodies of law in question. *Shutts*, 472 U.S. at 816.

Defendants have not established any conflict between any of the bodies of law that might apply

in this matter, including the laws of New Jersey, Texas, or Delaware. Def. Mem. at 31–36. Nor

have they argued that the application of New Jersey, Texas, or Delaware law would infringe their

Constitutional rights. *Id.*

 This Court held in *Doe I* that there is no material conflict between these bodies of law.

*Doe I*, 2006 WL 516744, at *4. Under *Shutts*, it is thus unnecessary to reach the due process

question as there is no material conflict of laws and the court is merely applying forum law in

lieu of another state that has significant contacts with the claims. *Shutts*, 472 U.S. at 816. As a

result, unless Defendants are prepared to argue that the due process clause prohibits the

application of Texas law, where EMC has its principal place of business, or New Jersey law,

where EMC is incorporated, or Delaware law, where EMOI was incorporated at all times

relevant to Plaintiffs' injuries, then *Shutts* directs that "[t]here can be no injury" in applying

District of Columbia law. *Id.*

 Defendants cite several cases that applied a due process test and ultimately found

insufficient contacts between the chosen law and the controversy before the court. Unlike the

instant case, these cases identified a true conflict between the competing bodies of law. *See, e.g.*,

*Shutts*, 472 U.S. at 816 (finding numerous conflicts between Oklahoma, Kansas, and Texas law

and remanding for a more thorough conflicts analysis); *McCluney v. Joseph Schlitz Brewing Co.*,

649 F.2d 578 (8th Cir. 1981) (finding material conflicts between Missouri and Wisconsin law);

*Price v. International Telephone and Telegraph Corp.*, 651 F. Supp. 706 (S.D. Miss. 1986)

(material conflicts between Mississippi and Alabama statutes).[13]

Moreover, Defendants have extensive contacts in the District of Columbia, either directly or through their agents. Compl. ¶¶ 12, 15, 17, 18. Thus, there is no basis for arguing that the choice of law in this case—as dictated by the District of Columbia choice of law rules—impairs Defendants' constitutional rights. The choice of law due process analysis invoked by the Defendants is wholly satisfied by the analyses undertaken by this Court in *Doe I* and requires no further analysis in the instant case.[14]

### E.    The Complaint Is Sufficient To Sustain Plaintiffs' Claim That ExxonMobil Is Liable For The Tortious Conduct Of Its Security Personnel

In *Doe I*, this Court rejected Defendants' argument that the same claims — among them, negligent supervision, negligent hiring, assault, battery and intentional infliction of emotional distress — failed to state a claim. *Doe I*, 2006 WL 516744, at *3-4.[15] Defendants present no reason to depart from this conclusion as the allegations in the complaint clearly meet the standards of *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). As in *Doe I*, "Plaintiffs have adequately alleged that defendants knew or had reason to know that paying the Indonesian military personnel to provide security for defendants' pipeline posed a danger to others as evidenced by the alleged history of human rights abuses by Indonesian soldiers." *Doe I*, 2006 WL 516744, at *4.

---

[13]    *Boehner v. McDermott*, 332 F. Supp. 2d 149 (D.D.C. 2004) is inapposite because the plaintiff in that case filed his complaint in the District of Columbia, but urged the application of Florida law, on the grounds it was similar to the D.C. statute. The Court rightly concluded that *Shutts* conflict analysis did not extend to this dissimilar scenario.

[14]    Indeed, given that substantially similar claims were brought against them under District of Columbia tort law in 2001, *Doe I* Compl., No. 01-1357, Dkt. 3, Defendants had ample notice that District of Columbia tort law would apply to Plaintiffs' claims.

[15]    *Doe I* dismissed plaintiffs' negligent infliction of emotional distress claim. *Id.* That claim is not alleged here.

24

Defendants attempt to stretch *Twombly* far beyond its holding – which relates to the plausibility of facts pled in support of a complex antitrust conspiracy – to argue that Plaintiffs have failed to state their tort claims. *Twombly* does not alter the pleading standard for tort claims:

> Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'

*Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (citing *Twombly*, 127 S. Ct. at 1964–65). Defendants cite *Twombly* for the principle that "[f]actual allegations must be enough to raise a right to relief above the speculative level". 127 S. Ct. at 1965. Plaintiffs' Complaint easily satisfies this standard.

Plaintiffs adequately pled that Defendants made the relevant decisions regarding hiring and supervision. Compl. ¶¶ 76–93. Plaintiffs also pled that Defendants paid individual, low-ranking military personnel on a monthly basis, in addition to making other lump sum payments. Compl. ¶¶ 44-45.[16] Plaintiffs have also properly alleged that ExxonMobil security personnel were acting under the supervision, direction, and control of, and with the knowledge and authority of ExxonMobil. Compl. ¶¶ 42-43, 50, 80, 87-91. In addition, Plaintiffs allege that Defendants' "supervision, control and direction" over the security personnel included:

    (a)    conditioning payment on the provision of specific security services;
    (b)    making decisions about where to place bases, strategic mission planning, and making decisions about specific deployment areas;

---

[16]    Defendants are mistaken when they assert that Plaintiffs failed to allege that Defendants paid individual soldiers. However, this fact is not dispositive in any of the claims and, moreover, Plaintiffs need not plead specific facts, particularly facts that can only be obtained through discovery. *E.g., Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) (rejecting demand for greater factual detail in *respondeat superior* claim).

(c)     material support to ExxonMobil security personnel, including but not limited to:

       (i)   constructing and/or providing facilities that were used for the detention and other abuses of Plaintiffs;

      (ii)  providing weapons funding, military equipment, and other supplies used in the abuse of Acehnese residents, including Plaintiffs;

     (iii)  paying consultants and/or mercenaries to provide advice, training, intelligence, and equipment to ExxonMobil security personnel.

Compl. ¶ 47. Plaintiffs allege that "ExxonMobil security personnel shot Plaintiff John Doe VIII in the knee"; "ExxonMobil security personnel dragged Plaintiff John Doe IX along the ground" and "stomped Plaintiff John Doe IX's head"; John Doe X was "taken inside the ExxonMobil security post, detained, and beaten"; and "ExxonMobil security personnel stationed [at a security post] kicked and punched" John Doe XI as he "traveled by car past an ExxonMobil security post on his way to a volleyball match." Compl. ¶¶ 60–63. Plaintiffs allege that "In committing the tortious conduct alleged herein, ExxonMobil's security personnel were acting under the supervision of Defendants and/or as Defendants' agents" and "were acting in furtherance of ExxonMobil's financial and corporate interests." Compl. ¶ 64. Plaintiffs allege that "Defendants had reason to know and/or did know the nature and scope of the tortious conduct alleged herein, including the unprovoked shootings, assault, battery and detention of Plaintiffs carried out by ExxonMobil's security personnel." Compl. ¶ 66. These allegations are clearly "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action," *Twombly*, 127 S. Ct. at 1965, and they are more than enough to satisfy the federal pleading standards.

### 1.    There Is A Clearly Established Standard Of Care For Security Personnel

The focus of this litigation, as this Court has articulated, is to answer the question: "did U.S. corporations in their effort to secure their pipeline in Indonesia violate U.S. state tort law?" *Doe I*, 393 F. Supp. 2d at 29–30. Defendants' insistence that the "crux of the Plaintiffs' Complaint" is "the oversight of military activities," Def. Mem. at 44, misstates the claims in this

case. Plaintiffs do not challenge military judgments; they are seeking redress for their injuries inflicted by the security personnel retained by a private U.S. corporation.

Defendants overlook a number of cases that provide a clear standard of care for armed security personnel. In *Jones v. Wittenberg University*, 534 F.2d 1203 (6th Cir. 1976), for example, the court applied the objective standard of a "reasonably prudent person under the circumstances" to decide the liability of a university security guard who negligently shot and killed a university student. The claims at issue are routinely confronted by the courts. *See, e.g., Dillard Dep't Store v. Silva*, 148 S.W.3d 370 (Tex. 2004) (store liable for false imprisonment and negligence in detention and arrest of customer by police officer working security); *Pusey v. Bator*, 762 N.E.2d 968, 973 (Ohio 2002) (applying enhanced duty of care after finding that hiring armed guards to protect property was inherently dangerous activity because it was foreseeable that an armed confrontation might occur); *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856 (D.C. 1982) (holding grocery store vicariously liable for tortious conduct of independent contractor security guard); *accord Wilson v. Good Humor Corp.*, 757 F.2d 1293, 1312 (D.C. Cir. 1985) ("one who employs an independent contractor to do work involving a special danger to others which the employer . . . contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."). Defendants' suggestion that there is no standard of care applicable to the conduct at issue is mistaken.

Defendants rest their argument on a series of cases dismissed under the *Feres* doctrine, which has no bearing on the instant litigation.[17] *Gilligan v. Morgan*, 413 U.S. 1 (1973), is

---

[17]     *See U.S. v. Shearer*, 473 U.S. 52 (1985) (dismissed under the *Feres* doctrine—an exception to the FTCA that bars soldiers from recovering from the Government for injuries that are incident to their service); *Chappell v. Wallace*, 462 U.S. 296 (1983) (holding that enlisted military personnel are not entitled to a Bivens-type remedy

similarly inapposite, as it was dismissed on political question grounds based on the type of relief sought. *Compare Scheuer v. Rhodes*, 416 U.S. 232 (1974) (justiciable tort suit) *with Gilligan* (non-justiciable suit arising out of same episode, but seeking judicial supervision and training of Ohio National Guard). Defendants cite only two cases involving corporate, rather than government or military defendants, and neither is relevant to the instant case. In *Smith v. Halliburton Co.*, No. 06-0462, 2006 WL 2521326 (S.D. Tex. Aug. 30, 2006), the court found that the defendant corporation was hired to provide *food services* at a military dining facility, and was therefore not responsible for providing security at the soldiers' mess hall where the injury occurred. In *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. 2006), the victim was an enlisted U.S. soldier stationed in Iraq who was rear-ended by the contractor he was assigned to escort. The court held that the political question doctrine barred the wrongful death and survivor claims brought by the soldier's parents. These cases – both of them brought by U.S. soldiers injured in the course of duty – have no bearing on the negligence standard applicable to armed security personnel who are alleged to have injured civilians in the course of protecting corporate interests.

## 2. ExxonMobil Is Directly Liable For Negligent Hiring And Supervision

Defendants attempt to escape liability for their negligent hiring and negligent supervision by making two additional arguments. First, Defendants argue that Plaintiffs failed to allege that Defendants "hired" or "retained" members of the Indonesian military to provide security. To the contrary, Plaintiffs have indeed alleged that Defendants hired members of the Indonesian military and police forces to secure the corporations' interests in Aceh, Indonesia. Compl. ¶¶ 39–47, 77. In addition, Plaintiffs pled that Defendants made the relevant decisions regarding

---

against their superior officers); *Satterfield v. U.S.*, 788 F.2d 395 (6th Cir. 1986) (*Feres* doctrine barred recovery by a decedent serviceman whose death was caused by fellow soldiers).

hiring and supervision, Compl. ¶¶ 54–59, and did so negligently, Compl. ¶¶ 70–75, 78–80. As a

direct result of their negligent acts, Plaintiffs suffered and continue to suffer injuries. Compl. ¶¶

81–82. Thus, Defendants' argument that "no causation could be established" is without merit.

*See Doe I*, 2006 WL 516744, at *3-4.

Second, Defendants' assertion that Plaintiffs must plead more specific facts for each

individual security person is incorrect. The Restatement (Second) of Torts § 411 (1965),

provides as its first illustration of Negligence in the Selection of a Contractor.

> The A Company … employs the B Company, a collecting agent.
> A Company knows that the B Company's employees are rough and
> violent and addicted to quarreling with the customers of its clients.
> The A Company instructs the B Company to collect C's unpaid
> installments. The B Company sends D, one of its employees, to do
> so. D gets into an argument with C and in the course of it
> unjustifiably knocks C down and seriously harms him. A is
> subject to liability to C.

This rule has been adopted in the District of Columbia. *See, e.g., Levy v. Currier*, 587 A.2d 205

(D.C. 1991); *Wilson v. Good Humor Corp.*, 757 F.2d 1293 (D.C. Cir. 1985). The illustration

above is very similar to the facts of this case. Plaintiffs allege that Defendants employed

members of the Indonesian military although "ExxonMobil knew or should have known that

members of the military continued to commit gross abuses," rendering them "unfit, incompetent

or otherwise dangerous to Plaintiffs." Compl. ¶ 52, 72.[18]

Defendants further assert that Plaintiffs' claim is defective because "Plaintiffs do not

allege that any Defendants 'supervised' the alleged" attacks on John Doe VIII, John Doe IX,

John Doe X, and John Doe XI. Def. Mem. at 43. Plaintiffs need not show that Defendants

---

[18]    Whether the individuals were hired via an independent contractor does not heighten the pleading standards
or diminish Defendants' liability. Defendants cite only one case for this proposition, which does not support
Defendants' claim that such a rule exists. *Alexander v. Washington Gas Light Co.*, 481 F. Supp. 2d 16 (D.D.C.
2006), was decided on defendants' motion for summary judgment, not a motion to dismiss, and there was no
discussion of the pleading standards applicable to negligent hiring claims.

actually witnessed each Plaintiff's injury; rather, they must show that Defendants "knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752 (D.C. 2001) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985)). Indeed, there is a "line of cases holding that an employer is liable for the negligence of his employee if at the time of the negligent act the employee is acting within the scope of his employment even where the employee injures a third person while disobeying his master's orders." *District of Columbia v. Davis*, 386 A.2d 1195, 1202 (D.C. 1978) (citations omitted) (holding District of Columbia liable for negligent acts of off-duty officer who, in a private apartment, was wearing improperly holstered firearm at time of injury). In the instant case, it is sufficient that Plaintiffs allege that Defendants supervised the security personnel in their daily work, providing security services for the Arun Project, Compl. ¶¶ 87–88, and that Plaintiffs' injuries were caused by actions of the security personnel committed within the scope of their employment. Compl. ¶ 43.

As stated above, the Federal Rules require only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Erickson*, 127 S. Ct. at 2200. Plaintiffs satisfied the federal pleading standard when they asserted that Defendants retained security personnel who Defendants knew or reasonably should have known to be unfit, incompetent, and dangerous on the basis of the extremely well-publicized history of abuses committed by these security personnel including kidnapping, murder, rape, torture and other forms of abuse. Compl. ¶¶ 51–53, 79; *Doe I*, 2006 WL 516744, at *3-4.

### 3. ExxonMobil Is Vicariously Liable For The Actions Of Its Security Personnel

Defendants contend that that Plaintiffs have failed to properly plead a master-servant relationship between the tortfeasing security personnel and the Defendant corporations. Def.

30

Mem. at 41. Defendants cite two cases in which the courts failed to find the District of Columbia liable for the tortious conduct of federal law enforcement officers patrolling areas routinely patrolled by Metropolitan Police. Both cases, however, clearly demonstrate that the District of Columbia follows the "borrowed servant doctrine," which provides vicarious liability where a traditional master-servant relationship cannot be established. According to this doctrine, "If the borrowed servant commits a tort while carrying out the bidding of the borrower, vicarious liability for that tort attaches to the borrower and not to the general master." *Estate of Carter v. District of Columbia*, 903 F. Supp. 165, 167 (D.D.C. 1995) (quoting *Dellums v. Powell*, 566 F.2d 216 (D.C. Cir.1977), cert. denied, 438 U.S. 916 (1978)). As this Court found in *Saffron v. Wilson*, 481 F. Supp. 228, 246 (D.D.C. 1979), "the District could be liable for the Park Police officers' action if those officers had, as a result of the cooperation of official defendants, come under the 'authoritative direction and control' of the District."

Ultimately, the plaintiffs in *Saffron* failed to show anything more than "an arrangement of cooperation and consultation" between two police forces with overlapping jurisdiction over the city. In contrast, Plaintiffs allege that Defendant EMC and its subsidiaries "supervised, controlled and directed" military and police personnel in the provision of private security services, that the "security personnel were acting in furtherance of ExxonMobil's financial and corporate interests," not the interests of the Indonesian military, generally, and that "ExxonMobil security personnel acted 'for defensive purposes only, and not for maintaining general law and order.'" Compl. ¶ 41, 47, 65. Thus, Defendants' relationship with the tortfeasing soldiers clearly goes beyond "an arrangement of cooperation and consultation" and the borrowed servant doctrine is properly applied to Plaintiffs' claims.

Moreover, the borrowed servant doctrine is only one among several theories of vicarious

liability that applies to Defendants' conduct. Employers are vicariously liable for the actions of independent contractors in a number of situations, including when the employer retains control over the activities of the independent contractor, when the work contracted for involves an inherent danger, or when the work is likely to create a particular risk of harm to others absent special precautions. *See, e.g.*, Prosser & Keeton, *Torts* (5th ed. 1984) § 71; Restatement (Second) Torts §§ 413 ("Duty to provide for taking of precautions against dangers involved in work entrusted to contractors"), 414 ("one who entrusts work to an independent contractor, but who retains the ability to control any part of the work, is subject to liability for physical harm to others"), 416 (liability imposed on one "who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others"), 427 comment b (employer is liable if the work "involves a risk, recognizable in advance, of physical harm to others which is inherent in the work itself, or normally to be expected in the ordinary course of the usual or prescribed way of doing it, or that the employer has special reason to contemplate such a risk under the particular circumstances under which the work is to be done"), 877 (imposing liability on, *inter alia*, one who orders or induces another's conduct, permits another to act upon his premises or with his instrumentalities, or has a duty to use care to control the conduct of another, knowing the conduct is likely to do harm). These doctrines are recognized and applied in the District of Columbia. *See, e.g.*, *Wilson v. Good Humor Corp.*, 757 F.2d 1293 (D.C. Cir. 1985). They were likewise relied on in *Doe I*, 2006 WL 516744, at *5–6.

### 4.    The PSC

Defendants assert that their Production Sharing Contract (PSC) with BPMIGAS "disproves Plaintiffs' claim." Def. Mem. at 38–40. This challenge to the merits is not cognizable on a motion to dismiss and is moreover inaccurate: The PSC cannot and does not

32

"disprove" Plaintiffs' allegations.

Plaintiffs have alleged that Defendants made a number of arrangements with members of the Indonesian military having nothing to do with the PSC. *See, e.g.,* Compl. ¶¶ 39-47. For the purposes of deciding Defendants' Motion to Dismiss, this Court must accept these allegations as true. *See Osseiran v. International Finance Corp.*, 498 F. Supp. 2d 139 (D.D.C. 2007) ("The complaint must be construed in the light most favorable to the plaintiff and 'the court must assume the truth of all well-pleaded allegations.'"). *See also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3rd Cir. 1997) (at pleading stage, Court must credit plaintiffs' allegations rather than defendants' responses). The PSC is not the sole agreement governing Defendants' contractual obligations in the Aceh region; it therefore cannot "disprove" Plaintiffs' allegations by negative implication. Defendants have simply cherry-picked this document from among the many contractual arrangements identified or implied in Plaintiffs' complaint. In so doing, and in asserting that "the provision of security was solely BPMIGAS' obligation," Def. Mem. at 40, Defendants have not established grounds for dismissal; they have merely identified one of the material facts that is in dispute and must be resolved at trial.

**F.    Plaintiffs Have Standing**

Defendants do not contest that Plaintiffs have met the Article III standing requirements. Def. Mem. at 10. That Plaintiffs are nonresident aliens "does not alter the fact that [they] have suffered a concrete injury in fact sufficient to ground Article III standing …it is the injury and not the party that determines Article III standing." *Cardenas v. Smith*, 733 F.2d 909, 913 (D.C. Cir. 1984) (citing *Warth v. Seldin*, 422 U.S. 490 (1975)).

Nor are Plaintiffs denied access to the Court by any prudential standing limitation. There is no "general rule," as Defendants assert, barring suits by nonresident aliens. *See, e.g., Rasul v. Bush,* 542 U.S. 466, 484 (2004) ("United States courts have traditionally been open to

nonresident aliens"); *Disconto Gesellschaft v. Umbreit*, 28 U.S. 570, 578 (1908) ("Alien citizens, by the policy and practice of courts of this country are ordinarily permitted to resort to the courts for the redress of wrongs and the protection of their rights"); *Accord* Dag Ytreberg, 3 C.J.S. Aliens § 168 (Supp. 2007) ("An alien may generally maintain an action based on contract, or wrongful or tortious conduct, and may bring an action to recover under a state wrongful death statutes. Aliens have been permitted to bring actions for personal injuries, including products liability actions. . . .") (citations omitted). Contrary to Defendants' suggestion, a myriad of cases demonstrate that nonresident alien plaintiffs have standing to sue for wrongful or tortious conduct. *See, e.g., Sale v. Haitian Centers Council*, 509 U.S. 155 (1993) (reviewing challenge by nonresident Haitian boat people to repatriations); *Windward Shipping (London) Ltd. v. American Radio Ass'n, AFL-CIO*, 415 U.S. 104 (1974) (reviewing suit by nonresident aliens to bar, as tortious under Texas law, the picketing of their vessels); *Wilderness Soc'y v. Morton*, 463 F.2d 1261 (D.C. Cir. 1972) (nonresident Canadian citizen and Canadian environmental organization have standing to intervene); *Constructores Civiles de Centroamerica, S.A. v. Hannah*, 459 F.2d 1183 (D.C. Cir. 1972) (nonresident alien corporation has standing); *Estrada v. Ahrens*, 296 F.2d 690 (5th Cir. 1961) (nonresident alien has standing); *People of Saipan v. United States Dep't of Interior*, 356 F. Supp. 645, 652 (D. Haw. 1973) (finding no prudential bar to suit by nonresident aliens, who "have been allowed to sue in United States courts to protect their property or personal rights").

That Plaintiffs have standing is evidenced by the fact that cases very similar to this one, where aliens bring common law tort claims in United States courts, are not uncommon. This Court found in *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.D.C. 2005), for example, that common law claims brought by the nonresident alien plaintiffs could go forward even though

claims under the Alien Tort Statute required dismissal. *Id.* at 15 (Plaintiffs' claims "actionable

under a number of common law theories."); *see also Bowoto v. Chevron Corp.*, No. C. 99-02506

SI, 2007 WL 2349345, at *1-2 (N.D. Cal. Aug. 14, 2007) (granting Nigerian plaintiffs' summary

judgment motion in suit by nonresident alien plaintiffs bringing common law tort claims against

Chevron for tortious conduct in Nigeria); *Arias v. Dyncorp*, No. 01-1908, 2007 WL 1521044, at

*1 (D.D.C. May 21, 2007) (permitting nonresident aliens to proceed with claims under statutory

and common law of District of Columbia for tortious conduct on the Colombia/Ecuador border);

*Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 342-43, 359 (C.D. Cal.

1997) (Burmese labor organization had standing to bring negligence claim against Unocal and

permitting claims, including, *inter alia*, state tort law claims, of individual nonresident aliens to

proceed against Unocal).[19]

## G.    This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims

ExxonMobil Oil Indonesia's ("EMOI") recent reincorporation in the Cayman Islands

does not defeat subject matter jurisdiction under 28 U.S.C. § 1332(a)(2).  Complete diversity still

exists because EMOI's citizenship is determined solely by the principal place of business of its

alter ego and ultimate parent company, EMC.

---

[19]    The cases Defendants cite do not hold that there is a prudential standing limitation against nonresident aliens bringing tort claims against domestic corporations. *See Arbelaez v. Newcomb*, 1 Fed. Appx. 1 (D.C. Cir. 2001) (holding only that nonresident aliens had no standing to challenge constitutional limitation on Bill of Attainder or *ex post facto* laws); *Eminente v. Johnson*, 361 F.2d 73 (D.C. Cir. 1966) (holding that action against United States could not be maintained because United States declined to consent to suit, not because plaintiff was nonresident alien). *Kukatush Min. Corp.* v. *S.E.C.*, 309 F.2d 647, 650 (D.C. Cir. 1962), which predates *Wilderness Society*, 463 F.2d at 1261, and *Constructores Civiles de Centroamerica*, 459 F. 2d at 1183, notes that "the decisions over the years disclose a definite trend to relax the rigidities" of standing requirements for non-resident aliens, as does *Berlin Democratic Club*, 410 F. Supp. 144, 152 (D.D.C. 1976). *Compare also El-Shifa Pharmaceutical Indus. Co. v. United States*, 378 F.3d 1346, 1352 (Fed. Cir. 2004) (declining to hold that Takings Clause does not protect interests of nonresident aliens whose property is located in foreign country) *with Ashkir v. United States*, 46 Fed. Cl. 436 (Fed. Cl. 2000) (earlier case holding nonresident alien did not have standing under the Taking Clause because the property at issue was outside United States). Finally, *Johnson v. Eisenstrager*, 339 U.S. 763 (1950), deals with the extension of Constitutional protections to enemy aliens in wartime, and has no bearing here.  Moreover, its holding has been called into question by *Rasul v. Bush*, 542 U.S. 466 (2004).

Pursuant to 28 U.S.C. § 1332(c), an alien corporation is a citizen of the state in which it has its principal place of business. As an alter ego of EMC, however, EMOI does not have its own principal place of business, but is treated as having the same principal place of business as EMC. The fact that EMOI is now incorporated outside the United States is irrelevant to the analysis, making EMOI a citizen only of Texas, where EMC has its principal place of business.

Accordingly, the Court should deny Defendants' motion to dismiss the complaint for lack of subject matter jurisdiction.

### 1.    An Alien Corporation Is Deemed A Citizen Of The State In Which It Has Its Principal Place Of Business

In *Saadeh v. Farouki*, 107 F.3d 52 (D.C. Cir. 1997), the D.C. Circuit noted that it "has yet to decide whether an alien corporation is deemed a citizen of its principal place of business for purposes of the diversity statute." *Id.* at 56 n.5. It then cited *Jerguson v. Blue Dot Investment, Inc.*, 659 F.2d 31 (5th Cir. 1981), which held that "a foreign corporation is a citizen for diversity jurisdiction purposes of a state where it has its principal place of business." *Id.* at 35; *see generally* 13B Charles Alan Wright et al., *Federal Practice and Procedure* ("*FP&P*") § 3628 (3d ed. 2004).

Although the *Saadeh* court did not need to resolve the issue, the Supreme Court subsequently noted that "those Circuits that have reached the issue are in agreement that § 1332(c) extends to alien corporations" and concluded that "[t]here is no need for us to weigh in on this point." *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 98 (2002); *Vareka Investment, N. V. v. American Investment Properties, Inc.*, 724 F.2d 907, 909 (11th Cir. 1984); *Jerguson*, 659 F.2d at 35). This Court should therefore follow *Jerguson* and its progeny.

Because 28 U.S.C. § 1332(c) applies to alien corporations, EMOI is deemed a citizen of

the state in which it has its principal place of business. As discussed below, EMOI's principal

place of business is in Texas, and it should be considered to be a citizen *only* of Texas for

purposes of diversity jurisdiction.

### 2. Because EMOI Is An Alter Ego Of EMC, EMOI's Principal Place Of Business Is In Texas

Plaintiffs allege that EMOI is an alter ego of its ultimate parent, EMC. *See* Compl. ¶ 27.

Addressing personal jurisdiction in *Doe I*, this Court held that "Plaintiffs have sufficiently pled

facts that, if true, would support jurisdiction over Exxon Indonesia as an alter ego of Exxon

Mobil." 393 F. Supp. 2d at 29. These same facts, if proven by Plaintiffs, establish Texas – the

principal place of business of EMC – as the principal place of business of EMOI as well.

"The general rule . . . is that a subsidiary corporation has its own principal place of

business for purposes of diversity jurisdiction, *unless it is merely an 'alter ego' or agent of the*

*parent corporation.*" 13B *FP&P* § 3625 (emphasis added); *see, e.g.*, *Toms v. Country Quality*

*Meats, Inc.*, 610 F.2d 313 (5th Cir. 1980). This rule was applied in *Grimandi v. Beech Aircraft*

*Corp.*, 512 F. Supp. 764 (D. Kan. 1981), a closely analogous case. In *Grimandi*, French citizens

sued a Canadian company and its U.S. parent, a Connecticut corporation with its principal place

of business in Connecticut. *See id.* at 771. The defendants argued that there was no complete

diversity, but the court disagreed, explaining that "[a]lter ego analysis can . . . be used in

determining Pratt & Whitney's true principal place of business." *Id.* at 774-75. Noting that it

had "previously held that plaintiffs have established a prima facie case to justify the piercing of

the corporate veil," the court held that "[i]f the veil is pierced, United Technologies' principal

place of business may be imputed to Pratt & Whitney of Canada." *Id.*

As in *Grimandi*, Plaintiffs have alleged and intend to prove that EMOI is an alter ego of

EMC. If they succeed, EMC's principal place of business (Texas) may be imputed to EMOI. If

not, the Court may "reconsider subject matter jurisdiction at that time." *Id.* In any event,

whether EMOI is an alter ego of EMC is a "question of fact," 13B *FP&P* § 3625, that should not

be resolved until later in these proceedings.

Plaintiffs' argument is consistent with *Pyramid Securities Ltd. v. IB Resolution, Inc.*, 924

F.2d 1114 (D.C. Cir. 1991), in which the court declined to adopt an argument that was the

reverse of Plaintiffs' argument here. The district court in *Pyramid* had imputed a subsidiary's

citizenship to its parent, using a "wholly anomalous" analysis that was "in some ways the *reverse*

of veil-piercing, for it looks through the shareholder (parent corporation) and treats the

corporation (subsidiary) as the controlling reality." *Id.* at 1120 (emphasis added). Here,

Plaintiffs submit that the subsidiary's principal place of business should be deemed to be that of

its ultimate parent, not the other way around.

In dicta, the *Pyramid* court stated that "[i]n the reverse context, addressing efforts to

attribute a parent's citizenship to its subsidiary, the courts have treated the two as separate

entities." *Id.* The court then cited two cases, both of which *support* using an alter ego analysis in

this context. In *U.S.I. Properties Corp. v. M.D. Construction Co.*, 860 F.2d 1 (1st Cir. 1988), the

court explained that the alter ego issue involves a "factual determination" about whether "the

corporate separation is real and carefully maintained." *Id.* at 7. It then performed a "ping-pong

exercise" to discuss the evidence on both sides and concluded that the court's holding that the

subsidiary was not an alter ego of the parent was not clearly erroneous. *Id.* A similar factual

analysis was involved in the other case cited by the *Pyramid* court, *Quaker State Dyeing &

Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140 (3d Cir. 1972).[20]

---

[20]     It is true, as the *Pyramid* court noted, that "[t]he statute [28 U.S.C. § 1332(c)] suggests no attribution rule in either case." 924 F.2d at 1120. But the statute merely refers to a corporation's "principal place of business" – it

The fact that Plaintiffs' complaint alleges that "upon information and belief, [EMOI's] principal place of business [is] in Indonesia," Compl. ¶ 16, does not affect the analysis. If EMOI had "its *own* principal place of business for purposes of diversity jurisdiction," 13B *FP&P* § 3625 (emphasis added), that place would be in Indonesia. For the reasons described above, however, EMOI does not have its own principal place of business, because it is an alter ego of EMC. Thus, this case is no different from *Grimandi*, in which the court explained that "Pratt & Whitney's principal place of business is Quebec" but that its "*true* principal place of business" would be in Connecticut because if the corporate veil were pierced, "United Technologies' principal place of business may be imputed to Pratt & Whitney of Canada." 512 F. Supp. at 773, 776 (emphasis added); *see also Bonar, Inc. v. Schottland*, 631 F. Supp. 990 (E.D. Pa. 1986) ("That the parties allege in their complaints that ABPI-Del.'s principal place of business is Delaware is of no consequence to the court's jurisdictional determination.").[21]

### 3.     EMOI Should Be Deemed To Be A Citizen Only Of Texas

As explained above, 28 U.S.C. § 1332(c) applies to alien corporations and EMOI's principal place of business is Texas. This Court should deem EMOI to be a citizen *only* of Texas – not a dual citizen of Texas and the Cayman Islands. *See* 13B *FP&P* § 3628 ("Another analytical method for upholding jurisdiction would be to treat the foreign corporation as having a single domestic citizenship rather than dual citizenship. This approach would be most appropriate when the alien corporation's principal place of business is in an American state.").

This is precisely what happened in *Grimandi*, discussed above. There, the court held that

---

does not specify how the principal place of business is to be determined. As the courts have recognized, this determination is fact-intensive.

[21]     If the Court believes that it is necessary for Plaintiffs to clarify their allegation about EMOI's principal place of business, they request leave to so amend their complaint. *See Toms*, 610 F.2d at 316 (citing 28 U.S.C. § 1653).

it had diversity jurisdiction over a suit brought by a French plaintiff against a Canadian

corporation with a principal place of business in Connecticut (as a result of an alter ego analysis).

*See Grimandi*, 512 F. Supp. at 776. Thus, it considered the corporation a citizen only of

Connecticut, not a dual citizen of Connecticut and Canada (which would have destroyed

complete diversity).

Similarly, in *Trans World Hospital Supplies Ltd. v. Hospital Corp. of America*, 542 F.

Supp. 869 (M.D. Tenn. 1982), a United Kingdom corporation with its principal place of business

in the United Kingdom sued a Tennessee corporation with its principal place of business in

Tennessee. *See id.* at 871. The plaintiff later sought to add the defendant's subsidiary – a

Cayman Islands corporation with its principal place of business in Tennessee – as an additional

defendant. *See id.* The court found that the addition of this new defendant would not defeat

diversity jurisdiction because the subsidiary was a citizen only of Tennessee, holding that "[f]or

purposes of diversity jurisdiction an alien corporation is a citizen of the state in the United States

in which the corporation maintains its principal place of business." *Id.* at 879.[22]

Commentators have agreed that alien corporations with their principal places of business

in the United States should be deemed to be citizens of a U.S. state, not dual citizens of that state

and a foreign country. *See* 13B *FP&P* § 3628; Lisa Daniels, Comment, *The Diversity Statute

and Alien Corporations: International Shipping Co. v. Hydra Offshore, Inc.* ("*The Diversity

Statute*"), 16 Brook. J. Int'l L. 675, 678 (1990) ("[T]he 1958 amendment's application to alien

---

[22]     Not all courts have agreed with this interpretation of the statute. *See, e.g., Int'l Shipping Co. v. Hydra
Offshore, Inc.*, 875 F.2d 388 (2d Cir. 1989); *Choo v. Exxon Corp.*, 764 F.2d 1148 (5th Cir. 1985). In *Danjaq S.A. v.
Pathe Communications Corp.*, the Ninth Circuit stated that "an alien corporation, like a domestic corporation, is a
citizen of both" its place of incorporation and the principal place of business. 979 F.2d at 772 (9th Cir. 1992). But
the *Danjaq* court did not confront the issue presented here, making its remark dicta on this point. The plaintiff in
*Danjaq* was a Swiss corporation with its principal place of business in California, and the defendants were
California citizens. *See id.* at 773. Thus, the result would have been the same whether the plaintiff was considered a
dual citizen of Switzerland and California or a citizen only of California.

corporations was intended to create single domestic citizenship for foreign corporations with their principal place of business in the United States."); H. Geoffrey Moulton, Jr., *Alien Corporations and Federal Diversity Jurisdiction* ("*Alien Corporations*"), 84 Colum. L. Rev. 177, 178 (1984) ("[S]pecial concerns of alienage jurisdiction strongly support an interpretation of section 1332(c) that vests the alien corporation with single, domestic citizenship . . . .").

Such an interpretation is consistent with the purposes of the diversity jurisdiction statute. *See* Daniels, *The Diversity Statute*, at 689 ("The single citizenship interpretation . . . helps to attain Congress' goal in enacting the diversity statute: providing a neutral federal forum to hear controversies between litigants from different states."); *accord Trans World*, 542 F. Supp. 878 n.8 (holding that the alternative "would be obviously unfair to the totally alien [plaintiff]").

Moreover, an alien corporation "may not even have true ties to the country in which it is chartered, other than the fact that it was incorporated there." Daniels, *The Diversity Statute*, at 689. That is the case here – EMOI was incorporated in Delaware for nearly forty years, and reincorporated in the Cayman Islands only after it was sued in federal court by another group of Indonesian villagers.

In addition, a "single citizenship" interpretation "is likely to serve the 1958 amendment's purpose of reducing litigation in the federal district courts." Moulton, *Alien Corporations*, at 187. While it "would create diversity in a small class of cases in which it had previously not existed – those involving suits between an alien and an alien corporation with its principal place of business in the United States," there would likely be a "net reduction" because this reading "would defeat diversity in the apparently more common case of a suit between a citizen of state A and an alien corporation with its principal place of business in state A." *Id.*; *see also Trans World*, 542 F. Supp. at 879.

As noted above, the D.C. Circuit has not had occasion to decide this issue. But its brief discussion in *Saadeh* suggests that whether an alien corporation has a principal place of business in the United States does make a difference to whether there is diversity jurisdiction in a suit brought by an alien plaintiff. Thus, the *Saadeh* court explained that "because Dinavest was incorporated in the United Kingdom and had its principal place of business outside the United States, it was an alien." *Saadeh*, 107 F.3d at 56 n.4. This statement would be superfluous, however, if Dinavest would have been a dual citizen no matter where its principal place of business was located, because in that case there would have been no need for the D.C. Circuit to even consider the location of its principal place of business. (The court could have stated instead that "because Dinavest was incorporated in the United Kingdom, its principal place of business is irrelevant" – but it did not do so.)

Single citizenship for alien corporations also is supported by the text of 28 U.S.C. § 1332(c). "Prior to 1958, an alien corporation was considered, for purposes of diversity jurisdiction, a citizen solely of the foreign state in which it was incorporated." 13B *FP&P* § 3628. But this was a "constructive[]" rule that "deemed" alien corporations to be citizens of the foreign state. *E.g.*, *Nat'l S.S. Co. v. Tugman*, 106 U.S. 118, 121 (1882). A corporation is not a "natural citizen of its state of incorporation," and "Congress clearly has the power to change the status of corporations for diversity purposes." 13B *FP&P* § 3628.

This is precisely what Congress did in 1958. Section 1332(c) supplanted the prior, "constructive[]" rule and replaced it with a new one: "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business . . . ." 28 U.S.C. § 1332(c). Yet the first part of this statutory provision ("a citizen of any State by which it has been incorporated") applies only to states of the United

States because of the use of the capital "S." *See Jerguson*, 659 F.2d at 35 (stating that "[t]his is undoubtedly a correct reading of that part of the statute," but holding that the "principal place of business part of section 1332(c)" does apply to alien corporations). Thus, where alien corporations are concerned, the statute has replaced the default rule determined only by place of incorporation with a new rule determined only by principal place of business.[23] Accordingly, the Court has subject matter jurisdiction.

## H.    This Court Has Personal Jurisdiction Over EMOI

Defendants acknowledge that this Court has already found, in its evaluation of identical allegations, that "Plaintiffs have sufficiently pled facts that, if true, would support jurisdiction over Exxon Indonesia as an alter ego of Exxon Mobil," *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 29 (D.D.C. 2005), and permitted jurisdictional discovery. Defendants provide no basis for deviating from that precedent. *See GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000) (granting jurisdictional discovery to "sort out" whether a parent company and its subsidiary should be treated identically); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998) (permitting jurisdictional discovery where plaintiff has "a good faith belief that such discovery will enable it to show that the court

---

[23]    If the Court should determine that having EMOI as a party destroys diversity jurisdiction, then Plaintiffs request that the Court dismiss EMOI from this lawsuit pursuant to Rule 21. *See* Fed. R. Civ. P. 21; *Roy v. Theradyne Corp.*, 111 F.3d 963 (D.C. Cir. 1997) ("[I]t is clear that Rule 21 authorizes the dismissal of a nondiverse and dispensable party in order to preserve diversity jurisdiction. Such a dismissal establishes jurisdiction retroactive to the filing of a complaint and thus represents an exception to the general rule that the existence of jurisdiction is determined by reference to the facts that exist when an action is commenced.") (citing *Newman-Green, Inc. v. Alfonzo-Lorrain*, 490 U.S. 826, 830, 832 (1989); *Long v. District of Columbia*, 820 F.2d 409, 416-17 (D.C.Cir.1987)); *see also* 3A James W. Moore, *Moore's Federal Practice & Procedure* ¶ 21.03[2] at 21-10 (2d ed. 1996) ("court may permit the dismissal of such parties and thereby establish jurisdiction with *retroactive* effect.") (emphasis in original). Furthermore, if the Court were to dismiss EMOI, the remaining Defendants should not be heard to complain that EMOI is an indispensable party under Rule 19. The tortious conduct alleged in the Complaint is based on the centralized structure and decision-making of EMC and its subsidiaries, including EMOI. Compl. ¶¶18-27. Plaintiffs can therefore obtain complete relief in this action without EMOI. *See Nat'l Coalition Government of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 357 (C.D. Cal. 1997) (rejecting a defendant's claim that its joint venture partner was a necessary party in a suit alleging human rights abuses in Burma, because complete relief could be afforded among the remaining parties); *see also infra* Section J.

has personal jurisdiction over the defendant."); *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668,

676 (D.C. Cir. 1996) ("A plaintiff faced with a motion to dismiss for lack of personal jurisdiction

is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by

withholding information on its contacts with the forum.").

## I.    Plaintiffs' Claims Are Not Barred By The Statute Of Limitations

### 1.    Plaintiffs' Claims For Negligence, Negligent Hiring And Negligent Supervision Are Not Time-Barred

Plaintiffs' claims are not time-barred.  Defendants acknowledge that Plaintiffs'

negligence, negligent hiring and negligent supervision claims are subject to a three-year statute

of limitations.  *See* Def. Mem. at 39 (citing *Johnson v. District of Columbia*, No. 04-936 (RMC),

2005 WL 1903551 (D.D.C. July 20, 2005)); *see also* D.C. Code § 12-301(8) (establishing a

three-year residual statute of limitations for all claims not "otherwise specially prescribed").

Defendants argue that Plaintiffs' negligence claims are "intertwined" with the battery

claims, and therefore subject to the shorter statute of limitations for battery.  This argument

misstates both the governing law and Plaintiffs' allegations.  Where, as here, "the allegation of

negligence is based on an independent duty; namely, that the appellees breached a duty of care"

both negligence and battery claims may be brought, each subject to separate statutes of

limitations.  *See, e.g., Reaves-Bey v. Karr*, 840 A.2d 701, 703 (D.C. Cir. 2004); *see also Marusa*

*v. District of Columbia*, 484 F.2d 828, 831 (D.C. Cir 1973) (rejecting one-year statute of

limitations applicable to a "wounding" by a police officer, noting that a jury could well find the

misuse by the officer of his weapon "to have been proximately caused by the government's

negligence in hiring, training, or supervising the policeman," a distinct count in negligence); *Cf.*

*McCracken v. Walls-Kaufman*, 717 A.2d 346, 351 (D.C. Cir. 1998) (recognizing that "same

course of conduct may support both a claim of assault and battery and a claim of negligence" if

the defendant is shown to have breached a duty owed to the plaintiff in addition to commission of an intentional tort).  Defendants' own authority is not to the contrary, as it holds that both negligence and battery may go to the jury where the claims are "separate and distinct from each other, even though related." *District of Columbia v. Chinn*, 839 A.2d 701 (D.C. Cir. 2003).[24]

Here Plaintiffs have clearly alleged both vicarious liability for intentional torts, Compl. ¶¶ 94-110, and direct liability for negligent hiring and negligent supervision, *Id.* ¶¶70-93, separate and distinct claims.  Plaintiffs' negligence allegations are not conclusory.  Plaintiffs set out in detail the negligent actions of Defendants, including the decision to retain members of the Indonesian military for security services, despite knowledge that its members had a history of perpetrating gross human rights abuses. *Id.* ¶¶ 39-59. *See also, supra* pp. 24-32.

### 2. Plaintiffs' Claims For Assault, Battery, False Imprisonment And False Arrest Are Subject To Equitable Tolling

Plaintiffs' claims for assault, battery, false imprisonment and false arrest are subject to equitable tolling.  Limitations periods are customarily subject to equitable tolling and equitable estoppel. *See Young v. U.S.*, 535 U.S. 43, 48 (2002); *Zipes v. TWA, Inc.*, 455 U.S. 385 (1982)(statutes of limitations are subject to waiver, estoppel and equitable tolling); *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 275 (D.C. Cir. 2003) ("In litigation between private parties, courts have long invoked waiver, estoppel, and equitable tolling to ameliorate the inequities that can arise from strict application of a statute of limitations.").  Moreover, the policy of statutes of limitation "is frequently outweighed, however, where the interests of justice require vindication of plaintiff's rights." *See Burnett v. N.Y. Cent. Railroad Co.,* 380 U.S. 424, 428 (1965).  If a

---

[24]      *See also Rynn v. Jaffe*, 457 F. Supp. 2d 22, 24 (D.D.C. 2006) (IIED claims which stemmed from independent or separate acts would retain their three-year limitation). *Maddox v. Bano*, 422 A.2d 763, 764 (D.C. 1980) is inapposite: there, claims of negligence were rejected because the complaint specified "no negligent act." Here, Plaintiffs have sufficiently pled negligent acts (Compl. at ¶¶ 74-75, 79-83, & 87-93), and stated the duty owed by Defendants to Plaintiffs (Compl. ¶¶ 71-73, 78, & 86).

court determines that equitable tolling or equitable estoppel is appropriate, it "extends the time

for filing by a reasonable period after the tolling circumstance is mended." *Phillips v. Heine*,

984 F.2d 489, 492 (D.C. Cir. 1993).[25]

Courts routinely permit equitable tolling in "extraordinary circumstances" such as those

faced here by Plaintiffs.  In fact, the Eleventh Circuit recently found that "every court that has

considered the question of whether a civil war and a repressive authoritarian regime constitute

'extraordinary circumstances' . . . has answered in the affirmative." *Jean v. Dorelien*, 431 F.3d

776, 780 (D.C. Cir. 2005).  In *Jean*, Plaintiffs alleged that widespread, human rights abuses took

place in their country, the military routinely engaged in a campaign of repression, and threats of

retaliation kept individuals from reporting abuses, leading the Eleventh Circuit to conclude

tolling was appropriate.  *Id.  See also, e.g., Hilao v. Estate of Marcos*, 103 F.3d 767, 773 (9th

Cir. 1996) (tolling statute of limitations for claims of torture and summary execution until former

Philippine dictator left power and the country returned to democratic rule); *Doe v. Rafael

Saravia*, 348 F. Supp. 2d 1112, 1146-48 (E.D. Cal. 2004) (fear of retaliation from military,

government and death squads if plaintiffs brought litigation in United States warranted tolling

statutes of limitations during and after El Salvadoran civil war); *Rosner v. United States*, 231 F.

Supp. 2d 1202, 1209 (S.D. Fla. 2002) (presence of "difficult" circumstances after World War II

tipped balance in favor of equitable tolling); *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117

(E.D.N.Y. 2000) (Holocaust survivors alleged unlawful seizure of assets in 1940s; court found

extraordinary circumstances, including a policy of denial, precluded dismissal on limitations

---

[25]      Contrary to Defendants' representation, courts within the District of Columbia do recognize the doctrines
of equitable tolling and equitable estoppel. *See, e.g., Wiggins v. State Farm Fire and Cas. Co.*, 153 F .Supp. 2d 16,
21 (D.D.C. 2001) (equitable tolling applies where a plaintiff presents an "extraordinary" case); *see also Jankovic v.
International Crisis Group*, 494 F.3d 1080, 1086-87 (D.C. Cir. 2007).  The cases relied upon by Defendants have
declined to adopt these doctrines when a party requests a finding that timely filing in another jurisdiction tolled the
statute of limitations in the District of Columbia. *See, e.g., Johnson v. Marcheta Investors Ltd. Partnership*, 711
A.2d 109 (D.C. 1998) (citing *Bond v. Serano*, 566 A.2d 47, 49 (D.C. 1989)).

grounds); *Doe v. Unocal Corp.*, 963 F. Supp. 880, 897 (C.D. Cal. 1997) (tolling statute of limitations during Burmese dictatorship based on plaintiffs' alleged inability to "obtain access to judicial review" in Burma and threat of reprisal government if plaintiffs attempted to access courts in the United States); *Forti*, 672 F. Supp. at 1550 (equitable tolling applied during Argentine military rule "given the pervasiveness of the military's reign of terror").

In the instant case, Plaintiffs recount facts that similarly justify equitable tolling. Compl. ¶ 54 (citing sources from 1975 to 2001 that reference the long-running history of abuses and retaliation by members of the Indonesian military).[26] Throughout this time period, the Indonesian justice system was closed to Plaintiffs. *See Doe* I, 393 F. Supp. 2d at 25 (noting "that efforts to pursue this case in Indonesia would be futile"); Clarke Decl. at 2 ("Aceh, like many other conflict zones across Indonesia, is no exception to the Indonesian Government's well-documented failure to uphold international law and provide accountability for gross violations of international human rights and humanitarian law...[I]t is generally accepted that efforts to provide transitional justice have been thwarted by the powerful political influence of the Indonesia military."). Moreover, Plaintiffs, villagers in rural Indonesia, were unaware that a forum was available in the United States. Plaintiffs' inability to access this court sooner was further hindered by the declaration in Aceh of a "state of emergency with the status of martial law" by the Indonesian president in May 2003, followed by a period of "civil emergency," both of which severely restricted movement and information within the province. *See* Presidential Decree No. 28/2003 (attached hereto as Ex. T); Presidential Decree No. 43/2004 (attached hereto

---

[26]     Third-party reports making comparable assertions lend credibility to Plaintiffs' claims. *See, e.g.,* Human Rights Watch, *2006 World Report* ("undisciplined and unaccountable troops commit widespread abuses against civilians" and "Indonesia's executive and judicial branches regularly fail to address such abuses.") (attached hereto as Ex. R); and United States Department of State, Country Reports on Human Rights Practices – 2006, Indonesia (March 6, 2007) at 1 (attached hereto as Ex. S).

as Ex. U).  The situation was further aggravated by the mass destruction and devastation caused

by the December 2006 tsunami, which made Aceh inaccessible to Plaintiffs' counsel for a

prolonged period of time.  Indeed, the United States embassy in Indonesia was still restricting

U.S. Government employees' travel to Aceh until October 2007.  *See* United States Department

of State, Travel Warning – Indonesia (Jan. 9, 2007) (attached hereto as Ex. V).  As a result, even

if Plaintiffs had, in a timely fashion, become aware that they could bring claims in the United

States, limitations wholly outside of their control would have prevented them from accessing

counsel to seek redress of their grievances.

Statutes of limitations are "designed to promote justice by preventing surprises through

the revival of claims that have been allowed to slumber until evidence has been lost, memories

have faded, and witnesses have disappeared." *Order of R.R. Telegraphers v. Ry. Express

Agency, Inc.*, 321 U.S. 342, 348-349 (1944).  Here, because these claims arise from the same

pattern of conduct alleged in *Doe I,* and that case is presently in discovery, evidence has not been

lost, memories have not faded and witnesses have not disappeared.  Defendants will not suffer

prejudice from equitable tolling, as it is possible that little additional discovery would be

necessary.  *See Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 152 (1984) (noting

that the "absence of prejudice is a factor to be considered in determining whether the doctrine of

equitable tolling should apply"); *United States v. BCCI Holdings (Lux.), S.A.*, 916 F. Supp. 1276,

1281 (D.D.C. 1996) (government was effectively placed on notice through an earlier

correspondence regarding "the nature and extent of [plaintiffs'] claim and no prejudice would

arise to the government by equitable tolling").

These circumstances present an appropriate case for application of the doctrine of

equitable tolling.  Accordingly, this Court should toll the statute of limitations on these claims

and allow Plaintiffs' claims to proceed.

### 3.    Plaintiffs' Claims For Intentional Infliction Of Emotional Distress Are Subject To The Three-Year Residual Statute Of Limitations

Typically, claims for intentional infliction of emotional distress ("IIED") are governed by D.C. Code § 12-301(8) ("subsection 8"), which provides a three-year residual statute of limitations. However, courts apply a one-year statute of limitation to IIED claims that are 'intertwined' with D.C. Code § 12-301(4) ("subsection 4") claims. *See Rynn*, 457 F. Supp. 2d at 24.

Plaintiffs' IIED claims qualify for subsection 8's three-year limitation because they stem from conduct separate from the alleged subsection 4 wrongs. For example, Plaintiffs John Doe X and John Doe XI allege that they were first subjected to interrogation and abuse, and after being assaulted and battered by ExxonMobil security personnel, they were then subjected to further emotional distress when "armed ExxonMobil security personnel entered" their homes and "conducted what they called a 'peaceful ceremony,'" despite the fact that they remained "armed throughout the entire ceremony." Compl. at ¶¶ 62-63. Clearly, these allegations are independent of the assault and battery claims that Plaintiffs have set forth. *See Saunders v. Nemati*, 580 A.2d 660, 665 (D.C.1990). Accordingly, Plaintiffs' IIED claims are subject to subsection 8's three-year residual statute of limitations.

### J.    BPMIGAS Is Neither A Necessary Nor Indispensable Party, Rendering Irrelevant BPMIGAS's Absence From This Suit

The absence of BPMIGAS from the suit does not make the Complaint susceptible to dismissal for failing to join an indispensable party. Under Rule 19, the Complaint can only be dismissed for failure to join an indispensable party if the Court first finds that the absent party, BPMIGAS here, is "necessary" to the litigation according to factors enumerated in Rule 19(a). *Cherokee Nation of Oklahoma v. Babbitt*, 117 F.3d 1489, 1495 (D.C. Cir. 1997) (quoting Fed. R.

49

Civ. P. 19(b)). Only after the absent party is determined to be "necessary" does the Court

undertake a pragmatic analysis to determine whether the absent party can be joined.[27] "If a

necessary party cannot be joined, the court must turn to the second step, examining the factors in

Rule 19(b) to 'determine whether in equity and good conscience, the action should proceed

among the parties before it, or should be dismissed, the absent person being regarded as

indispensable.'" *Id.* (quoting Fed. R. Civ. P. 19(b)); *see also Western Maryland Ry. Co. v.

Harbor Ins. Co.*, 910 F. 2d 960, 961 (D.C. Cir. 1990) (citing *Provident Tradesmens,* 390 U.S.

102). Because BPMIGAS is not a necessary party, much less an indispensable party, the

Complaint cannot be dismissed because of BPMIGAS's absence.

### 1.    BPMIGAS Is Not A Necessary Party

Defendants argue that BPMIGAS is a necessary party under each of the three categories

in Rule 19(a). For each category, Defendants are mistaken.

Defendants' argument that an injunction cannot be effective because BPMIGAS manages

the Arun gas field, Def. Mem. at 21, which Defendants claim thereby impedes the ability of the

parties to achieve complete relief necessary under Rule 19(a)(1), is based on the false premise

that Defendants cannot be held accountable for their own tortious conduct. The Complaint

alleges that *Defendants* committed myriad torts against Plaintiffs in violation of United States

state tort law while securing oil facilities in Indonesia. *See* Compl. ¶¶ 39-49, 70-110.

Accordingly, Plaintiffs' injunction seeks to stop *Defendants* from participating in the continued

victimization of the Plaintiffs. *See* Compl. ¶ IX(d) (seeking equitable relief "permanently

enjoining Defendants from further engaging in abuses against Plaintiffs and their fellow

---

[27]    Rule 19 calls for a pragmatic decision based on practical considerations in the context of the particular
litigation. *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 116-17 n.12, 118 (1968).

villagers"). Such an injunction does not make BPMIGAS a necessary party.[28]

In *National Coalition Government of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 357 (C.D. Cal. 1997) ("*Burma*"), the court faced a similar argument from an oil company, Unocal, that its joint venture partner in Burma was a necessary party to a case alleging human rights abuses. The court rejected Unocal's argument, stating that the tortious nature of the conduct alleged led to the conclusion that "there is no reason complete compensatory relief may not be afforded among the remaining parties." *Id.* at 357-58.[29] *See also Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 691 (9th Cir. 1998); *Eldredge v. Carpenters 46 N. California Counties Joint.*, 662 F.2d 534, 537 (9th Cir. 1981) ("relief on plaintiffs' claims against [defendant] as an entity could be afforded by an injunction against [the defendant] alone"); *Hulburt Oil & Grease Co. v. Hulburt Oil & Grease Co.*, 371 F.2d 251 (7th Cir. 1966).

Nor does BPMIGAS "claim an interest relating to the subject matter of the action" that "as a practical matter impair[s] or impede[s] [its] ability to protect that interest." *See Fed. R. Civ. P. 19(a)(2).* A ruling against Defendants will force Defendants to pay its tort victims while an injunction will ensure that Defendants cease any conduct that could lead to further tortious injury. *See Exxon Corp.*, 94 F.R.D. 252, 257 (D.D.C. 1981) (holding that the interest of absent

---

[28]    *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), involved a standing analysis, not whether an absent party was "necessary" under Rule 19(a). *Lujan* notes, moreover, that the redressability element of Article III standing and the "*complete* relief" referred to by Rule 19 "are not identical." *Id.* at 569 n.4.

[29]    In rejecting Unocal's argument that Burmese entities were necessary parties, the *Burma* court distinguished *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 538 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470 (2d Cir. 2002), a case on which Defendants heavily rely:

[In Aguinda,] the court based its decision on the nature of the "extensive equitable relief sought by the plaintiffs – ranging from total environmental 'clean-up' of the affected lands in Ecuador to a major alteration of the consortium's Trans-Ecuador pipeline to the direct monitoring of the affected lands for years to come[.]" . . . Even though plaintiffs cannot obtain injunctive or declaratory relief against [the alleged necessary parties] in this action, complete relief can be accorded among those parties before the Court. Similarly, if injunctive relief against the existing defendants is available, such relief will not burden them any more than it would burden them if [the alleged necessary parties] were joined in the action.

*Burma*, 176 F.R.D. at 357-58 (emphasis added) (internal citations omitted). The court therefore concluded that the Burmese entities were not necessary parties, and that the indispensable party analysis need not be undertaken. Id. at 358. The facts here are closer to *Burma* than to *Aguinda*.

parties will not be impeded because the ultimate disposition of the case would, at most, find

Exxon responsible for the damage it caused).  Defendants all but ignore that the allegations in the

Complaint relate to their own conduct, and instead insinuate that BPMIGAS's asserted (and

unproven) role in providing security at the Arun gas field makes BPMIGAS the only party that

was either responsible for any harm Plaintiffs suffered or capable of redressing those harms.

Def. Mem. at 20-22.  But it is *Defendants'* obligations and responsibilities that are at issue in this

suit.  *See Exxon Corp.*, 94 F.R.D. 252, at 257-58 (rejecting Exxon's contention that the ability of

absent parties to protect their interests was impeded because the decision would not rule upon the

actions of other interested parties).

Furthermore, Defendants' insistence that BPMIGAS is a necessary party because

BPMIGAS has an interest in opining on the military and political situation in Aceh, Def. Mem.

at 22, is without merit.  To the extent Defendants feel obligated to respond to the Complaint with

a description of the situation in Aceh, they are more than capable of crafting such responses

without BPMIGAS.  Indeed, Defendants have already put forth arguments that depend on an

analysis of Aceh's political conditions.  Def. Mem. at 11-19.  An absent party is not necessary

simply because a defendant already in the action believes that an absent party is more capable of

presenting or explaining arguments that the defendant itself is also putting forth.

Defendants' argument under Rule 19(a)(2)(ii) – that BPMIGAS is a necessary party

because any steps Defendants would undertake to comply with an injunction would involve

obligations inconsistent with Defendants' obligations to BPMIGAS – is equally unavailing.

First, the nature of Defendants' obligations to BPMIGAS presents an issue of fact that depends

on more than the language of the contract Defendants attach to their motion, and therefore should

not be decided on a motion to dismiss.  Second, to the extent there is any conflict between

obligations owed to the Court and BPMIGAS, the conflict would not be the type of "inconsistent obligation" with which Rule 19(a)(2)(ii) is concerned. *Delgado v. Plaza Las Ams., Inc.*, 139 F.3d 1, 3 (1st Cir. 1998) ("Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident."); 4 James Wm. Moore, Moore's Fed. Prac. ¶ 19.03 (3d ed.1997); *see also Nelligan v. Cmty. Gen. Hosp. of Sullivan County*, 240 F.R.D. 123, 125 (S.D.N.Y. 2007) (finding joint tortfeasors not to be necessary parties under Rule 19(a)(2)(ii) because the joint tortfeasors would not be susceptible to inconsistent court rulings). Defendants' compliance with an injunction regulating *their own* behavior has no bearing on BPMIGAS's status as an absent party, and in no way makes BPMIGAS a necessary party under Rule 19(a).

BPMIGAS is therefore not a necessary party under any section of Rule 19(a).

### 2. BPMIGAS Is Not An Indispensable Party Even If The Court Determines That It Is A Necessary Party

Even if the Court finds that BPMIGAS is a necessary party,[30] considerations of equity and good conscience" prevent the Court from dismissing the action. *See* Fed. R. Civ. P. 19(b).[31]

> Dismissal [under Rule 19(b)] is essentially discretionary; the court's focus is on the following equitable factors: (1) to what extent a judgment rendered in the party's absence might be prejudicial to him or those already parties; (2) the extent to which, by the shaping of relief, prejudice can be lessened or avoided; (3)

---

[30] Plaintiffs will not attempt to join BPMIGAS as a party to this litigation, thereby obviating the need to determine whether joinder is feasible. Defendants' statement that "if an indispensable party has immunity from lawsuit, the court should dismiss the case" Def. Mem. at 23 is tautological. A party is defined as an indispensable party if a court determines that her joinder is required for the case to continue. Fed. R. Civ. P. 19(b). Nor does immunity of suit for a necessary party lead to automatic dismissal of the case, as Defendants contend. *See Wichita & Affiliated Tribes of Ok. v. Hodel*, 788 F.2d 765, 774 (D.C. Cir. 1986).

[31] *Aguinda,* which involved a suit brought by Peruvian and Ecuadorian citizens against a large oil consortium that included PetroEcuador, a state-run oil company, and the Republic of Ecuador, is inapposite. The district court initially dismissed the case on Rule 19 grounds, finding that PetroEcuador and the Republican of Ecuador were indispensable parties who could not be joined. 945 F. Supp. 625, 627-28. On appeal, the Second Circuit rejected the district court's indispensable party analysis: "[S]ince much of the relief sought could be fully provided by Texaco without any participation by Ecuador, dismissal of the entire complaint on Rule 19 grounds exceeds [the district court's] discretion." *Jota v. Texaco, Inc.*, 157 F.3d 153, 162 (2d Cir. 1998).

> whether a judgment rendered in the person's absence will be
> adequate; and (4) whether the plaintiff will have an adequate
> remedy if the action is dismissed for nonjoinder.

*Exxon Corp.*, 94 F.R.D. at 259.[32]

No prejudice would result, either to Defendants or BPMIGAS, should BPMIGAS not be joined in this action. *See Burma*, 176 F.R.D. at 357-58. In *Wichita & Affiliated Tribes*, 788 F.2d at 774, a case Defendants themselves cite, the court described the prejudice with which Rule 19(b) is concerned. There, conflicting claims by beneficiaries to a common trust presented a "textbook example . . . where one party may be severely prejudiced by a decision in his absence." *Id.* Needless to say, BPMIGAS faces no such prejudice here.

In arguing that the second and third factors favor finding BPMIGAS an indispensable party, Defendants state that participation of BPMIGAS "is required to change the soldiers' behavior." Def Mem. at 24. In so arguing, Defendants once again attempt to deflect blame for their alleged role as tortfeasors to another potential tortfeasor. *See Burma*, 176 F.R.D. at 357-58. At most, Defendants' argument amounts to stating that BPMIGAS is indispensable because it is an alleged joint tortfeasor. Joint tortfeasors, however, are not indispensable parties. *Id.* at 358 (citing *Temple v. Synthes Corp.*, 498 U.S. 5, 7-8 (1990)) (finding joint tortfeasor not a necessary party, making the indispensable party analysis unnecessary); *see also Krieger v. Trane Co.*, 765 F. Supp. 756, 763 (D.D.C. 1991) ("well-settled that joint tortfeasors are not indispensable parties"); *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distrib. Pty. Ltd.*, 647 F.2d 200, 207 (D.C.Cir.1981) (plaintiff "may sue as many or as few of the alleged wrongdoers as he

---

[32]    If the Court were to require the joinder of BPMIGAS, the Court would no longer have diversity jurisdiction over this action. *See* Def Mem. at 8-9. The "good conscience" standard of Rule 19(b) prohibits finding an absent party indispensable if joinder of that party destroys diversity unless continuation of the action is "impossible" without the absent party. *See Jaser v. New York Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 242 (2d Cir. 1987) (finding "very few cases should be terminated"), *cited in Wright v. Herman*, 230 F.R.D. 1, 7 (D.D.C. 2005). Moreover, Plaintiffs have no other means of seeking an adequate remedy against Defendants should this case be dismissed. *See* section C *supra*.

chooses, those left out of the lawsuit, commentary underscores, are not indispensable parties").

## CONCLUSION

For the above reasons, Defendants' Motion to Dismiss should be denied.

Respectfully submitted,

/S/

Michael D. Hausfeld (D.C. Bar #153742)
Agnieszka M. Fryszman (D.C. Bar #459208)
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, NW
West Tower – Suite 500
Washington, DC 20005
Tel:  (202) 408-4600
Fax:  (202) 408-4699

Brent W. Landau (D.C. Bar #479251)
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
One South Broad St., Suite 1850
Philadelphia, PA  19107
Tel:  (215) 825-4012
fax:  (215) 825-4016

Terrence Collingsworth  (D.C. Bar #471830)
**International Rights Advocates**
218 D Street, S.E., 3rd Floor
Washington, D.C.  20003
Tel:     (202) 470-2515

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN DOE VIII, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case: 1:07-cv-01022 (LFO) |
| EXXON MOBIL CORPORATION, et al., | ) | |
| Defendants. | ) | |

## DECLARATION OF AGNIESZKA FRYSZMAN

I, Agnieszka Fryszman, declare as follows:

1. I am an attorney at Cohen, Milstein, Hausfeld, & Toll, PLLC, representing Plaintiffs. This declaration is being filed in conjunction with Plaintiffs' Opposition to Defendants Exxon Mobil Corporation, Mobil Corporation, ExxonMobil Oil Corporation, and ExxonMobil Oil Indonesia Inc.'s Motion to Dismiss.

2. Attached hereto as Exhibit A is a true and correct copy of the Memorandum of Understanding between the Government of the Republic of Indonesia and the Free Aceh Movement, August 15, 2005, *available at* www.aceh-mm.org/download/english/Helsinki %20MoU.pdf.

3. Attached hereto as Exhibit B is a true and correct copy of the Declaration of Johnson Panjaitan, dated November 1, 2007.

4. Attached hereto as Exhibit C is a true and correct copy of an English language translation of articles 228 and 229 of the Law on Governance in Aceh, Statute of the Republic of Indonesia, Number 11 of 2006.

5.  Attached hereto as Exhibit D is a true and correct copy of the Declaration of Ross Clarke, dated November 1, 2007.

6.  Attached hereto as Exhibit E is a true and correct copy of the report by the United Nations Development Program, *Access to Justice in Aceh: Making the Transition to Sustainable Peace and Development in Aceh* (2006), *available at* www.undp.or.id/pubs /docs/Access%20to%20Justice.pdf.

7.  Attached hereto as Exhibit F is a true and correct copy of an English language translation of the decision of the Constitutional Court of the Republic of Indonesia, *Concerning Commission for the Truth and Reconciliation,* Number 006/PUU-IV/2006 (December 4, 2006), *available at* http://www.mahkamahkonstitusi.go.id/download/putusan_sidang_ eng_Putusan%20006_PUU-IV_2006%20(UU%20KKR)%20-%20Eng.pdf.

8.  Attached hereto as Exhibit G is a true and correct copy of the news article by the Associated Press, *Indonesian Court Rules Truth Commission Illegal, Casts Doubt On Justice For Suharto Abuses*, Dec. 7, 2006, *available at* http://www.iht.com/articles/ap/ 2006/12/08/asia/AS_GEN_Indonesia_Truth_Commission.php

9.  Attached hereto as Exhibit H is a true and correct copy of the news article by Ary Hermawan, *Court Throws Out 'Illogical Law' on Rights Tribunal*, Jakarta Post, Dec. 8, 2006, *available at* http://www.thejakartapost.com/Archives/ArchivesDet2.asp?FileID =20061208.@02.

10. Attached hereto as Exhibit I is a true and correct copy of the news article by Chad Bouchard, *Indonesian Court Voids Key Human Rights Law*, Voice of America.com, Dec. 8, 2006, *available at* http://www.voanews.com/english/archive/2006-12/2006-12-08- voa12.cfm?CFID=226695238&CFTOKEN=30787483.

11. Attached hereto as Exhibit J is a true and correct copy of an interview by AsiaSource, *Interview with Governor of Aceh, Irwandi Yusuf,* September 13, 2007, *available at* http://www.asiasource.org/news/special_reports/acehgovernor.cfm.

12. Attached hereto as Exhibit K is a true and correct copy of the report by the World Bank, *The Aceh peace agreement: How far have we come?* (2006), *available at* http://www.conflictrecovery.org/bin/WB-Conflict_briefing_note_EngFinal.pdf

13. Attached hereto as Exhibit L is a true and correct copy of the press release by Human Rights Watch, *Indonesia: Aceh Rights Court Must Address Past Abuse* (May 26, 2006), *available at* http://hrw.org/english/docs/2006/05/26/indone13463.htm.

14. Attached hereto as Exhibit M is a true and correct copy of a speech by Aceh's overnor Irwandi Yusuf, *A Vision for Economic and Social Progress in the Wake of the Tsunami and the Helsinki Peace Accord* (2007), *available at* http://www.modus.or.id/opini/reborn.html

15. Attached hereto as Exhibit N is a true and correct copy of the report by the World Bank, *Aceh Conflict Monitoring Update, 1-31st August 2007* (2007), *available at* http://www.conflictanddevelopment.org/data/doc/en/regCaseStudy/aceh/mon/Aceh%20Conflict%20Monitoring%20Update%20-%20August%202007.pdf

16. Attached hereto as Exhibit O is a true and correct copy of the news article by Maslan Rizal, *Rights activists in Aceh charged under public incitement articles,* Detik.com, Aug. 10, 2007, *available at* http://www.asia-pacific-action.org/southeastasia/indonesia/indoleft/2007/detik_rightsactivistsinacehcharged_100807.htm.

17. Attached hereto as Exhibit P is a true and correct copy of the report on human rights practices issued by the State Department, *Indonesia – 2005,* March 8, 2006, *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61609.htm

18. Attached hereto as Exhibit Q is a true and correct copy of the report on human rights practices issued by the State Department, *Indonesia—2004,* Feb. 28, 2005, *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61609.htm.

19. Attached hereto as Exhibit R is a true and correct copy of a book chapter from Human Rights Watch, *World Report 2006* (2006), *available at* http://hrw.org/wr2k6/wr2006.pdf.

20. Attached hereto as Exhibit S is a true and correct copy of the report on human rights practices issued by the State Department, *Indonesia – 2006,* March 6, 2007, *available at* http://www.state.gov.g.drl/rls/hrrpt/2006/78774.htm.

21. Attached hereto as Exhibit T is a true and correct copy of the Decree of the President of the Republic of Indonesia Number 28 of Year 2003, On the Declaration of a State of Emergency with the Statue of Martial Law in Nanggroe Aceh Darussalam Province (2003), *available at* http://www.indonesia-house.org/archive/Presidential%20Decree% 20No28_en.htm.

22. Attached hereto as Exhibit U is a true and correct copy of the Decree of the President of the Republic of Indonesia Number 43 of Year 2004, Concerning the Declaration of a Change in the Level of State of Danger in Nanggroe Aceh Darussalam Province from a State of Military Emergency to a State of Civil Emergency (2004), *available at* http://www.acheh-eye.org/data_files/english_format/indonesia_government/indogovt_ decrees/indogovt_decrees_2004_05_18_43.html

23. Attached hereto as Exhibit V is a true and correct copy of the United States Department of State, Travel Warning: Indonesia, of Jan. 9, 2007.

24. Attached hereto as Exhibit W is a true and correct copy of the Declaration of Abdul Haris Semendawi, dated December 12, 2005.

I declare, under penalty of perjury and the laws of the United States of America, that to the best of my knowledge and belief, the statements made in this Declaration are true and correct.

Executed on November 2, 2007, at Washington, D.C.


Agnieszka Fryszman



# EXHIBIT A

...................................................

## Memorandum of Understanding
### between
### the Government of the Republic of Indonesia
### and
### the Free Aceh Movement

...................................................

The Government of Indonesia (GoI) and the Free Aceh Movement (GAM) confirm their commitment to a peaceful, comprehensive and sustainable solution to the conflict in Aceh with dignity for all.

The parties commit themselves to creating conditions within which the government of the Acehnese people can be manifested through a fair and democratic process within the unitary state and constitution of the Republic of Indonesia.

The parties are deeply convinced that only the peaceful settlement of the conflict will enable the rebuilding of Aceh after the tsunami disaster on 26 December 2004 to progress and succeed.

The parties to the conflict commit themselves to building mutual confidence and trust.

This Memorandum of Understanding (MoU) details the agreement and the principles that will guide the transformation process.

To this end the GoI and GAM have agreed on the following:

## 1    GOVERNING OF ACEH

### 1.1    Law on the Governing of Aceh

1.1.1   A new Law on the Governing of Aceh will be promulgated and will enter into force as soon as possible and not later than 31 March 2006.

1.1.2   The new Law on the Governing of Aceh will be based on the following principles:

   a)    Aceh will exercise authority within all sectors of public affairs, which will be administered in conjunction with its civil and judicial administration, except in the fields of foreign affairs, external defence, national security, monetary and fiscal matters, justice and freedom of religion, the policies of which belong to the Government of the Republic of Indonesia in conformity with the Constitution.

   b)    International agreements entered into by the Government of Indonesia which relate to matters of special interest to Aceh will be entered into in consultation with and with the consent of the legislature of Aceh.

c)     Decisions with regard to Aceh by the legislature of the Republic of Indonesia will be taken in consultation with and with the consent of the legislature of Aceh.

d)     Administrative measures undertaken by the Government of Indonesia with regard to Aceh will be implemented in consultation with and with the consent of the head of the Aceh administration.

1.1.3     The name of Aceh and the titles of senior elected officials will be determined by the legislature of Aceh after the next elections.

1.1.4     The borders of Aceh correspond to the borders as of 1 July 1956.

1.1.5     Aceh has the right to use regional symbols including a flag, a crest and a hymn.

1.1.6     Kanun Aceh will be re-established for Aceh respecting the historical traditions and customs of the people of Aceh and reflecting contemporary legal requirements of Aceh.

1.1.7     The institution of Wali Nanggroe with all its ceremonial attributes and entitlements will be established.

## 1.2     Political participation

1.2.1     As soon as possible and not later than one year from the signing of this MoU, GoI agrees to and will facilitate the establishment of Aceh-based political parties that meet national criteria. Understanding the aspirations of Acehnese people for local political parties, GoI will create, within one year or at the latest 18 months from the signing of this MoU, the political and legal conditions for the establishment of local political parties in Aceh in consultation with Parliament. The timely implementation of this MoU will contribute positively to this end.

1.2.2     Upon the signature of this MoU, the people of Aceh will have the right to nominate candidates for the positions of all elected officials to contest the elections in Aceh in April 2006 and thereafter.

1.2.3     Free and fair local elections will be organised under the new Law on the Governing of Aceh to elect the head of the Aceh administration and other elected officials in April 2006 as well as the legislature of Aceh in 2009.

1.2.4     Until 2009 the legislature of Aceh will not be entitled to enact any laws without the consent of the head of the Aceh administration.

1.2.5     All Acehnese residents will be issued new conventional identity cards prior to the elections of April 2006.

1.2.6     Full participation of all Acehnese people in local and national elections will be guaranteed in accordance with the Constitution of the Republic of Indonesia.

1.2.7     Outside monitors will be invited to monitor the elections in Aceh. Local elections may be undertaken with outside technical assistance.

1.2.8    There will be full transparency in campaign funds.

## 1.3    Economy

1.3.1    Aceh has the right to raise funds with external loans. Aceh has the right to set interest rates beyond that set by the Central Bank of the Republic of Indonesia.

1.3.2    Aceh has the right to set and raise taxes to fund official internal activities. Aceh has the right to conduct trade and business internally and internationally and to seek foreign direct investment and tourism to Aceh.

1.3.3    Aceh will have jurisdiction over living natural resources in the territorial sea surrounding Aceh.

1.3.4    Aceh is entitled to retain seventy (70) per cent of the revenues from all current and future hydrocarbon deposits and other natural resources in the territory of Aceh as well as in the territorial sea surrounding Aceh.

1.3.5    Aceh conducts the development and administration of all seaports and airports within the territory of Aceh.

1.3.6    Aceh will enjoy free trade with all other parts of the Republic of Indonesia unhindered by taxes, tariffs or other restrictions.

1.3.7    Aceh will enjoy direct and unhindered access to foreign countries, by sea and air.

1.3.8    GoI commits to the transparency of the collection and allocation of revenues between the Central Government and Aceh by agreeing to outside auditors to verify this activity and to communicate the results to the head of the Aceh administration.

1.3.9    GAM will nominate representatives to participate fully at all levels in the commission established to conduct the post-tsunami reconstruction (BRR).

## 1.4    Rule of law

1.4.1    The separation of powers between the legislature, the executive and the judiciary will be recognised.

1.4.2    The legislature of Aceh will redraft the legal code for Aceh on the basis of the universal principles of human rights as provided for in the United Nations International Covenants on Civil and Political Rights and on Economic, Social and Cultural Rights.

1.4.3    An independent and impartial court system, including a court of appeals, will be established for Aceh within the judicial system of the Republic of Indonesia.

1.4.4    The appointment of the Chief of the organic police forces and the prosecutors shall be approved by the head of the Aceh administration. The recruitment and training of

organic police forces and prosecutors will take place in consultation with and with the consent of the head of the Aceh administration in compliance with the applicable national standards.

1.4.5   All civilian crimes committed by military personnel in Aceh will be tried in civil courts in Aceh.


2        HUMAN RIGHTS

2.1      GoI will adhere to the United Nations International Covenants on Civil and Political Rights and on Economic, Social and Cultural Rights.

2.2      A Human Rights Court will be established for Aceh.

2.3      A Commission for Truth and Reconciliation will be established for Aceh by the Indonesian Commission of Truth and Reconciliation with the task of formulating and determining reconciliation measures.


3        AMNESTY AND REINTEGRATION INTO SOCIETY


3.1      **Amnesty**

3.1.1   GoI will, in accordance with constitutional procedures, grant amnesty to all persons who have participated in GAM activities as soon as possible and not later than within 15 days of the signature of this MoU.

3.1.2   Political prisoners and detainees held due to the conflict will be released unconditionally as soon as possible and not later than within 15 days of the signature of this MoU.

3.1.3   The Head of the Monitoring Mission will decide on disputed cases based on advice from the legal advisor of the Monitoring Mission.

3.1.4   Use of weapons by GAM personnel after the signature of this MoU will be regarded as a violation of the MoU and will disqualify the person from amnesty.


3.2      **Reintegration into society**

3.2.1   As citizens of the Republic of Indonesia, all persons having been granted amnesty or released from prison or detention will have all political, economic and social rights as well as the right to participate freely in the political process both in Aceh and on the national level.

3.2.2   Persons who during the conflict have renounced their citizenship of the Republic of Indonesia will have the right to regain it.

3.2.3   GoI and the authorities of Aceh will take measures to assist persons who have participated in GAM activities to facilitate their reintegration into the civil society. These measures include economic facilitation to former combatants, pardoned political prisoners and affected civilians. A Reintegration Fund under the administration of the authorities of Aceh will be established.

3.2.4   GoI will allocate funds for the rehabilitation of public and private property destroyed or damaged as a consequence of the conflict to be administered by the authorities of Aceh.

3.2.5   GoI will allocate suitable farming land as well as funds to the authorities of Aceh for the purpose of facilitating the reintegration to society of the former combatants and the compensation for political prisoners and affected civilians. The authorities of Aceh will use the land and funds as follows:

    a)   All former combatants will receive an allocation of suitable farming land, employment or, in the case of incapacity to work, adequate social security from the authorities of Aceh.

    b)   All pardoned political prisoners will receive an allocation of suitable farming land, employment or, in the case of incapacity to work, adequate social security from the authorities of Aceh.

    c)   All civilians who have suffered a demonstrable loss due to the conflict will receive an allocation of suitable farming land, employment or, in the case of incapacity to work, adequate social security from the authorities of Aceh.

3.2.6   The authorities of Aceh and GoI will establish a joint Claims Settlement Commission to deal with unmet claims.

3.2.7   GAM combatants will have the right to seek employment in the organic police and organic military forces in Aceh without discrimination and in conformity with national standards.

## 4     SECURITY ARRANGEMENTS

4.1   All acts of violence between the parties will end latest at the time of the signing of this MoU.

4.2   GAM undertakes to demobilise all of its 3000 military troops. GAM members will not wear uniforms or display military insignia or symbols after the signing of this MoU.

4.3   GAM undertakes the decommissioning of all arms, ammunition and explosives held by the participants in GAM activities with the assistance of the Aceh Monitoring Mission (AMM). GAM commits to hand over 840 arms.

4.4   The decommissioning of GAM armaments will begin on 15 September 2005 and will be executed in four stages and concluded by 31 December 2005.

4.5     GoI will withdraw all elements of non-organic military and non-organic police forces from Aceh.

4.6     The relocation of non-organic military and non-organic police forces will begin on 15 September 2005 and will be executed in four stages in parallel with the GAM decommissioning immediately after each stage has been verified by the AMM, and concluded by 31 December 2005.

4.7     The number of organic military forces to remain in Aceh after the relocation is 14700. The number of organic police forces to remain in Aceh after the relocation is 9100.

4.8     There will be no major movements of military forces after the signing of this MoU. All movements more than a platoon size will require prior notification to the Head of the Monitoring Mission.

4.9     GoI undertakes the decommissioning of all illegal arms, ammunition and explosives held by any possible illegal groups and parties.

4.10    Organic police forces will be responsible for upholding internal law and order in Aceh.

4.11    Military forces will be responsible for upholding external defence of Aceh. In normal peacetime circumstances, only organic military forces will be present in Aceh.

4.12    Members of the Aceh organic police force will receive special training in Aceh and overseas with emphasis on respect for human rights.


5       ESTABLISHMENT OF THE ACEH MONITORING MISSION

5.1     An Aceh Monitoring Mission (AMM) will be established by the European Union and ASEAN contributing countries with the mandate to monitor the implementation of the commitments taken by the parties in this Memorandum of Understanding.

5.2     The tasks of the AMM are to:

        a)    monitor the demobilisation of GAM and decommissioning of its armaments,
        b)    monitor the relocation of non-organic military forces and non-organic police troops,
        c)     monitor the reintegration of active GAM members,
        d)    monitor the human rights situation and provide assistance in this field,
        e)    monitor the process of legislation change,
        f)     rule on disputed amnesty cases,
        g)     investigate and rule on complaints and alleged violations of the MoU,
        h)    establish and maintain liaison and good cooperation with the parties.

5.3     A Status of Mission Agreement (SoMA) between GoI and the European Union will be signed after this MoU has been signed. The SoMA defines the status, privileges and immunities of the AMM and its members. ASEAN contributing countries which have been invited by GoI will confirm in writing their acceptance of and compliance with

the SoMA.

5.4 GoI will give all its support for the carrying out of the mandate of the AMM. To this end, GoI will write a letter to the European Union and ASEAN contributing countries expressing its commitment and support to the AMM.

5.5 GAM will give all its support for the carrying out of the mandate of the AMM. To this end, GAM will write a letter to the European Union and ASEAN contributing countries expressing its commitment and support to the AMM.

5.6 The parties commit themselves to provide AMM with secure, safe and stable working conditions and pledge their full cooperation with the AMM.

5.7 Monitors will have unrestricted freedom of movement in Aceh. Only those tasks which are within the provisions of the MoU will be accepted by the AMM. Parties do not have a veto over the actions or control of the AMM operations.

5.8 GoI is responsible for the security of all AMM personnel in Indonesia. The mission personnel do not carry arms. The Head of Monitoring Mission may however decide on an exceptional basis that a patrol will not be escorted by GoI security forces. In that case, GoI will be informed and the GoI will not assume responsibility for the security of this patrol.

5.9 GoI will provide weapons collection points and support mobile weapons collection teams in collaboration with GAM.

5.10 Immediate destruction will be carried out after the collection of weapons and ammunitions. This process will be fully documented and publicised as appropriate.

5.11 AMM reports to the Head of Monitoring Mission who will provide regular reports to the parties and to others as required, as well as to a designated person or office in the European Union and ASEAN contributing countries.

5.12 Upon signature of this MoU each party will appoint a senior representative to deal with all matters related to the implementation of this MoU with the Head of Monitoring Mission.

5.13 The parties commit themselves to a notification responsibility procedure to the AMM, Including military and reconstruction issues.

5.14 GoI will authorise appropriate measures regarding emergency medical service and hospitalisation for AMM personnel.

5.15 In order to facilitate transparency, GoI will allow full access for the representatives of national and international media to Aceh.

## 6     DISPUTE SETTLEMENT

6.1     In the event of disputes regarding the implementation of this MoU, these will be resolved promptly as follows:

a)      As a rule, eventual disputes concerning the implementation of this MoU will be resolved by the Head of Monitoring Mission, in dialogue with the parties, with all parties providing required information immediately. The Head of Monitoring Mission will make a ruling which will be binding on the parties.

b)      If the Head of Monitoring Mission concludes that a dispute cannot be resolved by the means described above, the dispute will be discussed together by the Head of Monitoring Mission with the senior representative of each party. Following this, the Head of Monitoring Mission will make a ruling which will be binding on the parties.

c)      In cases where disputes cannot be resolved by either of the means described above, the Head of Monitoring Mission will report directly to the Coordinating Minister for Political, Law and Security Affairs of the Republic of Indonesia, the political leadership of GAM and the Chairman of the Board of Directors of the Crisis Management Initiative, with the EU Political and Security Committee informed. After consultation with the parties, the Chairman of the Board of Directors of the Crisis Management Initiative will make a ruling which will be binding on the parties.

..............................

GoI and GAM will not undertake any action inconsistent with the letter or spirit of this Memorandum of Understanding.

..............................

Signed in triplicate in Helsinki, Finland on the 15 of August in the year 2005.

**On behalf of the Government of the Republic of Indonesia,   On behalf of the Free Aceh Movement,**

**Hamid Awaludin**                              **Malik Mahmud**
*Minister of Law and Human Rights*              *Leadership*

As witnessed by

**Martti Ahtisaari**
*Former President of Finland*
*Chairman of the Board of Directors of the Crisis Management Initiative*
*Facilitator of the negotiation process*

# EXHIBIT B

I, Johnson Panjaitan, hereby state and declare under the penalty of perjury under the laws of the United States as follows:

1.  My name is Johnson Panjaitan, and I am the Coordinator for Advocacy and Legal Aid of Central Leadership Council (Dewan Pimpinan Pusat/DPP) of, and the Director of Legal Aid and Human Rights Institute of Indonesian Advocates Association (Asosiasi Advokat Indonesia/AAI).

2.  In my capacity as chairperson of Indonesian Legal Aid and Human Rights Association (Perhimpunan Bantuan Hukum dan Hak Asasi Manusia, PBHI), I have monitored the process leading up to the signing of the Aceh Peace Accord, signed on August 15, 2005. More important, I have been carefully observing the process of implementation. As I detail below, very little has been done in that regard.

3.  The Aceh Peace Accord is an agreement between the Government of Indonesia (GOI) and Free Aceh Movement (GAM), facilitated by President Marti Ahtisaari of Finland and the Crisis Management Initiative. The Accord covers the areas of *governance, human rights, amnesty and reintegration of society, security arrangements, establishment of the Aceh Monitoring Mission (AMM), and dispute settlement*. Subsequently, as a party to the Accord, GOI establish the Law No. 11, 2006 as the legal framework for administration of the Accord within Indonesia.

4.  The Accord applies to the civil conflict that existed in Aceh prior to the Tsunami up to August, 15, 2005. As the preamble of the Accord explains, *"the parties are deeply convinced that only a peaceful settlement will enable the rebuilding of Aceh after the Tsunami disaster on 26 December 2004 to progress and succeed."*

5.  Within the proper jurisdiction of the Indonesian legal administration, the Constitutional Court struck down Law No. 24/2007, which established as part of the Accord the Commission of Truth and Reconciliation. The case was registered as case No. 006/PUU-

IV/2006, and finally decided on Thursday, December 7, 2006. The Constitutional Court stated clearly that Law No.24/2007 was invalid because it breached the Indonesian Constitution, UUD 1945 (*menyatakan Undang-Undang Republik Indonesia Nomor 27 tahun 2004, tentang Komisi Kebenaran dan Rekonsiliasi bertentangan dengan Undang-Undang Dasar Republik Indonesia Tahun 1945*), and therefore does not have legal power whatsoever (*menyatakan Undang-Undang Republik Indonesia Nomor 27 Tahun 2004 tentang Komisi Kebenaran dan Rekonsiliasi tidak mempunyai kekuatan hukum mengikat*). By this decision, the Commission of Truth and Reconciliation does not exist, including in administering the implementation of Aceh Peace Accord. Because of the clear ruling by the Court that such a Commission violates the Constitution, there is no plan moving forward to create a modified Commission of Truth and Reconciliation.

6.  Regarding amnesty, the Aceh Peace Accord addresses only the issue of amnesty for actual combatants, particularly those who were members of and/or affiliated with GAM, as well as political prisoners and detainees prior to the Tsunami and up to the date the Accord was signed. The Amnesty process, and the overall Accord itself, does not have any application to any person or entity that is not specifically included as an express party or beneficiary of the Accord.

7.  Integrated with amnesty process, the Accord provided direct assistance to all former combatants of GAM, or those affiliated with them. To facilitate the process, the Badan Reintegrasi Aceh (BRA), or Aceh Reintegration Body, was set up, dealing especially with Accord provision No. 3.2.3 (*GOI and the authorities of Aceh will take measures to assist persons who have participated in GAM activities to facilitate their reintegration into civil society. These measures include economic facilitation to former combatants, pardoned political prisoners and affected civilians. A Reintegration Fund under the administration of the Authorities of Aceh will be established.*) and No. 3.2.4. (*GOI will allocate funds for the rehabilitation of public and private property destroyed or damaged*

*as a consequence of the conflict to be administered by authorities of Aceh).* So far, there is not program of the BRA which deals with Accord provision No. 3.2.5 (relating to farm land). However, a Joint Claims Settlement Commission has yet to be established. I am not aware of any concrete legal proposal to establish this Commission

8.  The Aceh Peace Accord expressed the intent to establish a Human Rights Court, which, in practice, would reach only new instances of Human Rights violations occurring from the date of the Accord, August 15, 2005, onwards. However, this Human Rights Court has not been created yet.

9.  Even if the Commission of Truth and Reconciliation, the Human Rights Court, or the Joint Claims Settlement Commission were to be created in the future and survive future Constitutional scrutiny, these institutions, rooted in the original language of the Aceh Peace Accords, could not adjudicate disputes between private parties who are not signatories to or expressed beneficiaries of the Accord.

Executed this 31 day of October, 2007 in Jakarta, Indonesia

_____
Johnson Panjaitan,



# EXHIBIT C

Statute of the Republic of Indonesia
Number 11 of the year 2006

**Law on Governance in Aceh**

\*\*\*

**Article 228**

1. To investigate, try, decide on and resolve a case of a human rights violation that has occurred after the promulgation of this Law, there shall be established a Human Rights Court in Aceh.

2. Decisions of the Human Rights Court in Aceh, as referred to in clause 1, include, among other things, granting compensation, restitution and/or rehabilitation to the victims of the human rights violations.

**Article 229**

1. To pursue truth and reconciliation, this Law shall establish a Truth and Reconciliation Commission in Aceh.

2. The Truth and Reconciliation Commission in Aceh referred to in clause 1 shall not be separate from the (national) Truth and Reconciliation Commission.

3. The Truth and Reconciliation Commission in Aceh shall operate based on the legislative regulation.

4. In resolving cases of human rights violations in Aceh, the Truth and Reconciliation Commission in Aceh can consider *adat* principles that are practiced among citizens.

\*\*\*

Translation of relevant articles from United Nations Development Program, *Access to Justice in Aceh* (2007), available at http://www.undp.or.id/pubs/docs/Access%20to%20Justice.pdf, pp. 45-46.

# EXHIBIT D

# DECLARATION OF ROSS CLARKE

I, Ross Clarke, declare as follows:

I have been requested by counsel for the plaintiffs in this civil action to provide my opinion as to specific points regarding transitional justice developments in Aceh, Indonesia. This opinion is offered in a personal capacity.

## Qualifications and Experience

I am a qualified Australian lawyer, with significant experience in the field of human rights protection in Indonesia. I am a solicitor and barrister of the Supreme Court of Victoria, Australia, a graduate of the University of Melbourne Law School and have been based in Aceh since June 2006, working on legal reform and transitional justice for renowned international organizations such as the International Development Law Organization (IDLO), the United Nations Development Programme (UNDP) and the International Center for Transitional Justice (ICTJ).

In particular, from June–October 2007, I was the lead ICTJ consultant for a forthcoming report entitled "Considering Victims: The Aceh Peace Process from a Transitional Justice Perspective". In this position I led a detailed research process to analyze the current status of transitional justice initiatives and to identify key gaps. The research included numerous interviews with key government, former combatant and civil society stakeholders. This report will be the first comprehensive analysis of transitional justice in Aceh since the peace agreement of August 2005. Given my regional and Aceh-specific experience on transitional justice and in light of my fluent Indonesian language skills, I am appropriately qualified to comment on the status of transitional justice initiatives in Aceh. My Curriculum Vitae is attached for more detail.

## A Truth and Reconciliation Commission (TRC) for Aceh

While an Acehnese TRC was provided for in both the peace agreement which brought about an end to the Aceh conflict (the Helsinki MoU) and its promulgation into Indonesian law, the Law on Governance in Aceh (LOGA), until now a TRC has not been established. To suggest otherwise demonstrates a complete misunderstanding of the current political and transitional justice context in Aceh. Advocacy efforts by civil society organizations are currently taking place to put an Acehnese TRC on the political agenda, however up until now, these have not achieved concrete results.

The misconception that a TRC has been established in Aceh arises from a simplistic, abstract reading of the LOGA. According to art 229 of the LOGA, "a Truth and Reconciliation Commission is established by this law". Problematically, the same article also states that the Aceh TRC is an "inseparable part" of Indonesia's planned national Truth and Reconciliation Commission. In development since 2000, the creation of a national TRC received a significant setback when in December 2006 its foundational law was struck down by Indonesia's Constitutional Court. For Aceh, the annulment of the national TRC law created legal uncertainty as to whether an Acehnese TRC can be established outside the ambit of a national Commission. The result has been deadlock, with the Acehnese TRC in limbo until the uncertainty is

1

resolved. This uncertainty remains until the present, and more than any other factor the Constitutional Court decision to annul the national TRC law has prevented the establishment of an Aceh-specific TRC.

Other factors have also contributed to the impasse. Recent Indonesian history demonstrates the significant political obstacles to implementing effective transitional justice mechanisms and the barriers to holding military personnel accountable for past human rights violations. Relevant examples include the widely criticized Ad hoc Human Rights Court for East Timor, the flawed trials regarding the Tanjung Priok massacre of 1998, as well as the failure to address the estimated massacre of over one million people across Indonesia in the political violence of 1965. Aceh, like many other conflict zones across Indonesia, is no exception to the Indonesian Government's well-documented failure to uphold international law and provide accountability for gross violations of international human rights and humanitarian law. In all of these cases, it is generally accepted that efforts to provide transitional justice have been thwarted by the powerful political influence of the Indonesian military (TNI). Given that democratic reform in Indonesia commenced less than ten years ago, after thirty of years of brutal military dictatorship under President Soeharto, the obstacles to providing accountability should not be underestimated.

While in Aceh, political barriers to the establishment of an Aceh TRC exist from both sides of the conflict – the Government of Indonesia and the Free Aceh Movement (GAM). The central government is dominated by military interests that have strongly resisted all manner of efforts aimed at military reform. An Aceh TRC is seen as a threat given the implication of senior Generals in human rights violations. On the other side, senior GAM commanders, who now hold significant political power at the provincial level, are also implicated in human rights abuses, with it widely acknowledged that both parties to the conflict were responsible for human rights violations. Aceh's present Governor Irwandi Yusuf – a former GAM spokesmen – therefore risks alienating the central Government and antagonising GAM membership if he pursues the establishment of a TRC.

There are therefore very real political obstacles to the creation of a TRC in Aceh. Combined with legal uncertainty as to whether an Acehnese TRC can be established prior to the formation of a national TRC, and the protracted process to draft a new national TRC law and then have it passed by the national parliament, it is unsurprising that the Acehnese Commission has yet to be created. And while both parties agreed to the formation in the Helsinki MoU, the provision for a TRC was apparently initiated by the mediator of the Helsinki negotiations, Maathi Athisaari. Since then, the political landscape following the peace agreement has not been amenable to the establishment of transitional justice mechanisms. There can be no doubt therefore that an Acehnese TRC is neither "established," "fully functioning," or "in effect". Words to this effect are a gross mischaracterization of the situation Aceh and most likely arise from an abstract reading of the LOGA without analysis of the extent to which this law has been applied or enforced.

### A Human Rights Court for Aceh

Similar to the failure to establish a TRC, the formation of a Human Rights Court for Aceh has further not occurred. This is despite a Human Rights Court being a clear

2

commitment in both the Helsinki MoU and the LOGA. Even though these provisions exist, prosecutions of alleged perpetrators of human rights abuses have never seriously been on either party's agenda. This is illustrated in article 228 of the LOGA which limits the proposed Court's jurisdiction to prospective cases only. As it may only deal with cases that occurred after the enactment of the LOGA, the proposed Human Rights Court – if indeed it is ever functional – is by and large meaningless. Without a retroactive mandate to address Aceh's well-documented history of human rights violations, the Court appears little more than a symbolic act to appease calls for justice, accountability and military reform. It should further be noted that the issue of retroactive jurisdiction (or lack thereof) for human rights trials does not solely relate to Aceh but provides ongoing controversy across Indonesia.[1]

At present, in breach of international legal obligations to prosecute gross violations of international human rights law, no trials related to the Aceh conflict appear likely. Domestically, the slow pace of military reform, central Government and GAM complicity in violations in Aceh, combined with the proposed Court's lack of retroactive jurisdiction provide significant barriers to human rights trials.[2] While internationally, there is insufficient political will to either pressure Indonesia to uphold its legal obligations or push for trials through an international or hybrid mechanism.

Further, if the Ad hoc Human Rights Court for East Timor is any indication, the Indonesian judiciary appears incapable of holding human rights trials for military personnel that adhere to international fair trial guarantees.[3] Even if a Human Rights Court for Aceh is ever established, and the lack of retroactive jurisdiction can be overcome, the continued political influence of senior military commanders could render such a process impotent. It therefore must be emphasized that even the mere establishment of a Human Rights Court, notwithstanding its limited prospective jurisdiction and questionable independence if created, is not on the current political agenda at either the provincial or national level.

Due to the presumed impossibility of establishing an effective trial procedure and the political sensitivity prosecutions provoke, advocacy for a Human Rights Court is notably absent in Aceh. Rather, the establishment of a TRC dominates all discussion on transitional justice. This is despite the strong arguments justifying prosecutions in Aceh under national and international law. In the current political climate therefore, the Acehnese appear to have little choice but to accept the unlikelihood of an effective Human Rights Court and channel advocacy efforts toward a TRC.

### Joint Claims Settlement Commission

Just like the illusory TRC and Human Rights Court, a Joint Claims Settlement Commission referred to in article 3.2.6 of the Helsinki MoU, has not been established. The failure to do so remains a key concern of GAM, particularly as the reintegration process in Aceh progresses and aggrieved parties have no official forum to voice their

---

[1] See Ross Clarke, "Retrospectivity and the Constitutional Validity of the Bali Bombing and East Timor Trials", Australian Journal of Asian Law, 5(2) 2003; 2-32.
[2] Ibid.
[3] See David Cohen, "Intended to Fail, The Trials Before the Ad hoc Human Rights Court in Jakarta", International Center for Transitional Justice, 2003.

3

concerns. While such a Commission could play a valuable role, over two years following the peace agreement no concrete steps have been taken towards its establishment. Given previous inaction there can be no confidence that such a Claims Settlement Process will be established in the foreseeable future.

## Land Compensation to Conflict-affected civilians

To continue the pattern, land compensation for conflict-affected persons was agreed to in the Helsinki MoU but has failed to eventuate. This is despite further regulation (INPRES 15/2005) mandating the provision of land to conflict victims. More broadly, land compensation was also to be provided to former combatants as part of the reintegration process but this approach was also cancelled.

Conflict-affected civilians, or conflict victims as they should more appropriately be called, have received limited support through the Acehnese Reintegration Body (BRA), however this has not included land. This much maligned assistance package, the BRA-KDP Program, has involved the provision of grants to conflict-affected communities who through a facilitated community process jointly select a project through which to utilize the funds. No conflict victim has received individual economic assistance through BRA. Thus while minimal reintegration support has been provided to conflict victims on a general community-based level, this can in no way be construed to meet victims' right to individual reparations or justice.

## Response to Arguments Purporting to Disallow Extraterritorial Litigation for Acehnese Victims of Human Rights Violations

Even if the transitional justice framework set forth in the Helsinki MoU and LOGA were fully and effectively implemented -- it must be reiterated that it has not -- this should in no way preclude claimants seeking redress through other mechanisms, extraterritorial or otherwise. Given inherent limitations in any reconciliation or judicial mechanism, a wide-ranging number of processes are generally recommended to fully account for a history of conflict. Best practice from a number of post-conflict contexts, notably South Africa, Peru and East Timor, demonstrates that no single mechanism alone can achieve justice. Thus, trial processes, truth and reconciliation commissions, security sector reform, wide-ranging reparations including memorials, searches for the missing, social and economic compensation, are all considered vital aspects of a transitional justice framework.

An assumptions that the disparity in outcome caused by extraterritorial litigation raises serious concern is unfounded. The human rights violations inflicted on the claimants, while not isolated, were closely related to the existence of Exxon Mobil's instalments near their communities and caused by the actions of security personnel specifically recruited by Exxon Mobil to protect their interests. There is therefore every justification for a disparity of outcome as compared to other Acehnese victims. In any event, transitional justice mechanisms by their very nature result in disparity of outcome as redress should be related to harm suffered.

Further, suggesting that extraterritorial litigation undermines the peace agreement is a baseless argument. As demonstrated above, the peace agreement while positive as it appears on paper, has not led to the establishment of the transitional justice

4

mechanisms provided for. There could be no greater undermining of the Helsinki MoU than the Indonesian Government failing to uphold the commitments it agreed to. Rather than undermine the peace agreement, extraterritorial litigation would therefore more likely highlight the Indonesian Government's inaction and increase pressure to ensure that all Helsinki commitments, including those intended to uphold victims' rights, are realized.

## Conclusion

It can therefore be seen that while significant legally enshrined commitments were made to provide truth, accountability and justice to Acehnese victims of human rights abuses, none of these have been effectively established. This trend should be interpreted as the continued marginalization of victims' rights to justice rather than as a delay in implementation. In Indonesia, commitments in legal instruments do not amount to the implementation of the provisions contained therein. The provisions of the Helsinki MoU, and those enacted by the LOGA, do not amount to their realization. To make this simplistic assumption amounts to a dangerous legal fiction that denies the reality faced by the vast number of Acehnese victims. Thus an evaluation of the *implementation* of the Helsinki MoU and the LOGA cannot occur in the abstract, but must be interpreted by those with a detailed understanding of the post-disaster and post-conflict context currently facing Aceh.

The Indonesian Government has a tradition of promising and enacting progressive transitional justice mechanisms but then failing to implement them, or failing to implement them effectively. Usually such situations arise from severe international criticism of its human rights track-record and the subsequent need to appear to take steps toward justice. The trials of the Ad Hoc Human Rights Court for East Timor offer one such example. Thus transitional justice mechanisms in Indonesia (indeed if they are ever established) often result in a perversion of justice with the political influence of powerful military interests and an unprofessional judicial system limiting the independence and effectiveness of any processes.

The situation in Aceh is therefore a continuation of this trend. Despite positive signs following the Helsinki MoU and the LOGA, establishing the truth, providing justice and building reconciliation have now all but been side-lined in the peace-building process. Democratic reform in Indonesia remains a slow, painstaking process. Crucial to such reform is building the rule of law to such an extent where the law as it is written reflects the law as it is applied and enforced. Often at present, such a situation, particularly as it pertains to human rights issues, is simply not tenable.

Where transitional justice mechanisms have been stipulated in law but not implemented, extraterritorial litigation may be an indispensable aspect of the process to uphold victims' rights and achieve full accountability for human rights violations. There is further no provision in either the Helsinki MoU or LOGA, or under international law, that restricts victims of human rights violations in the plaintiffs' circumstances from accessing international fora. The current post-conflict context in Aceh which sees victims' rights and interests significantly marginalized should therefore not impact on the plaintiffs' right to seek redress through extraterritorial litigation.

5

I declare, under penalty of perjury and the laws of the United States of America, that to the best of my knowledge and belief, the statements made in this Declaration are true and correct. Executed on October 30, 2007, at Banda Aceh, Indonesia.

Ross Clarke

6

# Ross Clarke

Email: roscoclarke@gmail.com
Phone: +62 (0) 812 6299 2149

## Skill Summary

- Over 6 years of high-level research, analysis, reporting and programming on post-conflict issues, transitional justice and human rights, with particular emphasis on Indonesia and East Timor.
- Over 4 years of progressive field-based work in transitional justice, reconciliation and judicial reform in post-conflict contexts within a UN-sponsored Court, UNDP, a Truth and Reconciliation Commission, and for local and international legal organisations.
- Advanced research, writing and interviewing skills, especially regarding human rights issues.
- High-level experience in the design, implementation, monitoring and evaluation of post-conflict justice, judicial reform and access to justice programs, including the mainstreaming of gender issues.
- Extensive program management experience, including reporting, budgeting and management of large teams.
- Highly attuned capacity building, public outreach and civic education skills in developing contexts.
- Advanced knowledge of international human rights, refugee, humanitarian and criminal law.
- Published author on human rights issues in Indonesia and East Timor.
- Fluent Bahasa Indonesia, conversational Tetum.
- Qualified Australian lawyer.

## Qualifications

**Solicitor and Barrister of the Supreme Court of Victoria, Australia:** Admitted to practice in 2006.

**Graduate Diploma in Legal Practice:** (2005-06) *College of Law*, Australia.

**Bachelor of Laws (honours):** (1998-03) *University of Melbourne,* Australia.

**Bachelor of Arts:** (1998-03) *University of Melbourne,* Australia.

- Undergraduate law degree focusing on international law and law and society in Asia. Prize for highest mark in Advanced Legal Research for research on human rights in Indonesia and East Timor.
- Received scholarship for intensive study on international law, human rights law and humanitarian law while on exchange at University College Dublin, Ireland (2001).
-

## Employment

**Consultant** (Aug 2007 – Present): **United Nations Development Programme (UNDP)**, Aceh, Indonesia.

- Collaboration with Syiah Kuala University (UNSYIAH) and the State Institute of Islamic Studies (IAIN) to establish and develop the Aceh Justice Resource Centre.
- Needs assessment, strategic planning, and development of a long-term work plan.
- Strengthening civil society actors' ability to act as an oversight mechanism and providing a hub for legal research and legal information.

**Consultant** (June – Sept 2007): **International Center for Transitional Justice (ICTJ)**, Aceh, Indonesia.

- Research, analysis and writing on transitional justice options and mechanisms for Aceh, including in-depth analysis on a Truth and Reconciliation Commission for Aceh.
- Focus group discussions with victim groups and key security sector stakeholders, field based research, and managing research teams to implement a large scale research project on justice issues.
- Collaboration with local human rights organisations to develop and implement field research.
- Policy analysis and legislative review.

**Legal Officer** (June 2006 – June 2007): **International Development Law Organization (IDLO)**, Aceh, Indonesia.

- Design, implementation, reporting, monitoring and evaluation of the *Community Legal Skills and Mediation Program*, part of IDLO's *Post-Tsunami Legal Assistance Initiative.*
- Development and management of the UNICEF Legal Support for Tsunami Orphans project.
- Collaboration with the Indonesian Institute for Conflict Transformation in the design of community mediation training modules and the implementation of a 2 week Training of Trainers on mediation and legal skills.
- Program activities include training community leaders in 100 villages on land, inheritance and guardianship law and using mediation to resolve disputes at the village level.
- Research, analysis and report writing on key post-tsunami legal issues facing Acehnese communities.
- Relationship building with local and international partners, including Acehnese lawyers, the Shariah Court, State Courts, Shariah Office, Adat Council, prominent local and international NGOs and agencies.
- Support to IDLO's other *Post-Tsunami Legal Assistance Initiative* projects.

**Program Officer** (June 2005 – May 2006): **Avocats Sans Frontieres**, Dili, East Timor

- Design, implementation, reporting monitoring and evaluation of the *Access to Justice* Program.
- Program activities include collaborating with civil society to establish and train a network of community paralegals and raise awareness on legal process, human rights and mediation through grassroots legal education workshops.
- Design, implementation and management of pilot *Prevention of Gender-based Violence* program.
- Detailed monitoring and evaluation of program activities, including use of Most Significant Change methodology.
- Management of 12 staff and partnership with 2 local human rights NGOs.
- Developing and providing training on human rights, mediation, reconciliation, legal process, gender-based violence, property disputes, dispute resolution and evaluation.
- Drafting of narrative, monitoring and evaluation reports.
- Budgeting, financial reporting and financial management of a USD 1 million project.
- *Acting Head of Mission: December 2005.*

**Legal Officer** (Jan – June 2005): **Serious Crimes Unit, UNMISET**, Dili, East Timor

- Preparation of crimes against humanity cases for prosecution before the UN Special Panel for Serious Crimes.
- Drafting and editing of arrest warrants, legal submissions and motions.
- Drafting prosecution appeal statements and determining prosecution appeal strategy.
- Working with prosecutors, lawyers and investigators in the drafting of indictments.
- Assisting international prosecutors in court.
- Design and implementation of work processes for case management.
- Finalisation and handover of case files to national authorities.
- Member of the UN Working Group on the Serious Crimes Process – a group providing policy recommendations to the Security Council on the future of the serious crimes process in East Timor.

**Writer, Editor, Mentor** (Sept – Dec 2004): **Commission for Reception, Truth and Reconciliation (CAVR)**, Dili, East Timor

- Research, analysis and writing for the Final Report of East Timor's Truth and Reconciliation Commission.
- Responsible for the drafting and editing of the Final Report's chapter on *Political Trials*.
- Collaborative research and writing with national staff.
- Detailed analysis of primary legal documents in Bahasa Indonesia.
- Mentoring, training and capacity building of national staff on research and writing techniques.
- Management of writing team to ensure stringent timelines were met.

**Legal Officer** (Aug 2003 – Sept 2004): **Judicial System Monitoring Program (JSMP)**, Dili, East Timor

- Court monitoring of the Special Panels for Serious Crimes, District Courts and Court of Appeal.

- Writing of legislative analysis, thematic and case reports regarding major human rights issues.
- Analysis of trials for compliance with UN law, Indonesian law, East Timorese law, international human rights law and fair trials standards.
- Providing policy recommendations and working with the legal profession to implement change.
- Public outreach and education regarding the justice system and human rights.
- Media work, drafting of press releases, radio interviews.
- Liaison with local NGOs and networks to lobby for justice related issues regarding East Timor.
- Collaboration with local legal aid organisations to identify training needs and design appropriate interventions.
- Extensive collaboration with Amnesty International to write and research 'Justice for Timor-Leste: The Way Forward', a detailed joint report released in April 2004.
- Capacity building, training and mentoring national staff members in court monitoring, report writing, research techniques, international human rights and humanitarian law.

### Researcher (Aug 2002 – Aug 2003): **Asian Law Centre**, University of Melbourne, Australia

- Writing, research and analysis on Indonesian and East Timorese law.
- Detailed research into the Islamic legal system in Aceh, and more generally the Indonesian legal system and its compliance with human rights standards.
- Detailed research on Indonesia's Ad hoc Human Rights Courts and the trials related to East Timor.
- Writing, editing, research and administrative assistance in relation to the Asian Law Centre's Australian Research Council grant on the role and development of Islamic law in Indonesia.
- Drafting of opinion pieces for major Australian newspapers.
- Co-editor for the Asia Pacific Centre for Military Law publication 'Lessons Learned on Peace Operations'.

### Paralegal (Jan 2002 – Mar 2003): **Freehills**, Melbourne, Australia

- Research and analysis of corporate legislation and case law.
- Drafting of research memos on areas of corporate law.
- Assisting in the drafting of pleadings, submissions and contracts.
- Database management of case materials. Assistance in training seminars and material preparation.
- Writing and editing of newsletters and updates on relevant legal issues.

### Case Officer (Jan 2001 – Aug 2001): **Migration Review Tribunal**, Melbourne, Australia

- Research and legal advice on merits of review cases before the Migration Review Tribunal.
- Legal analysis of cases according to migration legislation.
- Tribunal clerk in tribunal hearings.
- Explanation of case decisions to tribunal applicants of diverse cultural backgrounds.
- Communication with tribunal applicants explaining the status and implications of their case.

### Voluntary Work

- Case work volunteer (2002-2003): **Asylum Seeker Resource Centre**, Footscray, Australia.
- Committee member (2003): **Red Cross International Humanitarian Law Committee**, Melbourne Australia.

### Publications

- *Human Rights in Indonesia: The Impact of Retrospective Prosecution*, in Lindsey, T. (ed), 'Indonesia: Law and Society', 3rd Edition, Federation Press (forthcoming).
- *Retrospectivity and the Constitutional Validity of the Bali Bombing and East Timor Trials*, Australian Journal of Asian Law, 5(2), 2-32.
- Clarke, Ross, 'How Amrozi may cheat death sentence', *Financial Review,* 21 August 2003.
- Clarke, Ross, and Lindsey, Timothy, 'American secrecy lets Bashir off lightly', *The Australian*, 5 September 2003.
- Butt, Simon; Clarke, Ross; Lindsey, Timothy, 'Review is Not Release', *The Australian,* 27 July 2004.