# EXHIBIT E





BAPPENAS

# Access to Justice in Aceh



Making the Transition to Sustainable Peace and Development in Aceh













BAPPENAS

# Access to Justice in Aceh

Making the Transition to Sustainable Peace and Development in Aceh











# Foreword

Access to justice is increasingly recognised as a necessary condition for peace and development, especially in poor and post-conflict settings. Access to justice consolidates peace by creating the conditions that permit people to resolve legitimate grievances, which might otherwise lead to social conflict, in an effective and expedient manner based on legal certainty. Access to justice also contributes to sustainable human development by defining a minimum scope of legitimate claims based on human rights, while seeking to enhance claim-holders' ability to reclaim these rights and holding duty-bearers accountable in protecting these rights.

The correlation between access to justice and peace and development provides the rationale for this access to justice assessment undertaken by UNDP between January and April 2006 in Indonesia's western-most province of Nanggroe Aceh Darussalam (Aceh). The assessment was conducted in partnership with the *Badan Rehabilitasi dan Rekonstruksi* (BRR; Agency for Rehabilitation and Reconstruction), *Badan Perencanaan dan Pembangunan Nasional* (BAPPENAS; National Planning and Development Agency), Syiah Kuala University (UNSYIAH), IAIN Ar-Raniry, the International Development Law Organization (IDLO) and the World Bank.

While UNDP has simultaneously undertaken another five access to justice assessments across the archipelago (in Maluku, North Maluku, Central Sulawesi, Southeast Sulawesi and West Kalimantan), this assessment is particularly crucial as Aceh emerges from the devastating dual ruin brought about by the tsunami of the 26th of December 2004, as well as over three decades of civil war. The Government of Indonesia and UNDP expect that, if sound progress can be made in strengthening citizens' access to justice and the justice system at large, then sustainable peace and development can be achieved in Aceh.

On behalf of UNDP, I thank the Government of Indonesia for inviting UNDP to engage in the justice sector. UNDP is a lead organisation for institutional capacity development and is the primary UN Programme providing support and assistance to member governments in the Rule of Law and Access to Justice Sectors worldwide. UNDP is currently implementing over 20 Access to Justice Projects in conflict and post-conflict settings in Asia and the Pacific alone. Additionally, UNDP Country Offices that are implementing access to justice programmes have established an internal Rights and Justice Network to share information and lessons learned.

I would like to extend my gratitude to every individual and organization that was involved in this assessment. Our responsibility now is to take action and address the challenges identified in order to strengthen peace and development for the people of Aceh.

Bo Asplund

Resident Representative
UNDP Indonesia

# Acknowledgements

This work has been made possible by the support and assistance of many different people. Much of the information herein is based on primary interviews and focus group discussions conducted in the municipalities and districts of Banda Aceh, Lhokseumawe, Aceh Utara, Aceh Tengah, Aceh Barat, and Pidie in the Province of Nanggroe Aceh Darussalam. Hundreds of community respondents gave their time to the assessment and placed their trust in research team members by disclosing often painful and traumatic histories. The Government of Indonesia also offered tremendous support and co-operation in Aceh. Many provincial and district government officials took time to talk with the research team and provided valuable inputs to the assessment.

Professor Richard Chauvel (Victoria University, Australia), Cathy McWilliam and Dr. Arskal Salim (IDLO), Matthew Stephens and Phillippa Venning (World Bank), Cate Sumner and Stewart Fenwick (IALDF), Edoardo Gonzalez (ICTJ), Toshi Nakamura (UNDP), Guy Janssen (AIPRD) and others provided invaluable comments on drafts of the paper or contributions to the report at various stages. The team extends its gratitude to those mentioned above and to the hundreds of people in Aceh who gave their time and trust to team members in participating with this assessment.

This study was made possible through financial support from the UNDP Aceh and Nias Emergency Response and Transitional Recovery (ERTR) Programme. The views expressed herein are those of the authors and do not necessarily represent those of the United Nations, UNDP, or any of the partner organizations to this assessment. It is our genuine hope that the findings and recommendations may make a small yet tangible contribution to post-tsunami reconstruction and post-conflict peace-building efforts by strengthening the rule of law and increasing community access to justice.

## Assessment Team Members

**Assessment Coordinator :**
Neven Knezevic

**Technical Consultant :**
Nesya Hughes

**Programme Manager (Jakarta) :**
Ewa Wojkowska

**Administrative Assistant :**
Halasan Panggabean

**Team Leader :**
Saifuddin Bantasyam

**Field Researchers :**
Ernita Dewi
Neni Indriati
Juliani Jacob
Muazzin
Nyak Anwar
F. Asisi S. Widanto

# Table of Contents

| | |
|---|---|
| **Foreword** | 03 |
| **Acknowledgements** | 04 |
| **Table of Contents** | 05 |
| **Table of Figures** | 07 |
| **Executive Summary** | 11 |
| **Glossary** | 17 |
| | |
| **Chapter 1 - Introduction** | 21 |
| 1.1   Access to Justice in Aceh | 23 |
| 1.2   Prior Needs Assessments | 25 |
| 1.3   Rationale and Aims of the Assessment | 25 |
| 1.4   The Access to Justice Framework | 26 |
| **Chapter 2 - Background** | 29 |
| 2.1   History | 31 |
| 2.2   The Tsunami and the Memorandum of Understanding | 33 |
| 2.3   Major Grievances Identified during the Assessment | 34 |
| **Chapter 3 - Normative Legal Framework** | 39 |
| 3.1   National State Law | 42 |
| 3.1.1 Law on Governing Aceh | 43 |
| 3.2   *Syariah* Law | 46 |
| 3.3   *Adat* | 49 |
| 3.4   Oversight and Monitoring | 51 |
| 3.4.1 Corruption Eradication Commission | 52 |
| 3.4.2 Ombudsman's Commission | 53 |
| **Chapter 4 - Legal Awareness of Justice Systems** | 55 |
| 4.1   Legal Awareness and the General Justice System | 58 |
| 4.2   Legal Awareness and the *Syariah* Justice System | 61 |
| 4.3   Legal Awareness and *Adat* | 62 |
| 4.4   Civil Society Organisations and Legal Awareness Raising | 63 |
| **Chapter 5 - Access to Appropriate Forums** | 67 |
| 5.1   Social Factors | 70 |
| 5.2   Political Factors | 72 |
| 5.3   Economic Factors | 75 |
| 5.4   Institutional Factors | 77 |
| 5.5   Why No Action is Taken | 79 |

**Chapter 6 - Handling of Grievances by Selected Forum**                81

    6.1   General Justice System                                84

    6.2   Human Rights Court and Truth and Reconciliation Commission    88

    6.3   *Syariah* Justice System                            91

    6.4   *Adat*                                          95

    6.5   Oversight and Monitoring of Grievance Handling        101

**Chapter 7 - Satisfactory Remedies Obtained**                         103

    7.1   General Justice System                                106

    7.2   *Syariah* Justice System                            107

    7.3   *Adat* Justice System                                110

**Chapter 8 - Recommendations**                                        113

    8.1   To National and Provincial Governments               116

    8.2   To Donors                                        119

    8.3   To Civil Society                                    120

**Appendix 1 - Justice Issues Identified by Village**                   121

**Appendix 2 - Profiles of Village Research Sites**                     143

**Appendix 3 - Matrix: Institutional Obstacles for Duty-Bearers**       161

**Appendix 4 - A Discussion of Horizontal and Vertical Conflicts**      173

**Appendix 5 - Methodology, Research and Site Selection**               175

**Bibliography**                                                        181

# Table of Figures

**Tables**

TABLE 1: DAMAGE ESTIMATES FOR RULE OF LAW INSTITUTIONS    34
TABLE 2: KEY FINDINGS "NORMATIVE LEGAL FRAMEWORK"    41
TABLE 3: KEY FINDINGS "LEGAL AWARENESS"    57
TABLE 4: KEY FINDINGS "ACCESS TO APPROPRIATE FORUM"    69
TABLE 5: KEY FINDINGS "HANDLING OF GRIEVANCES"    83
TABLE 6: EXAMPLES OF EFFECTIVENESS OF *ADAT* IN HANDLING GRIEVANCES    98
TABLE 7: KEY FINDINGS "REMEDIES OBTAINED AND SANCTIONS ENFORCED"    105
TABLE 8: *TA'ZIR* PUNISHMENTS AS STIPULATED IN *QANUN*    108

**JUSTICE ISSUES IDENTIFIED BY VILLAGE**

TABLE 9:  VILLAGE TA5    123
TABLE 10: VILLAGE TA8    124
TABLE 11: VILLAGE TA2    125
TABLE 12: VILLAGE TA3    126
TABLE 13: VILLAGE TA1    127
TABLE 14: VILLAGE TA7    128
TABLE 15: VILLAGE TA6    129
TABLE 16: VILLAGE TA4    130
TABLE 17: VILLAGE CA5    132
TABLE 18: VILLAGE CA6    134
TABLE 19: VILLAGE CA2    135
TABLE 20: VILLAGE CA3    136
TABLE 21: VILLAGE CA4    137
TABLE 22: VILLAGE CA9    138
TABLE 23: VILLAGE CA1    139
TABLE 24: VILLAGE CA8    140
TABLE 25: VILLAGE CA7    141
TABLE 26: VILLAGE C1    142

**CAPACITY WEAKNESSES UNDERMINING ACCESS TO JUSTICE**

TABLE 27: *ADAT*    163
TABLE 28: JUSTICE AUXILIARIES    164
TABLE 29: POLICE    165
TABLE 30: GENERAL COURTS    166
TABLE 31: *SYARIAH* COURTS    167
TABLE 32: PROSECUTORS    168
TABLE 33: *WILAYATUL HISBAH*    169
TABLE 34: PRISONS    170
TABLE 35: INTERVIEWS CONDUCTED    180

## Boxes

BOX 1: ACCESS TO JUSTICE FRAMEWORK                                                                  26

BOX 2: LANDLESSNESS: DISADVANTAGING THE DISADVANTAGED                               36

BOX 3: CORRUPTION AND MISHANDLING OF GOVERNMENT ASSISSTANCE                37

BOX 4: HUMAN RIGHTS COMPENSATION CLAIMS                                                      37

BOX 5: CASE HANDLING-*SYARIAH* COURT                                                                38

BOX 6: NORMATIVE LEGAL FRAMEWORKS FOUND IN ACEH                                   42

BOX 7: STRUCTURE OF THE INDONESIAN JUDICIARY                                              43

BOX 8: INTER-VILLAGE DISPUTE RESOLUTION - THE ROLE OF THE *IMAM MUKIM*   52

BOX 9: COMMUNITY LEGAL AWARENESS                                                                58

BOX 10: ORGANIZATIONS ACTIVE IN RAISING AWARENESS OF *SYARIAH*              65

BOX 11: ESCALATING CONFLICT                                                                           71

BOX 12: A PRIVATE MATTER                                                                                72

BOX 13: THE SUGAR FIELDS                                                                               73

BOX 14: FEAR                                                                                                    74

BOX 15: ELITE CAPTURE AND COMMUNITY GRIEVANCE                                          77

BOX 16: COLLUSION                                                                                          77

BOX 17: ATTITUDINAL OBSTACLES INFLUENCING CHOICE OF JUSTICE FORUM        79

BOX 18: IMPROVED HUMAN RIGHTS POLICING                                                      85

BOX 19: BURYING THE PAST OR SEEKING CLOSURE ? *INONG BALEE*                     90

BOX 20: *WILAYATUL HISBAH:* COMMUNITY RESPONSE TO MORAL POLICING           91

BOX 21: VOICES OF THE POWERLESS: *WILAYATUL HISBAH* ABUSES OF POWER     92

BOX 22: MORAL OFFENCES PUNISHABLE UNDER *QANUN*                                      93

BOX 23: *TUHA PEUT*                                                                                       97

BOX 24: IMPACT OF CONFLICT AND THE TSUNAMI ON ACCESS TO JUSTICE           102

BOX 25: DISPROPORTIONATE PUNISHMENTS                                                        106

BOX 26: THE APPRORIATENESS AND EFFECTIVENESS OF CANING AS

       A PUNISHMENT                                                                                109

BOX 27: *ADAT* JUSTICE : ENSURING SOCIAL HARMONY                                       111

BOX 28: DISCRIMINATION AND EXTORTION OF MINORITIES                                    112

BOX 29: EFFECTS OF CONFLICT ON VILLAGE CA2                                                150

# Nanggroe Aceh Darussalam (NAD) Province



# Executive Summary

Access to justice is increasingly recognised as a necessary pre-condition for peace and development, especially in poor and post-conflict settings. By 'access to justice', UNDP means "the ability of people, particularly from poor and disadvantaged groups, to seek and obtain a remedy through formal and informal justice systems, in accordance with human rights principles and standards". To support the post-tsunami and post-conflict recovery in Aceh, an assessment has been undertaken to understand citizens' access to justice in Aceh. The key findings of the assessment are as follows:

## Types of Grievances

Acehnese face a variety of justice grievances, particularly due to the tsunami and conflict. Grievances include but are not limited to: economic grievances (including lost or destroyed property, land claims, inheritance disputes, unequal aid distribution, and lack of assistance for orphans and widows), violence against women, conflict-related human rights violations (including, but not limited to, intimidation, beating, torture, disappearances, summary executions), and displacement.

## Normative Legal Framework

The normative legal framework in Aceh is pluralist, includes both formal and informal justice systems and includes the recently promulgated Law on Governing Aceh. The formal systems include what the assessment refers to as the General justice system (informed by National Law, which in turn has incorporated provisions of International Human Rights Law) and the *Syariah* justice system (informed by Islamic legal principles). The informal justice system includes the *adat* system (informed by fluid and evolving customary values). These justice systems are simultaneously functioning and sometimes overlapping. The result is competing sets of laws and procedures that, while giving claim-holders some degree of choice, in many instances serve to obstruct claim-holders' access to justice and impede effective handling of grievances by duty-bearers. Meanwhile, oversight mechanisms and processes with which to review competing normative legal frameworks and harmonise the pluralist justice system are weak or lacking in Aceh.

## Legal Awareness

Levels of legal awareness relating to rights, duties and procedures within the formal and informal justice systems remain low among Acehnese. Villagers do not have information on laws that are relevant to them, nor processes to access the General and *Syariah* justice systems and are largely unaware of the limited existing legal aid services. For a variety of reasons, knowledge of the *adat* system is marginally better.

Meanwhile, the ability of duty-bearers and civil society groups to undertake legal awareness raising activities is weak. Legal awareness raising is hindered by lack of capacity, resources and commitment. Of the three justice systems, more activities have been undertaken to raise awareness of *Syariah* Law. However, these activities have focused on citizens' obligations, rather than rights and how to access justice through this channel.

### Access to Appropriate Forum

Social, political, economic and institutional factors influence citizens' choice of justice forum when seeking to resolve a grievance. Overall, cultural beliefs that 'local problems should be kept local', continued mistrust towards the state apparatus due to three decades of civil war, the high financial cost of approaching formal institutions and the bureaucratic and labyrinthine nature of the formal system have combined to discourage or, in some cases, altogether prevent Acehnese from employing this system to address grievances.

The *adat* justice system is more comprehensible and accessible than the formal justice system. However, it too is not free of deficiencies. Disadvantaged groups, in particular, face challenges in accessing informal justice mechanisms due to a lack of neutrality, unclear standards and guidelines, as well as a lack of capacity on the part of informal justice duty-bearers.

There are also numerous cases in which community members simply take no action to resolve their justice grievances. In most of these cases, citizens stated that it was because they did not think that either the formal or informal justice system could or would assist them. A significant number of victims of conflict-related human rights violations never took any action to try to have the injustices committed against them redressed because of a lack of confidence in the system. This lack of confidence is due to a perceived culture of impunity for human rights violators. Tsunami victims are also increasingly not taking action to redress their grievances because of a growing despondency with the slow pace of recovery progress.

### Handling of Grievances

There are a range of challenges that constrain the ability of formal and informal justice providers to handle citizens' grievances effectively. Within the formal justice system, human resource skills vary greatly among justice providers and there is a shortage of trainings provided for police, prosecutors and judges. Information management systems among formal justice institutions are severely deficient and there is a dearth of legal information available to legal practitioners. This has been exacerbated by the destruction caused by the tsunami. Furthermore, communication and the interface between institutions within the formal justice 'chain', namely between police, the prosecutors office, the courts and prisons, is weak. Meanwhile, insufficient budget limits the capacity of formal justice providers to undertake their duties effectively and handle grievances fairly and expeditiously. Among other things, courts are challenged in terms of understaffing, are impeded in undertaking substantive activities that involve additional costs (such as calling witnesses and undertaking field visits) and must work within damaged or poor infrastructure. Additionally, with regards to the *Syariah* justice system specifically, while *Syariah*

jurisdiction has been expanded since 2004, the provincial budget allocated to the administration of *Syariah* has not increased, reducing its ability to deal with a growing caseload. The ability of the formal justice system to handle grievances is also weak in districts undergoing administrative sub-divisioning (*pemekaran*).

A number of reasons contribute to diminish effective grievance handling by *adat* justice providers. First, in ethnically and politically divided villages, mistrust continues to exist between citizens and *adat* justice providers. Second, the conflict and tsunami have led to instances in which communities are dislocated from their *adat* leaders because of displacement or loss of life. Third, the ability of *adat* justice providers to handle grievances is weak in villages with feeble governance structures, such as no village office, poor record keeping, and weak administrative skills of village leaders. Fourth, there is a lack of oversight mechanisms to prevent instances of corruption, collusion and nepotism. Fifth, *adat* emphasises social harmony often at the expense of individual rights and interests. Finally, *adat* justice providers often have insufficient knowledge of local government functions and procedures to ensure effective handling of grievances. These factors undermine the ability of the *adat* justice system to handle grievances effectively.

### Provision of Remedies

Remedies for grievances must be obtained and sanctions enforced in a satisfactory manner. 'Satisfactory' means appropriate from a Constitutional Law and international legal perspective, as well as enforceable.

Acehnese expressed dissatisfaction with formal justice systems, which they perceive as often imposing sanctions that are disproportionate to crimes committed due to corruption and impartiality among duty-bearers. Additionally, the formal justice systems have faced challenges in enforcing sanctions, particularly after the tsunami. Among other things, there is a serious shortage of incarceration facilities, leading to treatment of prisoners in a manner that violates their rights.

Concerning *Syariah*, debate continues within Aceh as to whether caning is an appropriate form of sanction. Many consider caning a violation of international human rights law. Others consider it appropriate because, among other things, the punishment is expedient and involves low financial costs. Meanwhile, there is increasing anger among Acehnese towards the actions of the *Wilayatul Hisbah* (responsible for monitoring compliance with *Syariah* Law), who have been undertaking their functions in a manner that possibly violates Constitutional Law and human rights principles.

Sanctions imposed by *adat* decisions are not legally binding (although formal courts can consider them) and the lack of enforcement mechanisms means that it is not uncommon for more powerful figures and groups to ignore or manipulate decisions that are not in their favour. At the same time, however, *adat* remain strong because the majority of communities voluntarily submit to its customs.

## Key Recommendations

The assessment concluded that rapid and equitable responses from the justice sector – both formal and informal – are necessary to facilitate successful reconstruction and reintegration. While the tsunami and conflict have wreaked enormous damage on the justice sector, with disaster comes the opportunity to start afresh and build a coherent and trusted legal system. The assessment recognizes that an effective formal legal system is vital for that process but that, at the same time, the majority of disputes will be resolved through informal village-level institutions. Both mechanisms, therefore, require support. The assessment identifies the following six areas as priorities for action:

1. **Community legal awareness:**
   Without an understanding of their rights and how to enforce them, communities cannot resolve the legal problems they have identified in this assessment as the most critical. Legal awareness programs must focus not only as they do now on obligations, but also on rights.

2. **Community legal advisory/advocacy services:**
   Disadvantaged groups who face economic or social hardship often need support to access their legal rights or defend their legal interests. Mechanisms to support CSOs establish and maintain legal advisory and assistance posts in cities and more remote parts of Aceh are essential if more vulnerable sections of the community are to have full access to justice.

3. **Strengthen the capacity of local level justice institutions:**
   The majority of complaints are being handled by local level institutions, including *adat* institutions, village heads and religious leaders. These mechanisms require capacity building encompassing mediation skills, knowledge of the law (substantive law and processes) and gender awareness to deliver sustainable and equitable dispute resolution.

4. **Support the formal justice sector:**
   The courts, prosecutors and police were badly damaged by the tsunami, compounding existing weaknesses. The conflict has undermined public confidence in the legal institutions, reducing their capacity to respond to legal problems and support accountable government. While it is hoped that this assessment has identified a significant portion of the needs, coordinated consultations with those stakeholders who are mandated and able to respond to these needs must continue in order to (i) seek input on other needs and (ii) strategise on how these needs might best be addressed.

5.   **Resolve jurisdictional overlaps:**

The jurisdictional ambiguity between the General and *Syariah* Courts and *adat* institutions needs to be clarified. The jurisdiction of *adat* institutions in particular requires regulation. All regulations passed in Aceh should be consistent with the Indonesian Constitution and human rights principles.[1]

6.   **Monitoring and oversight:**

National commissions charged with oversight of the judiciary, the prosecutors and the police, as well as other government institutions responsible for public service provision, should establish provincial offices in Aceh. Oversight and accountability mechanisms must also be established for *adat* institutions to ensure consistency with the Indonesian Constitution and human rights principles.

---

[1] As confirmed in the Memorandum of Understanding (Helsinki Peace Accord) signed between the Government of Indonesia and the *Gerakan Aceh Merdeka* (GAM; Free Aceh Movement) on 15 August, 2005.

# Glossary

| | |
|---|---|
| **A2J** | Access to Justice |
| ***Adat*** | The Indonesian term for culturally and ethnically-specific forms of law (*hukum adat*) or custom (*istiadat*). It is the largely un-codified body of rules of behaviour, enforced by social sanctions. It consists of living norms, respected and recognised by people, and acts as society's code of conduct. It is also today a symbol of local autonomy. |
| **ADR** | Alternative Dispute Resolution |
| **AMM** | Aceh Monitoring Mission |
| **APBD** | *Anggaran Pendapatan dan Belanja Daerah* (Regional Government Budget) |
| **APBN** | *Anggaran Pendapatan dan Belanja Negara* (National Government Budget) |
| **BAL** | The Basic Agrarian Law |
| ***Baitul Mal*** | Regional government department for management of religious assets |
| **BAPPEDA** | *Badan Perencanaan Pembangunan Daerah* (Regional Development Planning Board) |
| **BAPPENAS** | *Badan Perencanaan Pembangunan Nasional* (National Planning and Development  Agency) |
| **BERANTAS** | *Barisan Rakyat Anti-Separatis* (People's Bastion Against Separatism) |
| **BPN** | *Badan Pertanahan Nasional* (National Land and Property Titles Office) |
| **BPS** | *Badan Pusat Statistik* (Central Statistics Agency) |
| **BRIMOB** | *Brigade Mobil* (Police Mobile Brigade) |
| **BRR** | *Badan Rehabilitasi dan Rekonstruksi* (Tsunami Rehabilitation and Reconstruction Agency) |
| ***Camat*** | Head of *Kecamatan* (subdistrict) |
| **CBO** | Community Based Organisation; community group formed for mutual benefit  or around a common interest |
| **CSO** | Civil Society Organisation; made up of disparate actors coming together in different organisations freely and formally associating in order to pursue non-profit  purposes (religious bodies, recreational clubs, professional associations, unions, social movements etc.) |
| **CoHA** | Cessation of Hostilities Agreement between the Government of the Republic of Indonesia and the GAM (Signed December 9, 2002) |
| ***Darul Islam*** | Islamic movement from the 1950s seeking to transform Indonesia into an Islamic state |
| ***Dayah*** | Derives from the Arab word *sawiyah*, meaning corner or small place for meditation. In Aceh, *dayah* refers to a place to learn religion. *Dayah* function as private non-formal religious educational institutions. |
| ***Dinas Syariat Islam*** | Department of *Syariah* Islam; a governmental body established by Provincial Law 33 / 2001 under the Office of the Governor of Aceh; responsible  for the implementation of *Syariah* in Aceh, including drafting of *Syariah* laws, dissemination of *Syariah* information and providing guidance to citizens on *Syariah* conduct. Led by urban based *ulama*. |
| **DPD** | *Dewan Perwakilan Daerah* (House of Regional Representatives) |
| **DPR** | *Dewan Perwakilan Rakyat* (National House of Representatives) |
| **DPRA** | *Dewan Perwakilan Rakyat Aceh* (Aceh House of Representatives) |
| **ERTR** | Emergency Response and Transitional Recovery Programme |
| **GAM** | *Gerakan Aceh Merdeka* (Free Aceh Movement) |
| ***Gampong*** | A village inhabited by a number of persons forming the lowest administrative unit within the Indonesian governance system. Each *gampong* consists of several sub-villages (*dusun*). |

| | |
|---|---|
| **HRC** | Human Rights Court |
| **ICRC** | International Committee for the Red Cross |
| **IDLO** | International Development Law Organisation |
| **IDP** | Internally Displaced Person |
| ***Imam Mukim*** | Head of *Mukim* |
| **INGO** | International Non-governmental Organisation |
| ***Inong balee*** | Widows of conflict (Acehnese term) |
| **IOM** | International Organisation for Migration |
| ***Janda*** | Female widow (by death, divorce or separation) |
| **JKMA** | *Jaringan Komunitas Masyarakat Adat* (Indigenous People's Network); Acehnese NGO |
| **KAPOLDA** | *Kepala Polisi Daerah* (Chief of Provincial Police) |
| **KAPOLRI** | *Kepala Polisi Republik Indonesia* (Chief of the National Police) |
| ***Keucik*** | A person selected by the community and who is officially appointed by the ditrict/municipality government to lead the *gampong* administration. |
| **KPK** | *Komisi Pemberantasan Korupsi* (Corruption Eradication Commission) |
| **KPA** | *Komite Peralihan Aceh* (Aceh Transitional Committee); the post-peace agreement transitional political body of the GAM |
| **KUA** | *Kantor Urusan Agama* (Religious Affairs Office); primarily responsible for registering marriage and divorce between Muslims. |
| **LAPAS** | *Lembaga Pemasyarakatan* (Penal Institutions) |
| **LoGA** | Law on Governing Aceh |
| ***Madrasah*** | A formal religious education institution under government supervision. |
| ***Majelis Hakim*** | Panel of judges that form one bench in the courts |
| ***Meunasah*** | Derives from the Arab word *Madrasah*, a place of learning or "small mosque". *Meunasah* are found throughout Acehnese villages as places for learning religion or to study, places to perform religious observation or to resolve disputes arising within the community. In some places, the *Meunasah* has become a centre for village socio-cultural development. |
| **MoU** | Memorandum of Understanding (Helsinki Peace Accord); signed between the GoI and the GAM on 15 August, 2005. |
| **MPR** | *Majelis Permusyawaratan Rakyat* (People's Consultative Assembly) |
| **MPU** | *Majelis Permusyawaratan Ulama* (Religious Scholars or Ulamas' Consultative Council); involved in drafting *Qanun,* established by *Qanun* 3/2000. |
| ***Mukim*** | A subdistrict administrative level in Aceh. A *mukim* covers all the villages that are linked to the main mosque in the area. |
| ***Musyawarah*** | Meeting to find consensus |
| **NAD** | *Nanggroe Aceh Darussalam*; the official title for the Province of Aceh |
| **NGO** | Non-governmental Organisation |
| **PDI-P** | *Partai Demokrasi Indonesia – Perjuangan* (Indonesian Democratic Party of Struggle) |
| ***Perda*** | *Peraturan Daerah* (Regional Regulation) |
| ***Perda* 7/2000** | Regional Regulation on the Establishment of *Adat* Life |
| **PUSA** | *Persatuan Ulama Seluruh Aceh* (All-Aceh *Ulama's* Union) |

| | |
|---|---|
| *Perwalian* | Guardianship |
| **POLDA** | *Kepolisian Daerah* (provincial police command) |
| **POLRES** | *Kepolisian Resort* (district level police command) |
| **POLSEK** | *Kepolisan Sektor (*ubdistrict level police command) |
| *Pondok pesantren* | Religious boarding school |
| **PuGAR** | *Pusat Gerakan Rakyat* (People's Movement Centre); Acehnese NGO |
| *Qanun* | An Arabic term used in Aceh to denote *Peraturan Daerah* or Provincial Law since the Province was granted regional autonomy under National Law 18 / 2001. |
| **RANHAM** | *Rancangan Aksi Nasional Hak Asasi Manusia* (National Human Rights Action Plan) |
| *Syariah* | A set of rules based on Islamic scripture and jurisprudence potentially applicable to all forms of legal interaction. |
| *Teungku* | Acehnese traditional leaders |
| *Timsos* | *Tim Sosialisasi* (Socialisation Team); MoU awareness-raising team consisting of representatives from the GoI and GAM. |
| *Tuha Peut* | Traditional village level governance body. *Tuha peut* (in Gayo: *sorakopat*) or, as it is otherwise called, the Village Representative Body, consists of the *keucik*, *ulama*, knowledgeable village members, *adat* leaders, farmers and traders. The total number of members depends on the population of the village, although in Acehnese the term means 'four leaders'. The *tuha peut* provides advice and oversight in the area of law and religion for a village. |
| *Tuha Lapan* | Traditional village level governance body. The total number of members depends on the population of the village, although in Acehnese the term means 'eight leaders'. The *tuha lapan* acts as the legislative institution that focuses on economic and development issues for a village. |
| **TNI** | *Tentara Nasional Indonesia* (Indonesian Military Forces) |
| **TRC** | Truth and Reconciliation Commission |
| *Ulama* | Muslim religious scholars trained in Islam and Islamic law and influential authority figures involved in local-level conflict resolution. Historically, the *ulama* were key figures in the struggle against colonial occupation. |
| **UN** | United Nations |
| **UNDP** | United Nations Development Programme |
| **UNICEF** | United Nations Children's Fund |
| *Wanra* | *Perlawanan Rakyat* (Civil Defense Force) |
| *Warisan* | Inheritance |
| *Wilayatul Hisbah (WH)* | A governmental body established by Governor's Decree 1 / 2004 and administered by the *Dinas Syariat Islam*, the WH is responsible for monitoring *Syariah* conduct and compliance to *Syariah* Law within Acehnese society; do not currently have enforcement powers but are authorized to provide 'moral guidance'. |

# Chapter 1
# Introduction

# Chapter 1 - Introduction

Access to justice is increasingly recognised as a necessary pre-condition for peace and development, especially in poor and post-conflict settings. By 'access to justice', UNDP means "the ability of people, particularly from poor and disadvantaged groups, to seek and obtain a remedy through formal and informal justice systems, in accordance with human rights principles and standards".[2] The term 'justice' is interpretive and contextual. When people think of justice, they may prioritise legal, economic, social or political justice and may not necessarily think of the justice system only as constituted by police, courts and lawyers but as constituted by other public service providers as well. Access to justice contributes to peace and development in a number of ways.

First, it acts to consolidate peace and support reconciliation by creating the conditions that permit people to resolve legitimate grievances, which might otherwise lead to broader social conflict, in an effective and expedient manner that is based on legal certainty. Second, it contributes to sustainable human development by defining a minimum scope of legitimate claims based on human rights, such as the right to education, the right to shelter or the right to food, and then identifying who are the claim-holders and duty-bearers in a particular situation. It then seeks to enhance claim-holders' ability to reclaim these rights, while holding duty-bearers' accountable in protecting these rights.

In the Indonesian context, access to justice may be achieved through both formal governmental and informal community-based mechanisms. With regards to formal mechanisms, numerous studies have shown that the justice system has suffered from severe and widespread deficiencies for decades. The legal deficiencies occur sector-wide including within the Courts, the Police, the Attorney General's Office and the private sector legal professions. The Government of Indonesia (GoI) has recognised these deficiencies and has undertaken a number of reforms to strengthen the justice system. Important reforms include the judicial reform programs, including the Supreme Court Blueprints, Anti Corruption Court Blueprints, and the *satu atap* or 'one roof' court reform, as well as the *Rencana Aksi Nasional Hak Asasi Manusia* (RANHAM; National Human Rights Action Plan). While implementation of this reform agenda was arguably erratic in its initial years,[3] there are indications that the GoI under President Susilo Bambang Yudhoyono is stepping up its efforts to reform and strengthen the justice system. Among other things, it has identified development and peace as explicit priority goals under the Medium Term Development Strategy for 2004 – 2009.[4] Consequently, the time is opportune for additional assistance efforts that support access to justice.

## 1.1  Access to Justice in Aceh

While many factors have contributed to the deficiencies in the functioning of the justice system in Indonesia, these are exacerbated in situations of conflict and natural disaster. In Indonesia's western-most province of Nanggroe Aceh Darussalam (NAD, or Aceh), thirty years of conflict, which has resulted in the deaths of over 15,000 people, has led to

---

[2]  UNDP, Programming for Justice: Access for All, p. 6.

[3]  Asian Development Bank, "Country Governance Assessment Report: Republic of Indonesia", September 2002.

[4]  Republic of Indonesia-Bappenas, 2005, Indonesia's Medium Term Development Strategy 2004-2009. The Strategy aims for: (1)security and peace; (2) justice and democracy; (3) prosperity and welfare.

court closures, destruction of infrastructure and diminished confidence in the legal system – all of which has led to a drastic decline in the number of legal cases reported and a mass departure of legal personnel due to fear or intimidation. The formal justice system was further weakened by the devastating tsunami of 26 December 2004 that killed over 130,000 people, left 93,600 people missing and some 500,000 homeless or dis-placed.[5] Some 105 court personnel and over 1,000 police officers lost their lives or remain missing. Thirty-four percent of justice-related infrastructure including police stations, prosecution offices, court houses and prisons, is esti-mated to have been gravely damaged or destroyed.[6] Court documents, much of which existed only in hardcopy, were severely damaged or completely lost. Rehabilitation and reconstruction isunderway under the coordination of the *Badan Rehabilitasi dan Rekonstruksi* (BRR; Rehabilitation and Reconstruction Agency).

However, until recently, programming has – understandably - focused on res-



Mass Grave - Victims of the Earthquake and Tsunami,

ponding to the life-saving and livelihood needs of victims of the disaster and, as yet, insufficient emphasis has been devoted to rehabilitating the justice sector.

With the signing of the Memorandum of Understanding (MoU) between the GoI and the Gerakan Aceh Merdeka (GAM; Free Aceh Movement) that ended thirty years of civil war, Aceh is now making its way through the multiple processes of post-disaster and post-conflict recovery.[7] While the peace has so far held strong, it is far from consolidated. In order to avoid a reversal into con-flict, the people of Aceh will have to feel that they are experiencing first-hand the dividends of peace brought about by the MoU and development brought about by tsunami recon-struction.

To this end, strengthening access to justice – through both formal or informal mechanisms – is a critical condition for sus-taining peace and development in Aceh.

---

[5] Republic of Indonesia – Bappenas, 2005, Master Plan for Rehabilitation and Reconstruction for the Regions and People of the Province of NAD and Nias Islands of the Province of North Sumatra – Main Book of Rehabilitation and Reconstruction, p. I-1.

[6] CGI,"Preliminary Loss and Damage Assessment", January 2005, p.64.

[7] Toshihiro Nakamura, UNDP's Initial Response to the Tsunami in Indonesia (End of Mission Report: January-March 2005) (UNDP: Transition Recovery Unit, Bureau for Crisis Prevention and Recovery with UNDP Indonesia, Geneva, 17 April 2005), p. 8.

## 1.2   Prior Needs Assessments

Assessments of Aceh's justice system during the conflict period and prior to the tsunami depict a system that had stopped functioning almost entirely. In 2003, immediately after the signing of the Cessation of Hostilities Agreement at end-2002, a UNDP justice sector assessment concluded the following:

> "While many factors contribute to the demise of institutional integrity and functioning of the justice system-factors which are present throughout Indonesia – corruption, lack of account-ability, transparency, independence and legal expertise among legal personnel, poor regulations governing recruitment and training of judges and weak supporting infrastructure all contribute to the overall picture - in Aceh, we find an acute expression of all of these."[8]

Post-tsunami assessments of Aceh's justice system have demonstrated new concerns relating to citizens' access to justice. For example, among other things, new justice grievances have arisen as a result of the tsunami that the justice system was not equipped to deal with. One example is that much private and communal land was inundated or submerged by the tsunami to the extent of becoming unusable for accessibility or safety reasons.[9] Aceh's local government and *Badan Rehabilitasi dan Rekonstruksi* (BRR; Rehabilitation and Reconstruction Agency) have had to come up with innovative solutions to this unprecedented problem.

## 1.3   Rationale and Aims of the Assessment

The correlation between access to justice and peace and development provides the rationale for the Access to Justice Assessment (hereinafter referred to as the assessment) undertaken by UNDP in Aceh between January and March 2006, and in partnership with BAPPENAS, BRR, Faculty of Law UNSYIAH, Faculty of *Syariah* IAIN Ar-raniry, *Mahkamah Syariah*, World Bank and the International Development Law Organization (IDLO).[10]

The assessment examined citizens' access to justice - through both the formal (*Syariah* and General Courts) and informal (*adat*) justice systems - in four districts and two municipalities of Aceh; namely, Aceh Utara, Aceh Tengah, Aceh Barat, Pidie and Kotamadya Banda Aceh and Lhokseumawe.

The assessment aims to identify how community access to justice can be improved by strengthening the abilities of users (or claim-holders) to access justice mechanisms and the service delivery capabilities of service providers (or duty-bearers). The assessment aims to provide a better understanding of community needs and the challenges facing duty-bearers in the present context. Understanding problems from the claim-holders' perspective offers guidance on which aspects of the justice system need strengthening, in particular, to reach poor and vulnerable groups and on how to establish priorities to maximize positive impact on access to justice.

---

[8]   UNDP, A Review of the Justice System in Aceh, Indonesia, p. 6.  Some observers state that the system worked quite well with respect to arresting and prosecuting individuals suspected of being involved with GAM.

[9]   UNDP/OXFAM has produced a report addressing key legal issues regarding land claims/rights in tsunami affected areas; see, Daniel Fitzpatrick "Restoring and Confirming Rights to Land in Tsunami-Affected Aceh", 14 July 2005. The report outlines a number of recommendations to address post-tsunami land rights issues.

[10]  See Appendix 5 for Methodology. The assessment is largely qualitative, though does include quantitative data when available.

This report articulates an overall strategy for improving community access to justice and coordinating initiatives based on actual needs inside Aceh, which is in accordance with the GoI's reconstruction and peace-building aims, as referred to in the MoU. As the GoI and several organisations have begun to launch, or are planning to launch, different justice related projects, a unanimous objective must be to strengthen synergies among different government and donor agencies in a manner that will have a multiplier effect to the value of specific sectoral initiatives.[11]

## 1.4   The Access to Justice ....... Framework

This assessment is based on a conceptual framework on access to justice outlined below and, as such, the report is structured in this manner. The access to justice framework is based on two goals: promoting human rights and enhancing capacity development to allow people to "solve problems, perform functions, and set and achieve objectives".[12] The ultimate aim is to "empower poor and disadvantaged people to access fair justice remedies that can help them to enhance their well-being".[13]

## Normative Legal Framework

A fair and effective normative legal framework is critical to ensuring access to justice as it has the capacity to both protect and defend the interests of the poor. Norms in this context consist of: rules, be they international or national or formal or informal; the processes through which these rules are made, applied, interpreted, enforced and changed; and, the capacity of individual actors and institutions that are involved in these processes. Formal norms are reflected in the Constitution, national legislation, regional regulations and jurisprudence issued by the courts.

Formal norms may also include officially codified religious regulations. Informal norms evolve through social interaction and reflect customs and accepted behaviours within a particular group or community.[14] Informal norms are uncodified customs, beliefs and rituals that guide "processes of resolving disputes outside of formal court systems".[15] Informal norms may be protected by law as well, as they are in Aceh. Chapter 3 examines the normative legal framework of Aceh



BOX 1: ACCESS TO JUSTICE FRAMEWORK

Normative Legal Framework → Legal Awareness → Access to Appropriate Forum → Effective Handling of Grievance → Satisfactory Remedy Obtained

Monitoring, Oversight and Transparency

---

[11]   International organisations that have initiated projects include, inter alia, UNICEF (women and child protection), IRC (police human rights training), IOM (reconstruction and police training), the World Bank (village level justice and legal awareness) and IDLO (gender issues, legal awareness, and assistance to courts).

[12]   UNDP, Programming for Justice: Access for All, p. 6.

[13]   Ibid., p. 11.

[14]   Ibid., p. 39.

[15]   Ibid., p. 97.

and its capacity to ensure access to justice in the post-tsunami, post-conflict setting.

## Legal Awareness

Legal awareness is critical to securing access to justice. Poor and disadvantaged groups often fail to make use of laws and rights precisely because they are not aware of them. Poor communities need to be aware of the law, of available remedies and of how to access those remedies. Chapter 4 describes assessment findings with regards to citizens' legal awareness in Aceh and examines some of the identified impediments to greater legal awareness.

## Access to Appropriate Forum

Once equipped with legal knowledge, the poor and disadvantaged require adequate access to appropriate formal and informal justice systems to seek remedies. In practice, this access – or citizens' choice of forums – may be restricted due to social, political, economic or institutional factors, as well as due to the institutional strengths and weaknesses of the justice forums, and community perceptions about different justice forums. It is necessary to understand these factors in order to address them to enhance citizens' choices with regards to justice forums. Chapter 5 discloses factors that restrict citizens' access to appropriate justice forums in Aceh.

## Effective Grievance Handling

Effective handling of grievances refers to case handling in a manner that is according to the law, impartial, expedient and consistent with human rights standards. Effective handling of grievances may be compromised for a variety of reasons, including a weak normative legal framework and low capacity of duty-bearers. Chapters 6 discusses assessment findings concerning the capacity of formal and informal justice duty-bearers and institutions in Aceh to handle grievances.

## Obtaining a Satisfactory Remedy

Justice is only fully served when claim-holders obtain satisfactory remedies and sanctions are enforced in a manner consistent with the law and human rights principles. Public confidence in justice institutions further depends on satisfactory outcomes. Chapter 7 examines the extent to which the various justice systems in Aceh are able to ensure satisfactory remedies and enforce sanctions.

## Oversight and Monitoring

Public oversight and monitoring of formal and informal justice systems is fundamental to achieving the above goals. Oversight functions should cut across all elements of access to justice initiatives. Consequently, oversight and monitoring are discussed in each chapter in relation to each step of the access to justice framework and findings of the assessment.

# Chapter 2
# Background

# Chapter 2 - Background

Indonesia's Province of Aceh is located on the northern tip of the island of Sumatra and consists of 21 districts. In 2004, the Central Bureau of Statistics (*Biro Pusat Statistik*, BPS) listed the total population of Aceh at 4,075,599.[16] The population of Aceh consists of over a dozen indigenous ethnic groups, including Acehnese, Alas, Aneuk Jamee and Gayo. Each ethnic group speaks their own languages that are further differentiated by various regional dialects.[17] The level of written and spoken fluency with Bahasa Indonesia varies among the different ethnic groups. Employment figures from 2004 indicate that 52.69% of the population was employed and 42.36% was "non-economically active".[18] Per capita regional income derived from gas and oil activities is listed at approximately Rp 8.3 million and non oil and gas per capital regional income was approximately Rp 4.9 million[19] with an average non-agricultural wage in 2002 of Rp 527,300 (female) and Rp 975,300 (male)[20] Non-oil and gas related economic activities include paddy agriculture, dry field agriculture, animal husbandry, fresh water fishery, marine fishing, home industry, and petty trading. The Indonesian Human Development Report 2004 notes that the level of poverty is markedly higher in heavily conflict affected eastern and central districts of the Province.[21] Close to 95% of the population practices Islam, while an unspecified number mix Islamic practices with animistic beliefs and rituals.

## 2.1 History

Acehnese take pride in the Province's history as the strongest centre of resistance within Indonesia against colonial Dutch rule. Prior to World War II the *ulama* leadership (religious leaders) led the Acehnese in opposition to the Dutch.[22] The PUSA, the All-Aceh *Ulama's* Union, and broader *ulama* leadership in the 1940's considered their struggle against colonialism as a movement against "feudal" structures and in "Acehnese and Islamic terms rather than Indonesian terms".[23] The result was a fundamentally different social and ideological view among Acehnese leaders that differentiated their struggle from the broader Indonesian independence movement led by urban based Dutch educated elite in Java who sought to build a modern state based on secular law.[24] This political and ideological division underpinned the Acehnese *Darul Islam* rebellion (beginning in 1953) against the Indonesian central government. However, rather than seeking to establish an independent Acehnese state, the rebellion sought to create an Indonesian Islamic state.[25]

Following early political instability in the 1950's, President Sukarno introduced the notion of "Guided Democracy", in which the political and economic role of the *Tentara Nasional Indonesia* (TNI; Indonesian National Military Force) expanded greatly with a corresponding decline of civilian control over

---

[16] BPS, Badan Pusat Statistik, Table 2, Number of population by regency/city in Nanggroe Aceh Darussalam Province, 1999-2004 http://aceh.bps.go.id/isi/pop/2.htm (May 2006).

[17] Based on information published in: Z Hidayah, Ensiklopedi Suki Bangsa di Indonesia (Jakarta: P3ES, 1997) and M.J. Melalatoa, Ensiklopedi Suku Bangsa di Indonesia (Jakarta: Proyek Pengkajian dan Pembinaan Nilai-nilai Budaya, Direktorat Sejarah dan Nilai Tradisional, Ditjen Kebudayaan Departemen Pendidikan dan Kebudayaan Republik Indonesia, 1995).

[18] BPS, Badan Pusat Statistik, Table 1, Percentage of Labour and Not Labour Force by Regency/City, 2004 http://aceh.bps.go.id/isi/employment/1.htm (7 May 2006).

[19] BPS, Badan Pusat Statistik, Table 4, Gross Domestic Regional Product per Capita and Regional Income per Capital Figures at Constant Prices in Nanggroe Aceh Darussalam Province 2002-2004 http://aceh.bps.go.id/isi/ri/4.htm (7 May 2006).

[20] UNDP, Indonesia Human Development Report 2004 (UNDP, BPS, BAPPENAS, 2004), p. 144.

[21] Ibid, pp. 144, 217. Although recent statistics are not available, it is likely that there have been significant changes since the tsunami.

[22] For a fuller historical discussion see, Anthony Reid, An Indonesian Frontier: Achehnese & Other Histories of Sumatra (Singapore: Singapore University Press, 2005), pp. 275-337.

[23] Ibid., pp. 315, 327.

[24] Ibid., p. 328.

[25] Ibid., p. 341.

national politics.[26] In 1965, President Suharto introduced the New Order regime and, by 1967, a state ideology "obsessed with national unity, and preoccupied by perceived threats of subversion" had emerged.[27] The subsequent centralization of political authority between 1965 and 1976 gave rise to renewed conflict in 1976 with the GAM, led by Hasan di Tiro, calling for Aceh to be independent from Indonesia.[28] Although this first secessionist conflict was quickly subdued, conflict was renewed in 1989 and, by 1990, Aceh had unofficially become a *Daerah Operasi Militer* (DOM, or Military Operations Area). The number of TNI personnel (then known as ABRI) increased from approximately 6,000 territorial troops to 12,000 military personnel.[29] A serious escalation of conflict in 1998 between the parties was due to a number of factors: economic exploitation; centralism and uniformity; military repression; and the politics of impunity. Aceh's *ulama*, who had presented a challenge to "secular" Indonesian nation-building and an obstacle to the centralized developmentalist ideology[30], lost influence in Aceh as most were "either co-opted or forced to play the role of government supporters".[31]

The secessionist conflict in Aceh led to widespread human rights violations committed by GoI security forces (TNI/police). Killing of suspected GAM supporters, rapes of alleged GAM women, arbitrary arrests, unfair

trials and detentions took place on a large scale, while corruption, poor access to legal rights and a culture of impunity served to further protract the violations. Rather than seeking "win-win" political solutions for local actors,[32] patterns of rent-seeking and corruption became reinforced by corrupt and violent governance that fuelled the grievances underpinning the secessionist struggle. For example, by 1998 more than 40% of Aceh's GDP came from oil production but the level of poverty increased by 239% between 1980 and 2002; compared to a fall of 47% in the level of poverty in the rest of the country over the same period.[33]

The GAM also committed human rights violations, including the killing of suspected informants (*cuaks*) and GoI security personnel (TNI/police) or their family members, unlawful detentions, forced expulsions of minority ethnic groups, destruction of property and systematic extortion.[34] In 2004, Human Rights Watch argued that a condition of near lawlessness existed in Aceh, with only one fully functioning court located on the island of Sabang.[35]

Following the resignation of President Suharto and the collapse of the New Order Regime in 1998, there was recognition among some Indonesian political elites that military action alone would not resolve the conflict in Aceh. This led to several attempts at a negotiated

---

[26] Muthiah Alagappa (ed.), Coercion and Governance, p.456.

[27] Geoffrey Robinson, Indonesia: On a New Course?, in Alagappa (ed.), p.227.

[28] Edward Aspinall, The Helsinki Agreement: A More Promising Basis for Peace in Aceh? (Washington: East-West Centre, 2005), p.65.

[29] Rizal Sukma, Security Operations in Aceh: Goals, Consequences and Lessons (Washington: East-West Center, 2004), p.8.

[30] Kirsten E. Schulze, The Free Aceh Movement (GAM): Anatomy of a Separatist Organization (Washington: East-West Center, 2004), p. 1.

[31] Rizal Sukma, Security Operations in Aceh, p.4.

[32] Satya Arinanto and Agung Djojosoekarto, The Role of Parliamentary Institutions in Transitional Democracy, p.5.

[33] Graham Brown, Horizontal Inequalities, Ethnic Separatism, and Violent Conflict: The Case of Aceh, Indonesia (UNDP: Human Development Report Office, Occasional Paper, 2005), p.3.

[34] Human Rights Watch, Indonesia: The War in Aceh, p.22.

[35] Ibid., pp. 34-35; Human Rights Watch, Aceh at War: Torture, III-Treatment, and Unfair Trials, Vol. 16 , No. 11 September 2004 (Human Rights Watch: Asia Division, 2004).

settlement.[36] However, the unstable transition process between 1999 and 2004 and a nationalistic backlash against the "loss" of Timor-Leste following 1999 provided space for conservative-minded TNI figures to reassert their influence on national policy-making. This led to the militarization of Aceh, which by 2002 had an estimated 21,000 TNI personnel and 12,000 police personnel stationed in the Province.[37] In practice, the GoI followed an "integrated approach" to resolving the conflict that included intensive military campaigns against GAM alongside parallel attempts to negotiate a political settlement.[38] In December 2002, the Cessation of Hostilities Agreement (CoHA) was signed but collapsed in May 2003 when the GoI declared Martial Law in Aceh.[39] In addition to the human rights violations perpetrated by GoI security forces and GAM combatants during the period immediately subsequent to the collapse of the CoHA, there were also violations committed by local militia groups that terrorized people suspected of anti-government actions.[40]

## 2.2 The Tsunami and the ........ Memorandum of ................. Understanding

While the effects of the tsunami in Aceh on 26 December 2004 were devastating, it did provide a window of opportunity to push forward a peaceful resolution to the secessionist struggle in the Province. The tsunami killed over 130,000 people and displaced over 500,000.[41] The destruction left some 3,000 kilometers of roads impassable and 120 arterial bridges and approximately 1,500 minor bridges destroyed.[42] As detailed in the box below, the tsunami also had a debilitating impact upon Aceh's rule of law institutions. Post-tsunami losses and challenges included the destruction of justice institutions in some areas and the collapse of investigatory, prosecutorial and adjudicatory services. The total estimated financial damage is placed at USD 82 million and damage or loss to public records is estimated at USD 18 million.[43]

In the context of this devastation and human suffering, the GoI and GAM were able to present subsequent peace negotiations as a response to the tsunami.[44] Indonesian politics had seen the electoral defeat of President Megawati Sukarnoputri prior to the 2004 tsunami and the ascendancy of those in government who favoured a negotiated settlement to the conflict, principal among these being the new President Susilo Bambang Yudhoyono and Vice-President Jusuf Kalla.[45] On August 15 2005, a Memorandum of Understanding (MoU) was signed between the parties in Helsinki, Finland. The agreement preserves the territorial

[36] Edward Aspinall, The Helsinki Agreement, p.13.

[37] Human Rights Watch, A Return to the New Order? Political Prisoners in Megawati's Indonesia, Vol. 15, No.4 (New York: Human Rights Watch, 2003), p. 3-4; Rival Sukma, Security Operations in Aceh, p. 16.

[38] Edward Aspinall, The Helsinki Agreement, p. 14.

[39] ibid., pp. 4-6.

[40] Geoffrey Robinson, Indonesia: On a New Course? pp. 237, 242.

[41] GoI, Master Plan for Rehabilitation and Reconstruction for the Regions and People of the Province of Nanggroe Aceh Darussalam and Nias Islands of the Province of North Sumatra (Republic of Indonesia), p. II-3. Figures on IDPs vary by source and time and can be misleading. For example, many Gayo conflict IDPs in Aceh Tengah are not officially recognized as IDPs because they often found housing/support from extended family members within the district.

[42] BRR, Aceh and Nias One Year After the Tsunami: The Recovery Effort and Way Forward (A joint Report of the BRR and International Partners; December 2005), p. 16.

[43] Reconstruction Notes, CGI, January 2005, p. 135.

[44] Ibid., pp. 20-21.

[45] Edward Aspinall, The Helsinki Agreement, p. 37.

| TABLE 1: DAMAGE ESTIMATES FOR RULE OF LAW INSTITUTIONS[48] | | | | | |
|---|---|---|---|---|---|
| | Category | Damaged | Out of | % Damaged | Impact (USD) |
| **Justice** | Building | 16 | 47 | 34% | 5,973,826 |
| | Equipment | 16 | 47 | 33% | 1,048,686 |
| | Personnel | 105 | N/A | | 22,631 |
| | Records | N/A | N/A | | |
| | Other | | | | 704,514 |
| | Oversight | | | | 774,966 |
| | **Subtotal** | | | | **8,524,623** |
| **Police** | Building | 34 | 171 | 20% | 2,775,625 |
| | Equipment | 34 | 171 | 20% | 1,460,489 |
| | Personnel | 2,502 | 14,763 | 17% | 2,952,600 |
| | Records | 686,259 | 2,541,701 | 27% | 3,431,297 |
| | Other | | | | 1,062,001 |
| | Oversight | | | | 1,168,201 |
| | **Subtotal** | | | | **12,850,213** |
| **Parliament** | Building | 4 | 22 | 18% | 594,000 |
| | Equipment | 158 | 880 | 18% | 3,247,200 |
| | Personnel | 123 | 880 | 14% | N/A |
| | Records | 59 | 220 | 27% | 950,400 |
| | Other | | | | 479,160 |
| | Oversight | | | | 527,076 |
| | **Subtotal** | | | | **5,797,836** |

integrity of Indonesia.[46] While the peace process remains in its early stages, the agreement appears a viable solution for GAM's political leadership, which has argued that its primary objective has been to achieve justice and prosperity for the people of Aceh rather than independence.[47] If the peace process holds, there is a real hope for the strengthening of the justice sector in Aceh. Simultaneously, the strengthening of the justice sector plays a critical role in consolidating the peace process.

## 2.3  Major Grievances Identified  during the Assessment

It is critical that citizens' access to justice is enhanced and that the channels that they choose to redress their grievances are able to resolve them in a fair and effective manner, in order that the Acehnese may feel that they are genuinely benefiting from the dividends of peace and development. This section examines the major justice grievances faced by Acehnese in tsunami- and conflict-affected areas. Common justice grievances identified in tsunami-affected areas :

- No housing;
- Land claims (abrasion, land boundary disputes, missing land documents);
- Unequal aid distribution (discrimination, unfair distribution, corruption);
- Inheritance disputes;
- Lack of assistance for orphans;
- Domestic violence against women; and
- Past human rights violations.

---

46  Ibid., p. 13.

47  Ibid., p. 58.

48  Drawn from "Preliminary Loss and Damage Assessment", CGI January 2005, p. 64.

Common justice grievances identified in conflict-affected areas :

- Past human rights violations committed by TNI, POLRI, GAM, *wanra*, and "unknown persons" (e.g., intimidation, beating, torture, disappearances, summary executions, etc)[49];
- Theft and destruction of property;
- Destruction of livelihoods;
- Government and village level corruption;
- Displacement due to the conflict;
- Land disputes (especially for returnees);
- Disputed land ownership and land usage;
- Violence against women; and
- Inheritance disputes.

The following are some examples of these grievances. As is seen from these examples, vulnerable groups are further marginalised because they are taken advantage of and, as later chapters will discuss, find it especially difficult to access justice and redress their grievances.

## Economic Grievances

Village respondents complained of a variety of tsunami and conflict-related economic grievances. These relate, *inter alia*, to loss of land, destruction of property and the unequal distribution of aid.

The loss of land and destruction of property during the tsunami is a major grievance already well documented in other reports.[50] The loss of land documents has resulted in legal uncertainty regarding land ownership rights for survivors of the tsunami. There has also been increasing competition among heirs and community members

seeking to gain legal title over properties that are increasing in value.[51] Respondents report that this has created social mistrust among community members and is undermining social cohesion.

Loss of land and destruction of property is also a major grievance in conflict areas. Significant problems exist for displaced communities attempting to return to their land and homes. The assessment found two village sites in which Acehnese returnees are blocked from accessing their land and homes (Villages CA3, CA2). In the meantime, the returnees remain camped outside the village living in temporary dwellings (while others make only infrequent visits to the area). In fact, upon initial return, several Acehnese were chased by a village mob that was hostile to their return, which forced the returnees to seek refuge in the *kencik's* office. In another village, some twenty Acehnese returnees have been forced to live in a single temporary dwelling while Gayonese displaced from a neighboring village occupy their homes and farm their lands. Although the village leaders recognise the ownership rights of returnees, there is a palpable fear among duty-bearers of resolving the issue because, during the conflict, pro-GoI militia groups were very strong in the area and were made up of local Javanese and Gayonese residents. Although several ad hoc attempts have been made to reconcile different groups in these areas, the land ownership claims of returnees remained unresolved upon the writing of this assessment. Returning community members also expressed grievances about a lack of government reconstruction assistance for homes des-

---

[49] See Appendix 1.
[50] See, among others, Daniel Fitzpatrick "Restoring and Confirming Rights to Land in Tsunami-Affected Aceh", 14 July 2005.
[51] Interview, *Syariah* Court Judge, 12 January 2006, Banda Aceh.

troyed or damaged during the conflict. Aceh Utara alone contains close to two thousand recorded cases of houses burnt during the conflict. Citizens have presented claims for assistance to *keuciks*, *camats*, and *bupatis* (head of district). However, the authorities have thus far taken inadequate action to resolve these problems. This may be changing as the international community begins to allocate greater funding towards post-conflict reconstruction since the signing of the MoU.

Another economic problem put forth as a primary grievance by village respondents is unequal distribution of aid. One reason is the pattern of reconstruction aid provided by donors and the method of distributing aid. As noted by a HURIST mission report:

> …[I]nternational bilateral and multilateral agencies are each setting their own housing standards and working on a first come first served basis that risk exacerbating jealousy and tensions….[52]

Different standards of assistance provided by government and donors in tsunami areas are creating grievances among different communities, particularly as there appears to be no rationale behind the different standards. This is exacerbated by the lack of competence or corruption among duty-bearers when identifying aid beneficiaries.[53] Unclear criteria for aid distribution often lead to the disadvantaged, who have little or no voice to articulate their needs, being further disadvantaged. For example, landless renters in tsunami-affected villages, who the assessment identified as a disadvantaged group because land ownership carries with it socio-economic status, had been further disadvantaged because, without land, the humanitarian community was, at the time of writing, unable to provide them with housing.[54] Also, village respondents complained that powerful village leaders often direct benefits to their associates or family networks.[55] For example, in a village where an NGO was undertaking a road reconstruction project, villagers complained that the *keucik* deceived the community by claiming that the NGO was offering Rp 7,000 for the

---

**BOX 2: LANDLESSNESS: DISADVANTAGING THE DISADVANTAGED**

The government has prohibited the citizens to rebuild their houses there with the excuse that the land is state land…The community doesn't have proof of property ownership…the proof owned by the community is only the land clearing documents and land and building tax payment documents, all lost during the tsunami.

I don't have any land so they cannot give me a house. Those who already have something are given more. Those with nothing cannot receive help.

We are not allowed to live there because it is too close to the beach…our previous lands are now part of the ocean…All the people from our village must go to a new location several kilometers inland…we are forced to move there…only those with a land certificate can get a house…I don't want to move to another place. It is impossible for us to live in the area far from our place of work.

I have seen the houses in the new location, when I leaned against the wall it gave way and I felt like I pushed into the wall, it looks like cement but it's not, it's only made of asbestos.

*Interview, Widower, and FGD, Fishermen, 10 February 2006, Village TA8; FGD, Widows, 7 February 2006, Village TA8.*

---

[52] UNDP, Report to UNDP Indonesia: Human Rights Programme Review, HURIST Mission Team, 30 May- 10 June 2005 (UNDP, Jakarta: Draft of 10 July 2005), p. 21.

[53] FGD, Widows, 8 February 2006, Village CA9, Banda Aceh.

[54] Muamar Vebry, 'Helping the Survivors, Landless Renters', Aceh World, February 14-20, p. 8.

> **BOX 3: CORRUPTION AND MISHANDLING OF GOVERNMENT ASSISTANCE**
>
> With the CoHA agreement in 2002, the government pledged Rp 50,000,000 *diyat* or blood money for each woman in Aceh who had become a widow due to the conflict. In the first stage, widows only received Rp 3,000,000. Widows did not receive this initial payment in full because a portion was taken by *keuciks*, *camats*, and others. As for the remaining assistance, widows are still waiting to receive payments. For example, on several occasions widow Y sought information from the government about her assistance payment but has not received any answers. Instead, she has been subjected to insults from social service employees. Other widows choose not to inquire about their outstanding assistance payments because they are the wives of ex-GAM members and are afraid of approaching the government. These widows said that they only hope that the government will pay attention to continuing their children's education so that their children will not nurse grudges against the government that will later influence them to commit criminal acts.
>
> *FGD, Widows of Conflict, 15 February 2006, Village TA2, Aceh Barat*

installation of one meter of *bamboo pancang*, whereas in truth the NGO was offering Rp 7,500, thus giving the *keucik* a Rp 500 profit for each meter.[56] Finally, economic grievances have arisen among conflict-affected populations who perceive the distribution of aid to tsunami populations as disproportionate, as they too have faced destruction and loss over, as they argue, a much longer period of time.

Village respondents receiving government assistance also complained that they do not receive the full share of the assistance they are entitled to because of corruption within the system or apathy among government officials responsible for distributing assistance. This was particularly the case in conflict areas among widows and families looking after orphans. The box above demonstrates an example of this grievance relating to the corruption of assistance.

### Past Human Rights Violations

Human rights violations committed by both the GoI and the GAM during the conflict were a major grievance encountered in the assessment. As discussed in section 5.5, Acehnese have, for a variety of reasons, generally not pursued legal action to identify and bring to justice perpetrators of human rights violations. Neither has the GoI thus far actively sought to do so. However, Acehnese are interested in accessing compensation or assistance from the GoI for the pain and damages suffered. The assessment found that, so far, such com-

> **BOX 4: HUMAN RIGHTS COMPENSATION CLAIMS**
>
> S was the victim of violence perpetrated by TNI personnel. One evening during the conflict around 15 people came to her house to look for her husband. They asked her and the children to go outside. The children were tied up outside the house, while S was taken to the sea and told to stay in the water for a couple of hours. Then, in a fisherman's boat she was beaten, kicked, pushed, and abused. Those abusing her wanted to get information about the location of her husband. A few days later she received news that her husband was shot dead by TNI and that his body had been found in another village. No assistance has been provided to her since the incident or to help with the care of raising her children.
>
> *Interview, Widow of Conflict, 22 February 2006, Village CA7.*

---

55 Interview, Panglima Laot, 22 January 2006, Village TA5, Aceh Utara; Interview, Village leaders, 21 January 2006, Village TA4, Aceh Utara; FGD, Widows of Conflict, 8 February 2006, Village CA9, Banda Aceh.

56 Interview, IDP Camp Coordinator, 22 February 2006, Banda Aceh.

pensation or assistance has been seriously lacking, creating further grievance to victims of human rights injustices. Box 4 outlines a typical outcome for victims of human rights violations.

**Domestic Violence**

Domestic violence and family disputes were a major grievance of women in assessment sites. While the assessment did not collect statistics on domestic violence, it is clearly a significant issue that arose at least once in almost every village assessed. Additionally, while the *Syariah* Courts cannot decide on domestic violence cases because it has not been criminalised under *Syariah* Law, officials report that they receive a high number of complaints concerning such violence.[57] The assessment researchers can only speculate that there are more incidents than were reported, due to the cultural taboo on openly discussing such a topic.

The assessment found that the highest numbers of recorded cases filed with the *Syariah* Courts throughout the assessment districts are divorces instigated by women. This indicates that domestic problems, while it is unclear what they may be, are another major source of grievance. Women report a number of procedural problems that limit their ability to access the *Syariah* Court when seeking divorce, as indicated in the following box.

---

**BOX 5: CASE HANDLING - *SYARIAH* COURT**

X has brought her case to the *Syariah Court* six times, but her petition for divorce is still not finalized.  As witnesses for her petition, she brought the *Keucik* and *Tengku Imam*, but she was told by the judge that they were "not good enough". She later had to return with her sibling.  X comes from a poor family, but did not want to get a letter of poverty because she felt embarrassed. As a result, she had to pay Rp 360,000, Rp 50,000 of which went to administrative typing fees. X feels that she has been treated unfairly and asks why the process has taken so long, and why she has had to come to the court so many times.

*Interview, Villager, 12 February 2006, Village CA3*

---

[57] Ibid.

# Chapter 3
# Normative Legal Framework

# Chapter 3 - Normative Legal Framework



| TABLE 2: KEY FINDINGS: NORMATIVE LEGAL FRAMEWORK | |
|---|---|
| **General Justice System** | - Indonesian National Law applies in Aceh.<br>- Indonesian human rights law is developing and there are provisions for the establishment of a Human Rights Court and Truth and Reconciliation Commission (discussion of these in Chapter 6). |
| **Syariah Justice System** | - *Syariah* Law is currently limited to family and property law and four criminal offences. However, there are intentions to expand its jurisdiction significantly.<br>- *Syariah* Law must be consistent with Constitutional Law.<br>- On-going unclarity as to whom *Syariah* Law applies to. |
| **Adat Justice System** | - Legal reforms now recognise *adat* as a key dispute resolution process.<br>- *Adat* must be consistent with National and *Syariah* Law. |
| **DPRA** | - Is responsible for drafting and promulgating legislation, estimating and authorising provincial budgets, and monitoring the Executive.<br>- Aceh's provincial legislature has limited skills to effectively draft *qanuns* that will be consistent with National law and the Indonesian Constitution.<br>- Islamic figures and the Governor's Office are key players in drafting legislation.<br>- There is limited, if any, community participation in the legislative process. |
| **KPK and oversight** | - Government oversight mechanisms against corruption and for public service delivery are weak or non-existent.<br>- The KPK in Aceh lacks a strong mandate. |

The normative legal framework in Aceh is pluralist, with simultaneously functioning and sometimes overlapping justice systems that include formal and informal systems. The formal systems include the General justice system (informed by positive state law, which in turn has incorporated provisions of International Human Rights Law) and the *Syariah* justice system (informed by Islamic legal principles). The informal justice system includes the *adat* system (informed by fluid and evolving customary values).

The General justice system is defined here as the set of institutions bearing a duty to administer justice as per National Law. These institutions include the police, the prosecution service, the courts and the prisons. The *Syariah* justice system refers to the set of institutions bearing a duty to administer justice towards Muslims as per the codified *Syariah* Laws, where these laws are the set of rules that govern Muslims' behaviour and interactions in society. These institutions currently include the Mahkamah *Syariah* (*Syariah* Courts) and the *Wilayatul Hisbah* (WH; responsible for monitoring *Syariah* conduct and compliance to *Syariah* Law), as well as utilising the General justice system's police and prosecution services. The *adat* justice system is defined here as the largely un-codified culturally- and ethnically-specific forms of law (*hukum adat*) or custom (*istiadat*) that traditionally governs rules of behaviour and is enforced by the community using social sanctions. It consists of living norms, respected and recognised by people, and acts as society's code of conduct. It is also today a symbol of local autonomy. In Aceh, legislation has been passed that formally recognises the role of *adat* in dispute resolution. This chapter examines the normative legal framework of justice systems that apply in Aceh.[58]

## BOX 6: NORMATIVE LEGAL FRAMEWORKS FOUND IN ACEH

| National Law (Formal) | Syariah Law (Formal) | Adat Law (Informal) |
|---|---|---|

## 3.1 National State Law

The General justice system in Aceh is informed by Indonesia's national positive state law. In this respect, all laws that apply in the rest of Indonesia also apply in Aceh. Since 2001, when Law 18/2001 granting Aceh special autonomy was passed, *Syariah* Law has also come into formal effect in Aceh (discussed in the following section).

The hierarchy and authority of Indonesian laws is illustrated below.[59]

1. *Undang-Undang Dasar*; the Constitution of 1945 - the written law of the state of the Republic of Indonesia, containing the basis and broad legal outlines in organizing the state;

2. *Undang-Undang*; Statute, and *Peraturan Pengganti Undang-Undang* (*Perpu*), or the Substitute Regulation for Law;

3. *Peraturan Pemerintah* (*Perpem*); Government Regulation to implement the order of the Statutes;

4. *Peraturan Presiden*; Presidential Laws; and,

5. *Peraturan Daerah* (*Perda*); Regional or Provincial Laws.

Since special autonomy was granted in 2001, perda have been referred to in Aceh as *qanun*. *Qanun* are passed locally by the *Dewan Perwakilan Rakyat* Aceh (DPRA, Aceh House of Representatives).[60] MPR Decree 3/2000 article 4 (1) stipulates that lower level laws may not contradict with higher laws. This is important to ensure that the rights of Acehnese as Indonesians are protected, in particular in terms of International Human

[58] Challenges with these systems and the ways in which they contribute to effective handling of grievances are discussed in Chapter 6.

[59] MPR Decree No. 3/2000 Articles 2 and 3 updated by Law No. 10/2004.

[60] District or municipal parliaments (*Dewan Perwakilan Rakyat Kabupaten / Kotamadya*) can also legislate. District or municipal regulations are also referred to, in Aceh, as *qanun*.

Rights Laws, which have generally been incorporated into National Law through statutes.[61] Consequently, the DPRA cannot pass *qanun* in Aceh that contravene higher laws. In practice, however, respondents noted that reviews to safeguard harmonisation of lower laws with higher ones are rarely undertaken.[62]

The diagram below shows the national structure of courts in Indonesia's formal justice system (exclusive of specialist courts such as the Commercial Court). The structure in Aceh is identical except that, since 2001 (as described in the following section), the Religious Courts have been re-named *Mahkamah Syariah*, or the *Syariah* Courts. The fact that Aceh has now entered into a period of post-conflict recovery and transitional justice renders it worth examining the state of the General justice system specifically in terms of addressing human rights violations.

### 3.1.1 Law on Governing Aceh

Specific to Aceh is the Law on Governing Aceh (LoGA, Law No.11/2006), which the MoU called for and which was promulgated by the national DPR on 11 July 2006. The LoGA is a legislative code that will inform the formal normative legal framework in Aceh to a significant extent and, in turn, citizens' access to justice. Provisions of the LoGA that will arguably most affect citizens' access to justice include, inter alia, those on the *Dewan Perwakilan Rakyat* Aceh (DPRA; Aceh House of Representatives), on the establishment of a Human Rights Court and Truth and Reconciliation Commission, and on *adat* institutions (discussed in section 3.3 below). While there are other provisions that may affect citizens' access to justice (such as article 75 on the creation of local political parties and the albeit brief article 231 protecting women and children's rights), this assessment examines those that it considers most pertinent and substantive.



**BOX 7: STRUCTURE OF THE INDONESIAN JUDICIARY**

| ADDITIONAL COURTS OF SPECIAL JURISDICTION | SUPREME COURT MAHKAMAH AGUNG | CONSTITUTIONAL COURT MAHKAMAH KONSTITUSI |
|---|---|---|

| HIGH COURT PENGADILAN TINGGI | HIGH RELIGIOUS COURT PENGADILAN TINGGI AGAMA IN ACEH, PROVINCIAL MAHKAMAH SYARIAH | HIGH ADMINISTRATIVE COURT PENGADILAN TINGGI TATA USAHA NEGARA | HIGH MILITARY COURT PENGADILAN TINGGI MILITER |
|---|---|---|---|
| DISTRICT COURT PENGADILAN NEGERI | RELIGIOUS COURT PENGADILAN AGAMA IN ACEH, MAHKAMAH SYARIAH | ADMINISTRATIVE COURT PENGADILAN TATA USAHA NEGARA | MILITARY COURT PENGADILAN MILITER |

---

[61]  For example, Laws 11 and 12/2005 enshrine the International Covenant on Civil and Political Rights (ICCPR) and the International Covenant on Economic, Social and Cultural Rights (ICESCR) in national law.

[62]  Interview, Academics, UNSYIAH, April 12 2006, Banda Aceh.

### *Dewan Perwakilan Rakyat* Aceh (DPRA)

As the institution responsible for drafting *qanun* that constitute part of the normative legal framework of justice in Aceh, it is worth examining the functions, strengths and weaknesses of the DPRA.

Prior to May 2005 when Martial Law in Aceh was lifted after the tsunami, parliamentary responsibilities in Aceh were largely controlled by the Military and National Executive. The recently promulgated LoGA, in Chapter VII, restores all the parliamentary functions of the DPRA. These functions include legislating, estimating and ratifying provincial budgetary allocations, and policy supervision and monitoring.

Currently, the DPRA consists of 65 members with representatives from 8 political parties.[63] The DPRA is supported by a Secretariat that consists of 4 divisions[64] with DPRA members grouped into several commissions to fulfil various aspects of their functions.[65] The DPRA holds plenary meetings up to seven times a year to discuss: determining the Regional Budget (APBD); preparing to write-off regional assets; promulgating draft *qanuns*; preparing an accountability report for the budget year; and final accountability report of the Governor.[66]

While drafting legislation is one of the functions of the DPRA, in practice institutions such as the *Dinas Syariat Islam* (Department of *Syariah Islam*) and *Majelis Permusyawaratan Ulama* (MPU; *Ulama's* Consultative Council) have played a more significant role in drafting and proposing draft *qanun*. Nevertheless, it remains solely the DPRA's responsibility to pass or promulgate *qanun*. Before promulgating a draft *qanun*, DPRA members are meant to solicit the views of the public and discuss the drafts in plenary sessions to ensure that they reflect the "aspirations" of the Acehnese people.[67]

In order to promote public participation in legal drafting processes and solicit community input, DPRA members are required to take recess in order to "discover the aspirations of the people".[68] Recess periods can last up to 15 days and DPRA members will take recess four to five times in a year. However, some commentators have noted that, apart from the very public debate that was held regarding the draft LoGA, the level of public input solicited before *qanuns* are promulgated is generally very low.[69] This appears to be due to a lack of resources needed for members

---

[63] Membership of DPRA is made up of a Chairman, 3 Vice Chairmen, 11 GOLKAR representatives, 11 representatives from *Partai Persatuan Pembangunan* (PPP), 8 representatives from *Partai Amanat Nasional* (PAN), 8 representatives from *Partai Bintang Reformasi* (PBR), 8 representatives from *Partai Bulan Bintang* (PBB), 7 representatives from *Partai Keadilan Sejahtera* (PKS), 6 representatives from *Partai Demokrat* (PD) faction, and 5 representatives from *Perjuangan Umat* (PU).

[64] These are the General Affairs Division, Trial and Minutes Division, Law and Regulations Division, Public Relations and Protocol Division, and Finance Division.

[65] Interview, DPRA Secretary, 12 April 2006, Banda Aceh. Commissions of the DPRA include: Commission A, Security and Policing; Commission B, Economic Affairs; Commission C, Financial Affairs; Commission D, Development Affairs; Commission E, Aceh's Special Territory and People's Welfare; DPRA NAD Council for Design and Study; DPRA NAD Honorary Council.

[66] Supervision and control can also be exercised by a Special Committee or *Pansus* (*Panitia Khusus*) which is an ad hoc instrument of the DPRA formed to handle specific problems. A *Pansus* can conduct oversight when, according to information received from the public, there is strong suspicion of irregularities or infringement being made by the government. The DPRA Secretariat attempts to issue information on the activities of the DPRA, in cooperation with a publishing company, for example by publishing news about the Parliament in the weekly tabloid, Modus.

[67] Article 26(2)d of the LoGA.

[68] Interview, DPRA Secretary, 12 April 2006, Banda Aceh.

[69] Arskal Salim provides an interesting analysis in which he argues that public aspirations are, for all intents and purposes, not reflected in legal drafting processes because of the control over drafting processes of *qanun* exercised by Acehnese *ulamas* from rural areas: Arskal Salim, Islamising Indonesian Laws? Legal and Political Dissonance in Indonesian *Shari'a, 1945-2005* (Phd Dissertation, Melbourne University Faculty of Law, 2005), pp. 201-203.

to travel to the field to solicit grassroots input, as well as a predominant paradigm among members that does not consider public participation a priority step of the legislative process.

Additionally, the capacity of DPRA members in legal drafting (more precisely, redrafting proposed *qanuns* and ensuring their harmonisation with higher laws) varies significantly. According to academics interviewed, DPRA members are often not university graduates and lack experience in government as well as National and Constitutional Law.[70] In order to improve the capacity and skills of DPRA members in the area of legal drafting, each year the DPRA Secretariat sends 5 to 10 members of the DPRA to attend a workshop on legal drafting held in Jakarta. However, over ninety percent of DPRA members continue to lack basic knowledge about legal drafting processes, a problem that is compounded, as some commentators have noted, by the introduction of "impractical religious stipulations" into law made by *Syariah* jurists and Acehnese *ulamas*.[71]

While the *Syariah* justice system is discussed in more detail in the following section, it must be noted here that the potential for expansion of the *Syariah* Courts' jurisdiction through *qanuns* may add a significant workload on DPRA members. Considering DPRA members' weaknesses with legislative drafting and limited knowledge about national laws and Constitutional Law, there is a danger that new *qanuns* ratified by the DPRA will contain legal inconsistencies with higher laws.

Regarding budgeting, DPRA Commission B deals with economic affairs. As such, its members are responsible for estimating annual budgets for all government institutions in the Province of Aceh. Interviews with DPRA Commission members and academics that have been requested by the DPRA to assist in budgeting activities indicate that members have inadequate experience in or knowledge of budgetary drafting processes.[72] As a result, several dangers exist that include: misallocation of funds that do not address local development or governance needs, slow and inefficient budgeting and planning for development and reconstruction, and executive control of budgetary allocations.

## Human Rights Court

Since the signing of the MoU, there has been much debate concerning the establishment, structure and jurisdiction of a Human Rights Court (HRC) to try the numerous human rights violations that have occurred in Aceh. Article 228 of the LoGA provides some norms or legal basis for a framework with which to address such violations. It states :

1. To investigate, try, decide on and resolve a case of a human rights violation that has occurred after the promulgation of this Law, there shall be established a Human Rights Court in Aceh.

2. Decisions of the Human Rights Court in Aceh, as referred to in clause 1, include, among other things, granting compensation, restitution and/or rehabilitation to the victims of the human rights violations.[73]

---

[70] Interview, Academics, UNSYIAH, 12 April 2006, Banda Aceh.

[71] Arskal Salim, Islamising Indonesian Laws? Legal and Political Dissonance in Indonesian Shari'a, 1945-2005, p. 201.

[72] Interview, DPRA Secretary, 12 April 2006, Banda Aceh.  Interview, Professor of Law, UNSYIAH Faculty of Law, Banda Aceh.

[73] Author's translation.

National Law 26/2000 on Human Rights Courts also provides norms with which human rights violations in Aceh can be addressed. Thus, there is some local legal basis within Indonesia and Aceh, more specifically, for trying such crimes. Section 6.2 will discuss the effectiveness of these legal bases for addressing human rights violations.

## Truth and Reconciliation Commission

As with the HRC, there has been much debate as a result of the conflict on the establishment of a Truth and Reconciliation Commission (TRC) for Aceh. Article 229 of the LoGA provides the most recent legal basis for the creation of such an institution. It states:

1. To pursue truth and reconciliation, this Law shall establish a Truth and Reconciliation Commission in Aceh.
2. The Truth and Reconciliation Commission in Aceh referred to in clause 1 shall not be separate from the (national) Truth and Reconciliation Commission.
3. The Truth and Reconciliation Commission in Aceh shall operate based on the legislative regulation.
4. In resolving cases of human rights violations in Aceh, the Truth and Reconciliation Commission in Aceh can consider *adat* principles that are practiced among citizens.

Article 230 proceeds to state that the functions, structure, appointment of Commissioners, and budget will be specified by *qanun* based on existing legislation. The reference to existing legislation here and 'legislative regulation' in article 229(3) is a reference to National Law 27/2004 on Truth and Recon-

ciliation Commissions. As with the HRC, the effectiveness of the existing normative legal framework (both within Aceh, in the form of the LoGA, and nationally, in the form of Law 27/2004) to achieve truth and reconciliation in Aceh after nearly three decades of civil war will be discussed later, in section 6.2.

## 3.2 *Syariah* Law

The development of the *Syariah* justice system in Aceh cannot be detached from the Province's status as a 'special region'. While the *Syariah* justice system's emergence in Aceh dates as far back as the sixteenth century,[74] *Syariah* Courts were only recognised in the Province by the post-colonial National Government in 1957 through Law 29/1957. In 1989, in an effort to harmonise legal systems across the Indonesian archipelago, Law 7/1989 on Religious Judicature was passed under the New Order Regime, which renamed the *Syariah* Courts of Aceh as 'Religious Courts'.

In an effort to pacify the civil war in Aceh, the GoI later stipulated the status of Aceh as a 'special region' under Law 44/1999. One of the bases of this provision was the unique religious life of the Acehnese community, including the placement of *ulamas* (Muslim religious scholars) as highly respected community leaders.[75] In the area of religious affairs, Article 4 (1) of the Law designating Aceh as a 'special region' permits the implementation of *Syariah* Law.

In further attempts to resolve the conflict (and as part of post-Suharto democratic reform efforts termed *reformasi* in Indonesia), the GoI further decentralised governance in

---

[74] See, A.D.A. de Kat Angelino, Colonial Policy (The Hague: Martinus Nijhoff, 1931), p 178; Amirul Hadi Amirul, Islam and State in Sumatra: A Study of Seventeenth-Century Aceh (Leiden: Brill, 2004), pp. 209-216.

[75] Article 3(2) of this Law stipulates that this specifically covers the fields of religious life implementation, traditional life, education, and the role of the Moslem leader in the stipulation of regional policy.

Aceh through Law 18/2001 concerning Special Autonomy for Aceh. This Law permitted the re-establishment of *Syariah* Courts in Aceh, but did not specify the jurisdiction that these courts would assume. Consequently, in 2002, the DPRA passed *Qanun* 10/2002 on *Syariah* Law, giving the *Syariah* Courts rather vague but very expansive jurisdiction over the following types of cases: *ahwal al-syakhshiyah* (religious judicature), *mu'amalah* (civil) and *jinayah* (criminal). The *Qanun* does not specify the types of offences intended but the three categories can potentially include all of the below:

- *Ahwal Al-Syakhshiyah* - covering matters regulated in Article 29 Law 7/1989 concerning  Religious Judicature, except for religious donations (*wakaf*), gifts (*hibah*) and alms (*sadaqah*).

- *Mu'amalah* - covering laws on goods and bonds like buying and selling, as well as debts, capital (*qiradh*), agricultural production sharing (*mukhabarah*), proxy (*wakilah*), consortium (*syirkah*), loans (*ariyah*), wealth confiscation (*hajru*), land right (*syuf'ah*) pawning (*rahnun*), land opening (*ihyaul mawat*), mining (*ma'din*), weavings (*luqathah*), banking, leasing (*ijarah*), labour, wealth from robbery, donations (*wakaf*), gifts (*hibah*), alms (*sadaqah*) and presents.

- *Jinayah* – covers three categories of crimes. (i) *Hudud* crimes carry specified sentences to be found in the *Qur'an*, and include adultery, false accusation or libel (*qadhaf*), stealing, robbing, drinking alcohol (*khamar*) and narcotics, psychotropic substances and other addictives (*napza*), apostasy, revolt (*bughat*). (ii) *Qishas / diat* crimes cover murder  and mistreatment, and are

punishable through retaliation or compensation. (iii) *Ta'zir* crimes include gambling, indecent acts, and not carrying out obligated prayers or the fast during *Ramadhan*. There are no specified sentences for these crimes and punishments are left  to the discretion of a *Syariah* judge.

Concern that this potentially all-encompassing jurisdiction would lead to confusion with the General Courts or undermine them altogether led to Presidential Decree 11/2003. This asserted that the *Syariah* Courts would maintain the same jurisdiction as the former Religious Courts, which essentially covered family and property law, with the addition of cases relating to *ibadah* (ritual worship) and *syi'ar* (promoting the greatness of Islam). However, in 2004, Decision KMA/070/SK/X/2004 of the Supreme Court Chief Justice authorised a 'spill-over' (*pelimpahan*) of jurisdiction from the General Courts to the *Syariah* Courts in Aceh, once again endorsing an expanded jurisdiction for the latter. The Decision stated that the spill-over would cover an increased number of *muamalat* (civil) cases, as well as some *jinayah* (criminal) cases, provided the DPRA had promulgated *qanun* to that effect. This Decision clarified earlier confusions regarding the extent of the *Syariah* Courts' jurisdiction. In article 128(4), the LoGA confirmed the necessity for *qanun* to promulgate specific *Syariah* codes. Legislators, *Dinas Syariat Islam* officials and judges have suggested that there are plans to expand the *Syariah* jurisdiction through *qanun* in the near future.[76]

The DPRA has indeed promulgated additional *qanun* to expand the number of offences that *Syariah* Courts may examine. These include:

---

[76]  Interview, Chairman of Lhokseumawe *Syariah* Court, 19 January 2006, Lhokseumawe.

- *Qanun* 11/2002 regarding the Implementation of *Syariah* Law in the Fields of *Aqidah* (correct belief), *Ibadah* (ritual worship), and *Syi'ar* Islam (promoting the greatness of Islam);

- *Qanun* 12/2003 concerning *Khamar* (liquor);

- *Qanun* 13/2003 concerning *Maisir* (gambling); and

- *Qanun* 14/2003 concerning *Khalwat* (illicit relations).

*Qanun* 10/2002 (article 4) dictates that the first-instance *Syariah* Courts are to be located in the district or municipality capital and their jurisdiction covers that district or municipality. Appeals proceed to the Provincial *Syariah* Court (article 6), which is situated in Banda Aceh. Furthermore, existing autonomy laws and Constitutional Law stipulate that the *Syariah* Courts remain subordinate to the legal authority of the Supreme Court as the final court of cassation and that *Syariah* Law must be consistent with Constitutional Law.

The national laws have generally been clear about the fact that *Syariah* Law in Aceh applies only to Muslims. Article 25(3) of Law 18/2001 on Special Autonomy clearly states this. However, the provincial *qanun* passed later do not reaffirm this and, for some time during deliberations of the draft LoGA, local *ulama* argued that *Syariah* Law should apply to every person in Aceh. The large Chinese, Indian and, more recently, international (humanitarian) presence in Aceh contested this.

The promulgation of the LoGA in July 2006 appears, at first glance, to provide clarity on this subject via article 126, which states that *Syariah* Law will apply only to Muslims, although non-Muslims must respect it and its implementation. However, article 129 concerning the jurisdiction of the *Syariah* Courts, states that "all non-Muslims committing *jinayah* (criminal) offences that are not governed by the National Criminal Code or other criminal offences that are not governed by the National Criminal Code will be subject to the law that governs *jinayah* offences."[77] While the precise meaning has yet to be formally clarified, the article suggests that non-Muslims will be subject to *Syariah* law for committing, for example, the Syariah offence of *khalwat* (illicit relations), in spite of the fact that it is not a crime under the National Criminal Code. This means that, in practice, article 126 that extends *Syariah* only to Muslims in Aceh is irrelevant. However, there is on-going debate as to the precise meaning and implications of this article and it is yet unclear how the Courts and subsequent *qanuns* will interpret it.

A legal framework exists for the establishment of the *Wilayatul Hisbah* (WH) in Aceh as well. The WH is a governmental body established by Governor's Decree 1/2004 on the Establishment and Functions of the WH and administered by the *Dinas Syariat Islam*. The WH is responsible for monitoring *Syariah* conduct and compliance to *Syariah* Law within Aehnese society. They do not currently have enforcement powers but are authorized to provide moral guidance. *Qanuns* 12, 13 and 14 / 2003 on Alcohol, Gambling and Immoral Acts called for the formation of the WH. However, this was not achieved until 2004, with the promulgation of the above-mentioned Governor's Decree. Organizationally, the WH exists at the

---

[77] Author's translation.

provincial, district/municipal, subdistrict, *mukim* and village levels. Staffing of the WH consists of a head, deputy head, secretary, and the *muhtasib* (officers of WH). WH at the *mukim* level consists of a coordinator and several *muhtasib* that are meant to serve at village level. While this means that several people from the WH can be present in every village throughout Aceh, the assessment revealed that the current organizational structure of the WH only extends to district level. However, the WH will travel to villages if called upon. Administratively and functionally, the WH reports to the *Dinas Syariat Islam*, rather than the *Syariah* Court. As such, the WH is under the authority of the provincial government, rather than the central government.

In order to be appointed as a *muhtasib,* a candidate has to meet the following requirements: be an Indonesian citizen; be faithful to *Syariah* Law, *Pancasila* and the Indonesian Constitution; be able to lead communal prayers; be honest, just, and authoritative; and have passed *muhtasib* education and training. Recruitment is carried out by the Governor and Regent/Mayor through the *Dinas Syariat Islam* after consultation with the local MPU.

Governor's Decree 1/2004 establishing the WH stipulates that its role includes: a) providing guidance and spiritual advocacy, including informing the public of *qanun* relating to *Syariah* Law; b) monitoring compliance of *Syariah* Law; c) rebuking, warning and providing moral guidance to those suspected of violating *Syariah* Law; d) trying to stop activities/conduct suspected of violating *Syariah* Law; e) settling violations through a *Gampong Adat* Meeting (*Rapat Adat*); and f) transferring violations of *Syariah* Law to the police who are legally responsible for conducting investigations of criminal offences.

## 3.3  *Adat*

The Indonesian term *adat* refers to culturally- and ethnically-specific forms of law (*hukum adat*) or custom (*istiadat*). It is the largely un-codified body of rules of behaviour or a system of "community leadership and governance", enforced by social sanctions, which is utilised, among other things, for dispute resolution.[78] It consists of living norms, respected and recognised by people, and acts as society's code of conduct. In Aceh today, it is also a symbol of local autonomy.

It is important to understand the normative legal framework surrounding *adat* because, as the assessment found, *adat* continues to be the justice system upon which Acehnese predominantly rely for resolution of their grievances. The normative legal framework governing *adat* in Aceh today consists of the following laws: the Constitution; *Perda* 7/2000 on the Establishment of *Adat* Life; *Qanun* 4/2003 on the *Mukim* Governance Structures; *Qanun* 5/2003 on the *Gampong* Governance Structures; and the LoGA.

Under Suharto, the GoI passed National Law 5/1979 on Local Government to create a standardized national village governance structure. The structure gave authority to new administrative leaders in villages, replacing the traditional *adat* leaders. In many instances,

---

[78]  World Bank, Interim Report: Justice for the Poor Program: Research Paper on Community Access to Justice and Village Judicial Autonomy (World Bank Social Dvevelopment Office, Jakarta, 2004), pp, 2-3.

the *adat* leaders actually assumed the administrative post themselves. However, in other instances, the new structure led to a weakening of the *adat* system or at least created a dichotomy of leaderships in villages.

Article 18(b)1 of the first amendment to the Constitution states:

> The state acknowledges and honours traditional legal community units and its *adat* rights as long as this is still living and in accordance with community development and the principle of the unitary state of the Republic of Indonesia, regulated by law.

In recognition of Acehnese culture and its 'special status' following 1999, the Provincial Government of Aceh passed *Perda* 7 / 2000 on the Establishment of *Adat* Life. This law acknowledged the role of *adat* institutions in village leadership. For example, it employs the Acehnese *adat* term *keucik* to refer to the village head, rather than the Indonesian term *kepala desa*. In article 5(2), the law lists the different *adat* institutions. The most important for *adat* dispute resolution are listed here:

- *Imam Mukim*: the head of a *mukim* (a subdistrict administrative level that only exists in Aceh. Traditionally, a *mukim* covers all the villages that are linked to the main mosque in the area.
- *Keucik*: the head of a *gampong* (village).
- *Tuha Peut* (in Gayo: *sorakopat*) : a village level governance body traditionally consisting of four members who oversee issues in the areas of law and religion.

- *Tuha Lapan*: a village level governance body traditionally consisting of eight members who oversee economic and development issues.
- *Imam Meunasah*: the head of the village mosque.

Article 6 of the *Perda* states that the function of *adat* institutions is to settle social problems at the community level and mediate disputesbetween community members. Article 10 requires the police to give opportunity to the *imam mukim* and the *keucik* to settle disputes at the *mukim* and village levels before conducting investigations and forwarding cases to the Prosecutor's Office.

The practices and rituals of *adat* vary, most notably across ethnic groups.[79] *Perda* 7/2000 recognizes different *adat* institutions, laws and customs at village level, so long as they do not contradict *Syariah* Law.[80] Additionally, as codified law, national legislation takes precedence over *adat* law in the case of inconsistencies.

To further set out the role of *adat* institutions, *Qanuns* 4 and 5/2003 on the *Mukim* and *Gampong* Governance Structures, respectively, were passed. *Qanun* 4/2003 on the *Mukim* Governance Structure defines the role of the *mukim*. Article 4 states that the *imam mukim's* functions relate to all governance matters at village level and issues relating to harmony and order in society. To this end, the *imam mukim* is given the authority to facilitate dispute resolution and implement *adat* law. An important difference is the scale and scope of problem solving with an *imam mukim* covering a wider geographic area, thus allowing it to handle conflicts between

---

[79] Matt Stephens, 'Local-level Dispute Resolution in Post-*Reformasi* Indonesia: Lessons from the Philippines' (2003) 5(3) Australian Journal of Asian Law 213, p. 222.

[80] Interestingly, *adat* and *Syariah* law can often be synonymous as interpretations of *Syariah* often reflect local custom and habit and vice-versa. Also, traditionally in Indonesia, "reception theory" has applied in that *Syariah* would only apply to the extent that it was not inconsistent with *adat* law. This *Perda* consequently implements "reverse reception theory".

villages. The types of disputes can include, for example, a herd of cows owned by people from one village destroying paddy fields owned by people from a neighbouring village.[81]

Meanwhile, article 12(1) of *Qanun* 5 / 2003 on the *Gampong* Governance Structure states that "the duties and responsibilities of *keucik* include: (f) acting as Judge to resolve disputes between villagers."[82]

The LoGA includes a provision on *adat* institutions as well. Article 98 (1) states: "*Adat* institutions function and act as a vehicle for civic participation in the establishment and running of the Governments of Aceh and of Ditricts / Municipalities in the fields of safety, security, harmony and social order."



BRR poster encouraging the use of *adat* mechanisms to resolve disputes

in Aceh, this section turns to the institutions in place that are intended to act as oversight and monitoring mechanisms to ensure the fair and effective functioning of this framework; that is, to ensure that this framework operates in a manner that enhances citizens' access to justice. Earlier peace agreements in Aceh suffered in part due to inadequate government oversight mechanisms.[83]

However, recent GoI reforms have the potential to create a solid foundation upon which to overcome this earlier weakness. These include – at the national level - the establishment of, first, a Constitutional Court empowered to conduct constitutional reviews of legislation and dispute resolution between state institutions and, second, an independent Judicial Commission to oversee issues of judicial ethics.[84]

## 3.4  Oversight and Monitoring

Having discussed the normative legal framework of formal and informal justice systems

It is not within the scope of this assessment to examine the strengths of these above reforms in overseeing the normative legal framework of justice systems in Aceh. The assessment does, however, examine the strengths of two institutions that various

---

[81]  Interview, *Imam Mukim*, 23 February 2006, Pidie; see also "Ternak Tetangga Makan Hasil Kebun (Herd of Cow Owned by Neighbors Eat and Destroy field)", a case mentioned in the interview.

[82]  Author's translation.

[83]  See also, *ICG*, Aceh: A Fragile Peace (Jakarta/Brussels: Asia Report no 47, 27 February 2003), p. 5.

[84]  Drawn from, Satish Mishra, 'Indonesia's Systemic Transition: Reasons for Optimism', Presentation at "The Quest for Good Global Governance" (UNDP/UNSFIR, [no date]) Workshop organized by the Monash Governance Research Unit, p. 14.

**BOX 8: INTER-VILLAGE DISPUTE RESOLUTION – THE ROLE OF THE *IMAM MUKIM***

X was trying to find crabs around a fishpond. Catching crabs for a living is a common activity among villagers that is not protested by local fishpond owners. However, when the owner saw X, he accused her of stealing fish, The family of the fishpond owner felt offended and planned to assault the neighbouring village from which X came, and gathered people to attack. Meanwhile, the neighbouring villagers heard about the plan and prepared to defend themselves. Realizing that a big problem was developing, a person from one of the villages suggested that the problem be solved by village elders. To solve the problem, the elders approached the families and invited the *mukim* to help them solve the problem.

The *mukim* approached both families with help from elders in both villages. At first the families could not reach an agreement and wanted to go to the police, but after advice from the mukim and village elders they were able to find a solution and sign a peace agreement. There have not been problems between the villages since that time.

*Village TA6.*

respondents suggested may be of particular importance for the oversight and transparency of justice institutions in Aceh. These include the *Komisi Pemberantasan Korupsi* (KPK, Corruption Eradication Commission) and the Ombudsman's Commission.

### 3.4.1 Corruption Eradication Commission

The authority and the functions of the national *Komisi Pemberantasan Korupsi* (KPK) are stipulated by Law 28/1999, Law 31/1999, Law 20/2001, and Law 30/2002. Although laws calling for the eradication of governmental corruption date back to 1999, the KPK was only established in 2004 and is still developing its own internal capacities to successfully implement its mandate. Article 6 of Law 30/2002 stipulates that the KPK is to:

a) Coordinate with other institutions authorized to eradicate corruption;
b) Supervise institutions authorized to eradicate corruption;
c) Perform pre-investigations, investigations, and prosecutions against corrupt acts;
d) Perform preventive actions against corruption; and

e) Monitor state governance.[85]

In this respect and because – as will be discussed in Chapter 5 – corruption remains a significant obstacle to access to justice in Aceh, the KPK is an important institution for monitoring the normative legal framework of justice systems.

The KPK's strategy for eradicating corruption consists of institution-building, prevention, repression, and rallying for public support.[86] In Aceh, the KPK has thus far had minimal impact. Currently, it has a limited mandate to implement functions in the field, with a small presence of two junior staff in a newly established office in Banda Aceh. KPK personnel only receive reports of corruption and then pass those reports along to its National Office in Jakarta for further consideration.[87] It is currently further constrained by the fact that KPK officials at the national level (probably quite justifiably) fear "growing too fast" as an institution and worry that "losing control" of its personnel at regional levels can introduce opportunities for corruption within the organisation itself.

The limited scope of KPK investigations in Aceh thus far is also due to a national level

[85] KPK, Bring Indonesia Free From Corruption: Annual Report 2004 (Jakarta: Republic of Indonesia, KPK), p. 4. Coordination activies to prevent corruption are meant to occur with the Attorney's General's Office, the Inspector General's Office, the Police, and the Financial Development and Supervisory Board, among several others.

[86] For more details see, KPK, Bring Indonesia Free From Corruption: Annual Report 2004, pp. 9-34.

[87] Interview, KPK personnel, March 2006, Banda Aceh.

policy within KPK to direct its primary efforts at national-level court judiciary.[88] The rationale is that, to deter misconduct and corruption within government, one must first have judicial services that will conduct genuine investigations and that will impose "real" penalties upon convicted officials. For this to occur, the judicial services must first be "cleaned". While this is logical, parallel bottom-up efforts to eradicate corruption at the provincial level can support national top-down initiatives to enhance citizens' access to justice.

## 3.4.2 Ombudsman's Commission

The assessment found that justice for Acehnese – in the tsunami recovery and post-conflict setting – means more than legal redress and instead weighs greatly towards the realisation of socio-economic rights. An overwhelming number of citizens' justice-related grievances centred on the inefficient delivery of government services (e.g. food and oil rations, housing assistance, issuance of official letters and certificates, etc.) due to corruption and discrimination. In spite of this, no mechanisms currently exist in Aceh to demand the accountability and transparency of public service providers. While formal actor respondents stated that they are open to receiving complaints from citizens regarding unsatisfactory provision of services, very few had formal mechanisms through which to do so and no independent mechanisms through which to process complaints. Thus, while justice sector reform is necessary to enhance access to justice, it is arguably not sufficient for the expedient promotion of accountability of government services. On the other hand, a monitoring mechanism in the form of an ombudsman's function could act to promote transparency and accountability of a broader spectrum of government services.

Presidential Decree 44/2000 encourages the establishment of regional ombudsmans' offices. No such office yet exists in the Province of Aceh.[89] Given high levels of corruption and ineffective service delivery found in Aceh's public administration, which extends into the justice system (discussed in subsequent chapters), oversight of public service delivery is important to promote community access to justice.

---

[88]  Interview, BRR Official, February 2006, Banda Aceh.
[89]  There are a number of national level monitoring and oversight initiatives that could contribute to enhancing access to justice in Aceh were their regional level counterparts to be established. Besides the Ombudsman's Office, other initiatives include the Judiciary and Police Review Commissions.

# Chapter 4
# Legal Awareness of Justice Systems

# Chapter 4 - Legal Awareness of Justice Systems



| TABLE 3: KEY FINDINGS: LEGAL AWARENESS | |
|---|---|
| **General Justice System** | - Community legal awareness of laws, rights and procedures is low.<br>- State institutions engaged in awareness raising activities lack resources and capacity to effectively disseminate information on national law.<br>- NGOs conducting awareness raising activities lack capacity and tend to be focused on urban areas. |
| **Syariah Justice System** | - State institutions engaged in awareness raising activities lack resources and capacity to effectively disseminate information on *Syariah* Law.<br>- Most CSO awareness raising activities on *Syariah* promote appropriate moral behaviour instead of individual rights under the law. |
| **Adat** | - Fluid, oral and un-codified nature of *adat* means that community members are often not entirely aware of its customs and processes.<br>- Other factors, including urbanisation and growing awareness and reliance (compared to earlier generations) of formal justice systems, have degraded community level understanding about *adat*. |

Earlier studies have established that a large proportion of Indonesian citizens, particularly those with no or little formal education, are unaware not only of laws that may be relevant to them, but also of their legal rights, services.[90] This assessment found a similar lack of legal awareness among village level respondents in Aceh. Vulnerable groups have perceptibly lower legal awareness because they are often illiterate and have less access to sources of information.[91]

This, in turn, further disadvantages them. Moreover, the level of citizens' legal awareness directly influences their perceptions of the law. For disadvantaged groups and community members more broadly to seek effective and fair resolutions for justice grievances, there needs to be sufficient information disseminated in a manner that is understood by target audiences and that will empower them to seek resolution of their grievances under the law.[92]

---

[90] Asia Foundation, Survey Report on Citizens' Perceptions of the Indonesian Justice Sector: Preliminary Findings and Recommendations (Jakarta: Asia Foundation and AC Nielson, August 2001), p. 23.

[91] UNDP, Programming for Justice: Access for All, p. 140.

[92] Ibid.

> **BOX 9:   COMMUNITY LEGAL AWARENESS**
>
> "We are afraid to claim our rights, because we do not know the laws, we are afraid to act wrongly.  If we report, they do not care, so we have lost our enthusiasm."
>
> *FGD, Landless men, Village TA5.*
>
> "We don't know! If we want to go to court, where do we have to go first?"
>
> *FGD, Widows, 7 February 2006, Village TA8.*
>
> "We don't know what we're doing; we are just simple people, not like the other women who dare to report their plight."
>
> *Interview, Widows of Conflict, 22 January 2006, Village CA5.*
>
> "Where is the law official? What we know is only in the newspaper, about the *Syariah* Law, but where is the custom law?  Sometimes when we want to make a rule, we think it will disturb someone else's rules."
>
> *Interview, Keucik, 21 January 2005, Village TA4.*

This chapter examines assessment findings relating to citizens' legal awareness vis-à-vis the different justice systems (General, *Syariah* and *adat*) and the obstacles duty-bearers (including civil society organisations that have assumed a role to raise legal awareness) encounter with raising legal awareness among community members.

## 4.1   Legal Awareness and the General Justice System

The assessment revealed that legal awareness remains low amongst community members and severely affects citizens' ability to access, in particular, formal channels of justice. The assessment identified a range of legal issues in which citizens had weak legal knowledge. First, many citizens do not know that they have a right, which is enshrined under Indonesian Constitutional Law as stated above, to choose between utilizing *adat* or the formal justice system to resolve disputes. They have very little knowledge of their rights under national law and how to access the channels that can provide them those rights. As a consequence, they perceive *adat* justice providers (in particular, the *keucik*) to be the only mechanism or, at least, a compulsory first 'port of call' through which they can claim their rights. Connected to this lack of knowledge of alternative dispute resolution channels is the fact that citizens' awareness of the existence of legal aid facilities is very low (largely because these facilities are centred in district capitals).

Second, land and property owners in villages were often unaware of the benefit of registering land ownership and believe that *adat* law remains sufficiently strong to protect their rights over their property. Notably, this was often the case in isolated or rural tsunami- and conflict-affected areas. Yet, because *adat* is not binding, the assessment also found instances of citizens being unable to claim compensation for both tsunami and conflict-induced lost or damaged land and property because they lacked official title.

Third, a majority of women did not know or understand that registering their marriages and divorces can afford them legal protection in terms of, among other things, custodianship of children, ownership of property and the right to receive continued assistance (alimony) after a divorce. Women in many areas visited by the assessment relied on customary procedures of marriage and divorce witnessed and sanctified by a village religious leader, which are inadequate under national law for many of the woman's rights to be protected. Others, particularly with divorce, did not even do this, rendering the woman with ambiguous marital status and no legal protection.

Additionally, respondents often did not know that domestic violence constitutes a serious crime under national law. As one formal actor respondent stated, "People's level of education is very low…They do not know that hitting one's wife is a form of violence and think it is something normal."[93]

A fourth example of low legal awareness is found with regards to awareness of assistance programmes that are available. One example can be found with women who have become widows because of the conflict, known in Acehnese as *inong balee*. After the CoHA in 2002, the GoI agreed to disburse compensation or *diyat* (blood money) to *inong balee*. The GoI had collected data of the number of *inong balee* and had begun to issue payments when the CoHA failed. Nevertheless, many *inong balee* were entirely unaware of their right to such assistance.

Finally, the majority of citizens are unaware of the actual roles and responsibilities of different justice providers. This renders them vulnerable to extortion when providers demand money for the provision of services. Citizens, including those in urban areas, are especially unaware of the powers of the *Wilayatul Hisbah*, a governmental body established to monitor adherence to *Syariah* law in Aceh, believing that they have powers of arrest, which they do not.[94]

In conclusion, the assessment revealed weak community legal awareness among citizens, particularly among already disadvantaged groups, thereby further disadvantaging them.

## Legal Awareness Raising

A government programme established to raise community awareness about human rights is the *Rancangan Aksi Nasional Hak Asasi Manusia* (RANHAM; National Human Rights Action Plan). RANHAM II (2004 – 2009) was passed by Presidential Decree 40/2004 and, in Aceh, a provincial level RANHAM office was established in February 2005 by Governor's Decree 003/PKS/2005. The functions of Aceh's RANHAM committee include:

- Establishing and strengthening institutions to implement RANHAM;
- Contributing towards harmonizing regional laws;
- Dissemination of information and providing education on human rights (including civil and political rights);
- Application of human rights norms and standards; and
- Monitoring, evaluation and reporting.

The provincial RANHAM Committee is made up of representatives drawn from government, civil society and academia. However, various problems exist with its human rights awareness raising and monitoring efforts due to a lack of funding and capacity weaknesses. At the provincial level, RANHAM has been allocated an annual budget of Rp 56 million (roughly the equivalent of USD$5,500), thus leaving it grossly under-funded to carry out any of its mandated functions. Additionally, administrative support personnel and regular staff have also received insufficient training

---

[93]  Interview, Police Official, 22 January 2006, Aceh Utara.

[94]  The *Wilayatul Hisbah* (WH) was established by Governor's Decree 1 / 2004 to monitor adherence to *Syariah*. The WH are administered by the *Dinas Syariat* Islam and, while empowered to 'guide' citizens suspected of violating one of the currently existing four *Syariah qanun* (on conducting one's self in an Islamic manner (including mode of dressing, gambling, drinking alcohol, and non-halal relations), have no power to conduct arrests. This power remains with the general police.

and lack the experience, skills, and knowledge about Human Rights Law to effectively socialize principles broadly. Thus far, GoI officials have demonstrated limited commitment to strengthen RANHAM.

According to officials from the organic police services, community members have an active role to play in securing the rule of law.[95] To this end, police attempt to conduct the following legal awareness raising activities :

- Awareness raising of the MoU;
- Awareness raising about legal obligations to act as witnesses in court proceedings when summoned;
- Awareness raising concerning community responsibility for self-help through village security systems (i.e., *wanra - Perlawanan Rakyat;* Civil Defense Force); and
- Awareness raising regarding the need to report criminal offences and not take the law into their own hands (i.e., preventing vigilantism).

However, only a small number of POLRES (district police) offices surveyed have made progress at introducing structured awareness raising campaigns with communities. Current ad hoc efforts include discussion forums at village level every two weeks through meetings with *keuciks, camats* and TNI personnel.[96] However, besides lacking adequate financial resources, police officials note that the trauma of conflict remains a significant impediment to their conducting legal awareness raising activities because of lingering fear and mistrust toward GoI apparatus, including the police.

Several state institutions are mandated to conduct legal awareness raising activities to enhance people's understanding of the General justice system. For example, respondents reported that the Prosecutor's Office in Aceh has, in the past, undertaken legal awareness raising activities in the form of 'legal guidance' and the provision of 'legal information'.[97] Legal guidance is awareness raising for people with little knowledge of the law, while legal information is training for people with at least a basic knowledge of the law. Legal guidance is based on the particular needs of different communities relating to prevalent local criminal activities (e.g., narcotics trading/usage), while legal information is more wide-ranging. During the planning stage for legal guidance activities, representatives from the Prosecutor's Office visit villages and speak with local leaders to identify the most pressing information needs relating to criminal behaviour. Legal guidance programs are then developed based upon identified needs at village level and, once approved by the village leadership, legal guidance programs are implemented by officials from the Prosecutor's Office. On the other hand, legal information is provided to civil servants working in state institutions mandated to conduct development activities. Legal information campaigns are framed around anti-corruption issues and strengthening the public accountability of government officials.[98]

However, respondents explained that the Office has encountered many problems in conducting these activities, in particular due to limited staff numbers and a lack of

---

[95]  Interview, Chief of POLRES, 20 January 2006, Lhokseumawe; Interview, Chief of POLRES, 8 February 2006, Aceh Barat.

[96]  The involvement of TNI personnel potentially violates written law under the Constitution that stipulates a separation of roles between the TNI and the Police regarding civilian security functions. Additionally, in several assessment sites, it seemed clear that TNI involvement in raising legal awareness can undermine the objective of building a harmonious relationship between the police and the population and, by extension, successfully implementing a community policing approach.

[97]  Interview, Head of Special Crime Unit of Banda Aceh Attorney's Office, 8 February 2006, Banda Aceh.

[98]  Interview, Head of Special Crime Unit of Banda Aceh Attorney's Office, 8 February 2006, Banda Aceh.

educational resources. The activities have thus been limited in terms of their geographic scope.[99] Additionally, although prosecutors receive training to carry out these activities, a lack of operational funds means that not many prosecutors are able to engage in skills training activities (i.e., the Attorney General's office in Jakarta provides training for 30 prosecutors per year nationally).[100] As a result, current awareness raising activities emphasise legal obligations towards the state rather than citizens' rights.

Prior to a re-escalation of the conflict in 1999, the General Courts also provided legal education to the population. According to court officials, these efforts primarily related to the obligations of citizens to bear witness in criminal proceedings before the court. However, the conflict brought an end to those efforts and they have not resumed since.[101] A further obstacle to promoting legal awareness about the General justice system relates to lingering security concerns from the conflict period. Several government officials note that they remain fearful of going into villages or subdistricts that were heavily affected by the conflict and that had a strong GAM presence.[102]

Respondents were critical that current legal awareness raising activities are focused in district capitals and do not extend to subdistrict and village levels.[103] This criticism carries weight based on the assessment finding that community members in all but

2 of the 18 villages reported that they have never participated in nor heard of any legal awareness raising activity. The overall result is that villagers remain unaware of legal aid services and do not have information on the court system. In short, the majority of respondents stated that there is a large need for legal awareness raising.[104]

## 4.2  Legal Awareness and the *Syariah* Justice System

Village respondents' legal awareness of *Syariah* Law was perceptibly higher than their awareness of laws of National Law and the General justice system. This is perhaps not surprising as Acehnese generally embrace Islam as a way of life so that principles of *Syariah* Law, such as the prohibition against alcohol and pre-marital relations, are taught to Muslims from a young age and apply in every day life. Nevertheless, respondents' awareness of how to redress grievances through the *Syariah* justice system remains weak.

### *Syariah* Awareness Raising

Since granting special status for Aceh through Law 44/1999, the Provincial Government has undertaken concerted efforts to raise awareness among community members of provisions of *Syariah* that have been codified in Aceh (i.e., the *qanun*). Institutions working to raise this awareness include the *Syariah* Courts, WH, *Dinas Syariat Islam*, Article 4(e)

---

99    For example, in only 1 (located in Banda Aceh) of the 18 villages assessed was it reported by community members that they received this type of legal guidance from government officials and even then it had been conducted several years ago.

100   Interview, Head of Special Crime Unit of Banda Aceh Attorney's Office, 8 February 2006, Banda Aceh.

101   Interview, Vice Chairman of Meulaboh District Court, 14 February 2006, Aceh Barat.

102   Interview, Meulaboh Court Judge, 14 February 2006, Aceh Barat.

103   Ibid.

104   This is best reflected in Appendix 5 under the heading of 'action taken'. Most villagers that either took no action or had no resolution of their grievance at village level often expressed the need for legal awareness raising activities and the provision of legal assistance.

of *Perda* 33/2001 on the Organisation and Structure of the *Dinas Syariat Islam*[105] MPU,[106] and *Kantor Urusan Agama* (KUA; Religious Affairs Office).

*Syariah* Courts personnel have begun "go around" campaigns in districts like Aceh Tengahto raise people's awareness about *Syariah* Law, people's rights in court, and how to access courts. In other areas, some *Syariah* Court judges have promoted awareness about rights through preaching activities in mosques, or in community gatherings during Islamic celebrations.

The *Syariah* Court in Aceh Tengah has employed a new strategy for raising awareness by printing some 1,200 booklets on *Syariah qanun* for distribution to *keuciks*.[107] The Prosecutor's Office also plans to undertake *Syariah* justice system awareness raising activities.

However, thus far, the geographic scope of existing activities remains limited. *Syariah* Courts personnel ascribe the limited geographic coverage to insufficient resources (e.g., vehicles and insufficient operational funds).[108] An additional factor allegedly limiting the effectiveness of existing awareness raising activities has been poor cooperation between key state institutions such as the KUA, *Syariah* Court, organic police services, and the General Courts.[109]

## 4.3   Legal Awareness and *Adat*

Sources of information regarding *adat* include the *keucik*, *imam mukim*, *imam meunasah*, *tuha peut* and other *adat* figures. The uncodified nature of *adat* means that it is typically passed down orally from one generation to the next. However, the assessment identified several factors that impede villagers' legal awareness about *adat*.

First, respondents in several villages noted that the fluid nature of *adat* as oral customary law tends to subject it to varying interpretations, renders it flexible and, therefore, often difficult to pinpoint. Indeed, the assessment found that, in a significant number of villages, the *adat* leaders were themselves unclear of not only *adat* laws and customs but the *adat* institutions as well. For example, few *keuciks* were able to explain precisely how the institutions of *tuha peut* and *tuha lapan* function. This suggests either that there has been a substantial erosion of people's awareness of *adat* laws and customs or, alternatively and more likely, it confirms the fluid nature of these institutions and laws and demonstrates that they cannot be rigidly defined in the way that the concerned legislation (i.e. *Perda* 7/2000) attempts to do.

Second, increasing mobility and urbanisation has meant that younger generations are moving away from their villages, weakening the 'handing down' of *adat* knowledge. Finally,

---

[105] Article 4(e) of Perda 33/2001 on the Organisation and Structure of the *Dinas Syariat Islam* states "… the *Dinas Syariat Islam* shall function to undertake guidance [training] and awareness raising of *Syariat Islam*." [Author's translation.]

[106] According to MPU officials, one of the MPU's tasks is to "socialize Islamic Laws to communities and related matters that ought to be practiced by Muslim followers". Interview, Secretary of MPU, 26 January 2006, Takengon, Aceh Tengah.

[107] Interview, *Dinas Syariat Islam*, 26 January 2006, Takengon.

[108] Interview, Registrar Secretary, *Syariah* Court, 30 January 2006, Takengon, Aceh Tengah.

[109] Interview, Head of Religious Affairs Office, 24 January 2006, Seunuddon.

the assessment found in a number of villages that village respondents did not even necessarily know who, besides their *keucik* and perhaps *imam meunasah*, other *adat* leaders in their village are. For example, many people, unless they had been involved directly in a dispute that was dealt with by these leaders, were unaware who their *imam mukim* was and who constituted the *tuha peut* and *tuha lapan* in their villages. This is discussed further in the section on grievance handling.

### *Adat* Awareness Raising

The primary government institution with a mandate to raise awareness of *adat* to communities is the *Majelis Adat Aceh* (MAA). As custodians of *adat* in Aceh, its responsibility is to liaise with *adat* leaders at village and subdistrict level to enhance their knowledge and ensure that villagers too are aware of *adat* customs and habits.

However, the assessment found that, in village assessment sites, the MAA is not actively engaged in *adat* awareness raising. This is due to a number of factors. First, according to MAA officials, they lack the resources to undertake field activities.[110] Article 13 of *Qanun* 3/2004 on the Organisation and Structure of the MAA states that the MAA will derive its funds from the APBD. These funds have been limited presumably due to the determination by the DPRA that the activities of the MAA are not a priority. Second, academics interviewed by the assessment explained that, while never explicitly articulated, MAA posts are 'reward posts' for retired civil servants. For this reason, almost all MAA officials are significantly

older, which – while garnering them respect – also means that they are less likely to access the field, as well as articulate concepts of *adat* in a manner that is comprehensible and appealing to younger generations. Finally, as stated above, any effort to raise awareness of *adat* will be constrained by the fact that it is fluid, orally-based and differs from one area and ethnic group to another. It is not a constant code or common law in the way that the National and, even, *Syariah* Laws are.

## 4.4  Civil Society Organisations and Legal Awareness Raising

The role of government institutions in raising legal awareness, as discussed above, has been limited due to a range of political, economic and institutional factors. However, the assessment found that civil society organisations (CSOs) have, to an extent, come in to fill the gap left by the GoI's shortcoming. CSOs in Aceh constitute non-governmental organisations (NGOs), community based organisations (CBOs), religious groups involved in self-help activities, community development and religious education, student and campus-based groups comprising of students and intellectuals, and other groups, including the media and labour organisations.[111]

### Civil Society and General Law Awareness Raising

The assessment found a handful of NGOs active in legal awareness raising of National Law. However, activities focused on women and children's rights, international human

---

110   Interviews, MAA Officials, 23 January 2006, Aceh Utara.

111   Hadiwinata and Bantasyam, Civil Society and Conflict Resolution in Aceh, pp. 9-22.

rights and, in tsunami areas, civil issues relating to re-registering lost documents and property. The assessment did not identify activities to raise legal awareness of other criminal and civil cases and procedures.

The assessment found that NGOs involved in raising legal awareness on women and children's rights primarily deal with the Domestic Violence Act and Children's Protection Act.[112] Aceh's Gender Transformation Working Group (*Kelompok Kerja Transformasi Gender Aceh*; KKTGA) is one of the few organizations identified that actively works at village level by providing assistance and counselling to female victims of domestic violence. Other notable examples of NGOs undertaking legal awareness raising activities in this field include: *Mitra Sejati Perempuan Indonesia* (MISPI, the Real Partner of Indonesian Women), founded in 1998; and FLOWER, founded in 1986. Activities of these organizations are geared towards women's empowerment and include:

- Strengthening community organizations to engage in self-help;
- Conducting FGDs with women to gather data and socialize women's rights and how to access legal protection;
- Providing legal aid to community members;
- Establishing and training paralegal groups to provide legal assistance to victims of gender-based violence; and
- Printing and distributing leaflets and brochures on women's rights.

The assessment found a number of NGOs with self-declared mandates that include legal

awareness raising about Human Rights Law. One of the most well-known organizations working in this field in Aceh is the *Koalisi NGO HAM* (NGO Coalition for Human Rights) established in August 1998, which brings together over a dozen local human rights NGOs.[113] The Coalition's current organizational network inside Aceh extends to several districts: Aceh Timur, Aceh Utara, Pidie, Aceh Barat, Aceh Selatan, and Aceh Tengah.[114] The Coalition's mission is to:

- Raise public awareness about human rights;
- Investigate and collect data about human rights abuses;
- Carry out campaigns against human rights abuses;
- Provide assistance to human rights victims both by litigation and non-litigation; and
- Urge central and local government to take responsibility for human rights violations and rehabilitate and give compensation to the victims.

Several other NGOs involved in human rights legal awareness raising include: *Peduli HAM* (Care Human Rights Foundation); *Lembaga Bantuan Hukum* (LBH, Legal Aid Foundation) Banda Aceh; TAMASYA (*Tim Advokasi untuk Masyarakat Sipil*, Advocacy Team for Citizens); and *PB HAM* (Legal Aid and Human Rights Center), which, operating in six districts, also acts as offices for *Koalisi HAM*.

However, the assessment found that NGO trainings tend to refer to international human rights instruments rather than placing emphasis on those instruments or principles that have been incorporated into National

---

[112] Interview, Head of Sub-Section, Women Empowerment Bureau, 25 January 2006, Aceh Utara.

[113] Koalisi NGO HAM membership: 1)LBH Banda Aceh, 2) Walhi Aceh, 3) KKTGA, 4) Flower Aceh, 5) Sahara, 6) CDI, 7) LPLHa, 8) LeUHAM, 9) SULoH, 10) Kontras, 11) Cordova, 12) YAB, 13) ADESA.  Koalisi HAM also has several partners organizations: Aceh NGOs Coalition for Human Rights Profile .

[114] Interview, NGO HAM, 4 January 2006, Banda Aceh.

Law. Additionally, NGO respondents explained that, while security and lack of funds were principal factors restricting activities during the conflict, the primary problems encountered with raising legal awareness today include lack of skilled and trained personnel to conduct legal awareness raising and exhausted capacity.[115] That is, without adequate skilled and trained personnel, NGOs are finding it difficult to expand their operations. Indeed, most NGOs have offices at district capitals rather than subdistrict, from where they venture as much as possible to the subdistrict and village level.

The assessment further found that weak staff capacities of many NGOs, as well as CBOs, have meant that the organisations rely upon individual leadership figures rather than a consolidated staff base. This weakens the organisations communication capabilities; thus making them "recipients" of information and restricting their capacity to actively disseminate information.[116]

## Civil Society and *Syariah* Legal Awareness Raising

The assessment found that civil society activities to raise legal awareness of *Syariah* are more prevalent than of the National Law. The following table lists groups involved in raising awareness of *Syariah* Law.

The above CSOs employ the following forums and media to raise awareness of *Syariah* Law: Friday prayers, village meetings, in *pesantran* (Islamic boarding schools), by raising banners, participating in radio talk shows, organising seminar discussions and workshops and publishing and distri-buting materials about *Syariah*.[118]

However, discussions with respondents from some of the CSOs indicates that the focus of awareness raising efforts has been on citizens' obligations under *Syariah* Law, rather than citizens' rights and how to access justice employing the *Syariah* system. Religious

| BOX 10: ORGANIZATIONS ACTIVE IN RAISING AWARENESS OF *SYARIAH*[117] |
|---|
| - PII (mass organization) |
| - Himpunan Mahasiswa Islam (HMI) |
| - Pemuda Muhammadiyah |
| - Partai Keadilan Sejahtera (PKS, political party) |
| - Majelis Dakwah Islamiyah (MDI, mass organization) |
| - Dewan Dakwah Islamiyah (DDI, mass organization) |
| - Kesatuan Aksi Mahasiswa Islam Indonesia (KAMMI, Islamic student union) |
| - Himpunan Mahasiswa Al-Wasliyah (HIMMAH, Islamic Student Union) |
| - Muslimah Nahtdatul Ulama (women's wing in Nahdatul Ulama) |
| - Fatayat NU (young women's wing in Nahdatul Ulama) |
| - Gerakan Muslimah Indonesia (GMI)(mass organization) |
| - Aisyiah Muhammdiyah (mass organization) |
| - Badan Kontak Majelis Taklim (BKMT)(Islamic studies group for women led by wife of the governor) |
| - Persatuan Ulama Seluruh Aceh (PUSA, All Aceh Ulama's Union, mass organization) |
| - Partai Persatuan Pembangunan (PPP, United Development Party, political party) |
| - Partai Kebangkitan Banqsa (PKB, National Awakening Party, political party) |

[115] Interviews with villagers and local NGOs.

[116] UNDP, Civil Society in Aceh: An Assessment of Needs to Build Capacity to Support Community Recovery, pp. 18-21.

[117] Aside from PUSA most organizations listed are nationally based with links to other provinces and do not have deep roots in Acehnese society. Additionally, PUSA's effectiveness at organizing at the grass roots level tends to vary by district.

[118] Interview, *Dinas Syariat Islam*, 26 January 2006, Takengon, Aceh Tengah.

leaders, such as *ustadz* (Islamic teacher) and *da`i* (preacher), teach issues relating to correct moral behaviour according to *Syariah* but little is taught on the types of cases that the *Syariah* Courts can now handle, the functions and limitations of the WH and the rights of citizens under *Syariah*.

The assessment also found that there have been more rigorous attempts to raise community awareness on *Syariah* Law in tsunami-affected areas. There are indications that underpinning such efforts has been a fear among some religious Acehnese circles that the international presence will undermine community adherence to Islamic values. Additionally, there are concerns among moderate Muslims that, following the tsunami, religious leaders have ascribed the natural disaster to 'sins' committed by the Acehnese and women, in particular, and now insist that "Acehnese women must conform to strict Islamic laws to avoid another disaster."[119]



Banner in downtown Banda Aceh - "Women in tight clothing are the same as the Devil".

## Civil Society and *Adat* Awareness Raising

The assessment only found one NGO working to raise community legal awareness about *adat* as a justice system. *Jaringan Komunitas Masyarakat Adat* (JKMA Aceh; Indigenous People's Network),established in 1999, sees its mission as protecting Acehnese tradition and cultural practices. To this end, it is currently planning an extensive socialization campaign to be implemented in the future.[120] The JKMA, working with BRR and PuGAR *(Pusat Gerakan Rakyat)* has commenced a program of institutional strengthening for *imam mukims*, including their role in raising awareness of adat law. This has taken the form of a series of workshops held in March 2006, aimed at developing a work plan for future concrete action.

---

119   Aceh: Peace after the Waters? Aceh: Challenges of Reconstruction and Peace One Year Later  (Global Exchange, March 2006), p. 6.

120   Interview, Executive Secretary JKMA Aceh, 5 January 2006, Banda Aceh.



Chapter 5
Access to Appropriate Forums

# Chapter 5 - Access to Appropriate Forums



| Normative Legal Framework | Legal Awareness | Access to Appropriate Forum | Effective Handling of Grievance | Satisfactory Remedy Obtained |

**Monitoring, Oversight and Transparency**

| TABLE 4: KEY FINDINGS: ACCESS TO APPROPRIATE FORUM |
| --- |
| - Acehnese opt overwhelmingly for *adat* dispute resolution over the formal system.<br>- Within the formal justice system, perceptions of the *Syariah* justice system are more positive than of the General justice sytem.<br>- A range of social, political, economic and institutional factors influence people's choice of forum. |

| Summary of Factors and Community Perceptions | |
| --- | --- |
| **Opt For…** | **Opt Against…** |
| **General Justice System** | |
| - Decisions are more easily enforced than *adat;*<br>- Punishments are more punitive and have a deterrent effect against criminal behaviour;<br>- Better protection of confidentiality offered (in urban areas). | - Prohibitive costs;<br>- Shameful to take problems outside of village;<br>- Belief that system is corrupt;<br>- Court judges (often from outside Aceh) are culturally insensitive towards Acehnese;<br>- Formal system is adversarial;<br>- Mistrust of system due to conflict trauma;<br>- Lawyers think of how to make money rather than giving human assistance;<br>- Court decisions are disproportionate to crimes;<br>- Complicated and intimidating bureaucracy;<br>- System is not user-friendly. |
| **Syariah Justice System** | |
| - Provides women with opportunity to receive fair inheritance and divorce rights;<br>- Reflects Acehnese culture;<br>- Fair and just;<br>- Free of corruption; and<br>- Decisions made are binding and enforceable. | - The *Syariah* Law applied does not fit with modern Acehnese culture;<br>- WH is "arrogant and abusive";<br>- Expensive;<br>- Complicated procedures. |
| **Adat Justice System** | |
| - Speedy decision-making;<br>- Easy to access;<br>- Not expensive;<br>- Processes easily understood and culturally relevant to villagers;<br>- Peaceful way of resolving disputes. | - Subject to collusion, corruption, and nepotism;<br>- No accountability;<br>- Does not lead to lasting dispute resolution;<br>- Minority groups can be treated unfairly;<br>- Laws, decisions and procedures can change (no certainty) because *adat* is flexible and fluid. |

Access to an appropriate forum refers to the right of every person to access an independent and impartial justice system (whether formal or informal) that will provide them with an effective remedy to a justice grievance.[121] Besides levels of legal awareness (discussed in chapter 4), factors identified as affecting people's choice of justice system or, in many cases, the choice not to take any action include social, political, economic and institutional factors, all of which are in turn influenced by community perceptions.[122] This chapter presents findings regarding these factors and how they influence people's choice of justice forum in both tsunami- and conflict-affected research sites. Findings regarding community in action for resolving justice grievances are presented herein under the heading "Why No Action is Taken", followed by an additional section on the *de facto role* of the Aceh Monitoring Mission (AMM) in resolving grievances.

## 5.1  Social Factors

The assessment disclosed a number of pervasive social factors that cause the Acehnese people to rely predominantly on *adat* rather than the formal justice system for dispute resolution.

First, village respondents stated that they felt more comfortable and confident bringing their grievances to the *adat* justice system because, while – as stated in section 4.3 – specific *adat* principles may be elusive to explain, villagers are still generally more

familiar with its procedures, punishments and, perhaps most importantly, with the *adat* leaders themselves, such as the *keucik*, than they are with these elements of the formal justice system. As discussed below, the formal justice system (both National and *Syariah* systems) is perceived as bureaucratic, labyrinthine and, therefore, intimidating.

A second social factor that encourages citizens to choose the *adat* system over formal justice systems is the belief that 'local problems' should be 'kept local'; i.e. that one should not escalate a grievance between two parties and bring shame upon them and, therefore, upon the village by referring it to a higher system or 'outsiders', which the formal system is considered to be. Associated with this belief is a fear, due to years of conflict, that involving state authorities will only bring violence and harm (Village CA5, CA4, CA9, CA1). This is discussed further below as a political factor preventing people from accessing the formal justice system.

Third, and related to the above, is the strong belief held and promoted among villagers that social harmony must be maintained at virtually all costs so that it is preferable to employ dispute resolution mechanisms, such as *adat*, that keep a dispute or grievance localised. *Adat* dispute resolution mechanisms, which focus on settlement of disputes and reconciliation, attempt to resolve problems in a "familial way".[123] The mechanisms are conciliatory, rather than adversarial as in the formal justice system. As one *keucik* put it,

---

[121]   UNDP, Programming for Justice: Access for All, p. 85.

[122]   These reasons are similar to those influencing citizens' choice of justice system in other parts of Indonesia. Other assessments have demonstrated that there is generally a poor view among local communities towards the General justice system throughout the archipelago due to perceptions that they operate only for the wealthy, are risky and inefficient. Police have similarly been regarded as corrupt and ineffective. See, Asia Foundation, Survey Report on Citizens' Perceptions of the Indonesian Justice Sector: Preliminary Findings and Recommendations, p. 52; see also, World Bank, Village Justice in Indonesia: Case Studies on Access to Justice, Village Democracy and Governance (Jakarta: World Bank, February 2004)  http://www.justiceforthepoor.org/

[123]   FGD, Villagers, 21 January 2006, Village TA4, Aceh Utara; Interview, Sub-district Official, 15 February 2006, Aceh Barat; Interview, Villagers, 24 January 2006,Villager CA6, Aceh Utara; FGD, Widows, 16 February 2006, Village TA2, Aceh Barat.

**BOX 11: ESCALATING CONFLICT**

In 1982, village X located in the Banda Aceh area requested permission from the BPN to farm on land situated adjacent to the village. This request was granted and the usage of the land was not disputed by any group until after the tsunami. On 9 March 2005, the *Keucik* of village X received information from the BPN that a farmers group was claiming the land, and that the land was to be used for constructing housing complexes to relocate victims of the tsunami.

The Head of BPN summoned the *Keucik* to a meeting and stated that their ownership was invalid because it was not based upon a Land Ownership Certificate issued by BPN. The BPN then dispatched a team of surveyors and security officers along with a group of people from the farmer's association to survey the disputed land. This led to an incident in which local villagers intercepted the team and ordered them to leave. On 25 April 2005, another group returned to the village to conduct surveying activities, this time consisting of people from the rival village supported by TNI personnel. Local villagers again intercepted the team, after which the TNI ordered the villagers to tear down the huts used for shelter on the disputed land.

*(Report, Confidential)*

"with *adat*, we can persuade people to forgive each other and agree on a settlement. With the courts, there is severe punishment, which can lead to a desire for revenge. This is not good for the village."[124]

While many respondents appreciated the conciliatory nature of the *adat* justice system and the priority it places on social harmony, the assessment found that the system can compromise the interests of claim-holders and, in the case of socially disadvantaged or economically vulnerable (such as women, widows and landless labourers), can further marginalise them.(Box 11 provides a case study illustrating this.)

Additionally, while *adat* processes may be considered less shameful as conflicts are kept at the village level, this appears to apply more in rural areas. In urban areas such as in Banda Aceh, respondents suggested that they might access the formal justice system because it would permit greater confidentiality. Although cases are heard in an open public forum (i.e., court rooms), the process provides confidentiality because lawyers will generally not originate from the village and other villagers are less likely to attend a court hearing. With *adat*, respondents believed that private information relating to their cases becomes public knowledge very quickly at the village level, which – while not as shameful as having information escape the village – can be embarrassing as well.[125]

A fourth factor compelling citizens to opt for the *adat* justice system over the formal one is that, as the assessment found in several locations, *adat* leaders will often actively discourage citizens from approaching the formal justice system to resolve their grievances (Villages CA9, TA1).[126] These leaders explained that, traditionally, it is believed that they should be able to address the problems of their village. Consequently, if a villager takes his/her grievance to another external forum, this becomes a judgement on these leaders' capacity to resolve disputes, thereby compromising their credibility as leaders. *Adat* leaders, therefore, have a vested interest in ensuring that village grievances do not 'make their way' out of a village. Villagers, consequently, find it difficult to bypass the *adat* system because of the strength of village hierarchies and of a principle of respecting one's 'elders'.

---

124   Interview, *Keucik*, 29 January 2006, Village CA2, Aceh Tengah.

125   Interviews, Villagers, Banda Aceh.

126   FInterview, Widow, 17 February 2006, Village TA1, Aceh Barat.

**BOX 12: A PRIVATE MATTER**

The people of Village CA5 are of the opinion that domestic violence is a private family matter. When U was beaten by her husband, nobody did anything about it. When finally the *Teungku Imam* and *Keucik* intervened, there was no penalty or punishment. The husband was only reprimanded. She  went to the *adat* leaders two times, and  each time she was advised to reconcile  with her husband. But each time after reconciliation, her husband would beat her again. U also did not go to the police because it would cost too much and she was still  scared of the police.Now she chooses to submit to her fate. According to Y, the nephew  of U, the beatings still continue. Many other women in this village suffer the same way  but they remain silent, either out of shame  or fear.

*Interview, Villagers, Village CA5, 25 January 2006.*

Finally, in villages populated by more than one ethnic group, the assessment found that the dominant ethnic group would often hold the view that minority communities must ascribe to their *adat* principles (Villages CA2, CA3, CA9, CA5, CA6, TA4, CA4). Dominant groups would use *adat* mechanisms to ensure favourable outcomes for themselves, thereby coercing the minority group to turn to formal justice mechanisms to defend their rights. For example, in one predominantly Gayo village, minority Acehnese called upon the formal justice system to support them in resolving a land dispute because they felt the application of Gayonese *adat* had been unfair to them. A member of the *sorak opat* (Gayonese *tuha peut*) in the village said, "Between Gayonese and Acehnese in disputes, problems are solved by Gayonese *adat* because our *adat* is proper for them. We try to look for similarity that can strengthen cohesion in the community. After we solve the problem, if they are not satisfied, they can bring the matter to the police".[127]

In another example, Javanese transmigrants in a predominantly Acehnese village still perceive that they will be treated in a discriminatory manner if they access *adat* justice forums. Patterns of discriminatory behaviour were more intense in locations where social cleavages were aggravated by the legacy of competing political alliances during the conflict (i.e., pro-GoI or pro-GAM).

Because of the strengths of the above beliefs and social pressure, rejecting the *adat* justice system and opting directly to take one's grievance to a formal justice forum can lead to stigmatization and public shaming of the claim-holder. This is particularly the case with disadvantaged and vulnerable groups, such as widows, who often rely on other villagers for assistance and support.[128]

## 5.2  Political Factors

Political factors were and, in spite of the MoU, continue in some instances to constrain citizens' options in terms of which justice system they would approach to redress a grievance. Some factors act to encourage usage of the formal justice system, while others have a deterrent effect.

For example, the assessment found that, during the conflict, citizens feared that their choice of legal forum would impute them with a certain political opinion, for which the GAM and GoI would punish them for. On the one hand, those who employed the formal justice system to resolve their disputes were oftentimes accused by the GAM and its supporters of loyalty to the GoI. Respondents related that, during the conflict, it was common for community members to be targeted

---

127   Interview, Village Elder, 28 January 2006, Village CA2, Aceh Tengah.

128   FGD, Widows of Conflict, 8 February 2006, Village CA9, Banda Aceh.

**BOX 13: THE SUGAR FIELDS**

X's husband was an Acehnese merchant from Pidie. One evening, during the conflict period, there was a knock at the door of their home; some villagers had come and they took her husband away. The next morning X, together with some neighbours, went to look for her husband and found his body in the sugar field next to the village. His throat had been slit, the facial skin on his head had been peeled off, a bullet had been shot through his head, and there was other evidence of torture.

Y reported that the same had happened to her husband during the conflict period. Y's husband was taken by villagers on the same evening as X's husband. Y also found her husband the next morning in the sugar field outside the village. His throat had been slit and his stomach was full of stabs. She does not know anything about the law and is afraid to talk "wrongly" about the case.

Z also reported that her husband had been murdered on the same evening as the husbands of X and Y. Z's husband had been taken from their home to the sugar field by "unknown people". Z reports that the next morning she found her husband's body in the sugar field; one of his ears had been cut off.

In all these cases there has been no resolution for the justice grievances of the victims of past human rights violations. Moreover, the village apparatus has not assisted these women in seeking justice. In fact, the village apparatus has actively discouraged these women from going to formal justice actors.The practice of keeping such issues at village level has an ongoing negative impact upon the psychological and emotional well-being of the victims. For example, the plight of X is made worse because her son was recently stigmatized as being a "GAM child" by other children in the village. X wanted to report the incident to the police but the *Keucik* stopped her by saying, "This is just a small case, why bring it to the police".

*FGD, Widows of Conflict, Village CA3.*

by GAM combatants if they had approached formal justice duty-bearers.[129] On the other hand, the GAM also operated their own alternative dispute resolution processes and government apparatus often accused citizens who opted for this system of being in opposition to the government.[130] Nevertheless, as a result of the above, many people have distanced themselves from the formal justice system and, while the MoU has brought peace and security has improved, the "wait and see" attitude of community members continues.[131] This is particularly the case with ex-GAM combatants who continue to be especially wary of accessing formal justice forums.

The assessment found that, while maintaining this "wait and see" attitude, many villagers with justice grievances – particularly but not solely in conflict areas – have forwarded complaints to the Aceh Monitoring Mission (AMM). The AMM was never intended in any way as a substitute justice forum. However, it is mandated to "investigate and rule on complaints and alleged violations of the MoU" (article 5.2.g of MoU). Yet, villagers have also forwarded cases that are unrelated to the MoU because, as respondents explained, many Acehnese feel more comfortable accessing the AMM than the formal justice system. In these cases, the AMM can do little more than refer these plaintiffs to the appropriate justice forum (including *adat* duty-bearers). Nevertheless, it demonstrates that civic confidence in the formal justice system remains low and must be addressed as a priority, particularly before the eventual withdrawal of AMM from Aceh.

---

[129] Interviews, Police, Aceh Barat, Aceh Tengah, Aceh Utara, Aceh Pidie; FGD, Informal Justice Actors, 21 January 2006, Village TA4, Aceh Utara.

[130] FGDs, ex-GAM Combatants, Villages CA1, CA5, CA6, TA4, TA5, Aceh Utara; Villages TA7, CA7, Pidie; for an historical case study see; Geoffrey Robinson, 'Indonesia: On a New Course', in Muthiah Alagppa (ed), Coercion and Governance: The Declining Political Role of the Military in Asia pp. 240-251.It was reported that decisions made by GAM figures were accepted by villagers, although there was some indication that acceptance was due to fear of these figures. Interview, FGD Disadvantaged Group, 24 January 2006, Village CA6, Aceh Utara.

[131] Villagers did occasionally distinguish between organic and non-organic police, as organic police were often considered to be more sympathetic to the Acehnese plight. Nevertheless, overall, the "wait and see" attitude remains. Villages CA1, CA5.

On the other hand, the assessment found that, in at least three locations, community members from particular non-Acehnese ethnic groups stated that they felt safer with either a police or military presence close to their villages during the conflict.[132] These are generally those ethnic groups, such as the Gayo and Javanese (transmigrants into Aceh), that were traditionally pro-GoI during the conflict. Nevertheless, although these respondents are more confident in the formal justice system than their fellow citizens in other villages, they stated that, even then, they prefer not to involve the formal justice system in dispute resolution because of other factors, including corruption and inefficiency (discussed below).

Paradoxically, General Court officials report that community members have increasingly sought the General justice system since the signing of the MoU. People choose this forum to resolve criminal matters such as traffic violations, robbery, murder, and narcotics trafficking; offences that have been on the rise due to economic hardship.[133] The same official argues that the General Court is preferred by claim-holders because, in cases of injury or death, this is the forum best suited to provide an outcome that will lead to a fair decision for victims and is binding.[134] Moreover, according to some court officials, an important factor giving rise to preference for the General Court is that it can redress power imbalances at the local level that undermine fair decision-making.[135]

Nevertheless, the assessment found that it is still more often the case that villagers prefer to avoid taking cases to the General Court.

> ### BOX 14: FEAR
>
> "You could file a report anywhere, but here all of us are considered as members of GAM. Reporting means he or she is a GAM member. They will search for your identity, and sometimes they even kidnap you at night. That's why we don't dare to report."
>
> *Interview, Keucik, Village TA4,*
> *21 February 2006, Aceh Utara.*
>
> "Please don't expose us. In the past the *Keucik* was close to the military and even now still goes around with the military. During the conflict many people disappeared because they spoke to the military; we are still afraid that we will disappear."
>
> *Interview, Villager, Village CA5,*
> *22 February 2006, Aceh Utara*

Another political factor that has prevented Acehnese from accessing the formal justice system is that during the conflict, GAM not only encouraged the use of *adat* but, in some cases, would coerce villagers against using the formal justice system (Villages CA5, CA6, TA4, TA5, TA1). The assessment identified two main reasons for this: first, ex-GAM respondents stated that one objective was to prevent the TNI or police from coming to a village, as this presence often led to violence and extortion; second, other respondents argued that rejecting formal institutions (and coercing civilians to do the same) was one way in which the GAM could discredit the Indonesian state.[136]

---

132  Villages CA1, CA2, CA3, CA4, TA3.

133  Interview, Court Official, 14 February 2006; FGD, Informal Actors, 21 January 2006, Village TA4, Aceh Utara.

134  Interview, Court Official, 14 February 2006, Banda Aceh.

135  Interview, Court Official, 14 February 2006; FGD, Informal Actors, 21 January 2006, Village TA4, Aceh Utara.

136  Interviews, Villages TA4, 17 January 2006. For further discussion see, Kirsten E. Schulze, The Free Aceh Movement (GAM): Anatomy of a Separatist Organization (Washington: East-West Center, 2004); Rizal Sukma, Security Operations in Aceh: Goals, Consequences, and Lessons (Washington: East-West Center, 2004). The GAM's rejection of formal justice institutions led to the burning and destruction of many government buildings, including police stations, Courts and other justice auxiliaries. For example, BPN officials in Lhokseumawe note that during the conflict  their office was bombed and their offices were forced to close down, as were all other government services. However, since the Helsinki Accord, BPN officials report that they now visit ex-GAM members in their villages and can "sit together as friends" and address questions raised by ex-combatants; Interviews, BPN Officials, 24 January 2006, Lhokseumawe.

## 5.3  Economic Factors

The assessment found that economic factors are a primary constraint on citizens' ability to access the formal justice system. In particular, disadvantaged and vulnerable groups identified during this assessment, who confront economic hardship and have inadequate sources of income, opt for the *adat* justice system as a forum for resolving grievances (see Appendix 5, Village Profiles).[137] This is especially true in tsunami-affected areas where people have lost assets and livelihoods as well.

First, respondents stated that corruption is prevalent among formal justice providers. As one village respondent said, "If we report a loss of a chicken to the police, we will lose a goat".[138] Other respondents noted that requests for assistance made to formal justice providers are often answered with the condition of a bribe, marked by the expression "*jangan lupa sama saya*" ("don't forget about me").[139] The insinuation is that assistance will be provided by the formal duty-bearer. However, the claim-holder should not forget to reward the duty-bearer for their assistance – in spite of the fact that it may be their duty to assist. The corollary to this endemic corruption within the formal system is a perception that the Courts are partial towards wealthy claim-holders; that is, those people who can afford to buy their way through the system.



What appears at first glance to be a Police Complaints Box is in fact a box for villagers to report the presence of alleged GAM members or supporters. A remnant of the conflict.

While the above applies to both the General and *Syariah* justice systems, interviews with respondents indicated that they perceived the General justice system to be more susceptible to corruption than the *Syariah* justice system. The assessment was unable to verify this and, while stories of corruption within the General justice system were plenty, the lack of anecdotal evidence concerning the *Syariah* system does not necessarily indicate that corruption does not occur. Indeed, it appears that the perception is based on an assumption that religious institutions such as the *Syariah* Courts would not participate in corrupt activity. However,

---

[137] Livelihoods typically consist of subsistence agricultural farming, unskilled labour work on plantations or in paddy fields, with incomes ranging between Rp 30,000 to Rp 50,000 per day for seasonal work (i.e., work days are not constant). Official statistics for Aceh state that the average non-agricultural wage for women ranges between some Rp 366,000 and Rp 590,000 per/year and for men between Rp 692,000 and Rp 925,000 per year. Moreover, poverty levels appeared much higher in heavily conflict affected areas. [Villages CA1, CA4, CA5, CA7, CA8, TA4, TA5.] Official statistics note that in Aceh Utara 118,000 people lived under the poverty line in 2002 (in Pidie 225,800, in Aceh Tengah 77,800, and in Aceh Barat 97,600). See, UNDP, Indonesia National Human Development Report 2004, p. 192.

[138] Interview, Academic, 19 January 2006, Lhokseumawe.

[139] Interview, Villagers, 20 February 2006, Pidie.

the point of note here is that this perception renders the *Syariah* justice system more attractive to claim-holders seeking to redress grievances. Previous assessments on the justice sector in Aceh have made similar findings.[140]

Second, respondents noted that the legitimate costs alone related to accessing the formal justice system are too high for many villagers to afford. These costs include court and legal assistance fees, as well as high travel and accommodation costs when accessing formal justice providers, which tend to be situated in district capitals that can be significant distances from villages.[141] Related to this is the allegation that formal court procedures are not expedient. The time that cases take to process through the formal justice system translates into an economic cost on claim-holders as well. For example, while a claim-holder has to await a trial session in a district capital, they not only have to pay for living costs there. They may also be prevented, for the time of their absence, from earning an income through their livelihood in their village.



"Jangan lupa sama saya"- tsunami and conflict orphans: Director of orphanage says that officials have "skimmed assistance fees" off assistance meant for the orphanage.

The assessment revealed an additional economic factor that has led Acehnese to opt for the *Syariah* justice system over the General system in the case of criminal offences. This is that the *Syariah* Courts tend to sentence the accused to caning, which bares no economic cost (although fines and prison sentences are possible punishments as well), while the General Courts mete out fines and prison sentences, both of which can be financially too burdensome for many Acehnese. In one case, a group of Christian men, arrested for gambling, requested that their case be adjudicated by the *Syariah* Courts.[142] It became apparent that their motivation was to escape the financially costly sanctions that the General Courts would have imposed.

However, poverty or inadequate income is not the only economic factor that encourages the usage of *adat* mechanisms. The assessment found that, in both tsunami and conflict areas that are benefiting from humanitarian assistance, leaders in several villages discourage reporting of grievances to formal mechanisms because

---

[140]  UNDP, A Review of the Justice System in Aceh, Indonesia, p.34. See also Asia Foundation, Survey Report on Citizens' Perceptions of the Indonesian Justice Sector: Preliminary Findings and Recommendations (Jakarta: Asia Foundation and AC Nielson, August 2001).

[141]  Interview, General Court Official, 14 February 2006, Aceh Barat. While the assessment did not collect quantitative data on this, an overwhelming number of respondents identified these economic factors as prohibitive vis-à-vis their incomes.

[142]  Assessment team members' direct observations of the Court hearing. The *Syariah* Court judge ultimately refused to accept  the cases before the Court believing that that the suspects were seeking less lenient sanctions through the *Syariah* Court. See Appendix 4.

**BOX 15: ELITE CAPTURE AND COMMUNITY GRIEVANCE**

Community Member: "Most of the people who get houses are the *Keucik's* relatives. When I asked him, he always said, 'You do not have land, how can you get a house?'...*Keucik* does not care for us because we are outsiders here. He listens to the Insiders, rather than us...he gives priority to his relatives. *Imam Mesjid, Tuha Peut, Tuha Lapan* are the relatives of the *Keucik*. They were nominated by the *Keucik*; he asked the people whether or not they are proper to be *adat* leaders, and all the people certainly answered 'yes'".

*Interview, Villagers, 24 January 2006, Village CA6.*

*Keucik:* "We already made a list of people who really need help, so they don't have to ask anymore, everyone will get their turn".

*Interview, Keucik, 21 February 2006, Village TA4.*

Academic: "The *Keucik* involves highly regarded and rich people in the village...because people heed and respect their voices. The resolutions made by the informal institution always satisfy them...The resolutions of the village informal institution are made verbally and there is no follow-up because everybody accepts the resolutions."

*Interview, Academic, 19 January 2006, Lhokseumawe*

they are engaged in trying to control aid distribution (i.e. "elite capture") and reporting to formal systems may prevent them from doing so.[143] This was most prevalent in tsunami-affected areas where donors have expended significant resources for post-tsunami reconstruction activities. In these locations, community grievance within villages is high because of unequal aid distribution or, in other words, corruption is skewing the distribution of aid.

While corruption among formal justice providers is a key reason that many opt for the *adat* justice system, the *adat* system is also not free of corrupt behaviour, as the example

below demonstrates. This in turn gives rise to new community grievances and anger.

## 5.4  Institutional Factors

Institutional factors also affect citizens' choice of justice forum. Factors identified by the assessment that have discouraged citizens from accessing the formal (General and *Syariah*) justice system include the bureaucratic and labyrinthine nature of procedures and confusion regarding jurisdictions.

First, village respondents gave, as a primary reason for not accessing the formal justice system, the fact that it is intimidating to them.

**BOX 16: COLLUSION**

Y's ex-husband stole her water buffalo. He then sold it without giving her any money. He used all the funds from the sale to marry another woman. Y reported the theft to the *Keucik*, but the *Keucik* said "let's not make a fuss about this; it will only make the matter bigger." The *Keucik also* told Y that it was better not to go to the police because that would "cost too much money, probably more than the price of one water buffalo". Y then chose to remain silent. She was told by another villager that her former husband had paid the *Keucik* to keep silent over the case.

*Interview, Widow, 16 February 2006, Village TA2.*

[143]  FGD, IDPs, 17 February 2006, Village TA1, Aceh Barat.

Respondents said that they perceived the formal justice system to be, besides bureaucratic and labyrinthine, also non-responsive to people's needs. In other words, they felt the system was not service-oriented and did not seek to respond to claim-holders' needs. Many respondents said they feared that, by taking a grievance to the formal system, they could find themselves in greater trouble because they do not understand procedures. Additionally, illiteracy or inability to speak Indonesian (many people only speak Acehnese or another local language such as Gayonese, while the official language of the Courts is Indonesian) further constrain an individual's ability to access the formal system.[144] Justice institutions do not have services available to support such citizens.

Respondents stated that a better understanding of the formal system and accompaniment through legal processes would encourage them to utilise the National and *Syariah* justice systems. However, low legal awareness (as discussed in Chapter 4) is compounded by a shortage and lack of knowledge of legal aid facilities that can support citizens through formal legal processes. The NGOs identified in Chapter 4, which undertake legal awareness raising activities, all have legal aid programmes as well. However, for a number of reasons, these legal aid programmes have been unable to respond to all the needs. First, many programmes are based in district capitals and, due to a lack of capacity, are unable to reach out to citizens at the subdistrict, let alone the village level. Consequently, many respondents interviewed by the assessment were unaware of the existence of such programmes. Second, while funding is no longer a primary constraint faced by these NGOs (since the tsunami and signing of the MoU, donors have increased their funding towards human rights and legal NGOs), a shortage of human resource capacity is a critical constraint. NGOs stated that there is a shortage of lawyers in Aceh who are trained and willing to undertake legal aid activities. Additionally, they have found it difficult to attract lawyers from outside Aceh to come to the Province because of low living standards and wages. The result is limited capacity to assist citizens who might otherwise choose to bring their grievances to the formal justice system.



House marked as GAM-owned and destroyed during conflict forcing its owners to flee; Owners have sought assistance from the Government but assistance is still pending.

---

144   The generally high levels of literacy for the population (ranging between 91.6% and 99.5%) noted in the 2004 Indonesia Human Development Report did not appear to be reflected in village assessment sites; see, UNDP, Indonesia National Human Development Report 2004, pp. 117.

> **BOX 17: ATTITUDINAL OBSTACLES INFLUENCING CHOICE OF JUSTICE FORUM**
>
> "Police do not respond seriously to the cases that the people report and they sometimes belittle the cases reported by women. Prosecutors often side with men or powerful people. Lawyers are expected to assist in legal processes, but many people cannot afford the lawyer services. Traditional laws also often act unjustly and side with certain parties. Traditional laws often defend men, rather than women."
>
> *Interview, NGO, 5 January 2006, Banda Aceh*
>
> "Prosecutors in Aceh are reluctant to side with the cases that women have. Even female prosecutors attending the court show lack of sympathy to the cases that women have…When a person has a case and reports it to the court of justice, public figures will usually get angry and will not make themselves available when needed. This is caused by the assumption that people's case should not be reported to the court because public figures in the village can resolve it…police are often not cooperative and do not care about the cases reported by women."
>
> *Interview, NGO, 4 January 2005, Banda Aceh*
>
> "Prosecutors still have lack of understanding regarding gender injustice, as a consequence many of them defend the violent perpetrator and blame the women victims of violence ."
>
> *Interview, NGO, 4 January 2006, Banda Aceh*
>
> Assistance to Widows: "Sometimes the widow doesn't get all the aid. It's a matter of aid percentage. Sometimes it is cut in the regency and subdistrict office."
>
> *Interview, NGO, 30 January 2006, Takengon, Aceh Tengah*
>
> Police comment after receiving a report of rape against a woman: "Why do you have to exaggerate this kind of case?"
>
> *Interview, NGO, 30 January 2006, Takengon, Aceh Tengah*

## 5.5  Why No Action is Taken

In cases where claim-holders took no action to redress a grievance (i.e., they accessed neither the formal nor *adat* system), it is generally due to a combination of the above reasons or that, as they stated, they did not believe that either type of duty-bearer could or would assist. The assessment found that a significant number of victims of conflict-induced human rights violations (perpetrated by GoI security personnel, ex-GAM and militia groups) never took any action to try to have the injustices committed against them redressed (see Appendix 5). The lack of trust in the system is due to a perceived culture of impunity for human rights violators in Aceh.[145] The assessment further found that respondents with justice grievances in tsunami areas were increasingly deciding not to take action to redress their grievances either. In these cases, the assessment found that tsunami victims were becoming despondent with the slow pace of progress made by international and local NGOs, as well as government and their own traditional *adat* leaders, which was diminishing their confidence in the system. This lack of confidence has, over the years, created an attitude of resignation towards justice mechanisms when it comes to particular types of grievances so that, rather than exhaust one's self attempting to access justice with futile results, people prefer to 'submit to their fate'. The Indonesian term for 'submitting to one's fate' – *pasrah* – was a term that the assessment team heard time and time again.

---

[145]   Indeed, no cases of human rights violations committed in Aceh have been taken to any of the ad hoc Human Rights Courts established by Law No. 26/2000, such as that in Medan or Jakarta. This is due, in part, to the lack of confidence in these Courts, as their track record of convictions of human rights violations from other parts of the country has been very poor and does little to counteract the public perception that a culture of impunity for government-perpetrated violations continues.

# Chapter 6
# Handling of Grievances

# Chapter 6 - Handling of Grievances

| Normative Legal Framework | Legal Awareness | Access to Appropriate Forum | Effective Handling of Grievance | Satisfactory Remedy Obtained |

**Monitoring, Oversight and Transparency**

| TABLE 5: KEY FINDINGS: HANDLING OF GRIEVANCES[146] | |
|---|---|
| **General Justice System** | - Resources and infrastructure of police, prosecutors, courts and prisons damaged by the tsunami and the conflict.<br>- Poor training of staff and insufficient operational resources undermines the effective provision of justice.<br>- Allegations of corruption in all institutions.<br>- Aggressive policing mentality, a remnant of conflict, is a challenge to building public confidence in General justice system.<br>- There is an urgent need to establish a Truth and Reconciliation Commission and a Human Rights Court in order to redress a culture of impunity for human rights violations and to prevent future conflicts in the province. General justice system as it is cannot do this.<br>- Weak oversight and public accountability of General justice institutions. |
| **Syariah Justice System** | - Resources and infrastructure damaged by the tsunami and the conflict.<br>- Insufficient resources to handle expanded jurisdiction and growing caseload.<br>- Judges have limited knowledge of criminal legal procedure, as jurisdiction was limited to family and property law until 2004.<br>- Weak oversight and public accountability of *Syariah* justice institutions.<br>- WH's zealous attempts to enforce Islamic law are leading to possible Constitutional and human rights violations. |
| **Adat Justice System** | - Can handle many grievances effectively as is conciliatory rather than adversarial.<br>- Vague normative legal framework leads to confusion regarding jurisdiction (i.e., what cases *adat* can handle) and procedure (i.e., minimum standards for dispute resolution).<br>- *Adat* institutions lack training, resources and facilities.<br>- *Adat* can be subject to collusion, corruption and nepotism. Can further disadvantage already disadvantaged groups.<br>- Fluid nature means that not all *adat* institutions will exist in a given village.<br>- Weak oversight and public accountability |

---

[146] A more detailed matrix analysis for each of the institutions considered is found in Appendix 3.

Handling of grievance refers to the manner in which duty-bearers receive and process cases in a given justice forum. Effective handling of grievances implies case handling that is according to the law, impartial, expedient and consistent with human rights standards. Thus, effective handling of grievances is critical for access to justice and strengthening the rule of law. This chapter presents findings about weaknesses with the handling of grievances in different justice forums and obstacles encountered by duty-bearers in providing access to justice.

## 6.1  General Justice System

An interesting finding made by the assessment was that, overall, POLSEK offices surveyed in the districts of Aceh Tengah, Aceh Barat, Aceh Utara, and Pidie had a low number of reported cases. Cumulatively, the nine POLSEK stations visited had recorded around half a dozen criminal cases between 2004 and early 2006. Most reports of criminal cases are filed at POLRES offices. In tsunami-affected areas, POLSEK offices had received a high number of reports of missing documents and requests of letters of guarantee (e.g. missing diplomas, vehicle documents, bank books). While it was initially thought that this reflected the extent to which villagers did not want to utilise the formal justice system, it was later found that, in fact, there has been a significant level of reporting of unrecorded cases to POLSEK officials of civil and criminal cases. However, standard practice for officers is to refer cases back to *mukim* or *gampong* levels and attempt to mediate dispute resolution through informal justice mechanisms. According to police, the small number of recorded criminal offences at

POLSEK offices is due to the fact that POLSEK personnel work closely with community members in efforts to resolve/facilitate dispute resolution at the village level. While cases reported should still be recorded (and there remain issues with the types of cases that are referred back), the manner in which such grievances are being handled (i.e. the referral back to *adat* institutions) is consistent with the law, which, in *Perda* 7/2000, requires that police give *adat* institutions first opportunity to resolve disputes. The types of cases referred back to informal mechanisms include criminal matters (e.g., theft, assault, cases involving ex-GAM, and most commonly domestic violence). Most police respondents prefer using *adat* conflict resolution mechanisms because they aim to strengthen social cohesion within villages.[147]

Nevertheless, in spite of many cases being first referred back to the *adat* system, the assessment did identify a number of factors that diminish the capacity of the General justice system to handle grievances effectively when grievances do reach this system. This section examines challenges vis-à-vis the General Courts, Prosecutor's Office and Police in Aceh.

Once judges are assigned to a court, the opportunity to attend various trainings is limited. In Aceh, it is reported that not a single acting judge has received mediation certification; a stipulation made by the Supreme Court in order to mediate settlements of cases before the court.[148] Moreover, judges themselves report that they have received either limited or no additional training relating to human rights standards and how to apply those principles when -

---

[147]  Interview, Deputy Commander of POLSEK Office, 22 January 2006, Aceh Utara.
[148]  Interview, General Court Judge, 12 January 2006, Banda Aceh.

handling cases before the court. The same applies with public prosecutors in Aceh.

With regards to police, all personnel receive initial training at the police academy Akpol (*Akademi Kepolisian*), and higher level officers at the *Sekolah Calan Perwira* (Police Officers Academy). Standard Operating Procedures exist for all policing operations and each police officer is issued with a manual that includes the Police Code of Conduct. However, field observations of police training activities suggest that the method of operational training remains somewhat militaristic and not conducive to a human rights based community policing approach and there is no "learning through doing" (i.e., real life situation training regarding the application of human rights policing practices). Instead, training focuses on building physical strength and military style discipline among officers.

With international support, POLRI has also provided human rights education and training for organic police in Aceh. In fact, such training dates back to at least 2001 with organizations such as Koalisi NGO HAM providing workshop training for government officials and police personnel regarding human rights, with funding support provided by UNDP and UNICEF.[149] Recent training has included raising awareness about human rights principles, improving police understanding about domestic violence issues, improving standards for use of firearms, and introducing community policing approaches.[150] However, in remote locations, most police have yet to benefit from these initiatives. An inadequate amount of money is allegedly allocated for respond-ents to attend training activities and respondents stated that, in many cases, middle and low-ranking officers are required to expend personal resources to meet trans-portation expenses to attend POLDA training in Banda Aceh or at district capitals. As a result, the motivation of such officers to attend training activities springs from orders issued by senior commanders, rather than a genuine commitment to improve skills and individual capacities. Moreover, a potential weakness with current training activities implemented by POLDA and donors is that they remain highly "theoretical" and do not provide real life situation training for police personnel on "how" to implement human rights principles in an operational environment.

However, there are some indications that human rights training since the peace agreement has reportedly improved police case handling (see Box 18).

### BOX 18: IMPROVED HUMAN RIGHTS POLICING

"The real output of the training can be seen in the implementation of daily duties, which means that police have been able to recognize whether one particular action is a form of human rights violation or not and they try to avoid doing so. In the past for example, probably due to the conflict situation, when police arrested people they tended to do it with beating, heartless actions, humiliating, and statements. Now they have realized that they are not allowed to do such actions, all has to be handled based on existing procedures".

*Interview, POLRES Chief of Police, 20 January 2006, Lhokseumawe*

Infrastructure and information management systems among formal justice institutions are severely deficient. Poor judicial infrastruc-

---

149   Interview, NGO HAM, 4 January 2006, Banda Aceh; However, a noted weakness with earlier training is that formal justice system actors that participated were usually low ranking officials that could not influence the overall policy direction of state institutions.

150   Interview, Police Official, 22 January 2006, Aceh Utara; Interview, Police Official, 8 February 2006, Aceh Barat; Interview, Police Official, 14 February 2006, Pidie.

ture in both tsunami- and conflict-affected areas undermines case handling procedures. Court buildings affected by the tsunami include those of the district courts of Banda Aceh and Meulaboh and, in several instances, courts now operate in temporary building facilities. The Meulaboh District Court building was completely damaged and no documents survived. Currently, the Meulaboh District Court is located at the second floor of the Aceh Barat District Highway Traffic Services building. The Banda Aceh District Court building also suffered damages, though not asseverely as Meulaboh's. Of the three courtrooms that were formerly used, only one remains operational. The District Prosecutor's Office of Banda Aceh also suffered severe damage in the tsunami. To date,



Meulaboh District Court was destroyed by the tsunami.

With regards to information management, several district police stations and courts have computers but information management systems and the capacity to operate them are almost totally lacking. Most sub-district stations do not have computers at all. There is also a dearth of legal information available to judges at the district level and, as a result of the tsunami, at the provincial level (i.e. in Banda Aceh) as well. Additionally, communication and the interface between institutions within the formal justice 'chain', namely between police, the prosecutors office, the courts and prisons, appears to be very weak. This undermines the institutions' ability to create an integrated justice system that would contribute to expeditious and fair handling of grievances. This leads to disrupted case

legal services to the public have been resumed by the opening of an office at the official residence of the head of the Banda Aceh district Prosecution Office. The same situation was experienced by the Meulaboh District Prosecution Office which was completely damaged and where no documents survived. Currently the Meulaboh District Prosecution Office is based at the official residence of the head of the District Prosecution Office.

handling, files being lost and, what is worse for disputants, extensive delays in case handling. Finally, respondents noted that court administrative support staff operate inefficiently and "lose" files or materials for court proceedings. Case scheduling was also identified as a problem with duty-bearers often showing up late to scheduled proceedings, thus placing further burdens on claim-holders that already face difficulties attending court.

Insufficient budget also limits the capacity of formal justice providers to undertake their duties effectively and handle grievances fairly and expeditiously; for example, shortage of funds for witness and prisoner transportation and field verification visits to ensure fair examination of cases reduces the ability of justice providers to resolve disputes in a manner consistent with national and international standards. Rehabilitation and (re)construction of court buildings and legal offices since the conflict, tsunami and subdivision of districts has been slow, thereby inhibiting the ability of justice providers to handle cases.

According to police officials, several procedural problems with law enforcement spring from understaffing, lack of resources, and insufficient operational funds. Every POLSEK surveyed reports 30 to 60 percent understaffing of personnel. For example, officials in Pidie argue that each POLSEK should have up to 31 officers, but the current average is 7 officers per POLSEK station. Senior police officials suggest that a significant obstacle to addressing under-staffing is found with article 4.7 of the MoU that limits the total number of organic police personnel in the province to 9,100.



Police vehicles destroyed in tsunami. Police infrastructure in conflict areas was also badly damaged.

A lack of communications equipment such as radios and telephones also limits the ability of officers to work effectively in the field. For administrative matters POLSEK offices rely on manual typewriters or logbooks for recording and processing cases. In several tsunami-affected POLSEK offices, filing systems were destroyed and still have not been replaced, while in conflict affected areas offices lack up to date resources. Additionally, police officers continue to carry bulky military style assault rifles when on patrol or posted in front of police offices, which serves only to continue to frighten an already traumatised population.

Several districts in Aceh have recently been subdivided (*pemekaran*) into additional smaller districts with the intention of bringing public services closer to citizens. However, the assessment found that these subdivisions have not always been accompanied by a parallel expansion of those public services due to inadequate resources. The result is that, in many cases, the public is still no closer to public services, including justice services, than they were prior to the subdivision of districts. Indeed, the dislocation of government services between districts now renders a confusion of jurisdictions among

service providers. For example, a crime that was committed in Bener Meriah (a district that was subdivided from Aceh Tengah in 2003) should be investigated by the police and tried in the courts of Bener Meriah. However, while there is a POLRES (*Polisi Resort*; District Police) in Bener Meriah, there are still no courts so that cases investigated still have to be forwarded to the Aceh Tengah courts.[151] Meanwhile, the judiciary in Aceh Tengah question whether they can examine cases that were perpetrated in a geographical jurisdiction outside of their own. Similarly, the Meulaboh General Court's territorial jurisdiction has expanded to cover the Nagan Raya district. Claim-holders from Nagan Raya district have to travel one day to the court if summoned to present evidence in a case.[152] As citizens are obliged under law to act as witnesses, the court does not pay for their accommodation or travel costs, rendering it difficult for many citizens to undertake this duty.[153] The territorial scope of court jurisdictions also delays serving summons and the speedy resolution of cases.[154] In order to address such problems, the Lhoksukon General Court in Aceh Utara, from which Lhokseumawe Municipality has been subdivided, established a session room in Panton Labu. The opening of this session room was meant to facilitate effective and speedy case hearings by making it easier for witnesses to provide testimony and for claim-holders to access the Court of first instance. However, a lack of operational funds and vehicles for court personnel to travel resulted in the closure of the session room several years ago

(this was also due to security concerns caused by GAM who had a strategy of attacking all government administration offices).[155]

Finally, another factor reducing the effectiveness of grievance handling is that, as police respondents report, organic police have suffered traumatic post-conflict stress disorder. In Pidie, up to 19 officers in the district suffer from traumatic post-conflict stress disorders and cannot perform their duties effectively.[156] These officers have not yet received any treatment because NGOs and donors have thus far focused trauma healing programs on tsunami victims and paid little attention to people suffering from conflict-related trauma.

In conclusion, there are large capacity development needs relating to human resource skills, information management systems and infrastructure that prevent both the General justice system to handle grievances effectively.

## 6.2  Human Rights Court and Truth and Reconciliation Commission

This section examines the effectiveness of the existing legal framework (in the form of the LoGA, and nationally, in the form of Law 26/2000 on Human Rights Courts and Law 27/2004 on the Truth and Reconciliation Commission) to redress human rights violations committed in Aceh over the past 30 years of conflict.

---

151   Interview, Head of Takengon Court of First Instance, 30 January 2006, Takengon, Aceh Tengah.

152   Interview, Vice Chairman of Meulaboh Court, 14 February 2006, Meulaboh, Aceh Barat.

153   Ibid.

154   Interview, Vice Chairman of Meulaboh Court, 14 February 2006, Meulaboh, Aceh Barat; Interview, Chairman of Takengon Court, 30 January 2006, Takengon, Aceh Tengah; Interview, Vice Chairman, Lhoksukon Court, 24 January 2006, Lhoksukon, Aceh Utara.

155   Interview, Vice Chairman of Lhokseumawe Court, 24 January 2006, Lhokseumawe.

156   Interview, Chief of POLRES Pidie, 6 March 2006, Sigli.

As a legal framework for addressing human rights violations, it is arguable that the provisions of the LoGA are weak and may do little to enhance citizens' access to justice. First, its temporal jurisdiction covers violations that occurred only after the promulgation of the LoGA. This means that it cannot address violations that occurred during nearly thirty years of civil war, violations that cannot – from the perspective of citizens' access to justice – be left untried.[157] Second, while clause 2 is not exhaustive in its list of what a Court decision might entail (i.e., it does state "among other things"), it mentions only reparation for the victims, and fails to mention the importance of punishing perpetrators. This could be misread as implying that the latter is secondary in terms of Court decisions. Third, unlike other provisions in the LoGA (such as regarding the DPRA or even, as discussed below, the Truth and Reconciliation Commission), there is no mention of how a HRC should be funded (e.g. from which budget funding would come from), what timeframe a HRC should be established in and, finally, whether the


Victim of human rights violations during the conflict.

details of the establishment of a HRC should be specified by *qanun*. Fourth, the MoU states, in article 1.4.5, that "all civilian crimes committed by military personnel in Aceh will be tried in civil courts." This may be interpreted as restricting the Human Rights Court's jurisdiction to exclude crimes committed by military personnel, thus seriously undermining the courts credibility.

On the other hand, the article may be interpreted as preventing crimes committed by military personnel from being tried in military courts, which may have a tendency to protect its forces. The LoGA provides no further clarity on this issue. These weaknesses of the current provision render a feeble and potentially ineffective normative legal framework for addressing human rights abuses in Aceh.

Some observers to the peace process have argued that "too much emphasis on human rights investigations" can undermine the successful implementation of the MoU,[158] presumably because it would antagonize hardline TNI elements and those in the civilian

157  A Human Rights Court established as per Law 26/2000 on Human Rights Courts would at least have a jurisdiction extending as far back as 2000. Indeed, other legal experts argue that the violations committed during the thirty-year conflict constitute gross human rights violations that were clear offences at the time of their commission and are crimes under international customary law. As a result, the overriding interest to prosecute gross human rights violations and prevent a culture of impunity outweighs the principle of *juge naturel* (the guarantee to be tried by a pre-constituted court). Acehnese NGOs, as well as Human Rights Watch, advocate for the Human Rights Court for Aceh to try human rights abuses committed during throughout the conflict, not just since the August 2005 peace agreement. See, Human Rights Watch; *Aceh Human Rights Court Must Address Past Abuses*; 26 May 2006; at http://hrw.org/english/docs/2006/05/26/indone13463.htm..

158  ICG, *Aceh, A New Change for Peace* (ICG, Jakarta/Brussels: Asia Briefing No 40, 15 August 2005), p. 13.

**BOX 19: BURYING THE PAST OR SEEKING CLOSURE ?** *INONG BALEE*

During the conflict, N's husband was a member of the police. He was kidnapped when travelling from location A to location B. N approached GAM to locate her husband's body but was told that the police had killed him, not GAM. His body still has not been recovered. Even now, with the MoU and everybody returning to ordinary life, GAM will still not reveal where his body is buried. N feels treated unfairly by GAM, "my husband was a good person and never hurt anybody". In searching for his body, N became depressed and now suffers from high blood pressure and other illnesses. Her condition is only getting worse because she is concerned about her children and their future without a father. Now she only hopes that she can find her husband's body so that she can bury him properly.

*FGD, Widows of Conflict, Village CA9.*

Z is a mother of two. Her husband was killed by GoI security forces in 2003; his body has not yet been recovered. Z has not reported the incident to any authorities, including the keucik because he informed on her husband to the TNI. She claims that her husband was never part of GAM, he was an ordinary person. So far the only group providing her family with assistance has been ex-GAM. In the past, she was abused by TNI, intimidated and kicked when she was two months pregnant, had her house searched for weapons, and her personal belongings destroyed. She feels that she has been treated unjustly. Now she is unsure what will become of her children and wonders if the injustice her family has experienced will create a sense of vengeance within the minds of her children as they grow older.

*Interview, Widow of Conflict, Village CA5.*

administration that either allowed or promoted past human rights violations. Similar arguments can be made about ex-GAM perpetrators of human rights violations.

On the other hand, NGO critics argue that a failure to establish a meaningful investigative process to effectively handle human rights grievances will lead to a "deep-seated grief that could become the seed for revenge for the Acehnese people" and "strengthen the culture of impunity"[159] for human rights violations. Still others argue that impunity for serious violations committed in the past, but still present in the public memory, sows discontent, weakens the rule of law, and erodes the prospects of building sustainable peace.[160]

With regards to the Truth and Reconciliation Commission (TRC), article 229(2) of the LoGA requires the Acehnese TRC 'not to be separate from' the national TRC. Herein is the first problem, as the national TRC is yet to be established.[161] As with the HRC,

there is no legally-binding time frame for the establishment of either the Aceh TRC or the national one.

A second problem arises from the fact that the law governing the establishment of the national TRC, Law 27/2004, is currently under Constitutional review. There are a number of concerns that have been raised with the Law from which it is under review. These include that:

- There are provisions for amnesties for the perpetrators of genocide and crimes against humanity;

- Reparations, which are a victim's right, are made conditional and contingent. Victims are required to forgive in order for the victims to receive reparations and for the perpetrators to receive amnesties;

- Truth-seeking only focuses on individual cases and does not contain provision for historical analysis or the establishment of systematic patterns of violations;

---

[159] Aceh Kita, 12 January 2006.

[160] Eduardo Gonzalez, email correspondence, ICTJ; much of the analysis regarding the legal frameworks/issues for the establishment of a Human Rights Court and a Truth and Reconciliation Comissión are drawn from comments provided by Gonzalez.

[161] While the nomination of Commissioners has started, President Yudhoyono has encountered obstacles in garnering sufficient support to establish the national TRC. Tony Hotland, 'SBY still seeking political support for truth body', Jakarta Post, Friday, February 24 2006, p. 4.

- Crimes under International Humanitarian Law applicable to non-international conflicts are not considered; and

- The existing legislation does not include a function for the TRC to recommend measures of non-repetition or to have mechanisms of publicity.

Unless these concerns are addressed by the Constitutional review, the national TRC may end up being ineffective in handling grievances and obtaining truth and reconciliation. If the Aceh TRC is meant to be based on the national TRC, the same may be the case for the Aceh TRC.

## 6.3 *Syariah* Justice System

The assessment identified a number of factors that diminish the capacity of the *Syariah* justice system to handle grievances effectively. As defined above, effective grievance handling implies case handling that is consistent with law and human rights principles, expedient and impartial. Institutions of the *Syariah* justice system in Aceh today, particularly the *Wilayatul Hisbah* (WH) and the Courts, face challenges in handling grievances effectively.

### *Wilayatul Hisbah*

With respect to the WH, the assessment examined not precisely how they 'handled grievances' but instead how the institution fulfilled its function of monitoring compliance to *Syariah* Law. The primary concern is that, while the WH is mandated to monitor *Syariah* compliance, they have been overstepping their jurisdiction and treating citizens in a manner that could potentially violate Constitutional Law and human rights principles. A number of Acehnese have expressed concern at the heavy-handed manner in which the WH have attempted to uphold social morals - accusing them of being "arrogant and overzealous".[162] For example, on several occasions members of the WH have violated citizens' rights by arbitrarily dispensing punishments to women without due legal process in the *Syariah* Court.[163] Arbitrary punishments have included: cutting off the hair of women caught without a *jilbab* (head scarf); slapping of women; unlawful detention; and, cutting the pants of women that are considered by WH members to fit too tightly, thus shaming women publicly.

Box 20 describes one occasion that resulted in a violent community backlash. The above incident signposts potentially more violent community responses to the imposition of *Syariah* Law in ethnically plural or non-Acehnese districts.[164] For example, non-Acehnese residents in Aceh Tengah that hold different views of *Syariah* to policy-makers at provincial government level openly claimed during the assessment that if the provincial

---

**BOX 20: *WILAYATUL HISBAH*: COMMUNITY RESPONSE TO MORAL POLICING**

In Kota Sabang, WH officers once arrested an innocent young girl they suspected of being a prostitute for the mere reason that she was standing 'with no purpose' on the roadside. The girl's family complained about the incident. However, the WH officers insisted on detaining the girl. Upon hearing of the incident, community members from her village became angry and joined together to raid the WH office, whence the girl was released. The WH officers apologised for the incident.

---

[162] Nani Afrida, 'Acehnese accuse religious police of arrogance and thuggery', Jakarta Post, Thursday, February 23, 2006, p. 5.

[163] Workshop Findings, 16 March 2006, Banda Aceh.

[164] See, 'Parties warn of conflict over contentious local regulations', The Jakarta Post, 20 March 2006.  In other settings the imposition of Islamic law on culturally heterogeneous Islamic societies has led to violent communal killings, as was the case in Pakistan during the 1980s; 'Does it have to be war?', The Economist, Volume. 378, Number 8467, 4 March 2006, p. 25.

government imposes a particular Islam that destroys local traditions they will "fight".[165]

There are a number of factors that lead to the WH going about their duties in the above-described manner. First, WH personnel are not provided with training on criminal procedure, nor on human rights principles. Training consists of "merely some days with the normal police to learn how to stand to order."[166] This has led to weak capacity in terms of fulfilling their functions of monitoring compliance with *Syariah* Law in a manner that is consistent with national law and international human rights principles.



*Wilayatul Hisbah patrolling vehicle.*

Additionally, procedural irregularities with the actions of the WH also spring from a lack of guidelines and standard operational procedures regulating the conduct of WH officers. These weaknesses provide significant opportunity for violations of Constitutional Law and human rights principles.

Second, police are generally confused about coordination with the WH and somewhat reluctant to participate in "sweeping operations" given legal uncertainties surrounding WH actions and nature of arrests they conduct. Some police officers believe that they have no powers to conduct arrests of people violating

**BOX 21: VOICES OF THE POWERLESS: *WILAYATUL HISBAH* ABUSES OF POWER**

**Voice A:** 9 February 2006. Last night we were caught by WH officers at Sultan Hotel. We were detained by the WH for not wearing a *jilbab* while inside the hotel. The officers entered the hotel without having a permit from the hotel's management. At that time we were sitting in front of the room, discussing materials for the training workshop. We had been staying at the hotel for a couple of days and the WH came last night and forced their way in. While I was sitting and having a discussion with three other colleagues, WH officers suddenly came, and forced us to go downstairs and to get into the WH vehicle. At the police station, we were interrogated with harsh questions and asked whether we believed that our actions aroused the penises of men. An officer threatened to slap one of us when getting the name of a WH member.

**Voice B:** Our colleagues had already been arrested for an hour when I and some other colleagues visited them at the police station. We and the National Women's Commission had a negotiation with WH officers, but they still refused to release our colleagues. WH officers then demanded that their families come get them. We told them that they didn't have any family members here. We were then asked to sign three documents of assurance that stated, if one day the WH caught any of the same people again, they would be arrested and subject to punishment.

*Drawn from letters written by women NGO workers arrested by the WH.*

[165] FGD, Villagers, 17 February 2006, Village CA2, Aceh Tengah.

[166] For example, officials from Banda Aceh's prosecutor's office point out that "Procedural law is not regulated clearly in the *Qanun*. This leads to a worry that the lower level regulations will override the higher level regulation…If we make amendment to the *Qanun* and regulate procedural law ourselves, it would conflict with provisions in the KUHAP"; Interview, Attorney's Office Official, 8 February 2006, Banda Aceh.

moral codes of conduct as this is not an offence under national law.[167]

Under article 133 of the LoGA, police are meant to enforce *Syariah* Law. Further legal problems arise from Article 5 of Governor's Decree 1/2004 which stipulates that the *muhtasib* (officials of WH) are authorized to: a) receive complaint reports from the community; b) stop someone on the street suspected to be in violation of *Syariah* Law; c) ask for identity papers from anyone suspected of violating *Syariah* Law; and d) stop any activity suspected of violating *qanun*. Interpreting such stipulations literally means that the enforcement powers of the WH go far beyond the enforcement powers given to the police under the KUHAP (Criminal Procedure Code).

Leading to greater confusion and possible violations of Constitutional Law and human rights principles is the fact that particular elements of *Syariah* Law remain open to interpretation. The starkest example of this is in relation to the wearing of Islamic dress, which for women must cover the *aurat* (every part of the body except face, hands and feet). There have been examples in which WH officials have detained women who, although covered, were accused of wearing clothes that were too tight. The subjectivity of determining what constitutes a violation in cases such as these has led to a culture of fear, particularly among urban women in Aceh.

Box 22 outlines competing views about another criminal offence of *Syariah* Law that remains open to interpretation and has been subjectively enforced by the WH. Currently, the district/municipal *muhtasib* is meant to submit a periodic report to the district/municipal *Dinas Syariat Islam* with copies sent to the provincial *Dinas Syariat Islam*. There is no other external oversight or accountability for the WH, especially in view of the fact that, by reporting to the *Dinas Syariat Islam*, the WH effectively reports only to a provincial, and not a national, body. In fact, the few voices of public dissent against the powers of the WH have been silenced through passive forms of intimidation and social stigmatization (e.g., subject to accusations of being "unreligious" or, even, "inviting another tsunami").

### *Syariah* Court

The assessment identified a number of factors that diminish the effective handling of grievances by the *Syariah* Courts. First, the *Syariah* Courts operate with the same

---

**BOX 22: MORAL OFFENCES PUNISHABLE UNDER *QANUN***

"Indecent behaviour consists of behaving like a husband and wife, for example kissing in public, and individuals who do so can be arrested. There are three categories of indecent behaviour. First, sitting in a quiet or deserted place which, if left alone, will lead to a 'worse situation', then it is our duty to warn the person and tell the person to go home. Then, for holding hands and kissing, we will arrest the perpetrators and bring them to the police office, then we summon the parents and afterwards they can all go home. Finally, if it concerns sexual activity we cannot tolerate it at all.  We will arrest the perpetrators and hand them over to the police for further processing."

*Interview, WH Official, 27 February 2006, Banda Aceh*

"*Qanun* relating to *khalwat* is unclear and gives rise to injustice for people. The *khalwat* states that two persons (a male and a female) who are in an isolated place, go in the direction of *khalwat*, in what sense is this a violation of *khalwat*, simply because they alone in an isolated place? It states there is an act of embracing, throwing one's arms around. Therefore, it is somewhat unclear to testify that the act is categorized into *khalwat* as the *Qanun* does not mention 'into the direction'"".

*Interview, Vice-Chairman Lhokseumawe district court, 19 January 2006, Lhokseumawe*

---

167   Interview, Police Officials, 23 February 2006, Pidie.

procedural rules as those applicable to the General Courts. However, *Syariah* judges' acknowledge that their understanding of criminal procedure is weak as their jurisdiction and therefore experience has, until the recent promulgation of the four *qanun* related to criminal offences, been limited to civil cases.[168]

*Syariah* Court judges stated that the Court faces no obstacles in carrying out its duties and that, as long as a plaintiff can produce a *surat miskin*, or letter of poverty, their case will be treated free of charge. Additionally, cases relating to the tsunami were treated free of charge based on a decree from the Supreme Court.[169] Judges stated that, as long as witnesses can attend when summoned, cases are generally resolved within three days.[170] Nevertheless, the assessment found that poor court infrastructure and administrative procedures undermine the effectiveness of case handling in the *Syariah* Court, similar to the sorts of capacity weaknesses that undermine case handling in the General Courts. Courts report shortages of personnel and logistical support material, poor information and case management systems (i.e., use manual recording and case filing), and lack computers. It is also reported that insufficient funding has meant that Court personnel never visit the areas covered by their jurisdictions. Increased territorial jurisdictions and responsibilities have not been accompanied with increased budgetary allocations from either provincial or district/municipality governments. Moreover, there are not any officially trained mediators assigned to the court to help find amicable resolutions of disputes between claim-holders.[171] These problems are more pronounced in tsunami-affected areas like

Banda Aceh. Although the *Syariah* Court office was not damaged, nearly all supporting facilities and infrastructure such as the courtroom, computers, and filing systems were destroyed. The *Syariah* courtroom is now operational, but supporting facilities and infrastructure remain inadequate for ensuring normal court functions.

Procedures for handling criminal cases are also poorly developed. Legal practitioners in Aceh explain that this leaves the *Syariah* Court learning from and adapting General Court procedures. The *Syariah* Court judges rarely attend trainings and lack experience in handling criminal cases. Neither have they attended any human rights training. In some instances, officials argued that human rights training is not necessary because principles of human rights underpin *Syariah* Law, as based on Islamic teaching. On the other hand, *Syariah* Court judges have stated that there is a tremendous need to introduce a range of training programs to build the administrative skills and capacities of court personnel to handle grievances more effectively.

The problem faced by the General Courts regarding territorial jurisdiction due to administrative sub-divisioning (*pemekaran*) is faced by the *Syariah* Courts as well and acts to diminish the effective handling of grievances for the same reasons that it does so with the General Courts (see section 6.1). As an example, some cases that arose in certain areas of the District of Aceh Utara are being filed at Lhokseumawe Municipal *Syariah* Court because of the long distance and associated high costs of travelling to Lhoksukon, the capital of Aceh Utara where the Aceh Utara District *Syariah* Court is

---

168  Interview, *Syariah* Judge,  8 January 2006, Banda Aceh.
169  Interview, *Syariah* Judge, 12 January 2006, Banda Aceh.
170  Ibid.
171  Ibid.

found.[172] The problem with this is that the territorial jurisdiction of the Lhokseumawe Court does not cover Aceh Utara, which means that it has no legal competence to try cases originating from this other District.[173] Similar problems exist with the *Syariah* Court in Takengon, Aceh Tengah, with regards to the newly created District of Bener Meriah, which used to be a part of Aceh Tengah.[174]

Finally, while *Syariah* jurisdiction and the *Syariah* bureaucracy have expanded since 2004, the provincial budget allocated to the administration of *Syariah* has not increased, reducing its ability to deal with a growing caseload. Moreover, plans to fund the *Syariah* Court from the provincial budget, as provided for under article 136(2) of the LoGA, may endanger its political independence and ability to administer justice fairly and equally.

## 6.4  *Adat*

The following section examines the ways in which *adat* duty-bearers handle grievances, their effectiveness in doing so and the challenges they face.

*Keuciks* handle small administrative matters directly, but will generally invite other *adat* leaders, such as the *tuha peut*, to help resolve more serious justice grievances. In order to resolve disputes, the *adat* leaders will conduct meetings with disputing parties separately to solicit their views and provide them an opportunity to make peace. The *adat* leaders may then hold an internal meeting in order to formulate common understandings of the problem and plan a follow-up meeting that brings together disputing parties. During this follow-up meeting, the *adat* leaders will give advice to the parties to the grievance for problem solving. The meeting at this level can be held more than once, during which time the *adat* leaders essentially persuade disputing parties to settle the case. If settled, the leaders may draft a letter of agreement to be signed by the disputing parties and kept by the *keucik*. If agreement cannot be reached, the problem is then submitted to the *imam mukim* or *camat*.

In practice, the process is flexible but generally proceeds along these lines. Indeed, the assessment found numerous variations to the process outlined above. For example, it is not always the case that all of the *adat* leaders participate in resolving disputes. The level of involvement by duty-bearers depends on the nature of the dispute and the availability of leaders, who may for exam-ple be occupied with their subsistence livelihoods, thereby introducing constraints to participation and coordinating mediation efforts.

Although no standardized approach exists with village level dispute resolution processes, several practices for handling and resolving cases were commonly identified: seeking testimony from several witnesses that can be cross-checked; requiring witness oaths before giving testimony; imposing sanctions for false testimony; re-questioning witnesses whose truthfulness is in doubt to establish consistency; and inspecting physical evidence. Evidence in such cases is typically oral, but can sometimes include visits by duty-bearers to inspect damaged property or crops. In all assessment sites, there appeared to be no procedures for documenting evidentiary

---

172  To date several subdistricts like Krung Gekueh and Krung Mane still file their cases with Lhokseumawe's *Syariah* Court. This is despite that both are part of the administrative jurisdiction of North Aceh, and fall therefore under the jurisdiction of Lhoksukon's *Syariah* Court. Lhokseumawe has a *Syariah* Court of which jurisdiction covers Lhokseumawe. Juridically, Lhokseumawe's *Syariah* Court has only authority to examine and hear cases inside its jurisdiction.

173  Krueng Raya subdistrict is administratively a region of Aceh Besar District, and therefore under the jurisdiction of Jantho *Syariah* Court. To date the community in this region always files its cases at Banda Aceh *Syariah* Court.

174  Interview, Secretary of Takengon *Syariah* Court, 30 January 2006, Aceh Tengah.

if cases cannot be resolved through informal justice mechanisms. Villagers also stated that they would be reluctant to present oral evidence in the formal courts because of social taboos that prevent people from taking problems outside of a village. In practice, the types of cases heard in informal justice forums can include:

- Non-or extra marital relationships between opposite sexes;
- Unfair accusations of adultery or other libel;
- Incest;
- Re-marrying within the time of `mourning;
- Family matters (e.g., land disputes, domestic violence, rape, murder);
- Letting cattle roam so that they damage crops or gardens;
- Petty theft;
- Human rights violations committed by GoI security forces and GAM combatants.



An example 'letter of agreement' between disputing parties that was resolved by local adat leaders.

As stated earlier, most community level justice grievances identified during the assessment are dealt with at village level through *adat* justice forums. However, there are a variety of challenges that impede the effective handling of grievances through this forum. First, there are a number of problems that arise out of the normative legal framework surrounding the *adat* justice systetm to do

with the system's jurisdiction and procedures employed in dispute resolution and case handling.

Concerning jurisdiction, *Perda* 7/2000 and *Qanuns* 4 and 5/2003 state that *adat* justice providers have a duty to resolve disputes relating to the *adat* law and custom with no further explanation as to the *adat* law and custom these constitute. Neither does the LoGA provide more clarity. The assessment found that perceptions vary greatly among *adat* justice providers as to their jurisdiction. This confusion leads to uncertainty for disputants. It also raises questions of consistency with national and international law of the administration of justice.

For example, in some areas of Aceh, *adat* justice providers believe they can and should examine criminal cases, including murder, incest and domestic violence. In Aceh Tengah, *adat* justice providers explained that, if 'blood is spilt' but the two parties can be reconciled, compensation consists merely of sacrificing a bull. Some *imam mukim* and *keuciks* have responded that there are some types of cases that they would refer immediately to the police but, when asked to provide examples of such cases, they were unable to provide clear categories of cases. One *imam mukim* stated

**BOX 23: *TUHA PEUT***

We haven't been involved in any problem solving yet. We, as *tuha peut/tuha lapan*, have never had any single meeting to assess the *keucik's* performance. Community gathering between community leaders has never been held. The candidates of *tuha peut/tuha lapan* come from *dusun* (sub-village; neighbourhoods of a village); there are 11 members of *tuha peut/tuha lapan*. One of us is a female member and others are male members. I don't know who the female member is or from what sub-village she comes from."

*Interview, tuha peut, 9 February 2006, Village TA8.*

that cases of theft within the village would be referred immediately to the police "because you cannot change thieves – once a thief, always a thief – and the punishments that police impose are stronger than those which can be imposed by us." The same *imam mukim* proceeded to state that other criminal cases, including domestic violence, could be dealt with in the village. While different concepts of justice exist the world over, extending the jurisdiction of *adat* to violent criminal cases raises concerns from a human rights perspective regarding the ability of *adat* justice providers to administer justice that is satisfactory to the victim while simultaneously protecting the rights of the accused. With regards to domestic violence, for example, the assessment found that, as such violence is traditionally not considered a crime, *adat* dispute resolution of these violations often leads to victims being coerced into unfavourable settlements (discussed in Chapter 5).

Some formal justice providers have consequently suggested that *adat* jurisdiction should be restricted to criminal cases of a non-violent nature, such as petty theft. This indeed may be more appropriate as the resolution of such cases through the formal system as it exists today in Aceh will lead to case backlogs, while also producing an unnecessarily high social burden on parties to the dispute.

Additionally, the issue of jurisdiction raises the question of whether *adat* should be permitted to examine all civil and family law cases, which – as the assessment revealed – is the understanding of the majority of *adat* justice providers. For example, should cases concerning formal ownership of land (particularly if the dispute is between private and communal claims over land) or concerning claims that exceed a particular value be dealt with by *adat*? The assessment disclosed that there are strong indications that *adat* justice providers are, first, not equipped to deal with such cases and, second, may prioritise certain interests rather than acting as a neutral mediator in the dispute. In conclusion, confusion regarding jurisdiction leads to uncertainty for disputants while, from a human rights perspective, raises serious concerns as to the fair administration of justice.

Finally, *Qanun* 4/2003 on the *Gampong* Governance Structure empowers the *gampong* leadership (namely, the *keucik* and *tuha peut*) to 'promulgate and codify' village-level *aturan* (regulations), *petunjuk* (directives, guidelines), and *adat* customs. Once in agreement, the *gampong* leadership must forward the newly promulgated pronouncement to the *Bupati* (district head) or *Walikota* (municipality head) within 45 days, who has an additional 45 to reject the pronouncement. The assessment did not find any instances of *gampong*

| TABLE 6: EXAMPLES OF EFFECTIVENESS OF *ADAT* IN HANDLING GRIEVANCES | |
|---|---|
| Assessment Sites | Examples of Effectiveness of *Adat* in Handling Grievances |
| Village CA2, Village CA3, Village CA1 | Cultural and ethnic divides among ethnically heterogeneous villages undermining *adat* as dispute resolution mechanisms. During the conflict GAM viewed *adat* as a mechanism for disengaging from formal state justice mechanisms and promoting local independence. Resulting political divisions between pro-RI and ex-GAM undermine the coherence of traditional conflict resolution mechanisms. Politicized imposition of *Syariah* can potentially lead to conflict with community members that ascribe to Positive State Law and citizenship rights guaranteed by the Constitution. |
| Village CA5 | Ethnically homogenous village. Divisions between ex-GAM and ex-militia have undermined the coherence of traditional conflict resolution mechanisms. Lingering political mistrust and grievances between groups. |
| Village CA6, Village TA 5, Village TA6 | *Adat* seen as a traditional method of resolving disputes and a means by which to further gain local level independence. Mechanism strongly supported by ex-GAM. During the conflict, used as a means of gaining greater levels of local independence and disengaging from formal state justice institutions (i.e., *Adat* as law versus Positive State Law underpinned by political and economic grievance leading to secessionist movement). |
| Village CA4 | Village governance structures fractured by TNI security operations. Village suspected of harbouring GAM during the conflict. |
| Village CA9, Village TA8 | Tsunami destroyed or fractured village governance structures. *Adat* mechanisms unable to effectively mediate dispute resolution as a result. |

leadings having passed *aturan*. However, it is worth pointing out that, in the absence of clear legislation delineating the types of cases that might be dealt with through *adat*, such a provision could, if unchecked, lead to the 'promulgation' of *aturan* that are inconsistent with national and human rights laws.

A second factor related to the normative legal framework surrounding *adat* that impedes the effective handling of grievances concerns procedure. The concern that a wide jurisdiction may compromise effective grievance handling is compounded by the fact that the relevant legislations provide no clear legal procedures to govern *adat* dispute resolution. First, the relevant legislation relating to *adat* contain no safeguards to ensure the rights of the disputants, including the

presumption of innocence, the right to representation and the right to appeal. Second, there are no guidelines as to whether a defendant guilty of repeat offences can continue to have his/her case heard only by the *adat* justice system. Finally, there is a need to clarify that particular punishments imposed by the *adat* system, contravene human rights standards.

The relevant legislations are also unclear on the intersection of adat with the formal General and *Syariah* justice systems. One provision requires cases to be dealt with first by *adat* justice providers before they are permitted to be addressed by the formal justice system.[175] This provision is inconsistent with citizens' right to opt for the formal justice system under Indonesian constitutional

---

[175] Article 10 of *Perda* 7 / 2000 on the Establishment of *Adat* Life.

law, as well as the national Human Rights Law 39 / 1999.[176] This inconsistency is further compounded by a provision that states that an *imam mukim's* decision is 'final and binding'[177] Some *adat* justice providers perceive this to mean that there are no further levels of appeal within the *adat* system after an *imam mukim* and that, if disputants are unsatisfied at this point, they can proceed to the formal system. However, this legal interpretation is unclear and implies a certain hierarchy of justice forum within the *adat* system (a sort of appeals process as in the formal system) before they can seek resolution through the formal system. In practice, the assessment found that *adat* leaders and village respondents generally knew that they could access the formal justice system if they so wished. As discussed in Chapter 5, there are a number of other reasons why, in actual fact, the Acehnese continue to rely predominantly on the *adat* justice system. Nevertheless, these ambiguities can serve to hinder citizens' access to justice.

Arguably, the main strength of *adat* is its fluid and flexible nature that is able, because of an absence of codified rules, to respond to the needs of a community at a given time. However, the lack of clarity regarding jurisdiction and the absence of a minimum set of procedural standards can severely compromise the rights of disputants.

Other challenges to effective grievance handling include the fact that, in ethnically and politically divided villages, particularly in conflict-affected areas, mistrust can exist between citizens, as well as between citizens and the village leadership and *adat* justice

providers. This mistrust undermines villagers' confidence in the *adat* system, thereby weakening it and its ability to handle grievances. The starkest example of this was found in one location (Village CA5) where the *keucik* had been the leader of a local militia group known as *Berantas* (*Barisan Rakyat Anti-Separatis*; People's Bastion against Separatism). Since the signing of the MoU and the return of ex-GAM combatants to the village, this *keucik* has had to move to the district capital for his own security. The villagers no longer consider this man their *adat* leader, although he continues, at least formally, to be their administrative village leader. They now rely on other elders in their village to resolve disputes. This example demonstrates that effective grievance handling relies on the community's acceptance of those seated in the *adat* institution positions.

Second, the conflict and tsunami have led to instances in which communities are dislocated from their *adat* leaders because of displacement.[178] The assessment came across a number of examples in tsunami areas, especially in Banda Aceh, where villagers needed the assistance of their *adat* leaders to resolve grievances but were unable to locate them or were in camps too distant from them. This has contributed to weakening *adat* structures and their ability to handle grievances effectively.

In heavily tsunami-affected sites, some *adat* leaders died as a result of the natural disaster. This has required the formation of new *adat* leaderships, often comprised of a younger generation. The assessment found

---

[176] Article 28D(1) of the Indonesian Constitution provides for "just legal recognition, guarantees, protection and certainty, and to equal treatment before the law." Article 17 of the Human Rights Law states that every person has the right to "without discrimination, obtain justice by lodging an application, complaint, or claim in a criminal, civil or administrative case, and to have the case heard in a free and impartial judicial process. The process must comply with procedural law and involve an objective examination of the case by an honest and just judge in order to obtain a just and correct decision".

[177] Article 12 (3) of *Qanun* 5 / 2003 on the Gampong Governance Structure. The *imam mukim* is an *adat* justice provider that covers a collection of villages also known as a *mukim*.

that, while these new *adat* leaders often had greater administrative skills (due to higher rates of literacy and education), they still lacked experience, knowledge and the charisma required to be genuinely respected by their communities and undertake effective grievance handling.

Third, the assessment concluded that, in villages where the administrative structures and skills of the leadership are weak, not all the *adat* institutions listed in the relevant legislation exist, undermining the adat systems grievance handling capacity. That is, in many villages where there was no village office, where the *keucik* had weak administrative skills, and record keeping was poor, not all the *adat* institutions that are listed in the legislation and traditionally administer leadership would actually exist. It appeared that, where administrative skills and structures were stronger, village leadership had more knowledge of the relevant legislation related to *adat* institutions and were keener to put these legislations into practice and utilise the adat institutions. As a consequence, grievance handling was generally stronger in those villages with complete *adat* structures.

For example, the assessment showed that the administrative structure of the *imam mukim* apparatus has not, in most villages, been established as stipulated by law.[179] Among other things, *imam mukims* rarely have offices from which to operate.[180] Additionally, while a position as *imam mukim* earns social respect, the position is – unlike that of *keucik* - generally unpaid, rendering it difficult for

individuals to put substantial time and energy into the job. This has also left *imam mukims* working without administrative staff.[181] As a result, the *imam mukim's* performance is largely determined by his personal integrity and charisma. Also, *imam mukims* tend to be very old, which can sometimes undermine their ability to do their job effectively (e.g., unable to travel to villages extensively or coordinate between villages). The absence or weakness of this position due to weak administration diminishes the grievance handling capability of the *adat* justice system.[182]

A third issue leading to ineffective handling of grievances is due, as mentioned earlier, to the emphasis placed by *adat* custom on restorative justice geared at maintaining social harmony over the individual's interests. The result is that the handling of grievances can be ineffective because the priority is to ensure a peaceful settlement rather than to resolve the root cause of the dispute. Additionally, as the final decision can often be unsatisfactory to individual parties, the grievance may arise again in the future. The primary example encountered during the assessment was of domestic violence cases. *Adat* grievance handling is largely ineffective in these cases because settling the dispute peacefully did not guarantee that the perpetrator would not commit the crime again. Indeed, many respondents who were victims of domestic violence said that their husbands continued to assault them after interventions by *adat* leaders.

---

[178]   Interview, IDP Camp Coordinator, 22 February 2006, Banda Aceh; FGD, Widows of tsunami, 7 February 2006, Village TA8, Banda Aceh; FGD, Tsunami IDPs, 8 February, Village TA8, Banda Aceh; Interview, Villager, 7 February 2006, Village TA8, Banda Aceh; Interview, Villagers, 7 February 2006, Village CA9, Banda Aceh.

[179]   Interview, *Imam Mukim*, 24 February 2006, Pidie; Interview, *Imam Mukim*, 22 January 2006, Aceh Utara

[180]   Interview, *Imam Mukim*, 23 February 2006, Pidie; Interview, *Keucik*, 7 February 2006, Village TA7, Banda Aceh.

[181]   Interview, *Imam Mukim*, 7 February 2006,  Aceh. Interview, *Imam Mukim*,  23 February 2006, Pidie.

[182]   In urban conflict- or tsunami-affected areas, many respondents reported that they do not know about the role of *imam mukim* or its authority. Instead, community grievances are typically resolved by the *keucik*. For example, over the past three years in one assessment location, the *imam mukim* has only been involved in settling one land dispute, with respondents further stating that *mukim* structures in Banda Aceh are not used by the people. In practice, it appears that the *imam mukim* has a much less significant role in the governmental system or resolving community level justice grievances. Interview, *Imam Mukim*, 10 February 2006, Banda Aceh.

Access to Justice in Aceh - Making the Transition to Sustainable Peace and Development in Aceh

Finally, *adat* justice providers often admitted that they have insufficient knowledge of local government functions and procedures to inform the community of alternative options and services to resolve their grievances. One example of this is that village leaders, lacking proper knowledge of the criteria to issue *surat miskin* (declaration of poverty), sometimes issue these declarations in a discriminate manner rather than determining entitlements based on set criteria. This lack of knowledge compromises citizens' ability to access services that could otherwise be free if they possessed these declarations.

## 6.5  Oversight and Monitoring of Grievance Handling

The assessment found a dearth of government mechanisms in Aceh that actively and independently act to oversee and enhance the accountability of justice institutions in handling grievances. The only national oversight initiative that has reached Aceh is the *Komisi Pemberantasan Korupsi* (KPK, the Corruption Eradication Commission). However, as discussed in section 3.4.1, the KPK in Aceh is merely a 'referral' office. It can only receive claims and refer them to the National KPK in Jakarta. It does not currently have the capacity to actively oversee and investigate corruption cases itself.

The assessment did, however, identify a handful of NGOs that are active in overseeing and monitoring formal justice institutions to increase accountability of grievance handling. The most notable of the NGOs identified is the Aceh Judicial Monitoring Institute (AJMI). Others include –GERAK (*Gerakan Anti-Korupsi*; Anti-Corruption Movement), *Koalisi* NGO HAM, *Lembaga*

*Bantuan Hukum* Banda Aceh, PB HAM, *Peduli HAM* and TAMASYA. No NGOs overseeing *adat* institutions were identified.

Current monitoring and oversight functions of these NGOs include: monitoring of policy and law development; monitoring of prominent court cases or cases that might set a precedent; post-trial monitoring of cases and decisions made; and investigating and monitoring government corruption.

### Challenges faced

NGOs face a number of challenges that are impeding their ability to effectively monitor justice institutions and their handling of grievances. First, although NGO respondents admitted that the security situation since the signing of the MoU has markedly improved, several NGO respondents still harbour conflict-related security concerns regarding monitoring functions.[183]  In other cases, NGO personnel fled the district during the conflict period and have not returned since.[184] Due to conflict-related security concerns, local NGOs engaged in monitoring and human rights activities undertook "self-censorship"[185] to avoid reprisals from both the GoI and the GAM. One respondent working for an NGO involved in corruption monitoring noted that the only reason the NGO has been able to function for so long with no interference from the authorities is because the father of a leading staff member of the NGO is a local legislator.[186]

Second, NGOs state that their human resource capacity to undertake monitoring of justice institutions and human rights is low because, prior to the signing of the MoU, there was little space afforded to

---

[183]  Interview, NGO, 12 January 2006, Banda Aceh.

[184]  Interview, NGO, 30 January 2006, Takengon, Aceh Tengah.

[185]  Building Human Security in Indonesia (Conference Report) http://www.preventconflict.org/portal/main/report_ngo.php.

[186]  Interview, NGO, Confidential.

NGOs to undertake such activities. The secu-
rity situation during the conflict meant that
NGOs monitoring activities were severely
restricted, rendering their capacities poorly
developed up to the signing of the MoU.

Third, the impact of conflict was com-
pounded by the tsunami because the
natural disaster destroyed local NGO
information networks (e.g., death of staff
or destruction of offices).[187] For example,
one source notes that up to 30 core activists
were killed during the tsunami, thus
undermining the leadership capacity of
local NGOs and their ability to work
effectively with the massive influx of inter-
national NGOs following December
2004.[188] Moreover, inflationary pressures
following the influx of internationals
raised operating costs, thus making it
increasingly difficult for local NGOs to
provide services effectively and in a finan-
cially sustainable manner not to mention
being able to keep good staff from mo-
ving to INGOs.[189]

Fourth, given the capacity weaknesses and
operational constraints encountered by NGOs
monitoring and reporting activities tend to
focus on urban areas. Additionally, or
perhaps because of this, NGOs tend not to
have as close links with grassroots
communities as CBOs, for example, might.
This reduces the community's trust in
them and generally means that it will
take more time for community's to open
up and share stories with them, as required
for monitoring.[190]

Other assessments have identified other
organizational capacity weaknesses of CSOs
in Aceh more generally.[191] These apply to
those NGOs working to monitor justice in-
stitutions as well and include :

• Poor human resource management and
  capacity;
• Lack of operational and financial ma-
  nagement systems;
• Poor strategic planning and project ma-
  nagement;
• Poor data collection and analysis; and
• Weak monitoring and evaluation proce-
  dures.

---

**BOX 24: IMPACT OF CONFLICT AND THE TSUNAMI ON ACCESS TO JUSTICE**

Before the military state of emergency, people were not afraid to come to our office to report arrests of their
family members as well as cases of abduction. However, while the military emergency was in force, people no
longer dared to report such cases. If the victim was treated unfairly or had his/her rights violated by GAM, the
victim was afraid to report because of GAM. And if the victim was treated unfairly or had his/ her rights violated
by the military/ TNI or the police, then the victim would be afraid of the military or the police…The level of
violence was very high…We experienced difficulty in performing our activities in the office and in the field. At
the time there were rumours that offices of NGOs had to be closed. People became even more afraid to report
what they experienced or witnessed…After the tsunami, we were unable to carry out activities for several months.
But the security conditions were better and there was no more armed conflict…Cases after the MoU were
mostly extortion and assault. Some dared to provide information while others did not. The conflict has caused
the people to still be afraid of claiming their rights.

*Interview, NGO, 20 February 2006, Pidie*

---

187   Interview, NGO, 30 January 2006, Takengon, Aceh Tengah.

188   Mubariq Ahmed, Case Study: Civil Society Rebuilding Post-Tsunami Indonesia (Development Gateway, 15 July 2005) http://topics.develop-
      mentgateway.org/ict/sdm/previewDocument.do~activeD.

189   As reported by the UN's humanitarian information centre NGO mapping survey forms: NGO Mapping Survey Form (UN Humanitarian
      Information Center, Banda Aceh, 2005) http://www.humanitarianinfo.org/sumatra/products/LNGO/display_NGO.asp?

190   UNDP, Civil Society in Aceh: An Assessment of Needs to Build Capacity to Support Community Recovery, p. 21.

191   Ibid., p. 18.

# Chapter 7
# Remedies Obtained and Sanctions Enforced

# Chapter 7 - Remedies Obtained and Sanctions Enforced





| TABLE 7:  KEY FINDINGS: REMEDIES OBTAINED AND SANCTIONS ENFORCED | |
| --- | --- |
| **General Justice System** | - Community members believe that sanctions imposed for offences tend to be disproportionately heavy and poorly enforced by courts.<br><br>- Insufficient resources exist for the courts / prosecutors /police to enforce decisions. |
| **Syariah Justice System** | - *Syariah* Courts have effectively managed non-disputed, declaratory decisions related to ownership, inheritance and guardianship in post-tsunami context.<br><br>- Caning as a punishment violates human rights principles. Some argue ...that canin is quick and less costly. |
| **Adat Justice System** | - Outcomes promote harmony over individual rights.<br><br>- Powerful community figures can manipulate remedies and sanctions to .their own advantage at the expense of vulnerable groups.<br><br>- Certain punishments may violate human rights principles.<br><br>- Decisions are often poorly enforced. |

A key component of an effective justice system is ensuring that remedies are obtained and sanctions enforced in a satisfactory manner. This means that the remedies and sanctions are appropriate and the enforcement thereof is consistent with national and international standards and law.[192] This Chapter considers the appropriateness - from a national and international legal perspective - of remedies and sanctions imposed by the different justice systems in Aceh. It also examines the ability of these justice systems to enforce these remedies and sanctions in order to ensure claim-holders' access to justice.

---

[192]  UNDP, Programming for Justice: Access for All, p. 60.

## 7.1 General Justice System

### Appropriateness of Remedies and Sanctions

The assessment did not assess in any depth the appropriateness of remedies and sanctions imposed by the General justice system because the remedies and sanctions that are applied under this system in Aceh are those that are applied across the archipelago under Indonesian Law. There is an abundance of literature on this topic.[193] There was, however, one point concerning the appropriateness of remedies and sanctions that was raised several times by respondents, which is highlighted here.

Several NGO respondents stated that sanctions imposed by the General Courts in Aceh are disproportionate to offences committed. That is, minor offences will be harshly punished, while more serious offences, such as corruption, receive a virtual 'slap on the hand'.

This is an important finding in the context of Aceh (and Indonesia more widely, for that matter) where corruption, according to this assessment, is prevalent and exists at all levels of the justice system. According to Court officials, Indonesian Law gives high levels of discretion to adjudicating judges to determine and impose sanctions.[194] While this may be consistent with National Law, it is arguably inconsistent with international standards and principles of equity law.

### Enforcement of Remedies and Sanctions

One main issue identified by the assessment concerning enforcement relates to the Provincial Government's capacity to incarcerate the accused. As a result of the tsunami, penal institutions (*Lembaga Pemasyarakatan*, LAPAS) in Banda Aceh, Lhoknga (Aceh Besar) and Meulaboh (Aceh Barat) were completely destroyed while others suffered damage and are no longer able to function. During the tsuna-

---

**BOX 25: DISPROPORTIONATE PUNISHMENTS**

X, an indigent with a low level of education living in an isolated rural area, was caught while attempting to steal a fish from another villager's fishpond. X fled the village and returned four months later, at which point the *Keucik* took X to POLSEK. While detained at POLSEK, he was kept in a small room, which was actually a latrine, and had to sleep in a seated position. He had to defecate and urinate in the same room. He was given two meals a day. X claims that he was beaten by police officers (blows by hand or hard objects) and had water poured over him every night. This lasted for a month. The police then told X that if he wanted to be released he had to pay them Rp 6 million. Unable to pay the sum, X's case was then submitted to Lhoksukon's Public Prosecutor.

X claims that friends and family were always required to pay prison guards Rp 5,000 when visiting him. After an additional month in the Lhoksukon prison X was summoned to the court. During hearings court officials did not appoint legal representation for X, who by law was entitled to free legal representation to be appointed by the court. After a second hearing, the judge imposed a penalty of eight months imprisonment, reduced by two months he had already served. The public prosecutor then told X that he would reduce his sentence if X paid the prosecutor Rp 1 million. As X had no money to pay the bribe or appeal the decision, he accepted the penalty imposed by the judge. After serving four months, prison guards offered to release him if he paid Rp 800,000.

*Interview, Villager, 22 January 2005, Village TA 5.*

---

[193] See, for example, Dr. Andi Hamzah, SH., Pengantar Hukum Acara Pidana Indonesia (Introduction to the Indonesian Criminal Code),Ghalia Indonesia, Jakarta, 1984, page 262; and, Retnowulan Sutanto and Iskandar Oeripkartawinata, Hukum Acara Perdata Dalam Teori dan Praktek, (The Civil Code in Theory and Practice), Mandar Maju, Bandung, 1995.

[194] Interview, Vice Chairman Lhoksemawe District Court, 19 January 2006, Lhokseumawe.

mi, there were 278 inmates at the Banda Aceh LAPAS; 238 have been declared missing (either escaped or killed) and 40 survived. Currently, the administrative office of LAPAS Banda Aceh occupies space at the Regional Office of the Ministry of Law and Human Rights. All LAPAS Banda Aceh inmates have been transferred to LAPAS Jantho (Aceh Besar), which does not have the capacity to accommodate the large number of inmates.

The LAPAS Meulaboh was completely destroyed during the tsunami but its 140 inmates survived. It has since transferred inmates to a local residence, while some inmates are simply required to report regularly to the Meulaboh Penal Office. The Prosecutor has placed new inmates sentenced to less than one year imprisonment in detention rooms in the Aceh Barat POLRES. However, these detention rooms were not intended as long term penal facilities, are small, over-crowded and lack basic amenities for prisoners. From an international human rights perspective, they fall short in meeting prisoners' rights. Similarly in Banda Aceh, the absence of a long-term incarceration facility has meant that many prisoners are kept in short-term holding cells in police stations before they can be transferred to the long-term facility in Aceh Besar. At the time of this assessment, rehabilitation and reconstruction of penal institutions had not begun. As a result, the shortage of detention facilities compromises the ability of the General Courts to enforce sanctions as stipulated by law in a manner that is consistent with national and international standards.

## 7.2  *Syariah* Justice System

### Appropriateness of Remedies and Sanctions

Remedies delivered by the *Syariah* Courts in Aceh include 'Declaratory' decisions and 'Deeds of Peace'. 'Declaratory' decisions are decisions in which the *Syariah* Courts declare a status or situation relating to one or more parties as a legal status. This may include declaring a marriage between two parties, pronouncing a divorce, determining a legal custodian or legitimate heir, and certifying deaths or disappearances. A 'Deed of Peace' is a decision passed by the *Syariah* Courts after the resolution of a dispute between parties. This occurs because every judge is obligated first to facilitate disputing parties to reach an agreement. The *Syariah* Court strongly urges disputing parties to settle their problem through peaceful deliberation outside the court because of its limited human resources and facilities.

As discussed in section 3.2, the three categories of sanctions under *Syariah* are *ta'zir* (discretionary),[195] *hudud* (fixed punishments) and *qisas* (just retaliation). Currently, the existing *Syariah qanun* in Aceh empower *Syariah* Courts to sentence the accused to *ta'zir* and *hudud* punishments.

The criminal *Syariah* offences relating to ritual worship (*Qanun* 11/2002), the making, distribution and selling of liquor (articles 6-8, *Qanun* 12/2003), gambling (*Qanun* 13/2003), as well as immoral acts (*Qanun*

---

[195] For further discussion on *ta'zir* see Mohammed El-Awa, *"Ta'zir* in the Islamic Penal System", Journal of Islamic and Comparative Law 6 (1976).

14/2003) carry a *ta'zir* punishment. *Ta'zir* punishments include fines, imprisonment, or caning but are at the discretion of the judge.[196] Meanwhile, the consumption of alcohol (article 5, *Qanun* 12/2003) carries with it a *hudud* punishment in the form of 40 lashes. There are two concerns relating to the appropriateness - from a national and international legal perspective - of such sanctions. The first concern relates to the discretionary element of punishments. It is arguable that punishments left to the discretion of the presiding judge may be unfair and may deviate from precedence, thereby permitting no legal certainty.[197] On the other hand, respondents note that, within the *ta'zir* category, the existing *qanun* do provide guidelines as to maximum sentences that may be imposed.[198] The following *ta'zir* punishments are stipulated in *qanun*. The second concern regarding the appropriateness of sanctions relates to caning as a punishment. Many respondents consider caning a human rights violation because of the excessive physical pain imposed upon the body. Additionally, the fact that it is enforced in public (canings in Aceh have been conducted usually at the main mosque after Friday prayer when the *umma*, the Muslim community, have congregated) is considered by many as violating human rights because it leads to excessive public shaming. Finally, others have argued that it is inappropriate because it has no deterrent effect.[199] Box 26 outlines different perspectives identified during the assessment.

| TABLE 8:  *TA'ZIR* PUNISHMENTS AS STIPULATED IN *QANUN* | | |
|---|---|---|
| **Offences** | **Number of Canings** | **Source of Law** |
| The propagation of deviant sects or cults | Maximum 12 lashes or 2 years imprisonment | Article 20(1), *Qanun* 11/2002 |
| Apostasy or disgracing the religion of Islam | Not yet determined (will be provided for in a subsequent *qanun*) | Article 20(2), *Qanun* 11/2002 |
| Failure to observe Friday prayers three weeks consecutively without good reason | Maximum 3 lashes or 6 months imprisonment | Article 21(1), *Qanun* 11/2002 |
| To provide amenities that encourage Muslims to break fasting during Ramadhan | Maximum 6 lashes, 1 year imprisonment, or a fine of up to Rp. 3 million | Article 22(1), *Qanun* 11/2002 |
| To eat or drink publicly during the fasting period of Ramadhan | Maximum 2 lashes or 4 months imprisonment | Article 22(2), *Qanun* 11/2002 |
| To commit gambling | Maximum 12 and minimum 6 lashes | Article 23(1), *Qanun* 13/2003 |
| To commit *khalwat* | Maximum 9 and minimum 3 lashes | Article 22(1), *Qanun* 14/2003 |

From: Arskal Salim, *Islamising Indonesian Laws? Legal and Political Dissonance in Indonesian Shari'a, 1945-2005*, p. 200.

[196] Arskal Salim, Islamising Indonesian Laws? Legal and Political Dissonance in Indonesian *Shari'a, 1945-2005*, p. 199; Salim points out that *ta'zir* is a "discretionary punishment for committing the prohibited acts or for omitting the obligatory acts".

[197] Interview, NGO, 14 January 2006, Banda Aceh.

[198] Interview, *Syariah* Court Judge, 13 January 2006, Banda Aceh.

[199] Interview, Head of Special Crime Unit of Banda Aceh Attorney's Office, 8 February 2006, Banda Aceh.

However, *Dinas Syariat Islam* and WH officials explained that caning is considered to be an appropriate sanction for a number of reasons.[200] From the perspective of the accused, the punishment is quickly over with and does not involve financial costs. From the perspective of the justice system

and *Syariah* bureaucracy, caning is considered an appropriate sanction because it is intended not to cause pain but to deter through shame. Its financial cost on the justice system is lower than imprisonment in which the system must house and feed prisoners. Finally, respondents noted that caning is regulated by a set of rules, stipulated in Governor's Decree 10/2005 on the Technical Implementation of Caning. This Decree sets out rules including the mandatory presence of a doctor (article 4(1)), how the lashing is to be executed (articles 4 –10), and scenarios that may lead to a cessation of the caning (article 11).

> **BOX 26:  THE APPROPRIATENESS AND EFECTIVENESS OF CANING AS A PUNISHMENT**
>
> "The sentence of whipping will be carried out by the prosecutor's office and the detainee will be allowed to go home afterwards. This sentence does not have any punitive effect; many perpetrators violate the law again."
>
> *Interview, Attorney's Office Official,*
> *8 February 2006, Banda Aceh*
>
> "Our community is demanding for no more whipping. If possible the whipping punishment should be abolished. Give the heaviest penalty. Drinking alcohol should be fined a sum of Rp 75 million. Who wants to pay for the price of one car if the price of a bottle is only so much? So now the demand in our community is not to whip, give the heaviest fine/jail term for such offences."
>
> *Interview, Dinas Syariat Islam Official,*
> *26 January 2006, Takengon, Aceh Tengah*
>
> "Caning by *Syariah* Courts does not have a significant punitive effect for deterring criminal behaviour."
>
> *Interview, Head of Special Crime Unit of Banda Aceh*
> *Attorney's Office, 8 February 2006, Banda Aceh*
>
> "Most of the people who have been in court and have been punished feel regret. Whipping punishment is more acceptable than jail punishment because when they receive whipping, afterwards they are free and it will not cost much money, unlike jail punishment where they must stay in prison for a long time and it costs a lot of money."
>
> *Interview, Head of West Aceh Syariah Court,*
> *14 February 2006, Aceh Barat*

## Enforcement of Remedies and Sanctions

Since the tsunami, the *Syariah* Courts have rendered over 10,000 'declaratory' decisions determining the identity of heirs *(penetapan ahli waris)* and some 3,000 declarations of death *(penetapan kematian)*.[201] While not remedies as such, these decisions by the *Syariah* Courts have permitted tsunami victims to access bank accounts, demonstrate ownership over property and request humanitarian assistance.[202]

With regards to the enforcement of caning as a punishment for criminal offences, the first caning was executed in August 2005 and, at the time of writing, there had been over 100 more throughout the province.[203] Officials report that there have not been problems with the enforcement of canings. Funds are allocated from the provincial and district budgets through the Prosecutor's Office, who execute the sanction.

---

200  Interview, *Dinas Syariat Islam* Official, 26 January 2006, Takengon, Aceh Tengah. Interview, WH Official, 14 February 2006, Aceh Barat.

201  IDLO Update, October 2005.

202  Salim points out that by November 2005 it was estimated that 9,000 cases of inheritance had already been brought before the *Syariah* Court; a very small number relative to the more than 130,000 estimated dead caused by the tsunami, and that cases did not include land claims; see, Salim Arskal, Islamising Indonesian Laws? Legal and Political Dissonance in Indonesian *Shari'a*, 1945-2005, p. 215.  Statistics gathered for this assessment demonstrate that most land claims have not been brought to any court for resolution in early 2006 and that the number of inheritance cases brought to the courts remains relatively low compared to the number of overall dead.

203  Interview, *Dinas Syariat Islam*, 14 January 2006, Banda Aceh.

The *Syariah* justice system has encountered difficulties in the enforcement of sanctions taking the form of imprisonment because it utilises the same detention facilities as the General justice system. Inadequate space and large distances to prisons has meant that standards of imprisonment can violate national and international standards for the detention of prisoners.

## 7.3 *Adat* Justice System

### Appropriateness of Remedies and Sanctions

Remedies and sanctions as stipulated in *Perda* 7/2000 on *Adat* Law (article 19) include: giving advice, reprimanding, a public apology, imposing fines, compensation, alienation by the village community, expulsion from the village community, and revocation of *adat* title. According to *adat* duty-bearers, sanctions principally take the form of restorative justice measures with the aim of preserving social harmony, at rehabilitating offending parties, and at reintegrating offending parties into a harmonious community. For example, in Gayonese *adat*, in cases of "spilling of blood" such as a traffic accident, perpetrators of the offence must pay the cost of treatment to the victim followed by a *peusijuk* (cleansing) ceremony intended to symbolise the resolution of conflict and forgiveness. Once the cleansing ceremony is complete, the perpetrator and victim are considered as having become related, thus preventing resentment and future conflict between the parties.

According to *adat* duty-bearers, specific sanctions imposed through *adat* forums go beyond those stipulated in law and can include: physical punishment, community service, detention, seizure of property or property rights extinguished and marriage (i.e., as a punishment for unmarried couples found in a relationship). In cases of disputes between a husband and wife, including cases of domestic violence, "amicable solutions" without penalties are often imposed. In many cases identified by the assessment, these solutions did not stop the domestic violence, with abusive husbands commonly beating their wives again.



Peusijuk cleansing ceremony being demonstrated by villagers for the assessment team.

<div style="box">

**BOX 27:  *ADAT* JUSTICE: ENSURING SOCIAL HARMONY**

According to Gayonese customary law, for an agreement to be reached it must be based on the principles of *Maaf, Rujuk, Diat* and *Bela*. "*Maaf*" is when the perpetrator asks forgiveness. "*Rujuk*" is when everything is back to normal again and the perpetrator has been forgiven regardless of the type of offence. "*Diat*", is agreement on the amount of compensation to be paid to the victim. "*Bela*" is the same as *Qisas* (An eye for an eye), or a life for a life. Usually settlement is reached when parties have progressed to the third principle.

Settlement is followed by "*tepung tawar*"; this is a traditional process led by a village elder that gives advice to both parties and their families not to harbor any feelings of resentment. The perpetrator and victim then sit next to each other and a woven cloth is placed over their heads and both parties make a pledge, "You are my brother, in life and in death" that is witnessed by the community. After the pledge, the older party acts as an older brother to the younger and the younger acts like a younger brother to the older.

*Village C1, Aceh Tengah*

</div>

The assessment found that *adat* justice mechanisms have dealt with past human rights abuses committed by ex-GAM and ex-militia. In one case, the *keucik* himself had been ostracised from a village for his allegiance to the GoI and violations he abetted. However, in many instances, due to the political and social sensitivities of addressing serious human rights violations head-on, efforts are geared at "forgetting the past" and "moving forward" without any compensation provided to victims. Additionally, the assessment did not locate local forums that have investigated or imposed sanctions on individuals accused of corruption or manipulating aid distribution (i.e., grievances relating to unequal aid distribution), unlawful attempts to deny the inheritance

rights of women or orphans (conflict-affected areas), or acts of intimidation and violence committed against minority groups (conflict-and tsunami-affected areas).

Although seeking to promote social harmony, the sanctions imposed through informal justice forums can breach principles of human rights and be unfair to minority ethnic groups.[204] For example, a strong argument can be made that expulsion from a village, one of the sanctions that *adat* leaders are permitted to enforce under Perda 7/2000, contravenes human rights principles. Across the assessment sites, it was found that those community members most unhappy with informal justice outcomes were among the weakest and most disadvantaged groups. It is typically the case that these claim-holders do not have methods for going beyond the village level to seek justice remedies. As shown in several case studies in Chapter 5, when choosing justice forums, claim-holders are often coerced to file complaints with informal system duty-bearers. This is often rationalized on the grounds that individual rights are secondary to promoting social harmony. However, many respondents expressed frustration with informal decision-making processes, most notably disadvantaged groups including women and landless labourers.

## Enforcement of Remedies and Sanctions

The assessment found that the ability of *adat* to enforce remedies and sanctions can be weak because of the absence of physical mechanisms to bind decisions. However those communities ascribing to *adat* will self-enforce sanctions because of the strength of the "considerations of morality, religion and tradition" that underpin the *adat* system.[205]

---

204  Matt Stephens, 'Local-level dispute resolution in post-*reformasi* Indonesia: Lessons from the Philippines', p. 232.
205  M.B. Hooker, *Adat Law in Modern Indonesia* (Oxford University Press, Kuala Lumpur, 1978), p. 146.

The weak enforcement capability of the *adat* system has meant that citizens can 'forum shop' if they are unsatisfied with the outcome of a dispute.[206] This is not always a problem; indeed, Acehnese have a right guaranteed under National Law to employ the General justice system to resolve their disputes. That is, *adat* resolutions are not legally binding. However, a problem is found in attempts to manipulate processes to avoid sanctions or to manipulate forums at the expense of other individuals. Additionally, because sanctions imposed by *adat* decisions are not binding, it is not uncommon for more powerful figures to ignore decisions not in their favour.[207] As the following example demonstrates, the assessment found that the level of respect or even fear that the *adat* leaders garner in their community will influence the extent to which decisions, remedies and sanctions are accepted by a community.

Furthermore, the capability of *adat* to enforce its sanctions proves especially weak in conflict-affected villages that are ethnically plural and politically divided. For example, in ethni-

> ### BOX 28:  DISCRIMINATION AND EXTORTION OF MINORITIES
>
> N, a female Javanese transmigrant, was told, "Don't look for a house because you are not Acehnse, you're not entitled". N worked as a cook at an international NGO that operated in Village TA2. The local owner of the house, known to be a "cruel and powerful man", asked N to give him 10% of her earnings. N refused and was then threatened by the man (murder, rape, burning). N was very scared, especially because she heard that another woman from Java had been raped in the village several years ago. N was scared to report the case to the police because she would have no protection when alone in the village. The *Keucik* was not responsive to N's requests for help, because he too feared the man and his family.
>
> *Interview, Widow, Village TA2, 16 February 2006,*
> *Aceh Barat*

cally mixed villages, such as Villages CA3 and CA2, the conflict has aggravated conflicting interpretations of *adat,* minor differences with cultural practices, and increased pre-existing patterns of discrimination. Thus, *adat* remedies and sanctions are susceptible to manipulation, patronage, coercion and power imbalances that can be used to ensure favourable outcomes for more powerful and well-connected individuals.[208]

---

[206]   UNDP, A Review of the Justice System in Aceh, Indonesia, p. 19.

[207]   World Bank, Interim Report: Justice for the Poor Program: Research Paper on Community Access to Justice and Village Judicial Autonomy (World Bank Social Development Office, Jakarta, 2004), p. 166.

[208]   UNDP, A Review of the Justice System in Aceh, Indonesia, pp. 35-36; Stephens, p. 228.

# Chapter 8
# Recommendations

# Chapter 8 - Recommendations

This Chapter concludes that rapid and equitable responses from the justice sector – both formal and informal – are necessary to facilitate successful post-tsunami and post-conflict reconstruction and reintegration. It recognizes that an effective formal legal system is vital for that process but, at the same time, the majority of disputes will be resolved through village-level *adat* institutions. Both mechanisms, therefore, require support.

Based on the findings, the assessment identifies a series of recommendations to support the formal and informal justice systems in Aceh. The needs are significant, so some prioritization is necessary. All of the recommendations below are important, but the assessment identifies the following six areas as the immediate and most important priorities for action. Prioritization was based on an assessment of actions that most rapidly assist communities to build back their lives and restore their livelihoods.

## 1. Community legal awareness :

Without an understanding of their rights and how to enforce them, communities cannot resolve the legal problems they have identified in this assessment as the most critical. Legal awareness programs must focus not only as they do now on obligations, but also on rights.

## 2. Community legal advisory/ advocacy services :

Disadvantaged groups who face economic or social hardship often need support to access their legal rights or defend their legal interests. Mechanisms to support CSOs establish and maintain legal advisory and assistance posts in cities and more remote parts of Aceh are essential if more vulnerable sections of the community are to have full access to justice.

## 3. Strengthen the capacity of local level justice institutions :

The majority of complaints are being handled by local level institutions, including *adat* institutions, village heads and religious leaders. These mechanisms require capacity building encompassing mediation skills, knowledge of the law (substantive law and processes) and gender awareness to deliver sustainable and equitable dispute resolution.

## 4. Support the formal justice sector:

The courts, prosecutors and police were badly damaged by the tsunami, compounding existing weaknesses. The conflict has undermined public confidence in the legal institutions, reducing their capacity to respond to legal problems and support accountable government. While it is hoped that this assessment has identified a significant portion of the needs, coordinated consultations with those stakeholders who are mandated and able to respond to these needs must continue in order to (i) seek input on other needs and (ii) strategise on how these needs might best be addressed.

## 5. Resolve jurisdictional overlaps:

The jurisdictional ambiguity between the General and *Syariah* Courts and *adat* institutions needs to be clarified. The jurisdiction of *adat* institutions in

particular requires regulation. All regulations passed in Aceh should be consistent with the Indonesian Constitution and human rights principles.

### 6. Monitoring and oversight :

National commissions charged with oversight of the judiciary, the prosecutors and the police, as well as other government institutions responsible for public service provision, should establish provincial offices in Aceh. Oversight and accountability mechanisms must also be established for *adat* institutions to ensure consistency with the Indonesian Constitution and human rights principles.

Assuming that there will be a long-term donor commitment to strengthening the justice system, the recommendations made are holistic in nature and point to a wide range of areas that need support over the long-term. As the list of recommendations is substantial but by no means exhaustive, critical to successful reform will be coordination among all stakeholders. This includes the Government of Indonesia (in particular, but not limited to, BAPPENAS, the Supreme Court and the Attorney General's Office), the Provincial Government of Aceh (BAPPEDA, BRR, and the High Court), Acehnese civil society, donors and other international partners.

## 8.1 To National and Provincial Governments

### Normative Legal Framework

- Ensure that all regulations passed are harmonized with national and international human rights standards; any regulations which contradict the Constitution should be revoked.

- Develop an accessible online database of *qanun* which can be easily updated and reviewed for vertical consistency and harmonisation.

- Promote public participation in the drafting of *qanun* through DPRA outreach and commission hearings on draft regulations.

- Support the evolution of *adat* (specifically jurisdiction and procedures) to be consistent with Indonesian Constitutional Law and international human rights standards.

- Clearly delineate and then raise awareness on the types of cases that can and cannot be heard by *adat* and develop guidelines on procedure so that it is consistent with Indonesian Constitutional Law and international human rights standards.

- Establish gender components in all legal reforms and procedures.

- Undertake continued extensive civil consultation regarding the establishment of a Human Rights Court in Aceh with a clear mandate to investigate crimes falling under the jurisdiction provided under Law 26/2000 on Human Rights Courts.

- Once the current process of Constitutional Review of Law 27/2004 on the National Truth and Reconciliation Commission (TRC) is resolved, based on extensive civic consultation establish a TRC in Aceh to rebuild civic trust between community members and groups with the State.

- Alternatively, if a National TRC is not created, establish an ad hoc TRC in Aceh by legislation promulgated by the DPRA based on extensive civic consultation.

- Promulgate a law on legal aid to define the standing of public defenders to support disadvantaged justice users.

- Promulgate the "freedom of information" law to facilitate citizens' access to information and enhance accountability and transparency with public service provision.

- Promulgate a Supreme Court Decision to simplify judicial procedural requirements to facilitate circuit trials for isolated areas.

- Resolve the regulatory problems associated with the role and functions of the WH.

- Discourage *pemekaran* (administrative sub-divisioning of districts) where adequate service delivery capability is unlikely due to a lack of human and infrastructure resources and financial resources.

## Legal Awareness

- Support legal awareness programmes that emphasise: those legal problems and processes that are most common to citizens and that will most empower citizens under the law; the criminality of domestic and gender-based violence; and the accessible provision of public services.

- Increase emphasis on the awareness-raising mandate of government institutions (especially those at district

and subdistrict levels) by earmarking a larger percentage of the APBD to this end.

- Review legal awareness outreach strategies used by various government institutions and revise as needed in order to promote community empowerment under the law.

## Handling of Grievances

- Draw on the institutional matrix analysis (see Appendix 3) to devise appropriate institutional development strategies to address identified weaknesses.

- Strengthen the provision of assistance to disadvantaged groups by: identifying and registering claim-holders; allotting special funds towards assistance packages; supporting local government (district and subdistrict) to distribute funds effectively and transparently.

- Support continuous capacity development of formal justice system duty-bearers and establish clear and transparent recruitment and promotion criteria.

- Provide training to legislators at provincial and district levels so that the drafting of laws reflects local aspirations and does not contravene national laws or the Constitution.

- Provide mediation training for judges leading to mediation certification for judges as stipulated by law.

- Reinforce divisions between police services and TNI regarding internal

and external security functions and introduce measures in the field so that the different security functions of police and TNI personnel are understood and followed by GoI security personnel in Aceh.

- Recruit higher numbers of local residents into the organic police services and introduce training measures that prevent the factionalisation of the police services along ethnic or political lines (e.g., ex-GAM versus pro-GoI, Acehnese versus Gayonese etc.).

- Conduct an assessment to determine the extent to which police personnel suffer from post-conflict mental trauma and take appropriate measures to respond to identified needs.

- Provide cultural awareness and conflict sensitivity training for police.

- Expand Special Women's Desks down to the subdistrict level, adequately staffed with women police officers.

- Monitor low level clerk staff and administrative support staff to limit opportunities for loss of files or evidence in court cases.

- Encourage the registration of advocates (especially women).

- Increase the dispute resolution and mediation capacities of *adat* operators.

- Develop training packages for *adat* operators regarding national and international human rights laws and standards, how to refer cases to the formal justice system, and gender and mediation training [in conjunction with MAA].

- Implement training packages for *adat* duty-bearers to ensure they provide justice in a manner consistent with national and international law and standards and have appropriate case referral systems to the formal justice system [in conjunction with MAA].

- Support sustainable capacity development of *adat* duty-bearers in the fields of: human rights (with emphasis on women and children's rights); basic substantive and procedural law; mediation and conflict resolution; legal principles (including ethics, corruption, and non-discrimination); administrative procedures; and, information management and recording of data.

- Provide training and institutional development support for *imam mukim* and *mukim* offices.

- Provide sustainable and multi-year (subject to performance reviews) support to legal aid organisations and social worker schemes to support citizens through the justice process and the ability of legal aid organizations to extend their coverage to rural areas.

- Establish land dispute committees at district level in conflict affected regions to handle major land disputes arising from disputed land claims.

- Support reintegration and confidence building between citizens and government authorities.

## Oversight and Accountability

- Support the strengthening of the KPK (Corruption Eradication Office); provide full cooperation with the Office in fulfilling its functions; and, raise public awareness of the office's functions and reporting mechanisms.

- Support the KPK to develop and implement an anti-corruption curriculum into Aceh's school system. A short-term strategy to adopt is launching quick school-based information campaigns.

- Call for the establishment, within all government institutions, of: provincial institutional review commissions (e.g. Provincial Judicial Review Commission, Provincial Police Review Commission); internal oversight systems; public complaints mechanisms; and, review and revise codes of conduct and make codes of conduct public knowledge through information campaigns.

- Endorse the establishment of a Regional Ombudsman's Office; provide full cooperation to fulfil its functions; and, raise public awareness of the Office's functions and mechanisms.

- Strengthen CSO and media capacities to act as oversight bodies to improve the provision of public services to the community.

- Develop recording systems at *mukim* and *camat* offices that document decisions and types of punishments imposed so as to ensure appropriateness of sanctions and to facilitate external review of regional and local justice processes and the harmonization of different justice forums.

- Support the establishment of confidential complaints mechanisms at subdistrict and district levels for community members to file grievances.

## 8.2  To Donors

- Establish a provincial level steering committee comprised of donors, government officials, and CSOs to meet and review justice system reform efforts as required.

- Support a constructive process of dialogue and training on the links between transitional justice, reconciliation and the rule of law.

- Advocate for gender mainstreaming in all legal system reforms, as well as support specific activities and programmes to enhance women and children's access to justice.

- Advocate for and provide support for the establishment of the above-listed oversight institutions and the promulgation of the freedom of information law and the law on legal aid.

- Support sustainable and multi-year (subject to performance reviews) activities of both government institutions and CSOs directed towards legal awareness-raising of citizens.

- Fund a follow-up needs assessment that is narrow in scope and targeted

to identify logistical, infrastructure, staffing and personnel training needs of the courts and legal aid services.

- Support sustainable capacity development of justice providers (both formal and informal justice systems), including *adat* leaders, judges, prosecutors, lawyers, police and prison wardens, and justice auxiliaries, in particular those involved in providing assistance to disadvantaged groups such as conflict widows, orphans, and tsunami-affected citizens.

- Based on extensive civic consultation, support the establishment of a HRC and TRC.

- Provide support to encourage the education and registration of local Acehnese advocates (especially women).This could be done in the form of legal scholarships.

- Support legal aid organisations to enhance their capacity to serve disadvantaged clients and to expand their geographic scope.

- Provide support to improve inter-institutional case referral and recording systems.

- Support information management needs of justice institutions in the form of communications technology, legal documentation and the development of an integrated justice system.

- Support civil society initiatives geared towards monitoring and oversight to act as a force for accountability of formal and informal justice system duty-bearers.

- Support and develop the judicial system monitoring activities of local CSOs and media and publicise findings to enhance accountability.

## 8.3  To Civil Society

- Raise public awareness about available legal aid services.

- Extend outreach to the districts and subdistricts.

**Appendix 1**
**Justice Issues Identified by Village**

# Appendix 1 - Justice Issues Identified by Village

| TABLE 9: VILLAGE TA5 | | |
| --- | --- | --- |
| **Justice Issues** | **Community Actions and Perceptions** | **Justice System Used** |
| **Divorce, no support provided by ex-husband.** | Seen as a normal occurrence. Nothing that can or should be done to resolve the problem. The woman was afraid that her ex-husband would be arrested and, if he was arrested, then he would be unable to support her anyway. | No action taken. |
| **Domestic violence committed against women victim; result of economic hardship.** | Domestic violence is considered a private family matter. No outside party should interfere. | *Adat* and traditional leaders. |
| **Disappeared person during the conflict. Whereabouts and whether still alive or dead unknown.** | The villagers are very sympathetic to the victim (widow of the disappeared person). The majority of villagers face hardships a result of the conflict. People are still afraid of reporting such cases. | No action taken. |
| **Human rights violations (conflict period). TNI personnel conducting sweeping operations intimidating villagers.** | Villagers scared to report cases and generally remain traumatized. | No action taken. |
| **Theft of property; individual stole fish from another person's aquaculture pond.** | No data. | Formal; villagers brought suspect directly to the police. Police mediated resolution of dispute and compensation to the victim. |
| **Inheritance dispute (land ownership after the tsunami). Dispute emerged following tsunami. All witnesses for land ownership died during the tsunami. Plaintiff then made claim because no one could challenge his ownership claim. Plaintiff comes from a wealthy family and defendant comes from poor family and has no knowledge about the law and cannot afford legal representation.** | No data. | Informal and formal. *Keucik* and *adat* dispute resolution not finalized. Plaintiff not happy with decision. Plaintiff has brought the case to the General Court and is now using a lawyer to acquire the disputed property. |
| **Economic injustice post-MoU. Ex-GAM angry that reintegration assistance has not yet materialized.** | No data. | Informal. *Camat* sought information but no resolution to grievance. |

## TABLE 10: VILLAGE TA8

| Justice Issues | Community Actions and Perceptions | Justice System Used |
| --- | --- | --- |
| Grievances arising from unfilled promises of aid delivery made by an international NGO in this tsunami-devastated area. | Community anger and graffiti painted on walls to slander NGO. Villagers feel that, because it is a foreign NGO, there would not be much the *keucik* could do. | No action taken. |
| Gender-biased aid distribution. Children whose mothers died in the tsunami and are now living with their fathers have received very little attention from the government or NGOs. | The villagers are very sympathetic to these children and their fathers who have trouble to provide for them. In Acehnese culture, it is considered that only children who have lost their fathers are considered to be entitled to assistance. This is because it is assumed that fathers should still be able to provide for their families. | Informal. These cases have been reported to the *dusun* head. No resolution of grievances. |
| Corrupt aid distribution. Those who are closer to the village leadership receive greater levels of aid assistance. | The villagers are very angry but are afraid to say anything because of the respected position of the village leaders. Community members do not believe that the government will help resolve the problem. | No action taken. |
| Inheritance disputes following the tsunami. Many properties left without owners (high number of dead). Has led to high number of claims by surviving villagers. | No data. | Informal and formal. *Keucik* and other *adat* leaders, as well as *camat* helped to establish letters of ownership among survivors. Cases were then taken to the *Syariah* Court where they were legitimised. |
| Landless villagers. Property submerged under water. Landless villagers cannot receive government housing reconstruction assistance. | Community members frustrated that they are not receiving housing assistance. | Informal. *Keucik* seeking to resolve grievances by allocating land without cost to tsunami survivors that have no useable land. |
| Land ownership certificates lost. Villagers cannot prove ownership of property. | Community wants to re-establish land ownership boundaries. | Government conducting land ownership mapping exercises supported by NGOs. |
| Land boundary disputes (prior to the tsunami). Majority of villagers did not have land certificates. Led to many boundary disputes when a villager died. | No data. | Informal. *Keucik* but typically resolved only through mediation – not in traditional *adat* way (post-tsunami, other *adat* institutions were not functioning). |
| Property dispute. Claim-holder feels that he has been abused by other party that has involved the military in winning a favourable settlement. | Claim-holder believes this is unjust. | Formal – TNI. No resolution of grievance. |

## TABLE 11: VILLAGE TA2

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| **Human rights violation. Widow suffering from trauma as a result of intimidation by government apparatus during the conflict.** | The villagers are angry about the actions of the government apparatus. The issue remains too sensitive to be discussed publicly because the community still fears reprisals from the TNI and police. | No action taken. |
| **Government corruption. Widow with dependents not receiving full diyat payment (government officials claimed that administrative costs must be taken from the full amount).** | Most villagers do not know what the entitlement for blood money is, or the procedure to claim it. | Informal: *Keucik* and *camat*. No resolution of justice grievance. |
| **Discriminatory aid distribution by the government. Widow was meant to receive government assistance (house) but only the walls were built. Government claims they ran out of funds.** | Villagers are not very sympathetic because the claim-holder is not Acehnese. Claim-holder believes she is being discriminated against by the community and by government officials. | Informal: *camat* (reported six times). Issue still not resolved. Claim-holder has now given up seeking resolution of her grievance. |
| **Extortion.** | Community is afraid of the suspect because he is a "rough" person suspected of having criminal connections. | Informal: *Keucik*. Grievance not resolved. |
| **Corruption. Aid distributed by village apparatus unfairly.** | Grievances have led to conflict among community members at village level. Youth are opposed to village apparatus (comprised of mostly older generation). Younger generation feels that it has been excluded from any village level decision-making. | No action taken. |
| **Domestic violence and denial of marital property.** | Seen as a private family matter. Community also fears the ex-husband and his family. | Informal: *Keucik*. Issue remains unresolved. |
| **Theft from ex-wife.** | Villagers sympathetic to the claim-holder but feel that they cannot do anything to assist. | Informal: *Keucik*. Issue remains unresolved. |
| **Divorcees with dependents not receiving financial support from ex-husband.** | The villagers are sympathetic but cannot do much to support these women because they are themselves poor. The women are also embarrassed to talk about their situation to others. | No action taken. |

## TABLE 12: Village TA3

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| **Human rights violations. Kidnapping and violence against the keucik during the conflict (suspects are GAM fighters).** | Victim and community still fear ex-GAM. During the conflict no one would say anything about this incident because they were scared of reprisals. | Formal. Victim rescued following intervention of police and TNI. |
| **Forced relocation and land ownership claims. Javanese migrants from North Sumatra forced off land in neighbouring village by GAM members during the conflict period.** | Community generally supportive of claimholders rights. Security for migrants guaranteed by *Keucik*. | Formal and informal: *Keucik* and *camat*. Issue remains unresolved. |
| **Unequal aid distribution.** | People still waiting for aid, others passive. Villagers and refugees in barracks have started to distrust government and some NGOs. | Informal: *Keucik*. Issue remains unresolved. |
| **Unequal aid distribution. No assistance provided to farmers. Land destroyed by tsunami, cannot be used for agriculture. Community members do not have tools for clearing the land.** | Community members angry that aid has not been provided. They are waiting for external assistance. | Formal: *Camat*. Issue remains unresolved. *Camat* says it is out of his hands but does not appear to be doing anything more to refer the case. |
| **Widows not receiving government assistance.** | Widows depressed but scared to ask for their rights and do not know where to go to ask for assistance. | Informal: *Keucik*. Issue remains unresolved. |
| **Human rights violations. Violations included assault, intimidation and destruction of private property. Suspected perpetrators of violations included TNI personnel and GAM fighters.** | Community members remain scared. | No action taken. |
| **Violent assault. Villager using knives to attack another community member.** | No data. | Informal: *Keucik*. Unclear whether issue was resolved or not. |
| **Divorce. Wife seeking divorce because the husband left the wife (eight years ago). No financial assistance provided by the husband to ex-wife or children.** | Community members do not consider it a major justice grievance. | Formal: *Syariah* Court. In process. |

## TABLE 13: VILLAGE TA1

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| **Landless tsunami victims not receiving housing assistance.** | Villagers are often fighting about who is entitled to assistance and who is not. Selection criteria for assistance unclear. This is leading to internal conflict in the village. | Informal: *Keucik*. Issue remains unresolved. |
| **Destroyed property. House destroyed by fire due to negligence of another villager.** | Community generally passive about the matter. No one has done anything to assist the claim-holder. | Informal and formal: *Keucik* and police. Compensation agreement made but weak enforcement. Claim-holder has not been reimbursed the full amount agreed upon. No further action taken. |
| **Widows not receiving any tsunami assistance.** | Selection criteria for assistance unclear, leading to suspicion of corruption. The villagers ask why some receive and others do not. | Informal: *Keucik*. Issue remains unresolved. Explanation given is that assistance is provided in rotations. |
| **Domestic violence victims seeking divorce.** | Some are sympathetic while most others do not say anything because it is considered to be a domestic problem. Support from community is not provided because the community believes that to take the case to court is a shameful act. Claim-holder wants to get divorced through the formal courts. | Informal: *Keucik*. Advised reconciliation through traditional *adat* practices and assistance from the *imam mukim*. |
| **Corruption.** | Community members claim that villagers related to the *keucik* receive assistance ahead of others that are in greater need. Villagers happy with other assistance provided by INGO for local fishermen and wish other assistance was provided as fairly and transparently. | Informal: *Keucik*. Issue remains unresolved. |
| **Environmental damage and destruction of livelihoods (natural resource dispute). Traditional fishermen in conflict with modern fishermen from another sub-district. Eco-friendly versus ecologically damaging methods such as trawling for fish.** | Traditional fishermen complain that corals and local fish stocks are being destroyed. Now they must travel far out to sea in order to catch fish. | Informal and formal: *Adat*, *camat*, DPRD, police, prosecutors. Discussion has taken place to resolve the issue. Agree-ment taken to end trawling. No enforcement of agreement.In fact, trawling has increased. |

## TABLE 14: VILLAGE TA7

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| Orphans not receiving any assistance. | There does not seem to be much sympathy on the part of the villagers towards these orphans. | No action taken. |
| Harassment. Victim is a female tsunami survivor. Woman now suffering from mental trauma as result of harassment by a village youth. | Villagers do not say much to the male youth who harasses the woman. There is still a strong sense of patriarchal male dominated authority in the village and the youth are considered quite strong physically. | No action taken. *Keucik* is aware of the problem but has taken no action. |
| Destruction of communal property - aquaculture fishpond (during the conflict period). Suspected perpetrators -TNI and police personnel. | Community afraid to report case because did not want GAM to associate them with government offices. | No action taken. |
| Claims of human rights violations perpetrated by TNI against the wife and children of a GAM member (during the conflict period). | Community only stated that the TNI suspects should not have done do what they did. Villagers remain scared of reprisals. | No action taken. |
| Human rights violations - Physical abuse and harassment. Widespread against community. Suspected per-petrators - GAM and GoI security forces. | Villagers very scared during the conflict, remain scared. | No action taken. |
| Homeless villagers - houses destroyed by the tsunami. No assistance provided for reconstruction. | No data. | Informal: *Keucik* approached NGOs and donors. 264 houses rebuilt. |
| Land boundary disputes. Common problem - no proof of land ownership (certificates). | No data. | Formal. BPN and UN Habitat providing assistance with spatial mapping to determine land ownership. |
| Unequal aid distribution/ economic injustice. Following tsunami, all aqua-culture destroyed by sea water. Community does not have equipment to repair damage. | Community members angry that aid has not been provided. Livelihoods depend on it. They have become passive and waiting for external assistance. | Formal: *Keucik* has requested help from NGOs and government but no response yet. |

## TABLE 15: VILLAGE TA6

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| **Widow not receiving any assistance.** | Villagers are sympathetic but are also poor and cannot offer any assistance. The community has alleged that government officials have stolen almost 14 billion rupiah (i.e., through corruption of *diyat*). | Informal and formal: *Keucik* and *Camat*. Widow still has not received proper assistance. |
| **Unequal aid distribution /economic injustice** | Social envy between villagers still living in IDP camps that receive assistance against those who have returned to their villages and no longer receive assistance. This problem has been prolonged and creates sense of distrust among villagers toward the *Keucik* who is considered as pro returnees (i.e., discriminates). | Informal: reported to secretary of village, but not to *Keucik* since *Keucik* has different point of view on this matter. |
| **Land ownership dispute. Parties claiming different ownership rights (traditional versus formal certificate from government).** | No data | Formal: General Court. Wealthier party sought to resolve case through courts and won recognition of ownership with land certificate. |
| **Unequal aid distribution. Village governance not functioning well (office of keucik). NGO distributing boats directly to villagers without coordination to identify needy groups.** | Community members upset that needy people not receiving assistance. Also upset that not enough aid provided to the community (only six boats distributed) | Informal: *Adat*. No resolution of grievances. |
| **No health facilities. Community members need to travel long distances to access health facilities (to sub-district capital). Expensive to access.** | Community members believe that this is a form of economic injustice. | No action taken. |
| **Economic injustice. Government promised financial assistance to IDPs affected by the conflict. Aid provided for only four months (promised for eight months). Some did not receive any assistance at all.** | Community members angry that they have not yet received assistance. | Informal: *Keucik*. No resolution of grievances. |

## TABLE 16: VILLAGE TA4

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| **Divorce. Women divorcees without marriage certificates unable to access rights in formal justice system.** | The villagers see this situation as normal and feel sorry for a woman if her husband abandons her. However, still considered a private family matter. | Informal: *Keucik*. No resolution of grievances. |
| **Domestic violence.** | Many people condemn the domestic violence, but some community members blame women for domestic violence occurring (i.e., they are not being "good wives" to their husbands or are "disobedient"). Such issues are considered private family matters. | Informal: *Keucik* and *Adat* operators, reconcile couple. |
| **Theft of property. Suspect - husband of the wife.** | Some villagers are sympathetic to the wife. But there are many others who believe the husband had the right to take the gold. People afraid to take action because the woman's ex-husband is a respected village figure. | Informal: *Keucik*. No resolution of grievances. |
| **Limited education opportunities for women.** | There is still an assumption that women do not have to receive secondary education. There is very little women's participation in village decision-making processes | No action taken |
| **Intimidation and threats of violence. Ex-GAM members attempted to force migrant workers out of the village.** | Villagers angry at Javanese migrant workers brought in to build houses following the tsunami. Community believes that villagers should be employed to build the homes. On the other hand, some community members are just happy that houses are being rebuilt. | Formal: police and AMM. Temporary resolution achieved. |
| **Unfair land acquisition by the Government.** | Villagers complain that government has purchased land for construction of homes from local residents at a rate below market value. | No action taken. |
| **Corruption.** | Villagers accuse *Keucik* and *Camat* of corruption. This has undermined livelihood activities and led to tensions within the village. | No action taken. |

| TABLE 16: VILLAGE TA4 (cont'd) | | |
|---|---|---|
| **Justice Issues** | **Community Actions and Perceptions** | **Justice System Used** |
| **Human rights violations. Villagers beaten, harassed and intimidated by TNI personnel and police personnel.** | Victims remain scared of the TNI and police. Do not trust the state apparatus. | No action taken. |
| **Human rights violations (during the conflict period). Disappeared persons. Villagers suspected of being GAM taken by unknown people. Suspected that perpetrators were police or TNI.** | Victims remain scared of the TNI and police. Do not trust the state apparatus. | No action taken. |
| **Economic injustice** | Ex-GAM angry that reintegration assistance has not yet materialized. Members did not have information about upcoming programs to be launched by donors and by the government. | Formal: *Camat* sought information from government agencies about status of assistance but no resolution to grievance. |
| **Land boundary disputes.** | Considered minor issue easily resolved at village level using traditional methods. | Informal: *Adat* leaders. Case resolved. |

## TABLE 17: VILLAGE CA5

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| **No compensation for victims of conflict (e.g., those with houses destroyed or family members killed by GAM or TNI).** | Citizens do not have a place through which to forward their complaints. Lack of knowledge and traumatic past experiences prevent people from asking authorities for assistance. Neither could the *Keucik* explain in a trans-parent manner where social assistance to the village is going. | No action taken. |
| **Unequal aid distribution. Conflict widows did not receive diyat money at the same rates as in other places.** | The *dusun* head considers this unjust in comparison to what people in other areas are receiving but has not taken any action. Villagers are afraid to complain to government officials and do not know how to access formal justice mechanisms. | No action taken. |
| **Domestic violence leading to psychosocial harm and divorce. No alimony was given and property jointly owned by the couple was not split fairly.** | Villagers feel sympathy for the woman but no assistance was provided. One family member wanted to report to the police but was afraid of other villagers and did not have the money to go through with it. Villagers still consider domestic violence as private matters and exposing such cases is a social taboo. | Informal: *Imam Mukim* and *Keucik*. No resolution. |
| **Domestic violence.** | Condemnation and sympathy from villagers but no action. The victim's parents also did not do anything because the problem is considered to be one between the couple. | Informal: *Imam Mukim* and *Keucik*. Couple advised to reconcile. |
| **Land boundary disputes.** | Common problem that villagers believe is easily solved by traditional leaders. | *Adat*. |
| **Inheritance rights of child denied. The father (GAM member shot by TNI) of the child left a plot of land to his wife and child but this plot was taken by the father's brother, who then sold the land without giving any compensation to the wife and child.** | The case was not reported to the *Keucik* because the land had already been sold and the *Keucik* was allegedly given commission for the sale. | No action taken. |
| **Human rights violation. Allegations of gender-biased violence committed by TNI (during the conflict period).** | No opinions were expressed on this matter by the villagers because everyone is still afraid. | Informal: *Dusun* head. No resolution. |
| **Economic injustice. No educational opportunities and high levels of poverty.** | People joined GAM as a form of protest during the conflict period. | No action taken. |

## TABLE 17: VILLAGE CA5 (cont'd)

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| Environmental destruction caused by manufacturing plant. Allegations made that the TNI were being paid protection money to ensure the plant could operate. | The villagers strongly condemned the factory's actions. Villagers never received any compensation for the damage caused to their fields or the economic loses they experienced. Community did not know where to report their grievances. Villagers were afraid to complain. Claimed that a villager from a neighbouring village had complained and then later disappeared (during the conflict). | No action taken. |
| Disputed land ownership case dating back to 1978. The Keucik and village government apparatus sold land belonging to 12 villagers without con-sulting the owners. The rightful owners of the land have not returned to the village. | Citizens condemned this action but did not know what action to take to address the problem. Perpetrator of the offence was the *Keucik*. Because of villagers' lack of legal knowledge, they feel that they can only accept injustices. | No action taken |
| Human rights violations committed against an elderly couple (parents of a GAM commander). The mother suffers from memory loss and has a speech impediment resulting from the physical abuse she suffered. Until now, there has been no government assistance to support the victim for her medical costs or for lost and destroyed property. | All the citizens of this village suffered as a result of the conflict, with the general feeling that everybody had to look after themselves first. | No action taken |
| Human rights violations. Disap-peared persons. Several reports of people kidnapped by GoI se-curity personnel. The where-abouts of those people is still un-known, but the community believes them to be dead. | The community is scared and feels power-less to seek justice. | No action taken. |
| Human rights violations (com-mitted after MoU). Community accuses TNI personnel of raping a woman in the village. | Villagers remain very afraid of pressing the issue. Fear reprisals from TNI and from ex-militia now living in the village. | Formal and informal: AMM nego-tiated resolution with help from *Keucik* and *adat* leaders; achieved through traditional methods. |
| Economic grievance | Ex-GAM angry that reintegration assistance has not yet materialized. Members did not have information about upcoming programs to be launched by donors and by the government. | Not clear. |
| Land boundary disputes. | Considered minor issue easily resolved at village level using traditional methods. | Informal: *Adat*. Case resolved. |

## TABLE 18: VILLAGE CA6

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| **Human rights violation. Disappeared persons.** | The villagers and village leaders condemned these acts but they could not do anything because there was nothing that one could do to help others. Community afraid to report their grievances to the formal justice system. | Informal: *Keucik*. No resolution. |
| **Human rights violations. Summary public executions (during the conflict period). Accusation that TNI personnel summarily executed suspected GAM fighters in full view of villagers. Aim was to scare villagers and deter them from joining GAM.** | Community members remain angry over these past violations but are scared to take any action. Believe that no investigations will be conducted to reveal the truth or prosecute perpetrators of human rights violations. | No action taken. |
| **Economic injustice. Widows of the conflict not receiving any assistance.** | The *Keucik* did not know anything about this issue. Nobody has raised the issue elsewhere because they are afraid of the state apparatus. | No action taken. |
| **Domestic violence.** | The villagers condemned the violence but villagers cannot do anything because such problems are considered private family problems. The victim herself believes that it is a private family matter. The victim is afraid that, if her husband finds that she has reported it, he will leave her or treat her worse than he already does. | No action taken. |
| **Land boundary disputes.** | Common problem easily solved by traditional leaders. | Informal: *Keucik*. Case resolved. |
| **Inheritance rights of a child challenged by extended family member. The case of a GAM orphan whose father was shot and killed and whose land ownership rights of widow and children were disputed by an uncle. The uncle could not sell the land because the certificate remains with the mother.** | Widow is still concerned because she fears that he may coerce her into giving him the certificate. | Informal: *Keucik*. If intimidation continues, woman will report to the police. |
| **Human rights violations. House burnt down by militia assisted by Brimob during the conflict. Wife of suspected GAM member physically abused.** | The villagers condemned very strongly the actions of the Brimob and militia. | Formal: *Camat*. No resolution of grievance and no compensation provided by the government. |
| **Economic grievance** | Ex-GAM angry that reintegration assistance has not yet materialized. Members did not have information about upcoming programs to be launched by donors and by the government | Informal: *Keucik* has sought information but no resolution to grievance. |
| **Human rights violations. Villagers reported that during the conflict GAM from a neighbouring village conducted raids and extortion against residents of this village.** | Villagers afraid to discuss the issue publicly. Community members stated that during the conflict GAM members sometimes raided other GAM villages, but would never do so with their own village. | No action taken. |

## TABLE 19: VILLAGE CA2

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| **Unequal distribution of marital assets after divorce.** | The villagers gave no opinion on this issue because they felt that it was a private family matter. | Informal: *Keucik*, no resolution of grievance. Wife cannot afford to access the formal system. |
| **No government assistance for widows of conflict.** | The villagers did not want to give an opinion on this issue because village assistance is distributed through the *keucik* and other village leadership. Villagers cannot ask directly to related government personnel e.g. *Dinas Sosial*. Villagers want to approach government officials but lack knowledge about procedures to do so, they also experience financial difficulties and distance is too far to travel. | Informal: *Keucik* said that he would follow-up with the *camat* but still no resolution. |
| **Acehnese returnees denied land and housing rights.** | The Gayo villagers told the research team that they were sympathetic to the situation of these Acehnese who were displaced from Gayo land but that they could not provide any assistance. Village leaders also said that it is a 'sensitive matter' as those now living in Acehnese households are Gayonese. Acehnese IDPs have not reported their cases to the police or courts because they are afraid of local militia. | Informal: *Adat* and *keucik*. No resolution of justice issue. |
| **Human rights violations. Heavy fighting during the conflict, villagers intimated and suffered physical abuses from all parties (intimidation, killing of persons).** | Community members remain scared to discuss these matters openly. | No action taken. |
| **Destruction of property (homes and assets during the conflict). Suspected perpetrators - GAM, TNI personnel and local militia members.** | Community members remain scared to discuss these matters openly. | No action taken. |
| **Human rights violation. Intimidation/threats to keucik.** | *Keucik* and villagers remain traumatized. | No action taken. |
| **Unequal aid distribution. No reconstruction assistance. Villagers have not received assistance to clear the village and rebuild their homes.** | Community members believe they are entitled to assis-tance and are waiting for external aid. | Formal: *Keucik* put forth proposal to *camat* but no action taken to resolve grievances. |
| **Economic grievance. Poor infrastruc-ture and remote location.** | Community feels disadvantaged and unable to access government services. Isolation makes it difficult for community members to engage in productive livelihood activities | Formal: *Camat* given proposals but grievances not resolved. |

## TABLE 20: VILLAGE CA3

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| **Human rights violation. Acehnese widow claims husband was killed by TNI.** | The villagers think that the victim must have been GAM and therefore the widow does not deserve assistance. | Informal and formal : *Keucik* and police. Issue not yet resolved. |
| **Harassment. Stigmatization of a child whose father was killed because he was suspected of being a GAM member.** | The villagers did not say anything about this because the issue of GAM remains very sensitive in this village. | Informal: *Keucik*. No resolution of grievances. Harassment continues. |
| **Land ownership cases. Many Acehnese have not been able to return to their lands, which they left in 2000. There were a couple of people who tried to return but still faced harassment by militia. Some IDPs have reported land ownership claims to the *camat* but a repre-sentative from the IDPs was later beaten so it is not yet safe for them to return.** | Gayonese and Javanese villagers gave no reaction to this. Acehnese remain scared and feel intimidated by local groups. | Formal: *Camat* and AMM. Issue not yet resolved. |
| **Domestic violence leading to psychological and physical trauma.** | Only women are sympathetic to this case. Men largely think that the woman was beaten because she did not serve her husband adequately. | Informal: *Keucik*. Reconciliation achieved. Then violence started again and woman advised to go to formal courts by relatives living in the village. Unclear what happened. |
| **Domestic violence, woman seeking divorce.** | The villagers consider this case to be a private issue. | Informal: *Keucik*. No resolution of grievance. |
| **Child abuse. A young girl now experiences severe headaches because of continued beatings. Younger sister suffered a burn to the chest when her father threw a paraffin lamp on her.** | People are sympathetic but do not do anything because they feel these are private family issues. | Informal: *Keucik*. No resolution of grievances. *Keucik* reluctant to take the case to the police because he fears the father. |
| **Economic grievance. No assistance for widows of conflict, whose husbands were killed by RI forces.** | There continues to be paranoia within the community regarding 'outsiders' and their intentions. Women could not speak openly with the research team because the *keucik's* wife attended every interview. | Informal: *Keucik*. No resolution of grievances. |
| **Corruption. Suspicion of corrupt aid distribution by the government. Widows are not receiving government fuel subsidies.** | There was no response from the villagers because they say that these decisions are taken by the *Keucik*. Women do not report these cases to any authorities because they are afraid of the state apparatus. | No action taken. |

## TABLE 21: VILLAGE CA4

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| **Unequal aid distribution.** **No housing for victims of conflict and discriminatory aid distribution by the government. Villages that were not directly affected by the conflict have received assistance.** | Community members feel that they do not receive aid because the state administration discriminates against them. | Informal: *Keucik*. No resolution of grievances. |
| **Human rights violation committed against women. One woman's child now limps as a result of beatings and suffers from heart problems.** | The villagers condemned the actions and would try to protect the women but there was little they could do vis-à-vis the TNI. Villagers remain scared of reprisals. | Informal: *Keucik*. No resolution of grievances. |
| **Domestic violence. Man traumatized by conflict is abusing his wife.** | The villagers are sympathetic to the wife and agree that she should divorce him immediately. | Formal: Wife has filed for divorce at the *Syariah* Court. |
| **No aid for widows of conflict.** | The villagers are sympathetic but can do very little to support them. | Informal: *Keucik*. No resolution of grievances. Claim-holders do not have re-sources to access other justice mechanisms. |
| **Human rights violation.** **Man shot by TNI, house and crops destroyed. Beaten by TNI, now he is paralysed on the right hand side of his body.** | The villagers strongly condemned the forces' actions. Villagers say that the TNI did not even try to prove that someone was a member of GAM before committing such offences. However, at that time, there was not a person who could try to defend the victim because everyone was afraid for his/her own life. | Informal: *Keucik*; resolution of case leading to compensation and government financial assistance for the victim in the form of a monthly pension. |

| TABLE 22: VILLAGE CA9 | | |
|---|---|---|
| Justice Issues | Community Actions and Perceptions | Justice System Used |
| Divorce. | Most villagers supported the wife's decision to leave her husband. | Formal, *Mahkamah Syariah*, difficult process because the husband does not want to divorce his wife, case not yet resolved |
| Human rights violation. Disappeared person. Woman's husband was a policeman and his body has still not been found till today. | Many villagers are sympathetic to this woman, while others are not because her husband had been a policeman. | Formal: Police; no resolution of grievance. |
| Women divorcees with dependents not receiving any financial support from ex-husbands (no official divorce). | These women would like to officially divorce their husbands but all say that they do not have enough money to file for divorce at the courts and do not understand how the courts work. Villagers consider divorce to be a private domestic matter. | Informal and Formal : *Keucik*; no resolution of grievances. KUA; no resolution of grievances |
| Land ownership dispute. Parents sold land belonging to their adult daughter. | The villagers are sympathetic to the claim-holder's situation, especially as she now has nothing since her parents sold the land. She now has to live in the house of the person who bought her land. | Informal; *Keucik*, no resolution of grievance.Claim-holder now wants to go to the formal justice system. |

## TABLE 23: VILLAGE CA1

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| **Discrimination. Government officials discriminating against ex-GAM combatants and their family members.** | Villagers cannot do anything to intervene because they think that this is the government's prerogative. | Formal: *Camat*; no resolution of grievance. |
| **Corruption with distribution of government assistance. Ex-GAM members allege that all the assistance they receive is short of what they are entitled to because government officials take percentages before it gets to them.** | The villagers do not ask anyone about these issues because they perceive them not to be their business. Ex-GAM members reported the issue to the *camat* but they were received in a "rough and unprofessional manner". Ex-GAM combatants are angry about corruption that they believe keeps them poor. | Formal: *Camat*; no resolution of grievance. |
| **Human rights violation. GAM wives who were victims of violence and stigmatization from government personnel and TNI during the conflict. Damaged and seized properties of GAM families during the conflict by military personnel.** | During the conflict, villagers were not sympathetic towards GAM. Villagers were also afraid of the TNI and that the TNI would affiliate them to GAM if they showed any sympathy towards GAM. | No action taken. |
| **Economic grievance.** | Ex-GAM angry that reintegration assistance has not yet materialized. Members did not have information about upcoming programs to be launched by donors and by the government. | No action taken. |

## TABLE 24: VILLAGE CA8

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| Human rights violation. Women now suffering from trauma. Husbands were killed by TNI during the conflict. Women were also threatened and intimidated by TNI personnel. | It was reported that virtually everybody in this village is experiencing trauma. | Informal: *Keucik*. No resolution of grievances. |
| Illegal marriage. Woman married to one man married another man who himself was already married to another woman. | The villagers strongly condemn this woman's actions and consider it a violation of human rights. | Informal and Formal: *Keucik* and *adat*; no resolution of grievance. Police; no resolution of grievance. |
| No government land assistance for female GAM member *(inong balee)* that has not yet received her land package (as per MoU). | No data. | Informal: *Keucik*. No resolution of grievances. |
| Illegal divorce. Victim of domestic violence seeking divorce. | No data. | Informal: *Keucik*; divorce papers for woman written by *keucik* because the woman could not afford to go to the courts. |
| Abandoned wife. Disabled woman physically abused by her husband and then abandoned with no financial support. | Villagers are sympathetic but have not done anything. Considered a private family problem. | No action taken. |
| Landless IDPs. Two families that have land and houses have been unable to return to their homes because of insecurity and the continued presence of militia. They believe their land is being used other people. | No data. | No action taken. |

## TABLE 25: VILLAGE CA7

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| Child abuse. Perpetrator - mother with mental illness. | Villagers condemn the mother's maltreatment of her child but do not think that they can do anything. Village leaders have not intervened. | No action taken. |
| Widows and elderly not receiving any government assistance. | No data. | No action taken. |
| Unfair decision-making and distribution of assistance. | Villagers feel that the family members of the *Keucik* receive preferential treatment regarding aid distribution and rights to use communal properties. Villagers will only discuss such cases among themselves and not take their cases elsewhere. They often feel that they cannot go to the police or *camat* either because the police and *camat* are friends with the *keucik*. | No action taken. |
| Human rights violation. Community members experienced violence and intimidation from TNI personnel and GAM. | Community traumatized and scared to report grievances. | No action taken. |
| Forcible acquisition of private property (during the conflict). TNI and police forcibly took motorcycles and vehicles of community members in order to conduct operations against GAM. Would later return assets in damaged condition without compensation or repair. If community members refused they were afraid that they would be killed. | Community members remain scared of discus-sing such issues for fear of reprisals. Moreover, they do not believe that the state will take serious action to investigate past human rights violations. | No action taken. |
| Destruction of private property (during the conflict). Houses burnt, perpetrators unknown. Community members have not yet received reconstruction assistance. Community members have forwarded reconstruction proposals to BRR. | No data. | Formal: *Camat*; no resolution of grievance. |
| Economic grievance. Livelihoods un-dermined during conflict by limited association. | During the conflict community members were afraid to go to the local farmers association. Post-MoU community feels safer with greater freedom of movement. | No action taken. |
| Economic grievance. No formal state education facilities available. Only informal/ traditional education facilities available in the village (e.g., *pesantren*). No government assistance to access formal education. Conflict in the area prevented government from improving education facilities. | Community members believe that lack of education facilities undermines their ability to build good lives for themselves and denies them equal opportunities with people that have access to education. | Formal: *Camat*; no resolution of grievance. |
| Land boundary disputes. | Common in the village and community members believe these problems are easily solved through traditional methods. | Informal: *Keucik*. Case resolved. |
| Minor fighting among community members. | Common in the village and community members believe these problems are easily solved through traditional methods. | Informal: *Keucik*. Case resolved. |

## TABLE 26: VILLAGE C1

| Justice Issues | Community Actions and Perceptions | Justice System Used |
|---|---|---|
| **Landless returnees. These people do not have land and live in very poor conditions.** | Villagers are sympathetic but cannot do anything to assist as they themselves are poor. Some villagers related to returnees along kinship lines provided them with assistance. | Informal: *Keucik*. No resolution of grievances. |
| **Economic grievance. Poor infrastructure undermining community livelihoods. The village leadership has tried to claim assistance from the *Camat* who says that the issue needs to be decided from the district government. The keucik has taken the issue to the district government but there has been no reply yet.** | Community members believe that lack of education facilities and infrastructure undermines their ability to build good lives for themselves and denies them equal opportunities with people that have access to education. Lack of road infrastructure also undermines their ability to make productive livelihoods by selling crops at markets (i.e., markets not easily accessible). | Informal and formal: *Keucik*, who later requested help of *camat*. No resolution of grievances. |
| **Poor access to education. Many children only complete elementary school. The villagers are trying to rally the local government to build education facilities in the village.** | Community members believe that lack of education facilities undermines their ability to build good lives for themselves and denies them equal opportunities people that have access to education. | Formal: *Camat*; no resolution of grievance. |
| **Corruption (during conflict period). Village leadership gave Brimob personnel stationed in the village a television.** | Village leaders claim it was necessary that in order to make sure security personnel did not harass the community or make false accusations that villagers were part of GAM. | No action taken. |
| **Accidental shooting with air rifle (during conflict period).** | Community members believed it was an accident and should be resolved at village level. | Informal: *Keucik*. Case resolved. |



**Appendix 2**
**Profiles of Village Research Sites**

# Appendix 2 - Profiles of Village Research Sites

## Profile, Village TA4

The village measures 335 ha in area. Most of the village land is used for productive ends; 40% for fisheries, 30% for estate plantation farming and 1% for rice farming.[209] Local mainstay livelihoods vary greatly, including fishing, salt farming, trading, hawking (before the tsunami, hawking on the beach was possible), raising livestock (goats, chickens, cows; most families own livestock), clothes washing (there are about 5 washers). Some fishponds are owned by villagers, only 2% are owned by people from outside the village.[210] In the meantime, there are not that many rice farmers due to the limited area for rice fields.[211] The village has a population of 964, which consists of 247 households. Most are of Acehnese ethnicity. As informed by the *keucik*, the village has 12 widowers, 52 widows, 84 orphans[212] and 262 school-aged children enlisted in elementary to senior high school. During the tsunami 47 people died. Most were women and children; only two adult men died during the disaster.

Socially, the village's community is internally coherent. The assessment did not find social frictions or inequalities strong enough to create horizontal conflicts among village residents. Former combatants are presently integrating with the community which is mostly Acehnese and the influence of ex-GAM remains strong; they have considerable influence in both formal and informal village forums.[213] However, the assessment found tens of construction workers – Javanese transmigrants involved in housing projects. They were brought in from outside the village by the project's contractor. Their presence caused a problem as local villagers became jealous. Local villagers were of the opinion that they too should be involved in construction activities; this led to a political/ethnic/economic influenced horizontal conflict between villagers and the transmigrant workers with ex-GAM intervening to intimidate the migrant works. Villagers also suspected that the *Keucik* colluded with the contractor to benefit from the construction work at the expense of local residents. AMM later intervened together with Indonesian police and military personnel to mediate the dispute. Village TA4 comprises 4 sub-villages (*dusun*). There is only one formal school in the village, i.e. *Al-Kindi* Kindergarten. Other schools found here are Islamic boarding schools, *pesantren* or Koran study centres (i.e. *Babul Khairat*, *Darul Fatah*, *Nurul Yaqin* and *Daiyul Fata*).

During the conflict, the village was affected by rampant abuse of human rights perpetrated by TNI. The community was prevented from conducting any form of advocacy against the violence. Most of the village was destroyed by the tsunami. However, the *keudee*, the village's economic centre situated at a three-way junction, was immediately repaired. When the A2J team arrived, rows of wooden shop houses were seen back in operation. Local shops and eateries have revived as well.

---

209 Of 335 ha, 100 ha are estates; 3.5 ha are rice fields; 133.5 ha are fishery ponds; 4 ha are marshland; 21 ha are settlements; and 73 ha are used for other purposes.

210 Ponds were built in the 1970s.

211 Rice farmers source their income partly from rice fields outside the village. They apply a pawning system, locally known as *gala*. The only records thereof are receipts made as witnessed by the *keucik* of where the rice fields are located.

212 Data on the number of widows are strikingly different from that of the sub-district administration and the provincial Social Affairs Office (Dinsos). The former claims there are 3 while the latter 18.

213 In an interview at a coffee shop with four formal leaders, one who was facing the door said out of the blue, "As long as there is GAM everything goes unhindered. Everything gets done." But not long after, the same person said, "Those joining GAM are fools. Many of them have only graduated from elementary school; or not even that. They are poor, and jobless." The first statement he said when a GAM member entered the establishment, the second came after they had more privacy.

Another issue which occurred in the wake of the tsunami is related to distribution of assistance. There are many cases of dissatisfaction related to the humanitarian aid that is seen as insufficient to help speed the village's economic growth. The *adat* (traditional) structure is functioning as is the village's administrative apparatus in terms of facilitating resolution of village disputes. Some cases were discussed in several interviews with village administrators. The community has very little trust in law enforcers, especially in light of what they endured during the conflict.

## Profile, Village TA5

The village is 367 ha in area. Most of the area (267 ha or 73% of the total area) is used for pond farming with the remaining used for crop farming (25 ha, 7%), settlements (32 ha, 9%) and "other" purposes (43 ha, 12%).

Various acts of violence were experienced by the people here during the past conflict. In this particular village a military post had been established at one of the fish auction halls. It was here that the people reported their activities, whether they were going to sea (to catch fish) or to the fisheries. The village was seriously affected by the tsunami. Fifty people died in the disaster, and the entire population was displaced.

When the assessment was conducted, most of the residents had returned, residing in makeshift homes constructed with support from an NGO. These houses serve as replacements of temporary living centres (barracks). Plans are in place for an International NGO to support construction of permanent homes in the village. The village's population is comprised of 889 people, or 216 households. Of the 216 households, 36 are headed by women. Some of these women were widowed because of the conflict. Before the tsunami the village was struggling economically. For example, of the 205 homes 165 were shacks.[214] Mainstay livelihoods are made up of: fishing, rice farming, fisheries, salt farming. In addition, before the tsunami there were traders, employees, home industries, and providers of transportation service. Local economic activities were destroyed by the tsunami. For example, fishery ponds were destroyed and could not be restored and fishing boats were lost/damaged.

At present, livelihoods activities that appear to be recovering are salt farming and "individual traders". Assistance is also being provided by an NGO to rebuild the fishery ponds. Some of the women here are salt farmers. Their husbands also take on jobs such as trading or *muge*. Some of the public facilities available in this village are: a football field, elementary school, public cemetery, fish auction hall, *meunasah* (prayer house, but not used for Friday prayer), a testing hall, "MCK" (bathing, washing and toilet facilities), and artesian wells.

Houses will be built by the NGO on the condition that is it on land owned by the aid recipient. However, there are 50 family heads (FH) who do not own any land and therefore cannot receive housing assistance. In the past, these families had built houses on land owned by another person and lived there for tens of years.  There are 32 female family heads.

---

[214]  Details: 22 permanent houses, 18 semi permanent houses and 165 non permanent houses [shacks].

Out of these 32 women 13 are divorced while 19 are widows whose husbands died a natural death. Meanwhile there are 27 children who have lost their fathers.

Divorced women do not receive any kind of alimony from their ex-husbands. They have to bear the burden of supporting their family themselves and looking after the interests of their children (school, etc.). They do not demand support from their former husbands. They also do not report their conditions to the *keucik* or to the police. Women revealed that they were not given the opportunity to become leaders because in the village it is a common understanding that leadership positions are held by men. They relate it with religion. Also, according to them, problems are settled faster when handled by men. Women in general do not have permanent productive livelihoods (i.e., income generating employment). The only work available is catching fish in the river or at sea when the tide is not high. They sell the fish that they catch but the income is meagre and only enough to buy food for one day. Another problem for them is the availability of health services. There is a *puskesmas* (community health centre) but it is not operating due to lack of medical equipment. For this reason, the villagers must go to the sub-district capital when they need medical treatment. Women also have difficulty in providing for the schooling needs of their children; the elementary school in the village does not have enough teachers. The cost of sending children to SMP (junior high school) and SMU (senior high school) is quite expensive for them, particularly in terms of transportation cost. The nearest SMP and SMU are located in the sub-district. The "*jadup*" or contribution for living costs should be of some help to them, but is not received regularly.

## Profile, Village CA5

The area of the village measures 315 hectares. Some 150 hectares are used for rice fields. The economy evolves around the agricultural sector: namely rice farming, coconut, areca nut, and cacao plantations. The rice fields in this village are dry and dependent on rain water for their irrigation. The people also plant other crops during the dry season, such as soya beans, peanuts, maize and cassava.

Some of the public facilities available in this village are schools, [215] a mosque, two *meunasah* and one health centre *(puskesmas)*. The *puskesmas* has not functioned since the military state of emergency was declared in 2003. For health services the people must to the sub-district capital but this is difficult because of transportation problems.

In 2003 the population was recorded at 793 people consisting of 383 males and 410 females, or 185 house holds. According to statistical data from the subdistrict-administration office, the village is categorized as a poor village. 63% of houses in the village are made from wooden planks /bamboo.[216] There are 138 family heads who receive fuel compensation subsidies.

A factory is located approximately 1-2 kilometers from the village. According to the local residents the factory is a source of many problems because of ecological damage caused to plants and agricultural fields. This village does not have a village office. Administration is handled at the home of the *keucik* or at the home of the village secretary. The village has six sub-villages *(dusun)*. The election of a *keucik* begins with each sub-village proposing candidates, from which three candidates will

[215]   A private Islamic elementary school, a state elementary school, state junior high school, and a private Islamic high school.

[216]   There are 6 houses with brick walls, 61 houses with half brick half wooden walls and 113 houses with walls from wood or bamboo.

be selected, and then one will be elected as the *keucik*. The election will be witnessed by the *camat*.[217] The *tuha peut* and *tuha lapan* function as legislative bodies and provides advice in the area of law and religion, while the *tuha lapan* handles the economic sector and development sector. However the *keucik* no longer handles traditional (*adat*) problems, since the *keucik* seldom stays in the village.[218]

During the conflict this village was considered to be a "grey area". Armed fighting often broke out between the TNI/ POLRI and GAM. In this village several TNI (Military) posts were set up. Villagers report many cases of violence, such as killing, torture, ill treatment, and intimidation.[219]

## Profile, Village CA6

The road to this village is an asphalted road, making it easy to reach and for villagers to travel to the sub-district and district.[220] Almost half of the area of the village is used to plant rice. The total area of the village is 106 hectares, while the land used for rice planting is 50 hectares. The majority of the people here earn a living as rice farmers. Other livelihood activities include plantation farming (coconut, coffee, areca nut and cacao), livestock breeding and small-scale/ home industries. This village is a poor village,

according to statistics in the sub-district office 76% of the homes in this village are made from wooden planks/ bamboo. According to the village statistics, 54% of the families are destitute while the remainder are poor (i.e., do not generate any income or live below the poverty line).

The population in 2001 was recorded as 628 persons; in 2002 it was 794 (or 197 FH) and in 2003 it was 704 (or 172 FH, consisting of 333 males and 371 females). The decrease between 2002 and 203 is attributed to people either moving out of the village or death.

According to the statistical data at the sub-district office, this village is another "grey area".[221] Several cases of human rights violations were suffered by the residents. This included burning of homes and cruel treatment of the residents by *Wanra* from other villages with support from the Military and the police (TNI/ POLRI),[222] and several cases of murder and missing persons.[223] Violations were also perpetrated by members of *Berantas*, a *Wanra* group formed by the TNI.[224] There were, in addition, cases of extortion by either the TNI/ POLRI or by GAM. When the conflict escalated in 2003 there were only five pupils and one teacher

---

217  The current *keucik* has been the *keucik* since 15 June 1999 and his term of service will end on 15 June 2007. During the Military State of Emergency (DM), he was accused of being an informant.

218  Up to now the *keucik* rarely stays in the village. Probably for security reasons, in connection with the involvement of the *keucik* in *Berantas* during the conflict and suspected corruption of PPG funds in 2004.

219  A2J Team interviewed several widows whose husbands were killed because they were suspected of being GAM members or the parent of GAM members. A case of rape happened in 2005 after the MoU, the rapist wore a mask; his identity is unknown.

220  Many of them have a motor vehicle, namely a motorcycle. There were 70 motorcycles in this village.

221  During the conflict, areas were classified according to the level of escalation in conflict between TNI/POLRI and GAM, namely white areas, grey areas and black areas. White areas refer to low escalation of conflict, grey areas are medium escalation of conflict and black areas refer to high escalation of conflict in the area.

222  There were 4 cases of house-burning and other cases of violence.

223  There were 3 cases of murder and 3 cases of missing persons.

224  *Benteng Rakyat Anti Separatis*, a *Wanra* group, established for an intelligence operation by the Intelligence Task Force in the territorial unit of Kodim 0103/ AcUt. This organisation was declared for the first time in Pidie on 1 October 2003 and in Lhokseumawe on 12 November 2003. It is estimated that the masses reached a total of around 20,000 people. Some cases of violence involved members of *Berantas* from the neighboring villages as the perpetrators.

(school principal) that still attended the state elementary school.[225]

The village consists of 5 sub-villages. The existing village apparatus are the *keucik* (village head), village secretary, *tuha peut/ tuha lapan*.[226] There is no village administration office in this village. In settling disputes, the village residents rely on the village apparatus and traditional (*adat*) leaders. Before the military state of emergency, GAM members were quite dominant and involved in settling problems within the village.

## District, Aceh Tengah

### Profile, Village CA2

Up until the end of January 2006 the village was empty. It had been abandoned by residents that sought refuge elsewhere from the conflict. All the houses were burned down or otherwise damaged by elephants and the only remaining buildings were *meunasah* and some school buildings.[227]

The majority of the population originally comes from the Gayo ethnic group, later residents come from the Acehnese ethnic group and a minority comes from the Javanese ethnic group. In total there are 365 people, 87 family households. The village consists of 3 sub-villages. Since being abandoned during the conflict period nobody resided in the village.

Some of the residents moved to a relocation area in a nearby village (10 km from Village CA2). The IDPs occupy wooden houses built by the government. The majority of families living in the relocation area are Gayonese and a small number are Javanese. At the end of January 2006 some Acehnese that had been IDPs in other districts people began entering Village CA2 by occupying the *meunasah* and abandoned school buildings. They are the people from coastal areas of Aceh.

In the past, the economy of the residents of Village CA2 depended on crop farming and profits from selling coffee and nutmeg. Now the people's plantations have been overgrown by jungle after five years of being neglected. The economy of people from this village is now dependent on the plantations around the location of their temporary place of settlement, with most of them working as hired labourers earning between Rp 20,000 to Rp 50,000 per day.  However, employment is largely seasonal.

As security conditions are beginning to improve, more Acehnese residents are returning to their home villages. These returnees have the potential to cause new conflict with regard to the location of resettlement areas in the neighbouring village, most of whom are Gayonese. In addition, many of the returnees no longer have adequate housing with most living in the ruins of the *meunasah* or in the homes of other residents who are willing to give them shelter.

---

[225]   In 2003, only three boys and two girls remained as pupils with only one teacher/ principal of the school. This school is one of two elementary schools in this village. The other elementary school is an Islamic school.

[226]   Other apparatus such as the Head of Government Affairs, Head of Development Affairs, Head of Social Welfare Affairs, Head of Financial Affairs, and Head of General Affairs could not function properly, particularly during the conflict.

[227]   There are 95 houses that are totally damaged: 36 damaged because the residents had left the area, 20 houses burned down and 39 houses damaged by elephants. According to one of the informants, while the conflict ensued between GAM and TNI, both parties were equally violent and involved in burning down the houses of the people.

## Profile, Village CA3

The area of the village measures about 16 km2 with a population of 1,219 people, or 308 families. There are three ethnic groups in this village, namely the Gayonese (12%), Acehnese (3%) and Javanese (85%).[228] The relationship between the Gayonese and Javanese is good and there are many marriages and family relations between the two ethnicities. Nevertheless there are also marriages between the Gayonese and Acehnese, as well as between the Javanese and Acehnese.

This village was a part of the conflict area and several villagers were victims of the conflict. In the year 2000 the *keucik* and head of LKMD were murdered.[229] On 21 July 2001, three of the Acehnese villagers were executed in the sugar cane fields. From the information we received, there are 10 widows living in the village, their husbands had all died in the conflict and all were Acehnese.

During the conflict period, in 2000-2001, many of the Acehnese in the village moved out and therefore the people living in the village are now mostly Gayonese and Javanese.[230] Among the community there is an assumption that the Acehnese are members of GAM, and consequently they are subjected to threats and intimidation. Some of the Acehnese families who left the area during the conflict have tried to come back but did not receive a positive response from the local population. As the situation was not very promising, they returned to the shelter in Ronga-ronga or at Kilo 60.[231] Others are camped on the outskirts of the village in temporary dwellings and are attempting to have their abandoned lands returned to them that have been occupied and farmed by local residents.

The village comprises of three sub-villages. In each of the sub-villages there is a *meunasah* (prayer house). In addition to the prayer houses there is one mosque for the entire

### BOX 29: EFFECTS OF CONFLICT ON VILLAGE CA2

When the A2J Team came to the Village CA2, we experienced problems, because we encountered only forest. Fortunately we met 5 men who were sitting by the side of the road at the edge of the forest. We stopped and asked them where Village CA2 was located. And they pointed to the area where we had stopped. They told us they were displaced residents who were currently living in another sub-district. All the people of Village CA2 had left the village due to the conflict, since 2001 and spread out to various different areas. At present the largest concentration is found at the resettlement location. We visited the location of Village CA2. Our first goal was to see the *meunasah* in the sub-village, which is one of the few buildings left standing, and to see the physical impact that the conflict had on the village (e.g., through either conflict or abandonment).

The five men we met when we visited the location of Village CA2 who accompanied us said this was the first time they returned since 2001. They pointed out the plots of land where their homes had once been, that were now covered with trees, and the coffee plantations were now more appropriately called forests. Two of the 3 *meunasah* that remain standing are in a much damaged condition and their walls full of graffiti. Meanwhile, the school buildings that the men said are still standing could not be accessed as the road and entry into the school area was overgrown with thick jungle. However, it was also stated that returnees currently live in the schools.

---

[228] Gayonese 148 persons, Acehnese 39 persons and Javanese 1046 persons.

[229] *Keucik* of Village CA3 was shot to death and body thrown under the bridge.

[230] The A2J team was able to talk to several Acehnese women. These women came from Ronga-Ronga .

[231] A case of assault on several ex-members of GAM. There are several versions to this story: the PB-HAM Aceh Tengah says the ex-GAM members demanded money from the village head (*keucik*). The *keucik* would give them the money because he felt sorry for the ex-GAM members. However they acted impolitely while in Village CA3.

village. In general, the residents of the village that did not flee during the conflict period have faith in the government's formal institutions. This is a form of loyalty (to a certain degree) towards the Unitary state of the Republic of Indonesia. As in most places in Aceh Tengah, one can see many red and white flags (Indonesia's national flag). Almost all houses put up the "Red 'n White" flag.

The village government is supported by strong ties between the *keucik* (village head) and *sorak opat*. Consultations are always held before a decision is made. Likewise with the *mukim*. The function of the *mukim* is said to be still important in settling disputes.[232] However it is not yet known how this traditional institution can reduce the friction between the different ethnic groups that live in this village. As a result, when there are disputes among members of different ethnic groups cases are often reported to police.

The majority of the people earn their living from agriculture. The major crops that people cultivate in plantations are coffee, in 6 hectares with the capacity to produce 7 tones; sugarcane plantations 72 hectares with production capacity of 720 tones; and chili pepper plantations, 10 hectares. Sugarcane is the key crop in this village with many traditional sugarcane industries. Compared to other village assessment sites, Village CA3 has adequate teaching facilities. There are 2 kindergartens, 2 elementary schools, and 1 junior high school.

## Profile, Village CA4

The village is about 5 km away from the main road and is situated on a steep slope. The road leading to the village itself is already asphalted, except for the last 2 km. When the A2J team came to visit the village, we could see wild grass growing high on each side of the road for the last 5 km before reaching the village. The village is divided into 2 sub-villages that are located far apart from each other. The existing houses and buildings in the village are built in scattered locations and far apart from each other. The first impression one gets upon entering the village, is that it is a deserted and unoccupied place. There are houses, but they clearly appear to be neglected and unkempt. All the houses are made from wooden planks. Similarly, the plantations around the housing area are also unkempt.

Since early 2000 the entire population left the village for safety/ security reasons as there was increased intensity of conflict between GAM and TNI/ POLRI. In all, 448 people or 115 families were displaced. Eight houses were burnt down during the conflict.[233] Meanwhile 62 homes were abandoned. A number of plantations covering an area of 106.5 hectares had also been abandoned. These plantations were owned by 69 farmers.[234] All the houses registered were wooden houses.

Up until January 2006 it was recorded that 183 persons (or 52 families) moved to a neighbouring village and 265 persons (or 63 families) relocated to other villages in the sub-district area or to other sub-districts in the district. Besides displacement, the village suffered physical and material damage, as recorded by the village apparatus. [235] In the past the people's economy depended on coffee

---

[232] The fact that the *balee mukim* in Village CA3 is not used does not mean that the *mukim* has no role in the social life of the village/ *mukim*.

[233] "Caught Fire" is the official term used in the government's administrative documents. Meanwhile according to the residents, the eight houses were *purposely burnt down* or *torched*. There is no mention of who the perpetrators are.

[234] Taken from recapitulation of data on abandoned plantations and houses due to conflict in Aceh Tengah. In the recapitulation it is mentioned that 62 homes were abandoned, 8 houses burned and 106.5 hectares of plantations abandoned, owned by 69 persons.

[235] Eight houses burned, 22 houses damaged, 1 *meunasah* damaged, 230 hectares of plantation abandoned, 9 persons suffered physical and mental disability due to shooting and torture; and 7 were victims of robbery.

plantation farming. Some of the residents have begun to make efforts to restore their coffee plantations, even if limited only to the land immediately surrounding the resettlement area. They have not gone farther to the plantations outside the resettlement/village area because of lingering security fears. No assistance has been provided by the government or donors (i.e., tools) to help the villagers rehabilitate their lands or homes.

## Profile, Village C1

The village is small covering an area of 7 km[2]. It has a population of 309 people consisting of 141 females and 168 males, or a total of 73 families. The village comprises two sub-villages. Almost all of the population are Gayonese and generally have a familial relationship with each other. According to tradition, marriage between the residents in one village is forbidden. Other ethnicities in the village are Acehnese (3 persons) and Javanese (2 persons).[236]

This village still upholds traditional customs very strongly. Any problems that emerge tend to be settled at village level in order to maintain social harmony in the village. In general the people personally know the village leaders. The current village apparatus began their term of service in 1999, which shall end in 2007.[237] Another reason the people know the village apparatus personally is economic. In order to have a dispute settled through the police, the people must pay a number of prohibitive costs for transportation. As a result they rely on village leaders to resolve disputes.

The majority of the people are farmers (as high as 98%) that work in the agricultural/plantation sector, either as rice farmers, or cultivating coffee, vegetables, or they breed fish at inland (lake) fisheries, or work as civil servants.[238]

During the conflict period, some of the villagers who had earlier left the area to seek work in other places, returned home as displaced persons.[239] In Village C1 there was no report of any serious violence, unlike in CA4 which is situated one hour away. Although both villages are similar in ethnic profile, this village escaped a conflict impact by ensuring that GAM did not enter the village. This worked to guarantee GoI security forces that the village was loyal to the GoI. Moreover, village leaders report paying bribes to Brimob personnel that were stationed in the village during the conflict period.

Some of the public facilities available in this village are a *Pustu* (medical treatment centre) managed by a *mantri* (medical aide) and a village midwife; and an elementary school. There is no secondary/high school located close to this village. Also, there are no kindergartens in this village. As a result, the children have difficulty in speaking Indonesian when they enter elementary school.

## Profile, Village CA1

Previously the majority of the population was Javanese with a minority of Acehnese.[240] During the conflict period, around 2001, there was an exodus of all the residents in the

---

[236]  Field data from Village CA1.  Meanwhile in the Population Register, it is recorded that there is only one Acehnese that is a woman who married a Gayonese man.

[237]  Field data 29-30 January 2006.

[238]  It is noted that there are only 3 civil servants.

[239]  It is noted that 6 families returned.

[240]  Standard composition of a transmigration settlement is 70-80% transmigrants from outside the region and around 20-30% are local transmigrants.

village that had been intimidated and terrorized; especially newcomers from Java.[241] Some of the people fled to Meulaboh and the surrounding area, and some went back to Java. They only began to feel brave enough to live in the village again after an Indonesian military post was set up in the village. Some of those who moved to Meulaboh had to move out again after being displaced by the tsunami.

At the time the A2J team visited the Village, people were beginning to return to the area, but most of the families living there now are not the original transmigrants. According to these residents they came to live in the village with the "permission" of the transmigration service office, one of the considerations being that it is better to have the houses lived in rather than become dilapidated from non-use.[242] The current residents are therefore worried that the original owners may someday return and tell them to move out. They hope the local government will give some attention to their problem.

During the conflict period an Indonesian military post was built at the top of the hill outside the settlement area. This military post was built similar to a fort with a watch tower at one of the corners.[243] During the conflict period the *keucik* resigned. The current *keucik* is an acting-*keucik* who was appointed by the sub-district office (i.e., the *Camat*). Meanwhile the position of secretary is held by a young man who is not well experienced. The functions of the *tuha peut* are not maximal as

not all of the residents have returned to the village.[244] Members of the *tuha peut* and *tuha lapan* are not knowledgeable about traditional systems and laws. Whenever there is a dispute between members of the community, it will always be reported to the *keucik*, and then the *keucik* will settle the problem according to his capacity and ability. However, since the population of the village is small, the number of disputes is also small.

The main livelihood of the people is farming, particularly the cultivation of palm oil. The agricultural produce of the transmigrants that moved out of the village is collected by other persons. They do this because the owners have abandoned the plantations for many years. Some plantations are left in the care of returnees who have come back to the village, but these returnees cannot do much because they are unable to frequently visit and control the plantations.

At present, the issue of security which is a big problem in the community is the presence of *teungku rayeuk* that often come to the village. So far the people have not been able to do much in facing the *teungku rayeuk* (elephants).

## Profile, Village TA1

As it is situated on the coast this village has been seriously affected by the tsunami. At least 89 houses were totally destroyed. The majority of the population derives income as fishermen while others engage in rice farming and plantation farming. As an

---

[241] The people began their exodus on 30 May 2001.

[242] The FGD team found that the unoccupied houses were indeed unkempt and shabby. Some were already damaged. The government, in this case the Transmigration Service Office, are making efforts to get the IDPs who are ex transmigrants at the former transmigrant settlements, including the former transmigrant settlements in Aceh Barat, to return and occupy the houses.

[243] When the A2J Team arrived in mid February, the post had been left by the military. The building still remained, the electricity was still on. The building has a watch tower in front, a praying room, a living room to receive guests, and several bedrooms. At the back there is a kitchen. Around the structure is an earthen wall for protection.

[244] One of the *tuha peut* is a transmigrant from Java who is considered to be one of the elders in the village.

additional livelihood, some of villagers also raise livestock. The problem encountered after the tsunami is that the rice fields cannot be planted.

In this village there are many widows, fatherless children and poor people. It is on record that there are 30 widows and at least 42 fatherless children. They are part of the total population which is 919 (consisting of 462 males and 457 females; or 201 KK where 174 FH are males and 27 FH are females). The population of the village consists mostly of Acehnese and some from the *Aneuk Jame* ethnicity. The village government does not fully function. There is often a change in *keucik* within a relatively short time. Administratively there are four sub-villages.

Many of the villagers have returned to the village and are occupying emergency homes while waiting for the construction of houses that are planned to be built with assistance from an INGO. However, this INGO will only build 52 houses to replace some of the houses totally damaged by the tsunami. This caused tension and suspicion among the villagers, as well as between the villagers and the village apparatus and between the villagers and the INGO as to who would receive reconstruction assistance. For a while the tension could be suppressed, particularly because the houses have not yet been completed. Several of the villagers are worried that when it is known for certain who will receive a house and who will not a bigger conflict will break out. The *keucik* cannot resolve these tensions because he has familial relationship with potential beneficiaries that give rise to further mistrust among villagers as to how aid recipients are identified.

## Profile, Village TA2

This village was also affected by the tsunami. A large part of the rice fields were damaged by the tsunami (around 85%) but the residential areas were not affected. In this village there are many IDPs that come from neighbouring villages and are concentrated in barracks.

The livelihood of the majority of the population is rice farming (around 80%). Another agricultural produce is coconuts. Some of the people are 'newcomers' from Meulaboh. The total population is 303 persons (160 males and 143 females).

Administrative matters regarding the village are handled at the home of the *keucik* or the home of the village secretary because the village does not have a village office. Nevertheless it has complete village apparatus in terms of people taking up positions of responsibility.

The *Imam meunasah* plays a very central role in village governance and is the first place people will go to discuss matters when they have a problem. The villagers prefer to report their problems to the *imam* rather than the *keucik* or the *tuha peut*. The *tuha peut* has a small role due to the busy activities of the members concerned. Also, the *tuha peut* is dominated by old citizens. Meanwhile the level of trust and faith of the younger residents towards the village apparatus is low, particularly towards the *keucik*. The lack of trust in the *keucik* is strongly influenced by rumours that there is dishonesty in managing the humanitarian aid received from NGOs operating in the village.[245] In fact, some of

---

245  Field notes, *Adat* Systems by Location and Regions.

the *tuha peut* members are not sure about their function in accommodating complaints from the locals or resolving grievances held by villagers.

## Profile, Village TA3

The road provides relatively easy access, even though it passes through areas affected by the tsunami. This village is one of the areas badly damaged by the tsunami, particularly its rice fields. In this village there are several ethnic groups, namely Aceh, Minang, Batak and Java. There are 547 males, and 531 females, thus totalling 1078. All of them comprise 237 families (with 226 male family heads and 11 female family heads).

The residents of this village include 109 IDPs from another village that had to relocate after their village was destroyed by the tsunami. They are temporarily living in the emergency tents set up in the premises of a *pesantren* (Islamic boarding school). Among these IDPs there are 5 fatherless/motherless children, and three among them are siblings. In addition, there are also IDPs that are victims of conflict from another location that sought refuge in this village. They are transmigrants who cannot return to their homes for security reasons. They want to go back, as they still have many assets there. For the time being, they are residing in Village TA3 with guarantee of protection from the *keucik*.

The traditional /*adat* role is dominant, all traditional structures from *keucik* up to *tuha peut* are functioning well, and all cases are

settled in the traditional manner. When a dispute arises or a problem must be settled, the first person contacted is the village head, and then the village head will call the *tuha peut*. The settlement of a 'normal dispute' shall be reached through discussions in the *meunasah* or at the home of one of the *tuha peut* members. The sanctions imposed for fighting in public or fighting in front of another person's house is the fine of one goat. Fighting in front of another person's home is considered very shameful; the decision can be made in a peace agreement signed by the village head, the *tuha peut*, witness and family of the victim on both sides. There are no formal standards in the process of settling a traditional case. There is no neat documentation regarding the process or the decision that is made.

## Profile, Village TA7

The population of the village includes 177 family households, or 663 persons (329 males and 334 females).[246] The livelihood of the majority of the population is fishing at sea or fish farming (fisheries). Other types of occupation in this village are trading and mat weaving.

This village was heavily damaged by the tsunami with 251 houses destroyed. The *meunasah* (prayer house) is the only building still standing and shall soon function as one of the centres of village life.[247] The local residents have added a *balee* (open platform house) made from wood carried by the tsunami. The *balee* has become one of the

---

[246] When compared to the population in February of the same year, there is a discrepancy of 276 persons or 67 FH, as in that month it was reported that the population before the tsunami was 1,103 persons or 244 FH; after the tsunami, it was noted that 164 people died while 939 persons survived and 939 were displaced. There is no explanation for the large discrepancy. The possibility is that they moved to another area outside the village during February to September.

[247] The *meunasah* is an open structure with brick walls, still standing strongly after the tsunami. The *balee*, in the yard of the *meunasah*, is an open platform house, with roof from sago palm leaves.

centres of village community life. Many activities are carried out at the *balee*: such as village meetings, sewing fishnets, reading the newspaper, taking naps, chatting.

When the A2J team came to the village, various reconstruction activities were going on in the village, such as the building of houses, reconstruction of the *meunasah*, building the school, water facilities, and sanitation.[248] In addition, several projects were being implemented in this village such as establishing a mobile health clinic, providing boats and nets for the fishermen, and mat weaving as a source of income.

Most of the population has come back to the village as returnees. They have put up emergency shelters, some are wooden houses, and others are only tents. The wood they use is the wooden beams and planks carried along by the tsunami and which they can find anywhere. The material used for roofs includes zinc sheet, canvas, leaves. Currently they are waiting for the completion of a housing project by an NGO.

The marine fishing sector is also economically active. Boats and other equipment provided by NGOs have arrived and been received by the fishermen.[249] Meanwhile other economic assistance has also been received, for example funds for mat weaving which is distributed to women's groups.

Marriage in the village between village residents is common here; and therefore many of the residents have familial ties with each other, even those at the leadership level.[250]

In the village the role of the *keucik* is very dominant, even though there are also other traditional leaders such as the *tuha peut/lapan*. Problems that occur in the village are usually settled at village level. The people are reluctant to deal with the police because of bad experiences with police during the conflict period. Violence by the security forces has been experienced by the local residents.

## Profile, Village TA6

Most of the land in this village is surrounded by fishery ponds. The village is not far from the sub-district and is easy to reach. Part of the road leading to the village is asphalted but other parts are still dirt roads. The population of the village consists of 104 family households or 378 persons (193 males and 185 females). The area covers 2.50 km$^2$. Most of the village area is used for fisheries. Other types of livelihoods include fishing, fish farming, and salt farming. From the four existing sub-villages, only one was badly damaged by the tsunami. In general the tsunami did much damage to housing and fishery locations. During the tsunami 41 houses were destroyed, 22 houses were seriously damaged and 3 slightly damaged. In addition a school was also damaged. At present, the population of one sub-village is divided into two with one group having returned to the sub-village while the other group still lives in barracks under coordination of the barracks coordinator. When the A2J team arrived in the village, the school and houses were still being built with construction work facilitated by an NGO.[251]

---

[248]  Several humanitarian agencies noted as having entering the village.

[249]  Not many complaints were put forth in the interviews made by the team.

[250]  The *Keucik* and *Panglima Laot* of the village are brothers.

[251]  However there was some dissatisfaction towards the NGO. This discontent gave rise to protests manifested in the form of graffiti on the public announcement board, among others "*Kami tak sanang Serasih* (We do not like *Serasih*); "*Serasih keluar dari Aceh* (get out of Aceh) "*Polus hajingan Kamu Jangan Coba2x ganggu orang Aceh* (Don't dare to disturb the Acehnese), and "*Serasih keluar kamu* (get out) . Besides the graffiti, some youths threw away the material that would be used to repair the bridge connecting their village, so that the truck carrying material from the NGO could not enter. As far as we know, this discontent is related to the use of local manpower for the development project.

Residents of the village complain that they have not received any fishing boats. Meanwhile the traditional institutions such as *tuha peut* and *tuha lapan* still function well in the sense that they are actively involved in decision-making processes regarding village development and the settlement of disputes between villagers.

## Profile, Village CA7

An asphalted road connects this village with the district capital, thus making it easily accessible. However this village is located in an area that was prone to heavy conflict in the past. Most of the village area is flatland covering an area of 275 hectares.

Part of the village land is used for farming and plantation farming. There are 60 hectares of rice fields with irrigation and 35 hectares of rice fields with semi-technical irrigation. Meanwhile the plantation area covers 20 hectares and the main crops are cacao, areca nut, coconut and *melinjo* (*gnetum gnemon*). The 35 hectares of rice fields are owned by 15 persons; meanwhile there are 105 farm workers and 13 farm labourers. The plantations are owned by 3 persons, and there are 10 plantation labourers. Most of the land does not have a certificate. The people tend to be reluctant to arrange for land certificates.

The population in 2006 was recorded at 568 persons or 148 family households. The types of livelihoods include: farmers, farm workers, land renters, mining labourers, civil servants, military service, teachers, midwives, military/civilian pensioners, traders, carpenters, bricklayers, tailors, barbers, and motorcycle taxi drivers. It is noted that 60 persons did not graduate from SD (elementary school), 30 persons only graduated from elementary school, 40 persons only graduated from SLTP (junior high), 60 persons only graduated from SLTA (senior high school), 16 persons graduated from an academy, and 18 graduated from university.

This village is the place where IDPs that left other villages in the sub-district have gathered to seek shelter. In addition, there are several widows whose husbands died during the conflict. The *keucik* of this village had once been abducted and tortured by GAM. The *keucik* is quite dominant in the decision-making process in the village. The head of the *Tuha Peut* is concurrently the Head of the Office of Religious Affairs in the sub-district and plays a significant role in decision-making at village level, especially when regarding the settlement of disputes between residents. At present, the villagers are beginning to revive the functions of the traditional institutions in the village.

## Profile, Village CA6

This village is located in an area which is prone to conflict. Armed contact often broke out in this area. The population is 543 persons with the number of unemployed persons in 2005 recorded at 40 persons (25 men and 15 women).

The people's economy relies mostly on the agricultural sector, particularly rice farming and cacao plantations. The total area of land is estimated to be 65 hectares of rice fields and 110 hectares of plantations. The main livelihood is farming, which involves 164 persons (98 men and 66 women). However,

at the time of the conflict, many of the plantations were abandoned for security reasons and the villagers only planted rice. Now, they are beginning to revive their plantations but have difficulty with raising funds to buy fertilizer and seeds.

This village was one of GAM's base camps. Several ex-combatants have returned and mingle with the local communities and have tried to restart their livelihoods.[252] In this village live a number of IDPs from Aceh Tengah who suffered the impact of the conflict and IDPs from Aceh Jaya, affected by the tsunami. In general they have not received much assistance. In addition there are some victims of military violence and some people suffer physical and mental disability. The team found at least one case of physical disability and two cases of deep trauma.

The village apparatus also have traumatic experiences related to the conflict. Even the *Imam Mukim*, who lives in the Village, stated his wish to resign as *mukim* because of pressures experienced from combatant groups. In many cases the traditional institutions of this village could not function properly because of pressures created by the combatants (TNI, GAM, and police). The *tuha peut* left the village for 2 years because of pressure from the Indonesian military/police.[253] In the *Tuha Peut* there is one woman who also serves as head of Muslim women's affairs.

### Profile, Village CA9

An asphalt road runs into the village but there is no public transportation that enters the village, thus making travel difficult for those residents that do not own a motor vehicle. The village population consists of 1103 people, or 496 family households.

This village has a village office that, according to the *keucik*, is often used at night because during the daytime the people and the village apparatus are too busy with subsistence farming work. The village office is organised relatively well. In addition this village is supported by an adequate amount of capable human resources, but lacks infrastructure to run the village administration effectively.[254] The village apparatus consists of: *keucik*, village secretary, and head of government affairs, head of development affairs, head of financial affairs, head of general affairs and head of social welfare. In addition to that, there are three sub-village heads. The village secretary has resigned and his position is temporarily held by the head of government affairs. Administrative-wise the village consists of 3 sub-villages. The roles of the *keucik* and village secretary are very dominant in this village. The secretary is a well educated person. Transparency is evident in this village. The *Tuha Peut* also has the capability to issue village policies which are binding to all the residents.

Some public facilities available in this village are a kindergarten, elementary school, *pesantren* (Islamic boarding school), mosque, *meunasah* (prayer house) and *puskesmas pembantu* (assistant health centre). Although not affected by the tsunami there are around 200 persons who are victims of the tsunami and that live in the homes of their relatives.

---

[252] We met at least 12 ex-combatants in one of the meetings that we held. Included in the group were 2 former members of *"inong bale"*.

[253] A member of the *tuha peut* is the younger brother of the *Imam Mukim*. *Peutua tuha peut* was wanted by the apparatus because his son was a combatant with GAM. Meanwhile, the *Imam Mukim* has a son and son-in-law that are policemen.

[254] Like the *keucik*, members of the village apparatus have high levels of formal education compared to other research sites with most having completed high school. One piece of office equipment that they claim to need is a computer for administrative work.

The social and familial relationship is very high and therefore problems are always settled at village level. The villagers have faith in the traditional system rather than the formal legal system. The settlement of disputes regarding inheritance is done through deliberation to reach an agreement or through Islamic law. However, not all problems can be settled at village level however. There have been some cases that had to be taken to sub-district level.[255]

This village suffered an indirect impact of the conflict. Several times GAM members entered the village and even approached the *keucik*. There are widows from the conflict. There is a police officer's widow who to this day does not know where her husband is buried; there is another widow whose husband was a member of GAM. Both the policeman's widow and the GAM widow are on good terms with each other.

## Profile, Village TA8

The population consists of 600 males and 334 females, or 570 family households. The majority are Acehnese while the rest are Javanese. The village was heavily affected by the tsunami with the population being displaced and homes destroyed. Most village records were destroyed. The majority of the population is fishermen and now lives as displaced persons scattered in several locations inside and outside of the village. Many of the fishermen are known to be living temporarily in barracks but they agree that they will one day return to their homes. Before the tsunami the traditional village institutions such as *tuha peut* and *tuha lapan*

were functioning well. The function of traditional institutions is to prevent improper or indecent acts. However, after the tsunami, the *tuha peut/lapan* have only been in place for a few months and do not yet function properly. There has not been enough time to arrange a meeting between the members because each is busy with their daily activities. So far the villagers have more frequent contact with the *kepala lorong* rather than the *keucik*; because the *keucik* usually resides in another location.

The process of reconstructing the village has begun. The village apparatus is making efforts to straighten up and improve the village government. Assistance is not evenly distributed, which has given rise to tensions among villagers. The population's economy is still in the early stage of recovery. Some fishermen in the village have received small boats provided by NGOs, but others in the village have not yet received such assistance and are asking for boats. For those that are not fishermen some have received housing reconstruction assistance provided by an NGO. There is also a problem with land claims. People admit that the land they occupied was officially state owned land and that the villagers did not have land ownership certificates. They believed that their traditional land ownership claims would be recognized by the state and therefore certificates were not sought in the past. Now, the only proof of ownership held by villagers are certificates for land clearing and land tax documents (i.e., receipts of payments to the government), but these were lost when the village was hit by the tsunami.

---

[255] The A2J team noted two examples of land dispute cases in the area.



**Appendix 3**

**Matrix: Institutional Obstacles for Duty-Bearers**

# Appendix 3 – Matrix: Institutional Obstacles for Duty-Bearers

Using a UNDP capacity development assessment matrix as an analytical guide this section presents a series of matrices summarizing key institutional obstacles encountered by duty-bearers within formal and informal justice systems to promoting community access to justice.

| TABLE 27: *ADAT* - CAPACITY WEAKNESSES UNDERMINING ACCESS TO JUSTICE | |
|---|---|
| *System / Regulatory* | |
| **Legal Regulatory Environment** | · Lack of awareness of a human rights based approach to justice.<br>· *Adat* law recognizes verbal divorce, whereas National Law does not, thus creating legal uncertainty for women.<br>· Confused jurisdictions and inconsistencies between *Adat*, National Law, *Syariah* law, and human right standards.<br>· Different interpretations of *Adat* fuel ethnic cleavages. |
| **Management and Accountability** | · Weak administrative structures, poor management procedures.<br>· No accountability to public or government authorities. |
| **Independence** | · Overall decision-making processes are easily manipulated by outside actors.<br>· Strong kinship networks undermining fair decision-making. |
| *Organizational* | |
| **Human Resources** | · Duty-bearers typically drawn from powerful village families.<br>· No skills training provided.<br>· Unclear decision-making jurisdictions between village leaders. |
| **Information Resources** | · Oral tradition passed down from generation to generation. No resources regarding *Adat* system, procedures or decision-making.<br>· No legal resources regarding domestic violence, or any other legislation.<br>· Primary source of information are *Keucik*, *Camat*, and *Mukim*. |
| **Infrastructure** | · Village governance structures fragmented or destroyed following the tsunami.<br>· Governance structures in conflict affected areas fragmented or dysfunctional.<br>· Poor case handling and data recording systems (e.g., evidentiary materials). |
| *Individual* | |
| **Knowledge and Skills** | · Limited awareness regarding criminal nature of domestic violence.<br>· Confusion over legal jurisdictions arising from competing normative legal frameworks.<br>· Village authorities do not actively disseminate information on laws. As a result, villagers are not aware of their rights under National Law or *Syariah* law or how to access formal justice mechanisms. |
| **Behaviour / Attitude** | · Domestic Violence - Most informal justice system duty-bearers believe that domestic violence is an internal family matter.<br>· *Mukim*, *Camat*, and *Keucik* focus on resolving conflict and preserving harmony. Taking cases of domestic violence outside the village is considered 'taboo'. Decision-making influenced by more powerful members of the community. Disadvantaged groups at village level are given little, if any, voice in dispute resolution processes. |

| TABLE 28: JUSTICE AUXILIARIES (E.G. *CAMAT*, KUA, ETC.) - CAPACITY WEAKNESSES UNDERMINING ACCESS TO JUSTICE | |
|---|---|
| *System / Regulatory* | |
| **Legal Regulatory Environment** | · Lack of awareness of a rights based approach to justice.<br>· Lack of coordination with formal justice system actors.<br>· Generally poor coordination with other justice mechanisms.<br>· Unclear guidelines and standards for mediation of disputes Unclear referral system with formal courts for mediating disputes. |
| **Management and Accountability** | · Weak case management systems.<br>· Limited accountability to the public No evaluation processes for performance. |
| **Independence** | · Unclear. |
| *Organizational* | |
| **Human Resources** | · Insufficient administrative support personnel.<br>· *Mukims* typically old and lack enthusiasm.<br>· Lack of training regarding administrative matters.<br>· No personnel in place in some locations. |
| **Information Resources** | · Weak or non-existent, lack of legal information and limited reference materials.<br>· Poor legal and mediation training. |
| **Infrastructure** | · Lack of office furniture and equipment. Lack of communication equipment such as telephones, stationery.<br>· In some research sites *Mukim* structures are not functioning at all.<br>· *Mukim* offices geographically inaccessible for disadvantaged groups.<br>· Village governance structures poorly resourced to deal with administrative matters. |
| *Individual* | |
| **Knowledge and Skills** | · Do not actively disseminate information on laws.<br>· Capacity varies greatly. |
| **Behaviour / Attitude** | · Focus on harmony rather than individual rights.<br>· Post-conflict trauma and lingering security concerns undermining mediation roles. |

| TABLE 29: POLICE - CAPACITY WEAKNESSES UNDERMINING ACCESS TO JUSTICE | |
|---|---|
| *System / Regulatory* | |
| **Legal Regulatory Environment** | · Confusion over jurisdictions between civil and criminal matters.<br>· Poor understanding of human rights based approach to law enforcement.<br>· Some SOPs contradict principles of community policing and a human rights based approach to policing.<br>· Lingering uncertainty about police and military roles in civilian policing.<br>· Awkward division of policing functions between *Syariah* police upholding religious law and organic police upholding secular law. |
| **Management and Accountability** | · Weak civilian oversight.<br>· Internal oversight mechanisms lacking strong deterrent capabilities for preventing misconduct among rank and file officers.<br>· Lack of public transparency in procurement, budgetary allocations, and operational costs. |
| **Independence** | · Unclear. |
| *Organizational* | |
| **Human Resources** | · Insufficient personnel.<br>· Insufficient ongoing training for personnel.<br>· Insufficient funding to support training of personnel.<br>· Police personnel underpaid.<br>· Lack of administrative support personnel. |
| **Information Resources** | · SOPs inconsistent with community policing approach.<br>· Weak reporting mechanisms for community members with justice grievances.<br>· Legal awareness activities currently implemented focus on "harmony" rather than a rights based approach for citizens. |
| **Infrastructure and procedures** | · Shortage of accommodation, equipment (cars, radios, office equipment).<br>· Insufficient housing facilities for police personnel.<br>· Poor reporting mechanisms for community members with grievances.<br>· Poor case filing systems and recording of non-criminal grievances.<br>· Emphasis on mediating village disputes prevents access to justice for disadvantaged community members.<br>· Poor detention facilities for detainees.<br>· Limited training in non-violent crowd control techniques.<br>· Insufficient equipment for non-lethal crowd control. |
| *Individual* | |
| **Knowledge and Skills** | · Sporadic human rights training programs.<br>· Training focuses on field tasks and operations.<br>· Insufficient training regarding gender based violence.<br>· Careless handling of firearms.<br>· In some districts there are language barriers with local populations that do not speak *Bahasa* Indonesia. |
| **Behaviour / Attitude** | · Endemic practices of petty corruption by police personnel.<br>· Limited understanding of community policing.<br>· Lingering conflict mentality among some police officers.<br>· Police officers known to suffer from conflict induced psychological trauma.<br>· Reported that some officers still discriminate against or publicly shame ex-GAM members.<br>· Many police officers still adopt a 'culture of force' in policing duties.<br>· Promotion of harmony over individual rights.<br>· Police morale varies by location. |

## TABLE 30: GENERAL COURTS - CAPACITY WEAKNESSES UNDERMINING ACCESS TO JUSTICE

| | |
|---|---|
| *System / Regulatory* | |
| **Legal Regulatory Environment** | · Lack of awareness of a human rights based approach to justice.<br>· Lack of coordination with formal justice system actors.<br>· Generally poor coordination with other justice mechanisms.<br>· Outdated rules of evidence.<br>· Confusion over normative legal framework (National Law, Human Rights, *Adat*, and *Syariah* law).<br>· Confusion over jurisdictions regarding civil and criminal cases with *Adat* and *Syariah* Courts. |
| **Management and Accountability** | · Weak case management systems.<br>· Limited accountability to the public.<br>· Bureaucratic and complicated systems and procedures.<br>· Weak internal oversight and evaluation systems.<br>· No accurate data on judicial corruption available.<br>· Weak external review mechanisms. |
| **Independence** | · Unclear. |
| *Organizational* | |
| **Human Resources** | · Insufficient administrative support personnel.<br>· Low pay for all court personnel.<br>· Insufficient number of lawyers to represent defendants.<br>· Courts do not have interpreters to accommodate non-Indonesian speaking claim-holders and defendants. |
| **Information Resources** | · Lack of legal information and limited reference materials, poor legal education, inconsistent law development and application resulting, in part due to jurisdictional confusion.<br>· Limited legal information and reference materials (law reports, law gazettes and other information).<br>· Insufficient legal awareness raising programs for the community. |
| **Infrastructure and procedures** | · Lack of office furniture and equipment. Lack of communication equipment such as telephones, stationery.<br>· Insufficient number of courts. Insufficient number of detention facilities.<br>· Geographically inaccessible for many villagers.<br>· Lack of witness protection.<br>· No interpreters available for non-Indonesian speaking claim-holders or defendants.<br>· Inability to summon witnesses to court. |
| *Individual* | |
| **Knowledge and Skills** | · Administrative support personnel lacking sufficient training.<br>· Inadequate continuing legal education for all personnel (judges, lawyers, clerks).<br>· No training to deal with post-conflict issues (i.e., sensitivity).<br>· No formalized human rights training for court personnel.<br>· Insufficient funding for training programs.<br>· No judges with mediation certificates.<br>· No specialized training provided to deal with issues arising from conflict and the tsunami. |
| **Behaviour / Attitude** | · Corruption, bureaucratic attitudes, sometimes arrogant.<br>· Discriminatory practices against some groups.<br>· Lack of political will to openly acknowledge problems with the justice system (i.e., harmony of divisiveness).<br>· Cultural and linguistic barriers with the local population. |

| TABLE 31: *SYARIAH* COURTS - CAPACITY WEAKNESSES UNDERMINING ACCESS TO JUSTICE | |
|---|---|
| *System / Regulatory* | |
| **Legal Regulatory Environment** | · Discriminatory laws against non-Muslim women (i.e., Marriage Act Law 1/1974).<br>· Poor coordination with General Courts. Conflicting jurisdictions and competition.<br>· Conflicts with *Adat* law regarding inheritance rights for women.<br>· No guidelines for confiscating or destroying evidence.<br>· Vague code of ethics for *Syariah* Court judges. |
| **Management and Accountability** | · Poor management and weak public accountability.<br>· No external oversight of *Syariah* Court judges or evaluations of decision - making. |
| **Independence** | · Unclear. Signs of influence from conservative Islamic forces found in the *Ulama* council and national level Islamic organizations. |
| *Organizational* | |
| **Human Resources** | · Weak. Insufficient administrative support personnel. |
| **Information Resources** | · Insufficient legal information resources (law reports, law gazettes and other information for judges).<br>· Insufficient funds and equipment to conduct legal awareness raising activities for community members. |
| **Infrastructure** | · No detention facilities. Poorly resourced court facilities.<br>· Lack of modern case management systems (e.g., computers/filing systems).<br>· Limited accessibility to rural villagers. |
| *Individual* | |
| **Knowledge and Skills** | · Administrative support personnel poorly trained.<br>· No training for human rights or sensitivity training for post-conflict case handling. |
| **Behaviour / Attitude** | · Overly bureaucratic, duty-bearers uncertain about jurisdiction role and appropriate application of *Syariah* law.<br>· Administrative support personnel reported in some instances to be arrogant with claim-holders. |

| TABLE 32: PROSECUTORS - CAPACITY WEAKNESSES UNDERMINING ACCESS TO JUSTICE | |
|---|---|
| *System / Regulatory* | |
| **Legal Regulatory Environment** | · Confusion over case handling and jurisdictions between *Syariah* and General Courts.<br>· Procedural law not regulated in *Qanun* makes it possible that lower level regulations will override higher level regulations.t |
| **Management and Accountability** | · Weak public accountability and civilian oversight.<br>· Imprecise criminal handling procedures for detainees suspected of violating *Qanun*. |
| **Independence** | · Unclear |
| *Organizational* | |
| **Human Resources** | · Low salaries.<br>· Insufficient number of personnel and administrative support personnel.<br>· No female prosecutors in some districts. |
| **Information Resources** | · Inadequate legal resources.<br>· Limited human rights training for prosecutors. |
| **Infrastructure** | · Insufficient infrastructure and poor case filing systems.<br>· Prosecutors offices generally inaccessible for most villagers (distance or terrain).<br>· Prosecutors and their families are vulnerable to intimidation and threats from segments of Acehnese society.<br>· Lack of operational funds for the execution of court decisions.<br>· Insufficient detention facilities. |
| *Individual* | |
| **Knowledge and Skills** | · Cases of cultural and linguistic barriers with local populations in different districts. |
| **Behaviour / Attitude** | · Indications that corruption remains a problem among prosecutors.<br>· Prosecutors sometimes arrogant and unwilling to support victims, particularly in regards to female victims of domestic violence or rape.<br>· Post-conflict security concerns remain a factor undermining service delivery. |

| TABLE 33: *WILAYATUL HISBAH* - CAPACITY WEAKNESSES UNDERMINING ACCESS TO JUSTICE | |
|---|---|
| *System / Regulatory* | |
| **Legal Regulatory Environment** | · Confusion over legal framework is undermining the introduction of 'minimum standards' for the enforcement of *Qanun*.<br>· Political and religious sensitivities preventing the resolution of regulatory problems.<br>· WH personnel using civilian powers of 'citizens arrest' granted under National Law (Criminal Code) to empower themselves as a state institution enforcing *Syariah* law.<br>· Legal uncertainty about procedural law.<br>· No clear protection guidelines in place for individuals arrested  by WH. |
| **Management and Accountability** | · Weak management procedures.<br>· No public accountability or civilian oversight. |
| **Independence** | Heavily influenced by Islamic religious leaders. |
| *Organizational* | |
| **Human Resources** | · Lack of administrative support personnel.<br>· Lack of training for personnel.<br>· No skills training regarding human rights standards and the rights of citizens under National Law or the Constitution.<br>· WH not recognized as civil servants, not receiving government salaries.<br>· Inadequate experience. |
| **Information Resources** | · Lack of information resources/limited literature.<br>· Insufficient funding for training programs or legal awareness raising. |
| **Infrastructure** | · No vehicles to conduct patrolling.<br>· No communication equipment.<br>· No office facilities. |
| *Individual* | |
| **Knowledge and Skills** | · Personnel confused about their own functions and roles.<br>· No standard operating procedures for enforcement functions of WH.<br>· No standardized criteria for what constitutes a violation of *Qanun*, particularly in relation to women. Highly subjective and open to abuse by duty-bearers. |
| **Behaviour / Attitude** | · Aggressive enforcement practices violating human rights standards and Constitutional rights of women, resulting in excessive arrests of women.<br>· Personnel consider themselves enforcers of Islamic law and enforcers of correct moral conduct and behaviour of other Indonesian citizens.<br>· Discriminatory attitudes towards non-Muslim groups.<br>· Non-Muslim women sometimes intimidated or harassed by WH regarding "inappropriate" behaviour or dress. |

| TABLE 34: PRISONS - CAPACITY WEAKNESSES UNDERMINING ACCESS TO JUSTICE | |
|---|---|
| *System / Regulatory* | |
| Legal Regulatory Environment | · No data. |
| Management and Accountability | · No data. |
| Independence | · No data. |
| *Organizational* | |
| Human Resources | · No data. |
| Information Resources | · No data. |
| Infrastructure | · Insufficient facilities to house suspects<br>· Lack of operational funds for to provide food and other care for detainees<br>· Lack of vehicles for transporting suspects under detention |
| *Individual* | |
| Knowledge and Skills | · No data. |
| Behaviour / Attitude | · No data. |



**Appendix 4**
**A Discussion of Horizontal and Vertical Conflicts**

172

Appendix 4

# Appendix 4 - A Discussion of Horizontal and Vertical Conflicts

Although a simplification of complex theories, vertical and horizontal conflicts are defined at a macro-political level here with vertical conflicts considered as conflicts between local groups and the state; whereas horizontal conflicts are considered as conflicts between different groups in society that can transform into vertical conflicts with the state.[256] This is done in order to identify social cleavages in village assessment sites that can give rise to new patterns of violent conflict and that can undermine the peace process, community access to justice and strengthening the rule of law. The principal difference between the two conflict patterns is the nature of power struggles underpinning both. For example, unequal power hierarchies are unstable, ambiguous, reversible, and prone to "evasion and modification".[257] These hierarchies can exist at village level and extend upwards to the state level. This makes hierarchical power structures different from systems of state domination involving asymmetrical power relationships among social groups in which minorities have little room to manoeuvre or exercise liberty,[258] and in which local patterns of domination are linked to state systems of domination. In hierarchical systems, although giving rise to power struggles between unequal social groups, contests for power can be reversed through peaceful means by individuals that enjoy equal citizenship rights under the law.[259] On the other hand, asymmetric power struggles that occur in systems of domination can give rise to "zero-sum" forms of competition between "dissimilar parties", or between majority and minority groups, with minority groups seeking social transformation through violent methods.[260] At a macro-political level then the term asymmetrical conflict is used here to describe conflicts between local groups that oppose a political system (vertical conflicts), whereas the term symmetrical conflict is used to describe struggles between local groups in a hierarchical system that can be changed by groups of unequal power but with equal citizenship rights (horizontal conflicts). Achieving the latter is dependent upon institutional reforms that ensure equal rights and protections for all citizens within a state.

Dangers for violent horizontal and vertical conflicts also exist with "ad hoc" reconciliation attempts being made by ex-militia and ex-GAM combatants in ethnically homogenous Acehnese villages. Although not confronting obstacles due to ethnicity or religious difference, Village CA5 experiences obstacles with building social cohesion. This is due to lingering political mistrust and past violence committed by both groups. Divisions are compounded by significant economic disparities between ex-militia members that are better off than ex-GAM combatants; the latter have yet to receive any livelihood assistance from the GoI or donors. Feelings of economic injustice, particularly acute among ex-GAM combatants, claims of corruption against the village apparatus and GoI officials, and political

---

[256] In the context of Aceh, Brown points out that "overlapping aspects of vertical, horizontal and spatial inequality…reinforce each other, contributing to the durability of separatist conflict"; Graham Brown, Horizontal Inequalities, Ethnic Separatism, and Violent Conflict, p. 2.

[257] Hugh Miall, Oliver Ramsbotham and Tom Woodhouse, Contemporary Conflict Resolution: The prevention, management and transformation of deadly conflicts pp. 101-102.

[258] ibid.

[259] Claude Ake describes the differences between the two as "pathological vertical social cleavages" (hostile exclusive sub-group affiliations) as opposed to healthy horizontal social articulations (a sense of "nation" and citizenship); see, Claude Ake, Why Humanitarian Emergencies Occur: Insights from the Interface of State, Democracy and Civil Society.

[260] Miall et al., Contemporary Conflict Resolution: The prevention, management and transformation of deadly conflicts, pp. 12-13, 22, 189, 203.

injustice create possible conflict trajec-tories along vertical and horizontal lines.

In Village CA6 the assessment team received reports that during the conflict period GAM groups regularly "raided" other GAM villages taking food, crops, or livestock.[261] It is worth noting that this information was provided very cautiously and privately by villagers, whereas in separate questioning ex-GAM FGD respondents denied such acts were ever committed.[262] No action was ever taken to address those crimes and villagers remain fearful of seeking resolution (i.e., no sanctions imposed by informal forums to address justice grievances). In Village CA1 the assessment found an ex-GAM unit that was comprised of individuals from several villages in one subdistrict, but that had unclear links with ex-GAM units from neighbouring subdistricts. Respondents explicitly asked UNDP assess-ment team members to tell donors not to provide funds to their leadership because they "cannot be trusted with money, better to provide funds to an NGO that will help us for certain."[263] Although difficult to determine precise factional divisions given the secretive nature of ex-GAM combatants,

the World Bank identifies three groupings: moderates, ideological revolutionaries and younger criminal elements that joined after 1998.[264] Possible sources of conflict among these groups arise from unequal aid distribu-tion, economic and political grievance, per-ceptions of leadership corruption, and inter-village competition for natural resources. The inability of local justice forums to address such tensions or resolve justice grievances can result in violent criminality among ex-GAM combatants, inter-village conflicts between ex-GAM groups, or conflict bet-ween local ex-GAM groups and the GoI.

Other dangers of horizontal conflicts between different groups at village level spring from a failure to resolve justice grievances arising from unequal aid distribution and claims of corruption (i.e., hierarchical power imbalances potentially leading to violent horizontal conflicts within villages or between villages). However, these types of conflicts are less likely to be underpinned by political, religious or cultural grievances that can lead to vertical conflict with either the provincial government or the GoI.

[261]  FGD, Widows of Conflict, 27 January 2006, Village CA6, Aceh Utara.  These sorts of actions are usually attributed to the need of GAM combatants to "survive" during the conflict period. However, they can also be considered a form of natural resource competition that can re-emerge in the post-conflict period.

[262]  FGD, ex-GAM Combatants, 24 January 2006, Village CA6, Aceh Utara.  On the other hand, an ex-GAM commander openly admits that there were "good and bad GAM"; Interview, ex-GAM Commander, 22 January 2006, Village CA5, Aceh Utara.

[263]  FGD, ex-GAM Combatants, 18 February 2006, Village TA1, Aceh Barat.

[264]  Barron, Clark, Daud, Conflict and Recovery in Aceh: An Assessment of Conflict Dynamics and Options for Supporting the Peace Process (World Bank: Decentralisation Support Facility), p. 24.  The younger and more hostile groups relative to older ex-combatants are sometimes referred to as the "invisible youth"; Christine Susanna Tjhin, Post Tsunami Reconstruction and Peace Building in Aceh: Political Impacts and Potential Risks (Jakarta:Centre for Strategic and International Studies, October 2005)  http://www.csis.or.id/papers/wps053.



**Appendix 5**
**Methodology, Research Phases and Site Selection**

Appendix 5

# Appendix 5 - Methodology, Research Phases and Site Selection

During the assessment planning stage, it was decided that the research team should focus upon several thematic issues that appeared in earlier assessments as priority areas. These include land, property, guardianship and inheritance, as well as on the implications of the MoU on the justice sector and the attendant potential areas of support. In addition to this, the research team was assigned the following set of tasks:

- To assess the impact of the tsunami and the conflict on the formal and informal justice systems in selected areas;
- To understand the implications of the MoU for the justice system and identify priority areas of support to strengthen the peace building and recovery process;
- To identify the key factors obstructing access to justice at the community level;
- To understand the role of formal and informal justice systems at the community level;
- To understand the experience of different providers of justice-related services (such as judges, prosecutors, lawyers, police, traditional leaders and civil society organisations), and the users of the justice system, what specific challenges and obstacles they face to ensure/access justice remedies, particularly for poor and vulnerable groups, what type of strategies they have developed to access justice, and what type of factors influence their success or failure; and,
- To provide recommendations on priority areas to strengthen access to justice in the province and possible strategies to employ.

## Stage One: Recruitment and Training of Researchers

Recruitment was conducted by UNDP and partner organizations between November and December 2005. Recruitment sought a gender balance within the team as well as a balance between technical and academic skills. Additionally, emphasis was placed on researchers with Acehnese language skills. Between 3 and 17 January, 2006, the research team underwent a training and piloting of tools stage. Technical inputs for the design of the assessment as well as the research tools were received by two of UNDP's partner organizations (World Bank and IDLO). During this period, the team also created a list of duty-bearers and institutions to incorporate into the assessment based on guidelines and tools provided by UNDP's Jakarta office.

The assessment was carried out by a team of six field researchers under the direction of a research team leader. Field support for the team was provided by a Project Development and Technical Assistance Consultant and an Assessment Coordinator.

## Stage Two: Site Selection, Verification Process and Identifiction of Disadvantaged Groups

*Geographic scope.* In order to address post-tsunami and post-conflict political reconstruction needs, the geographic scope of the assessment covered a mix of conflict affected and tsunami affected districts and municipalities (identified by the World Bank and UNDP as priority areas of focus): the districts of Aceh Barat, Pidie, Aceh Utara and Aceh Tengah, and the municipality of Banda Aceh.

*Sampling Method and Justification.* For each district the team was required to identify two sub-districts, two villages in each of the selected sub-districts, and two sites in Banda Aceh (total 18 villages). Selection criteria included: was the village affected by conflict or the tsunami; were there any disputes arising from land, property, guardianship or inheritance claims. In order to identify villages that best represented the sets of thematic issues to be investigated, a purposive / theoretical sampling method was used to identify sub-districts and villages. This is a method by which,

> [I]nterviews are conducted with representatives of each category, stakeholder, or socio-economic group of interest to the objective of the study, but without random selection of the particular subjects who are studied in each group.[265]

Groups and sites selected can be representative of problems confronting groups in a society more broadly. Nevertheless, the generalizations that are made need to be treated as "guidelines" about the types of isues/dynamics one will encounter in the field, the details of which can be subject to regional variations. Even considering this caveat sufficient scope exists for donors and aid agencies to design interventions in a manner that will ensure maximum relevance to the local context, thus minimizing the danger that a project will need to be entirely redesigned after it has been launched.

Sub-district site selection began with inputs from team members. This was followed by a stakeholder meeting with groups at provincial level. At district level, the team received further inputs from several groups in each district so as to identify villages for the assessment. One "control" village was introduced into the assessment in order to establish the extent to which findings could be more broadly applied or what different types of problems might exist in villages that did not match our selection criteria. At each stage of the site selection process the team conducted a verification process of the thematic research issues identified as priorities. This allowed scope for the investigation of other issues that may have been more pressing grievances confronting members of the community.

In order to complete the assignment in a manner consistent with empowering people, the team used participatory methods to bring out illustrative voices of poor and other disadvantaged and vulnerable individuals. Similar methods were used to solicit the views of lawyers, judges, community leaders, prosecutors, police and NGOs. Research methods included :

- Piloting and refinement of access to justice related research tools;
- Desk review of relevant laws and regulations, official statistics and selected literature and reports examining the impact of conflict on the justice system in Aceh;
- Focus group discussions, in-depth interviews with users and providers of justice services at district and village levels;
- Use of transects, mobility maps and sociograms outlining power relationships within villages; and
- Identification and elaboration of illustrative case studies to examine specific problems.

265  Michel Bamberger (ed.), Integrating Quantitative and Qualitative Research in Development Projects (Washington: The World Bank, 2000), pp. 10-15.

## Stage Three: Research of Justice Mechanisms and Obstacles

Between 15 January and 29 February 2006 the research team mapped socio-economic settings, claim-holders and duty-bearers in 18 villages, 9 sub-districts, and 4 districts and at the provincial level in Banda Aceh. The research team identified dispute resolution mechanisms at each administrative level (village, sub-district, district, province), the source of authority for each (e.g., formal law, custom, informal arrangements) and powers; how the different mechanisms are used and by whom; how well the outcomes of these mechanisms are enforced; civil and parliamentary oversight of these mechanism; and the level of integration between the formal and informal mechanisms. Donor responses in various justice sectors were also mapped. At district level the assessment team devoted between one to two days canvassing formal system actors and conducting NGO mapping exercises. At sub-district and village level the assessment team divided into two sub-teams made up of four and five people respectively and devoted two days carrying out research in each of the village assessment sites. Follow-up data collection was conducted during March and the first two weeks of April as data analysis progressed and in order to fill key gaps that emerged. In sum, the assessment team conducted approximately 250 FGDs and interviews at village, sub-district, district and provincial level with over 500 respondents.

**Research Limitations.** The institutional, geographic and thematic scopes of the assessment are daunting and, combined with time and budgetary constraints meant that statistical data is sometimes absent from the assessment. For example, the total number of legal aid practitioners, lawyers or judges is not listed at an aggregate provincial level. Information on such gaps/needs is often drawn from qualitative interview data. Moreover, time constraints in the field meant that site selection included considerations of accessibility; thus meaning that only three isolated villages in extremely remote areas are represented in the assessment. Additional constraints revolve around issues of "community trust" with outsiders. The assessment team often expended considerable energies to build trust with village respondents in order to solicit accurate data. Issues of mistrust with formal system justice actors also proved obstacles in the field, with some assessment team members even accused of being "spies". Furthermore, even with the trust-building measures attempted by assessment team members, there remained highly sensitive political issues that community members were sometimes reluctant to discuss openly. Related to the large scope of the assessment, constraints are also drawn from the number of questions team members were required to ask respondents, and the time respondents could devote to the assessment; meaning that on numerous occasions not all relevant questions were delivered and answered in the FGDs and interviews. Another constraint is found with the nature of the assessment and the research questions that potentially skewed the fieldwork in favour of formal institutional structures at the expense of "community". This last obstacle was addressed through the assessment team's site selection and verification process of issues to investigate, which sought to ensure that the issues investigated are those that community members feel are their most serious problems and obstacles for accessing justice, as opposed to investigating justice issues identified by outside "experts". Irrespective of the listed constraints, this assessment identifies key problems and obstacles to community access to justice

180

Appendix 5

| TABLE 35: INTERVIEWS WERE CONDUCTED WITH THE FOLLOWING PEOPLE AND INSTITUTIONS : | | Province | District | Sub-district | Village |
|---|---|---|---|---|---|
| **Executive** | Governor's Office | ● | | | |
| | *Bupati* Office | | ● | | |
| | *Camat* Office | | | ● | |
| **Legislative** | House of Representatives | ● | | | |
| **Formal** | General Court | ● | | | |
| | *Syariah* Court | ● | | | |
| | Public Prosecution | ● | | | |
| | Police | ● | | ● | |
| | *Wilayatul Hisbah* | ● | | | |
| **Informal** | *Imam Mukim* | | | | ● |
| | *Geuchik* | | | | ● |
| | *Adat* operators | | | | ● |
| **Auxillary** | Planning board | ● | | | |
| | *Dinas Syariat Islam* | ● | ● | | |
| | Land Office (BPN) | ● | | | |
| | Women's Empowerment Bureau | ● | ● | | |
| | *Dinas Social* | ● | ● | | |
| | Religious Affairs Office (KUA) | | | ● | |
| | Acehnese *Adat* Council (MAA) | ● | ● | | |
| | *Ulamas'* Consultative Council (MPU) | ● | ● | | |
| **Civil Society** | Civil Society Organizations | ● | ● | ● | |
| | Community members | | | ● | ● |
| **Other** | *Donor* agencies/INGOs | ● | ● | | |

with accurate input from community members. This provides important findings and recommendations that will contribute to addressing justice issues arising from tsunami reconstruction and the post-conflict peace building process. Table 35 lists the types of justice system actors and civil society groups that were involved in the assessment and the administrative levels at which the assessment was conducted.

## Stage Four: Analysis and Report Writing

Analysis and report writing for the assessment was completed between March and May 2006. In March the assessment team presented preliminary findings at a workshop held at the Europe House located in Banda Aceh. The presentation sought to promote participatory inputs from attendants that included representatives from the provincial government, from the Indonesian Supreme Court, from Civil Society groups, and from several international agencies engaged with justice sector reform. The workshop led to the identification of additional justice grievances and obstacles for community access to justice, as well as innovative recommendations on how to promote community access to justice that were subsequently incorporated into UNDP's Access to Justice for Peace and Development in Aceh Project Document. During the assessment writing stage valuable contributions were also made by two of UNDP's partner organizations (IDLO and the World Bank) to the analysis of formal and informal legal mechanisms.

# EXHIBIT F



**DECISION**

**Number 006/PUU-IV/2006**

**FOR THE SAKE OF JUSTICE UNDER THE ONE ALMIGHTY GOD**

**THE CONSTITUTIONAL COURT OF THE REPUBLIC OF INDONESIA**

Examining, hearing and deciding upon constitutional cases at the first and final level, has passed a Decision on the Petition for Judicial Review on Law of the Republic of Indonesia Number 27 Year 2004 concerning Commission for the Truth and Reconciliation against the 1945 Constitution of the Republic of Indonesia, filed by:

1. **Lembaga Studi dan Advokasi Masyarakat (ELSAM)** having its address at Jalan. Siaga II Number 31, Pejaten Barat, South Jakarta, Telephone (021) 7972662, 398 99777, in this case represented by **Asmara Nababan, S.H.,** born in Siborong-borong, on the 2nd of September 1946, Christian, Indonesian Citizen, the Chairperson of the Executive Board of Lembaga Studi dan Advokasi Masyarakat (ELSAM);

    Hereinafter referred to as  ----------------------------------------- **PETITIONER I;**

2. **Komisi untuk Orang Hilang dan Korban Kekerasan (Kontras)** having its address at Jalan Borobudur Number 14, Central Jakarta, in this case

represented by **Ibrahim Zakir,** born in Jakarta, on the 31st of May 1951, Muslim, Indonesian Citizen, the Chairperson of the Executrive Board of Perkumpulan Komisi untuk Orang Hilang dan Korban Kekerasan (Kontras);

Hereinafter referred to as ------------------------------------------ **PETITIONER II**;

3. **Solidaritas Nusa Bangsa (SNB),** having its address at Perumahan Depok Mulya III Blok AF 3 Tanah Baru, Depok, West Java, Telephone (021) 775 0677 in this case represented by **Ester Indahyani Yusuf, S.H.,** born in Malang, the 16th of January  1971, Christian, Indonesian Citizen, The Chairperson of the Executive Board of Solidaritas Nusa Bangsa (SNB);

Hereinafter referred to as ------------------------------------------ **PETITIONER III**;

4. **Inisiatif Masyarakat Partisipatif untuk Transisi Berkeadilan (Imparsial),** having its address at Jalan. Diponegoro Number 9, Central Jakarta, Telephone (021) 319 00627 in this case represented by **Rachland Nashidik,** born in Tasikmalaya, on the 27th of February 1966, Muslim, Indonesian Citizen, Executive Director;

Hereinafter referred to as ------------------------------------------ **PETITIONER IV;**

5. **Lembaga Penelitian Korban Peristiwa 65 (LPKP 65)**, having its address at Jalan. Kramat V No. I C, Central Jakarta in this case represented by **Soenarno Tomo Hardjono**, born in Solo, on the 24th of November 1934, Muslim, Indonesian Citizen, Chairperson of Lembaga Penelitian Korban Peristiwa 65 (LPKP 65)

Hereinafter referred to as ----------------------------------------- **PETITIONER V**;

6. **Lembaga Perjuangan Rehabilitasi Korban Rezim ORBA (LPR-KROB)** having its address at Jalan. Taman Singotoro Number 13, Candi Baru, Semarang, Central Java, in this case represented by **Sumaun Utomo**, born in Surabaya, on the 18th of August 1923, Christian, Indonesian Citizen, General Chairperson;

Hereinafter referred to as ----------------------------------------- **PETITIONER VI**;

7. **Raharja Waluya Jati**, born in Jepara, on the 24th of December 1969, Muslim, Indonesian Citizen, provate entrepreneur, having his address at Jalan. Mede II No. 11 Utan Kayu Utara Matraman, East Jakarta, Telephone (021) 813 8274;

Hereinafter referred to as ----------------------------------------- **PETITIONER VII**;

8. **H. Tjasman Setyo Prawiro**, born in Semarang, on the 3rd of March 1924, Muslim, Indonesian Citizen, provate entrepreneur, having his address at Jalan. Raya Pondok Gede No 19, Rt. 015/Rw. 011, Kramat Jati Sub-district, Kramat Jati District, East Jakarta, Telephone (021) 9147026;

Hereianfater referred to as ----------------------------------------- **PETITIONER VIII**;

- Petitioners I to VI are Petitioners in the form of Private Legal Entities;

- Petitioners VII and VIII are Individual Petitioners;

Based on the Special Power of Attorney, dated the 29th of August 2005, the following persons have been authorized, namely:

1.  A.H. Semendawai, S.H., LL.M;

2.  Asfinawati, S.H;

3.  Betty Yolanda, S.H;

4.  Chrisbiantoro, S.H;

5.  Edwin Partogi, S.H;

6.  Erna Ratnaningsih, S.H;

7.  Fajrimei. A. Gofar,  S.H;

8.  Gatot, S.H;

9.  Haris Azhar, S.H;

10. Hermawanto, S.H;

11. Ignatius Heri Hendro Harjuno, S.H;

12. Indria Fernida, S.H;

13. Indriaswati D. Saptaningrum,  S.H., LL.M;

14. Ines Thioren Situmorang, S.H;

15. Poengki Indarti, S.H., LL.M;

16. Sondang Simanjuntak, S.H., LL.M;

17. Sri Suparyati, S.H;

18. Supriyadi Widodo Eddyono, S.H;

19. Taufik Basari, S.H., S.Hum., LL.M;

20. Uli Parulian Sihombing, S.H;

21. Wahyu Wagiman, S.H;

22. Yusuf Suramto, S.H;

23. Zainal Abidin,  S.H;

All of whom are Advocates and Solicitors of the Jakarta Legal Aid Agency, Lembaga Studi dan Advokasi  Masyarakat (ELSAM), Komisi untuk Orang Hilang dan Korban Tindak Kekerasan (KONTRAS), Solidaritas Nusa Bangsa (SNB), and Perkumpulan Inisiatif Masyarakat Partisipatif untuk Transisi Berkeadilan (IMPARSIAL), Yayasan Pengabdian Hukum Indonesia (YAPHI), joined together in the Advocacy Team for Justice and Truth selecting its legal domicile at the Office of the Jakarta Legal Aid Agency,  at Jalan. Diponegoro No. 74, Central Jakarta, who are acting both individually and jointly;

Hereinafter referred to as  ------------------------------------------------ **The Petitioners;**

Having read the Petition of the Petitioners;

Having heard the testimonies of the Petitioners;

Having heard and read the affidavits of the Government;

Having heard and read the affidavits of the People's Legislative Assembly of the Republic of Indonesia;

Having heard and read the affidavits of domestic and foreign experts as well as witnesses presented by the Petitioners;

Having heard the testimonies of the National Commission for Human Rights;

Having heard and read the testimonies of the former Chairperson of the Special Committee for the Draft Law on the Commission for Truth and Reconciliation;

Having read the concluding opinion of the Petitioners.

Having read the concluding opinion of the National Commission for Human Rights;

Having examined the evidence;

## LEGAL CONSIDERATIONS

Considering that the purpose and objective of the petition is as described above.

Considering that there are three matters to be considered by the Court in this case, namely:

1. The authority of the Court to examine, try and decide upon the petition filed by the Petitioners;

2. The legal standing of the Petitioners to file the petition;

3. The subject matter of the petition regarding the constitutionality of the laws on which a judicial review is petitioned by Petitioners.

With regard to the aforementioned three matters, the Constitutional Court is of the following opinions:

## I.    THE AUTHORITY OF THE COURT

Considering whereas based on the provision of Article 24C paragraph (1) of the 1945 Constitution of the Republic of Indonesia (hereinafter shall be referred to as the 1945 Constitution), the Constitutional Court has the authority "*to try cases at the first and final level, the decisions of which shall be final, to conduct judicial review on laws against the Constitution, to settle disputes on authorities between state institutions whose authorities are bestowed by the Constitution, to decide upon the dissolution of political parties, and to decide upon electoral disputes*". The provision is restated in Article 10 paragraph (1) of Law of the Republic of Indonesia Number 24 Year 2003 concerning Constitutional Court (State Gazette of the Republic of Indonesia Year 2003 Number 98, Supplement to State Gazette of the Republic of Indonesia Number 4316, hereinafter shall be referred to as the CC Law);

Considering that the petition of the Petitioners is regarding judicial review on Law of the Republic of Indonesia Number 27 Year 2004 concerning Commission for the Truth and Reconciliation (State Gazette of the Republic of Indonesia Year 2004 Number 114, Supplement to State Gazette of the Republic of Indonesia Number 4429, hereinafter shall be referred to as the KKR Law) against the 1945 Constitution, so that the aforementioned petition is within the jurisdiction of the Constitutional Court.

## II.    LEGAL STANDING

Considering whereas Article 51 paragraph (1) of the Constitutional Court Law (UUMK) stipulates that petitioners in the review of law against the

1945 Constitution are those who deem that their constitutional rights and/or authorities are harmed by the establishment of a law, namely:

a.    Indonesian Citizen individuals (including group of people having the same interest);

b.    units of customary law communities insofar as still in existence and in accordance with the development of the community and the principle of the Unitary State of the Republic of Indonesia regulated in a law;

c.    public or private legal entities; or

d.    state institutions.

Considering also that since the issuance of Decision Number 006/PUU-III/2005, the Constitutional Court has determined 5 (five) requirements for the existence of constitutional losses as intended in Article 51 paragraph (1) of the Constitutional Court Law (UUMK) as follows:

a.    petitioners must have constitutional rights granted by the 1945 Constitution;

b.    such constitutional rights shall be deemed to have been harmed by the coming into effect of a law;

c.    the constitutional right losses shall be specific and actual in nature or at least potential in nature which pursuant to a logical reasoning will take place for sure;

d.    there is a causal connection (*causal verband)* between the constitutional right losses and the law against which review is petitioned;

e.  there is a possibility that upon the granting of a petition, the constitutional right losses argued shall not come into existence or shall not occur any longer;

Considering that to examine whether the Petitioners have the proper legal standing to file the petition, the Court must observe (i) into which category the Petitioners can be classified, and (ii) which constitutional rights are harmed by the establishment of the KKR Law;

Considering whereas Petitioners I up to VI argued that they are private legal entities, as intended in Article 51 paragraph (1) point (c), however based on the evidence presented, there is no legalization as legal entity issued by the Ministry of Law and Human Rights as required by applicable regulations. On the other hand, Petitioners I up to VI, who claim to have what they call as organizational standing, are only associations, which have not had a status as legal entities in accordance with applicable regulations, so that the Court is of the opinion that the Petitioners can only be classified as individual citizens or groups of individuals having common interests. Therefore, their qualification is similar to that of Petitioners VII and VIII as individual Indonesian citizens.

Considering the Petitioners argued their constitutional rights are human rights not to be tortured, to live, and to obtain equal treatment without any discrimination which are guaranteed by the 1945 Constitution. They argued that the establishment of the KKR Law harm their constitutional rights, because the KKR Law is deemed to provide guarantee, respect and protection for the basic rights of the Petitioners as intended in Article 27 paragraph (1), Article 28D

paragraph (1), Article 28I paragraph (2) and paragraph (5) of the 1945 Constitution, especially because Article 1 point 9, Article 27, and Article 44 of the KKR Law provide that the compensation and rehabilitation depend on the granting of amnesty, the provision of which can negate the right to rehabilitation and compensation as human rights which must be unconditionally guaranteed, protected and fulfilled based on the 1945 Constitution and render them uncertain.

Considering whereas Article 1 point (9) of the KKR Law reads as follows: *Amnesty shall be the pardon granted by the President to the perpetrators of gross human rights violation by taking into account the considerations of the People's Legislative Assembly*."

Article 27 of the KKR Law reads as follows, "*Compensation and rehabilitation as intended in Article 19 can be granted if the request for amnesty is granted*".

Article 44 of the KKR Law reads as follows, "*The cases of gross violation of human rights which have been disclosed and settled by the Commission cannot be filed again to an ad hoc human rights court*".

The Petitioners argued that the aforementioned articles are contradictory to the 1945 Constitution, as described below:

1.  Article 1 point (9) of the KKR Law is contradictory to Article 28D paragraph (1) of the 1945 Constitution, which provides acknowledgement, guarantee, protection, and equitable legal certainty, and Article 28I paragraph (5) of the 1945 Constitution, which stipulates that to uphold and protect human rights in accordance with the principle of democratic constitutional state, the

application of human rights must be guaranteed by laws that are in line with the constitution.

2. Article 27 of the KKR Law is contradictory to Article 27 paragraph (1) of the 1945 Constitution, which provides for equal treatment before the law and the government and respect for the law and government, Article 28D paragraph (1) of the 1945 Constitution, which provides for guarantee, protection and equitable legal certainty as well as equal treatment before the law, Article 28I paragraph (2) of the 1945 Constitution which reads, "*Every person shall be entitled to be free from discriminative treatment based on anything and shall be entitled to obtain protection from such discriminative treatment*" and Article 28I paragraph (4) of the 1945 Constitution which reads, "*Protection, advancement, upholding, and fulfillment of the human rights shall be the responsibility of the state, especially the government.*"

3. Article 44 of the KKR Law is contradictory to Article 28D paragraph (1) of the 1945 Constitution provides for guarantee, protection and equitable legal certainty as well as equal treatment before the law, Article 28I paragraph (2) of the 1945 Constitution which provides that every person shall be entitled to be free from discriminative treatment based on anything and shall be entitled to obtain protection from such discriminative treatment, and Article 28I paragraph (4) of the 1945 Constitution which provides that protection, advancement, upholding, and fulfillment of the human rights shall be the responsibility of the state, especially the government.

Considering Petitioners VII and VIII are individuals arguing that they are respectively victim of abduction and forced disappearance in 1997-1998 and former political prisoner for 14 years for alleged involvement in the G-30-S coup, without being tried before a court of law and being found guilty. Based on an assumption that the KKR Law is contradictory to the aforementioned articles of the 1945 Constitution and harms the constitutional rights of Petitioners VII and VIII especially with regard to Article 28D paragraph (1) which reads as follows, "*Every person shall be entitled to acknowledgement, guarantee, protection, and equitable legal certainty and equal treatment before the law*", Article 28I paragraph (1) which reads, "*The right to live and the right not to be tortured ...*", Article 28I paragraph (4) which reads, "*Protection, advancement, upholding, and fulfillment of the human rights shall be the responsibility of the state, especially the government*", the Court is of the opinion that the aforementioned constitutional rights of Petitioners VII and VIII are deemed as having been harmed by the KKR Law so that the Court can accept them as parties meeting the requirements set forth in Article 51 paragraph (1) of the CC Law. Therefore, Petitioners VII and VIII have the required legal standing to file this petition. Whereas with regard to Petitioners I up to VI, who are acting as social organizations providing advocacy and attention and striving for defending the basic rights of victims of human rights violation and participating in the public hearing with the People's Legislative Assembly during the discussions of the KKR Draft Law and considering the human rights set forth in the Constitution as their rights and interests as citizens, in accordance with the Decisions of the

Constitutional Court Number 002/PUU-I/2003, Number 058-059-060-063/PUU-II/2004 and Number 008/PUU-III/2005, as well as Number 003/PUU-III/2005, the Court is of the opinion that Petitioners I up to VI have the proper legal standing to file the aforementioned petition.

Meanwhile, two constitutional judges, namely H. A. S. Natabaya and H. Achmad Roestandi, are of the opinion that Petitioners I up to VI do not have a proper legal standing to engage in legal proceeding before the Court. This is based on the argument that the claim made by Petitioners I up to VI as associations of acting in their capacity as victims based on the *a quo* law is not founded, because according to the criminal law the Petitioners as associations cannot possibly be qualified as victims of gross human rights violation based on Law Number 26 Year 2000 concerning Human Rights Court. Whereas Petitioners VII and VIII, as individuals, cannot also be qualified as victims under the *a quo* law because the Petitioners do not mean the definition of victim as set forth in Article 1 point 5 *juncto* Article 1 point 4 of the KKR Law. Moreover, the KKR institution having the authorities to reveal the truth of gross human rights violations has not been established, and especially the authority to conduct investigation and clarification on gross human rights violations is still premature.

## III.    THE PRINCIPAL ISSUE OF THE PETITION

Considering whereas the arguments in the Petitioners' petition state that Article 27, Article 44, and Article 1 point (9) of the KKR Law are contradictory to the 1945 Constitution for the following reasons:

14

1.    The provision of Article 27 of the KKR Law renders the rights of the victims to compensation and rehabilitation depending on the granting of amnesty, not on the substance of the case.

2.    Amnesty as provided in Article 27 of the KKR Law requires the existence of perpetrators. As the consequence, if the perpetrators cannot be found, it is impossible that the amnesty would be granted, so that the victims are deprived from guarantee for reparation;

3.    This provision has placed the victims in an unequal and depressed position because the victims are subject to a burdensome requirement for obtaining their rights, namely depending on the granting of amnesty.

4.    The formulation of Article 27 of the KKR Law creates in-equal positions between the victims and the perpetrators and discriminates the victims' rights to reparation and not to depend on the perpetrators and it also fails to respect the victims suffering from the gross human rights violation.

5.    Article 44 of the KKR Law placing the KKR as a pseudo-judicial body closes the access for every person to obtain settlement through a judicial process.

6.    The provision of Article 44 of the KKR Law, which does not allow judicial examination by an ad hoc human rights court if the case has been settled through the KKR, deprives citizens of their rights to sue perpetrators of

gross human rights violation as set forth in the international law, either international practices or international treaties.

7.     Amnesty for the perpetrators of gross human rights violation is a violation of the international law, but the provision of Article 1 point (9) of the KKR Law in the contrary states that amnesty may be granted to the perpetrators of gross human rights violation and therefore this article is contradictory to the legal principles acknowledged by the international community.

Considering whereas to support their arguments, the Petitioners presented documentary evidence marked as P-1 up to P-36b, two witnesses, and six experts the testimonies of which have been described in full in the principal issue of the case, which principally stated as follows:

**Witness Testimonies.**

**1.  Witness Marullah:**

-       Whereas the witness is a victim of torture in the Tanjung Priok case who was detained in Guntur and Cimanggis detention centres, and then relocated to Salemba penitentiary. The witness was tried in a juvenile court and was sent to prison for 20 months less the detention period, the remaining term of 17 months was served in Cipinang penitentiary;

-       Whereas the witness is an eye-witness who informed the authorities

about the places where the victims killed in the incident were buried, such as in the Pondok Rangon cemetery, Mengkok cemetery, and Tipar Cakung cemetery. The witness is one of 13 victims who received a compensation in the amount of Rp.21,000,000.- (twenty-one million Rupiah).

2. **Witness Mugiyanto:**

- The witness was an activist of Solidaritas Mahasiswa Indonesia untuk Demokrasi (SMIK - Indonesian Students' Solidarity for Democracy) fighting for campus autonomy and refusing military intervention in campus. He was abducted on March 13, 1998 from his rented house in Klender at around 19:00 West Indonesia Time by the authorities and was taken to the Duren Sawit Military Post. After being interrogated, he was then taken to the East Jakarta Military District Headquarters;

- The witness was charged with violation of the anti-subversion regulations and detained at the East Jakarta Military District Headquarters, before being transferred to the Headquarters of Jakarta Military Region and then to the Headquarters of Jakarta Regional Police, for three months as from March 15 up to June 6, 1998. The witness was released following the downfall of Soeharto and the revocation of the anti-subversion law by the new president, Habibie;

- The witness is one of nine surviving victims. According to his fellow activists, among those abducted during the period of 1997 – 1998 there were 13 persons who are still missing and one of them was found dead after missing for several days;

- According to the witness, the judicial process on the "Rose Team" did not implicate the perpetrators. It was far from what was expected by the victims, the victims' families and the witness;

- The witness is very upset because to date despite of the fact that he is a good citizen, people still perceive him as a communist, a rebel and a fundamentalist. As the consequence, the witness has been subject to discrimination, impoverishment and deception. This was an unfair government policy.

**Testimonies of Expert Witnesses:**

1. **Expert Witness Dr. Tamrin Amal Tomagola**:

- Whereas omission of human rights is contradictory to the first sentence of the Preamble of the 1945 Constitution and it is the duty of the state to protect the human rights of its citizens;

- Whereas to achieve settlement among the parties involved in order to uphold the national unity of Indonesia and solidarity among all components of the nation, the KKR is expected not to leave behind untreated wounds or a gap and distrust among different groups or components of the nation;

- Actually, the focus and the point of concern of all processes of the KKR should be placed on the victims and their rights, including the right to forgive and to give pardon. The main and ultimate aspect is the victims' right to give pardon, or, in relation to the President, amnesty;

- Therefore, the right to give pardon belongs to the victims, which must be endeavored through a full mechanism in the KKR to be settled by the parties involved, without any necessary judicial process;

2.    **Expert Witness Dr. Asvi Warman Adam, APU.**:

- Before 1965, political power was dominated by three parties, namely President Soekarno, the Army and the Indonesian Communist Party (PKI). However, conflicts were common at the lowest level of the hierarchy, involving PKI, BPI, as well as their community organizations and Muslim groups. Those conflicts were triggered by unilateral actions;

- On September 30 or October 1, 1965, the balance between Soekarno, the Army and PKI collapsed. Soekarno was gradually cast aside and PKI was alleged of masterminding the incident. Between 1965 – 1966, massacres were rampant in Central Java, East Java and Bali;

- RPKAD troops then trained local youths, especially Muslim youths, which was followed by mass arrests and massacres;

-       Indonesia case was very different from the South Africa case, where many of the perpetrators agreed to give their testimonies/confession for obtaining amnesty. They were afraid that they would be brought before the court if they refused to give testimonies or confession;

-       If the victims are to receive compensation after the granting of amnesty, there may be a connivance, because the victims want the compensation and they can arrange a compromise with the perpetrators, by not telling the whole story;

-       The article that makes the fate of the victims depending on amnesty for the perpetrators is very unfair and impossible to be implemented. The victims' right to obtain compensation is vested to them and not related to the perpetrators;

-       History is again used as an agent of freedom, in this case the KKR provides the opportunity for the victims to tell their stories. This is also a part of psychological healing, namely healing the wounds by telling their past sufferings.

3.      **Expert Witness Rudi Muhammad Rizky, S.H., LL.M.**:

-       The Commission for the Truth and Reconciliation has formally met the requirements for such commission based on the Dougatt Principle. The minimum requirement for such a commission is that it is established by the legislative and executive bodies that are elected democratically and such commission must have far-ranging

authorities as well as far-reaching mandates;

-     Such commission must have the authority to recommend reparation for the victims of gross human rights violation. While perpetrators refusing to cooperate with the commission or refusing to disclose their crimes openly will not obtain amnesty;

-     Punishment for the perpetrators is actually an obligation of the mankind as a whole. Whereas victim compensation is only for the benefits of the victims or their heirs;

-     One of the basic reasons for establishing the KKR Law is to reveal the truth for the interests of the victims and their heirs to obtain compensation, restitution and rehabilitation. The most important thing is the victims and is related to the obligation on an effective remedy;

-     Article 27 of the KKR Law provides for "compensation and rehabilitation" that can be granted if the request for amnesty is granted. Amnesty must be granted if the perpetrators give their confession of their crimes, actual facts, remorse and agreement to apologize to the victims and their heirs;

**4.     Expert Witness Prof. Douglas Cassel**:

-     The KKR Law has failed to fulfill the obligation of Indonesia as a state and failed to respect the rights of the victims, their families and Indonesian people based on the international human rights law in three ways:

First, it has failed to investigate and reveal the truth about any case related to genocide and crime against humanity before 2000;

Second, it has failed to provide reparation to the victims and their families;

Third, it has failed to prosecute and properly punish the perpetrators;

- Indonesia as a member of the UN, based on Articles 55 and 56 of the UN Charter as an international treaty, is responsible for human rights;

- Since 1927, the World Court has stipulated that all states have the obligation to conduct thorough and effective investigations, to provide effective reparation for the victims, as well as to prosecute and punish the perpetrators. The victims have the right to know the truth and are entitled to obtain justice in the form of the prosecution and punishment of the perpetrators;

- The scope of such effective reparation must include not only access to justice, but also the following five elements:

    1. Restitution, namely the restitution of the victims' properties or good reputation;

    2. Compensation, in the form of cash money for the losses;

    3. Rehabilitation, including medical or psychological care;

4.    Satisfactory measures, including acknowledgement by the public that it is the responsibility of the state and also public apology by a high-ranking official;

5.    Guarantee that such violation of human rights will not be repeated or recur;

-    There is a limitation in the granting of amnesty based on the international law and such limitation is specifically applicable for genocide and crime against humanity, which are the subjects of the KKR Law;

**5.    Expert Witness Prof. Paul Van Zyl**:

-    Whereas the currently existing form of the Indonesian Truth Commission fails to meet the standard made by the UN to achieve truth and justice, rather than truth or justice;

-    The only KKR granting amnesty for gross violation of human rights is the KKR of South Africa. However, the KKR of South Africa, which allowed amnesty, was an exception, rather than a rule. The reason was that such limitation was made because the apartheid government said that democracy could not arrive in South Africa if amnesty was not given and Nelson Mandela as well as the leaders of South Africa Human Rights movement agreed and gave their constitutional covenants on the amnesty. Therefore, the new constitution of South Africa includes a clause allowing amnesty for

perpetrators of gross human rights violation. If such clause was not included in the constitution of South Africa, the Constitutional Court of South Africa would not give its approval on such amnesty;

- Whereas the convention on civil and political rights has been adopted into the domestic law, along with the convention against torture. Article 7 of Law Number 39 Year 1999 concerning Human Rights stipulates that international regulations on human rights which have been ratified by the Republic of Indonesia shall be applicable and legally binding in Indonesia;

- Whereas several articles in the KKR Law constitute violations of the international law, as set forth in the international convention on civil and political rights and convention against torture. Those articles are Article 1 paragraph (9), Article 27, Article 28, and Article 44 of the KKR Law, the articles of which allow the Commission to recommend to the President to grant amnesty to the perpetrators of gross human rights violation;

- The amnesty as provided in the KKR Law is contradictory to Article 6 and Article 2 paragraph (3) of the ICCPR;

- Whereas Human Rights Commission has now been replaced by Human Right Council, and Indonesia has an important role in the council;

6.    **Expert Witness Prof. Naomi Roht-Arriaza**:

- The state is not only required to provide reparation for the victims, but must also ensure or guarantee that at least its national law provides the required protection for human rights in accordance with international liabilities or obligations. The state must also provide effective access to justice for those claiming themselves as victims of human rights violation;

- Based on the international law, the victims of gross human rights violation are the victims whose human rights have been violated. At the time such a crime is committed, those people at the same time have the status as victims. The state will grant to the victims the rights to obtain access to justice and to obtain reparation or reparation. Those rights are two separated but interconnected rights;

- Amnesty may be granted after a conflict. However, there is a limitation, based on which amnesty cannot be grated for certain crimes. According to the current practices and based on the law, amnesty cannot be granted for genocide or crimes against humanity. This is an international agreement included in various treaties, such as the anti-torture treaty, to which Indonesia is also a party;

- The Truth and Reconciliation Commission of South Africa allows amnesty in return for the truth. However, those who fail to convey the whole truth will be prosecuted;

- The Truth and Reconciliation Commission of East Timor has a procedure for reconciliation in the community as a part of the

procedures of the Commission. However, this procedure applies only for minor crimes. There is no such commission in Columbia, but this country has a law on peace and justice, which allows reduction of prison term by five years. In this matter, Columbia only provides the truth and reparation, but does not provide amnesty;

Considering whereas the Government, the People's Legislative Assembly, the former Chairperson of the Special Committee for KKR Draft Law, and the Chairperson of the National Commission for Human Rights have given their testimonies, in writing and verbally before the court, which are included in full in the explanation on the case and basically state as follows:

1. The Government:

   a. Whereas the establishment of the Truth and Reconciliation Commission was a collective initiative which gave an emphasis on "the values of peaceful settlement" of the Indonesian people in the context of the protection and enforcement of human rights. In the past (before the application of Law Number 26 Year 2000 concerning Human Rights Court, hereinafter Law on Human Rights Court), gross violations of human rights were often disregarded or even deemed non-existent, without any examination and investigation on the perpetrators, the victims and the number of the victims.

   b. Whereas one of the most important issue in the settlement of gross violation of human rights occurring in the past is that there is a

reconciliation between the perpetrators and the victims (Article 29 of the KKR Law), in order to achieve national reconciliation for stabilizing the national unity and integrity as mandated by the Stipulation of the People's Consultative Assembly of the Republic of Indonesia Number V/TAP/MPR/2000 concerning Stabilization of National Unity and Integrity.

It is expected that such incidents will not recur in the future, as described in the motto of the Truth and Reconciliation Commission of Argentina saying "*Nunca Ma'as*" (Never happen again), or that of South Africa saying "*to forgive but not to forget*";

c.  Whereas if the perpetrators give voluntary confession of their crimes, admit the truth of the facts, convey their regret for their crimes and are willing to apologize to the victims or their heirs, but the victims or their heirs refuse to forgive them, the Truth and Reconciliation Commission shall independently and objectively decide the submission of recommendation to the President for granting amnesty. This is intended to avoid protracted settlement of gross violation of human rights, which may finally hamper the achievement of the national reconciliation;

d.  Whereas if the perpetrators refuse to give voluntary confession of their crimes, admit the truth of the facts and convey their regret for their crimes, they shall lose their right to obtain amnesty from the President and their cases of gross violation of human rights may be referred to

an ad hoc human rights court based on Article 43 paragraph (1) of the Law on Human Rights Court.

e.  Whereas if the request for amnesty is refused by the President, this shall not be the end of the efforts to uphold justice on gross violation of human rights occurring in the past, especially for the victims and their heirs. In fact, such refusal of the request for amnesty provides an opportunity for the victims or their heirs to claim for their rights to obtain compensation, restitution and rehabilitation to the state (*please refer to* Government Regulation Number 3 Year 2002 concerning Compensation, Restitution and Rehabilitation for the Victims of Gross Violations of Human Rights), as the follow up to the provisions of Article 35 of the Law on Human Rights Court;

f.  The establishment of the Truth and Reconciliation Commission in various countries has lead to a shift in the concept of justice in settlement of criminal cases, namely from retributive justice/prosecutorial justice to restorative justice/community based justice, which emphasizes the importance of the restorative aspect for those suffering because of the crimes.

g.  Whereas lately the UN recommends wider application of the concept of restorative justice in the criminal courts through the United Nation Declaration on the Basic Principles on the Use of Restorative Justice Programmes in Criminal Matters. This is in line with the purpose and objective of the establishment of the KKR Law, which emphasizes the

settlement of gross violations of human rights through the out of court system.

For that reason, it can be concluded that amnesty is the right of the perpetrators showing good faith, who sincerely admit their crimes and apologize for their crimes in the past, whereas compensation, restitution and/or rehabilitation are the rights of the victims or their heirs that must be granted by the state;

2.    The People's Legislative Assembly:

   a.    Whereas the establishment of the KKR Law was based on the following considerations:

   The settlement of gross violations of human rights committed in the past before the Law on Human Rights Court comes into effect is very urgent because dissatisfaction and political friction should not be allowed to persist without any certainty as to the settlement. With the disclosure of the truth about gross violations of human rights committed in the past before the Law on Human Rights Court comes into effect through the Truth and Reconciliation Commission, it is expected that national reconciliation can be achieved. This is also in line with Article 47 of the Law on Human Rights Court, concerning the legal basis for the establishment of the KKR as a means for the settlement of gross violations of human

rights, other than the matters under the jurisdiction of the Human Rights Court.

b.    Whereas the objective of the establishment of the KKR is to settle past gross violations of human rights outside the court, in order to achieve national unity and amity as well as to create national reconciliation and unity with the spirit of mutual-understanding.

c.    Whereas the KKR Law is based on the principles of independence, freedom and impartiality, honesty, transparency and peace;

d.    Whereas the provision of Article 27 of the KKR Law, which provides for the granting of compensation, restitution and rehabilitation to the victims or their heirs of gross violations of human rights following the granting of request for amnesty by the President, is intended to create balanced positions of the perpetrators and the victims of gross violations of human rights, which will eventually create the sense of justice in the community. Amnesty is the constitutional right of the President granted by the Constitution (by taking into account the considerations from the People's Legislative Assembly) as intended in Article 14 paragraph (2) of the 1945 Constitution. Therefore, the victims of gross violations of human rights the perpetrators of which have obtained

amnesty are entitled to obtain compensation and rehabilitation from the state;

e.    Whereas the Truth and Reconciliation Commission is not intended merely for punishing or pillorying or prosecuting a person, but primarily for finding the truth which in the end will be useful for supporting the restoration of harmonious relationship between the perpetrators, the victims and the people, all of whom are basically victims of the crime;

Justice in the KKR is synonymous with the complete disclosure of all incidents by bringing together and confronting the perpetrators and the victims, while avoiding complicated procedural law. The process of the KKR is intended to avoid the recurrence of similar incidents in the future through a reconciliation process and is not aimed merely at criminal prosecution based on humanity and awareness of the existence of community interdependence;

The protection and restoration of the rights of the victims and the people at large are considered as equally important as the criminal prosecution and/or rehabilitation of the perpetrators.

f.    Whereas Article 44 of the KKR Law, which stipulates that cases of gross violations of human rights which have been

disclosed and settled by the Commission cannot be brought to an ad hoc human rights court, is not contradictory to Article 28D paragraph (1) and Article 28I paragraph (1) of the 1945 Constitution, because the KKR does not have the function to substitute human rights court under the Law on Human Rights Court. In this matter, the KKR Law does not provide any prosecution procedure, instead it only provides for:

Procedure for the disclosure of the truth;

Procedure for the granting of compensation, restitution and/or rehabilitation to the victims; and

Procedure for the granting of amnesty to the perpetrators;

Therefore, to provide legal certainty, cases of gross violations of human rights which have been disclosed and settled by the Commission cannot be brought to Human Rights Court.

g.     Whereas the perpetrators of gross violations of human rights who refuse to admit the truth and their crimes and refuse to show their remorse for their crimes shall lose their right to obtain amnesty and may be brought before an ad hoc human rights court, as set forth in Article 29 paragraph (3) of

the KKR Law. Therefore, the provision of Article 29 paragraph (3) can be construed that the KKR Law does not close the access for any person to obtain settlement through a judicial process;

h.  Whereas Article 1 Paragraph (9) of the KKR Law provides that amnesty shall be the pardon granted by the President to the perpetrators of gross violation of human rights by taking into account the consideration of People's Legislative Assembly. It can be explained that universally amnesty in the context of KKR Law has a special meaning and is more measurable. Amnesty in the KKR Law may only be granted to those who are fully admitting their involvement in gross violations of human rights and solely associated with political objectives proportionately;

3.  The Former Chairperson of the Special Committee for KKR Draft Law [Mayjen. Pol. (Ret.) Drs. Sidarto Danusubroto, S.H.]:

a.  The People's Legislative Assembly has made every effort to perform the duties mandated by the people in accordance with the mandate of the Stipulation of the People's Consultative Assembly Number V/MPR/2000 at its best ability, although it realizes that it has not achieved the optimum results to satisfy all interested parties. The final

results of the work of the People's Legislative Assembly (the Special Committee for KKR Draft Law) is deemed to have been better compared to the preliminary draft conveyed by the Government.

b.   Two important matters inciting lengthy debates in the discussion of KKR Draft Law were Article 1 Paragraph 1 and Article 5 of the KKR Law concerning disclosure of the truth and Article 27 of the KKR Law. Some parties expressed their "objection" to the inclusion of disclosure of the truth in the Law, as it would provide for an opportunity to disclose various national problems for which various attempts have been made to "leave them behind". Meanwhile, objections to Article 27 were raised by the victims and their families, as this Article 27 can be construed as a means to eliminate the existence of Article 19.

c.   When the Special Committee dealt with Article 27, there were about 15 victims' organizations expressing their objection to this article, including *Forum Komunikasi Eks Menteri Kabinet Dwikora Korban Penyalahgunaan Supersemar, Tim Advokasi Jajaran TNI AD, Tim Advokasi Jajaran TNI AU, Tim Advokasi Jajaran TNI AL, Tim Advokasi Jajaran Polri Paguyuban Korban Orde Baru, Lembaga*

*Perjuangan   Rehabilitasi   Korban   Rejim   Orde   Baru,*

*Solidaritas   Korban   Pelanggaran   HAM,   Komite   Aksi*

*Pembebasan   Tapol/Napol,   Lembaga   Penelitian   Korban*

*Peristiwa '65 Bali.*

The objection or refusal to the provision of Article 27 of the
KKR Law conveyed by the victims and agencies fighting for
the victims' rights was acceptable. However, political
constellation existing at that time forced the factions in the
People's Legislative Assembly to accept the formulation of
Article 27 of the KKR Law as it is now. The approval of the
People's Legislative Assembly to this article was some kind
of a compromise to avoid protracted discussion on the KKR
Draft Law that would lead to a deadlock, and there was a
concern about the diminishing number of surviving
witnesses, so that the existence of the KKR would no longer
be significant as it would have lost the momentum.
Therefore, when the KKR Draft Law was ratified, most of the
members of the Special Committee were of the opinion that
the objection raised by unsatisfied parties can actually be
accommodated by the existing instruments, such as
submitting "Judicial Review Petition" to the Constitutional
Court, as what they are doing now.

d.  According to Article 44, cases of gross violation of human rights which have been disclosed and settled by the Commission, cannot be filed again to an ad hoc Human Rights court.

Gross violations of human rights constitutes "extraordinary crimes" so that they cannot be settled using the available legal provisions, such as Indonesian Criminal Code, but must use "special treatment". Therefore, in accordance with the mandate of Article 104 of Law Number 39 Year 1999 concerning Human Rights, a Law on Human Rights Court has been established, which is expected to be able to protect Human Rights of individuals and the people, and serves as a basis of law enforcement, legal certainty, justice, and secure feeling, both for individuals and the people, from gross violations of Human Rights.

In addition to Ad Hoc Human Rights Court, the Stipulation of the People Consultative Assembly Number V/MPR/2000 also mentions about the need to establish a Truth and Reconciliation Commission, as an extra-judicial institution having the duty to uphold the truth by disclosing power abuses and Human Rights violations occurring in the past, in

accordance with the applicable laws and regulations and pursuing reconciliation in the context of national interests.

The first issue to be agreed upon by all parties was that reconciliation, which also includes national reconciliation, constitutes a mandate of the Stipulation of the People's Consultative Assembly Number V/MPR/2000 concerning Stabilization and National Unity, which is followed up by the application of the Law on Ad Hoc Human Rights Court, and forms a part of the implementation of constitution order to all state officials, in line with the purpose and objective of the Amendments to the 1945 Constitution of the Republic of Indonesia, particularly Article 28A – 28 J concerning Human Rights (HAM).

4.    National Commission for Human Rights represented by **Abdul Hakim Garuda Nusantara, S.H., LL.M.**:

a.    Whereas, Law Number 39 Year 1999 provides for Human Rights court, however this Human Rights Court issue is stipulated further in the Law on Human Rights Court.

b.    Whereas, violations of human rights occurring in the past can be settled through two legal avenues, in order to achieve justice. The first avenue is through the ad hoc Human Rights Court, the

establishment of which is based on the proposal of the People's Legislative Assembly to the President, and then the President would issue a Presidential Decree. The second avenue is through the KKR.

c.  If it is true that the case contains an uncontestable truth, the compensation and rehabilitation cannot be related to the granting or refusal of amnesty by the President.

d.  Amnesty cannot used as a requirement for the granting of compensation and rehabilitation because amnesty is a separate process and conditional in nature. Article 29 Paragraph (2) of the KKR Law states, "In the event that the perpetrators give voluntary confession of their crimes, admit the truth of the facts, convey their regret for their crimes and are willing to apologize to the victims or their heirs, but the victims or their heirs refuse to forgive them, the Truth and Reconciliation Commission shall independently and objectively decide the submission of recommendation to the President for granting amnesty." Therefore, making decisions independently and objectively cannot be related to the compensation and rehabilitation, as compensation and rehabilitation are the responsibility of the state and relates to the facts found by the Commission for the Truth.

e.  With regard to the Article 44 of the KKR Law which provides that
    in the cases of gross violation of Human Rights which have
    been disclosed and settled cannot be filed again to an Ad Hoc
    Human Rights Court, the petitioners are of the opinion that the
    provision is contradictory to Article 27, Article 28D, and Article
    28 of the 1945 Constitution. Article 44 is a logical consequence
    of the concepts set forth in Article 29 Paragraphs (2) and (3).
    Amnesty may only be granted by the President, and be
    recommended by the KKR to the President if the requirements
    have been met.

f.  If the KKR is processed through an ad hoc Human Rights Court,
    the ad hoc Human Rights Court will be held when the request
    for amnesty is refused. With regard to this matter, Article 7
    Paragraph (1) point 9 of the KKR Law provides that in
    performing the duties as set forth in Article 6, the Commission
    has an authority to reject the request for compensation,
    restitution, rehabilitation, or amnesty, if the case has been filed
    to a human rights court. Therefore, the refusal of requests for
    compensation, restitution, rehabilitation, or amnesty is
    depending on whether the case has been filed or not to a
    Human Rights Court.

g.  If a gross violation of Human Rights cannot be settled through the KKR, it can be settled through an Ad Hoc Human Rights Court. However, it is more appropriate to settle certain gross violations of Human Rights through the KKR.

**THE OPINION OF THE COURT**

Considering whereas before entering the case substance, basically the decision of the legislators determining reconciliation policies as one of settlement to gross violations of Human Rights occurring prior to the issuance of Law on the Human Rights Court, is not merely a political decision, but it is also a legal mechanism set forth in the KKR Law. As the consequence, assessment on this matter is conducted specifically from the aspects of legal and constitutional principles, including philosophy and viewpoint of the nation constituting the spirit of the 1945 Constitution. In addition, the adoption of Section XA as a part of the 1945 Constitution in the second amendment to the 1945 Constitution made in 2000, which also provides for guarantee and protection of Human Rights, also leads to the condition where the review on the constitutionality of the KKR Law is based on the guarantee and protection of Human Rights as provided in the 1945 Constitution, in which considerations will be given to its consistency with the guarantee and protection of Human Rights provided in the 1945 Constitution.

Considering whereas as a nation claiming that its national and state philosophy is based on Pancasila as legal aspirations *(rechtsidee)* and state aspirations *(staatsidee)*, the open mindness and openheartedness to observe

this issue must be in the context of the broader interests of the Unitary State of the Republic of Indonesia, with the purpose of investigating gross violations of Human Rights in order to disclose the truth, uphold justice and adapt to establish respect for Human Rights, so that reconciliation and national unity can be achieved. This must be done by applying an appropriate approach, by previously obtaining more objective comprehension of the conflicts, despite of the necessity to take possible serious risks, in order to attain a safe and peaceful condition enabling the optimal implementation of economic, social, and political development, so that all Indonesian people and territory can be protected. On the other hand, as a member of the United Nations which has adopted the principles of Human Rights of the United Nations that are actually have been included in the 1945 Constitution, documents of the United Nations concerning Human Rights are also taken into considerations by the Court in construing the 1945 Constitution;

Considering whereas based on such paradigm, the Court will provide opinion on the petition of the Petitioners as follows:

**1)      Article 27 of the KKR Law**

Article 27 provides that the compensation and rehabilitation as set forth in Article 19can be granted if the request for amnesty is granted.  The elucidation on this article provides that, if the perpetrators give voluntary confession to their crimes, admit the truth of the facts, convey their regret for their crimes and are willing to apologize to the victims or their heirs, the

perpetrators of gross violation of Human Rights may submit a request for amnesty to the President.  If the request is founded, the President can approve the request, and the victims shall be granted compensation and/or rehabilitation. Meanwhile, if the request for amnesty is refused, the compensation and rehabilitation shall not be granted by the state, and the case will be followed up based on the provisions of the Law on Human Rights Court.

This provision contains a contradiction between one part and another, specifically the parts regulating:

a.    Perpetrators have given voluntary confession to their crimes, admit the truth of the facts and convey their regret for their crimes and are willing to apologize to the victims.

b.    Perpetrators can submit the request for Amnesty to the President.

c.    The request can either be granted or refused.

d.    Compensation and or rehabilitation shall only be granted if amnesty is granted by the President.

e.    If amnesty is refused, the case will be filed to the Ad Hoc Human Rights Court.

The confusion and contradiction existing in Article 27 of the KKR Law are related to the emphasis on the perpetrators as an individual in individual criminal responsibility, whereas the perpetrators and victims as well as witnesses of human rights violation incidents prior to the application of the Law on Human Rights Court can no longer be found.

Reconciliation between the perpetrators and victims intended in the law a quo becomes almost impossible to be achieved, if it is conducted by applying individual criminal responsibility approach. With such approach, which depends on amnesty must be only restitution, namely compensation granted by the perpetrators or a third party. On the other hand, if the purpose is to achieve a reconciliation and the approach applied is not of individual nature, the starting point shall be gross violation of human rights and the existence of victims serving as a parameter of reconciliation by granting compensation and rehabilitation. Those two approaches, in relation to restitution, compensation, and rehabilitation, cannot be rendered dependant on an irrelevant issue because amnesty is a prerogative right of the President, the granting or refusal of which is up to the President.

The facts that there are gross violations of Human Rights, for which the state is actually obligated to avoid and prevent them, and victims whose Human Rights should be protected by the state, are adequate to incur legal responsibility of the state and identified individual perpetrators for granting restitution, compensation, and rehabilitation to the victims, without any other requirements. The provision making amnesty as a requirement is a negation of legal protection and justice, which are guaranteed under the 1945 Constitution. It is also a universal practice and custom as included in the *Basic Principles and Guidelines on the Right to A Remedy and Reparation for Victims of Gross Violations of International*

*Human Rights Law And Serious Violations of International Humanitarian Law,* stipulating *adequate, effective and prompt reparation for harm suffered*, aimed at prioritizing justice in handling gross violations of Human Rights, by granting proportional reparation in accordance with the extent of the violations and damages sustained. This constitutes an interpretation used to explain Article 28A, Article 28D Paragraph (1), and Article 28I Paragraph (1), Paragraph (4), and Paragraph (5), so that based on the above reasons the petition of the Petitioners concerning Article 27 of the KKR Law is adequately founded.

## 2)     Article 44 of the KKR Law

Article 44 of the KKR Law provides that "*cases of gross violation of human rights which have been disclosed and settled by the Commission cannot be filed again to the Ad Hoc Human Rights Court.*"

Based on the General Elucidation on the KKR Law, it can be concluded that the KKR have the duties to disclose the truth and to uphold justice and to establish respect for Human Rights for reaching reconciliation to achieve national unity, considering the existence of gross violations of Human Rights prior the application of the Law on Human Rights Court. The KKR is not related to legal prosecution, but it arranges for the disclosure of the truth, granting of restitution, and/or rehabilitation and provides considerations for amnesty. A question arises as to whether or not the KKR constitute a substitution or replacement of a court of justice.

Such general elucidation has expressly stipulates that if the gross violation of human rights cases have been settled by the KKR, an ad hoc human rights court does not have the authority to make a decision, unless the request for amnesty is refused by the President. On the contrary if an ad hoc human rights court has made a decision, the KKR has no authority to make a decision. Even though it is stated that the KKR is only an alternative to the Human Rights Court and does not constitute a law enforcement commission, it is clear that it constitutes an alternative dispute resolution mechanism, which will settle a Human Rights dispute amicably and if this effort is successful, it will close an access to obtain settlement through judicial mechanism. Although the arguments of the Petitioners quote the arguments and principles of international Human Rights opposing impunity principle, the settlement of Human Rights violation by adopting this principle has been accepted by the international practice, such as in South Africa, and has also been known by the customary law. Closedness of judicial process through Ad Hoc Human Rights Court if the case can be settled through KKR is a logical consequence of an alternative dispute resolution mechanism so that it cannot be deemed as a justification for impunity principle. This is due to, in general, the settlement through judicial mechanisms for gross violation of human rights prior the application of the Law on Human Rights Court, reaches difficulty by the lapse of the time causing the loss of the evidence as the basis of verification in the individual criminal responsibility

approach. Under the stipulation in the Law of KKR, the KKR has an objective to uphold justice to the best possible extent in the alternative resolution mechanism. Therefore, the Court is of the opinion that there are no legal grounds and reasons for the granting of amnesty, particularly due to the stipulation is only applicable for the gross violation of Human Rights occurring prior the application of the Law on Human Rights Court;

3)    **Article 1 Point (9) of the KKR Law**

Article 1 Point (9) of the KKR Law stipulates that "Amnesty shall be the pardon granted by the President to the perpetrators of gross violations of human rights by taking into account the considerations of the People's Legislative Assembly." Gross violations of human rights as intended in Article 1 point (4) of the KKR Law shall be construed as "human rights violation as stipulated by the Law on Human Rights Court, which in Article 7 is stated that gross violations of Human Rights includes a. Genocide crimes, b. Crimes against humanity." The Law on Human Rights Court referring to the Statute of Rome on International Criminal Court classifies the genocide crimes and crimes against humanity as the most serious crimes within the overall international community. In general, the international practices or General Comment of the Commission for the Human Rights of the United Nations are of the opinion that amnesty shall not be granted in the gross violation of human rights. It is stated that although the KKR is intended to create conducive condition in achieving

peace and national reconciliation, it is necessary to determine the limitation for the granting of amnesty, namely amnesty shall not be in favor of the perpetrators. Amnesty shall not have legal consequences relating to the rights of the victims to obtain reparation, and further amnesty shall not be granted to those committed violations of human rights and international humanitarian law, which constitute offences, for which amnesty and other form of immunity are not justified.

Although the General Comment and Report of the Secretary General of the United Nations have not been accepted as binding law, it seems that such conception mirror the content of the 1945 Constitution stipulating the principles of human rights protection as set fort in Article 28G Paragraph (2) of the 1945 Constitution, namely the right to be free from torture, Article 28I Paragraph (1) of the 1945 Constitution, namely the right to live and the right not to be tortured, Article 28 Paragraph (4) and Paragraph (5) of the 1945 Constitution, namely protection, advancement, and fulfillment of human rights shall be the responsibility of the state. However, Article 1 point (9) only covers the definition as set forth in the general provision, and is not a regulating norm and is relating to other articles, so that the petition of the Petitioners in relation to such provision shall be disregarded and will be considered later along with the other articles related to amnesty, as explained below:

Considering whereas although the petition granted is only the one related to Article 27 of the KKR Law, however as the overall implementation of

the KKR Law depends on and leads to the aforementioned article, the declaration that Article 27 of the KKR Law is contradictory to 1945 Constitution and does not have binding force, renders all provisions of the KKR Law unenforceable. This is because Article 27 is closely related to Article 1 point (9), Article 6 point (c), Article 7 Paragraph (1) point (g), Article 25 Paragraph (1) point (b), Article 25 Paragraph (4), Paragraph (5), Paragraph (6), Paragraph 26, Article 28 Paragraph (1), and Article 29 of the KKR Law. However, Article 27 and the articles related to Article 27 of the KKR Law are the articles which are highly affecting the enforceability or unenforceability of all provisions in the KKR Law, so that declaring that Article 27 of the KKR Law does not have binding force will give rise to legal implications, which will render all articles relating to amnesty not having binding force.

Considering whereas the aforementioned matter can be performed and shall not violate procedural law, although the petition (petitum) filed by the Petitioners relates only to Article 1 Point 9, Article 27, and Article 44 of the KKR Law, because basically the procedural law concerning the judicial review on laws against the 1945 Constitution relates to public interest and its legal consequences are *erga omnes* in nature, so that it is not appropriate to consider it as a matter of *ultra petita* known in the civil procedural law. Prohibition to try and make a decision beyond the matters being petitioned (petitum) is set forth in the Article 178 Paragraphs (2) and (3) of the HIR and similar provision set forth in Article 189 paragraphs (2) and (3) of the RBg, namely the procedural law applicable in District Courts and Religious Courts in Indonesia. This is

understandable, as the initiative to defend one of the private rights owned by individual or private person or otherwise depends on the intention or consideration of such individual, which cannot be exceeded. However, the current development and social needs lead to partial application of such provisions. Considerations for justice and appropriateness have also been used as reasons, as can be seen among others in the decisions of the Supreme Court dated May 23, 1970, dated February 4, 1970, and dated January 8, 1972 and other decisions, and it has also been confirmed that Article 178 Paragraphs (2) and (3) of the HIR and Article 189 Paragraphs (2) and (3) of the RBg are not applicable absolutely due to obligation of Judges to be active and to always make decisions which really provide settlement to the case. In addition, a civil lawsuit usually includes a request of the Plaintiffs to the Judge to make the fairest decision (ex aequo et bono). Therefore, the Judge has the flexibility to make a decision exceeding the petitum, especially for Constitutional Judges examining cases of judicial review related to the public interest. Although the party filing judicial review is an individual deemed to have legal standing, the law on which the judicial review is requested is applicable to the public and relates to the interests of the people at large, and has legal consequences of wider scope rather than the interests of the Petitioner as an individual. If the intended public interests so require, Constitutional Judges should not only focus on the petition alone. It has become a common practice applied in the Constitutional Court of other countries. For example, Article 45 of Law on the Constitutional Court of South Korea (1987) which reads, "*The Constitutional Court shall decide only*

*whether or not the requested statute or any provision of the statute is unconstitutional: Provided, That if it is deemed that the whole provisions of the statute are unable to enforce due to a decision of unconstitutionality of the requested provision, a decision of unconstitutionality may be made on the whole statute"*. The Court has also applied the abovementioned clausal, such as Case Decision Number 001-021-022/PUU-I/2003 concerning Judicial Review on the Law of the Republic of Indonesia Number 20 Year 2002 concerning Electric Power;

Considering whereas it is also necessary to take into account the following matters found in the KKR Law:

1. Whereas the KKR has the authority to accept complaints, collect information and evidence of gross violations of human rights, summon witnesses and **obtain clarification from perpetrators/victims, determine the category of gross violations of human rights in hearings open to public** (**Article 18 of the KKR Law**), draw conclusions regarding the existence of gross violations of human rights, the perpetrators and the victims, as well as apology, which according to the general elucidation of the KKR Law are in the form of final and binding decisions. A decision of the KKR stipulating **the granting of compensation, restitution or rehabilitation [Article 25 paragraph (1) letter a] will not have binding force if the request for amnesty is refused.** The perpetrators and the victims or the Government are

also not bound by a decision that depends on such amnesty requirement. Therefore, the authority of the KKR is uncertain.

2. Article 28 paragraph (1) provides that in the event that reconciliation has been reached between the perpetrators and the victims of gross violations of human rights, the KKR **may** give a recommendation to the President for granting amnesty. However, Article 29 paragraph (1) provides that if the perpetrators and the victims agree to forgive each other, the KKR **must decide** on amnesty recommendation. The use of the word **"may"** in Article 28 paragraph (1) and the word **"must"** in Article 29 paragraph (1) indicates the lack of consistency  in the KKR Law which leas to legal uncertainty (*onrechtszekerheid*).

3. If the perpetrators admit the truth of the facts, convey their remorse and agree to apologize to the victims, but the victims refuse to forgive them, the KKR decide upon the granting of amnesty **independently and objectively.** Such condition does not support the disclosure of the truth and will instead discourage the parties to disclose the truth and acknowledge the actual facts.

4. If the perpetrators refuse to admit the truth and their mistake and refuse to convey their remorse, the perpetrators will lose their right to obtain amnesty and they may be brought to an ad hoc human rights court. In such case, there is a possibility of dispute of authorities between the KKR and the People's Legislative Assembly, because Articles 42 and 43 of Law Year 2000, provides that political decision of the People's Legislative Assembly is required to determine the existence of alleged gross violations of human rights to be

examined by an ad hoc human rights court. It is not clear whether the authority of the KKR under Article 23 of the KKR Law for clarifying the perpetrators and the victims of gross violations of human rights, which according to the KKR Law is implemented by issuing **final and binding decisions, will lose the binding force, or such decision of the KKR regarding the existence of gross violations of human rights is adequate to bring the case to an ad hoc human rights court without requiring any decision of the People's Legislative Assembly**.

Reconciliation provides alternative opportunity for the perpetrators to confess to their crimes without having to undergo regular legal process. The perpetrators have the opportunity to consider their stand in the case inflicting them.

The KKR Law fails to give certainty to the perpetrators intending to choose the KKR for settling their cases. Article 28 paragraph (1) of the KKR Law provides that in the case that reconciliation has been achieved between the perpetrators and the victims of gross violations of human rights before the coming into effect of the Law on Human Rights Court, the Commission may give a recommendation to the President to grant amnesty. Based on the provisions of Article 1 point (2) of the KKR Law, it can be concluded that a reconciliation must meet the following conditions; (1) disclosure of the truth, (2) confession, (3) pardon. Therefore, if it cannot be ascertained that the three conditions have been met, reconciliation is deemed non-existent. If the truth about a case is not disclosed, either with regard to the

incident, place, time, or perpetrators, it is clearly impossible that such reconciliation has been achieved. The KKR Law does not have any provision which directly states that the refusal of amnesty request will lead to judicial process on the perpetrators, it instead provides that refusal of amnesty request will incur an obligation for the perpetrators to assume legal responsibilities for their crimes. Based on the above explanation, it has been clear that the KKR Law fails to encourage the perpetrators to settle their cases through the KKR, because the law has so many legal uncertainties. Meanwhile, if the victims or their heirs refuse to give pardon, they may submit reports to the law enforcement agencies against the perpetrators based on the confession made by the perpetrators. As this provision creates a possibility of self-incrimination, it would be difficult to expect the achievement of reconciliation as envisaged by the KKR Law. The KKR Law does not expressly provide whether or not a reconciliation can be achieved without any pardon from the victims or their heirs. The provision of Article 29 paragraph (2) of the KKR Law can create a problem in cases where the victims take the initiative to file a complaint/report to the KKR. The victims should have the intention to forgive the perpetrators from the beginning, namely at the time they choose the KKR for settling their cases. If the victims do not have the intention to forgive the perpetrators, the available alternative for them is judicial process, not reconciliation. In other words, a reconciliation requires mutual intention from the perpetrators and the victims.

5.     With regard to complaints accompanied with request for compensation, restitution, rehabilitation or amnesty, the Commission must make its decision by no later than 90 days as of the receipt of the request (Article 24 of the KKR Law).

This provision gives rise to a question whether the decision made by the Commission within 90 days also includes the disclosure of "the truth about the gross violations of human rights " (*please refer to* Article 1 point (3) and Article 5 of the KKR Law).

Article 25 paragraph (1) provides that Decision of the Commission as intended in Article 24 may be in the form of:

a.  The granting or refusal of the granting of compensation, restitution and/or rehabilitation, or

b.  Recommendations in the form of legal considerations in the case of requests for amnesty.

Pursuant to the provision of Article 25 paragraph (1), the Commission must make decisions within 90 days on the requests for compensation, restitution, rehabilitation or amnesty. Such provision is completed by Article 25 paragraph (3), (4), (5), and (6), as well as Article 26, which stipulate the timeframe for the making of decisions on requests for amnesty. However, the KKR Law does not determine a timeframe for making decisions on the KKR's findings, namely the disclosure of the truth about gross violations of human rights. As the Law provides for a time limit of 90 days for deciding upon requests for compensation, restitution,

54

rehabilitation and amnesty, it is not clear whether decisions on such requests must be made first if the time limit has been lapsed but investigation and clarification for the disclosure of the truth require more than 90 days. A complaint or report may be submitted to the Commission, and after the submission of the complaint, the Commission must conduct investigation and clarification on the incident and the perpetrators.

The provision of Article 24 reads "if the Commission has received a complaint or report of gross violation of human rights, along with a request for amnesty". The phrase "**along with**" is construed that the request is filed at the same time with the complaint or report of gross violation of human rights. The problem is that amnesty can only be granted if it has already clear who the perpetrators of the gross violation of human rights are, and the perpetrators are granted the right to submit a request for amnesty, while the right to decide is with the President. How can the perpetrators, who have not been clarified, submit a request for amnesty at the same time with the report? The perpetrators can only be identified after the KKR discloses the truth about the existence of the gross violation of human rights. Therefore, Article 24 creates a confusion that may lead to legal uncertainty, because the article stipulates a timeframe of 90 days. Amnesty can only be requested, recommended and granted when the perpetrators have been definitely identified. The identification of the perpetrators at the earliest stage can be conducted if there is a "confession" of the gross violation of human rights as intended in Article

23 letter (a), or if there has already a reconciliation between the perpetrators and the victims as intended in Article 28. Article 24 provides for a process which is different from that provided by Article 23 letter (a). The process provided by Article 24 is based on Article 18 paragraph (1) letter (a), namely it is the authority of sub-commission for investigation and clarification. This means that the victims assume the active role in submitting the complaint or report. Whereas pursuant to Article 23 letter (a), the sub-commission for amnesty considerations will exercise its authority in cases where the perpetrators assume the active role by making "confession". Therefore, it is juridically illogical if a request for compensation, restitution, rehabilitation and amnesty is filed at the same time with a complaint or report, which must be decided upon within a maximum period of 90 days as from the receipt of the request as intended in Article 24 of the KKR Law.

Considering whereas all the above facts and circumstances create legal uncertainty, both in the formulation of the provisions and the possible implementation of the provisions to achieve the expected reconciliation. By taking into account the considerations above, The Court is of the opinion that the basis and purpose of the KKR, as set forth in Article 2 and Article 3 of the Law, are impossible to be achieved due to the lack of guarantee of legal certainty (*rechtsonzekerheid*). Therefore, the Court has reviewed this Law against the 1945 Constitution and it must accordingly be declared as not having binding legal force. As the KKR Law in its entirety has been declared as not having binding

legal force, the Court has accordingly eliminated the opportunity for the settlement of past gross violation of human rights through reconciliation. Many options can be selected for achieving such goal, among others, by achieving **reconciliation** in the form of legal policies (laws), which are in line with the 1945 Constitution and universally applicable human rights instruments, or achieving **reconciliation** through political policies on **general rehabilitation and amnesty**. In view of Article 56 paragraphs (2) and (3) as well as Article 57 paragraphs (1) and (3) of the Law of the Republic of Indonesia Number 24 Year 2003 concerning Constitutional Court (State Gazette of the Republic of Indonesia Year 2003 Number 98, Supplement to State gazette of the Republic of Indonesia Number 4316);

## PASSING THE DECISION

-       **Granting the Petition of the Petitioners;**

-       **Declaring that Law of the Republic of Indonesia Number 27 Year 2004 concerning the Truth and Reconciliation Commission is contradictory to the 1945 Constitution of the Republic of Indonesia.**

-       **Declaring that Law of the Republic of Indonesia Number 27 Year 2004 concerning the Truth and Reconciliation Commission does not have binding legal force.**

-       **Ordering the publication of this decision in the State Gazette of the Republic of Indonesia.**

Hence the decision was made on Monday, December 4, 2006, in the Consultative Meeting of Judges attended by 9 (nine) Constitutional Judges and was read out in a Plennary Session of the Constitutional Court open for public on this day Thursday, December 7, 2006, by us Prof. Dr. Jimly  Asshiddiqie, S.H., as the Chairperson acting also as a Member, Maruarar Siahaan, H.A.S. Natabaya, Harjono, Soedarsono, H.M. Laica  Marzuki, I Dewa Gede Palguna, Abdul Mukthie Fadjar, and H. Achmad Roestandi, respectively as Members, and assisted by Alfius Ngatrin, acting as Substitute Clerk and attended also by the Petitioners/their Attorneys, the People's Legislative Assembly, and the Government;

**CHAIRPERSON,**

**SIGNED**

**Prof. Dr. Jimly Asshiddiqie, S.H.**

**MEMBERS**

| | |
|---|---|
| **SIGNED** | **SIGNED** |
| **H.A.S Natabaya.** | **Harjono** |
| **SIGNED** | **SIGNED** |
| **Soedarsono.** | **H. M. Laica Marzuki.** |
| **SIGNED** | **SIGNED** |
| **Abdul Mukthie Fadjar.** | **H. Achmad Roestandi.** |

**SIGNED**                                    **SIGNED**

**I Dewa Gede Palguna.**                     **Maruarar Siahaan.**

## DISSENTING OPINIONS

With regard to the aforementioned Court's decision granting the petition of the Petitioners, the Constitutional Judge I Dewa Gede Palguna has dissenting opinions, as follows:

**On the Legal Standing of the Petitioners**

Whereas in determining the parties having legal standing as Petitioners before the Court in a petition for a judicial review on a law, in accordance with the provisions of Article 51 paragraph (1) of the Constitutional Court Law, the party or parties concerned must:

(1)   explain their qualifications, whether as Indonesian Citizen Individuals, as units of customary law communities (insofar as they are still in existence and in accordance with the development of the community and the principle of the Unitary State of the Republic of Indonesia as provided in laws), as legal entities, or as state institutions;

(2)   the loss of their constitutional right and/or authority in the qualifications as referred to in number (1) as the consequences of the application of a law.

Meanwhile, the Court has determined the following five requriements for the existence of constitutional right and/or authority losses:

(1) Petitioners must have constitutional rights and/or authorities granted by the 1945 Constitution;

(2) Such constitutional rights and/or authorities shall be deemed to have been harmed by the coming into effect of the law on which the judicial review is requested;

(3) Such constitutional losses shall be specific and actual in nature or at least potential in nature which pursuant to a logical reasoning will certainly take place;

(4) There is a causal connection (*causal verband)* between the constitutional right losses and the coming into effect of the law on which the judicial review is requested;

(5) There is a possibility that upon the granting of a petition, the constitutional right losses argued shall not come into existence or shall not occur any longer.

Whereas the KKR Law is a special law, because it aims at revealing the truth of gross human rights violations in the past and is then directed to result in reconciliation for the realization of national unity, as confirmed in the considerations particularly points (a) and (b) and General Elucidation of the *a quo* law. Hence, basically, there are only two parties having direct interests in the application of the *a quo* law, namely the victims and the perpetrators of gross

human rights violations. Therefore, basically, the constitutional rights of the two parties may be harmed by the application of the *a quo* law.

Whereas based on the aforementioned considerations and the evidences found during the trial, Petitioners V, VI, VII, and VIII *prima facie* may be deemed as meeting the first criteria of the provisions of Article 51 paragraph (1) of the Constitutional Court Law, namely as a group of Indonesian citizen individuals having similar interests assuming that their constitutional rights have been harmed by the application of the *a quo* law, the assumption of which must be further proven. In addition, there is also a question as to whether the Petitioners concerned (Petitioners V, VI, VII, VIII) have met the requirements of constitutional right losses as described above, as must be proven in examination on the subjects and substances of the petition. Hence, the legal standing of the Petitioners concerned (Petitioners V, VI, VII, VIII) can only be determined at the same time as the examination on the subjects or substances of the petition.

**Regarding the Subjects or Substances of the Petition**

Whereas the Petitioners argued that Article 1 number (9), Article 27, and Article 44 of the **KKR Law** are contradictory to the 1945 Constitution for the reasons that are basically as follows:

(1) Article 1 point (9) of the KKR Law which reads, *"Amnesty shall be the pardon granted by the President to the perpetrators of gross human rights violation*

*by taking into account the considerations of the People's Legislative Assembly"*, according to the Petitioners, is contradictory to the 1945 because:

    a. Gross human rights violation is a crime of the highest level. Therefore, there is provision restricting amnesty for the perpetrators of gross violations of human rights;

    b. The definition of amnesty in the aforementioned article is not in accordance with the principles admitted by civilized communities in the world, and Indonesia is among the aforementioned civilized communities, therefore amnesty for the perpetrators of gross violations of human rights is contradictory to Article 28D paragraph (1) and Article 28I paragraph (5) of the 1945 Constitution;

    c. Amnesty for gross violations of human rights is contradictory to the international law, but the formulation of Article 1 point (9) of the KKR Law in fact explains that amnesty shall be granted to the perpetrators of gross violations of human rights, therefore the aforementioned article is contradictory to the law accepted by International communities, in which Indonesia is also included;

(2) Article 27 of the KKR Law which reads, *"Compensation and rehabilitation as intended in Article 19 can be granted if the request for amnesty is granted"*, is contradictory to the 1945 Constitution because:

    a. The provisions of Article 27 of the said KKR Law render the rights of the victims to compensation and rehabilitation depending on the granting of amnesty, not on the substance of the case, and

discriminates the victims, as well as violate the guarantee for protection and equality before the law as well as appreciation of human dignity;

b. Based on the provisions of Article 27 of the said KKR Law and the Elucidation thereof, reparation (compensation and rehabilitation) can only be given if the request for amnesty is granted, therefore it negates the victims' rights for reparation, whereas the victims' reparation is not at all related to the existence or non-existence of amnesty;

c. The concept of amnesty in Article 27 of the KKR Law requires the existence of perpetrators. As the consequence, if the perpetrators cannot be found, it is impossible that the amnesty would be granted, so that the victims are deprived from guarantee for reparation. This provision has placed the victims in an unequal and depressed position because the victims are subject to a burdensome requirement for obtaining their rights, namely depending on the granting of amnesty;

d. The implication of formulation of Article 27 of the KKR Law shall cause injustice to the victims because the victims should believe in chance that the perpetrators during all this time causing the victims to suffer may obtain amnesty so that the victims' rights to reparation (compensation and rehabilitation) cannot be obtained and the victims must undergo other uncertain efforts;

e. Article 27 of the KKR Law has created in-equal positions between the victims and the perpetrators, and has discriminated the victims' rights

to reparation (compensation and rehabilitation) attached to the victims and not to depend on the perpetrators. Article 27 of the KKW Law also fails to respect the victims suffering from the gross human rights violation. Therefore, any provision restricting the victims' rights to reparation and negating the state's obligation to grant the reparation is one of the forms of discrimination and inequality before the law and is contradictory to the admission, guarantee, protection and fair legal certainty;

f.  Based on the aforementioned reasons, the constitutional rights of the Petitioners, both as victims or co-victims, to obtain guarantee for equality before the law, guarantee for admission, protection, and fair legal certainty, as well as guarantee to be free from discriminative treatment have been violated by the provisions of Article 27 of the KKR Law.

(3) Article 44 of the KKR Law which reads, *"The cases of gross violation of human rights which have been disclosed and settled by the Commission cannot be filed again to an ad hoc human rights court"*, is contradictory to the 1945 Constitution because:

a.  Article 44 of the KKR Law placing the KKR as a pseudo-judicial body closes the access for every person to obtain settlement through a judicial process.

b.  The provision of Article 44 of the KKR Law, which does not allow judicial examination by an ad hoc human rights court if the case has

been settled through the KKR, deprives citizens of their rights to sue perpetrators of gross human rights violations as set forth in the international law, either international practices or international treaties;

In respect of the aforementioned arguments of the Petitioners, it is necessary to first affirm that the three provisions petitioned for review may not be read and understood severally and separately from the context of the entire provisions in the KKR Law. Therefore, in evaluating the constitutionality of the provisions of the KKR Law petitioned for review, it is necessary to first state the following considerations:

o   whereas, as affirmed in Article 1 paragraph (3) of the 1945 Constitution, Indonesia is a law state, therefore appreciation, protection, and and fulfilment of human rights are the attached requirements that cannot be ignored;

o   whereas appreciation, protection, and fulfilment of human rights are proven not only from the separate regulation of the chapter on human rights in the 1945 Constitution (Chapter XA) and the promulgation of a number of laws regulating human rights related to the efforts of appreciation, protection, and fulfilment of human rights, but also from the ratification of international legal instruments related to human rights;

o   whereas in relation to the participation of Indonesia as a party in various international agreements, including therein those related to human rights, Article 4 paragraph (2) of Law Number 24 Year 2000 concerning International Agreement states, *"In drafting international agreement, the Government of the Republic of Indonesia shall be guided by the **national interests** and shall*

*use the principles of equality, mutualism, and shall give due observance of, both the applicable national and international law".* Hence, the participation of Indonesia in various international legal instruments in the field of human rights implicitly shows three things: (a) confirmation that the aforementioned international legal instruments are in line with the 1945 Constitution, which respects, protect, and guarantee the fulfillment of human rights; (b) therefore Indonesia is bound to implement all the provisions in the aforementioned international legal instruments; (c) the promise to implement all the provisions of the aforementioned international legal instruments, in which Indonesia is a party, is not based upon the doctrine of supremacy of international law on national law, but merely because provisions in the aforementioned various international legal instruments have been received as part of the Indonesian national law through the process of ratification, therefore it should be assumed the existence of preasumption that the international legal provisions concerned are not contradictory to the 1945 Constitution, unless it can be proven otherwise that it does no exist during the process of examination on the *a quo* petition;

o  Whereas in the implementation at the national level, two opinions or interpretation with respect to provisions of various international law's instruments concerning gross violation of human rights have developed, namely:

- *first*, opinion stating that amnesty is not applicable to perpetrators of gross violation of human rights;

- *second*, opinion stating that clauses in a number of international law's instruments providing freedom for the implementation of the provisions in accordance with the laws of the respective countries shall mean that amnesty to perpetrators of gross violation of human rights may be granted insofar as it is not expressly prohibited in the relevant international law's instrument and insofar as it is deemed beneficial by the relevant country to achieve higher objectives other than sentencing the perpetrators.

Whereas based on the above reasons and assessing the three provisions of the KKR Law on which the judicial review is requested (Article 1 point (9), Article 27, Article 44) in the context of the entire KKR Law, I, responding to the a quo request, hold the opinion that:

- The provision of Article 1 point 9 of the KKR Law is not contradictory to the 1945 Constitution because the authority to grant amnesty under the 1945 Constitution is vested on the President upon hearing the opinion of the People's Legislative Assembly as set forth in Article 14 Paragraph (2) of the 1945 Constitution, and besides the granting of amnesty in the context of the entire provisions of the KKR law is intended to guarantee the achievement of higher objectives, namely reconciliation to reach the national unity;

- Article 27 of the KKR Law is contradictory to the 1945 Constitution, but not entirely, because of the reasons as argued by the Petitioners but because the provision of Article 27 of the KKR Law concerned does not provide legal certainty and justice both to the victims and perpetrators of gross violations of

human rights. The provision of Article 27 of the KKR Law does not provide legal certainty to the victims because compensation and rehabilitation depend on something uncertain, namely amnesty – which is entirely under the President's authority to grant or not to grant upon hearing considerations from the People's Legislative Assembly, even, for example, it has been proven that the person concerned is a victim. It is also not fair for the victims, because, on one hand, amnesty granted to the perpetrators of gross violation of human rights is implicitly stated as a right [Article 29 Paragraph (3) of the KKR Law], but compensation and rehabilitation are not implicitly stated as rights. Whereas, the provision of Article 27 of the KKR Law also does not provide legal certainty and justice to the perpetrators, because there is no guarantee in the a quo law that the perpetrators will automatically obtain amnesty after giving voluntary confession to their crimes, admitting the truth of the facts, conveying regret for his crime, and willing to apologize to the victims and or their heirs. This is because, pursuant to the provision of Article 29 paragraph (2) of the KKR law, if the victims or their heirs refuse to forgive, "the Commission shall decide the granting of recommendation independently and objectively". The a quo law does not specify the meaning of the phrase "the Commission shall decide the granting of recommendation  independently and objectively".  However, based on logical reasoning, it is likely in the phrase that the perpetrators are not recommended to obtain amnesty, even though they have voluntarily confessed to their crimes, admitted the truth of the facts, conveyed regret for their crimes and willing to apologize to the victims and or

their heirs.

- Article 44 of the KKR Law is not contradictory to the 1945 Constitution because the provision of Article 44 is one of the important keys to achieve the purpose of the KKR Law, namely whether the parties (the victims and perpetrators of gross violations of human rights) will choose other than the legal avenue (in this case settlement through the Truth and Reconciliation Commission) or through the Ad Hoc Human Rights Court.

Considering whereas even though there has been sufficient reason to declare that Article 27 of the KKR Law contradictory to the 1945 Constitution, the a quo petition is not automatically granted for the following reasons:

- A petition can be declared granted if there is no doubt concerning the legal standing of the Petitioners so that the purpose of the granting of the petition can be achieved namely restoration of the constitutional rights of the Petitioners violated as the consequence of the application of unconstitutional laws, or at least, the constitutional rights of the Petitioners are no longer harmed. Meanwhile, with respect to the a quo petition, based on available evidence during court hearings, the status of the Petitioners as victim of gross violations of human rights has not been entirely proven. This is because Article 1 point 5 of the KKR Law defines victims as "*individual or group of individuals experiencing physical, mental or emotional suffering, economic loss or experiencing neglect, reduction or expropriation of basic rights, as the direct consequence of gross violation of human rights; inclusive victim is the*

*heir*".   During court hearings, matters revealed are that the Petitioners, as mentioned above (Petitioners V, VI, VII, VIII) experienced physical, mental or emotional suffering, economic loss or experienced neglect, reduction or expropriation of basic rights, as the direct consequence of  **a past event or deed**.   The question is, does the intended event or deed constitute gross violation of human rights? In this matter doubt arises because:

   a.  One hand, Article 1 point 4 of the KKR Law stipulates that referred to as gross violation of human rights shall be human rights violation as intended in Law Number 26 Year 2000 regarding Human Rights Court (The Human Rights Court Law). Pursuant  to Article 7 of the Human Rights Court Law, gross violation of human rights  violation shall include (a) genocide crime; (b) crime against humanity. Hence, in relation to the a quo Petitioners, the question is, is the Petitioners victim of genocide or victim of crime against humanity? The problem is, pursuant to Article 43 paragraph (2) and elucidation to Article 43 paragraph (2) of the Human Rights Court Law, to determine the existence of gross human right violation in the past, which includes determination whether a crime is genocide or crime against humanity, is based on the opinion of the People's Legislative Assembly. Hence, whether the physical, mental or emotional suffering, economic loss or neglect, reduction or expropriation of basic rights,  experienced by the aforementioned Petitioners are the consequence of gross human right violations will depend on the standing or opinion of the People's

Representative Assembly.  Thus, viewed from this perspective, the a quo Petitioners can fully meet the requirement of legal standing as intended in Article 51 paragraph (1) of the MK Law.

b.  On the other hand, the KKR Law stipulates that KKR has several sub commissions, one of which is sub-commission for investigating and clarifying gross violations of human rights (Article 16 letter a). This sub-commission, pursuant to Article 18 letter (f) of the KKR Law has the authority of "determining the category and type of gross violations of human rights' as intended in the Human Right Court Law. This provision means that the investigation and clarification sub-commission has the authority to determine whether a gross violation of human right existed in the past and at the same time determining its type, namely whether such violation is genocide or crime against humanity. Based on this view 'physical, mental or emotional suffering, economic loss or neglect, reduction or expropriation of basic rights" experienced by the aforementioned a quo Petitioners, at this time cannot yet be determined whether they were caused by gross violation of human rights or not, because the KKR (including sub-commission for investigating and clarifying gross violations of human rights) has yet to be established until now.

c.  Based on the explanations in letters (a) and (b) above, determination of the legal standing of the a quo Petitioners, or any party experiencing event similar to the Petitioners, have been rendered uncertain by the

two provisions of the law and there is no settlement to it. Indeed, this Court may interpret that if settlement chosen to settle a past gross violation of human rights is through the KKR, then the provision of the KKR Law shall apply, because Article 47 paragraph (1) of the Human Right Court Law provides that, *"gross violations of human rights occurring prior to the enactment of this Law may be settled by the Truth and Reconciliation Commission"*.  However, if the court takes this definition, the legal standing of the a quo Petitioners cannot still be determined at this time because it has to wait  for the establishment of KKR and with the assumption that the KKR will later determine whether the event experienced by the a quo Petitioners was as the consequence of gross violation of human rights, be in the form of genocide or crime against humanity

- In addition, even if the KKR had been formed and had decided that what had happened to the Petitioners *a quo* was a consequence of past gross violation of human rights, so that accordingly the Petitioners *a quo* had the required legal standing as intended in Article 51 paragraph (1) of the CC Law, the granting of the petition of the Petitioners *a quo* for Article 27 of the KKR Law would result in larger losses for the Petitioners *a quo*. This is because of the provision of Article 29 paragraph (2) of the KKR Law, the formulation of which is as quoted above.  A person or a group of person, based on a normal reasoning, is unlikey to confess to their crimes or admit the facts that they committed past gross violation of human rights and then apologize, without

any guarantee that by making such confession and apology, he or they will obtain amnesty.  As a further consequence, it will be difficult to disclose the relevant past gross violation of human rights, whereas actually such disclosure is a condition or requisite that cannot be set aside for the restoration of the rights of Petitioners *a quo*.  Therefore, the granting of Article 27 by using the arguments of the Petitioners as the basis*,* as elaborated above, and without taking into account the whole context of the KKR Law, would certainly eliminate the possibility for the Petitioners *a quo* to obtain compensation and rehabilitation, which means that the Petitioners *a quo* would be further harmed.

Therefore, based on the the above considerations, and using the Petitioners' arguments as the basis*,* this petition shaould be declared unacceptable. Because by at least declaring it unacceptable, there would be a better chance for the Petitioners to obtain compensation.

**SUBSTITUTE CLERK**

**SIGNED**

**Alfius Ngatrin.**

# EXHIBIT G

Indonesian court rules truth commission illegal, casts doubt on justic...    file:///C:/Documents%20and%20Settings/bsheppard/Desktop/Exhibi...

# Indonesian court rules truth commission illegal, casts doubt on justice for Suharto abuses

The Associated Press

Published: December 7, 2006

JAKARTA, Indonesia: Indonesia's Constitutional Court has ruled the country's much-criticized truth and reconciliation commission illegal, casting doubt on whether victims of former dictator Suharto will ever see justice.

The commission, which has yet to start sitting, was meant to probe political killings, disappearances and massacres during Suharto's 32-year rule, toppled in 1998 by pro-democracy demonstrations.

Critics say lawmakers — many linked to Suharto and the brutal military that propped him up — created a severely flawed commission that infringed on victims' rights and did not allow for the full truth behind abuses to be revealed.

The court on Thursday declared that several articles, concerning the provision of amnesty and reparations in laws setting up the commission, are unconstitutional.

The court also said on its Web site that the body has no legal basis.

## Today in Asia - Pacific

Chinese chemicals flow unchecked to market

Commanding yet isolated, Suharto fades away

50 Taliban killed, thwarting attempt to capture Kandahar



www.monocle.com

The surprise ruling means laws must be rewritten to set up the body, a process likely to take several years and to depend on the political will of current President Susilo Bambang Yudhoyono, a former military officer.

"The fact that the legislation has been struck down should not relieve the Indonesian government of its ongoing commitment to provide justice, truth and reparations to victims of gross violations of human rights," said Paul van Zyl, vice president of the New York-based International Center for Transitional Justice.

"It places a greater obligation on the government to ensure that the rights and needs of victims are properly addressed," he said.

Presidential spokesman Andi Mallarangeng said the government is studying the ruling and "its implications for the future."

The court's judgment came in response to a plea by rights groups seeking to challenge several articles in the law — not to have the commission declared illegal.

Former President Abdurrahman Wahid took steps to establish the commission soon after Suharto's downfall, but legislation to set it up was only passed in 2004, after going through the country's notoriously slow parliament.

The commission was assigned to find the truth behind systematic rights abuses committed in Indonesia before 2000, and to recommend reparations for victims or amnesties for perpetrators.

It was seen as the only way to help Indonesia reconcile with its bloody past, given the vast number of cases and the country's slow, inefficient and corrupt legal system.

But many rights activists have said they feared the commission was becoming a way to whitewash past crimes — not to meaningfully address them.

The commission has faced opposition from right-wing Muslim groups opposed to any move to uncover the truth behind the 1965 massacre of about 500,000 suspected communists. Muslim groups carried out most of the killings under the orders of Suharto, who assumed power a year later.

Still-powerful military officers also oppose the commission, which could reveal the extent of army killings in stifling separatist movements in far-flung regions, notably Papua and Aceh.

Suharto, 85, has been declared too sick to stand trial for any crimes committed during his rule.

Home > Asia - Pacific

Back to top

More Features
Blogs
Top Ten Articles



IHT Subscriptions
Sign Up | Manage

The Newspaper
Today's Page One in Europe
Today's Page One in Asia
IHT Electronic Edition
E-Mail the Editor

Services
Funds Insite
Classifieds
Advertise with the IHT

Other Formats
E-Mail Alerts
AudioNews
Mobile
RSS

E-Mail Article
Listen to Article
Printer-Friendly
3-Column Format
Translate
Share Article
Add to Clippings
Text Size

# EXHIBIT H

**The Jakarta Post.com**            ✒ Print            October 31, 2007

## Court throws out 'illogical law' on rights tribunal

National News - Friday, December 08, 2006

**Ary Hermawan**, The Jakarta Post, Jakarta

The Constitutional Court scrapped Thursday an 2004 law mandating the establishment of the Truth and Reconciliation Commission (KKR) because judges said it made no sense.

The surprising ruling further sets back the chances of victims of human rights violations to have their cases resolved and receive compensation.

Eight of the nine judges were of the opinion that articles in the law on the commission were "problematic" and did not encourage people to settle their cases through the commission.

"The aims of the establishment of the commission cannot be achieved because the law that accounts for its legal basis does not give legal certainty. The court rules that the law goes against the Constitution and has to be dropped," presiding judge Jimly Asshidiqque said.

The court ruling has shot down the commission before it was ever established.

President Susilo Bambang Yudhoyono had not yet selected the commission's 21 members, although a team screened and submitted 42 names to him last August. For the delay, Yudhoyono was accused of protecting alleged human rights abusers, especially those in the military.

The judges in their ruling said immunity from prosecution could only be given to people who had admitted to committing rights violations. The right to give immunity was the President's prerogative, not the commission's, they said.

"It is legally illogical if requests for compensation, restitution, rehabilitation and amnesty are filed simultaneously to the body before it has conducted any investigation to discover if gross human rights violation actually occurred," the judges said.

The court's decision to declare the entire law unconstitutional surprised rights activists, who had requested the judges review only three articles in it. These ruled compensation for victims could only be given after perpetrators were granted amnesty and stated resolved cases could not be tried again in other courts.

Asmara Nababan of the Institute for Policy Research and Advocacy (Elsam) said the ruling showed how bad the government and legislators were at law-making.

"They should apologize to the people, especially taxpayers, for having spent a lot of money to make a law that turns out to be against the Constitution," he said.

Activists and victims of rights abuses had hoped that the establishment of KKR would

resolve rights cases that had occurred before the 2000 Law on Human Rights Trials was passed.

"I didn't expect this (decision to drop the law)," Nababan said. However, he said he understood the court's reasons for doing so and respected them.

"What concerns us is the fate of the victims. They have waited for years to see the truth (behind their cases) revealed. Now they have to wait longer," he said.

Suratih, a former teacher jailed for six years without trial for suspected affiliation with the banned Indonesian Communist Party (PKI), said she would continue fighting for justice despite the ruling.

"I know the truth will prevail. If I fail, my children will continue my fight. And if they fail too, the people will take it over," said the 81-year-old, who flew from Surakarta, Central Java, to Jakarta to hear the verdict read.

The judges, however, said the ruling should not prevent the government from finding other legal ways to solve rights abuses.

They recommended it create new legislation that was in line with the Constitution and international law.

# EXHIBIT I

 

# Indonesian Court Voids Key Human Rights Law

By Chad Bouchard
Jakarta
08 December 2006

**Indonesia's Constitutional Court has annulled the country's Truth and Reconciliation law, saying it has no legal basis. As Chad Bouchard reports from Jakarta, the surprise decision throws the future of many laws into question, and challenges investigations into past human rights violations.**



The law the Indonesian Constitutional Court threw out on Thursday would have established a special Truth and Reconciliation Commission to investigate human rights violations going back more than 40 years.

The law was intended to bring to justice those responsible for abuses under Indonesia's former dictator, Suharto, and those responsible for the massacre of half a million suspected communists in 1965.

**Indonesian activist holds poster during rally to commemorate International Human Rights day (file photo)**

The proposed Truth and Reconciliation Commission has long been opposed by some conservative Muslim groups and high-ranking military officials, who fear they might be implicated in abuses.

President Susilo Bambang Yudhoyono's spokesman, Andi Mallarengeng, says the government must now look for ways to ensure that the spirit of the law is preserved.

"I think the spirit of the law itself was meant by the parliament to bring justice, to bring truth to come forward, and to get over with some dark parts of our history," he said. "But unfortunately, yesterday's ruling canceled the law. And so we are now studying the consequences and the implications."

He said Thursday's court decision is final, with no chance for appeal.

Critics and human rights activists had challenged three provisions of the legislation, saying the law was too vague and opened too many doors for those with blood on their hands to secure amnesty.

Instead of focusing on just those provisions, the panel of judges threw out the whole law.

Patra M. Zen is chairman of the Indonesian Legal Aid Foundation, one of the groups that had sought a review. He says the decision has widespread implications for human rights laws, including key laws governing Indonesia's Aceh and Papua provinces, where the military is accused of brutality in putting down separatist violence.

"There is two laws at least," he said. " Law regarding Aceh - special autonomy in Aceh - and law regarding special autonomy in Papua. You know, there's many laws also depend on that law. So now there is a vacuum of law, yeah?"

Zen says the decision sets Indonesia's human rights work back several years. He says the country's parliament must now review and rewrite dozens of related laws, which will cost money and time.

Human rights activists are planning to meet with Indonesia's Justice and Human Rights Department next week to discuss the implications of the ruling.

Print



# EXHIBIT J

Case 1:07-cv-01022-LFO    Document 26-6    Filed 11/02/2007    Page 2 of 6

AsiaSource Interview with Governor of Aceh, Irwandi Yusuf          file:///C:/Documents%20and%20Settings/bsheppard/Desktop/Exhibit...

October 31, 2007October 31, 2007
A Resource of the Asia Society

 Asia◉Source

Arts & Culture  |  Business & Economics  |  Policy & Government  |  Social Issues

◎ Special Reports

◎ Interviews

**AsiaTODAY**
latest news stories

**AskASIA**
educational resource

**AsiaFOOD**
Asian food resource

**AsiaSTORE**
online bookstore

**AsiaPROFILES**
maps & statistics

**AsiaVIEWS**
articles & speeches

**AsiaLINKS**
related links

**AsiaEXPERTS**
specialists database

**AsiaEVENTS**
worldwide calendar

**AsiaInNYC**
cultural travel guide

**AsiaBULLETIN**
email updates

 Search Site

**RESOURCES**

Asian Holidays

Chronologies

Country Comparison

Dictionary Tool

Embassies

Glossary of Terms

Regional News

home | sitemap
about asiasource
comments | credits

 **Q&A** AsiaSource
Interview

◎ Interviews

September 13, 2007

**Irwandi Yusuf** is the Governor of Aceh. A former separatist leader, Governor Yusuf has held several positions with the Free Aceh Movement (GAM). He was formally installed as Aceh's first democratically elected governor on February 8, 2007.

In this interview, he talks about the transition he made from leading a movement for national liberation to serving in government. Governor Yusuf is hopeful that Aceh will be able to attract more foreign investment and will receive a fair share of revenues for its resources from the central government in Java as stipulated in the Helsinki agreement.

**Governor Yusuf, you spent many years working with GAM, the Free Aceh Movement. Could you explain how you made the transition from being part of a movement for national liberation to serving the government?**

Well, this is quite a difficult question, very complex. Aceh was a sovereign state, a sovereign country before the invasion of the Dutch in 1873, which resulted in a protracted war for many, many years resulting in many killings, but not surrendering of the Achenese. The Japanese came to Aceh, and drove away the Dutch, and then the Japanese, as you know, were defeated in World War II, in the Pacific War, and then Indonesia declared its independence. Without the consent of the Acehnese people, all of a sudden Aceh became part of Indonesia, and the people protested by launching the rebellion in Aceh in 1953, led by an ulama.

Then the government agreed to grant special autonomy to Aceh, but never implemented the law. Later on, in 1976, a new generation of Acehnese people formed the Free Aceh Movement (GAM). And this time, we struggled for independence (in 1953 we had settled for some sort of greater autonomy; now we wanted independence).

At first the Free Aceh Movement didn't use arms to achieve its goals, but instead launched an awareness program to the people of Aceh. The people of Aceh were expected to understand who they are. But the Indonesian government responded by sending the military to crush this movement, and many of its founders were imprisoned or killed, and the rest fled overseas. We were aware that the struggle needed a back bone. What back bone? Armed force. We trained our people abroad for the armed forces, to protect ourselves, and to protect the movement. In 1990 all the trainees had completed the program and returned to Aceh,

Case 1:07-cv-01022-LFO    Document 26-6    Filed 11/02/2007    Page 3 of 6

AsiaSource Interview with Governor of Aceh, Irwandi Yusuf                 file:///C:/Documents%20and%20Settings/bsheppard/Desktop/Exhibit...

@disclaimer
press releases



AsiaSociety.org

Information on the Asia
Society, its programs,
publications, exhibitions,
regional centers,
membership, and more.



Subscribe

Stay informed of Asia
Society events with free
weekly updates.

Enter Email Here
         Subscribe



Membership

Become an Asia Society
Member and receive:
invitations to
member-only receptions,
discounts on tickets to
performances, films and
lectures, and purchases
at Asia Store; and much
more.

and the government again responded heavily, and we lost many people, and the survivors fled again overseas, mainly to Malaysia.

In 1998, with the end of Suharto and the formation of a more democratic government in Indonesia, our remaining forces from Malaysia and elsewhere in the world came back to Aceh, reconciled and united. Then we launched the awareness program throughout Aceh and gained a lot of support from the people all over Aceh. Then bit by bit we established an armed force to protect this struggle and the people of Aceh. Of course the government also reacted militarily in 2003. But before 2003 there was a peace deal mediated by the Henry Dunant Centre from Geneva. We called it a cessation of hostilities; actually, not a cessation, but a "humanitarian pause".

From 1998 I was heavily involved, and actually the first headquarters of GAM, administratively, was in my home. Later on, in 2001, I infiltrated ICRC [International Committee of the Red Cross]. I was working for the ICRC to learn humanitarian law. And three months later I left the ICRC after getting enough training in law, and then I went up to the hills to teach the GAM soldiers humanitarian law. In 2003, after the failure of the Tokyo talks, the government launched a massive military attack on the GAM position, and we withstood the raid for more than two years, and then the tsunami happened. The tsunami actually sped up the peace process in Aceh. Why do I say sped up? Because before the tsunami the government already approached us for negotiations.

**What are relations like now though between the Indonesian military and your government in Aceh?**

Well, as a result of the MoU in 2005, the military's role is only for external defense. While before-

**The Indonesian military's role?**

Yes, Indonesian military. The GAM military has been dissolved, and we decommissioned all of our weapons.

**How many are there now in Aceh, Indonesian military?**

Well, too many, 14,700.

**What were the key points in the Helsinki Agreement, and what have its consequences been in terms of changes in civil and political life in Aceh?**

OK, in the military, the GAM must dissolve its military and decommission its weapons. And the Indonesian military must withdraw from Aceh, because there used to be more than 100,000 Indonesian military in Aceh, and they had to withdraw and remain only 14,700.

**So that number was actually outlined in the Helsinki Agreement, that 14,700 would remain?**

Yes. And in the political, the government agreed to provide venues for local elections, not only involving candidates from a political party, but also independents, with no political party. I am one of the independent candidates. And also the sharing of power, Indonesia agrees only to hold six authorities: external defense, national security, monetary and

fiscal, justice, religious issues, and foreign affairs. And later on they added one more: all national interests. This is a very, very obscure stipulation.

**Are you concerned, given how resource rich Aceh is, about the revenue sharing agreement that exists now between the Acehnese government and the central government in Java?**

Yes, the oil and gas is almost finished in Aceh, but now we're getting 70 percent of the net profit.

**Is that according to the Helsinki Agreement?**

Yes, according to Helsinki, but we don't know from what that 70 percent comes because it's never openly audited.

**So who's responsible for that? Is it the central government?**

Yes, the central government.

**And the central government maintains control over the revenues?**

Yes.

**I see. So, how do you think that Aceh, or rather let me say when, given this, when do you think Aceh will be able to attract investment in the resources it has, and actually gain the benefits of the resources that belong to Aceh?**

When? Now. Why? Because we have now the law, authority of law, that Aceh can control its own affairs. But this year is a transition year. The government is providing the bylaws, and also in Aceh we are creating bylaws to implement the law number eleven. The law number eleven is the law derived form the MoU, although not fully one hundred percent complying to the MoU. But that's a better law than nothing.

**What are the sectors in which you hope to attract the most investment in Aceh?**

Agro-businesses, because most of our people base their job on agriculture.

**Has there been an increase in investment since you've been-**

I have signed many MoUs with overseas investors, now they are dealing with the financial institutions to get money, and to invest in Aceh.

**And what are your main priorities as governor in the first year?**

Of course I want to make the government right. I inherited a wrong government from the past regime.

**In what sense?**

In every sense, the corruption and the power abuse. I'm correcting it now. And at the same time, launching the grassroots economy by providing access to the grassroots community-

**What would the grassroots economy be?**

Case 1:07-cv-01022-LFO    Document 26-6    Filed 11/02/2007    Page 5 of 6

AsiaSource Interview with Governor of Aceh, Irwandi Yusuf          file:///C:/Documents%20and%20Settings/bsheppard/Desktop/Exhibit...

Well, whatever grassroots people can do, whatever their background is, they should be able to do. So they do not have access to finances, to capital, so I provide the capital to the bank, soft loans. The problem with grassroots people is when they deal with the bank, they do not have collateral, so I instruct the government of Aceh bank there to issue credit without collateral.

**This is not like micro-credit, is it?**

Micro, yes.

**What do you see as the main obstacles to Aceh's growth in the next decade or so?**

Well, again, the economy. This small grassroots economy won't create a big and modern Aceh. We need, later on, investment. And we have potential to offer: mining and agriculture.

**But you're optimistic about the extent to which Aceh will actually benefit from the resources it has?**

Oh yes. It has now been two years already, and my ex-combatants are waiting. I want the central government in Java, the government of Indonesia, to be fully committed to the MoU and the law number eleven. Also, there are other commitments to be fulfilled by the central government on human rights issues: the courts, the trial of human rights abusers, truth and reconciliation, and also the Joint Claims Settlement Commission.

**And these are all to deal with victims of the Indonesian military's operations in Aceh?**

Yes.

**And the Indonesian military has agreed to comply ? In the Helsinki agreement this was-**

For the human rights? Well, they're very elusive.

**Very evasive?**

Evasive and elusive. [laughs]

So there was an agreement in Helsinki that there is going to be a human rights court for Aceh, but no stipulation that past abuses will be tried in this court. And then the Indonesian government is very smart, because law number eleven was created in Jakarta, by the parliament in Jakarta, so they shaped it a bit, the human rights court for future violations -- give me a break!

*Interview conducted by Nermeen Shaikh*

Send comments on this interview.

The views represented in AsiaSource interviews are not

10/31/2007 10:14 AM

Case 1:07-cv-01022-LFO    Document 26-6    Filed 11/02/2007    Page 6 of 6

AsiaSource Interview with Governor of Aceh, Irwandi Yusuf          file:///C:/Documents%20and%20Settings/bsheppard/Desktop/Exhibit...

necessarily those of Asia Society or its funders.

Copyright © 20072007. Asia Society. All rights reserved. Please click
here for legal restrictions and terms of use applicable to this site and
Asia Society's Privacy Policy.

# EXHIBIT K



# THE WORLD BANK SUPPORT FOR POST-TSUNAMI RECONSTRUCTION IN ACEH AND NIAS, INDONESIA

The World Bank, Indonesia

http://www.worldbank.or.id

## The Aceh Peace Agreement:
## How Far Have We Come?
### *December 2006*

It is now 15 months since the Government of Indonesia and the Free Aceh Movement (GAM) signed an historic Memorandum of Understanding (MoU) in Helsinki aimed at bringing to an end thirty years of conflict in Aceh. As the two year anniversary of the tragic Indian Ocean tsunami approaches and as the EU and ASEAN-led Aceh Monitoring Mission (AMM) prepares for its departure from Aceh, it is time to reflect on the successes and failures of the last 15 months since the signing of the MoU, and on the challenges that remain ahead. What have been the consequences of the Helsinki MoU? How far have we come in consolidating peace in Aceh? What are the challenges ahead?

### Implementation of the Helsinki MoU: Great Steps towards the Consolidation of Peace

> "So far I think it is working. GAM has all come home safely, I saw the troops going home, and my friends tell me they destroyed weapons at the market."
>
> *Female villager, Sabit, Aceh Jaya*

**Since the signing of the Helsinki MoU in August last year, much progress has been made towards consolidating peace in Aceh.** The Aceh Monitoring Mission (AMM) has successfully overseen the destruction of GAM weapons and police and military withdrawal from Aceh. On December 21st 2005, GAM handed over the final 142 weapons bringing the total number of weapons destroyed to the 840 stipulated in the MoU. On December 31st 2005, a ceremony was held to mark the final withdrawal of 7,628 soldiers and 2,150 police, bringing the total security forces withdrawn to 31,681.[1] On July 11th 2006, the Indonesian national parliament passed the Law on Governing Aceh (LoGA), which operates the clauses of the MoU.

Initially GAM and civil society groups were dissatisfied with some articles of the law, in particular those relating to the Indonesian military's role in Aceh, the lack of retroactivity for an Aceh human rights court, and whether the national government must have "agreement" from or only "consult" with the Aceh provincial government on national laws that affect Aceh. However, GAM, through dialogue facilitated by AMM, and society generally has accepted its content. The passing of the LoGA has provided the basis for the direct election of a new Governor and almost all Districts Heads. Elections are scheduled for December 11th. Former GAM and military personnel are to stand on party and independent tickets. The *Badan Rehabilitasi dan Rekonstruksi* (Rehabilitation and Reconstruction Agency – BRR) has committed to help with infrastructure reconstruction and economic development in conflict-affected areas and the local government has formed a new agency, the *Badan Reintegrasi Aceh* (Aceh Reintegration Agency – BRA)

---

[1] The final group of 2,150 police actually departed on January 4th 2006.



**THE WORLD BANK SUPPORT FOR POST-TSUNAMI RECONSTRUCTION IN ACEH AND NIAS, INDONESIA**
The World Bank, Indonesia

http://www.worldbank.orld

to coordinate and oversee the distribution of reintegration assistance and has established programs to target key groups.

### Levels of Conflict Post-MoU: GAM-Government Incidents Drop Off but New Forms of Conflict Emerge

> "Go to the coffee shop, and instantly you can feel the peace process is going on. Since the MoU, people like to sit in the coffee shop for 24 hours – from morning to late at night. [And] that's good for my business."
>
> *Villager, Alue Bu Jalan, Aceh Timur*

**The security situation has improved remarkably across the province.** The number of incidents involving GAM and the Government has dropped dramatically since the signing of the MoU. Indeed, as Figure 1 indicates, only three incidents have occurred since the beginning of this year.[2] Those that have occurred have been the result of personal grievances between former combatants and security personnel or to a lack of discipline, particularly from police and military still nervous about having their former enemies around. However, both sides have shown genuine commitment to work together in order to resolve such one-off incidents, and local tensions have not escalated.

**Figure 1: GAM-Government and Local Level Conflict Incidents**



Source: WB newspaper conflict dataset

**"Vertical" GAM-Government conflict has been replaced by "horizontal" local level conflict.** As GAM-Government conflict has dropped, local level disputes have increased

---

[2] As part of an analytical support program to the peace process, the World Bank Office Indonesia, with support from the Decentralization Support Facility (DSF), has been using a newspaper conflict mapping methodology to record and categorize reported incidents of conflict in Aceh. Monthly updates are available in English and Indonesian at: www.conflictanddevelopment.org.



# THE WORLD BANK SUPPORT FOR POST-TSUNAMI RECONSTRUCTION IN ACEH AND NIAS, INDONESIA
The World Bank, Indonesia

http://www.worldbank.or.id

and are now far more prevalent than conflict between the parties to the MoU (see Figure 1 above). These conflicts include local land and natural resource disputes, vigilante violence, administrative issues and, increasingly, disputes relating to the targeting, distribution and provision of tsunami aid assistance. In September of this year, 27 of 61 local conflict incidents related to development aid. Generally, the rise in such conflicts can be seen as a positive development. The resolution of the conflict between GAM and the Government has opened space for people to contest government and aid agency policies and projects. This is part of the fabric of democracy. Yet, the rising trend in protests against aid and the broader 'democratization of conflict' also present dangers. Aid efforts must be more effective and transparent, and the police must prevent local violence, crime and extortion occurring, to ensure that isolated incidents do not escalate and become more serious.

### Reintegration: Smooth Return of GAM to Villages but Much to be done

> "The car dropped me off at Krueng Sabee, I started to walk towards my village and I saw my wife for the first time in five years, many other villagers also came out to the road to welcome me back. When they recognized me, they would cry, kiss and hug me because their prayers had been answered and I was able to make my way home safely."
>
> *Former political prisoner, Krueng Sabee, Aceh Jaya*

**The initial return of GAM combatants and political prisoners did not cause problems and was often a happy moment for returnees and villagers.** The vast majority of active GAM (80 percent) returned in the first two months following the signing of the MoU. In almost all cases, there has been a high level of acceptance of these GAM returnees; 90 percent of GAM members reported not having encountered any problems and most that did occur were minor.[3] This is primarily because they have returned to their home villages and are familiar faces in their communities. Most combatants also managed to return home for short periods during the conflict. Over three-quarters of GAM returnees surveyed indicated that some form of traditional ceremony (*peusijuk*, also known as *tepung tawar*) or *kenduri* welcome had been held upon their return.

**However, 15 months on, former combatants and conflict-affected vulnerable groups continue to face livelihood and economic problems and this is testing social cohesion.** In February 2006, 75 percent of GAM returnees were unemployed.[4] Recent field visits indicate that little has changed since then. For the first few months, former GAM combatants were satisfied to spend time with their families. However, there is growing dissatisfaction and frustration at the pace of reintegration assistance and growing resentment at both the government and GAM leadership, particularly amongst the younger, lower ranking former combatants who see their superiors driving new cars and sporting mobile phones while they have nothing. Money from the Government reintegration agency (BRA) has been slow to reach combatants because of political

---

[3] World Bank (2006). *GAM Reintegration Needs Assessment: Enhancing Peace through Community-level Development Programming*. Banda Aceh/Jakarta: World Bank/DSF.
[4] *Ibid.*



disputes in Banda Aceh and the difficulty of designing an effective delivery mechanism acceptable to both sides. (The 2,000 pardoned political prisoners have done better, receiving support from the time of their departure from prison). Lack of support for former combatants is a serious problem, and crime rates are beginning to rise as disillusioned ex-GAM turn to "alternative" income generation methods.

Similarly, dissatisfaction is rising amongst conflict-affected communities who have received very little but standby watching tsunami-affected communities receive projects and support. BRA's recently launched $60 million assistance program, which will provide funds to every rural village in Aceh by the end of next year, is an important start (see Box 1). However, additional interventions to generate livelihood opportunities must be a top priority, since the project will mostly fund public goods while villagers also want and expect capital and individual assistance. Equally important is addressing the current inequalities in assistance to tsunami- and conflict-affected communities. A recent survey found that families displaced by conflict are viewed to be significantly worse off in comparison to their host communities, compared to families displaced by tsunami.

> **Box 1: A Good Start: BRA delivers benefits to GAM, vulnerable groups and conflict-affected communities**
> The Government and many donors have prioritized the use of community-driven approaches for delivering assistance to both tsunami and conflict-affected individuals and communities in Aceh. Such approaches, which involve heavy participation from recipient communities, can ensure that aid meets community needs. BRA is using the community-driven Kecamatan Development Program (KDP) to deliver approximately $ 60 million of reintegration assistance to conflict-affected communities over a two-year period. All rural Acehnese villages will receive between $6,000 and $17,000 depending on history of conflict and village population size. Recognizing that both GAM combatants and ordinary villagers were affected by years of conflict, the program allows communities to determine themselves how their block grant is to be used, including whether it should be distributed to specific individuals or used for community projects.

**Many combatants and villagers remain traumatized 15 months after signing the MOU due to years of violence and abuse.** A recent IOM-Harvard-Unsyiah psychological assessment conducted in high-conflict sub-districts in Pidie, Bireuen, and Aceh Utara shows that both men and women experienced high levels of violence and traumatic events, comparable with the likes of Bosnia and Afghanistan.[5] Some 56% of men and 20% of women report was being beaten; 36% of men and 14% of women report being attacked with a knife; 25% of men and 11% of women report having been tortured while 19% of men and 5% of women report is having been taken captive. People are suffering from significant mental health problems as a result of these experiences. The assessment found that 65% of the population ranked high on depression symptoms, 69% on anxiety symptoms and 34% on post-traumatic stress disorder symptoms. These figures indicate the need to expedite the provision of

---

[5] IOM-Harvard-Unsyiah (2006). *Psychosocial Needs Assessment of Communities Affected by the Conflict in the Districts of Pidie, Bireuen Aceh Utara.* Banda Aceh: IOM/Harvard Medical School/University of Syiah Kuala.



THE WORLD BANK SUPPORT FOR POST-TSUNAMI
RECONSTRUCTION IN ACEH AND NIAS, INDONESIA
The World Bank, Indonesia

http://www.worldbank.or.id

economic and livelihood programs in order to reduce today's burden, as well as a clear need for mental health services that can address the psychological effects of past traumatic events.

**Immediate Issues for Consolidating Peace in Aceh**

Tremendous progress has been made but much remains to be done, and must be done quickly. There are three immediate priorities.

*Elections*
**Aceh's first post-conflict elections, initially delayed, are scheduled to take place on December 11th.** The preamble of the MoU commits the parties to create conditions for "fair and democratic" government and clause 1.2.2 specifies that elections be held by April 2006 at the latest. Delays in finalizing the LoGA meant this deadline was missed, but fortunately this did not caused problems as both sides understood the reasons for delay. The establishment of a stable political environment through peaceful and legitimate elections is indeed crucial to ensuring the peace process continues as smoothly as it has to date. At the time of writing there was no indication that the race for political power will seriously disrupt the peace process. To be sure, there have been some tensions between candidates and the bodies that will implement the elections, as well as intra-party conflict surrounding the selection of party candidates (including tensions between the two GAM-affiliated candidates). These have not yet resulted in violence.

However, those monitoring, implementing and participating in Aceh's elections must be aware of tensions that remain from 30 years of conflict and take active steps to ensure that the contests remain peaceful. This requires close coordination between parties at the local level and strong control from elites to ensure that voters are not mobilized along divisive lines.

*AMM's departure*
**AMM has done an excellent job at overseeing the peace process, facilitating dialogue between the two sides, and building community trust.** A recent IFES survey shows that 97 percent of people in Aceh are satisfied with AMM's performance. However, many also felt they should stay in Aceh for one or even two more years and Acehnese are increasingly worried about what will happen when they leave on December 15th.[6] What should come next? It is extremely important that a clear and widely advertised exit strategy is drawn up. There will be a need for some institutional oversight over the coming years. Key elements of the MoU—including the establishment of a Commission for Truth and Reconciliation, the Joint Claims Settlement Commission, and the commitment to rehabilitate public and private property destroyed or damaged during the conflict—remain to be implemented. At this point no one is expecting any massive break-downs in relations between GAM and the Government. Yet some

---

[6] IFES Survey, August 2006.



**THE WORLD BANK SUPPORT FOR POST-TSUNAMI RECONSTRUCTION IN ACEH AND NIAS, INDONESIA**
The World Bank, Indonesia

http://www.worldbank.or.id

mechanism for ensuring dialogue and gently nudging the two sides will continue to be necessary until at least the elections of 2009.

*Reintegration and Post-Conflict Development*
**Much still has to be done to reintegrate former GAM into social and economic life.** Initial benefits for combatants, prisoners and conflict-affected persons are welcome but will not in themselves create sustainable livelihoods. There is a danger that as former conflict actors see no real benefits from the peace, they will become less invested in it. There are also serious inequalities in the provision of aid and services to tsunami and conflict affected areas. This may provide a basis for future unrest. Government, donors and NGOs must adopt an area-focused policy of development assistance to ensure all those vulnerable and in need receive support.

**Towards Sustainable Peace: The Importance and Challenge of Local Governance in Aceh**

**The conflict in Aceh was primarily driven by resentment that the province's rich resources did not result in development for ordinary Acehnese.** Dissatisfaction was directed against the Indonesian state, which was seen as corrupt and ineffective. Building sustainable peace in Aceh will necessitate building the legitimacy of the state in the eyes of Acehnese communities and elites. It will also require ensuring that economic opportunities reach those most vulnerable to being mobilized for conflict: the poor and vulnerable in rural Acehnese villages.

**The peace process presents a tremendous opportunity to develop and build Aceh.** The MoU and LoGA provide for a massive injection of financial resources and increasing local authority to manage and distribute them. In 2006, the local government in Aceh received revenues three times higher than before decentralization in 1999, an increase from Rp. 2.2 trillion ($ 232 million at current prices) in 1999 to Rp. 10.4 trillion ($ 1.1 billion) in 2006. The World Bank estimates that from 2008 onwards, local government revenues will stabilize at around Rp. 13 trillion ($1.4 billion) due to the benefits of the MoU/LoGA. Yet local government institutions, arguably, do not presently have the capacity to effectively manage and spend such resources. Corruption is a major problem. Mechanisms for managing political competition and ensuring accountability are weak. Government expenditure has largely been concentrated in urban centers, captured by politically connected elites, and continues to disenfranchise the rural poor.

**Arguably for the donor and international community, supporting and strengthening the adoption of able, accountable, corruption free, and accessible local state institutions is *the* medium to long-term priority.** This, along with the ability of donors and the government to get assistance to villagers and ex-combatants in a timely manner, will largely dictate whether Aceh remains at peace in years to come.

# EXHIBIT L

<u>HUMAN RIGHTS WATCH</u>

# Indonesia: Aceh Rights Court Must Address Past Abuse

(New York, May 26, 2006) – The new Human Rights Court for Aceh must try human rights abuses committed during three decades of conflict, not just abuses since the August 2005 peace agreement, Human Rights Watch said today.

Next week the Indonesian parliament will debate the scope of the court's jurisdiction when it considers legislation implementing the peace agreement between Indonesia and the Free Aceh Movement (Gerakan Aceh Merdeka, or GAM).

"Both sides in the war in Aceh committed grave and systematic crimes," said Brad Adams, Asia director at Human Rights Watch. "What's the point of a human rights court unless it can offer justice to victims on all sides?"

To implement the peace deal, Indonesia's House of Representatives is now debating the Aceh governance bill. Parliamentarians from Indonesia's two largest parties, the Indonesian Democratic Party of Struggle (PDI-P) and Golkar, have sought to limit the jurisdiction of the court to try only those human rights violations committed since the August 2005 signing of the Helsinki agreement. That agreement allows for the trial of past abuses.

Human Rights Watch supported recent calls from a coalition of Indonesian human rights organizations for the court to be granted jurisdiction to prosecute all serious abuses and violations of international humanitarian law committed by either side during Aceh's 30 years of armed conflict. The coalition, known as the Aceh Working Group, recently stated that parliament's apparent reluctance to take up past abuses showed that it is attempting to bury abuses committed during the conflict.

Human Rights Watch and others have extensively documented atrocities perpetrated by both the Indonesian military (TNI) and GAM in Aceh. Serious human rights abuses and war crimes committed in the province during the conflict affected almost the entire population at one time or another and included extrajudicial killings, torture, arbitrary arrests and detention, "disappearances," extortion and forced displacement of civilians.

Most recently, Human Rights Watch documented widespread abuses during TNI military operations from May 2003 to the signing of the peace deal in August 2005. These included routine torture and other mistreatment, including the use of electric shock, burning with cigarettes, beatings and threats against accused GAM members or supporters. Unfair and highly politicized trials were also a characteristic of the government's prosecution of the war in Aceh.

The conflict caused massive internal displacement. The military frequently displaced thousands of civilians during operations, a violation of international humanitarian law when

it is not for the security of the civilians involved or for imperative military reasons. Civilians forced into flight often had difficulty obtaining access to humanitarian assistance, in part because of excessive government restrictions on freedom of movement.
"So far the military leaders who committed crimes in Aceh have been rewarded, not punished," said Adams. "It is time to end this – individuals on both sides who committed serious abuses must be held accountable."

Opponents of giving the court broad temporal jurisdiction argue that past violations should be dealt with by the Commission of Truth and Reconciliation, because trials would jeopardize the fragile peace in Aceh. But Human Rights Watch stated that the violations in Aceh were too serious to be addressed only by the truth commission, which cannot impose criminal penalties. States have an obligation under international law to prosecute serious abuses of human rights and war crimes.

Human Rights Watch said that accountability for human rights atrocities demonstrates respect for the dignity of victims, punishes criminals who commit atrocities, and may save lives by deterring at least some future perpetrators. Ongoing impunity for human rights violations in Aceh has created an environment of mistrust between the people of Aceh and the Indonesian government.

Indonesia recently pledged during its successful campaign for membership in the new United Nations Human Rights Council to strengthen human rights and the rule of law at home. A decision by the parliament to foreclose trials for the serious abuses in Aceh would undermine that pledge.

"Even if the political situation is not conducive for trials to go ahead immediately, the authorities should not close the door on justice forever," Adams said. "Accountability will help all parties come to grips with the past and move forward."

Human Rights Watch urged the "Quartet" of the U.S., the EU, Japan and the World Bank, as well as other key international actors, to publicly and privately endorse a human rights court in Aceh with no temporal restrictions.

"The international community has pursued justice for past abuses in East Timor, as well as in Rwanda, Sierra Leone and the former Yugoslavia," said Adams. "Why should Aceh be treated any differently?"

---

**Related Material**

Next steps for Aceh after the peace pact

Commentary, August 26, 2005

Indonesia: Military Tortures Prisoners in Aceh
Press Release, September 28, 2004

Aceh and Human Rights
Web Site

Indonesia
Country Page

From: http://hrw.org/english/docs/2006/05/26/indone13463.htm

© Copyright 2003, Human Rights Watch    350 Fifth Avenue, 34th Floor    New York, NY 10118-3299    USA



# EXHIBIT M

Modus



Senin, 22 Oktober 2007

Politik & Keamanan

Ekonomi & Bisnis

Aspirasi Daerah

Internasional

Wisata & Entertainment

Hukum & Kriminal

Pendidikan

Suara Parlemen

Olah Raga & Kesehatan

Opini & Tajuk

Arsip Berita

Home

Redaksi

Iklan

Senin, 1/10/07 10:30 WIB

### ACEH REBORN:

# A VISION FOR ECONOMIC AND SOCIAL PROGRESS IN THE WAKE OF THE TSUNAMI AND THE HELSINKI PEACE ACCORD

**By Irwandi Yusuf \*)**

On behalf of the Government and the people of Aceh, I would like to extend my sincerest appreciation to our host today, the World Affairs Council, and to their cooperators: The Asia Foundation, TransFair USA and the American Indonesian Chamber of Commerce and its Sustain Sumatra program. I also want to thank individuals and organizations here in San Francisco who donated funds and person-power to relief and recovery efforts after the tsunami. I especially salute the work of the Asia Foundation and the Give2Asia Fund. In Aceh's greatest moment of need, you showed that the world cared about our fate.

And lastly I want to thank those who helped us begin the process of restoring a normal life to former combatants and victims of nearly three decades of conflict in Aceh.

It is an honor for me to speak at the World Affairs Council. I'm using this opportunity, and my swing up the West Coast, to talk about Aceh's rebirth and reach out to the business community, to NGOs, foundations and civic organizatons.

I want to build cultural and commercial bridges between Aceh and the United States, bridges as strong and striking as your Golden Gate. Today I want to talk about Aceh's rebirth. I want you to know that after having endured and overcome the worst natural disaster in living memory and survived 130 years of one kind of war or another we are stronger and more hopeful than ever.

I say this all with the profound emotion that comes from first-hand experience as a combatant, as a political prisoner and tsunami survivor (while almost all my fellow prisoners died), as a peace negotiator, and now as the first democratically- elected governor of Aceh.

So, what is Aceh's rebirth? In general terms, it means Aceh progressing economically, socially and politically, and serving as a model for resolving armed conflicts and recovering from natural disaster and years of war. In Aceh today, we hear the phrase "the way forward," as frequently as we once heard the immediate posttsunami slogan "build back better." Naturally, my administration is determined to ensure that the way forward is as bright as the past was dark. Aceh must, and will have, a better tomorrow than its yesterday.

More specifically, my vision for Aceh's rebirth is based on substantial progress in five broad areas: 1) economic development, 2) social welfare, 3) environmental initiatives that benefit local communities, 4) combating corruption including reforming the civil service, and 5) human rights.

I avoid slogans and grand statements. But I need to say at the outset and return to it later - that there will not be economic development without continued peace. And there cannot be peace without economic progress. They are like the two towers of the Golden Gate Bridge , mutually reinforcing, one useless without the other. Let me elaborate on the five components of my plan for Aceh's social and economicrenewal.

First: Economic development
I am determined to put in place programs that help people gain the means to sustain themselves. This includes access to affordable, collateral-free credit for agricultural tools and business start-ups. Most urgently, in order to deepen the peace, we must generate employment for ex-combatants and victims of the conflict.

In the longer-term, I want to expand markets forour agricultural products, and I want to modernize our agriculture using advanced information, communication and processing technologies. This morning, I met with leading American importers and roasters who buy our world-famous Gayo Highland coffee. We discussed issues of mutual interest, including increasing production, improving quality, and supporting recovery of farming communities affected by the conflict.

I also heard from our friends at TransFair USA in Oakland , who told me that it's not just the bold earthy flavor of our coffee that attracts American consumers, but also the fact that we produce it by Fair Trade cooperatives using organic farming methods. These methods protect our forests and our watersheds. You may be surprised to know that much of what is sold in America as organic Sumatran coffee comes from Aceh.

We intend to expand trade with the United States for a number of high-quality commodities that support our grass-roots economy. This would include cocoa, bananas, spices, and bio-fuel from renewable sources like palm oil grown on degraded land not what is now forest and which doesn't contribute to global warming.

Aceh is open for business, but open for business that benefits the Acehnese and is environmentally friendly. We want to encourage trade, investment, and tourism that promotes peace and prosperity for our people. This is where I hope many of you will come in or continue to work with us. We need your help to help ourselves. We need foreign investment in all sorts of infrastructure. We need investment in estate crops, in mining, and in the energy field. Investment is sorely needed in these areas where Aceh has great potential.

Let me say strongly: we don't want handouts. As you know, we pride ourselves on our independent nature. Once upon a time, Aceh was a trading empire of great repute, our boats carrying goods and travelers along the African Coast , into Ottoman lands, up through Arabia , India and back to what is now Malaysia . During the recent years of conflict, the two professions that village boys aspired to were guerrilla fighter and businessman. The fighting is now behind us, and we want businesses to boom.

I have already initiated a multi-part program in the grassroots economy: familybased palm oil plantations for food and fuel; small loans for new businesses; and development of fisheries in cooperaton with our neighbors in Thailand and Malaysia .

Now, we are looking for ideas, innovation, and partners here in the United States. Let me say something about Aceh's largely unknown but nonetheless longstanding ties to the United States . First, on a personal note, I obtained my master's degree in veterinary science from Oregon State University . A number of other newly elected Aceh officials lived in the United States for many years, including the mayor of the free port of Sabang . This morning, I had the occasion to speak to the current rector of our top university, who, as a Fulbright Scholar, is also an alumnus of Oregon State.

Earlier, the founder of GAM, the Free Aceh Movement, Hasan di Tiro, lived for thirty years in the U.S. as a businessman. His love of this country and of its unique, innovative business culture has been passed on to us. Many of you may not be aware that during the Eisenhower administration much assistance was provided to an earlier Acehnese rebellion fighting Jakarta for regional autonomy. Even further back, in 1873, it was to the United States , in an urgent letter to President Grant, that Aceh's sultan first appealed when the Dutch proclaimed their intention to invade.

Enough of history, though. Back to the present and the other parts of my program. The second part of what I intend to establish is a tightly focused social welfare program.

Let me emphasize that no matter what economic development takes place, the people of Aceh want and need to work for their rewards. As you well know, work gives self-respect and meaning to life.

We are, however, determined to provide free quality education and universally available health care. Further funding for these two initiatives will come from the additional revenues flowing to the government as specified in the peace accord and the new Law on Governing Aceh. We must do our utmost to educate our children for the high tech world we now live in; and we must tend to the sick, including those traumatized by the long conflict and the tsunami.

The third component of my plan is sustainable environmental initiatives that yield positive returns to local communities. I have long personal involvement in environmental issues through years of work with Fauna and Flora International, which began activity in Aceh at my request.

On June 6 of this year, I proclaimed a logging moratorium in Aceh. The moratorium was not an easy decision, but I am convinced that our forests - part of the world's great biological heritage - must be protected. The future of Aceh will remain green. Sumatran rainforest cover 30 percent of the island, but 80 percent of this is in Aceh.

My announced moratorium (bad news for loggers) was made with full knowledge of how difficult implementation and monitoring were going to be. I know we must find a way to allow local communities long living off forest products to continue to do so. And we've got to be creative - and realistic - in addressing the economic challenge that a moratorium on logging creates in Aceh, especially in the south and east.

Finally, I am a supporter of carbon trading and avoided deforestation. We will be pushing at COP 13 in Bali this December to have avoided deforestation made a provision of any post-Kyoto protocol. We want to work with the developed countries of the West to address the problems arising from global warming.

Let me introduce some caveats. I recently traveled to Latin America , where some of the earliest carbon trades have been made. I learned there both positive and negative things. On the negative side, I learned that in some instances, communities don't receive the money that was due them from their efforts. It disappeared into the pockets of corrupt officials. In other instances, where communities did get what was due, they ended up over several years supplying more labor and money than they received.

Of course, the developed world must also take strong measures at home to bring down their own production of greenhouse gases. Carbon trading cannot be used by developed nations to avoid far stronger regulations of their domestic emissions. Carbon trading is only a small part of the urgent fight to drastically reduce the heating of the planet. In the coming years, global warming will challenge and affect almost every aspect of our lives. We ignore it at our peril.

The fourth component is a no-nonsense fight against corruption. During the conflict, Aceh gained a reputation as probably the most corrupt province in a country notoriously corrupt. The conflict is over and now things can and will change. Aceh will never be "corruption-free" , but with peace we can certainly put in place a clean government far more responsive to the needs of the people. The Acehnese must know that hard work - the sweat of their brow - will not be undercut by someone paying off a government official. The Acehnese must be assured that the just benefits of the peace - the blood of Aceh's sons and daughters - will truly benefit them.

A major part of fighting corruption is civil service reform. Aceh's civil service was nearly paralyzed from three decades of conflict and the death in the tsunami of ten percent of our personnel. Thanks to many of you, billions of dollars of post-tsunami aid flowed to Aceh. Those funds run out in 19 months, however. But our biggest problem is not a lack of capital. Rather, it's responsibly and effectively allocating and managing what we do have. Unfortunately, I inherited a 2007 budget that I have relatively little control over, just as I inherited a civil service burden by deep corruption.

Our fiscal house has to be put in order for many reasons, including self-respect. It would be criminal if my colleagues and I in government fail to institute effective financial management and anti-corruption measures in the coming years. I intend to put in place a tougher system of financial accounting and I will tolerate nothing less than full transparency and accountability in all financial transactions.

There are at least two related outstanding issues: first, the fate of new infrastructure built under the coordination of the Aceh Reconstruction Agency; and second, what will happen to unspent monies donated by the international community.

Those assets must go to productive uses by being transferred to appropriate local Aceh government departments. Those departments must in turn have sufficient budgets to manage and operate the assets properly. Lastly, government personnel must be capable of managing the monies and making sensible decisions about their allocations.

Here's my bottom line on this: I will continue to push my administration to exceed normal performance standards, to be honest and fair and to work and think hard. Laziness in government office is as poisonous on the body politic as corruption is. I will challenge my government to be a government for the people, just as I challenge myself to fulfill the long-felt desire of Acehnese to have a governor of the people The fifth component of my plan is human rights in a broad sense, including the rights of women of Aceh to be equal citizens and the rights of all citizens to enjoy the benefits that peace should bring.

After every speech I make in the West I am always asked about Sharia law. So Let me take a few minutes to talk about some of the perceptions – actually misperceptions – of Shari'a in Aceh, which now exists as a rather slender addition to our civil and criminal law.

A bit of history to start. First of all, neither the people of Aceh nor any Acehnese provincial government in recent times asked for or legislated shari'a. Rather, a half-dozen years ago, the central government in Jakarta imposed Shari'a as a means to reduce support for the independence movement among conservative religious leaders by giving them what they supposedly wanted. Shari'a came to Aceh but it only created more anger about religion being used for unpopular political purposes.

Later, during the Helsinki peace talks, despite efforts by the Indonesian government to make Shari'a part of the peace accord, we in GAM said we didn't want it. As a result, Shari'a was NOT included.

However, when the parliament in Jakarta wrote the Law on Governing Aceh meant to codify the peace accord in a formal legal way, Shari'a was added. We weren't happy with it, just as we weren't happy with other provisions that watered down or changed what we had gained at the peace table.

In terms of content and effect, there are two issues of concern: one is public punishment; the other, Shari'a's impact on women. Let me talk about the punishment issue first.

Obviously, it disturbs people in the West - and many of us - to see public, corporal punishment. I oppose caning, both the very mild form in Aceh, which is really a public shaming rather than anything physically hurtful... and the harsh caning and whipping practiced in other countries where lasting physical damage often results.

Shaming a criminal in his community is intended to help rehabilitate him. I would certainly prefer to be shamed rather than spend several years in prison... again! But the image hurts our standing in the world Just a few words regarding Shari'a's effect on women. Let me get sociological for a moment. The status of women in Aceh, like everywhere else, is typically the product of economic forces in relation to long-term cultural and social patterns of patriarchal societies. This is equally true in Christian Papua New Guinea as it is in Muslim Morocco . Of course, in some places, Saudi Arabia for example, patriarchal domination is so strong that even economic progress has not helped women much.

But generally, in economically underdeveloped countries and regions like Aceh where a woman has to spend a large part of her day fetching water, washing clothes and dishes, or gathering wood to burn for cooking, and where there is often a simple lack of employment opportunities, it is tough to break the longstanding logic that says a women's place is in the home and in the kitchen.

But bring water and natural gas and electricity into Acehnese homes, and provide washing machines and employment opportunities, and you will see the same kind of progress that women in this country began making in the late 1950s. We are behind but trying to catch up.

I should note that Aceh does have a history of strong women in prominent public roles: we had female sultans and generals; Cut Nyak Dhien, our most famous anti-Dutch fighter was a woman. And in recent years, there was my dear friend Cut Nur Asikyin, the great orator of the referendum movement, who died in a rotten Indonesian prison a hundred meters from the beach when the tsunami struck. [Wandi - tell your story of talking to Cut Nur the day before??? Can we make it relevant] Women played a huge role in GAM's armed struggle and today we have LINA, the League of Acehnese Women, with 50,000 members advocating a greater role for women in public life and the non-household economy. Let me briefly turn to the

peace process.

My vision of Aceh's future requires the current peace momentum be sustained. Conversely, the way to sustain the peace is by stimulating the economy, generating employment, educating our people and improving the health of our people. But for a more internal peace, we also must address certain unresolved issues in the Helsinki Peace Accord, especially the question of reconciliation and past human rights abuses. Here the following are foremost: the establishment of a functioning human rights court; a joint claims settlement commission; and a truth and reconciliation commission. The people of Aceh want me and my colleagues now in office to help put the past behind them by doing so in a fitting and just way.

Finally, in closing summary, the people of Aceh expect their newly elected eaders to govern better and more honestly, to create jobs, to educate their children and to help heal their wounds. They expect my colleagues and I to begin Aceh's rebirth from the terrible darkness that has befallen them. I invite all of you to support Aceh's efforts in ways that also brighten your lives and make this ever-smaller planet a more livable, lovely and joyous place. (Red/Speech of Irwandy Yusuf (Governor If Aceh Speech at the World Affairs Council (WAC) 18 September 2007 San Francisco)



# EXHIBIT N

## Aceh Conflict Monitoring Update
1st – 31st August 2007

World Bank/DSF





In August, tensions from the conflict era manifested most strikingly in a series of incidents related to the theft or disappearance of Independence Day national flags.[1] These cases drew nationwide attention and one led to a beating by the police of a dozen alleged ex-GAM members in Tanjung Beuridi, Bireuen. Other pre-MoU cleavages were also evident in demonstrations and cases of police brutality, and a land dispute revealed how intra-GAM splits can spill over into other forms of conflicts. Violence continued at the high level which has been recorded since March of this year, once again reaching its highest post-MoU level of 24 incidents. Many of these were related to the ongoing post-election conflict in Aceh Tenggara (see previous Updates), which this month escalated with a series of arson and grenade attacks. This Update also discusses a new development in the Bumi Flora land case, where NGO staff assisting villagers to assert their land claims were charged under draconian "incitement" laws. The outcome of these legal proceedings might set a precedent with regards to the limits of democratic expression in Aceh.

### Political conflict over flag incidents[2]
Indonesia's National Independence Day on August 17th is a time of festivity throughout the country, and Indonesian citizens are expected to fly flags in front of their houses as a demonstration of patriotism and adherence to the principle of national unity. The apparent theft of 150 flags in Lhokseumawe on August 12th sparked a public debate that drew nationwide attention, with statements by the Chairman of the National Parliament (DPR) and the heads of the national military and police. Three days later, a similar incident in Tanjong Beuridi, Bireuen, had even more dramatic consequences, as police went to investigate and ended up beating a dozen people (see Box 1 for details).[3] On August 16th, at least 57 flags were removed and burned in Sawang, Aceh Utara, a past GAM stronghold. The next day, the police seized three GAM flags which were found flying in Pidie.

---

[1] As part of an analytical support program to the peace process, the Conflict and Development Program, within the World Bank Office Indonesia, is using a newspaper conflict mapping methodology to record and categorize all incidents of conflict in Aceh as reported in two provincial newspapers (Serambi and Aceh Kita). The Program publishes monthly updates analyzing the data, complemented by fieldwork where possible, in both English and Indonesian. Updates are available online at www.conflictanddevelopment.org. The dataset is available for those interested; contact Blair Palmer at bpalmer@worldbank.org or Adrian Morel at amorel1@worldbank.org. There are limitations to using newspapers to map conflict; see Barron and Sharpe (2005) "Counting Conflict: Using Newspaper Reports to Understand Violence in Indonesia", *Indonesian Social Development Paper* No. 7. Jakarta: World Bank, also available on the web-site.

[2] Previous Updates opened with a record of "GAM vs GoI" conflicts (GAM: *Gerakan Aceh Merdeka*, former separatist movement; GoI: Government of Indonesia). Categorizing conflicts as "GAM vs GoI" now has reduced relevance for two reasons. First, since GAM has transformed from a separatist movement into a local political actor that is now in control of key government positions, the distinction between GAM and GoI is not as clear as it once was. Second, no violent clash between the national armed forces and the TNA (GAM's army) has been reported since the Payo Bakong incident of July 2006. Pre-MoU tensions and cleavages continue to appear in a range of different forms, from political disputes in Banda Aceh to localized violent incidents. However, these old divisions now tend to play a role in inflaming disputes about other things (such as resources, aid, political competition or vigilantism), rather than being a radically different form of conflict.

[3] Our account of the incident in Box 1 is based on newspapers and further investigation by World Bank researchers.

On the positive side, most parties involved in the debate initiated by the Lhokseumawe incident were cautious and measured in their arguments, to avoid fuelling tensions. Although initial statements by Aceh Utara and province-level military commanders hinted at the persistence in Aceh of parties hostile to the peace process, the National Military Commander, Djoko Suyanto, denied the incident could be interpreted as a separatist action. Similarly, the National Police Headquarters (*Mabes Polri*) stated that there was not enough evidence to hold KPA (*Komite Peralihan Aceh* – the civil organization representing ex-GAM members) responsible for the incidents, and pointed out that the motivation for the theft of flags could be criminal rather than political – to re-sell them for money. This kind of statement seems designed to defuse tensions.

Nevertheless, the wide extent of the debate sparked by these incidents, and the severity of many of the statements, associating the theft of flags to a crime of treason to the Indonesian nation and people, shows how sensitive this issue is.[4] It is also important to note that the debate did not only focus on stolen flags, but tended to implicitly extend the accusation of treason to citizens who had failed to fly the flag in a timely manner.

In an interesting development, the Mayor of Lhokseumawe distributed 150 new flags to replace the stolen ones and referred to this as a "flag aid" program (*bantuan bendera*). The use of developmentalist terminology in speaking about nationalism is somewhat insidious, given that the military assisted in the distribution of the "flag aid", and local authorities recorded the names of the recipients (perhaps to enable monitoring of the "sustainability" of the nationalism created by the flag aid program?)

> **Box 1: The Tanjung Beuridi Case**
>
> On August 15th, following allegations that 57 national flags had been removed in Tanjung Beuridi village, Peusangan Selatan, Bireuen, police raided a coffee shop, owned by Ahmad Kumis, a local GAM figure. Ironically, when the police arrived at his *warung*, Ahmad Kumis himself was busy chatting with the District Police Chief and the Sub-District military commander in a nearby coffee shop. He returned to his shop, and the police there apparently attacked him and a number of other villagers (including ex-GAM), beating them. Twelve were injured, with seven requiring hospitalization. It appears the police started beating villagers after verbal provocation by local youth, including ex-GAM elements. Some sources also stated that ex-GAM elements had asked villagers not to fly the national flag on August 17th, sometimes resorting to intimidation.
>
> The Tanjung Beuridi *geuchik* (Village Head) denied that flags were ever intentionally removed. Ibrahim KBS, the provincial KPA spokesman, issued a strong protest, asking that the case be brought to court and disciplinary measures be taken against the perpetrators. FKK (Communication and Coordination Forum for Peace in Aceh) has promised to conduct a thorough investigation of the case.

Other MoU/peace process related incidents consisted of peaceful demonstrations: by students demanding timely creation of local laws to fully implement the MoU, by families of political prisoners (*Tapol/Napol*) still detained outside of Aceh asking for their return, and by PETA (*Pembela Tanah Air* – a former anti-separatist front) to protest against the use of the GAM flag and symbols by local political parties.[5] On the whole, these demonstrations are a positive sign that issues related to the peace process are now normally expressed through peaceful means, even when demonstrators appear to be former antagonists. However, one cannot automatically associate demonstrations with democratic expression. Demonstrations in new democracies can sometimes be a show of force by local leaders, with demonstrators sometimes not understanding

---

[4] The incidents in Aceh occurred in the aftermath of two flag incidents in other parts of Indonesia which raised worries of "national disintegration" and led to aggressive assertions of nationalism. On June 29th in Ambon, Maluku, 20 dancers unfurled a flag of the Republic of the South Moluccas at a cultural event which was being attended by the President. Both the police chief and the military commander of Maluku lost their jobs over the incident. On July 3rd in Jayapura, a flag of the Free Papua Movement was unfurled at a cultural event, after a dance portraying orphans of human rights abuses in Papua.

[5] A demonstration in support of Armen Desky in the Aceh Tenggara election dispute this month also protested against the formation of local parties, specifically targeting Partai GAM (see Table 1).

the issues they are protesting well. As demonstrations continue to occur in Aceh, analysis of why they are occurring, and how people are being mobilized, is necessary.

*Pre-MoU cleavages continue to manifest in contemporary conflicts*
Table 1 shows the pre-MoU tensions which appeared in conflict incidents during August.

Table 1: Pre-MoU cleavages as a factor in post-MoU conflict incidents

| Cleavages | Contemporary conflicts |
|---|---|
| I. GAM vs. GoI (incl. security forces) | • National flags incidents in Lhokseumawe and Sawang, Aceh Utara (see above).<br>• Tanjung Beuridi flag incident (see above).<br>• *August 17th, Pidie.* Police seize 3 GAM flags.<br>• *August 12th, Lhokseumawe.* House of GAM member searched without legal warrant by unidentified persons (possibly intelligence operatives). |
| II. GAM vs. anti-separatist group | • *August 20th, Aceh Tengah.* Demonstration by PETA against the use of a GAM banner by Partai GAM. KPA denounces the demonstration as "undemocratic". |
| III. Intra-GAM | • *August 4th, Aceh Barat Daya.* Two GAM factions opposed in a land dispute.[6] |
| IV. Community vs. security forces | • *August 15th Aceh Singkil.* Police beat a man who allegedly sent an "inappropriate" sms.<br>• *August 16th, Aceh Tengah.* Police beat a *becak* driver over a traffic accident. Incident sparks demonstration by hundreds of *becak* drivers. |
| V. Intra-community (GAM vs. GoI loyalties) | • *August 2nd, Aceh Tenggara.* Pro-Desky demonstrators also protest against formation of local parties, specifically targeting Partai GAM. |

Hostility between GAM and security forces resulted in the series of flag incidents. Tensions between GAM and former anti-separatists, between security forces and communities, and between pro- and anti-GAM elements of society also took place this month, in the form of demonstrations and two cases of alleged police brutality. Note that of the incidents in Table 1, the violent ones were all carried out by police. Again, the lack of professionalism and discipline of security forces seems to be a key factor in allowing pre-MoU tensions to escalate into violence. Security Sector Reform (SSR) should be a major focus of both the local government and donors.

*Land dispute reveals divisions within GAM in Aceh Barat Daya*
Another interesting incident highlights intra-GAM divisions in Aceh Barat Daya. On August 4th, a demonstration over the proposed land permit for the company PT Babahrot Agro Lestari (PT BAL) almost ended in a riot. In April Governor Irwandi Yusuf signed a permit for PT BAL to develop 5030 hectares of government land for oil palm. The District Head of Aceh Barat Daya, Akmal Ibrahim, recently decided instead to give the land to villagers, at two hectares per family. On August 4th, villagers opposed to the PT BAL permit demonstrated in the thousands. Their procession was blocked by hundreds of people supporting PT BAL, with KPA members prominent. However, other KPA members were in the crowd of anti-BAL protestors. A riot was only avoided when the Bupati and the provincial team met with Abdurrahman, the KPA head for Blangpidie (the KPA region covering Aceh Barat Daya). KPA's official position is that it supports the land being granted to villagers rather than to PT BAL.

Note that splits in KPA Blangpidie, which stemmed from a dispute over reintegration funds, worsened during the local elections (which included a second round in March) and possibly affected the outcome of the elections (see March 2007 Update). It is unsurprising that the

---

[6] Various splits and tensions within GAM were present before the MoU, hence the category "intra-GAM". This particular split involving GAM factions in Aceh Barat Daya may have developed after the MoU, but there are indications that it was related to pre-MoU tensions over the replacement of the GAM regional commander.

3

different factions have managed to find another issue on which to oppose each other. The case points to the potential for intra-GAM splits to spill over into other forms of conflict throughout Aceh, although the intra-GAM element may not always be visible.

### Violence again hits its highest post-MoU level

This month we recorded 70 local level conflicts. Although this appears to represent a drop from previous months (see Figure 1), these 70 conflicts resulted in a total of 106 incidents, similar to that recorded over the previous few months.[7]



Figure 1: Violent incidents vs. total # of conflicts, by month

Violence continued at the high level which has been recorded since March of this year, with a post-MoU high of 24 incidents this month. A third of these incidents (8 out of 24) resulted from the escalation of Aceh Tenggara's political conflict, discussed below. The violence was mostly directed at properties (11 buildings damaged). Two deaths were recorded, as well as 24 injuries (including 12 as a result of the Tanjung Beuridi incident alone). Table 2 summarizes all of the violent incidents that took place in August.

**Table 2: Violent incidents in August**

| # | Type | Details |
|---|------|---------|
| 9 | Political violence | • 2 Camat offices burned down (Aceh Tenggara).<br>• 2 schools burned down (Aceh Tenggara).<br>• 1 market arson (Aceh Tenggara, likely political).<br>• 3 grenades/bombs (Camat's car in Bener Meriah, Aceh Tenggara parliament, Aceh Tenggara Bupati's house in Medan.<br>• 1 riot over the inauguration of new Camats in Aceh Tenggara. |
| 2 | Revenge killings | Exact motives unknown. |
| 4 | Beatings by police or WH | • Tanjung Beuridi incident, see earlier explanation. 12 injured.<br>• 1 beating in police custody.<br>• WH (Syariah Police) beat a youth after he called them "dogs".<br>• Police beat a *becak* driver after a small traffic incident. |
| 6 | Other beatings | • 2 road rage incidents.<br>• 1 beating over parking turf (by parking guard).<br>• 1 *khalwat* beating.<br>• 1 beating of villager by contractor, after villager complained about quality of aid houses.<br>• 1 stabbing for unknown reasons. |
| 2 | Vandalism | Citizens damaged government offices or projects due to disappointment with public services. |
| 1 | Other | Minor incident. |

---

[7] We tabulate both the number of *conflicts* and the number of *incidents* each month. A conflict over a plot of land, for example, might involve several incidents such as a protest, a demonstration, and a blockade. We code this as three incidents but one conflict. In most months, the number of incidents is only slightly higher than the number of conflicts, since most conflicts consist of only one reported incident. This month, however, the number of incidents was a full 50% higher (at 106) than the number of conflicts, due to multi-incident conflicts such as the Aceh Tenggara political conflict and the Bumi Flora case. Note that Figure 1 reflects violent incidents vs. total number of *conflicts* (not incidents).

4

*Political conflict in Aceh Tenggara escalates into violence*

The most prominent conflict in August was the escalation into violence of the ongoing tensions in Aceh Tenggara (Agara) over the results of the local elections last December. Beginning with a bombing at the local parliament (DPRK Agara) on August 1st, tensions remained high throughout the month, with a series of arson attacks and a grenade attack in the last days of August, as the September 1st inauguration of Hasanuddin and Syamsul Bahri as Bupati and Vice Bupati approached (see Box 2 for details of these incidents). Luckily, none of the incidents caused injuries. All remain unsolved. A member of KPA was interrogated by police in relation to the DPRK bombing, but was subsequently released. KPA Agara denied any involvement in that incident and put the blame for the unrest in Aceh Tenggara on the incumbent Bupati, Armen Desky, a local Golkar[8] strongman and loser in the elections.

This surge of violence can probably be regarded as a desperate attempt to resist the shift in political power, after Jakarta endorsed the Hasanuddin ticket as the official winners and Governor Irwandi Yusuf pushed for inauguration. However, it is highly unlikely that violence will stop with the inauguration of Hasanuddin and Syamsul Bahri on September 1st. The Golkar incumbent can rely on a very powerful network of loyal supporters, strengthened by clan affiliations, which spreads throughout the legislative, executive, and judiciary branches of local government, and his followers have demonstrated their resolve to go to great lengths to maintain their grip on power in Aceh Tenggara. It is likely that violence will continue as they resist the "cleaning" of the local administration by the newly appointed Bupati – a process that started even before his inauguration with the replacement of 61 civil servants, including the 15 Sub-District Heads (Camat) mentioned in Box 2, on August 15th.

> **Box 2: Political violence in Aceh Tenggara in August**
>
> - *August 1st, DPRK building, Kutacane.* A bomb damaged the building but caused no injuries. The DPRK had been siding with KIP Agara (the Local Elections Committee, Aceh Tenggara branch) in contesting the outcome of the elections and recognizing the incumbent Golkar Bupati, Armen Desky, as the winner. DPRK Agara had refused to hold the inauguration ceremony of Hasanuddin and Syamsul Bahri, the pair recognized by KIP NAD (the Local Elections Committee, Provincial branch) and the Ministry of Home Affairs as the official winning ticket.
> - *August 14th, Bupati's office, Kutacane.* A mob raided the office, interrupting the inauguration ceremony of 15 newly appointed Sub-Districts Heads (Camat). 15 of 16 Camat in Aceh Tenggara had gone to Jakarta on August 4th without authorization, in order to convey their concern to the Coordinating Ministry for Political and Security Affairs (Menkopolhukam) about the "transparency" of the election process (likely in support of Armen Desky). Governor Irwandi Yusuf subsequently called for disciplinary measures, and the acting Bupati decided to replace them. The inauguration of the 15 new Camat eventually took place the next day, under heavy police protection.
> - *August 25th, Offices of Camat of Bambel and Badar Sub-Districts.* The offices of two of the newly appointed Camat were targeted by arson attacks.
> - *August 27th, House of Acting Bupati of Aceh Tenggara, Medan.* Grenade attack on a house belonging to Marthin Desky, Acting Bupati of Aceh Tenggara.
> - *August 27th, Semadam Sub-District, Aceh Tenggara.* Arson attack on a school.
> - *August 28th, Bambel Sub-District.* Arson attack on a Muslim boarding school, in one of the sub-districts where the office of Camat had been arsoned on August 25th.
> - (Another arson was reported on a market in Kutacane on August 30th, but the political nature of the incident has not been established)

The situation in Aceh Tenggara further underlines the risk that conflict between newly elected administrations, on the one side, and old guard legislatures and political figures on the other,

---

[8] Golkar (*Golongan Karya*) was President Suharto's political vehicle, and remains one of Indonesia's major political parties.

might lead to mobilization of followers and explosions of violence on the ground. This can happen even in districts where ex-GAM did not accede to power and do not play, at least openly, a major role in local politics. Importantly, it also reveals the persistence of violence in local politics, where violence is strategically used as a tool in power struggles once other methods fail. These are features of contemporary Indonesian politics which go beyond Aceh.

### Democratic activism and state repression: The Bumi Flora case continues

Last month's Update described the July 3rd demonstration by thousands of Aceh Timur villagers alleging that PT Bumi Flora seized their land with military backing in the early 1990s.[9] In August, eight members of the Aceh Legal Aid Foundation (*Lembaga Bantuan Hukum*, LBH), which had assisted in the protest, were named as criminal suspects by police for distributing pamphlets. They are charged under articles 160 and 161 of the Criminal Code on incitement to hatred and public unrest, which carry a sentence of up to six and four years jail respectively.

The prosecution led to strong protests from civil society, with human rights NGOs (including Kontras, Gerak, and Koalisi NGO-HAM), conflict victims associations, and KPA demanding that the charges be dropped. The police, they claimed, had reverted to a pre-MoU repressive approach by criminalizing the advocacy of basic human rights – and by doing so, intended to divert public attention from the land seizure case itself. The NGOs also questioned the use of articles 160 and 161, which are part of a set of laws known as *Hatzai Artikelen* ("hate articles") inherited from the Dutch colonial era.[10]

In a move seemingly aimed at damage control, PT Bumi Flora subsequently dropped the civil charges they had pressed against the LBH staff, and proposed a resolution of the land case without legal proceedings (*penyelesaian secara damai*). Nonetheless, the police investigation of the LBH staff is still ongoing, and the eight suspects still face jail sentences.

The evolution of this case will need continued monitoring, as it is likely to set a precedent with regards to the limits of the democratization of Acehnese civic life. As underlined in previous Updates, the post-MoU period has seen the opening of a space for public debate and democratic expression as well as a significant empowerment and emboldening of civil society. However, these positive developments are still fragile and a lot will depend on the behavior of local authorities, and police in particular. Allowing for democratic contestation is key to building sustainable peace in Aceh, as is building the capacity of citizens to raise and pursue grievances stemming from past abuses through democratic means. Supporting NGO and other civil society networks will also help to deter authorities from slipping back to a repressive approach to security.

---

[9] Protestors stated that the company used the military to intimidate villagers into accepting meagre compensation, and that three leaders of a farmer organization were killed in 1991 (see the June-July 2007 Update – all Updates are available at: www.conflictanddevelopment.org). It is important to avoid confusion with another major case associated with PT Bumi Flora, where 32 Acehnese employees of the company were killed in 2001. An investigation of the 2001 case by the National Humans Right Commission (Komnas HAM) suggested that the military was responsible for the massacre.
[10] The legitimacy of these laws, seen as *pasal karet* ("elastic articles") i.e. articles whose vague definition allows for arbitrary arrests, has been recently challenged by the Indonesian Constitutional Court. On July 17th this year, the Court declared articles 154 and 155 on "hate sowing" to be unconstitutional, although it did not revoke articles 160 and 161 on "incitement". Interestingly, the decision of the Constitutional Court was in response to the case of Panji Utomo, leader of Inter-Barrack Communication Forum (Forak), who was charged with incitement to hatred for demonstrating in front of BRR last year (see Updates from September 2006 and April 2007).



# EXHIBIT O

[Europe Solidaire Sans Frontières] Rights activists in Aceh charged ...    file:///C:/Documents%20and%20Settings/bsheppard/Desktop/Exhibi...

[Europe Solidaire Sans Frontières] - http://www.europe-solidaire.org/spip.php?article7483
English > International > Asia > Indonesian Archipelago

# Rights activists in Aceh charged under public incitement articles

## MASLAN RIZAL

*10 August 2007*

M. Rizal Maslan, Jakarta — The Indonesian Legal Aid Institute (YLBHI) and the Commission for Missing Persons and Victims of Violence (Kontras) says it is disappointed that eight Legal Aid Foundation (LBH) activists in Banda Aceh have been named as suspects by the police saying that the police are protecting the interests of a company that appropriated land belonging to the people in 1990.

"We are warning the police not to side with the company. It would be ironic if it is precisely those fighting for the interests of the people that are charged with inciting hatred against a public company", said YLBHI director for advocacy Taufik Basari during a press conference at the Kontras' offices on Jl Borobudur in the Menteng area of Central Jakarta on Friday August 10.

Furthermore continued Basari, the charges against the eight LBH activists are based on the ambiguous hate-sowing articles, which are no longer in use. "We are disappointed over the arrests of the eight LBH Banda Aceh activists at the Langsa Post by the East Aceh district police", he repeated.

The federal secretary of Kontras, Oslan Purba meanwhile said that he is concerned that the police's actions will serve to obscure a problem that is actually of concern to LBH, that is the actions of PT Bumi Flora in forcibly taking over land owned by the people in 1990.

The eight activists who were arrested on July 2 are Muksalmina, Yulisa Fitri, Sugiono, Muhammad Jully Fuadi, Mardiati, Mustiqal Syahputra and Juanda. They were named suspects on August 8 and are being charged under articles 160 and 161 of the Criminal Code(1).

Purba added that the two articles being used by police to indict the activists have actually been revoked by the Constitutional Court. The Constitutional Court recently decided that the two articles are no longer relevant in the development of a democratic environment.

"The police's actions have in fact done irreparable damage to a state constitutional verdict in using articles that threaten democratisation and human rights", asserted Purba.

YLBHI and Kontras will therefore asking the police to act professionally by respecting the rights of the people and the activists assisting them. They also asking that the police investigate suspicions that the land at Bumi Flora(2) was forcibly seized and investigate the death of three local residents in 1999 who were defending their land. (zal/nvt)

**Notes:**

1. On July 17 the Indonesia's Constitutional Court declared unconstitutional articles 154 and 155 of Indonesia's Criminal Code, commonly known as the "hate sowing" (Haatzai Artikelen) articles. It did not however revoke articles 160 or 161 on incitement which carry a maximum sentence of six and four years jail respectively.

[Europe Solidaire Sans Frontières] Rights activists in Aceh charged ...    file:///C:/Documents%20and%20Settings/bsheppard/Desktop/Exhibi...

2. On August 9, 2001, 31 people were massacred by the Indonesian Military at a plantation, Bumi Flora in East Aceh. The military later claimed that the Free Aceh Movement carried out the killings.

* From Detik.com – August 10, 2007.

* Translated by James Balowski. The INDOLEFT news service.



**EXHIBIT P**



# Indonesia

Country Reports on Human Rights Practices  - 2005
Released by the Bureau of Democracy, Human Rights, and Labor
March 8, 2006

Indonesia is a multiparty, democratic, presidential republic with a population of approximately 241 million. In October 2004 Susilo Bambang Yudhoyono became the country's first directly elected president as a result of elections that international and domestic observers judged to be free and fair. Voters also chose two national legislative bodies in 2004: the house of representatives (DPR) and the newly created house of regional representatives (DPD). While civilian authorities generally maintained effective control of the security forces, in some instances elements of the security forces acted independently of civilian authority.

There were improvements in the human rights situation during the year and, although significant problems remained particularly in areas of separatist conflict, the end of the country's long-running internal conflict in Aceh Province was a major step forward. The government faced an intermittent, low intensity guerrilla conflict in Papua and West Irian Jaya provinces; inter-communal violence in Maluku and Central Sulawesi provinces; and terrorist bombings in various locations. Inadequate resources, poor leadership, and limited accountability contributed to serious violations by security forces. Widespread corruption further degraded an already weak regard for rule of law and contributed to impunity. Poverty, high unemployment, and a weak education system rendered all citizens, particularly children and women, vulnerable to human rights abuses. During the year the government devoted considerable resources and attention to the recovery effort following the devastating December 2004 earthquake and tsunami that left more than 130 thousand persons dead and missing in Aceh and North Sumatra provinces. The country struggled to come to terms with human rights abuses committed by prior governments. The following human rights problems were reported:

- extrajudicial killings, particularly in areas of separatist conflict
- disappearances
- torture
- harsh prison conditions
- arbitrary detentions
- a corrupt judicial system
- warrantless searches
- infringements on free speech
- restrictions on peaceful assembly
- interference with freedom of religion by private parties, sometimes with complicity of local officials
- violence and sexual abuse against women and children
- trafficking in persons
- failure to enforce labor standards and violations of worker rights, including forced child labor

During the year there were significant improvements in the human rights situation. For the first time, citizens directly elected leaders in 149 local elections at the city, regency (county equivalent), and provincial level. On August 15, the government signed a peace agreement with the Free Aceh Movement (GAM), which both sides implemented thereby greatly reducing human rights abuses in that province. In Papua and West Irian Jaya provinces, the government inaugurated the Papuan People's Assembly and took other steps toward fulfilling the 2001 Special Autonomy Law on Papua. Security forces showed increasing restraint in response to nonviolent separatist demonstrations in Papua. The government began an anticorruption campaign that achieved some results, including high profile convictions.

Armed separatist groups, terrorists, and militant groups also committed serious human rights abuses. In Aceh, prior to the August 15 peace agreement, rebels committed killings and kidnappings. In Central Sulawesi, Malaku, and Bali provinces terrorists conducted bombings that killed and injured many civilians. In Malaku extremists launched an attack against security forces. Militant groups attacked minority religious believers and acted to restrict religious freedom.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

Security forces continued to commit unlawful killings of rebels, suspected rebels, and civilians in areas of separatist activity, where most politically motivated extrajudicial killings also occurred. There was evidence that the Indonesian Armed Forces (TNI) considered anyone killed by its forces in conflict areas to be an armed rebel. The government largely failed to hold soldiers and police accountable for such killings and other serious human rights abuses in Aceh and Papua.

Following the December 2004 earthquake and tsunami that hit Aceh Province, the government and GAM rebels pursued negotiations that resulted in an August 15 peace accord in the form of a Memorandum of Understanding (MOU). Implementation of the MOU ended an almost three decades-long conflict and resulted in a substantial decrease in human rights violations by the TNI, police, and GAM rebels.

The Human Rights Nongovernmental Organization (NGO) Coalition in Aceh reported that during the year the TNI killed 42 GAM insurgents and arrested 1; 44 civilians were killed. The same organization reported that 40 civilians and 37 GAM members were killed before the MOU and 4 civilians and 5 GAM members were killed after the MOU.

On January 3, in Bireuen, Aceh, six members of the TNI special forces (Kopassus) reportedly killed two men and injured another when the men tried to intervene in the alleged apprehension of the son of a GAM member.

Humanitarian volunteers reported that TNI and Police Mobile Brigade (Brimob) personnel killed three suspected rebels after capturing them during a joint operation in Serba Jaya village in Aceh Jaya District.

The NGO Commission for Disappearances and Victims of Violence Aceh reported that GAM killed seven civilians; the Human Rights NGO Coalition reported that GAM killed 17 soldiers during the year.

On May 4, GAM rebels allegedly shot and killed a seven-year-old boy in North Aceh Regency during a rebel ambush of a vehicle carrying the boy. The incident left 10 others, including three soldiers, injured.

The TNI and the police rarely investigated extrajudicial killings and almost never publicized such investigations.

There was no known progress in the following cases from 2004: the four civilians found dead in a jungle near Peureulak, East Aceh; the killing of civilian Cut Musdaifah in Wakheuh village; the alleged GAM killing of local legislature candidate Muhammad Amin; and the shooting death of a paramedic in South Aceh. There were no developments in the May 2003 killing of local legislature member Jamaluddin Hasany; in the July 2003 killing of former GAM member Cut Aca Budi; in the July 2003 killing of schoolteachers Muslim Sulaiman and his wife Darmawati; or in December 2003 bombing that killed 9 persons at an outdoor concert in Peureulak.

In Papua Province, the government continued to conduct operations against rebels of the Free Papua Movement (OPM), and OPM rebels continued sporadic, low intensity operations against military and police units. TNI authorities estimated that OPM forces consisted of 620 guerillas armed with approximately 150 firearms ranging from modern M-16s to outdated Mausers.

On January 17, TNI personnel allegedly beat local Papuan residents in Nabire, leaving seven seriously injured and one, Miron Wonda, dead. On April 10, in pursuit of a group of 11 OPM rebels, police carried out a raid in Mulia City, capital of Puncak Jaya Regency; the police shot and killed Tolino Iban Giri and arrested eight other persons. Local church leaders told the press that Tolino Iban Giri and the eight others were not members of OPM.

In March, in Mulia, according to the military district command, an unknown person, believed to be an OPM member, shot and killed local civilian Tinius Tabuni.

Also in Papua, the TNI and police continued to cooperate with US law enforcement in their joint investigation of the 2002 ambush that killed 2 American citizens and 1 Indonesian and injured 12 other persons near a large gold and copper mine near the city of Timika. A joint task force sought to apprehend the perpetrators, including OPM guerrilla Anthonious Wamang, who was indicted by a US grand jury in connection with the killings.

The government made limited progress in establishing accountability for numerous human rights violations committed in Papua in previous years, including those committed in Biak (1998), Abepura, Wasior, and Wamena. During the year a human rights court in Makassar acquitted both defendants of all charges in the 2000 Abepura case in which police allegedly killed at least 3 persons and assaulted up to 100 persons during a raid (see section 1.e.). In 2004 the National Human Rights Commission (Komnas HAM), an independent organization created and funded by the government, completed its report on the 2001 Wasior incident, in which police allegedly killed 12 civilians following an attack on a police post that left five policemen dead, and on the 2003 Wamena incident, in which dozens of residents of the central highlands area of Kuyowage allegedly were tortured and villages razed during a military operation that followed the April 2003 break-in at the Wamena armory. In these two cases, the commission found that soldiers and police had committed gross human rights violations, including murder, forced displacements, and torture. Komnas HAM categorized these violations as crimes against humanity and, in September 2004 submitted its report to the attorney general's office (AGO) for possible prosecution. The AGO reportedly told Komnas HAM that it would not investigate the case because Komnas HAM's report did not meet the AGO's standards or represent admissible testimony. At year's end, Komnas HAM had no plans to revise its report.

Police used deadly force to apprehend suspects or acted recklessly in pursuit of suspects, and these actions sometimes resulted in the deaths of civilians. In other cases, suspects in police custody died under suspicious circumstances.

On March 27, during a raid on a gambling establishment, police shot Sunaryoko in Tasikmadu village, East Java. Local police later detained the officers involved and reportedly disciplined them. No details about the nature of the disciplinary action were available.

During the year the government made no significant progress establishing accountability for the following 2004 abuse cases: the beating death of an East Java resident by police in June, the August killing of three persons who allegedly tried to escape police custody in Sragen, Central Java, the August killings of Hermansyah and Ade Candra who allegedly tried to escape police questioning in Pekanbaru, or the July police shooting in Poso that injured Bambang, a wrongly accused murder suspect.

In September 2004 unknown persons fatally poisoned prominent human rights activist Munir Said Thalib on a flight from Jakarta to the Netherlands via Singapore. According to a Dutch government autopsy, the cause of death was arsenic poisoning. On December 20, the Central Jakarta Court convicted Pollycarpus Budihari Priyanto, a pilot who was on the flight as a passenger, for the murder of Munir and sentenced him to 14 years in prison. The judges described the murder as a conspiracy and called for further investigation. A report on the case prepared by a presidentially appointed fact-finding team was not publicly released, but, according to press reports, concluded that Munir's killing was a conspiracy and recommended investigation of former and current officials of the State Intelligence Agency (BIN) and of Garuda airlines officials. At year's end both the prosecution and the defense were appealing the trial court's decision on Pollycarpus.

There was no progress in the investigation of the 2003 alleged suicide of Ihwanuddin, a suspected member of the terrorist organization Jemaah Islamiya (JI).

On March 29, the Palu District Court in Central Sulawesi, sentenced Sofyan, previously detained for suspected involvement in the 2004 killing of prosecutor Ferry Silalahi, to eight months in prison for possessing an illegal firearm. He was acquitted of all charges in the killing of Silalahi. During the year police arrested three new suspects for the shooting of Silalahi: Hence Said, Farid Podungge, and Wagiman. In August police

turned Wagiman's case file over to prosecutors for trial; however, there have been no reported developments since that time. In November police arrested Andi Ipong, a suspect in as many as nine cases of violence in Palu and Poso. At year's end he was being questioned. There was no progress in the investigation of the 2004 killing of Reverend Freddy Wuisan near Membuke Church, Poso.

The government made very little progress during the year in prosecuting those responsible for the 1998 killing of four students at Trisakti University and nine demonstrators at Semanggi intersection, and the 1999 killing of an additional four demonstrators at Semanggi. In 2004 Komnas HAM Chairman Abdul Hakim Garuda Nusantara asked the DPR to reverse its 2001 decision not to classify these cases as human rights violations. In July members of the DPR representing several political parties proposed forming a special committee to reopen the shooting cases based on the recommendation from the House Commission for Legal and Human Rights. However, by year's end, there were no known further developments.

During the year bombings occurred in Aceh, Bali, the Maluku islands, and Sulawesi. On October 1, three suicide bombers killed 19 persons and injured more than 100 in the tourist areas of Kuta and Jimbaran in Bali. Several senior members of the terrorist organization JI, including Malaysian national Noordin Mohammad Top, remained at large and the focus of law enforcement counter-terrorism efforts.

The courts tried a number of suspected terrorists in connection with major terrorist incidents, including the September 2004 bombing of the Australian embassy, which killed 10 and injured more than 150. Law enforcement and judicial officials arrested, tried, and convicted six men for their roles in the attack. Two of the perpetrators, Iwan Dharmawan Mutho and Achmad Hasan, both charged with planning and organizing others for the attack, received death sentences. Their appeals were pending at year's end. The other four convicted persons received sentences ranging from 3½ to 10 years in prison.

On November 9, the police exchanged gunfire with approximately five suspected terrorists, resulting in the death of two and the wounding of one police officer. The dead included Azahari bin Husin, a Malaysian national and expert bomb-maker linked with four major terrorist bombings, including the October 1 Bali bombing.

In August the Makassar District Court in South Sulawesi sentenced Agung Abdul Hamid to life imprisonment for the 2002 bombings of a McDonald's restaurant and a Toyota car dealership.

The courts continued with prosecutions related to the August 2003 Marriott hotel bombing that killed 12 persons. By year's end the courts sentenced 15 suspects to terms ranging from 3 to 12 years. The trials of two other suspects were ongoing.

Since 2002 courts convicted nearly 130 persons in connection with terrorist attacks. The harshest punishments included five death sentences and seven life sentences.

In Central Sulawesi, at least 37 persons were killed, and at least 104 persons were injured during the year. Political and economic tensions between Christians and Muslims contributed to the violence.

On May 28, a bomb exploded in a major market in the Christian majority town of Tentena, Poso Regency, killing at least 21 persons and injuring 40 others. Other small explosions occurred in front of the Indonesian Democratic Party-Struggle's office on May 15; at the Tentena market on June 29; and in the back yard of the Poso election commission on July 12. No major casualties were reported in these incidents.

During the year 13 persons were killed and approximately 80 injured in Maluku Province, significantly fewer than in 2004. As in Central Sulawesi and other conflict areas, it was not clear whether these deaths were due to interreligious conflict, or to criminal or other motives.

On May 16, unidentified gunmen attacked a Brimob operations command post in Loki village, Piru District, in West Seram Island, Maluku Province, killing seven persons, including five police officers. Police said the attackers were members of a local Islamic extremist group. On May 19, police arrested two suspects, who reportedly admitted to the attacks.

Government and police continued to make some progress in handling conflicts in Central Sulawesi and Maluku. Police made stronger efforts to investigate, arrest, and prosecute those involved in violence. In August two suspects were arrested in the investigation into the November 2004 shooting death of Reverend Susianti Tinulele; there was no further reported progress in the case. In June police declared 18 persons suspect in the May 28th Tentana bombing, including Hasman, the head of Poso prison. Police subsequently released Hasman and 13 others for lack of evidence. In October and November, five teenage girls--four Christian and one Muslim--were killed in and near Poso, Cental Sulawesi (see section 2.c.).

The Central Sulawesi provincial government and police pressed in some cases for the investigation and trial of security forces allegedly involved in past religious violence in that province. In April the national police headquarters publicly named a senior police officer as a suspect in December 2004 church bombings in Palu, Central Sulawesi--the first senior officer so identified.

In March the Maluku police detained 3 men for possible involvement in that month's bus attack that killed 4 and injured 14.

b. Disappearance

During the year dozens of disappearances occurred, most frequently in Aceh Province, and large numbers of persons who disappeared over the past 20 years, mainly in conflict areas, remained unaccounted for. The government reported little progress in prosecuting those responsible for disappearances that occurred in previous years.

According to the Human Rights NGO Coalition, in Aceh, 31 civilians and 1 GAM member were kidnapped during the year; 46 civilians and 4 GAM members reportedly were kidnapped in 2004. There were no reports of kidnappings after the signing of the MOU.

The security forces were implicated in some disappearances. On January 22, five TNI officers in civilian clothes allegedly kidnapped a civilian, Hamdani, and threatened his wife. The soldiers freed Hamdani three days later. On April 21, two units of the Military Joint Intelligence Unit allegedly kidnapped Dhalan bin Abdurrahman and Ardiyansyah bin Amin Yusuf, both accused of being GAM members, while conducting an operation in Cot Bak U village.

There was no known progress in the 2004 case of a wounded 16-year-old boy whom police allegedly took into custody or in the cases of Mukhlis and Zulfikar, members of the local NGO Link for Community Development.

The GAM also abducted persons during the year. On February 14, GAM members allegedly kidnapped four persons, including an eight-year-old child, and demanded a ransom. At year's end their whereabouts remained unknown. In June GAM members allegedly abducted Marhaban, a Muslim cleric representing the United Development Party, after failure to extort money from him. GAM released Marhaban after he paid an unspecified amount of money.

There was no known progress in the 2004 disappearances of elementary school teachers Muhammad Amin Alwi and Hasballah who were forcibly taken by 10 armed men in military uniforms in Nagan Raya Regency.

On December 10, police arrested the suspected kidnapper of Pentecostal minister Jarok Ratu, who was kidnapped in South Buru Island, Maluku Province in December 2004. The minister remained missing at year's end.

On September 14, Komnas HAM announced the results of their inquiry into the 1998 abductions of 12 to 14 prodemocracy activists during the rule of former president Suharto. Despite refusals from military personnel to cooperate in the investigation, Komnas HAM concluded that all victims still missing were dead and identified suspects for an official investigation without publicly releasing their names.

In Papua there were no credible reports of disappearances during the year. The government did not report any progress in prosecuting those responsible for disappearances that occurred in previous years, including those of Martinus Maware, Mathius Rumbrapuk, or Hubertus Wresman.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law makes it a crime punishable by up to four years in prison for any official to use violence or force to elicit a confession; however, law enforcement officials widely ignored such statutes. Security forces continued to employ torture and other forms of abuse. The government made some efforts to hold members of the security forces responsible for acts of torture. During the year the use of torture to obtain confessions from suspects was most apparent in Aceh and Papua.

Torture was sometimes used to obtain confessions, punish suspects, and seek information that incriminated others in criminal activity. Security forces also allegedly used torture to extort money from villagers. Reliable figures on the number of incidents of torture that occurred during the year were difficult to obtain. Torture used included random beatings, bitings, whippings, slashings, and burnings.

In Aceh Province the Human Rights NGO Coalition reported 80 cases of civilians and no cases of GAM members tortured, compared with 77 civilians and 7 GAM members tortured in 2004. In September 2004 Human Rights Watch (HRW) reported widespread abuse of prisoners in Aceh by security forces, including electric shocks and beatings with wooden beams and gun butts. The government announced it would investigate the allegations; however, at year's end, there were no known investigations.

The Legal Aid Foundation in Papua and Komnas HAM in Papua reported that there were 35 cases of torture by security forces in Papua during the year.

On February 16, 10 Marines reportedly beat 6 internally displaced persons (IDPs) in Aceh for being unable or unwilling to supply them with information on the whereabouts of GAM members. In another alleged incident, eight TNI members dragged a 53-year-old village head behind a pickup truck from his village to the nearest TNI post, allegedly as punishment for not reporting that GAM members passed in front of his house on occasion.

In May local NGOs accused a police officer and three military personnel of torturing Ivan Mardiawan, a Surabaya resident. The then Surabaya police chief publicly pledged to investigate the case; at year's end, no information regarding the status of an investigation was available. In January the NGO People's Justice and Human Rights Legal Aid Commission (LBHKR–HAM) reported the Surabaya police to the provincial legislature for alleged human rights violations. LBHKR-HAM accused the Surabaya police of mistreating two suspects during interrogation in a narcotics case.

On July 14, soldiers allegedly tortured a presumed OPM member by slashing his face and body with a knife and razor and then pouring petrol over his head and setting his hair on fire. On July 22, 14 soldiers allegedly tortured two Papuan civilians over the course of a day. The soldiers reportedly kicked, bit, and punched them. The soldiers then tied up one of the victims and set fire to dried weeds on his back after whipping him.

The government reported no progress in prosecuting those responsible for acts of torture committed in Aceh in 2004 or 2003, including in those cases detailed in reports by HRW and Amnesty International (AI).

There was no new progress in the case of suspected JI member Saifudin Umar, alias Abu Fida, who was found seriously injured in an East Java hospital in August 2004. He claimed to have been secretly arrested and tortured by police, who admitted arresting Abu Fida for helping to hide two JI fugitives; however, police denied torturing him.

On March 24, in Blang, Bintang District of Aceh Besar, the Banda Aceh military court sentenced six military personnel to three months in jail each for beating Farid Faqih on January 26. Faqih was in custody for allegedly stealing aid meant for victims of the December 2004 tsunami.

During the year television news broadcasts frequently aired scenes of police hitting and kicking apprehended criminal suspects, including minors, and footage of persons in police custody who clearly appeared physically abused.

On June 24, in Aceh, Shari'a (Islamic law) police publicly caned 52 persons convicted of gambling, consumption of alcohol, and being alone with members of the opposite sex who were not blood relatives.

On August 15, dozens of military personnel from an infantry battalion in Lumajang, East Java, attacked Kalibuntu village of Probolinggo

http://www.state.gov/g/drl/rls/hrrpt/2005/61609.htm

Regency, East Java. The incident left approximately 100 persons injured and several motorcycles, cars, and houses damaged. Local residents believed the attack may have been prompted by the stabbing a week earlier of a member of the battalion by a village resident. The East Java military commander later apologized publicly to local residents and promised to fire all personnel involved in the attack. In August the military discharged the battalion commander and two other members of the infantry battalion involved in the attack.

Rapes occurred in conflict zones (see section 5). Human rights advocates blamed many of the rapes on soldiers. Statistics were unavailable, but credible sources provided a number of accounts involving soldiers. The extent to which rape was a problem in Aceh was hard to assess, due to social stigma, lack of reporting, and restricted access to the region.

The Council of the Central Information for Referendum Aceh (SIRA) (a GAM-funded NGO) reported four cases of rape by military personnel in Aceh.

According to SIRA, on February 7, soldiers raped a villager in Julok, East Aceh. The local unit commander questioned the victim but there was no information regarding any further investigation. SIRA also reported that on May 6, soldiers raided a house in Kambam, North Aceh in search of a suspected GAM member but when the soldiers found only his wife they interrogated and raped her, reportedly as punishment for her answers regarding her husband's activities and whereabouts.

There was no reported progress in the investigation of the 2004 case of the TNI soldiers who repeatedly raped a 16-year-old girl in Kampung Meureu Baro-Indrapuri over a period of several months, leaving her pregnant.

In September police charged Bogor police chief Bambang Wasgito with assault for slapping a subordinate who failed to intervene in an attack against Wasgito's 15-year-old son. Wasgito's driver was also charged with serious assault for causing severe injuries.

On April 29, Brimob personnel attacked a TNI soldier in revenge for a previous assault by a group of soldiers on a police station in Cimanggis, Depok. According to the latest public information available, the police had no suspects at year's end.

On March 21, two unidentified men hurled a hand grenade into a Muslim neighborhood in the Batumerah area of Ambon City, injuring five persons. The incident sparked retaliation from Muslim residents, who attacked a bus carrying Christians in the nearby Kapaha neighborhood, injuring a total of 14 persons.

On April 26, in Poso City two small explosions occurred in front of the offices of the NGOs, Poso Conflict Resolution Working Group and Institute for the Empowerment of Civil Society; there were no injuries. Police and local persons believed that the attacks were related to upcoming local elections or a corruption case involving Poso refugee funds.

On August 24, a home-made bomb exploded inside a pedicab in the Mardikaa market in Ambon, injuring nine persons and damaging motorcycles and cars parked nearby. Police made five arrests, four of them just hours after the incident. While in pursuit of the four, police shot and wounded two suspects, one of whom died in the hospital. At year's end the police were investigating the suspected planner of the bombing.

Mobs carried out vigilante justice, but reliable statistics on such actions were not available. Incidents of theft or perceived theft triggered many such incidents. For example, on February 13, in Banyumas, Central Java, a mob beat and badly injured Suhartim after a house owner spotted him breaking into his house. On July 4 in Sanur, Bali, a mob beat Putu Bayu Widiantara for stealing a cellular telephone. No official action was taken against those responsible for these beatings.

Unlike last year there were no reports of security forces marking the houses of families of suspected GAM members with a red "X" or "GAM."

No known progress was made in the investigation of the alleged revenge burning by Brimob of 80 shops and homes in Keude Seuneddon, North Aceh, in a 2003 incident that occurred immediately after the killing of 2 Brimob officers.

Prison and Detention Center Conditions

Conditions at the country's 365 prisons and detention centers were harsh, and overcrowding was widespread. Occupancy frequently was two or three times over recommended capacity. Guards regularly mistreated inmates and extorted money from them. There were widespread reports that the government did not supply sufficient food to inmates, and family members often brought food to supplement their relatives' diets. Unruly detainees were held in solitary confinement for up to six days on a rice-and-water diet.

On July 30, Miftahudin Yulianto, a prisoner at Salemba Prison, died after allegedly being denied proper medical attention.

The wealthy or privileged had access to better treatment in prison. During the year the country's most famous inmate, Hutomo "Tommy" Suharto, the son of former president Suharto convicted of arranging the killing of a judge in 2004, reportedly left his Central Java prison cell for Jakarta every month via helicopter and stayed at a luxury hotel while being treated at Subroto Army Hospital for a benign tumor behind his eye.

Most children convicted of serious crimes served their sentences in juvenile prisons. However, in the arrest and trial phases, authorities held juveniles in detention centers with adults (see section 5). In theory, prisons held those convicted by courts, while detention centers held those awaiting trial; however, in practice, pretrial detainees at times were held with convicted prisoners.

There were no official restrictions on prison visits by human rights monitors, and prison officials granted varying degrees of access. The International Committee of the Red Cross made some visits to prisoners during the year.

d. Arbitrary Arrest or Detention

The law contains provisions against arbitrary arrest and detention but lacks adequate enforcement mechanisms, and authorities routinely violated it. The law provides prisoners with the right to notify their families promptly and specifies that warrants must be produced during an arrest. Exceptions are allowed if, for example, a suspect is caught in the act of committing a crime. The law allows investigators to issue warrants; however, at times, authorities made arrests without warrants.

**Role of the Police and Security Apparatus**

The president appoints the national police chief, subject to DPR confirmation. The police chief reports to the president but is not a full member of the cabinet. The National Police has approximately 250 thousand officers deployed throughout the 33 provinces. The police have largely maintained a centralized hierarchy, in which local police forces formally report to their national headquarters rather than to local governments. The military is responsible for external defense but also has domestic security responsibilities. In Aceh the Shari'a police, a provincial body, is responsible for enforcing Shari'a law.

During the year police generally improved their ability to fight crime and apprehended more than 45 suspects in terrorist attacks. Overall, however, police professionalism remained low, as did their respect for human rights and effectiveness at investigating human rights abuses. Impunity and corruption remained significant problems. There were instances in which the police failed to respond to mob or vigilante violence. Police commonly extracted bribes, from minor payoffs in traffic cases to large bribes in criminal investigations. The Division of Profession and Security (Propam) reportedly investigated 90 police officers in Jakarta, resulting in 34 dismissals during the year. Other punishments varied from demotion to criminal prosecution. Unlike in previous years, the police also investigated several high-ranking police officers. In October Propam arrested police Brigadier General Ismoko for discriminatory practices against suspects in the Bank Negara Indonesia (BNI) bank fraud case. He has been charged under criminal law and at year's end was awaiting trial. In the same BNI case, Commissioner General Suyitno Landung (former head of the Criminal Investigation Division and current governor of the National Institute of Defense) was arrested in December on suspicion of accepting bribes.

In November Propam forced police Inspector General Binarto into early retirement; Binarto admitted sending a text message to the chief of police in Surabaya asking him to release a suspect in a case of illegal logging.

In December Propam declared Inspector General Saleh Saaf a suspect in the investigation of corruption in the purchase of communications equipment.

**Arrest and Detention**

A defendant may challenge the legality of his arrest and detention in a pretrial hearing and may sue for compensation if wrongfully detained; however, defendants rarely won pretrial hearings and almost never received compensation after being released without charge. Military and civilian courts rarely accepted appeals based on claims of improper arrest and detention. The law limits periods of pretrial detention. Police are permitted an initial 20-day detention, which can be extended to 60 days; prosecutors may detain a suspect 30 days initially, with a 20-day extension permitted. Prosecutors may extend police detention periods, and a district court may further extend prosecutors' detention of a suspect. The district and high courts may detain a defendant up to 90 days during trial or appeal, while the Supreme Court may detain a defendant 110 days while considering an appeal. In addition, the law allows detention periods to be extended up to an additional 60 days at each level if a defendant faces a possible prison sentence of 9 years or longer or if the individual is certified to be mentally or physically disturbed. Authorities generally respected these limits in practice.

In areas of separatist conflict, such as Aceh and Papua, police frequently and arbitrarily detained persons without warrants, charges, or court proceedings. The authorities rarely granted bail, frequently prevented access to defense counsel during investigations, and limited or prevented access to legal assistance from voluntary legal defense organizations.

On March 3, Brimob forces detained Muladi bin Sulaiman, a farmer from Aceh Jaya Regency suspected of being a GAM member, and beat him until he was unconscious. He was later transferred to West Aceh police resort before his release.

**Amnesty**

On August 30, the government amnestied more than 1,500 GAM prisoners. In accordance with the MOU, the government unconditionally released all remaining prisoners and detainees held due to the conflict. The government facilitated the reintegration of the released prisoners, which proceeded without violence. The government continued to hold a relatively small number of GAM personnel who it maintained had been convicted on criminal charges.

**e. Denial of Fair Public Trial**

The law provides for judicial independence. In practice, the judiciary became increasingly independent but remained influenced at times by the executive branch, the military, business interests, and politicians. The Constitutional Court demonstrated significant independence and, in some major cases, ruled against the government. Low salaries continued to encourage corruption, and judges were subject to pressure from government authorities, which often influenced the outcome of cases.

Under the Supreme Court are general, religious, military, and administrative courts. The law provides for the right of appeal. The Supreme Court does not consider factual aspects of a case but rather the lower court's application of the law. Parallel to the Supreme Court is the Constitutional Court, which is empowered to review the constitutionality of laws, settle disputes between state institutions, dissolve political parties, resolve certain electoral disputes, and decide allegations of treason or corruption against the president or vice president. The judicial branch theoretically is equal to the executive and legislative branches, and it has the power of judicial review of laws passed by the DPR; government regulations; and presidential, ministerial, and gubernatorial decrees. In practice, the judiciary was less influential than the executive and legislative branches.

In the country's 2,418 district courts, a panel of judges conducts trials by posing questions, hearing evidence, deciding on guilt or innocence, and assessing punishment. At times, judges reversed initial judgments in the appeals process, and sometimes lengthened or shortened sentences. Both the defense and prosecution can appeal verdicts.

**Trial Procedures**

The law presumes that defendants are innocent until proven guilty. It also permits bail, which was used but rarely in areas of separatist conflict. Court officials sometimes accepted bribes in exchange for granting bail. Defendants have the right to confront witnesses and call witnesses in their defense. An exception is allowed in cases in which distance or expense is deemed excessive for transporting witnesses to court; in such

http://y.state.gov/g/drl/rls/hrrpt/2005/61609.htm

cases, sworn affidavits may be introduced. The courts allowed forced confessions, particularly in conflict areas, and limited the presentation of defense evidence. Defendants have the right to avoid self-incrimination but generally were required to give testimony before the conclusion of a trial. However, in practice, defendants regularly refused to answer questions.

The law gives defendants the right to an attorney from the time of arrest and at every stage of examination, and requires that counsel be appointed in cases involving capital punishment or a prison sentence of 15 years or more. In cases involving potential sentences of five years or more, the law requires the appointment of an attorney if a defendant is indigent and requests counsel. In theory, indigent defendants may obtain private legal assistance, and nongovernmental lawyer associations provided free legal representation to indigent defendants. For example, the Women's Legal Aid Foundation (LBH-APIK) represented many women who otherwise could not afford representation. In many cases, procedural protections, including those against forced confessions, were inadequate to ensure a fair trial.

Prior to the implementation of the MOU, many suspected GAM members were denied their right to a fair trial. Defendants rarely had counsel present during interrogations and usually had no counsel during court proceedings. Defendants rarely were able to confront their accuser. The prosecution usually based its cases on testimony given by witnesses to government investigators; neither witnesses nor investigators appeared in court, and only written witness statements were submitted. Prosecutors rarely produced physical evidence, which they claimed was not available because it consisted of military weapons. In 2004 a lawyer with a legal aid organization told AI that in nearly 100 cases handled by his organization only 2 defense witnesses agreed to appear.

Widespread corruption continued throughout the legal system. Bribes influenced prosecution, conviction, and sentencing in countless civil and criminal cases. The National Ombudsman Commission (KON) reported that 36 percent of complaints they received were related to judicial corruption, which involved judges, clerks, and lawyers. For example, former Aceh Governor Abdullah Puteh's attorney, Teuku Syaifuddin Popon, was caught delivering $25 thousand (250 million rupiah) to two Jakarta high court clerks, Ramadhan Rizal and Mochammad Soleh, to win his client's case. Popon, Rizal, and Soleh were all standing trial at year's end. On September 30, the Corruption Eradication Commission (KPK) arrested five employees of the Supreme Court and a lawyer in an alleged bribery incident involving Probosutedjo, the half-brother of former president Suharto. According to press reports, KPK officials confiscated approximately $480 thousand (approximately 5 billion rupiah), which they believed was to be used to bribe Supreme Court Chief Justice Bagir Manan (see section 3). Probosutedjo admitted to paying $600 thousand (6 billion rupiah) to his lawyer to bribe the court, but claimed he did so to assist an anticorruption investigation. Bagir Manan denied accepting a bribe from Probosutedjo.

Most judges earned $180 to $203 (1.8 million to 2.03 million rupiah) per month, while a judge with three decades' experience earned approximately $594 (5.94 million rupiah) per month. Key individuals in the justice system not only accepted bribes but also appeared to turn a blind eye to other government offices suspected of corruption.

Apart from the handful of soldiers who were tried in human rights courts, hundreds of low-level and sometimes mid-level soldiers were tried in military court, including for offenses that involved civilians or occurred when soldiers were not on duty. If a soldier was suspected of committing a crime, military police investigated and then passed their findings to military prosecutors, who decided whether or not to prepare a case. While administratively managed by the TNI, military prosecutors and judges were responsible to the AGO and the Supreme Court for the application of laws. However, under the "one roof system" adopted in 2004, the Supreme Court exercises administrative control over military and religious courts. A three-person panel of military judges heard trials while the military high court and the military supreme court heard appeals. Some civilians criticized the short length of prison sentences imposed by military courts. TNI legal officials noted that all personnel sentenced to terms of three months or longer, regardless of their record or length of service, were discharged from military service.

Four district courts adjudicated cases of gross human rights violations. The law provides for each court to have five members, including three noncareer human rights judges, who are appointed to five-year terms. Verdicts can be appealed to the standing high court and the Supreme Court. The law provides for internationally recognized definitions of genocide, crimes against humanity, and command responsibility, but it does not include war crimes as a gross violation of human rights.

On September 8 and 9, in its first verdict, the country's first permanent human rights court in Makassar, South Sulawesi, found that 2000 police attacks against almost 100 victims in Abepura, Papua, were not "crimes against humanity"; the court dismissed all charges against Brimob Brigadier General Johny Wainal Usman and South Sulawesi Police High Commissioner Daud Sihombing. The court also denied the victims' request for rehabilitation and compensation. Prosecutors appealed to the Supreme Court, which had not begun its review of the decision at year's end (see section 1.a.).

In August 2003 the ad hoc Human Rights Tribunal for East Timor concluded its trial phase in Jakarta. Of the 18 defendants, 6 were convicted at the trial level: Adam Damiri (3 years), Abilio Jose Soares (3 years), Noer Muis (5 years), Eurico Guterres (10 years), Sudjarwo (5 years), and Hulman Gultom (3 years). The defendants were convicted in connection with atrocities that occurred during April 1999 and September 1999 in three East Timor locations: Liquica, Dili, and Suai. In July 2004 the Jakarta High Court overturned the convictions of Damiri, Noer Muis, Hulman Gultom, and Sudjarwo, and reduced Guterres' sentence from 10 years to 5 years but confirmed Soares' sentence. In 2004 the Supreme Court acquitted Soares. During the year the Supreme Court confirmed the High Court's acquittal of Sudjarwo and Gultman and the trial court's acquittal of Tono Suratman. The prosecution did not appeal Damiri's case. At year's end the Supreme Court was still reviewing the cases of Noer Muis and Guterres.

East Timor's Serious Crimes Unit indicted a total of 391 individuals for crimes against humanity committed during and after the 1999 referendum; however, 290 of these individuals remained at large with little chance of being returned to East Timor to stand trial. During the year the UN sent a Commission of Experts to Indonesia to evaluate the ad hoc tribunal and Serious Crimes Unit and to recommend next steps for achieving accountability. The commission recommended that either Indonesia retry the perpetrators of violence within six months or that the cases be tried before an international tribunal. The commission also included the possibility of an exceptional international criminal code investigation (that would extend the Court's jurisdiction to crimes committed before its establishment) if the above recommendations were not implemented.

Meanwhile, the governments of Indonesia and East Timor formed a bilateral Truth and Friendship Commission (TFC) to address accountability for the 1999 crimes. Indonesia's commissioners included a Catholic bishop, a senior diplomat, former members of Komnas-HAM and a retired general. The TFC began work, but did not hold public hearings or reach any findings by the end of the year.

In 2003 the ad hoc human rights tribunal for the 1984 Tanjung Priok incident, in which dozens and perhaps hundreds of persons were shot and

killed, held its first court sessions in Jakarta. Panels consisting of 5 judges heard the cases of 16 defendants, including retired Army Major General Pranowo; retired Army Major General Rudolf Adolf Butar-Butar; Army Major General Sriyanto Mutrasan, the commander of Army Special Forces; and other lower-ranked military officers and enlisted personnel under the command of Captain Sutrisno Mascung. All of the defendants faced charges of crimes against humanity. The tribunal sentenced Butar-Butar to 10 years in prison and found 13 others guilty and sentenced them to 2 or 3 years in jail. The prosecutors had requested 10-year sentences. The court found Pranowo and Muntrasan not guilty. In July the high court overturned all 14 convictions and upheld the lower court's finding that Pranowo and Muntrasan were not guilty as well. At year's end, all 16 defendants remained free as the Supreme Court considered the AGO's second level appeal.

In September 2004 the Central Jakarta District Court found *Tempo* magazine chief editor Bambang Harymurti guilty of criminal libel and sentenced him to a year in prison. NGOs and journalists complained that the court should have applied the 1999 Press Law rather than the Criminal Code in the case. The use of the Press Law would have provided plaintiff Tomy Winata the right of reply or imposed a fine on *Tempo* rather than a prison sentence. During the year Harymurti filed an appeal but lost again at the high court. At year's end, Harymurti remained free pending the outcome of his second appeal (see section 2.a.).

In September 2004, the DPR passed legislation to establish a "Truth and Reconciliation Commission" to investigate human rights violations before making recommendations to the president to grant amnesty to abusers and rehabilitation to their victims. The legislation would allow the commission to recommend amnesty for a confessed violator even in cases in which the victim does not consent. Once the commission has resolved a case, it cannot later be filed in a human rights court. During the year the government took steps to form the commission. The selection committee narrowed the pool of candidates to 42, from an original pool of 1,883 candidates; the president, with DPR approval, will ultimately select 21 commission members.

In October 2004 Supreme Court Chief Justice Bagir Manan inaugurated the first Shari'a courts in Aceh. Under the new system, 19 district religious courts and 1 court of appeals heard cases. The courts heard only cases involving Muslims and used decrees formulated by the Aceh local government rather than the penal code. During the year a new gubernatorial decree made caning the Shari'a court punishment for persons found guilty of gambling, drinking, or being alone with a nonrelated member of the opposite sex (see sections 1.c. and 2.c.).

Political Prisoners

The August 15 MOU signed between the government and GAM rebels required the government to release "political prisoners and detainees held due to the conflict…" This group of prisoners largely consisted of persons held by the government based on their alleged association with or participation in the armed secessionist conflict, or alleged acts of treason associated with the conflict. The government implemented this requirement but continued to hold a relatively small number of persons whom it said had been convicted of criminal offenses.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law requires judicial warrants for searches except for cases involving subversion, economic crimes, and corruption. The law also provides for searches without warrants when circumstances are "urgent and compelling." Security officials occasionally broke into homes and offices. The authorities occasionally conducted surveillance on individuals and their residences and monitored telephone calls. Corrupt officials sometimes subjected migrants returning from abroad, particularly women, to arbitrary strip searches, theft, and extortion at special lanes set aside at airports for returning workers.

Land disputes generated charges of unfair evictions and the use of excessive force by security officials. The NGO Jakarta Resident Forum estimated that security officials evicted at least 5 thousand persons during the year compared with 20 thousand in 2004.

The National Identity Card (KTP), which all citizens are required to carry, identifies the holder's religion. NGOs charged that the KTPs undermined the country's pluralistic tradition and endangered cardholders who traveled through an area of interreligious conflict. Members of the five religions officially recognized by the government—Islam, Protestantism, Catholicism, Hinduism, and Buddhism—had little or no trouble obtaining accurate identification cards; however, members of other religions frequently were denied either a card or one that accurately reflected their faith. Additionally, low-level officials and village heads responsible for issuing KTPs often demanded small bribes or made the process inordinately bureaucratic, which made it difficult for disadvantaged groups such as itinerant workers, the poor, and the homeless to obtain KTPs.

In many parts of the country, particularly in Kalimantan and Papua, local residents believed that the government-sponsored transmigration program interfered with their traditional ways of life, land usage, and economic opportunities. No new families have transmigrated since 2004. The government continued to support at least 87,678 households moved in previous years from overpopulated areas to 369 more isolated and less developed areas in 24 different provinces.

The government used its authority, and at times intimidation, to appropriate land for development projects, often without fair compensation. In other cases, state-owned companies were accused of endangering resources upon which citizens' livelihood depended. On May 3, President Yudhoyono signed a decree on land acquisition for public use, which allows the government to acquire land for public development projects even if landowners have not agreed on the amount of compensation. A number of NGOs argued that the decree served the interests of wealthy developers at the expense of the poor.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The law provides for freedom of speech and freedom of the press; however, the government at times restricted these rights in practice. A vigorous, independent media operated in the country and generally expressed a wide variety of views without restriction. However, during the year the government jailed at least three antigovernment protestors convicted of "insulting the president" or "spreading hatred against the government" and four others for raising separatist flags. In addition, politicians and powerful businessmen often filed criminal or civil complaints against journalists whose articles they found insulting or offensive. Also during the year some journalists faced threats or violence.

In May a court sentenced two student activists to jail for insulting the president. The court sentenced Monang Johannes Tambunan, a student activist of the Indonesian National Students Movement Presidium, to six months in prison for calling the president a dog and a pig during a

January 28th demonstration held in front of the presidential palace. On May 26, the court sentenced Bay Harkat Jonday Firdaus, a Syarif Hidayatullah State Islamic University student, to five months and two days in prison for burning pictures of President Yudhoyono and Vice President Jusuf Kalla during a protest against the fuel price increase in December 2004. On June 10, the Denpasar District Court sentenced I Wayan Gendo Suardana, a law student at Udayana University, to six months in prison for setting fire to the president's picture during a protest against the government's plan to raise fuel prices.

Courts convicted four persons in Papua of treason for raising the separatist "Morningstar" flag. Courts sentenced Filep Semuel Karma to 15 years in prison and dismissed him from the civil service; Yusak Pakage to 10 years; Moses Aspalek to 6 years; and Moses Holago to 4 years (see section 2.b.).

In May, according to press reports, a court sentenced two journalists from Lampung to nine months in jail for libeling Alzier Dianis Thabranie, the leader of the Golkar Party's Lampung chapter, in a story on vote-buying in Lampung during the 2004 presidential election.

Abdulla Hendropriyono, former chief of BIN, filed criminal defamation charges against Rachland Nashidik, program director for The Indonesian Human Rights Monitor and Usman Hamid, coordinator for The Commission for Disappearances and Victims of Violence. Both Nashidik and Hamid were prominent members on the government-established fact-finding team investigating the murder of human rights campaigner Munir (see section 1.a.). Hendropriyono said the two spread damaging rumors about him and defamed him during the course of the team's work. The police questioned both Nashidik and Hamid, but at year's end they remained free.

Akbar Tandjung, former DPR speaker, sued Retno Listyarti, a civics teacher at a senior high school, and publisher PT Erlangga for writing and publishing a textbook he considered libelous. The textbook used Akbar's 2003 graft trial (in which he was found innocent on appeal) to illustrate issues of transparency and the social safety net. Akbar also complained that the inclusion of the graft trial in the textbook had a psychological impact on one of his daughters, whose school used the book. In an out-of-court settlement, Listyarti agreed to revise the textbook.

On October 6, Chief Justice Bagir Manan directed judges across the country to fine, not imprison, journalists found guilty in criminal cases related to press disputes. However, he defended the application of the criminal code rather than the more liberal press law in certain cases.

Following the December 2004 tsunami, the government eased restrictions on domestic and international press access to tsunami-affected areas in Aceh, imposed under the civil emergency. The government ended the state of civil emergency in Aceh on May 18, lifting legal restrictions on the press, movement, assembly, and other civil rights. In practice, the ability of the TNI to limit information affected the ability of journalists to report freely, as did ad hoc interventions by local officials.

Although the government did not formally restrict foreign journalists from traveling to the provinces of Papua and West Irian Jaya, as a matter of practice the government expected journalists to request permission through the foreign ministry or, if abroad, through the nearest Indonesian embassy. The government approved some requests and denied others. Some journalists traveled to Papua without specific government permission. There were no reports of restrictions on journalists traveling to previous areas of conflict in Maluku, North Maluku, and in Sulawesi.

Journalists faced violence and intimidation from police, soldiers, government officials, rebels, thugs, students, and ordinary citizens. As of August, the Alliance of Independent Journalists (AJI) recorded at least 14 physical attacks against journalists as well as 15 nonphysical acts that included verbal threats and lawsuits. In August, I Wayan Puspa Negara, a member of the Badung District parliament, threatened to shoot Ashadi Iksa, a journalist for the *Nusa* daily, for an article titled "The New Provincial Government Asks for More Budget on Clothes up to Rp. 28 million." In May unknown persons repeatedly telephoned Heri, a journalist for the national news agency Antara, threatening to smash his head if he did not stop writing "awful news."

In 2003 persons linked to tycoon Tomy Winata entered *Tempo* magazine's headquarters in Jakarta and criticized an article that implied Winata stood to benefit from a fire that destroyed a Jakarta market. They assaulted *Tempo* journalists, including chief editor Bambang Harymurti, at the headquarters and later at a police station. *Tempo* lawyers reported the matter to the authorities and sued the assailants, but judges exonerated the group's leader. Winata's attorneys responded by initiating four lawsuits (two civil and two criminal), which free press activists asserted were attempts to intimidate the media. In September 2004 the Jakarta High Court overturned two district court decisions in civil suits against *Tempo*, finding in favor of *Tempo* and dismissing fines levied by the district court against the magazine. However, two days later, the Central Jakarta District Court found *Tempo* guilty of criminal libel and sentenced Bambang Harymurti to a year in prison; the court acquitted *Tempo* journalists Ahmad Taufik and Teuku Iskandar Ali. Human rights observers called the decision a blow to press freedom in the country and criticized the prosecutors' decision to use the criminal code on libel instead of the 1999 Press Law. Harymurti filed an appeal but the decision was upheld by the high court. At year's end, Harymurti remained free pending a Supreme Court decision on his second appeal.

On June 25, approximately two thousand persons calling themselves the Palu City Muslim community, held a protest against an opinion article entitled "Islam, A Failed Religion" written by Rus'an, a lecturer at Muhammadiyah University in Palu, which highlighted corruption in the country. In response the management of Central Sulawesi's biggest daily, *Radar Sulteng*, decided not to publish the newspaper for three days. The police, after questioning a number of witnesses including expert witnesses from a Central Sulawesi branch of the Indonesian Council of Ulemas (MUI), charged Rus'an with insulting Islam. However, MUI later withdrew the charges and authorities released him.

During the year the government took no legal action against any person responsible for crimes committed against journalists in 2004. In 2003 the Central Jakarta District Court ordered Jakarta Governor Sutiyoso to apologize to a reporter intimidated by a city public order officer who tried to prevent him from covering a 2002 eviction. Sutiyoso lost his appeal to a high court and twice appealed to the Supreme Court. The second appeal remained under consideration at year's end.

In 2004 the government implemented a broadcasting law, which included measures for licensing additional frequencies and establishing an impartial broadcasting commission. Since its inception, the Broadcasting Commission has been largely ineffectual due to an inadequate budget and legal uncertainty regarding its authority.

Despite incidents of violence and intimidation of the press, unity among journalists and their commitment to protect their colleagues continued to strengthen. Some members of the press also continued aggressive reporting on such issues as corruption, the Munir murder case, and environmental degradation. Regional media increasingly prospered. In addition, moderate Islamic publications continued to increase in number and popularity.

There were no government restrictions on the Internet or academic freedom.

The government-supervised Film Censorship Institute continued to censor domestic and imported movies for content deemed pornographic or religiously offensive. In December the government banned two films about East Timor from being shown at a Jakarta film festival. The film festival organizers quoted the government as stating that the films "might remind the people of an old wound."

By law, communist teachings cannot be disseminated or developed; however, on February 4, with no government interference, former president Abdurrahman Wahid launched the publication of an Indonesian-language version of Karl Marx's *Capital*.

On several occasions during the year an extremist group, the Islamic Defenders' Front (FPI), sought to limit freedom of expression through intimidation. In June FPI attempted to disrupt a beauty contest for transvestites. In September FPI intimidated an art curator into covering up art they found offensive. In both cases, the FPI filed charges of insulting Islam with the police.

A number of Muslim groups, led by FPI, also reported a popular local rock group to the police for blasphemy on April 26; the group allegedly used the word "Allah" in Arabic script on an album cover. The Muslim groups also complained that the band, during a concert, stepped on the word, which was painted on stage. The band changed the album cover. In June the lead singer for the same band received complaints from a Hindu organization for having a Hindu God on the cover of an album. The singer apologized and changed his album cover.

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The law provides for freedom of assembly, and the government generally respected this right; however, the government restricted this right in conflict areas. The law generally does not require permits for social, cultural, or religious gatherings; however, any gathering of five or more persons related to political, labor, or public policy requires police notification, and demonstrations require a permit.

Although the Papua Special Autonomy Law permits flying a flag symbolizing Papua's cultural identity, police arrested Philep Karma and Yusak Pakage for flying the Papuan Morning Star flag, identified with the armed separatist struggle (see section 2.a.) in December 2004. On December 1, police refused permission for a pro-separatist demonstration in Abepura, and prevented several hundred demonstrators from occupying the planned site of the aborted demonstration. On the same day, a student demonstration in Jayapura proceeded without incident.

During the year there were reports of police using excessive force in controlling demonstrations. On May 10, a court session in Jayapura trying Karma and Pakage ended in chaos when spectators lobbed stones into the court grounds, and police officers guarding the court fired warning shots. The ensuing violence injured dozens of persons, including 10 police officers. The national police chief asserted that the police had overreacted, and Jayapura police chief Son Ani and his subordinate Novly Pitooy were removed from their positions. Nine other lower-ranking officers were demoted and detained for human rights and procedural violations. On May 26, the Jayapura District Court sentenced Karma and Pakage to 15 and 10 years in jail respectively for treason.

In other instances police showed restraint in dealing with violent demonstrations. For example, in Central Lombok, on September 19, in a dispute between landowners and airport officials, several hundred farmers attacked police with rocks and arrows. The police responded with rubber bullets and other nonlethal crowd control measures. None of the demonstrators were seriously injured.

In Aceh, before the end of the civil emergency on May 18, some permits for gatherings were denied if the meetings were deemed political in nature. In April the civil authorities denied the Consortium for Assisting Refugees and the Displaced in Indonesia's request for a permit to hold a workshop on international standards for refugee care. The authorities did not give a reason for the denial.

Since the end of the civil emergency and especially after the August signature of the MOU, peaceful assemblies occurred frequently and without incident. As a result of the MOU, the authorities granted Muhammad Nazar, chairman of SIRA, amnesty and freed him on August 30. Authorities arrested Nazar in February 2003 for planning a public rally in Lhokseumawe, Aceh.

Freedom of Association

The law provides for freedom of association, and the government generally respected it in practice. The Communist Party was banned in 1966.

c. Freedom of Religion

The law provides for "all persons the right to worship according to his or her own religion or belief" and states that "the nation is based upon belief in one supreme God." The government generally respected the former provision, but only five major faiths--Islam, Protestantism, Catholicism, Hinduism, and Buddhism--received official recognition in the form of representation at the Ministry of Religious Affairs. Other religious groups were able to register with the government, but only with the Ministry of Home Affairs and only as social organizations. These groups experienced official and social discrimination. The law does not recognize atheism, and in practical terms requires all persons to identify themselves with one of the five faiths acknowledged by the government.

The civil registration system continued to discriminate against members of minority religions. Civil registry officials refused to register the marriages or births of children of animists, Confucians, members of the Baha'i faith, and others because they did not belong to one of the five officially recognized faiths. According to the Hindu association Parisadha Hindu Dharma Indonesia, Hindus, particularly in North Lampung, Southeast Sulawesi, Kalimantan, and some areas in East Java, despite official recognition of their religion, sometimes had to travel some distance to register marriages or births because local officials could not or would not perform the registration. Persons whose religion was not one of the five officially recognized faiths as well as persons of Chinese descent had difficulty obtaining a KTP, which was necessary to register marriages, births, and divorces. Several NGOs and religious advocacy groups urged the government to delete the religion category from the KTPs (see section 1.f.).

Men and women of different religions experienced difficulties in marrying and in registering marriage. The government refused to register a marriage before a religious marriage ceremony had taken place. However, very few religious officials were willing to take part in a wedding involving a man and woman of different faiths. For this reason, some soon-to-be brides and grooms converted to their partner's religion. Others

resorted to traveling overseas to wed. In July the Indonesian Council of Ulemas (MUI) issued an edict that reaffirmed its 1980 ban on marriages between persons of different faiths. MUI edicts are influential but do not have legal effect.

On September 1, a court sentenced three women to three years in prison each for proselytizing based on their inclusion of Muslim children albeit with parental permission in Christian Sunday school activities. On November 22, the three women lost their appeal, and at year's end an appeal to the Supreme Court was pending.

In November a foreign citizen and an Indonesian working on a dam project on Madura were arrested following accusations that they were trying to corrupt the Muslim community. At year's end possible charges were still pending.

During the year the government took no concrete steps to implement controversial provisions of the education law that require schools to provide religious instruction to students in their own faith.

As in previous years, some political parties advocated amending the constitution to adopt Shari'a on a nationwide basis, but most parliamentarians and the country's largest Muslim social organizations remained opposed to the proposal. On March 28, the third South Sulawesi Muslims Congress urged the provincial government to apply Shari'a throughout the province. However, as in previous years, the provincial government did not respond.

In Aceh Province, the government continued to implement Shari'a courts, which heard only cases involving Muslims and did not enforce the penal code but rather *qanuns*, decrees formulated by local governments. The qanuns covered issues such as "immoral behavior." For example, extramarital contact between a man and woman could be punishable by public lashings or a fine of up to $555 (5.5 million rupiah). Other qanuns banned gambling and the production, distribution, or consumption of alcohol. A Muslim found guilty of consuming alcohol could receive 40 lashes. On August 26, authorities lashed two young unmarried couples 45 times in Takengon Public Square in Central Aceh for violating qanuns on immoral behavior and the consumption of alcohol while in their vehicle. The press reported that the two women fainted from the lashings. During the year a total of 52 persons were caned: 6 for being alone with persons of the opposite sex who were not blood relatives, 7 for consumption of alcohol, and 39 for gambling.

On May 20, 60 members of the Banda Aceh Shari'a office, supported by local police, enforced headscarf use by Muslim women in front of the provincial parliament and another government building. According to the newspaper *Serambi Indonesia*, hundreds of women were briefly detained and lectured on Shari'a.

In some municipalities outside of Aceh, local leaders also applied stricter Islamic practices. In Bulukumba Regency, South Sulawesi, two years after the implementation of Shari'a, the regent claimed that 100 percent of Muslim women wore headscarves. The law does not apply to non-Muslims and is not enforced in an area popular with tourists. In Padang, West Sumatra, the mayor instructed all Muslim women to wear a headscarf; the local authorities enforced this instruction.

Courts sentenced several persons to jail for insulting Islam. In August a court sentenced Muhammad Yusman Roy to two years in jail for praying in the Indonesian language, which Muslim *ulemas* (religious authorities) said tarnished the purity of Arabic-based Islam. In September an East Java court sentenced each of six drug and cancer treatment counselors to five years in jail and another to three years in jail for violating key precepts of Islam. A local MUI edict had characterized their rehabilitation center's teachings as heretical. Police arrested the counselors while they were trying to defend themselves from hundreds of persons who raided the center's headquarters.

As in previous years, during the Muslim fasting month of Ramadan, many local governments ordered either the closure or limited operating hours for various types of "entertainment" establishments. For instance, the municipal governments of Kendari, Medan, Palembang, and Pekanbaru ordered the closure of all discotheques, massage parlors, karaoke outlets, pubs, and bars during Ramadan. However, authorities said they would allow bars and karaoke outlets in hotels catering to foreign tourists to remain open. The Medan government ordered the closure of such establishments on December 24 and 25 in observance of Christmas. Enforcement of the orders varied.

Societal Abuses and Discrimination

There were frequent efforts to close unlicensed churches during the year. Through intimidation and sometimes force, FPI and the Alliance for Anti-Apostates shut down dozens of Protestant places of worship in West Java that lacked permits. Police did nothing to stop the closures and, in some cases, assisted in the closures. Many of the churches reopened later in the year.

On July 15, a mob under the banner of the "Indonesian Muslim Solidarity Group" attacked the Ahmadiyah Indonesia Congregation (JAI) compound in Bogor, West Java. Armed with stones and batons, the assailants damaged Ahmadiyah buildings and set fire to a women's dormitory, in spite of a heavy police presence. The attack followed an aborted July 9 attack on the same Ahmadiyah property by individuals associated with the FPI. The police made no arrest of perpetrators in either attack, and the Ahmadiyah compound remained sealed at year's end.

The perpetrators of the attacks justified their actions by referring to a religious edict (*fatwa*) issued in 1980 by the MUI that declared the Ahmadiyah to be "deviants" from Islam. The fatwa, which was renewed in August, has no official force of law. The violence sparked fears of possible attacks against Ahmadiyah members in other parts of the county. In Bandung, West Java, more than one thousand Ahmadiyah followers sought police protection to secure their two mosques in the Cikutra and Bojongloa areas. They also reduced their ritual activities at the mosques. Komnas HAM began an investigation of the JAI campus attacks.

On September 19, in Cianjur, West Java, a mob reportedly attacked and vandalized an Ahmadiyah mosque and private homes and cars belonging to Ahmadiyah members. Unlike the July attacks, however, the police reportedly arrested 45 suspects and were pursuing criminal charges against 12 alleged ringleaders. Shortly after the attack, local government officials in Cianjur Regency formally banned all Ahmadiyah activities purportedly to protect Ahmadiyah members from further attacks.

On October 21, in Central Sulawesi, a man on a motorcycle fired at a house being used for prayer meetings by a Christian congregation; the owner was injured.

Religiously motivated violence and vigilante acts in Central Sulawesi, Maluku, and North Maluku occurred less frequently then in previous years. However, Central Sulawesi continued to experience sporadic bombings, shootings, and other violence in spite of broad societal support

for security restoration and reconciliation. On October 29, three teenage Christian schoolgirls were beheaded near Poso, Central Sulawesi. Days later, two teenage girls, one Muslim and one Christian, were shot and killed at a bus stop in Poso. That same week, a Palu-area university professor and his wife were shot and injured. On December 31, unknown persons bombed a Palu pork market killing 7 persons and injuring more than 50.

In March, despite an agreement by Muslim and Hindu leaders in Bali calling on their followers to respect both the Hindu's Nyepi Day (seclusion day) and the Muslim Friday prayer, some villages prohibited Muslims from leaving their homes to perform Friday prayer in mosques, threatening to fine them if they did so. The local MUI in Jimbaran called on Muslims to move out of the villages before Friday so they could perform their Friday prayers.

The indigenous Jewish population is small. *Sabili*, a radical Islamic publication and the country's second largest magazine by circulation, published articles with anti-Semitic statements and themes.

For a more detailed discussion, see the *2005 International Religious Freedom Report*.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The constitution allows the government to prevent persons from entering or leaving the country, and sometimes the government restricted freedom of movement. The Law on Overcoming Dangerous Situations gives military forces broad powers in a declared state of emergency, including the power to limit land, air, and sea traffic; however, the government did not use these powers.

The government continued to restrict freedom of movement for foreigners through a system of "travel letters," required for Papua. Enforcement was inconsistent.

In May 2003 then-president Megawati issued a decree ending martial law in Aceh and establishing a state of civil emergency. The decree returned overall government authority for the province to the governor, but the Provincial Civil Emergency Administration (PDSD) maintained authority to issue emergency measures to control travel, trade, transport, and other civilian activities. The government formally ended the state of civil emergency and the PDSD on May 18. Following the signing of the MOU, authorities removed all non-locally based TNI units and reduce the TNI's role to protecting against external threats.

The government maintained controls on the movement of residents in Aceh through the use of national identity cards specific to Aceh. These cards required the signatures of the holder's local military commander, police chief, and village head. Acehnese who wished to travel or leave the province had to show these cards at security checkpoints along main highways. Failure to produce the card was cause for arrest. In practice, residents could easily obtain the cards, and there was no evidence that the policy resulted in restriction of movement. In Aceh, those outside Banda Aceh also had to obtain a travel letter from police describing the purpose and length of trip and also naming the persons the traveler would meet. Under the MOU, travel letters were no longer required, and national identity cards specific to Aceh were no longer official. However, in practice the government did not issue standard identity cards, and Acehnese continued to use identity cards specific to Aceh at year's end.

Relations between Madurese and indigenous Dayaks remained poor. In Central Kalimantan, ethnic violence in 2001 prompted approximately 130 thousand ethnic Madurese migrants to leave, mainly going to Madura and East Java. According to Oxfam and the UN Office for Coordination of Humanitarian Affairs, between 30 thousand to 57 thousand Madurese have returned to Central Kalimantan. A Central Kalimantan government regulation stipulates that returning Madurese be: able to live side by side in peace and harmony with community members; be recognized and received by the indigenous population as well as local community members; and obey the values, customs, and traditions of the local culture. The regulation also requires returnees to register with the local government, but only those with identity cards, a house, and a permanent job are qualified to do so. The West Kalimantan city of Sambas remained effectively inaccessible to its former Madurese residents.

The government prevented at least 600 persons from leaving the country during the year. The AGO and the high prosecutor's office prevented most of these departures. Some of those barred from leaving were delinquent taxpayers, convicted or indicted persons, and persons otherwise involved in legal disputes.

In June 2004 the government expelled Sidney Jones, country director for the international NGO International Crisis Group (ICG). In July Jones returned and resumed her work. She subsequently left the country voluntarily and was briefly barred from returning in November, but this restriction was lifted after a few days.

In January, a month after the tsunami, authorities in Aceh briefly detained or asked to leave at least five foreign journalists. On January 7, soldiers asked Martin Chulov and Renee Nowytager of *The Australian* to leave. On January 23, authorities said freelance journalist William Nessen had violated a ban imposed on him in August 2003 and expelled him from Aceh. In March the government barred Dr. Erward Aspinall, a lecturer at Sydney University and an expert on the county, from entering the country. His name was on a blacklist. On September 8, an antiterror police unit in Maluku arrested Rohan Kumar Gunaratna, a Singapore-based professor and expert on terrorism, for failing to show a document allowing him to carry out research on terrorist cells in Maluku Province. Authorities charged Gunaratna with violating immigration law and deported him.

The constitution prohibits forced exile, and the government did not use it.

Internally Displaced Persons

The National Coordinating Board for Disaster Management reported that there were 977,395 internally displace persons (IDPs) in the country, 561,478 of whom were in Aceh, almost all the result of the December 2004 tsunami. Some of the Aceh IDPs lived in emergency shelters, while others stayed with host families or were integrated into local communities. The government dealt with many aspects of crisis but continued to rely on international organizations and donors to assist with most IDP needs. IDPs had three options: return to their place of origin, start anew in their current location with the government's assistance, or relocate to another part of Aceh if return to their place of origin was impossible.

Protection of Refugees

The law does not provide for the granting of asylum or refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol, and the government has not established a system for providing protection to refugees. However, in practice, there were no reports of the forced return of persons to a country where they feared persecution. The government cooperated with the UN High Commissioner on Refugees (UNHCR), which maintained an office in Jakarta, for assisting refugees and asylum seekers. At year's end, there were 89 UN-recognized refugees and 58 asylum seekers living in the country. Some were applicants and others were dependents. Most were from Iraq, Afghanistan, or Sri Lanka. During the year the UNHCR shifted its primary focus from assisting refugees and asylum seekers to tsunami relief. However, it did help resettle 75 refugees

The above figures did not include approximately 28 thousand former refugees from East Timor who resided in West Timor at year's end, according to the UNHCR and the National Coordinating Board for Disaster and IDPs Management Secretariat. In 2003 the government and UNHCR stated that the remaining East Timorese in West Timor would no longer be considered refugees, and on December 31, UNHCR ended its six-year assistance program in West Timor.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens with the right to change their government peacefully, and citizens exercised this right in practice through periodic, free, and fair elections held on the basis of universal suffrage.

The constitution provides for national elections every five years. The security forces lost their appointed DPR seats in October 2004 with the inauguration of the new legislature. DPR members automatically are members of the People's Consultative Assembly (MPR), which until October 2004 included regional and government appointed representatives. In October 2004 the MPR became a fully elected body consisting of the 550 DPR members (50 seats were added pursuant to a law adopted in 2003) and the 128 members of the House of Regional Representatives (DPD).

Elections and Political Participation

Domestic and international observers monitored peaceful, first-ever, direct local elections to choose provincial- and district-level executives beginning in June. By year's end the government had held a total of 149 local elections: 7 governors, 26 mayors, and 116 regents. Observers generally perceived the local elections as free and fair, and, with a few exceptions, without incident affecting the outcome.

Most instances of violence involved supporters of losing candidates attacking local election offices. A riot broke out in Kaur District in Bengkulu Province, where supporters of a losing candidate burned down government and public buildings. In Depok, West Java, a controversial West Java court ruling overturned the mayoral election results. An inquiry into the court's decision found indications of impropriety and recommended sanctions against the judges. In December the Supreme Court overruled the West Java High Court's decision. The losing party planned a further appeal, arguing that according to the election law the high court decision should be final. At year's end a new mayor had not been inaugurated.

In October 2004 President Yudhoyono became the country's first directly elected president. Domestic and international observers monitored the legislative and presidential elections, organized by an independent election commission, and considered the elections free and fair. The national elections featured high voter turnouts, an absence of any notable violence, and broad public acceptance of the results.

All adult citizens are eligible to vote except convicts serving a sentence of five years or more, persons suffering from mental disorders, and persons deprived of voting rights by an irrevocable verdict of a court of justice. Former members of the banned Indonesian Communist Party are allowed to vote, and, following a November 2004 Constitutional Court ruling, they may run for office.

There were no legal restrictions on the role of women in politics. A woman, Megawati Soekarnoputri, served as president from July 2001 until October 2004. During the year women held 4 of 36 cabinet seats. The current election law includes a nonbinding call for parties to select women for at least 30 percent of the candidate slots on their party lists. In the 2004 elections, 61 women were elected to the 550-seat DPR, an increase from 1999, when 44 women held seats in the 500-seat DPR. In the DPD, women were 27 of the 128 members. Women won two district chief positions in the local elections.

There were no legal restrictions on the role of minorities in politics. There were no official statistics on the ethnic backgrounds of legislators in the DPR. President Yudhoyono's cabinet consisted of a plurality of Javanese, with others being of Sudanese, Bugis, Batak, Acehnese, Papuan, Balinese, Arab, or of Chinese heritage.

In Papua the government moved to implement the Special Autonomy Law, which, among other things, provides for a portion of the revenues raised from extractive industries in the territory to be returned to the provincial and regency governments for use in health, education, and infrastructure projects intended to benefit the indigenous population. The Special Autonomy Law also provides for formation of a Papuan People's Assembly (Majelis Masyarakat Papua, MRP) that would provide input into policies, legislation, and appointments affecting indigenous Papuans, and which began work on November 11. Nevertheless, significant discontent with the central government's policies persisted. Thousands of Papuans participated in antigovernment demonstrations held on August 12.

The creation by the central government of a new province, West Irian Jaya, which was carved out of Papua under controversial political and legal circumstances remained contentious. A constitutional court ruling in November 2004 held that while West Irian Jaya's formation was legally invalid, it could continue to function since its institutions were already in place. On November 24, the central government and provincial authorities reportedly agreed that the two provinces would function as a single cultural, economic, and social entity, and that their partition would be strictly administrative; however, at year's end the matter remained under discussion among the central and provincial governments and the MRP.

Government Corruption and Transparency

There was a widespread domestic and international perception that corruption was a part of daily life. In his first 100 days in office, the president stated that eradicating corruption was one of his goals, and he subsequently established the Corruption Eradication Commission (KPK) with a broad investigative mandate. The AGO prioritized high-profile corruption cases. During the year the government prosecuted

corruption cases against two governors, including Aceh Governor Abdullah Puteh, who was convicted and sentenced to 10-years' imprisonment. The government also prosecuted and convicted four members of the National Electoral Commission (KPU) including Chairman Nazaruddin Sjamsuddin and Commissioner Mulyana Kusumah, for corrupt practices related to KPU procurements. The government also began prosecution of former minister of religion Said Agil Hussein Munawar for embezzlement and arrested staff members of the Supreme Court for accepting bribes (see section 1.e.).

With the exception of Aceh, the AJI reported no problems obtaining unclassified public documents from the government.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The government met with local NGOs, responded to their inquiries and took some actions in response to NGO concerns. When prominent human rights activist Munir was murdered in 2004, the president met with a coalition of persons concerned about Munir and formed a fact-finding team (TPF) consisting of leading members of the NGO community, prosecutors, and a senior police officer. However, at year's end, the president had not released the TPF's report, which, according to press reports, called for the investigation of former and active officials of the State Intelligence Agency in connection with Munir's death (see section 1.a.). The president also met with religious organizations to discuss their concern over forced church closings, and instructed the minister of religion to review the joint-ministerial decree that requires houses of worship to obtain community approval before being built (see section 2.c.). At year's end a revised joint-ministerial decree had not been released.

Domestic human rights organizations reported being subjected to monitoring, harassment, and interference by the government; however, they actively advocated improvements to the government's human rights performance. Before the verdict in the Pollycarpus trial (see section 1.a.), Komnas HAM reported that since 2000, 14 human rights activists had been killed, and no perpetrators had been brought to justice. There were no reports of any human rights activists killed during the year.

A prominent activist on the TPF investigating Munir's death, as well as Munir's wife, reported receiving numerous, anonymous death threats.

NGOs in Papua reported widespread monitoring by intelligence officials as well as threats and intimidation. Activists reported that intelligence officers took their pictures surreptitiously and sometimes questioned their friends and family members regarding their whereabouts and activities.

In Aceh there was a large increase in the number of international and domestic NGOs to help with the relief and reconstruction following the December 2004 earthquake and tsunami. There were no reports of government interference; however, most international and local NGOs reported they did not conduct human rights work in Aceh for fear of losing their mandate to be in the region.

The government generally viewed outside investigations or foreign criticism of its human rights record as interference in its internal affairs. The security forces and intelligence agencies tended to regard with suspicion foreign human rights organizations, particularly those operating in conflict areas. Government monitoring of foreigners was apparent in conflict areas. Some domestic human rights organizations expressed concern about the possible negative consequences of contacting foreigners.

A number of government agencies and affiliated bodies addressed human rights problems, including the Ministry of Law and Human Rights, the Ministry of Foreign Affairs, the Ministry of Women's Empowerment, and Komnas HAM. However, in 2003, Komnas HAM's efforts to expose human rights violations and bring perpetrators to account were undermined by a number of court decisions regarding its jurisdiction or authority. For example, in June 2003 a Jakarta court refused to subpoena former and active military officers who had ignored Komnas HAM summonses to face questioning about 1998 riots, which claimed more than 1,200 lives. In June the TNI stated it could not cooperate with attempts by Komnas HAM to summon retired and active-duty generals to answer questions about the abduction of prodemocracy activists between 1997 and 1998. The TNI insisted that Komnas HAM must first obtain permission from the DPR before it could summon retired and active-duty generals for questioning (see section 1.b.). By law severe human rights violations that occurred before 2000 could be investigated only by an ad hoc human rights court, not Komnas HAM. Such a court could be formed only at the suggestion of the DPR, but for the DPR to know enough about an incident to approve the formation of a court, a thorough investigation was necessary. The resulting stalemate continued to block progress toward accountability.

During the year the government formed a Truth and Reconciliation Commission and, in cooperation with East Timor, a bilateral Truth and Friendship Commission (see section 1.e.).

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The constitution does not explicitly prohibit discrimination based on gender, race, disability, language, or social status. It provides for equal rights for all citizens, both native and naturalized. However, in practice, the government failed to defend these rights adequately.

Women

The law prohibits domestic abuse and other forms of violence against women. However, rape and domestic violence were problems.

Violence against women remained poorly documented. Nationwide figures were unavailable. The NGO Mitra Perempuan-affiliated Women's Crisis Centers recorded 329 cases in Jakarta, Bogor, Tangerang, and Bekasi combined, and the local press reported that violence against women continued to increase. In East Java Province incidents of violence against women increased both in number and severity. The East Java Integrated Service Center reported 107 cases of violence against women, whereas the Prodemocracy Women's Coalition reported 63. Most East Java NGOs working on women and children's issues believed the real figure was far higher, noting the tendency of many victims to keep silent. During the year three cases were investigated using the 2004 Domestic Violence Act; however, there were no prosecutions by year's end. Two types of crisis centers were available for abused women: government-run centers in hospitals and NGO centers in the community.

Rape was a problem. Although it is punishable by 4 to 12 years in jail, and the government jailed perpetrators for rape and attempted rape, most convicted rapists were sentenced to the minimum or less. Reliable nationwide statistics were unavailable. The legal definition of rape is narrow and excludes some acts that would commonly be treated as rape in other countries.

Rapes by members of the security forces occured in Aceh. Human rights activists expressed concern that rapes were underreported in the province, partly because of reluctance by victims to come forward. SIRA accused military personnel of committing four rapes in Aceh, but no cases of rape or sexual harassment had been reported to the authorities. During the year the TNI did not prosecute any of its personnel for rape.

Nationwide, the police operated more than 200 "special crisis rooms" or "women's desks" where female officers received criminal reports from women and child victims of sexual assault and trafficking and where victims found temporary shelter. During the year the police opened a major trafficking victims' recovery center in a police hospital in Jakarta and a similar center in Surabaya.

State policy and the law state that women have the same rights, obligations, and opportunities as men. However, the law also states that women's participation in the development process must not conflict with their role in improving family welfare and the education of the younger generation. Marriage law designates the man as the head of the family. Women in many regions of the country, particularly in Papua, complained about differential treatment based on gender.

The legal differentiation between a woman and a girl was not clear. The law sets the minimum marriageable age at 16 for a woman (and 19 for a man), but the Child Protection Law states that persons under age 18 are children. A girl who marries has adult legal status. Girls frequently marry before reaching the age of 16, particularly in rural areas.

Female genital mutilation (FGM), also known as female circumcision, was practiced in some parts of the country, including West Java. Complications reportedly were minimal. Two types of persons, midwives and local traditional practitioners, performed the procedure. Researchers said the midwives' procedure involved the tearing, cutting, or piercing of part of the genitals but not the removal of tissue. Most of the local traditional practitioners, on the other hand, said that they customarily removed tissue, but the extent of this removal remained unclear. Similarly, it was unclear whether the removed tissue was from the clitoris, labia minora, or elsewhere. Some NGO activists dismissed any claims of mutilation, saying the ritual as practiced in the country was largely symbolic.

Prostitution is not specifically addressed in the law. However, many officials interpret "crimes against decency/morality" to apply to prostitution. Child prostitution is illegal. While contrary to societal and religious norms, prostitution was widespread and largely tolerated. Security forces reportedly participated in the running of brothels or protection rackets, which shielded brothels from prosecution. International sex tourism took place, especially on the islands of Batam and Karimun, both near Singapore.

Although it is not explicitly mentioned, sexual harassment is against the law and is actionable under the Criminal Code. In 2004 the State Ministry of Women's Empowerment said that 90 percent of women and 25 percent of men have been victims of sexual harassment in the workplace.

Divorce is open to both men and women. Muslims who sought divorce generally turned to the Shari'a-based family court system as a faster and cheaper alternative to the national court system. Non-Muslims obtained divorces through the national court system. Due to prejudicial attitudes, women often faced a heavier evidentiary burden than men, especially in the Shari'a-based family court system. Although both Islamic and national courts may award alimony, many divorcees received no alimony, since there was no system to enforce such payments. Men and women both keep the separate property they owned before marriage. If there is no prenuptial agreement, joint property is divided equally. The law requires a woman who has become divorced to wait a certain period of time before remarrying; a man can remarry immediately.

The law stipulates that a child's citizenship is derived solely from the father. Children of citizen mothers and foreign fathers are considered foreigners and must have visas to remain in the country until age 18, when they can apply for citizenship. These children are prohibited from attending public schools. In cases in which a citizen mother lived abroad with her foreign husband, divorce could involve child custody problems. The children of foreign women married to citizen men also faced difficulties. A foreign woman married to a citizen can obtain citizenship after one year.

During the year the government continued to implement Shari'a in Aceh (see section 2.c.). The most visible impact on women's rights appeared to be the enforcement of dress codes. After issuing two written warnings to women in violation of the dress code, authorities referred the matter to a Shari'a court. In Banda Aceh, police briefly detained improperly dressed women in the Shari'a enforcement office, where the women were lectured on appropriate attire. Local governments and groups in other areas also undertook campaigns to promote conformance by women with the precepts of Shari'a. Some women told reporters that they felt humiliated when detained for dress code violations.

Women faced discrimination in the workplace, both in hiring and in gaining fair compensation. In 2003 the International Labor Organization's (ILO) Jakarta office reported that on average, women's earnings were 68 percent of that of men. According to the government, 41 percent of all civil servants were women but women accounted for only 7 percent of senior government officials.

Some activists said that in manufacturing, employers relegated women to lower-paying, lower-level jobs. Many female factory workers were hired as day laborers instead of full-time permanent employees, and companies were not required to provide benefits, such as maternity leave, to day laborers. According to the government's central statistics bureau, during the year the unemployment rate was higher for men than for women. By law, if a husband and wife both worked for a government agency, the couple's head-of-household allowance was given to the husband.

A number of organizations promoted women's rights or otherwise addressed women's issues during the year including Solidaritas Perempuan, Mitra Perempuan, LBH-Apik, and the International Catholic Migration Commission (ICMC). During the year the Ministry of Women's Empowerment worked with the DPR to finalize an antitrafficking bill. The ministry also worked on issues of child protection, including trafficking.

Children

The government stated its commitment to children's rights, education, and welfare, but it devoted insufficient resources to fulfill that commitment. In practice, most schools were not free of charge, and poverty put education out of the reach of many children. Child labor and sexual abuse were serious problems. Although girls and boys ostensibly received equal educational opportunities, boys were more likely to finish school. In 2003 the leader of the National Commission for Child Protection identified the most pressing problems related to the country's youth as child labor, child trafficking, child prostitution, street children, children in conflict areas, and undernourished children. The Child

Protection Act addresses economic and sexual exploitation of children as well as adoption, guardianship, and other problems; however, some provincial governments did not enforce its provisions.

Unlike last year there were no reports of children being used as human shields or as combatants; however, one child was killed in a clash in Aceh (see section 1.a.).

By law, children are required to attend six years of elementary school and three years of junior high school; however, in practice, the government did not enforce these requirements. According to the government's 2004 National Socio-Economic Household Survey, school enrollment rates were 96.1 percent for children ages 7 to 12, 79.2 percent for children ages 13 to 15, and 49.8 percent for children ages 16 to 18.

Monthly fees for public schools varied from province to province and were based on average incomes. Some parents continued to find it difficult to send their children to school. Tuition, transportation, and school materials, could cost a family between $400 and $700 (4 million to 7 million rupiah) per year for each primary and secondary student. In June the ILO conducted a limited child labor survey in areas within five provinces (North Sumatra, East Kalimantan, West Java, East Java and South Sulawesi), which revealed that one in five school-age children from low-income families had no access to education and experienced various kinds of exploitation at work--both in the formal and informal sectors. The survey also found that of 2,438 school-age children between 15 years of age, 19 percent were not attending school. It was unclear how many children were forced to leave school to help support their families. In some remote areas of East Java, lack of nearby school locations contributed to drop out rates as high as 50 percent and led children to seek work. In some areas, parents and watchdog groups complained that corruption among public servants severely undermined the quality of education. During the year the tsunami and the lingering effects of conflicts disrupted the education of some children.

Many children grew up in unhealthy circumstances. Malnutrition remained a serious problem. The country's infant mortality rate remained high. According to a demographic and health survey published in December 2003, there were 35 deaths for every 1 thousand live births. There was improvement in under-five mortality, but a lack of improvement in infant mortality led the government to increase its focus on newborn healthcare.

A severe drought exacerbated malnutrition in East Nusa Tenggara Province this year. The total number of children thought to be suffering from malnutrition in East Nusa Tenggara was more than 12 thousand, and at least 59 infants died of acute malnutrition during the year.

Child abuse is prohibited by law, but government efforts to combat it generally have been slow and ineffective. NGOs reported that it continued to take excessively long to bring a child rape case to court and that mechanisms for reporting and dealing with child abuse were vague.

The East Java Children's Protection Agency recorded 389 cases of violence against children in East Java during the year. The East Java police recorded 137 cases of violence against children. In most cases, the offender was a parent of the victim.

Commercial sexual exploitation of children continued to be a serious problem. The number of child prostitutes in the country was unclear; however, a 2004 ILO assessment estimated there were approximately 21 thousand child prostitutes on the island of Java. In 2003 a team of NGO and government health officials visited a prostitution complex in Riau Province and estimated that 30 to 40 percent of the 365 female sex workers there were under 18 years of age. Many teenage girls were forced into or found themselves caught in debt bondage. At times law enforcement officials treated child sex workers as criminals rather than victims. Women's rights activists and religious groups accused government officials, particularly police and soldiers, of operating or protecting brothels that employed underage prostitutes. Corrupt civil servants issued identity cards to underage girls, facilitating entry into the sex trade. According to official East Java government statistics, there were approximately 4 thousand child prostitutes in East Java, 30 percent of the total number of recorded prostitutes; there were approximately 3 thousand child prostitutes in Central Java; and 194 in the city of Yogyakarta. There also were reports of sexual exploitation of boys. NGOs reported long-active pedophile rings operating in Bali, and authorities arrested and tried at least one man, a French national, for pedophilia there.

During the year there were cases in which employment brokers paid parents advances of future salaries to be earned by their daughters. The child was required to repay the employment brokers. Researchers described a "culture of prostitution" in some parts of the country, where parents encouraged their daughters to work as big-city prostitutes and send the proceeds home.

NGO observers said many girls were forced into prostitution after failed marriages they had entered into when they were 10 to 14 years of age. There was no obvious violation of the law, because their paperwork identified them as adults due to the fact they were once married.

Child labor was a problem. The Ministry of Manpower and Transmigration reported 4.5 million child workers in its national labor survey; however, in 2003 the ILO reported that 8 million children under 18 were doing the work of adults (see section 6.d.).

During the year all district courts had a juvenile court.

In East Java, local NGOs reported that the government paid little attention to the rights of juvenile offenders. In Surabaya the government held juvenile offenders in the same prison as adult criminals during trial. There was only one prison for juveniles in East Java, located in Blitar. As of July, there were 107 juveniles in the Blitar prison, the majority from Malang and Blitar. Most juveniles from Surabaya are remanded to Surabaya-area adult facilities. Juveniles sometimes experienced abuse while in detention. In July local newspapers reported that four juveniles in the Rungkut area of Surabaya City claimed that police injured their knees and legs during interrogation conducted in the local police office. The head of the local police denied the accusation.

According to the Ministry of Social Affairs, there were 46,800 street children across 21 provinces. Substantial numbers of street children were apparent in Jakarta and the provinces of East Java, West Java, North Sumatra, and South Sulawesi. Surabaya, in East Java, was home to approximately 8 thousand street children, many reportedly susceptible to sexual abuse and violence. Approximately 40 shelters in the province provided services to such children. The Jakarta City government opened a shelter in 2004 with the capacity for approximately 200 children. The government continued to fund other shelters administered by local NGOs and paid for the education of some street children.

A number of NGOs promoted children's rights, including Child Advocacy Network, National Commission on Child Protection, Center for Study and Child Protection, and Foundation for Indonesian Child Welfare.

Trafficking in Persons

Trafficking in persons is illegal under the law; however, the law is not comprehensive in its definition of trafficking. During the year persons were trafficked to, from, and within the country for the purposes of prostitution and forced labor, including instances of debt bondage. Internal trafficking was a significant problem.

During the year the government continued to implement the 2002-07 National Action Plan to counter trafficking of women and children. The plan identifies specific roles for the government and civil society at national and local levels and included goals for lawmaking and law enforcement. The Child Protection Act prohibits economic and sexual exploitation of children and also child trafficking. The act specifies severe criminal penalties and jail terms for persons who violate children's rights, including by trafficking in persons. The government, with the help of NGOs, conducted public education efforts on trafficking. Several provincial and district governments adopted new antitrafficking regulations and plans.

The criminal code lacks an adequate legal definition of trafficking in persons. The Solidarity Center and the ICMC identified laws that could be applied in cases of trafficking and related offenses. The penal code prohibits trade in women and male minors but is silent on female minors. The Child Protection Act provides for prison sentences of 3 to 15 years plus fines for child traffickers. In many cases involving underage victims, police and prosecutors used the Child Protection Act, a change from previous reliance on the penal code with its weaker sentencing guidelines. Prior to 2004 judges rarely sentenced traffickers to more than three years in prison; however, During the year judges imposed heavier sentences on child traffickers, with some convictions resulting in five- or six-year jail terms.

Reliable figures were not available on the number of persons trafficked. A study by the Solidarity Center and ICMC estimated between 2.4 and 3.7 million women and children worked in the vulnerable categories of migrant workers, sex workers, and child domestic workers (see section 5, Children). Within these categories, the estimated total number of children ranged from 254 thousand to 422 thousand. These were not estimates of victims but rather of women and children vulnerable to trafficking.

According to the foreign labor federation-financed Center for International Labor Solidarity, hundreds of Burmese fishermen, apparently forced to work on Thai fishing boats, either escaped or were abandoned in Tual, a small island in Maluku Province, where they lived in difficult conditions. In 2004 immigration officials forcibly repatriated a number of Burmese fishermen to Thailand via foreign fishing vessels. During the year the Burmese Seafarers Union estimated that there were still more than 100 Burmese seafarers living near Tual but did not anticipate further repatriations.

During the year the government, NGOs, and the media reported that women were trafficked to Malaysia, Japan, the Middle East (including Saudi Arabia and Kuwait), Taiwan, Hong Kong, Singapore, and other destinations. Malaysia was the destination for the greatest number of credibly documented cases of female trafficking victims. Women possibly trafficked to Indonesia included foreign prostitutes from China, Thailand, Eastern Europe, and Central Asia.

During 2004 police investigated 141 suspected traffickers, while prosecutors tried 51 cases. Courts convicted at least 45 suspects, an increase from 25 in 2003. The average jail sentence for convicted traffickers increased from 2.5 years to 3.2 years, while the average sentence for traffickers convicted under the Child Protection Act reached 5.3 years.

Lack of evidence, insufficient laws, low awareness of trafficking, and corruption were the main obstacles in prosecuting trafficking cases. For example, in December 2004, local police arrested six persons in a brothel in Semarang, Central Java after receiving reports from alleged victims of trafficking. However, the suspects were released due to alleged lack of evidence.

During the year the police and immigration officials launched operations to reduce the number of foreign prostitutes. On August 24, the Jakarta Police apprehended 68 foreign sex workers in raids on nightclubs, saunas, and beauty salons. The 68 were subsequently deported.

On February 26, North Surabaya police arrested a suspected trafficker after receiving a report from the alleged victim who escaped from a Surabaya brothel. A Surabaya court sentenced the trafficker, Radji, to a few months in jail. On March 15, in Probolinggo, East Java police arrested the suspected head of trafficking syndicate that allegedly had sold six children into prostitution in Surabaya; this case remained under investigation. In April East Java police arrested three persons suspected as traffickers in the Bondowoso area. Four girls were reported as their victims.

The Singkawang District of West Kalimantan remained well known as an area from which poor, ethnic Chinese women and teenage girls between the ages of 14 and 20 were recruited as "mail order" brides for men, primarily in Taiwan but also in Hong Kong and Singapore. In some cases the women were trafficked for sex work and slave-like servitude.

In many cases traffickers recruited girls and women under false pretenses. One tactic was to offer young women in rural areas jobs as waitresses or hotel employees in distant regions, including island resorts. After the new recruits arrived and incurred debts to their recruiters, they learned that they had been hired as prostitutes. In October Jakarta police arrested 2 persons for duping at least 51 women with offers to work in Japan as "cultural performers." Once in Japan, the women were exploited as prostitutes. At year's end the two suspects remained in custody awaiting trial.

Many victims became vulnerable to trafficking during the process of becoming migrant workers. Many unauthorized recruiting agents operated throughout the country and were involved in trafficking to various degrees, and some government-licensed recruiting agents also were implicated in trafficking. Recruiting agents often charged exorbitant fees leading to debt bondage and recruited persons to work illegally overseas, which increased the workers' vulnerability to trafficking and other abuses.

The basic three-month course that all police officers received did not include training on counter-trafficking in persons. During the year international agencies continued to provide police with specific counter-trafficking training. Trafficking falls under the purview of the Criminal Investigation Department (CID). In 2003 the police established a separate anti-trafficking unit within CID with operational and coordinating responsibilities.

In 2004 the national police headquarters issued instructions to district police chiefs to break up trafficking rings, assist victims, and report cases

to national headquarters.

Credible sources noted that individual security force members were involved in setting up and protecting brothels. Traffickers and brothel owners reportedly paid protection money to security force members. An NGO survey of trafficking in Papua concluded that military members operated or protected brothels that housed trafficking victims. Apart from police and soldiers, some government officials were complicit in trafficking, particularly in the production of false documents. The prevalence and ease of obtaining fraudulent national identity cards, which could document children as adults, contributed to the trafficking problem. Within society and the government, there was continued reluctance to acknowledge that prostitution was a major problem.

Domestic NGOs, with international support, led efforts to monitor and prevent trafficking, frequently in coordination with government agencies. These NGOs included the Consortium for Indonesian Migrant Workers Advocacy, LBH-Apik, Women's Aid and Protection Group, Women's Coalition (Koalisi Perempuan), and Solidaritas Perempuan.

In January the government reacted swiftly to rumors of trafficking of children orphaned or separated due to the December 2004 earthquake and tsunami in Aceh Province. The government restricted the travel of Acehnese minors out of Aceh or abroad and posted police monitors at points of exit. The rumors proved almost entirely unfounded, and few cases of trafficking victims in Aceh emerged in the months following the disaster. NGOs reported some cases of Acehnese women trafficked to a neighboring country later in the year.

National- and local-level assistance to trafficking victims increased compared with previous years but remained small in comparison with the scope of the problem. In general government assistance was modest and focused on citizens trafficked abroad, while domestic assistance was minimal. Over the year the government and community groups established a number of new shelters in Dumai, Riau Province, and in West Kalimantan Province. The police operated more than 200 women's desks, units established to help women and children who fall victim to violence including trafficking. The women's desks provided temporary shelter, special police handling, and some legal services for victims. The women's desks often cooperated with local NGOs to provide medical and psychological services and longer-term shelter. However, distrust of police discouraged some victims from using these desks.

The government's policy is to "treat persons who are trafficked not as criminals but as victims who need help and protection." During the year the People's Welfare Coordinating Ministry and the Ministry of Women's Empowerment reinforced this policy in public settings and training programs for police and other officials. However, local government and police practice varied, particularly in the lower ranks of law enforcement agencies. Local governments, exercising greater authority under the country's decentralization program, sometimes enacted laws or regulations that tended to treat trafficked sex workers as criminals, contrary to national policy. In many instances, government officials and police actively protected and assisted victims. In other cases, police treated victims such as trafficked prostitutes as criminals, subjected them to detention, and took advantage of their vulnerability to demand bribes and sexual services. Police and immigration officials periodically rounded up foreign prostitutes and quickly deported them without any reported screening for potential trafficking victims. The media and lower-level officials, including police, often failed to protect victims' identities and commonly provided victims' names to the public.

The government encouraged victims to assist in the investigation and prosecution of traffickers, but victims frequently were reluctant or refused to provide testimony due to shame and fear of retribution against themselves or their families.

Persons with Disabilities

The government classified persons with disabilities into four categories: blind, deaf, mentally disabled, and physically disabled. The constitution requires the government to provide them with care; however, "care" is not defined, and the provision of education to children with disabilities never was inferred from the requirement. The law also mandates accessibility to public facilities for persons with disabilities; however, the government did not enforce this provision. Few buildings and virtually no public transportation facilities provided such accessibility. The law requires companies that employ more than 100 workers to set aside 1 percent of their positions for persons with disabilities. However, the government did not enforce the law, and persons with disabilities faced considerable discrimination.

Recent statistics on the number of persons with disabilities were not available. In 2004 the World Health Organization estimated that 10 percent of the population, or approximately 20 million persons, had disabilities.

In urban areas only a few city buses offered wheelchair access, and many of those have had their hydraulic lifts vandalized, rendering them unusable.

In 2003 the government stated the country was home to 1.3 million children with disabilities, but only 50 thousand of them attended school. The actual number of children with disabilities was believed to be much higher. The law provides children with disabilities with the right to an education and rehabilitative treatment. A government official alleged that many parents chose to keep children with disabilities at home; however, many schools refused to accommodate such children, stating they lacked the resources to do so. According to the government, there were 1,234 schools dedicated to educating children with disabilities; 960 of them were run privately. Some young persons with disabilities resorted to begging for a living.

Human rights activists in Surabaya reported that discrimination against persons with disabilities existed in the employment and education sectors. For example, in November 2004 the Surabaya city government refused a civil service candidate charging that she did not fulfill the health requirement. In May the Surabaya Administrative Court ruled in her favor. City officials appealed to the Supreme Court, and at year's end the appeal was pending.

National/Racial/Ethnic Minorities

The government officially promotes racial and ethnic tolerance. Ethnic Chinese accounted for approximately 3 percent of the population, by far the largest nonindigenous minority group, and played a major role in the economy. Instances of discrimination and harassment of ethnic Chinese declined compared with previous years. Recent reforms increased religious and cultural freedoms. However, some ethnic Chinese noted that public servants still discriminated in issuing marriage licenses and in other services and often demanded bribes or a citizenship certificate, although such certificates were no longer legally required. In 2004 an attorney advocate for the rights of ethnic Chinese noted that more than 60 articles of law, regulation, or decree were in effect that discriminated against ethnic Chinese citizens. NGOs such as the Indonesia Anti-Discrimination Movement urged the government to revoke these articles.

There were no reports of overt discrimination against Acehnese outside the province. However, some Acehnese reported that they faced extra scrutiny when trying to leave the country and resented having a different identity card. The MOU signed on August 15 (see section 1.a.) included a provision to issue Acehnese conventional identity cards by April 2006.

Indigenous People

The government views all citizens as "indigenous," with the exception of ethnic Chinese; however, it recognizes the existence of several "isolated communities" and their right to participate fully in political and social life. These communities include the myriad Dayak tribes of Kalimantan, families living as sea nomads, and the 312 officially recognized indigenous groups in Papua. During the year indigenous people, most notably in Papua, remained subject to widespread discrimination, and there was little improvement in respect for their traditional land rights. Mining and logging activities, many of them illegal, posed significant social, economic, and logistical problems to indigenous communities. The government failed to prevent domestic and multinational companies, often in collusion with the local military and police, from encroaching on indigenous people's land.

In Papua tensions continued between indigenous Papuans and migrants from other provinces, between residents of coastal and inland communities, and among tribes. Some in the indigenous community accused the newcomers of price gouging and condescension, while some newcomers claimed that indigenous Papuans treated them with resentment and suspicion.

In Central Kalimantan, relations between indigenous Dayaks and ethnic Madurese transmigrants remained poor in the wake of 2001 interethnic violence. However, at least 30 thousand to 57 thousand displaced ethnic Madurese had returned to Central Kalimantan by year's end. Despite interethnic tensions, local elections were orderly and relatively peaceful. Relations between the two groups also remained poor in West Kalimantan, where former residents of Madurese descent were obstructed in their attempts to reclaim their property.

In February the Human Rights Commission in South Sulawesi concluded that the police committed a gross human rights violation in 2003 when they fired on farmers and indigenous persons attempting to reoccupy lands leased by the government to the London Sumatra Company; four persons were killed and more than a dozen were injured.

Human rights activists said that the government-sponsored transmigration program violated the rights of indigenous people, bred social resentment, and encouraged the exploitation and degradation of natural resources on which many indigenous persons relied. In some areas, such as parts of Sulawesi, the Malukus, Kalimantan, Aceh, and Papua, relations between transmigrants and indigenous people were poor.

Other Societal Abuses and Discrimination

There was some societal discrimination against persons with HIV/AIDS. Some individuals received prejudicial treatment at medical centers, saw their confidential laboratory results released, or had their identity published in a newspaper. In most if not all such cases, the government failed to take corrective action. In Papua, where the incidence of HIV infection is significantly higher than elsewhere in the country, community members and even families often stigmatized and ostracized those known to be infected with the virus. However, the government encouraged tolerance, took steps to prevent new infections, and drew up plans to subsidize antiretroviral drugs.

Section 6 Worker Rights

a. The Right of Association

The law provides broad rights of association for workers, and workers exercised these rights. The law allows workers to form and join unions of their choice without previous authorization or excessive requirements, and workers did so in practice. The law stipulates that 10 or more workers have the right to form a union, with membership open to all workers, regardless of political affiliation, religion, ethnicity, or gender. Private sector workers are by law free to form worker organizations without prior authorization, and unions may draw up their own constitutions and rules and elect representatives. The government records, rather than approves, the formation of a union, federation, or confederation and provides it with a registration number. Under the law, 87 union federations notified the Ministry of Manpower and Transmigration (the manpower ministry) of their existence and received registration. Ministry officials noted that only 64 federations recorded by the ministry had verifiable members. The vast majority of union members belonged to one of three union confederations: the All-Indonesia Trade Union Confederation (KSPSI), the Indonesian Prosperity Trade Union Confederation (KSBSI), and the Indonesian Trade Union Congress (KSPI). In addition more than 18 thousand workplace-level units were registered with the manpower ministry.

According to the government, the country's total labor force consisted of approximately 110 million workers, 42 percent of whom worked in the agricultural and forestry sector. From April to September, the manpower ministry conducted a survey of union membership, the results of which indicated a significantly reduced number of union members compared with previous estimates. In the past, the government had relied upon unions' self-reported membership statistics. The manpower ministry estimated total trade union membership at 3.4 million workers, less than 4 percent of the total workforce. However, if compared to the country's 23.8 million regular, formal sector employees (a category that excludes the self-employed, employers, casual workers, and unpaid workers), union membership would be approximately 14 percent.

The law recognizes civil servants' freedom of association and right to organize, and employees of several ministries formed employee associations; union organizations sought to organize these workers. Unions also sought to organize state-owned enterprise (SOE) employees, although they encountered resistance from enterprise management, and the legal basis for registering unions in SOEs remained unclear.

The law allows the government to petition the courts to dissolve a union if it conflicts with the state ideology of *Pancasila* or the constitution, or if a union's leaders or members, in the name of the union, commit crimes against the security of the state and are sentenced to at least five years in prison. Once a union is dissolved, its leaders and members may not form another union for at least three years. There were no reports that the government dissolved any unions during the year.

The law prohibits antiunion discrimination by employers and others against union organizers and members and provides penalties for violations; however, the government did not effectively enforce the law in many cases. There were frequent, credible reports of employer retribution against union organizers, including dismissals and violence that were not prevented effectively or remedied in practice. Some employers warned employees against contact with union organizers. Some unions claimed that strike leaders were singled out for layoffs when companies downsized. Legal requirements existed for employers to reinstate workers fired for union activity, although in many cases the

government did not enforce this effectively.

During the year the International Union of Food Workers Associations (IUF) accused the management of a sugar plantation of suspending Daud Sukamto, the president of the IUF-affiliated independent Federation of Sugar Plantation and Mill Workers (FSPM TG), following the FSPM TG's founding in February, and of otherwise harassing the union. Manpower officials in Lampung upheld the dismissal based on Daud's rejection of a company wage proposal. The officials withdrew legal recognition of the union. In October the manpower minister informed the union it would need to reregister and asked FSPM TG to withdraw its complaint to the ILO. The local manpower office formally registered the union on October 26.

In April workers at a private security firm in Jakarta, Group4/Securicor, went on strike over the firm's plans to reduce benefits for employees following a company merger. According to the foreign-financed, labor support organization Center for International Labor Solidarity, on May 30, Jakarta police called in for questioning and intimidated four union leaders. The police reportedly explained that they were investigating the union leaders for possible charges of defamation and asked them to identify other workers from photographs taken at a lawful union demonstration in April. The company terminated 200 workers and refused to rehire them despite a decision by the local manpower officer that the strike was legal and the strikers should be rehired. In October a labor dispute resolution committee awarded the workers two months' salary. At year's end the workers had not yet received any monetary compensation.

Local union leader Ahmad Fauzi, from KSBSI, completed an 11-month jail sentence in August. In 2004 a court in Batam convicted Fauzi of theft and sentenced him to jail. The conviction followed a union campaign at PT Batam Expressindo Shipyard. According to the Solidarity Center, Fauzi denied the company's accusation that reportedly centered on the theft of $8 of scrap aluminum. KSBSI claimed that the company's legal action against Fauzi constituted retribution for his union activities.

Pending implementation of the 2004 Disputes Settlement Act and its new labor court system, regional and national labor dispute resolution committees continued to adjudicate charges of antiunion discrimination. The committees' decisions could be appealed to the state administrative court. However, due to a history of adverse decisions for labor and the long time necessary to process disputes, sometimes requiring years, many unions believed that these committees were not realistic alternatives for settling disputes. As a result, workers frequently presented their grievances directly to Komnas HAM, the DPR, or NGOs. Administrative decisions in favor of dismissed workers usually took the form of monetary awards but rarely reinstated workers. The law required that employers obtain the approval of the labor dispute resolution committee before firing workers, but employers often ignored the law in practice.

b. The Right to Organize and Bargain Collectively

The law allows unions to conduct their activities without interference; however, the government often did not protect this right in practice. The law provides for collective bargaining and allows workers' organizations that register with the government to conclude legally binding collective labor agreements (CLAs) with employers and to exercise other trade union functions. The law includes some restrictions on collective bargaining, including a requirement that a union or unions represent more than 50 percent of the company workforce to negotiate a CLA.

The Manpower Development and Protection Act (Manpower Act), which regulates collective bargaining, the right to strike, and general employment conditions does not apply to SOEs. Although the law was written with ILO technical assistance, some unions claim that the law contains inadequate severance benefits and protection against arbitrary terminations; and does not sufficiently restrict against outsourcing and child labor. The government continued to issue implementing decrees for the Manpower Act.

In January 2004 the president approved the Industrial Relations Disputes Settlement Act that, together with the 2000 Trade Union Act and the 2003 Manpower Act, constitutes the revised legal basis for industrial relations and worker rights. The Disputes Settlement Act stipulates a new system of tripartite labor courts, replacing the previous tripartite committees. The act also outlines settlement procedures through mediation and arbitration. The ILO provided assistance in the development of the law. The government had not established the new labor court system by year's end.

According to the manpower ministry, during the year there were 9,146 CLAs in effect between unions and private companies. Company regulations, allowed for under government regulations, substituted for CLAs in another 36,459 companies, many of which did not have union representation. The Manpower Act requires that employers and workers form joint employer/worker committees in companies with 50 or more workers, a measure to institutionalize communication and consensus building. However, the number of such bodies did not increase significantly after passage of the act.

All workers, whether or not union members, have the legal right to strike, except for public sector workers and those involved in public safety activities. The law allows workers in these latter categories to carry out strikes if they are arranged so as not to disrupt public interests or endanger public safety. Private sector workers exercised their right to strike, as did those in state enterprises, although the latter did so with less frequency. The large majority of government-recorded strikes involved nonunion workers. Unions or workers' representatives must provide seven days' notice to carry out a legal strike. The law calls for mediation by local manpower ministry officials but does not require government approval of strikes. In previous years, workers and employers rarely followed dispute settlement procedures, and workers rarely gave formal notice of the intent to strike because manpower ministry procedures were slow and had little credibility among workers. The 2003 passage of the Manpower Act did not significantly change this situation. The number of government-recorded strikes declined in recent years, from 220 strikes involving more than 97 thousand workers in 2002 to 125 strikes involving some 53 thousand workers in 2004.

The underpayment or nonpayment of legally required severance packages precipitated strikes and labor protests. The Solidarity Center documented cases in which foreign employers in the garment and footwear industry, faced with falling orders and plant closures, fled the country to avoid making legally required severance payments.

Labor activists also reported that factory managers in some locations employed thugs to intimidate and assault trade union members who attempted to organize legal strike actions. At times the police intervened inappropriately and with force in labor matters, usually to protect employers' interests. In April the national police adopted new guidelines for "handling law and order in industrial disputes," developed with the assistance of the ILO.

On July 20, security personnel and police clashed with workers protesting layoffs at two companies, PT Pan United and IMES, in Batam. According to a joint statement by 3 labor unions, the violence left 26 workers injured and damaged many motorcycles owned by the protesting workers.

The management of a palm oil plantation in Riau Province, P.T. Musim Mas, fired approximately 700 workers for striking, authorities arrested 6 union officials and members in connection with the strike. The strike followed the company's termination of nine union leaders. On September 15, company security guards reportedly drove a truck into a group of striking workers outside the factory, injuring two of the workers.

There are no special laws or exemptions from regular labor laws in export processing zones (EPZs). However, nongovernmental observers, including the Solidarity Center, described stronger antiunion sentiment and actions by employers in EPZs.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced labor or compulsory labor, including by children; however, there were reports that such practices occurred (see section 5).

The government tolerated forms of compulsory labor practiced in the migrant worker recruitment process. The unscrupulous practices of migrant worker recruiting agencies, and poor enforcement of government regulations often led to debt bondage and extended unlawful confinement. According to press reports and research by the Solidarity Center, recruiting agencies frequently kept migrant workers in holding centers for months before sending them abroad. While in the holding centers, migrant workers normally did not receive pay, and recruiters often did not allow them to leave the centers. In most instances, workers were forced to pay recruiters for the cost of their forced stay, which resulted in large debts to the recruiters. Police and manpower ministry officials conducted raids on 14 illegal migrant worker holding centers in Jakarta from December 2004 to January, targeting unlicensed holding centers that forcibly held prospective female workers, both adults and children, some in inhumane conditions. The raids resulted in the release of 1,227 women and girls, and the arrests of 10 suspects. Another 12 police raids through October freed 565 female workers and led to the arrest of 10 persons, according to the manpower ministry.

Forced and compulsory labor by children occurred (see section 6.d.).

d. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits children from working in hazardous sectors and the worst forms of child labor, to include mining, skin diving, construction, prostitution, and offshore fishing platforms. However, the government did not enforce these laws effectively. Law, regulations, and practice acknowledged that some children must work to supplement family incomes. The Manpower Act prohibits the employment of children, defined as persons under 18, with the exception of those 13 to 15 years of age, who may work no more than 3 hours per day and only under a number of other conditions, such as parental consent, no work during school hours, and payment of legal wages. The law does not appear to address exceptions for children ages 16 to 17.

The law addresses economic and sexual exploitation, including child prostitution, child trafficking, and the involvement of children in the narcotics trade, and provides severe criminal penalties and jail terms for persons who violate children's rights. During the year the government prosecuted a small number of cases under these provisions.

The government has a national action plan to eliminate the worst forms of child labor, as well as separate national action plans for combating trafficking and for eliminating the commercial sexual exploitation of children.

Child labor remained a serious problem in the country. An estimated six to eight million children exceeded the legal three-hour daily work limit, working in agriculture, street vending, mining, construction, prostitution, and other areas. More children worked in the informal than the formal sector. Some children worked in large factories, but their numbers were unknown, largely because documents verifying age could be falsified easily. Children worked in industries such as rattan and wood furniture, garment, footwear, food processing, and toy making, and also in small-scale mining operations. Many girls between 14 and 16 years of age worked as live-in domestic servants. The ILO estimated that there were 2.6 million domestic servants in Indonesia, of whom at least 688 thousand were children. According to a June Human Rights Watch report, children between 12 and 15 years of age worked 14 to 18 hours per day, 7 days a week from 4 a.m. to 10 p.m. with employers who often subjected them to physical and sexual threats. Many child servants were not allowed to study and were forced to work long hours, received low pay, and generally were unaware of their rights.

The law and regulations prohibit bonded labor by children; however, the government was not effective in eliminating forced child labor, which remained a serious problem. A significant number of children worked against their will in prostitution, pornography, begging, drug trafficking, domestic service, and other exploitative situations, including a small number on fishing platforms (see section 5).

Social and cultural resistance remained a challenge in addressing child labor. Many parents disagreed with government efforts to restrict children from working, arguing that the government offered inadequate economic support to guarantee these families' welfare.

Enforcement of child labor laws remained largely ineffective. Despite legislative and regulatory measures, most children who worked, including as domestics, did so in unregulated environments. Anecdotal evidence suggested that local labor officials carried out few child labor investigations.

e. Acceptable Conditions of Work

Provincial and district authorities, not the central government, establish minimum wages, which vary by province, district, and sector. Provincial authorities determined provincial minimum wage levels based on proposals by tripartite (workers, employers, and government) provincial wage commissions. The provincial minimum wage rates establish a floor for minimum wages within the province. Local districts set district minimum wages using the provincial levels as references. Districts also set minimum wages in some industrial sectors on an ad hoc basis. Provinces and districts conducted annual minimum wage rate negotiations, which often produced controversy and protests.

The minimum wage levels set by most local governments did not provide a worker and family with a decent standard of living. Most province-level minimum wage rates fell below the government's own calculation of basic minimum needs. During the year Jakarta offered the highest minimum wage level approximately $71 (710 thousand rupiah) per month, while the manpower ministry reported official minimum wages as low as $34 (340 thousand rupiah) per month in one area. In December most provincial governments decided to raise minimum wages by 15 percent or more effective in January 2006. Following that decision thousands of workers in Medan, Surabaya, Jakarta, and elsewhere demonstrated to protest minimum wage rates, which they said were still below the government-determined minimum cost-of-living

standard. Employers argued that increasing wage rates, among a number of other factors, made the country's workers less competitive internationally and limited job growth.

Local manpower officials are responsible for enforcing minimum wage regulations. Enforcement remained inadequate, particularly at smaller companies and in the informal sector. In practice, official minimum wage levels applied only in the formal sector, which accounted for 35 percent of the workforce.

Labor law and ministerial regulations provide workers with a variety of benefits. Persons who worked at more modern facilities often received health benefits, meal privileges, and transportation. The law also requires employers to register workers with and pay contributions to the state-owned insurance agency JAMSOSTEK. At year's end, companies had registered 26 million workers, according to JAMSOSTEK.

The law establishes a 40-hour workweek, with one 30-minute rest period for every 4 hours of work. Companies often required a 5½ or 6-day workweek. The law also requires at least one day of rest weekly. The daily overtime rate was 1½ times the normal hourly rate for the first hour and double the hourly rate for additional overtime, with a maximum of 3 hours of overtime per day and no more than 14 hours per week. Workers in industries that produced retail goods for export frequently worked overtime to meet contract quotas. Unions complained that companies relied upon excessive overtime in some electronics assembly plants, to the detriment of workers' health and safety. Observance of laws regulating benefits and labor standards varied between sectors and regions. Employer violations of legal requirements were fairly common, resulting in some strikes and protests. In May approximately 2,500 workers at the Katexindo Citra Mandiri company in North Jakarta occupied the factory in protest of the company's increase in the hourly quota of garment items to be produced from 60 to 85 per hour. Workers described the quota as excessive and in violation of voluntary labor standards endorsed by the company's international buyers. The Manpower Ministry continued to urge employers to comply with the law; however, government enforcement and supervision of labor standards were weak.

Both law and regulations provide for minimum standards of industrial health and safety. In practice, the country's worker safety record was poor. As revealed in press reports, JAMSOSTEK recorded 49,148 occupational accidents in the first half of the year and 95,418 in all of 2004. Local officials have responsibility for enforcing health and safety standards.

In larger companies, the quality of occupational health and safety programs varied greatly. Health and safety standards in smaller companies and in the informal sector tended to be weaker or nonexistent. Workers are obligated to report hazardous working conditions, and employers are forbidden by law from retaliating against those who do report hazardous working conditions; however, the law was not enforced effectively.

BACK TO TOP



# EXHIBIT Q



# Indonesia

Country Reports on Human Rights Practices  - 2004
Released by the Bureau of Democracy, Human Rights, and Labor
February 28, 2005

Indonesia is a republic with a presidential system and three branches of government. The President is head of state and serves a 5-year term for a maximum of two terms. On October 20, Susilo Bambang Yudhoyono, the country's first popularly elected president, was inaugurated after defeating incumbent President Megawati Soekarnoputri. The People's Consultative Assembly (MPR), which convenes once a year, has the power to amend the Constitution. Routine legislative affairs, including enacting legislation, are the responsibility of the House of Representatives (DPR). During the year, the Government made further progress in its transition from 3 decades of repressive and authoritarian rule to a more pluralistic and representative democracy. The country held successful legislative elections and free, fair, and peaceful direct presidential elections. Previously, the legislature chose the president. The Government further reduced the formal political role of the police and military, who relinquished their appointed seats in the DPR in October, when the new legislature was sworn in. The Constitution provides for an independent judiciary; however, in practice, the courts remained subject to outside influences, including the executive branch.

The Indonesian Armed Forces (TNI) formally have responsibility for external defense, and the Indonesian National Police for internal security; however, in practice, the division of responsibilities remained unclear. They are known collectively as the security forces. The military played a role in internal security matters, particularly in conflict areas such as Aceh, the Moluccas, Central Sulawesi, and Papua (formerly known as Irian Jaya). There was considerable friction between the police and the TNI, but joint operations were common in conflict areas. A civilian defense minister oversees the military but in practice exercised only limited control over TNI policy and operations. The military and the police continued to wield significant political influence as well as economic power through businesses operated by security force members, their proxies, and foundations. The security forces showed greater willingness to hold accountable human rights violators within their ranks; during the year, hundreds of soldiers were court-martialed, and dozens of police officers were dismissed or otherwise disciplined. However, most such disciplinary actions involved low-level officers and sometimes mid-level officers who committed lesser crimes, such as beatings, and in some cases punishments did not match the crime. Members of the security forces continued to commit numerous serious human rights violations, particularly in areas of separatist conflict.

During the year, the economy, which increasingly was market driven, grew by an estimated 4.8 percent; however, this failed to reduce unemployment or absorb the estimated 2.5 million new job seekers entering the market every year. The population was approximately 238 million. The poverty rate fell from 27 percent in 1999 to 16 percent in 2002; however, it increased slightly to an estimated 17.5 percent during the year. The estimated per capita income was $867. Consumer demand was the leading force driving economic growth. At year's end, the northern Sumatra region was struck by an earthquake and a resultant tsunami, which together left some 240,000 persons dead and missing in Aceh and North Sumatra Provinces and caused extensive destruction of infrastructure in Aceh Province.

The Government's human rights record remained poor; although there were improvements in a few areas, serious problems remained. Government agents continued to commit abuses, the most serious of which took place in areas of separatist conflict. Security force members murdered, tortured, raped, beat, and arbitrarily detained civilians and members of separatist movements, especially in Aceh and to a lesser extent in Papua. Some police officers occasionally used excessive and sometimes deadly force in arresting suspects and in attempting to obtain information or a confession. Retired and active duty military officers known to have committed serious human rights violations occupied or were promoted to senior positions in the Government and the TNI. Prison conditions remained harsh. The judicial system was corrupt, which contributed to the failure to provide redress to victims of human rights violations or hold perpetrators accountable. Security force violators sometimes used intimidation and bribery to avoid justice. Land disputes generated numerous human rights abuses. These frequently involved forced evictions, some accomplished with lethal force. As in previous years, the Government jailed some peaceful antigovernment protestors for "insulting the President" or "spreading hatred against the Government." Politicians and tycoons showed greater willingness to take legal action against news organizations whose reporting they found insulting or offensive, and this trend had a chilling effect on some investigative reporting. Members of the security forces and other groups sometimes limited freedom of expression by intimidating or attacking journalists whose articles they found objectionable. The Government restricted the foreign press from traveling to conflict areas in Aceh, Papua, Sulawesi, and Maluku. Authorities occasionally tolerated discrimination against and abuse of religious groups by private actors. The Government at times restricted the activities of nongovernmental organizations (NGOs), particularly in Aceh and Papua. Women were victims of violence and discrimination. Female genital mutilation (FGM) occurred in some parts of the country, although the type practiced was largely symbolic in nature. Child sexual abuse and violence against children remained serious problems. Trafficking in persons was a serious problem. Discrimination against persons with disabilities and mistreatment of indigenous people were problems. The Government allowed new trade unions to form and operate, but it frequently failed to enforce labor standards or address violations of

worker rights. Forced child labor remained a serious problem.

Terrorists, civilians, and armed separatist groups also committed serious human rights abuses.

The country made substantial progress in strengthening its democracy. There was a series of three national elections, in which voter turnout was notably high and the transition from defeated incumbent to newly elected President peaceful. The military and the police lost their nonelected seats in Parliament. The Government passed the Domestic Violence Act, which criminalizes domestic violence, and took steps to address trafficking in persons, including prosecuting traffickers and beginning to strengthen antitrafficking laws. The Government issued a decree authorizing the establishment of a 40-member Papuan People's Council. The Government also took serious legal measures to bring terrorists to justice.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

Security forces continued to commit unlawful killing of rebels, suspected rebels, and civilians in areas of separatist activity, where most politically motivated extrajudicial killings also occurred. There was evidence that the TNI considered anyone its forces killed in conflict areas to have been an armed rebel. Security forces also committed nonpolitical extrajudicial killings. The Government largely failed to hold soldiers and police accountable for such killings and other serious human rights abuses in Aceh.

The TNI tried, jailed, and discharged some soldiers for rape, robbery, and torture; however, no security force members were prosecuted for unlawful killings in Aceh (see Section 1.d.).

In Aceh, military and police personnel committed extrajudicial killings and used excessive force against noncombatants. The Government placed Aceh under martial law from May 19, 2003, until May 18, when the Government introduced a state of civil emergency. The Government extended the same extraordinary measures introduced during martial law to the civil emergency period, including severe restrictions on civil liberties, and created extraordinary powers for the security forces, which continued to operate with greatly reduced restrictions. During the civil emergency period, the TNI continued to use martial law authority to make arrests, a legal authority normally reserved for the police. The TNI media center in Lhokseumawe, Aceh, reported that the TNI killed 1,883 Free Aceh Movement (GAM) insurgents and arrested at least 1,529 and that 1,137 others surrendered to TNI between May 2003 and November. At year's end, a disastrous tsunami struck the region resulting in a temporary cessation of hostilities declared unilaterally by both the TNI and GAM.

Accurate, independent, and up-to-date information on the number of GAM insurgents and other persons killed in Aceh was difficult to obtain. According to a coalition of NGOs in Aceh, between January and October, at least 57 civilians, 251 GAM members, and 21 security personnel were killed. Martial law administrators limited information, restricted access for foreign journalists, and forbade contact with the GAM. Until the tsunami struck on December 26, the Government effectively prohibited foreign humanitarian aid workers, except for a limited number of U.N. workers, from entering the province. Data from different sources, even within the Government, often were contradictory. NGO sources frequently questioned casualty figures announced by security forces, and they claimed that the number of victims was much higher and that many of those killed were civilians. Security forces and rebels gave conflicting information on victims' identities, which made it difficult to determine the breakdown of civilian, rebel, and security force deaths. The press routinely was under pressure to report only official casualty figures, which may have underreported both civilian and security force casualties. Police rarely investigated extrajudicial killings and almost never publicized such investigations.

Amnesty International (AI) reported that a farmer from Kuala Simpang subdistrict in East Aceh fled the country after two men in his village were killed by the military in a month. According to the farmer, the first person was killed by mistake because he shared the same name as a suspected GAM member, and the second person was captured and killed during a sweep for GAM members. Most killings were of young men suspected of being GAM members; however, there also were reports in the media of unlawful killings of women and children.

The Government made no progress in establishing accountability in a number of extrajudicial killings in Aceh in 2003, including the June 16 killing of Muzakkir Abdullah and the May killing of Muhammad Jamaluddin. There were no known developments in the May 2003 killing by TNI soldiers of 10 men in Cot Rebo village in Aceh. There also was no progress made in establishing accountability for extrajudicial killings in Aceh in 2002, including the June killings of two farmers on Kayee Ciret Mountain and the August killings of three women in the north Aceh village of Kandang.

During the year, GAM members killed many soldiers, police, civil servants, and civilians. In many cases, the victims were killed for allegedly collaborating with the security forces, while in other cases, the motive appeared to be criminal. Although many Acehnese feared and resented the security forces, many also feared and were intimidated by the GAM because of its extortion and criminal activities and the severe hardships that the GAM's long-running insurgency has caused for the Acehnese. On February 5, TNI troops found the bodies of four civilians in the jungle near Peureulak, East Aceh. The four had died of gunshot wounds. The TNI believed they had been GAM hostages. On February 11, GAM rebel Junaidi allegedly shot and killed civilian Cut Musdaifah in Wakheuh village. According to witnesses, two gunmen forced Musdaifah to accompany them and shot her when she attempted to escape. On March 24, GAM rebels allegedly shot and killed local

http://www.state.gov/g/drl/rls/hrrpt/2004/41643.htm

legislature candidate Muhammad Amin. The TNI believed the GAM was targeting civilians who supported the coming elections. Also on March 24, a group of armed men believed to have been GAM rebels shot and killed a paramedic in South Aceh; the TNI believed extortion was the motive for the attack.

The Government reported limited progress in prosecuting those responsible for unlawful killings that might have been carried out by GAM members in previous years, including those of Zaini Sulaiman, Sukardi, Sulaiman Ahmad, Tengku Safwan Idris, and Nashiruddin Daud. A police investigation into the 2001 killing of Dayan Dawood, rector of Banda Aceh's Syiah Kuala University who was shot after offering to mediate between the GAM and the Government, led to the arrest and conviction of Mahyeddin bin M. Adan with a 17-year prison sentence.

There were no known developments in the following cases in 2003 and previous years of unlawful killings that could not be clearly attributed to either the security forces or GAM rebels: The December 2003 bombing that killed 9 persons at an outdoor concert in Peureulak; the July 2003 killing of former GAM member Cut Aca Budi; the July 2003 killing of schoolteachers Muslim Sulaiman and his wife Darmawati; the May 2003 killing of local legislature member Jamaluddin Hasany; the mass graves discovered in 2003 in Nisam and Permata Districts; the 2002 killings of 6 persons in the town of Lombaro Angan, Aceh Besar District; the 2002 killings of 2 high school girls in the village of Gumpueng Tiro, Pidie regency; and the 2001 massacre of 31 persons at a palm oil plantation in Idi Rayeuk, East Aceh.

On September 7, prominent human rights activist Munir Said Thalib was found dead on a flight from Jakarta to the Netherlands. The Dutch Government announced that an autopsy report indicated the cause of death was arsenic poisoning. The incident was under investigation at year's end.

In Central Sulawesi, political and economic tensions between approximately equal populations of Christians and Muslims continued to cause violence. A total of 22 persons died in communal violence, the same number as in 2003. Unlawful killings included a series of shootings by unidentified gunmen, continuing a trend that began in October 2003. On March 30, unidentified gunmen shot and killed Reverend Freddy Wuisan near Membuke Church in Poso. On May 30, unidentified gunmen shot and killed prosecutor Fery Silalahi, a Christian, in Palu after he and his family left a religious service. Silalahi was the lead prosecutor in the ongoing trial of three accused Bali bombing accomplices. The fact that assailants shot only Silalahi, leaving his wife and children unharmed, gave the impression of an assassination. On July 18, two unidentified assailants shot and killed Reverend Susianti Tinulele in Palu. These incidents remained unsolved at year's end. During the year, 12 suspects were arrested for the October 2003 attack in Beteleme in which at least 14 persons were killed. The Palu District Court found 11 guilty and handed down prison sentences ranging from 3 to 4 years; 1 suspect was acquitted for lack of evidence. Most residents reportedly were satisfied with results of the investigation and trials. There was no progress reported in police investigations of October 2003 attacks on mainly Christian villages, in which 10 persons were killed, or of the November 2003 killings of 2 men in the Poso coastal villages of Kilo Trans, home to ethnic Balinese migrants, and 2 men in the Christian village of Marowo.

In Maluku and North Maluku, unlawful killings increased from 2003 when sectarian violence broke out on April 25 after a commemoration of the anniversary of the separatist Republic of South Maluku (RMS). In the violence that followed, at least 40 persons were killed and approximately 260 were injured. The following weeks were marred by sporadic violence and small bomb explosions that destroyed approximately 356 buildings, including a church and a mosque. By June, the government-brokered peace agreements between the two religious communities were restored.

The Government reported little progress in establishing accountability in the following cases in Poso: The July 2003 explosion of a bomb in a cafe in the village of Sayo, which killed one person and injured five others; the June 2003 shooting of two men in the village of Kapompa; the 2002 bombing of a crowded passenger bus, which killed five persons; and numerous crimes committed in the province by former Laskar Jihad members.

The Government made some progress during the year establishing accountability for violence and human rights abuses in the region in 2003 and previous years. In February, Maluku prosecutors filed indictments against seven persons for the killing of two civilians during the 1999-2002 sectarian conflict in the region.

In Papua Province, the Government continued to conduct operations against rebels of the Free Papua Movement (OPM), and OPM rebels continued their operations against military units. Also in Papua, the TNI and police continued their joint investigation of the 2002 ambush that killed 2 American citizens and 1 Indonesian and injured 12 other persons near a large gold and copper mine near the city of Timika. On June 16, a foreign court indicted OPM guerilla Anthonious Wamang in connection with the killings. At year's end, Wamang remained at large, and the investigation remained open.

The Government made limited progress in establishing accountability for numerous human rights violations committed in Papua in previous years, including those committed in Biak, Abepura, Wasior, and Wamena. During the year, a human rights court in Makassar began proceedings against police implicated in abuses and killings of Papuans in a 2000 incident in Abepura. The National Human Rights Commission (Komnas HAM), created and funded by the Government but not a government agency, completed its report on the 2001 Wasior incident, in which police allegedly killed 12 civilians following an attack on a police post that left 5 policemen dead, and the Wamena incident, in which dozens of residents of the Central Highlands area of Kuyowage allegedly were tortured by unknown parties during a military operation that followed the April 2003 break-in at the Wamena armory. The Commission found that soldiers and police had committed gross human rights violations, including murder, evictions, and torture. Komnas HAM categorized these violations as crimes against humanity and, on September 2, submitted its report to the Attorney General's Office (AGO) for possible prosecution (see Section

1.c.).

Police frequently used deadly force to apprehend suspects or acted recklessly in pursuit of suspects, and these actions sometimes resulted in the deaths of civilians. In other cases, suspects in police custody died under suspicious circumstances. On July 31, in Poso, police shot and injured Bambang, a wrongly accused suspect in the July murder of Reverend Susianti Tinulele. Police alleged Bambang had tried to escape, but neighbors said he was shot for no reason. On August 29, in Sragen, Central Java, police shot and killed three suspects who they claimed tried to escape from police custody. On August 30, in Pekanbaru, police shot and killed criminal suspects Hermansyah and Ade Candra, allegedly because the two tried to escape when police demanded to know the hiding place of their partners.

During the year, the Government made no significant progress establishing accountability for abuses from 2003, including the fatal burning by police of burglary suspect Arnoldus Adu in Rote, in East Nusa Tenggara Province, the beating death of an East Java resident by police in June, and the alleged suicide of Ihwanuddin, suspected member of the terrorist organization Jemaah Islamiya (JI).

The Government made no significant progress during the year in prosecuting those responsible for the 1998 killing of four students at Trisakti University and nine demonstrators at Semanggi intersection, and the 1999 killing of an additional four demonstrators at Semanggi. Komnas HAM Chairman Abdul Hakim Garuda Nusantara asked the DPR to reverse its 2001 decision not to classify these cases as human rights violations, but at year's end, the DPR had not responded. In June 2003, the court-martial began of an enlisted man, one of three TNI soldiers indicted for reckless killing in connection with the 1999 Semanggi incident. The soldier was accused of shooting and killing student Yap Yun Hap without orders from his superior. Two other defendants, who were officers, were to be tried separately. At year's end, all of the cases were pending in the AGO, awaiting a decision from the DPR.

During the year, bombs exploded in or near the cities of Jakarta, Ambon, Peureulak, and Poso, among others. On January 10, members of Sulawesi-based Laskar Jundullah, an extremist organization, bombed a cafe in Palopo, South Sulawesi, killing four persons. Police arrested at least eight suspects, including alleged mastermind Agung Abdul Hamid, whose trial started on October 28. On September 9, suspected JI members set off a powerful bomb in front of the Australian Embassy in Jakarta, killing 10 persons and injuring more than 150 others. By year's end, the Government had arrested at least 19 persons in connection with the attack, including the suspected mastermind Iwan Darmawan, also known as Rois.

The Government made significant progress in prosecuting those responsible for bombings carried out in previous years. Authorities identified, apprehended, and successfully prosecuted many of those involved in the August 2003 bombing of the J.W. Marriott Hotel in Jakarta, which killed 12 persons, and the 2002 Bali bombings, which killed 202 persons. Those trials were scheduled to start in early 2005. In total, police investigators had arrested more than 130 JI-related suspects since 2002. By year's end, courts in Denpasar, Bali; Palu, Central Sulawesi; Lamongan, East Java; and Jakarta had convicted approximately 80 persons in connection with a series of terror attacks since 2001. Following the 2002 bombings in Makassar, South Sulawesi, the Makassar District Court convicted 18 suspects and acquitted another. In October, police captured Agung Abdul Hamid, the suspected mastermind behind the Makassar bombings and the January 10 South Sulawesi bombing.

Mobs carried out vigilante justice on many occasions, but reliable statistics on its prevalence were not available. Incidents of theft or perceived theft triggered many such incidents. For example, on August 16 in Bogor, West Java, a mob attacked and killed Ilham Kurniawan for stealing a motorcycle. On August 21 in Palembang, South Sumatra, a mob mistook a man named Junaedi for a thief and beat him to death. No official action was taken against those responsible for these killings.

Police and soldiers clashed on a number of occasions during the year. On March 22, more than 100 TNI soldiers from Battalion 143 in South Lampung attacked a police post at Rajabasa bus terminal. The clash stemmed from a personal dispute, and regional military commander Major General Syahrial BP Peliung later apologized to police and promised to take disciplinary action against the soldiers involved. At the end of the year, four privates were under investigation for the incident. On November 25, TNI members killed one police officer and seriously injured three others when they attacked a police post in East Aceh over a dispute involving palm oil business interests. Twenty-five TNI soldiers were arrested for their participation in the attack.

At schools, universities, police training centers, and other institutions, upperclassmen, or superiors sometimes physically mistreated underclassmen or subordinates, continuing a practice that dated back many years. During the year, a number of such incidents resulted in death. On February 23, police in Bandung, West Java, named 12 students of the State Sunan Gunung Djati Islamic Institute as suspects in the death of fellow student Imam Nawawi, who died during an extracurricular activity the previous week. Eight were accused of beating Nawawi to death. Police authorities reportedly took no further action regarding the September 2003 deaths of five recruits in Palu, Central Sulawesi, who were victims of hazing by members of the Police Mobile Brigade (Brimob). In September 2003, in Sumedang, West Java, upperclassmen at the government-run Public Administration Institute (STPDN) allegedly strangled sophomore Wahyu Hidayat. An STPDN student said upperclassmen beat Wahyu to teach him a lesson in loyalty after he failed to appear at a flag-raising ceremony on Independence Day. On April 15, 10 students were convicted and sentenced to 7 to 10 months in jail in connection with the death. Prosecutors had sought up to 5 years in prison for the defendants (see Section 1.c.).

b. Disappearance

During the year, dozens of disappearances occurred, most frequently in Aceh Province, and large numbers of persons who disappeared over the past 20 years, mainly in conflict areas, remained unaccounted for. The Government reported little progress in prosecuting those responsible for disappearances that occurred in previous years.

According to a coalition of human rights NGOs, 46 civilians and 4 GAM members were kidnapping victims as of November; the same organization reported 130 civilians and 3 GAM kidnapping victims in 2003.

The security forces were implicated in some disappearances. An eyewitness report to AI claimed a 16-year-old boy working in a rice paddy was shot in the ankle when he tried to run away from a soldier. The boy was subsequently captured, and his whereabouts were unknown at year's end. The Government made no significant progress ascertaining the whereabouts of those who disappeared in 2003, including Mukhlis and Zulfikar, members of the local NGO Link for Community Development, after plainclothes military intelligence officers detained them in the town of Bireuen.

The GAM also abducted persons during the year. Elementary school teachers Muhammad Amin Alwi and Hasballah were forcibly taken by 10 armed men in military uniforms in Nagan Raya regency. The TNI believed the men were members of the GAM, because students reported that the kidnappers used an Acehnese dialect and complained the school had not helped in their struggle since martial law was implemented. In June 2003, in the East Aceh area of Peureulak, journalist Ersa Siregar of Rajawali Citra Televisi, cameraman Fery Santoro, driver Rahmatsyah, and the wives of two TNI officers were taken hostage by the GAM. One of the wives, Cut Soraya, was pregnant. Ersa Siregar was killed in December 2003 during a firefight between GAM and marines. After lengthy negotiations between the GAM and the International Committee of the Red Cross (ICRC), Ferry Santoro was released in May along with 150 other civilian hostages, including the two wives of TNI officers. Soraya reported being beaten by her captors and ultimately miscarried.

In Papua, there were no credible reports of disappearance. The Government did not report any progress in prosecuting those responsible for disappearances that occurred in previous years, including those of Martinus Maware, Mathius Rumbrapuk, or Hubertus Wresman.

In Central Sulawesi, Maluku, and North Maluku, there were no credible reports of disappearance during the year. The Government made some progress in prosecuting those responsible for disappearances that occurred in Central Sulawesi in 2002. During the year, 14 soldiers were court-martialed and received punishments ranging from dishonorable discharge to 4 years in prison over abductions and extrajudicial killings committed in the Central Sulawesi regency of Poso in December 2002. The TNI accused 2 lieutenants and 12 privates of kidnapping dozens of civilians in the Toyado area but declined to make their names public. The soldiers allegedly abducted the civilians in December 2002, after one of their commanders was shot in the head during a clash between Christians and Muslims in the Sepe area. Some of the abducted civilians turned up dead, while others remained missing at year's end.

The Government made no additional progress in prosecuting those responsible for the 1996 attack by hundreds of progovernment civilians and soldiers on the Jakarta headquarters of what was then the Indonesian Democratic Party (PDI); 5 persons died and 23 persons disappeared in the attack. The Central Jakarta District Court charged five persons, three of them civilians, with vandalism and assault during the attack: Retired Colonel Budi Purnama, Lieutenant Suharto, Mochammad Tanjung, Jonathan Marpaung, and Rahimmi Illyas. However, Petrus Kurniawan, a key figure in a group pressing for accountability, called the trial an "orchestration," saying the defendants were field operators, not the leaders behind the attack. During the year, police investigators again submitted to prosecutors six dossiers on the case, but prosecutors returned the case files to the police, saying the files were incomplete. Named in the dossiers were Jakarta Governor Sutiyoso, who in 1996 served as Jakarta's military commander; former State Intelligence Chief Zacky Anwar Makarim; Brigadier General Syamsiar Wangsamihardja; former Jakarta Police Chief Hamami Nata; Central Jakarta police official Abubakar Nataprawira; Colonel Haryanto; and former PDI Chairman Soerjadi.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Criminal Code makes it a crime punishable by up to 4 years in prison for any official to use violence or force to elicit a confession; however, law enforcement officials widely ignored such statutes in practice. Security forces continued to employ torture and other forms of abuse. The Government made some efforts to hold members of the security forces responsible for acts of torture. During the year, the use of torture to obtain confessions from suspects was most apparent in Aceh.

Torture was sometimes used to obtain confessions, punish suspects, and seek information that incriminated others in criminal activity. Security forces also allegedly used torture to extort money from villagers. Reliable figures on the number of incidents of torture that occurred during the year were difficult to obtain. Physical torture cases included random beatings and acts involving hair, nails, teeth, and genitals. Heat, suffocation, electricity, and suspension by the feet were also used. Psychological torture cases reportedly included food and sleep deprivation, sexual humiliation, and forced witnessing or participation in acts of torture.

During the year, press restrictions in Aceh Province limited media reports on cases of torture there. However, a coalition of human rights NGOs reported 77 cases of civilians and 7 GAM members tortured, compared with 256 civilians and 16 GAM members tortured in 2003. The NGO Kontras reported that 214 civilians were tortured. In September, Human Rights Watch (HRW) reported widespread abuse of prisoners in Aceh by security forces. HRW reported that 24 of 35 Acehnese prisoners interviewed claimed they had been tortured and forced to confess involvement with the GAM. Examples of torture

in the report included electric shocks and beatings with wooden beams and gun butts. The Government announced it would investigate the allegations contained in the HRW report. AI reported that in January, members of Brimob arrested a small shop owner suspected of being a GAM intelligence officer. He was held for 24 hours, during which Brimob members allegedly beat him in the face with the butt of a rifle and broke his nose. He also allegedly was burned by cigarettes on his arms, stomach, and thighs. AI representatives reported seeing dozens of burn marks still visible when they met with him in May. He was released and fled the country after his village paid $22 (198,000 rupiah) to Brimob.

The Government reported no progress in prosecuting those responsible for acts of torture committed in Aceh in 2002 or 2003, including the beating and burning of civilian Rizki Muhammad.

In November 2003, in the Papuan city of Wamena, suspects Jigibalom and Tenius Murib were arrested for stealing weapons from a military arsenal. The two were ill but were denied proper medical attention. Also in Wamena, unidentified gunmen raided a government armory in April 2003. TNI officials detained for questioning suspect Yapenas Murib, who later died in TNI custody (see Section 1.a.). The Government did not investigate his death. Komnas HAM completed an investigation into reports that dozens of residents of the Central Highlands area of Kuyowage were tortured by unknown parties during a military operation that followed the break-in at the Wamena armory. Komnas HAM concluded that military forces tortured villagers and committed other gross human rights violations. The Government did not report any progress in prosecuting those responsible for this or other acts of torture committed in Papua in 2003 or 2002, including the torturing to death of Yanuarius Usi.

In early August, suspected JI member Saifudin Umar, alias Abu Fida, was found seriously injured in an East Java hospital. He claimed to have been secretly arrested and tortured by police. Police admitted arresting Abu Fida on the grounds that he had helped hide two JI fugitives; however, police denied torturing him. The Government made progress arresting and prosecuting those responsible for cases of torture in East Java. On January 19, three police officers were arrested for allegedly torturing two college students in Surabaya. On September 6, the Padang District Court in West Sumatra convicted and handed down 18-month prison sentences to five police officers accused of torturing to death narcotics suspect Faisal.

Rapes occurred in conflict zones (see Section 5). Human rights advocates blamed many of the rapes on soldiers and police. Statistics were unavailable, but credible sources provided a number of accounts that involved soldiers and police. Kontras reported that during the year of martial law in Aceh, 47 women and 29 children were victims of violence, including rape. The extent to which rape was a problem in Aceh was hard to assess, due to social stigma, the lack of reporting, and access to the region. The Council of the Central Information for Referendum Aceh (SIRA) received nine cases of rape by military personnel in Aceh. The NGO Aceh Sehabat confirmed a report that on July 24, three TNI soldiers raped a 16-year-old girl in Kampung Meureu Baro-Indrapuri over a period of several months, leaving her pregnant. Family and friends reportedly knew that the girl was being raped but did nothing to stop it due to fear for their safety.

At schools, universities, police training centers, and other institutions, upperclassmen or superiors sometimes physically mistreated underclassmen or subordinates, a practice that dated back many years. During this period, a number of such incidents resulted in death (see Section 1.a.).

The Government failed to make progress in establishing accountability for the 1998 riots, which included acts of torture and other attacks against ethnic Chinese women in Jakarta, Solo, Medan, and other cities. In 2003, an investigative team from Komnas HAM investigated the incident, received the testimony of dozens of witnesses, and identified 20 suspects. However, at the end of the investigation, team leader Solahuddin Wahid declined to name publicly the suspects, some of whom were members of the police and military. The team summoned 86 civilians, mostly witnesses, to testify; all but 5 complied. The team also summoned 48 government, military, and police officials, of whom only 3 complied. Among those who did not comply were former armed forces commander Wiranto, TNI spokesman Major General Sjafrie Sjamsoeddin, and the former commander of the Army's Strategic Command Reserve (Kostrad), retired Lieutenant General Prabowo Subianto. Komnas HAM prepared a 1,500 page report on the riots and in September 2003 forwarded the report to the AGO, with the expectation that the AGO would conduct an investigation of its own. However, on March 4, the AGO returned the report to Komnas HAM, reportedly because it lacked testimony from key members of the security forces.

In Aceh Province, following the introduction of martial law in May 2003, more than 603 school buildings, the majority of them elementary schoolhouses, were burned. The Government attributed the arson attacks to the GAM, which has a history of destroying public buildings, including schools, because they were the most visible symbols of government presence and also because security forces often used abandoned government facilities as barracks or village headquarters. The GAM denied these allegations. By the end of the year, the Government had rebuilt 328 of the schools, but several hundred schools reportedly were destroyed by the December 26 tsunami. Human rights groups in Aceh reported that security forces continued the practice of marking houses of families of suspected GAM members with a red "X" or "GAM," thereby stigmatizing the inhabitants and in many cases leading to their ostracization.

No progress was made in the investigation of the alleged intentional revenge burning by Brimob of 80 shops and homes in Keude Seuneddon, North Aceh, in a 2003 incident that occurred immediately after the killing of 2 Brimob officers.

On September 28, approximately 150 members of the Betawi Brotherhood Forum (FBR), a group of criminals who claimed to be native Jakartans, raided a number of nightspots in the Jakarta areas of Cilincing and Muara Baru, saying the businesses were immoral and should close within a week. Police officers reportedly stood by as FBR members terrorized

the nightspots. It was the FBR's first major attack since its 2002 attack against members of the Urban Poor Consortium at the Jakarta office of Komnas HAM. On June 27, self-described FBR members also forced the closure of a church in East Jakarta (see Section 2.c.). In October, the month of Ramadan, FBR gangs invaded nightclubs and other establishments that they believed were open inappropriately during the holy month. Eight FBR members were arrested for their actions. Several hundred stick-wielding persons from the Islam Defender's Front (FPI) attacked a popular Jakarta nightclub. Some police officials reportedly acquiesced in the attack, but after other high profile leaders criticized the attack, police deployed more than a thousand extra officers to patrol the streets. Four FPI members were arrested.

Conditions at the country's 365 prisons and detention centers were harsh, and overcrowding was widespread. Facilities frequently were two or three times over capacity. Guards regularly mistreated inmates and extorted money from them. Unruly detainees were held in solitary confinement for up to 6 days on a rice-and-water diet. The wealthy or privileged had access to better treatment in prison. In July, the country's most famous inmate, Hutomo "Tommy Suharto" Mandala Putra, son of former President Suharto and convicted of arranging the killing of a judge, was flown aboard a helicopter to stay in the luxury Kartika Pavillion Suites at the Gatot Subroto Army Hospital for 6 days. Tommy Suharto did not appear for seven court appearances for health reasons. A team of 10 doctors detected a possible tumor behind Suharto's left eye and a stomach ulcer but ultimately declared him able to conduct normal activities.

Prison authorities held female inmates separately from men but in similar conditions. Most children convicted of serious crimes were sent to juvenile prisons. However, until they were convicted, most juveniles were held with adults at detention centers. In theory, prisons held those convicted by courts, while detention centers held those awaiting trial; however, in practice, pretrial detainees at times were held with convicted prisoners.

There were no official restrictions on prison visits by human rights monitors, and prison officials granted varying degrees of access. The ICRC made some visits to prisoners during the year.

d. Arbitrary Arrest or Detention

The Criminal Procedures Code contains provisions against arbitrary arrest and detention but lacks adequate enforcement mechanisms, and authorities routinely violated it. The Code provides prisoners with the right to notify their families promptly, and it specifies that warrants must be produced during an arrest. Exceptions are allowed if, for example, a suspect is caught in the act of committing a crime. The law allows investigators to issue warrants; however, at times, authorities made arrests without warrants. No reliable statistics existed on how many arbitrary arrests and detentions took place during the year.

The President appoints the Indonesian National Police Chief, subject to DPR confirmation. The Police Chief reports to the President but is not a full member of the Cabinet. The Indonesian National Police consist of approximately 250,000 officers deployed to each of the 33 provinces. Despite decentralization, the police have largely maintained their centralized hierarchy, in which local police forces formally reported to the national headquarters rather than to local governments.

During the year, police generally improved their professionalism and effectiveness at fighting crime, and they succeeded in apprehending a large number of suspects in terrorist attacks. Overall professionalism of the police remained low, as did respect for human rights and effectiveness at investigating human rights abuses. Impunity and corruption remained significant problems. The extent of wrongdoing within the nation's police forces was difficult to gauge. Police commonly extracted bribes, from minor payoffs in traffic cases to large bribes in criminal investigations. According to police, 36 members of the national police force were investigated for human rights violations during the year. Punishments varied from demotion to criminal prosecution.

A defendant may challenge the legality of his arrest and detention in a pretrial hearing and may sue for compensation if wrongfully detained; however, defendants rarely won pretrial hearings and almost never received compensation after being released without charge. Military and civilian courts rarely accepted appeals based on claims of improper arrest and detention. The Criminal Procedures Code limits periods of pretrial detention. Police are permitted an initial 20-day detention, which can be extended to 60 days; prosecutors may detain a suspect 30 days initially, with a 20-day extension permitted. Prosecutors may extend police detention periods, and a district court may further extend prosecutors' detention of a suspect. The district and high courts may detain a defendant up to 90 days during trial or appeal, while the Supreme Court may detain a defendant 110 days while considering an appeal. In addition, the Criminal Procedures Code allows detention periods to be extended up to an additional 60 days at each level if a defendant faces a possible prison sentence of 9 years or longer, or if the individual is certified to be mentally or physically disturbed. Authorities generally respected these limits in practice.

In areas of separatist conflict, such as Aceh and Papua, police frequently and arbitrarily detained persons without warrants, charges, or court proceedings. Kontras reported that in Aceh such detentions occurred frequently because of suspected connections with GAM members. According to HRW, 60 percent of arrests in 2003 were made without a warrant. Additionally, none of the 35 detainees in Aceh that HRW interviewed during the year reported being shown an arrest warrant when they were arrested in 2003. The authorities rarely granted bail. The authorities frequently prevented access to defense counsel during investigations and limited or prevented access to legal assistance from voluntary legal defense organizations. At least one person died in custody during the year.

The 2002 terrorism decree and the March 2003 antiterrorism law allowed the use in court of evidence from wiretaps, video

recordings, and other surveillance. The Government applied this law in the cases of at least five individuals associated with the GAM. They included former negotiators Teuku Kamaruzzaman, Teuku Muhamad Usman, Amni bin Ahmad Marzuki, Sofyan Ibrahim Tiba, and Nasiruddin bin Achmed. In October 2003, the Banda Aceh District Court convicted the five for acts of terrorism and sentenced them to between 12 and 15 years in prison. On June 1, the Supreme Court rejected their appeal.

There were no reports of political detainees during the year.

e. Denial of Fair Public Trial

The Constitution provides for judicial independence. In practice, the judiciary became increasingly independent but remained heavily influenced at times by the executive branch. The judiciary also continued to be influenced by military, business interests and politicians. On April 1, as required by law, the Justice Ministry transferred administrative and financial control over the judiciary to the Supreme Court. The new constitutional court demonstrated significant independence and, in some major cases, ruled against the Government. Previously, judges were civil servants employed by the executive branch, which controlled their assignments, pay, and promotion. Low salaries continued to encourage corruption, and judges were subject to pressure from government authorities, which often influenced the outcome of cases. In August, the TNI transferred administrative control of the military courts to the Supreme Court.

Under the Supreme Court is a quadripartite judiciary of general, religious, military, and administrative courts. The law provides for the right of appeal, sequentially, from a district court to a high court to the Supreme Court. The Supreme Court does not consider factual aspects of a case but rather the lower court's application of the law. Parallel to the Supreme Court is the Constitutional Court, which is empowered to review the constitutionality of laws, settle disputes between state institutions, dissolve political parties, resolve electoral disputes, and decide allegations of treason or corruption against the President or Vice President. The judicial branch theoretically is equal to the executive and legislative branches, and it has the power of judicial review of laws passed by the DPR; government regulations; and presidential, ministerial, and gubernatorial decrees. In practice, the judiciary was less influential than the executive and legislative branches, and it often was heavily influenced by the executive branch.

In the country's 2,418 district courts, a panel of judges conducts trials by posing questions, hearing evidence, deciding on guilt or innocence, and assessing punishment. Judges rarely reversed initial judgments in the appeals process, although they sometimes lengthened or shortened sentences. Both the defense and prosecution can appeal verdicts.

The law presumes that defendants are innocent until proven guilty. It also permits bail, which was used in practice but rarely in areas of separatist conflict. Court officials sometimes accepted bribes in exchange for granting bail. Defendants have the right to confront witnesses and call witnesses in their defense. An exception is allowed in cases in which distance or expense is deemed excessive for transporting witnesses to court; in such cases, sworn affidavits may be introduced. The courts allowed forced confessions, particularly in conflict areas, and limited the presentation of defense evidence. Defendants have the right to avoid self-incrimination but generally were required to give testimony before the conclusion of a trial. However, in practice, defendants regularly refused to answer questions.

The Criminal Procedures Code gives defendants the right to an attorney from the time of arrest and at every stage of examination. The law requires counsel to be appointed in cases involving capital punishment or a prison sentence of 15 years or more. In cases involving potential sentences of 5 years or more, the law requires the appointment of an attorney if the defendant is indigent and requests counsel. In theory, indigent defendants may obtain private legal assistance, but in practice, few actually obtained the services of an attorney. In many cases, authorities quietly persuaded defendants not to hire an attorney. In many cases, procedural protections, including those against forced confessions, were inadequate to ensure a fair trial.

Widespread corruption continued throughout the legal system. In October 2003, the World Bank reported that endemic corruption was compromising law and order. Bribes influenced prosecution, conviction, and sentencing in countless civil and criminal cases. Most judges earned $200 to $225 (1.8 million to 2.03 million rupiah) per month, while a judge with three decades' experience earned approximately $660 (5.94 million rupiah) per month. Key individuals in the justice system not only accepted bribes but appeared to turn a blind eye to other government offices suspected of corruption. During the year, the Supreme Audit Agency (BPK) named the AGO as the state institution with the most "irregularities" in its use of state funds. In 2003, BPK repeatedly accused the AGO and police of not following up on cases of suspected corruption that had been referred to them, stating that, since 2001, the BPK had reported 6,162 cases of suspected corruption to the AGO and police but that only 505 cases--approximately 8 percent--had been investigated by both offices.

In August 2003, the Legal Review journal investigated the buying of verdicts in corporate civil lawsuits at district courts, high courts, and the Supreme Court. Based on information obtained from leaked corporate memos and other sources, the Review published a list that estimated the "price of victory" in a court case from as little as $8,300 (74.7 million rupiah) at the Bandung District Court to as much as $600,000 (54 billion rupiah) at the Supreme Court.

Apart from the handful of soldiers who were tried in human rights' courts, hundreds of low-level and sometimes mid-level soldiers were tried in military court, even for offenses that involved civilians or occurred when soldiers were not on duty. If a soldier was suspected of committing a crime, military police investigated and then passed their findings to military prosecutors, who decided whether or not to prepare a case. Military prosecutors, like military judges, were managed

administratively by the TNI but were responsible to the AGO and the Supreme Court for the application of laws. However, under the "one roof system" adopted by the judiciary during the year, administrative control of military and religious courts was scheduled to transfer gradually to the Supreme Court. Trials are conducted before a three-person panel of military judges. Appeals are made to the Military High Court; such appeals may question matters of fact or law. A Military Supreme Court bases its rulings only on the application or interpretation of law. Some civilians complained about the brevity of prison sentences handed down by military courts. TNI legal officials responded that all troops sentenced to terms of 3 months or longer were discharged from the armed forces, regardless of their record or length of service, and claimed this constituted a significant punishment.

Gross human rights violations can be adjudicated by four district courts. The law provides for each court to have five members, including three noncareer human rights judges, who are appointed to 5-year terms. Verdicts can be appealed to the standing high court and the Supreme Court. The law provides for internationally recognized definitions of genocide, crimes against humanity, and command responsibility, but it does not include war crimes as a gross violation of human rights.

In August 2003, the Ad Hoc Human Rights Tribunal for East Timor concluded its trial phase in Jakarta with the conviction of Major General Adam Damiri of crimes against humanity. Damiri, who remained free on appeal, became the 6th of 18 tribunal defendants convicted in connection with atrocities that occurred during April 1999 and September 1999 in 3 East Timor locations: Liquica, Dili, and Suai. On July 29, the Jakarta High Court overturned the convictions of Damiri, Noer Muis, Hulman Goeltom, and Sudjarwo. This court later acquitted and freed Abilio Jose Soares, who was the only convict to have served prison time. The sentence of Eurico Guterres was reduced on appeal from 10 years to 5 years in prison. He appealed the case to the Supreme Court and, at year's end, remained free. Subsequently, the AGO appealed to the Supreme Court to review the Jakarta High Court's decision to overturn the convictions of Noer Muis, Hulman Goeltom, Sudjarwo, and Guterres. The AGO also appealed to the Supreme Court to review the district court's decision to acquit Tono Suratman. All five cases were under review at year's end. East Timor's Serious Crimes Unit indicted a total of 391 individuals for crimes against humanity committed during and after the 1999 referendum; however, 290 of these individuals remained at large with little chance of being returned to East Timor to stand trial. The U.N. stated its intention to send out a Commission of Experts to evaluate the Ad Hoc Tribunal and Serious Crimes Unit and to recommend next steps for achieving accountability. As a possible alternative to a Commission of Experts, the Governments of Indonesia and East Timor agreed in December to form a bilateral Truth and Friendship Commission to address accountability.

In 2003, the ad hoc human rights tribunal for the 1984 Tanjung Priok incident, in which dozens and perhaps hundreds of persons were shot and killed, held its first court sessions in Jakarta. Panels consisting of 5 judges heard the cases of 16 defendants, including retired Major General Pranowo; retired Army Major General Rudolf Adolf Butar-Butar; Army Major General Sriyanto Mutrasan, the commander of Army Special Forces (Kopassus); and other high-ranking active or former military officers. All of the defendants faced charges of crimes against humanity. The tribunal sentenced Butar-Butar to 10 years in prison and found 13 others guilty and sentenced them to 2 or 3 years in jail, far less than the 10-year sentences that prosecutors had requested. At year's end, all 14 convicted persons remained free as the high court considered their appeals. Some Tanjung Priok victims reported that they had received death threats from soldiers at the courthouse. Some of the defense teams argued that charges of crimes against humanity were unfairly being applied retroactively to their clients. The tribunal generated considerable domestic interest as the first human rights court to hear a case involving crimes against humanity committed during Suharto's rule.

In March, the Supreme Court confirmed the acquittal of suspected JI leader Abu Bakar Ba'asyir on treason charges and reduced his prison sentence for minor immigration charges from 3 years to 18 months. Ba'asyir's critics were upset that he was not convicted on the primary charge of planning treason and stated that his sentence of 18 months was not adequate for the crime. On April 30, police rearrested Ba'asyir as his jail sentence expired. In October, the South Jakarta District Court began proceedings against him on terrorism charges for allegedly authorizing the 2002 Bali bombing as JI "Emir" and for his alleged role in the conspiracy that led to the August 2003 attack on the Marriott Hotel in Jakarta. Prosecutors also charged him with involvement in a foiled plot to attack national police headquarters in Jakarta as well as his connection to an arms and explosives cache that police seized in 2003 in the Central Java town of Semarang. At year's end, the trial remained underway (see Section 2.b.).

In September, the Central Jakarta District Court found Tempo Magazine chief editor Bambang Harymurti guilty of criminal libel and sentenced him to a year in prison. NGOs and journalists complained the 1999 Press Law rather than the Criminal Code should have been applied in the case. The use of the Press Law would have provided plaintiff Tomy Winata the right of reply or imposed a fine on Tempo rather than the threat of a prison sentence. At year's end, Harymurti remained free pending the outcome of his appeal (see Section 2.a.).

Many suspected GAM members were denied their right to a fair trial. Defendants rarely had counsel present during interrogations and usually had no counsel during court proceedings. Defendants rarely were able to confront their accuser: The prosecution usually based its cases on testimony given by witnesses to government investigators; neither witnesses nor investigators appeared in court, and only written witness statements were submitted. Prosecutors rarely produced physical evidence, which they claimed was not available because it consisted of military weapons. A lawyer with a legal aid organization told AI that, in nearly 100 cases handled by his organization, only 2 defense witnesses agreed to appear.

On September 7, the DPR passed legislation to establish a "Truth and Reconciliation Commission" to investigate human

rights violations before making recommendations to the President to grant amnesty to abusers and rehabilitation to their victims. The legislation would allow the commission to recommend amnesty for a confessed violator in cases where the victim does not consent. Once the commission has resolved a case, it cannot later be filed in human rights court. At year's end, the executive branch had not promulgated the law or established the commission.

On October 12, Supreme Court Chief Justice Bagir Manan inaugurated the first Shari'a (Islamic law) courts in Aceh. Under the new system, 19 district religious courts and 1 court of appeals are scheduled to begin hearing cases. The courts are to hear only cases involving Muslims and use decrees formulated by the Aceh local government rather than the Penal Code but (see Section 2.c.). In the most visible initial effect, authorities began enforcing dress codes for Muslim women.

There were no reports of political prisoners.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law requires judicial warrants for searches except for cases involving subversion, economic crimes, and corruption. The law also provides for searches without warrants when circumstances are "urgent and compelling." Security officials occasionally broke into homes and offices. The authorities occasionally spied on individuals and their residences and listened in on telephone calls. There were reports that the Government occasionally infringed upon privacy rights of migrant workers, particularly women, returning from abroad. Corrupt officials sometimes subjected migrants to arbitrary strip searches, stole their valuables, and extracted bribes at special lanes set aside at airports for returning workers.

Land disputes generated charges of unfair evictions and excessive force by the public security officials. The NGO Jakarta Resident Forum estimated that public security officials evicted at least 20,000 persons during the year, compared with 40,000 in 2003. In Sumatra, local communities involved in the pulp and paper industry reportedly continued to experience persistent human rights abuses, including land seizures, by police and corporate security guards. HRW also alleged that companies such as Arara Abadi routinely seized local residents' land for plantations, with little or no compensation.

The National Identity Card (KTP), which all citizens are required to carry, identifies the holder's religion. NGOs charged that the KTPs undermined the country's pluralistic tradition and endangered cardholders who traveled through an area of interreligious conflict. Members of the five religions officially recognized by the Government—Islam, Protestantism, Catholicism, Hinduism, and Buddhism—had little or no trouble obtaining accurate identification cards; however, members of minority religions frequently were denied either a card or one that accurately reflected their faith. Additionally, low-level officials and village heads, responsible for issuing KTPs, often demanded small bribes or made the process inordinately bureaucratic, which made it difficult for disadvantaged groups such as itinerant workers, the poor, and the homeless to obtain KTPs.

In many parts of the country, particularly in Kalimantan and Papua, local residents believed that the government-sponsored transmigration program interfered with their traditional ways of life, land usage, and economic opportunities. During the year, the program moved at least 87,678 households from overpopulated areas to 369 more isolated and less developed areas in 24 different provinces. The Government sent at least 12,329 households to Central Kalimantan, making that province again the top destination. However, transmigration was far less than during the Suharto era.

The Government used its authority, and at times intimidation, to appropriate land for development projects, often without fair compensation. In other cases, state-owned companies were accused of endangering resources upon which citizens' livelihood depended.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of speech and freedom of the press; however, the Government at times restricted these rights in practice. During the year, the Government jailed at least seven peaceful antigovernment protestors convicted of "insulting the President" or "spreading hatred against the Government." In addition, politicians and powerful businessmen more often filed criminal or civil complaints against journalists whose articles they found insulting or offensive. Also during the year, journalists faced increasing threats or violence.

In September, trials of six student and labor activists for insulting the former President during an April 3 demonstration opened in Makassar, South Sulawesi. The defendants were Rudi Hartono, the chairman of the Makassar National Democratic Student League; Ihsar Yatim; Al Ilyas Akbar, director of the Association of the Indonesian Poor; Muhammad Anshar, chairman of the National Front for United Indonesian Labor Unions; Wahida Baharuddin Upa; and Petrus Pice Jailahi, director of the Makassar Legal Aid Institute. On December 23, another student was arrested for insulting the President when he allegedly burned a photograph of Susilo Bambang Yudhoyono.

In Aceh Province, press freedom was severely curtailed during the year. Martial law and civil emergency administrators restricted access by foreign journalists and diplomats, blocked cellular telephones, and forbade contact with the GAM. Journalists in Aceh experienced serious difficulties operating under martial law and the civil emergency. A government decree required that each news coverage activity "be supported by written permission by the head of Aceh's Emergency Military Authority"; however, enforcement of the decree was erratic. In practice, only foreign journalists and local journalists

reporting for foreign news organizations were required to obtain the permits. There was no direct censorship, but local journalists were intimidated by army spokesmen's criticism of specific stories, as well as by passionate calls by military commanders for journalists to report "patriotically." Journalists also were concerned that critical reporting could cause them to lose access to military press briefings. Finally, the uncertain security situation limited access to many areas. The Government lifted restrictions on domestic journalists when it ended martial law in May but maintained restrictions on foreign journalists. As a practical matter, journalists in the province appeared reluctant to exercise their press freedoms fully, due to fear of possible reprisals by the GAM or by government authorities. Although foreign journalists were not formally banned from traveling to the Provinces of Papua, Maluku, and North Maulu or to the towns of Sampit, Poso and Palu, the Government issued an appeal for foreign journalists not to enter those areas in particular and often rejected their requests to do so. According to a Jakarta-based broadcasting station, a radio journalist was beaten by Brimob and TNI personnel after being caught interviewing an individual in a military-designated "black area" (areas in Aceh considered to be a GAM stronghold, including North Aceh, East Aceh, Pidie, and South Aceh Provinces).

Journalists faced violence and intimidation from police, soldiers, government officials, rebels, thugs, students, and ordinary citizens. During the year, the Alliance of Independent Journalists (AJI) recorded at least 17 physical attacks against journalists as well as 8 nonphysical acts that included death threats and lawsuits. For example, on July 13, East Nusa Tenggara journalist Benny Djahang was "poked and throttled" by provincial council member John Oga while attending a plenary session of the East Nusa Tenggara Provincial Council. The attack reportedly was in response to a story Djahang had written the previous week detailing the arrest of Oga and two other councilors.

The Government made little or no progress prosecuting those responsible for violent attacks against journalists in Aceh in 2003, including those against TVRI cameraman Jamaluddin, Waspada newspaper journalist Idrus Jeumpa, and 68H radio journalist Alif Imam Nurlambang.

According to AJI, unlike in 2003, there were no reports of journalists expelled from Aceh.

In March 2003, persons linked to tycoon Tomy Winata entered Tempo Magazine's headquarters in Jakarta and criticized an article that implied Winata stood to benefit from a fire that destroyed a Jakarta market. They assaulted Tempo journalists, including chief editor Bambang Harymurti, at the headquarters and later at a police station. Tempo lawyers reported the matter to the authorities and sued the assailants, but judges exonerated the group's leader. Winata's attorneys responded by initiating four lawsuits (two civil and two criminal), which free press activists asserted were attempts to intimidate the media. On September 14, the Jakarta High Court overturned two district court decisions in civil suits against Tempo, finding in favor of Tempo and dismissing fines levied by the district court against the magazine. However, 2 days later, the Central Jakarta District Court found Tempo guilty of criminal libel and sentenced Bambang Harymurti to a year in prison; the court acquitted Tempo journalists Ahmad Taufik and Teuku Iskandar Ali. Human rights observers called the decision a blow to press freedom in the country and criticized prosecutors' decision to use the Criminal Code on Libel instead of the 1999 Press Law. At year's end, Harymurti remained free pending a high court decision on his appeal.

On December 23, the former general manager of the newspaper Radar Jogja was sentenced to 9 months in jail for defamation after he published articles alleging the general manager of a competing newspaper was sexually harassing a member of his staff. The judge in the case refused to tell the press why he applied the Criminal Code on Libel rather than the available 1999 Press Law.

During the year, government officials filed three other criminal cases against journalists under the same Criminal Code on Libel.

During the year, the Government took no legal action against any person responsible for crimes committed against journalists in 2003. However, in 2003, the Central Jakarta District Court ordered Jakarta Governor Sutiyoso to apologize to a reporter intimidated by a city public order officer who tried to prevent him from covering an eviction in 2002. Sutiyoso lost his appeal to a high court and appealed to the Supreme Court. The appeal remained under consideration at year's end.

Pervasive corruption among journalists and the lack of an enforceable journalistic code of ethics compromised the integrity of some journalists.

During the year, the Government implemented the 2002 Broadcasting Law, which included measures for issuing licenses for additional frequencies and establishing an impartial broadcasting commission.

Despite numerous incidents of violence and intimidation of the press, there were positive developments. Unity among journalists and their commitment to protect their colleagues appeared to have strengthened. Some members of the press also continued aggressive reporting on such issues as corruption, the conflict in Aceh, and environmental degradation. Regional media increasingly prospered. In addition, moderate Islamic publications increased in number and popularity.

The government-supervised Film Censorship Institute continued to censor domestic and imported movies for content that it deemed pornographic or religiously offensive. In August, the institute ordered the local movie "Kiss Me Quick" pulled from cinemas after religious leaders complained that it would encourage young persons to have sex.

By law, Communist teachings cannot be disseminated or developed.

The Government did not restrict Internet use or content.

The law provides for academic freedom, and the Government respected this provision.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of assembly; however, the Government restricted this right in certain areas. The law generally does not require permits for public social, cultural, or religious gatherings; however, any gathering of five or more persons related to political, labor, or public policy requires police notification, and demonstrations require a permit.

During the year, police used excessive force at a number of demonstrations. For example, on May 1 in Makassar, South Sulawesi, police forcibly entered the campus of the Indonesian Muslim University and injured 65 students demonstrating against the arrest of radical Muslim cleric and suspected JI leader Abu Bakar Ba'asyir. Demonstrators reportedly had taken a police officer hostage on the campus and had attacked two others. The violent police response led to the dismissal of the regional police chief and several other senior officers. Police investigated the incident and named 22 police suspects, 8 of whom were convicted for collective violence in public and sentenced to between 7 and 12 months. On February 26, police forcefully broke up a peaceful demonstration by the Bandung Student Executive Body. Dozens of students were injured, 23 of whom were taken to the hospital.

In July, the treason trial of 17 alleged activists of the Maluku Sovereignty Front began over the April separatist rally that sparked renewed violence. In August, the Ambon District Court began the trials of 36 others charged with treason in relation to April and May rallies that ended in violence.

There were reports of counterprotesters violating the right to peaceful assembly in the case of labor disputes.

The Government did not report any progress in prosecuting those responsible for the 2002 forcible dispersal by Jakarta police of participants in a massive rally against the reelection of Governor Sutiyoso. Similarly, no arrests were made in connection with the distribution of food containing cyanide at the same rally. In addition, no arrests were made regarding the 2002 attack in the Central Java city of Semarang on two antipoverty activists by persons who claimed to be members of the ruling PDI P, nor were arrests made in connection with the March 2003 attack on students in East Java by PDI-P members.

The Constitution provides for freedom of association; however, the Government restricted the exercise of this right in areas of separatist conflict. Although the Papua Special Autonomy Law permits flying a flag symbolizing Papua's cultural identity, police prohibited the flying of the Papuan Morning Star flag, identified with the armed separatist struggle.

There were reports of restrictions on peaceful assembly in Aceh, where NGOs and activists faced strict restrictions on their activities during martial law and the civil emergency. Organizers of events frequently were required to submit in advance the names of speakers and the text of their speeches for approval, which was frequently denied. This led to caution and self-imposed restrictions by those organizing events. Outside of Banda Aceh, the province remained closed to foreigners. In April, police dispersed a group of university students demonstrating in conjunction with SAMAN (Solidarity for Acehnese Students Nusantara) to demand an end to martial law; police arrested a coordinator of the demonstration but later released him. The security forces continued to enforce a prohibition on flying the GAM flag in Aceh. Political rallies and meetings in conjunction with the legislative and presidential elections were allowed and occurred without significant incident.

At year's end, Muhammad Nazar, chairman of SIRA, remained in detention. Nazar was arrested in February 2003 for planning a public rally in Lhokseumawe.

c. Freedom of Religion

The Constitution provides for "all persons the right to worship according to his or her own religion or belief" and states that "the nation is based upon belief in one supreme God." The Government generally respected the former provision, but only five major faiths--Islam, Protestantism, Catholicism, Hinduism, and Buddhism--received official recognition in the form of representation at the Ministry of Religious Affairs. Other religious groups were able to register with the Government, but only with the Ministry of Home Affairs and only as social organizations. These groups experienced official and social discrimination. The law does not recognize atheism, and in practical terms, it requires all persons to identify themselves with one of the five faiths acknowledged by the Government.

The civil registration system continued to discriminate against members of minority religions. Civil Registry officials refused to register the marriages or the births of children of animists, Confucians, members of the Baha'i faith, and others because they did not belong to one of the five officially recognized faiths. Hindus, despite official recognition of their religion, sometimes had to travel some distance to register marriages or births because local officials could not or would not perform the registration. Persons whose religion was not one of the five officially recognized faiths, as well as persons of Chinese descent, had difficulty obtaining a KTP, which was necessary to register marriages, births, and divorces. Several NGOs and religious advocacy groups urged the Government to delete the religion category from the KTPs (see Section 1.f.).

Men and women of different religions experienced difficulties in marrying and in registering a marriage. The Government

refused to register a marriage before a religious marriage ceremony had taken place. However, very few religious officials were willing to take part in a wedding involving a man and woman of different faiths. For this reason, some soon-to-be brides and grooms converted to their partner's religion. Others resorted to traveling overseas to wed.

Foreign missionaries who obtained visas generally were allowed to work without serious restriction.

During the year, the Government took no concrete steps to implement controversial provisions of the Education Law that require schools to provide religious instruction to students in their own faith.

As in previous years, some political parties advocated amending the Constitution to adopt Shari'a on a nationwide basis, but most parliamentarians and the country's largest Muslim social organizations remained opposed to the proposal.

In March 2003, in Aceh Province, the Government began implementation of Shari'a by issuing a presidential decree establishing Islamic law courts. On October 12, Supreme Court Chief Justice Bagir Manan inaugurated the first Shari'a courts in Aceh. Under the new system, 19 district religious courts and 1 court of appeals were scheduled to begin hearing cases. The courts were to hear only cases involving Muslims and not use the Penal Code but rather "qanuns," decrees formulated by local governments. The Lhokseumawe city government established qanuns for that city and began recruiting Islamic law monitors, down to the village level. The qanuns covered issues such as "immoral behavior." For example, extramarital contact between a man and woman would be punishable by public lashings or a fine of up to $555 (4.9 million rupiah). Other qanuns banned gambling and the production, distribution, or consumption of alcohol. A Muslim found guilty of consuming alcohol would receive 40 lashes. Some in Aceh worried that implementation of Shari'a would provide new powers to already-distrusted law enforcement institutions and provide opportunities to intrude on private religious matters, such as whether an individual attends Friday prayers.

Women's groups helped to draft local regulations to avoid provisions that might restrict women's rights. However, because there were no women in the Aceh Consultative Assembly except secretaries and other lower-ranking service positions, women remained largely marginalized. During the year, jilbab (headscarf) inspections by various groups were frequent. There was a three-step process for women in violation. After issuing two written warnings, authorities referred the matter to a Shari'a court. In Banda Aceh, police took women in improper Islamic dress and detained them for brief periods in the Shari'a enforcement office, where the women were lectured on appropriate attire. Local governments and groups in other areas also undertook campaigns to promote conformance by women with the precepts of Shari'a (see Section 5). Some women told reporters that they felt humiliated when detained for dress code violations.

In some municipalities, local leaders applied stricter Islamic practices. For example, in the West Java regency of Cianjur, a local regulation required all Muslim civil servants to wear Islamic clothing every Friday and attend congregational noon prayer. Virtually all women complied with the regulation, and women's groups, including Women's Solidarity (Solidaritas Perempuan), stated that women were afraid not to comply. On January 12, the mayor of the Jakarta suburb Tanggerang ordered public employees to wear Islamic clothing on Fridays. In Bulukumba, South Sulawesi, the regent instituted limited Shari'a laws that forbade alcohol and required the wearing of Islamic clothes and obligatory daily Muslim prayers. However, these regulations applied only to Muslims and were not enforced.

As in previous years, during the Muslim fasting month of Ramadan, many local governments ordered either the closure or limited operating hours of various types of "entertainment" establishments. For instance, on October 9, the municipal governments of Kendari, Medan, Palembang, and Pekanbaru ordered the closure of all discotheques, massage parlors, karaoke outlets, pubs, and bars during Ramadan. However, authorities said they would allow bars and karaoke outlets in hotels catering to foreign tourists to remain open. The Medan government ordered the closure of such establishments on December 24 and 25 in observance of Christmas. Enforcement of the orders varied.

Political and economic tensions between Christians and Muslims in the eastern provinces of Central Sulawesi, Maluku, and North Maluku continued to cause sectarian violence, resulting in unlawful killings (see Section 1.a.).

During the year, more than 10 churches were attacked, compared with 7 churches in 2003. In addition to attacks in the capital cities of Central Sulawesi and Maluku, there were attacks in the West Java communities of Purwodadi, Margahayu, Tangerang, Bogor, Banten; the Jakarta communities of Ciputat and Pamulang; and the Central Java city of Yogyakarta. Attacks consisted of vandalism, arson, shootings, mob violence, and forced closures. One mosque was destroyed in Maluku during the year.

Due to renewed violence in Ambon in April and May, interreligious tolerance and cooperation between Christians and Muslims in Maluku, North Maluku, and Central Sulawesi remained poor. In the Moluccas, local governments continued to reunite many government offices that since 1999 had separated into Christian and Muslim units.

For a more detailed discussion, see the 2004 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The Constitution allows the Government to prevent persons from entering or leaving the country, and sometimes the Government restricted freedom of movement. The Law on Overcoming Dangerous Situations gives military forces broad powers in a declared state of emergency, including the power to limit land, air, and sea traffic; however, the Government

did not use these powers.

The Government continued to restrict freedom of movement through a system of "travel letters," which were required for travel within Maluku, Aceh, and Papua. Enforcement was inconsistent.

On May 19, then President Megawati issued a decree ending martial law in Aceh and establishing a state of civil emergency, which remained in effect at year's end. The decree returned overall government authority for the province to the governor, but the Provincial Civil Emergency Administration (PDSD), headed by the provincial chief of police, maintained power to issue emergency measures to control travel, trade, transport, and other civilian activities.

The Government instituted new controls on the movement of residents in Aceh by issuing new national identity cards specific to Aceh. These cards required the signatures of the holder's local military commander, local police chief, and village head. Acehnese who wished to travel or leave the province had to produce these cards at security checkpoints along main highways. Failure to produce the card was cause for arrest. In practice, the cards were easily obtained, and there was no evidence that the policy resulted in restriction of movement. In Aceh, those outside Banda Aceh also had to obtain from police a travel letter that described the purpose and length of trip and also name the persons the traveler would meet. In conflict areas, individuals also were required to report to police to leave villages to fish, tend fields, or leave their village, which significantly hindered their ability to earn a livelihood.

The Government also controlled movements to close avenues of supply to GAM rebels. In the remote Lokop District of East Aceh, home to 30 villages and a heavy rebel presence, TNI units monitored and controlled food shipments moving in and out of villages and limited shipments to TNI-linked suppliers. Soldiers also limited the amount of food each family could purchase, which resulted in malnutrition, according to the Aceh branch of Kontras. In addition, troops reportedly restricted the hours that fishermen could fish and the hours that rice farmers could work in their fields.

In Central Kalimantan, where ethnic violence in 2001 prompted approximately 130,000 ethnic Madurese migrants to leave, mainly to Madura and East Java, at least 45,000 voluntarily returned to Kalimantan. However, in the interim, a number of regency governments, including those of Barito Utara, Barito Selatan, and Kotawaringin Barat, had introduced regulations that prohibited the return of ethnic Madurese unless they could prove they had previously lived in the area and did not have a criminal record. Relations between Madurese and indigenous Dayaks remained poor. The West Kalimantan city of Sambas remained effectively inaccessible to its former Madurese residents.

The Government prevented at least 412 persons from leaving the country during the year. The AGO and the High Prosecutor's Office prevented most of these departures. Some of those barred from leaving were delinquent taxpayers, while others were involved in legal disputes. There were reports of the Government barring the exit of some foreigners without proper application of the law.

In June, the Government expelled Sidney Jones, country director for the international NGO International Crisis Group (ICG) (see Section 4).

The Constitution prohibits forced exile, and the Government did not use it.

The country continued to make progress reducing the number internally displaced persons (IDPs). The U.N. Office for the Coordination of Humanitarian Affairs (OCHA) estimated that there were 1,478,736 IDPs in the country during the year, compared with 587,000 in 2003. OCHA reported that there were 6,946 IDPs in Aceh as of June, but this number increased considerably as a result of the December 26 tsunami. According to the Coalition of NGOs for Aceh and Kontras, there were still two refugee camps in Aceh before the tsunami. The Government's military operation in Aceh did not produce a large flow of IDPs outside the borders of the province. Some IDPs lived in emergency shelters, while others stayed with host families or were integrated into local communities. The Government dealt with many aspects of crisis but continued to rely on international organizations and donors to assist with most IDPs' needs. In theory, IDPs had three options: Return to their place of origin, start anew in their current location with the Government's assistance, or resettle through a relocation program. In some cases, including in North Sumatra, governmental assistance amounted to a one-time payment of approximately $1,000 (9 million rupiah) per family.

In June 2003, on the North Maluku island of Ternate, thousands of IDPs who claimed that the governor had stolen aid earmarked for their return to Halmahera Island clashed with police and soldiers. No injuries were reported. On September 24, the Ambon District Court began hearing the trial of Husni Lessy, head of organizational guidance and social assistance at the Maluku Social Welfare Office. Lessy, who was responsible for the distribution of rice to IDPs from January to September 2002, faced charges of demanding "commissions" before distributing rice. He was accused of demanding more than $18,888 (170 million rupiah) in kickbacks and costing the State as much as $555,555 (4.1 billion rupiah) in losses. NGO activists who worked with IDPs reported that, in conflict areas, the Government was doing little or nothing to see that compensation was provided for losses suffered or that justice was done to those responsible. Activists reported that IDPs were vulnerable to trafficking in persons, and others warned that widespread violence could re-ignite at any time in some regions.

Although the law does not include provisions for granting refugee status or asylum to persons who meet the definition in the 1951 U.N. Convention Relating to the Status of Refugees or its 1967 Protocol, there were no reports of the forced return of persons to a country where they feared persecution. The Government cooperated with the U.N. High

http://www.state.gov/g/drl/rls/hrrpt/2004/41643.htm

Commissioner on Refugees (UNHCR), which maintained an office in Jakarta. At year's end, there were 113 U.N.-recognized refugees and 60 asylum seekers living in the country. Some were applicants and others were dependents. Most were from Iraq, Afghanistan, or Somalia. Some of the refugees had been accepted by Western resettlement countries but had not yet departed.

The above figures did not include approximately 10,000 former refugees from East Timor who resided in West Timor at year's end. In 2003, the Government and UNHCR stated that the remaining East Timorese in West Timor would no longer be considered refugees. Most of these former refugees resided in makeshift camps in the West Timor regencies of Atambua and Kupang. Many of these individuals did not want to return to their homeland; others wanted to return but apparently felt constrained by those opposed to returning. According to the labor rights group Jakarta Solidarity Center, hundreds of Burmese fishermen, refugees apparently forced to work on Thai fishing boats, either escaped or were abandoned in Tual, a small island in Maluku, where they lived in difficult conditions. Immigration officials forcibly repatriated a number of Burmese fishermen via foreign fishing vessels.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

During the year, the implementation of several constitutional amendments increased the ability of citizens to change their government. The Constitution provides citizens with the right to change their government peacefully, and citizens exercised this right in practice through periodic, free, and fair elections held on the basis of universal suffrage. They exercised this right in peaceful legislative elections on April 5 and the country's first direct presidential election on July 5, with a second round on September 20, when Susilo Bambang Yudhoyono defeated the incumbent President Megawati. The Constitution provides for general elections every 5 years. During most of the year, the police and armed forces continued to hold 38 appointed seats jointly in the DPR and 10 percent of the seats in provincial and district parliaments; however, in accordance with a 2002 amendment to the Constitution, the security forces lost their appointed DPR seats in October with the inauguration of the new legislature. DPR members automatically are members of the MPR, which until October included regional and government appointed representatives. On October 1, the MPR became a fully elected body consisting of the 550 DPR members (50 seats were added pursuant to a law adopted in 2003) and the 128 members of the House of Regional Representatives (DPD).

Domestic and international observers monitored the legislative and presidential elections, organized by an independent election commission, and considered the elections largely free and fair.

The MPR can amend the Constitution and issue decrees, functions it performed in the first of its "annual sessions," held in 2000. A key demand of the post-1998 reform movement was an overhaul of the 1945 Constitution, which was seen as having fostered the development of past authoritarian regimes. In the First Amendment of the Constitution, the 1999 MPR passed curbs on executive power, including a limit of two 5-year terms for the President and Vice President. In 2000, the MPR adopted the Second Amendment, which contained many important changes, including provisions for protection of human rights, regional autonomy, and further separation of powers. During its 2001 session, the MPR amended the Constitution to provide for direct presidential and vice-presidential elections, a bicameral legislature with a regional representatives chamber, and a Constitutional Court with the power of judicial review of legislation, certain election disputes, and impeachment proceedings. This court was inaugurated in 2003. In 2002, the MPR approved the Fourth Amendment, which requires presidential and vice-presidential candidates to run together on a single ticket. It provides for a second round of direct voting if no candidate receives a majority of votes cast and at least 20 percent of the vote in half of the provinces. The MPR retained authority to amend the Constitution but was no longer empowered to establish broad guidelines of state policy. The constitutional changes also restricted the MPR's authority to impeach the President. The 1999-2002 amendments make the President and the Vice President directly accountable to the electorate.

All adult citizens are eligible to vote except active duty members of the armed forces, convicts serving a sentence of 5 years or more, persons suffering from mental disorders, and persons deprived of voting rights by an irrevocable verdict of a court of justice. Former members of the banned Indonesian Communist Party are allowed to vote, and, following a Constitutional Court ruling during the year, they may now run for office. This ruling marked an important step forward in restoring the basic rights of victims of Suharto's New Order regime.

There was a widespread domestic and international perception that corruption was a part of daily life when dealing with authorities in the executive and legislative branches. The need to tackle corruption was a high-profile issue in the year's election campaign. President Susilo Bambang Yudhoyono bemoaned that corruption was "systemic" to the country, and this was a major focus of his administration's initial 100-day program.

Two versions of a Freedom of Information act were before the DPR for consideration at year's end: One represented a governmental draft, and the other contained NGO input. Despite the absence of such a law, the AJI reported no problems obtaining unclassified public documents from the Government. The exception to this rule was in Aceh, where information could be obtained only from the TNI Media Center.

There were no legal restrictions on the role of women in politics. A woman, Megawati Soekarnoputri, served as President until October, when Susilo Bambang Yudhoyono was inaugurated as President; however, under President Megawati, women accounted for only 2 of the 33 cabinet ministers and 8 of the 45 Supreme Court justices. On October 20, President Yudhoyono appointed women to 4 of his Cabinet's 36 seats. In February 2003, the DPR passed an election law that included a nonbinding call for parties to select women for at least 30 percent of the candidate slots on their party lists. In

this year's elections, 61 women were elected to the 550-seat DPR, an increase from 1999, when 44 women held seats in the 500-seat DPR. In the DPD, women comprised 27 of the 128 members.

There were no legal restrictions on the role of minorities in politics. There were 365 members of minorities (defined as persons from outside of Java and neighboring Madura Island) in the 500-seat outgoing DPR. There were no statistics for the 2004-09 DPR. There were 12 members of minorities in President Megawati's 33-member Cabinet. While most of Megawati's cabinet members were Javanese, Sundanese, or Madurese, minority members were of Bugis, Batak, Acehnese, Minang, Flores, Balinese, Banjar, Arab, or Chinese heritage. President Yudhoyono's Cabinet also consisted of a plurality of Javanese, with others being of Sundanese, Bugis, Batak, Acehnese, Papuan, Balinese, Arab, or Chinese heritage.

In Papua, the Government's plan to divide the province into three continued to generate significant opposition from NGOs, religious leaders, community leaders, and the Papuan governor. Legislation called for the creation of the two additional provinces of West Irian Jaya and Central Irian Jaya. However, the subsequent 2001 Law for Special Autonomy in Papua makes clear that partition is possible only with approval of the Papuan People's Council (MRP) and the Papuan legislature. Nevertheless, the Government established the West Irian Jaya Province, although it delayed creation of Central Irian Jaya. On November 11, the Constitutional Court annulled the 1999 law partitioning Papua into three provinces but ruled that West Irian Jaya could continue to exist, since it was functioning in accordance with constitutional principles. In December, President Yudhoyono issued a decree authorizing the creation of a 40-member Papuan People's Council. The council would have input into the appointment of the governor and deputy governor of Papua Province, as well as provincial-level legislation affecting indigenous Papuans. The council would consist of one-third religious figures, one-third representatives of tribal organizations, and one-third women's groups. However, the central Government reserved veto power over candidates for the MRP whom it deemed objectionable.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

Domestic human rights organizations reported being subject to monitoring, harassment, and interference by the Government; however, they remained active in advocating improvements to the Government's human rights performance. Komnas HAM reported that, since 2000, 14 human rights activists had been killed and that no perpetrators been brought to justice. However, there were no reports of any human rights activists killed during the year. Many NGOs, particularly those in Aceh, accused security forces of obstructing their activities. Unlike in the previous year, there were no reports that organized groups attacked members or offices of NGOs.

In Aceh, NGOs experienced intense government interference. The security forces repeatedly summoned domestic NGO activists for questioning regarding possible links to the GAM, which prompted between 100 and 200 activists to leave the province. The Government effectively prohibited foreign humanitarian aid workers from the province, except for a limited number attached to U.N. agencies. According to AI, once the provincial governor took over as head of the Civil Emergency Authority, he extended existing restrictions on international humanitarian organizations. Access reportedly was especially poor in those regions designated by the military as "black areas." AI believed that some of these areas had not been accessed by independent humanitarian organizations since May 2003.

The Government criticized NGOs that questioned its policies. In June, the former Government expelled Sidney Jones, ICG Country Director. Jones appeared to have been expelled because of the Government's displeasure with her portrayal of its handling of politically sensitive issues (see Section 2.d.).

On June 30, the court ruled in favor of Major General Nurdin Zainal, who in 2003 had sued two persons of the NGO Institute for Human Rights Study and Advocacy (ELS-HAM) and four newspaper editors for defamation. The lawsuit stemmed from a press conference ELS-HAM held in the wake of a 2002 ambush near Timika. ELS-HAM appealed the verdict.

There was no progress in the case of six FBR members involved in a 2002 attack against activists of the Urban Poor Consortium at the Jakarta office of Komnas HAM. The six cases remained on appeal to the Jakarta High Court at year's end. The Government reported no progress in prosecuting the perpetrators of the 2002 shooting in Papua of several family members of Johannes Bonay, executive director of ELS-HAM.

The Government generally viewed outside investigations or foreign criticism of its human rights record as interference in its internal affairs. The security forces and intelligence agencies tended to regard with suspicion foreign human rights organizations, particularly those operating in conflict areas. Government monitoring of foreigners was apparent in some conflict areas. Some domestic human rights organizations expressed concern about possible negative consequences of contacting foreigners.

A number of government agencies and affiliated bodies addressed human rights problems, including the Ministry of Law and Human Rights, the Ministry of Foreign Affairs, the Ministry of Women's Empowerment, and Komnas HAM. However, in 2003, Komnas HAM's efforts to expose human rights violations and bring perpetrators to account were undermined by a number of court decisions regarding Komnas HAM's jurisdiction or authority. For example, in June 2003, a Jakarta court refused to subpoena former and active military officers who had ignored Komnas HAM summonses to face questioning over the 1998 riots, which claimed more than 1,200 lives. By law, severe human rights violations that occurred before 2000

could be investigated only by an ad hoc human rights court, not Komnas HAM. Such a court could be formed only at the suggestion of the DPR, but for the DPR to know enough about an incident to approve the formation of a court, a thorough investigation was necessary. The resulting stalemate continued to block progress toward accountability.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The Constitution does not explicitly prohibit discrimination based on gender, race, disability, language, or social status. It provides for equal rights for all citizens, both native and naturalized. However, in practice, the Government failed to defend these rights adequately.

Women

Violence against women remained poorly documented. Nationwide figures were unavailable, but the NGO Mitra Perempuan-affiliated Women's Crisis Centers (WCC) conducted a 13-city survey from April 2003 to March. WCC found 300 cases of violence against women in Jakarta, 33 in Bandung, 14 in Purwokerto, 25 in Surakarta, 53 in Jombang, 14 in Banda Aceh, 22 in Bengkulu, 25 in Bandar Lampung, 10 in Palembang, 7 in Pontianak, 10 in Manado, 30 in Makassar, and 32 in Kupang. The local press reported that violence against women continued to increase. Two types of crisis centers were available for abused women: Government-run centers in hospitals and NGO centers operated in the community. During the year, the Ministry of Women's Empowerment successfully lobbied for the passage of the Domestic Violence Act, presented the antitrafficking bill to the DPR, and supported the election law's target of 30 percent female candidates for legislative office. The Ministry also worked on issues of child protection, including trafficking.

The Domestic Violence Act that passed in the DPR on September 14 criminalizes domestic violence. Physical violence is punishable by imprisonment for up to 15 years or $5,000 (45 million rupiah). Psychological violence is punishable by imprisonment for up to 3 years or $1,000 (9 million rupiah). Sexual violence is punishable by imprisonment for up to 20 years. At year's end, there were no prosecutions.

Rape was a problem. It is punishable by 4 to 12 years in jail. Although the Government jailed perpetrators for rape and attempted rape, convicted rapists most commonly were sentenced to the minimum or less. Reliable nationwide statistics were unavailable. The definition of rape is narrow and excludes heinous acts that would commonly be treated as rape in other countries.

Rapes by members of the security forces were most numerous in Aceh. Human rights activists expressed concern that rapes were underreported in the province, partly because of reluctance by victims to do so. SIRA stated that military personnel committed nine rapes in Aceh but that no cases of rape or sexual harassment had been reported to the authorities. During the year, the TNI prosecuted 15 personnel for rape.

It was unclear whether GAM rebels committed rape during the year, although there were numerous reports that GAM members committed rape in previous years.

Over the past several years, many police stations set up a "special crisis room," where female officers received criminal reports from victims of sexual assault and trafficking, and where victims found temporary shelter.

The Guidelines of State Policy, legal statutes adopted by the MPR, state that women have the same rights, obligations, and opportunities as men. However, the guidelines also state that women's participation in the development process must not conflict with their role in improving family welfare and the education of the younger generation. Marriage law designates the man as the head of the family. Women in many regions of the country, particularly in Papua, complained about differential treatment based on gender.

The legal differentiation between a woman and a girl was not clear. The Marriage Law sets the minimum marriageable age at 16 for a woman (and 19 for a man), but the Child Protection Law states that persons under age 18 are children.

Female genital mutilation (FGM), also known as female circumcision, was practiced in some parts of the country, including West Java. The most recent data available, from a 2002 study in areas where FGM was prevalent, indicated that pain, suffering, and complications were minimal. Two types of persons, midwives and local traditional practitioners, performed the procedure. Researchers said the midwives' procedure involved the tearing, cutting, or piercing of part of the genitals but not the removal of tissue. Most of the local traditional practitioners, on the other hand, said that they customarily removed tissue, but the extent of this removal remained unclear. Similarly, it was unclear whether the removed tissue was from the clitoris, labia minora, or elsewhere. Some NGO activists dismissed any claims of mutilation, saying the ritual as practiced in the country was largely symbolic. During the year, the Ministry of Health (MOH) and the Ministry of Women's Empowerment became more engaged in the prevention of FGM and its practice by midwives in clinics. The MOH, World Health Organization, and Ford Foundation planned to sponsor efforts in January 2005 to sensitize and share information regarding the status of FGM practices and to mobilize prevention efforts with the religious community, NGO advocates, and medical providers. The MOH worked on, but did not finalize, an official policy statement prohibiting FGM from being practiced in government clinics by health care providers. The MOH included the prevention of FGM as a subject in training curricula for traditional birthing attendants and midwives.

Prostitution is not specifically addressed in the Penal Code. However, the code refers to "crimes against decency/morality,"

which many interpret to apply to prostitution. Child prostitution is illegal under the Penal Code and the 2002 Child Protection Act. While contrary to societal and religious norms, prostitution was widespread and largely tolerated. Security forces reportedly participated in the running of brothels or protection rackets, which shielded brothels from prosecution. International sex tourism took place, especially on the islands of Batam and Karimun, both near Singapore.

Sexual harassment is against the law. Although it is not explicitly mentioned, sexual harassment is actionable under the Criminal Code. According to a statement during the year by the State Ministry of Women's Empowerment, 90 percent of women and 25 percent of men have been victims of sexual harassment in the work place.

Divorce was open to both men and women. Muslims who sought divorce generally turned to the Islam-based family court system as a faster and cheaper alternative to the national court system. Non-Muslims obtained divorces through the national court system. Due to prejudicial attitudes, women often faced a heavier evidentiary burden than men, especially in the family court system. Although both Islamic and national courts may award alimony, many divorcees received no alimony, since there was no system to enforce such payments. Men and women both keep the separate property they owned before marriage. If there is no prenuptial agreement, joint property is divided equally. The Marriage Law requires a woman who has become divorced to wait a certain period of time before remarrying, while a man can remarry immediately.

The Citizenship Law stipulates that a child's citizenship is derived solely from the father. Children of citizen mothers and foreign fathers are considered foreigners and must have visas to remain in the country until age 18, when they can apply for citizenship. These children are prohibited from attending public schools. In cases when a citizen mother lived abroad with her foreign husband, divorce could involve child custody problems. The children of foreign women married to citizen men also faced difficulties. A foreign woman married to a citizen can obtain citizenship after 1 year, if desired.

During the year, the Government continued to implement Shari'a in Aceh (see Section 2.c.). The most visible impact on women's rights appeared to be the enforcement of dress codes.

Women faced considerable discrimination in the workplace, both in terms of obtaining positions and in gaining fair compensation for labor performed. In 2003, the International Labor Organization's (ILO) Jakarta office reported that on average, women's earnings were 68 percent of that of men workers. In 2002, the Government stated that 14 percent of women civil servants were in positions of authority, but only 38 percent of all civil servants were women, which meant that only 5 percent of civil servants in positions of authority were women.

Some activists said that, in manufacturing, employers relegated women to lower-paying, lower-level jobs. Many female factory workers were hired as day laborers instead of as full-time permanent employees, and companies were not required to provide benefits, such as maternity leave, to day laborers. According to the Government's Central Statistics Bureau, in 2002, the unemployment rate was higher for men than for women. If a husband and wife both worked for a government agency, the couple's head-of-household allowance was given to the husband. There were reports that female university graduates received an average salary that was 25 percent less than that of their male counterparts.

A number of organizations promoted women's rights or otherwise addressed women's issues during the year, including Solidaritas Perempuan, Mitra Perempuan, LBH-Apik, and the International Catholic Migration Commission (ICMC).

Children

The Government stated its commitment to children's rights, education, and welfare, but it devoted insufficient resources to fulfill that commitment. In practice, most schools were not free of charge, and poverty put education out of reach of many children. Child labor and sexual abuse were serious problems. Although girls and boys ostensibly received equal educational opportunities, boys were more likely to finish school. In January 2003, the leader of the National Commission for Child Protection (Komnas PA) identified the most pressing problems related to the country's youth as child labor, child trafficking, child prostitution, street children, children in conflict areas, and undernourished children. The National Child Protection Act addresses economic and sexual exploitation of children as well as adoption, guardianship, and other problems; however, some provincial governments did not enforce its provisions.

Children were casualties in areas of armed conflict. In Maluku, following the anniversary of the RMS movement in April, an unidentified person shot a 9-year-old child in Ambon. AI reported that in May, TNI used children, wives, and other relatives of GAM members from three different villages as human shields. They were instructed by TNI soldiers to hold bags of rice in front of themselves for shielding and walk through the forest ahead of soldiers searching for GAM members. The operation lasted from May 16 through May 18. According to AI, the TNI also used children to spy, cook, clean, and communicate. Local NGOs reported to AI that the GAM also used children, forcing them to act as informants, participate in arson, collect "taxes," cook, and provide supplies. In addition, the GAM reportedly used teenagers as combatants.

A newly established police child welfare hotline recorded a total of 576 cases of violence against children in East Java in the first 3 months of the year. The increase in reported cases was likely the result of this new, more effective reporting mechanism rather than a reflection of a dramatic increase in actual cases of violence against children. Police received reports of domestic violence, sexual violence, and neglect.

By law, children are required to attend 6 years of elementary school and 3 years of junior high school; however, in practice, the Government did not enforce these requirements. According to 2002 UNICEF data, school enrollment rates were 96

percent for children ages 7 to 12, 79 percent for children ages 13 to 15, and 49 percent for children ages 16 to 18.

Monthly fees for public schools varied from province to province and were based on average incomes. Some parents continued to find it difficult to afford to send their children to school. Including tuition, transportation costs, and school materials, primary and secondary schools could cost a family between $444 and $778 (4 million to 7 million rupiah) per year for each student. It was unclear how many children were forced to leave school to help support their families. In some areas of the country, parents and watchdog groups complained that corruption among public servants severely undermined the quality of education. Indonesian Corruption Watch reported that some principals in East Java, West Java, and North Sumatra bribed Education Ministry officials to secure funding for their schools.

During the year, conflicts or the lingering effects of conflicts disrupted the education of some children. For example, during the renewed sectarian conflict in Ambon, Maluku, two Islamic schools were destroyed and several others were temporarily closed due to unsafe conditions. In Aceh Province, more than 603 school buildings were burned following the introduction of martial law in May 2003. The Government rebuilt 328 of these schools during the year; however, several hundred schools were destroyed by the December 26 tsunami.

Many children grew up in poor health conditions. Malnutrition remained a serious problem. The country's infant mortality rate remained high. According to the Indonesia Demographic and Health Survey published in December 2003, there were 35 deaths for every 1,000 live births. There was improvement in under-5 mortality, but a lack of improvement in infant mortality led the Government to increase its focus on newborn healthcare.

The number of street children across the country was unknown. Komnas PA estimated 50,000 nationwide, while a 2002 Family Health International study estimated the number at nearly 71,000. During the year, an NGO estimated the number of street children in the 12 largest cities had decreased slightly.

Substantial numbers of street children were apparent in Jakarta and the Provinces of East Java, West Java, North Sumatra, and South Sulawesi. Surabaya, in East Java, was home to approximately 8,000 street children, many reportedly susceptible to sexual abuse and violence. Approximately 40 shelters in the province provided services to such children. In August 2003, the Jakarta city government announced that it would establish a dormitory housing between 600 and 1,000 street children. The city government also agreed to pay for the children's schooling and provide a stipend of approximately $58 (522,000 rupiah) to the children's parents to help them set up home businesses. The shelter had not been opened by year's end. The Government continued to provide some shelters throughout the country, administered by local NGOs, and paid for the education of some street children. One NGO estimated that 5,000 children lived in these shelters. During the year, the Government designated $1 million (9 million rupiah) to alleviate the problem of street children in Bandung, West Java, but the program was unsuccessful, reportedly due to corruption.

Commercial sexual exploitation of children continued to be a serious problem. The number of child prostitutes in the country was unclear; however, an ILO assessment estimated there were approximately 21,000 child prostitutes on the island of Java. In October 2003, a team of NGO and government health officials visited a prostitution complex in Riau Province and estimated that 30 to 40 percent of the 365 female sex workers there were under 18 years of age. Many teenage girls were forced into or found themselves caught in debt bondage. At times, law enforcement officials treated child sex workers as criminals rather than victims. Women's rights activists and religious groups accused government officials, including police and soldiers, of operating or protecting brothels that employed underage prostitutes. Corrupt civil servants issued identity cards to underage girls, facilitating entry into the sex trade. According to the Surabaya Social Department, of the 6,703 sex workers in that city and its environs, 30 percent were under the age of 18. There also were reports of sexual exploitation of boys. NGOs reported long-active pedophile rings operating in Bali, and authorities arrested, tried, and convicted at least one man, an Australian, for pedophilia there.

During the year, there were cases in which employment brokers paid parents advances of future salaries to be earned by their daughters. The child was required to repay the employment brokers. Researchers described a "culture of prostitution" in some parts of the country, where parents encouraged their daughters to work as big-city prostitutes and send the proceeds home.

NGO observers said many girls were forced into prostitution after failed marriages they had entered into when they were 10 to 14 years of age. There was no obvious violation of the law, because their paperwork identified them as adults due to the fact they were once married.

Child abuse is prohibited by law, but government efforts to combat child abuse generally have been slow and ineffective. NGOs reported that it continued to take excessively long to bring a child rape case to court and that mechanisms for reporting and dealing with child abuse were vague.

Child labor was a problem. In January 2003, the ILO reported that 8 million children under 18 were doing the work of adults (see Section 6.d.).

During the year, the Government began implementing a 1997 juvenile justice law that called for the creation of a juvenile court system. In cities where a juvenile court had not been established, ordinary courts adjudicated such cases. On August 13, Supreme Court Chief Justice Bagir Manan inaugurated the country's first juvenile court, located in Bandung, West Java. Komnas PA reported that more courts were starting to involve social workers in children's trials but that financial

constraints kept social workers from being available at all such trials.

A number of NGOs promoted children's rights, including Child Advocacy Network, National Commission on Child Protection, Center for Study and Child Protection, and Foundation for Indonesian Child Welfare.

Trafficking in Persons

Trafficking in persons is illegal under the Penal Code and the 2002 Child Protection Act; however, these laws are not comprehensive in their definition of trafficking. During the year, persons were trafficked to, from, and within the country for the purposes of prostitution and forced labor, including instances of debt bondage.

In 2002, a national action plan to counter trafficking of women and children was approved by presidential decree. It identifies specific roles for the Government and civil society at both the national and local levels, and it includes goals for lawmaking and law enforcement. The Child Protection Act prohibits economic and sexual exploitation of children and also child trafficking. The act specifies severe criminal penalties and jail terms for persons who violate children's rights, including trafficking in persons. During the year, the Government finalized a comprehensive antitrafficking bill, and President Megawati submitted the bill to the DPR in August. The Government, with the help of NGOs, conducted public education efforts on trafficking. In January, North Sulawesi Province enacted the country's first broad province-level antitrafficking in persons law. On September 30, the DPR passed legislation concerning the protection of migrant workers and the law on domestic violence.

The Criminal Code lacks an adequate legal definition of trafficking in persons. The Solidarity Center and the ICMC identified laws that could be applied in cases of trafficking and related offenses. The Penal Code prohibits trade in women and male minors but is silent on female minors. The Child Protection Act provides for prison sentences of 3 to 15 years plus fines for child traffickers. In many cases, police and prosecutors continued to use the Penal Code against traffickers because they lacked familiarity with the relatively new Child Protection Act. However, the number of prosecutions based on the act increased. In the past, judges rarely sentenced traffickers to more than 3 years in prison. However, during the year, judges imposed increasingly heavy sentences on child traffickers, with some convictions resulting in 5- or 6-year jail terms. On September 16, a North Sumatra court sentenced Desi Prisanti Siregar to 13 years in jail for the trafficking of nine young women and girls into the sex trade in Malaysia.

Reliable figures were not available on the number of persons trafficked. A study by the Solidarity Center and ICMC estimated there were between 2.4 and 3.7 million women and children who worked in the vulnerable categories of migrant workers, sex workers, and child domestic workers (see Section 5, Children). Within these categories, the estimated total number of children ranged from 254,000 to 422,000. These were not estimates of victims but rather of women and children vulnerable to trafficking.

During the year, the Government, NGOs, and the media reported that women were trafficked to Malaysia, Japan, the Middle East (including Saudi Arabia and Kuwait), Taiwan, Hong Kong, Singapore, and other destinations. Malaysia was the destination for the greatest number of credibly documented cases of female trafficking victims.

During the 12-month period ending in February, police investigated 125 cases of trafficking in women and children, involving 160 traffickers and 85 victims. Police submitted 67 of these cases for prosecution. At least 25 suspects were convicted. During the year, trafficking convictions increased to approximately 35 convictions, according to preliminary data.

In June and July, police arrested six traffickers identified as the Rizal gang, reportedly responsible for selling hundreds of women as prostitutes in Malaysia. A Jakarta court convicted the six gang members in November but sentenced them to only 4 or 5 months in jail.

The Singkawang District of West Kalimantan remained well known as an area from which poor, ethnic Chinese women and teenage girls between the ages of 14 and 20 were recruited as "mail order" brides for men primarily in Taiwan but also in Hong Kong and Singapore. In some cases, the women were trafficked for sex work and slavery-like servitude.

In many cases, traffickers recruited girls and women under false pretenses. One tactic was to offer young women in rural areas jobs as waitresses or hotel employees in distant regions, including island resorts. After the new recruits arrived and incurred debts to their recruiters, they learned that they had been hired as prostitutes.

Many trafficking victims became vulnerable to trafficking during the process of becoming migrant workers. Many unauthorized recruiting agents operated throughout the country and were involved in trafficking to various degrees, and some government-licensed recruiting agents also were implicated in trafficking. Recruiting agents often charged exorbitant fees leading to debt bondage and recruited persons to work illegally overseas, which increased the workers' vulnerability to trafficking and other abuses.

The basic 3-month course that all police officers received did not include training on countertrafficking in persons. During the year, international agencies continued to provide police with specific training with regard to trafficking. Trafficking falls under the purview of the Criminal Investigation Department (CID). In 2003, the police established a separate antitrafficking unit within CID with operational and coordinating responsibilities. As a result, coordination within the police force and between the police and other interested departments on trafficking in persons improved somewhat during the year.

http://www.state.gov/g/drl/rls/hrrpt/2004/41643.htm

The national police headquarters issued new instructions to district police chiefs to break up trafficking rings, assist victims, and report cases to national headquarters. However, credible sources noted that individual security force members were involved in setting up and protecting brothels. Traffickers and brothel owners reportedly paid protection money to security force members. Apart from police and soldiers, some government officials were complicit in trafficking, particularly in the production of false documents. The prevalence and ease of obtaining fraudulent national identity cards, which could document children as adults, contributed to the trafficking problem. Within society and the Government, there was continued reluctance to acknowledge that prostitution was a major problem.

Domestic NGOs, with international support, led efforts to monitor and prevent trafficking, frequently in coordination with government agencies. These NGOs included the Consortium for Indonesian Migrant Workers Advocacy, LBH-Apik, Women's Aid and Protection Group, Women's Coalition (Koalisi Perempuan), and Solidaritas Perempuan.

In 2003, the Government cooperated with Australia in investigating a trafficking ring sending Indonesian women into sexual servitude in Australia. Bilateral police cooperation led to the trial of at least one trafficker in Australia and the arrest of others in Indonesia. The Government also cooperated with Malaysia to investigate trafficking.

The Government at various levels and to varying degrees assisted victims of trafficking, both domestically and abroad. National- and local-level assistance efforts increased compared with previous years but remained small in comparison with the scope of the problem. In general, government assistance was modest and focused on citizens trafficked abroad, while domestic assistance was minimal. Over the year, the Government and community groups established a number of new shelters for trafficking victims, including shelters in Batam, Riau Islands. The police increased the number of police women's desks, units established to help women and children who fall victim to violence including trafficking. The women's desks provided temporary shelter, special police handling, and some level of legal services for victims. The women's desks often cooperated with local NGOs to provide medical and psychological services and longer term shelter. However, distrust of police discouraged some victims from using these desks.

The Government's policy is to "treat persons who are trafficked not as criminals but as victims who need help and protection." During the year, the People's Welfare Coordinating Ministry and the Ministry of Women's Empowerment reinforced this policy in public settings and training programs for police and other officials. However, local government and police practice varied, particularly in the lower ranks of law enforcement agencies. Local governments, exercising greater authority under the country's decentralization program, sometimes enacted laws or regulations that tended to treat trafficked sex workers as criminals, contrary to national policy. In many instances, government officials and police actively protected and assisted victims. In other cases, police treated victims such as trafficked sex workers as criminals, subjected them to detention, and took advantage of their vulnerability to demand bribes and sexual services. The media and lower-level officials, including police, often failed to protect victims' identities and commonly provided victims' names to the public.

The Government encouraged victims to assist in the investigation and prosecution of traffickers. The Government reported that victims frequently were reluctant or refused to provide testimony due to shame and fear of retribution against themselves or their families.

Persons with Disabilities

The law mandates access to buildings for persons with disabilities; however, the Government did not enforce this provision. The Disability Law requires companies that employ more than 100 workers to set aside 1 percent of their positions for persons with disabilities. However, the Government did not enforce the law, and persons with disabilities faced considerable discrimination. The law also mandates accessibility to public facilities for persons with disabilities; however, extremely few buildings and virtually no public transportation facilities provided such accessibility. Recent statistics on the number of persons with disabilities were not available. In 1999, the U.N. estimated the percentage of such persons at 5.4 percent of the population, or approximately 12 million persons; the Government put the number at 3 percent, or approximately 7 million persons. The Government classified persons with disabilities into four categories: Blind, deaf, mentally disabled, and physically disabled. The Constitution requires the Government to provide them with care; however, "care" is not defined, and the provision of education to children with disabilities never was inferred from the requirement.

In urban areas, only a few city buses offered wheelchair access, and many of those have had their hydraulic lifts vandalized, rendering them unusable. In other cases, the space reserved for wheelchairs was occupied by other passengers because the bus conductors could earn more money.

In 2003, the Government stated the country was home to 1.3 million children with disabilities but only 50,000 of them attended school. The true number of such children was believed to be much higher. The law provides children with disabilities with the right to an education and rehabilitative treatment. A government official alleged that many parents chose to keep their children with disabilities at home; however, many schools refused to accommodate such children, stating they lacked the resources to do so. According to the Government, there were 700 schools dedicated to educating children with disabilities; all but 41 of them were run privately. Some young persons with disabilities resorted to begging for a living.

National/Racial/Ethnic Minorities

The Government officially promotes racial and ethnic tolerance. Ethnic Chinese accounted for approximately 3 percent of the population, by far the largest nonindigenous minority group, and played a major role in the economy. Instances of discrimination and harassment of ethnic Chinese Indonesians declined compared with previous years. On April 14, then President Megawati publicly called on Immigration officials to stop asking ethnic Chinese citizens for a Republic of Indonesia Citizenship Certificate (SBKRI), a document not required of non-Chinese citizens; however, many ethnic Chinese citizens reported they were still frequently asked to show one. An attorney advocate for the rights of ethnic Chinese stated that more than 60 articles of law, regulation, or decree were in effect that discriminated against ethnic Chinese citizens. NGOs such as the Indonesia Anti-Discrimination Movement urged the Government to revoke these articles.

In September 2003, approximately 50 ethnic Chinese families in the West Java city of Tangerang protested in front of the Tangerang Council building over the alleged sale of land traditionally used as a Chinese cemetery. The families complained that the sale of the land for a commercial development prevented them from being able to bury their dead beside loved ones. City councilors agreed to review the case, but there were no developments by year's end.

During the year, some ethnic Chinese citizens complained that the Government had not done enough to prosecute those responsible for the 1998 violence against them and their businesses.

In Papua, TNI authorities estimated the number of OPM guerillas at 620. These guerillas were poorly armed with an estimated 150 weapons ranging from modern M-16s to outdated Mausers. Indigenous Papuans complained that they were underrepresented in the civil service of that province; however, due largely to the partial implementation of the Special Autonomy Law and the creation of 14 new regencies in Papua, there was a large increase in the number of government positions for ethnic Papuans.

Unlike in 2003, there were no reports of overt discrimination against Acehnese outside the province. However, some Acehnese reported that they were not comfortable saying they were from Aceh, faced extra scrutiny when trying to leave the country, and resented having a different identity card.

Indigenous People

The Government views all citizens as "indigenous," with the exception of ethnic Chinese; however, it recognizes the existence of several "isolated communities" and their right to participate fully in political and social life. These communities include such groups as the myriad Dayak tribes of Kalimantan, families living as sea nomads, and the 312 officially recognized indigenous groups in Papua. During the year, indigenous people remained subject to widespread discrimination, and there was little improvement in respect for their traditional land rights. Mining and logging activities, many of them illegal, posed significant social, economic, and logistical problems to indigenous communities. The Government failed to stop domestic and multinational companies, often in collusion with the local military and police, from encroaching on indigenous people's land.

In Sumatra, where there were many lowland tropical forests, corporate interests continued to take over lands traditionally claimed by indigenous communities, who relied on them for rice farming and rubber tapping. HRW and other NGOs reported that the creation of huge plantations to serve the paper and pulp industry threatened the livelihoods of many indigenous people. Some indigenous people unsuccessfully filed land claims with the authorities. In 2003, in the Sumatran subdistrict of Porsea, local citizens and environmental groups, including WALHI, condemned the Government's decision to reopen a pulp company, PT Toba Pulp Lestari (formerly PT Indorayon), which was closed in 2002. The company's pulp mills were blamed for far-reaching environmental degradation, and at least five persons involved in the dispute had been killed in recent years. Komnas HAM noted that both sides in the dispute had committed significant human rights violations.

Unlike in previous years, indigenous peoples in Sulawesi reportedly did not protest development projects in their traditional lands.

In Papua, tensions continued between indigenous Papuans and migrants from other provinces, between residents of coastal and inland communities, and among tribes. Some in the indigenous community accused the newcomers of price gouging and condescension, while some newcomers claimed that indigenous Papuans treated them with resentment and suspicion.

In Central Kalimantan, relations between indigenous Dayaks and ethnic Madurese transmigrants remained poor in the wake of 2001 interethnic violence. However, at least 45,000 displaced ethnic Madurese returned to Central Kalimantan during the year. Relations between the two groups also remained poor in West Kalimantan, where former residents of Madurese descent were obstructed in their attempts to reclaim their property.

Human rights activists said that the government-sponsored transmigration program violated the rights of indigenous people, bred social resentment, and encouraged the exploitation and degradation of natural resources on which many indigenous persons relied. In some areas, such as parts of Sulawesi, the Malukus, Kalimantan, Aceh, and Papua, relations between transmigrants and indigenous people were hostile. Some indigenous groups claimed that they received less government support than transmigrants, and some transmigrants claimed that in some cases they were moved to areas with undesirable land or where the land's ownership was in dispute.

http://www.state.gov/g/drl/rls/hrrpt/2004/41643.htm

Other Societal Abuses and Discrimination

There was some societal discrimination against persons with HIV/AIDS. Some individuals received prejudicial treatment at medical centers, saw their confidential laboratory results released, or had their identity published in a newspaper. In most if not all such cases, the Government failed to take corrective action. However, the Government encouraged tolerance, took steps to prevent new infections, and drew up plans to subsidize antiretroviral drugs.

Section 6 Worker Rights

a. The Right of Association

The 2000 Trade Union Act provides broad rights of association for workers, and workers exercised these rights. The law allows workers to form and join unions of their choice without previous authorization or excessive requirements, and workers did so in practice. The law stipulates that 10 or more workers have the right to form a union, with membership open to all workers, regardless of political affiliation, religion, ethnicity, or gender. Private sector workers are by law free to form worker organizations without prior authorization, and unions may draw up their own constitutions and rules and elect representatives. The Government records, rather than approves, the formation of a union and provides it with a registration number. Under the law, 86 union federations notified the Ministry of Manpower and Transmigration (the Manpower Ministry) of their existence. In addition, more than 18,000 workplace-level units registered with the Manpower Ministry.

According to an ILO estimate made during the year, the country's total labor force consisted of approximately 100 million workers, 42 percent of whom worked in the agricultural and forestry sector. The Government estimated total trade union membership at 9.7 million workers, just below 10 percent of the total workforce. However, if compared to the country's 23.8 million regular employees (a category that excludes the self-employed, employers, casual workers, and unpaid workers), union membership would reach almost 41 percent.

The law allows the Government to petition the courts to dissolve a union if it conflicts with the state ideology of Pancasila or the Constitution, or if a union's leaders or members, in the name of the union, commit crimes against the security of the State and are sentenced to at least 5 years in prison. Once a union is dissolved, its leaders and members may not form another union for at least 3 years. There were no reports that the Government dissolved any unions during the year.

In May, a Jakarta court dismissed all charges filed by prosecutors against leaders of the Indonesian Seafarers' Union, thereby upholding their 2001 election. Former Manpower Ministry officials, who led the union during the Suharto era, had convinced prosecutors to argue that the 2001 election was invalid and that former union officials should resume control over the union.

The Labor Union Act prohibits antiunion discrimination by employers and others against union organizers and members, and it provides penalties for violations; however, the Government did not effectively enforce the law in many cases. There were frequent, credible reports of employer retribution against union organizers, including dismissals and violence, that were not prevented effectively or remedied in practice. Some employers warned employees against contact with union organizers. Some unions claimed that strike leaders were singled out for layoffs when companies downsized. Legal requirements existed for employers to reinstate workers fired for union activity, although in many cases the Government did not enforce this effectively.

The Indonesia National Workers Struggle Front charged that employers dismissed its officials from at least five companies, allegedly because of their union activities. In March, the Indonesian Prosperity Trade Union Confederation (KSBSI) filed a freedom of association complaint with the ILO regarding PD. Jaya Bersama, a Jakarta company processing birds' nests for Chinese cooking, and its firing of 11 union officials and members allegedly for their union activities. In response, in May the Manpower Ministry conducted a labor inspection that found numerous labor violations, including child labor, but took no corrective action. According to accounts by the Seafarers Union of Burma (SUB), police in Tual, North Maluku, arrested and allegedly beat six Burmese SUB members because of their attempts to organize Burmese fishermen present in the country. Police claimed they acted because of immigration violations, not at the behest of Thai fishing boat captains, as SUB had alleged. The Government deported the six Burmese sailors.

The law recognizes civil servants' freedom of association and right to organize. In 2002, employees of several ministries began to form employee associations, and union organizations began to seek members. Unions also sought to organize state-owned enterprise (SOE) employees, although they encountered some resistance from enterprise management, and the legal basis for registering unions in SOEs remained unclear.

b. The Right to Organize and Bargain Collectively

The law allows unions to conduct their activities without interference; however, the Government often did not protect this right in practice. The law provides for collective bargaining and allows workers' organizations that register with the Government to conclude legally binding collective labor agreements (CLAs) with employers and to exercise other trade union functions. The law includes some restrictions on collective bargaining, including a requirement that a union or unions represent more than 50 percent of the company workforce to negotiate a CLA.

In 2003, the DPR passed the Manpower Development and Protection Act (Manpower Act), which regulates collective

bargaining, the right to strike, and general employment conditions. The act does not apply to SOEs. The ILO provided technical assistance in the development of the law, which generally meets ILO standards. Some unions remained opposed to the law, claiming it contains inadequate severance benefits, insufficient protection against arbitrary terminations, insufficient restrictions against outsourcing, and legalization of child labor under some conditions. The Government continued to issue implementing decrees for the Manpower Act.

In January, the President approved the Industrial Relations Disputes Settlement Act that, together with the 2000 Trade Union Act and the 2003 Manpower Act, constitutes the revised legal basis for industrial relations and worker rights. The Disputes Settlement Act stipulates a new system of tripartite labor courts, replacing the previous tripartite committees. The act also outlines settlement procedures through mediation and arbitration. The ILO provided assistance in the development of the law. The Government had not established the new labor court system by year's end.

According to the Manpower Ministry, in July there were 9,122 CLAs in effect between unions and private companies. Company regulations, allowed for under government regulations, substituted for CLAs in another 36,274 companies, many of which did not have union representation. In addition, in 2003 there were 59 labor agreements in effect between unions and state enterprises and another 65 agreements between nonunionized workers and state enterprises. The Manpower Act requires that employers and workers form bipartite bodies (joint employer/worker committees) in companies with 50 or more workers, a measure to institutionalize bipartite communications and consensus building. However, the number of such bodies did not increase significantly after passage of the act.

All workers, whether or not they are union members, have the legal right to strike, except for public sector workers and those involved in public safety activities. The law allows workers in these latter categories to carry out strikes if they are arranged not to disrupt public interests or endanger public safety. Private sector workers exercised their right to strike, as did those in state enterprises, although the latter group did so with less frequency. The large majority of government-recorded strikes involved nonunion workers. Unions or workers' representatives must provide 7 days' notice to carry out a legal strike. The law calls for mediation by local Manpower Ministry officials but does not require government approval of strikes. In previous years, workers and employers rarely followed dispute settlement procedures, and workers rarely gave formal notice of the intent to strike because Manpower Ministry procedures were slow and had little credibility among workers. The 2003 passage of the Manpower Act did not significantly change this situation.

The underpayment or nonpayment of legally required severance packages precipitated strikes and labor protests. The Solidarity Center documented cases in which foreign employers in the garment and footwear industry, faced with falling orders and plant closures, fled the country to avoid making legally required severance payments.

Labor activists also reported that factory managers in some locations employed thugs to intimidate and assault trade union members who attempted to organize legal strike actions. At times, the police intervened inappropriately and with force in labor matters, usually to protect employers' interests. On September 8, approximately 200 police assaulted striking workers at PT Shamrock Manufacturing Corporation in Medan, a clash that injured several workers and police. The workers had been on strike for 1 month, following the company's dismissal of 14 union officials affiliated with the Medan Independent Workers Union. The company also had employed local thugs to put down the strike, according to media sources. To develop standards of conduct in labor disputes, the national police participated fully in an ILO worker rights training program initiated during this period.

Pending implementation of the 2004 Disputes Settlement Act and its new labor court system, regional and national labor dispute resolution committees continued to adjudicate charges of antiunion discrimination. The committees' decisions could be appealed to the State Administrative Court. However, due to a history of adverse decisions for labor and the long time necessary to process disputes, sometimes requiring years, many unions believed that these committees were not realistic alternatives for settling disputes. As a result, workers frequently presented their grievances directly to Komnas HAM, the DPR, or NGOs. Administrative decisions in favor of dismissed workers usually took the form of monetary awards but rarely reinstated workers. The law required that employers obtain the approval of the labor dispute resolution committee before firing workers, but employers often ignored the law in practice.

There are no special laws or exemptions from regular labor laws in export processing zones (EPZs). However, nongovernmental observers, including the Solidarity Center, described stronger antiunion sentiment and actions by employers in EPZs.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced labor or compulsory labor, including by children; however, there were reports that such practices occurred (see Section 5).

The Government tolerated forms of compulsory labor practiced in the migrant worker recruitment process. The unscrupulous practices of migrant worker recruiting agencies, or Perusahan Jasa Tenaga Kerja Indonesia (PJTKI), and poor enforcement of government regulations often led to debt bondage and extended, unlawful confinement. According to press reports and research by the Solidarity Center, recruiting agencies frequently kept migrant workers in holding centers for months before sending them abroad. While in the holding centers, migrant workers normally did not receive pay, and recruiters often did not allow them to leave the centers. In most instances, workers were forced to pay recruiters the cost of their forced stay, which resulted in large debts to the recruiters. In what the Solidarity Center and other NGOs

described as commonplace, the Jakarta Post newspaper reported in July that guards at a migrant worker holding center caught and beat a prospective worker, Fadijah, who attempted to escape from the center in South Jakarta. Local residents rescued Fadijah and took the guards to a local police station. Tired of waiting for a promised job in Malaysia, Fadijah reported that she tried to return to her home but the PJTKI would not allow her to leave the center until she had paid a debt of $280 (2.5 million rupiah).

Forced and compulsory labor by children occurred (see Section 6.d.).

d. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits children from working in hazardous sectors and the worst forms of child labor, to include mining, skin diving, construction, prostitution, and offshore fishing platforms. However, the Government did not enforce these laws effectively. Law, regulations, and practice acknowledged that some children must work to supplement family incomes. The Manpower Act prohibits the employment of children, defined as persons under 18, with the exception of those 13 to 15 years of age, who may work no more than 3 hours per day and only under a number of other conditions, such as parental consent, no work during school hours, and payment of legal wages. The law does not appear to address exceptions for children ages 16 to 17.

The National Child Protection Act addresses economic and sexual exploitation, including child prostitution, child trafficking, and the involvement of children in the narcotics trade. The law provides severe criminal penalties and jail terms for persons who violate children's rights. During the year, the Government prosecuted a small number of cases under this act.

The Government has a national action plan to eliminate the worst forms of child labor, as well as separate national action plans for combating trafficking and for eliminating the commercial sexual exploitation of children.

Child labor remained a serious problem in the country. An estimated 6 to 8 million children exceeded the legal 3-hour daily work limit, working in agriculture, street vending, mining, construction, prostitution, and other areas. More children worked in the informal than the formal sector. Some children worked in large factories, but their numbers were unknown, largely because documents verifying age could be falsified easily. Children worked in industries such as rattan and wood furniture, garment, footwear, food processing, and toy making, and also in small-scale mining operations. Many girls between 14 and 16 years of age worked as live-in domestic servants. The ILO informally estimated that 700,000 children worked as servants. Many child servants were not allowed to study and were forced to work long hours, received low pay, and generally were unaware of their rights.

The law and regulations prohibit bonded labor by children; however, the Government was not effective in eliminating forced child labor, which remained a serious problem. A significant number of children worked against their will in prostitution, pornography, begging, drug trafficking, domestic service, and other exploitative situations, including a small number on fishing platforms (see Section 5).

Enforcement of child labor laws remained largely ineffective. Despite legislative and regulatory measures, most children who worked, including as domestics, did so in unregulated environments. Anecdotal evidence suggested that local labor officials carried out few child labor investigations.

e. Acceptable Conditions of Work

Provincial and district authorities, not the central Government, establish minimum wages, which vary by province, district, and sector. Provincial authorities determined provincial minimum wage levels based on proposals by tripartite (workers, employers, and government) provincial wage commissions. The provincial minimum wage rates establish a floor for minimum wages within the province. Local districts set district minimum wages using the provincial levels as references. Districts also set minimum wages in some industrial sectors on an ad hoc basis. Provinces and districts conducted annual minimum wage rate negotiations, which often produced controversy and protests.

The minimum wage levels set by most local governments did not provide a worker and family with a decent standard of living. Most province-level minimum wage rates fell below the Government's own calculation of basic minimum needs. Jakarta offered the highest minimum wage level $74 (671,550 rupiah) per month, while East Java stipulated the lowest at $34 (310,000 rupiah) per month. In December, workers in Jakarta protested the Governor's decision to raise the monthly minimum wage by only 6 percent to $78 (711,843 rupiah), which fell below the government-determined minimum living standard. Employers argued that increasing wage rates, among a number of other factors, made the country's workers less competitive internationally and limited job growth in the industry.

Local manpower (Disnaker) officials are responsible for enforcing minimum wage regulations. Enforcement remained inadequate, particularly at smaller companies and in the informal sector. In practice, official minimum wage levels applied only in the formal sector, which accounted for 35 percent of the workforce.

Labor law and ministerial regulations provide workers with a variety of benefits. Persons who worked at more modern facilities often received health benefits, meal privileges, and transportation. The law also requires employers to register workers with and pay contributions to the state-owned insurance agency JAMSOSTEK; however, at year's end, companies had registered only 23 million workers, according to JAMSOSTEK.

http://www.state.gov/g/drl/rls/hrrpt/2004/41643.htm

The law establishes a 40-hour workweek, with one 30-minute rest period for every 4 hours of work. Companies often required a 5-and-a-half or 6-day workweek. The law also requires at least 1 day of rest weekly. The daily overtime rate was 1½ times the normal hourly rate for the first hour and double the hourly rate for additional overtime, with a maximum of 3 hours of overtime per day and no more than 14 hours per week. Workers in industries that produced retail goods for export frequently worked overtime to meet contract quotas. Unions complained that companies relied upon excessive overtime in some electronics assembly plants, to the detriment of workers' health and safety. Observance of laws regulating benefits and labor standards varied between sectors and regions. Employer violations of legal requirements were fairly common, resulting in some strikes and protests. The Manpower Ministry continued to urge employers to comply with the law; however, government enforcement and supervision of labor standards were weak.

Both law and regulations provide for minimum standards of industrial health and safety. In practice, the country's worker safety record was poor. As revealed in press reports, JAMSOSTEK recorded 105,846 occupational accidents in 2003, an increase from 103,804 in 2002. Local Disnaker officials have responsibility for enforcing health and safety standards.

In larger companies, the quality of occupational health and safety programs varied greatly. Health and safety standards in smaller companies and in the informal sector tended to be weaker or nonexistent. Workers are obligated to report hazardous working conditions, and employers are forbidden by law from retaliating against those who do report hazardous working conditions; however, the law was not enforced effectively.

BACK TO TOP



**EXHIBIT R**

# INDONESIA

The December 2004 earthquake and tsunami overshadowed all other issues in Indonesia in 2005. While the disaster helped propel an August 2005 peace agreement for Indonesia's northwest Aceh province, Indonesia struggled to cope with the massive rehabilitation and reconstruction needs posed by the crisis. The Indonesian military continued to commit human rights violations in Papua, and impunity reigned in other parts of Indonesia. There were disturbing signs of a return to intimidation of the press and criminalization of dissent. In September Indonesia's parliament finally ratified the two main international human rights covenants, on civil and political rights, and economic, social and cultural rights. Three bombs killed at least twenty-three people in Bali in October, in an attack similar to that of October 2002.

## Aceh: Tsunami and Subsequent Peace Agreement

The tsunami devastated Aceh, which lies only ninety miles from the epicenter of one of the worst natural disasters in recent history. Over 127,000 people were killed there in the span of minutes; an additional thirty-seven thousand are still missing and presumed dead. More than half a million displaced continue to rely on outside help for basic necessities. Aftershocks, including the March 28, 2005 Nias Island quake, which killed at least 905 people and displaced almost 107,000, continue to traumatize the populations in Aceh and North Sumatra. It will take years for Aceh to recover from the physical, emotional, and human toll of the earthquake and tsunami.

In August 2005, the government of Indonesia and the Free Aceh Movement (Gerakan Aceh Merdeka, GAM) signed a comprehensive peace agreement after thirty years of devastating armed conflict. In August and September, approximately 200 monitors from the European Union and the Association of Southeast Asian Nations (ASEAN) arrived in the province to observe the initial implementation of the agreement, which includes the release of all GAM prisoners convicted of treason, a disarmament program, and a significant reduction of government troops in the province. The agreement also covers the planned establishment of an ad hoc court in Aceh to hear cases of

270

human rights violations. As of November, the ceasefire and implementation of the peace agreement appeared to be holding, with prospects for a sustainable peace in the region stronger than ever.

## Papua

There was a significant build-up of troops in Papua, the easternmost part of the country, with reports of widespread displacement of civilians, arson, and arbitrary detention in the central highlands region. In August a reported 10,000 Papuan protestors held the largest ever demonstration in the province over the failure of the government to implement special autonomy as mandated in a 2001 agreement. In October the government finally set up the Papuan Peoples Council (MRP) in accordance with provisions in the 2001 Act on Papuan Special Autonomy and a subsequent government regulation.

To date there has been no judicial accounting for atrocities committed in Papua in 2000. In September 2005 two police officers standing trial for the December 2000 killing in Papua of three students and the torture of up to 100 civilians were acquitted by a human rights court in Sulawesi.

Papua has the highest HIV prevalence in Indonesia, and discrimination against people living with HIV/AIDS is widespread.

## Terrorism

Indonesia faces a domestic terrorist threat, with more than 200 civilians killed since 2002 in bomb attacks targeting Western interests. Indonesia is addressing this threat through criminal prosecutions and a slowly improving police force, although the perpetrators of some of the attacks remain at large.

Abu Bakar Bashir, believed by many to be the spiritual head of the terrorist organization Jemaah Islamiyah, was convicted in March 2005 of criminal conspiracy behind the 2002 Bali bombings. Due to poor conduct of the prosecution, he was acquitted of the more serious charge of planning a terrorist attack. He received a sentence of only thirty months, which was further

shortened to twenty-five-and-a-half months in an August 2005 Independence Day sentence reduction.

## Impunity and the TNI

The Indonesian armed forces (Tentara Nasional Indonesia, TNI) continue to violate international human rights and humanitarian law with impunity. Military operations in Papua and Aceh are characterized by undisciplined and unaccountable troops committing widespread abuses against civilians, including extrajudicial executions, torture, forced disappearances, beatings, arbitrary arrests and detentions, and drastic limits on freedom of movement. Torture of detainees in police and military custody is also widespread across the country; some of the detainees tortured are children. Indonesia's executive and judicial branches regularly fail to address such abuses.

September 30, 2005, marked the fortieth anniversary of the alleged coup attempt that precipitated former Indonesian President Soeharto's rise to power. The Indonesian Communist Party remains banned for allegedly plotting the coup attempt, and former members or supporters continue to suffer discrimination. At least half a million people were killed in anti-communist purges after the coup attempt, and hundreds of thousands more were imprisoned without charge or trial. To date there has been no accountability for atrocities committed in 1965 and 1966. There has also been no legal accounting for the majority of atrocities committed during Soeharto's more than three decades in power, or for the violence instigated by pro-Soeharto forces in a failed attempt to stave off his 1998 fall from power.

Trials for the 1984 killing of civilians by Indonesian security forces at Tanjung Priok, Jakarta, finished in July 2005 with the appeals court overturning the convictions of twelve of the fourteen defendants. The other defendants had been acquitted the previous year amid reports of political interference and witness intimidation.

Despite significant international pressure and interest, trials of senior Indonesian officers in Jakarta failed to give a credible judicial accounting for atrocities committed in East Timor in 1999 (see East Timor chapter).

### Freedom of Expression

Although political space for dissent increased enormously after the fall of President Soeharto, the June 2005 conviction and six-month sentence for a student in Bali for burning a portrait of President Susilo Bambang Yudhoyono illustrates how broadly-worded laws limiting freedom of expression are still used by authorities to target outspoken critics.

After the fall of Soeharto, Indonesia for a time was considered a center of media freedom in Southeast Asia. However, the trend more recently has been toward a more restrictive environment characterized by extensive restrictions on, and intimidation of, journalists in Aceh, and ongoing use of criminal defamation laws to target journalists and editors who criticize public figures.

In May 2005 two newspaper editors, Darwin Ruslinur and Budiono Syahputro, were each sentenced to nine months in jail after a judge found them guilty of defaming a local Golkar Party leader in Lampung, Sumatra. In April an appeals court upheld a one-year prison sentence for Bambang Harymurti, the editor of the prominent independent Jakarta news magazine *Tempo*, for an allegedly defamatory article about a well-connected businessman.

### Freedom of Religion

In July 2005 Indonesia's Council of Ulemas issued a *fatwa* against the Ahmadiyah, prompting a series of attacks against their places of worship. Founded in 1889 by Mirza Ghulam Ahmad, the Ahmadiyah identify themselves as Muslims but differ with other Muslims as to whether Mohammad was the "final" monotheist prophet; consequently, some other Muslims perceive the Ahmadiyah as heretics. The police regularly failed to respond to the attacks, and at the time of writing no charges had been brought against any perpetrator. By November 2005 at least two local regencies in Java had banned all Ahmadiyah religious activity in those areas, in direct violation of Indonesian constitutional religious freedom guarantees.

273

WORLD REPORT 2006



274

## Indonesian Migrant Workers

Over a million Indonesians work abroad, sending home remittances critical to the country's economy. Women comprise over 75 percent of these migrant workers.

In addition to problems these workers encounter while abroad (see the Malaysia and Saudi Arabia chapters), many women domestic workers confront a wide range of human rights abuses during recruitment, pre-departure training, and return to Indonesia. These abuses include being confined in locked, overcrowded training centers for months on end, and many fall deeply into debt to pay exorbitant agency fees. Some girls and women seeking employment become victims of human trafficking.

Indonesia has taken some positive steps to address this issue, but 2004 migrant workers legislation is deeply flawed. Indonesian officials have not vigorously implemented necessary protections, such as effectively monitoring and prosecuting labor agencies or fighting corruption.

## Child Domestic Workers in Indonesia

At least 688,000 children, mainly girls, are estimated to work as domestics in Indonesia. Typically recruited between the ages of twelve and fifteen, often on false promises of decent wages and working conditions, girls may work fourteen to eighteen hours a day, seven days a week, and earn far less than the prevailing minimum wage. In the worst cases, child domestics are paid no salary at all and are physically and sexually abused. Domestic workers in Indonesia are not recognized as workers by the government, and are excluded from the nation's labor code, which affords basic labor rights to workers in the "formal" sector such as a minimum wage, overtime pay, an eight-hour work day and forty-hour work week, weekly day of rest, vacation, and social security. The Ministry of Manpower does not monitor the "informal" sector, and no effective mechanisms exist for domestics to report cases of abuse. The exclusion of all domestic workers from these rights denies them equal protection of the law and has a discriminatory impact on women and girls, who constitute the vast majority of domestic workers.

### Human Rights Defenders

On September 7, 2004, one of Indonesia's most outspoken and respected human rights defenders, Munir Said Thalib, died under suspicious circumstances on a plane to the Netherlands. The autopsy report, released in November 2004, concluded that Munir had died from arsenic poisoning.

In December 2004 President Yudhoyono established, by presidential decree, an independent fact-finding team to investigate Munir's killing. The team's unpublished report identified Garuda airlines pilot Pollycarpus Priyanto as a leading suspect in the case, and linked him to senior employees of the Garuda airline and high-ranking intelligence officials. On August 9, 2005, the trial of Pollycarpus began at the Central Jakarta District Court. Pollycarpus was charged with committing or participating in the planned murder of Munir, either alone or in collaboration with two other named suspects. However, the indictment against Pollycarpus made no mention of the fact-finding team's report or findings. The trial is ongoing at this writing.

The fact-finding team also issued a summons to retired army Lt. Gen. Hendropriyono, the head of Indonesia's State Intelligence Body at the time of the murder. He refused to comply with the summons, and subsequently filed criminal defamation charges against two respected human rights defenders, Usman Hamid (the head of Kontras) and Rachland Nashidik (the head of Imparsial), who were members of the fact-finding team.

In Aceh, human rights defenders still suffer threats and intimidation from security forces and GAM when monitoring and investigating human rights abuses.

### Key International Actors

In February 2005 the United States lifted long-running restrictions and resumed full International Military Education and Training (IMET) for Indonesia. First imposed following the massacre of civilians at Santa Cruz cemetery in East Timor in 1991, the restrictions had remained in place pending Indonesia's cooperation with the FBI in an ongoing investigation into the

276

killing of two Americans and one Papuan in Papua in August 2002. In November the U.S Congress voted to maintain some restrictions on U.S military assistance to Indonesia in foreign military financing, pending progress in accountability for human rights violations, and increased civilian control over the military.

Indonesia's relationship with the United States continues to focus on joint efforts to fight terrorism. The United States has made it clear that cooperation in the "war on terror" is more critical than human rights to normalization of the U.S.-Indonesia relationship.

In February 2005 U.N. Secretary-General Kofi Annan announced the establishment of a commission of experts to review the prosecution of serious human rights violations committed in East Timor in 1999, given Indonesia's failure to do so effectively. After initially being refused visas to enter the country, the commission traveled to Jakarta in May 2005. The commission's report to the secretary-general, published in July, found that the trials in Jakarta for crimes committed in East Timor in 1999 were "manifestly inadequate," showing "scant respect for or conformity to relevant international standards," primarily due to a lack of commitment on the part of the prosecution, and a lack of expertise, experience and training. The commission recommended that Indonesia accept international support to strengthen its prosecutorial capacity, advising that the Indonesian government be given a clear six-month timetable to show progress on the commission's recommendations. At the time of writing neither the U.N. Security Council nor the secretary-general had acted on any of the commission's recommendations.

The Consultative Group on Indonesia (CGI) meeting, an annual conference of Indonesia's largest donors convened by the World Bank, continues to pledge significant sums, although donors are increasingly conditioning assistance on good governance and legal reform.



# EXHIBIT S



# Indonesia

Country Reports on Human Rights Practices - 2006
Released by the Bureau of Democracy, Human Rights, and Labor
March 6, 2007

Indonesia is a multiparty republic with a population of approximately 245 million. In 2004 Susilo Bambang Yudhoyono became the country's first directly elected president in elections that international observers judged to be free and fair. Voters also chose two national legislative bodies in 2004: the House of Representatives (DPR) and the newly created House of Regional Representatives (DPD). While civilian authorities generally maintained effective control of the security forces, in some instances elements of the security forces acted independently of civilian authority.

The government generally has been unable to adequately address serious human rights abuses committed in the past. Inadequate resources, weak leadership, and limited accountability contributed to continued abuses by security force personnel, although with sharply reduced frequency and gravity than under past governments. The following human rights problems occurred during the year: unlawful killings by security force personnel, terrorists, vigilante groups, and mobs; torture; harsh prison conditions; arbitrary detentions; a corrupt judicial system; warrantless searches; infringements on free speech; restrictions on peaceful assembly; interference with freedom of religion by private parties, sometimes with complicity of local officials; intercommunal religious violence; violence and sexual abuse against women and children; trafficking in persons; failure to enforce labor standards and violations of worker rights, including forced child labor.

During the year the implementation of the Aceh peace accord, signed in 2005, continued to yield substantial legal and judicial improvements. No unlawful disappearances occurred; human rights observers were given open access to the province; and the year marked the election of a former Free Aceh Movement (GAM) leader as governor. Domestic and international observers judged the elections to be free and fair. In the legal area the government added Confucianism to the list of officially recognized faiths; a new law gave important citizenship rights to foreign spouses of citizens and the children of such marriages; court decisions applied the more expansive press law rather than the more punitive criminal law in press freedom cases; and the Constitutional Court declared articles of the penal code criminalizing defamation of the president and vice president unconstitutional.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

During the year there was a sharp decrease in unlawful killing by security forces, particularly in the conflict areas of Aceh and Papua. However, the government, in the past, rarely investigated such killings and largely failed to hold soldiers and police accountable for killings and other serious human rights abuses that occurred in past years.

On January 20, soldiers opened fire on a crowd in Paniai, Papua killing one Papuan and wounding two others. The Indonesian Armed Forces (TNI) is reportedly investigating the incident. At year's end no charges had been filed.

On March 6, a man on a motorcycle, trying to evade a police roadblock in Peudawa, East Aceh, died. Police maintained that death was the result of a fall; local residents and others maintained that he was shot by police and that other bystanders on the scene were shot and wounded as well. An investigation reportedly was underway, but no results had been released at year's end.

On May 17, police in Wamena, Papua, shot and killed two persons in a crowd trying to block the arrest of a local official on corruption charges. There were no further developments at year's end.

On July 3, TNI personnel reportedly shot and killed a former GAM member in Keude Paya Bakong, North Aceh, in what may have been a traffic dispute. No new developments were reported at year's end.

On August 19, Deny Lewol was arrested by police in Benteng, Ambon City, Maluku. He reportedly was beaten while in custody at the Benteng police station and later died at the hospital (see section 1.c.).

There were no known developments regarding the 44 civilians and 37 GAM members whom the Human Rights Nongovernmental Organization Coalition in Aceh reported were killed during 2005.

There were no known developments regarding the following 2005 cases: the January incident in Bireuen, Aceh, during which six members of the TNI special forces (Kopassus) reportedly killed two men and injured another; the January

incident in Nabire, Papua, in which TNI personnel allegedly beat local Papuan residents leaving seven seriously injured and one, Miron Wonda, dead; the April incident in Mulia City, the capital of Puncak Jaya Regency, during which the police shot and killed Tolino Iban Giri and arrested eight other persons; the report that TNI and Police Mobile Brigade (Brimob) personnel killed three suspected rebels after capturing them during a joint operation in Serba Jaya village in Aceh Jaya District.

The government made no significant progress establishing accountability for the following 2004 abuse cases: the beating death of an East Java resident by police; the killing of three persons who allegedly tried to escape police custody in Sragen, Central Java; the killings of Hermansyah and Ade Candra, who allegedly tried to escape police questioning in Pekanbaru; the police shooting in Poso that injured Bambang, a wrongly accused murder suspect.

On October 4, the Supreme Court overturned the murder conviction of Pollycarpus Budihari Priyanto for the 2004 poisoning death of prominent human rights activist Munir Thalib. The Court upheld Pollycarpus's conviction and two-year sentence on lesser charges of falsifying official documents. On December 25, Pollycarpus received a three-month remission for good behavior and was released from prison, having served 21 months. A report on the case prepared by a presidentially appointed fact-finding team in 2005 was not publicly released but, according to press reports, concluded that Munir's killing was a conspiracy and recommended investigation of former and current officials of the State Intelligence Agency and of Garuda airlines officials. Munir's widow publicly expressed disappointment with the Supreme Court ruling. She had previously called on the president to establish a new investigation team with more power than the previous one. President Yudhoyono has publicly promised that the government would find and try all those responsible for the killing. On December 29, after a meeting with President Yudhoyono, the national police chief declared that the police were continuing to pursue new evidence in the case.

During the year the Indonesian Human Rights Commission (Komnas HAM) investigated the 1998 killing of four students at Trisakti University and nine demonstrators at Semanggi intersection and the 1999 killing of an additional four demonstrators at Semanggi; it concluded that the killings were gross human rights violations. Komnas HAM submitted these cases to the Attorney General's office (AGO) for prosecution; however, the AGO argued that it could not prosecute these cases unless the DPR classified them as gross human rights violations. In February DPR Speaker Agung Laksono said that the DPR would not reconsider its 2001 decision that these cases were not gross human rights violations.

In August 2005 the governments of Indonesia and East Timor established the Truth and Friendship Commission (TFC) to address the human rights violations that occurred in East Timor in 1999. The mandate of the TFC has been extended to August 2007. The TFC prioritized 14 cases to be addressed, including the Liquica killing, the ambush of Suai Church, and the shooting in the house of Mario Carrascalao (see section 1.e.).

During the year, there were no reports of known killings by the GAM or the Free Papua Movement (OPM).

In 2005 the nongovernmental organization (NGO) Commission for Disappearances and Victims of Violence Aceh reported that GAM killed seven civilians; the Human Rights NGO Coalition reported that GAM killed 17 soldiers during 2005. There were no known developments in these cases.

In May 2005 GAM rebels allegedly shot and killed a seven year-old boy in North Aceh Regency during a rebel ambush of a vehicle carrying the boy. The incident left 10 others, including three soldiers, injured. There were no known developments in this case.

There was no known progress in the following cases from 2004: the four civilians found dead in a jungle near Peureulak, East Aceh; the killing of civilian Cut Musdaifah in Wakheuh village; the alleged GAM killing of local legislature candidate Muhammad Amin; and the shooting death of a paramedic in South Aceh.

In March 2005 in Mulia, Papua, according to the military district command, an unknown person, believed to be an OPM member, shot and killed local civilian Tinius Tabuni. There was no known progress in this case.

On November 7, a Central Jakarta court sentenced OPM guerrilla Anthonius Wamang to life in prison for the 2002 murder of two American citizens and an Indonesian citizen in Timika, Papua. Two co-defendants were convicted of conspiracy to murder and sentenced to seven years. Four other defendants were convicted of assisting the conspiracy and sentenced to 18 months in prison.

The courts tried a number of suspects in connection with major terrorist incidents. On September 14, the Denpasar District Court in Bali announced the final of four convictions of Jemaah Islamiyah (JI) associates for their role in the October 2005 Bali suicide bombings, which killed 19 persons and injured more than 100 in the tourist areas of Kuta and Jimbaran. The Bali Court used the country's 2003 Counterterrorism Law and the Criminal Code to hand down sentences for charges that varied from assembling explosives linked to the attacks to hiding the suspected architect of the bombing, Noordin Top, and facilitating his use of the Internet to spread the group's violent ideology. The stiffest sentences were given to Mohammad Cholily (18 years) and Anif Solchanudin (15 years), in each case exceeding the prosecutor's recommendations. The court handed down sentences for Abdul Aziz and Widiyarto that were two years less than the 10 recommended by prosecutors. Following the convictions, lawyers for Cholily, Solchanuddin, and Widiyarto filed appeals, which were withdrawn at the insistence of the convicted men.

http://www.state.gov/g/drl/rls/hrrpt/2006/78774.htm

On December 6, lawyers for the three men convicted of carrying out the 2002 Bali bombing, Amrozi, Ali Ghufron (alias Mukhlas), and Imam Samudra, filed requests for judicial review of their convictions. The attorneys argued that the 2003 antiterror law, which was passed after the bombing and under which the bombers were convicted, could not be applied retroactively. At year's end, the review was underway.

On December 13, the Surabaya district court sentenced Ahmed Arif Hermansyah to three years in prison for hiding explosives that were used in the 2004 bombing of the Australian Embassy in Jakarta, which killed 10 and injured more than 150 people.

On December 21, the Supreme Court overturned the conviction for conspiracy of JI spiritual leader Abu Bakar Ba'asyir in connection with the 2002 Bali bombings. After a key witness renounced his statement that Ba'asyir had attended meetings where the bombings had been discussed, the court decided there was insufficient evidence to uphold Ba'asyir's conviction. Ba'asyir had already completed his prison sentence.

The courts continued with prosecutions related to the 2003 Marriott hotel bombing that killed 12 persons. On May 1, the South Jakarta District Court sentenced Muhammad Iqbal (alias Bayhaqi) to four years for aiding terrorists and smuggling weapons; Abdullah Sunata (alias Arman) was sentenced to seven years for financing terrorists and withholding information on Noordin Top; Joni Ahmad Fauzani and Joko Sumanto were found guilty of helping to conceal Top and received four-year sentences.

Religious and ethnic conflict in Central Sulawesi abated somewhat during the year. The number of murders declined from 37 in 2005 to eight, and the number injured due to religious or ethnic attacks declined from 104 to three. A new provincial police chief and 1,000 additional police improved security which reduced violence in the province.

On January 25, the Poso police chief survived an attack by an assailant on a motorbike when a bullet narrowly missed his head. On September 6, a 50-year-old male was killed when a bomb exploded in Tangkura village of Poso Pesisir subdistrict. On September 9, a bomb exploded in Kawua, South Poso, killing one person. No arrests have been made. On October 1, a Christian woman was stabbed and killed while riding public transportation through a predominantly Muslim area of Poso City. On October 16, an unidentified gunman shot and killed Reverend Irianto Kongkoli in Palu, Central Sulawesi. Police continued to investigate but had made no arrests at year's end.

Government and police continued to make some progress in handling conflicts in Central Sulawesi and Maluku. Police made stronger efforts to investigate, arrest, and prosecute those involved in violence. On May 8, provincial police captured two men, Hasanuddin and Taufik, believed to be the perpetrators of the October 2005 beheadings of three Christian schoolgirls near Poso. Taufik admitted to participating in the beheadings and the murder of Helmi Tobiling in 2004. At year's end Taufik was awaiting trial. Based on information provided by Hasanuddin and Taufik, police arrested five additional suspects for a number of outstanding crimes over the last several years: Jendra (alias Asrudin), Irwanto Irano, Lilik Purwanto (alias Haris), Nano Maryono, and Abdul Muis in Toli-Toli, Central Sulawesi. Police provided local media with a video in which Hasanuddin, Purwanto, Jendra, and Irano confessed to the 2005 beheadings of the three schoolgirls and named two other co conspirators. On the same video Irano also confessed to participating in the May 2005 Tentena market bombing as well as the 2004 Immanuel Church bombing. Lilik Purwanto confessed to murdering Poso prosecutor Ferry Silalahi and Reverend Susianti Tinulele and to bombing the Immanuel Church and the Anugerah Central Sulawesi Protestant Church in 2004. At year's end neither Purwanto nor Irano had been charged for these crimes.

In November 2005 police arrested four men, Parlin, Nurdin, Arsam, and Alfitzar, in connection with the November 2005 beheading of a Muslim girl in Palu. At year's end all four had been convicted of involvement in the murder.

On September 22, Fabianus Tibo, Dominggus da Silva, and Marianus Riwu were executed for their roles in connection with sectarian violence in Poso in 2000 and in the murder of 191 Muslims in a school. The executions led to violence in areas of Flores and West Timor, Nusa Tenggara Province, and in Central Sulawesi. In Flores, 3,000 persons rioted and burned down at least three government buildings. In Kefamananu and Atambua, West Timor, between 3,000 and 5,000 persons rioted, destroying government buildings, homes, and vehicles. In Central Sulawesi, on the same day as the executions, two Muslims, Arham Badaruddin and Rendi Rahman, were pulled from their car and killed while passing through Taripa, a predominantly Christian village. According to the local police, an autopsy revealed that the men were beaten to death with a blunt object. Police arrested 17 people for participating in the killings, all of whom admitted their involvement. The suspects told police that the victims were killed because of the executions of Tibo, Riwu, and Da Silva. At year's end, the suspects were awaiting trial. Several other incidents occurred following the executions, including three small bombings, attacks on both Muslims and Christians, and an attack on the Central Sulawesi police chief that resulted in the mobbing and destruction of his police helicopter by a crowd of 5,000. Police continued to investigate convicted murderer Fabianus Tibo's accusation that 16 other Christians masterminded the Central Sulawesi violence. In April Central Sulawesi police again questioned 10 out of the 16 people named by Tibo.

Maluku Province saw greatly reduced ethnic and religious tensions during the year, and religious leaders met frequently and openly to discuss local events while cooperating to maintain peace and security in the province. During the year four murders and two injuries from violent attacks occurred in Maluku Province; in 2005 four murders and 13 injuries were reported.

In February the Ambon state court sentenced Ongen Pattimura to life in prison and Muthalib Patty to 15 years in prison for

their roles in killing two persons and injuring two others during the February 2005 attack on the "Villa" Karaoke Club in Hative Besar, Ambon. The Ambon district court also sentenced Syamsudin (alias Fatur or Andi) to life in prison for his role in planning the attack.

On April 26, Ambon district court sentenced Zainuddin Nasir to 20 years in prison for his role in the 2004 attack on Wamkana village of Buru Island, during which attackers fired on the village from a speedboat, killing three and injuring four.

On September 12, the Ambon state court sentenced Syarif Tarabubun to 15 years in prison for his involvement in the "Villa" attack. Police originally arrested Tarabubun, a police officer, in November 2005 as a suspect in a number of terrorist actions, including the killings at Wamkana in March 2005, the attack on the "Villa" Karaoke club in February 2005, and the May 2005 attack on a Brimob operations command post in Loki Village, Piru District in West Seram Island, Maluku Province, which killed seven persons, including five police officers.

During the year the Ambon district court convicted three men for participating in a series of attacks in 2004 and 2005. On February 13, the court sentenced Asep Djaja to death for his involvement in the May 2004 Wamkana attack and the May 2005 Loki attack. The sentence was reduced to life imprisonment on appeal. The court also sentenced Nazaruddin Mochtar (alias Abu Gar) to nine years in prison for his involvement in the Loki attack. On April 13, the court convicted Abdullah Umamit of involvement in the Loki attack and the 2004 Batu Merah grenade attack, which injured five persons in a Muslim neighborhood. The incident provoked Muslim residents to attack a bus in March 2005, killing four and injuring 14 Christian passengers. There has been no progress on the bus attack investigation.

On March 16, protesters in Abepura, Papua Province, killed three policemen and an air force intelligence sergeant. According to a Federation of Papuan Churches report, a civilian, Jeni Hisage, was shot, beaten, and killed by police in the aftermath of the riot.

b. Disappearance

In the past Aceh Province was the scene of numerous disappearances. During the year there were no known disappearances in Aceh. On November 6, in a speech in Aceh, the TNI commander said that the TNI no longer engaged in kidnapping. The government reported little progress in accounting for persons who disappeared in previous years or in prosecuting those responsible for those disappearances.

During 2005, according to the Human Rights NGO Coalition, 31 civilians and one GAM member were kidnapped in Aceh; 46 civilians and four GAM members reportedly were kidnapped in 2004. Security forces were implicated in some of the disappearances.

There has been no known progress in the 2004 case of a wounded 16 year-old boy whom police allegedly took into custody, or in the cases of Mukhlis and Zulfikar, members of the local NGO Link for Community Development. There was no known progress regarding the 2004 disappearances of elementary school teachers Muhammad Amin Alwi and Hasballah, who were forcibly taken by 10 armed men in military uniforms in Nagan Raya Regency.

In February 2005 GAM members allegedly kidnapped four persons, including an eight year-old child, and demanded a ransom. Their whereabouts remained unknown at year's end.

In 2004 Pentecostal minister Jokran Hardi Ratu (alias Jarok Ratu) was abducted in South Buru Island, Maluku Province. Abdullah Umamit, who was serving a life sentence for his involvement in the Loki attack (see section 1.a.), was also convicted in the kidnapping of minister Ratu. Umamit admitted in the investigation report that he kidnapped and killed the minister and then threw the body into the sea.

On September 30, a Komnas HAM ad hoc team submitted to the AGO the results of their inquiry into the 1998 abductions of between 12 and 14 pro-democracy activists; the findings had been previously announced publicly in September 2005. Despite refusals from military personnel to cooperate in the investigation, Komnas HAM concluded that all victims still missing were dead and identified suspects for an official investigation without publicly releasing their names. During the year the AGO took no action, stating that it could not prosecute these crimes unless the DPR declared them gross human rights violations (see section 1.a.).

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The constitution states that every person shall have the right to be free from torture, inhuman and degrading treatment. The law makes it a crime punishable by up to four years in prison for any official to use violence or force to elicit a confession; however, law enforcement officials widely ignored such statutes. Security forces continued to employ torture and other forms of abuse. The government made some efforts to hold members of the security forces responsible for acts of torture. During the year the use of torture to obtain confessions from suspects was most apparent in Papua. Torture was sometimes used to obtain confessions, punish suspects, and seek information that incriminated others in criminal activity. Security forces also allegedly used torture to extort money from villagers. Reliable figures on the number of incidents of torture that occurred during the year were difficult to obtain. Torture and other abuse included random beatings, bitings, whippings, slashings, and burnings.

http://www.state.gov/g/drl/rls/hrrpt/2006/78774.htm

The Catholic Peace and Justice Secretariat (CPJS) reported that police arrested more than 20 Papuans following the March 16 Abepura incident, in which three policemen and an air force sergeant were killed (see sections 1.a. and 2.b.). CPJS staff visited the detainees and reported visible signs of abuse on detainees' faces. On August 28, a police officer named Novril beat one of the Abepura defendants, Nelson Rumbiak, in front of the Abepura Penitentiary (see section 2.b.). Novril was escorting Rumbiak from the Jayapura District Court where Rumbiak had testified that police had beaten him and others following the March 16 incident. The Jayapura disciplinary committee sentenced Novril to 21 days' detention.

In Aceh Province the Human Rights NGO Coalition reported 17 cases of human rights violations committed by security forces against civilians and two cases against former GAM members during the year, compared with violations of 80 civilians' rights in 2005. In September 2004 Human Rights Watch (HRW) reported widespread abuse of prisoners in Aceh by security forces, including electric shocks and beatings with wooden beams and gun butts. The government announced it would investigate the allegations; however, there were no known investigations.

On January 20, security officers opened fire on a group of protesters outside a police station in Paniai Regency, Papua Province, killing one person and injuring two others (see section 1.a.).

Following the May 17 incident in Wamena, Papua, in which police killed two persons in a crowd trying to prevent the arrest of a local official (see section 1.a.), police allegedly detained more than 100 villagers, including women and children, and required them to sit in the sun in front of the police station for nearly four hours.

During the year the government reported no progress in prosecuting those responsible for acts of torture committed in Aceh in past years, including those cases detailed in reports by HRW and Amnesty International (AI).

During the year 15 persons were publicly caned in Aceh for offenses under Shari'a (Islamic law) such as gambling, consumption of alcohol, and being alone with members of the opposite sex who were not blood relatives, a sharp reduction from 2005, when at least 88 people were caned (see section 2.c.).

Military personnel and police officers were responsible for mistreatment and other cruel acts during the reporting period. In March Rosidi from Ra'ab, East Java, was arrested and accused of running an illegal lottery. According to the head of the village, Rosidi was in good health when he was taken to the police station. Following a severe beating, he was rushed to Dr. Sutomo Hospital in Surabaya. On March 27, Probolinggo police arrested three officers accused of the beating. At year's end no details of punishment were available.

On August 19, Deny Lewol was arrested by police in Benteng, Ambon City, Maluku. He was beaten while in custody at the Benteng police station and died at the hospital. A group of persons subsequently attacked and destroyed the Benteng police station. A crowd of hundreds brought his body to the Maluku police to protest. On August 20, Maluku provincial police arrested and charged three members of Maluku provincial police intelligence (Luis Nusamara, Albert Wattimena, Raders Ralahalu) and one civilian, Robert Latuheru, in the death. At year's end they were awaiting trial.

No known disciplinary action has been taken in the September 2005 attack by a group of Brimob officers in Kampu Pisa, North Maluku, which injured 12 persons. The deputy chief of the North Maluku Brimob unit had promised to punish the attackers.

On January 16, the Makassar military court sentenced three army soldiers to 10-week jail sentences and fines of $0.55 (Rp 5,000) each for their involvement in the November 2005 attack on Banrimanurung village in South Sulawesi. Investigators from the Makassar military police found that 25 soldiers were involved in the attack, which injured three persons and destroyed 50 houses, four cars, and three motorcycles. The attack was triggered by an incident the previous week when villagers punched a soldier.

On August 20, Subiyanto, a police officer from the Probolinggo police precinct, beat and kicked five-year-old Rian Amarullah. Amarullah required hospitalization for his injuries. According to a source in the police unit, Subiyanto was drunk and hit three other men who saw the incident. Probolinggo police arrested Subiyanto. On August 23, Subiyanto reportedly committed suicide, hanging himself in his cell. In Poso, in November 2005 two schoolgirls, Ivon Nathalia and Siti Nuraini, were shot as they walked in the street. They stated that one of the perpetrators was a Poso police sergeant. Central Sulawesi Police Chief Oegroseno formed a special task force to investigate the incident and other shooting incidents that had occurred in Central Sulawesi, possibly involving police officers. On April 10, Central Sulawesi police arrested a police sergeant for the shooting of the two schoolgirls. At year's end, no further information about the investigation was available.

There was no reported progress in the investigation of the 2004 case of the TNI soldiers in Kampung Meureu Baro-Indrapuri who repeatedly raped a 16-year-old girl over a period of several months, leaving her pregnant.

On March 24, Hendra Saputra, a cadet at the Semarang Police Academy, was beaten, kicked, and subjected to electric shocks by five senior cadets in a hazing incident. He suffered serious brain injuries as a result. In November five cadets were charged with torturing Saputra. The five cadets were not suspended from the police academy and their ongoing police academy duties delayed the start of the trial until December. The court had not reached a verdict at year's end.

Mobs carried out vigilante justice, but reliable statistics on such actions were not available. Incidents of theft or perceived theft triggered many such incidents. On September 6, in West Jakarta, a mob beat and blinded in one eye a man who

attempted to steal a woman's cellular telephone. Police saved him from being burned alive.

Prison and Detention Center Conditions

Conditions at the country's 365 prisons and detention centers were harsh, and overcrowding was widespread. Occupancy frequently was two or three times over recommended capacity. Guards regularly mistreated inmates and extorted money from them. There were widespread reports that the government did not supply sufficient food to inmates, and family members often brought food to supplement their relatives' diets. Family members reported that prison officials often sought money to allow relatives to visit inmates. Unruly detainees were held in solitary confinement for up to six days on a rice-and-water diet.

The wealthy or privileged had access to better treatment in prison. The country's most famous inmate, Hutomo "Tommy" Suharto, the son of former president Suharto, reportedly left his Central Java prison cell for Jakarta every month via helicopter and stayed at a luxury hotel while being treated at Subroto Army Hospital for a benign tumor behind his eye. In 2002 the Central Jakarta District Court sentenced Tommy to 15 years in prison for hiring two men to kill Supreme Court Justice Syaifuddin Kartasasmita, who had convicted him for corruption. On appeal, the Supreme Court reduced the sentence to 10 years. While serving his sentence, Tommy received regular remissions of between six months and one year for "good behavior," and he was released conditionally on October 30.

Most children convicted of serious crimes served their sentences in juvenile prisons. However, in the arrest and trial phases, authorities held juveniles in detention centers with adults (see section 5). In theory, prisons held those convicted by courts, while detention centers held those awaiting trial; however, in practice, pretrial detainees at times were held with convicted prisoners.

There were no official restrictions on prison visits by human rights monitors, and prison officials granted varying degrees of access, including to the International Committee of the Red Cross.

d. Arbitrary Arrest or Detention The law contains provisions against arbitrary arrest and detention but lacks adequate enforcement mechanisms, and authorities routinely violated it. The law provides prisoners with the right to notify their families promptly and specifies that warrants must be produced during an arrest. Exceptions are allowed if, for example, a suspect is caught in the act of committing a crime. The law allows investigators to issue warrants; however, at times authorities made arrests without warrants.

Role of the Police and Security Apparatus

The president appoints the national police chief, subject to DPR confirmation. The police chief reports to the president but is not a full member of the cabinet. The national police force has approximately 250,000 officers deployed throughout the 33 provinces. The police maintain a centralized hierarchy, and locally deployed forces formally report to their national headquarters rather than to local governments. The military is responsible for external defense, but also has a residual obligation to support the police in their domestic security responsibilities. In Aceh, the Shari'a police, a provincial body, is responsible for enforcing Shari'a law. During the year international NGOs noted improvement in the degree of police crime-fighting professionalism and an increased emphasis on law enforcement ethics. Overall, however, police professionalism remained low, as did their respect for human rights and effectiveness at investigating human rights abuses. Impunity and corruption remained significant problems. There were instances in which the police failed to respond to mob or vigilante violence. Police commonly extracted bribes, ranging from minor payoffs in traffic cases to large bribes in criminal investigations. From January to October, the Division of Profession and Security (Propam) reportedly investigated 5,486 police officers, including high-level officials, across the country, resulting in 240 dismissals. Other punishments varied from demotion to criminal prosecution.

In August Propam ordered that Southwest Sulawesi Police Chief Brigadier General Edhy Susilo be removed from his position following a disciplinary hearing on sexual harassment charges. On September 16, the provincial chief of police in East Kalimantan, Inspector General Djosua Sitompul, was removed from his position on suspicion of involvement in illegal logging.

On September 26, the South Jakarta District Court found Brigadier General Ismoko guilty of receiving bribes and sentenced him to 20 months in prison. In the same case, Commissioner General Suyitno Landung, the former head of the Criminal Investigation Division and an instructor at the National Institute of Defense, was arrested in December 2005 on suspicion of accepting bribes. On October 10, Landung was sentenced to 18 months in prison. He is the highest-ranking police official to be jailed for corruption.

On December 4, Senior Commissioner Erick Bismo, the deputy police chief in Rembang, Central Java, was removed from his position for allegedly beating 26 subordinates.

Arrest and Detention

A defendant may challenge the legality of his arrest and detention in a pretrial hearing and may sue for compensation if wrongfully detained; however, defendants rarely won pretrial hearings and almost never received compensation after being released without charge. Military and civilian courts rarely accepted appeals based on claims of improper arrest and

detention. The law limits periods of pretrial detention. Police are permitted an initial 20-day detention, which can be extended to 60 days; prosecutors may detain a suspect 30 days initially, with a 20-day extension permitted. Prosecutors may extend police detention periods, and a district court may further extend prosecutors' detention of a suspect. The district and high courts may detain a defendant up to 90 days during trial or appeal, while the Supreme Court may detain a defendant 110 days while considering an appeal. In addition, the law allows detention periods to be extended up to an additional 60 days at each level if a defendant faces a possible prison sentence of nine years or longer or if the individual is certified to be mentally or physically disturbed. Authorities generally respected these limits in practice. The antiterrorism law allows investigators to detain any person who, based on adequate preliminary evidence, is strongly suspected of committing or planning to commit any act of terrorism for up to four months before charges must be filed.

In areas of separatist conflict, such as Papua, police frequently and arbitrarily detained persons without warrants, charges, or court proceedings. The authorities rarely granted bail, frequently prevented access to defense counsel during investigations, and limited or prevented access to legal assistance from voluntary legal defense organizations.

In the aftermath of the March 16 Abepura incident in which three police officers were killed, police allegedly physically abused and arbitrarily arrested suspects. Only one of the persons arrested was on the list of suspects issued by local police immediately after the incident. According to human rights groups, the persons arrested were a combination of student activists and innocent bystanders implicated during the interrogation of other suspects (see sections 1.a., 1.e., and 2.b.).

e. Denial of Fair Public Trial The law provides for judicial independence. In practice the judiciary became increasingly independent but remained influenced at times by the executive branch, the military, business interests, and politicians. The Constitutional Court demonstrated significant independence and, in some major cases, ruled against the government. Low salaries continued to encourage corruption, and judges were subject to pressure from government authorities, which often influenced the outcome of cases.

Under the Supreme Court are general, religious, military, and administrative courts. The law provides for the right of appeal. The Supreme Court normally considers only the lower court's application of the law. Another avenue for appeal is the judicial review process. Judicial review allows the Supreme Court to revisit cases that have already been decided (including by the Supreme Court itself), provided that there is new evidence that was not available during earlier trials. Parallel to the Supreme Court is the Constitutional Court, which is empowered to review the constitutionality of laws, settle disputes between state institutions, dissolve political parties, resolve certain electoral disputes, and decide allegations of treason or corruption against the president or vice president.

In August 2005 the president inaugurated the Judicial Commission with a mandate to propose candidates for appointment as justices to the Supreme Court and to monitor and ensure the integrity of judges. In an August 23 verdict, the Constitutional Court stripped the Judicial Commission of an oversight role and concluded that the law establishing the commission did not clearly state what the body would monitor. Legal experts criticized the court's decision as counter to efforts to combat corruption. During the year the commission received a total of 473 reports about the conduct of judges.

The judicial branch theoretically is equal to the executive and legislative branches, and it has the power of judicial review of laws passed by the DPR; government regulations; and presidential, ministerial, and gubernatorial decrees. In practice the judiciary was less influential than the executive and legislative branches. In each of the country's 2,418 district courts, a panel of judges conducts trials by posing questions, hearing evidence, deciding on guilt or innocence, and assessing punishment. Both the defense and prosecution can appeal verdicts. At times judges reversed initial judgments in the appeals process and sometimes lengthened or shortened sentences.

In the aftermath of the March 16 Abepura civil disorder, police arrested a total of 24 persons on charges ranging from murder to assault to obstructing an officer in the performance of official duties; at year's end 22 had been convicted and given sentences ranging from four months to 15 years in jail. The trials of the remaining two were in progress at year's end. Human rights activists raised serious questions about the fairness of the trials. They noted the lack of positive identifications of suspects by police in most cases, the admission of physical evidence without proper foundation being laid, and alleged that the judicial panel was biased against the defendants. Komnas HAM was asked to investigate the trials, but, at year's end, it had not yet decided whether to open an investigation (see sections 1.a., 1.d., and 2.b.).

Trial Procedures

The law presumes that defendants are innocent until proven guilty. It also permits bail, which was used rarely in areas of separatist conflict. Court officials sometimes accepted bribes in exchange for granting bail. Defendants have the right to confront witnesses and call witnesses in their defense. An exception is allowed in cases in which distance or expense is deemed excessive for transporting witnesses to court; in such cases, sworn affidavits may be introduced. The courts allowed forced confessions, particularly in conflict areas, and limited the presentation of defense evidence. Defendants have the right to avoid self incrimination but generally were required to give testimony before the conclusion of a trial. However, in practice, defendants regularly refused to answer questions. The law gives defendants the right to an attorney from the time of arrest and at every stage of examination, and requires that counsel be appointed in cases involving capital punishment or a prison sentence of 15 years or more. In cases involving potential sentences of five years or more, the law requires the appointment of an attorney if the defendant is indigent and requests counsel. In theory, indigent defendants may obtain private legal assistance, and NGO lawyer associations provided free legal representation to indigent

defendants. For example, the Women's Legal Aid Foundation (LBH-Apik) represented many women who otherwise could not afford representation. In many cases procedural protections, including those against forced confessions, were inadequate to ensure a fair trial.

On August 11, President Yudhoyono signed the Witness and Victim Protection Act, which is intended to protect witnesses who testify or provide information to investigators from harm and threats to their safety and security. The law provides security to witnesses and victims, and their family members. In the past many witnesses were reluctant to testify in court for fear of defamation charges. The Witness and Victim Protection Act does not shield against defamation charges.

Widespread corruption throughout the legal system continued. Bribes and extortion influenced prosecution, conviction, and sentencing in countless civil and criminal cases. On January 3, investigators from the AGO and the national police took Judge Herman Alossitandi into custody after he allegedly attempted to extort $22,000 (200 million rupiah) from Walter Sigalingging, a key witness in a $34.5 million (311 billion rupiah) graft case involving the former head of the state social security agency. The Supreme Court ordered the Jakarta High Court to set up a disciplinary council and move forward with the possible suspension of Alossitandi. On June 26, Alossitandi was sentenced to 4� years in prison and fined $22,000 (200 million rupiah).

On September 6, the Anti-Corruption Court sentenced Suparman, a former Corruption Eradication Commission (KPK) investigator, to eight years' imprisonment and fined him $22,000 (200 million rupiah) for corruption and blackmailing a witness. The judges concluded Suparman abused his authority as a KPK investigator to extort money and goods from Tintin Surtini, a witness in a corruption case.

On December 19, the Constitutional Court ruled that the legal provision creating the Anti-Corruption Court was unconstitutional but permitted the court to continue functioning for three more years.

During the year the National Ombudsman Commission reported that it received 102 complaints of judicial corruption involving judges, clerks, and lawyers. This represented 13 percent of all corruption complaints, a reduction from 2005, when 36 percent of complaints related to judicial corruption. Key individuals in the justice system not only accepted bribes but also appeared to turn a blind eye to other government offices suspected of corruption.

Most judges earned $200 to $256 (1.8 million to 2.3 million rupiah) per month, while a judge with three decades' experience earned approximately $660 (5.94 million rupiah) per month; Supreme Court justices earned between $1,540 and $2,640 (14 to 24 million rupiah) per month. During the year the government issued a presidential instruction to adjust the salary of judges to $1,100-1,600 (10 to 15 million rupiah) per month. At year's end this decision had not been implemented.

Apart from the handful of soldiers who were tried in human rights courts, hundreds of low-level and sometimes mid-level soldiers were tried in military court, including for offenses that involved civilians or occurred when soldiers were not on duty. If a soldier was suspected of committing a crime, military police investigated and then passed their findings to military prosecutors, who decided whether or not to prepare a case. While administratively managed by the TNI, military prosecutors and judges were responsible to the AGO and the Supreme Court for the application of laws. However, under the "one roof system" adopted in 2004, the Supreme Court exercises administrative control over military and religious courts. A three-person panel of military judges heard trials while the military high court and the military supreme court heard appeals. Some civilians criticized the short length of prison sentences imposed by military courts. TNI legal officials noted that all personnel sentenced to terms of three months or longer, regardless of their record or length of service, were discharged from military service.

Four district courts adjudicated cases of gross human rights violations. The law provides for each court to have five members, including three non-career human rights judges, who are appointed to five-year terms. Verdicts can be appealed to the standing high court and the Supreme Court. The law provides for internationally recognized definitions of genocide, crimes against humanity, and command responsibility, but it does not include war crimes as a gross violation of human rights.

In September 2005, in its first verdict, the country's first permanent human rights court in Makassar, South Sulawesi, found that the police attacks in 2000 against almost 100 victims in Abepura, Papua, were not "crimes against humanity" (see section 2.b.). The court dismissed all charges against Brimob Brigadier General Johny Wainal Usman and South Sulawesi Police High Commissioner Daud Sihombing. The court also denied the victims' request for rehabilitation and compensation. Prosecutors appealed the verdict to the Supreme Court, which had not issued a decision by year's end (see section 1.a.).

On March 13, the Supreme Court acquitted Noer Muis of all charges and sentenced Eurico Guterres to 10 years in jail for charges in connection with atrocities that occurred during 1999 in three East Timor locations: Liquica, Dili, and Suai. Of the 18 original defendants, only Guterres received a jail sentence. Guterres filed for a judicial review and the hearing was held on October 2. At year's end no decision had been issued. Six of the 18 originally were convicted at the trial level. In 2004 the Jakarta High Court overturned four of the sentences. Later in 2004 the Supreme Court acquitted a fifth.

By 2005 East Timor's Serious Crimes Unit had indicted a total of 391 individuals for crimes against humanity committed during and after the 1999 referendum; however, 290 of these individuals remained at large with little chance of being

returned to East Timor to stand trial. The UN sent a Commission of Experts to Indonesia in 2005 to evaluate the Indonesian ad hoc tribunal and the Serious Crimes Unit and to recommend next steps for achieving accountability. The commission recommended that either Indonesia retry the perpetrators of violence within six months or that the cases be tried before an international tribunal. The commission also included the possibility of an exceptional International Criminal Court investigation (that would extend the court's jurisdiction to crimes committed before its establishment) if its recommendations were not implemented.

In August 2005 Indonesia and East Timor established the TFC to address the human rights violations that occurred in East Timor in 1999. The mandate of the TFC has been extended to August 2007.

In January and February, the Supreme Court acquitted Captain Sutrisno Mascung, retired army major general Pranowo, and 10 subordinates of all charges stemming from the 1984 Tanjung Priok incident, in which dozens and perhaps hundreds of persons were shot and killed. The court held that the Tanjung Priok incident was a criminal case, not a human rights one. In 2003 the ad hoc human rights tribunal for the 1984 Tanjung Priok incident heard the cases of 16 defendants, including Pranowo; retired army major general Rudolf Adolf Butar-Butar; army major general Sriyanto Muntrasan, the commander of Army Special Forces; and other lower ranked military officers and enlisted personnel under the command of Captain Sutrisno Mascung. All of the defendants faced charges of crimes against humanity. The tribunal sentenced Butar-Butar to 10 years in prison and found 13 others guilty and sentenced them to two or three years in jail. The prosecutors had requested 10-year sentences. The court found Pranowo and Muntrasan not guilty. In July 2005 the high court overturned all 14 convictions and upheld the lower court's finding that Pranowo and Muntrasan were not guilty as well.

In 2004 Supreme Court Chief Justice Bagir Manan inaugurated the first Shari'a courts in Aceh. Under the system, 19 district religious courts and one court of appeals heard cases. The courts heard only cases involving Muslims and used decrees formulated by the Aceh local government rather than the penal code. In 2003 the provincial legislature passed laws that included caning among the punishments that the Shari'a court may administer as punishment for persons found guilty of gambling, drinking, or being alone with a non-related member of the opposite sex (see sections 1.c. and 2.c.).

Political Prisoners and Detainees In accordance with the 2005 Helsinki Memorandum of Understanding (MOU) between the Government of Indonesia and GAM, the government unconditionally released prisoners and detainees held due to the Aceh conflict. The government facilitated reintegration of released prisoners, which proceeded without violence. The government continued to hold a relatively small number of former GAM personnel whom it maintained had been convicted on criminal charges.

Civil Judicial Procedures and Remedies

Widespread corruption exists at all levels of the civil legal system. Bribes, extortion, and political considerations influenced the outcomes in large numbers of civil cases.

The civil court system can be used to seek damages for victims of human rights violations. However, corruption and political influence over the civil court system limit access of victims to this remedy.

On December 8, the Constitutional Court ruled that the Truth and Reconciliation Commission (TRC) created in 2004 by the DPR was unconstitutional (see section 4). The Constitutional Court chief justice stated that the government's lack of progress in appointing the TRC's members was one factor in its decision.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law requires judicial warrants for searches except for cases involving subversion, economic crimes, and corruption. The law also provides for searches without warrants when circumstances are "urgent and compelling." Security officials occasionally broke into homes and offices. The authorities occasionally conducted surveillance on individuals and their residences and monitored telephone calls. Corrupt officials sometimes subjected migrants returning from abroad, particularly women, to arbitrary strip searches, theft, and extortion at special lanes set aside at airports for returning workers. Under the special autonomy arrangement in Aceh, Shari'a courts and police have been established to enforce locally drafted laws which ban Muslims from, among other things, drinking alcohol, gambling, and being in close proximity to a member of the opposite sex to whom one is not a close blood relation. The special police charged with upholding Shari'a conducted warrantless searches during the year.

In December the DPR passed a law reaffirming a longstanding requirement that the National Identity Card (KTP), which all citizens are required to carry, identify the holder's religion. NGOs charged that this feature of the KTP undermined the country's pluralistic tradition and endangered cardholders who traveled through areas of interreligious conflict.

Members of the six religions officially recognized by the government--Islam, Protestantism, Catholicism, Hinduism, Buddhism and Confucianism--had little or no trouble obtaining identification cards. On February 24, the government issued a decree officially recognizing Confucianism, and Confucians are now able to get KTPs which list Confucianism as their religion (see section 2.c.). Members of unrecognized religious groups such as the Sikhs or Baha'is remained unable to obtain KTPs unless they consented to listing themselves as belonging to one of the officially recognized religions. Also, low-level officials and village heads responsible for issuing KTPs often demanded small bribes or made the process very

cumbersome, which made it difficult for disadvantaged groups such as itinerant workers, the poor, religious minorities, and the homeless to obtain KTPs.

In many parts of the country, particularly in Kalimantan and Papua, local residents believed that the government sponsored transmigration program interfered with their traditional ways of life, land usage, and economic opportunities. No new families have transmigrated under government auspices since 2004. The government continued to support at least 71,748 households moved in previous years from overpopulated areas to 361 isolated and less developed areas in 26 provinces.

The government used its authority, and at times intimidation, to appropriate land for development projects, often without fair compensation. In other cases, state-owned companies were accused of endangering resources upon which citizens' livelihood depended. In May 2005 President Yudhoyono signed a decree on land acquisition for public use, which allows the government to acquire land for public development projects even if landowners have not agreed on the amount of compensation. A number of NGOs argued that the decree served the interests of wealthy developers at the expense of the poor.

Land disputes generated charges of unfair evictions and the use of excessive force by security officials. The NGO Jakarta Residents Forum estimated that security officials evicted at least 6,000 persons in 13 areas during the year compared with 5,000 in 2005.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press The constitution and the law provide for freedom of speech and freedom of the press; however, the government at times restricted these rights in practice. A vigorous, independent media operated in the country and generally expressed a wide variety of views without restriction. During the year trials were held for two men charged with criminal defamation for "insulting the president," but in December the Constitutional Court ruled these articles of the criminal code unconstitutional. At least three persons were arrested for raising separatist flags. In addition, politicians and powerful businessmen often filed criminal or civil complaints against journalists whose articles they found insulting or offensive. During the year some journalists faced threats or violence.

During the year there was a vigorous debate over proposed revisions to the criminal code. Among the more controversial provisions were ones that would protect government officials and the state ideology (Pancasila) from defamation and would criminalize pornography and certain acts deemed pornographic. The revisions were still under debate at year's end.

Three chief editors were charged with the crime of publicly expressing or inciting animosity and defamation towards Islam after they published controversial Danish cartoons of the Prophet Mohammad. However, only Teguh Santosa, editor of the news Web site Rakyat Merdeka Online, was brought to court. On September 20, the South Jakarta District Court dismissed the charges against Santosa saying the prosecution had used an improper legal argument against him. The judges accepted the defense lawyers' argument that journalists should not be tried under the criminal code, but rather under the press law.

On June 28, police arrested student activist Fahrur Rahman for burning pictures of the president and vice president in a student demonstration. On October 30, Rahman was convicted and sentenced to three months in jail. On August 3, the North Jakarta district court tried lawyer Eggi Sudjana on charges of defamation for criticizing the president for allegedly accepting gifts of luxury cars for his son and three of his aides from a businessman. Sudjana asked the Constitutional Court to review the two provisions of the criminal code which criminalize defamation of the president and vice president. On December 7, the Constitutional Court declared the two provisions unconstitutional.

On April 28, police arrested Popy Egenderph, Jhon Sahureka, and Dominggus Saranamual for their involvement in raising the separatist South Maluku Republic flag in the Kudamati area. Popy had been the target of police investigation since 2004 because of her involvement in coordinating such actions as a flag-raising in front of the residence of Maluku Sovereignty Front (FKM) leader Alex Manuputy in 2004. Police were also investigating the involvement of Sahureka and Saranamual in the FKM.

Although the government did not formally restrict foreign journalists from traveling to the provinces of Papua and West Irian Jaya, as a matter of practice the government expected journalists to request permission through the foreign ministry or, if abroad, through the nearest Indonesian embassy. The government approved some requests and denied others. Some journalists traveled to Papua without specific government permission. There were no reports of restrictions on journalists traveling to previous areas of conflict in Aceh, Maluku, North Maluku, and Sulawesi.

Journalists faced violence and intimidation from police, soldiers, government officials, rebels, thugs, students, and ordinary citizens. During the year the Alliance of Independent Journalists (AJI) recorded at least 53 acts of violence against journalists, including physical attacks as well as verbal threats and lawsuits. One journalist was murdered, four faced lawsuits, 17 were threatened, and 31 were attacked. AJI found the most dangerous provinces for journalists were Jakarta (16 cases of violence), East Java (seven cases), and West Java (six cases). Mobs and thugs committed 15 acts of violence, government officials (district heads, regents, governors, ministerial staff) and the police were each responsible for seven.

On April 29, freelance reporter Herliyanto was found dead with numerous stab wounds to his head, neck, stomach, and

back in a teak plantation near Tarokan village, East Java. Herliyanto was investigating corruption allegations involving school construction funds in Tulupari village. Police ruled out robbery as a motive but did not say publicly whether the killing was linked to his reporting.

On June 13, unknown persons attacked a group of journalists from Jakarta who were on assignment in Kutai Kertanegara, East Kalimantan. The journalists were invited by the governor to cover preparations for the 2008 National Sports Week. Police arrested 10 attackers. Several were known delinquents and one was a tribal leader from the Kutai Kertanegara Forestry Service.

On several occasions during the year, an extremist group, the Islamic Defenders' Front (FPI), sought to limit freedom of expression through intimidation. In April the country's first edition of Playboy magazine was published and sparked protests although it contained no nudity. The police charged four models and the chief editor of the magazine in a lawsuit filed by FPI and a group called the Indonesian Anti-Piracy and Pornography Society. The editor's trial began in December and continued through year's end. On April 12, approximately 300 FPI activists attacked the building housing the magazine's office, causing damage and injuring two police officers. They demanded that the magazine cease publication. The police arrested three of the FPI members. The publisher moved the magazine's operations from Jakarta to Bali.

On February 9, the Supreme Court overturned Tempo magazine chief editor Bambang Harymurti's 2004 criminal defamation conviction in a case stemming from an article that suggested that prominent businessman Tomy Winata stood to benefit from a fire that destroyed a Jakarta market. In overturning the conviction, the Supreme Court ruled that the press law should be used in defamation cases against journalists instead of the criminal law.

During the year the government took no legal action against any person responsible for crimes committed against journalists in 2004 and 2005.

In 2002 the government enacted a broadcasting law that established an impartial broadcasting commission (KPI) and designated the state as the sole authority to issue broadcasting licenses. In November 2005 the government issued four implementing regulations banning live broadcast of regularly scheduled foreign programs by domestic carriers and giving the broadcast licensing authority to the Ministry of Communications and Information. Although some stations continued to air live broadcasts of foreign news reports, others delayed them to comply with the law. The 2002 law does not specify whether the ministry or the KPI controls issuance of broadcast licenses, so broadcasters continued to apply to both. In May both KPI and a coalition of NGOs separately requested that the Supreme Court review the 2005 implementing regulations, arguing they infringe on media freedom. At year's end the Supreme Court had not issued a decision in either case.

Despite incidents of violence and intimidation of the press, members of the press continued aggressive reporting on such issues as corruption, the Munir murder case, and environmental degradation. Regional media increasingly prospered. In addition, moderate Islamic publications continued to increase in number and popularity. Internet Freedom

In November, the Ministry of Information issued a decree creating an agency aimed at preventing online crime among local users. Under the decree, Internet cafes are required to provide the identities of Internet users to the agency on a monthly basis. The Ministry of Communication and Information denied that this agency would monitor online content. Human rights NGOs formed a team to monitor implementation of the decree.

Academic Freedom and Cultural Events

The March 16 Abepura incident, in which three police officers and an air force noncommissioned officer were killed, occurred near Cendrawasih University. In the aftermath police swept the dormitories in search of suspects. Many students reportedly fled the university, and it was forced to close for 10 days.

The government-supervised Film Censorship Institute continued to censor domestic and imported movies for content deemed pornographic or religiously offensive.

In December the Jakarta film festival showed the documentary film A Hero's Journey about East Timor President and former Indonesian prisoner Xanana Gusmao. Media coverage of the film was limited. The Film Censorship Institute reportedly prevented the planned showing of three other films at the festival, all of which touched upon politically sensitive topics: East Timor, the 2002 Bali bombing, and the Aceh conflict.

In July the women's chapter of FPI, the Mujahidah FPI, claimed that Miss Indonesia's participation in the Miss Universe contest violated an education minister's decree forbidding the holding of beauty contests. FPI also reported members of the Miss Indonesia Foundation to the police for their involvement in sending Miss Indonesia to the contest. Although the case remained open, no charges had been filed at year's end.

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The law provides for freedom of assembly, and the government generally respected this right; however, the government restricted this right in conflict areas. The law generally does not require permits for social, cultural, or religious gatherings;

however, any gathering of five or more persons related to political, labor, or public policy requires police notification, and demonstrations require a permit.

Although the Papua Special Autonomy Law permits flying a flag symbolizing Papua's cultural identity, on January 28, police arrested Jacob Mamori for hoisting the Papuan Morning Star Flag. Soon after he was described as being mentally deranged and was released. On May 11, police refused permission for a May 12 seminar at Cendrawasih University on the topic "the demand for Freeport closure."

There were instances when police showed notable restraint in dealing with violent demonstrations. For example, on March 16 in Abepura, approximately 150 demonstrators, including students from Cendrawasih University, blocked off roads for two days in front of the university demanding the closure of the foreign-owned Freeport mine in Timika. Demonstrators and students attacked the police and, with large rocks, beat to death three police officers and one member of the air force. In response, police used tear gas and fired rubber bullets at the crowd (see sections 1.a., 1.d., and 1.e.).

On May 3, the police used tear gas and water cannons in confronting labor demonstrators who had torn down the gates to the parliament compound, set fire to tires, and thrown stones at the police (see section 6.b.).

On other occasions police took no action to protect persons being attacked by mobs. On February 4, a mob in West Lombok attacked the houses of Ahmadiyah sect members, destroying 27 houses and leaving 137 people homeless. On March 17, a mob in Central Lombok attacked another Ahmadiyah settlement, destroying 45 homes. In each incident, police received information that an attack was imminent, but took no action to prevent it. In July a mob ransacked an Ahmadiyah mosque in Bogor, West Java (see section 2.c.).

Freedom of Association

The law provides for freedom of association, and the government generally respected it in practice. The Communist Party was banned in 1966.

c. Freedom of Religion

The constitution provides for "all persons the right to worship according to his or her own religion or belief" and states that "the nation is based upon belief in one supreme God." The government generally respected the former provision, but until recently only five faiths--Islam, Protestantism, Catholicism, Hinduism, and Buddhism--received official recognition in the form of representation at the Ministry of Religious Affairs. However, in February the government recognized Confucianism as a formal religion following a statement by President Yudhoyono on the celebration of the Chinese New Year (most Confucians in the country are ethnic Chinese). On February 24, the Home Affairs Ministry issued a regulation requiring local and provincial administrations to provide administrative services to Confucians, such as issuing marriage licenses and identification documents which denote the bearer's Confucian religious affiliation. Other religious groups were able to register with the government, but only with the Ministry of Home Affairs and only as social organizations. These groups experienced official and social discrimination. The law does not recognize atheism, and in practical terms requires all persons to identify themselves with one of the six faiths acknowledged by the government.

The civil registration system continued to discriminate against members of minority religions. Civil registry officials refused to register the marriages or births of children of animists, members of the Baha'i faith, and others because they did not belong to one of the six officially recognized faiths. According to the Hindu association Parisadha Hindu Dharma Indonesia, Hindus, particularly in North Lampung, Southeast Sulawesi, Kalimantan, and some areas in East Java, despite official recognition of their religion, sometimes had to travel some distance to register marriages or births because local officials would not perform the registration.

Persons whose religion was not one of the six officially recognized faiths, as well as persons of Chinese descent, had difficulty obtaining a KTP, which was necessary to register marriages, births, and divorces. Several NGOs and religious advocacy groups urged the government to delete the religion category from the KTPs, but the DPR passed legislation in December retaining it (see section 1.f.). Men and women of different religions experienced difficulties in marrying and in registering marriages. The government refused to register a marriage unless a religious marriage ceremony had taken place. However, very few religious officials were willing to take part in a wedding involving a man and woman of different faiths. For this reason, some brides and grooms converted to their partner's religion. Others resorted to traveling overseas to wed. In July 2005 the Indonesian Council of Ulemas (MUI) reaffirmed its 1980 ban on marriages between persons of different faiths. MUI edicts are influential but do not have legal standing.

On March 21, the ministers of religious affairs and home affairs signed a joint ministerial decree on the establishment of houses of worship, which replaced a 1969 joint ministerial decree, and declares that a permit for a house of worship can be issued if it is petitioned in a signed statement by at least 90 congregation members and 60 other community members. The petition must then be approved by both the local head of the Religious Affairs Department and the local office of the Communication Forum for Religious Harmony. The joint ministerial decree was in part a response to attacks on unregistered houses of worship. The decree was intended to make it easier to open houses of worship by reducing the number of other community members who must sign the petition. Some groups criticized the new rules for retaining the requirement that community members consent to establishment of houses of worship. These groups also noted that the high number of congregation members required to sign the petition limited the ability of small congregations to register and

to exercise their constitutional right to freedom of worship.

In Central Sulawesi and Maluku, NGOs worked closely with religious leaders and the local community to promote mutual respect and cooperation among religions. Muslim and Christian groups in Poso/Palu were communicating better and interacting more intensively.

In March in Bulukumba, South Sulawesi, approximately 100 members of the militant Islamic group Laskar Jundullah ransacked an office/house of two foreign university lecturers/linguists, accusing the two long-term residents of translating the Bible into the local dialect and demanding the two leave the country for allegedly trying to convert residents to Christianity. The local police dispersed the crowd, after allowing them to "search" the couple's house.

In September 2005 a court in West Java sentenced three women to three years in prison each for proselytizing based on their inclusion of Muslim children, albeit with parental permission, in Christian Sunday school activities. On February 7, the Supreme Court denied their appeal. In November 2005 a non-Indonesian and a citizen working on a dam project in Madura were arrested following accusations that they were trying to corrupt the Muslim community. On March 29, the non-Indonesian was found guilty of misusing his visa and sentenced to four months in jail. After serving his sentence, he was deported. The citizen was sentenced to 2� years in jail.

During the year the government took no concrete steps to implement controversial provisions of the education law that require schools to provide religious instruction to students in their own faith.

As in previous years, some political parties advocated amending the constitution to adopt Shari'a on a nationwide basis, but most parliamentarians and the country's largest Muslim social organizations remained opposed to the proposal. There were no attempts by the national parliament or local legislatures to amend the constitution to adopt Shari'a laws. However, local governments have issued Shari'a-based local laws. Some human rights groups argue that these religiously based laws are illegal, since the Government of Indonesia's regional autonomy law prohibits local laws from dealing with religion. Others argue that the Shari'a based laws violate constitutional provisions that proscribe religiously based laws. The central authorities have not challenged the issuance of such local regulations.

According to the Indonesian Women's Coalition, more than 56 Shari'a-based local laws have been issued throughout Indonesia. These include laws requiring that women wear headscarves in public, that village heads be able to read the Koran (in Arabic), and that prohibit drinking alcohol and gambling.

In Aceh, in accordance with Aceh's special autonomy arrangement, the government continued to establish Shari'a courts, which heard only cases involving Muslims and did not enforce the national penal code but rather qanuns, decrees formulated by the Aceh government and approved by the provincial legislature. The qanuns cover such "immoral behavior" as extramarital contact between a man and a woman, gambling, and the production, distribution, or consumption of alcohol. Extramarital contact warrants from three to nine lashes, consumption of alcohol 40 lashes, and gambling six to 12 lashes. During the year a total of 15 persons were caned.

Members of the Banda Aceh Shari'a office, supported by local police, enforced headscarf use by Muslim women. In a series of December sweeps, Aceh's Shari'a police raided more than 30 beauty salons for allowing "improper contact" between men and women that, they alleged, could lead to adultery. The police also arrested local women for not wearing headscarves.

Courts sentenced several persons to jail for insulting Islam.

On May 17, the Palu District Court sentenced eight followers of Madi, a fugitive sect leader, to nine months in jail for their involvement in a October 2005 clash that left five dead, including three police officers. Two other suspects were acquitted of all charges.

As in previous years, during the Muslim fasting month of Ramadan, many local governments ordered either the closure or limited operating hours for various types of "entertainment" establishments, particularly bars and nightclubs not located in five star hotels. Government and mainstream Islamic leaders called on fringe groups not to carry out vigilante closings of establishments that violated these decrees, and these radical groups complied.

Societal Abuses and Discrimination

The Ahmadiyah Islamic sect, considered heretical by many mainstream Muslims, was attacked by mobs on several occasions, sometimes with elements of the authorities assisting the attackers or acquiescing in the attack. The government has not sought to punish the perpetrators of these attacks (see section 2.b.). At year's end the Ahmadiyah compound in Bogor, West Java, which was attacked and damaged in July 2005, remained sealed, although Ahmadiyah members were able to use the office facilities in a limited fashion.

On February 4, between 500 and 1,000 local residents attacked an Ahmadiyah housing complex in Gegerungan, injuring six persons and destroying all 25 homes. The 137 residents were forced to take shelter in an internally displaced persons (IDP) camp in Mataram, the Lombok provincial capital. The village head informed police of the impending attack but the police were unable or unwilling to stop the violence. Police arrested three participants in the violence after the situation

calmed, but they were subsequently released and no further action was taken. An alleged provocateur of the violence was also later arrested, but was released when an angry crowd showed up at the police station holding him. No one has been charged with any crime in the incident.

On March 17, members of the Anti-Ahmadiyah Alliance destroyed homes of Ahmadiyah members in Prapen, Central Lombok Regency, causing the evacuation of 45 people to the Ahmadiyah IDP camp in Mataram. There were no arrests after this attack.

At year's end 182 Ahmadiyah members were living as IDPs in government barracks in Mataram. Police would not allow them to return and rebuild their homes until the local government decided what to do about them. Local political and religious leaders blamed the Ahmadiyah's plight on their unwillingness to "return to the flock" of mainstream Islam.

On February 15, the Regent of Bulukumba closed the Ahmadiyah mosque in Ujung Loe district of Bulukumba Regency, South Sulawesi. Hundreds of persons demanded that Ahmadiyah followers leave the village.

On April 29, dozens of unidentified people vandalized the Ahmadiyah mosque in Ranowila, South Sulawesi Province, while Ahmadiyah followers were commemorating the Prophet Mohammad's birthday. No injuries or arrests were reported.

On October 24, a group attacked a mosque belonging to the Ahmadihyah sect in Buton regency, South Sulawesi, while the group was performing Idul Fitri prayers. Buton police prevented the attackers from setting the mosque on fire and evacuated members of the sect. No arrests were made.

On October 25, followers of Ahmadiyah clashed with local community members in Manislor, West Java, causing damage to the Ahmadiyah mosque and the house of a local resident. No arrests were made.

On October 27, a mob in Bogor, West Java, dragged Muslim cleric Alih bin Hadi from his mosque and beat him to death. Members of the local community had contended for some time that Alih, who was a member of a group called Yayasan Karisma Usada Mustika, was delivering heretical sermons; the MUI was also looking into charges of heresy. In December 2005, Alih agreed to leave Bogor and stop preaching but returned to Bogor during the fall of this year. At year's end an investigation was ongoing.

Religiously motivated violence and vigilante acts in Central Sulawesi, Maluku, and North Maluku occurred less frequently than in previous years. However, Central Sulawesi continued to experience sporadic bombings, shootings, and other violence in spite of broad societal support for security restoration and reconciliation. During the year the police withdrew some forces from areas of the Poso Regency, bombing and other attacks increased in an apparent effort to provoke renewed intercommunal violence. On March 22, a small bomb exploded in front of the Poso Nursing Academy causing no injuries. Another detonated in the empty Eklesia church in Poso on July 1. An explosion took place in front of the residence of the Poso police chief on August 3. On October 16, an unidentified gunman shot and killed Reverend Irianto Kongkoli in Palu, Central Sulawesi (see section 1.a.).

The indigenous Jewish population is small. Sabili, a radical Islamic publication and the country's second largest magazine by circulation, regularly published articles with anti-Semitic statements and themes. During the year a commercial company, Trustco Multimedia, circulated an interactive computer disk (cd) with material on the Prosperous Justice Party (PKS), which included a "game" entitled "Shoot the Jews." PKS denied any connection with the cd and requested Trustco Multimedia remove it from circulation.

For a more detailed discussion, see the 2006 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The constitution allows the government to prevent persons from entering or leaving the country, and sometimes the government restricted freedom of movement. The Law on Overcoming Dangerous Situations gives military forces broad powers in a declared state of emergency, including the power to limit land, air, and sea traffic; however, the government did not use these powers. The government continued to restrict freedom of movement for foreigners through a system of "travel letters," required for Papua. Enforcement was inconsistent. In June two foreign citizens were detained and deported for misusing their tourist visas to attend a meeting of a local tribal group in Papua Province. Under the 2005 Helsinki MOU between the government and GAM, special national identity cards for Acehnese were no longer issued. However, at year's end many Acehnese continued to use Aceh-specific identity cards, as the government had not yet issued national identity cards in all parts of the province.

The government prevented at least 1,167 persons from leaving the country during the year. The AGO and the High Prosecutor's office prevented most of these departures. Some of those barred from leaving were delinquent taxpayers, convicted or indicted persons, and persons otherwise involved in legal disputes.

On April 19, a noncitizen was barred from entering the country. The individual had been detained by the authorities in 2005 for illegally entering Aceh, and was jailed and deported in 2003 for associating with Acehnese rebels. On September 14, five foreign journalists were deported from Jayapura, Papua, for not possessing appropriate permission to cover news in the area. The five journalists came to Jayapura as tourists but then allegedly engaged in journalistic activities without the

permission of the Foreign Ministry.

The constitution prohibits forced exile, and the government did not use it.

Internally Displaced Persons (IDPs)

The Internal Displacement Monitoring Center (IDMC) reported that there were between 200,000 and 350,000 IDPs in the country, between 140,000 and 150,000 of whom were in Aceh, almost all the result of the 2004 tsunami. Some of the Aceh IDPs lived in temporary shelters, while others stayed with host families or were integrated into local communities.

Protection of Refugees

The law does not provide for the granting of asylum or refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol, and the government has not established a system for providing protection to refugees. However, in practice, there were no reports of the forced return of persons to a country where they feared persecution. The government cooperated with the UN High Commissioner for Refugees (UNHCR), which maintained an office in Jakarta, for assisting refugees and asylum seekers. At year's end there were 61 UNHCR recognized refugees and 265 asylum seekers living in the country. Some were applicants and others were dependents. Most were from Iraq, Burma, Nigeria, or Sri Lanka.

The above figures do not include approximately 10,000 former refugees from East Timor who resided in West Timor at year's end, according to the UNHCR and the National Coordinating Board for Disaster and the IDMC. The precise number of East Timorese refugees is a matter of debate; the East Nusa Tenggara Governor cited a figure of 104,436 individuals remaining in West Timor.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens with the right to change their government peacefully, and citizens exercised this right in practice through periodic, free, and fair elections held on the basis of universal suffrage.

The constitution provides for national elections every five years. The security forces lost their appointed DPR seats in October 2004 with the inauguration of the new legislature. DPR members automatically are members of the People's Consultative Assembly (MPR), which until October 2004 included regional and government appointed representatives. In October 2004 the MPR became a fully elected body consisting of the 550 DPR members and the 128 members of the DPD.

Elections and Political Participation

Domestic and international observers monitored peaceful, first-ever, direct local elections to choose provincial- and district level executives beginning in June 2005. During the year the government held 54 local elections: six for governor, seven for mayor, and 41 for regent. Observers generally perceived the local elections as free and fair and, with a few exceptions, without incident affecting the outcome.

Most instances of violence involved supporters of losing candidates attacking local election offices.

In 2004 President Yudhoyono became the country's first directly elected president. Domestic and international observers monitored the legislative and presidential elections, organized by an independent election commission, and considered the elections free and fair. The national elections featured high voter turnouts, an absence of any notable violence, and broad public acceptance of the results.

All adult citizens are eligible to vote except members of the military and the police, convicts serving a sentence of five years or more, persons suffering from mental disorders, and persons deprived of voting rights by an irrevocable verdict of a court of justice.

There were no legal restrictions on the role of women in politics. During the year women held four of 36 cabinet seats. The current election law includes a nonbinding call for parties to select women for at least 30 percent of the candidate slots on their party lists. In the 2004 elections, 61 women were elected to the 550-seat DPR, an increase from 1999, when 44 women held seats in the 500-seat DPR. In the DPD, 27 of the 128 members were women. During the year a woman was elected governor of Banten Province; and women won six district chief positions in local elections, raising, the total number of female district chiefs to 18. Women are greatly underrepresented in local government in some provinces; for example, in Aceh the highest positions held by women are two deputy mayor and deputy regent positions.

With the exception of Aceh Province, where non-Muslims are effectively blocked from political office by a requirement that all candidates must demonstrate their ability to read the Koran in Arabic, there were no legal restrictions on the role of minorities in politics. There were no official statistics on the ethnic backgrounds of legislators in the DPR. President Yudhoyono's cabinet consisted of a plurality of Javanese, with others being of Sundanese, Bugis, Batak, Acehnese, Papuan, Balinese, Arab, and Chinese heritage. The authorities swore in a directly elected governor for West Irian Jaya on July 24, and for Papua Province on July 26.

On December 11, Aceh held its first direct elections for regents, mayors, and governor since the 2005 peace accord. Domestic and international observers judged the elections to be free and fair. A former GAM field commander won the gubernatorial election and GAM-affiliated candidates won positions in six local and district governments.

Government Corruption and Transparency

There was a widespread domestic and international perception that corruption was a part of daily life. Soon after taking office, the president established the Corruption Eradication Commission, giving it a broad investigative mandate. On February 7, former minister of religion Said Agil Hussein Munawar was sentenced for illegally spending approximately $78.7 million (709 billion rupiah) entrusted to his ministry by Muslims wanting to perform the pilgrimage to Mecca. The Supreme Court reaffirmed the decision in August. On August 25, Theodorus F. Toemion, former chief of the National Investment Board, was sentenced to six years in prison and fined $33,300 (300 million rupiah) for embezzling $3.3 million (3 billion rupiah). On November 30, former minister of oceans and fisheries Rokhmin Dahuri was detained in connection with an investigation into his management of an off-budget fund.

The AJI reported no problems for the media in obtaining unclassified public documents from the government.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The government met with local NGOs, responded to their inquiries, and took some actions in response to NGO concerns. Following the 2004 murder of human rights activist Munir, the president formed a fact-finding team (TPF) consisting of leading members of the NGO community, prosecutors, and a senior police officer. However, the president did not release the TPF's report, which, according to press reports, called for the investigation of former and active officials of the State Intelligence Agency in connection with Munir's death (see section 1.a.). After Pollycarpus's murder conviction for Munir's killing was overturned in October (see section 1.a.), the police reconstituted an investigatory team. The chief of the national police stated that police were continuing to pursue leads in the case.

Domestic human rights organizations were subjected to monitoring, harassment, and interference by the government; however, they actively advocated improvements to the government's human rights performance. Including the October reversal of Pollycarpus' conviction for Munir's murder, Komnas HAM reported that since 2000, 14 human rights activists had been killed, and no perpetrators had been brought to justice. There were no reports of human rights activists killed since 2004.

NGOs in Papua reported widespread monitoring of their activities by intelligence officials as well as threats and intimidation. Activists reported that intelligence officers took their pictures surreptitiously and sometimes questioned their friends and family members regarding their whereabouts and activities.

There were no reports of government interference with the large number of international and domestic NGOs in Aceh to help with the relief and reconstruction following the 2004 earthquake and tsunami, and human rights organizations had full access to the province.

The government generally viewed outside investigations or foreign criticism of its human rights record as interference in its internal affairs. The security forces and intelligence agencies tended to regard with suspicion foreign human rights organizations, particularly those operating in conflict areas. Government monitoring of foreigners was apparent in conflict areas. Some domestic human rights organizations expressed concern about the possible negative consequences of contacting foreigners. A number of government agencies and affiliated bodies addressed human rights problems, including the Ministry of Law and Human Rights, the Ministry of Foreign Affairs, the Ministry of Women's Empowerment, and Komnas HAM. However, in recent years Komnas HAM's efforts to expose human rights violations and bring perpetrators to account were undermined by a number of court decisions regarding its jurisdiction or authority. In 2003 a Jakarta court refused to subpoena former and active military officers who had ignored Komnas HAM summonses to face questioning about 1998 riots, which claimed more than 1,200 lives. In June 2005 the TNI stated it could not cooperate with attempts by Komnas HAM to summon retired and active-duty generals to answer questions about the abduction of pro-democracy activists between 1997 and 1998. The TNI insisted that Komnas HAM first obtain permission from the DPR (see section 1.b.). By law, severe human rights violations that occurred before 2000 could be investigated only by an ad hoc human rights courts, not Komnas HAM. Such a court could be formed only by a decision of the DPR, but for the DPR to know enough about an incident to approve the formation of a court, a thorough investigation was necessary. The resulting stalemate continued to block progress toward accountability. In June Komnas HAM asked the attorney general for permission to visit places where the victims were taken during the abduction. In July Komnas HAM also wrote to the Central Jakarta District Court to summon retired and active-duty generals for questioning. These efforts apparently were fruitless, and the Komnas HAM team that worked on this issue from October 2005 was disbanded in September.

In 2005 the government, in cooperation with East Timor, formed a bilateral Truth and Friendship Commission (see section 1.e.) to investigate alleged human rights abuses that occurred in East Timor.

In 2004 the DPR passed legislation to establish a TRC to investigate human rights violations before making recommendations to the president regarding amnesty for abusers and rehabilitation for their victims. The TRC was empowered to recommend amnesty for a confessed violator, even without the victim's consent. The law also stipulated that

cases resolved by the commission could not later be filed in a human rights court. Human rights activists filed an appeal with the Constitutional Court, questioning the constitutionality of two articles: a provision permitting payment of compensation before a finding of guilt and the prohibition on TRC cases being filed in human rights courts. On December 8, the Constitutional Court ruled the entire TRC act unconstitutional. The Constitutional Court chief justice stated that the government's lack of progress in selecting the 21 TRC members factored into its decision.

The Law on the Government of Aceh promulgated in August states that a Human Rights Court will be established in Aceh within one year and that the judgments passed by the Human Rights Court may prescribe compensation, restitution, and rehabilitation for the victims of human rights violations.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The constitution does not explicitly prohibit discrimination based on gender, race, disability, language, or social status. It provides for equal rights for all citizens, both native and naturalized. However, in practice, the government failed to defend these rights adequately.

Women

The law prohibits domestic abuse and other forms of violence against women. However, rape and domestic violence were problems.

Violence against women remained poorly documented. Nationwide figures were unavailable. The National Commission for Women's Rights reported that in 2005 (the most recent statistics available) there were 20,931 cases of violence handled by 215 NGOs in 29 provinces, and the local press reported that violence against women continued to increase. In East Java incidents of violence against women continued to increase both in number and severity. The East Java Integrated Service Center recorded 213 cases of violence against women and children in the first half of the year, compared with approximately 300 cases of violence against women and children in all of 2005. Most East Java NGOs working on women and children's issues believed the real figure was far higher, noting the tendency of many victims to keep silent. During the year at least 10 cases were prosecuted under the 2004 Domestic Violence Act, with punishments ranging from three to 18 months' imprisonment. Two types of crisis centers were available for abused women: government-run centers in hospitals and NGO centers in the community. Reliable nationwide statistics on the incidence of rape were unavailable. The legal definition of rape is narrow and excludes some acts that would commonly be treated as rape in other countries, such as marital rape. Sentencing was a problem. Although rape is punishable by four to 12 years in jail, and the government jailed perpetrators for rape and attempted rape, most convicted rapists were sentenced to the minimum or less.

In past years rapes by members of the security forces occurred in Aceh. The TNI did not prosecute any of its personnel for rape.

Nationwide, the police operated more than 200 "special crisis rooms" or "women's desks" where female officers received criminal reports from women and child victims of sexual assault and trafficking, and where victims found temporary shelter. During the year the police opened trafficking victims' rehabilitation recovery centers in Pontianak (West Kalimantan) and Makassar (South Sulawesi).

The legal differentiation between a woman and a girl was not clear. The law sets the minimum marriageable age at 16 for a woman (and 19 for a man), but the Child Protection Law states that persons under age 18 are children. A girl who marries has adult legal status. Girls frequently marry before reaching the age of 16, particularly in rural areas. Female genital mutilation (FGM) was practiced in some parts of the country, including West Java. Complications reportedly were minimal. Some NGO activists dismissed any claims of mutilation, saying the ritual as practiced in the country was largely symbolic. In April the Ministry of Health banned FGM by doctors and nurses. However, symbolic female circumcisions that do not involve physical damaging of the child could be carried out and violators of the ban did not face prosecution.

Prostitution is not specifically addressed in the law. However, many officials interpret "crimes against decency/morality" to apply to prostitution. Child prostitution is illegal. While contrary to societal and religious norms, prostitution was widespread and largely tolerated. Security forces reportedly participated in the running of brothels or protection rackets, which shielded brothels from prosecution. International sex tourism took place, especially on the islands of Batam and Karimun, both near Singapore.

Although it is not explicitly mentioned, sexual harassment is against the law and is actionable under the criminal code. In the most recent statistics available, the State Ministry of Women's Empowerment said in 2004 that 90 percent of women and 25 percent of men have been victims of sexual harassment in the workplace.

State policy and the law state that women have the same rights, obligations, and opportunities as men. However, the law also states that women's participation in the development process must not conflict with their role in improving family welfare and educating the younger generation. Marriage law designates the man as the head of the family. Women in many regions of the country, particularly in Papua, complained about differential treatment based on gender.

Although legal scholars believed that local governments lacked authority to legislate on religious matters, local governments increasingly passed Shari'a-based local laws that some human rights and women's activists believed

discriminate against women. The central government has not challenged the validity of these regulations. In 2005 the local government of Tangerang, Banten, issued a local regulation prohibiting women who behave like prostitutes and who are unaccompanied by male relatives, from frequenting public areas in Tangerang after dark. The law also prohibits public displays of affection. Violation of this law is punishable by three months' imprisonment or a maximum fine of $1,666 (15 million rupiah). Many activists protested the law because of its potential to lead to wrongful arrests of innocent women. On February 27, public order officers arrested the pregnant wife of an elementary school teacher (for suspected prostitution) as she waited unaccompanied for public transportation. She filed a lawsuit against Tangerang Mayor Wahidin Halim for wrongful arrest and defamation of character. On August 29, the Tangerang District Court ruled in favor of the mayor.

Divorce is available to both men and women. Muslims who sought divorce generally turned to the Shari'a-based family court system as a faster and cheaper alternative to the national court system. Non-Muslims obtained divorces through the national court system. Due to prejudicial attitudes, women often faced a heavier evidentiary burden than men, especially in the Shari'a based family court system. Although both Islamic and national courts may award alimony, many divorcees received no alimony, since there was no system to enforce such payments. Men and women both keep the separate property they owned before marriage. If there is no prenuptial agreement, joint property is divided equally. The law requires a divorced woman to wait a certain period of time before remarrying; a man can remarry immediately. On August 1, the president signed a citizenship law to end longstanding discrimination against Chinese-Indonesians and Indonesian women with foreign spouses. Among other things, the law revises the definition of "indigenous Indonesian" to include all citizens who have never assumed foreign citizenship; enables foreign spouses, including males, to seek citizenship after living in the country for five consecutive years or 10 accumulated years; entitles foreign-born spouses to permanent resident status after they reside in the country for a stipulated period of time; and allows a child born to a citizen parent and a foreign parent to maintain dual citizenship until age 18, at which point the child would have to choose citizenship.

During the year the government continued to implement Shari'a in Aceh (see section 2.c.). The most visible impact on women's rights appeared to be the enforcement of dress codes. In Banda Aceh, Shari'a police briefly detained improperly dressed women in the Shari'a enforcement office, where the women were lectured on appropriate attire. In February media reported on a protest against the Shari'a police's humiliation of women in Banda Aceh. In Western Aceh, Shari'a police publicly humiliated women they considered improperly dressed by cutting off their clothes. Local governments and groups in other areas also undertook campaigns to promote conformity by women with the precepts of Shari'a. Some women told reporters that they felt humiliated when detained for dress code violations. In West Sumatra the governor approved a regulation requiring all female civil servants, regardless of religion, to wear headscarves.

Women faced discrimination in the workplace, both in hiring and in gaining fair compensation. In 2003, the latest year for which statistics are available, the International Labor Organization's (ILO) Jakarta office reported that, on average, women's earnings were 68 percent of that of men. According to the government, 41 percent of all civil servants were women but they accounted for less than 7 percent of senior government officials. Some activists said that in manufacturing, employers relegated women to lower-paying, lower-level jobs. Many female factory workers were hired as day laborers instead of as full-time permanent employees, and companies were not required to provide benefits, such as maternity leave, to day laborers. By law, if a couple both worked for a government agency, the couple's head-of-household allowance was given to the husband.

Organizations around the country promoted women's rights or otherwise addressed women's issues during the year, including Solidaritas Perempuan, Mitra Perempuan, LBH-Apik, and the International Catholic Migration Commission (ICMC).

Children

The government stated its commitment to children's rights, education, and welfare, but it devoted insufficient resources to fulfill that commitment. Although the law provides for free education, in practice most schools were not free of charge, and poverty put education out of the reach of many children. Child labor and sexual abuse were serious problems. In 2003 the leader of the National Commission for Child Protection identified the most pressing problems related to the country's youth as child labor, child trafficking, child prostitution, street children, children in conflict areas, and undernourished children. The Child Protection Act addresses economic and sexual exploitation of children as well as adoption, guardianship, and other problems; however, some provincial governments did not enforce its provisions.

By law children are required to attend six years of elementary school and three years of junior high school; however, in practice, the government did not enforce these requirements. According to the government's 2004 National Socio-Economic Household Survey, school enrollment rates were 96.1 percent for children ages seven to 12, 79.2 percent for children ages 13 to 15, and 49.8 percent for children ages 16 to 18. Although girls and boys ostensibly received equal educational opportunities, boys were more likely to finish school.

Monthly fees for public schools varied by province and were based on average incomes. Tuition, transportation, and school materials, could cost a family between $444 and $777 (four million to seven million rupiah) per year for each primary and secondary student. In June 2005 the ILO conducted a limited child labor survey in areas within five provinces (North Sumatra, East Kalimantan, West Java, East Java and South Sulawesi), which revealed that one in five school-age children from low-income families has no access to education and experienced various kinds of exploitation at work--both in the formal and informal sectors. The survey also found that of 2,438 school-age children below 15 years of age, 19 percent were not attending school. It was unclear how many children were forced to leave school to help support their families. In

some remote areas of East Java, lack of nearby school locations contributed to drop out rates as high as 50 percent and led children to seek work. In some areas, parents and watchdog groups complained that corruption among public servants severely undermined the quality of education. The 2004 tsunami and the lingering effects of conflicts continued to disrupt the education of significant numbers of children in the coastal areas of Aceh.

Many children grew up in unhealthy circumstances. Malnutrition remained a serious problem. The country's infant mortality rate remained high. According to Bureau of Statistics data for the year, there were 36 deaths for every thousand live births.

During the year malnutrition continued to be a problem in East Nusa Tenggara Province. More than 17,000 children were believed to be suffering from malnutrition in East Nusa Tenggara as of September, an increase from the 2005 figure of 12,000. As of August, 21 infants had died of acute malnutrition, a decrease from 59 such deaths during the first eight months of 2005.

Child abuse is prohibited by law, but government efforts to combat it generally have been slow and ineffective. NGOs reported that it continued to take excessively long to bring a child rape case to court and that mechanisms for reporting and dealing with child abuse were vague. The East Java Children's Protection Agency (LPA) estimated that the number of cases of physical and sexual violence against children increased during the year. In most cases, the offender was a parent of the victim. Commercial sexual exploitation of children continued to be a serious problem. The number of child prostitutes in the country was unclear; however, a 2004 ILO assessment estimated there were approximately 21,000 child prostitutes on the island of Java. In 2003 a team of NGO and government health officials visited a prostitution complex in Riau Province and estimated that 30 to 40 percent of the 365 female prostitutes there were less than 18 years of age. Many teenage girls were forced into or found themselves caught in debt bondage. At times law enforcement officials treated child prostitutes as criminals rather than victims. Women's rights activists and religious groups accused government officials, particularly police and soldiers, of operating or protecting brothels that employed underage prostitutes. Corrupt civil servants issued identity cards to underage girls, facilitating entry into the sex trade. According to official East Java government statistics, there were approximately 4,000 child prostitutes in East Java, 30 percent of the total number of recorded prostitutes; there were approximately 3,000 child prostitutes in Central Java; and 194 in the city of Yogyakarta. There also were reports of sexual exploitation of boys. During the year NGOs reported that long active pedophile rings continued to operate in Bali, and authorities arrested at least one foreign national and deported another for pedophilia.

There were cases in which employment brokers paid parents advances of future salaries to be earned by their daughters. The child was required to repay the employment brokers. Researchers described a "culture of prostitution" in some parts of the country, where parents encouraged their daughters to work as big city prostitutes and send the proceeds home. NGO observers said many girls were forced into prostitution after failed marriages they had entered into when they were 10 to 14 years of age. There was no obvious violation of the law, because their paperwork identified them as adults due to the fact they were once married. In 2004 the latest year for which data was available, the Ministry of Manpower and Transmigration reported 2.86 million child workers in its national labor survey; however, this was far lower than the figure cited in a 2003 ILO report of 8 million children under 18 doing the work of adults (see section 6.d.).

In East Java, local NGOs reported that the government paid little attention to the rights of juvenile offenders. In Surabaya, juveniles were held in the same detention facilities as adults during pre-trial and trial phases of detention. The only prison for juveniles in Blitar, East Java, is far from the population centers of the province. As of July, there were 126 juveniles in the Blitar prison. According to the LPA, the physical conditions were inhumane. Most juveniles from Surabaya were remanded to Surabaya-area adult facilities. Juveniles frequently experienced abuse while in detention. There were no further developments regarding the July 2005 allegation by four juveniles in the Rungkut area of Surabaya that police injured their knees and legs during an interrogation. The head of the local police denied the accusation. Substantial numbers of street children were apparent in Jakarta and the provinces of East Java, West Java, North Sumatra, and South Sulawesi. Surabaya, in East Java, was home to approximately 8,000 street children, many reportedly susceptible to sexual abuse and violence. Approximately 40 shelters in the province provided services to such children. The Jakarta City government opened a shelter in 2004 with the capacity for approximately 200 children. The government continued to fund other shelters administered by local NGOs and paid for the education of some street children.

A number of NGOs promoted children's rights, including Child Advocacy Network, National Commission on Child Protection, Center for Study and Child Protection, and Foundation for Indonesian Child Welfare.

Trafficking in Persons

Trafficking in persons is illegal under the law; however, the law is not comprehensive in its definition of trafficking. During the year persons were trafficked to, from, and within the country for the purposes of prostitution and forced labor, including instances of debt bondage. Internal trafficking was a significant problem. Although the criminal code lacks an adequate legal definition of trafficking in persons, a variety of laws are applied in cases of trafficking and related offenses. The penal code prohibits trade in women and male minors but is silent on female minors. The Child Protection Act provides for prison sentences of three to 15 years, plus fines for child traffickers. For cases involving underage victims, police and prosecutors used the Child Protection Act, a change from previous reliance on the penal code with its weaker sentencing guidelines. Prior to 2004 judges rarely sentenced traffickers to more than three years in prison; however, during the year sentences for trafficking convictions continued to increase. Judges imposed heavier sentences on child traffickers, with convictions regularly resulting in five- or six-year jail terms.

http://www.state.gov/g/drl/rls/hrrpt/2006/78774.htm

During the year the government, NGOs, and the media reported that women were trafficked to Malaysia, Japan, the Middle East (including Saudi Arabia and Kuwait), Taiwan, Hong Kong, Singapore, and other destinations. Malaysia was the destination for the greatest number of credibly documented cases of female trafficking victims. An undetermined number of women from China, Thailand, Eastern Europe, and Central Asia were trafficked into the country for sexual exploitation.

Reliable figures were not available on the number of persons trafficked. A 2003 study by the NGO Solidarity Center and the ICMC estimated that between 2.4 and 3.7 million women and children worked in the vulnerable categories of migrant workers, sex workers, and child domestic workers (see section 5, Children). Within these categories, the estimated total number of children ranged from 254,000 to 422,000. These were not estimates of victims but rather of women and children vulnerable to trafficking.

There is little reliable data regarding human trafficking victims in eastern Indonesia. However, the LPA estimated that at least 100,000 women and children would be trafficked from, to, or through East Java during the year. They also believed that the number of trafficking victims increases between 5 and 10 percent per year. The women's division of the country's largest Muslim organization, Nahdlatul Ulama, believed that the number of victims of trafficking in East Java doubles annually. Based on East Java police data, there were 14,896 trafficking victims in East Java from January to July. The Surabaya NGO Abdi Ahsi reported that 3,000 women per year were trafficked from rural East Java to one of the large prostitution areas in Surabaya.

In West Nusa Tenggara Province, 3,336 cases of "overseas worker problems" were referred to the Panca Karsa Foundation (PCF) in Mataram, Lombok, by the victims and their families during the first six months of the year. These cases ranged from workers not receiving the jobs or salaries they were promised, to torture and rape by employers and employment agents. PCF estimated that at least 10,000 to 15,000 persons were trafficked annually by extensive illegal networks operating in the province.

A notable West Nusa Tenggara case occurred in mid-2005 in Krukah subdistrict, East Lombok. Two 12-year-old girls escaped involuntary captivity and were referred to the Mataram Legal Aid Society. They complained that they had given $320 (3,000 rupiah) to an overseas worker agency that promised the girls jobs as domestic workers abroad. They said that the agents held them captive and raped them. The NGO LBH APIK notified the police, who conducted a raid, which discovered 55 other young girls being held captive under conditions that included rape and torture. The perpetrators were arrested, eventually convicted of defrauding the girls' parents of the placement fees, and sentenced to nine months in prison. Public outrage over this case led the East Lombok government to pass the province's first antitrafficking regulations during the year, empowering local police to combat trafficking more effectively.

The Singkawang District of West Kalimantan remained well known as an area from which poor, ethnic Chinese women and teenage girls between the ages of 14 and 20 were recruited as "mail order" brides for men, primarily in Taiwan but also in Hong Kong and Singapore. In some cases the women were trafficked for sexual exploitation and slave-like servitude. In many cases traffickers recruited girls and women under false pretenses. One tactic was to offer young women in rural areas jobs as waitresses or hotel employees in distant regions, including island resorts. After the new recruits arrived and incurred debts to their recruiters, they learned that they had been hired as prostitutes. In October 2005 Jakarta police arrested two persons for duping at least 51 women with offers to work in Japan as "cultural performers." Once in Japan, the women were exploited as prostitutes. No developments in this case were reported during the year.

Many victims became vulnerable to trafficking during the process of becoming migrant workers. Many unauthorized recruiting agents operated throughout the country and were involved in trafficking to various degrees, and some government-licensed recruiting agents also were implicated in trafficking. Recruiting agents often charged exorbitant fees leading to debt bondage and recruited persons to work illegally overseas, which increased the workers' vulnerability to trafficking and other abuses. According to Solidarity Center, hundreds of Burmese fishermen, apparently forced to work on Thai fishing boats, either escaped or were abandoned in Tual, a small island in Maluku Province, where they lived in difficult conditions. In 2004 immigration officials forcibly deported a number of Burmese fishermen to Thailand via foreign fishing vessels. In 2005 the Burmese Seafarers Union estimated that there were still more than 100 Burmese seafarers living near Tual but did not anticipate further deportations. The Southeast Maluku police and the local Maritime and Fishery Office estimated that there were about 500 Thai and Burmese working as fishermen in Tual during the year.

From January until mid-October, the national police trafficking unit reported investigations of 91 suspects involving 437 victims, compared with 82 suspects and 143 victims for all of 2005. Police have submitted 23 cases to prosecutors and continue to investigate 24 cases, compared with 12 cases submitted in 2005. The AGO created a Transnational Crime Task Force, which began operating in July and which is pursuing 10 trafficking cases. Many of the traffickers are members of well financed crime syndicates. During the year courts convicted 18 traffickers, a slight increase over 2005. According to NGOs, convictions resulted in an average jail sentence of four years, an increase from 2.25 years in 2005.

East Java police demonstrated improved commitment in combating trafficking, resulting in increased numbers of investigations, arrests, and detainments. However, relatively few cases resulted in successful prosecutions. It is unclear whether police were unable to gather sufficient evidence to secure convictions or if corruption of prosecutors and judges interfered with the prosecution of these cases.

On March 13, police officers from Rogojompi precinct, Banyuwangi arrested Lemahbangdewo village head Suwardi for allegedly trafficking two girls from his village. No charges were filed.

In March Jember police arrested Burawi and Santo on suspicion of trafficking a girl from Jember, East Java. In November the Jember district court convicted Burawi and Santo for trafficking and sentenced them to seven and six years in prison, respectively.

On March 22, Surabaya police arrested a couple named Jatimah (alias Yati) and Nur Iman as members of a large human trafficking syndicate in Surabaya. No charges were filed.

In March, Surabaya police arrested Saka Baharuddin, owner of "Wisma Barbara" brothel, on trafficking charges. He was convicted and sentenced to two months in jail. On June 19, Surabaya police again arrested Baharudin, on trafficking charges. In July police forwarded the file of Baharudin to the Surabaya prosecutors' office. On September 6, the prosecutors' office returned the case to the police as incomplete. Police released Baharudin on September 16. No charges were filed.

On May 8, Surabaya police arrested two members of a trafficking syndicate in the city's "Moro Seneng" prostitution complex. They allegedly trafficked 14 juvenile girls for prostitution. Their trial was still pending.

On May 30, Nganjuk police in East Java arrested Sudarwati on human trafficking charges. In September she was convicted of trafficking girls from East Java to East Kutai, East Kalimantan and sentenced to 4� years in prison. She was the second person convicted under East Java's Child Protection Law.

On July 20, Krembangan police in Surabaya rescued two female trafficking victims and arrested three alleged traffickers, Alexander Go, Yola (alias Candra Asri), and Lisawati.

The basic three-month course that all police officers received did not include training on countertrafficking in persons. During the year international agencies continued to provide police with specific counter-trafficking training. Trafficking falls under the purview of the Criminal Investigation Department, which has a dedicated antitrafficking unit with operational and coordinating responsibilities. During the year 40 officers trained in countertrafficking were assigned to train police nationwide.

Credible sources noted that individual security force members were involved in setting up and protecting brothels. Traffickers and brothel owners reportedly paid protection money to security force members. An NGO survey of trafficking in Papua concluded that military members operated or protected brothels that housed trafficking victims. Apart from police and soldiers, some government officials were complicit in trafficking, particularly in the production of false documents. The prevalence and ease of obtaining fraudulent national identity cards, which could document children as adults, contributed to the trafficking problem. Within society and the government, there was continued reluctance to acknowledge that prostitution was a major problem. During the year the government continued to implement the 2002 07 National Action Plan to counter trafficking of women and children. The Child Protection Act prohibits economic and sexual exploitation of children and also child trafficking. The act specifies severe criminal penalties and jail terms for persons who violate children's rights, including by trafficking in persons. The government, with the help of NGOs, conducted public education efforts on trafficking. In September the Ministry of Women's Empowerment held a series of workshops on debt bondage to raise awareness and develop a coordinated approach to this issue.

During the year the government established a trial program to help trafficking victims reintegrate into society, thereby mitigating the risk of people becoming two-time victims, and opened a trafficking victims' shelter in Batam. Police, prosecutors and judges attended workshops on enforcement of antitrafficking laws, and in some provinces government officials and civil society formed committees to stop trafficking. Prosecutors began identifying trafficking cases as such, a step that will help track success in bringing traffickers to justice. Overall, government and society became increasingly aware of trafficking and the special rehabilitation needs of trafficking victims.

Nevertheless, the government faced several challenges in battling trafficking, including: a limited budget; a lack of awareness of the trafficking issue across a full range of government agencies; uneven collection of data related to trafficking, especially with respect to prosecutions and investigations; and the need for capacity building in the government's ability to report on and collect information about trafficking within the country's borders. International organizations have witnessed collusion by immigration officials with traffickers at transit points, making victims more vulnerable to traffickers at border and transit points.

Domestic NGOs, with international support, led efforts to monitor and prevent trafficking, frequently in coordination with government agencies. These NGOs included the Consortium for Indonesian Migrant Workers Advocacy, LBH-Apik, Women's Aid and Protection Group, Women's Coalition (Koalisi Perempuan), Solidaritas Perempuan, and Pusaka.

National and local assistance to trafficking victims increased compared with previous years but remained small in comparison with the scope of the problem. In general government assistance was modest and focused on citizens trafficked abroad, while domestic assistance was minimal. The government and community groups have a number of shelters in Dumai, Riau Province; Nunukan, East Kalimantan Province; West Kalimantan Province; Jakarta; North Sumatra; and North Sulawesi. The police operated more than 200 women's desks, units established to help women and children who fall victim to violence including trafficking. The women's desks provided temporary shelter, special police handling, and some legal services for victims. The women's desks often cooperated with local NGOs to provide medical and psychological services and longer-term shelter. However, distrust of police discouraged some victims from using these

http://www.state.gov/g/drl/rls/hrrpt/2006/78774.htm

desks. The government's policy is to "treat persons who are trafficked not as criminals but as victims who need help and protection." During the year the People's Welfare Coordinating Ministry and the Ministry of Women's Empowerment continued to reinforce this policy in public settings and training programs for police and other officials. However, local government and police practice varied, particularly in the lower ranks of law enforcement agencies. Local governments, exercising greater authority under the country's decentralization program, sometimes enacted laws or regulations that tended to treat those trafficked for sexual exploitation as criminals, contrary to national policy. In many instances, government officials and police actively protected and assisted victims. In other cases, police treated victims such as trafficked prostitutes as criminals, subjected them to detention, and took advantage of their vulnerability to demand bribes and sexual services. Police and immigration officials periodically rounded up foreign prostitutes and quickly deported them without any reported screening for potential trafficking victims. The media and lower-level officials, including police, often failed to protect victims' identities and commonly provided victims' names to the public. The government encouraged victims to assist in the investigation and prosecution of traffickers, but victims frequently were reluctant or refused to provide testimony due to shame and fear of retribution against themselves or their families. The new Victim Protection Law was intended to encourage witnesses and victims to come forward with testimony to enable successful prosecutions (see section 1.e.).

During the year the government established an educational pilot program in East Java and East Nusa Tenggara to raise awareness of trafficking among housewives, religious leaders, out-of-school children, and parents.

Persons with Disabilities

The government classified persons with disabilities into four categories: blind, deaf, mentally disabled, and physically disabled. The constitution requires the government to provide them with care; however, "care" is not defined, and the provision of education to children with disabilities never was inferred from the requirement. The law also mandates accessibility to public facilities for persons with disabilities; however, the government did not enforce this provision. Few buildings and virtually no public transportation facilities provided such accessibility. The law requires companies that employ more than 100 workers to set aside 1 percent of their positions for persons with disabilities. However, the government did not enforce the law, and persons with disabilities faced considerable discrimination.

In urban areas only a few city buses offered wheelchair access, and many of those have had their hydraulic lifts vandalized, rendering them unusable.

In 2003 the government stated the country was home to 1.3 million children with disabilities, but only 55,000 of them attended school. The actual number of children with disabilities was believed to be much higher. The law provides children with disabilities with the right to an education and rehabilitative treatment. A government official alleged that many parents chose to keep children with disabilities at home; however, many schools refused to accommodate such children, stating they lacked the resources to do so. According to the government, there were 1,234 schools dedicated to educating children with disabilities; 960 of them were run privately. Some young persons with disabilities resorted to begging for a living.

Human rights activists in Surabaya reported that discrimination against persons with disabilities existed in employment and education. In 2004 the Surabaya city government refused a civil service candidate with disabilities claiming that she did not fulfill health requirements. In May 2005 the Surabaya Administrative Court ruled in her favor. City officials appealed to the Supreme Court to uphold their actions. At year's end the case was still pending and the city government had not issued a policy to allow persons with disabilities to apply for civil service jobs.

Few companies in East Java provided facilities for persons with disabilities and fewer companies employed disabled persons. Accessibility to public facilities for disabled persons in eastern Indonesia was limited. In November Surabaya's new airport opened and reportedly was not accessible for disabled persons. Lack of funds was generally cited as the primary reason for not improving accessibility.

National/Racial/Ethnic Minorities

The government officially promotes racial and ethnic tolerance. Ethnic Chinese accounted for approximately 3 percent of the population, by far the largest nonindigenous minority group, and played a major role in the economy. Instances of discrimination and harassment of ethnic Chinese continued to decline compared with previous years. Recent reforms increased religious and cultural freedoms. However, some ethnic Chinese noted that public servants still discriminated against them when issuing marriage licenses and in other services and often demanded bribes for a citizenship certificate, although such certificates were no longer legally required. An attorney advocate for the rights of ethnic Chinese noted 50 articles of law, regulation, or decree that discriminated against ethnic Chinese citizens. During the year President Yudhoyono revoked a previous presidential decree that required special permits to engage in Chinese cultural and religious celebrations. The new citizenship law explicitly states that an Indonesian citizenship certificate, which ethnic Chinese often had a difficult time obtaining, is not required to establish citizenship. NGOs such as the Indonesia Anti Discrimination Movement urged the government to revoke the remaining discriminatory articles.

The ethnic Chinese community in Surabaya established an anti discrimination organization, Sikad, on September 27, to address discrimination problems faced by ethnic Chinese.

In May hundreds of students threatened to attack Chinese Indonesians in Makassar, South Sulawesi, if the police failed to

investigate the death of a maid after she was allegedly tortured by her Chinese-Indonesian employer.

On August 7, dozens of university students held violent protests and threatened to expel ethnic Chinese from Makassar after a Chinese-Indonesian man was accused of attempting to rape his maid. No casualties were reported during the protests. Five students were detained and questioned at Makassar police headquarters following the protest.

There were no reports of overt discrimination against Acehnese outside the province. Some Acehnese continued using a national identity card specific to Aceh. The 2005 Helsinki MOU between the government and GAM included a provision to issue Acehnese standard national identity cards by April. This had not been completed by the end of the year.

Indigenous People

The government views all citizens as "indigenous"; however, it recognizes the existence of several "isolated communities" and their right to participate fully in political and social life. These communities include the myriad Dayak tribes of Kalimantan, families living as sea nomads, and the 312 officially recognized indigenous groups in Papua. During the year indigenous people, most notably in Papua, remained subject to widespread discrimination, and there was little improvement in respect for their traditional land rights. Mining and logging activities, many of them illegal, posed significant social, economic, and logistical problems to indigenous communities. The government failed to prevent domestic and multinational companies, often in collusion with the local military and police, from encroaching on indigenous people's land. In Papua tensions continued between indigenous Papuans and migrants from other provinces, between residents of coastal and inland communities, and among tribes. Some in the indigenous community accused the newcomers of price gouging and condescension, while some newcomers claimed that indigenous Papuans treated them with resentment and suspicion. In Central Kalimantan, relations between indigenous Dayaks and ethnic Madurese transmigrants remained poor in the wake of 2001 interethnic violence. However, between 30,000 and 57,000 displaced ethnic Madurese had returned to Central Kalimantan by the end of 2005. Despite interethnic tensions, local elections were orderly and relatively peaceful. Relations between the two groups also remained poor in West Kalimantan, where former residents of Madurese descent were obstructed in their attempts to reclaim their property.

Human rights activists said that the government-sponsored transmigration program violated the rights of indigenous people, bred social resentment, and encouraged the exploitation and degradation of natural resources on which many indigenous persons relied. In some areas, such as parts of Sulawesi, the Malukus, Kalimantan, Aceh, and Papua, relations between transmigrants and indigenous people were poor.

Other Societal Abuses and Discrimination

There was some societal discrimination against persons with HIV/AIDS. Some individuals received prejudicial treatment at medical centers, saw their confidential laboratory results released or had their identity published in a newspaper. In most, if not all such cases, the government failed to take corrective action. In Papua, where the incidence of HIV infection is the highest in the country, community members and even families often stigmatized and ostracized those known to be infected with the virus. However, the government encouraged tolerance, took steps to prevent new infections, and drew up plans to subsidize antiretroviral drugs.

Section 6 Worker Rights

a. The Right of Association

The law provides broad rights of association for workers, and workers exercised these rights. The law allows workers to form and join unions of their choice without previous authorization or excessive requirements, and workers did so in practice. The law stipulates that 10 or more workers have the right to form a union, with membership open to all workers, regardless of political affiliation, religion, ethnicity, or gender. Private sector workers are by law free to form worker organizations without prior authorization, and unions may draw up their own constitutions and rules and elect representatives. The Ministry of Manpower and Transmigration (the manpower ministry) records, rather than approves, the formation of a union, federation, or confederation and provides it with a registration number. During the year, some unions reported local manpower ministry offices prejudicially recommended denial of registration. During the year one union federation registered with the manpower ministry, bringing the total number of registered federations to 88. Ministry officials noted that only 64 federations recorded by the ministry had verifiable members. The vast majority of union members belonged to one of three union confederations: the All-Indonesia Trade Union Confederation (KSPSI), the Indonesian Prosperity Trade Union Confederation (KSBSI), and the Indonesian Trade Union Congress. In addition more than 11,000 workplace-level units were registered with the manpower ministry, a drop from the 18,000 reported in 2005, which were based on unions' self-reported data.

According to the government, the country's total labor force consisted of approximately 110 million workers, 42 percent of whom worked in the agricultural and forestry sector. From April to September 2005, the manpower ministry conducted a survey of union membership, the results of which indicated a significantly reduced number of union members compared with previous estimates. In the past, the government had relied upon unions' self-reported membership statistics. The manpower ministry estimated total trade union membership at 3.4 million workers, less than 4 percent of the total workforce. However, this figure of 3.4 million union members is 14 percent of the regular, formal sector workforce of 23.8 million (a category that excludes the self-employed, employers, casual workers, and unpaid workers).

The law recognizes civil servants' freedom of association and right to organize, and employees of several ministries formed employee associations; union organizations sought to organize these workers. Unions also sought to organize state-owned enterprise (SOE) employees, although they encountered resistance from enterprise management, and the legal basis for registering unions in SOEs remained unclear.

The law allows the government to petition the courts to dissolve a union if it conflicts with the state ideology of Pancasila or the constitution, or if a union's leaders or members, in the name of the union, commit crimes against the security of the state and are sentenced to at least five years in prison. Once a union is dissolved, its leaders and members may not form another union for at least three years. There were no reports that the government dissolved any unions during the year. The law prohibits anti-union discrimination by employers and others against union organizers and members and provides penalties for violations; however, the government did not effectively enforce the law in many cases. There were frequent, credible reports of employer retribution against union organizers, including dismissals and violence that were not prevented effectively or remedied in practice. Some employers warned employees against contact with union organizers. Some unions claimed that strike leaders were singled out for layoffs when companies downsized. Legal requirements existed for employers to reinstate workers fired for union activity, although in many cases the government did not enforce this effectively.

On May 19, the Supreme Court upheld the decision of the State Administrative High Court and the lower courts that the workers dismissed following an April 2005 strike be reinstated and receive back pay. On July 19, the union and company reached an agreement whereby the company would compensate the workers for back pay and provide a severance payment. In turn the workers renounced their right to be re-hired. The workers at a private security firm in Jakarta, Group4/Securicor, went on strike over the firm's plans to reduce benefits following a merger. According to the NGO Solidarity Center, in May 2005, Jakarta police called in for questioning and intimidated four union leaders. The police reportedly explained that they were investigating the union leaders for possible charges of defamation and asked them to identify other workers from photographs taken at a lawful union demonstration in April 2005. The company terminated 200 workers and refused to rehire them, despite a decision by the local manpower officer that the strike was legal and the strikers should be rehired. In October 2005 a labor dispute resolution committee awarded the workers two months' salary.

On March 13, the independent Indonesian Union Federation (IUF) held a mass rally in Surabaya to demand government intervention against anti-union activities at PTPN X, and to ensure inclusion of the federation's locals in collective bargaining at both state-owned complexes, and to reinstate IUF-affiliated Federation of Sugar Plantation and Mill Workers president Daud Sukamto, who was fired from his job at a plantation in Central Lampung in 2005 for "gross misconduct" after recommending that his union reject a management wage proposal during labor negotiations. In June the ILO's Freedom of Association Committee concluded that Sukamto's termination violated the right to conduct legitimate trade union activity and called on the government to reinstate him.

In August Amnesty International called on the government to release six imprisoned trade union leaders, who were arrested following a strike and demonstration at a palm oil plantation in Riau Province in September 2005.

In September the state-owned workers' insurance company, PT Jamsostek, demoted two Jamsostek union members and transferred twelve others in connection with a union vote of no confidence in company management. More than 40 workers at a branch office in Banten staged a demonstration at the company's main office in Jakarta, demanding the cancellation of the demotions and transfers. In October legislators called on the government to end the labor conflict. All the affected workers sued the company seeking reinstatement. At year's end the cases were still pending.

On October 30, KSBSI filed 20 complaints with the manpower ministry on behalf of workers who claimed they had been denied the right to form unions. Many of them had been reportedly dismissed without severance payment or demoted despite their having cases pending in the labor court.

The Industrial Relations Disputes Settlement Act together with the Trade Union Act and the Manpower Act constitute the revised legal basis for industrial relations and worker rights. The Disputes Settlement Act stipulates a system of tripartite labor courts, replacing the previous tripartite committees. The act also outlines settlement procedures through mediation and arbitration. The ILO provided assistance in the development of the law. By the end of 2005, the government had established the new labor courts in all 33 provinces.

b. The Right to Organize and Bargain Collectively

The law allows unions to conduct their activities without interference; however, the government often did not protect this right in practice. The law provides for collective bargaining and allows workers' organizations that register with the government to conclude legally binding collective labor agreements (CLAs) with employers and to exercise other trade union functions. The law includes some restrictions on collective bargaining, including a requirement that a union or unions represent more than 50 percent of the company workforce to negotiate a CLA. The Manpower Development and Protection Act (Manpower Act), which regulates collective bargaining, the right to strike, and general employment conditions does not apply to SOEs. Although the law was written with ILO technical assistance, some unions claimed that it contains inadequate severance benefits and protection against arbitrary terminations and does not sufficiently restrict against outsourcing and child labor. The government continued to issue implementing decrees for the Manpower Act.

The government planned to revise the 2003 Labor Law to make Indonesia more competitive and attractive to foreign

investors. However, labor unions voiced opposition to the plan, and on May 1, international Labor Day, tens of thousands of workers protested peacefully on the streets of Jakarta and other cities against the proposed revisions, which would have made it easier for employers to hire and fire workers by reducing severance payments and allowing companies to employ workers for up to five years without a contract. On May 3, tens of thousands of workers again took to the streets in opposition to modifying the labor law. The rally turned violent when protesters took down the main gate of the parliament compound, set fire to tires and threw stones at the police. In response, police fired tear gas and water cannons. Police also detained 13 members of the KSPSI. On September 13, the Minister of Manpower and Transmigration announced that the government had dropped its plan to revise the labor law and instead would issue government regulations detailing termination procedures and severance payments for workers to give them more job certainty.

According to the manpower ministry, during the year there were 9,168 CLAs in effect between unions and private companies. Company regulations, allowed for under government regulations, substituted for CLAs in another 36,652 companies, many of which did not have union representation. The Manpower Act requires that employers and workers form joint employer/worker committees in companies with 50 or more workers, a measure to institutionalize communication and consensus building. However, the number of such bodies did not increase significantly after passage of the act. All workers, whether or not union members, have the legal right to strike, except for public sector workers and those involved in public safety activities. The law allows workers in these latter categories to carry out strikes if they are arranged so as not to disrupt public interests or endanger public safety. Private sector workers exercised their right to strike, as did those in state enterprises, although the latter did so with less frequency. The large majority of government-recorded strikes involved nonunion workers. Unions or workers' representatives must provide seven days' notice to carry out a legal strike. The law calls for mediation by local manpower ministry officials but does not require government approval of strikes. Workers and employers rarely followed dispute settlement procedures, and workers rarely gave formal notice of the intent to strike because manpower ministry procedures were slow and had little credibility among workers. The number of government-recorded strikes had declined in recent years, from 220 strikes involving more than 97,000 workers in 2002, to 125 strikes involving some 56,082 workers in 2005. During the year, the number of strikes rose to 282 involving 595,783 workers. According to the manpower ministry, the increase was due to protests of the government's proposed labor law reform.

The underpayment or nonpayment of legally required severance packages precipitated strikes and labor protests. The Solidarity Center documented cases in which foreign employers in the garment and footwear industry, faced with falling orders and plant closures, fled the country to avoid making legally required severance payments. Labor activists also reported that factory managers in some locations employed thugs to intimidate and assault trade union members who attempted to organize legal strike actions. At times the police intervened inappropriately and with force in labor matters, usually to protect employers' interests. In April 2005 the national police adopted new guidelines for "handling law and order in industrial disputes," developed with the assistance of the ILO.

On July 31, police shot labor leader Samsir Hasibuan during a labor dispute near Medan at P.T. Cipta Mebelindo Lestari, a furniture manufacturer. According to Hasibuan, police dragged him from his house after the demonstration ended. The police maintained he was shot in front of the factory gate after protesters became violent. According to Medan human rights advocates, police later coerced Hasibuan into signing a document accepting representation by a police-provided attorney by police beating on his injured knee. He and two other labor leaders remained in jail but were allowed to have their own attorney. Other strikers whom the company could identify were all fired.

In September 2005 the management of a palm oil plantation in Riau province, P.T. Musim Mas, fired approximately 700 workers for striking in protest of the termination of nine union leaders. In June the Indonesian Union of Wood and Forestry Workers signed an agreement with the company to provide severance pay to strikers, but the workers were not rehired.

On December 8, Kompas newspaper fired union activist Bambang Wisudo. Kompas claimed that Wisudo was fired on grounds that he refused a transfer to Ambon, but the Association of Independent Journalists stated that he was fired for demanding that the newspaper respect the right of employees to profit-sharing.

There are no special laws or exemptions from regular labor laws in special economic zones (SEZs). However, nongovernmental observers, including the Solidarity Center, described stronger antiunion sentiment and actions by employers in SEZs.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced labor or compulsory labor, including by children; however, there were reports that such practices occurred (see section 5). The government tolerated forms of compulsory labor practiced in the migrant worker recruitment process. The unscrupulous practices of migrant worker recruiting agencies, and poor enforcement of government regulations often led to debt bondage and extended unlawful confinement (see section 5). According to press reports and research by the Solidarity Center, recruiting agencies frequently kept migrant workers in holding centers for months before sending them abroad. While in the holding centers, migrant workers normally did not receive pay, and recruiters often did not allow them to leave the centers. In most instances, workers were forced to pay recruiters for the cost of their forced stay, which resulted in large debts to the recruiters. During the year the manpower ministry took limited measures to enforce existing labor laws that prevent employment agencies from trafficking workers through debt bondage and thus protect workers against internal and external trafficking. During the year police and manpower ministry officials conducted raids on 32 licensed and six illegal migrant worker holding centers in Jakarta, targeting those that forcibly held prospective

workers, both adults and children, some in inhumane conditions. The raids resulted in the release of 3,438 prospective workers, and the arrests of eight suspects. The manpower ministry was unable to provide information on the disposition of 20 arrest cases arising from the raids conducted in 2004 and 2005.

Under a Malaysia-Indonesia agreement, as of June, Indonesians working in Malaysia's informal sector are to be accorded basic labor rights including a monthly minimum wage, a mandatory day off per week, and paid annual leave for a home visit. However, activists stated that the agreement often protects Malaysian employers to the detriment of Indonesian workers.

Forced and compulsory labor by children occurred (see section 6.d.).

d. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits children from working in hazardous sectors and the worst forms of child labor, including mining, skin diving, construction, prostitution, and offshore fishing platforms. However, the government did not enforce these laws effectively. Law, regulations, and practice acknowledged that some children must work to supplement family incomes. The Manpower Act prohibits the employment of children, defined as persons under 18, except for those 13 to 15 years of age, who may work no more than three hours per day and only under a number of other conditions, such as parental consent, no work during school hours, and payment of legal wages. The law does not appear to address exceptions for children ages 16 to 17. The law addresses economic and sexual exploitation, including child prostitution, child trafficking, and the involvement of children in the narcotics trade, and provides severe criminal penalties and jail terms for persons who violate children's rights.

The government has a national action plan to eliminate the worst forms of child labor, as well as separate national action plans for combating trafficking and for eliminating the commercial sexual exploitation of children. Child labor remained a serious problem in the country. An estimated six to eight million children exceeded the legal three hour daily work limit, working in agriculture, street vending, mining, construction, prostitution, and other areas. More children worked in the informal than the formal sector. Some children worked in large factories, but their numbers were unknown, largely because documents verifying age could be falsified easily. Children worked in industries such as rattan and wood furniture, garment, footwear, food processing, and toy making, and also in small-scale mining operations. Many girls between 14 and 16 years of age worked as live-in domestic servants. The ILO estimated that there were 2.6 million domestic workers in the country, of whom at least 688,000 were children. According to a 2005 Human Rights Watch report, children between 12 and 15 years of age worked 14 to 18 hours per day, seven days a week from 4 a.m. to 10 p.m. with employers who often subjected them to physical and sexual threats. Many child servants were not allowed to study and were forced to work long hours, received low pay, and generally were unaware of their rights. The law and regulations prohibit bonded labor by children; however, the government was not effective in eliminating forced child labor, which remained a serious problem. A significant number of children worked against their will in prostitution, pornography, begging, drug trafficking, domestic service, and other exploitative situations, including a small number on fishing platforms (see section 5). Social and cultural resistance remained a challenge in addressing child labor. Many parents disagreed with government efforts to restrict children from working, arguing that the government offered inadequate economic support to guarantee these families' welfare.

Enforcement of child labor laws remained largely ineffective. Despite legislative and regulatory measures, most children who worked, including as domestics, did so in unregulated environments. Anecdotal evidence suggested that local labor officials carried out few child labor investigations.

e. Acceptable Conditions of Work

Provincial and district authorities, not the central government, establish minimum wages, which vary by province, district, and sector. Provincial authorities determined provincial minimum wage levels based on proposals by tripartite (workers, employers, and government) provincial wage commissions. The provincial minimum wage rates establish a floor for minimum wages within the province. Local districts set district minimum wages using the provincial levels as references. Districts also set minimum wages in some industrial sectors on an ad hoc basis. Provinces and districts conducted annual minimum wage rate negotiations, which often produced controversy and protests. The minimum wage levels set by most local governments did not provide a worker and family with a decent standard of living. Most province-level minimum wage rates fell below the government's own calculation of basic minimum needs. During the year Aceh offered the highest minimum wage level of approximately $91 (820 thousand rupiah) per month, while the manpower ministry reported official minimum wages as low as $43 (390 thousand rupiah) per month in one area.

Local manpower officials are responsible for enforcing minimum wage regulations. Enforcement remained inadequate, particularly at smaller companies and in the informal sector. In practice, official minimum wage levels applied only in the formal sector, which accounted for 35 percent of the workforce. Labor law and ministerial regulations provide workers with a variety of benefits. Persons who worked at more modern facilities often received health benefits, meal privileges, and transportation. The law also requires employers to register workers with and pay contributions to the state-owned insurance agency JAMSOSTEK.

The law establishes a 40-hour workweek, with one 30-minute rest period for every four hours of work. Companies often required a five and a half- or six-day workweek. The law also requires at least one day of rest weekly. The daily overtime

rate was 1� times the normal hourly rate for the first hour and double the hourly rate for additional overtime, with a maximum of three hours of overtime per day and no more than 14 hours per week. Workers in industries that produced retail goods for export frequently worked overtime to meet contract quotas. Unions complained that companies relied upon excessive overtime in some garment and electronics assembly plants, to the detriment of workers' health and safety. Observance of laws regulating benefits and labor standards varied between sectors and regions. Employer violations of legal requirements were fairly common, resulting in some strikes and protests. The Solidarity Center reported that workers in the garment industry worked extremely long hours but because their pay slips do not specify the amount of overtime paid, workers cannot be certain they are fully compensated for overtime. The manpower ministry continued to urge employers to comply with the law; however, government enforcement and supervision of labor standards were weak. Both law and regulations provide for minimum standards of industrial health and safety. In practice, the country's worker safety record was poor. JAMSOSTEK reported 70,069 accidents in the first nine months of the year, compared with 99,023 for the whole of 2005. Local officials have responsibility for enforcing health and safety standards. In larger companies, the quality of occupational health and safety programs varied greatly. Health and safety standards in smaller companies and in the informal sector tended to be weaker or nonexistent. Workers are obligated to report hazardous working conditions, and employers are forbidden by law from retaliating against those who do report hazardous working conditions; however, the law was not enforced effectively.

BACK TO TOP

# EXHIBIT T

**Presidential Decree No. 28/2003 On The Declaration of a State of Emergency with the Status of Martial Law in Nanggroe Aceh Darussalam Province**

THE PRESIDENT OF THE REPUBLIC OF INDONESIA

Considering:

a. that a series of amicable efforts made by the government, either by means of the stipulation of special autonomy for the Province of Nanggroe Aceh Darussalam, as an integrated approach in a comprehensive development plan or as dialog held overseas, has failed to stop the intention and actions by the Free Aceh Movement (GAM) to secede from the unitary State of the Republic of Indonesia and declare its independence;

b. that such a situation and intensified armed violence that has been increasingly geared toward acts of terrorism by the Free Aceh Movement (GAM), have not only disrupted public order and peace, as well as the smooth running of the local administration and the implementation of various development programs, but also has led to widespread and heavy difficulties for the Acehnese community and other communities in the Province of Nanggroe Aceh Darussalam in general;

c. that the situation would eventually disrupt the integrity of the Unitary State of the Republic of Indonesia and thus cannot be allowed to continue, but must immediately be ended through integrated efforts to ensure that public life and the running of the administration can be restored;

d. that in conformity with the mandate in the 1945 Constitution that the President is required to protect the entire nation and the entire motherland of Indonesia, and also in accordance with the authority that the President holds on the basis of the Emergency Law, and after listening to and considering thoroughly all the views and support expressed by the Leadership of the House of Representatives of the Republic of Indonesia, the factions and Commissions I and II of the House of Representatives of the Republic of Indonesia, as jointly decided upon at the conclusion of a consultation meeting on May 15, 2003, between the President and the entire Leadership of the House of Representatives of the Republic of Indonesia, the factions and the two Commissions referred to earlier, and further to this, after observing the development of circumstances and the attitude of the Free Aceh Movement (GAM) in the days after said consultation meeting, which failed to change for the better, it is deemed necessary to declare an emergency at the level of martial law for the entire territory of the Province of Nanggroe Aceh Darussalam;

In view of:

1. Subarticle (1) of Article 4, Article 10 and Article 12 of the 1945 Constitution, as already amended by the Fourth Amendment to the 1945 Constitution;

2. Law No. 23 Prp/1959 on a state of emergency (Statute Book No. 139/1959, Supplement to Statute Book No. 1908) as already amended twice, the latest by Law No. 52 Prp/1960 (Statute Book No. 170/1960, Supplement to Statute Book No. 2113);

3. Law No. 2/2002 on the Police Force of the Unitary State of the Republic of Indonesia (Statute Book No. 2/2002, Supplement to Statute Book No. 4168);

DECIDES

To stipulate:

A PRESIDENTIAL DECREE ON THE DECLARATION OF A STATE OF EMERGENCY WITH THE STATUS OF MARTIAL LAW IN THE PROVINCE OF NANGGROE ACEH DARUSSALAM

Article 1

The entire territory of the Province of Nanggroe Aceh Darussalam is declared to be in a state of emergency with the status of martial law.

Article 2

(1) The President, as the central martial law ruler, shall exercise the highest authority at the level of

martial law, as referred to in Article 1.

(2) In exercising the authority of a state of emergency with the status of martial law, the President shall be assisted by the martial law central board of executives in charge of day-to-day operations, which shall comprise:

1. Chairman:

Coordinating Minister for Political and Security Affairs

2. Members :

a. Coordinating Minister for the Economy;

b. Coordinating Minister for Public Welfare;

c. Minister of Social Affairs;

d. Minister of Home Affairs;

e. Minister of Foreign Affairs;

f. Minister of Defense;

g. Minister of Justice and Human Rights;

h. Minister of Health;

i. Minister of National Education;

j. Minister of Manpower and Transmigration;

k. Minister of Resettlement and Regional Infrastructure;

l. Minister of Religious Affairs;

m. Minister of Transportation;

n. Minister of Finance;

o. State Minister of Communications and Information;

p. Commander-in-Chief of the Indonesian Military;

q. Chief of the Police of the Republic of Indonesia

r. The Attorney General;

s. Chief of the State Intelligence Agency;

t. Chief-of-Staff of the Army of the Indonesian Military;

u. Chief-of-Staff of the Navy of the Indonesian Military; and

v. Chief-of-Staff of the Air Force of the Indonesian Military.

Article 3

(1) Martial law in the territory of the Province of Nanggroe Aceh Darussalam shall be exercised by the commander of the Iskandar Muda Military Command, as the regional martial law authority.

(2) In exercising martial law in the region, the chief of the Iskandar Muda Military Command shall be assisted by:

1. the governor of the Province of Nanggroe Aceh Darussalam;

2. the chief of the regional police of the Province of Nanggroe Aceh Darussalam;

3. the chief of the provincial prosecutor's office of the Province of Nanggroe Aceh Darussalam.

Article 4

The Province of Nanggroe Aceh Darussalam, as referred to in Article 1, shall be subject to the provisions of martial law as referred to in Law No. 23 Prp/1959 on a state of emergency, as already amended twice, the latest by Law No. 52 Prp/1960.

Article 5

All expenses arising from the enforcement of this presidential decree shall be borne by the state budget and the regional budget of the Province of Nanggroe Aceh Darussalam.

Article 6

This presidential decree shall take effect as from 00.00 Western Indonesia Standard Time on May 19, 2003, for a period of 6 (six) months, unless extended by virtue of a separate presidential decree.

For public knowledge, this presidential decree shall be published in the Statute Book of the Republic of Indonesia.

Stipulated in Jakarta
On May 18, 2003
PRESIDENT OF THE REPUBLIC OF INDONESIA
sgd.
MEGAWATI SOEKARNOPUTRI
Proclaimed in Jakarta
On May 18, 2003
STATE SECRETARY OF
THE REPUBLIC OF INDONESIA
sgd.
BAMBANG KESOWO
STATUTE BOOK OF THE REPUBLIC OF INDONESIA NO. 54/2003
Copied true to the original
Deputy Secretary of the Cabinet
for Laws and Legislation
sgd.
Lambock V. Nahattands
(Seal of the Secretariat of the Cabinet of the Republic of Indonesia over signature)



# EXHIBIT U




**November 1, 2007**

Home
Martial Law
Daily Reports
Indonesian Government
International Response
A S N L F
Peace Process
NGOs
Issues
Analysis
General Info
Links
Contact Us

INDONESIAN GOVERNMENT

Indonesia Government ▷ Decrees and Legislations..

**PRESIDENTIAL DECREE**

### DECREEE OF THE PRESIDENT OF THE REPUBLIC OF INDONESIA NUMBER 43 YEAR 2004
### CONCERNING
### THE DECLARATION OF A CHANGE IN THE LEVEL OF STATE OF DANGER IN NANGGROE ACEH DARUSSALAM PROVINCE FROM A STATE OF MILITARY EMERGENCY TO A STATE OF CIVIL EMERGENCY

### THE PRESIDENT OF THE REPUBLIC OF INDONESIA,

**Considering:** that since the declaration of a State of Danger of the level of Military Emergency in Nanggroe Aceh Darussalam province, which was combined with the implementing of a Co-ordinated Operation involving a Humanitarian Operation, an Economic Restoration Operation, an Law Enforcement Operation, an operation to Stabilise Governance, and a Security Restoration Operation, have together produced significant results in improving the conditions of public security, order and calm, of government organisation and of social and economic life and public welfare in Nanggroe Aceh Darussalam;

That based on the above-mentioned considerations, and in order to safeguard the continuance of the steps taken in the various [government/military] Operations described above, as well as after thorough consideration of all views and endorsements expressed by the Indonesian national parliament through the consultative Meeting between the government and the national parliament on May 17 2004, [the president] considers it has become necessary to downgrade, by Presidential Decree, the State of Danger of the level of Military Emergency to a State of Danger of the level of Civil Emergency, in Nanggroe Aceh Darussalam province.

**Remembering:** Article 4 subsection 1, Article 10, Article 12 and Article 28 A-J of the 1945 Constitution, as they have been amended, most recently with the Fourth Amendment to the 1945 Constitution;

Law Number 23 of Year 1959 on States of Danger (Republic of Indonesia Government Gazette Year 1959 Number 139, Government Gazette Appendix Number 1908), as it has been amended on two occasions, most recently by Law Number 52 of Year 1960 (Republic of Indonesia Government Gazette Year 1960 Number 170, Government Gazette Appendix 2113);

Law Number 8 of Year 1981 on Legal Procedure in Criminal Cases (Republic of Indonesia Government Gazette Year 1981 Number 76, Government Gazette Appendix 3209);

Law Number 2 of Year 2002 on the Police Force of the Republic of Indonesia (R of I Government Gazette Year 2002 Number 2, Government Gazette 4168);

Law Number 3 of Year 2002 on National Defence (R of I Government Gazette Year 2002 Number 3, Government Gazette Appendix 4169);

Presidential Decree Number 28 of Year 2003 declaring a State of Danger of the level of Military Emergency in Nanggroe Aceh Darussalam province (R of I Government Gazette Year 2003 Number 54), and its extension through Presidential Decree Number 97 of Year 2003 on the Prolonging of the State of Danger of the level of Military Emergency in Nanggroe Aceh Darussalam province (R of I Government Gazette Year 2003 Number 135).

**DECREES THE FOLLOWING:**

**PRESIDENTIAL DECREE ON THE DOWNGRADING OF THE STATE OF DANGER IN NANGGROE ACEH DARUSSALAM FROM THE LEVEL OF MILITARY EMERGENCY TO THE LEVEL OF CIVIL EMERGENCY.**

**Article 1**

From the beginning of the day this Presidential Decree comes into force the status of the State of Danger of the level of Military Emergency in Nanggroe Aceh Darussalam province is downgraded to a State of Danger of the level of Civil Emergency.

**Article 2**
(1)

(2) The highest authority for the State of Danger of the level of Civil Emergency as decreed in Article 1 shall be exercised by the President as Central Civil Emergency Authority.

In carrying out this authority for the State of Danger of the level of Civil Emergency the President shall be assisted by the Central Civil Emergency Authority Day-to-day Implementation Body, consisting of:

**a. Chair: The Co-ordinating Minister for Politics and Security;**

**b. Members:**

01. The Co-ordinating Minister for the Economy;
02. The Co-ordinating Minister for Social Welfare;
03. The Minister of the Interior;
04. The Minister for Foreign Affairs;
05. The Minister for Defence;
06. The Social Minister;
07. The Minister for Justice and Human Rights;
08. The Health Minister;
09. Menteri Pendidikan Nasional;
10. The Minister for Settlement and Regional Infrastructure;
11. The Minister of Religions;
12. The Minister for Communications;
13. The Finance Minister;
14. The Minister for Industry and Trade;
15. The minister for Energy and Mineral Resources;
16. The Minister for Fisheries and the Sea;
17. The Minister of Agriculture;
18. The Minister of Forestry;
19. The Minister of Manpower and Transmigration;
20. The State Minister for Co-operatives and small and Middle sized Enterprises;
21. The State Minister for Communication and Information;
22. The Commander in Chief of the Indonesian National Armed Forces (TNI);
23. The Chief of the Indonesian National Police;
24. The Attorney General;
25. The Chief of the State Intelligence Agency;
26. The Chief-of-Staff of the Indonesian National Army (TNI-AD);
27. The Chief-of-Staff of the Indonesian National Navy (TNI-AL);
28. The Chief-of-Staff of the Indonesian National Air Force (TNI-AU).

**c. Secretary: The Secretary of the State co-ordinating Minister for Politics and Security.**

**Article 3**
(1)

(2) The highest authority for the State of Danger of the level of Civil Emergency within Nanggroe Aceh Darussalam province shall be exercised by the Governor of Nanggroe Aceh Darussalam as Regional Civil Emergency Authority. In carrying out this authority the Governor shall be assisted by:

1. The Commander (Pangdam) of Iskandar Muda Regional Military Command (KODAM);
2. The Chief of Police for Nanggroe Aceh Darussalam province;
3. The Chief Public Prosecutor of Nanggroe Aceh Darussalam province.

**Article 4**

To facilitate the carrying-out of the tasks of the Regional Civil Emergency Authority for Nanggroe Aceh Darussalam province, a Team shall be assigned to him to give assistance and carry out monitoring as staff of the Central Civil Emergency Auhthority assigned to Nanggroe Aceh Darussalam province.

**Article 5**
(1)

(2) In exercising his authority and carrying out its duties the Regional Civil Emergency Authority must follow directions and orders given by the Central Civil Emergency Authority and shall be responsible to that authority through the Chair of the Central Civil Emergency Authority Day-to-day Implementation Body. In all decisions he takes the Regional Civil Emergency Authority must consult with all [three above-mentioned] assistants to the Regional Civil Emergency Authority.

### Article 6
(1)

(2) The Co-ordinated Operation that was been carried out throughout the State of Danger of the level of Military Emergency shall be continued by the Civil Emergency Authority.

The Co-ordinating Minister for Politics and Security, as Chair of the Central Civil Emergency Authority Day-to-day Implementation Body, shall remain as Implementation Co-ordinator of the Co-ordinated Operation at the national level.

### Article 7

With the coming into force of the downgrading of the State of Danger of the level of Military Emergency to the level of Civil Emergency, detainees of the Regional Military Emergency Authority shall be transferred to the custody of the Indonesian National Police and become detainees of the Indonesian National Police in accordance with Law Number 8 of Year 1981 on Legal Procedure in Criminal Cases.

### Article 8

All expenses required for the carrying out of this Presidential Decree shall be borne by the National State Budget and the Budget of Nanggroe Aceh Darussalam province.
Segala biaya yang diperlukan dalam rangka pelaksanaan Keputusan

### Article 9

This Presidential Decree shall come into force at 00.00 hours on May 19 2004, and remain in force for six months unless terminated or extended by Decree of the President him/herself.

So that everyone shall know of it, it is ordered that this Presidential Decree be published in the Government Gazette of the Republic of Indonesia.

Written in Jakarta
on 18 May 2004

by

**THE PRESIDENT OF THE REPUBLIC OF INDONESIA**

signed

**MEGAWATI SOEKARNOPUTRI**

Enacted in Jakarta
on 18 May 2004

by

**THE SECRETARY OF STATE OF THE REPUBLIC OF INDONESIA**

signed

**BAMBANG KESOWO**

**REPUBLIC OF INDONESIA GOVERNMENT GAZETTE YEAR 2004 NUMBER 46.**

Back 

Copyright © 2003-2005 Acheh-Eye.Org. All rights reserved.
Comments and suggestions please email.
webmaster@acheh-eye.org

# EXHIBIT V

\n'); document.write(' \n'); document.write(' \n'); } -->



Travel Warnings | Travel Public Announcements | Travel Information by Country

**Search**

Feedback | Contact Us

Thursday November 1, 2007

 Most Requested

🖶 Printer friendly version ✉ Email

# Travel Warning
### United States Department of State
*Bureau of Consular Affairs*
*Washington, DC 20520*

*This information is current as of today, Thu Nov 01 2007 17:19:56 GMT-0400 (Eastern Daylight Time).*

## INDONESIA

**January 09, 2007**

This Travel Warning updates information concerning the security situation in Indonesia and reminds Americans of the risks associated with travel to that country. This Travel Warning supersedes the November 18, 2005, Travel Warning for Indonesia.

Due to the possibility of terrorist attacks directed against American or other Western citizens and interests, the Department of State urges American citizens to evaluate carefully the risks of travel to Indonesia. The October 1, 2005, terrorist attacks in Bali in which suicide bombers killed 20 people and injured more than 100 are a reminder that terrorists remain active in Indonesia. The possibility of future attacks in Bali, Jakarta, or other areas of Indonesia cannot be ruled out.

Terrorist attacks in Indonesia could occur at any time and could be directed against any location, including those frequented by foreigners, as well as identifiably American or other Western facilities or businesses in Indonesia. Such targets could include but are not limited to places where Americans and other Westerners live, congregate, work, study, shop, or visit, including hotels, clubs, restaurants, shopping centers, identifiably Western businesses, housing compounds, transportation systems, places of

worship, schools, or public recreation events. While past terrorist attacks have involved the use of vehicle-borne explosives or suicide bombers carrying explosives in backpacks, terrorists may use other forms of attack in the future. Terrorists may target individual American citizen residents, visitors, students, or tourists, and tactics could include but are not limited to kidnapping, shooting, or poisoning.

The Department of State urges Americans in Indonesia to avoid crowds, maintain a low profile, and be vigilant about security at all times. Americans are advised to monitor local news broadcasts, vary their routes and times in carrying out daily activities, and consider the level of preventive security when visiting public places in Indonesia. Americans who choose to vacation in Indonesia despite the security risks are advised to consider the level of preventive security when choosing hotels, restaurants, beaches, entertainment venues, and recreation sites.

In addition to the October 1, 2005, bombings in Bali, several other serious terrorist incidents occurred in Indonesia in recent years. A terrorist bombing outside the Australian Embassy in Jakarta on September 9, 2004, killed eleven and injured more than 180 people. An August 2003 terrorist bombing at a major international hotel in Jakarta killed 12 persons and injured scores, including several American citizens. A terrorist attack in Bali in October 2002 killed 202 people, including seven Americans. Suicide bombers wearing explosives in vests or backpacks carried out the October 1, 2005, bombings in Bali. Prior terrorist attacks involved the use of vehicle-borne explosives.

The U.S. Mission in Indonesia restricts U.S. government employees' travel to certain areas of the country and, at times, denies them permission to travel to specific locations. As of early 2007, employee travel to the provinces of Aceh, Papua, Central and South Sulawesi, and Maluku requires the concurrence of the Embassy's Regional Security Officer. Americans seeking the latest travel restriction information may contact a consular office. The U.S. Mission can occasionally suspend service to the public, or close, because of security concerns; in these situations, it will continue to provide emergency services to American citizens.

Americans who choose to travel to Indonesia despite this Travel Warning should obtain up-to-date health information before departing the United States. The websites of the U.S. Centers for Disease Control at http://www.cdc.gov/travel and the World Health Organization at http://www.who.int have current information on outbreaks of contagious and tropical diseases. Americans considering travel to Indonesia should read the Department of State's Fact Sheet on Avian Influenza dated July 2006, and should consult with their personal physicians concerning avian flu.

Americans living and traveling in Indonesia are urged to register and update their contact information with U.S. Embassy Jakarta, U.S. Consulate General Surabaya, or the U.S. Consular Agent in Bali. Registration facilitates the U.S. Mission's contact with Americans in emergency situations and may be done on line and in advance of travel. Information on registering can be found at the Department of State's Consular Affairs website: https://travelregistration.state.gov. Registration information and recent warden messages are also available on the U.S. Embassy Jakarta website at http://jakarta.usembassy.gov.

Americans can obtain information on travel and security in Indonesia from the Department of State by calling ▨▾ 1-888-407-4747 within the United States; or ▨▾ 1-202-501-4444 from outside the United States and Canada. Americans also can call the Embassy in Jakarta at ▨▾ (62)(21) 3435-9000 , the Consulate General in Surabaya at ▨▾ (62)(31) 295-6400 , and the Consular Agent in Bali at ▨▾ (62)(361) 233-605 . American citizens should read the Department of State's Consular Information Sheet for Indonesia, the latest Worldwide Caution Public Announcement, and Fact Sheet on Avian Influenza, all available at http://travel.state.gov.

 Printer friendly version  ✉ Email

## Other Government Websites

- USA Gov Service Locator
- Department of Homeland Security
- The White House
- more >



About Us | Feedback | Contact Us | Email this
Page | Print | Search | Top of Page
This site is managed by the Bureau of Consular Affairs,
U.S. Department of State. External links to other Internet
sites should not be construed as an endorsement of the
views contained therein.
Copyright Information | Disclaimers | Other U.S.
Government Information

Designed for
Internet Explorer 6.0



# EXHIBIT W

I, Abdul Haris Semendawai, declare under penalties of perjury of the laws of the United States that the following is true and correct:

1.  My name is Abdul Haris Semendawai, SH, LL.M. My curriculum vitae are attached.

2. I have reviewed the Declaration of Frans Hendra Winarta submitted by Defendant Exxon Mobil in the captioned case.

3. The Civil Code system in Indonesia would allow for tort claims based on wrongful death, battery, assault, arbitrary arrest and detention, false imprisonment, intentional and negligent infliction of emotional distress, negligence, negligent supervision, and conversion. While these torts are not specifically provided for under the civil law, there is nothing in the law that would preclude them, or any other actions defined as crimes under Indonesian law, from being brought as tort actions under the Civil Code. There is nothing in Mr. Winarta's Declaration that conflicts with this assertion. He says only that tort claims in Indonesia are governed by the Civil Code. This is true, and it is also true that the claims asserted by the Plaintiffs against Exxon Mobil could be brought under the substantive law of Indonesia. There is certainly nothing in the Civil Code that would preclude the delineated claims from being brought under Indonesian law.

4. The Indonesian legal system would allow for broad types of damages, including what the American legal system refers to as punitive damages. Article 1365 Indonesian Civil Code provides in my translation: "Any action by a person which violates the law and causes financial loss, harm or damage to someone else, requires the person responsible for the violation to provide financial compensation for the loss, harm or damage." This does not contain the term "punitive," but an element of the compensation amount could be punitive. Nothing in the law precludes this.

5. The State Security Law No 3 of 2002 referenced by Mr. Winarta's Declaration states only that as a part of the National Defense, the National Army is also responsible for protecting vital national resources. This has no application to a situation in which a private party, like Exxon Mobil, makes private security arrangements. In that situation, the normal laws of principal-agent would apply. The Upstream Government Regulation No. 35 of 2004 applies to exploration activities and has no application to a situation in which a private party specifically engages government troops for private security purposes. In order to sort out properly the application of either of these laws to the Exxon Mobil situation, I would need to examine the contracts and other documents that define the relationship between Exxon Mobil and the security forces.

6. Under the law of Indonesia, if an agent is acting within the general scope of his employment, his principal would be liable for the acts of the agent. The primary source for this law is Article 1367 of the Indonesian Civil Code, which provides that a person is liable not only for harm, damage or financial loss which is caused by his/her own acts, but also for the actions of someone under his/her supervision or employment.

Executed this 12th day of December, 2005 in Jakarta, Indonesia

Abdul Haris Semendawai

# Curriculum Vitae

N A M E        : ABDUL HARIS SEMENDAWAI, SH, LL.M
Date of Birth  : 28th September 1964
Place of Birth : Ulak Baru, OKU, South Sumatera, Indonesia
Nationality    : Indonesian
Occupation     : Attorney at Law
Home Address   : Jl. Kemuning IV No. 55 Pejaten Timur, Pasar Minggu, Jaksel 12510

## EDUCATIONAL BACKGROUND

1. Northwestern University School of Law, in Chicago, IL, USA, 2004
2. Faculty of Law Indonesian Islamic University, in Yogyakarta, 1991
3. SMA Negeri II (Senior High School), in Yogyakarta, 1984
4. SMP Xaverius Belitang (Junior High School), in Belitang, OKU, South Sumatera 1981
5. SD Negeri Ulak Baru (Secondary School), in Ulak Baru, OKU, South Sumatera, 1977

## TRAINING AND WORKSHOP BACKGROUND

1. **Forensic Training for Human Rights Investigation,** Indonesia National Commission of Human Rights and United Nation, Jakarta – Aceh, November 1998
2. **State Responsibilities on Human Rights Resolution Workshops,** Indonesia National Commission and Indonesia Foreign Affairs, Jakarta, December 1998
3. **Alternative Prosecution Procedure for Human Rights and Environment Violation Training,** WALHI, Jakarta, December 1998
4. **Human Rights Course for Lawyer,** ELSAM, Jakarta, May 1999
5. **International Human Rights Training Program,** Canadian Human Rights Foundation, Montreal Canada, June - July 2000
6. **Regional Workshop on Human Rights in Asia and Pacific,** Ichon (Republic of Korea), December 2000
7. **South East Asia Seminar on Human Rights and Security,** Non-Violence International, Bangkok – Thailand, June 2001
8. **Indonesian Supreme Court Seminar on International Humanitarian Law,** East West Center, Hawaii – USA, January 10 – 14, 2005
9. **Study Trip to ICC - ICTY,** Norwegian Center for Human Rights, Denhaag, November 20 – 23, 2005

## EMPLOYMENT HISTORY

1. **Coordinator of Institute for People's Rights (Lekhat),** Yogyakarta 1991 – 1993
2. **Attorney at Law at** Titiek R. Danumihardjo, SH and Associate Law Firm in Yogyakarta, 1994 – 1998
3. **Attorney at Law at ELSAM** (The Institute for Policy Research and Advocacy), Jakarta 1998 – 1999

4. **Coordinator of Legal Service Division – ELSAM**, Jakarta 1999 – Now
5. **Coordinator of Capacity Building Division – TAPAL**, Jakarta 2000 – 2003
6. **Coordinator of Steering Committee – Sawit Watch**, Bogor 2003 - Now

## EXPERIENCES IN HANDLING LEGAL CASES

1. **Freeport Cases** (Mining in Timika, Papua), August 1999-now
2. **Wardah Hafidz Case** (The Social Safety Net Case), June 1999
3. **Journalist Case against General Attorney** (Andi Muhammad Ghalib), July, 1999
4. **Indonesian Corruption Watch (ICW) Case** against General Attorney (Andi M.Ghalib / Corruption Case), July, 1999
5. **Aceh Case against Indonesian Government, Military and Police** (Habibie Govt. period), September, 1999
6. **Indigenous People Case** (Indigenous Leader Arbitrary Arrest; LB. Dingit, East Kalimantan), Supreme Court – December 1998
7. **Indigenous People Case** (Indigenous Leader Murder: Adeng Bin Lame, West Kalimantan), December, 1998
8. **Papua Case** (Gross Human Rights violation case in three area; Mapenduma, Biak and Bintang Mountains), Reported these cases to Parliament (House of Representatives / DPR) and National Commission on Human Rights, August 1999
9. **Land Dispute Case** (The land dispute between Dayak Benuaq / Indigenous People in East Kalimantan against London Sumatera / Lonsum Palm Oil Company), Mei 1999 – now
10. **Environmental Case** (The one million hectares field of peat moss / gambut in Central Kalimantan), July 1999-now
11. **Kidnapping and torture case** (Ruidrianto / Telapak Foundation, Bogor West Java and Faith / Environmental Investigation Agency, England) – by Lodging Company Gang in Central Kalimantan, January 2000
12. **The Jakarta Pedicap Case** against Jakarta's Governor (Soetiyoso), January 2000
13. **People Democratic Party Case** against Central Government and Military (Suharto period), July 2000
14. **Thamrin Amal Tomagola** (Human Rights Activist and University Lecture) Case against Four Military High Rank Generals (Wiranto, Djaja Suparman, etc.), May 2001
15. **Legal Standing "Sampit Case of Ethnic Conflict"**, June 2001
Etc.

## Legal Drafting Involvement

**Designing and Formulating the legal drafting of human rights Laws and Government Decree :**

1. The Draft of Victim and Witness Protection Act
2. The Draft of Amnesty, Abolition, Clemency and Rehabilitation Act
3. The Draft of Compensation, Restitution, Rehabilitation for the Gross Human Rights Violations Victim (Government Decree).

## Authorship/Literature

1. Essay "Hukum dan Tuntutan Persamaan Hak-hak Sipil (*Law and the Demand for Civil Right Equality*)", presented in the Training organized by Yayayasan Lintas Sara, Yogyakarta, 1999.
2. Essay "Advokasi NGO antara Urgensi dan Problem (*NGO Advocacy between the Urgemcy and Problem*)", used for comparative study with the National Central for Advocacy Studies, India, 2001
3. Essay "*Advokasi* Kasus Masyarakat Adat dalam Sistem Hukum Nasional (*Advocacy of Indigenous Peoples Cases with the National Legal System*)", presented in the Training for Indigenous People Activists organized by Institute Dayakologi, Pontianak 2002
4. Essay "Ekploitasi SDA vs Perlindungan terhadap Masyarakat Adat, Pelajaran Berharga untuk Perbaikan Konstitusi Indonesia (*Natural Resources Exploitation vs Protection of Indigenous people, A Valuable Lesson for the Reformation of Indonesian Constitution*) ", presented in the Workshop on New Constitution presented by IDEA International, Jakarta 2000.
5. Essay "MNC dan Pelanggaran Hak-hak Asasi Manusia: Beberapa Pengalaman di Indonesia (*MNC and Human Right Violation: Several Experiences in Indonesia*)" presented in the Workshop "Corporate Social Responsibility", as a part of Prepcom IV Rio+ 10, held in Bali on June 1 – 7, 2002.
6. Essay "Hukum dan Advokasi Masyarakat (*Law and People's Advocacy*)", presented in the "Lokakarya Nasional Advokasi Hukum untuk Penerima Bantuan PPK (*National Workshop on Legal Advocacy for PPK Beneficiaries*)", held in Jakarta on April 17, 2002.
7. Essay "The Current Situation of Human Rights in Indonesia", presented in the workshop for Human Right NGO's in Asia and Pacific, December 4-6, 2000, Ichon, South Korea, organized by Korean National Commission for UNESCO.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE VIII, et al., )<br><br>    Plaintiffs, )<br><br>    v. )<br><br>EXXON MOBIL CORPORATION, et al., )<br><br>    Defendants. ) | Case: 1:07-cv-01022 (LFO) |

### [PROPOSED ORDER]

Upon consideration of Defendants' Motion to Dismiss, and the memoranda both in support and in opposition thereof, and the accompanying declarations and exhibits, it is on this _____ day of _____, 2007, hereby

ORDERED, that the Defendants' Motion to Dismiss be, and the same hereby is, denied.

_____
Hon. Louis F. Oberdorfer
United States District Judge