IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE VIII, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 07-cv-1022 (LFO) |
| ) | |
| EXXON MOBIL CORPORATION, *et al.*, ) | |
| ) | |
| Defendants. ) | |

ERRATA

Attached is a clearer copy of the Declaration of Ross Clarke, which is Exhibit D to Plaintiff's Response to the Motion to Dismiss [Dkt. No. 25], which was filed on November 2, 2007. This exhibit is being resubmitted due to the poor quality of text in the original electronic copy.

Dated: November 13, 2007      Respectfully submitted,


_____/s/_____
Michael D. Hausfeld, DC Bar No. 153742
Agnieszka Fryszman,  DC Bar No. 459208
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
West Tower - Suite 500
Washington, DC  20005-3964
Tel:  (202) 408-4600
Fax:  (202) 408-4699

Terrence Collingsworth, DC Bar No. 471830
INTERNATIONAL LABOR RIGHTS FUND
2001 S Street, NW, Suite 420
Washington, DC  20009
Tel:  (202) 347-4100
Fax:  (202) 347-4885

*Counsel for Plaintiffs*

# EXHIBIT D

# DECLARATION OF ROSS CLARKE

I, Ross Clarke, declare as follows:

I have been requested by counsel for the plaintiffs in this civil action to provide my opinion as to specific points regarding transitional justice developments in Aceh, Indonesia. This opinion is offered in a personal capacity.

## Qualifications and Experience

I am a qualified Australian lawyer, with significant experience in the field of human rights protection in Indonesia. I am a solicitor and barrister of the Supreme Court of Victoria, Australia, a graduate of the University of Melbourne Law School and have been based in Aceh since June 2006, working on legal reform and transitional justice for renowned international organizations such as the International Development Law Organization (IDLO), the United Nations Development Programme (UNDP) and the International Center for Transitional Justice (ICTJ).

In particular, from June–October 2007, I was the lead ICTJ consultant for a forthcoming report entitled 'Considering Victims: The Aceh Peace Process from a Transitional Justice Perspective'. In this position I led a detailed research process to analyze the current status of transitional justice initiatives and to identify key gaps. The research included numerous interviews with key government, former combatant and civil society stakeholders. This report will be the first comprehensive analysis of transitional justice in Aceh since the peace agreement of August 2005. Given my regional and Aceh-specific experience on transitional justice and in light of my fluent Indonesian language skills, I am appropriately qualified to comment on the status of transitional justice initiatives in Aceh. My Curriculum Vitae is attached for more detail.

## A Truth and Reconciliation Commission (TRC) for Aceh

While an Acehnese TRC was provided for in both the peace agreement which brought about an end to the Aceh conflict (the Helsinki MoU) and its promulgation into Indonesian law, the Law on Governance in Aceh (LOGA), until now a TRC has not been established. To suggest otherwise demonstrates a complete misunderstanding of the current political and transitional justice context in Aceh. Advocacy efforts by civil society organizations are currently taking place to put an Acehnese TRC on the political agenda, however up until now, these have not achieved concrete results.

The misconception that a TRC has been established in Aceh arises from a simplistic, abstract reading of the LOGA. According to art 229 of the LOGA, "a Truth and Reconciliation Commission is established by this law". Problematically, the same article also states that the Aceh TRC is an "inseparable part" of Indonesia's planned national Truth and Reconciliation Commission. In development since 2000, the creation of a national TRC received a significant setback when in December 2006 its foundational law was struck down by Indonesia's Constitutional Court. For Aceh, the annulment of the national TRC law created legal uncertainty as to whether an Acehnese TRC can be established outside the ambit of a national Commission. The result has been deadlock, with the Acehnese TRC in limbo until the uncertainty is

1

resolved. This uncertainty remains until the present, and more than any other factor the Constitutional Court decision to annul the national TRC law has prevented the establishment of an Aceh-specific TRC.

Other factors have also contributed to the impasse. Recent Indonesian history demonstrates the significant political obstacles to implementing effective transitional justice mechanisms and the barriers to holding military personnel accountable for past human rights violations. Relevant examples include the widely criticized Ad hoc Human Rights Court for East Timor, the flawed trials regarding the Tanjung Priok massacre of 1998, as well as the failure to address the estimated massacre of over one million people across Indonesia in the political violence of 1965. Aceh, like many other conflict zones across Indonesia, is no exception to the Indonesian Government's well-documented failure to uphold international law and provide accountability for gross violations of international human rights and humanitarian law. In all of these cases, it is generally accepted that efforts to provide transitional justice have been thwarted by the powerful political influence of the Indonesian military (TNI). Given that democratic reform in Indonesia commenced less than ten years ago, after thirty of years of brutal military dictatorship under President Soeharto, the obstacles to providing accountability should not be underestimated.

While in Aceh, political barriers to the establishment of an Aceh TRC exist from both sides of the conflict – the Government of Indonesia and the Free Aceh Movement (GAM). The central government is dominated by military interests that have strongly resisted all manner of efforts aimed at military reform. An Aceh TRC is seen as a threat given the implication of senior Generals in human rights violations. On the other side, senior GAM commanders, who now hold significant political power at the provincial level, are also implicated in human rights abuses, with it widely acknowledged that both parties to the conflict were responsible for human rights violations. Aceh's present Governor Irwandi Yusuf – a former GAM spokesmen – therefore risks alienating the central Government and antagonising GAM membership if he pursues the establishment of a TRC.

There are therefore very real political obstacles to the creation of a TRC in Aceh. Combined with legal uncertainty as to whether an Acehnese TRC can be established prior to the formation of a national TRC, and the protracted process to draft a new national TRC law and then have it passed by the national parliament, it is unsurprising that the Acehnese Commission has yet to be created. And while both parties agreed to the formation in the Helsinki MoU, the provision for a TRC was apparently initiated by the mediator of the Helsinki negotiations, Maathi Athisaari. Since then, the political landscape following the peace agreement has not been amenable to the establishment of transitional justice mechanisms. There can be no doubt therefore that an Acehnese TRC is neither "established," "fully functioning," or "in effect". Words to this effect are a gross mischaracterization of the situation Aceh and most likely arise from an abstract reading of the LOGA without analysis of the extent to which this law has been applied or enforced.

## A Human Rights Court for Aceh

Similar to the failure to establish a TRC, the formation of a Human Rights Court for Aceh has further not occurred. This is despite a Human Rights Court being a clear

commitment in both the Helsinki MoU and the LOGA. Even though these provisions exist, prosecutions of alleged perpetrators of human rights abuses have never seriously been on either party's agenda. This is illustrated in article 228 of the LOGA which limits the proposed Court's jurisdiction to prospective cases only. As it may only deal with cases that occurred after the enactment of the LOGA, the proposed Human Rights Court – if indeed it is ever functional – is by and large meaningless. Without a retroactive mandate to address Aceh's well-documented history of human rights violations, the Court appears little more than a symbolic act to appease calls for justice, accountability and military reform. It should further be noted that the issue of retroactive jurisdiction (or lack thereof) for human rights trials does not solely relate to Aceh but provides ongoing controversy across Indonesia.[1]

At present, in breach of international legal obligations to prosecute gross violations of international human rights law, no trials related to the Aceh conflict appear likely. Domestically, the slow pace of military reform, central Government and GAM complicity in violations in Aceh, combined with the proposed Court's lack of retroactive jurisdiction provide significant barriers to human rights trials.[2] While internationally, there is insufficient political will to either pressure Indonesia to uphold its legal obligations or push for trials through an international or hybrid mechanism.

Further, if the Ad hoc Human Rights Court for East Timor is any indication, the Indonesian judiciary appears incapable of holding human rights trials for military personnel that adhere to international fair trial guarantees.[3] Even if a Human Rights Court for Aceh is ever established, and the lack of retroactive jurisdiction can be overcome, the continued political influence of senior military commanders could render such a process impotent. It therefore must be emphasized that even the mere establishment of a Human Rights Court, notwithstanding its limited prospective jurisdiction and questionable independence if created, is not on the current political agenda at either the provincial or national level.

Due to the presumed impossibility of establishing an effective trial procedure and the political sensitivity prosecutions provoke, advocacy for a Human Rights Court is notably absent in Aceh. Rather, the establishment of a TRC dominates all discussion on transitional justice. This is despite the strong arguments justifying prosecutions in Aceh under national and international law. In the current political climate therefore, the Acehnese appear to have little choice but to accept the unlikelihood of an effective Human Rights Court and channel advocacy efforts toward a TRC.

### Joint Claims Settlement Commission

Just like the illusory TRC and Human Rights Court, a Joint Claims Settlement Commission referred to in article 3.2.6 of the Helsinki MoU, has not been established. The failure to do so remains a key concern of GAM, particularly as the reintegration process in Aceh progresses and aggrieved parties have no official forum to voice their

---

[1] See Ross Clarke, "Retrospectivity and the Constitutional Validity of the Bali Bombing and East Timor Trials", Australian Journal of Asian Law, 5(2) 2003, 2-32.
[2] Ibid.
[3] See David Cohen, "Intended to Fail. The Trials Before the Ad hoc Human Rights Court in Jakarta", International Center for Transitional Justice, 2003.

3

concerns. While such a Commission could play a valuable role, over two years following the peace agreement no concrete steps have been taken towards its establishment. Given previous inaction there can be no confidence that such a Claims Settlement Process will be established in the foreseeable future.

### Land Compensation to Conflict-affected civilians

To continue the pattern, land compensation for conflict-affected persons was agreed to in the Helsinki MoU but has failed to eventuate. This is despite further regulation (INPRES 15/2005) mandating the provision of land to conflict victims. More broadly, land compensation was also to be provided to former combatants as part of the reintegration process but this approach was also cancelled.

Conflict-affected civilians, or conflict victims as they should more appropriately be called, have received limited support through the Acehnese Reintegration Body (BRA), however this has not included land. This much maligned assistance package, the BRA-KDP Program, has involved the provision of grants to conflict-affected communities who through a facilitated community process jointly select a project through which to utilize the funds. No conflict victim has received individual economic assistance through BRA. Thus while minimal reintegration support has been provided to conflict victims on a general community-based level, this can in no way be construed to meet victims' right to individual reparations or justice.

### Response to Arguments Purporting to Disallow Extraterritorial Litigation for Acehnese Victims of Human Rights Abuses

Even if the transitional justice framework set forth in the Helsinki MoU and LOGA were fully and effectively implemented – it must be reiterated that it has not – this should in no way preclude claimants seeking redress through other mechanisms, extraterritorial or otherwise. Given inherent limitations in any reconciliation or judicial mechanism, a wide-ranging number of processes are generally recommended to fully account for a history of conflict. Best practice from a number of post-conflict contexts, notably South Africa, Peru and East Timor, demonstrates that no single mechanism alone can achieve justice. Thus, trial processes, truth and reconciliation commissions, security sector reform, wide-ranging reparations including memorials, searches for the missing, social and economic compensation, are all considered vital aspects of a transitional justice framework.

An assumptions that the disparity in outcome caused by extraterritorial litigation raises serious concern is unfounded. The human rights violations inflicted on the claimants, while not isolated, were closely related to the existence of Exxon Mobil's instalments near their communities and caused by the actions of security personnel specifically recruited by Exxon Mobil to protect their interests. There is therefore every justification for a disparity of outcome as compared to other Acehnese victims. In any event, transitional justice mechanisms by their very nature result in disparity of outcome as redress should be related to harm suffered.

Further, suggesting that extraterritorial litigation undermines the peace agreement is a baseless argument. As demonstrated above, the peace agreement while positive as it appears on paper, has not led to the establishment of the transitional justice

4

mechanisms provided for. There could be no greater undermining of the Helsinki MoU than the Indonesian Government failing to uphold the commitments it agreed to. Rather than undermine the peace agreement, extraterritorial litigation would therefore more likely highlight the Indonesian Government's inaction and increase pressure to ensure that all Helsinki commitments, including those intended to uphold victims' rights, are realized.

## Conclusion

It can therefore be seen that while significant legally enshrined commitments were made to provide truth, accountability and justice to Acehnese victims of human rights abuses, none of these have been effectively established. This trend should be interpreted as the continued marginalization of victims' rights to justice rather than as a delay in implementation. In Indonesia, commitments in legal instruments do not amount to the implementation of the provisions contained therein. The provisions of the Helsinki MoU, and those enacted by the LOGA, do not amount to their realization. To make this simplistic assumption amounts to a dangerous legal fiction that denies the reality faced by the vast number of Acehnese victims. Thus an evaluation of the *implementation* of the Helsinki MoU and the LOGA cannot occur in the abstract, but must be interpreted by those with a detailed understanding of the post-disaster and post-conflict context currently facing Aceh.

The Indonesian Government has a tradition of promising and enacting progressive transitional justice mechanisms but then failing to implement them, or failing to implement them effectively. Usually such situations arise from severe international criticism of its human rights track-record and the subsequent need to appear to take steps toward justice. The trials of the Ad Hoc Human Rights Court for East Timor offer one such example. Thus transitional justice mechanisms in Indonesia (indeed if they are ever established) often result in a perversion of justice with the political influence of powerful military interests and an unprofessional judicial system limiting the independence and effectiveness of any processes.

The situation in Aceh is therefore a continuation of this trend. Despite positive signs following the Helsinki MoU and the LOGA, establishing the truth, providing justice and building reconciliation have now all but been side-lined in the peace-building process. Democratic reform in Indonesia remains a slow, painstaking process. Crucial to such reform is building the rule of law to such an extent where the law as it is written reflects the law as it is applied and enforced. Often at present, such a situation, particularly as it pertains to human rights issues, is simply not tenable.

Where transitional justice mechanisms have been stipulated in law but not implemented, extraterritorial litigation may be an indispensable aspect of the process to uphold victims' rights and achieve full accountability for human rights violations. There is further no provision in either the Helsinki MoU or LOGA, or under international law, that restricts victims of human rights violations in the plaintiffs' circumstances from accessing international fora. The current post-conflict context in Aceh which sees victims' rights and interests significantly marginalized should therefore not impact on the plaintiffs' right to seek redress through extraterritorial litigation.

5

I declare, under penalty of perjury and the laws of the United States of America, that to the best of my knowledge and belief, the statements made in this Declaration are true and correct. Executed on October 30, 2007, at Banda Aceh, Indonesia.

*/s/ Ross Clarke*
Ross Clarke

6

# Ross Clarke

Email: roscoclarke@gmail.com
Phone: +62 (0) 812 6299 2149

**Skill Summary**
- Over 6 years of high-level research, analysis, reporting and programming on post-conflict issues, transitional justice and human rights, with particular emphasis on Indonesia and East Timor.
- Over 4 years of progressive field-based work in transitional justice, reconciliation and judicial reform in post-conflict contexts within a UN-sponsored Court, UNDP, a Truth and Reconciliation Commission, and for local and international legal organisations.
- Advanced research, writing and interviewing skills, especially regarding human rights issues.
- High-level experience in the design, implementation, monitoring and evaluation of post-conflict justice, judicial reform and access to justice programs, including the mainstreaming of gender issues.
- Extensive program management experience, including reporting, budgeting and management of large teams.
- Highly attuned capacity building, public outreach and civic education skills in developing contexts.
- Advanced knowledge of international human rights, refugee, humanitarian and criminal law.
- Published author on human rights issues in Indonesia and East Timor.
- Fluent Bahasa Indonesia, conversational Tetum.
- Qualified Australian lawyer.

## Qualifications

**Solicitor and Barrister of the Supreme Court of Victoria, Australia:** Admitted to practice in 2006.

**Graduate Diploma in Legal Practice:** (2005-06) *College of Law*, Australia.

**Bachelor of Laws (honours):** (1998-03) *University of Melbourne*, Australia.

**Bachelor of Arts:** (1998-03) *University of Melbourne*, Australia.

- Undergraduate law degree focusing on international law and law and society in Asia. Prize for highest mark in Advanced Legal Research for research on human rights in Indonesia and East Timor.
- Received scholarship for intensive study on international law, human rights law and humanitarian law while on exchange at University College Dublin, Ireland (2001).
- 

## Employment

**Consultant** (Aug 2007 – Present): **United Nations Development Programme (UNDP)**, Aceh, Indonesia.

- Collaboration with Syiah Kuala University (UNSYIAH) and the State Institute of Islamic Studies (IAIN) to establish and develop the Aceh Justice Resource Centre.
- Needs assessment, strategic planning, and development of a long-term work plan.
- Strengthening civil society actors' ability to act as an oversight mechanism and providing a hub for legal research and legal information.

**Consultant** (June – Sept 2007): **International Center for Transitional Justice (ICTJ)**, Aceh, Indonesia.

- Research, analysis and writing on transitional justice options and mechanisms for Aceh, including in-depth analysis on a Truth and Reconciliation Commission for Aceh.
- Focus group discussions with victim groups and key security sector stakeholders, field based research, and managing research teams to implement a large scale research project on justice issues.
- Collaboration with local human rights organisations to develop and implement field research.
- Policy analysis and legislative review.

**Legal Officer** (June 2006 – June 2007): **International Development Law Organization (IDLO)**, Aceh, Indonesia.

- Design, implementation, reporting, monitoring and evaluation of the *Community Legal Skills and Mediation Program*, part of IDLO's *Post-Tsunami Legal Assistance Initiative*.
- Development and management of the UNICEF Legal Support for Tsunami Orphans project.
- Collaboration with the Indonesian Institute for Conflict Transformation in the design of community mediation training modules and the implementation of a 2 week Training of Trainers on mediation and legal skills.
- Program activities include training community leaders in 100 villages on land, inheritance and guardianship law and using mediation to resolve disputes at the village level.
- Research, analysis and report writing on key post-tsunami legal issues facing Acehnese communities.
- Relationship building with local and international partners, including Acehnese lawyers, the Shariah Court, State Courts, Shariah Office, Adat Council, prominent local and international NGOs and agencies.
- Support to IDLO's other *Post-Tsunami Legal Assistance Initiative* projects.

**Program Officer** (June 2005 – May 2006): **Avocats Sans Frontieres**, Dili, East Timor

- Design, implementation, reporting monitoring and evaluation of the *Access to Justice* Program.
- Program activities include collaborating with civil society to establish and train a network of community paralegals and raise awareness on legal process, human rights and mediation through grassroots legal education workshops.
- Design, implementation and management of pilot *Prevention of Gender-based Violence* program.
- Detailed monitoring and evaluation of program activities, including use of Most Significant Change methodology.
- Management of 12 staff and partnership with 2 local human rights NGOs.
- Developing and providing training on human rights, mediation, reconciliation, legal process, gender-based violence, property disputes, dispute resolution and evaluation.
- Drafting of narrative, monitoring and evaluation reports.
- Budgeting, financial reporting and financial management of a USD 1 million project.
- *Acting Head of Mission: December 2005.*

**Legal Officer** (Jan – June 2005): **Serious Crimes Unit, UNMISET**, Dili, East Timor

- Preparation of crimes against humanity cases for prosecution before the UN Special Panel for Serious Crimes.
- Drafting and editing of arrest warrants, legal submissions and motions.
- Drafting prosecution appeal statements and determining prosecution appeal strategy.
- Working with prosecutors, lawyers and investigators in the drafting of indictments.
- Assisting international prosecutors in court.
- Design and implementation of work processes for case management.
- Finalisation and handover of case files to national authorities.
- Member of the UN Working Group on the Serious Crimes Process – a group providing policy recommendations to the Security Council on the future of the serious crimes process in East Timor.

**Writer, Editor, Mentor** (Sept – Dec 2004): **Commission for Reception, Truth and Reconciliation (CAVR)**, Dili, East Timor

- Research, analysis and writing for the Final Report of East Timor's Truth and Reconciliation Commission.
- Responsible for the drafting and editing of the Final Report's chapter on *Political Trials*.
- Collaborative research and writing with national staff.
- Detailed analysis of primary legal documents in Bahasa Indonesia.
- Mentoring, training and capacity building of national staff on research and writing techniques.
- Management of writing team to ensure stringent timelines were met.

**Legal Officer** (Aug 2003 – Sept 2004): **Judicial System Monitoring Program (JSMP)**, Dili, East Timor

- Court monitoring of the Special Panels for Serious Crimes, District Courts and Court of Appeal.

- Writing of legislative analysis, thematic and case reports regarding major human rights issues.
- Analysis of trials for compliance with UN law, Indonesian law, East Timorese law, international human rights law and fair trials standards.
- Providing policy recommendations and working with the legal profession to implement change.
- Public outreach and education regarding the justice system and human rights.
- Media work, drafting of press releases, radio interviews.
- Liaison with local NGOs and networks to lobby for justice related issues regarding East Timor.
- Collaboration with local legal aid organisations to identify training needs and design appropriate interventions.
- Extensive collaboration with Amnesty International to write and research *'Justice for Timor-Leste: The Way Forward'*, a detailed joint report released in April 2004.
- Capacity building, training and mentoring national staff members in court monitoring, report writing, research techniques, international human rights and humanitarian law.

**Researcher** (Aug 2002 – Aug 2003): **Asian Law Centre**, University of Melbourne, Australia

- Writing, research and analysis on Indonesian and East Timorese law.
- Detailed research into the Islamic legal system in Aceh, and more generally the Indonesian legal system and its compliance with human rights standards.
- Detailed research on Indonesia's Ad hoc Human Rights Courts and the trials related to East Timor.
- Writing, editing, research and administrative assistance in relation to the Asian Law Centre's Australian Research Council grant on the role and development of Islamic law in Indonesia.
- Drafting of opinion pieces for major Australian newspapers.
- Co-editor for the Asia Pacific Centre for Military Law publication *'Lessons Learned on Peace Operations'*.

**Paralegal** (Jan 2002 – Mar 2003): **Freehills**, Melbourne, Australia

- Research and analysis of corporate legislation and case law.
- Drafting of research memos on areas of corporate law.
- Assisting in the drafting of pleadings, submissions and contracts.
- Database management of case materials. Assistance in training seminars and material preparation.
- Writing and editing of newsletters and updates on relevant legal issues.

**Case Officer** (Jan 2001 – Aug 2001): **Migration Review Tribunal**, Melbourne, Australia

- Research and legal advice on merits of review cases before the Migration Review Tribunal.
- Legal analysis of cases according to migration legislation.
- Tribunal clerk in tribunal hearings.
- Explanation of case decisions to tribunal applicants of diverse cultural backgrounds.
- Communication with tribunal applicants explaining the status and implications of their case.

## Voluntary Work

- Case work volunteer (2002-2003): **Asylum Seeker Resource Centre**, Footscray, Australia.
- Committee member (2003): **Red Cross International Humanitarian Law Committee**, Melbourne Australia.

## Publications

- *Human Rights in Indonesia: The Impact of Retrospective Prosecution*, in Lindsey, T. (ed), 'Indonesia: Law and Society', 3rd Edition, Federation Press (forthcoming).
- *Retrospectivity and the Constitutional Validity of the Bali Bombing and East Timor Trials*, Australian Journal of Asian Law, 5(2), 2-32.
- Clarke, Ross, 'How Amrozi may cheat death sentence', *Financial Review,* 21 August 2003.
- Clarke, Ross, and Lindsey, Timothy, 'American secrecy lets Bashir off lightly', *The Australian*, 5 September 2003.
- Butt, Simon; Clarke, Ross; Lindsey, Timothy, 'Review is Not Release', *The Australian*, 27 July 2004.