IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
JOHN DOE VIII, et al.,                    )
                                          )
            Plaintiffs,                   )
                                          )
      v.                                  )        Case: 1:07-cv-01022 (LFO)
                                          )
EXXON MOBIL CORPORATION, et al.,          )
                                          )
            Defendants.                   )
_____ )

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
EXXON MOBIL CORPORATION, MOBIL CORPORATION,
EXXONMOBIL OIL CORPORATION, AND EXXONMOBIL OIL INDONESIA INC.'S
MOTION TO DISMISS**

Theodore V. Wells, Jr. (Bar No. 468934)
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Alex Young K. Oh (Bar No. 499955)
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
1615 L Street, NW, Suite 1300
Washington, DC 20036

Martin J. Weinstein (Bar No. 37792)
Robert J. Meyer (Bar No. 41620)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
Telephone: (202) 303-1000
Facsimile: (202) 303-2000

Paul W. Wright (Bar No. 20747)
Patrick J. Conlon (Bar No. 414621)
Exxon Mobil Corporation
800 Bell Street
Houston, TX 77002

Attorneys for Defendants Exxon Mobil
Corporation, Mobil Corporation, ExxonMobil Oil
Corporation, and ExxonMobil Oil Indonesia Inc.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 2

I.     EMOI IS AN ALIEN, AND THE PARTIES ARE THEREFORE NOT DIVERSE ............ 2

       A.     An "Alter Ego" Theory of Citizenship Cannot Create Diversity Jurisdiction. .......... 3

       B.     The Court Cannot Ignore EMOI's Place of Incorporation. ......................................... 4

II.    NON-RESIDENT ALIENS OUTSIDE THE UNITED STATES MAY NOT SUE IN
       U.S. COURTS UNDER COMMON LAW FOR INJURIES SUSTAINED ABROAD ........ 7

III.   THE STATEMENTS OF THE UNITED STATES AND THE GOVERNMENT OF
       INDONESIA, ALONG WITH THE HELSINKI PEACE ACCORD, REQUIRE
       DISMISSAL ON GROUNDS OF COMITY, ACT OF STATE, POLITICAL
       QUESTION, AND FOREIGN AFFAIRS PREEMPTION .................................................... 9

       A.     Comity Dictates that this Court Yield to the Acehnese Peace Process. .................... 10

       B.     The Act of State Doctrine Applies Because the Indonesian Government
              Considers the Soldiers' Actions To Be Official Acts. ............................................... 14

       C.     The Political Question Doctrine Bars Adjudication of Plaintiffs' Claims Because
              the Political Branches Have Expressed Support for the Helsinki Peace Accord. ...... 16

       D.     The Foreign Affairs Preemption Doctrine Bars Adjudication of Plaintiffs'
              Common Law Claims. ................................................................................................. 17

IV.    BPMIGAS IS AN INDISPENSABLE PARTY WHOSE INTERESTS WOULD BE
       ADVERSELY AFFECTED BY ADJUDICATION OF THE CASE IN ITS ABSENCE ... 18

       A.     BPMIGAS Is a Necessary Party to this Lawsuit. ...................................................... 18

       B.     BPMIGAS Cannot Be Joined, So the Suit Should Be Dismissed. ............................ 19

V.     THE COURT LACKS PERSONAL JURISDICTION OVER EMOI .................................. 20

VI.    PLAINTIFFS' CLAIMS EXPIRED AFTER ONE YEAR, AND NO DOCTRINE OF
       EQUITABLE TOLLING EXISTS UNDER D.C. LAW ...................................................... 21

       A.     District of Columbia Law Does Not Recognize the Concept of Equitable
              Tolling, and This Court Cannot Create the Doctrine. ................................................ 22

       B.     Plaintiffs' Intentional Infliction of Emotional Distress and Negligence Claims
              Are Not Distinct from their Other Claims. ................................................................ 24

        1.      Intentional Infliction of Emotional Distress ................................................... 24

        2.      Negligence .......................................................................................................... 25

VII.    INDONESIAN LAW MUST APPLY BECAUSE INDONESIA HAS THE GREATEST INTEREST IN THIS LITIGATION .................................................. 26

VIII.   THE PSC AND INDONESIAN LAW DEFEAT PLAINTIFFS' CLAIMS, AND THERE IS NO STANDARD BY WHICH TO MEASURE LIABILITY HERE ................ 28

      A.     The PSC and Indonesian Law Establish that Defendants Did Not Have any Legal Relationship with the Indonesian Military. ...................................................... 29

        1.      Vicarious Liability ............................................................................................. 29

        2.      Direct Liability ................................................................................................... 31

      B.     There Is No Discernible Standard to Measure EMOI's Alleged Liability ................ 31

## TABLE OF AUTHORITIES

**CASES**

*Abdullahi v. Pfizer, Inc.*, No. 01-8188, 2005 WL 1870811 (S.D.N.Y. Aug. 9, 2005).................. 14

*Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004) ............................................................... 16

*Ali v. MedStar Health*, No. 99-1753, 2003 D.C. Super. LEXIS 32 (Super. Ct. Aug. 15, 2003)... 25

*\*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) ..................................................................... 18

*American Banana Co. v. United Fruit Co.*, 213 U.S. 347 (1909) .................................................. 11

*Arias v. Dyncorp*, No. 01-1908, 2007 WL 1521044 (D.D.C. May 21, 2007)................................. 9

*Ashenden v. Lloyd's of London*, 934 F. Supp. 992 (N.D. Ill. 1996)................................................ 7

*Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34 (D.D.C. 2003) ........................................ 21

*Baker v. Carr*, 369 U.S. 186 (1962) .............................................................................................. 16

*Beightol v. Capitol Bankers Life Ins. Co.*, 730 F. Supp. 190 (E.D. Wis. 1990)............................. 4

*Bejcek v. Allied Life Fin. Corp.*, 131 F. Supp. 2d 1109 (S.D. Iowa 2001)...................................... 5

*\*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ................................................................... 28

*\*Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144 (D.D.C. 1976) .................................... 7,8

*Bigio v. Coca-Cola Co.*, 448 F.3d 176 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 1842 (2007)....... 11

*Boise Tower Assocs., LLC v. Wash. Capital Joint Master Trust*, No. 03-141,
    2006 U.S. Dist. LEXIS 45851 (D. Idaho June 22, 2006)....................................................... 27

*Bonar, Inc. v. Schottland*, 631 F. Supp. 990 (E.D. Pa. 1986) ....................................................... 3

*Bowoto v. Chevron Corp.*, No. 99-02506, 2007 WL 2349345 (N.D. Cal. Aug. 14, 2007)............. 9

*Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424 (1965) .................................................................... 23

*\*Caisse Nationale de Credit Agricole*, No. 94-773, 1995 U.S. Dist. LEXIS 1991
    (N.D. Ill. Feb. 16, 1995)......................................................................................................... 7

*\*Chick Kam Choo v. Exxon Corp.*, 764 F.2d 1148 (5th Cir. 1985) ............................................ 5,6

*Constructores Civiles de Centroamerica, S.A. v. Hannah*, 459 F.2d 1183 (D.C. Cir. 1972) ...7,8,9

\* - Authorities upon which we chiefly rely are marked with asterisks.

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962)...................................11

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786 (2d Cir. 1980).........7

*Curley v. AMR Corp.*, 153 F.3d 5 (2d Cir. 1998)...................................................................27

*Danziger v. Ford Motor Co.*, 402 F. Supp. 2d 236 (D.D.C. 2005).................................................27

*Dewhurst v. Telenor Invest A.S.*, 83 F. Supp. 2d 577 (D. Md. 2000)............................................6,7

*Disconto Gesellschaft v. Umbreit*, 208 U.S. 570 (1908)............................................................8

*Doe v. Exxon Mobil Corp.*, 473 F.3d 345 (D.C. Cir. 2007)..........................................................17

*Doe v. Exxon Mobil Corp.*, No. 01-1357, 2006 U.S. Dist. LEXIS 11732
    (D.D.C. Mar. 2, 2006)...........................................................................................13,16,28

*Doe v. Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2004).............................................................23

*\*Doe v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005).......................................................16

*Eminente v. Johnson*, 361 F.2d 73 (D.C. Cir. 1966).................................................................8

*\*Estate of Carter v. Dist. of Columbia*, 903 F. Supp. 165 (D.D.C. 1995)....................................30

*Forti v. Suarez-Mason*, 672 F. Supp. 1531 (N.D. Cal. 1987).......................................................23

*\*Freiman v. Lazur*, 925 F. Supp. 14 (D.D.C. 1996).................................................................21

*\*Fritz v. Am. Home Shield Corp.*, 751 F.2d 1152 (11th Cir. 1985).............................................5

*Galu v. Swisair*, 873 F.2d 650 (2d Cir. 1989).......................................................................16

*\*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000).............................................................17

*Gibson v. United States*, 781 F.2d 1334 (9th Cir. 1986).........................................................23

*Grimandi v. Beech Aircraft Corp.*, 512 F. Supp. 764 (D. Kan. 1981)............................................3

*Haggerty v. Bethel*, No. 25653, 2001 Wash. App. LEXIS 507
    (Wash. Ct. App. Mar. 30, 2001)..............................................................................22

*\*Herbert v. Dist. of Columbia*, 808 A.2d 776 (D.C. 2002).......................................................26

*Hercules Inc. v. Dynamic Export Corp.*, 71 F.R.D. 101 (S.D.N.Y. 1976)........................................15

*Hicks v. Ass'n of Am. Med. Colleges*, 503 F. Supp. 2d 48 (D.D.C. 2007).......................................28

*Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996)..........................................................23

iv

* - Authorities upon which we chiefly rely are marked with asterisks.

*Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.D.C. 2005) ........................................ 5,9

*\*Int'l Shipping Co., S.A. v. Hydra Offshore Inc.*, 875 F.2d 388 (2d Cir. 1989)........................... 7

*\*J.A. Olson Co. v. City of Winona, Miss.*, 818 F.2d 401 (5th Cir. 1987)........................................ 4

*\*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88 (2002) ............ 5

*Jankovic v. Int'l Crisis Group*, 494 F.3d 1080 (D.C. Cir. 2007) ..................................... 23

*Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399 (3d Cir. 1993)..................... 20

*Jean v. Dorelien*, 431 F.3d 776 (11th Cir. 2005) ......................................................... 23

*Jerguson v. Blue Dot Inv., Inc.*, 659 F.2d 31 (5th Cir. 1981)....................................... 6

*Johnson v. Eisenstrager*, 339 U.S. 763 (1950)........................................................... 7

*Johnson v. Marcheta Investors L.P.*, 711 A.2d 109 (D.C. 1998)................................... 22

*Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998)..................................................... 11

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) .................................................... 15,16

*Kukatush Mining Corp. v. SEC*, 309 F.2d 647 (D.C. Cir. 1962)................................... 8

*W. S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400 (1990)........................... 15

*\*Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843 (11th Cir. 1999) ........................... 20

*\*Maday v. Toll Bros., Inc.*, 72 F. Supp. 2d 599 (E.D. Va. 1999)..................................... 4

*Moscovits v. Magyar Cukor Rt.*, No. 00-0031, 2001 U.S. Dist. LEXIS 9252,
   (S.D.N.Y. July 9, 2001), *aff'd*, 34 Fed. Appx. 24 (2d Cir. 2002) ........................... 14

*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005) ....................... 17

*Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329 (C.D. Cal. 1997) ............. 9

*Nat'l S.S. Co. v. Tugman*, 106 U.S. 118 (1882) ..................................................... 5

*Needham v. Wedtech (USA), Inc.*, 918 F. Supp. 6353 (N.D. Okla. 1996)....................................... 4

*Nike, Inc. v. Comercial Iberica de Exclusivas D19eportivas, S.A.*, 20 F.3d 987 (9th Cir.
   1994)............................................................................................... 6

*Osseiran v. Int'l Fin. Corp.*, 498 F. Supp. 2d 139 (D.D.C. 2007) ............................... 19

*\*Panalpina Welttransp. GmBh v. Geosource, Inc.*, 764 F.2d 352 (5th Cir. 1985) .................. 4,5,7

\* - Authorities upon which we chiefly rely are marked with asterisks.

*People of Saipan v. United States Dep't of Interior*, 356 F. Supp. 645 (D. Haw. 1973) ............... 9

*Polanco v. H.B. Fuller Co.*, 941 F. Supp. 1512 (D. Minn. 1996) ................................. 4,5

*Pyramid Sec. Ltd. v. Int'l Bank, Inc.*, 726 F. Supp. 1377 (D.D.C. 1989) ........................ 3

*\*Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114 (D.C. Cir. 1991) .................................. 3

*Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140
    (3d Cir. 1972) ....................................................................................... 3

*Rasul v. Bush*, 542 U.S. 466 (2004) .......................................................... 8

*Rouhi v. Harza Eng'g Co.*, 785 F. Supp. 1290 (N.D. Ill. 1992) ....................................... 4

*Roz Trading Ltd v. Zeromax Group, Inc.*, No. 06-1040, 2007 WL 2812760
    (D.D.C. Sept. 28, 2007) ............................................................................ 21

*\*Rynn v. Jaffe*, 457 F. Supp. 2d 22 (D.D.C. 2006) ................................................ 22,24

*\*Saadeh v. Farouki*, 107 F.3d 52 (D.C. Cir. 1997) ................................................ 2,5

*Sage Enters., Inc. v. Wells Fargo Alarm Servs., Inc.*, No. 94-2100, 1996 WL 1057144
    (E.D.N.Y. June 20, 1996) ............................................................................ 31

*Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993) .................................... 8

*Satterfield v. United States*, 788 F.2d 395 (6th Cir. 1986) ................................. 17

*Scales v. George Wash. Univ.*, No. 89-0796, 1991 U.S. Dist. LEXIS 16765
    (D.D.C. Nov. 15, 1991) ............................................................................ 24

*Schreiber v. Camm*, 848 F. Supp. 1170 (D.N.J. 1994) ..................................... 31

*Se. Guar. Trust Co. Ltd. v. Rodman & Renshaw, Inc.*, 358 F. Supp. 1001 (N.D. Ill. 1973) ........... 7

*Simon Holdings PLC Group of Cos. U.K. v. Klenz*, 878 F. Supp. 210 (M.D. Fla. 1995) ............ 6,7

*In re Ski Train Fire in Kaprun, Austria*, 230 F. Supp. 2d 376 (S.D.N.Y. 2002) ......................... 27

*\*Smith v. Halliburton Co.*, No. 06-0462, 2006 U.S. Dist. LEXIS 61980
    (S.D. Tex. Aug. 30, 2006) ...................................................................... 32,33

*Stewart-Veal v. Dist. of Columbia*, 896 A.2d 232 (D.C. 2006) ....................................... 26

*Taylor v. Sunbelt Mgmt., Inc.*, 905 S.W.2d 743 (Tex. App. 1995) ................................. 31

*Toms v. Country Quality Meats, Inc.*, 610 F.2d 313 (5th Cir. 1980) ............................... 3

\* - Authorities upon which we chiefly rely are marked with asterisks.

*Trans World Hosp. Supplies Ltd. v. Hosp. Corp. of Am.*, 542 F. Supp. 869
(M.D. Tenn. 1982)...................................................................................................... 6

*Turedi v. Coca Cola Co.*, 460 F. Supp. 2d 507 (S.D.N.Y. 2006).................................. 14

*U.S.I. Props. Corp. v. M.D. Constr. Co.*, 860 F.2d 1 (1st Cir. 1988)............................. 3

*Wiggins v. State Farm Fire & Cas. Co.*, 153 F. Supp. 2d 16 (D.D.C. 2001)................ 23

*Wilderness Soc'y v. Morton*, 463 F.2d 1261 (D.C. Cir. 1972)........................................ 8

*Williams v. Dist. of Columbia*, 916 F. Supp. 1 (D.D.C. 1996).............................. 22,23

*Windward Shipping (London) Ltd. v. Am. Radio Ass'n, AFL-CIO*, 415 U.S. 104 (1974) ............. 8

*Zipes v. TWA, Inc.*, 455 U.S. 385 (1982)..................................................................... 23

## STATUTES

D.C. Code § 12-301(4) (2007) ..................................................................................... 22

## OTHER AUTHORITIES

Restatement (Second) of Torts § 427 (1965) ............................................................... 31

15 *Moore's Federal Practice* ¶ 102.56[7][b] (3d ed. 2007)........................................... 8

\* - Authorities upon which we chiefly rely are marked with asterisks.

## PRELIMINARY STATEMENT

Defendants' motion to dismiss identified multiple jurisdictional and legal deficiencies in Plaintiffs' complaint. Most prominently, this Court clearly lacks subject matter jurisdiction over a lawsuit that involves aliens on both sides, Plaintiffs and defendant ExxonMobil Oil Indonesia Inc. ("EMOI"). Plaintiffs attempt to dodge this deficiency by asking the Court to transform EMOI's place of business (Indonesia), and to ignore its place of incorporation (Cayman Islands), but neither effort has any support in existing law. Plaintiffs similarly recognize that most of their claims are barred by the applicable statute of limitations, and ask this Court to be the first Court to recognize equitable tolling under District of Columbia law. This argument too is without merit. Plaintiffs' attempts to avoid the myriad other deficiencies in their complaint are also unavailing:

- Plaintiffs insist that as non-resident aliens asserting only common law claims, they nevertheless have standing in this Court, relying only on cases that are demonstrably distinguishable;

- Focusing primarily on the inevitable delay in perfecting administrative claims procedures under the Helsinki Peace Accord, Plaintiffs ask this Court to ignore both the successful peace that was implemented as a result of the Helsinki Peace Accord and the salient statements from the United States and Indonesia – not considered by the Court in *Doe I* – that support the peace process and require dismissal on grounds of comity, act of state, political question justiciability, and foreign affairs preemption;

- Plaintiffs have not – and cannot – join BPMIGAS in this action despite the fact that BPMIGAS, and not Defendants, is responsible for providing the security forces that allegedly injured Plaintiffs;

- Plaintiffs summarily declare that this Court must exercise jurisdiction over EMOI – a non-resident with no meaningful connections to the District of Columbia – under an alter ego theory, but do not contest Defendants' proof that EMOI is a separate company from its shareholders;

- Ignoring this Court's ruling in *Doe I*, Plaintiffs incorrectly assert that there are no material differences between Indonesian law and D.C. law, and ask the Court to ignore completely the constitutional deficiencies resulting from their attempt to apply D.C. law to claims bearing no nexus to the District of Columbia; and

- Plaintiffs do not contest that, under both Indonesian law and EMOI's production sharing contract ("PSC") with BPMIGAS, BPMIGAS (and not EMOI) is

1

responsible for providing the security about which Plaintiffs complain. This concession is fatal to Plaintiffs' substantive claims.

For these reasons and others, the Court should dismiss the Complaint.

## ARGUMENT

## I.    EMOI IS AN ALIEN, AND THE PARTIES ARE THEREFORE NOT DIVERSE

Plaintiffs identify themselves as aliens from Aceh, Indonesia. (Compl. ¶¶ 6-9.) Plaintiffs also allege that EMOI is (1) "incorporated in the Cayman Islands," (2) with its "principal place of business in Indonesia." (Compl. ¶ 16; *see also* Fitzpatrick Decl. ¶ 6 & Exs. 1, 2; Coleman Decl. ¶ 2.) Thus, Plaintiffs and defendant EMOI are both aliens, "complete diversity" is absent in this case, and the Court must dismiss the complaint for lack of subject matter jurisdiction. *Saadeh v. Farouki*, 107 F.3d 52, 55, 56 n.5, 61 (D.C. Cir. 1997) (a corporation with its place of incorporation and principal place of business abroad is an alien, and courts lack jurisdiction "over a lawsuit between an alien on one side, and an alien and a citizen on the other side").

Plaintiffs do not dispute that subject matter jurisdiction must be construed narrowly, and that Plaintiffs bear the burden of demonstrating diversity jurisdiction here. (Defs.' Mem. at 8.) Plaintiffs also do not dispute that they are aliens, and that defendant EMOI is incorporated in the Cayman Islands. (Compl. ¶¶ 6-9, 16.) Yet, in an effort avoid this deficiency in subject matter jurisdiction, Plaintiffs ask the Court to reach two implausible conclusions: *first*, that EMOI's principal place of business can be shifted from Indonesia to Texas under an "alter ego" theory; and *second*, that EMOI's place of incorporation should be ignored entirely in the jurisdictional analysis. (Pls.' Mem. at 35-36.) Neither conclusion is tenable.[1]

---

[1]    Recognizing the infirmity of their argument, Plaintiffs preemptively suggest, in a footnote, that the Court simply dismiss EMOI as a party here and that Defendants should be precluded from making certain arguments concerning EMOI's absence from the case. (Pls.' Mem. at 43 n.23.) Should EMOI be dismissed from this case, the remaining Defendants reserve their rights to make all available arguments as to why the case cannot proceed in the absence of EMOI, given that the remaining Defendants' alleged liability is premised solely on EMOI's alleged conduct. The Court should reject Plaintiffs' premature request to foreclose any arguments by Defendants should EMOI be dismissed from the case. (*See id.*)

### A.    An "Alter Ego" Theory of Citizenship Cannot Create Diversity Jurisdiction.

The first deficiency in Plaintiffs' convoluted diversity jurisdiction argument is that an "alter ego" theory cannot be used to transform one entity's citizenship to another's for purposes of creating subject matter jurisdiction.  In *Pyramid Securities Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114 (D.C. Cir. 1991), an alien plaintiff filed suit against a U.S.-based parent corporation based on the acts of an alien subsidiary.  The district court dismissed the entire suit on subject matter jurisdiction grounds (even though the plaintiff did not sue the alien subsidiary) after using an "alter ego" theory to attribute the citizenship of the alien subsidiary to the U.S.-based parent corporation – a situation that destroyed "complete diversity" for jurisdictional purposes.  *Pyramid Sec. Ltd. v. Int'l Bank, Inc.*, 726 F. Supp. 1377, 1385-87 (D.D.C. 1989).  On appeal, the D.C. Circuit reversed, holding that the "alter ego" theory cannot be applied in this context:

> The [district] court argued that imputing a subsidiary's citizenship to its parent is proper where the latter is the "alter ego" of the former and, as in this case, "the parent corporation is being sued solely for the acts of its completely controlled subsidiary." *We reject this analysis.*  In the reverse context, addressing efforts to attribute a parent's citizenship to its subsidiary, the courts have treated the two as separate entities.  The [diversity] statute suggests [a] *no attribution rule in either case.*  Nor are we persuaded by the district court's suggestion that because [the plaintiff's] substantive claim involved piercing the corporate veil, consistency requires the court to do so for purpose of determining diversity.

*Pyramid Sec. Ltd.*, 924 F.2d at 1121 (internal citations omitted; emphasis added).[2]

_____

[2]    Plaintiffs' discussion of *Pyramid* (Pls.' Mem. at 38) as advancing their cause is incorrect.  As stated above, the D.C. Circuit in *Pyramid* expressly rejected the attempted attribution for purpose of establishing diversity jurisdiction.  Moreover, the cases cited by Plaintiffs to counter the D.C. Circuit's decision in *Pyramid* are either inapplicable or support Defendants.  *See U.S.I. Props. Corp. v. M.D. Constr. Co.*, 860 F.2d 1, 7 (1st Cir. 1988) (affirming a district court's ruling not to attribute an alter ego's citizenship to a subsidiary corporation); *Toms v. Country Quality Meats, Inc.*, 610 F.2d 313 (5th Cir. 1980) (no discussion of alter ego theory); *Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1142-44 (3d Cir. 1972) (affirming dismissal for lack of complete diversity); *Bonar, Inc. v. Schottland*, 631 F. Supp. 990 (E.D. Pa. 1986) (no discussion of alter ego theory); *Grimandi v. Beech Aircraft Corp.*, 512 F. Supp. 764, 774 (D. Kan. 1981) (noting that "this Court rejects the plaintiffs' argument that a foreign corporation is a citizen of the State in which it has its principal place of business within the United States, regardless of where its principal place of business is on a world-wide basis" and "[s]ome courts have applied alter ego analysis to subject matter-jurisdiction, although this Court has found no case that actually retained jurisdiction on that ground").

3

Moreover, even if Plaintiffs' alter ego argument was convincing, it could only be used to expand EMOI's corporate citizenship to two principal places of business, not restrict it to only the alter ego's principal place of business. In *Maday v. Toll Brothers, Inc.*, 72 F. Supp. 2d 599 (E.D. Va. 1999), the court held that, irrespective of the plaintiff's factual allegations with respect to a parent's purported domination of a subsidiary, an alter ego theory designed to *create*, rather than *eliminate*, diversity jurisdiction, is not possible:

> [E]ven if plaintiff's [factual] alter ego argument were convincing, it is not clear that plaintiff could use such a theory to exclude consideration of [the subsidiary's] principal place of business in a diversity analysis. First, even to the extent that the alter ego theory of corporate diversity ever had any life, it has long since become moribund. And, significantly, courts that have acknowledged the alter ego theory in the diversity context have specifically restricted its use to the expansion of corporate citizenship, and thus the restriction of diversity jurisdiction, and have rejected its application in the converse context, *i.e.*, the expansion of diversity jurisdiction by contracting citizenship.

*Id.* at 606-07 (*citing*, *inter alia*, *Pyramid*). Other courts have similarly applied an alter ego theory, if at all, only to expand a corporation's citizenship, not restrict it. *See, e.g.*, *J.A. Olson Co. v. City of Winona, Miss.*, 818 F.2d 401, 414 (5th Cir. 1987) ("[T]he alter ego doctrine may not be used to create diversity jurisdiction by ignoring the principal place of business of a subsidiary corporation and imputing to it the principal place of business of the parent."); *Panalpina Welttransp. GmBh v. Geosource, Inc.*, 764 F.2d 352, 354 (5th Cir. 1985) (same); *Needham v. Wedtech (USA), Inc.*, 918 F. Supp. 353, 357 (N.D. Okla. 1996) (same); *Polanco v. H.B. Fuller Co.*, 941 F. Supp. 1512, 1517-18 (D. Minn. 1996) (same); *Rouhi v. Harza Eng'g Co.*, 785 F. Supp. 1290, 1295 (N.D. Ill. 1992) (same); *Beightol v. Capitol Bankers Life Ins. Co.*, 730 F. Supp. 190, 193 n.2 (E.D. Wis. 1990) (same); 15 *Moore's Federal Practice* ¶ 102.56[7][b] (3d ed. 2007) (same).

## B.    The Court Cannot Ignore EMOI's Place of Incorporation.

Plaintiffs' diversity argument also requires the court to ignore EMOI's place of incorporation, which it cannot do. An entity incorporated in a foreign country, such as EMOI, is a

4

citizen of that country for purposes of diversity jurisdiction. In *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88 (2002), the Supreme Court held that "[a] 'corporation of a foreign State is, for purposes of jurisdiction in the courts of the United States, to be deemed, constructively, a citizen or subject of such State.'" *Id.* at 91 (*quoting Nat'l S.S. Co. v. Tugman*, 106 U.S. 118, 121 (1882)); *Panalpina Welttransp. GmBh*, 764 F.2d at 354 ("A corporation incorporated in a foreign country is a citizen of that country for purposes of diversity jurisdiction."); *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 20 (D.D.C. 2005) ("entities incorporated in foreign countries are foreign citizens for purposes of diversity analysis").

Plaintiffs' own allegations establish that EMOI is incorporated in the Cayman Islands (Compl. ¶ 16).[3] Thus, even assuming, hypothetically, that EMOI has its principal place of business in Texas (under Plaintiffs' alter ego theory), the Court must conclude that EMOI is an alien based on its place of incorporation. *See Fritz v. Am. Home Shield Corp.*, 751 F.2d 1152, 1153-54 (11th Cir. 1985) (the alter ego theory does not allow courts to ignore a corporation's place of incorporation); *Polanco*, 941 F. Supp. at 1517-18 (an alter ego theory would simply grant the subsidiary an additional place of incorporation, which would deprive the court of diversity jurisdiction); *Bejcek v. Allied Life Fin. Corp.*, 131 F. Supp. 2d 1109, 1110-13 (S.D. Iowa 2001).

Moreover, courts have routinely held that corporations incorporated abroad are aliens even if they principally do business in the United States.[4] For example, in *Chick Kam Choo v. Exxon Corp.*, 764 F.2d 1148 (5th Cir. 1985), citizens of Singapore sued two corporations, one of which was a Liberian corporation with its principal place of business in New Jersey. In holding that

---

[3]    Plaintiffs twice characterize EMOI's incorporation to the Cayman Islands as recent. (Pls.' Mem. at 35, 41.) The fact is that EMOI incorporated in the Cayman Islands in December 2005 (Fitzpatrick Decl. Ex. 1), 18 months before this action was filed (and without any awareness that it would be).

[4]    Plaintiffs' reliance on *Saadeh* (Pls.' Mem. at 42), is misplaced because the court expressly declined to opine on the point. 107 F.3d at 56 n.5. Significantly, in *Saadeh* the D.C. Circuit noted that a defendant corporation with its place of business and place of incorporation abroad, such as EMOI, is an alien. *Id.*

federal courts lacked diversity jurisdiction, the Fifth Circuit noted the effect of Section 1332(c) on

domestic corporations:

> The Act *does not give an option* to a plaintiff of treating a corporation as a citizen
> *either* of the state of incorporation or of the state where its principal place of
> business is located.  The Act treats a corporation as a citizen of the state where it
> has its principal place of business *as well as* the state of incorporation.

*Chick Kam Choo*, 764 F.2d at 1152 (emphasis added).  The court noted that this principle applies

not only to domestic but also to alien corporations.  *Id.*; *see also Nike, Inc. v. Comercial Iberica de*

*Exclusivas Deportivas, S.A.*, 20 F.3d 987, 990 (9th Cir. 1994) ("We draw no distinction between

corporations incorporated in a state of the United States and those incorporated in a foreign country

when determining the corporation's citizenship for purposes of diversity jurisdiction."); *Dewhurst*

*v. Telenor Invest A.S.*, 83 F. Supp. 2d 577, 596 (D. Md. 2000); *Simon Holdings PLC Group of Cos.*

*U.K. v. Klenz*, 878 F. Supp. 210, 212 (M.D. Fla. 1995).  The Fifth Circuit thus concluded that the

Liberian corporation was both an alien and a New Jersey citizen for jurisdictional purposes and

thus was not diverse to the alien plaintiffs.  *Chick Kam Choo*, 764 F.2d at 1152.[5]

 The sole case relied on by Plaintiffs in arguing that the Court should ignore EMOI's foreign

place of incorporation is *Trans World Hospital Supplies Limited v. Hospital Corporation of*

*America*, 542 F. Supp. 869 (M.D. Tenn. 1982).  But that approach has been resoundingly rejected

---

[5] Ignoring *Chick Kam Choo*, Plaintiffs' opposition instead repeatedly cites to an earlier Fifth Circuit case,
*Jerguson v. Blue Dot Investment, Inc.*, 659 F.2d 31 (5th Cir. 1981), and asks the Court to "follow *Jerguson* and its
progeny." (Pls.' Mem. at 36.)  But *Jerguson* did not involve an attempt by an alien to sue a corporation incorporated
abroad with its principal place of business in the United States.  Moreover, *Jerguson* and its "progeny" squarely support
Defendants' position.  In *Chick Kam Choo*, the Fifth Circuit clarified *Jerguson* by finding and holding:

> *Jerguson* simply stands for the proposition that an alien corporation with its principal place of
> business in a particular state is not subject to suit in federal court by a citizen of the same state.
> The question here is whether a suit may be maintained in federal court between an individual alien
> and an alien corporation having its principal place of business in a state of the United States.  We
> answer this question in the negative. … [W]e hold that diversity jurisdiction under 28 U.S.C.
> § 1332(a)(2) may not be invoked in a suit between an alien and an alien corporation with its
> principal place of business in a state of the United States.

764 F.2d at 1152-53.  Thus, as "*Jerguson* and its progeny" establish, EMOI's incorporation in the Cayman Islands
destroys "complete diversity" in this case.

by other courts. *See, e.g., Caisse Nationale de Credit Agricole*, No. 94-773, 1995 U.S. Dist. LEXIS

1991, at *19, *26 n.2 (N.D. Ill. Feb. 16, 1995) (rejecting the *Trans World* court's "isolated position"

and noting the "manifest weight of authority" to the contrary), *aff'd in part and rev'd in part on

other grounds*, 90 F.3d 1264 (7th Cir. 1996).[6]

 Plaintiffs cannot establish complete diversity here, and therefore this Court lacks subject

matter jurisdiction over this action.

## II. NON-RESIDENT ALIENS OUTSIDE THE UNITED STATES MAY NOT SUE IN U.S. COURTS UNDER COMMON LAW FOR INJURIES SUSTAINED ABROAD

 Plaintiffs contend, in response to Defendants' argument that non-resident aliens have no

standing to sue in United States courts, that "[t]here is no 'general rule'" that non-resident alien

plaintiffs outside the United States lack standing to file suit for injuries sustained abroad. (Pls.'

Mem. at 33.) Plaintiffs are simply wrong. *See Berlin Democratic Club v. Rumsfeld,* 410 F. Supp.

144, 152 (D.D.C. 1976) ("the general rule [is] that non-resident aliens have no standing to sue in

United States courts").

 There are three recognized exceptions – none of which is applicable here – where a non-

resident alien may sue in United States courts; namely, where the alien is present in territory

controlled by the United States, *see Johnson v. Eisenstrager*, 339 U.S. 763, 770 (1950); where the

alien has a "res" within the United States, *see Constructores Civiles de Centroamerica, S.A. v.

Hannah*, 459 F.2d 1183, 1190 (D.C. Cir. 1972); or where the alien sues pursuant to a specific

statutory scheme, *see Berlin Democratic Club*, 410 F. Supp. at 152. None of these factors applies to

Plaintiffs: they are not present in the United States, do not claim an interest in any "res" in the

---

[6] The authorities are clear that a corporation with its place of incorporation abroad and its principal place of business in a U.S. state is an alien. *See Panalpina Welttransp. GmBh*, 764 F.2d at 354; *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 790 (2d Cir. 1980); *Dewhurst v. Telenor Invest A.S.*, 83 F. Supp. 2d 577, 596 (D. Md. 2000); *Ashenden v. Lloyd's of London*, 934 F. Supp. 992, 999 n.4 (N.D. Ill. 1996); *Simon Holdings PLC Group of Cos. U.K. v. Klenz*, 878 F. Supp. 210, 212 (M.D. Fla. 1995); *Hercules Inc. v. Dynamic Export Corp.*, 71 F.R.D. 101, 107 (S.D.N.Y. 1976); *Se. Guar. Trust Co. Ltd. v. Rodman & Renshaw, Inc.*, 358 F. Supp. 1001, 1007 (N.D. Ill. 1973). In *International Shipping Co., S.A. v. Hydra Offshore Inc.*, 875 F.2d 388, 392 (2d Cir. 1989), the court affirmed sanctions against an attorney for contesting this well-established rule.

United States, and are not suing pursuant to any statute.  Rather, Plaintiffs impermissibly attempt to obtain redress in this Court under common law for injuries that occurred abroad.  *See Eminente v. Johnson*, 361 F.2d 73, 73 (D.C. Cir. 1966) (suit nonjusticiable on standing grounds where a "non-resident alien" failed to file suit under any particular statutory provision and instead filed tort claims based on alleged injuries suffered "in a foreign country said to have been caused by the armed forces."); *Berlin Democratic Club*, 410 F. Supp. at 152 ("When the non-resident alien does not make application under a statute to the United States for certain action, or is not subjected to its courts, but is harmed in his own country, he cannot and should not expect entitlement to the advantages of a United States court.").

Importantly, each of the cases cited by Plaintiffs falls into one of these inapplicable exceptions, and/or contains no discussion of the prudential standing doctrine.  For example, in *Kukatush Mining Corp. v. SEC*, 309 F.2d 647 (D.C. Cir. 1962), the D.C. Circuit expressly distinguished its case from *Disconto Gesellschaft v. Umbreit*, 208 U.S. 570 (1908), a case on which Plaintiffs rely, *see Kukatush*, 309 F.2d at 649 ("The case of *Disconto Gesellschaft* …, relied on by the dissent, sheds little real light on the problem since it is readily distinguishable; there the court had jurisdiction of the res which consisted of assets of an insolvent debtor which it refused to allow the foreign claimant to remove."); *see also Rasul v. Bush*, 542 U.S. 466, 480-84 (2004) (aliens present within "the territorial jurisdiction" of the United States and suing under specific federal statutory provisions); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993) (plaintiffs present in territory controlled by the United States, sought relief pursuant to a federal statute, and the Court never addressed the standing issue); *Windward Shipping (London) Ltd. v. Am. Radio Ass'n, AFL-CIO*, 415 U.S. 104, 105-15 (1974) (plaintiffs' claims arose in Texas, and the Court never addressed the standing issue); *Wilderness Soc'y v. Morton*, 463 F.2d 1261, 1261-63 (D.C. Cir. 1972) (federal statute); *Constructores Civiles de Centroamerica, S.A.*, 459 at 1188-91 (federal

statutes); *People of Saipan v. United States Dep't of Interior*, 356 F. Supp. 645, 649-53 (D. Haw. 1973) (federal statute and plaintiffs were citizens of territories under control of the United States).[7]

As non-resident aliens outside the United States who do not fall within certain narrow exceptions to the general rule, Plaintiffs have no entitlement to proceed in a United States court.

## III.    THE STATEMENTS OF THE UNITED STATES AND THE GOVERNMENT OF INDONESIA, ALONG WITH THE HELSINKI PEACE ACCORD, REQUIRE DISMISSAL ON GROUNDS OF COMITY, ACT OF STATE, POLITICAL QUESTION, AND FOREIGN AFFAIRS PREEMPTION

In light of the landmark developments that have occurred in Aceh and Indonesia over the past two years, the Court should also dismiss Plaintiffs' claims on grounds of comity, the act of state doctrine, the political question doctrine, and foreign affairs preemption. As discussed in Defendants' memorandum, these events include: (1) a complete transition to democracy in Indonesia and Aceh (with elections in Aceh in December 2006); (2) the signing of the Helsinki Peace Accord; (3) the arrival of lasting peace in Aceh; (4) near-total autonomy for Aceh; (5) the election of former GAM leaders and anti-government leaders to high-level government posts in Aceh; (6) the passage of the Law on Governing Aceh ("LOGA"); (7) the agreement in the Helsinki Peace Accord to try war-related claims in civil courts in Aceh; (8) the establishment in the Helsinki Peace Accord and LOGA of a Truth & Reconciliation Commission ("TRC"), a Human Rights Court ("HRC"), and a Joint Claims Settlement Commission ("JCSC"); (9) the United States government's support for each of these developments; and (10) the Indonesian government's February 2007 diplomatic note specifically complaining that litigation in this Court would interfere with the peace process in Aceh. (Defs.' Mem. at 1-7, 9-16.) Plaintiffs' response is largely to trivialize those

---

[7]    Plaintiffs also cite a series of cases filed under the federal Alien Tort Statute, 28 U.S.C. § 1350, which are also inapplicable here. *See, e.g., Arias v. Dyncorp*, No. 01-1908, 2007 WL 1521044, at *1 D.D.C. May 21, 2007) (ATS and TVPA claims for alleged international law violations; court never addressed the standing issue); *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 15 (D.D.C. 2005) (ATS claims dismissed, and court never addressed the standing issue with respect to remaining common law claims); *Bowoto v. Chevron Corp.*, No. 99-02506, 2007 WL 2349345, at *1-*2 (N.D. Cal. Aug. 14, 2007) (ATS claims for aiding and abetting international law violations; court never addressed the standing issue); *Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 342-43, 359 (C.D. Cal. 1997) (ATS claims for alleged international law violations; court never addressed the non-resident alien standing issue).

developments and focus heavily on the delay in perfecting the peace process mechanisms in Aceh. (Pls.' Mem. at 1, 4-6.) Significantly, Plaintiffs make no mention of the February 2007 diplomatic note or the recent statements of support for peace in Aceh from the United States.

### A.    Comity Dictates that this Court Yield to the Acehnese Peace Process.

An Indonesian presidential decree (Defs.' Ex. E) and the Aceh Monitoring Mission ("AMM") report (Defs.' Ex. F) both suggest that the elements of the Helsinki Peace Accord including the TRC, HRC, and JCSC, were being implemented. (Defs.' Mem. at 5-6.) Plaintiffs, however, have pointed to several problems encountered in implementing those claims procedures, including the overturning of the law implementing the TRC by the Indonesian Constitutional Court, to assert that the peace process should be abandoned *now* because the claims process *will never work*. (Pls.' Mem. at 4-7.) This argument is specious and only demonstrates the need for this Court to exercise caution in taking any actions that would undermine the delicate situation presented in Aceh.

Despite the problems in implementing some of various means for redress of Acehnese citizens for wartime abuses, the Helsinki Peace Accord has indisputably ended decades of civil war in Aceh, resulted in a vast military drawdown in Aceh, brought significant autonomy to the region, and resulted in the democratic election of a formerly imprisoned separatist GAM fighter as its governor. (Defs.' Mem. at 4-7.) The Helsinki Peace Accord has been a resounding success. *See also* AMM Report (Defs.' Ex. F) ("The peace in Aceh has been re-established and the peace process has become irreversible and self-sustaining. … The peace process belongs to the people of Aceh and … will need to continue the long term implementation of the MoU."); Council Conclusions on Indonesia/Aceh, Council of The European Union, 2770th General Affairs Council Meeting (Dec. 11, 2006) (Defs.' Ex. Q) (welcoming the "significant progress made in restoring peace and stability" since the signing of the MoU and noting the local elections in Aceh on 11 December 2006

as a "visible manifestation of this progress …").  These developments have been hailed by the United States government (Defs.' Exs. G, H, I, J), and are worthy of this Court's deference.

The Indonesian government has warned that the peace process in Aceh is imperiled by litigation in this Court.  (Defs.' Ex. O.)  Plaintiffs offer no response to this point, and thereby ignore the central element of comity – deference to another sovereign and its preference for how claims arising in its jurisdiction should be handled.  *See Bigio v. Coca-Cola Co.*, 448 F.3d 176 (2d Cir. 2006) (noting that a country's objections to a lawsuit and the possible impact on international relations with a foreign country would warrant dismissal on international comity grounds), *cert. denied*, 127 S. Ct. 1842 (2007).[8]  Thus, the Court should honor the Indonesian government's position.  *See American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 355, 356 (1909) ("interference with the authority of another sovereign [is] contrary to the comity of nations");[9] *Jota v. Texaco, Inc.*, 157 F.3d 153, 160 (2d Cir. 1998) ("[I]nherent in the concept of comity is the desirability of having the courts of one nation accord deference to the official position of a foreign state, at least when that position is expressed on matters concerning actions of the foreign state taken within or with respect to its own territory.").  The Indonesian government's objections to this litigation are so strong that it will not cooperate with the Court in securing evidence and witnesses from BPMIGAS, Pertamina (BPMIGAS' predecessor), or the Indonesian military, all to the

---

[8]    Plaintiffs attempt to discount the significance of *Bigio* by stating that the Second Circuit reversed the lower court's dismissal on international comity grounds.  (*See* Pls.' Mem. at 10 n.3.)  The case, however, simply reversed and remanded the lower court's opinion for further consideration because the lower court had applied the wrong legal standard, a standard used to determine whether a court should apply U.S. law extraterritorially.  *Bigio*, 448 F.3d at 178.  The court also noted that, unlike the case at hand, the Government of Egypt "never raised the slightest objection to adjudication" by the United States.  *Id.*  The court's discussion on the lack of objection by the Egyptian government is highly significant because it contributed significantly to the finding that resolution of the case would "not likely impact on international relations."  *Id.*  In this case, however, the Indonesian government has *repeatedly* expressed its objections to such claims, and the State Department has opined that adverse effects on foreign relations are likely.  (*See* Indonesian government statements (Defs.' Exs. M, N, O); State Department statements (Defs.' Exs. K, L).)

[9]    Plaintiffs represent that the holding of *American Banana* "was overruled decades ago."  (Pls.' Mem. at 10 n.3.)  But *American Banana* has not been overturned, and in fact the primary case cited by Plaintiffs merely distinguishes *American Banana* on the facts.  *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 705 n.13 (1962) ("The circumstances of the present controversy are radically different from those presented in *American Banana Co.* v. *United Fruit Co., supra*, and the doctrine there approved is not controlling here . . . .").

detriment of Defendants' constitutional right to present a defense, including presenting testimony and evidence in their favor.

Ignoring the diplomatic note entirely, Plaintiffs principally argue that they should be able to continue with their lawsuit in the United States because some of the legal mechanisms established in the Helsinki Peace Accord are not yet fully functional. (Pls.' Mem. at 9-10.) As a preliminary matter, this argument ignores the fact that, under the Helsinki Peace Accord, remedial funds for conflict claimants, such as Plaintiffs, have been distributed in Aceh. (Supp. Wedgwood Decl. ¶¶ 51-74.) For 2005 and 2006, the budget for this program has totaled approximately $80 million. (*Id.* ¶ 57.) There are two other reasons why this component of Plaintiffs' argument is unsound.

*First*, the Helsinki Peace Accord's TRC, HRC, and JCSC – which as Plaintiffs point out are experiencing growing pains – can never work if claimants can bypass them in their infancy by simply filing their claims abroad. (Supp. Wedgwood Decl. ¶¶12-19; 93-99.) As opposed to an orderly reparations process handled domestically, litigation in worldwide forums will create vastly disparate recoveries and risk instability in Aceh. (*Id* ¶¶ 12-19.) Mr. Ross Clarke's summary dismissal of this concern (Pls.' Ex. D at 5) is unsupported, and contradicted not only by Professor Wedgwood's opinion and authorities (Supp. Wedgwood Decl. ¶¶ 13-16), but also by a report submitted by Plaintiffs expressly identifying concerns for Aceh's recovery posed by inconsistent economic aid, (Pls.' Ex. K at 3-5). More importantly, the absurdity of Plaintiffs' and Mr. Clarke's recommended approach – permitting a jury of D.C. citizens to supplant the three mechanisms outlined in the Helsinki Peace Accord – demonstrates the need for this Court to yield on grounds of comity so that those procedures in the Helsinki Peace Accord have a chance to take root.[10]

---

[10]    Plaintiffs argue that comity "cannot be extended to a tribunal that has yet to be established and where the existing justice system is inhospitable to Plaintiffs' claims." (Pls.' Mem. at 9.) Similarly, Plaintiffs discount *Ungaro-Benages v. Dresdner Bank* and similar cases regarding Nazi era war claims because "an alternative dispute mechanism had been firmly established" before the plaintiffs filed suit in a U.S. court. (*See* Pls.' Mem. at 10 n.3.) Plaintiffs cite no authority that supports their proposition. Plaintiffs' citation to *Doe I* (Pls.' Mem. at 9) relates to *forum non conveniens*, not comity, and is in any event premised on the *Doe I* parties' submissions to the court from six years ago. Moreover,

It is important to note that the Indonesian Constitutional Court invalidated the initial

formulation of the TRC to *protect* claimants' rights. (*See, e.g.*, Constitutional Court Decision on the

TRC Law (Pls.' Ex. F) (declaring portions of LOGA unconstitutional because the provisions in

question failed sufficiently to protect Acehnese villagers and their constitutional rights under

Indonesian law); Supp. Wedgwood Decl. ¶¶ 80-92.) The question of the best means of redress for

the Indonesian military's conduct during the civil war obviously raises sensitive and divisive issues

that are still being debated within Indonesia. These issues affect not only the sovereign interests of

Indonesia as a whole, but the particular interests of Aceh in preserving its developing democracy,

autonomy, and carefully-negotiated remedial procedures free of a foreign court's pronouncements

about the conduct of Indonesian actors within Indonesia. This Court should not hamper and

undermine confidence in the Helsinki Peace Accord's vision of local procedures to provide relief

for the victims of Aceh's long-running civil war. Certainly, this Court is not the proper forum or

tool for Plaintiffs to "pressure" the Indonesian government into making further progress in the

peace process. (Supp. Wedgwood Decl. ¶¶ 93-99.)

*Second*, Plaintiffs' focus on the current problems with the TRC, HRC, and JCSC overlooks a

critical issue – namely, that the Helsinki Peace Accord also provides that "[*all*] civilian crimes

committed by military personnel in Aceh shall be tried in *civil courts in Aceh*." (*See* Helsinki Peace

Accord (Defs.' Ex. D) ¶ 1.4.5 (emphasis added).) This provision establishes the exclusive

mechanism for resolving war-related claims by Acehenese residents: they must be tried in *civil*

*courts in Aceh* – not in civil courts in the United States (or elsewhere). Thus, contrary to Plaintiffs'

assertions (Pls.' Mem. at 8), there is a "true conflict" here.[11]

---

as shown below, Plaintiffs offer no proof that Acehnese civil courts, chosen by the Helsinki Peace Accord as the
exclusive forum for claims of civilian crimes committed by military personnel, are inhospitable to their claims.

[11]    Plaintiffs also claim, astonishingly, that "[t]here is no conflict here between Indonesian law and American law"
(Pls.' Mem. at 8) even though the Court in *Doe I* explicitly held that Indonesian law does not permit punitive damages
while American law does, *Doe v. Exxon Mobil Corp.*, No. 01-1357, 2006 U.S. Dist. LEXIS 11732, at *5 (D.D.C. Mar.
2, 2006). *See also* Part VII, *infra.*

Accordingly, whether or not the TRC, HRC, and JCSC are yet perfectly functioning, Plaintiffs must proceed in civil courts in Aceh. Recognizing this, Plaintiffs argue half-heartedly that civil courts in Aceh are unavailable to them.[12] They state (without support) that they "do not have access to an independent or functioning legal system within Indonesia to raise their complaints." (Pls.' Mem. at 4.) Courts, however, have routinely "cautioned against judges giving serious consideration to such conclusory attacks." *Turedi v. Coca Cola Co.*, 460 F. Supp. 2d 507, 525 (S.D.N.Y. 2006) (citing cases); *see also Moscovits v. Magyar Cukor Rt.*, No. 00-0031, 2001 U.S. Dist. LEXIS 9252, at *4 (S.D.N.Y. July 9, 2001), *aff'd*, 34 Fed. Appx. 24 (2d Cir. 2002). And, significantly, although Plaintiffs' declarations from Mr. Johnson Panjaitan and Mr. Ross Clarke both recount the current difficulties with the TRC, HRC, and JCSC, neither opines that civil courts in Aceh are unavailable to Plaintiffs. (*See generally* Pls.' Exs. B, D.) Moreover, Plaintiffs' veiled criticism of the Indonesian judiciary is implausible, as their own exhibits demonstrate the Indonesian Constitutional Court's willingness to void legislation to better protect Acehnese claimants.[13]

### B. The Act of State Doctrine Applies Because the Indonesian Government Considers the Soldiers' Actions To Be Official Acts.

---

[12]    Plaintiffs identify an incident in Indonesia where several foreign activists were allegedly arrested (with no allegations of physical harm) under an Indonesian statute that prohibits inciting riots. (Pls.' Mem. at 7.) This shows only that the Indonesian government filed criminal charges against several activists based on allegations that the activists directly urged villagers to riot against land takings. (Pls.' Exs. N, O.) Plaintiffs similarly misplace reliance on citations to State Department reports and statements from various non-governmental organizations, which are "insufficient to demonstrate the inadequacy" of the foreign judicial system. *See Turedi*, 460 F. Supp. 2d at 524-25 (*citing Abdullahi v. Pfizer, Inc.*, No. 01-8188, 2005 WL 1870811 at *15-*17 (S.D.N.Y. Aug. 9, 2005) (collecting cases)). More to the point here, Plaintiffs' counsel have made multiple visits to Aceh relating to *Doe I* without incident.

[13]    Plaintiffs' related arguments regarding the supposed danger in voicing complaints against the Indonesian military are also without merit. *See Indonesian Soldiers to Give Evidence at Truth Commission* (Oct. 23, 2007) (human rights claims against Indonesian soldiers proceeding without problems in Indonesia) (Defs.' Ex. R). The governor of Aceh, after all, is a former separatist rebel leader. (Defs.' Mem. at 6-7.) And, even according to Plaintiffs' submissions, the separatists have not been retaliated against for their direct role in fighting the Indonesian military, and no villagers have been retaliated against either. (*See* Pls.' Ex. K at 5 ("The vast majority of active GAM (80 percent) returned in the first two months following the signing of the MoU.... 90 percent of GAM members reported not having encountered any problems and most that did occur were minor."); *see also Aceh Military Chief Asks Public to Maintain Peace Process*, ANTARA (Oct. 3, 2007) (Defs.' Ex. S); *Security No Longer Obstacle to Investment in Aceh, Says KPA*, ASIAPULSE NEWS (Sept. 18, 2007) (Defs.' Ex. T); *TNI has No Objection to Retroactive Human Rights Court in Aceh*, ANTARA (May 19, 2006) (Defs.' Ex. U).)

The act of state doctrine also bars Plaintiffs' claims because the Indonesian government considers the soldiers' actions to be official acts. (*See* Defs.' Mem. at 12-14.) Plaintiffs' claims plainly rest on the conduct of Indonesian military personnel during a civil war in Aceh. (Compl. ¶¶ 1, 60-63.) Because Plaintiffs claim that Defendants retained members of the Indonesian military (*id.* ¶ 1), the Court will by necessity have to pass judgment on the actions of members of the Indonesian military during wartime. As the Indonesian government has repeatedly stated, the nearly identical claims in *Doe I* involve "an allegation against an *Indonesian government institution, cq the Indonesian military, for operations taking place in Indonesia.*" (Defs.' Ex. M (emphasis added); *see also* Defs.' Exs. N, O.) The Indonesian government considers the soldiers' actions to be official acts, and thus the Court should dismiss Plaintiffs' claims on act of state grounds. (Defs.' Exs. M, N, O.)

In opposition, Plaintiffs rely principally on *W. S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400 (1990). *Kirkpatrick*, however, is readily distinguishable. First, *Kirkpatrick* involved bribes to Nigerian government officials – *i.e.*, payments in breach of a fiduciary duty owed by government officials to the Nigerian government. *Id.* at 402. Thus, the case did not involve any "official act" designed to benefit the government in whole or in part: it involved acts designed to benefit the government officials themselves to the detriment of the Nigerian government. *See id.* Second, the Nigerian government never objected to the prosecution of the case in the United States. *See id.* Third, the State Department legal advisor specifically filed a statement indicating that adjudication would not cause embarrassment or interfere with the United States' foreign affairs. *Kirkpatrick*, 493 U.S. at 404. This case is markedly different in all three respects.[14]

_____

[14] The remainder of Plaintiffs' cases all involve situations where foreign governments refused to object to the claims at issue, and thus the courts there had grounds to refrain from identifying the conduct as "acts of state." *See, e.g.*, *Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir. 1995) ("[W]e doubt that the acts of even a state official, taken in violation

In *Doe v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005), the court dismissed similar claims of military misconduct on "act of state" grounds because "tort challenges brought against foreign military officials for such alleged harms as unlawful detentions during a [conflict] implore the court to 'declare invalid' and deny 'legal effect to acts of a military commander representing the . . . government.'" *Id.* at 113-14 (*citing Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 58 (D.D.C. 2004)). In this case, as in *Doe v. Israel* and other cases cited in Defendants' memorandum (Defs.' Mem. at 15-16), Plaintiffs have similarly raised claims based on allegedly unlawful detentions and military measures under D.C. tort law. (*See* Compl. ¶¶ 60-63.)

**C.**    **The Political Question Doctrine Bars Adjudication of Plaintiffs' Claims Because the Political Branches Have Expressed Support for the Helsinki Peace Accord.**

The Court should also dismiss Plaintiffs' claims under the political question doctrine, in light of statements from the Executive and Legislative Branches strongly supporting the Helsinki Peace Accord. (Defs.' Exs. G, H, I, J.) Plaintiffs make no attempt to address any of those statements, none of which were considered by this Court in *Doe I* or by the D.C. Circuit in the defendants' appeal from that decision. The statements, combined with the United States' earlier statements in *Doe I* (Defs.' Exs. K, L), demonstrate that this Court cannot adjudicate Plaintiffs' claims without infringing on the constitutional duties of the other branches, (Defs.' Mem. at 17-18).

Under *Baker v. Carr*, 369 U.S. 186, 217 (1962), a justiciability analysis also considers whether there is a lack of judicially discoverable and manageable standards for resolving the issue. Contrary to Plaintiffs' assertions (Pls.' Mem. at 14-15), there is no discernable "negligence" standard here, and these issues do not fall within the traditional role of the judiciary, (*see* Defs.' Mem. at 43-44). Plaintiffs have asked this Court to adjudicate whether Defendants "negligently

---

of a nation's fundamental law and wholly unratified by that nation's government, could properly be characterized as an act of state."); *Galu v. Swissair*, 873 F.2d 650, 654 n.3 (2d Cir. 1989) (acts unsupported by the government gain no protection by the act of state doctrine). Accordingly, these cases do not address the situation at issue here. And, as previously discussed (Defs.' Mem. at 15-16), the Court's prior decision in *Doe I* is unhelpful because the Indonesian government continues to complain about that litigation even after the Court attempted to address its sovereignty concerns, (*see* Defs.' Ex. O.) Plaintiffs offer no response to this argument.

supervised" or "negligently hired" Indonesian military personnel during the Aceh civil war. As

demonstrated below, *see* Part VIII *infra*, Plaintiffs have not properly alleged that Defendants

"hired" or "supervised" the Indonesian soldiers, but even if the Court concludes that they did, it

would not be able to discern whether Defendants were negligent in so doing. "[T]he Supreme Court

has consistently observed that the selection of personnel for the military is indeed a military

decision not subject to judicial scrutiny," and "civilian courts" have been repeatedly "counseled not

to 'question basic choices about discipline, supervision, and control of a serviceman.'" *E.g.*,

*Satterfield v. United States*, 788 F.2d 395, 398-99 & n.4 (6th Cir. 1986) (dismissing negligent

supervision and hiring claims relating to military personnel) (citation omitted).

> ### D.    The Foreign Affairs Preemption Doctrine Bars Adjudication of Plaintiffs' Common Law Claims.

The Court should also dismiss Plaintiffs' claims on grounds of foreign affairs preemption.

Citing *Doe I*, Plaintiffs argue that preemption does not apply to common law tort claims. (Pls.'

Mem. at 16-17.) But the Supreme Court has applied preemption analysis to common law tort

claims. *See, e.g., Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 886 (2000). In addition, the only

D.C. Circuit judge to have considered the issue has indicated that foreign affairs preemption would

preempt state common law tort claims under these circumstances. *Doe v. Exxon Mobil Corp.*, 473

F.3d 345, 365 (D.C. Cir. 2007) (Kavanaugh, J., dissenting) (*citing Geier*). Plaintiffs offer no

response to Judge Kavanaugh's opinion, and cite only law review articles criticizing the analogous

application of the foreign affairs preemption doctrine in *Mujica v. Occidental Petroleum Corp.*, 381

F. Supp. 2d 1164 (C.D. Cal. 2005). (Pls.' Mem. at 16-17.)

Contrary to Plaintiffs' assertions, Plaintiffs' state tort law claims are preempted in this case.

The Executive Branch has clearly articulated its support of the mechanisms established in the

Helsinki Peace Accord. (*See* Defs.' Exs. G, H, I, J.) And the Indonesian government has said

specifically that the peace process is imperiled by litigation in this Court. (*See* Defs.' Ex. O.) Thus,

adjudicating these claims in federal court risks the very real possibility that application of state law "will produce something more than [an] incidental effect in conflict with express foreign policy" of the United States. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003).

## IV.    BPMIGAS IS AN INDISPENSABLE PARTY WHOSE INTERESTS WOULD BE ADVERSELY AFFECTED BY ADJUDICATION OF THE CASE IN ITS ABSENCE

The Complaint also should be dismissed pursuant to Rule 19 of the Federal Rules of Civil Procedure for failure to join BPMIGAS as an indispensable party. BPMIGAS is both a necessary and indispensable party under Rule 19(a) that cannot be joined and, therefore, the case should be dismissed in its entirety.

### A.    BPMIGAS Is a Necessary Party to this Lawsuit.

In accordance with the first factor under Rule 19(a), complete relief cannot be granted in the absence of BPMIGAS. Plaintiffs have asked the Court to enjoin any "abuses against Plaintiffs and their fellow villagers." (Compl. ¶ IX(d).) As Plaintiffs explicitly allege in the Complaint, *every single incident* of "abuse" allegedly suffered by Plaintiffs was carried out by soldiers in the Indonesian military. (*Id.* ¶ 1.) An injunction would have to restrain BPMIGAS, which is the only entity capable of controlling the military's actions or determining who provides security to the Arun gas field. (*See* Defs.' Mem. at 3; Hornick Decl. ¶ 35 & Ex. C thereto; Coleman Decl. Ex. 1 ¶ 5.3(c).) Indeed, Indonesian law requires BPMIGAS, which has management responsibilities on behalf of the Indonesian government, to safeguard the Arun gas field as a "national vital object." (*See* Presidential Decree 63/2004, Art. 4 (Coleman Decl. Ex. 2).) An injunction against Defendants alone would be meaningless, because BPMIGAS and the Indonesian military would be free to operate as before without any changes in policy or practice.

Plaintiffs respond to this argument by suggesting that they merely seek "to stop *Defendants* [rather than the Indonesian military] from participating in the continued victimization of the Plaintiffs" and that "the allegations in the Complaint relate to their own [*i.e.*, Defendants'] conduct"

18

rather than the Indonesian military's. (*See* Pls.' Mem. at 50, 52 (emphasis in original).)  The flaw in Plaintiffs' reasoning is readily apparent.  Plaintiffs' allegations are based on the theory that Defendants are vicariously liable for the actions of the Indonesian military because the military acted as Defendants' "agent." (*See, e.g.,* Compl. ¶¶ 65, 75, 85, 95.)  Thus, even under Plaintiffs' flawed theory of the case, a meaningful injunction would have to prohibit the activity of Defendants' so-called "agents," *i.e.*, the Indonesian military.

Plaintiffs also suggest that BPMIGAS is not "necessary" under the second element of Rule 19(a) because it has no interest in the subject matter of this action. (*See* Pls.' Mem. at 51-52.)  This suggestion is flatly contradicted by the Indonesian governments' multiple objections in *Doe I*, which reflects its interest in this lawsuit not proceeding. (*See* Defs.' Exs. M, N, O.)

Finally, Plaintiffs argue that the third factor under Rule 19(a) is not met because the potentially inconsistent obligation EMOI would face in complying with an injunction and its commitments under the PSC[15] is not the type of "'inconsistent obligation' with which Rule 19(a)(2)(ii) is concerned." (*See* Pls.' Mem. at 53.)  This assertion is baseless.  Any breach by EMOI of its PSC with BPMIGAS would almost certainly lead to a lawsuit and court order that would be inconsistent with an injunctive order in the present matter.

### B.     BPMIGAS Cannot Be Joined, So the Suit Should Be Dismissed.

If an absent person is necessary under Rule 19(a), and cannot be joined, Rule 19(b) requires a court to determine whether the necessary party is "indispensable," or, in other words, so important to the disposition of the case that the matter should be dismissed rather than proceed in that person's absence.  BPMIGAS falls squarely into this category.

---

[15]     Plaintiffs' additional contention that Defendants' obligations under the PSC should not be considered in a motion to dismiss because they are issues of fact is incorrect. (Pls.' Mem. at 52.)  The Court may consider documents that "'are both referenced in the complaint and central to the plaintiff's claims,'" such as the PSC. *Osseiran v. Int'l Fin. Corp.*, 498 F. Supp. 2d 139, 146 (D.D.C. 2007) (citation omitted).

Plaintiffs argue that BPMIGAS would face no prejudice if it were not present, and that "[a]t most, Defendants' argument amounts to stating that BPMIGAS is indispensable because it is an alleged joint tortfeasor." (Pls.' Mem. at 54.)  As an initial matter, Plaintiffs have not pled that Defendants are joint tortfeasors with BPMIGAS or the Indonesian military or government.  Thus, there is no basis for Plaintiffs to now argue that BPMIGAS is not indispensable because it is a joint tortfeasor.

Moreover, Rule 19(a)(1), which states that a party may be necessary if complete relief could not be accorded in its absence, provides only one of three circumstances in which an absent party may be deemed necessary.  Rule 19(a)(2) identifies two other independent circumstances.  Any one of the three is sufficient to find a party to be "necessary."  *See, e.g., Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 405 (3d Cir. 1993); *see also Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999) (recognizing that joint tortfeasors are not generally indispensable parties under 19(a)(1), but holding that a joint tortfeasor needed to be joined because its interests were "more significant than those of a routine joint tortfeasor").

Plaintiffs repeatedly argue that their allegations relate solely to Defendants, and not to BPMIGAS or the Indonesian military.  These arguments are belied by the Complaint itself and Plaintiffs' counsel's efforts to obtain discovery concerning the Indonesian military's activities.  (*See Doe I* Docket No. 249 (Mem. Order re: Mot. to Compel).)  Plaintiffs simply cannot escape the fact that all of its claims are based on the actions of Indonesian soldiers under the control of BPMIGAS.  However, because BPMIGAS is an indispensable party that cannot be joined, the case should be dismissed in its entirety.

## V.     THE COURT LACKS PERSONAL JURISDICTION OVER EMOI

The Court should dismiss the claims against EMOI for lack of personal jurisdiction because Defendants demonstrated that EMOI conducts no business in the District of Columbia and

maintains an entirely separate corporate identity from Exxon Mobil Corporation. (Coleman Decl. ¶¶ 8-36.)[16]

Plaintiffs do not argue that jurisdiction over EMOI is proper under principles of general jurisdiction or even under the D.C. long-arm statute. (Pls.' Mem. at 43-44.) Instead, Plaintiffs rely solely on an alter ego theory, as the Court allowed other plaintiffs to do in *Doe I*. (*Id*.) But significantly, and despite the fact that Plaintiffs' counsel has had access to a year's worth of similar discovery in *Doe I*, Plaintiffs do not contest a single fact offered by Defendants demonstrating EMOI's separateness from Exxon Mobil Corporation. (*Id*.) For example, Defendants established that EMOI has observed all corporate formalities (including articles of incorporation, bylaws, and an independent board of directors), made its own day-to-day business decisions, kept its own offices, bank accounts, and payroll, is adequately capitalized, and otherwise maintained a completely separate financial identity. (Coleman Decl. ¶¶ 8-36.) Plaintiffs challenge none of this.

By failing even to dispute any component of Defendants' showing of EMOI's separateness, Plaintiffs, who bear the burden of demonstrating personal jurisdiction, *see Roz Trading Ltd. v. Zeromax Group, Inc.*, No. 06-1040, 2007 WL 2812760, at *3 (D.D.C. Sept. 28, 2007), impermissibly rest on "bare allegations" and "conclusory statements" (*see, e.g.*, Compl. ¶ 27) and fail to "demonstrate[] a factual basis for the exercise of personal jurisdiction over the defendants," *Freiman v. Lazur*, 925 F. Supp. 14, 21-22 (D.D.C. 1996) (Oberdorfer, J.).

## VI.    PLAINTIFFS' CLAIMS EXPIRED AFTER ONE YEAR, AND NO DOCTRINE OF EQUITABLE TOLLING EXISTS UNDER D.C. LAW

Plaintiffs' claims have also expired under the applicable statute of limitations. Plaintiffs' alleged injuries occurred in June 2004, but Plaintiffs failed to file suit until May 2007. (Compl. ¶¶ 60-63.) Accordingly, the District of Columbia's one-year statute of limitations on its face bars

---

[16]    This Court may consider Defendants' declarations in connection with EMOI's motion to dismiss for lack of personal jurisdiction. *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003).

Plaintiffs' battery (Cause V), assault (Cause VI), and false imprisonment (Cause VII) claims. *See* D.C. Code § 12-301(4) (2007); *Rynn v. Jaffe*, 457 F. Supp. 2d 22, 24 (D.D.C. 2006). Under D.C. law, "[r]esidual tort claims" are "subject to subsection 4's one-year limitation *if they are sufficiently 'intertwined' with subsection 4 claims.*" *Rynn*, 457 F. Supp. 2d at 24. Plaintiffs' intentional infliction of emotional distress ("IIED") and negligence claims are therefore also untimely.

Plaintiffs do not dispute that D.C. statute of limitations jurisprudence must apply in this purported diversity lawsuit. (*See* Defs.' Mem. at 28.) Instead Plaintiffs claim that their otherwise time-barred claims are subject to equitable tolling, and that their IIED and negligence claims are separate from their intentional tort claims. (Pls.' Mem. at 44-49.) Both arguments lack merit.

## A.    District of Columbia Law Does Not Recognize the Concept of Equitable Tolling, and This Court Cannot Create the Doctrine.

"District of Columbia law does not recognize the concept of equitable tolling." *Johnson v. Marcheta Investors L.P.*, 711 A.2d 109, 111 n.2 (D.C. 1998); *see also Haggerty v. Bethel*, No. 25653, 2001 Wash. App. LEXIS 507, at *7 (Wash. Ct. App. Mar. 30, 2001) (surveying jurisdictions and observing that D.C. courts "refuse to apply the [equitable tolling] doctrine and place the responsibility for developing any tolling policy entirely on the Legislature"). Plaintiffs' asserted excuses for not filing in a timely manner (Pls.' Mem. at 47-48) are thus entirely irrelevant. This Court cannot accept Plaintiffs' invitation to create, and then invoke, equitable tolling in this case. "In construing D.C. law, federal courts cannot apply the doctrine of equitable tolling differently than would the District of Columbia courts." *Williams v. Dist. of Columbia*, 916 F. Supp. 1, 5 (D.D.C. 1996).

Though Plaintiffs concede that D.C. statute of limitations jurisprudence must apply, Plaintiffs do not, and cannot, present the Court with authority for the proposition that equitable tolling exists under D.C. law. Plaintiffs argue slyly that "courts within the District of Columbia …

22

recognize the doctrines of equitable tolling and equitable estoppel." (Pls.' Mem. at 46 n.25.)[17]

Plaintiffs' deliberate word choice and exclusive citation of *federal* cases reveals the deficiency in

their argument; Plaintiffs have solely relied on *federal* cases applying *federal law* to support their

position. (*See* Pls.' Mem. at 45-49.)[18]  Although "federal law recognizes and applies principles of

equitable tolling of statutes of limitations to every federal claim," *Forti v. Suarez-Mason*, 672 F.

Supp. 1550, 1549 (N.D. Cal. 1987), federal law governs the limitations period for federal claims

only, *see Gibson v. United States*, 781 F.2d 1334, 1340 (9th Cir. 1986).  Plaintiffs' reliance on

equitable tolling in ATS cases is therefore misplaced.[19]

Moreover, while Plaintiffs cite to those ATS cases for the proposition that the existence of a

civil war can constitute extraordinary circumstances sufficient to invoke equitable tolling (Pls.'

Mem. at 46-47), the cases involved the question of whether to apply equitable tolling where the

doctrine already existed.  Especially in light of *Williams*, 916 F. Supp. at 5, Plaintiffs do not identify

a federal court in a diversity case that has *adopted*, and then *invoked*, the doctrine of equitable

tolling where, as here, the applicable state law does not recognize equitable tolling to begin with.[20]

---

[17]     The federal cases cited by Plaintiffs do not contradict the rule against equitable tolling announced by the District of Columbia courts.  In *Jankovic v. International Crisis Group*, 494 F.3d 1080, 1086-87 (D.C. Cir. 2007), the court distinguished between equitable estoppel, which involves a defendant's inequitable conduct that prevents a plaintiff from filing suit, and equitable tolling, which involves a plaintiff's own failure to timely file suit, recognizing that the latter does not exist under D.C. law.  *Wiggins v. State Farm Fire and Casualty Company*, 153 F. Supp. 2d 16, 20-21 (D.D.C. 2001), likewise principally discusses equitable estoppel.  Here, the doctrine of equitable estoppel is entirely irrelevant because Plaintiffs do not (and cannot) allege that Defendants took any action to prevent Plaintiffs from timely filing their suit.

[18]     For example, Plaintiffs cite *Zipes v. TWA, Inc.*, 455 U.S. 385 (1982), for the proposition that statutes of limitations are subject to waiver, estoppels, and equitable tolling.  *Zipes*, however, involved a federal Title VII claim brought in a class action suit in the Northern District of California.  455 U.S. at 387.  Similarly, Plaintiffs rely on *Burnett v. New York Central Railroad Co.*, 380 U.S. 424, 428 (1965), for the proposition that statutes of limitations are "frequently outweighed" in the interest of justice.  However, this too was a federal claim that originated in the Southern District of Ohio, *id.* at 424, and is thus irrelevant to whether the D.C. law recognizes equitable tolling.  Each of Plaintiffs' cases is thus distinguishable.

[19]     *See Jean v. Dorelien*, 431 F.3d 776 (11th Cir. 2005); *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1159 (E.D. Cal. 2004); *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1549 (N.D. Cal. 1987).

[20]     Even if equitable tolling could apply under D.C. law (which it does not), Plaintiffs have no legitimate basis to invoke it.  Plaintiffs contend that "extraordinary circumstances" in Indonesia made it impossible for them to file suit in a timely manner in the United States.  (Pls.' Mem. at 46-47.)  But the civil war in *Indonesia* did not close the courts in the *United States*, and none of the plaintiffs in *Doe I*, represented by the same counsel, had any difficulties filing suit in the

23

### B.    Plaintiffs' Intentional Infliction of Emotional Distress and Negligence Claims Are Not Distinct from Their Other Claims.

#### 1.    Intentional Infliction of Emotional Distress

"To qualify for subsection 8's three-year limitation, a claim of intentional infliction of emotional distress ('IIED') must be 'independent' in that it stems from conduct separate from the alleged subsection 4 wrongs." *Rynn*, 457 F. Supp. 2d at 24. In this case, Plaintiffs' IIED allegations are not "independent" of Plaintiffs' "assault," "battery," and "false imprisonment" claims. (*See* Compl. ¶¶ 94-97 (basing IIED claims on the same acts supporting the assault, battery, and detention claims.) Thus, the Court should dismiss Plaintiffs' IIED claims (Cause IV) as time-barred under subsection 4. *Rynn*, 457 F. Supp. 2d at 24; *Scales v. George Wash. Univ.*, No. 89-0796, 1991 U.S. Dist. LEXIS 16765, at *14 (D.D.C. Nov. 15, 1991) (Oberdorfer, J.) (same).

Plaintiffs depart from their pleadings and argue for the first time in their opposition that "peaceful ceremonies" conducted for John Does X and XI give rise to independent IIED claims. (*Compare* Pls.' Mem. at 49, *with* Compl. ¶¶ 94-97.) To begin with, this argument concedes that John Does VIII and IX, who do not allege any "peaceful ceremonies," and do not otherwise claim any injuries occurring separately from the alleged intentional torts (*see* Compl. ¶¶ 60, 61), have no distinct IIED claim. The Court may therefore dismiss those Plaintiffs' IIED claims as time-barred.

Turning to the "peaceful ceremonies" for John Does X and XI, and assuming *arguendo* they were not intertwined with their battery, assault, and false imprisonment claims, these claims still could not stand because Plaintiffs do not allege that the soldiers intended to cause or actually did

---

United States just several months after their alleged injuries occurred. Indeed, the security situation in Aceh was actually *far worse* in 2001 for the *Doe I* plaintiffs than it was from 2004 to 2007. Indeed, Plaintiffs' counsel represented to the Court in May 2005 that travel to and from Aceh, by way of a nearby city, Medan, was not difficult. (*Doe I* Docket No. 87 (May 4, 2005 Tr.) at 14.) This conclusively defeats Plaintiffs' equitable tolling argument for several reasons. First, Plaintiffs' lawsuit could have been timely filed in May 2005, the time as of which Plaintiffs' counsel claimed travel to and from Aceh was not difficult. Second, the ease of travel reported by Plaintiffs' counsel in *May 2005* negates Plaintiffs' arguments regarding "severely restricted movement and information within the province" caused by the *2003* and *2004* Presidential decrees, and the "further aggravat[ion]" supposedly caused by the *December 2004* tsunami. (The tsunami occurred in 2004 and not, as Plaintiffs' represent, 2006.) Thus, even if equitable tolling existed under D.C. law (which it does not), Plaintiffs cannot invoke the doctrine.

cause Plaintiffs any emotional harm during the ceremonies. (*See* Compl. ¶¶ 62, 63.) An IIED claim requires a plaintiff to show (1) extreme and outrageous conduct that (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress. *Ali v. MedStar Health*, No. 99-1753, 2003 D.C. Super. LEXIS 32, at *33 (Super. Ct. Aug. 15, 2003). The alleged conduct must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (merely providing a summary paragraph that sums up the defendants' actions as "simply outrageous" cannot support an IIED claim) (citation omitted). Although John Doe X alleges that the apologizing soldiers entered his home and were armed[21] (John Doe XI does not allege that the apologizing soldiers entered his home or that they were armed), Does X and XI do not (and cannot) allege that the apologizing soldiers in either case exhibited "outrageous conduct" or intentionally injured them through the "peaceful ceremonies." (*See* Compl. ¶¶ 62, 63.) Far from inflicting emotional injury, Does X and XI allege that the soldiers apologized. (*Id.*) Thus, even if these two Plaintiffs' IIED claims rest solely on the "peaceful ceremonies," they cannot survive a motion to dismiss.

### 2. Negligence

Plaintiffs' negligence claims are also untimely under the applicable statute of limitations. Plaintiffs do not dispute that they have no independent negligence claims under a *respondeat superior* theory: they have solely raised *negligent supervision* and *negligent hiring* claims (*i.e.*, Counts II and III).[22] (*See* Pls.' Mem. at 45 (stating that Plaintiffs have only alleged "both vicarious liability for *intentional* torts, Compl. ¶¶ 94-110, and direct liability for *negligent hiring* and *negligent supervision*") (emphasis added).) Even if Plaintiffs had attempted to plead a valid negligence claim, the claim would still be "intertwined" with their battery, assault, and false

---

[21]     Significantly, John Doe X does not allege that the apologizing soldiers entered his home without permission, nor does he allege that the "armed" apologizing soldiers brandished their weapons in any threatening manner.

[22]     Defendants did not contend that Plaintiffs' negligent hiring and negligent supervision claims were time-barred, but did argue that those claims could not survive under Rule 12(b)(6). (Defs.' Mem. at 36-45.)

imprisonment claims, and thus the Court should dismiss any such claim (*i.e.*, Count I) as untimely under the applicable statute of limitations. *See Stewart-Veal v. Dist. of Columbia*, 896 A.2d 232, 235-36 (D.C. 2006).

## VII.    INDONESIAN LAW MUST APPLY BECAUSE INDONESIA HAS THE GREATEST INTEREST IN THIS LITIGATION

The Court should also dismiss Plaintiffs' D.C. common law claims because Indonesian law applies. (Defs.' Mem. at 31-35.) Under D.C. choice-of-law rules, courts consider "a) the place where the injury occurred; b) the place where the conduct causing the injury occurred; c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and d) the place where the relationship is centered." *Herbert v. District of Columbia*, 808 A.2d 776, 779 (D.C. 2002). Each factor decisively weighs in favor of Indonesia: a) the injury occurred in Indonesia, b) the conduct causing the injury occurred in Indonesia, c) Plaintiffs reside in Indonesia, EMOI (the principal Defendant) resides in Indonesia, and no Defendant is incorporated or has its principal place of business in the District of Columbia, and d) the parties' relationship is centered in Indonesia. (Compl. ¶¶ 60-63.)

Nevertheless, Plaintiffs argue that "District of Columbia law applies to all of Plaintiffs' claims, because there is no material conflict between the laws of any of the interested jurisdictions." (Pls.' Mem. at 22.) Plaintiffs thus attempt to avoid any analysis by this Court of the constitutional implications of applying D.C. law here. (*Id.* at 22-23.) Plaintiffs are wrong for three reasons.

*First*, there are material differences between Indonesian civil law and D.C. common law. Incredibly, Plaintiffs argue there are no differences between Indonesian law and D.C. law (Pls.' Mem. at 22), and specifically, that Indonesian law permits punitive damages (*id.* at 19), even though this Court in *Doe I* explicitly held that Indonesia does not recognize punitive damages, *Doe v. Exxon Mobil Corp.*, No. 01-1357, 2006 U.S. Dist. LEXIS 11732, at *5 (D.D.C. Mar. 2, 2006) ("Indonesian law does not authorize punitive damages."). Although the Court did not reach the

question in *Doe I*, the other differences between Indonesia law (which is based on Roman-Dutch civil law) and D.C. law (which is based on English common law) are vast. *See Curley v. AMR Corp.*, 153 F.3d 5, 14 (2d Cir. 1998) ("New York courts do not indulge the presumption that New York law is the same as the law of a civil code country."); *see also In re Ski Train Fire in Kaprun, Austria*, 230 F. Supp. 2d 376, 390 (S.D.N.Y. 2002).[23]

*Second,* given that a conflict of laws exists, the Court must consider which jurisdiction has the greatest interest in applying its laws. Whether the Court measures the interests of Indonesia against those of the United States as a whole or against those of the District of Columbia in particular,[24] the interests of Indonesia must prevail. For example, it is not the case, as Plaintiffs posit, that a jurisdiction without punitive damages is indifferent to its own citizens' ability to recover punitive damages abroad. (Pls.' Mem. at 20.) A punitive damages judgment here would adversely affect EMOI, which principally does business in Indonesia and has approximately 580 employees there (Coleman Decl. ¶¶ 2-3), and directly conflict with Aceh Governor Yusuf's stated desire to attract foreign investment to Aceh, (Pls.' Ex. M at 2-3.) So Indonesia has a keen interest in adhering to its rule against punitive damages. Indeed, the *absence* of punitive damages in a jurisdiction is a policy choice that favors application of that jurisdiction's law. *See Danziger v. Ford Motor Co.*, 402 F. Supp. 2d 236, 240 (D.D.C. 2005); *Boise Tower Assocs., LLC v. Wash. Capital Joint Master Trust*, No. 03-141, 2006 U.S. Dist. LEXIS 45851, at *37, *41 (D. Idaho June 22, 2006). In a more general sense, Indonesia has the greatest interest in applying its own law to this dispute for reasons of sovereignty (Defs.' Exs. M, N, O), to protect and nurture the peace process in Aceh (*id.*), and to avoid disparate damages awards for conflict-affected civilians in Aceh.

---

[23]    Here, the actual differences resulting from application of Indonesian law would include no cause of action for intentional infliction of emotional distress, differences in vicarious liability standards, differences in damages calculations, and a substantive requirement that the individual soldiers that actually committed the wrongful acts be made parties. (*See generally* Hornick Decl.)

[24]    Defendants previously demonstrated why the applicable inquiry considers the interests of Indonesia against those of the District of Columbia only (Defs.' Mem. at 32-33), and do not repeat those arguments here.

(*Supra*, p. 12.) The interests of the United States, as the Executive and Legislative Branches have confirmed, are aligned with those of Indonesia (Defs.' Exs. G, H, I, J, K, L), and the District of Columbia has stated no interest, much less an interest greater than that of Indonesia, in applying its own law.[25]

*Finally*, Plaintiffs err in arguing that "Defendants cannot, and do not, argue that being subject to the laws of the United States violates their Constitutional rights." (Pls.' Mem. at 22.) In fact, Defendants' constitutional rights would be violated if the Court applied D.C. common law because D.C. has no nexus to Plaintiffs' claims, and because Defendants had no notice that EMOI's activities in Indonesia would be governed by D.C. law. (Defs.' Mem. at 34-35.)

## VIII.    THE PSC AND INDONESIAN LAW DEFEAT PLAINTIFFS' CLAIMS, AND THERE IS NO STANDARD BY WHICH TO MEASURE LIABILITY HERE

Lastly, the Court should dismiss Plaintiffs' claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Under the Supreme Court's minimum pleading standard announced in *Bell Atlantic v. Twombly*, the Court should dismiss a claim unless it presents a "plausible" claim for relief. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007); *see also Hicks v. Ass'n of Am. Med. Colleges*, 503 F. Supp. 2d 48, 50 (D.D.C. 2007). Thus, "[t]o survive a motion to dismiss, the factual allegations in the complaint 'must be enough to raise a right to relief above the speculative level.'" *Hicks*, 503 F. Supp. 2d at 51 (quoting *Bell Atl.*, 127 S. Ct. at 1965).

In their memorandum, Plaintiffs clarify their two theories of liability: first, that Defendants are vicariously liable for the soldiers' actions; second, that Defendants are directly liable for their own negligence in "hiring" and "supervising" those soldiers. (Pls.' Mem. at 28-30.)

---

[25]    The Court posited in *Doe I* that the United States had an overriding interest in applying its law to govern the activities of United States "super corporations" doing business abroad, *Doe v. Exxon Mobil Corp.*, No. 01-1357, 2006 U.S. Dist. LEXIS 11732, at *6 (D.D.C. Mar. 2, 2006), but this interest was articulated by the Court itself and was not based on any statement from the Executive or Legislative Branches.

Plaintiffs' claims fail under the minimum pleading standard because the PSC and Indonesian law conclusively demonstrate that Defendants cannot be liable for the soldiers' actions, either vicariously or on account of their own supposed negligence, because Defendants did not hire, control, or supervise the soldiers.  Moreover, even if a legally sufficient relationship between the Defendants and the soldiers could be identified (which it cannot), there is no standard by which to measure Defendants' supposed "oversight" of Indonesian military activities during a civil war.

### A.     The PSC and Indonesian Law Establish that Defendants Did Not Have Any Legal Relationship with the Indonesian Military.

By reference to the PSC, Defendants previously demonstrated that EMOI is merely an operator for the Indonesian government, that BPMIGAS, and not EMOI, is responsible for security of the gas fields, and that EMOI was required to make payments for security expenses to be included among its operating costs for accounting purposes.  (Defs.' Mem. at 39-40.)  Moreover, Indonesian law specifies that Indonesian soldiers must defend the Arun gas field (*id.*), which puts to rest the notion that Defendants "retained" or "hired" the Indonesian military to provide security.

Critically, Plaintiffs do not contest either of these points:  they offer absolutely no response to the fact that Indonesian law *requires* military presence to guard the Arun gas field and, regarding the PSC, merely speculate that other (unidentified) contracts must exist.  (Pls.' Mem. at 33.)  But there are no other contracts, and Plaintiffs' failure to offer any arguments based upon the contract upon which they rely, the PSC, is dispositive of their claims.

### 1.     Vicarious Liability

The PSC specifies that BPMIGAS is responsible for security, and Indonesian law specifies that Indonesian soldiers must defend the Arun gas field.  Defendants therefore cannot be vicariously liable for the actions of the Indonesian soldiers about whom Plaintiffs complain.

*First*, Plaintiffs cannot rely on a borrowed servant theory.  (Pls.' Mem. at 30-31.)  In particular, Plaintiffs argue that Defendants "'supervised, controlled and directed' military and police

29

in the provision of private security services." (*Id.* at 31.)  In *Estate of Carter v. District of Columbia*, 903 F. Supp. 165 (D.D.C. 1995), the plaintiffs asserted various tort claims, including negligent hiring and supervision claims, against the District of Columbia for the actions of a U.S. Park Police officer patrolling D.C. streets.  Plaintiffs based their claims on an agreement between the District of Columbia and the U.S. Park Police that allowed U.S. Park Police officers to patrol D.C. streets.  In dismissing the plaintiffs' claims, the Court held that the District of Columbia could not be sued for the acts of the officers employed by the U.S. Park Police because the District of Columbia did not have "authoritative direction and control" over the Park Police and because D.C. law specified that the U.S. Park Police would be under control of the Director of the National Park Service.  *Id.* at 168.  This case presents an analogous situation:  the PSC and Indonesian law establish that BPMIGAS, and not EMOI, was responsible for security and that Indonesian soldiers were required to defend the gas fields.  (Defs.' Mem. at 39-40.)  Defendants thus did not have "authoritative direction and control" over a "private security force," and liability for the soldiers' actions cannot shift to them.

*Second*, Plaintiffs' alternate discussion of employers' liability for the acts of independent contractors (Pls.' Mem. at 32) is also deficient.  Recognizing that employers are generally not liable for the acts of independent contractors, Plaintiffs attempt to invoke the rule that an employer can be liable for the acts of an independent contractor if the work involves an inherent danger.  (*Id.*)  This has two flaws.  Plaintiffs cannot, establish, as a preliminary matter, that EMOI "hired" the Indonesian military as its independent contractor.  As shown above, the PSC demonstrates that EMOI was a contractor for BPMIGAS, not that the Indonesian military was a contractor for EMOI. Indeed, BPMIGAS, and not EMOI, was responsible for providing security for the gas extraction operations.

Moreover, even assuming that an independent contractor relationship can be invoked here, Plaintiffs cite no cases applying the "inherent danger" exception to the rule that an employer cannot be liable for the acts of an independent contractor.  *See* Restatement (Second) of Torts § 427 (1965) (giving examples of "inherently dangerous" activities, including use of acetylene torch, excavating a highway, or use of scaffolding above a sidewalk).  The cases are to the contrary.  Hiring security guards – which EMOI did not do here in any event – does *not* constitute an "inherently dangerous" activity such as to make a person liable for an independent contractor's acts.  *See, e.g., Sage Enters., Inc. v. Wells Fargo Alarm Servs., Inc.*, No. 94-2100, 1996 WL 1057144, at *7 (E.D.N.Y. June 20, 1996) ("The work of a security guard is not so inherently dangerous as to impose a non-delegable duty to ensure proper performance on the employer."); *Taylor v. Sunbelt Mgmt., Inc.*, 905 S.W.2d 743, 744 (Tex. App. 1995) ("As a matter of law, work undertaken by the security company is not inherently dangerous and can be delegated to an independent contractor."); *Schreiber v. Camm*, 848 F. Supp. 1170, 1177 (D.N.J. 1994) ("Courts that have addressed the issue have concluded that the use of armed security guards to protect one's property is not so inherently dangerous as to confer a nondelegable duty upon the landowner.").

### 2.    Direct Liability

For similar reasons, Defendants cannot be liable for their supposed negligent hiring and negligent supervision.  Both claims are deficient because the PSC and Indonesian law demonstrate that EMOI was not responsible for security (Defs.' Mem. at 42-43), to which Plaintiffs, as shown above, offer no meaningful response.  Plaintiffs' claims that Defendants' "hired," "retained," and "supervised" the Indonesian soldiers (Pls.' Mem. at 28-29) are flatly contradicted by the PSC, upon which they rely.

### B.    There Is No Discernible Standard to Measure EMOI's Alleged Liability.

31

Even assuming that some legally tenable relationship exists between EMOI and the Indonesian soldiers, the Court should also dismiss Plaintiffs' claims for lack of a discernable standard by which to judge EMOI's asserted liability. (Defs.' Mem. at 43-44.) Plaintiffs counter that "there is a clearly established standard of care for security personnel." (Pls.' Mem. at 26-28.) This fundamentally misstates Defendants' argument. Defendants do not argue that there is no standard of care for security personnel; Defendants argue, and their cases establish, that there is no standard of care for *oversight of military activity*. (Defs.' Mem. at 44-45.)

Notwithstanding Plaintiffs' suggestions to the contrary in their memorandum (Pls.' Mem. at 26-27), this case is about oversight of military activities. The first paragraph in the Complaint specifies that the alleged injuries were "inflicted by *members of the Indonesian military*." (Compl. ¶ 1.) Allegations regarding the "Indonesian military," "military," "troops," and "soldiers" are omnipresent. (*Id.* ¶¶ 25 n.12, 39, 40, 44 & n.17, 45 & n.18, 46, 51, 52, 54 & nn.20-22, 55, 57, 58, 59.) On the one hand, Plaintiffs ask the court to impute knowledge of wrongdoing by the Indonesian military to Defendants, (*id.*), while on the other hand Plaintiffs ask the Court to treat this case as if it involves security guards patrolling a university or grocery store, (Pls.' Mem. at 27.)

Notably, none of the cases cited by Plaintiffs involve the standard of care for military personnel during a civil war. In the military context, Courts that have heard similar allegations have routinely rejected such claims. (*See* Defs.' Mem. at 44-45.) As one example, in *Smith v. Halliburton Co.*, No. 06-0462, 2006 U.S. Dist. LEXIS 61980, at *3 (S.D. Tex. Aug. 30, 2006), the plaintiff was injured at a dining facility ("DFAC") in Iraq. Plaintiffs filed suit against Kellogg Brown & Root ("KBR") for negligence, including negligent supervision and negligence in failing to take reasonable precautions to make the DFAC safe from attacks. *Id.* The defendants subsequently attached the relevant contract, which established that the government retained responsibility for security. *Compare id.* at *3-*4, *10-*11 (discussing how government retained responsibility for

security under the relevant contract), *with* PSC, Coleman Decl. Ex. 1 ¶ 5.3(c) (requiring the Indonesian government to supply "security protection"). In light of this contract, the court dismissed the plaintiff's claims because of the absence of any discernable standards:

> In order to determine if defendants acted reasonably as possessor, occupier, and operator of the DFAC, the court would have to decide what constitutes reasonable security measures at a military base located in an area of Iraq subject to threats from hostile forces. The court would have to assess what intelligence had been gathered regarding potential threats and evaluate whether the security measures implemented were reasonable in light of the potential threats. Security measures on military bases balance the need for functionality and access with the need for force protection. In striking this balance the military must also allocate limited personnel and resources, with the need for security on base competing with mission requirements off base in Iraq as well as throughout the world. The court would have to determine if the military was reasonable in striking this balance. Courts lack the facts, expertise, and standards necessary to evaluate whether reasonable care was taken in these circumstances.

*See Smith*, 2006 U.S. Dist. LEXIS 61980, at *24-*25. The same concerns apply here, and Defendants have cited many other cases in which courts have declined to entertain tort claims arising from military activities. (Defs.' Mem. at 44-45.) Professor Wedgwood similarly opines that, in the law of armed conflict, a party protected by a military operation cannot be held responsible for the acts of soldiers providing that protection. (Supp. Wedgwood Decl. ¶¶ 36-39.) Because Plaintiffs' claims do not concern "private security forces" but rather alleged oversight of military personnel, these authorities compel dismissal of Plaintiffs' claims.

## CONCLUSION

For all of these reasons the Court should dismiss Plaintiffs' complaint.

Washington, DC
December 7, 2007

_Alex Young K. Oh /ss_

Theodore V. Wells, Jr. (Bar No. 468934)
twells@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Alex Young K. Oh (Bar No. 499955)
aoh@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
1615 L Street, NW, Suite 1300
Washington, DC 20036

Respectfully submitted,

Martin J. Weinstein (Bar No. 37792)
mweinstein@willkie.com
Robert J. Meyer (Bar No. 41620)
rmeyer@willkie.com
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
Telephone: (202) 303-1000
Facsimile: (202) 303-2000

Paul W. Wright (Bar No. 20747)
paul.w.wright@exxonmobil.com
Patrick J. Conlon (Bar No. 414621)
patrick.j.conlon@exxonmobil.com
Exxon Mobil Corporation
800 Bell Street
Houston, TX 77002

Attorneys for Defendants Exxon Mobil
Corporation, Mobil Corporation,
ExxonMobil Oil Corporation, and
ExxonMobil Oil Indonesia Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE VIII, *et al.*, | |
| Plaintiffs, | |
| | |
| v. | Civ. No. 07-1022 (LFO) |
| | |
| EXXON MOBIL CORPORATION, *et al.*, | |
| Defendants. | |

**SUPPLEMENTAL DECLARATION OF RUTH WEDGWOOD**

I, Ruth Wedgwood, declare as follows:

1.  I have been asked by counsel for the Defendants in the above-entitled matter to address several points advanced in Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss, and Plaintiffs' accompanying exhibits, filed on November 2, 2007.

2.  This declaration is provided to assist the Court in its decision concerning the motion to dismiss filed by the Defendants on September 17, 2007.[1]

## I. Introduction

3.  Plaintiffs seek compensatory and punitive damages against the Exxon Mobil Corporation, its wholly-owned subsidiary Mobil Corporation, as well as ExxonMobil Oil Corporation, and ExxonMobil Oil Indonesia ("EMOI"), for the alleged conduct of Indonesian military personnel in Aceh, on the island of Sumatra, in the Republic of Indonesia.

4.  The complaint alleges that four unnamed Aceh residents were assaulted by unnamed members of the Indonesian military between June and October 2004. The alleged acts date from the period of a violent armed conflict fought between the Indonesian government and a secessionist movement called the GAM ("*Geraken Aceh Merdeka*"). The alleged events occurred shortly before the catastrophe of the

---

[1] This supplements my earlier declaration, dated September 17, 2007, previously submitted by Defendants in support of their Motion to Dismiss the Complaint on the same date.

"Tsunami" tidal wave in December 2004, which killed 120,000 people in Aceh and displaced another 400,000.

5.  The acts pleaded allegedly occurred in North Aceh, on the periphery of the "vast area" of natural gas extraction and production facilities which are operated by ExxonMobil Oil Indonesia (EMOI).[2]  The complaint asserts that the perpetrators are Indonesian military personnel who guarded the facilities, but the specific identities of the Indonesian soldiers are not stated.

6.  On August 15, 2005, eight months after the events of the Tsunami shocked and devastated the province of Aceh, international mediators (most notably, the former President of Finland, Martti Ahtisaari) succeeded in obtaining the agreement of the Government of Indonesia and the GAM insurgency to a binding international peace agreement.

7.  The celebrated Helsinki Accord or "Memorandum of Understanding" ended a thirty-year armed conflict in the province of Aceh.  Aceh has been changed in profound ways by the Helsinki Accord.  The Government of Indonesia has agreed to political autonomy for the province of Aceh, and a former leader of the insurgency has been elected as the new Governor of Aceh.  In the next national elections, slated for 2009, former members of the GAM insurgency will be eligible to run for national legislative office as well.  After a difficult and protracted period of conflict during which the facilities and the employees of extractive industries in Aceh came under armed attack by GAM insurgents,[3] the GAM has now agreed to lay down its arms.

8.  This delicate process of peacemaking was driven to a successful conclusion by former Finnish president Martti Ahtisaari, a highly-esteemed international diplomat who was also a key figure in resolving conflicts in Kosovo and Namibia. To oversee implementation of the Helsinki Accord, an Aceh Monitoring Mission (AMM) was organized by the European Union and Association of Southeast Asian Nations (ASEAN).  Though the AMM concluded its formal work in December 2006, seeking to return the process to local actors, oversight of the implementation has continued through interested international organizations, including the U.N. Development Program and the World Bank, as well as the Aceh Reintegration Board (*Badan Reintegrasi Aceh* or "BRA").

9.  The instant complaint by John Does VIII, IX, X, and XI was filed in the U.S. District Court for the District of Columbia on May 31, 2007.  The complaint was thus filed almost two years after the historic achievement of the Helsinki peace agreement between the Government of Indonesia and the former armed insurgents.

10.  Defendants have argued that the federal doctrines of comity, act of state, political question, and foreign affairs preemption require the dismissal of the instant complaint, especially in light of the binding provisions of the Helsinki Accord.

---

[2] See Complaint, paragraph 34.
[3] See paragraphs 20-30 *infra*.

11. In the Helsinki Accord, the Government of Indonesia and the Free Aceh Movement "confirm[ed] their commitment to a peaceful, *comprehensive and sustainable* solution to the conflict in Aceh."[4]  The Helsinki Accord prescribes an administrative method of compensation for "All civilians who have suffered a demonstrable loss due to the conflict."[5]  Nonetheless, plaintiffs assert that these particular allegations of tort should be tried in federal court under the law of the District of Columbia, suggesting that the Republic of Indonesia (including its autonomous province of Aceh) has no interest in applying its own law to this matter.  There are several aspects of plaintiffs' claim in this regard that will be addressed in turn.

## II. The Stability of the Helsinki Accord and the Effect of Unequal Recoveries

12. Plaintiffs assert that allowing the pursuit of compensatory and punitive damages in an American court will not have an adverse local impact on acceptance of the terms of the Helsinki Accord, nor destabilize or jeopardize the peace pact's future – even though the requested recovery under American tort law is many times larger than the settlements and assistance likely to be available to thousands of Aceh civilians who also suffered loss and injury during the thirty-year Aceh civil conflict.

13. The basis for plaintiffs' assertion is not evident. It is contradicted by the purpose of the Helsinki Accord, which seeks to provide some visible uniformity of recovery to the many innocent people who suffered in the long-running conflict.

14. The director of the International Center for Transitional Justice, Dr. Pablo de Grieff, has noted in a comprehensive study that disproportionate recoveries can be destabilizing to a post-conflict reparations plan.  In his essay, "Repairing the Past: Compensation for Victims of Human Rights Violations," Dr. de Grieff concludes that "once a government has made a good faith effort to create an administrative system that facilitates access to benefits … allowing beneficiaries to initiate civil litigation poses not just the danger of obtaining double benefits for the same harm but worse, of **destabilizing the whole reparations program** also. … [T]he second problem is not so easy to avoid, as the benefits obtained through the courts typically surpass the benefits offered by a massive program. This can lead to **a significant shift in expectations and to a generalized sense of disappointment in the program's benefits.**"[6]

---

[4] See Memorandum of Understanding between the Government of the Republic of Indonesia and the Free Aceh Movement, paragraph 1 (emphasis added)(hereafter MOU or "Helsinki Accord").
[5] See Helsinki Accord, paragraphs 3.2.5 and 3.2.6.
[6] Pablo de Grieff (editor), THE HANDBOOK OF REPARATIONS (Oxford University Press 2006), at p. 12 (emphasis added).

15. A similar caution is offered by a prosecutor famous for the investigation and prosecution of human rights abuses during the Argentine junta. Dr. Jaime E. Malamud-Goti served as the solicitor general of Argentina during the democratic regime of President Raul Alfonsin. He observes that "Human rights violations frequently occur in poor countries that cannot afford to compensate all victims in full. … A variety of case studies show that awards following ordinary tort actions are far above the administrative compensation provided by general reparations programs."[7] Litigation in an American courtroom thus can give rise to a disparity in outcomes that could have the effect of destabilizing the reparations programs of the Helsinki Accord.

16. In addition, Dr. Malamud-Goti notes that use of an administrative method permits reparations to be extended to the largest group of victims, who ordinarily cannot muster the rigorous forms of courtroom proof. The former prosecutor notes that "**the harms derived from human rights violations frequently will not fit the ordinary legal requirements in matters such as evidence, statutes of limitations, and identification of tortfeasors.** This is so because those standards were not developed for the kind of situations that human rights abuse typically involves."[8] Thus, an administrative method may provide a more complete and effective form of reparations.

17. The challenge of assuring even-handed compensation and assistance among thousands of potential claimants for injuries suffered in a thirty-year-long conflict is thus considerable. It accounts for the approach of the Helsinki Accord, in which individual cases have been subsumed into a national administrative compensation process. In their quest for judicially-administered punitive damages – a form of recovery apparently not permitted under the rules of Indonesian tort law – counsel for plaintiffs overlook the urgent and focused interest of the Indonesian government in providing even-handed compensation and assistance to many thousands of victims of the war. They also disregard the interests of the newly autonomous government of Aceh in supporting the Helsinki Accord.

18. Plaintiffs' counsel thus fall wide of the mark in supposing that "to the extent Indonesian law would provide less generous punitive damages, *Indonesia has no interest in applying these laws to Defendants*." See Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss, at page 20 (emphasis added).[9]

19. To the contrary, Indonesia – together with Aceh's civilians and the newly-elected democratic government of Aceh – have a compelling interest in assuring that all

---

[7] *See* Jaime E. Malamud-Goti and Lucas Sebastian Grosman, "Reparations and Civil Litigation," in THE HANDBOOK OF REPARATIONS, *supra* note 5, at pp. 539, 546.

[8] See *id.*, at p. 545 (emphasis added).

[9] As noted in the Declaration of Robert N. Hornick, dated Feb. 3, 2006, filed on September 17, 2007, as an Attachment to Defendant's Motion to Dismiss, at page 8, punitive damages in fact are not available in Indonesian law.

victims who have suffered injuries and losses "due to the conflict" are treated on an equal footing.  See Article 3.2.5, "Memorandum of Understanding between the Government of the Republic of Indonesia and the Free Aceh Movement," concluded at Helsinki, August 15, 2005.[10]

### III. The Conflict in Aceh and the Dangers of Insurgent Attacks Against the Employees of ExxonMobil Oil Indonesia (EMOI)

20.  As their basis for claiming that the 2005 Helsinki Accord is not preclusive, counsel for the plaintiffs assert that the matters at issue in this lawsuit are not related to the conflict in Aceh.  They state that "Plaintiffs bring suit against ExxonMobil **for its actions in securing its facilities, acts that bear only a tangential relationship, if any, to the unrest in Aceh.**"  See Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss, at page 1 (emphasis added).

21.  Plaintiffs' assertion is hard to square with the facts of the conflict. Newspaper reports at the time corroborate that the natural gas exploration and production facilities operated in Arun (in northern Aceh) by ExxonMobil Oil Indonesia, were the target of repeated and widespread attacks and threats by the insurgents of the Free Aceh Movement or "GAM." During its campaign, the GAM insurgency attempted to shut down natural gas production and thereby cut off the revenues which the extractive industry provided to the Indonesian government.

22.  The Indonesian and American employees of these facilities were directly endangered and attacked by the GAM insurgents.  Thus, the provision of some form of security would not appear to be an optional matter.  The presence of Indonesian military personnel was directly connected to the ongoing insurgency by the Free Aceh Movement, i.e., to "the unrest in Aceh."

23.  For example, on July 7, 2002, GAM members abducted nine Exxon Mobil employees "from a vessel heading for an oil exploration field off North Aceh" and freed them only "after members of their families paid unspecified amounts of ransom money to the GAM leadership." *See* "Aceh separatist group frees ExxonMobil staff, athletes," Jakarta Post, July 7, 2002.

24.  Similar tactics were used on land. "Two men … abducted and wounded an ExxonMobil contract employee … near the main town in North Aceh district,

---

[10] The Embassy of Indonesia sent a diplomatic note to the U.S. Department of State, dated February 1, 2007, stating its concern about the effect of extraterritorial damages actions.  The note remarks the importance of the Helsinki Accord, and the work of the Aceh Monitoring Mission conducted by the European Union and ASEAN Contributing Countries "to monitor the implementation of the MoU."  It further recites Indonesia's concern that litigation in federal court "could be deemed as undermining the result of the democratic process, ending more than three decades of conflict in Aceh."  The note was filed as Exhibit O to Defendants' Motion to Dismiss, on September 17, 2007.

Lhokseumawe," reported the Hong Kong bureau of the Agence France Presse on December 24, 2001.

25. Modalities of attack by GAM insurgents included ground fire directed at aircraft, intercepting and destroying ground vehicles, and landmines. According to the report of the Sydney Morning Herald on April 3, 2001, GAM insurgents were believed to be responsible for firing at aircraft transporting company workers, hijacking the company's vehicles, stopping and burning buses, and planting landmines along roads to blow them up.

26. Indeed, as the Jakarta Post reported on March 24, 2001, "[t]he cumulative effect of dozens of security incidents over the past year in Aceh … escalating death threats, extortion demands, random shootings and company aircraft taking ground fire" was to force ExxonMobil Oil Indonesia "to shut down its onshore gas fields on March 9."

27. A French news service likewise reported that ExxonMobil Oil Indonesia was forced to "pull [ ] out of three gas fields in North Aceh – in South Lhoksukon, Arun and Pase – citing threats from Free Aceh Movement (GAM) separatist rebels." A press spokeswoman stated that "We would like to resume operations as soon as possible but the decision depends on government security protection in the field. … Our main concern is the safety of our workers and the adjoining community." Agence France Presse, March 20, 2001.

28. The GAM insurgency may have staged these incidents in a single-minded pursuit of independence for the province. But the immediate effect was to endanger the employees of ExxonMobil Oil Indonesia – including local staff from Aceh. The need to secure the lives of employees, as well as the production facilities, against insurgent attacks thus had a direct relationship to "the unrest in Aceh" – and falls squarely within the reparations provisions of the 2005 Helsinki Accord.[11]

29. Martial law in the province of Aceh was suspended on May 19, 2004. However, the province was then placed under a declared state of "civil emergency."[12]

30. This period continued to be characterized by violence. Incidents reported in the international press included violations of the law of armed conflict by GAM rebel forces – including the murder of a hamlet chief and four other civilians,[13] an attack

---

[11] See Helsinki Accord, paragraph 3.2.5(c) (compensation for "All civilians who have suffered a demonstrable loss due to the conflict …").

[12] See, e.g., "Report on TNI Killing of GAM leader, Other Security Developments", Federal Broadcast Information Service Report on Indonesia, June 10, 2004 ("Koran Tempo reported that Nanggroe Aceh Darussalam Civil Emergency Administrator and Aceh's Governor Abdullah Puteh, extended the authorization for security forces to shoot on sight any person found disturbing the security or damaging public facilities in the region. The decision was put in place 9 June.").

[13] See "Suspected Rebels Kill Five People in Indonesia Aceh,"Agence France Presse, May 11, 2004 (killing of hamlet chief and one other civilian in Nisan in North Aceh, two civilians in Pidie district, and a plantation worker in Norgan Raye).

against a parliamentary candidate,[14] as well as threats and an attack against polling places in the April 5, 2004 general election.[15]

## IV. Plaintiffs do not claim that ExxonMobil Oil Indonesia had any alternative source of protection

31. Counsel for plaintiffs have not suggested that any alternative existed, consistent with Indonesian law, by which ExxonMobil Oil Indonesia could have secured its operations and protected its employees at the Arun natural gas facilities, other than through the state-mandated presence of the Indonesian police and military.  The limitations placed by a sovereign state upon a corporate investor are real.

32. An international corporation does not enjoy an unfettered right to import private security services into a foreign country.  In fact, a sovereign government may restrict the right of any foreign investor or contractor to import private security guards.  Indeed, even the importing of private firearms and other protective mechanisms is subject to the permission of the local sovereign.  Thus, plaintiffs offer no basis to suggest that there was a legal or practical alternative, consistent with Indonesian law, to the presence of the Indonesian military in protecting its employees and operations.

33. The law of Indonesia designates major extractive facilities as "national vital objects" and at the relevant date, prescribed that the Indonesian armed forces must  provide for their protection.  *See, e.g.,* Presidential Decree No. 63/2004, August 5, 2004, Article 8 ("The safeguarding of national vital objects which become an organic part or the territory of the National Defence Forces shall be conducted by the National Defence Forces."); see also *id.*, Article 7 ("In safeguarding national vital objects, the Police of the Republic of Indonesia may ask for assistance from the National Defence Forces in accordance with the law in force.").[16]

34. Indonesia's decision to classify major extractive sites as "national vital objects" and mandate protection by the military and police was also to guard against possible attack by Islamist fundamentalist groups, following the events of September 11,

---

[14] "Indonesian Troops Kill Two Suspected Rebels in Aceh," Agence France Presse, March 2004 ("rebels wounded a parliamentary candidate for the April elections in Lampanal, Aceh Besar District, by slashing him with a machete Sunday").

[15] "Two Injured in Attack on Aceh Polling Station on Indonesia's Election Day," Agence France Presse, April 5, 2004 ("An election monitor in Aceh said … that rebels had threatened to shoot or fine residents who vote.  Tal Haikal, chief of the Aceh Non-Government Organization Forum, said several villages had reported threats.").

[16] Presidential Decree No. 63/2004 is reproduced in Exhibit 2 to Declaration of Peter J. Coleman, September 17, 2007, filed with Defendants' Memorandum in Support of Motion to Dismiss, on September 17, 2007.  See also Indonesian "National Defense Law No. 3/2002," dated January 8, 2002, at Articles 4, 7, and 10, and "Elucidation" to Article 7(2) (Indonesian military is to counter military threats, including acts of "Sabotage … destroying … a vital national object, which endangers the safety of the people of the country"), reproduced as Appendix C of Declaration of Robert N. Hornick, *supra.*

2001. In particular, following the al Qaeda bombing of a hotel in Bali, Indonesia, on October 12, 2002, which killed 202 people, Indonesia's Minister for Mines and Mineral Resources announced to the press that military security would be increased at "seven vital national assets" including "the ExxonMobil and Arun natural gas operation in Aceh." Other "vital national assets" named by the minister as requiring protection by the armed services included the Natuna gasfield in the South China Sea, Caltext Pacific operations in Riau province, and a Papua gold and copper mine operated by Kalimantan. *See* "Indonesia to Increase Security at Vital National Projects," Agence France Presse, October 23, 2002.

35. In March 2001, an Indonesian minister stated that "Jakarta had deployed *more than 2,000 troops to protect the huge Arun gas field* ..." which was operated by ExxonMobil Oil Indonesia.[17] This scale is also far larger than any private security operation could ordinarily muster.

### V. The Law of Armed Conflict does not impose a duty on a Protected Party

36. The premise of the civil claim advanced by plaintiffs' counsel is that ExxonMobil was responsible, for any deficiency in the conduct of the particular members of the Indonesian armed forces who guarded the Aceh natural gas facilities operated by ExxonMobil Oil Indonesia.

37. In the law of armed conflict, sometimes called international humanitarian law, a military superior is responsible for the conduct of his subordinates, and has an active duty of supervision. A military superior may be held responsible for conduct that he orders, and as well, for a failure to monitor and discipline his subordinates if there was reason to believe that they were engaged in misconduct.[18]

38. However, the doctrine of so-called "command responsibility" has never been extended to impose responsibilities on the party or entity *protected by* a military operation as such.

---

[17] See Agence France Presse, March 20, 2001 (emphasis added). The Indonesian official who made this statement was Susilo Bambang Yudhoyono. He was then coordinating minister for political, social and security affairs. Yudhoyono subsequently became the president of Indonesia who signed the Helsinki Accord in 2005, for which he was nominated for the Nobel Peace Prize by U.S. Congressman Robert Wexler.

[18] See Ruth Wedgwood, INTERNATIONAL CRIMINAL JUSTICE/LA JUSTICE PENALE INTERNATIONALE – REPORT ON THE PRESENT STATE OF RESEARCH, Hague Academy of International Law, Centre for Studies and Research in International Law and International Relations (Martinius Nijhoff 2007), at pp. 64-65. *See generally* MORRIS GREENSPAN, THE MODERN LAW OF LAND WARFARE (University of California Press 1959); LINDSAY MOIR, THE LAW OF INTERNAL ARMED CONFLICT (Cambridge University Press 2002); YORAM DINSTEIN, THE CONDUCT OF HOSTILITIES UNDER THE LAW OF INTERNATIONAL ARMED CONFLICT (Cambridge University Press 2004).

39. This makes sense as a matter of logic, since the beneficiary has no authority in the military's chain of command. When a United Nations peacekeeping mission is sent to a conflict zone, local officials are not considered to be responsible for the conduct of international troops deployed in the area. Indeed, even the United Nations force commander faces clear limits on his ability to discipline troops. In the practice of United Nations peacekeeping, the discipline of peacekeeping troops for misbehavior is left to the state or states that send the contingents. In addition, the United Nations has, at times, also been constrained in its choice of personnel available for peacekeeping missions.

## VI. Comity, Acts of State, and Indispensable Parties

40. In international law, there is a doctrine that forbids the adjudication of a matter when an indispensable party is immune from the court's jurisdiction.

41. This was famously established in the International Court of Justice decision in *Portugal v. Australia*, [1995] I.C.J. Reports 90 (June 30, 1995), concerning the conduct of Indonesia in regard to East Timor.[19]

42. Portugal was unable to pursue its claim that Australia had improperly contracted with Indonesia for the extraction of gas and oil from the "Timor Gap" lying between Australia and East Timor. The complaint by Portugal alleged that Indonesia lacked any right to alienate natural resources belonging to the people of East Timor, and that Australia was in effect facilitating a misappropriation.

43. By a wide majority, the World Court – sitting as the United Nations' "principal judicial organ"[20] – refused to rule on the issue because Indonesia would be an essential party in the consideration of the merits of the case, and yet had not acceded to the jurisdiction of the court.

44. At the time of the decision, it was not anticipated that Indonesia would soon remarkably agree to the conduct of a democratic referendum in East Timor to decide upon independence or autonomy. Rather, the Court concluded that, even though other remedies were not then available, the adjudication of the case was impermissible because it would touch upon the propriety of Indonesia's occupation of East Timor. This could not be adjudicated where Indonesia was not properly before the court. The absence of an alternative remedy for East Timor did not

---

[19] *Case Concerning East Timor (Portugal v. Australia)*, 30 June 1995, paras. 23-37 (full opinion available at <www.icj-cij.org>; summary available at <www.icj-cij.org/icjwww/idecisions/isummaries/ipasummary 95063.htm>.

[20] See United Nations Charter, article 92 ("The International Court of Justice shall be the principal judicial organ of the United Nations.").

relieve the International Court of Justice of its duty to abide by the rule that forbids adjudication in the absence of an indispensable party.

45. Additionally, the International Court of Justice concluded in *Portugal v. Australia* that it was not sufficient to suppose that Indonesia could choose to intervene in the case or appear voluntarily.[21]

46. In the instant case, a member of the Indonesian military cannot be subpoenaed from abroad to give testimony in an American courtroom. The government of Indonesia has expressed its objection to any use of American judicial power to examine the conduct of Indonesian military forces.[22]  This limitation on the practical capacity to summon key witnesses will thus constrain both sides in their ability to examine the facts. Plaintiffs have not suggested in what way, or through what means, the facts of the several incidents at issue in this case could be fully adduced.

47. In addition, the limitations on hearsay established by the Federal Rules of Evidence mean that the defendants in such an action might have no admissible witness statements to establish what happened in particular incidents involving members of the Indonesian military.  The important principle of "equality of arms" in the trial of factual matters is protected under the standards of international law,[23] and it is an ideal of justice applicable to all defendants, including corporations.

---

[21] Earlier authority for the idea of indispensable parties and the limits of jurisdiction is found in *Monetary Gold Removed from Rome in 1943*, I.C.J. Reports 1954, pp. 19, 32 (June 15, 1954).  *See also* Oliver J. Lissitzyn, Judicial Decisions, 48 American Journal of International Law 649 (1954).  In the *Monetary Gold* case, the International Court of Justice held that "In order … to determine whether Italy is entitled to the gold, it is necessary to determine whether Albania has committed any international wrong against Italy, and whether she is under an obligation to pay compensation to her; and if so, to determine the amount of compensation.  In order to decide such questions, it is necessary to determine whether the Albanian law of January 13th, 1945, was contrary to international law … To go into the merits of such questions would be to decide a dispute between Italy and Albania.//The Court cannot decide such a dispute without the consent of Albania. … To adjudicate upon the international responsibility of Albania without her consent would run counter to a well-established principle of international law embodied in the Court's Statute, namely, that the Court can only exercise jurisdiction over a State with its consent.").

[22] See Exhibit M of Defendants' Motion to Dismiss the Complaint (note of the Indonesian ambassador dated 15 July 2002, stating  that "As a matter of principle, we cannot accept the extra territorial jurisdiction of a United States Court over an allegation against an Indonesian Government institution, e[.]g[.,] the Indonesian military, for operations taking place in Indonesia.").  Accord Exhibit N of Defendants' Motion to Dismiss the Complaint (note of the Indonesian Embassy dated June 15, 2005, stating that "limited discovery as proposed by the plaintiffs is unacceptable to Indonesia.").

[23] See, e.g., United Nations Human Rights Committee, "General Comment 32," at paragraph 13.  The General Comment, summarizing case law under Article 14 of the International Covenant on Civil and Political Rights, was adopted by the Human Rights Committee on July 27, 2007.  The United States ratified the International Covenant on Civil and Political Rights in 1992, and three Americans have thereafter been elected by the States Parties to serve as the U.S. member of the Human Rights Committee, which is charged with the administration of the Covenant.

Under Article 14 of the International Covenant, according to the Committee's General Comment, "The right to equality before courts and tribunals ensures the equality of arms.  This means that the same

48. So, too, the asserted claim of a "failure to supervise" Indonesian troops ordered by the government to provide security for the Arun natural gas facilities would touch directly upon the decisions of the Indonesian government concerning required security arrangements at energy facilities classified as "national vital assets." The doctrine of "indispensable party" as embodied in the Federal Rules of Civil Procedure, as well as in Indonesian law,[24] thus implicates many of the same interests as the idea of an "indispensable party" in international law. These same considerations also directly inform the application of the doctrines of comity and foreign affairs preemption.

49. In seeking to meet the problem of the missing "indispensable party," the plaintiffs assert that the "Individual acts of assault or battery are not the official acts of the Indonesian government." See Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss, at page 11. But it should be noted that in *Underhill v. Hernandez*, 168 U.S. 250, 253 (1897), where an insurgent military commander captured and physically mistreated a civilian in Venezuela, the United States Supreme Court held that the acts were not actionable in an American court – even as to "certain alleged assaults and affronts by the soldiers of Hernandez's army." This holding did not turn upon the status of the actor as a commander, but because he was a combatant for the faction that ultimately became the lawful government of the country.

50. To be sure, misconduct by any state party may be actionable through modalities of diplomatic protection and protest, or even by adjudication in an international forum whose jurisdiction has been accepted by the state. But a foreign government and its officials remain immune from the civil process of the national courts of another sovereign, in regard to non-commercial acts committed in its own territory, absent some explicit waiver of immunity. See, e.g., *In re Arrest Warrant of 11 April 2000* (*Democratic Republic of Congo v. Belgium*), International Court of Justice, Judgment of 14 February 2002 (Belgium could not issue arrest warrant against former foreign minister of Congo for alleged incitement of genocide); and *Certain Criminal Proceedings in France* (*Republic of Congo v. France*), International Court of Justice (application filed on December 9, 2002, by government of Congo Brazzaville asserting that French warrant for the testimony of Congolese president violates head of state immunity).[25]

---

procedural rights are to be provided to all parties unless distinctions are based on law and can be justified on objective and reasonable grounds, not entailing actual disadvantage or other unfairness to the defendant. … The principle of equality between parties applies also to civil proceedings and demands, inter alia, that each side be given the opportunity to contest all the arguments and evidence adduced by the other party."

[24] See Declaration of Robert N. Hornick, paras. 36-37, Exhibit 2 of Defendants' Memorandum of Law in Support of Motion to Dismiss, filed September 17, 2007.

[25] In the criminal extradition case of General Augusto Pinochet, the former Chilean dictator was no longer serving in office at the time of his arrest in the United Kingdom. In addition, the government of Chile had already ratified the United Nations Convention against Torture, under which each state party has a duty to

## VIII. The Helsinki Accord is providing compensation to affected civilians through ongoing programs

51. Counsel for the plaintiffs scoff at the Helsinki Accord, and suggest that no deference should be accorded to its compensation and reparation provisions, pointing to a December 2006 decision of the Indonesian Supreme Court that invalidated an initial statute creating a Truth and Reconciliation Commission.

52. This account overlooks the fact that the delivery of compensation and financial assistance is underway through the other key modalities of the Helsinki Accord. The World Bank has described the initiation of the program for aid distribution to persons harmed by the conflict, in a December 2006 report entitled "The Aceh Peace Agreement: How Far Have We Come?"[26]

53. Community-based assistance has been delivered to conflict areas, the World Bank reports. The *Badan Rehabilitasi dan Rekonstruksi* ("BRR") has committed to help with infrastructure reconstruction and economic development in conflict-affected areas.

54. The World Bank also notes the use of innovative mechanisms to assure that the aid is adapted to local needs and gets to the affected population. "The Government and many donors have prioritized the use of community-driven approaches for delivering assistance to both tsunami *and conflict-affected individuals* and communities in Aceh. Such approaches, which involve heavy participation from recipient communities, can ensure that aid meets community needs."[27]

55. In addition, the key efforts of the *Badan Reintegrasi Aceh ("BRA")* – also known as the "Aceh Reintegration Board" – are distributing monies to conflict victims. As World Bank notes, this has included the use of "the community-driven Kecamatan Development Program (KDP) to deliver approximately $60 million of reintegration assistance to conflict-affected communities over a two-year period."[28]

56. According to the official website of the Aceh Reintegration Board, the board "has been given the mandate to implement the Reintegration Program and support

---

prosecute or extradite.  Even then, the Law Lords held that an implied waiver of official acts immunity was predicated specifically on the allegation that General Pinochet was personally responsible for 3,000 acts of disappearance and torture.  See Ruth Wedgwood, International Criminal Law and Augusto Pinochet, 40 Virginia Journal of International Law 829 (2000).

[26] "The Aceh Peace Agreement: How Far Have We Come," December 2006, available on-line at <www.worldbank.org>.

[27] Id. (emphasis added).

[28] Id.

sustainable peace in Aceh."[29] Among the tasks of BRA personnel, according to its website, are "Monitoring the implementation of the Helsinki MoU" and "Monitoring the implementation of the LoGA (Law Number 11/2006 on Governing Aceh)", as well as "Monitoring and advising on the establishment of institutions called for under the Helsinki MoU and the LoGA".

57. I have examined a spread-sheet report entitled "Implementation of the Helsinki MoU", published by the Aceh Monitoring Mission and the Government of Indonesia. This report states at page 14 that the Government of Indonesia "has allocated fund[s] for victims of the conflict through Social Affiars (sic) Department and managed by BRA in order to support reintegration and rehabilitation program." It states that the budget for 2005 for this purpose was 200 billion RP and the budget for 2006 was 600 billion RP.

58. In light of this record, the plaintiffs have necessarily acknowledged that the programs under the Helsinki Accord have provided economic assistance for persons affected by the conflict.

59. Thus, the declaration of Mr. Ross Clarke, recently submitted as an exhibit to Plaintiffs' Response to Defendants' Motion to Dismiss, recites that "Conflict-affected civilians, or conflict victims as they should more appropriately be called, have received limited support through the Acehnese Reintegration Body (BRA)...." He also recounts that "the BRA-KDP Program has involved the provision of grants to conflict-affected communities, who through a facilitated community process jointly select a project through which to utilize the funds."[30]

60. I have examined the *Aceh Conflict Monitoring Update*, published by the Jakarta office of the World Bank in monthly issues starting in August 2005, at the beginning of the peace process under the Helsinki Accord. In its issue covering March 1-31, 2007, the Bank reports on the targets and performance of the aid programs of the Aceh Reintegration Board or *BRA*.

61. As of that date, the Aceh Reintegration Board had assisted 3,000 GAM combatants, 6,200 GAM non-combatants, and 2,035 political prisoners, which were stated to be 100 percent of those target groups. In addition, it had assisted "conflict-affected persons" located in 1724 villages, through the BRA-KDP program, distributing an average of 60 to 170 million Rupiah per village. The program was planning

---

[29] The Aceh Reintegration Board (also known as *BRA*) "was recently reorganized to include the Aceh Peace Resource Center (APRC) in order to provide support to BRA programs and functions." See website of the Aceh Reintegration Board at <http://www.bra-aceh.org>.

[30] See Plaintiffs' Response to Defendants' Motion to Dismiss, Declaration of Ross Clarke, at page 3. The use of community-based projects is, of course, an approach also taken by other international aid organizations. Its rationale is the debilitating effect of the conflict over broad areas of the Aceh population. For example, in some areas, notes the World Bank study, 56 percent of men and 20 percent of women report having suffered a beating, either by government forces or by the GAM insurgents, in the course of the violent conflict. See "The Aceh Peace Agreement: How Far Have We Come"?, *supra* note 26.

assistance to a total of 5,726 villages, and thus had reached 30.1 percent of its objective at that date.[31]

62. The importance of programs of even-handed compensation in the peace process has been acknowledged by the international community. As the World Bank study notes, "supporting the adoption of capable, accountable, corruption free, and accessible local state institutions is the medium to long-term priority. This, along with the ability of donors and the [Indonesian] government to get assistance to villagers and ex-combatants in a timely manner, will largely dictate whether Aceh remains at peace in years to come."[32]

63. The International Crisis Group also has provided an updated report on the post-conflict assistance program, as of October 2007. The new administrator of the Aceh Reintegration Board is a former leader of the GAM, Mr. Mohammed Nur Djuli. He is described by the ICG as a "smart, capable, cosmopolitan man" who was "part of the core GAM team in Helsinki in 2005." In the programs planned by Mr. Nur Djuli, according to the ICG, monies are targeted to "compensate conflict victims directly, not support general development."

64. Aid will be "directed to conflict victims … the grants would have to be used for ongoing economic activity; and aid would be given to individuals based on the

---

[31] See Aceh Conflict Monitoring Update, 1st – 31st March 2007, published by World Bank Jakarta Office, at p. 4, available at <www.conflictanddevelopment.org>. I have also examined a statement prepared by an organization called "Forbes Damai Aceh", which appears to be associated with the BRA, concerning compensation and assistance provided under the Helsinki Accord, dated June 5, 2007. It states that 3000 former combatants had received assistance as of that date, characterized as 100 percent of the category. 73.71 percent of former political prisoners reportedly had been assisted. And in "the community of Conflict casualties," 30.32 percent had already been aided through the PPK mechanism (Program Pengembangan Kecamatan).

[32] "The Aceh Peace Agreement: How Far Have We Come?", *supra* note 26, at p. 12. It has also been remarked by specialists in post-conflict reconstruction, that another linchpin for successful post-war transition is providing investment in economic sectors that will employ former combatants and civilians displaced by the conflict. See, e.g., Alvaro de Soto and Graciana del Castillo, *Obstacles to Peacebuilding*, 94 Foreign Policy 69 (1994); Paul Collier, *Policy for Post-Conflict Societies: Reducing the Risk of Renewed Conflict*, World Bank (2000); Allan Gerson, *Peace Building: The Private Sector's Role*, in Ruth Wedgwood and Harold K. Jacobson (eds.), *Symposium on "State Reconstruction After Civil Conflict,"* 95 American Journal of International Law 201 (January 2001).

The newly elected governor of Aceh -- former GAM leader Irwandi Yusuf -- has taken the same view. He spoke to the World Affairs Council in San Francisco on January 20, 2007, and noted his effort to solicit international investment and business from overseas, including meetings "with leading American importers and roasters who buy our world-famous Gayo Highland coffee … much of what is sold in America as organic Sumatran coffee comes from Aceh …. We intend to expand trade with the United States for a number of high-quality commodities that support our grass-roots economy. This would include cocoa, bananas, spice, and bio-fuel. … We need investment in estate crops, in mining, and in the energy field." President Yusuf's speech describing the key role of sustainable investment is reproduced as Plaintiffs' Exhibit M.

written names and addresses of beneficiaries."[33] In addition, according to the report of the International Crisis Group, Mr. Nur Djuli has focused on a "housing program for conflict victims." Under new audit procedures, "[a]nyone whose house was burned down or damaged during the conflict can apply for funds for a new one.[34]

65. In an assessment of community-based assistance programs, the International Crisis Group also states, "[I]ndependent reports raised questions about the effectiveness of some of the funded projects but did not challenge the findings about the breadth of community involvement." *Id.* at p. 13, n. 68 (also referencing a May 10, 2007 report entitled "Community-Based Assistance to Conflict Victims through KPP (BRA-KDP)," filed by "an unofficial supervision mission prepared by a KDP team.").

66. Finally, the ICG report also notes that the new director of the Aceh Reintegration Board "is very much part of the entitlement school, believing the money is supposed to compensate conflict victims directly, not support general development. It might be true that everyone in Aceh was a victim of the conflict but some suffered more than others."[35]

67. The plaintiffs' affiant, Mr. Clarke, states that "[n]o conflict victim has received individual economic assistance through the BRA." [36] This is, at best, a questionable characterization of prior assistance programs that sought to aid conflict-impacted villages and their citizens. In any event, it was the choice of the newly elected and autonomous government of Aceh as a policy well-suited to minimize corruption in aid distribution and provide sustainable assistance. In addition, it does not characterize the approach now taken by Mr. Nur Djuli as the new BRA administrator.

68. The plaintiffs' affiant, Ross Clarke, also suggests that there has been no provision of land (as opposed to housing) to conflict-affected victims.[37] But under paragraph 3.5.3 of the Helsinki Accord, land transfers are recognized as one of several possible modalities for compensation to civilians. Land transfers have no stated priority in the process.

---

[33] See International Crisis Group, *Aceh: Post-Conflict Complications*, October 4, 2007, Asia Report No. 139, at p. 11, available at <www.crisisgroup.org>.

[34] Id. According to the ICG report in its description of the housing program for conflict victims, "Data on housing claims [were] submitted at the subdistrict level, and between May and the end of August [2007], close to 40,000 had been registered, reduced to 31,000 once the data was entered on computer. Four-person teams, drawn from the BRA, the police, the subdistrict government and GAM to ensure objectivity, were then sent to verify the claims. By early September [2007], when some 1,200 people had been trained for this work, verification had been completed in three districts and only 36 per cent of the claims of loss or damage had stood up to scrutiny – [serving as] proof, according to Nur, that the system works." Id. at p. 12.

[35] Id., at p. 11.

[36] Declaration of Ross Clarke, at p. 4.

[37] Declaration of Ross Clarke, at p. 4.

69. One may also note the observation of the United Nations Development Program that the issue of land claims has been complicated in Aceh by the effects of the Tsunami on land records, with "abrasion, land boundary disputes, and missing land documents" from the destruction of public buildings throughout the province.[38]

70. As the UN study notes, "new justice grievances have arisen as a result of the tsunami that the justice system was not equipped to deal with. One example is that much private and communal land was inundated or submerged by the tsunami to the extent of becoming unusable for accessibility or safety reasons."[39]

71. Land disputes also bring into play the complicated mixture of traditional and modern sources of law that govern local matters in Aceh. As the UN Development Program study notes, three different sources of law can apply in legal disputes – first, general Indonesian law, which is derived from the Dutch system, second, the Islamic norms of *Syariah* (or Sharia), and third, the "adat" – described as "ethnically-specific forms of law (*hukum adat*) or custom (*istiadat*).[40]

72. The UN study also notes that "The practices and rituals of adat *vary*, most notably across ethnic groups."[41] It is "important to understand the normative legal framework surrounding the *adat* because, as the assessment found, *adat* continues to be the justice system upon which the Acehnese predominantly rely for resolution of their grievances."[42]

73. The plaintiffs also suggest that the reparations program is deficient because a Joint Claims Settlement Commission has not been yet established. It should be noted that the Commission is only tasked in the Helsinki Accord with the handling of "unmet claims," and the process of providing assistance appears to be ongoing. The Aceh Monitoring Mission states that the Government of Indonesia reported that "The establishment of Claim Settlement Commission (CSC) has reached the final step where the joint approval from GoI, AMM and GAM is needed."[43] This is an apparent reference to the joint approval process of the Government of Indonesia, the

---

[38] United Nations Development Program, Access to Justice in Aceh: Making the Transition to Sustainable Peace and Development in Aceh, *supra* note 26, at p. 34. *See also* Suahasil Nazara and Budy P. Resosudarmo, Aceh-Nias Reconstruction and Rehabilitation: Progress and Challenges at the End of 2006, Asian Development Bank Institute, June 2007, at pp. 15-16.

[39] United Nations Development Program, Access to Justice in Aceh: Making the Transition to Sustainable Peace and Development in Aceh, supra note 38, at p. 25.

[40] *Adat* functions as "a largely uncodified body of rules of behavior or a system of 'community leadership and government,' enforced by social sanctions, which is utilised , among other things, for dispute resolution. It consists of living norms, respected and recognized by people, and acts as society's code of conduct. In Aceh today, it is also a symbol of local autonomy." UN Development Program, Access to Justice, *supra* note 38, id. at 42.

[41] Id., at p. 50 (emphasis added).

[42] Id., at p. 96.

[43] Aceh Monitoring Mission, *Implementation of the Helsinki MoU*, at p. 16, available at <http://www.bra-aceh.org/download/archive/helsinki_mou/mou_implementation_by_ppri_%20for_amm_english.doc>.

Aceh Monitoring Mission, and the government of Aceh. The process was characterized as "ongoing."

74. There is thus no basis to suggest that the provision of aid under the provisions of the Helsinki Accord has not begun. There can be debates about the best modality, especially in an autonomous government in which public institutions need to be built and corruption remains a problem. But the intention of the Helsinki Accord is to make compensation available to the thousands of persons "who have suffered a demonstrable loss due to the conflict." See Helsinki Accord, section 3.2.5(c). This process is underway, within the difficult circumstances of a relatively poor society recovering from the natural disaster of the Tsunami. The prospect of individual tort actions in an extraterritorial forum does not have an obvious place within its architecture.

## IX. A Statute to Establish a Human Rights Court has been passed.

75. Plaintiffs also suggest that the ongoing Helsinki process is not worthy of deference because, plaintiffs assert, a satisfactory human rights court has not yet been established.

76. The new Law on the Governing of Aceh, passed in 2006 – which is now available in an English translation compiled by the U.S. Agency for International Development[44] – states at Article 228, paragraph (1) that "To investigate, prosecute, rule on, and resolve cases of human rights violations that take place subsequent to the enactment of this Law, a Human Rights Court shall be established in Aceh."

77. The 2006 Law also states in Article 228, paragraph (2) that "Rulings of the Human Rights Court referred to in paragraph (1) shall include, among others, granting of compensation, restitution, and/or rehabilitation to victims of human rights violations."

78. The Helsinki Accord states at paragraph 2.2 that "A Human Rights Court will be established for Aceh." Contrary to the suggestion made by Plaintiffs, the 2005 peace agreement does *not* state that the new human rights court has to be given retrospective jurisdiction.

79. Nonetheless, a commentary concerning the implementation of the 2005 Helsinki Accord, posted on the official website of the Aceh Integration Board, reports that **there is a modality for hearing earlier violations in a human rights court.** It states, "We understand that human rights violations that occurred between November

---

[44] See Republic of Indonesia Law No. 11/2006, on The Governing of Aceh, enacted August 1, 2006, with Explanatory Notes ("unofficial translation" funded by the Aceh Monitoring Missiion and the International Organization for Migration). The translation is available on the BRA website, at <http://www.bra-aceh.org/download/archive/loga/loga_law_on_the_governing_of_aceh_english_version.pdf>.

2000 and the time when the Aceh Human Rights Court will be ultimately established[,] *will be dealt with by the Human Rights Court in Medan which is responsible for the jurisdiction over Aceh during this period.*" (emphasis added).

## X. The 2006 Statute for a Truth and Reconciliation Commission was suspended by the Constitutional Court for reasons consistent with the peace process

80.  Law No. 11/2006 is the new Law on the Governing of Aceh  (LOGA). It provides in Article 229 that a Truth and Reconciliation Commission for Aceh will be established and that it will be a part of the national Indonesian Truth and Reconciliation Commission.[45]

81.  Plaintiffs assert that the TRC process has been faulty, because the Constitutional Court of Indonesia has assertedly invalidated the statute that constituted the underlying national Truth and Reconciliation Commission, Law No. 27/2004. This judicial disapproval, according to the plaintiffs, shows an intention to thwart the compensation provisions of the Helsinki Accord.[46]

---

[45] See Article 229, Law 11/2006 on The Governing of Aceh:

"(1) To seek the truth and reconciliation, a Truth and Reconciliation Commission shall be established in Aceh by virtue of this Law.
"(2) The Truth and Reconciliation Commission in Aceh referred in paragraph (1) shall constitute an inseparable part of the Truth and Reconciliation Commission.
"(3) The Truth and Reconciliation Commission in Aceh shall operate in accordance with prevailing laws and regulations.
"(4) In resolving cases of human rights violations in Aceh, the Truth and Reconciliation Commission in Aceh may take into account the living *adat* principles of local communities."

An explanation of the customary law standards of "*adat*" is provided at footnote 40, *supra*. .

[46] Plaintiffs concede that some of the initial difficulties in negotiating a successful formula for a Truth and Reconciliation Commission arose from former leaders of the GAM insurgency.  See Declaration of Ross Clarke, at p. 2 ("in Aceh, political barriers to the establishment of an Aceh truth and reconciliation commission exist from both sides of the conflict – the Government of Indonesia and the Free Aceh Movement (GAM)."). Mr. Clarke acknowledges that "senior GAM commanders, who now hold significant political power at the provincial level, are also implicated in human rights abuses." Id., at p. 2.

Since the new political leadership of the Aceh government has roots in the GAM, this remains an issue that exemplifies the sensitivity and delicacy of the peace process. A recent advertisement for a "Program Officer for Reconciliation" posted by the *BRA* (the Aceh Reintegration Board) notes that he or she will "Design and socialize Aceh community base[d] reconciliation programs" and "Facilitate meetings between Aceh TRC and the conflict victims."

82. A review of the Constitutional Court's opinion – indexed as Decision No. 006/PUU-IV/2006[47] – and its effect on Law No. 11/2006, reveals something quite different.

83. Contrary to plaintiffs' characterization, the decision shows no apparent purpose to frustrate the process of compensation for civilians and others injured in the conflict.

84. Though its opinion is not a model of clarity, the Constitutional Court states that compensation for human rights violations cannot be conditioned on a prior grant of amnesty to the alleged perpetrator.

85. One witness heard by the Constitutional Court testified that the statute for the Truth and Reconciliation Commission "has formally met the requirements for such commissions based on the Dougatt Principle. The minimum requirement for such a commission is that it is established by the legislative and executive bodies that are elected democratically and such commissions must have far-ranging authorities as well as far-reaching mandates."[48]

86. The Indonesian government represented to the Constitutional Court that "if the perpetrators refuse to give voluntary confession of their crimes, admit the truth of the facts and convey their regret for their crimes, they shall lose their right to obtain amnesty from the President and *their cases of gross violation of human rights may be referred to an ad hoc human rights court based on Article 43 paragraph (1) of the Law on Human Rights Courts*."[49]

87. The Indonesian government also represented to the Court that such a "refusal of the request for amnesty provides an opportunity for the victims or their heirs to claim for their rights to obtain compensation, restitution and rehabilitation to the state" under an older statutory provision from 2002.[50]

88. A representative of the People's Legislative Assembly, appearing before the Constitutional Court, added that "the provision of Article 27 of the KKR [Truth and Reconciliation Commission] Law, which provides for the granting of compensation, restitution and rehabilitation to the victims or their heirs of gross violations of human rights following the granting of request for amnesty by the President … will eventually create the sense of justice in the community."[51]

---

[47] An English language translation of the Constitutional Court's decision has been submitted by the Plaintiffs as Exhibit F to Plaintiffs' Response to Defendants' Motion to Dismiss. The opinion of the Constitutional Court is also available on the web at <www.kontras.org/data/kkr/kesimpulan/20ENG.pdf>, and also at <www.mahkamahkonstitusi.go.id>.

[48] Opinion of the Constitutional Court, supra note 47, at p. 19.

[49] Id., at pp. 25, 26-27.

[50] Id., at p. 27. The older provision is "Government Regulation Number 3 Year 2002 concerning Compensation, Restitution and Rehabilitation for the Victims of Gross Violations of Human Rights", as the follow up to the provisions of Article 35 of the Law on Human Rights Court." Id., at 27.

[51] Id., at p. 29.

89. In the Court's reading of the statute, only in a case where there was a confession and amnesty, could additional compensation be granted by the Truth Commission.

90. Thus, the Constitutional Court's objection was that amnesty should not be required as a prerequisite to an award to the victim.

91. As the Court noted, "The facts that there are gross violations of Human Rights, for which the state is actually obligated to avoid and prevent them, and victims whose Human Rights should be protected by the state, are adequate to incur legal responsibility of the state … without any other requirements. The provision making amnesty as a requirement is a negation of legal protection and justice, which are guaranteed under the 1945 Constitution."[52]

92. The Court went on to say that this incompatibility of amnesty as a prerequisite to compensation was "also a universal practice and custom as included in the *Basic Principles and Guidelines on the Right to A Remedy and Reparation for Victims of Gross Violations of International Human Rights And Serious Violations of International Humanitarian Law* … aimed at prioritizing justice in handling gross violations of Human Rights, by granting proportional reparation in accordance with the extent of the violations and damages sustained."[53]

## XI. There are Effective Monitors of the Ongoing Peace Process and Fulfillment of the Helsinki Accord

93. Finally, counsel for Plaintiffs are quite frank in suggesting that the real reason for litigation in an American courtroom is an attempt to monitor the *overall* process of post-conflict reconciliation, compensation, and reconstruction in Aceh, in regard to victims of the conflict. Mr. Clarke's declaration, offered by plaintiffs on behalf of the four anonymous plaintiffs in this case, states that "extraterritorial litigation would … more likely highlight the Indonesian Government's inaction and increase pressure to ensure that all Helsinki commitments, including those intended to uphold victims' rights, are realized."[54]

94. This instrumental use of litigation for a political purpose is hard to reconcile with the limited nature of federal jurisdiction. It also overlooks the many other international and regional entities that continue to monitor the process of implementation of the Helsinki Accord, and the consolidation of democracy in Aceh. Not least is the International Crisis Group, whose updated reports have been referenced in this supplemental declaration. The chairman emeritus of the International Crisis Group is the same Finnish former president, Martti Ahtisaari, who negotiated the 2005 Helsinki Accord. The work of the Aceh Reintegration Board (*Badan Reintegrasi*

---

[52] Id., at p. 42.
[53] Id., at pp. 42-43.
[54] Declaration of Ross Clarke, at p. 5.

*Aceh* or *BRA),* is also highly visible, as evidenced by its web site, and it has "been given the mandate to implement the Reintegration Program" under 2005 Helsinki Accord. See paragraph 56 *supra.*

95. There is an "Indonesia caucus" in the United States House of Representatives – co-chaired by Congressman Robert Wexler and Congressman Dan Burton – that has continued to monitor the progress in Aceh. The current United States ambassador to Indonesia is one of the most experienced American diplomats in the U.S. Foreign Service, the Honorable Cameron Hume, who previously served as U.S. ambassador to Algeria, South Africa, and Sudan. The World Bank has also stayed involved in the process, as indicated by their ongoing reports concerning the reconstruction of the justice system in Aceh. The United Nations Development Program has remained involved in the country as well.

96. The European Union and the Association of South East Asian Nations (ASEAN) also remain engaged in monitoring the developments in Aceh, and offering advice for the success of the post-conflict transition.

97. In addition, new elections for the Indonesian national parliament and presidency are scheduled for 2009, and former members of the Aceh GAM movement are eligible to run for office. This provides an additional focal point for measuring ongoing progress in the fulfillment of the Helsinki Accord. Thus, there is no apparent exigency which would require the use of a federal court as the forum to "increase pressure" to assure fulfillment of the Helsinki conditions in regard to all the victims of the war in Aceh.

98. The experience of conflict zones such as Bosnia, Kosovo, and Rwanda (as well as other areas that have suffered social trauma) shows that the work of democratic transition and peace-building is a delicate and gradual process. The international community has remained involved in Bosnia for over a decade following the Dayton Peace Accord. The process of reconciliation in Rwanda after the genocide has involved informal *Gacaca* courts in local communities for the return and reintegration of perpetrators. The future of Kosovo, nearly a decade after the NATO intervention, is still under negotiation among the interested parties.

99. It is not surprising that the extraordinary transformation of the relationship between Jakarta and Aceh, memorialized in the Helsinki Accord of 2005, is an ongoing effort. The process poses political questions and challenges for citizens and leaders on the ground, who must construct a polity that can achieve both peace and prosperity. In gauging the propriety of extraterritorial lawsuits concerning events of the war, the difficulties that such litigation may pose for the peace process and the centrality of the Helsinki Accord should surely be borne in mind.

Respectfully submitted,


Ruth Wedgwood
Edward Burling Professor of International Law and Diplomacy
School of Advanced International Studies
Johns Hopkins University
Washington, D.C.


December 7, 2007

I declare, under penalty of perjury and the laws of the United States of America,
that to the best of my knowledge and belief, the statements made in this Declaration are
true and correct.

Executed on December 7, 2007, at  Potomac, Maryland.

_____
**Ruth Wedgwood**

EXHIBIT Q



**COUNCIL OF**
**THE EUROPEAN UNION**



# Council Conclusions on

# Indonesia/Aceh

### 2770th GENERAL AFFAIRS Council meeting

*Brussels, 11 December 2006*

The Council adopted the following conclusions:

"The Council welcomes the significant progress made in restoring peace and stability in the Indonesian province of Aceh since the signing of the Helsinki Memorandum of Understanding in August 2005. A visible manifestation of this progress to date is the local elections held in Aceh on 11 December 2006. Given the importance attached to the peace process the EU has deployed an EU election observation mission. The Council expresses its hope that the elections contribute to the further consolidation of the peace process to the benefit of the people of Aceh and the whole Indonesia.

The Council commends the parties for their political vision and for respecting the commitments undertaken in Helsinki. The Council encourages the parties to further work closely together on the continued implementation of the MOU to ensure the sustainability of the peace process.

# P R E S S

The Council expresses its satisfaction at the important role played by the Aceh Monitoring Mission (AMM), which will conclude its mandate on 15 December, in monitoring and supporting the peace process. The Council underlines the need to draw comprehensive lessons from this experience for future EU civilian crisis management missions. The Council also expresses its appreciation for the very close cooperation between the EU countries and the five ASEAN Contributing Countries in this mission. In this context, the Council looks forward to building on this experience at the upcoming EU-ASEAN Foreign Ministerial meeting in Germany in 2007.

The Council underlines the European Union's determination to develop a lasting and comprehensive partnership with Indonesia, including its readiness to stay engaged in post-conflict reconstruction and peace-building in Aceh. The EU will remain committed to this process through Community programmes and Member States' bilateral efforts."

---

# P R E S S

# EXHIBIT R

# Indonesian soldiers to give evidence at truth commission

October 23, 2007 - 5:21PM

Advertisement

Two Indonesian military officers who served in East Timor will appear before a commission investigating an outbreak of deadly violence during the nation's 1999 independence vote, an official said today.

The Indonesia-East Timor Commission of Truth and Friendship (CTF), which was set up in 2005, held what was expected to be its final round of hearings in Dili last month, but one more has been scheduled in Jakarta tomorrow.

"We will hold another public hearing here tomorrow to hear the testimony of two more witnesses, both Indonesians and members of the military who were in Timor-Leste in 1999," East Timorese CTF member Jacinto Alves said.

"We are quite flexible. This time we are tying up some loose ends, and since the witnesses we need to hear are both Indonesians, we are holding it here," Alves told AFP.

Retired Lieutenant-General Kiki Syahnakri, who headed the military emergency command in East Timor in 1999, and Colonel Aris Martono, who headed an army battalion deployed there that year, would provide testimony, he said.

The CTF is tasked by the governments of Indonesia and Timor-Leste, as East Timor is formally known, to uncover the truth behind the violence surrounding East Timor's overwhelming vote to break from Indonesia.

Its powerful neighbour had invaded in 1975.

The United Nations has boycotted the CTF, saying that those guilty of human rights violations should face justice. The terms of reference of the commission allow for amnesties to be granted to witnesses.

But Alves said that if UN officials changed their mind and wish to testify, "we could still hold further hearings."

The commission has heard testimony from scores of witnesses, including East Timor's Prime Minister Xanana Gusmao, Indonesian officials, military, police and East Timorese who both backed Indonesia's rule or were pro-independence.

**AFP**

*This story was found at: **http://www.smh.com.au/articles/2007/10/23/1192941056127.html***

EXHIBIT S



**GALE**®

ACEH MILY CHIEF ASKS PUBLIC TO MAINTAIN PEACE PROCESS.*ANT - LKBN ANTARA (Indonesia)* (Oct 3, 2007)(299 words)  Reading Level (Lexile): 1430.

**Full Text:**COPYRIGHT 2007 Asia Pulse Pty Ltd

Banda Aceh, Oct 3 (ANTARA): All elements of the public in Nanggroe Aceh Darussalam (NAD) province must maintain the peace process in the province and nobody should try to disturb it, Iskandar Muda Military Commander Maj Gen Supiadin AS said. "The conducive security situation following the signing of the peace agreement between the government and the Free Aceh Movement (GAM) in Helsinki, Finland, on August 15, 2005 is now being enjoyed by the people," Supiadin said in the Central Aceh district town of Takengon on Wednesday. Speaking at a meeting with Central Aceh religious and community figures, Supiadin said the favorable security conditions in Aceh had resulted in a heightening in the people's economic activity. "I myself enjoy the benefit of the peaceful conditions as now I don't need to use air transportation to visit districts and municipalities in Aceh," he said. He said there should be no misinterpretation about the government's program in relation with the framework of the state's basic principles. "Therefore, the existence of Aceh as part of the Unitary State of the Indonesian Republic (NKRI) is already final. In the present peaceful situation, there should be no empty dreams or promises that can disturb the peace itself," he said. Meanwhile, Central Aceh district head Nasaruddin said since the signing of the Helsinki peace accord, the economic conditions of farmers in the Gayo Plateau had improved. Although Central Aceh's population of 173,000 consisted of people belonging to different tribes or ethnic groups, they were living in perfect harmony with each other. "The Central Aceh district administration and its people will continue to maintain and preserve the peace process which has prevailed for more than two years," Nasaruddin said, adding that the peaceful situation had had a positive impact on the local people's economy.

(THROUGH ASIA PULSE)

**Source Citation:**"ACEH MILY CHIEF ASKS PUBLIC TO MAINTAIN PEACE PROCESS." ANT - LKBN ANTARA (Indonesia) (Oct 3, 2007): NA. General OneFile. Gale. Arlington Public Library. 7 Nov. 2007 <http://find.galegroup.com/itx/start.do?prodId=ITOF>.

**Gale Document Number:**A169439480

© 2007 Gale, a part of The Thomson Corporation.
Thomson and Star Logo are trademarks and are registered trademarks used herein under license

EXHIBIT T

General OneFile Print



**GALE**®

## SECURITY NO LONGER OBSTACLE TO INVESTMENT IN ACEH, SAYS KPA.*AsiaPulse News* (Sept 18, 2007)(311 words)  Reading Level (Lexile): 1490.

**Full Text:**COPYRIGHT 2007 Asia Pulse Pty Ltd

BANDA ACEH, Sept 18 Asia Pulse - Security is no longer an impediment to investment in Aceh, where the most important problem now is having uncomplicated bureaucratic procedures to attract investment, an organization representing former separatist GAM (Free Aceh Movement) elements said.

"In our view, security conditions in Aceh are now not different from those in other regions in Indonesia. Criminal activity in Aceh now also tends to show a conventional pattern, similar to that in other regions," Ibrahim KBS, spokesman of the Central Aceh Transitional Committee (KPA), said on Monday.

He said the province was now safe for investment.

He called on the central government to transfer all authority regarding investment in a concrete way to Aceh's provincial administration.

"Allegations that security conditions still pose an obstacle to investment in Aceh are not entirely true. Today, investors can clearly see that the central government's commitment to ensuring the continuity of an investment project is very low," he said.

Ibrahim did not name the investment project he referred to but said there was a certain "vital project" in North Aceh that was facing closure because there was no certainty about the government's preparedness to guarantee its feed-stock supply.

"This is clearly something that will discourage investors from entering Aceh because it makes them believe the government may any time change its policy toward Aceh," he said.

He said it was the KPA's hope that the Law on Aceh's Administration is implemented to its fullest extent so as to guarantee legal certainty for parties investing in Aceh.

GAM fought the Indonesian government for 30 years to form an independent state in Aceh but eventually abandoned its separatist ambitions and signed a peace deal with Jakarta in Helsinki, Finland on August 15, 2005. The government-GAM armed conflict turned Aceh into a region with the worst security conditions in the country.

(ANTARA) 18-09 1129

**Source Citation:**"SECURITY NO LONGER OBSTACLE TO INVESTMENT IN ACEH, SAYS KPA." AsiaPulse News (Sept 18, 2007): NA. General OneFile. Gale. Arlington Public Library. 7 Nov. 2007 <http://find.galegroup.com/itx/start.do?prodId=ITOF>.

**Gale Document Number:**A168761500



© 2007 Gale, a part of The Thomson Corporation.
Thomson and Star Logo are trademarks and are registered trademarks used herein under license

EXHIBIT U



**GALE**®

TNI HAS NO OBJECTION TO RETROACTIVE HUMAN RIGHTS COURT IN ACEH.*ANT - LKBN ANTARA (Indonesia)* (May 19, 2006)(170 words)  Reading Level (Lexile): 1450.

**Full Text:**COPYRIGHT 2006 Asia Pulse Pty Ltd

Jakarta, May 19 (ANTARA) - The Indonesian Defence Force (TNI) said it had no objection to the human rights court in Aceh to become retroactively effective, a spokesman said. "The most important thing now is that the legal process takes place correctly, professionally and proportionally by promoting the interest of the state and nation," Col Ahmad Yani Basuki, head of the TNI headquarters' general information service, said here on Friday. He said the TNI always supported a commitment to uphold the law in Indonesia. According to him, the TNI has shown its commitment to bring its personnel to justice for their human rights violations during the military emergency in Aceh. Earlier, the Special Committee of the Aceh Administration Bill has approved an article on the setting up of a human rights court in the province one year after the draft law was passed. In response to it, the Free Aceh Movement (GAM) supported the formation of a human rights court and wanted it to be retroactively effective.

(THROUGH ASIA PULSE)

**Source Citation:**"TNI HAS NO OBJECTION TO RETROACTIVE HUMAN RIGHTS COURT IN ACEH." ANT - LKBN ANTARA (Indonesia) (May 19, 2006): NA. General OneFile. Gale. Arlington Public Library. 7 Nov. 2007
<http://find.galegroup.com/itx/start.do?prodId=ITOF>.

**Gale Document Number:**A145991887

© 2007 Gale, a part of The Thomson Corporation.
Thomson and Star Logo are trademarks and are registered trademarks used herein under license